UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARISE FOR SOCIAL JUSTICE; <br> ¿OISTE?; NEW ENGLAND STATE-AREA <br> CONFERENCE OF THE NAACP; <br> REV. TALBERT W. SWAN, II; <br> NORMAN W. OLIVER; DARLENE <br> ANDERSON; GUMERSINDO GOMEZ; <br> FRANK BUNTIN; RAFAEL RODRIQUEZ; <br> and DIANA NURSE <br><br>                Plaintiffs, <br><br> v. <br><br> CITY OF SPRINGFIELD and SPRINGFIELD <br> ELECTION COMMISSION, <br><br>                Defendants. | Civil Action No. 05-30080 MAP |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

Paul E. Nemser (BBO #369180)
J. Anthony Downs (BBO #532839)
William J. Connolly III (BBO #634845)
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109
(617) 570-1000

Nadine Cohen (BBO #090040)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW OF THE BOSTON BAR
ASSOCIATION
294 Washington Street, Suite 443
Boston, MA 02108
(617) 988-0609

## Table of Contents

INTRODUCTION ................................................................................................................ 1

FACTS ................................................................................................................................ 3
    I.    Springfield Demographics ................................................................................ 4

    II.   At Large Elections Have Preserved and Maintained White Control of
        Springfield's City Council ................................................................................ 5

    III.  The History of Discrimination in Springfield .................................................. 6

ARGUMENT ...................................................................................................................... 8
    I.    APPLICABLE LEGAL STANDARDS FOR GRANTING
        PRELIMINARY INJUNCTIVE RELIEF ........................................................ 8

        A.    Rule 65 ..................................................................................................8

        B.    Section 2 of the Voting Rights Act ......................................................8

    II.   PLAINTIFFS ARE ENTITLED TO PRELIMINARY INJUNCTIVE
        RELIEF TO ENJOIN DEFENDANTS FROM CONDUCTING FUTURE
        CITY COUNCIL ELECTIONS UNDER A DISCRIMINATORY
        SYSTEM OF ELECTIONS. ........................................................................ 12

        A.    Plaintiffs Have Demonstrated a Likelihood of Success on the
            Merits ................................................................................................ 12

            1.    Compactness .......................................................................... 12

            2.    Political Cohesiveness Among Minority Voters.......................... 13

                a    Cohesion Among Hispanic Voters ................................... 14

                b    Cohesion Among African American Voters .................... 14

                c    Crossover Voting Among Hispanic and African
                   American Voters.............................................................. 15

            3.    Significant "White Bloc Voting" Normally Defeats
                Hispanic and African American Preferences................................. 16

            4.    Totality of the Circumstances Factors......................................... 18

                a    The extent of any history of official discrimination
                   in the state or political subdivision that touched the
                   right of the members of the minority group to
                   register, to vote, or otherwise to participate in the
                   democratic process........................................................... 18

                b    Voting in Springfield is extremely racially polarized....... 20

c       Members of Springfield's minority communities unquestionably bear the effects of past and present discrimination which hinders their ability to participate effectively in the political process ................. 22

    i.       Education ............................................... 23

    ii.      Police Relations.................................... 26

    iii.     Discrimination in Public Employment ................. 30

    iv.      Discrimination in Housing.................... 32

    v.       Other Patterns of Discrimination ......................... 34

    vi.      Discrimination in Health Care ............................ 35

    vii.     Whether political campaigns have been characterized by overt or subtle racial appeals ................................................. 37

    viii.    The extent to which members of the minority group have been elected to public office in the jurisdiction........................................ 37

    ix.      There has been a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group............................ 38

    x.       The tenuousness of the policy underlying the at large system....................................................... 39

B.      Plaintiffs Will Suffer Irreparable Injury Absent the Requested Relief.......................................................................................... 40

C.      The Harm to Plaintiffs, If Relief Is Denied, Outweighs the Harm to Defendants If the Relief Is Granted ...................................... 41

D.      The Requested Preliminary Injunction is in the Public Interest .............. 42

CONCLUSION ............................................................................................................... 42

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 281 F. Supp. 2d 436 (N.D.N.Y. 2003)......................................................................................................................... 11

*Bell, et al. v. IBPO Local 364*, Civ. Action No. 04-30163-MAP (D. Mass.).................................... 30

*Boston Chapter, NAACP, Inc. v. Beecher*, 371 F. Supp. 507 (D. Mass. 1974)........................... 7, 30

*Castro v. Beecher*, 365 F. Supp. 655 (D. Mass. 1973)................................................................. 7, 30

*Citizens for Good Gov't v. City of Quitman, Mississippi*, 148 F.3d 472 (5th Cir. 1998)................ 11

*Clark v. Marengo Cty. Comm'n*, 623 F. Supp 33 (S.D. Ala. 1985) .................................................. 11

*Demarest v. Athol/Orange Community Television, Inc.*, 188 F. Supp. 2d 82 (D. Mass. 2002)................................................................................................................................................. 8

*EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577 (1st Cir. 2002)........................................... 8

*Elrod v. Burns*, 427 U.S. 373 (1976).................................................................................................. 41

*Greer v. City of Springfield*, Civ. Action No. 05-30001-MAP (D. Mass.) ...................................... 29

*Harris v. Graddick*, 593 F. Supp. 128 (M.D. Ala. 1984) ......................................................... 41, 42

*Johnson v. Halifax County*, 594 F. Supp. 161 (E.D.N.C. 1984) ....................................................... 41

*Metts v. Murphy*, 363 F.3d 8 (1st Cir. 2004)......................................................................... 9, 13, 17

*Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994)................................................................................. 17

*Reynolds v. Sims*, 377 U.S. 533 (1964) ....................................................................................... 41, 42

*Taylor v. Haywood County*, 544 F. Supp 1122 (W.D. Tenn. 1982)................................................... 11

*Thornburg v. Gingles*, 478 U.S. 30 (1986)…………………...................................................*passim*

*United States v. Berks County, Pennsylvania*, 250 F. Supp. 2d 525 (E.D. Pa. 2003)...... 8, 11, 41, 42

*United States v. Dallas Cty. Comm'n*, 791 F.2d 831 (11th Cir. 1986)............................................. 11

*Vecinos de Barrio Uno v. City of Holyoke*, 72 F.3d 973 (1st Cir. 1995) ............................... 9, 18, 42

*Wal-Mart Stores, Inc. v. Rodriguez*, 238 F. Supp. 2d 395 (D.P.R. 2002) ....................................... 41

LIBA/1566420.1

## FEDERAL STATUTES

42 U.S.C. § 1971, et seq. .................................................................................... 1, 9, 10, 11

## FEDERAL RULES

FED. R. CIV. P. 56.................................................................................................... 8

## STATE CASES

*Hancock v. Comm'r of Educ.*, 443 Mass. 428 (Mass. 2005)............................................ 23

*Hancock v. Driscoll*, No. 02-2978, 2004 Mass. Supr. LEXIS 118 (Mass. Super. Ct. Apr. 24, 2004)........................................................................................................... 6, 23,24

*School Comm. of Springfield v. Bd. Of Education*, 362 Mass. 417 (1972)...................... 26

*School Comm. of Springfield v. Bd. Of Education*, 365 Mass. 215 (1974)...................... 26

*Springfield Bd. of Police Comm'rs v. Mass. Comm'n Against Discrimination*, 375 Mass 782 (1978) ......................................................................................................... 30

## STATE STATUTES

Mass. G.L. c. 43 § 1 ............................................................................................... 39

## ADMINISTRATIVE DECISIONS

*Hamilton v. Springfield School Dep't*, No. 87-SEM-0058, 1994 Mass Comm. Discrim. LEXIS 73 (June 20, 1994)....................................................................................... 31

*Wilder v. Diamond Cab Co.*, No. 97-SPA-0789, 2001 Mass. Comm. Discrim. LEXIS 178 (Feb. 23, 2001) .................................................................................................. 34, 35

*Carpenter v. Yellow Cab Co.*, No. 95-SPA-0033, 2001 Mass. Comm. Discrim. LEXIS 177 (Feb. 23, 2001) ................................................................................................... 35

## OTHER

S. Rep. No. 417 (1982)............................................................................................ 11

Plaintiffs Arise for Social Justice, ¿Oiste?, New England State Area Conference of the

NAACP, Rev. Talbert W. Swan, II; Norman W. Oliver, Darlene Anderson, Gumersindo Gomez,

Frank Buntin, Rafael Rodriquez, and Diana Nurse (collectively, "plaintiffs") submit this

Memorandum of Law in support of their Motion for Preliminary Injunction. Plaintiffs seek to

enjoin the defendants from conducting the election for the Springfield City Council, currently

scheduled for November 8, 2005, utilizing Springfield's unlawful, discriminatory at-large voting

system with its winner-take-all method. Plaintiffs further request that the Court order the

establishment of single-member district elections for the City Council that comply with the

Voting Rights Act, 42 U.S.C. § 1971 *et. seq.*

## INTRODUCTION

Hispanics and Black/African Americans in Springfield currently constitute over half of

the population in the city and are politically cohesive groups that live in geographically compact

communities and vote in overwhelming numbers for Hispanic and Black/African American

candidates. Nonetheless, Springfield consistently rejects candidates preferred by people of color

and elects those chosen by whites. As a result, for decades people of color have had little or no

representation on the Springfield City Council. Indeed, the first and only Hispanic city councilor

was elected in 2003, and only four Black/African Americans have ever been elected. The reason

that Hispanics and Black/African Americans have not been able to elect candidates of their

choice to the City Council is that Springfield uses an at-large system that dilutes minority voting

power. This dilution of the voting power of Hispanics and Black/African Americans violates the

Voting Rights Act and imposes irreparable harm upon Springfield's minority voters. It has long

been recognized by the U.S. Supreme Court and others that such at-large election systems as that

1

used by Springfield, are likely to dilute minority voting strength. *See Thornburg v. Gingles*, 478
U.S. 30, 47 (1986).

For the reasons discussed below, plaintiffs are likely prevail on the merits of their claim
that the at large system used for City Council elections violates Section 2 of the Voting Rights
Act, 42 U.S.C. § 1973. Every one of Springfield's nine City Councilors is elected every two
years in a city-wide, winner-take-all system in which each voter may cast one vote for up to nine
candidates. People of color are now a majority of Springfield's population and were only
slightly less than a majority of the voting age population in the 2000 Census. Even so,
Springfield's at-large voting system has resulted in the consistent rejection of all but a handful of
minority candidates and the election instead of white candidates. Racially polarized voting thus
taints the City Council elections.[1]

The unlawful at-large voting system that denies people of color a voice in City
government is part of an historical pattern of discrimination in Springfield. As the City itself
concedes, racial tensions and discrimination have long been present in the City. Defendants'
Answer to Plaintiffs' Complaint ("Answer") ¶ 39. Discrimination and inequities in housing,
employment, schools, health care and socioeconomic status have held minorities back. Those
inequalities, as well as discriminatory and intimidating conduct such as police harassment have
discouraged minorities from trusting or participating in City government. Similar
discriminatory forces and discouragement of participation have shown up in the voting process,
as Hispanics and Black/African Americans often faced barriers to their participation in the
electoral process – from difficulty in registering to vote to lack of language assistance at the
polls.

---

[1]  Elections for the Springfield School Committee are similarly tainted, but the present motion pertains solely to
the upcoming City Council elections.

Springfield's City Council voting system does not have to be discriminatory. The issue whether Springfield should have a system based on representative districts rather than the existing approach has long been a subject of debate. In 1997, a majority of Springfield voters voted to approve a measure calling for the implementation of a ward representation system. Although the measure was nonbinding due to the number of votes cast, City Council members pledged to support replacing the at-large system with a district-based system. *See* Beatrice Dewberry, *Ward Vote Loses Battle, But Not War - Public Support Gets Attention of Councilors*, Union News, November 5, 1997, at A1 (Ex. 76).[2] Yet, in the years that followed, the City Council reneged on its promises and has not followed the majority's will. As a result, the at-large system remains in place. *See* Peter Goonan, *Council Votes 'No' on Wards*, Union News, October 5, 1999, at B1) (Ex. 83).

The Expert Report of John E. Harmon, submitted in support of this Motion for Preliminary Injunction, presents a nine-district system for City Council with four geographically compact districts containing a majority of Hispanics and Black/African Americans. A map showing the nine proposed districts and a summary sheet of data supporting those districts is also attached to this Memorandum as <u>Exhibit A</u>. Adopting this proposed district-based system would remedy the City's ongoing violation of the Voting Rights Act and would greatly improve the opportunity for Hispanics and Black/African Americans to elect candidates of their choice.

## FACTS

This is a voting rights action alleging that Hispanic and Black/African-American voters in the City of Springfield have had their voting power in elections for the Springfield City

---

[2] Submitted herewith is an Appendix of Exhibits in Support of Plaintiff's Motion for a Preliminary Injunction (Volumes 1-5), attaching numerous newspaper articles and other documentary evidence cited in this memorandum. Hereafter, all references to the Appendix of Exhibits are referred to as "Ex. __."

Council and School Committee unlawfully diluted by the at-large election system. All members of Springfield's City Council and School Committee are chosen in city-wide, winner-take-all, at-large elections. Complaint ¶¶ 21, 27.[3] Despite substantial growth in Springfield's population of color, which now constitutes over 55% of the City's total population and nearly half of its voting-age population, the at-large election system prevents voters of color from participating equally in the political process. The consistent result is that predominantly white candidates from certain neighborhoods with the largest number of white voters are elected. Complaint ¶ 1.

## I.    Springfield Demographics

The last 10 years has seen a significant shift in Springfield's population. In 1990, non-Hispanic whites comprised 63.3% of the city's 156,983 residents. Expert Report of John E. Harmon ("Harmon Rpt.") ¶ 4 & Ex. 1 (reviewing U.S. Census data). Hispanics and Black/African- Americans comprised 16.9% and 18.1%, respectively. *Id.* ¶¶ 5-6 & Ex. 1. By 2000, whites comprised less than half (48.85%) of Springfield's population, while the Hispanic community grew 55.85%, and now makes up 27.2% of the population. *Id.* ¶¶ 4-5. Springfield's Black/African-American community also grew to 19.6% of the population. *Id.* ¶ 6. This dramatic shift is illustrated in the following table:

### Springfield Population Shift: 1990-2000

|  | 1990 | | | 2000 | | |
|---|---|---|---|---|---|---|
|  | Population | % of Total | | Population | % of Total | % Change |
| White | 99,869 | 63.62% | | 74,291 | 48.85% | (25.61)% |
| Hispanic | 26,528 | 16.9% | | 41,343 | 27.2% | 55.85% |
| Black/African-American | 28,484 | 18.1% | | 29,831 | 19.6% | 4.72% |
| Total | 156,983 | | | 152,082 | | 3.12% |

---

[3]    The School Committee elections differ in certain respects from the City Council elections. There are only six members of the School Committee, and each sits for a four-year term. As a result, only three seats are open for election every two years. These open seats are filled by an at-large election. Answer ¶ 27.

## II.    At Large Elections Have Preserved and Maintained White Control of Springfield's City Council

Springfield's City Council consists of nine members, all currently elected at-large.[4]

Answer ¶ 21.  The City Council has not come close to reflecting the makeup of its electorate, which as of 2000 consisted of 21.78% Hispanic voters and 18.09% Black/African American voters.  Harmon Rpt. ¶ 11.[5]  Instead, the City Council has been and remains to this day a political stronghold of Springfield's white voters.  Only two persons of color currently serve on the nine-member City Council:  Jose Tosado (Hispanic) and Bud Williams (Black/African-American).

Answer ¶ 22.[6]  Mr. Tosado is *the first and only* Hispanic ever to be elected to the City Council.

*Id.*  Since 1961 only *four* Black/African-Americans have ever been elected to the City Council.

*Id.*[7]  In the last 10 years, more than half of Springfield's City Councilors have come from just one of the city's eight current wards, Ward Seven.  Ward Seven has the largest percentage of white voters and the highest household income.  Answer ¶ 23.  Currently, *four* of the nine City Councilors are from Ward Seven.  *Id.*  In contrast, no City Councilors have come from those wards that are predominantly Black/African-American or Hispanic.  Indeed, none of the City Councilors elected over the last 10 years live in four of the five Springfield wards with the highest minority voting age population (Wards 1, 3, 4, and 8).  Answer ¶ 24.  Although Black/African-American and Hispanic candidates for City Council consistently win or rank

---

[4]    Springfield adopted its "at-large" method of electing City Council members in 1961.  Defendants' Answer to Plaintiffs' Complaint ("Answer") ¶ 1.

[5]    According to Professor Harmon, due to the relatively young age of Springfield's Hispanic population, the voting age population for this group can be expected to grow in the future both absolutely and as a proportion of population.  Harmon Rpt. ¶ 8.

[6]    The 2003-2004 term marks only the second time during the entire at-large era in which more than one person of color has sat on the City Council.  During the 1999-2000 term, Carol Lewis-Caulton and Bud Williams, both Black/African American, each sat on the City Council.  Answer ¶ 22.

[7]    Paul R. Mason was elected in 1967 and again in 1977.  Morris Jones was elected in 1985.  Mr. Williams was elected in 1993.  Carol Lewis-Caulton was elected in 1999.  Answer ¶ 22.

highly in five of Springfield's eight wards, those candidates have had far less success than whites in winning seats on the City Council.  This lack of success is the direct result of the at-large election system.  Complaint ¶ 25.

As discussed in more detail below and in the affidavit of voting expert Richard L. Engstrom, Ph.D., Springfield's Latin and African American voters are sufficiently large and geographically compact groups so as to be able to elect representatives of their choice in a single member district system.  A detailed analysis of City Council and School Committee elections in 1999, 2001, and 2003, also reveals compelling evidence of racially polarized voting among Latinos, African Americans, and whites.  And, under the existing at-large system, Springfield's white voters vote as a bloc so as repeatedly to defeat candidates most preferred by Latino and African American voters.

### III.    The History of Discrimination in Springfield

The discriminatory nature of the City's at-large voting system for electing members of the City Council exists within a larger historical context of discrimination against minorities in many facets of life in Springfield.  The Defendants, including the City itself, have admitted in their Answer in this case that "as a general matter Black/African-Americans or Hispanic/Latinos (sic) persons have been subject to *de facto* discrimination in the City of Springfield" and that "in the past[,] race relations within the City of Springfield have been strained. . . ."  Defendants did not deny that race relations could be improved in the future.  Answer ¶ 39.

In the field of education, for example, the factual findings of Superior Court Judge Botsford in *Hancock v. Driscoll*, No. 02-2978, 2004 Mass. Super. LEXIS 118 at *486 (Mass. Super. Ct. Apr. 24, 2004), included a comprehensive report on the state of public education in Springfield and three other "focus" school districts.  As discussed in further detail below, Judge

6

Botsford was particularly concerned by "the fact, reflected in all the MCAS scores, that for children with learning disabilities, children with limited English proficiency, racial and ethnic minority children, and those from low-income homes, the inadequacies are even more profound." *Id.*

As detailed below, there has long been a history of strained race relations between the police and minorities in Springfield as well. For over thirty years, the Springfield police department has operated under a federal consent decree mandating the promotion of racial balance in hiring of officers. *See Castro v. Beecher*, 365 F. Supp. 655 (D. Mass. 1973). Likewise, the Springfield fire department operates under its own federal consent decree. *See Boston Chapter, NAACP, Inc. v. Beecher*, 371 F. Supp. 507 (D. Mass. 1974), *aff'd*, 504 F.2d 1017 (1st Cir. 1974), *cert. denied*, 421 U.S. 910 (1975). Further, data set forth in the state-mandated 2004 study of racial profiling demonstrates that the Springfield police are among the worst offenders with respect to the issuance of citations to African/Americans and Hispanics and the frequency of searches incident to vehicular stops. *See* Northeastern University Institute on Race and Justice, *Massachusetts Racial and Gender Profiling Study Final Report* (2004) (Ex. 21).

Springfield has a history of employment discrimination, as well as housing discrimination and segregation based on race, as documented below. In the field of health care, studies of Springfield's pregnancy, birth and infant mortality statistics likewise have shown significant health disparities between the city's Black/African-American and Hispanic populations and its white population.

7

The historical context, as well as the documented effect that the City's at-large election system has in diluting minority voting power, significantly harms the rights of Springfield's voters, creating the irreparable harm that justifies an award of an injunction here.

## ARGUMENT

## I.    APPLICABLE LEGAL STANDARDS FOR GRANTING PRELIMINARY INJUNCTIVE RELIEF

### A.    Rule 65

Rule 65 of the Federal Rules of Civil Procedure authorizes this court to issue preliminary injunctive relief. In order to obtain injunctive relief, plaintiffs must demonstrate: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions . . . ; and (4) the effect (if any) of the court's ruling on the public interest." *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 581 (1st Cir. 2002) (citation omitted) (affirming lower court's issuance of preliminary injunction); *Demarest v. Athol/Orange Community Television, Inc.*, 188 F. Supp. 2d 82, 89 (D. Mass. 2002) (Ponsor, J.) (granting motion to preliminarily enjoin enforcement of public broadcasting requirements alleged to violate the First Amendment); *see also United States v. Berks County, Pennsylvania*, 250 F. Supp. 2d 525, 542 (E.D. Pa. 2003) (granting preliminary injunction in connection with Section 2 challenge to county election practices and procedures).

### B.    Section 2 of the Voting Rights Act

The evidence presented in support of the instant motion clearly establishes a significant likelihood of success on the merits of plaintiffs' claim that Springfield's use of at-large or winner-take-all voting for its City Council violates, among other things, Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, *et seq.* Section 2 of the Voting Rights Act, as amended in 1982,

8

prohibits any standard, practice, or procedure "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a). A denial or abridgement of the right to vote is established when:

> [B]ased on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973(b).

In 1986, the Supreme Court established the preconditions necessary to demonstrate a violation of Section 2. *Thornburg v. Gingles*, 478 U.S. 30 (1986). In *Gingles*, the Supreme Court set forth three threshold conditions necessary to establish a prima facie case under Section 2. First, plaintiffs must demonstrate that the minority group is sufficiently numerous and compact to form "a majority" in a single-member district. *Gingles*, 478 U.S. at 50; *Metts v. Murphy*, 363 F.3d 8, 10 (1st Cir. 2004); *Uno v. City of Holyoke*, 72 F.3d 973, 979 (1st Cir. 1995). Second, plaintiffs must demonstrate that the minority group is politically cohesive, meaning that its members tend to vote alike. *Gingles*, 478 U.S. at 51; *Uno*, 72 F.3d at 979. Third, plaintiffs must show that the majority votes sufficiently as a bloc so as usually to defeat the minority's preferences. *Gingles*, 478 U.S. at 51; *Uno*, 72 F.3d at 79. If satisfied, these three conditions will raise a presumption that the challenged system violates Section 2. *Metts*, 363 F.3d at 10 (citing *Uno*, 73 F.3d at 980). In *Gingles*, the Supreme Court specifically noted that it "has long recognized that multimember districts and at-large voting schemes may operate to minimize or cancel out the voting strength of racial [minorities in] the voting population." *Gingles*, 478 U.S. at 47 (alteration in original) (citations omitted).

Once a Section 2 plaintiff has established the three prima facie conditions set forth in *Gingles*, the court must then proceed to examine additional factors, referred to as the "totality of the circumstances" factors, to determine whether the challenged electoral processes "are not equally open to participation" by members of protected classes "in that [those classes'] members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). The Senate Judiciary Committee, in its majority report accompanying the amendment to Section 2 in 1982, set forth several factors which the committee believed might be probative of a Section 2 violation.[8] These "Senate factors" include the following:

- The extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, to vote, or otherwise participate in the political process;

- The extent to which voting in the elections of state or political subdivision is racially polarized;

- The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

- If there is a candidate slating process, whether the members of the minority group have been denied access to that process;

- The extent to which the members of the minority in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

- Whether political campaigns have been characterized by overt or subtle racial appeals; the extent to which members of the minority group have been elected to public office in the jurisdiction;

---

[8] Congress' intent in amending Section 2 in 1982 was "to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the 'results test,' applied by [the Supreme] Court in *White v. Regester*, 412 U.S. 755 . . . (1973)." *Gingles*, 478 U.S. at 35.

- Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the member of minority group; and

- Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, standard, practice or procedure is tenuous.

*See* S.Rep. No. 417 at 28-29 (1982); *Gingles*, 478 U.S. at 36-37. Plaintiffs are not required to demonstrate any particular number of factors to prevail; the question is whether, when all factors are considered, members of minority groups challenging an election process have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 42 U.S.C. § 1973(b).

Courts do not hesitate to afford preliminary injunctive relief in Section 2 cases, including challenges to at-large election systems. *See, e.g., Citizens for Good Gov't v. City of Quitman, Mississippi*, 148 F.3d 472, 474 (5th Cir. 1998) (recounting earlier proceedings in which the district court had preliminarily enjoined at-large alderman elections); *United States v. Dallas Cty. Comm'n*, 791 F.2d 831, 833 (11th Cir. 1986) (ordering district court to enter preliminary injunction against at-large school board elections pending further court proceedings); *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 281 F. Supp. 2d 436, 442 (N.D.N.Y. 2003) (granting preliminary injunction in Section 2 challenge to county legislature redistricting plan); *United States v. Berks County, Pennsylvania*, 250 F. Supp. 2d 525, 542 (E.D. Pa. 2003) (granting preliminary injunction in connection with Section 2 challenge to county election practices and procedures); *Taylor v. Haywood County*, 544 F. Supp 1122, 1135 (W.D. Tenn. 1982) (preliminarily enjoining at-large election of county highway commissioners); *see also Clark v. Marengo Cty. Comm'n*, 623 F. Supp 33, 36 (S.D. Ala. 1985) (recounting that court had granted preliminary injunction enjoining defendants from holding at-large elections for County Commission and County Board of School Commissioners).

11

As set forth below, preliminary injunctive relief is clearly appropriate here.

## II. PLAINTIFFS ARE ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF TO ENJOIN DEFENDANTS FROM CONDUCTING FUTURE CITY COUNCIL ELECTIONS UNDER A DISCRIMINATORY SYSTEM OF ELECTIONS.

### A.    Plaintiffs Have Demonstrated a Likelihood of Success on the Merits

Here, plaintiffs can establish each of the *Gingles* preconditions to establish a violation of Section 2 of the Voting Rights Act: (1) Springfield's Hispanic and Black/African American communities are sufficiently numerous and compact to form majorities in single-member districts; (2) those groups are politically cohesive, meaning that their members tend to vote alike; and (3) the majority votes sufficiently as a bloc so as usually to defeat the preferences of Hispanics and Black/African Americans. *Gingles* 478 U.S. at 46, 50-51. Plaintiffs also can prove several of the factors relevant under the totality of the circumstances analysis. Springfield's at large/winner take all scheme dilutes Hispanic and Black/African American voting strength by precluding these voters from full and equal participation in City Council elections.

### 1.    "Compactness"

The Expert Report of John E. Harmon demonstrates that Springfield's Hispanic and Black/African-American voters are sufficiently large and geographically compact so as to be able to elect representatives of their choice in a single member district system. Using census data and a sophisticated spatial analysis and mapping program called Geographic Information Systems ("GIS")[9], Professor Harmon has concluded that the 2000 Census data support the creation of nine acceptable districts in Springfield that are compact and meet the Constitutional

---

[9]    GIS is commonly used to define voting districts and other administrative districts. Harmon Rpt. ¶ 1.

requirements of one-person, one vote.[10]  Harmon Rpt. ¶¶ 3, 9-10.  A map of these nine districts is

Exhibit 3 to Professor Harmon's report.  See also Exhibit A hereto.  Four of the proposed

districts are comprised of a majority of Hispanic and/or Black/African-American voters.[11]

Harmon Rpt. ¶ 11, Exhibit 6.  Further, each of the four "majority/minority" districts form a

contiguous cluster in Central Springfield.  Harmon Rpt. ¶ 3, Exhibit 3.  Accordingly, Plaintiffs

have demonstrated a likelihood of success with respect to *Gingles'* first prong.

### 2.    Political Cohesiveness Among Minority Voters

The affidavit of Professor Richard Engstrom, a well-known, widely published authority

in voting rights matters, establishes a likelihood of success with respect to *Gingles'* second

threshold requirement that minority voters within the proposed single member districts be

politically cohesive.  Using ecological regression analysis[12] Professor Engstrom analyzed City

Council and School Committee elections in 1999, 2001, and 2003, and found compelling

evidence of racially polarized voting among Latinos, African Americans, and whites.[13]  He

concluded:

---

[10]  Specifically, all of the proposed districts are within ± 5% of the ideal population, a variation level that is well within accepted limits for the creation of municipal districts.  Harmon Rpt. ¶ 9-10.  Professor Harmon observes that the accepted level of variation for the creation of state assembly districts (± 5%) is more restrictive than the level applied to *municipal* districts, such as those at issue in this case, but that the municipal districts proposed here easily meet the even more restrictive state assembly standard.  Harmon Rpt. ¶ 10.

[11]  Two districts are majority Hispanic voting age population ("VAP").  One district is majority Black/African-American VAP.  A fourth district is a combined Hispanic and Black/African-American majority VAP, with a plurality of Black/African American voters.  Harmon Rpt. ¶ 11, Exhibit 6.  See *Metts v. Murphy,* 363 F.3d 8, 11 (1st Cir. 2004) (holding that plaintiff could meet the first *Gingles* precondition – compactness – by demonstrating that in a single member district the minority candidate could attract a majority with the aid of cross-over voting, even though the racial minority did not constitute a majority of the VAP in the district).

[12]  Ecological regression analysis is one of two estimation procedures endorsed by the Supreme Court in *Gingles* for estimating group support of candidates.  478 U.S. at 52-53.

[13]  In his report, Professor Engstrom distinguishes among African American, Latino and "other" voters.  "Others" are comprised of persons that  fit neither of the first two categories.  People in this category are predominantly (93.5%) white.  Engstrom Aff. ¶ 4 & n.1.  Accordingly, Professor Engstrom appropriately defines this category as "white," as do the plaintiffs here.

> Voting in the past three city council elections, and in the simultaneous school committee elections, has been polarized along racial and ethnic group lines. African Americans and Latinos in Springfield, protected groups under the Voting Rights Act, have a pronounced preference to be represented by people from within their group. This was revealed for African Americans in all six elections. It was also revealed for Latinos in all four of the elections in which there were Latino candidates. The white voters in the city, which are predominantly non-Hispanic whites, do not share these preferences. They reveal a distinctly different preference, which is for white candidates in these elections.

Affidavit of Richard L. Engstrom, Ph.D ("Engstrom Aff.") ¶ 33; *see also id.* ¶ 8 (concluding that

candidate preferences "have been consistently divided along racial and ethnic group lines").

### a        Cohesion Among Hispanic Voters

Hispanic voters are cohesive in their support of Hispanic candidates. In every election in

which Hispanic candidates have run,[14] Hispanic voters have clearly and decisively preferred

those candidates over all others. Engstrom Aff. ¶¶ 18, 23, 28, 31 & Tables 2-4, 6. However, as

with African American voters, *see* below, the cohesive voting power of the Hispanic community

has not translated into election victories. Indeed, only one Hispanic candidate won *any* election

during the three election cycles considered by Professor Engstrom.[15]

### b        Cohesion Among African American Voters

Professor Engstrom also found that in every election, African American voters have been

"strongly cohesive" in their support of African American candidates. Engstrom Aff. ¶¶ 11, 14,

20, 27, 29, 30. With one exception, in every election African Americans have preferred African

American candidates over all other candidates.[16] *Id.* African American support for their

preferred candidates has been overwhelming, with their top choices in each of the six elections

---

[14]  There was no Hispanic candidate for City Council in 1999 or for School Committee in 2001.

[15]  In 1999, Tosado won a seat on the School Committee. In 2003 he won a seat on the City Council.

[16]  In the 2003 City Council election, one of the four African American candidates finished seventh among African American voters. Engstrom Aff. ¶ 20.

14

receiving in excess of 92% of the votes. Engstrom Aff. Tables 1-6. However, despite the strength of their support for their preferred candidates, African American voters succeeded in electing only two African American candidates to the City Council (Williams in 1999, 2001 and 2003; Lewis-Caulton in 2001)[17] and one African American candidate to the School Committee (Hurst in 2001).

       **c**     **Crossover Voting Among Hispanic and African American Voters**

The voting data set out in Professor Engstrom's report also demonstrate that, at times, Hispanic candidates have garnered significant crossover support from African American voters. In the 2001 City Council election, a Hispanic candidate (Tosado) received votes from an estimated 29.7% of African American voters. Engstrom Aff. ¶ 18 & Table 2. In the 2003 City Council election, this same candidate received votes from an estimated 44.3% of African American voters. Engstrom Aff. ¶ 23 & Table 3. Likewise, at times, African American candidates for City Council have received crossover support from Hispanic voters. In the 1999 City Council election, one African American candidate (Williams) received a vote from an estimated 43.1% of Hispanic voters. Engstrom Aff. ¶ 12 & Table 1. This same candidate received a vote from an estimated 23% of Hispanic voters in the 2001 election and an estimated 21.5% of Hispanic voters in 2003. Engstrom Aff. ¶¶ 15, 21 & Tables 2-3.[18]

---

[17]    Ms. Lewis-Caulton won the ninth seat on the City Council by a margin of only 21 votes. Engstrom Aff. ¶ 12.

[18]    There is similar evidence of crossover support from Hispanic and African American voters in connection with School Committee elections. In the 1999 School Committee election, the lone Hispanic candidate (Tosado) received a vote from an estimated 29.7% of African American voters and the lone African American candidate (McCollum) received a vote from an estimated 23.7% of Hispanic voters. Engstrom Aff. ¶ 28 & Table 4. In 2001, the two African American candidates (Hurst and Parker) received crossover support from 18.5% and 12.4% of Hispanic voters. Engstrom Aff. ¶ 29 & Table 5. In 2003, the lone Hispanic candidate (Davila) received crossover support from an estimated 12.5% of African American voters. Engstrom Aff. ¶ 31 & Table 6.

Professor Engstrom's report clearly satisfies *Gingles'* requirement that plaintiffs demonstrate that "a significant number of minority group members usually vote for the same candidates." *Gingles,* 478 U.S. at 56.

### 3.     Significant "White Bloc Voting" Normally Defeats Hispanic and African American Preferences

Professor Engstrom's report further demonstrates that under the existing at-large system, Springfield's white voters vote as a bloc so as repeatedly to defeat candidates most preferred by Hispanic and Black voters. Summarizing the experience of African American and Hispanic voters over the last three elections, Professor Engstrom writes:

> In only one of the city council elections have two African Americans been elected. This occurred in 1999, when one of the African Americans won the ninth seat by a margin of 21 votes. This was not repeated in 2001 and 2003, however. Indeed, one of the incumbent African American candidates was defeated for reelection in 2001, despite her African American support being estimated at 98.5 percent. She was again denied a seat in the 2003 election, despite her African American support being estimated at 98.2 percent. A Latino candidate did not win a seat until the latest election, in 2003, after being appointed to the council earlier that year. The nine-member council elected at-large in the last election therefore consists of only one African American and one Latino, 22.2 percent of the council, despite these politically cohesive groups constituting about 40 percent of the voting age population in the city.

Engstrom Aff. ¶¶ 34. Professor Engstrom traces these abysmal results to a persistent pattern of white bloc voting in Springfield that "usually results in the white voters vetoing" the choices of minority voters. *Id.* ¶ 8; *see also id.* ¶ 24 ("Minority candidates preferred by voters within their group were vetoed by the rest of the electorate in every election except the city council election in 1999."). Professor Engstrom observes that white voters in Springfield "reveal a distinctly different preference" than the preferences of African American and Hispanic voters. Engstrom Aff. ¶ 33. This preference "is for white candidates in these elections." *Id.*

The results of Professor Engstrom's analysis of the past three elections brings into sharp focus the "veto" power exercised by white voters under Springfield's at large system. More specifically, in the 1999, 2001 and 2003 City Council elections, out of a total of 27 possible seats (9 per election), white voters preferred white candidates in *all but one* instance. Engstrom Aff. ¶¶ 12, 18, 23.[19] Likewise, in School Committee elections during this period, out of a total of 9 possible seats (3 per election), white voters preferred white candidates in *every* instance. Engstrom Aff. ¶¶ 28, 29, 31.[20]

In short, white voters in Springfield usually vote for white candidates and they usually do not vote for Hispanic or African American candidates. Such white bloc voting is legally significant for purposes of Section 2 in that it almost invariably results in the defeat of candidates preferred by Springfield's Hispanic and African American voters. Accordingly, plaintiffs have satisfied *Gingles'* third threshold requirement, and a presumption arises that Springfield's at-large system violates Section 2 of the Voting Rights Act. *Metts*, 363 F.3d at 10; *Vecinos de Barrio Uno v. City of Holyoke*, 72 F.3d 973, 983 (1st Cir. 1995) ("The resultant inference is not immutable, but it is strong; it will endure *unless and until* the defendant adduces credible evidence tending to prove that detected voting patterns can most logically be explained by factors unconnected to the intersection of race with the electoral process."); *see also Nipper v. Smith*, 39 F.3d 1494, 1525 & n. 64 (11th Cir. 1994), *cert. denied,* 514 U.S. 1083 (1995).

---

[19]   Under regression analysis, Professor Engstrom concluded that white candidates were the top nine choices of white voters in 1999 and 2003 and the top eight choices of white voters in 2001.

[20]   The results of Engstrom's regression analysis are confirmed by his parallel application of "homogeneous precinct," or "extreme case" analysis. "Homogeneous precinct analyses simply report the percentage of the voters supporting a candidate or set of candidates within the precincts in which a particular group constitutes over 90 percent of the voting age population." Engstrom Aff. ¶ 7. There are six white homogeneous precincts in Springfield. Engstrom Aff. ¶ 7. In these precincts, white candidates were the top eight choices of white voters in the 1999 and 2001 City Council elections and the top nine choices of white voters in the 2003 election. *Id.* ¶¶ 12, 18, 23. Likewise, in elections for School Committee, white candidates were the top two choices of white voters in 1999, the top three choices of white voters in 2001, and the top four choices of white voters in 2003. *Id.* ¶¶ 28, 29, 31.

### 4.    Totality of the Circumstances Factors

Last, under a totality of the circumstances analysis, the "Senate factors" illustrate and further establish that Springfield's at large voting system denies and abridges the rights of Hispanic and Black/African-American voters on account of race. The at large voting system operates in and is in part the product of a history of pervasive discrimination in Springfield. The evidence set forth here, as well as the evidence that will be developed in this case, conclusively undermines any effort by the Defendants to demonstrate "that whites voted as a bloc for reasons wholly unrelated to racial animus." *Uno*, 72 F.3d at 981.

> ### a.    The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process.

It is a common belief among Springfield's Hispanic and Black/African American communities that the at large system disadvantages people of color and discourages them from seeking office by making it virtually impossible for them to be elected. Affidavit of Massachusetts State Representative Cheryl Rivera ¶¶ 7, 8; Affidavit of Massachusetts State Representative Benjamin Swan ¶¶ 7, 15, 16, 17, 18; Affidavit of Gumersindo Gomez ¶¶ 7, 8; Affidavit of Carol Lewis-Caulton ¶¶ 10, 11; Affidavit of Frank Buntin ¶¶ 3-5; Affidavit of Rev. Talbert Swan ¶¶ 2-3; Affidavit of Henry Thomas ¶¶ 3-5, 17. As set forth above, white bloc voting almost invariably operates to defeat or "veto" the preferences of minority voters. Also, the nature of at large elections makes campaigns much more costly than ward campaigns. It is possible for a candidate to knock on every voter's door in a single ward, but it is not feasible for a candidate to knock on every voter's door in the entire city. In order to win an at-large campaign, a candidate needs to purchase expensive advertisements in the newspaper, on the radio or on television that will reach voters across the city. These expenses make at-large

campaigns too expensive for many African American and Latino residents who otherwise might run for office. Benjamin Swan Aff. ¶ 18; Gomez Aff. ¶ 7; Lewis-Caulton Aff. ¶ 11; Talbert Swan Aff. ¶ 2; Thomas Aff. ¶ 5.

The City of Springfield has failed to protect the rights of its Hispanic residents to participate in the democratic process by maintaining obstacles that make it more difficult for eligible Hispanic voters to cast provisional ballots. For example, until 2004 the City of Springfield had never provided bilingual training for Hispanic poll workers. Rivera Aff. ¶ 9; Gomez Aff. ¶¶ 16, 21.[21] As a likely result of Springfield's failure to provide reasonable assistance to non-English speaking Hispanic voters at the polls, eligible voters are being denied an opportunity to exercise their right to vote. Non-English speaking Hispanic voters whose names do not appear on the list of registered voters have been turned away from the polls altogether, rather than being informed of their right to cast a provisional ballot. Gomez Aff. ¶ 9, 13.[22] Also, non-Hispanic poll workers have been heard speaking to Hispanic voters in a discouraging tone of voice, and making harassing, race-based comments to Spanish speaking voters designed to imply that people not fluent in English should not be voting. Gomez Aff. ¶ 14, 15 (recounting an incident where a white poll worker is said to have said "if you can't speak the language, what are you doing voting here anyhow?").

---

[21] To the extent that translations were provided at all for persons not fluent in English, they were provided unofficially. Rivera Aff. ¶ 9. Shortly before the 2004 elections, a number of non-fluent English speakers learned that the Election Commission would not permit them to serve as poll workers because they had not been trained. The reason that they had not been trained was that the City had not provided a bilingual training session. Rivera Aff. ¶ 10; Gomez Aff. ¶¶ 18-20. It was not until State Representative Cheryl Rivera personally intervened with the Election Commission and insisted that they hold a bilingual training session that the first bilingual training session took place. Rivera Aff. ¶ 11; Gomez Aff. ¶ 21.

[22] Such conduct is prohibited by the City of Springfield Election Handbook, which specifically provides that where a voter appears at the proper polling place but his or her name does not appear on the voting list, and attempts to contact the Election Office for instruction are unsuccessful, the voter must be allowed to cast a provisional ballot. *See* City of Springfield, Massachusetts Election Handbook at 6 (Ex. 1).

**b.    Voting in Springfield is extremely racially polarized.**

As set forth above, Springfield elections are characterized by extreme racial polarization. Black/African-American voters are "strongly cohesive" in their support for African-American candidates. *Supra* at 18. Hispanic voters are also cohesive, clearly and decisively preferring Hispanic candidates over others. *Id.* White bloc voting in Springfield almost invariably results in the "veto" of minority preferences and the election of white candidates. *Supra* at 20. Additionally, anecdotal evidence from long-time residents actively involved in Springfield politics demonstrates that voting along racial and/or ethnic lines is the norm. Benjamin Swan Aff. ¶¶ 9-11, 14; Rivera Aff. ¶¶ 7-8; Lewis-Caulton Aff. ¶ 11; Gomez Aff. ¶ 7; Buntin Aff. ¶ 3.

The affidavits of Carol Lewis-Caulton and Errol Campbell present a particularly vivid and disturbing example of how deeply race permeates and affects the conduct of Springfield election politics. Ms. Lewis-Caulton ran for City Council in 1997, 1999, 2001 and 2003. Lewis-Caulton Aff. ¶ 2. In 1999, she was elected to the City Council by a very small margin after late decisions by two incumbents not to run. Lewis-Caulton Aff. ¶ 9; *see also* Engstrom Aff. ¶ 12. During her unsuccessful campaign in 1997, Ms. Lewis-Caulton received some perhaps well-intentioned "advice" from a then-sitting Massachusetts state legislator that she should avoid campaigning with African-American men in white neighborhoods because white voters found African-American men threatening or intimidating.   Lewis-Caulton Aff. ¶ 4; Campbell Aff. ¶ 4. During the early stages of the 1997 campaign, Ms. Lewis Caulton was regularly accompanied at such events by her campaign manager, Errol Campbell (an African-American man).   Lewis-Caulton Aff. ¶ 6; Campbell Aff. ¶ 5. However, as the campaign progressed, Ms. Lewis-Caulton and Mr. Campbell both came to believe, due to behavior that they perceived as race-based, that Ms. Lewis-Caulton's reception in predominantly white neighborhoods was adversely impacted

20

when she campaigned with African-American men. Lewis-Caulton Aff. ¶ 6; Campbell Aff. ¶ 4-

5.[23] As a result, at some point during the 1997 campaign, Ms. Lewis-Caulton and Mr. Campbell

adopted an election strategy whereby Ms. Lewis-Caulton would usually attend events in

predominately white neighborhoods alone or in the company of her sister. Lewis-Caulton Aff. ¶

7; Campbell Aff. ¶ 4. This strategy was used with greater frequency in the 1999 campaign,

which Ms. Lewis-Caulton won only by the narrowest of margins. Lewis-Caulton Aff. ¶ 6;

Campbell Aff. ¶ 6.[24] Ms. Lewis-Caulton continued to employ this strategy during her 2001 re-

election campaign and the 2003 campaign, but lost both elections. Lewis-Caulton Aff. ¶¶ 7-8,

10; Campbell Aff. ¶ 6.

Other former candidates have had similar experiences. Plaintiff Frank Buntin ran twice

for City Council and twice for School Committee. Buntin Aff. ¶ 3. He lost all four elections.

During one of his City Council campaigns "a white candidate who was also running asked me to

take her around my African American neighborhood to introduce her to voters and she would

take me around her white neighborhood. She got a good reception in the African American

---

[23]  More specifically, Mr. Campbell's affidavit reads:

"Before making the decision to stop attending certain events, I had regularly attended debates and other
campaign events with Ms. Lewis-Caulton in predominantly white neighborhoods, as well as in predominantly
African-American and Latino/Hispanic neighborhoods. When I attended events in predominantly white
neighborhoods, I frequently felt unwelcome due to behavior that I perceived as race-based. For example,
during the 1997 City Council campaign, I attended a debate with Ms. Lewis-Caulton at the Goodwill Center in
Ward 5, which is in a predominantly white neighborhood. I felt generally unwelcome at that debate, and
noticed my presence affected Ms. Lewis-Caulton's reception; in particular, I noticed that people attending the
debate tended not to approach Ms. Lewis-Caulton if I was standing with her, but that people freely approached
her if I was not nearby. I never felt unwelcome because of my race when attending campaign events in
predominantly African-American and Latino/Hispanic neighborhoods."

Campbell Aff. ¶ 5.

[24]  In addition to not appearing with Ms. Lewis-Caulton while she was campaigning in predominantly white
neighborhoods, Mr. Campbell and other African-American men generally did not appear at "stand-outs" for
Ms. Lewis-Caulton in those neighborhoods either. At a "stand-out," volunteers typically stand near busy
intersections and hold campaign signs supporting a candidate and wave at passers-by. Lewis-Caulton Aff. ¶ 8;
Campbell Aff. ¶ 7.

community, but I got a much less cordial reception in her neighborhood. One white voter came up to us and told the white candidate 'you've got my vote' and pointedly ignored me." *Id.* ¶ 5. Likewise, Henry Thomas, the President and CEO of the Urban League of Springfield, states in his affidavit: "I have worked on the campaigns of candidates of color, and have observed that African American candidates get a cold response in the white neighborhoods and that they are not taken seriously." Thomas Aff. ¶ 8.

> **c.      Members of Springfield's minority communities unquestionably bear the effects of past and present discrimination which hinders their ability to participate effectively in the political process.**

As Defendants have admitted, racial discrimination is an integral part of Springfield's past and present. Answer ¶ 39 ("Defendants do not deny that …as a general matter Black/African-Americans or Hispanic/Latinos [sic] persons have been subject to *de facto* discrimination in the City of Springfield or that in the past race relations within the City of Springfield have been strained or that they cannot be improved in the future"). Defendants further admit that "the 2000 Census indicated that the socio-economic circumstances of Black/African-Americans and Hispanic Latinos are lower than those of Non-Hispanic white persons." Answer ¶ 39.[25] The effects of past and present discrimination in Springfield extend

---

[25] Specifically, Springfield's white residents earn significantly more than either Black/African American or Hispanic residents. Median income for white, non-Hispanic and non-Latino families was $48,159. This was more than double the median family income for Hispanic or Latino families, which was only $19,076. The figure for Black/African American families was $29,820. *See* Ex. 25 (2000 United States Census Tables: *Median Family Income in 1999 (Dollars) (Black or African American Alone Householder); Median Family Income in 1999 (Dollars) (Hispanic or Latino Householder); and Median Family Income in 1999 (Dollars) (White Alone, Not Hispanic or Latino Householder)).* Unemployment rates are similarly disparate, at 5.4% for whites, 9.9% for Blacks/African Americans, and a staggering 16.1% for Hispanic and Latino workers. *See* Ex. 24 (2000 United States Census Tables: *Sex by Employment Status for the Population 16 Years and Over (Black or African American Alone); Sex by Employment Status for the Population 16 Years and Over (Hispanic or Latino); and Sex by Employment Status for the Population 16 Years and Over (White Alone, Not Hispanic or Latino)).*

into virtually every aspect of the lives of Springfield's communities of color, and, together with the at large election system, clearly hinder their ability to participate in the political process.

As set forth in detail below, discrimination and racial tensions in Springfield are not only an historical fact but a present reality as well.

### i.    Education

Springfield's education system bears the effects of both past and present racial discrimination and segregation. Indeed, Defendants specifically acknowledge the existence of a "racial gap" in Springfield's education system. *See* Defendants' Response to Plaintiffs' First Request for the Production of Documents at 16. State Representative Benjamin Swan regularly receives complaints of racial discrimination relating to public education. Benjamin Swan Aff. ¶ 23.

Certain aspects of Springfield's "racial gap" in education were recently explored by Superior Court Judge Botsford in *Hancock v. Driscoll*, No. 02-2978, 2004 Mass. Super. LEXIS 118 at *486 (Mass. Super. Ct. Apr. 24, 2004). In *Hancock*, plaintiffs alleged that the Commonwealth was failing its constitutional obligation to educate its children. After trial, Judge Botsford issued a comprehensive report on the state of public education in Springfield and three other "focus" school districts. Judge Botsford concluded that although "the inadequacies of the educational program provided in (Springfield) . . . . are many and deep," she was most troubled by "the fact, reflected in all the MCAS scores, that for children with learning disabilities, children with limited English proficiency, racial and ethnic minority children, and those from low-income homes, the inadequacies are even more profound." 2004 Mass. Super. LEXIS 118 at *486. Although Judge Botsford's ultimate recommendations were not adopted by the Supreme Judicial Court, her findings of fact were accepted and accorded great deference by the Supreme Judicial Court in *Hancock v. Comm'r of Educ.*, 443 Mass. 428, 433 (Mass. 2005).

Springfield's Hispanic/Latino and Black/African American students have consistently, at all grade levels, performed significantly worse than white students on the Massachusetts Comprehensive Assessment System ("MCAS") test. Data from grades 4, 8 and 10 for the years 1999 and 2000 reveal that Springfield's Hispanic/Latino and Black/African American students underperformed white students in every MCAS category – English Language Arts, Mathematics, Science & Technology, and History & Social Science. *See* Mass. Dept. of Educ., *Report of 1999 Massachusetts and Local School Districts MCAS Results by Race/Ethnicity* (May 2000) at A-34, B-28, C-25 (Ex. 2); Mass. Dept. of Educ., *Report of 2000 Massachusetts and Local School District MCAS Results Race/Ethnicity* (July 2001) at A-28 – A-29, B-24 – B-25, C-22 – C-23 (Ex. 3). *See also* Springfield Public Schools, *Springfield MCAS Results Over Time 2000-2004* (Sept. 22, 2004) at 9-20 (Ex. 4).[26]

While the Massachusetts Department of Education ("DOE") reports that Springfield's MCAS pass rate or "competency determination" for the classes of 2005 and 2006 is 80% and 70% respectively, *see* Mass. Dept. of Educ., *Progress Report on Students Attaining the Competency Determination Statewide and by School District: Classes of 2005 and 2006* (June 2005) at 25 (Ex. 9), those percentages are misleading because they do not take into account the number of students who have dropped out. When adjusted for the difference between the grade 9 and grade 12 student population, the on-time pass rate for Springfield's class of 2005 is 44.4%,

---

[26]  From 2001-2004, the majority of Springfield's students have fallen into the "Needs Improvement" and "Failing" or "Warning" categories on many portions of the MCAS test. *See* Mass. Dept. of Educ., *MCAS Annual Comparisons for Springfield* (Ex. 5). Given that the combined Hispanic and African American student population in Springfield's public schools was approximately 76-78% from 2002-2004, *see* Springfield Public Schools, Springfield, Massachusetts, *Distribution of American Indian, White, Black, Asian and Hispanic Pupils, Oct. 1, 2002*; Springfield Public Schools, Springfield, Massachusetts, *Distribution of Native American, Asian, African American, Hispanic and White Pupils, Oct. 1, 2003*; Springfield Public Schools, Springfield, Massachusetts, *Distribution of American Indian, White, Black, Asian and Hispanic Pupils, Oct. 1, 2004* (Exs. 6-8), this poor overall performance is particularly striking.

not 80% as the DOE reports, and for the class of 2006 the on-time pass rate is 33.0%, not 70% as the DOE reports.[27]

Hispanic/Latino students consistently have, by far, the highest high school dropout rates in Springfield, and the Black/African-American high school dropout rate is also high. During the 2002-2003 school year, 11.1% of Latino students dropped out, and 7.0% of African-American students dropped out, while only 5.8% of white students dropped out. *See* Mass. Dept. of Educ., *Dropout Rates in Massachusetts Public Schools: 2002-03* (April 2004) at 63 (Ex. 12). For both the 2000-2001 and 1999-2000 school years, the Latino/Hispanic high school dropout rate was the highest, at 11.2% and 9.5% respectively.[28] *See* Mass. Dept. of Educ., *Dropout Rates in Mass. Public Schools 1999-2001* (Nov. 2001) at 68 (Ex. 14). Springfield's African-American and Hispanic students are also held back to repeat grades at much higher rates than white students: during the 2003-2004 school year, 7.5% of African-American students and 8.9% of Hispanic students repeated grades, compared to 5.2% of white students. *See* Mass. Dept. of Educ., *Grade Retention in Massachusetts Public Schools: 2003-2004* (Apr. 2005) at Appendix B, 6 (Ex. 15). Data from the 2002-2003 school year reveals the same pattern, with 6.6% of African-American students and 8.5% of Hispanic students repeating grades, compared to 4.7% of white students. *See* Mass. Dept. of Educ., *Grade Retention in Massachusetts Public Schools: 2002-2003* (June 2004) at Appendix A, 8 (Ex. 16).

---

[27]  For Springfield's class of 2005, the DOE reports that 1,010 students passed the MCAS test. *See id.* at 25. But, 2,274 were enrolled in the class of 2005's 9th grade in October 2001. *See* Mass. Dept. of Educ., *2001-2002 Enrollment by Grade Report* at 1 (Ex. 10). For Springfield's class of 2006, the DOE reports that 876 students have passed the MCAS test. *See* Ex. 9 at 25. But, 2,654 students were enrolled in the class of 2006's 9th grade in October 2002. *See* Mass. Dept. of Educ., *Enrollment by Grade* (Oct. 1, 2002) at 7 (Ex. 11).

[28]  The Hispanic high school dropout rate in Springfield has been higher than African-American and white dropout rates: during the 2000-01 school year the African-American rate was 5.3% and the white rate 6.8%, *see* Mass. Dept. of Educ, *Dropout Rates in Massachusetts Public Schools: 2000-01* (Aug. 2002) at 55 (Ex. 13); during the 1999-2000 school year the African-American dropout rate was 4.2% and the white rate 3.7%. *See* Ex. 14 at 68

It cannot be seriously disputed that Springfield's "racial gap" is due in large part to a long history of racial discrimination within the Springfield school system. Thomas Aff. ¶ 14 ("The education system in Springfield has a long and blatant history of segregation and discrimination."); Talbert Swan Aff. ¶¶ 12-13 (recounting discrimination in the allocation of school resources); Buntin Aff. ¶¶ 6-7. Until a series of lawsuits forced Springfield to desegregate its schools by implementing busing in 1974, Springfield's schools were largely segregated by race. *See School Comm. of Springfield v. Bd. of Education*, 365 Mass. 215 (1974) (finding that Springfield had not achieved racial balance in its public schools); *School Comm. of Springfield v. Bd. of Education*, 362 Mass. 417 (1972) (same). In addition, racial tensions among students in the late 1960s and early 1970s were high. For example:

> In 1969, numerous Springfield Technical High School students were injured when fighting broke out between black and white students, leading police to respond to the scene in full riot gear. *See* Exs. 40-42 (newspaper articles re: same).

> Following the Technical High School incident, race-related violence spread to other schools, escalating to the point that spectators were banned from high school basketball games during the 1969-70 season. *See* Exs. 43, 59 (newspaper articles re: same).

> In 1971 more race-related violence at Technical High School touched off a 12 day crisis, resulting in police officers in riot gear stationed outside of the city's four public high schools. *See* Exs. 43-46, 51, 85 (newspaper articles re: same).

### ii. Police Relations

Striking examples of how Springfield's communities of color continue to bear the effects of past and present discrimination are illustrated by a review of Springfield's long history of police violence against its minority communities. *See* Benjamin Swan Aff. ¶ 4; Buntin Aff. ¶ 12; Talbert Swan Aff. ¶ 15. During the 1950s, the police enforced the law in a discriminatory manner and engaged in racially-motivated brutality against African Americans. *See* Benjamin Swan Aff. ¶ 4. Likewise, the 1960s and '70s were marked by repeated incidents of violence

between police and minorities in Springfield, and repeated allegations of police brutality stemming from racially charged incidents.[29]  For example:

> In 1965, charges of police brutality and massive demonstrations followed an altercation between police and a predominantly black crowd at the Octagon Lounge in Springfield. *See* Exs. 32-36 (newspaper articles re: same).  Seventeen black men were arrested, and racial tensions and protests grew so heated following the incident that the Mayor called in the National Guard. *See id.*; Ex. 91 (video documentary describing same).

> In 1969, police clashed with welfare rights and anti-war protestors, resulting in more than two dozen arrests, several injuries, vandalism, and a city-wide curfew. *See* Exs. 37-39, 51 (newspaper articles re: same).

> In 1975, the fatal police shooting of an Hispanic man "unleashed a storm of protest from the city's Puerto Rican community." *See* Exs. 47, 48 (newspaper articles re: same).  A second fatal police shooting of an unarmed Hispanic robbery suspect touched off rioting in Springfield's predominantly Hispanic North End. *See* Exs. 47-49, 51, 69.

This pattern of police violence and harassment of minorities continued throughout the 80s, 90s and continues to this day.  The 2004 state-mandated study on racial profiling documented alarming disparities in the issuance of citations and the incidence of searches by the Springfield Police. *See* Northeastern University Institute on Race and Justice, *Massachusetts Racial and Gender Profiling Study Final Report* (2004) (Ex. 21).  The profiling study indicates that Black/African Americans and Hispanics in Springfield are cited more than 12% more frequently than what would be predicted by their representation in the population. *See id.* at 59.  These racial disparities are more than *nine times higher* than the median disparity rates for other Massachusetts jurisdictions. *Id.*  Once stopped by the Springfield police, Black/African American and Hispanic drivers are also more likely than white drivers to be subjected to noninventory searches of their persons or their vehicles. *See id.* at 85.  The study results indicate that the Springfield Police are among the worst offenders in the state.  Of the 366 law

---

[29]  Springfield residents describe the ten year period from 1965 to 1975 as "a decade when racial tensions blew the city apart." *See* Ex. 51 (newspaper article entitled, "A Decade that Tore the City").

enforcement agencies examined, Springfield was one of only fifteen with racial disparities above the study's threshold levels on all four of the measures considered. *See id.* at 9, 36.

The local media has frequently reported incidents involving violence against people of color by Springfield police, along with the public outrage stemming from those incidents:

1988:  Several complaints of police brutality are received by the NAACP, including that of a Black/African-American teen who said that police had put a trash can over his head and then hit it with sticks and objects, and that officers had played "Russian roulette" with him, pointing guns and pulling the trigger while throwing firecrackers at him as he was handcuffed and under a desk. *See* Ex. 50 (newspaper article re: same).

1994:  Springfield police shoot and kill a young, unarmed black man. A "welcome-back" party is thrown for the police officer who shot the victim. Signs for the party, posted at the police station, reportedly invited people to "congratulate [the officer] on a job well done" and said to "keep up the good work."[30] *See* Exs. 52, 53, 55, 63 (newspaper articles re: same).

1996:  A white police officer is alleged to have pepper-sprayed a 78 year-old African-American woman without justification.[31] *See* Exs. 64, 68, 73 (newspaper articles re: same).

1996:  Allegations are made that police beat, pepper-sprayed, and used racial epithets at an incident outside of the Nubian Athletic Club involving African-American and Latino/Hispanic youths. *See* Ex. 69 (newspaper article re: same).

1996:  An on-duty, white police officer admits to leaving a harassing message on the answering machine of an African-American church. The message appears to make light of racially-motivated church burnings. The officer is dismissed. *See* Exs. 65-67 (newspaper articles re: same).

1997:  A videotape shows a white police officer kicking a black suspect as the suspect is held down by other officers. *See* Exs. 70-72, 78, 79 (newspaper articles re: same).

1997:  A local NAACP official receives a threatening letter sent in a Springfield Police Department envelope. *See* Exs. 74-76 (newspaper articles re: same).

---

[30] A jury in a civil trial awarded the victim's family $2,000,000.00. After the verdict, the parties ultimately agreed to settle the case for $700,000.00. *See* Ex. 82 (newspaper article re: same).

[31] The City later settled a civil suit brought by the elderly woman and her granddaughter for $100,000. *See* Ex. 81 (newspaper article re: same).

2004:  Springfield police are alleged to have brutally beaten an African-American high school principal while he was having a diabetic attack.[32]  *See* Exs. 86-88 (newspaper articles re: same).

*See also* Benjamin Swan Aff. ¶ 25 (noting that his office receives complaints of police brutality). Time and again, media reports of such instances comment on the terrible state of race relations in Springfield.  *See* Exs. 61, 65, 67, 69, 70, 72, 76, 78, 79, 86.

Since 1987, at least 88 civil rights lawsuits have been filed against the City of Springfield.  *See* Exs. 19, 20 (documents produced by Defendants listing civil rights cases). According to a recently-issued report on the Springfield Police Department, fourteen civil rights cases are currently pending against the police.  *See* Carroll Buracker & Associates, Inc., *Report on a Comprehensive Study of the Springfield Police Department* (May 4, 2005) ("Buracker Report") at 364 (Ex. 18).[33]

Most recently filed with the Massachusetts Commission Against Discrimination on February 8, 2005, and currently pending, is *Pastors' Council of Greater Springfield v. City of Springfield Police Department,* Mass. Comm'n. Against Discrimination, No. 042403343, alleging on-going racial bias by the Springfield Police Department after it failed to discipline white officers who allegedly beat an African American diabetic school principal who was having an insulin reaction.  *See* above.  The complaint alleges that the City of Springfield Police Department "has in the past, and is currently, engaged in a continuous pattern and practice of physical abuse and disparate treatment toward individuals based on race and color (African-American)."  *See* Ex. 17 (Complaint).  The complaint further states that "the Springfield Police

---

[32]  The United States Department of Justice and the Massachusetts Commission Against Discrimination are both investigating the incident.  *See* Exs. 89, 90 (newspaper articles re: same).  Additionally, a civil suit is currently pending against the city.  *See Greer v. City of Springfield, et al.,* No. 05-30001-MAP (D. Mass.).

[33]  In June, 1999, the local newspaper reported that the City of Springfield had paid "approximately $1.2 million to settle 17 police-related lawsuits since 1990, largely involving claims of police misconduct and negligence."  *See* Ex. 82.

Department has engaged in a pattern and practice of racially discriminatory conduct in the handling of police matters in largely minority areas of the city when compared to its handling of police matters in largely white areas of the city." *See also Springfield Bd. of Police Comm'rs v. Mass. Comm'n Against Discrimination*, 375 Mass 782 (1978) (affirming finding of employment discrimination where Springfield board of police commissioners failed to promote a black officer because of his race).

### iii.   Discrimination in Public Employment

Since 1973, the Springfield police and fire departments have operated under a federal consent decree setting forth a hiring plan to increase the number of Blacks/African Americans and Hispanics on the police and fire forces. *See Castro v. Beecher*, 365 F. Supp. 655 (D. Mass. 1973); *Boston Chapter, NAACP, Inc. v. Beecher*, 371 F. Supp. 507 (D. Mass. 1974), *aff'd*, 504 F.2d 1017 (1st Cir. 1974), *cert. denied*, 421 U.S. 910 (1975). Springfield is required to hire from a civil service list where minority and white candidates are listed alternately. *See id.* Yet, more than three decades later, the Springfield Police Department has not achieved the parity required by the consent decree, and Hispanics and Black/African Americans constitute only 29% of the Springfield police force while Black/African Americans and Hispanics constituted 48.2% of the population as of the 2000 census, and over 50% of the population today. *See City of Springfield's Memorandum Pursuant To An Order For Further Briefing, Bell et al. v. IBPO Local 364*, CA No. 3:04-30163-MAP (D. Mass.). As a result, the Springfield Police Department lacks diversity, and its promotions process is viewed as political and unfair. *See* Ex. 18 (Buracker Report) at xvi, xvii, xix, xxxi, xxxiv, xxxv.[34] For example, the Buracker Report:

---

[34]   The Buracker Report is an independent report commissioned by Springfield Finance Control Board and released in May 2005. *See* Ex. 18 at 1.

- Notes that there are no black or women officers assigned to the 'Community Policing Unit,' observes that this "contradicts the very meaning of community policing," and recommends requesting a written report on the lack of black and women officers assigned to the 'Community Policing Unit.' *See id.* at xix, xxxiv, 135, 145, 155.

- Notes that the Training Division, or Police Academy is, and has been, comprised almost entirely of white males. *See id.* at xvii, 338-39.

- Repeatedly notes the lack of diversity in the Department, and recommends recruiting minorities and women, and enhancing the presence of minorities in supervisory positions. *See id.* at xvi, xvii, xix, xxxi, xxxv, 372, 374.

- Notes that "[m]any promotional decisions are . . . viewed as political and unfair," that the last two promotions were of white males. *See id.* at xvi, 333-34.

- Notes that there are 7 MCAD cases and 2 discrimination cases currently pending against the Springfield Police Department. *See id.* at 364.

- Recommends distribution of a "current citizen compliment and complaint process booklet in Spanish language." *See id.* at xxxii, 378.[35]

The local media has also reported on the lack of diversity within the police department. *See Exs.* 54, 61.

Discrimination in public employment has not been limited to the police. Thomas ¶ 7 ("Minorities have had minimal access to public sector jobs in Springfield, as well as private sector jobs."); Talbert Swan Aff. ¶¶ 7, 10; Buntin Aff. ¶ 10. For example, in 1994, the Massachusetts Commission Against Discrimination found that the City's School Department had unlawfully discriminated against an African American applicant for a teaching position because of his race. *Hamilton v. Springfield School Dep't*, No. 87-SEM-0058, 1994 Mass. Comm. Discrim. LEXIS 73 (June 20, 1994). The complainant had "a very heavy southern accent typical of African Americans from the South." *Id.* at *4. The MCAD found that the City's articulated fear that "students might mimic the Complainant" was evidence of unlawful racial stereotyping by the City. *Id.* at *15. The MCAD concluded that the City's stated reason for not hiring the

---

[35] Notably, the Buracker Report also concludes, among other things, that: the Department's organizational structure is "dysfunctional," Ex. 18 at xxxviii; the Department's crime data reporting is inaccurate, and has been for many years, *id.* at ix, x; the "process for investigating crimes is dysfunctional, duplicative and wasteful" and the Department "has no formalized case management systems for criminal investigations," *id.* at xi; and the Department "does not collect or utilize clearance rates (solution of crime)," *id.* at xiii-xiv.

complainant – "poor verbal communications" – was a discriminatory pretext for the City's
"aversion to his accent and manner of speaking that is directly related to race." *Id.* at *7, *15-
*16.

Further, Representative Swan "regularly receives complaints of racial discrimination in
public and private employment." Benjamin Swan Aff. ¶ 25. Some of those complaints are
referred to the MCAD. *Id.* A number of those MCAD referrals have resulted in favorable
decisions for the complainants, particularly with regard to employment in the Springfield
construction industry. *Id.* Representative Swan personally served as an advocate for one of his
constituents before the MCAD in a case involving racial discrimination in City employment that
resulted in a finding against the City. *Id.*[36]

### iv.    Discrimination in Housing

Springfield's African-American and Hispanic communities also bear the effects of
discrimination in the area of housing. As set forth in the Affidavit of Preston H. Smith, II, Ph.D.
("Smith Aff."), Springfield has a long history of housing discrimination and segregation based
on race.[37] In his 1995 paper entitled "Racial Segregation in Springfield and Holyoke: Historical
and Current Trends," Professor Smith observed that Springfield's historical and current "patterns
of racial concentration" in certain areas of the city "are not mainly the result of individual choice,
but are shaped by individual and institutional discriminatory practices that force minorities to
reside not only in designated cities -- Springfield and Holyoke -- but also in designated *sections*
of those cities." Smith Aff. ¶ 4; *see also* Benjamin Swan Aff. ¶ 4 (recounting "widespread and

---

[36]    Representative Swan's affidavit recounts his involvement in another constituent case against the City that was
settled by Springfield's School Superintendent before it reached the MCAD. Benjamin Swan Aff. ¶ 25.

[37]    Professor Smith is an Associate Professor of Politics at Mt. Holyoke College. His work principally focuses on
class and housing issues within the black community from 1940 to 1960, postwar black politics, and
community development. Smith Aff. ¶ 1.

open racial discrimination" in the 1950s, including African American families being "prevented by white residents from buying and renting homes in certain neighborhoods"); Buntin Aff. ¶ 8. Professor Smith believes that the conclusions set forth in his Report remain valid today, and that Springfield's housing patterns continue to be shaped by individual and institutional discriminatory practices that force minorities to reside in certain sections of the city. Smith Aff. ¶¶ 6, 8. Additionally, as a longstanding member of the Board of Directors of the Housing Discrimination Project, now known as the Massachusetts Fair Housing Center, Professor Smith regularly heard complaints of housing discrimination by African-Americans and Hispanics living in Springfield. Smith Aff. ¶ 7.

In 1988, the mayor's "Executive Housing Task Force" reached essentially the same conclusion as Professor Smith, stating in its report: "Patterns of concentrated racial occupancy in housing have developed over a period of decades. These housing patterns have resulted from not only past discrimination, but also from apparently neutral practices that are actually discriminatory in effect." *See* Richard E. Neal & Kevin Kennedy, *Mayor Neal's Housing Task Force Final Report: The Housing Problem in Springfield, 1988* (Dec. 15, 1988) at 23 (Ex. 22). The Mayor's report also concluded that a "city and regional commitment to providing affordable housing on an open occupancy basis must be made if we are to change what most people have come to accept as normal, that is, the concentration of minority groups in certain neighborhoods." *See id.*

Recent data also reveals that Black/African-Americans and Hispanics in Springfield are subject to discrimination in home mortgage lending. In a report analyzing lending practices in the Springfield Metropolitan Statistical Area[38] from 1996 to 2001, the Pioneer Valley Planning

---

[38] The "Springfield Metropolitan Statistical Area" includes Springfield and other surrounding cities and towns. *See* Ex. 23 at 9 n.8, 10.

Commission found "a disturbing trend of differences between the lending statistics of white applicants and African-American and Latino applicants." *See* Pioneer Valley Planning Commission, *Owning a Place to Call Home: An Analysis of Fair and Subprime Lending in the Springfield Metropolitan Area* (Nov. 2003) at 46 (Ex. 23). Specifically, the report found:

- "African-American and Latino applicants had consistently higher denial rates than white applicants, regardless of income. High-income Latino and African-American applicants were denied home loans at roughly three times the rate of high-income white applicants. High-income white applicants had an average denial rate of 7 percent while high-income African-American and Latino applicants had average denial rates of 22 and 21 percent respectively."

- "Denial rates for middle income African-American and Latino applicants were about twice as high as white applicants with similar incomes."

- "Latino and African-American applicants of *all income groups* experienced higher denial rates than all but the lowest income white applicants. Moderate-income white applicants had a denial rate of 16 percent as compared to 22 percent from high-income African-American applicants and 21 percent for high-income Latino applicants."

*Id.* at 30 (emphasis in original); *see also* Thomas Aff. ¶ 16; Talbert Swan Aff. ¶ 11.

Comparative home ownership rates in Springfield completes the picture. According to 2000 Census data, the renter-occupied housing rate among Black/African American households in Springfield is 61.5%. The rate for Hispanic households is even higher, at 79.1%. By contrast, only 34.6 of all white households rent their homes. *See* United States Census Tables: *Tenure By Race of Householder; Tenure (Hispanic or Latino Householder); and Tenure (White Alone, Not Hispanic or Latino Householder)* (Ex. 25).

### v.    Other Patterns of Discrimination

Recent MCAD decisions provide further evidence of the persistence of racial discrimination and racial stereotyping in Springfield. In two recent decisions issued on the same day, the MCAD found that the Diamond Cab Company and the Yellow Cab Company both discriminated against African American customers on the basis of race by refusing to provide taxi service unless the customers paid their fares in advance. *Wilder v. Diamond Cab Co.*, No.

97-SPA-0789, 2001 Mass. Comm. Discrim. LEXIS 178 (Feb. 23, 2001); *Carpenter v. Yellow Cab Co.*, No. 95-SPA-0033, 2001 Mass. Comm. Discrim. LEXIS 177 (Feb. 23, 2001). In *Diamond Cab*, the MCAD specifically found that the driver's reasons for demanding prepayment – that he felt uncomfortable given the circumstances surrounding the "pickup" and his belief that "you people don't like to pay" – were "rooted in racial stereotypes and bias." *Id.* at *9-*10. Among other sanctions, the MCAD found it necessary to order both companies to submit a driver and management non-discrimination program to the MCAD for approval.

**vi.    Discrimination in Health Care**

In the area of health care, Springfield's Hispanic and Black/African American communities suffer disproportionately. For example, as of January 2004, Blacks/African-Americans and Hispanics accounted for more than 80% of Springfield residents known to be living with HIV/AIDS. *See* Springfield Dept. of Health and Human Servs., *Health Update, HIV/AIDS 2004, Springfield, MA, Fourth Edition* (Aug. 23, 2004) at 9 (Ex. 27). More specifically, 53% of those with HIV/AIDs were Hispanic, 28% were Black, and 18% were white. *See id.* "The race/ethnicity make-up of people living with HIV/AIDS in Springfield at the beginning of January, 2004 differs considerably from the race/ethnicity make-up of the adult population of the city," which, according to the 2002 Census, was 20% Black, 27% Hispanic, and 49% white. *See id. See also* Springfield Dept. of Health and Human Servs., *Health Update, HIV/AIDS Epidemic in the City of Springfield, MA, Third Edition, 2002* (Aug. 15, 2002) at 8 (Ex. 28) (reporting that, as of July 1, 2002, Hispanics accounted for 53%, Blacks/African-Americans for 29%, and whites for 18% of Springfield residents known to be living with HIV/AIDS). Between 1982 and 1999 in Springfield, the percentage of Hispanic Springfield residents diagnosed with AIDS increased dramatically (from 27% of the total to 49%); in contrast, the percentage of whites diagnosed with AIDS dramatically decreased (from 37% of the total to

35

13%) during the same time period.[39] *See* Springfield Dept. of Health and Human Servs., *Health Update, A Profile of the AIDS Epidemic In the City of Springfield, MA, Second Edition 1999* at 11 (Ex. 29).

Springfield's pregnancy and birth statistics likewise reveal significant health disparities between the city's Black/African-American and Hispanic populations, and its white population. For example, between 1999 and 2002, Black and Hispanic newborns suffered from low birth weight and very low birth weight more often than white newborns.[40] *See* Springfield Dept. of Health and Human Servs., *Health Update, Pregnancies and Births, Springfield, MA, 1993-2005* at 6, 22-24 (Ex. 30). Springfield's 1989-2002 Black and Hispanic infant mortality rates were higher than white infant mortality rates during the same time period. *See id.* at 26. During that time period, "the average annual Black infant mortality rate in Springfield has been more than double the White infant mortality rate in the City." *See id.* at 6, 26. Additionally, Black and Hispanic infants in Springfield are less likely to be born to mothers who used adequate prenatal care: in 2002, only 67% of Black and Hispanic mothers used prenatal care adequately, as compared to 85% of white mothers. *See id.* at 16-17, 19. Teenage pregnancy from 1993 to 2000 was more common among Black and Hispanic teens than among white teens. *See* Springfield Dept. of Health and Human Servs., *Health Update, Birth to Teens, Springfield, MA, 1993-2000* (Aug. 8, 2002) at 7 (Ex. 31). And, just as in the adult population, Black and Hispanic teen mothers were less likely to adequately use prenatal care than white teen mothers, and were also

---

[39] The percentage of Blacks diagnosed with AIDS remained relatively stable during that time, comprising between 32% and 38% of the diagnoses. *See* Ex. 29 at 11.

[40] "[T]he rate of low birth weight in a particular population or group is a basic and widely accepted indicator of the health status of that group . . . Calculation of the rate of infant mortality in communities or populations is, of course, important because rates allow for comparisons between populations. Infant mortality rate is also an overall 'health status indicator', a snapshot of the health of the community." *See* Ex. 30 at 2.

more likely to give birth to babies who suffered from low birth weight than were white teen mothers. *See id.* at 11, 14.

The Thomas Affidavit captures the essential relevance of the foregoing to plaintiffs' Section 2 claims:

> The African American community in Springfield has been consistently neglected in terms of the provision of adequate city services, public safety, employment and education. As a result of this disinvestment and history of discrimination, many African Americans feel hopeless that things will improve and do not believe that elected officials will help their community. This discourages them from participating in the electoral process. For those African Americans who have engaged in the electoral system, the fact that African American candidates cannot get elected in at-large elections, makes them feel that their votes do not really make a difference.

Thomas Aff. ¶ 13.

### vii.    Whether political campaigns have been characterized by overt or subtle racial appeals.

Around the time the at-large system was instituted in Springfield in 1961, racism in Springfield politics was overt. *See* Benjamin Swan Aff. ¶ 4; Ex. 91 (video documentary describing same). In the 1960s, School Committee elections were defined by the racially-charged issue of busing, and candidates who supported busing were soundly defeated. *See id.* ¶ 6.

### viii.    The extent to which members of the minority group have been elected to public office in the jurisdiction.

The track record of Hispanic and Black/African American candidates for City Council and School Committee in at large elections has been abysmal. As set forth in greater detail above, only four Black/African-Americans and one Latino have ever been elected to the Springfield City Council under the at large system. *See* Answer ¶ 22; *infra* at 5. Of those five:

> One (Lewis-Caulton) was elected only by the narrowest of margins after two incumbents made late decisions not to run and after she adopted a strategy of not appearing at campaign events in white neighborhoods in the company African-American men. She

served only one term before losing her bid for reelection in 2001. Lewis-Caulton Aff. ¶¶ 2, 7, 9.

One (Tosado) had been appointed to the City Council immediately prior to his successful election campaign in 2003, and was thus able to campaign as an incumbent. *See* Engstrom Aff. ¶ 19.

> ### ix.    There has been a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

There is ample basis for finding a historical, significant lack of responsiveness on the part of Springfield's elected officials to the needs of the City's Hispanic and Black/African American communities.

The affidavits of Representatives Rivera and Swan, along with the affidavits of Henry Thomas and others, paint an undeniable picture of consistent neglect by Springfield towards its communities of color. Rivera Aff. ¶ 12 ("Because my district is not represented on the City Council or School Committee, the City Council and School Committee fail to address issues that are important to my constituents. They address other issues in ways that are harmful to my constituents."); *id.* ¶¶ 13-22 (describing her own personal intervention in city affairs to address constituent concerns regarding zoning issues, community policing issues and education issues not addressed by the City Council or School Committee); Benjamin Swan Aff. ¶ 26 ("I believe that I receive more complaints about city issues than other State Representatives in the Commonwealth because my constituents perceive the Springfield City Council and School Committee to be unresponsive to their needs. My office regularly receives complaints from my constituents about city services, including police-community relations, police response times, potholes, trash dumping, the assessor's office, water and sewage."); Thomas Aff. ¶¶ 13 ("The African American community in Springfield has been consistently neglected in terms of the

provision of adequate city services, public safety, employment and education."), 16 (neglect of

housing stock); Talbert Swan Aff. ¶ 5; Gomez Aff. ¶¶ 25-27.

In addition, the City Council manifested its lack of regard for the needs of Springfield's

Hispanic and Black/African American communities when it affirmatively voted to reject the

results of the 1997 ballot initiative whereby voters approved a measure to replace the at-large

system with what was essentially a ward-based system. Answer ¶ 37. The City Council again

turned a deaf ear to the needs of Springfield's Hispanic and Black/African American

communities in March of this year when it voted against submitting a new ballot initiative on

changing the at large system. Answer ¶ 38. Rather than addressing the longstanding community

concerns of bias in the operation of the at large election system, the City Council has opted on

two occasions to preserve it, thereby maintaining the system that preserves the mainly white

composition of that body.

        **x.**    **The tenuousness of the policy underlying the at large system.**

Springfield's move to at large elections in 1961 was the result of a 1959 special

referendum whereby Springfield amended its City charter and adopted the "Plan A" method of

government set forth in Chapter 43 of the Massachusetts General Laws. See Michael F. Konig,

"A Study in Leadership: Springfield and Its Mayors, 1945 to Present" at p. 11 (Westfield State

College 1986) (published in cooperation with the Mayor's Office of Community Affairs). "Plan

A" is defined as "a city government and legislative body composed of the mayor and a city

council, the councilors being elected at large." M.G.L. c. 43, § 1. Accounts of Springfield's

Plan A referendum suggest that a principal purpose in effecting this change was to make city

government more accountable to voters by centralizing administrative powers in the Mayor's

Office. See Konig at 1 (describing the pre-Plan A government as an "awkward and

cumbersome" apparatus that "encouraged political factionalism as well as tensions between the Mayor and the City Council" due to the fact that many key city administrators were appointed by the City Council rather than by the Mayor).

By contrast, the "at large" aspect of the Plan A model does not appear to have served any legitimate purpose. The policies underlying Springfield's move towards the greater administrative centralization contemplated by Plan A do not turn on the presence or absence of at large elections. Indeed, it is a common belief in the minority community that the at large system was adopted to prolong white dominance of City government. Thomas Aff. ¶ 4. Here, Plaintiffs do not seek to alter either the size or the structure of Springfield's current government. Ward representation will not affect the current allocation of power among the Mayor and City Council. No policy justifies the maintenance of discriminatory at large voting in Springfield.

In sum, the totality of the circumstances clearly and convincingly demonstrates that given the history of discrimination in Springfield, coupled with an at-large election system that makes it difficult for people of color to run for election, let alone win, the vote of Hispanics and Black/African Americans is diluted on account of race in violation of Section 2 of the Voting Rights Act. Accordingly, the court may continue its analysis of the remaining elements of irreparable harm, the balance of hardships and the public interest. As set forth below, plaintiffs' application for relief easily clears each remaining hurdle.

**B.    Plaintiffs Will Suffer Irreparable Injury Absent the Requested Relief**

Having established a likelihood of success on their Section 2 claim, it cannot be disputed that plaintiffs will suffer irreparable harm should the City of Springfield be permitted to continue to conduct future at-large elections for City Council. The deprivation of constitutionally-protected freedoms -- including the right to vote -- "for even minimal periods of time,

40

unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("[The] right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."); *Wal-Mart Stores, Inc. v. Rodriguez*, 238 F. Supp. 2d 395, 421(D. P.R. 2002) ("A presumption of irreparable harm flows from and is triggered by an alleged deprivation of constitutional rights"); *United States v. Berks County, Pennsylvania*, 250 F. Supp. 2d 525, 540 (E.D. Pa. 2003) (granting preliminary injunction); *Harris v. Graddick*, 593 F. Supp. 128, 135 (M.D. Ala. 1984) (*amended by consent decree entered at* 615 F. Supp. 239, 245 (M.D. Ala. 1985) ("[A]ny illegal impediment to the right to vote, as guaranteed by the U.S. Constitution or statute, would by its nature be an irreparable injury."). Accordingly, plaintiffs will suffer irreparable harm if the relief they seek is not granted.

### C. The Harm to Plaintiffs, If Relief Is Denied, Outweighs the Harm to Defendants If the Relief Is Granted

Ordering preliminary relief will not result in any significant harm to the defendants. Plaintiffs seek the establishment of nine single member districts for electing the City Council. Plaintiffs are not asking this Court to alter the existing size of the Council. Instead, plaintiffs only seek a more equal opportunity to decide who will sit on that representative body through ward elections. While such reform "might result in some administrative expenses for Defendants, such expenses are likely to be minimal and are far outweighed by the fundamental right at issue." *United States v. Berks County, Pennsylvania*, 250 F. Supp. 2d 525, 541 (E.D. Pa. 2003); *Johnson v. Halifax County*, 594 F. Supp. 161, 171 (E.D.N.C. 1984). Indeed, a representative City Council, untainted by a dilutive voting system, will benefit the City, not burden it.

41

**D.     The Requested Preliminary Injunction is in the Public Interest**

The public interest is served by the provision of preliminary relief that allows all Springfield voters to participate equally in the electoral process. There is no question that ordering defendants to conduct elections in compliance with the Voting Rights Act so all citizens may participate equally serves the public interest. As the Supreme Court noted in *Reynolds*, "[u]ndoubtedly, the right of suffrage is a fundamental matter in a free and democratic society." 377 U.S. at 561-62. "In cases such as the present one, where the continued presence of barriers to equal protection in the political process is strongly evident, the public interest commands all appropriate relief necessary to effect the immediate and complete removal of these barriers." *Berks County*, 250 F. Supp. 2d at 541 (internal alterations removed) (quoting *Harris v. Graddick*, 593 F. Supp. 128, 136 (M.D. Ala. 1984)).

Further, the remedy sought here will not adversely affect the public interest in that plaintiffs do not seek to change the size of the City Council. *Compare Uno*, 72 F. 3d at 978. Instead, plaintiffs only seek to replace the mechanism for electing the members of that body.

## CONCLUSION

The foregoing conclusively establishes that Plaintiffs are entitled to preliminary injunctive relief. Accordingly, Plaintiffs respectfully submit that their motion should be granted.

Respectfully submitted,

ARISE FOR SOCIAL JUSTICE; ¿OISTE?; NEW
ENGLAND STATE-AREA CONFERENCE OF
THE NAACP; REV. TALBERT W. SWAN, II;
NORMAN W. OLIVER; DARLENE ANDERSON;
GUMERSINDO GOMEZ; FRANK BUNTIN;
RAFAEL RODRIQUEZ; and DIANA NURSE

By their attorneys,


   /s/ Paul E. Nemser
Paul E. Nemser (BBO #369180)
J. Anthony Downs (BBO #532839)
William J. Connolly III (BBO #634845)
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109
(617) 570-1000


   /s/ Nadine Cohen
Nadine Cohen (BBO #090040)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW OF THE BOSTON BAR
ASSOCIATION
294 Washington Street, Suite 443
Boston, MA 02108
(617) 988-0609

Angela Ciccolo
Victor L. Goode
NAACP
4805 Mt. Hope Drive
Baltimore, Maryland 21215-3297
(410) 580-5790

*Of Counsel*

Dated: July 15, 2005

**EXHIBIT A**

**PROPOSED CITY COUNCIL DISTRICTS**
**(Exhibits from the Expert Report of John E. Harmon)**



Exhibit 3
Proposed City Council Districts
Plaintiff's Plan

| Exhibit 5 | | | | | | | |
|---|---|---|---|---|---|---|---|
| DISTRICT | Total VAP | White VAP | Black VAP | Asian VAP | Native Amer/Pac. Island VAP | Latino/Hispanic VAP | Other VAP |
| 1 | 11,394 | 3,328 | 1,532 | 137 | 26 | 6,155 | 216 |
| 2 | 10,722 | 2,659 | 1,941 | 95 | 26 | 5,805 | 196 |
| 3 | 10,441 | 1,674 | 6,058 | 144 | 46 | 2,210 | 309 |
| 4 | 10,985 | 4,516 | 4,226 | 161 | 32 | 1,804 | 246 |
| 5 | 12,763 | 9,092 | 872 | 143 | 30 | 2,439 | 187 |
| 6 | 12,746 | 9,364 | 1,541 | 138 | 37 | 1,458 | 208 |
| 7 | 13,006 | 10,807 | 1,186 | 182 | 21 | 667 | 143 |
| 8 | 13,576 | 11,403 | 882 | 342 | 19 | 763 | 167 |
| 9 | 12,422 | 7,894 | 1,314 | 697 | 38 | 2,229 | 250 |
| | | | | | | | |
| Total | 108,055 | 60,737 | 19,552 | 2,039 | 275 | 23,530 | 1,922 |

| Exhibit 6 | | | | |
|---|---|---|---|---|
| DISTRICT | Percent White VAP | Percent Black VAP | Percent Latino/Hispanic VAP | Percent Black + Latino/Hispanic VAP |
| 1 | 29.21% | 13.45% | 54.02% | 67.47% |
| 2 | 24.80% | 18.10% | 54.14% | 72.24% |
| 3 | 16.03% | 58.02% | 21.17% | 79.19% |
| 4 | 41.11% | 38.47% | 16.42% | 54.89% |
| 5 | 71.24% | 6.83% | 19.11% | 25.94% |
| 6 | 73.47% | 12.09% | 11.44% | 23.53% |
| 7 | 83.09% | 9.12% | 5.13% | 14.25% |
| 8 | 83.99% | 6.50% | 5.62% | 12.12% |
| 9 | 63.55% | 10.58% | 17.94% | 28.52% |
| | | | | |
| VAP % | 56.21% | 18.09% | 21.78% | 39.87% |