.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ARISE FOR SOCIAL JUSTICE; ¿OISTE?;
NEW ENGLAND STATE-AREA
CONFERENCE OF THE NAACP; REV.
TALBERT W. SWAN, II; NORMAN W.
OLIVER; DARLENE ANDERSON;
GUMERSINDO GOMEZ; FRANK BUNTIN;
RAFAEL RODRIQUEZ; and DIANA NURSE,

          Plaintiffs,

     v.

CITY OF SPRINGFIELD and SPRINGFIELD
ELECTION COMMISSION,

          Defendants.

Civil Action No. 05-30080 MAP

## AFFIDAVIT OF PRESTON H. SMITH, II, Ph.D.

I, Preston H. Smith, II, Ph.D., hereby certify as follows:

1)     I am an Associate Professor of Politics at Mt. Holyoke College in South Hadley, Massachusetts. I have a Ph.D. from the University of Massachusetts in Political Science. I earned a B.A. from Howard University in 1978 with a major in History. I am the Director of the Community Based Learning Program at the Weissman Center for Leadership and the Liberal Arts at Mount Holyoke. My research specialties are class and housing issues within the black community from 1940 until 1960, postwar black politics, and community development. I helped to develop Mount Holyoke's Community Based Learning Program and I teach a course in Community Development. Students enrolled in the Community Development course complete internships at community-based organizations in Holyoke and Springfield. I also teach courses in American Politics; Politics of Black Urban Reform; and Racial Stratification and Urban Political Economy.

2)     I first became an Assistant Professor of Politics at Mount Holyoke in 1992.

3)    Attached hereto as Exhibit A is a true and correct copy of a paper I authored on racial segregation in Springfield and Holyoke (hereinafter the "Report"), which I presented at the Regional Approaches to Ending Housing Segregation conference on April 25, 1995 at the Holyoke War Memorial.  My purpose in authoring the Report was to provide information concerning the prevalence of racial segregation in the Springfield Standard Metropolitan Statistical Area ("SMSA").  Specifically, I focused on housing discrimination and segregation based upon race in the Springfield SMSA.

4)    In the Report, I argue that "patterns of racial concentration in the region are not mainly the result of individual choice, but are shaped by individual and institutional discriminatory practices that force minorities to reside not only in designated cities - Springfield and Holyoke - but also in designated *sections* of those cities."  Report, p. 2.

5)    I further concluded that the movement in the 1980s of Puerto Rican and Black/African American residents out of racially and ethnically concentrated neighborhoods in Springfield and into other areas of the city was more likely the result of spill-over and expansion of the size of those communities, than it was the result of racial integration or dispersion.

6)    I believe that the conclusions set forth in my Report remain true today.  I have kept myself apprised of current academic literature on housing patterns and race.  While I am not aware of any recent literature specifically related to housing patterns and race in Springfield, literature about other comparable municipalities indicates that there have been no changes in the factors that serve to maintain patterns of racial segregation in cities such as Springfield.

7)    For seven years, from approximately 1996 to 2003, I served on the Board of Directors of the Housing Discrimination Project, which now is called the Massachusetts Fair Housing Center.  The Massachusetts Fair Housing Center is dedicated to protecting the rights of all persons to fair and equal opportunities to secure safe and affordable housing.  During that period, I regularly heard complaints of housing discrimination by African Americans and Hispanics living in Springfield.

8)    My knowledge of the academic literature, my experience on the Board of Directors of the Massachusetts Fair Housing Center, my involvement with the Community Based Learning Program, and my experience teaching Community Development at Mt. Holyoke lead me to believe that there have been no significant changes in racially segregated housing patterns in Springfield or the causes of those patterns since I authored the Report.  I believe that

Springfield's housing patterns continue to be shaped by individual and institutional discriminatory practices that force minorities to reside in certain sections of the City.

Signed under penalties of perjury, this $\underline{30}$ day of June, 2005.

_____
Preston H. Smith, II

LIB A/1559212.1

EXHIBIT A

# Racial Segregation in Springfield and Holyoke:
## Historical and Current Trends

by
Preston H. Smith
Assistant Professor of Politics
Mount Holyoke College

Presented at Regional Approaches to **Ending** Housing Segregation conference, on April 25, 1995 at the Holyoke War Memorial.

*Please do not quote or cite without* **permission** *from the author.*

## Introduction

The major theme of this conference is to approach the issue of fair housing from a regional perspective. That means it is important not only to look at regional trends of housing segregation, but also to consider remedies that will have a regional impact. The regional approach to problems of desegregation is not very popular. Witness the recent ruling that found the state of Connecticut *not* responsible for minority children's separate and unequal education. This conference has presentations and workshops that address housing discrimination in a number of different categories including — race, national **origin,** family status, disability, section 8 status, etc. In this **presentation**[1] I focus on housing discrimination and segregation based on race. I examine the residential patterns of African Americans and Puerto **Ricans** in the metropolitan Springfield area and within the cities of **Holyoke** and **Springfield.**[2]

The purpose of my talk is to provide some background and context to the prevalence of racial segregation in the region encompassing the Springfield SMSA (Standard Metropolitan Statistical Area) which includes the cities of Springfield, Holyoke, **Chicopee** and **Westfield,** and the towns of West Springfield, Longmeadow, East Longmeadow, Ludlow, and Agawam. The

---

[1] I like to acknowledge the research assistance provided by **Jeannine** Pinto, an intern at Housing Discrimination Project and a senior at Mount Holyoke College,

[2] Puerto Ricans who have been discriminated against use the national origin category to seek redress. It is a bit confusing since Puerto Ricans are technically citizens of the United States. The category of race is not completely accurate either since some Puerto Ricans identify as "white" thus the discrimination from whites would apparently be on another basis. For the purposes of my talk I will use the category of race to include both African Americans and Puerto Ricans when talking about housing discrimination and residential segregation.

bulk of my presentation though examines the residential patterns of African Americans and Puerto Ricans in Springfield and Holyoke. I argue that patterns of racial concentration in the region are not mainly the result of individual choice, but are shaped by individual and institutional discriminatory practices that force minorities to reside not only in designated cities -- Springfield and Holyoke - but also in **designated** *sections* of those cities. One could argue that the initial Settlement of black and Puerto Rican migrants in predominantly black and Puerto Rican areas occurs voluntarily for reasons of cultural and language familiarity. But I contend it is difficult to embrace this explanation for the slow **outmigration** from these predominantly minority neighborhoods especially when these communities are the poorest neighborhoods in their respective cities. When racial dispersion does occur it is usually into those neighborhoods that border on predominantly minority areas which may offer a slight upgrade in neighborhood quality.

**Current** Racial Concentration in Springfield and Holyoke

If you look at the distribution of racial groups in the region, it is clear that Springfield and Holyoke contain a disproportionate number of blacks and Puerto Ricans. According to the 1990 Census: Holyoke houses **28.8%** of all Latinos in the Springfield MSA. If you add the city of Springfield, both cities together hold **84.7%** of all Latinos. As for blacks, 82.5% of all blacks in the region reside in Springfield. Comparatively the city only houses **28%** of all whites in the region (US Census 1994).

The disparity in racial group distribution is stark when you compare the cities of Holyoke and Springfield with the surrounding cities and towns. Whereas **blacks** make up 19% of the

population of Springfield, they compose less than **2%** in each of the surrounding cities and towns including: **Chicopee** (1.9%), West Springfield and Wilbraham (1.3% each), East **Longmeadow** (1%), **Westfield** (1%), Longmeadow and Agawam (.85% each). Latinos make up 17% of **Springfield** and 30% of Holyoke respective populations, but they range between less than 1% (in each town of East Longmeadow, Agawam, Wilbraham, **Longmeadow respective** populations) to 4% (**Westfield;** 3.6% in Chicopee; 2.8% in West Springfield; and 2% in **Ludlow).** From this statistical picture it is clear that Puerto **Ricans** and blacks are **overrepresented** in the cities of Holyoke and Springfield (US Census 1994).

Beyond regional disparities there are patterns of minority concentration *within* the cities of Springfield and Holyoke. In these two cities Puerto Ricans and blacks are concentrated within specific **neighborhoods** and geographical areas. Puerto Ricans in Holyoke are **located** in four neighborhoods -- the Flats, South Holyoke, Churchill and Downtown -- accounting for **74%** of their total city population. **In** Springfield, Puerto Ricans are concentrated in the North End (**Brightwood** and Memorial Square and the western census tracts of Liberty **Heights**) making **up** 58% of their city **population.**[3] The neighborhoods of **McKnight,** Bay, Old Hill, Upper Hill and Six Corners encompass 60% of Springfield's black population. In contrast, East Forest Park is 2% black and **1%** Latino, and East Springfield is 4% black and **5% Latino.**[4]

At this point we might ask: What accounts for these spatial racial disparities in the

---

[3] **If** you add to those areas the contiguous neighborhoods of Metro Center, you get **68%; and** if you add Puerto Ricans in Six Corners and Old Hill you get **81%;** add South End you get 90% of the total city Puerto **Rican** population (Springfield Planning Department 1993).

[4] Also, Forest Park is 6% black and 8% Latino; Indian Orchard is 10% Latino **and** 8% black. Although Sixteen Acres is 13% black, it is only 4% Latino (Springfield Planning Department 1993).

region? Does "voluntary segregation" account for these disparities? Or can we detect historical and current institutional practices that produce regional and municipal racial segregation?

National **Patterns** of Racial Segregation in the Post WWII period

One way of addressing the concentration of racial groups **within** designated areas of Springfield MSA's is to examine the historical and institutional factors which created racial segregation in cities across the country. In their book, *American Apartheid*, Douglas Massey and Nancy Denton identify policies and institutional dynamics after World War II that expanded black ghettos.[5] The ghettoes were created by pervasive discrimination within private housing markets during and after the Great Migration of southern blacks in the 1920s. **Massey** and Denton point out that what was distinctive about racial segregation after the Second World War was the role the federal government played "not only in maintaining the color line but in strengthening the walls of the ghetto" (1993, 42).

The basic shape of large-city black ghettos was in place by 1930. Despite the Great **Depression,** 400,000 rural blacks migrated to northern and southern **cities** by the end of the decade. Upon arrival to the cities blacks found severe housing shortages. These shortages resulted from the virtual end of housing construction during the Depression and the world war. But the housing scarcity was worse for blacks because of their **restricted** access to white areas of the city due to white racial hostility and discrimination. Therefore, black housing demands were mainly met by dividing large houses or converting basements, garages, and closets into

---

[5]This section is heavily indebted to the excellent chapter, "The Construction of the Ghetto" in Massey and **Denton's** important but flawed book.

4

kitchenette apartments. By 1940, "the ghetto had become an enduring, permanent feature of the residential structure of black community life..." (Massey & Denton 1993, 46).

After the war, pent up housing demand, surplus savings, and governmental mortgage subsidies fueled **massive** suburban residential construction. Whites fled the inner cities seeking single-family homes on spacious lots in the outlying areas beyond city limits. The new suburban residents demanded and received new highways from the federal government to transport them to work and shop downtown.

As whites left the inner cities they were partially replaced by southern black migrants. In the 1950s, 1.5 million blacks moved to cities followed by another 1.4 million in the 1960s. The proportion of blacks in cities often doubled between 1950 and 1970 creating large black pluralities and some black majority cities (Massey & Denton 1993, 45). Black **in-migration,** however, did not alter the basic shape of the ghetto. In fact, Massey and Denton demonstrate that instead "the combination of rapid white suburbanization and extensive black in-migration led to an unprecedented increase in the physical size of the ghetto during the 1950s and 1960s" (45). Racial segregation persisted despite the new racial demographic changes in urban areas. Indeed, these new patterns solidified and extended rigid racial boundaries into the metropolitan area. Massey and Denton found that the "white strategy of ghetto containment and tactical retreat before an advancing color line, institutionalized during the 1920s, was continued after 1945" **(45).** The only change they noted was the speed by which neighborhoods turned from white to black. The pattern of racial turnover had become so universal by this point that all urban neighborhoods could be categorized by their stage in the process of racial transition, namely, "all white, invasion, succession, consolidation, or all black" (46).

Massey and Denton identified three sets of actors that contributed to the creation of the ghettos in the postwar period. They include: a) white homeowners; b) real estate and financial institutions; and c) the federal government.

The racial prejudices of white homeowners and landlords has contributed significantly to denying minorities access to good and affordable housing. In fact, they argue that the permanence of ghettoes and barrios "rests on a foundation of long-standing white racial prejudice." Although there has been a change in attitudes by whites over time, many still feel it is their right to restrict black and brown people's access to their neighborhoods solely on the basis of race. Whites resist (sometimes violently) black and brown residence in their neighborhoods. If whites are unsuccessful in keeping minorities out of their neighborhoods then they leave. Furthermore, new white home-buyers avoid these neighborhoods "guaranteeing racial turnover and resegregation" (49).

The real estate industry's discriminatory behavior reinforced the individual prejudices of white property owners. Once restrictive racial covenants were struck down by a 1948 Supreme Court decision, real estate agents' practice of "racial steering" became more widespread. White real estate agents refused to sell blacks property in white neighborhoods. And they discouraged new white homeseekers from buying in neighborhoods that were experiencing racial transition. In Chicago during the 1950s, 84% of white realtors thought that blacks should be excluded from residing in white neighborhoods. Furthermore, some real estate agents engaged in "blockbusting" by exploiting the racial anxieties of white homeowners in these neighborhoods causing panic selling. These realtors bought homes from fleeing whites at below market rates, then sold them

6

to incoming blacks who had little alternative but to accept the exorbitant prices creating, of course, huge profits for the brokers. In addition to their own discriminatory behavior, the realtors reported widespread discrimination against black homeseekers in securing mortgage loans from banks and savings and loans. The attitudes and actions of individual white property owners and real estate and financial professionals created "systematic, institutionalized racial discrimination within urban housing markets" (51).

The discriminatory actions of white homeowners, realtors, and banks created the ghettoes in the first quarter of the twentieth century. After World War II though, the major factor in institionalizing this discrimination was the role played by the federal government. The federal government first got involved in urban housing markets by promoting homeownership as a way to stimulate the national economy with its Home Owners' Loan Corporation (1933). This agency provided financing (in the form of low interest loans) as a safety net to those homeowners in danger of default or to those who had already lost their homes through foreclosure allowing them to reacquire their properties. The HOLC's most significant legacy however came from its rating system of the investment potential of urban neighborhood which "initiated and institutionalized the practice of 'redlining'" (52). According to a scale of four categories based on a class and race hierarchy, black neighborhoods were rated the lowest category marking them unsuitable for investment capital.

The real estate industry had been using an informal ratings system since the 1920s, but the federal government through HOLC institutionalized this discriminatory practice. Although, the amount of money distributed by HOLC was small, it codified a rating system later adopted by private financial institutions which expanded the practice of the redlining of minority and

7

*poor* neighborhoods. During this period, black communities had to contend with both public and private disinvestment. **(52).**

The federal government followed HOLC with Federal Housing Administration **(FHA)** and Veteran's Administration **(VA)** programs that provided mortgage loans to veterans in the 1940s and 1950s. Both loan programs though adopted the underwriting practices of HOLC and denied many eligible blacks access to a federal guarantee making **granting** mortgages to **blacks more** risky and therefore, less **likely** to occur. According to the 1939 FHA *Underwriting Manual,* "if a neighborhood is to retain stability, it is necessary that properties shall continue to be occupied by the same social and racial **classes"** (quoted on p. 54). In addition to racial bias, these programs favored single family construction over **multifamily** housing rehabilitation by giving the latter less attractive financial terms. These loan programs had the largest impact on the shape of the metropolitan residential market generating a massive capital infusion into the housing industry after the war. It was through these programs that the federal government played the most important role in creating rapid suburbanization.  The FHA and VA programs' preference for suburban construction "contributed significantly to the decline of the inner city by encouraging the selective out-migration of middle-class whites to the suburbs" (53) and thus, forever changing the racial character of the metropolitan area.

Blacks' desire for decent housing was suppressed in two **directions.** They could not secure government or private financing for settling in **white** neighborhoods because it would violate the principle of promoting racial homogeneity. Thus the suburbs were off limits to African Americans. But they also could not secure loans for **purchasing** or rehabilitating properties within inner cities since the ratings that affected investment potential was low. This

**8**

lack of loan capital meant minority owners could not maintain their properties or sell them "leading to steep declines in property values and a pattern of **disrepair,** deterioration, vacancy, and abandonment" (54).

Inner city deterioration facilitated by government loan programs created a spiral of decline in the 1950s. The influx of poor black migrants and the **outmigration** of more affluent whites generated **new** service demands creating a need for tax increases which **in** turn encouraged further white flight. In response to inner city decline, business managers and municipal government officials utilized federal urban renewal policies to clear slum areas that threaten downtown and elite white institutions, for example, hospitals and universities. Most of these blighted areas were inhabited by blacks causing many to rename these policies "Negro **removal.**" External racial hostility forced the black residents displaced by slum clearance (and highway construction) to relocate in other ghetto areas **contributing** to *those* **neighborhoods'** decline by overcrowding the fragile housing stock and overwhelming neighborhood service capacity. Even new public housing projects which was designed to accommodate displaced blacks was restricted by white politicians and neighborhood activists to the black community. During this process of urban renewal blacks suffered a net loss of housing, and the "second ghetto" became a permanent feature of postwar city life.

The process of displacement of minorities and **resegregation** continues unabated today. **Racial segregation** thrives in our major cities creating the typical spatial configuration of a black central city surrounded by white suburbs (67). Denton and Massey still find that whites "continue to avoid neighborhoods located anywhere near established black areas, and they are highly sensitive to the number of black residents" in their own neighborhoods (81). In addition,

9

they found that affluent blacks were still largely limited to segregated housing markets inside and outside of the city. The authors argue that African Americans have been and still are the most segregated group in the United States. Perhaps not surprisingly, the most segregated group of Latinos are Puerto Ricans which the authors attribute to the African origins of this group. The historical and current existence of racial segregation argues powerfully for the continue significance of race when it comes to access to decent housing.

Now I would like to turn to the local history of African Americans and Puerto Paeans to see how it converges or diverges with these larger patterns. I will briefly sketch each group's population growth and residential patterns. Then I will highlight some local practices that are consistent with national trends in racial segregation.

Local Racial Segregation of Blacks and Puerto Ricans

Blacks have a long history in the city of Springfield. Small numbers of blacks have lived in the city since antebellum times (Davis-Harris 1976). Recently, the greatest growth in the population came after 1940. Blacks migrated from the Carolinas which has supplied other Eastern seaboard cities. The African American population almost doubled between 1940 and 1950 from 3,212 to 6,334 (Davis-Harris 1976, 26; US Census 1952). It doubled again during the decade of the 1950s to 13,435. In 1950, blacks constituted only 3.9% of the city's population, but their proportion rose to 12.6% in 1970 (US Census 1952, 1962, 1972).

Blacks' residence in Springfield has historically been relegated to certain designated areas of the city. It appears that the Hill area has contained a significant portion of the black population for some time. But not unlike European immigrants before or Puerto Ricans after

10

them, there was a tendency for new black migrants to settle in the North End. In 1939, blacks resided mostly in the Hill area. The North End contained the second largest concentration of black families followed by a smaller collection in the South End (Springfield Council of Social Agencies [SCSA] 1942, 5). By 1960, though blacks were already concentrated in **five** neighborhoods - **McKnight,** Bay, Upper Hill, Old Hill and Six Corners -- constituting 72.4% of the city's black population (US Census 1960). Urban renewal displaced many blacks from the North End dispersing them into the predominantly black neighborhoods of the Mason Square area (formerly named Winchester **Square).** This trend is evidenced by the reduction of the black population in the Metro Center (census tract 8012) from 1675 in 1960 to 1 in 1970. During the same time period the Upper Hill neighborhood (census tract 8017) increased from 557 to 3,351 residents (US Census 1960 and 1970).

Although blacks have not been locked into a huge ghetto, black families were contained in certain areas of the city. The small number of blacks in the city before 1960 exaggerates the residential mixture of the races in the census tracts. Instead of a single "black **belt",** African Americans lived in racial enclaves before 1960. Afterwards, blacks became more concentrated in the Mason Square area with **82%** of all blacks in the city living there in 1970 (US Census 1970).

An **early indication** of segregated housing conditions came from a 1924 black newspaper advertisement seeking "colored families" for tenement apartments. In the same issue there was an item about a **KKK** cross-burning outside of Palmer which gives us some indication of the racial climate of surrounding communities at that time. More recent evidence comes from a study by the **Springfield** Council of Social Agencies in 1942 which interviewed two hundred

11

"representative Negroes." This report asserted that "ninety-five per cent Of those interviewed stated that there was discrimination against Negroes in securing rentals" (SCSA 1942, 8). The complaints of those interviewed echo those made in larger cities during the time. They reported that "whole sections of the city" were closed to blacks. Moreover, when blacks did get access to formerly white occupied rentals they paid higher rents. In general, these respondents described blacks' housing conditions as "deplorable" (SCSA 1942, 9).

One respondent commented on the availability of FHA loans to blacks. He reports that

It is impossible for a Negro to build an F.H.A. house in Springfield because F.H.A. loans are available only in areas    in which values are high enough to warrant such a loan, and Negroes are not permitted to buy or rent in such areas. (SCSA 1942, 9)

Blacks were also denied access to public housing. Many black leaders sought public housing in order to move blacks out of dilapidated structures. Discriminated against by federal loan programs, blacks were also denied conventional loans from banks because of their alleged financial "irresponsibility" (SCSA 1942, 9).

During the 1960s, blacks protested the lack of employment opportunities, police brutality, and lack of affordable housing. A housing shortage for blacks was highlighted by a full-page newspaper ad seeking housing for families displaced by urban renewal. The ad was signed by citizens and sponsors of the Mayor's Minority Group Housing Committee which said there was "enormous difficulty in finding decent homes for people of minority groups despite the large number of apartments for rent and homes for sale in the city" (quoted in Bauer 1975, 140). So even though housing was available blacks did not have access to it even when they had been displaced because of city policy.

For an individual's experience, I interviewed an African American man who was born

and raised in Springfield. His experience may illustrate the form some discriminatory **practices** took in Springfield's housing market. He remembers living in the Old Hill area off Eastern Avenue after the World War Two. His family was the only black one residing on a block dominated by European immigrant, working class families. He remembers that the family had to get mortgage financing outside of the city in order to purchase the house. No Springfield bank would grant them the mortgage loan. This man had a similar experience as an adult looking to buy a home in the 1960s. He reports that the first four white realtors he and his wife enlisted only showed them houses in black neighborhoods. It was not **until** the fifth realtor that they were shown property in a white neighborhood. Subsequently, he and his wife became the first blacks **to** purchase a home on their block in Sixteen Acres (Interview 1995b).

A critical mass of Puerto Ricans had not arrive to Springfield and Holyoke until 1970. In 1960, there were only roughly 700 Puerto Ricans in Springfield and almost 100 in Holyoke (US Census 1960). Larger numbers of Puerto Ricans came to these cities in subsequent decades. The largest increase of Puerto Ricans in Springfield was over 14,000 which came in the 1980s. Holyoke's Puerto Rican population also experience its largest growth during the 1980s increasing by 7400. According to the 1990 census there were **26,528** Puerto Ricans constituting 17% of Springfield's population, and  13,202 in Holyoke, making up 30% of that city's **population** (Springfield Planning Department 1993).

Puerto **Ricans** who migrated to Springfield and Holyoke left behind widespread poverty and unemployment that resulted from United States economic policies in Puerto Rico. The first arrivals were agricultural migrant workers who worked in Connecticut River Valley tobacco farms seeking inexpensive housing. Subsequent migrants came to Springfield and Holyoke

13

looking for job opportunities in manufacturing. Unfortunately, they arrived when most industrial jobs had relocated to. other parts of the country or had been shipped abroad. In addition, there was some internal migration when Puerto Ricans displaced by urban renewal in Springfield's North End moved to Holyoke (Bratt 1989, 207).

I mentioned before that Puerto Ricans in both cities are concentrated in designated areas. People seem more incline to believe that Puerto Ricans' segregation is voluntary because new migrants want the cultural and language familiarity of predominantly Puerto Rican communities. Extended family patterns in Puerto Rican communities necessitated apartments with three or more bedrooms which were not widely available in Puerto Rican neighborhoods. However, official efforts to address this need by relocating Puerto Rican families in a public housing project outside of the neighborhood backfired according to a 1972 study (US Commission on Civil Rights). These families soon move back to the neighborhood with their familiar churches, and stores (US Commission on Civil Rights 1972, 43). Clearly cultural familiarity is a factor as it is with most migrant groups. But how much of a factor? The report does not mention if Puerto Ricans were welcomed in their new environment. Nevertheless, housing discrimination has long been recognized as a barrier to more dispersion of Puerto Ricans citywide. In fact, the same study reported that "Puerto Ricans find that good housing often is not available to them, even if their income will permit it, when it is discovered that they are Puerto Ricans" (39). This is an good indication that while cultural familiarity is important for new migrants it is hard for long-term, more affluent residents to obtain housing outside the confines of Puerto Rican neighborhoods.

In Holyoke, as I mentioned before Puerto Ricans are overwhelmingly concentrated in

14

four neighborhoods **with** the largest number located in Churchill with currently over 4,000 people (Springfield Planning Department 1993). In particular, Puerto **Ricans** in the South Holyoke neighborhood suffered from a 1968 city plan to **reindustrialize** the area discouraging private investment in residential development. The resulting disinvestment contributed significantly to the decline of the neighborhood hurting its Puerto **Rican** residents. The drying up of capital **led** to housing deterioration and abandonment. Rundown buildings became prime candidates for arson which occurred on an increasing basis in the 1980s. The city was very slow in responding to arson suggesting that its stance was at best neglect, and at worst, a **complicit** desire to clear the land of both the blighted housing and its Puerto Rican inhabitants. Nueva **Esperanza,** a community development corporation building **on** the organizing efforts of earlier groups, fought the city's plan of **reindustrialization** seeking to preserve and enhance the residential character of the neighborhood. Despite tremendous odds, Nueva **Esperanza** has been successful in rehabilitating housing in the neighborhood. It also sought a fair housing plan that the city accepted after much foot dragging and pressure from the state community development agency. The existence of the fair housing plan suggested that this is a major concern of the Puerto Rican residents in South Holyoke, and other neighborhoods **(Bratt** 1989).

Current Trends of Racial Segregation in the Springfield MSA

What is the current situation of racial segregation in **Springfield** and Holyoke? The racial concentration of Puerto Ricans and blacks in Springfield and Holyoke has lessened somewhat in the 1980s. There has been some movement of Puerto Ricans from Memorial Square, **Brightwood,** and parts of Liberty Heights. In 1980, these **neighborhoods** housed 58% of the

city's Puerto Rican population. In 1990, that percentage had decreased to **43%**. (If you add the bordering neighborhoods of the Metro Center and South End the percentages change **from 69%** in 1980 to 55% in 1990.) Most of the movement seems to be into predominantly black **neighborhoods** of **McKnight,** Bay, Upper Hill, Old Hill, and Six Corners. Puerto **Ricans** now make up 32% of Six Corners population and 22% of the Old Hill population (they were 16% and 14% respectively in 1980) [Springfield Planning Department **1993].** The fact that the movement is into bordering neighborhoods and that these neighborhoods are poor suggest more a spill over from traditional Latino areas than unfettered residential dispersion. Perhaps, the main mode of resistance to Puerto **Ricans'** access to open housing according to a housing specialist in Springfield is the apparently neutral form of opposition to **multifamily** housing (Interview, 1995a). Whites' opposition can be couched in housing tenure terms when in fact they fear the poor and Puerto **Rican** tenants that these buildings attract. There has been some increases of Puerto Ricans in predominantly white neighborhoods of Indian Orchard, going from 3 to 9% of the population. Also, there was a fourfold increase of Puerto Ricans in Forest Park (albeit mostly in northern census tracts) in 1990. I should note however that Forest Park experienced the most white **outmigration** in the city from 1980 to 1990. In **Holyoke,** Puerto **Ricans'** concentration in the four neighborhoods decreased from 88% in 1980 to **74%** in 1990. Still, this concentration is extremely high since Puerto Ricans constitute only 30% of the city's **population.**[6]

---

[6]**These** four neighborhoods contained **30.1**% of the total population in Holyoke. If there was proportional distribution of all racial and ethnic groups in every neighborhood, then 30% of all Puerto Ricans not **74%** would be located in these four neighborhoods (Springfield Planning Department 1993; US Census 1990).

African Americans' concentration in five neighborhoods in Springfield has decreased over time. These neighborhoods housed 70% of the black population in 1980 but decreased to 60% in 1990. Both Old Hill and McKnight neighborhoods had a net lost of black residents in the 1980s. Much of blacks' movement seems to be east into Pine Point, Sixteen Acres, and Forest Park with an overall increase of 2,442 residents. The largest movement of blacks was into Forest Park with over a thousand moving there in the 1980s. There was more modest movement of blacks into Indian Orchard, East Springfield and Liberty Heights (an overall increase of 869 people). But there was also westward movement into the poorer neighborhoods of the South End, Six Corners and the Metro Center (an increase of 1,580 people). So the picture is mixed. The movement of blacks into Forest Park and Sixteen Acres has been in those census tracts closest to the black community suggesting again an expanding black community rather than integration (Springfield Planning Department 1993).

The traditional measure of racial segregation has been the dissimilarity index which measures how much neighborhoods or census tracts deviate from citywide racial group proportions. In 1990, whites (including Hispanics) made up 69%; blacks (including Hispanics) constituted 19%; and Hispanics made up 17% of the city of Springfield. In looking at Springfield's neighborhoods from the 1990 census none represented citywide racial proportions. There are 7 neighborhoods that exceed the white citywide proportion of 69% — going from 83% white in Liberty Heights/Atwater to 97% in East Forest Park. There are 8 neighborhoods that meet or exceed the black citywide proportion of 19% — going from 19% black in the South End to 70% in the Bay neighborhood. There are 8 neighborhoods that exceed the Latino proportion of 17% -- with 18% Latino in Bay to 81% in Memorial Square (Springfield Planning

17

Department 1993).

There are not any neighborhoods that represent the **citywide** proportions of three groups but there are some that contain more proportional representation of two groups.

a. Pine Point is 63% white, 29% black, but only 9% Latino.
b. Liberty **Heights/Atwater** is **83% white,** 16% Latino, but **only** 6%      black.
c. Sixteen Acres is **84%** white, **13%** black; but only 4% Latino.
d. South End is **55%** white; **34%** Latino; and 19% black.
(1990 Census)

Six Corners is the neighborhood with nearly equal proportions amongst the three groups: **41%** white; 36% Latino; and 34% black. The Metro Center is 56% white; 30% Latino; and **21%** black. These are poor communities (representing the 5th and 2nd highest percentage of families below poverty level; 6th and 11th highest percentage of residents who are unemployed; and 5th and 3rd lowest median family income) [Springfield Planning Department **1993].**

What is the significance of detecting and correcting patterns of racial segregation? First and foremost, the principle of open and fair housing is a fundamental right of a democratic society. Also, racial segregation tends to lock blacks and Puerto Ricans into neighborhoods that are poor; jobless; consist of older housing stock and contain a majority renter-occupied dwellings suggesting less community land-use control. As a pragmatic matter, minorities have long recognized if they cannot get decent housing in their own neighborhoods because of private and public disinvestment they must integrate white ones to get access to better quality housing. There are some who advocate choosing either neighborhood **revitalization** or residential dispersion as the best vehicle for providing good housing **to** poor and **minority** residents. I believe our goal should be to give Puerto **Rican** and black citizens equal access to affordable and quality housing both *within and outside* of their communities and let them choose to stay or venture into a new

18

environment. The existence of systemic racial **segregation** suggests we are far from a color-blind

society. We need affirmative remedies in the areas of housing, employment, and voting rights

to **reach** our goal of becoming a multiracial democratic society.

19

# References

Interview (1995a). Subject A. April 7, 1995.

Interview (1995b). Subject B. April 8, 1995.

Bauer, F. (1975). *At the Crossroads: Springfield, Massachusetts, 1636-1975.* Springfield, MA: USA Bicentennial Committee of Springfield, Inc.

Bratt, R.G. (1989). *Rebuilding a Low-Income Housing Policy.* Philadelphia: Temple University Press.

Davis-Harris, J.G. (1976). *Springfield's Ethnic Heritage: The Black Community.* Springfield, MA: USA Bicentennial Committe of Springfield, Inc.

Demerath, N.J., III and, & Williams, R.H. (1992). *A Bridging of Faiths: Religion and Politics in a New England City.* Princeton, N.J. Princeton University Press.

Massachusetts Commission Against Discrimination. (1992). *Report on Civil Disorders: Could it happen here?* Boston: Massachusetts Commission Against Discrimination.

Massey, D.S. & Denton, N.A. (1993). *American Apartheid: Segregation and the Making of the Underclass.* Cambridge, MA: Harvard University Press.

Springfield Council of Social Agencies [SCSA]. (1942). *The Social Needs of Negroes in Springfield,Massachusetts.* Springfield, MA: Springfield Council of Social Agencies.

Springfield Planning Department. (1993). *Springfield and its Neighborhoods: Statistical Profile with Selected Population, Housing, Economic and Social Data from the 1990 U.S. Census. Statistical Profile.* Springfield, MA: Springfield Planning Department.

U.S. Census. (1952). *County and City Data Book: 1952.* Washington, D.C. Government Printing Office.

U.S. Census. (1960). *Census Tracts in Springfield-Chicopee-Holyoke,Mass., and Adjacent Area,* Washington D.C. Government Printing Office.

U.S. Census. (1962). *County and City Databook: 1962.* Washington, D.C. Government Printing Office.

U.S. Census. (1970). *Census Tracts in Springfield-Chicopee-Holyoke, Mass.-Conn., SMSA: 1970.* Washington, D.C. Government Printing Office.

20

U.S.Census. (1972). *County and City Databook: 1972.* Washington, D.C. Government Printing Office.

U.S.Census. (1980). *Census of Population and Housing (1980), Census Tracts. Springfield-Chicopee-Holyoke, Mass.-Conn. Standard Metropolitan Statistical Area.* Washington, D.C. Government Printing Office.

U.S.Census. (1983). *County and City Databook: 1983.* Washington, D.C. Government Printing Office.

U.S.Census. (1988). *County and City Databook: 1988.* Washington, D.C. Government Printing Office.

U.S.Census. (1992). *1990 Census of Population and Housing.* Summary Tape File 3A. CD90-3A-26. Washington, D.C.: Bureau of the Census (issued September 1992).

U.S.Census. (1994). County and City Data Book: 1994. Washington, D.C.: Government Printing Office.

United States Commission on Civil Rights. (1972). *Issues of Concern to Puerto Ricans in Boston and Springfield: A Report of the Massachusetts State Advisory Committee to the United States Commission on Civil Rights.* Washington D.C.: Government Printing Office.

21