UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ARISE FOR SOCIAL JUSTICE; ¿OISTE?;
NEW ENGLAND STATE-AREA
CONFERENCE OF THE NAACP; REV.
TALBERT W. SWAN, II; GUMERSINDO
GOMEZ; FRANK BUNTIN; RAFAEL
RODRIQUEZ; and DIANA NURSE,

        Plaintiffs,

  v.

CITY OF SPRINGFIELD and SPRINGFIELD
ELECTION COMMISSION,

        Defendants.

Civil Action No. 05-30080 MAP

### AFFIDAVIT OF ERROL CAMPBELL IN SUPPORT OF
### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Errol Campbell, hereby certify as follows:

1)    I reside at 61 West Alvord Street in Springfield, Massachusetts. I have lived in Springfield for approximately 17 years. I am a 53 year old African-American male. I submit this affidavit in support of Plaintiffs' Motion for Preliminary Injunction in the above-captioned case. I have personal knowledge of the facts stated in this Affidavit.

2)    I served as Ms. Carol Lewis-Caulton's campaign manager when Ms. Lewis-Caulton ran for the Springfield, Massachusetts City Council ("City Council") in 1997, 1999, 2001 and 2003. In addition, I have been politically active in my community as secretary to the Springfield chapter of the National Association for the Advancement of Colored People in approximately 1996-1997, and as a member of the Springfield Million Man March Committee.

3) In 1997, Ms. Lewis-Caulton lost her race for City Council. In 1999, Ms. Lewis-Caulton won a seat on the City Council by a small margin, and then served a single two-year term. Ms. Lewis-Caulton ran for re-election in 2001, but lost. Ms. Lewis-Caulton ran again for City Council in 2003, and again lost. Ms. Lewis-Caulton is the only African-American woman ever elected to the City Council.

4) During the 1997 campaign, Ms. Lewis-Caulton and I decided that I, and other African-American men, would stop attending certain campaign events in predominantly white neighborhoods. Our decision was based on a number of factors. First, a member of the Massachusetts state legislature told Ms. Lewis-Caulton, during the 1997 campaign, that Ms. Lewis-Caulton should not campaign with me, or other African-American males, because voters would feel threatened or intimidated by African-American men. Additionally, Ms. Lewis-Caulton and I believed, based on our experiences living and campaigning in Springfield, that African-American men were not received well in predominantly white neighborhoods in Springfield, and that Ms. Lewis-Caulton's campaign was adversely affected by my presence in those neighborhoods.

5) Before making the decision to stop attending certain events, I had regularly attended debates and other campaign events with Ms. Lewis-Caulton in predominantly white neighborhoods, as well as in predominantly African-American and Latino/Hispanic neighborhoods. When I attended events in predominantly white neighborhoods, I frequently felt unwelcome due to behavior that I perceived as race-based. For example, during the 1997 City Council campaign, I attended a debate with Ms. Lewis-Caulton at the Goodwill Center in Ward 5, which is in a predominantly white neighborhood. I felt generally unwelcome at that debate, and noticed my presence affected Ms. Lewis-Caulton's reception; in particular, I noticed that

people attending the debate tended not to approach Ms. Lewis-Caulton if I was standing with her, but that people freely approached her if I was not nearby. I never felt unwelcome because of my race when attending campaign events in predominantly African-American and Latino/Hispanic neighborhoods.

6) For the remainder of the 1997 campaign, I frequently did not appear with Ms. Lewis-Caulton when she campaigned in predominantly white neighborhoods. Ms. Lewis-Caulton and I employed this strategy with greater frequency during the 1999, 2001, and 2003 campaigns than we had during the 1997 campaign. For example, during the 1999 campaign, I did not attend a debate held at Our Lady of Mercy in Ward 2, and I also did not attend a campaign event at the Frederick Harris School in Ward 7, both of which are in predominantly white neighborhoods. I continued, during the 1999, 2001 and 2003 City Council campaigns, to attend campaign events and to appear with Ms. Lewis-Caulton in predominantly African-American and Latino/Hispanic neighborhoods.

7) In addition to not appearing with Ms. Lewis-Caulton while she was campaigning in predominantly white neighborhoods, I and other African-American men generally did not appear at "stand-outs" for Ms. Lewis-Caulton in predominantly white neighborhoods. At a stand-out, volunteers would typically hold campaign signs for Ms. Lewis-Caulton and wave at passers-by in busy intersections. I started organizing stand-outs for Ms. Lewis-Caulton during the 1999 campaign, and continued to do so during the 2001 and 2003 campaigns. For about one month before election day, I would organize about three stand-outs per week, each at a different location in Springfield. For stand-outs in predominantly African-American or Latino/Hispanic neighborhoods, I would participate, and I would generally recruit African-American and Latino/Hispanic supporters of Ms. Lewis-Caulton to participate. I did not have difficulty

recruiting African-American or Latino/Hispanic volunteers to appear at stand-outs. For stand-outs in predominantly white neighborhoods, I would generally not participate; instead, I would go to the location of the stand-out to distribute campaign signs to the volunteers, but would wait in my car. I had difficulty recruiting enough white supporters from Springfield to appear at stand-outs for Ms. Lewis-Caulton. After continued difficulty recruiting white volunteers from Springfield, I began to recruit white individuals from outside of Springfield to participate in stand-outs in predominantly white neighborhoods. I, and other African-American men, only participated in stand-outs in predominantly white neighborhoods when there were not enough white volunteers.

Signed under penalties of perjury, this 6th day of July, 2005.

Errol Campbell