UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ARISE FOR SOCIAL JUSTICE;  )
¿OISTE?; NEW ENGLAND STATE-AREA  )
CONFERENCE OF THE NAACP;  )
REV. TALBERT W. SWAN, II;  )
NORMAN W. OLIVER; DARLENE  )
ANDERSON; GUMERSINDO GOMEZ;  )
FRANK BUNTIN; RAFAEL RODRIQUEZ;  )
and DIANA NURSE  )          Civil Action No. 05-30080-MAP
  )
          Plaintiffs,  )
  )
    v.  )
  )
  )
CITY OF SPRINGFIELD and SPRINGFIELD  )
ELECTION COMMISSION  )
  )
          Defendants.  )
  )

## MEMORANDUM SUPPORTING DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I.    **Introduction and Summary**

In their Complaint, the Plaintiffs allege that the at-large method of electing the City Council and School Committee in Springfield violates Section 2 of the Voting Rights Act, the Equal Protection Clause of the Fourteenth Amendment, and the Fifteenth Amendment. On July 18, 2005, they filed a motion to enjoin the Election Commission from carrying out the next scheduled election for City Council. The Defendants oppose that motion.

In order to prevail on their motion, the Plaintiffs must convince this Court: (1) that there exists a substantial threat that they will suffer irreparable injury if their injunction request is not granted; (2) that the threatened injury to them outweighs the threatened harm the injunction may visit upon the Defendants; (3) that granting the injunction will not disserve the public interest; and

(4) that there is a substantial likelihood that they will ultimately prevail on the merits of their claims. The Plaintiffs cannot meet their burdens in this regard.

First, the Plaintiffs will not be harmed if the fall election proceeds as planned. That election will provide a public forum for the Plaintiff's view. In addition, it will provide the Court with more data on which to base its decision on the merits in this case. Moreover, it is possible that in the fall election the citizens of Springfield will elect councilors who favor ward representation, thereby achieving politically what this suit seeks to achieve judicially. Indeed, it is puzzling that the Plaintiffs are seeking to enjoin the fall election at all. Enjoining the election will ensure that councilors who oppose ward representation remain seated indefinitely. Enjoining the election is the single best way to ensure that a council, with a racial make-up to which the Plaintiffs object, remains in place until this suit is resolved on the merits.

Second, the interests of the City and the Election Commission in providing the electorate with an opportunity to voice its dissatisfaction with, or support for, current city councilors, will be seriously harmed if the fall City Council election does not proceed as planned. The City and the Election Commission have a strong interest in ensuring that, on a regular basis, voters in the City have an opportunity to reelect or replace current city councilors. Accordingly the harm to the Defendants outweighs any alleged harm to the Plaintiffs.

Third, the public interest will not be served if this Court enjoins the fall City Council election. If the election is enjoined, current city councilors will serve indefinitely beyond their current terms without being reelected. Such a result would not be fair to those who seek to unseat them. Nor would it be fair to the electorate which has a right in our municipal democracy to voice its support for, or dissatisfaction with, current councilors. Enjoining this election will deprive the electorate of that right. The public interest weighs heavily against enjoining the scheduled City

Council election. The electorate, and not this Court, should be the body that decides whether sitting city councilors stay or go in 2006.

Finally, the Plaintiffs have not produced sufficient evidence to establish a substantial likelihood of success on the merits. In order for Plaintiffs to succeed on the merits they need to show: (1) that Black/African American and Hispanic/Latino voters are sufficiently numerous and geographically compact to constitute an effective majority in single-member districts; (2) that minority voters are politically cohesive; (3) that white persons vote sufficiently as a bloc to usually defeat the candidates of choice of minority voters; and (4) that a searching practical evaluation of the past and present reality, demonstrates that the political process is not equally open to minority voters.

Plaintiffs satisfy this first requirement by creating nine single member districts, one of which would be a majority Black/African American district and two which would be majority Hispanic/Latino districts. One Black/African American district may well be a step backward in a City that has in the past elected two Black/African Americans at large. Under the at-large method of election, Black/African American and Hispanic/Latino voters have the potential to influence the election of all nine members of the City Council equal to their proportion of the voting age population. In Plaintiffs' proposed plan the potential to influence the election of members to the City Council is reduced to only three Councilmembers – those who would serve the majority Black/African American and for Hispanic/Latino districts. That said, the Plaintiffs do not dispute that the Plaintiffs Black/African American and Hispanic/Latino voters are sufficiently numerous and geographically compact to constitute an effective majority in single-member districts.

As to the second requirement – that minority voters are politically cohesive - the Plaintiffs' evidence is inconclusive at best. The Plaintiffs have presented no evidence that Black/African American and Hispanic/Latino voters prefer and support the same candidates. In one instance,

3

Plaintiffs' evidence shows that the lack of Hispanic/Latino support may account for the loss of a Black/African American incumbent who was cohesively supported by Black/African American voters. Plaintiffs' evidence further shows that Black/African American voters have not cohesively supported all of Black/African American candidates equally and Hispanic/Latino voter cohesion is not equal to that of Black/African American voters. Indeed, if Hispanic/Latino cohesion remains as estimated by the Plaintiffs' expert, and if Hispanic/Latino voters turn-out remains low as it has been in the past, Hispanics/Latinos may not be elected to represent the Plaintiff's two proposed Hispanic/Latino districts.

As to the third requirement - that white voters vote sufficiently as a block to defeat candidates of choice of minority voters – the Plaintiffs also fail to present sufficient evidence. The Plaintiffs' experts' analysis demonstrates that white voters support the minority candidates most preferred by minority voters in numbers sufficient to elect those candidates. Indeed, Black/African American and Hispanic/Latino voters have frequently been proportionately represented on the City Council – a fact that supports a conclusion that Black/African American and Hispanic/Latino voters enjoy roughly proportional electoral opportunities.

In support of their arguments on the fourth requirement – that the political process is not equally open to minority voters, the Plaintiffs present significant demographic and socio-economic data. They point out correctly that in terms of socio-economics African Americans and Hispanics are worse off than Whites. They also present testimony that some members of minority communities have felt unwelcome at predominately white political gatherings. The City of Springfield, its government, and its citizens need to address both of these circumstances, and more work certainly needs to be done to ensure and promote respect for the diversity and quality of life of all of the City's residents. Nevertheless, these assertions do not constitute the required showing that Black/African American and Hispanic/Latino voters in the City of Springfield have been

4

subject to a history of official discrimination that has touched their rights to register, to vote, or to otherwise participate in the political process.

Plaintiffs argue that it would be easier and less costly for minority candidates to campaign and win in districts in which most of the residents were of the same race or ethnicity or socio-economic background and that "ward representation" would foster the election of members of the City Council who currently reside in each of the City's nine wards. In the absence of evidence that minority voters are shut out of the political process or that minority candidates cannot get elected, issues related to the ease of campaigning or the residences of elected City Councilors are not relevant - as a legal matter - to a Section 2 claim.

In sum, Plaintiffs have simply failed to provide evidence to satisfy the requirements that would justify enjoining the 2005 election.

## II. Factual Background
### A. Demographics: City and Wards

1. According to the 1960 Census, "white" persons represented 93.7 percent of the voting age population (104,012 persons) and "non-white" persons represented 6.3 percent of voting age population (7,026 persons) in the City of Springfield (7,026 persons).[1]

2. According to the 1970 Census, "white" persons represented 89.7 percent of the voting age population (91,079 persons); "Negro" persons represented 9.9 percent of voting age population (10,008 persons); and persons of Spanish origin or descent represented 4.8 percent of the voting age population (4,822 persons) in the City of Springfield.[2]

3. According to the Urban League of Springfield and the 1970 Census, the total population by ward was as follows:

---

[1] In 1960, persons could identify themselves either as white or nonwhite. Moreover the legal voting age was 21 years.

[2] In 1970, persons could identify themselves either as white or Negro (and other races) and separately were provided choices regarding country of origin. Accordingly those identifying themselves as "white" or "Negro" did not exclude those also identifying themselves as "persons of Spanish origin or descent" or "persons of Puerto Rican birth and parentage."

|             | Ward 1 | Ward 2 | Ward 3 | Ward 4 | Ward 5 | Ward 6 | Ward 7 | Ward 8 |
|-------------|--------|--------|--------|--------|--------|--------|--------|--------|
| *Total Pop.* | 10,901 | 26,140 | 17,760 | 11,948 | 18,294 | 16,223 | 24,118 | 38,521 |
| *Black TPop* | 09.8% | 00.6% | 12.9% | 64.5% | 45.9% | 00.7% | 00.4% | 03.8% |
| *Spanish-speaking TPOP* | 28.8% | 02.3% | 03.5% | 01.5% | 01.9% | 00.6% | 00.5% | 00.8% |

*Voting Behavior in Springfield, A Statistical and Analytic Report*, September 1973, "prepared under the auspices" of the National Urban League Voter Registration-Education Project, Henry M. Thomas, III, Director (First Report)(Exhibit A)

4.  According to the 1980 Census, "white" persons represented 81.2 percent of the voting age population (89,603 persons); "Black" persons represented 13.9 percent of voting age population (10,008 persons); and persons of "Spanish origin" represented 6.0 percent of the population (6,621 persons) in the City of Springfield[3]

5.  According to the Urban League of Springfield and the 1980 Census the total population by ward was as follows:

|             | Ward 1 | Ward 2 | Ward 3 | Ward 4 | Ward 5 | Ward 6 | Ward 7 | Ward 8 |
|-------------|--------|--------|--------|--------|--------|--------|--------|--------|
| *Total Pop.* | 9,377 | 22,967 | 15,810 | 10,125 | 16,545 | 16,203 | 19,584 | 41,708 |
| *Black TPop* | 09.3% | 02.5% | 18.7% | 70.4% | 56.9% | 01.4% | 01.0% | 09.3% |
| *Spanish origin TPOP* | 65.1% | 09.4% | 10.6% | 10.2% | 07.6% | 02.3% | 00.8 | 01.9% |

*Voting Behavior in Springfield, A Statistical and Analytic Report*, Second Edition, 1973-1982, prepared by the Urban League of Springfield, Inc., Ronald E. Peters, Chairman, Board of Directors; Henry M. Thomas, III, President (Second Report)(Exhibit B):

---

[3] In the 1980 Census, persons could identify themselves as belonging to a particular race, e.g., white or black (and other races) and could also identify themselves as "of Spanish origin." Accordingly, it does not appear that the data regarding the number of persons identifying themselves as white or black exclude those also identifying themselves as "of Spanish origin."

6. According to the 1990 Census, "white" persons represented 69.6 percent of the voting age population (79,906 persons); "Black" persons represented 16.4 percent of voting age population (18,891 persons); and Hispanic persons (regardless of race) represented 12.8 percent of the population (14,711 persons) in the City of Springfield .[4]

7. According to the 2000 Census, 19.6 percent of the total population of the City of Springfield identified themselves as Black/African-American (alone); 27.2 percent identified themselves as Hispanic/Latino (regardless of race); and 4.3 percent identified themselves as some other race or as two or more races.

8. According to the 2000 Census, 18.1 percent of the voting age population of the City of Springfield identified themselves as Black/African-American (alone), and 21.8 percent identified themselves as Hispanic/Latino (regardless of race), and 4.0 percent identified themselves as some other race or two or more races.

9. Using the 2000 Census, the Massachusetts Voter Education Project (MassVote) derived the following:

a) Ward One was comprised of a total voting age population of 12,866 of whom 12.4 percent were Black/African American and 51.2 percent were Hispanic/Latino (regardless of race)

b) Ward Two was comprised of a total voting age population of 14,139 of whom 06.9 percent were Black/African American and 20.8 percent are Hispanic/Latino (regardless of race)

c) Ward Three was comprised of a total voting age population of 12,414 of whom 19.3 percent were Black/African American and 37.4 percent were Hispanic/Latino

d) Ward Four was comprised of a total voting age population of 12,914 of whom 53.1 percent were Black/African American and 19.6 percent were Hispanic/Latino (regardless of race)

e) Ward Five was comprised of a total voting age population of 13,764 of whom 24.1 percent were Black/African American and 10.9 percent were Hispanic/Latino (regardless of race)

f) Ward Six was comprised of a total voting age population of 14,033 of whom 07.8 percent were Black/African American and 11.9 percent were Hispanic/Latino (regardless of race)

---

[4]The 1990 Census provided data as to the number of persons who are non-Hispanic white or black (or any other racial group). At this juncture, we have been unable to locate 1990 Census data by ward.

g) Ward Seven was comprised of a total voting age population of 14,638 of whom 07.6 percent were Black/African American and 04.8 percent were Hispanic/Latino (regardless of race)

h) Ward Nine was comprised of a total voting age population of 13,285 of whom 16.5 percent were Black/African American and 14.7 percent are Hispanic/Latino (regardless of race)

### B. *Neighborhoods: Demographics and Neighborhood Council*

10. There are 17 neighborhoods in the City of Springfield: Indian Orchard, East Springfield, Liberty Heights/Atwater, Memorial Square, Brightwood, Metro Center, South End, Six Corners, Old Hill, McKnight, Bay, Upper Hill, Pine Point, Boston Road, Sixteen Acres, East Forest Park and Forest Park. *Statistical Profile: Springfield and its Neighborhoods*, prepared by the Springfield Planning Department, May 1993 (Statistical Profile 1990) (Exhibit C).

11. The following chart provides 1990 Census and 2000 Census data for these 17 neighborhoods, as well as the total population according to the 2000 Census:

| Neighborhood | Hispanic Pop (regardless of race) | | non-Hispanic Black Pop | | Total PoP |
|---|---|---|---|---|---|
| | 1990 Census | 2000 Census | 1990 Census | 2000 Census | 2000Census |
| *Bay* | 18.0 | 28.2 | 67.3 | 60.3 | 4,256 |
| *Boston Road* | 04.8 | 15.7 | 12.8 | 17.0 | 3,670 |
| *Brightwood* | 78.2 | 85.2 | 10.3 | 06.2 | 3,936 |
| *East Forest Park* | 01.5 | 05.2 | 02.4 | 05.8 | 10,618 |
| *East Springfield* | 05.2 | 20.6 | 03.5 | 07.3 | 6,317 |
| *Forest Park* | 08.2 | 22.0 | 05.2 | 13.4 | 24,733 |
| *Indian Orchard* | 09.8 | 20.4 | 07.5 | 10.0 | 9,095 |
| *Liberty Heights* | 16.0 | 37.8 | 04.8 | 08.6 | 17,789 |
| *McKnight* | 18.3 | 26.7 | 57.8 | 52.6 | 4,881 |
| *Memorial Square* | 81.3 | 84.7 | 03.9 | 06.0 | 4,889 |
| *Metro Center* | 30.2 | 44.8 | 19.3 | 20.7 | 6,038 |
| *Old Hill* | 25.3 | 37.4 | 62.2 | 53.8 | 4,557 |
| *Pine Point* | 08.8 | 19.1 | 28.6 | 31.8 | 0,286 |
| *Six Corners* | 34.1 | 47.6 | 31.2 | 24.5 | 7,688 |
| *Sixteen Acres* | 03.5 | 08.3 | 12.3 | 15.1 | 22,937 |
| *South End* | 34.1 | 62.2 | 18.0 | 11.1 | 3,223 |
| *Upper Hill* | 09.2 | 13.1 | 59.2 | 53.4 | 7,179 |

8

*Statistical Profile: Springfield and its Neighborhoods*, prepared by the Springfield Planning Department, March 2003 (Statistical Profile 2000) (Exhibit D).

12. Currently there are the following 11 neighborhood councils: Bay Area Neighborhood Council, Hungry Hill Neighborhood Council, Indian Orchard Neighborhood Council, Maple-High/Six Corners Neighborhood Council, McKnight Neighborhood Council, New North Neighborhood Council, Old Hill Neighborhood Council, Pine Point Community Council, South End Citizens Council, Upper Hill Residents Council, and East Springfield Neighborhood Council. In addition, there are the following 12 civic associations: Armoury Quadrangle Civic Association, Atwater Park Civic Association, Boston Road Civic Association Chapin Terrace Association, East Forest Park Civic Association, Forest Park Civic Association, LaBroad Civic Association, Lower Liberty Heights Community Action Team, Mattoon Street Historic Preservation Association, Outer Belt Civic Association, Sixteen Acres Civic Association, and the Vietnamese/American Civic Association.[5] (Exhibit E)

13. Neighborhood Councils are elected, receive funding from the Office of Housing for an office and a staff and pre-approve all zoning permits and business locations in their respective neighborhoods. They conduct monthly or bi-monthly meetings and function as a "clearing house" for information relevant to the quality of life in the neighborhood that they serve. They also function as a liaison between the citizens of the neighborhoods that they represent and City government and the City Council.

## C. *Changes in the Method of Election*

14. Since 1961, elections for the School Committee and City Council have been conducted concurrently, with the "winners" determined by a plurality of the vote. Non-partisan primary elections are held when the number of candidates qualifying to run for City Council exceeds 18 or the number of candidates qualifying to run for School Committee exceeds six. M.G.L. c.43, §44G. Where a primary election is held, the 18 City Council candidates and six School Committee candidates receiving the most votes advance to the general election. M.G.L. c.43, §44B. Electors may vote for as many as nine City Council candidates and as many as six School Committee candidates. Accordingly there is no

---

[5]According to the 2000 Census, the greatest number of "Asians" (1,212) reside in Forest Park.

prohibition against single-shot voting and neither City Council nor School Committee elections are subject to a numbered post requirement.

15. Prior to 1961, Springfield's legislative body was bicameral. An 18-member Common Council was elected in partisan elections from the City's eight wards. The eight-member Board of Aldermen was elected in partisan at-large elections from residency districts.

16. In 1959, the electorate voted to abolish this structure of its governing authority and adopt what is known as the "Plan A" form of government, M.G.L. c.43, §§46-55, which established a mayor-council form of government. "Plan A" provides for a mayor with significant powers and a nine-member City Council, elected at large in non-partisan elections to two-year, non-staggered terms. "Plan A" further provided for a six-member School Committee, elected at-large in non-partisan elections to four year, staggered terms. M.G.L. c.43, §31.

17. The inefficiency of the pre-1961 form of government, the absence of a "strong" mayor, the ability of candidates to be elected with few votes in multi-member wards, a culture of ward patronage, and the absence of elected officials who were concerned about the City as a whole were among the reasons for the change in the form of governance and in its method of election.

18. In 1963, Springfield electors were presented with a ballot initiative that would have increased the number of city councilors to 13. The ballot initiative proposed that one member of the City Council would have been elected from each of the City's eight wards and five members elected at large ("8-5 mixed method of election"). (Exhibit F). The initiative not only failed to receive support from a majority of those casting a ballot, but also resoundingly failed to receive the support of the required one-third of the registered voting population to render it binding.[6] M.G.L. c. 43, §42

    a) Of those casting a ballot in the 1963 initiative, 19.9 percent favored the change to the 8-5 mixed method of election, 50.1 percent voted against the change to the 8-5 mixed method of election; and 30.0 percent left the ballot blank.

    b) In Ward One 2,999 people turned-out to vote, of whom 28.2 percent of those casting a ballot voted for and 29.1 percent voted against the proposed 8-5 mixed method of election for the City Council; 42.6 percent left the ballot blank.

---

[6] Over-all turn-out in the 1963 election was 58 percent according to the Urban League First Report at 21.

c) In Ward Four 2,867 people turned out to vote, of whom 26.0 percent of those casting a ballot voted for and 35.1 percent voted against the proposed 8-5 mixed method of election for the C ty Council; 38.4 percent left the ballot blank

d) In Ward Five, 3,821 people turned out to vote, of whom 24.2 percent of those casting a ballot voted for and 47.5 percent voted against the proposed 8-5 mixed method of election for the City Council; 28.3 percent left the ballot blank

19. In the 1977 City election, Springfield voters considered two separate initiative questions that proposed a change in the method by which members of the City Council (Question 1) and the School Committee (Question 2) were elected to "district representation."[7] (Exhibit G). Again the initiatives failed to attract the support of a majority of those casting a ballot and failed to receive the required support of one-third of the registered voter population.[8] M.G.L. c. 43, §42

a) Of those voters casting a ballot in the 1977 elections, 19.3 percent voted for districts representation for the City Council and 18.9 percent voted for district representation for the School Committee

b) Of those voters casting a ballot in the 1977 elections, 44.5 percent voted against districts representation for the City Council and 43.1 percent voted for district representation for the School Committee

c) Of those voters casting a ballot in the 1977 elections, 36.6 percent left the ballot initiative blank as to the City Council (Question 1) and 38.3 percent left the ballot blank as to the School Committee (Question 2)

d) In Ward One 768 people turned out to vote
  i) 24.0 percent of those casting a ballot voted for district representation for and 29.2 percent voted against district representation for the City Council; 50.7 percent left the ballot blank.
  ii) 22.4 percent of those casting a ballot voted for and 27.2 percent voted against district representation for the School Committee; 54.4 percent left the ballot blank.

f) In Ward Four, 1,141people turned out to vote
  i) 27.7 percent of those casting a ballot voted for and 24.5 percent voted against district representation for the City Council; 47.8 percent left the ballot blank.
  ii) 22.4 percent of those casting a ballot voted for and 27.2 percent voted against district representation for the School Committee; 54.4 percent left the ballot blank.

---

[7] Question #1: "Change the structure of the City Council to provide for District Representation". Question #2: "Change the structure of the City Council to provide for District Representation" See Exhibit _.

[8] Over-all turn-out in the was 42.3 percent according to the Urban League Second Report at 28-36.

g) In Ward Five, 1,842 people turned out to vote
    i) 24.5 percent of those casting a ballot voted for and 35.6 percent voted against district representation for the City Council; 44.5 percent left the ballot blank.
    ii) 24.1 percent of those casting a ballot voted for and 34.5 percent voted against district representation for the School Committee; 45.8 percent left the ballot blank.

20.  In 1987, Springfield voters were once again presented with a ballot initiative[9] that proposed a mixed method of election in which some members would have been elected at large and other elected from single-member districts or wards ("mixed method of election")[10] (Question 3). (Exhibit H).  Yet again, the initiative was defeated, having failed to attract the support of a majority of those casting a ballot and to receive the required support of one-third of the registered voter population. M.G.L. c. 43, §42

a) Of those voters casting a ballot in the 1987 elections, 23.1 percent voted for and  27.3 percent voted against the mixed method of election for the City Council; 49.6 percent left this initiative blank.

b) In Ward One, of the 1,886 persons casting a ballot in the 1987 election, 20.4 percent voted for and 23.1 percent voted against the adoption of a mixed method of election; 43.5 percent left the ballot blank as to Question 3.

c) In Ward Four, of the 2,127 persons casting a ballot in the 1987 election, 16.8 percent voted for and 10.0 percent voted against the adoption of a mixed method of election; 73.2 percent left the ballot blank as to Question 3.

d)  In Ward Five, of the 2,909 persons casting a ballot in the 1987 election, 28.1 percent voted for and 29.7 percent voted against the adoption of a mixed method of election; 42.2 percent left the ballot blank as to Question 3.

21.  In 1997, a ballot initiative proposed to change the method of electing the City Council and an increase in the size of the City Council.  Question 1 proposed an eleven-member council that consisted of one member elected from each of the City's eight wards and three members elected at large (8-3 mixed

---

[9]A proposal to increase the term of office for the City Council from two to four years was also defeated (Question 2). Of the 24,548 persons to cast a ballot, 19.4 percent voted for and 36.6 percent voted against the longer term-of-office; the remainder of those casting a ballot left it blank.

[10] The 1987 initiative did not propose a specific number of single-member districts or number of members to be elected at large.

method of election).[11] (Exhibit I)   Again the initiative failed to receive the requisite one-third support of

the registered voter population to constitute a binding referendum.  M.G.L. c. 43, §42.

a) The voter turn-out in the 1997 referendum was 26.5 percent of the total registered voters for the City of Springfield.  Only 13.6 percent of the registered voters in the City of Springfield supported the initiative proposing the 8-3 mixed method of election for the Springfield City Council.

b) Of the 20,112 persons who cast a ballot in the 1997 initiative, 51.4 percent voted for and 36.5 percent voted against a change to the 8-3 mixed method of election; 12.1 percent left the initiative blank.

c) In Ward One, 1417 persons turned out to vote;  26.3 percent of the registered voters supported the adoption of the 8-3 mixed method of election.

d)  In Ward Three, 1,225 persons turned out to vote; 08.9 percent of the registered voters supported the adoption of the 8-3 mixed method of election.

e) In Ward Four, 1,505 persons turned out to vote; 13.3 percent of the registered voters supported the adoption of the 8-3 mixed method of election.

## D.  *City Council and School Committee Elections: 1991 to Present* [12]

22.  Beginning with the 1991 elections, 12 Black/African-American persons have run for

Springfield City Council at least once.  Three of these Black/African-American candidates have been

elected at least once.  Of the remaining nine candidates, only three have been among the "top" 12 "vote-

getters:" Darnell Williams placed eleventh in 1993, Etta Hill placed twelfth in 1995, and Charles Rucks

finished twelfth in 2001.  Of these twelve Black/African-American candidates, five sought election more

than once; of those five, three were successful at least once:  Morris Jones, see, infra at ¶27, Carol Lewis-

---

[11]In the 1990s, Hispanic/Latino persons constituted a majority of the voting age population in only one ward – Ward One.  Likewise, Black/African American persons constituted a majority of the voting age population in only one ward – Ward Four.  Assuming – without admitting – the Plaintiffs' contention that at-large elections do not provide Black/African American and Hispanic/Latino voters with an opportunity to elect or that the at-large positions on the City Council will be most competitive for those incumbents who reside in the same ward and wish to avoid a head-to-head contest, it appears likely that this proposed 8-3 method of election would *not* provide to minority persons as much (proportional) representation on an 11-member council as the challenged method provides on a nine-member council.  Moreover, much of the campaign literature generated and available in the minority community explained the preferability of 8-3 method of election in terms of providing an opportunity for the election of residing in Wards 1, 3, 4, and 8.  Accordingly, it would be difficult to assess the basis of the support for or rejection of the 8-3 method of election, which might well ensure that a majority of the members of the City Council will remain white in the face of a growing minority population in the City of Springfield and more importantly might dilute the voting strength of both Black/African American and Hispanic/Latino persons now or in the future.

[12] See Declaration of Election Commissioner Denise Jordan  at ¶¶15-28, ("Jordan Dec.") Defendants' Memorandum (Exhibit L) for more information about the City Council and School Committee elections from 1991 to 2003.

Caulton, and Bud L. Williams, the current incumbent. <u>See</u> Declaration of Bud L. Williams, Defendants' Memorandum ("Williams Dec.")(Exhibit J)

23. Beginning with the 1991 elections, five Black/African-American candidates have run for Springfield School Committee at least once. Of those five candidates, three were elected at least once. Both of the two Black/African-American candidates who were not elected finished fifth (of six) in total votes received.

24. Beginning with the 1991 elections, six Hispanic/Latino candidates have run for the City Council. Of those six candidates, only one candidate, Jose Tosado, was successful. <u>See</u> Declaration of Jose Tosado, Defendants' Memorandum ("Tosado Dec.") (Exhibit K) Of the remaining five candidates, only one Hispanic/Latino candidate finished among the "top" twelve "vote-getters." Of the six Hispanic/Latino candidates, only Mr. Tosado sought election to the Springfield City Council more than once. He was not successful until his second "run" for a position on the City Council.

25. Beginning with the 1991 elections, four Hispanic/Latino candidates ran for Springfield School Committee. Of those four, two were successful the first time they sought a position on the School Committee. Both of the two remaining Hispanic/Latino candidates finished sixth (of six) in total votes received.

E. *Minority Electoral Success and Proportionality*

26. Prior to the adoption of the at-large method of electing members to the School Committee, the School Committee was comprised of nine members – one member elected from each of the City's eight wards and one member elected at large. Ms. Esther McDowell, a Black/African-American, was elected to and served on the School Committee from 1952-1956. J. Arthur Hickerson, a Black/African-American, was elected to the School Committee in its first at-large election in 1961. Since that time, the following Black-African-American persons have been elected to and served on the School Committee: Dr. Walter English (1972-1976), Rev. Ronald Peters (1980-1986), Candice Lopes (1988-1992), Robert McCollum (1990-2000; 2003-2004); and Marjorie Hurst (1998-precent). Since that time, the following

Hispanic/Latinos have been elected and served on the Springfield School Committee: Carmen Rosa (1994-1998) and Jose Tosado (2000-2003).[13]

27. At the time that the electors of the City of Springfield voted to adopt "Plan A," M.G.L. c.43, §§46-51, two members of the Common Council were Black/African-American persons, William A. Grant and W. Robert McDonald. Prior to that time, the following Black/African-Americans had been elected to – and served on – the Common Council: Alford H. Tavernier (1928-1931), J. Clifford Clarkson (1938-1943), James Higgins (1944-1949), Paul R. Mason (1950-1959), Rodman G. Johnson (1952-1957). In 1968, the first Black/African-American, Paul R. Mason, was elected at large to the City Council, having previously served on the Common Council in the 1950s.

28. According to the 1960 Census *6.3 percent* of voting age population was "non-white."

a) By 1968, *11.1 percent* (one of the nine members) of the membership of Springfield City Council was Black/African-American.

b) In 1961, *16.7 percent* (one of the six members) of the membership of the School Committee was Black/African American.

29. By 1970, the United States Census provided that *9.9 percent* of the voting age population of the City of Springfield were identified as "Negro."

a) During most of the 1970s, *11.1 percent* (one of the nine members) of the membership of the Springfield City Council was Black/African-American.

b) From 1972 to 1976, *16.7 percent* (one of the six members) of the membership of the Springfield School Committee was Black/African-American.

30. In 1980, the United States Census provided that *13.9 percent* of those persons of voting age identified themselves as Black and *6.0 percent* identified themselves as of "Spanish origin."

a) During the 1980s, *11.1 percent* (one of the nine members) of the membership of the Springfield City Council was Black/African-American person.

b) During the 1980s, *16.7 percent* (one of the six members) of the membership of the Springfield School Committee was Black/African-American.

---

[13] Information provided by Mr. William Metzger, the City Clerk for Springfield since 1981.

31. According to the 1990 Census, *16.4 percent* of the voting age population identified themselves as (not Hispanic) Black; and *12.8 percent* identified themselves Hispanic (regardless of race).

a) During the 1990s, *11.1 percent* (one of the nine members) of the membership of the Springfield City Council was Black/African-American.

b) Between 1994-1998, *16.7 percent* (one of the six members) of the membership of the Springfield School Committee was Black/African-American and *16.7 percent* (one of six members) was Hispanic/Latino

c) During the rest of the 1990s, *33.3 percent* (two of six members) of the membership of the Springfield School Committee was Black/African American

32. According to the 2000 Census, Black/African-Americans constituted *18.1 percent* of the voting age population and *21.8 percent* of the voting age population identified themselves as Hispanic/Latinos (regardless of race)

a) During the 2000-2001 term of office, *22.2 percent* (two of the nine members) of the membership of Springfield City Council was Black/African-American

b) From 2000 to 2002, *16.7 percent* (one of the six persons) of the membership of the Springfield School Committee was Black/African-American and *16.7 percent* (one of six members was Hispanic/Latino.

c) From 2002 to 2003, *33.3 percent* (two of six members) of the membership of Springfield School Committee was Black/African-American.

d) Currently, *11.1 percent* (one of nine members) of the membership of the City Council is Hispanic/Latino and *11.1 percent* (one of nine members) is Black/African American

e) Currently *16.7 percent* (one of six members) of the membership of the School Committee is Black/African American.

F. *Current Registration and Turn-out*

33. Official registration records (and the 2000 Census) and estimates indicate that the registration rates of white, Black/African American, and Hispanic/Latino persons is comparable. See Declaration of Chairperson of the Election Commissioner Denise Jordan at ¶14, Defendants' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction ("Defendants' Memorandum") ("Jordan Dec.") (Exhibit L).

16

a) The 2003 average registration rate of voting age persons, according to the 2000 Census, in precincts in which non-Hispanic white persons (alone) constituted at least 60 percent of the population (excluding precincts in which there is a substantial college population) was 81.7 percent.

b) The 2003 average registration rate of voting age persons, according to the 2000 Census, in precincts in which non-Hispanic Black/African Americans persons (alone) constituted at least 60 percent of the population was 78.8 percent.

c). The 2003 average registration rate of voting age persons, according to the 2000 Census, in precincts in which Hispanic/Latino persons (regardless of race) constituted at least 60 percent of the population was 105.7 percent.

34. Official election returns (and the 2000 Census) indicate that turn-out was significantly depressed in the 2003 City election among Black/African American and Hispanic/Latino voters as compared to white voters. See Jordan Dec. at ¶14.

a). The average rate of turn-out in the 2003 City election in the 38 precincts in which Non-Hispanic white persons (alone) constituted at least 50 percent of the voting age population was 39.4 percent of the registered voters.

b). The average rate of turn-out in the 2003 City election in the 26 precincts in which Non-Hispanic white persons (alone) constituted less than 50 percent of the voting age population and therefore persons who identified themselves as a member of any racial or ethnic minority group – in the aggregate – constituted more than 50 percent of the total voting age population was 23.0 percent of the registered voter population.

c). The average rate of turn-out in the 2003 election in the six precincts in which non-Hispanic Black/African-Americans (alone) constituted at least 50 percent of the voting age population was 27.2 percent of the registered voter population.

d). The average rate of turn-out in the 2003 City election in the six precincts in which Hispanic/Latinos (all races) constituted at least 50 percent of the voting age population was 23. percent of the registered voter population.

e). The rate of voter turn-out in the 2003 City election among the 38 precincts in which non-Hispanic white persons (alone) constituted at least 50 percent of the voting age population, ranged from 62.4 percent of the registered voters in Ward 7, Precinct B to 20.1 percent of the registered voters in Ward 8, Precinct D.

f). The rate of voter turn-out in the 2003 City election among the 26 precincts in which non-Hispanic white persons (alone) constituted less than 50 percent of the total voting population and therefore persons who identified themselves as a member of any racial or ethnic minority group – in the aggregate – constituted more than 50 percent of the total voting age population, ranged from 35.5 percent of the registered voter population in Ward 8, Precinct C to 11.6 percent of the registered voter population in Ward 1, Precinct H.

17

## III. **Argument**

As this Court reiterated, the standard for a preliminary injunction requires the moving party to show:

> (1) that she has a substantial likelihood of success on the merits; (2) that she faces a significant potential for irreparable harm in the absence of immediate relief; (3) that the ebb and flow of possible hardships are in a favorable juxtaposition; and (4) that the granting of prompt injunctive relief will promote the public interest.

Demarest v. Athol/Orange Community Television, 188 F. Supp.2d 82, 89 (2002)(citing McQuire v. Reilly, 260 F.3d 36, 42 (1st Cir. 2001). Plaintiffs have failed to provide sufficient evidence to satisfy any of these four prongs.

### A. *The Conduct of the 2005 City Council Election Will Not Harm Plaintiffs*

The only harm that the Plaintiffs identify is the deprivation of the right to vote – a deprivation that would be shared by *all* of the voters in the City of Springfield if the injunction were granted. Plaintiffs' Memorandum at 41-42. See Elrod v. Burns, 427 U.S. 347, 373 (1976)(The right to vote is, indeed, a fundamental right and its deprivation "for even minimal period of time, unquestionably constitutes irreparable injury"). Defendants, however, assume that Plaintiffs intended, instead, to identify the right of every citizen to a vote that is not abridged on account of race, membership in a language minority group. See Reynolds v. Sims, 377 U.S. 533, 555 (1964)(affirming lower court's refusal to enjoin upcoming elections after finding that State's legislative apportionment scheme unconstitutional).[14] Even where the deprivation of the right to an undiluted vote is determined to be a harm of the sort to justify a preliminary injunction of an upcoming election, it would seem appropriate or equitable to consider

---

[14] The Supreme Court held:

> In awarding and withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state elections laws, and should act and rely upon general equitable principles. With respect to the time of the relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands in adjusting to requirements of the court's decree

Reynolds v. Sims, 377 U.S. 533, 585 (1964).

enjoining only those elections that seek to implement "new" procedures, processes, redistricting plans, election schemes that have been determined to violate Section 2 or have not received the necessary "preclearance" pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. See Whitcomb v. Chavis, (court-ordered reapportionment plan stayed and election ordered conducted under the old scheme that had been found to be unconstitutional). See also, Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 281 F. Supp. 2d 436 (N.D.N.Y. 2003); Taylor v. Haywood County, Tennessee, 544 F. Supp. 1122 (1982). See, infra, n.19. Moreover, even assuming – without admitting – that the at-large elections for the City Council abridge the right of Black/African American and/or Hispanic/Latino persons to vote, there is no harm that will accrue to the Plaintiffs as the result of the conduct of the 2005 City Council elections different from the alleged harm caused by any of the elections conducted during the 44 years the City has implemented at-large elections for the City Council. Again assuming – but not admitting – the Plaintiffs' claims and therefore the proposition that the current or any of the other past City Councils are somehow "tainted" by the Voting Rights Act violation that defined the method by which members of the City Council were elected, the sitting City Council is no less tainted than would a newly elected City Council.

Indeed, Plaintiffs are to be benefited by the conduct of the upcoming election, which a) will provide Plaintiffs with a forum to garner additional community support for the adoption of a single-member district method of election; b) may result in the election of Councilmembers more sympathetic to the adoption of a single-member district method of election[15]; and c) will provide the Court with additional information to inform its determination on the merits. The present incumbent members of the City Council are the only persons who would benefit by the requested injunction; they would not have to

---

[15]There are many justifications for the adoption of a method of election that includes in whole or in part single-member districts that do not implicate the Voting Rights Act, including the provision of a voice for insular groups that can be unheard in at-large elections and the ease of campaigning in a district smaller than the jurisdiction, as a whole, and peopled by persons similar or known to the candidate. Single-member district elections obviate the need for candidates to familiarize themselves and to find common ground with all of the citizens of a jurisdiction – which as the Plaintiffs have claimed is a difficult, resource-intensive, and a daunting task. Indeed, it is these considerations that informed most of the support by members of the minority community of the 8-3 mixed method of election proposed in the 1997 initiative. Accordingly, even if – when – it is proven that the at-large method of electing members to the City Council does not deny Black/African American and Hispanic/Latino voters the *opportunity* to elect candidates of choice, the City Council and/or School Committee may still decide to adopt a method of election that included single-member districts for "other" reasons and to acquire benefits not afforded by the challenged method of election.

incur the expense and devote the time to running for re-election in a year in which there is much talk of "changes" in city government.[16]

Courts have been loathe to enjoin the conduct of elections even where there is a strong likelihood of success on the merits where there is "possibility that. . .other corrective relief will be available at a later date, in the ordinary course of litigation."[17] Sampson v. Murray, 415 U.S. 61, 70 (19745)(quoting Virginia Petroleum Jobbers Assn. v. FPC, 104 U.S. App. D.C. 106, 110 (1958)). See also Whitcomb v. Chavis, 396 U.S. 1055 and 396 U.S. 1064 (1970); Maryland Citizens v. Governor of Maryland, 429 F.2d 606 (4th Cir. 1970); Dillard v. Crenshaw County; Banks v. Bd. of Ed., City of Peoria, 659 F. Supp. 394 (C.D. Ill. 1987); Knox v. Milwaukee County, 581 F. Supp. 399 (E.D. Wis. 1984). "Only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief." Chisom v. Roemer, 853 F.2d at 1189 (quoting Wright & Miller, Federal Practice and Procedure § 2948 at 431-34 (1973). Here the Court has the authority to call for a special election should the Court order or the parties settle upon a change in the method by which members of the City Council and the School Committee are elected.

---

[16] Plaintiffs have included no affidavits or declarations of such harm that Plaintiffs or anyone else will suffer if the 2005 election were not enjoined.

[17] To support their claim that "Courts do not hesitate to afford preliminary injunctive relief in Section 2 cases," and therefore this Court should enjoin the 2005 elections for City Council, Plaintiffs have cited a small array of distinguishable cases. Plaintiffs' Memorandum at 11. Notable is their reliance on United States v. Berks County, Pennsylvania, 250 F. Supp.2d 525 (E.D. Pa. 2003), in which the Government claimed that the county discriminated against Hispanic individuals, primarily Puerto Rican voters, through hostile treatment at the polls, failure to provide adequate language assistance, and by not permitting Hispanic voters to bring assistors of their choice into the polling place. The Court enjoined these discriminatory election day practices. Since the court entered its decision, the Department has monitored elections, utilizing federal observers pursuant to a provision of the order, to ensure compliance with the court's order. In Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 281 F. Supp. 2d 436 (N.D.N.Y. 2003), the Court enjoined the implementation of the County's newly created 2000 redistricting plan in the then-upcoming election. Likewise, in Taylor v. Haywood County, Tennessee, 544 F. Supp. 1122 (W.D. Tenn. 1982), the Court enjoined the implementation of a change in method of electing members of the County Board of Highway Commissioners. In United States v. Dallas County Commission, 791 F.2d 831 (11th Cir. 1986), the United States challenged the at-large method of electing members to the School Board and County Commission, which had never elected an African American, before a Judge, who was reversed at least once before grudgingly ruling for the United States. Eventually, the Eleventh Circuit had to order the Judge to adopt a single-member districting plan and method of election proposed by the United States. Similarly, in Clark v. Marengo County, 623 F. Supp. 33 (S.D. Ala.)(1985) – heard by the same judge as heard Dallas County Commission , on remand after Eleventh Circuit reversal – the injunction to which Plaintiffs refer relates to an injunction as to a method of election found to violate Section 2 of the Voting Rights Act. Both Dallas County Commission and Marengo County were years in litigation – originally brought by the United States in 1978.

B. *The Harm to the Defendants Outweighs Any Possible Harm to the Plaintiffs*

Accordingly, since the Plaintiffs will not be harmed by the conduct of the 2005 City Council election, the real and potential harm to Defendants provides adequate grounds to deny Plaintiffs' motion In this regard Plaintiffs only identify the benefit to be gained by a nine-single-member districting plan and entirely fail to address the harms to the Defendants, with the exception of some unidentified "administrative expenses." Plaintiffs' Memorandum at 41. Defendants' interest in ensuring that the members of the City Council reflect the electoral preferences of the voters will be "harmed" should this Court enjoin the 2005 election. Courts have further recognized that the consequences of enjoining an election are "as significant as they are uncertain. Indeed, the very uncertainties introduced account in large measure for the significance of the impact." Id. at 1190. Here, members of the City Council would be holding over. Massachusetts General Law has not directly addressed the issue of the authority the City Council would retain to conduct "business" once the two year term of its members has expired. See, M.G.L. c. 43, §50.

As the Court is well aware, Section 2 cases are complex, are rarely resolved quickly; are often subject to appellate review; and are frequently subject to re-examination and rehearing occasioned by changes in the law. Even if the Plaintiffs were to succeed on the merits, the process of devising a remedial election scheme, including a redistricting plan, as to which the City Council should be deferred in its creation, see Wise v. Lipscomb, 437 U.S. 535, 540 (1978)("appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitution [or federal statutory] requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan"); McDaniel v. Sanchez, 452 U.S. 130, 150 n.30 (1981)("even after a federal court has found a districting plan unconstitutional, redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt"), necessitates a fairness hearing in which the proposed redistricting plan and method of election must be evaluated as to its compliance with the Voting Rights Act, the one-person; one-vote requirement of the Fourteenth Amendment, Reynolds v Sims, 377 U.S. 533 (1964); Cox v. Larios, 124 S. Ct. 2806 (2004); and the prohibition against the creation of redistricting plans as to which race was the predominate consideration, Shaw v. Reno, 509

21

U.S. 630 (1993) rev'g and remanding Shaw v. Barr, 808 F. Supp. 461 (E.D.N.C. 1992) (recognizing an "analytically distinct" equal protection claim for challenging an election district as a "racial classification") and its progeny. Given the complexity of the remedial phase, appellate review often plays a role there too. It is not beyond peradventure that the present members of the City Council may be asked to "hold over" for three – if not more – election cycles, should the Court enjoin the conduct of any further elections pursuant to the at-large method of election. See Banks v. Bd. of Ed., City of Peoria, 659 F. Supp. at 402 ("enjoining the. . .election would have the effect of preventing all of the voters in the respective election districts from exercising their right to vote).

### C. *Public Interest Supports the Conduct of the 2005 City Council Election*

Accordingly, the conduct of the 2005 City Council election is unquestionably in the public interest. To satisfy the public interest requirement, Plaintiffs rely upon the benefit to the public of a non-dilutive method of electing members to the City Council and do not address the public interest all voters have with regard to the opportunity to elect City Councilmembers. Plaintiffs' Memorandum at 42. Many courts have recognized that "the extension of the terms of incumbents. . .effectively denies the entire electorate of the right to vote and thus seems to offend basic principles.'" Chisom v. Roemer, 853 F.2d at 1191 (quoting Dillard v. Crenshaw County, 640 F. Supp. at 1363). There is simply no reason to deny *all* of the voters in the City of Springfield the right to vote for members of the City Council in the 2005 election and any future elections until this challenge is finally resolved. See Chisom v. Roemer, 853 F.2d at 1192 ("Is the electorate to have no say whatever as to the person to serve during that period" that a case "runs its full course"? Can that conceivably be considered in the best interests of the citizenry?) Likewise, there is no reason to frustrate those 25 persons who have already "taken out" papers to compete for a position of the City Council and presumably have been collecting signatures and otherwise preparing for and raising funds to conduct a campaign for the City Council. In sum, the conduct of the 2005 City Council election is in the public interest and there is no harm to the Plaintiffs that is sufficient to surpass, exceed, or overbalance the right of all of the electors of the City of Springfield to vote for members of the City Council.

## D. *Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits*

Given the total absence of any justification – legal or factual – for granting Plaintiffs' motion for Preliminary Injunction, it is not necessary for Defendants to address Plaintiffs' voluminous "evidence" supporting their contention that they are "likely [sic] prevail on the merits of their claim that the at[-]large [method of election] used for City Council elections violates Section 2 of the Voting Rights Act." Plaintiff's Memorandum at 2. See Chisom v. Roemer, 853 F.2d at 1188 (where court's decision was "empowered by a consideration of the essence and ramifications of the third and fourth factors, we pretermit a discussion of the first two, except for these limited comments")   Nevertheless, Defendant; will address some of Plaintiffs' presentations and assertions of "fact" relevant to the "merits" of their challenge and the manner in which Plaintiffs have construed the applicable law to alert the Court to Defendants' facts, claims, and interpretation of the law different from those presented by the Plaintiffs. Defendants contend that questions remain to be answered and issues addressed unique to Springfield and its method of electing members to the Springfield City Council. The Plaintiffs' presentation of "expert" analysis is incomplete and problematic. Further information and "testimony" provided by Plaintiffs is inadequate, unsupported, hearsay, and largely irrelevant to a totality of circumstances inquiry. Finally, Plaintiffs have failed to provide or even allude to adequate evidence to carry their burden in a Section 2 challenge, where there are no discriminatory practices or devices that frustrate the ability of minority voters to elect candidates of choice, where there is no real history of official discrimination, where the justifications that support the maintenance of the at-large method of election advantages all of the citizens of Springfield including Black/African American and Hispanic/Latino persons, and where the growing political strength of the minority communities will *not* be enhanced by the adoption of a single-member district method of election.

Indeed, Johnson v. DeGrandy, 512 U.S. 997 (1994)(N.D. Fla. 1992)(where a minority group has been provided with proportional electoral opportunities there is a presumption of no dilution in violation of Section 2) all but forecloses Plaintiffs' claim that the at-large method of electing members to the City Council and the School Committee violates Section 2 of the Voting Rights Act where Black/African American and Hispanic/Latino have been provided with proportional *opportunities* to elect candidates o?

choice. The racial or ethnic identification of the actual membership of the Springfield City Council has

often been proportional to that Black/African American and/or Hispanic/Latino[18] share of the total voting

age population. See, supra at ¶¶28-32. In DeGrandy the Supreme Court "counted" the number of

districts in which the minority group constituted an effective majority in reaching the conclusion there

was no vote dilution in violation of Section 2. Id. at 1000. The Supreme Court explained

> "Proportionality" as the term is used here links the number of majority-minority districts
> to the minority members' share of the relevant population. The concept is distinct from
> the subject of the proportional representation clause of §2, which provides that "nothing
> in this section establishes a right to have members of a protected class elected in
> numbers equal to their proportion of the population." 42 U.S.C. §1973(b). This proviso
> speaks to the success of minority candidates as distinct from the political or electoral
> power of minority voters. Cf. Senate Report 29, n.115 (minority candidates' success at
> the polls is not conclusive proof of minority voters' access to the political process). And
> the proviso also confirms what is otherwise clear from the text of the statute, namely,
> that the ultimate right of §2 is equality of opportunity, not a guarantee of electoral
> success for minority-preferred candidates of whatever race.

Id. at 1014, n.11 (Souter, J.). While it is not possible to "count" minority-majority districts here, it is

possible for the Court to assess electoral *opportunities* as they have been provided to Black/African

American and later to Hispanic/Latino persons over the last 44 years. That assessment provides strong

support for a claim that the at-large method of election has provided to Black/African American voters

and more recently to Hispanic/Latino voters electoral opportunities proportional to their share of the total

voting age population. See, supra at ¶¶28-32.

Admittedly it would be easier for Black/African American and for Hispanic/Latino – indeed, for

all – candidates to successfully compete for office in single-member districts, particularly where those

districts are comprised of persons who look like and are known to the candidate. It is entirely possible

that Plaintiff Gumersindo Gomez would have been elected had he only been required to compete in Ward

1. See Affidavit of Gumersindo Gomez at ¶7, Plaintiff's Memorandum ("Gomez Aff."). But Section 2

does not guarantee the election of particular members of a minority group. Likewise, Section 2 does not

---

[18]It is true that the number and/proportion of Hispanic/Latino persons elected to the City Council and the School
Committee lags behind the "numbers" achieved by Black/African American candidates. But there is every indication
that the political strength of Hispanic/Latino voters is on the rise. See Uno v. City of Holyoke, 960 F. Supp. 515, 524-
526 (D. Mass. 1997). See, generally, Tosado Dec. (Exhibit K)

guarantee an easy election that forecloses having to raise money – within or without the community of which the candidate is a member – or having to campaign in areas of the City that are unfamiliar, in which one feels uncomfortable, where it might be necessary to directly address racial preconceptions or to form political coalitions and to find common concerns, issues, and values. See, generally, Tosado and Williams Dec. (Exhibits J and K). The Supreme Court in DeGrandy has directly addressed this issue.

> If the lesson of Gingles is that society's racial and ethnic cleavages sometimes necessitate majority-minority districts to ensure equal opportunity, that should not obscure the fact that there are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single-member district in order to elect candidates of their choice. Those candidates may not represent perfection to every minority voter, but minority voters are not immune from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying a statute meant to hasten the waning of racism in American politics.

Johnson v. DeGrandy, 512 U.S. at 1020.

1. *Plaintiffs' Section 2 Burden of Proof and Persuasion*

Thornburg v. Gingles, 478 U.S. 30 (1986) sets forth the "now-familiar threshold conditions," Uno v. City of Holyoke, 880 F. Supp. 911, 914 (1995), that must be established to prove a Section 2 violation: (1) that the minority group is sufficiently numerous and geographically compact to constitute an effective majority in a single-member district; (2) that "the minority group is politically cohesive;" and (3) that "the white majority votes sufficiently as a bloc to enable it – in the absence of special circumstances. . .usually to defeat the minority's preferred candidate." Thornburg v. Gingles, 478 U.S. at 50-51  In addition, the Court "must always engage in an intensive examination of the "totality of circumstances" surrounding the Section 2 claim to determine if the minority group members have been denied an equal opportunity to participate in the political process and elect representatives of their choice." Uno v. City of Holyoke, 880 F. Supp. at 915 (internal quotations omitted).  "In order to answer this question, a court must assess the impact of the contested structure or practice on minority electoral opportunities 'on the basis of objective factors.'" Thornburg v. Gingles, 478 U.S. at 44.

25

The Senate Report specifies factors which typically may be relevant to a §2 claim: the history of voting related discrimination in the State or political subdivision; the extent to which voting. . .is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against single-shot voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority groups bear the effect of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction. The Report notes also that evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the State's or the political subdivision's use of the contested structure is tenuous may have probative value.

Id. at 44-45.

### 2. *Evidence of Polarized Voting Patterns is Equivocal and Supports At-Large Electoral Opportunities*[19]

Plaintiffs have provided an "Affidavit of Richard L. Engstrom, PhD" ("Engstrom Aff.") to support their claim of a substantial likelihood of proving that voting is racially polarized in City Council elections. In that regard, Dr. Engstrom concludes that white, Black/African American, and Hispanic/Latino persons generally prefer different candidates. Engstrom Aff at ¶33. Defendants objec to reliance upon what passes for an "expert report" from Dr. Engstrom that does not include-- as have almost all of his past expert reports-- correlation coefficients,[20] rate of voter turn-out[21] as among those of different racial and ethnic groups, underlying data, and "spread sheets," with which it would be possible

---

[19] It is recognized that evidence of racial polarization in voting addresses the second and third Gingles precondition. Thornburg v. Gingles, 478 U.S. 30, 50-51 (1986). Nevertheless, Defendants will address this evidence first since it impacts an analysis of the first Gingles precondition – numerosity and geographical compactness – which is informed by an assessment of the degree to which voting is polarized and the nature of polarization.

[20] Correlation coefficients reflects the consistency with which the vote for a candidate or a set of candidates varies with the racial composition of the precincts -- without which it is impossible to access the degree to which the "correlation" is "statistically significant." In n.2 in Dr. Engstrom's Affidavit, Plaintiff's Memorandum, he provides the partial explanation that such correlation coefficients that "result from the three group analysis are partial correlations that do not have the same straightforward interpretation as the correlation coefficients that result from analyses concerning only two groups." While this assertion may well be true, it does not obviate the need to provide that information or some other means of assessing the reliability or predictability of his analyses.

[21] Without voter turn-out data it is virtually impossible to make any assessment as to what the proportion of minority support means in terms of numerical support for the candidate.

for Defendants' expert to assess Dr. Engstrom's analysis. The inability to make an assessment of Dr. Engstrom's analysis is further exacerbated by Plaintiffs' or Dr. Engstrom's tables, Engstrom Aff at Tables 1-6, to correctly identify the race of the candidates. Without any real means of assessing the accuracy of the analysis provided by Plaintiffs or conducting our own within the 14 days within which Defendants' are required to respond, it is impossible to present any defense or contrary analysis to the claims of Dr. Engstrom regarding the nature of voting in the last three City elections for City Council and School Committee.[22] Nevertheless, Defendants are able to make some observations and raise some questions that weaken any claim or conclusion that Plaintiffs have met their burden or demonstrated a substantial likelihood of success with regard to the second and third Gingles preconditions.

> a) *There is No evidence of political cohesion between Black/African American and Hispanic/Latino voters*

Dr. Engstrom makes no representation as to the existence of voter cohesion between Black/African American and Hispanic/Latino voters. Plaintiffs, however, engage in a wholesale misrepresentation of Dr. Engstrom's analysis with regard to the degree to which Black/African American and Hispanic/Latino voters are cohesive in the aggregate. See Plaintiff's Memorandum at 15. With only two exceptions,[23] a greater proportion of white voters support Black/African American candidates than do Hispanic/Latino voters. Likewise, a greater proportion of white voters support Hispanic/Latino candidates than do Black/African American voters. Indeed, Ms. Lewis-Caulton[24] might have been re-elected in 2001 had the same proportion of Hispanic/Latino voters supported her as did white voters. That Plaintiffs would rely upon two isolated instances,[25] one of which involves an incumbent, to show

---

[22]Defendants have opted not to request additional time that would only postpone the Court's resolution of this matter, the public's discomposure at the prospect that the City Council elections will be enjoined, and the uncertainty of potential candidates as to whether the completion of nomination papers and pre-election campaign preparation and fund-raising are well-advised.

[23]In the 1999 election for City Council, longtime incumbent Bud Williams, an African American, received a marginally greater proportion of support from Hispanic/Latino voters than white. In the 2003 election for City Council, Hispanic/Latino candidate, Jose Tosado, received a marginally greater proportion of support from Black/African American voters than from white voters.

[24]Ms. Lewis-Caulton appeared to have also lost some Black/African American support in 2001 – as compared to 1999 where it appears that she may have been benefited by single-shot voting.

[25] Plaintiffs also provide testimony and assertions in a variety of their affidavits that Black/African American and Hispanic/Latino persons "share similar concerns," presumably to support the claim that Black/African American and

Black/African American – Hispanic/Latino support in face of the overwhelming evidence to the contrary and that they would represent this position as being supported by Dr. Engstrom, undermines any credibility to be accorded their analysis and representations of the same. Moreover, such misrepresentations frustrate Defendants' efforts to make an informed assessment as to whether the at-large method of election should be abandoned on the grounds that it dilutes the voting strength of the City's Black/African American and/or Hispanic/Latino voters. Indeed, if the proportion of Black/African American voters supporting Hispanic/Latino candidates and the proportion of Hispanic/Latino candidates supporting Black/African American candidates is to be considered significant as Plaintiffs contend, then the greater proportion of cross-over voting on the part of white voters cannot be viewed as of the sort to frustrate the politically aspirations of Black/African American and Hispanic/Latino candidates, i.e., legally significant white bloc voting. Plaintiffs cannot have it both ways.

### b) There is insufficient of evidence of a consistent pattern of white bloc voting or that failure of white voters to support minority candidates was the cause of loss

Dr. Engstrom further does not conclude that white persons vote as a bloc to usually defeat candidates of choice of minority voters. Rather he argues that in certain – not all – City Council elections, white persons "vetoed" some – but not all – of the choices minority voters. Engstrom Aff. at ¶24. He asserts that white voters and Black/African American and Hispanic/Latino voters prefer different candidates. Dr. Engstrom's analysis also provides evidence that a sufficient proportion of white electors have voted for Black/African American and Hispanic/Latino candidates in numbers to support their election. Indeed, in one of the three elections that Dr. Engstrom analyzed (1999) white voters did not veto the Black/African American candidate of choice and in another election (2003) white people did not veto the candidate of Hispanic/Latino voters. Where minority candidates are not elected, as discussed below, Dr. Engstrom's analysis supports the conclusion that their respective losses are attributable not only to the lack of white support, as well as lack of support from the "other" minority voters, but also to the failure of the minority community with which they are identified to support them at the same rate as

---

Hispanic/Latino voters are cohesive in the aggregate. See, e.g., Affidavits of Rev. Talbert Swan at ¶18; Rep. Cheryl Rivera at ¶24; Henry Thomas at ¶18. While these shared concerns are reasons for Black/African American and Hispanic/Latino persons to vote cohesively and support the same candidate, it is not evidence that they do. Moreover, it is very likely that these concerns are also shared by other minority and white persons in the City.

those candidates who have been successful and to otherwise turn-out to vote. See, e.g., Candidates Rucks, Stokes, and Cortes in 2001 and Jones and Cortes in 2003. What this analysis does not show is that white persons consistently vote to defeat candidates of choice of minority voters or an inference that non-support of minority candidates is based upon racial bias.

> c) *There is inadequate evidence of cohesion among minority voters sufficient to elect all minority candidates*

Dr. Engstrom does not state that Black/African American and/or Hispanic/Latino voters are cohesive, other than asserting that voters prefer candidates who share the same racial or ethnic identities as the voter. Again, assuming the reliability and accuracy of Dr. Engstrom's analysis, it would appear that Black/African American voters, in many cases, are politically cohesive. It does not appear, however, that Black/African American voters support every candidate of the same race equally, e.g., Candidates Charles Rucks and Charles Stokes in 2001 and Morris Jones in 2003, any more than do white voters. Requiring 65 percent support among Black/African American voters as a threshold requirement to a finding of "legally significant" minority voter cohesion" – as do some experts – it appears that of the six Black/African American candidates to compete for a position of the City Council in the three elections analyzed by Dr. Engstrom, two were not cohesively supported (40 percent). In addition, it also appears that some white candidates owe their election to the support of Black/African American voters, e.g., Candidates Brian Santaniello in 2001 and Rosemarie Mazza-Moriarity and Kateri Walsh in 2003.

Although it also appears that Hispanic/Latino voters appear to prefer Hispanic/Latino candidates and exhibit voter cohesion in some City Council elections, this assessment may have to await an increased frequency of Hispanic/Latino candidates for City Council. Of the two Hispanic/Latino candidates to compete for City Council in 1999, 2001 and/or 2003, only one consistently received greater that 65 percent of the Hispanic/Latino voter support. It does not appear that Hispanic/Latino voters routinely vote for non-Hispanic/Latino candidates in City Council elections unless none are running, as in 1999. Clearly, the Hispanic/Latino political organizations have not evolved as have those in the Black/African American community, which has far longer represented a significant proportion of the City's total population. Nor has the community "produced" as many candidates.

29

In summary, the evidence and analysis, when and if verified, does not support the conclusions that the at-large method of electing members to the City Council has consistently thwarted the ability of minority-preferred candidates to be elected except in the rarest of circumstances.  Moreover, it would be unfortunate if the second and third <u>Gingles</u> preconditions were satisfied merely by a showing the white and minority persons usually prefer different candidates and tend to more cohesively support candidates of the same race or ethnicity, where there is evidence that the minority candidates most supported by the minority community have garnered significant support from white voters sufficient in most cases to result in their election.  So too, where Black/African American voters have achieved proportional representation, there exists proportional opportunities and a presumption that the challenged method of election/election scheme does not violate Section 2.

3. *Evidence of Numerosity and Geographic Compactness Fails*
*as to Black/African Americans; Uncertain as to Hispanic/Latinos;*
<u>*and Neglects to Address Compliance with Shaw and its Progeny*</u>

To satisfy the first <u>Gingles</u> prong,  Plaintiffs provide the "Expert Report of John E. Harmon" ("Harmon Report"), in which Mr. Harmon proposes a nine single-member districting plan, which includes one Black/African American-majority district and two Hispanic/Latino districts.  Based upon the proposed districting plan, Plaintiffs claim that "Springfield's Hispanic and Black/African-American voters are sufficiently large and geographically compact so as to be able to elect representatives of their choice in a single member district system."  Plaintiffs Memorandum at 12.  As with Dr. Engstrom's Affidavit, Plaintiffs have neglected to provide any means by which Defendants can replicate the proposed plan created by John Harmon.  Likewise, the copy of the plan provided to the Defendants lacks sufficient detail and is such a small size as to all but foreclose any assessment of the proposed nine-single-member districting plan as to the degree to which the proposed plan splits precincts.[26]  Notwithstanding

---

[26] Equally as problematic is that fact that Mr. Harmon's report provided no information as to a) the instructions provided to the demographer by the Plaintiffs; b) the information about the City, its neighborhoods, wards, precincts that were furnished to or known by the demographer; c) priorities and goals that guided the creation of the proposed plan; d) the degree to which racial considerations guided the redistricting process; e) measures taken by the demographer to ensure that the City's traditional districting principles were not subordinated to racial considerations or that such considerations were narrowly tailored; f) his understanding and source thereof as to the proportion of Black/African American and Hispanic/Latino voters are needed to constitute an effective majority in a single-member district; g) local persons whom the demographer consulted or who assisted or directed in the districting process; and h) the degree to which the residencies of the Plaintiffs or incumbents factored into the creation of the proposed plan. While Defendants recognize that Mr. Harmon's plan may only be intended to be illustrative of the ability of Plaintiffs to

30

Defendants' objections and concerns about the inadequacy of the information and documentation provided by Mr. Harmon, several conclusions and assessments of the plan proposed by the Plaintiffs can be asserted.

Most importantly, Plaintiffs' proposed plan creates only one Black/African American majority district (District 3).[27] The challenged at-large method of election has provided to Black/African American voters, since 1968, an opportunity to elect one Black/African American candidate. Indeed, current elections provide evidence that the at-large method of election provides to Black/African American voters the opportunity to elect *two* Black/African American members of the City Council. Accordingly, the proposed plan fails to provide evidence that the at-large method of election dilutes the voting strength of Black/African Americans on grounds that an alternative means of electing a nine-member City Council does not exists that will provide for greater electoral opportunities than are available to them pursuant to the at-large method of election. In the alternative, Plaintiffs' proposed plan dilutes the voting strength of Black/African American by permanently limiting the electoral opportunities to only one of the nine positions on the City Council. Accordingly, Plaintiffs' proposed plan fails on the grounds that it provides evidence that a nine-single-member districting plan cannot be drawn that adequately protects the voting strength of Black/African Americans. See Williams Dec. at ¶16.

In addition, the proposed plan provides for two districts in which Hispanic/Latino voters constitute a majority of the voting age population (District 1 and 2). In neither of these two districts, however, do Hispanic/Latino voters comprise more that 54.1 percent of the voting age population. Assuming the validity of Dr. Engstrom's analysis and his estimations of Hispanic/Latino voter cohesion

---

meet the first Gingles precondition, much of the above information is relevant even to the most cursory appraisal. Ultimately, the Court cannot find for the Plaintiffs if no remedy can be devised that complies with Section 2, as well as with the Fourteenth Amendment and its one-person; one-vote requirement and prohibition against the creation of districts and districting plans that constitute racial classifications that will not survive a strict scrutiny analysis

[27]Defendants do not "count" District 4 as among those districts that provide to either Black/African American or to Hispanic/Latino persons an opportunity to elect candidates of choice on the grounds that there is absolutely no evidence of voter cohesion between Black/African American and Hispanic/Latino voters – a conclusion supported by the analysis of Plaintiffs' expert. Since white voting age persons constitute 41.1 percent of District 4 and Black/African Americans 38.5 percent of the district it would appear most likely that a white candidate would have the greatest chance of success as the candidate most likely to attract support from *both* Black/African American and Hispanic/Latino voters.

that has never been greater than 77 percent and evidence of depressed voter turn-out among Hispanic/Latino voters, see, supra at ¶34., there is a strong argument that neither district is "effective" within the meaning of the first Gingles precondition.

Accordingly, while Plaintiffs' proposed districting plan raises the inference of a likelihood that they will be able to sustain their burden with regard to the first Gingles precondition as to Hispanic/Latino voters, it also provides evidence that Plaintiffs may fail to sustain their burden with regard to the first Gingles precondition as to Black/African American voters. Indeed, that failure supports the maintenance of the at-large method of election that does not or will not force the Court, the City Council, or the Plaintiffs to chose between Black/African American and Hispanic/Latino voters and decide whose voting strength to enhance, guarantee, and protect and whose to dilute or diminish. Indeed, at-large elections provides for greater political influence for Black/African American and Hispanic/Latino voters than would the proposed or presumably any other single-member district method of election. At-large elections secure the ability of Black/African American voters (18.1 percent of the voting age population, according to the 2000 Census) and Hispanic/Latino voters (21.8 percent of the voting age population) to influence the election of all nine members of the Springfield City Council. See Thornburg v. Gingles, 478 U.S. at 99 (O'Connor, J. concurring in judgment)(Courts "should also bear in mind that the power to influence the political process is not limited to winning elections")(quoting Davis v. Bandemer, 478 U.S. 109 132 (1986)). See also Georgia v. Ashcroft, 539 U.S. 461, 479-485 (2003)(recognizing that the "most effective way to maximize minority voting strength may be to create more influence or coalition districts"). The proposed plan provides for commensurate influence for Black/African American voters in only three districts and for Hispanic/Latino voters in only three districts. See Georgia v. Ashcroft, 539 U.S. at 481 (recognizing the risk that the creation of a few minority-majority single member districts may "isolate voters from the rest of the [jurisdiction], and risk[]narrowing political influence to only a fraction of political districts"). Moreover, the political influence and ultimately the ability to elect candidates of choice in at-large elections will only increase as the proportion of

voting age Black/African American and Hispanic/Latino voters and respective rates of turn-out increases. In contrast, it is reasonable to conclude that the minority voting strength will be constrained to the districts in which they constitute a notable proportion in an appropriate single-member districting plan, i.e., minority voting strength will become "packed" in those minority-majority districts.

Finally, the proposed plan splits every one of the 17 neighborhoods of the City of Springfield. Defendants do recognize that some division of these longstanding neighborhoods is inevitable given the fact that there are 17 neighborhoods and nine single-member districts. Nevertheless, given the all-important role these various neighborhood councils have played, any districting plan that can be determined not to subordinate this most important among the City's districting principles will have to be drawn with the assistance and recognition of these "sub-jurisdictions." There is no evidence that the integrity of these neighborhoods was considered or the minimization of their division a goal. The maintenance of the at-large method of election will not, however, require the division of the City's neighborhoods, which will necessarily result in the subordination of some neighborhoods to others and limit the number of councilmembers to whom these neighborhood councils can direct their requests; from whom they can expect responsiveness; and whom they can hold accountable at election time. Since the recognition of the communities of interest that these neighborhoods and their governing bodies represent are among the considerations that can be classified as traditional districting principles, the maintenance of the present at-large method of election obviates the requirement of satisfying strict scrutiny every time the districting plan must be reapportioned to satisfy the one-person; one-vote requirement (every decade) should the redisricting plan subordinate these considerations to the goal of creating a particular number of districts that all but guarantee the electoral success of minority candidates.[28]

4. *Evidence Does Not Support a Totality of Circumstances Finding*

In evaluating a Section 2 claim, this Court will be required

> to consider the totality of the circumstances and to determine, based upon a
> searching practical evaluation of the past and present reality, whether the political
> process is equally open to minority voters. This determination is peculiarly

---

[28] A fair assessment of the City Council election history would accord incumbency as much a deterrent to the election of minority candidates as would race. The maintenance of the present at-large method of election forecloses any electoral advantage gained by incumbents who have a role in the redistricting.

dependent upon the facts of each case and requires an intensely local appraisal of the design and the impact of the contested electoral mechanism.

Thornburg v. Gingles, 478 U.S. at 79 (internal quotations and citations omitted). Proof of the "totality of the circumstances" requires the Plaintiffs to provide evidence of the existence of the various enumerated "Senate factors." See Plaintiff's Memorandum at 10-11. Of those Senate factors, Plaintiffs' efforts appear to be primarily directed at providing evidence to sustain their burden as to following three Senate factors: a) "the extent of any history of official discrimination. . .that touched the right of members of the minority group to register, to vote or to otherwise participate in the political process; b) "the extent to which members of the minority. . .bear the effect of discrimination in such areas as education, employment, and health, which hinder their ability to participate in the political process;" and c) "whether political campaigns have been characterized by overt or racial appeals;"[29] in addition to "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group."[30] Id. at 37 (quoting S. Rep. No. 97-417, p.28 (1982)("S. Rep.")). In Thornburg v. Gingles the lower Court found that "North Carolina had officially discriminated against its black citizens with respect to their exercise of the voting franchise from approximately 1900 to 1970 by employing at different times a poll tax, a literacy test, a prohibition against bullet (single-shot) voting, and designated seat plan for multi-member districts" and that "historic discrimination in education, housing, employment, and health services had resulted in a lower socio-economic state for North

---

[29]Here Plaintiffs made a meager showing, Plaintiffs' Memorandum at 37, by claiming – without providing evidence – that racism in Springfield politics was overt at the time of the 1959 initiative that resulted in the adoption of Plan A. Plaintiffs' only other claim concerns the debates that occurred during the time busing was first proposed for middle and elementary schools in the City of Springfield and the failure of proponents of busing to be elected. That issues of race are discussed does not constitute racial appeals as that Senate factor is understood. Moreover, it is far more likely that the Court would be most interested in whether such appeals have continued to typify politics in the City of Springfield today. Plaintiffs provided no such evidence.

[30]Plaintiffs' evidence of the lack of responsiveness appears to be assertions by minority leaders and elected officials that they have had to address the City Council or the Election Commission or to "intervene on the district's behalf in city issues, including zoning, policing, and education." Riviera Aff. at ¶13. Indeed, Rep. Riviera congratulates herself as "playing an important role in the passage of an ordinance in 2002 limiting the total number of billboards" in response to her concern that billboards were disproportionately located in the legislative district from which she was elected. Id. at ¶¶14-15. Both she and Mr. Gomez claim to have been responsible for the Election Commission agreeing to provide bi-lingual training for non-English-speaking persons who desired to work as poll officials. Id. at ¶¶9-11; Gomez Aff. at ¶¶19-22. This does not appear to evince a pattern of non-responsiveness on the part of the City's elected officials and government. Rather, it would seem that minority persons have been quite effective in procuring additional services, accommodations, funding, resources for their respective communities. See also Thomas Aff. at ¶15.

Carolina blacks as a group than for whites."[31]  Id. at 38-39.  In neither Gingles nor any of the subsequent cases has evidence sufficient to sustain the Plaintiffs' burden been of the sort adduced by the Plaintiffs in this case, which, largely, is comprised of ad hominem, unsupported statements and recollections, hearsay and attribution of all of the ills and adversities to which minority persons are often disparately subjected to an amorphous de facto discrimination.  In some cases, declarants rely upon the history of official discrimination in other parts of the country (the South) where the forefathers of various of these declarants had lived.  See Affidavit of Rev. Talbert W. Swan (Rev. Swan Aff.) at ¶4; Affidavit of Henry Thomas[32] at ¶11, Plaintiff's Memorandum.  Since Plaintiffs have not carried their burden of demonstrating that they will be harmed by the conduct of the 2005 election and have not shown a substantial likelihood of success on the merits, it is not necessary to discuss in detail and address all of the various charges, claims, accusations, and assertions leveled against the Defendants by various of Springfield's minority citizens.  Nevertheless, Defendants offer the following observations, clarifications and explanations.

---

[31] See Exhibit M, Charts identifying major disenfranchising devices used in Alabama, Georgia, Mississippi, North Carolina, South Carolina, and Texas, from Quiet Revolution in the South, Impact of the Voting Rights Act 1965-1990, Chandler Davidson, Grofman, Bernard, ed., 1994.

[32] In City of Springfield v. Springfield Library and Museum Association, Inc. C.A. No.05-399 (Ma. Sup Ct), the City claims that Mr. Henry Thomas had a pivotal role in the "secret" sale in 2003 of the Mason Square Branch Library, which had been completely renovated the year before to better serve the predominately Black/African American neighborhoods of Bay, Hill/McKnight, Upper Hill, Six Corners and which will cost the taxpayers of the City of Springfield $930,010.78 over a period of 20 years. As a result, the Mason Square neighborhoods have lost their library that had hosted almost 40,000 individual visits and over 850 group programs, and circulated over 20,000 volumes during it first and only year after the completion of the renovations. In addition, because the City was not reimbursed any of the money provided for the renovations, the City is not in a position to rebuild. Accordingly, it seems disingenuous for Mr. Thomas to charge the City with neglecting the minority population "in terms of the provision of adequate city services. . .and education," given his role in the closing of the branch library that had long been important to the Black/African American communities primarily located in Ward 4 and in profiting – to the disadvantage of the population his organization proposes to serve and for whom he portends to speak -- from taxes the City agreed to pay for the purposes of improving the library facilities available to the Black/African American community. See Affidavit of Henry Thomas at ¶13. It should be noted that the current Mayor has committed himself to restoring these funds and providing those residing in these neighborhoods with library services. Indeed, it is fair to say that the Mayor was elected on this platform from a City, the predominate population of which, is not likely to be served by the Mason Square branch library.

### a) *Plaintiffs have not provided evidence of official discrimination touching on the right of minority persons to participate in the political process*

Virtually the only evidence[33] that Plaintiffs proffer of "official discrimination. . .that touched the right of members of the minority group to register, to vote, or otherwise to participate in the political process," S. Rep. 28-29, are the claims that non-English speaking persons were unable to train and serve as poll workers until requested by Hispanic/Latino leaders and elected officials, Affidavits of Massachusetts Representative Cheryl Riviera at ¶9-11, Plaintiff's Memorandum ("Riviera Aff.") and Gomez Aff. at ¶¶16, 21; an incident where the declarant claims that one poll official was rude to Spanish-speaking voter, questioning his/her right to vote, Gomez Aff. at ¶¶14, 15; and other incidents in which a voter may not have been permitted to or did not understand his/her right to cast a provisional ballot. Id. at ¶9. As to the first claim, Defendants are under no legal obligation to provide training for an individual who does not speak English to enable him/her to serve as poll workers for an election in which the bulk of the record keeping activities would require some proficiency in English. The Voting Rights Act does require the provision of bi-lingual voting and registration-related materials, translators, and the assistor of choice in certain jurisdictions covered under Section 203(c) of the Voting Rights Act, 42 U.S.C. 1973aa-1a. See Gomez Aff. at 16-22. Plaintiffs do not claim that these materials have not been provided. Indeed, the Election Commission has long provided all registration or voting notices, forms, instructions, assistance, or other materials or information related to the electoral process, including ballots in both English and Spanish language. See Jordan Dec. at ¶3. In addition, Springfield has provided oral assistance at the polling places and announcements, publicity, and assistance in "oral form" to those who cannot easily read English or Spanish to enable Hispanic/Latino voters to participate effectively in the electoral process. Accordingly, Spanish-only-speaking poll workers are not necessary in order to assist

---

[33]The Plaintiffs offer additional anecdotal testimony that white persons are threatened by Black men and that Black/African American candidates have not felt comfortable or welcome in political forums or gatherings to which they have been invited in predominately white communities. See, generally Affidavit of Errol Campbell, Plaintiffs Preliminary Injunction Memorandum ("Campbell Aff") and Lewis-Caulton Aff.; Buntin Aff. at ¶5. While this is unfortunate, it would seem that the answer is not in removing the obligation for persons of different races to converse, discuss, argue, debate, and recreate and or otherwise segregating the various racial and ethnic groups in the City as would result from the imposition of a single-member district method of election, but rather to make such events commonplace and foster integration.

voters, where bi-lingual poll officials, translators, and voting instructions and ballots are available. See Section 208 (Voting Assistance) of the Voting Rights Act, 42 U.S.C. 1973aa-6.

While it is preferable for no one to be denied the opportunity to serve as a poll official, the law does not require the provision of such an opportunity to those who are not reasonably proficient in English (even when English is their primary language) or otherwise incapable of fulfilling the responsibilities of a poll official. Nevertheless, once bi-lingual training was requested by Rep. Riviera and Mr. Gomez, the Election Commission immediately complied, thereby demonstrating responsiveness on the part of the Defendants. Likewise, the claims that poll workers used a "tone of voice" that was discouraging to Spanish speaking voters and in one instance, challenged a non-English speaking person's right to vote, should have been brought to the attention of the Election Commission, the members of whom cannot remedy that which they have no knowledge. Gomez Aff. at ¶¶14 and 15. It is not – nor has it ever been – the position of the Election Commission that any disparate treatment, threats, intimidation, and even rudeness from poll and election officials is acceptable. The Voting Rights Act does not absolve citizens of the responsibility to inform the appropriate officials of violations of its provisions.

Finally, Plaintiffs have provided no period of time for the claim that few poll officials in Ward 1 have been Hispanic/Latino. Id. at 12. Currently it is the policy that poll officials are chosen from among lists provided by the Chairpersons of each of the eight Ward Caucuses serving the neighborhoods in which the polling places are located. Nevertheless, if it is true that there are routinely a disproportionately few Hispanic/Latino poll workers in predominately Hispanic/Latino precincts, the Election Commission is committed to doing everything possible to rectify that situation. [34] In addition,

---

[34]Likewise, the issue of the availability of provisional ballots is raised in Mr. Gomez's Affidavit in the context of the failure of poll officials to provide persons who only speak Spanish with that information. If these charges reference a failure on the part of the City to provide for adequate bi-lingual assistance to Spanish-speaking citizens, it is important for Mr. Gomez to bring to the Commission the specific details of the City's failure to comply with Section 203(c). It is impossible to know whether these incidents occurred prior or subsequent to the adoption Title III of the Help America Vote Act of 2002, since no dates for these denials are provided. Accordingly, should Mr. Gomez's claims relate to the failure to provide for provision ballots, Title III provides, in part, for provisional voting in all elections for any individual who contends that he/she is registered and eligible to vote, but where the poll officials, election commissioners and/or registrar contend that he/she is not eligible or not registered to vote. Prior to that time, the State of Massachusetts and, therefore, the City of Springfield, had no challenged or provisional ballot alternatives available to such voters. In such cases, every effort was made to contact the Election Commission when an individual's name did not appear on the registration roles to verify whether a mistake had been made. Should the incidents to which Mr.

members of the minority community are not without responsibility to encourage and work with these Caucuses to recruit and identify more minority poll officials to be assigned to predominately minority polling places.

> b) *Plaintiffs have proffered little evidence of a history of discrimination that accounts for socio-economic disparities, impacts the ability to participate in the political process or that can be attributable to the Defendants*

To demonstrate that past and present discrimination hinder the ability of minority persons to participate in the political process, Plaintiffs misrepresent Defendants' admission that "in the past race relations in the City of Springfield have been strained [and] can be improved in the future," Defendants' Answer at ¶39, by claiming that "racial discrimination is an integral part of Springfield's past and present. Plaintiffs' Memorandum at 22. To support this assertion, Plaintiffs provide a barrage of unsupported – albeit unsupportable -- claims, assertions, and charges. While some of the claims relate to serious circumstances or situations, they, nevertheless are relatively isolated and do not constitute a pattern or practice such as to render them evidence of a history of discriminatory treatment at the hands of the governing authorities of the City. Other claims merely recite facts and data that bear on the disparately poor academic performance of minority children, proportionately greater incidence of HIV/AIDS and premature births among minority persons, and proportionately fewer members of minority groups owning homes, without providing a "causal nexus" between the identified condition and any actions or inactions on the part of the Defendants. While Defendants would welcome the opportunity to address each and every claim and supply the Court with information concerning the actions taken by the City to remedy those situations that constitute violation of the law or otherwise have a discriminatory effect upon members of the minority communities, Defendants will not in the interest of sparing the Court's being embroiled in numerous disputes – the resolution of which are virtually irrelevant to the

---

Gomez referred occurred after the effective date of Title III, he should have availed himself of the "uniform, nondiscriminatory procedure for the resolution of any complaint alleging a violation of any provision of Title III" that

Court's ability to rule on the Plaintiffs' motion. Defendants will, however, make some observations, provide the occasional alternative explanation, and raise questions as to whether the concerns expressed or inequities identified by the Plaintiffs represent the kind of issues with which the Court may wish to or should explore in the context of a Section 2 challenge.

With regard to the Plaintiffs' effort to depict the City of Springfield to be rife with racial unrest and peopled by bigots, bullies, and the self-centered, only two so-called racial incidents are identified – both of which are more than thirty-five years-old. See Plaintiffs' Memorandum at 26 ("During the 1950s, the police enforce the law in a discriminatory manner and engaged in racially-motivated brutality against African Americans"). Of the two, only one can be deemed to constitute a "race riot" occurring as it did only five months after the "Bloody Sunday" March across the Edmund Pettus bridge in Selma, Alabama to secure the voter registration rights of Blacks citizens residing in Selma and in the State of Alabama and to protest the "murder" by an Alabama State Trooper of a young Black man who was participating in a voting rights march in Marion, Alabama several weeks earlier. Some might argue that a racial demonstration in Springfield was inevitable; indeed, was part of a necessary process of growth and the development of an awareness of and sensitivity to the issues of race and the failure of the country, states, cities, and towns to provide to Black persons the rights guaranteed to them by the United States Constitution and to grapple with the effects of decades and decades of discriminatory treatment and violence. The Court is free to revisit these events through the newspaper articles provided by the Plaintiffs, Plaintiffs' Exhibits 32-33, but should note that while – in retrospect – these events could have been handled differently, it is not true that the City's elected white officials did not try, did not listen, did not respond, and were not concerned – something that did not happen in many, many towns and cities in the South.

---

the City provides in compliance with the Help America Vote Act. See Jordan Dec.. at ¶9.

Plaintiffs enumerate other incidents with the presumed intention of creating a picture of a minority population whose members were consistently subject to violence, harassment, and discriminatory treatment at the hand's of the City Police over the last 40 years. See Plaintiffs' Memorandum at 26 (Springfield has a "long history of police violence against the minority community"). A review of the articles Plaintiffs have collected in Volume 5 of their Exhibits, however, will show that it most cases these incidents were addressed, otherwise decried by the elected officials of the City, and do not constitute a pattern or practice of behavior that is or has been condoned implicitly or explicitly by the City.[35] More importantly, today the members of the Police Commission, who review and make judgments and take action regarding all of the allegations of police misconduct is majority minority. Further, recent efforts on the part of Mayor Ryan that have and are resulting in dramatic changes in leadership demonstrate a strong commitment to addressing and remedying all of the meritorious claims against the Springfield police with regard to any lack of sensitivity to racial considerations, discriminatory application of the laws, and unnecessarily violent exercise of authority. Accordingly, Plaintiffs have not produced evidence of a pattern and practice of violence directed at and discriminatory treatment of minorities – as to which the City was complicit – that has hindered their respective ability to participate in the political process.[36]

Finally, Plaintiffs offer evidence of the socio-economic circumstances of Black/African American and Hispanic/Latino persons as a group as evidence of a history of official discrimination.. In support of

---

[35]To the extent that this evidence has been introduced to support the contention that the City Council is not responsive to the minority communities, it is not the City Council whose members have any authority over the Police Department;, rather it is the Mayor, as relevant newspaper article make clear. Indeed, these articles further provide evidence that among those to whom the Mayor has listened and taken direction are the leaders (religious and otherwise) of the minority communities. As discussed, Plan A provided for a very strong Mayor, to whom much of the power and authority to manage the City is delegated. That being the case, it is somewhat surprising that Plaintiffs would now be asking for a method of election that would *not* foster and support the development of minority candidates capable of attracting support from voters of different races or ethnicity, from all of the City's 17 neighborhoods, i.e., who can be elected at large to the one office in which much of the authority to "run" the City is vested.

[36] Of the 88 civil rights lawsuits that have been filed against the City of Springfield, Plaintiffs' Memorandum at 29, only one has resulted in a judgment for the Plaintiffs against the City.

their claim that "the Springfield education system bears the effects of both past and present discrimination and segregation,"[37] Plaintiffs' Memorandum at 23, Plaintiffs reiterate the relatively vast amount evidence that is available on the Springfield School Committee website and that the Defendants do not dispute, of a "racial gap" in learning, i.e., that Black/African American and Hispanic/Latino students do not perform as well on standardized tests and drop out of school at higher rates than do white and Asian American students. This so-called "racial gap in learning" is not unique to Springfield public school students, but rather represents a nation-wide problem. <u>See</u>, e.g., A. Thernstrom and Stephan Thernstrom, <u>No Excuses:  Closing the Racial Gap in Learning</u>, 11-23 (2003)(the National Assessment of Education Progress (NAEP) results "consistently show  frightening gap between the basic academic skills of the average African-American or Latino student and those of the typical white or Asian-American"). To support a claim of "[d]iscrimination in [h]ealth [c]are," the Plaintiffs present evidence of the disproportionate number of minority persons infected with HIV/AIDs and of incidents of premature births, as well as statistics that indicate that Black/African American and Hispanic/Latino mothers "were less likely to adequately use prenatal care than white. . .mothers." Plaintiffs' Memorandum at 35-37. The latter statement would seem to support Defendants' claim that prenatal care, which would presumably reduce the incidents of prenatal births, is available to minority mothers.  To support their claim that Springfield has a long history of housing discrimination and segregation based on race, Plaintiffs' Memorandum at 32-33, Plaintiffs cite the difficulty experience by a Black/African American declarant in the 1950s to move into a "white neighborhood," Buntin Aff. at ¶8, and that the Director of the Massachusetts Fair Housing Center "heard complaints of housing discrimination by African-

---

[37] The Springfield school system was never subject to *de jure* segregation. Moreover, the public high school in the City were never subject of *de facto* segregation, since most of the high schools were located in a centralized location and all students were bused to their high school of choice, depending upon their interests, abilities, or goals (Classical, Technical, Commerce, and Trade). No student was prohibited from attending any of these four schools on account of race, ethnicity, academic performance, or residence.

Americans and Hispanics living in Springfield" to which one can assume that he responded with appropriate remedial action.

Plaintiffs have presented no evidence that the increased number of Black/African American persons to be infected with HIV/AIDs has anything to do with a history of discrimination or that the schools that are located in the minority communities receive less funding than do schools in the predominately white communities. Indeed, the current Mayor is even more committed to ensuring that there is no disparate allocation of funds and resources among the City schools. Plaintiffs have identified no laws that have prevented minority persons from living where they chose and can afford. Where there are federal laws [state laws] that protect minority persons from discriminatory housing and lending practices, it is hard to find a connection between the fact that many persons live in communities of persons of a similar race, background, or ethnicity with a history of discrimination that has hindered the ability of minority persons to participate in the political process.[38] Indeed, that the Mayor in 1988 constituted a Task Force to address this issue, Plaintiffs' Memorandum at 33, provides evidence that even though the City does/did not have the authority to require that banks, real estate agencies, owners of apartments to abide by State and Federal laws or to enforce these laws, the City was responsive and concerned that each of its citizens were provided with adequate housing and opportunities for home ownership. Currently, the Office of Housing provides classes (bi-lingual) and assistance to minority persons to enable them to purchase their own homes.

Finally, it is the School Committee and not the City Council whose members have any authority with regard to the quality and equality of education provided to all of the City's children regardless of race. Plaintiffs are not seeking to enjoin the elections for the School Committee. Accordingly, even if t were possible to establish a causal connection between actions or inactions of the School Committee, it is

---

[38]A review of the racial demographics of the City's 17 neighborhoods provides evidence that those neighborhoods that had once been predominately white are increasingly more racially and ethnically integrated. See, supra at ¶_.

irrelevant to this instant motion.  Likewise, the department that has the authority to address these health and housing issues reports to the Mayor and no change in the method of electing members of the City Council will change the degree to which this department responds to the particularized needs of the minority community.  In sum, Plaintiffs have simply presented no evidence to support a claim that disparate socio-economic circumstances of minority persons in Springfield is attributable to a history of official discrimination that hinders their ability to participate effectives in the political process.

> c) *The justifications for the adoption and maintenance of the at-large method of election are not tenuous and were not and are not motivated by a discriminatory purpose.*

Plaintiffs reference a study conducted in Westfield State College in 1986, to support their claim that "the policy underlying the at[-]large system" was tenuous.  Plaintiffs' Memorandum at 39-40. Specifically, Plaintiffs assert that "[t]he policies underlying Springfield's move towards the greater centralization contemplated by Plan A do not turn on the presence or absence of at[-]large elections."  Id. Defendants have never claimed that the at-large method of election was necessary in order to centralize powers in the Mayor's office.  Plan A was – at the time of its adoption – the only alternative available to the City that provided for the delegation of more authority and responsibilities to the Mayor.  Plan A did provide a means by which the City could address the ward patronage and political power structures that were supported by the election of members of the Common Council from the City's wards.  That it was a "common belief in the minority community that the at[-]large system was adopted to prolong white dominance of City government, Plaintiffs' Memorandum at 40, citing Thomas Aff. at ¶4, appears to attribute to the City's leaders of the 1950s the ability to foretell that the Black/African American population would increase from slightly more than 6 percent to 19.6 percent and that there would be a dramatic influx of Hispanic/Latino persons.  Moreover, had such been common knowledge, it would seem that Black/African American voters would have supported a change in the method by which members of the City Council and School Committee were elected in 1961, in 1976, and in 1986 and would have turned-out in 1997 in sufficient numbers to ensure that the initiative calling for the 8-3 method of election was supported by one-third of the registered voters of the City and attempted to otherwise form political coalitions to support the passage of the initiative.  Likewise, if the prospect of

the election of Black/African American persons was the impetus for the adoption of the at-large method of election, one has to wonder why white persons did not seek to change the form of government and abandon ward elections in the 1920s when the first African American was elected to the Common Council.[39]

The policies underlying the maintenance of the at-large method of electing the Springfield City Council and School Committee are not pretextural or tenuous. The maintenance of the at-large method of electing members to the City Council is not motivated by any intent to discriminate against or dilute the voting strength of Black/African-Americans or other minority groups or to otherwise deny them political access or an electoral voice. Defendants provide the following non-exhaustive list of justifications supporting the maintenance of the at-large method of election.

i) The at-large method of electing members to the City Council and School Committee provides for greater influence and reasonable opportunities to elect candidates of choice for Black/African-American or Hispanic/Latino voters in the election of each and every member of these two governing bodies as compared to the influence and opportunities provided by a single-member district method of election or any alternative "proportional" election scheme.

ii) At-large elections foster the election of members of the City Council and School Committee who are committed to the best interests of the City *as a whole* and accountable to every voter in the City equally and without regard to race, ethnicity, and membership in a language minority group.

iii) That successful candidates for the City Council and the School Committee must campaign citywide provides the opportunity – if not the requirement – for elected officials to become familiar with *all* of the neighborhoods and communities in the City of Springfield, with the racially and ethnically diversity of the City's population, with each group's particularized needs, concerns, politics, goals, and view of the role of city government, and with the differences and commonalities among and within these various racial and ethnic groups.

iv) The maintenance of an at-large election scheme and rejection of a single-member or multi-member district alternative obviates the need to redistrict every decade to comply with the one-person; one-vote requirement, avoids the politics and partisanship of redistricting and advantage to incumbents acquired by their directing the adjustments to district boundaries, and forecloses in challenges to the redistricting process and resulting redistricting plan on constitutional racial or partisan gerrymandering grounds.

---

[39]In many a southern jurisdiction it took no more than a Black candidate *nearly* winning to trigger the imposition of various discriminatory election devices, methods of election, polling place practices, and registration requirements. See McMillan v. Escambia County, 638 F.2d 1239 (5th Cir. 1981); S. Rep. at p. 37-38, n.138.

v) At-large elections simplify the administration of elections and discourages election fraud. Voter confusion is likely to attend the assignment of voters to different City Council, School Board, State Legislative, and United States House of Representatives districts due to the different size of these governing bodies, the different jurisdictional reach of each governing authority, and different constitutional and statutory requirements.

vi) At-large elections promote the building of political, racial, ethnic, and community coalitions and the identification of shared concerns, interests, and goals for the growth and development of the City of Springfield and the education of its children.

## IV. **Conclusion**

For the foregoing reasons, Plaintiffs have failed to establish a substantial likelihood of success on the merits of their Section 2 challenge to the method by which members of the Springfield City Council and School Committee are elected; the potential for irreparable harm to the Plaintiffs as a result of the conduct of the 2005 City Council election; and that the balance of relevant impositions favors the Plaintiffs sufficiently to support an injunction of the 2005 City Council election -- the conduct of which is clearly and unequivocally in the public interest of all of the citizens of Springfield, including the Plaintiffs. Preventing the conduct of this election "at this late stage is not a passive or neutral act" and this Court's "awesome powers" under the Supremacy Clause should be "sparingly use[d]." Chisom v. Roemer, 853 F.2d at 1189-1190. Accordingly, this Court should deny Plaintiffs' motion for a preliminary injunction of the 2005 City Council election in the City of Springfield.

Respectfully submitted,

CITY OF SPRINGFIELD and
SPRINGFIELD ELECTION COMMISSION

By
Patrick J. Markey (BBO # 563542)
    City Solicitor
Deanne Bogan Ross (BBO #555407)
City of Springfield
Law Department
36 Court Street, Room 210
Springfield, Massachusetts 01103

45

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Memorandum Supporting Defendants'

Opposition to Plaintiffs' Motion for a Preliminary Injunction and Defendants' Motion for Leave

to File Memorandum in Excess of Twenty Pages has been served on the following counsel of

record on the 1st day of August 2005, by first-class mail and facsimile.

> Nadine Cohen
> LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
> OF THE BOSTON BAR ASSOCIATION
> 294 Washington Street, Suite 443
> Boston, Massachusetts 02108
>
> Paul E. Nemser
> J. Anthony Downs
> William J. Connolly III
> GOODWIN PROCTOR LLP
> Exchange Place
> 53 State Street
> Boston, Massachusetts 02109
>
> Angelo Ciccolo
> Victor L. Goode
> NAACP
> 4805 Mt. Hope Drive
> Baltimore, Maryland 21215-3297

> Deanne Bogan Ross
> City of Springfield
> Law Department
> 36 Court Street, Room 210
> Springfield, Massachusetts 01103