UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

ARISE FOR SOCIAL JUSTICE;                    )
¿OISTE?; NEW ENGLAND STATE-AREA              )
CONFERENCE OF THE NAACP;                     )
REV. TALBERT W. SWAN, II;                    )
NORMAN W. OLIVER; DARLENE                    )
ANDERSON; GUMERSINDO GOMEZ;                  )
FRANK BUNTIN; RAFAEL RODRIQUEZ;              )
and DIANA NURSE                             )
                                            )
              Plaintiffs,                    )    Civil Action No. 05-30080 MAP
                                            )
    v.                                       )
                                            )
CITY OF SPRINGFIELD and SPRINGFIELD          )
ELECTION COMMISSION,                         )
                                            )
              Defendants.                    )
_____)

**PLAINTIFFS' MOTION TO FILE A REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Pursuant to Local Rule 7.1(B)(3), plaintiffs hereby move for leave to file a reply

memorandum, attached hereto as Exhibit 1, in response to defendants' opposition to plaintiffs'

motion for a preliminary injunction.  Plaintiff also move for leave to file the supplemental

affidavits of Richard L. Engstrom and John E. Harmon, attached hereto as Exhibit 2 and Exhibit

3, respectively.

In support of their motion, plaintiffs state as follows.  Defendants' opposition is 45 pages

long and raises several issues bearing on the legal framework that governs plaintiffs' challenge to

the Springfield at large voting system.  Plaintiffs submit that a reply is necessary to fully respond

to certain incorrect arguments set out in the defendants' brief and to clarify certain aspects of

their claim under Section 2 of the Voting Rights Act.  Further, the subject matter of this action is

of great import, not only to plaintiffs but to all voters in Springfield.  Plaintiffs submit that the attached will assist the court in developing a full record on which to base its decision on plaintiffs' motion.

WHEREFORE, plaintiffs respectfully submit that good cause exists to grant their motion and to give them leave to file the attached.

<u>LOCAL RULE 7.1(A)(2) CERTIFICATION</u>

The undersigned hereby certifies that on August 15, 2005, they conferred with defendants' counsel and attempted in good faith to resolve or narrow the issues prior to the filing of this motion but were unable to do so.

Respectfully submitted,

ARISE FOR SOCIAL JUSTICE; ¿OISTE?; NEW
ENGLAND STATE-AREA CONFERENCE OF
THE NAACP; REV. TALBERT W. SWAN, II;
NORMAN W. OLIVER; DARLENE ANDERSON;
GUMERSINDO GOMEZ; FRANK BUNTIN;
RAFAEL  RODRIQUEZ; and DIANA NURSE

By their attorneys,

_____/s/ Paul E. Nemser_____
Paul E. Nemser (BBO #369180)
J. Anthony Downs (BBO #532839)
William J. Connolly III (BBO #634845)
GOODWIN PROCTER LLP
Exchange Place, 53 State Street
Boston, MA 02109
(617) 570-1000

_____/s/ Nadine  Cohen_____
Nadine Cohen (BBO #090040)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW OF THE BOSTON BAR
ASSOCIATION
294 Washington Street, Suite 443
Boston, MA 02108
Dated:  August 15, 2005                              (617) 988-0609

LIBA/1574795.1

Angela Ciccolo
Victor L. Goode
NAACP
4805 Mt. Hope Drive
Baltimore, Maryland 21215-3297
(410) 580-5790

*Of Counsel*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

ARISE FOR SOCIAL JUSTICE;                    )
¿OISTE?; NEW ENGLAND STATE-AREA              )
CONFERENCE OF THE NAACP;                     )
REV. TALBERT W. SWAN, II;                    )
NORMAN W. OLIVER; DARLENE                    )
ANDERSON; GUMERSINDO GOMEZ;                  )
FRANK BUNTIN; RAFAEL RODRIQUEZ;              )
and DIANA NURSE                             )
                                            )
                    Plaintiffs,             )    Civil Action No. 05-30080 MAP
                                            )
        v.                                  )
                                            )
CITY OF SPRINGFIELD and SPRINGFIELD         )
ELECTION COMMISSION,                        )
                                            )
                    Defendants.             )
_____)

**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Defendants' opposition does nothing to undermine the strength of plaintiffs' showing that

the at large system in Springfield unlawfully dilutes the votes of Hispanics and Black/African

Americans.  Defendants' "proportionality" defense is predicated not only on the mistaken view

that "proportional" outcomes in past elections could "all but foreclose" plaintiffs' dilution

claim—a view that is at odds with Supreme Court precedent—but also on facts which establish

the *absence of proportional representation* for both Hispanics and Black/African Americans in

city elections.  Further, and even more significant, defendants have failed to raise any material

issue concerning plaintiffs' *Gingles* proof.  Having neither submitted expert testimony nor

offered any legitimate excuse for their failure to do so, defendants resort instead to raising doubts

about the work of plaintiffs' experts, but none of those doubts has any staying power.

Concerning the first *Gingles* prong, plaintiffs have proposed two clear majority Hispanic districts.  Defendants suggest that Hispanics would not win in those districts because Hispanics would not turn out to vote, but plaintiffs need not prove that their majority-minority districts would be "effective," and defendants' "evidence" on turnout is so crude as to prove nothing.  Plaintiffs have also proposed one clear majority Black/African American district and one "cross-over" district with over 38% Black/African Americans in the voting age population ("VAP").  Given the tight cohesion of Black/African Americans behind the candidates they prefer—well over 90%—and the willingness of other groups to support such candidates, this cross-over district would create a significant opportunity for Black/African Americans to elect a second candidate of their choice.

Concerning the second and third *Gingles* prongs, defendants have hardly touched Professor Engstrom's conclusion that the last three elections demonstrate racially and ethnically polarized voting in Springfield.  Defendants do not contest that "African Americans and Latinos in Springfield . . . have a pronounced preference to be represented by people from within their group" or that non-Hispanic whites have "a distinctly different preference, which is for white candidates in these elections."  Affidavit of Richard L. Engstrom, Ph.D ("Engstrom Aff.") ¶ 33.  Defendants merely counter that whites do not always veto all minority candidates, minority groups do not always favor all candidates from their group, and one minority group does not always favor the other minority's candidates.  But none of these arguments negates the point that "[m]inority candidates preferred by voters within their group were vetoed by the rest of the electorate in every election except the city council election in 1999."  Engstrom Aff. ¶ 24.  The last three elections, in other words, demonstrate the minority political cohesion and white bloc voting required by *Gingles,* and Springfield's at-large system presumptively violates Section 2 of

the Voting Rights Act.  Since defendants have not made any showing to rebut that presumption, plaintiffs have established a significant likelihood of success on the merits of their Section 2 claim.

And by showing that likelihood of success, plaintiffs also have met their burden to show irreparable harm.  To permit elections to proceed under an election system that denies plaintiffs an equal opportunity to participate in the most fundamental aspect of our democracy is the epitome of irreparable harm.  As plaintiffs have indicated in the past, they are prepared to move forward quickly towards trial—in a matter of months—thus addressing defendants' concerns about delay.  Likewise there can be no public policy considerations sufficient to compel the Court to permit an unlawful election to proceed, particularly where a court-ordered special election following a tainted election would impose significant, unnecessary burdens on both candidates and voters alike and could hinder a smooth transition to a nondiscriminatory, district-based system.  Plaintiffs' motion should be granted without delay.

## <u>Argument</u>

## I.     Defendants "Proportionality" Argument is Flawed in Both Law and Fact

Defendants' principal argument on the merits is that Hispanic and Black/African American votes have not been diluted by the at large system because, since the at large system was put in place in 1961, the number of minority candidates sitting on the City Council and School Committee has allegedly been "proportional" to the percentage of Springfield's Hispanic and Black/African American voters at various points in time.  Memorandum Supporting Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Opposition") at 23.  Indeed, defendants go so far as to assert that, in light of this "proportionality," plaintiffs' Section 2 challenge is "*all but foreclose[d]*" by the Supreme Court's decision in *Johnson v. De Grandy*,

512 U.S. 997 (1994).  Opposition at 23 (emphasis added).  Defendants misread the law and misstate the facts.  In particular, there is simply no evidence that such "proportionality" existed to any degree relevant to a Section 2 analysis.

In *De Grandy*, the state of Florida had implemented a single member district plan for the election of state representatives.  The plan created a certain number of majority-minority districts—a number roughly proportional to minority groups' shares of the VAP.  512 U.S. at 1000.  Plaintiffs sued, alleging that their votes were diluted because the plan *could* have included more majority-minority districts.  *Id.* at 1001-02.  The Court concluded that even though plaintiffs might have established each of the three *Gingles* factors, the "totality of the circumstances" did not support a finding of vote dilution because Florida's plan already included "majority-minority districts in substantial proportion to the minority's share of voting age population."  512 U.S. at 1013.  The Court held that "failure to maximize [the electoral opportunities of minority voters] cannot be the measure of [a] § 2 [violation]."  *Id.* at 1017; *see also id.* at 1009 (rejecting the notion that Section 2 requires that what *could* have been done to increase the number of majority-minority districts *should* have been done).  However, the Court went on to hold that the presence (or absence) of proportionality, while probative, is *not* dispositive of a Section 2 vote dilution claim.  Instead, the degree of probative value assigned to proportionality will vary depending on the facts of the case.  *Id.* at 1020-21.

Accordingly, *De Grandy* cannot support defendants' assertion that their purported evidence of proportionality "all but forecloses" a claim of vote dilution under Section 2.  Opposition at 23.  The Court in *De Grandy* expressly rejected this argument.  512 U.S. at 1017-18.  In addition, defendants' reliance on *De Grandy* is misplaced because plaintiffs here are not seeking to "maximize" electoral opportunities in a districting plan.  Plaintiffs only seek a district

representation system for City Council and School Committee that permits them an *equal* opportunity to participate in a process that has been virtually closed to them for the last 44 years. Defendants also mistakenly assume that *De Grandy's* proportionality analysis of single member districts is equally applicable to at large elections. However, this Court need not reach that question or determine the proper probative value to assign to proportionality in this case because defendants' "evidence" of proportionality itself falls flat.

First, defendants' assertion that "[t]he racial or ethnic identification of the actual membership of the Springfield City Council has often been proportional to that . . . Hispanic/Latino share of the population," Opposition at 24, is entirely unsupported and demonstrably false. At no time in the last 44 years has the "racial or ethnic identification" of the City Council *ever* been proportional to the percentage of Hispanic voters in Springfield.[1] *See* Exhibit A, attached hereto (comparing City Council composition with VAP data for 1995, 1997, 1999, 2001 and 2003 elections). Until 2002, no Hispanic person had *ever* sat on the City Council. As applied to Hispanic voters, defendants' proportionality argument fails from the start.

As applied to Black/African American voters, defendants' evidence of proportionality completely undercuts their argument. At the outset, defendants' reliance on old election data is irrelevant and improper. The relevant data with which to analyze vote dilution is not to be found in the results of elections held twenty, thirty and forty years ago. Instead, "[t]he ultimate question in any Section 2 case must be posed in the present tense, not the past tense. The court must determine whether the challenged electoral structure deprives a racial minority of equal opportunity to participate in the political process *at present*." *Uno v. City of Holyoke*, 72 F.3d

---

[1]    At best, Jose Tosado's election to the City Council in 2003 (after being appointed to the Council in 2002) resulted in Springfield's Hispanic voters being underrepresented, as opposed to unrepresented entirely.

973, 990 (1st Cir. 1995) (emphasis in original); *see also Ruiz v. City of Santa Maria*, 160 F.3d

543, 555 (9th Cir. 1998); *United States v. Charleston County*, 316 F. Supp. 2d 268, 278 (D. S.C.

2003) (enjoining use of at large system for county council elections), *aff'd,* 365 F.3d 341 (4th Cir.

2004).  Accordingly, defendants' proportionality evidence is relevant only insofar as it relates to

recent elections.  So limited, the evidence unquestionably demonstrates that, except for a single,

unique election (1999),[2] the composition of the City Council over the past 10 years has *never*

been proportional to the percentage of Black/African American voters.  *See* Exhibit A.

**II.     Defendants Have Not Countered Plaintiffs' *Gingles* Showing**

     Defendants have not submitted any expert testimony to rebut the affidavits of Professor

John Harmon (compactness) and Professor Richard Engstrom (cohesion and white bloc voting).[3]

Accordingly, both affidavits should be deemed uncontested.  At any rate, nothing in defendants'

opposition undermines Professor Harmon's and Professor Engstrom's findings.

    **A.     Compactness**

       **1.     Plaintiffs' Proposed Plan Creates Two Black/African American
            Opportunity Districts**

     Plaintiffs' plan creates two districts (Districts 3 and 4) in which Black/African Americans

will have a real opportunity to elect representatives of their choice.  Defendants do not dispute

that proposed District 3 (58.02% Black/African American VAP) satisfies *Gingles'* compactness

requirement.  Harmon Aff., Exhibit 6.  Instead, defendants focus on proposed District 4, whose

---

[2]    As set forth in plaintiffs' opening brief, despite receiving extremely strong support from Black/African American voters, Carol Lewis-Caulton was elected only by an exceedingly narrow margin in 1999, following the decisions of two women incumbents not to seek reelection.  Plaintiffs' Brief Lewis-Caulton Affidavit ¶ 9; Engstrom Aff. ¶ 12, Table 1.

[3]    Defendants' assertion that they had insufficient time and/or data to assess Professors Engstrom's and Harmon's analyses or to submit their own expert affidavits should not excuse their failure to submit any expert testimony. The instant suit was commenced on April 5, 2005.  Early on, plaintiffs unambiguously placed defendants on notice that they intended promptly to seek a preliminary injunction.  *See* Plaintiffs' Motion For Expedited

VAP is 38.47% Black/African American, 16.42% Hispanic, and 41.11% White. *Id.* Obviously,

District 4 does not have a numerical majority of Black/African American voters, but this does

not preclude a finding that District 4 is "compact" for Section 2 purposes. Indeed, in *Metts v.*

*Murphy*, 363 F.3d 8 (1st Cir. 2004), the First Circuit joined other circuits in recognizing that

Section 2 plaintiffs can satisfy the compactness requirement by demonstrating that a minority

candidate will be able to attract a sufficient number of cross-over votes:

> [S]everal Supreme Court opinions after *Gingles* have offered the prospect, or at least
> clearly reserved the possibility, that *Gingles'* first precondition – that a racial minority
> must be able to constitute a "majority" in a single-member district – could extend to a
> group that was a numerical minority but had predictable cross-over support from other
> groups.

*Metts*, 363 F.2d at 11 (citing *Johnson v. De Grandy*, 512 U.S. 997, 1008-09 (1994)); *see also*

*Voinovich v. Quilter*, 507 U.S. 146, 158 (1993) (observing that "the *Gingles* factors cannot be

applied mechanically and without regard for the nature of the claim" and acknowledging that,

with respect to certain vote dilution claims "the first *Gingles* precondition . . . would have to be

modified or eliminated").[4]

Thus, the issue under *Metts* is not, as defendants argue, whether in the past "a greater

proportion of white voters support[ed] Black/African American candidates than d[id]

Hispanic/Latino voters." Opposition at 27. Rather, the issue is whether in proposed District 4

the combination of predictable Black/African American support and predictable cross-over

support from other groups would enable Black/African American voters to elect a candidate of

---

Scheduling Conference And Entry Of Expedited Scheduling Order, dated May 10, 2005. Defendants have had
almost 4 months to consult with their own experts.

[4] This proposition—that a minority group challenging an election system may rely on predictable cross-over
support from other groups to satisfy the "compactness" requirement—is distinct from the question whether an
aggrieved minority under the Voting Rights Act may be composed of a coalition of different groups that
together satisfy the *Gingles* factors. *See, e.g.*, *Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988)
(holding that "[t]here is nothing in the law that prevents the plaintiffs from identifying the protected aggrieved
minority to include both Blacks and Hispanics . . . . if, together, they are of such numbers residing
geographically so as to constitute a majority in a single member district, they cross the *Gingles* threshold as
potentially disadvantaged voters.").

their choice.  Given the proportion of Black/African American voters in proposed District 4 (38.47%) and the strength of cohesiveness among Black/African American voters, over 90% for the most preferred candidates, Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction ("Plaintiffs' Brief") at 14-15, a candidate preferred by Black/African American voters in proposed District 4 need only obtain very limited cross-over support (from either whites or Hispanics) to achieve a majority.  And such cross-over support is indeed predictable.  Both Hispanic and white voters have supported Black/African American candidates in the past and will likely do so in the future in proposed District 4.[5]  Engstrom Aff., Tables 1-6. Defendants all but acknowledge the likelihood of white support.  Opposition at 28 ("Dr. Engstrom's analysis also provides evidence that a sufficient portion of white electors have voted for Black/African American . . . candidates in numbers to support their election.").  Accordingly, plaintiffs' plan affords a meaningful remedy to Black/African American voters and satisfies the *Gingles* requirement of compactness.

### 2.    Plaintiffs' Proposed Plan Creates Two Hispanic Opportunity Districts

Defendants assert that plaintiffs' proposed majority Hispanic districts (Districts 1 and 2) do not satisfy *Gingles* "compactness" requirement because the numerical majorities within those districts are not "'effective' within the meaning of the first *Gingles* precondition."  Opposition at

---

[5]     It is possible to make a rough estimate of the cross-over effect using Professor Engstrom's data on city-wide candidate preferences in 2001 and 2003, *see* Engstrom Tables 2 and 3 results for Williams and Lewis-Caulton, and Professor Harmon's Exhibit 6 VAP results for proposed District 4.  For example, for Williams in 2001, an estimate for District 4 would be (98.5% of 38.47% African Americans) + (23% of 16.42% Latinos) + (48.6% of 41.11% whites) = 61.65%.  Thus, had Mr. Williams been running in District 4, he would have received roughly 62% of the vote in 2001 and roughly 54% in 2003; had Ms. Lewis-Caulton been running in District 4, she would have received roughly 54% of the vote in 2001 and 49% in 2003.  It is entirely likely, moreover, that in a district election in which each voter casts a single vote for one candidate drawn from a district-based field, rather than up to nine votes for a city-wide field, the percentage of Latino voters favoring an African American candidate would increase.  This is because under the at-large system, history has shown that few or no minority seats can be won, and this may foster competition between minorities such that voters in a particular minority try to ensure that their group wins representation at the expense of any competing minority group.  There

32.  As with *De Grandy*, defendants have misstated the relevant legal standard.  *Gingles* does not require an "effective" majority in order to satisfy the compactness requirement.  Not surprisingly, defendants cite no authority for this proposition.  "The minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute *a majority* in a single member district."  *Thornburg v. Gingles*, 478 U.S. 30, 49 (1986) (emphasis added).  *Gingles* only requires a showing of "the *potential* to elect representatives in the absence of the challenged structure or practice."  *Id.* at 50 n.17 (emphasis in original).  Plaintiffs' proposed Districts 1 (54.02% Hispanic VAP) and 2 (54.12% Hispanic VAP) will afford Hispanic voters the potential to elect representatives of their choice.  Accordingly, both districts satisfy *Gingles*.

Relying on alleged "depressed" Hispanic voter turnout data for a single election (2003), defendants briefly speculate that Hispanics in the two proposed districts will be unable to turn out enough voters to win elections.  Opposition at 31-32.  Defendants overlook that Hispanics significantly outnumber both white and Black voters in both proposed districts.[6]  Defendants also base their turn-out argument on weak data—an examination of turn-out of registered voters in precincts in which different groups comprised at least or less than 50% of the voting age population ("VAP").  Opposition at 17.  Yet 50% is such a low cut-off that defendants' data do not permit any legitimate inference about the turn-out of the groups in question.  For example, in a precinct with 1000 registered voters in which whites constituted 55% of the VAP and 40% of the registered voters turned out to vote, nonwhites could have turned out at a rate of 3:1 compared to whites – 300 nonwhites to 100 whites – but defendants' analysis would not have

---

would be more incentive for Black/African Americans and Hispanics to join together to elect a minority candidate who would best represent their common interests in district elections.

[6]     In proposed District 1, Hispanics comprise 54.02% of the voting age population, as compared to 29.21% white voters and 13.45% Black voters.  Likewise, in proposed District 2, Hispanics comprise 54.14% of the voting age population, as compared to 24.80% white voters and 18.10% Black voters.  Harmon Aff., Exhibit 6.

reflected this.  Similarly, in a precinct of 1000 registered voters in which Hispanics constituted 55% of the population and only 25% of registered voters turned out, Hispanics could have turned out at a rate of 4:1 compared to non-Hispanics (200 Hispanics, 50 non-Hispanics), but again defendants' analysis would not have captured this fact.  Defendants' evidence thus proves little or nothing about minority turnout.[7]

Further, using actual voting data from the same 2003 election, Professor Harmon has concluded that, had the elections taken place in a single member district system similar to plaintiffs' proposed district plan, the candidate most preferred by Hispanics would have won in both districts, regardless of the turnout rate.  Supplemental Affidavit of John E. Harmon.[8]

**B.    Racially Polarized Voting**

Defendants do not seriously challenge Professor Engstrom's conclusions about the high degree of cohesion among African American voters and among Hispanic voters.  Having submitted no expert testimony to counter Professor Engstrom's findings, defendants virtually concede cohesion:  "[A]ssuming the reliability and accuracy of Dr. Engstrom's analysis it would appear that Black/African American voters, in many cases, are politically cohesive."  Opposition at 29; *see also id.* at 29 ("it also appears that Hispanic/Latino voters appear to prefer

---

[7]    The premise for defendants' turn-out analysis—that registration rates for white, Black/African American and Hispanic/Latino persons are comparable, see Opposition at 16, is also similarly problematic because defendants have used a 60% cut-off for identifying the precincts in which they analyze registration rates.

[8]    Defendants also criticize plaintiffs' district plan for allegedly "splitting" each of Springfield's 17 neighborhoods and for disregarding or subordinating the "all important role" played by the neighborhood councils that operate in some of these neighborhoods.  Opposition at 33.  Plaintiffs are not proposing that Springfield abandon its neighborhood councils, and plaintiffs have no desire to interfere with those bodies' functions.  But defendants nowhere substantiate the councils' "all important role," and if neighborhood councils are as integral a part of municipal government as defendants claim, why do some neighborhoods have no council?  *See id.* at 9 (identifying 11 neighborhood councils).  Neighborhood councils are not elected pursuant to any state statute or any uniform process, and their existence is completely irrelevant to plaintiffs' access to elections for City Council.  Under the Voting Rights Act, plaintiffs have the right to participate, on an equal basis, in the election of their City Councilors; these rights are not defined or vindicated by the existence of an *ad hoc* neighborhood council system.

Hispanic/Latino candidates and exhibit voter cohesion in some City Council elections"). Nevertheless, defendants go on to voice "objections" to Professor Engstrom's conclusions. None of these arguments have merit.

### 1.  Plaintiffs' "Objections" to Professor Engstrom's Affidavit

Defendants first raise "objections" regarding perceived omissions from Professor Engstrom's affidavit. Defendants find fault that, unlike "almost all of his past reports," Professor Engstrom's affidavit does not include (i) "correlation coefficients," (ii) "rate of voter turnout as among those of different racial and ethnic groups," (iii) "underlying data" and (iv) "spread sheets." Opposition at 26. Professor Engstrom's Supplemental Affidavit, submitted herewith, denies that this information is routinely part of his initial affidavits and responds to each of these alleged shortcomings. First, as set forth in Professor Engstrom's original affidavit, correlation coefficients are not a useful analytical tool when conducting multivariate analysis, and it is Professor Engstrom's practice not to include them in reports not based on bivariate analysis. Engstrom Aff. n.2; Supplemental Affidavit of Richard L. Engstrom, Ph.D in Support of Plaintiffs' Motion for Preliminary Injunction ("Supplemental Engstrom Aff.") ¶¶ 4-6.[9] Second, Professor Engstrom does not always report voter turnout rates; the absence of such data in his affidavit here is a function of the scope of his engagement, not a limitation on the validity of his analysis. Supplemental Engstrom Aff. ¶ 9. Third, Professor Engstrom does not typically provide "underlying data and "spread sheets" as part of his reports. *Id.* ¶ 8.

---

[9]  Professor Engstrom further refutes defendants' complaint that his affidavit fails to provide sufficient information to permit an assessment of "the reliability or predictability of his analyses," Opposition at 26 n.20, by explaining in detail his reporting of statistical significance. Supplemental Engstrom Aff. ¶ 7.

## 2. Cohesion Among Black/African American Voters

Defendants' only substantive challenge to Professor Engstrom's findings that Black/African Americans have been "strongly cohesive" in the past three elections is based on the claim that Black/African Americans support some Black/African American candidates more than others and that "it appears that some white candidates owe their election to the support of Black/African American voters." Opposition at 29. But neither *Gingles* nor subsequent cases hold that cohesion means supporting *every* candidate from the relevant minority group or no candidates from other ethnic groups. "A showing that a significant number of minority group members *usually* vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim." *Gingles*, 478 U.S. at 56 (emphasis added). This should be particularly true where, as in Springfield, a voter may cast nine votes for City Council in a given year. As Professor Engstrom's initial Affidavit shows, the record unquestionably supports a finding that Black/African Americans in Springfield have almost always voted for the same candidates, and the candidates they most strongly support are Black/African American.

In arguing to the contrary, defendants rely on a bare assertion that "legally significant minority voter cohesion" requires support in excess of 65%. Opposition at 29. Defendants state that "of the six Black/African American candidates to compete for a position of (sic) the City Council in the three elections analyzed by Dr. Engstrom, two were not cohesively supported." *Id.* Defendants' argument fails on multiple levels. First, defendants neither cite authority nor identify any of the "experts" they allege to have adopted the so-called 65% "threshold requirement," and Professor Engstrom, an acknowledged expert in this field, does not recognize any such requirement. Supplemental Engstrom Aff. ¶ 10.

Second, defendants' carefully worded statement about the number of Black/African Americans who sought seats on the City Council misleadingly minimizes the relevant data pool. Defendants are correct that six Black/African Americans have run for election to City Council in the last three elections. Defendants ignore, however, that two of these six candidates have run three times each, increasing the number of African American candidacies from six to *ten*. In summary fashion, Professor Engstrom's results showing the degree to which African American voters supported African American candidates were as follows:

|     | Year | Candidate | Percent of Support From African American Voters |
| --- | --- | --- | --- |
| 1. | 1999 | Lewis Caulton | 106.4% |
| 2. | 1999 | Williams | 93.3% |
| 3. | 2001 | Williams | 98.5% |
| 4. | 2001 | Lewis-Caulton | 95.2% |
| 5. | 2001 | Rucks | 75.3% |
| 6. | 2001 | Stokes | 43.7% |
| 7. | 2003 | Lewis Caulton | 98.2% |
| 8. | 2003 | Williams | 93.8% |
| 9. | 2003 | Jones | 67.2% |
| 10. | 2003 | Wray | 32.0% |

Engstrom Aff., Tables 1-3. In 1999, two of two candidates exceeded defendants' 65% "threshold." In 2001, three of four exceeded the "threshold." In 2003, three of four exceeded the "threshold." And in those same elections, no non-African American received more than 44% African American support. Engstrom Aff. Tables 1-3. Thus, even using defendants' unsupported criterion for cohesion, African American cohesion was strong.

### 3. Cohesion Among Hispanic Voters

Defendants' suggestion that there are insufficient data to analyze Hispanic voting patterns flies in the face of the record. Hispanic candidates have run in two of the last three City Council elections and two of the last three School Committee elections. As set forth in Professor Engstrom's report, data from those elections provide clear proof that Hispanics decisively prefer

Hispanic candidates over all others.  Plaintiffs' Brief at 14.  Again, defendants' 65% threshold is without basis and an insufficient response to Professor Engstrom's findings that "Latinos in Springfield . . . have a pronounced preference to be represented by people from within their group."  Engstrom Aff. ¶ 33.[10]

### C.  Totality of the Circumstances

Defendants' myopic focus on "official" discrimination is misplaced because evidence relevant to the "totality of the circumstances" is not limited to official acts.  "[T]he literal language of the fifth Senate factor does not even support the reading that only discrimination by [the city] may be considered; the limiting language describes the people discriminated against, not the discriminator."  *Gomez v. Watsonville*, 863 F.2d 1407, 1418 (9th Cir. 1988).  Just as Section 2 does not require a showing of intentional discrimination, neither does the totality of the circumstances inquiry hinge on intent.  *See id*.  Defendants cannot seriously be contending that there is *not* a long history of discrimination against Black/African Americans and Hispanics, or that the socio-economic status of these groups is not depressed; those factors are highly relevant, and must be taken into account here.

### III.    Defendants Have Failed To Demonstrate That Plaintiffs Will Suffer "No Harm"

Defendants take the unsupportable position that plaintiffs will suffer *no harm at all* if the elections take place as scheduled.  *See* Opposition at 18-22.  Many courts have held that irreparable harm arises from a violation of the Voting Rights Act.  *See United States v. Berks County*, 250 F. Supp. 2d 525, 540-41 (E.D. Pa. 2003) (enjoining county from holding further elections in violation of Voting Rights Act and finding that denial of equal access to the electoral

---

[10]     In each election in which a Latino candidate ran, Latinos gave their strongest support to Latino candidates—often at a level greater than 75%--and there was a large gap between support for Latino candidates and support for candidates from any other group.  Engstrom Aff. Tables 1-6.

process caused irreparable harm to Hispanic voters); *Casarez v. Val Verde Cty*, 957 F. Supp. 847, 865 (W.D. Tex. 1997) (granting injunction on section 2 claim and stating plaintiffs would be irreparably harmed if elected officers were permitted to take office as a result of votes that were improperly allowed and that diluted the voting power of Hispanic voters); *United States v. Metropolitan Dade Cty*, 815 F. Supp. 1475, 1478 (S.D. Fla. 1993) (granting temporary restraining order against County on finding that failure to disseminate election material in Spanish violated the Voting Rights Act and would cause irreparable harm to the Hispanic community without court-ordered relief); *Puerto Rican Organization for Political Action v. Kusper*, 350 F. Supp. 606, 611 (N.D. Ill. 1972) (finding that evidence regarding violation of Voting Rights Act satisfied the preliminary injunction standard).[11]

Defendants make the remarkable argument that plaintiffs will not suffer harm if the November 2005 election goes forward because the harm would be no different than what minority voters have been suffering for the past 44 years under the at-large system. *See* Opposition at 19. The argument is specious. That plaintiffs would suffer the same kind of discrimination they have suffered in the past neither negates the harm, nor makes it acceptable, and defendants cite no authority to the contrary. That plaintiffs will again be harmed – their voting power will again be diluted – in a November 2005 at large election, is precisely the reason why a preliminary injunction is necessary.[12] *See Berks*, 250 F. Supp. 2d at 540-41.

---

[11] Defendants rely on a 1988 case in which the Fifth Circuit declined, in *dicta*, to adopt a *per se* rule that a violation of Section 2 automatically causes irreparable harm. *See Chisom v. Roemer*, 853 F.2d 1186, 1189 (5th Cir. 1988). That principle has not been adopted in this Circuit.

[12] Furthermore, this Court should reject defendants' argument that it should not enjoin this election, even if the harm is such as to justify a preliminary injunction, because the violation does not concern a "new" procedure, process, redistricting plan or election scheme. Defendants' distinction does not make sense, and ignores cases in which courts have preliminarily enjoined longstanding election schemes. *See* Plaintiffs' Brief at 11 (citing *United States v. Dallas Cty. Comm'n*, 791 F.2d 831 (11th Cir. 1986); *Clark v. Marengo Cty. Comm'n*, 623 F. Supp. 33 (S.D. Ala. 1985)).

In contrast to plaintiffs' showing of irreparable harm if the election goes forward, defendants have made no showing at all that they would be harmed by postponing the November election. Without any supporting authority, defendants identify their potential harm as their "interest in ensuring that the members of the City Council reflect the electoral preferences of the voters." See Opposition at 21. Yet, as has been the case year after year, the electoral preferences of Springfield's minority voters will *not* be reflected in yet another at large election. Defendants also mention the "uncertainties" that may flow from enjoining the election, particularly surrounding the authority of the City Council to continue to conduct business if the election were postponed. *See* Opposition at 21. But amorphous "uncertainties" do not outweigh the concrete harm plaintiffs will suffer if the November election proceeds as scheduled and their voting rights are violated once again.[13] *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 281 F. Supp. 2d 436, 456 (N.D.N.Y. 2003) ("on balance, the deprivation of the rights of blacks and Hispanics to exercise their vote and participate in the political process outweighed any disruption to the electoral process").

Defendants also assert that an injunction would deprive all Springfield voters of their right to choose or replace City Councilors in November. *See* Opposition at 18, 22. But in fact all voters are harmed by elections held in violation of Section 2.[14] *See Berks*, 250 F. Supp. 2d at

---

[13]    Defendants also argue that, if plaintiffs succeed on the merits, the Court should defer to appropriate legislative bodies to fashion a remedial election scheme. *See* Opposition at 21-22. But defendants are putting the cart before the horse. Whether after finding for plaintiffs the Court should solicit the current City Council's input in fashioning a remedy is irrelevant to whether the Court should enjoin the November 2005 election now.

[14]    Defendants' observation that a newly elected City Council would be "no less tainted" by the Section 2 violation that enabled their election than the sitting City Council is no justification for violating plaintiffs' rights anew. *See* Opposition at 19. In *Arbor Hil Concerned Citizens Neighborhood Ass'n v. County of Albany*, 357 F.3d 260 (2d Cir. 2004), the district court initially entered a preliminary injunction to prevent the county from holding legislative elections under a districting plan that violated Section 2. The order was lifted shortly before election day after the county submitted a redistricting plan that complied with Section 2. Because it was too late to implement the new plan, the November elections went forward under the plan that violated the Voting Rights Act. The Second Circuit held

540 ("Federal courts have recognized that the holding of an upcoming election in a manner that will violate the Voting Rights Act constitutes irreparable harm to voters."). Defendants are really arguing for perpetuation of an illegal system that produces illegal results – in violation of Section 2. *See* Opposition at 19. Given the history of City Council elections in Springfield, it is hardly realistic to claim, as defendants do, that plaintiffs will benefit from the conduct of the November 2005 election. See Opposition at 19. Current and former City Councilors have campaigned publicly in support of ward representation; time and again those campaign promises have been ignored.

Defendants conjure up a parade of horribles that they say would result from enjoining the November 2005 election, but this is nothing more than speculation and a scare tactic. *See* Opposition at 21-22. Plaintiffs request that the election only be postponed until the court can decide the case on the merits, which, given that plaintiffs are prepared to move quickly toward trial, is anticipated to be a period of months not years. Plaintiffs certainly do not contemplate the delay of three election cycles or more that defendants imagine. *See* Opposition at 22.

**IV**.    **It Is In The Public Interest to Enjoin the November 2005 City Council Election**

Neither the public interest nor the interest of the candidates currently running for City Council would be served if the Court allowed the November 2005 election to go forward, but shortly thereafter decided in plaintiffs' favor and invalidated the November 2005 election results. If this Court finds that plaintiffs are likely to succeed on the merits, it should enjoin the November 2005 election, as it is decidedly not in the public interest to have an illegal election proceed. Certainly, if plaintiffs succeed on the merits of their claim, the proper result would be an injunction. *See Latino Political Action Cmte. v. Boston.*, 568 F. Supp. 1012 (D. Mass. 1983).

---

that the district court erred by allowing the election to go forward under the old plan, and ordered that special primary and general elections be held. *See Arbor Hill*, 357 F.3d at 263.

In that case, plaintiffs won summary judgment on their apportionment claim, and the district court ordered that the election not proceed until a new, lawful plan was in place. *See id.* In so holding, the court rejected the defendants' reliance on *Reynolds v. Sims*, 377 U.S. 533 (1964), stating, "*Sims* in no way *requires* a Federal Court to allow an illegal election." *Id.* at 1020 (emphasis in original). On appeal, the First Circuit denied defendants' motion for a stay, and did not find persuasive the argument that the proximity of the upcoming election required the election to go forward under the old, unconstitutional plan. *See Latino Political Action Cmte. v. Boston*, 716 F.2d 68 (1st Cir. 1983). In refusing to grant the stay, the First Circuit found significant that the election was a local, city election, involving fewer voters and candidates, and less expense than a statewide election. *Id.* at 71. The same logic should apply here. If the Court concludes that plaintiffs are likely to succeed on the merits, a preliminary injunction would cause little disruption to the electoral process in this city-wide election, and would serve the public interest by not subjecting the candidates and voters alike to the harm of a likely illegal election held under the cloud of uncertainty of this pending lawsuit.

*Sampson v. Murray*, 415 U.S. 61 (1974), which defendants cite to support their argument that "[c]ourts have been loathe [sic] to enjoin the conduct of elections even where there is a strong likelihood of success on the merits where there is 'possibility that . . . other corrective relief will be available at a later date, in the ordinary course of litigation," is inapposite. Opposition at 20. *Sampson* was not a voting rights case, but rather involved a discharged government employee who sought temporary injunctive relief against her dismissal. *See id.* In holding that the plaintiff was not entitled to a temporary injunction, the Court observed that "temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." *See id.* at 90. Unlike the monetary loss in *Sampson*, a violation of plaintiffs' voting

rights cannot be compensated later by damages. *See U.S. v. Berks County*, 250 F. Supp. 2d 525 (E.D. Pa. 2003) ("[t]he impact of the discouragement of equal participation in the democratic system cannot be redressed by money, or any other remedy, following trial"); *Casarez v. Val Verde County*, 957 F. Supp. 847, 864-65 (W.D. Tex. 1997) (violation of Voting Rights Act constitutes irreparable injury that monetary damages cannot address).[15]  Having a special election on the heels of a tainted election in November 2005 would likely increase voter confusion and lower voter turnout during the introduction of the new, lawful district-based system for electing the City Council.  An eventual special election would not be an adequate substitute for an immediate injunction.

It is further in the public interest to implement a system that has demonstrated support among Springfield's voters.  Defendants' use of the percentage of registered voters who supported the 1997 ward representation ballot question, as opposed to the percentage of people who actually voted in the 1997 election and supported the ballot question significantly obscures

---

[15]    In further support of this proposition defendants appear to have simply copied a string cite from *Chisom v. Roemer*, 853 F.2d at. 1190.  These cases are all distinguishable.  In *Whitcomb v. Chavis*, 396 U.S. 1055 and 396 U.S. 1064 (1970), the Court stayed implementation of a court-ordered redistricting pending appeal, without articulating its rationale for doing so.  And in *Maryland Citizens for a Representative General Assembly v. Governor of Maryland*, 429 F.2d 606, plaintiffs challenged a reapportionment plan that had previously been held constitutional, and sought a remedy that would only apply to one election because reapportionment was scheduled to take place when census results were available shortly after the election.  Here, the plan at issue has not been held lawful, and the remedy sought would not apply to only one election.  Defendants' remaining cases on this point suggest that close proximity to an election date militates against enjoining the election.  *See* Opposition at 20.  Here, however, plaintiffs are ready and willing to move to trial quickly.  Less uncertainty and disruption will attend the election process if one lawful election is held belatedly than if the November 2005 election proceeds and produces illegal results that are invalidated soon thereafter.  Springfield City Council candidates filed certification papers less than two weeks ago; an injunction now would be much less harmful to those candidates, and to the electorate as a whole, than would invalidating the election after months of campaigning, fundraising and advertising.  Indeed, courts have enjoined elections at much later dates.  *See, e.g.*, *United States v. Dallas Cty Commission*, 791 F.2d 831, 832-33 (11th Cir. 1986) (in Section 2 case, after U.S. moved for preliminary injunction in mid-February 1986 to enjoin June at-large elections for county commission and school board, district court on May 23, 1986, granted injunction as to county commission, but not as to school board; and Eleventh Circuit reversed as to the school board and ordered district court to enter injunction); *Taylor v. Haywood Cty*, 544 F. Supp. 1122 (W.D. Tenn. 1982) (preliminary injunction entered on August 3, 1982 stopping August 5 county highway commissioner elections pending hearing on the merits).

its overwhelming support among Springfield's Black/African American and Hispanic communities. *See* Opposition at 13.[16] The predominantly white Ward 7 (home to the majority of Springfield's City Councilors over the last decade) was the only ward collectively voting "no" on the 1997 ward representation ballot question. *See* Defendants' Exhibit I.

Finally, a change to ward representation is simply good government. Now, not only are Springfield's Black/African American and Hispanic voters not adequately represented in City government, but all Springfield residents who do not reside in the predominantly white and comparatively wealthy areas of the City where the majority of City Councilors live also are not adequately represented. The proposed remedy not only provides Springfield's Black/African American and Hispanic voters an equal opportunity to elect candidates of their preference, but likely will also provide Springfield's poor white population with greater opportunities to elect representatives of their choice and have a voice in City government.

## <u>CONCLUSION</u>

Defendants' opposition fails to counter any material argument set forth in plaintiffs' papers. Accordingly, plaintiffs respectfully submit that their motion should be granted.

---

[16] Defendants say that in the predominantly Hispanic Ward One, 26.3% of registered voters supported the ballot question; what defendants do not point out is that, of those who actually voted in Ward One, 65% voted in favor of the ballot question (leaving out blanks, the percentage climbs to 80%). *See* Opposition at 13; Def. Ex. I. Likewise, defendants say that in the predominantly Black/African American Ward 4, only 13.3% of registered voters supported the ballot question; but of those who actually voted in Ward 4, 76% supported the ballot question (leaving out blanks, the percentage climbs to 86%).

Respectfully submitted,

ARISE FOR SOCIAL JUSTICE; ¿OISTE?; NEW
ENGLAND STATE-AREA CONFERENCE OF
THE NAACP; REV. TALBERT W. SWAN, II;
NORMAN W. OLIVER; DARLENE ANDERSON;
GUMERSINDO GOMEZ; FRANK BUNTIN;
RAFAEL  RODRIQUEZ; and DIANA NURSE
By their attorneys,


____/s/ Paul E. Nemser_____
Paul E. Nemser (BBO #369180)
J. Anthony Downs (BBO #532839)
William J. Connolly III (BBO #634845)
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109
(617) 570-1000


_____/s/ Nadine Cohen_____
Nadine Cohen (BBO #090040)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW OF THE BOSTON BAR
ASSOCIATION
294 Washington Street, Suite 443
Boston, MA 02108
(617) 988-0609

Angela Ciccolo
Victor L. Goode
NAACP
4805 Mt. Hope Drive
Baltimore, Maryland 21215-3297
(410) 580-5790
*Of Counsel*

Dated:  August 15,  2005

21

Exhibit A to
Plaintiffs' Reply to Defendants'
Opposition to Plaintiffs' Motion for a
Preliminary Injunction

# Minorities Not Proportionally Represented on Springfield City Council
## City Council Election Winners: 1995
### compared to Voting Age Population, Springfield, Massachusetts

**1995 Council Winners**
- OUT OF 9 -



**Voting Age Population**
**1990 US CENSUS**



# Minorities Not Proportionally Represented on Springfield City Council
## City Council Election Winners: 1997
### compared to Voting Age Population, Springfield, Massachusetts

## 1997 Council Winners
### - OUT OF 9 -



## Voting Age Population
## 2000 US CENSUS



# Minorities Not Proportionally Represented on Springfield City Council
## City Council Election Winners: 1999
### compared to Voting Age Population, Springfield, Massachusetts

## 1999 Council Winners**
### - OUT OF 9 -



## Voting Age Population
## 2000 US CENSUS



** In the 1999 election, Carol Lewis-Caulton, a new black candidate, finished 9th.  She won after two white incumbents did not run, one withdrawing after the filing deadline.  Lewis-Caulton was defeated in her re-election bid in the next two elections, 2001 and 2003, when more white candidates ran.

# Minorities Not Proportionally Represented on Springfield City Council
## City Council Election Winners: 2001
### compared to Voting Age Population, Springfield, Massachusetts

## 2001 Council Winners
### - OUT OF 9 -



## Voting Age Population
## 2000 US CENSUS



# Minorities Not Proportionally Represented on Springfield City Council
## City Council Election Winners: 2003
### compared to Voting Age Population, Springfield, Massachusetts

## 2003 Council Winners
### - OUT OF 9 -



## Voting Age Population
## 2000 US CENSUS



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

ARISE FOR SOCIAL JUSTICE; ¿OISTE?;
NEW ENGLAND STATE-AREA
CONFERENCE OF THE NAACP; REV.
TALBERT W. SWAN, II; GUMERSINDO
GOMEZ; FRANK BUNTIN; RAFAEL
RODRIQUEZ; and DIANA NURSE,

        Plaintiffs,

        v.

CITY OF SPRINGFIELD and SPRINGFIELD
ELECTION COMMISSION,

        Defendants.

Civil Action No. 05-30080 MAP

---

**SUPPLEMENTAL AFFIDAVIT OF RICHARD L. ENGSTROM, Ph.D.
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I declare the following:

    1.  The following affidavit supplements my original affidavit dated June 15, 2005 in this matter.

    2.  I have read the "Memorandum Supporting Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction." On p. 26 of that memorandum the defendants' state that my June affidavit "does not include – as have almost all of his past reports – correlation coefficients, rate of voter turn-out as among those of different racial and ethnic groups, underlying data, and 'spread sheets ....'

    3.  In cases involving only one minority group protected by the Voting Rights Act bivariate statistical analyses are performed. I routinely include in my reports for such cases the values of the correlation coefficients between the racial or ethnic composition of each precinct

and the vote for the minority candidate or candidates that result from these analyses. These correlation coefficients reveal, on a scale of -1.0 to +1.0, how consistently the vote varies with the racial composition of the precincts.

4. This case however involves two minority groups protected by the Voting Rights Act, African Americans and Latinos, and as a consequence <u>multivariate</u> analyses of the elections must be performed rather than bivariate analyses. Multivariate analyses include both minority groups at once in the analyses and therefore produce only <u>partial</u> correlation coefficients. These partial coefficients do not have the same meaning or interpretation as do the correlation coefficients that result from two-group analyses.

5. As I state in footnote 2 of my affidavit:

> Correlation coefficients that result from the three group
> analysis are partial correlations that do not have the
> straightforward interpretation as the correlation coefficients
> that result from analyses concerning only two groups, and
> therefore are not reported in this analysis.

This is not a "partial explanation" for not reporting partial correlation coefficients, as defendants suggest in footnote 20 of their memorandum, at 26, but the complete explanation.

6. I have never, to my knowledge, reported the partial correlation coefficients for any of the previous multivariate racially polarized voting analyses that I have performed. Indeed, there were no partial correlation coefficients reported for the multivariate analyses contained in my report for the <u>Black Political Task Force</u> v. <u>Galvin</u> case [300 F. Supp. 2d 291 (D.C. Mass. 2004)] involving state legislative districts in Boston.

2

7. Defendants also indicate in footnote 20 on p. 26 of their memorandum, concerning footnote 2 in my initial affidavit for this case (reproduced above), that "While this may be true, it does not obviate the need to provide that information or some other means of assessing the reliability or predictability of his analyses." I assume by this that they are referring to statistical significance tests for the difference in support for the various candidates for the different groups. I routinely report the statistical significance of the correlation coefficient, determined by the F-test, in my bivariate analyses. The statistical significance level of the correlation coefficient in the bivariate application is identical to the statistical significance level for the regression coefficient, determined by a t-test, indicating the estimated differences in support between the two groups. There is no reason, therefore, to report both. The F-test in the multivariate analysis however does not provide the statistical significance level for the differences in support among the groups in the multivariate analysis. I therefore report in my initial affidavit whether there are statistically significant differences, determined by the t-tests for the regression coefficients in the multivariate analysis, in the level of support between the residual group (the voters that are neither African American nor Latino, which are predominantly white) and African Americans and Latinos. When the significance level is below the standard .05 cutoff, i.e., the probability of differences of that size, or greater, occurring by chance is less than 5 in 100, I identify the statistical significance of that difference by placing an asterisk (*) next to the estimated support level by the particular minority group reported in my tables.

8. The defendants also indicate, on p. 26, that I typically provide "underlying data" and "'spreadsheets'" as part of my reports. This is not true. The "underlying data" used in my analyses are provided through the discovery process, not as part of a report itself. The same would be true for whatever information they think would be contained in "'spreadsheets'".

9.  As for reporting turnout rates, these are not always contained in my reports. The scope of the report is determined by the scope of the inquiry I am asked to perform.  In this case, I was asked to determine the extent to which the candidate preferences of African American, Latino and other voters in Springfield, Massachusetts have differed in the recent at-large elections for the city council and the school committee.  I was not engaged to report on voter turnout.

10.  Defendants also state, on p. 29 of their memorandum, that "some experts" have adopted 65 percent as "a threshold requirement to a finding of 'legally significant' minority voter cohesion."  I have served as an expert witness in voting rights cases since the early 1970s and I do not recall any expert asserting this.  The defendants do not identify a single such expert themselves.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and that this Affidavit was executed on August 14, 2005 in New Orleans, LA.

Richard L. Engstrom

4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| ARISE FOR SOCIAL JUSTICE; | ) |
| ¿OISTE?; NEW ENGLAND STATE-AREA | ) |
| CONFERENCE OF THE NAACP; | ) |
| REV. TALBERT W. SWAN, II; | ) |
| NORMAN W. OLIVER; DARLENE | ) |
| ANDERSON; GUMERSINDO GOMEZ; | ) |
| FRANK BUNTIN; RAFAEL RODRIQUEZ; | ) |
| and DIANA NURSE | ) |
| | ) |
| Plaintiffs, | )   Civil Action No. 05-30080 MFP |
| | ) |
| v. | ) |
| | ) |
| CITY OF SPRINGFIELD and SPRINGFIELD | ) |
| ELECTION COMMISSION, | ) |
| | ) |
| | ) |
| Defendants. | ) |

_____)

## SUPPLEMENTAL AFFIDAVIT  OF JOHN E. HARMON

I, John E. Harmon, hereby declare and say as follows:

1.  The following affidavit supplements my affidavit dated June 7, 2005.

2. In my June 7 affidavit, I expressed my expert opinion that the Plaintiffs' proposed plan creates nine acceptable districts in Springfield that are compact and meet the Constitutional requirements of one-person, one vote.  I also expressed my expert opinion that plaintiff's proposed plan would provide the Plaintiffs with a greater opportunity to elect council members of their choice.

3.  I was asked to reaggregate voting data from the 2003 Springfield City Council to determine what the results would have been had the election been conducted under a single member district system that is similar to the Plaintiffs' proposed plan.

4.  Plaintiffs' proposed districts are based on Census block data from the 2000 Census.

However, voting data from the 2003 election is only available at the precinct level, not at the

Census block level.  I was asked to perform a reaggregation of the voting data using nine

precinct-based districts that approximated the Plaintiffs' nine Census block-based districts.

5.  The precinct-based districts are similar to the Plaintiffs' proposed districts in several respects.

In the precinct-based plan, Blacks and Latino/Hispanics make up the majority of the voting age

population in four of the districts.  Similar to the Plaintiffs' proposed plan, the precinct plan has

one majority Black City Council district (District 3), two majority Latino/Hispanic districts

(Districts 1 and 2) and one additional majority Black/Latino/Hispanic district (District 4).   The

remaining districts (5-9) are majority white VAP. The precinct-based plan, like the Plaintiffs'

Proposed Plan, also meets the Constitutional requirement of one-person, one-vote as all the

districts are within +- 5% of ideal district population.

6. Reaggregation of the 2003 at-large City Council election involved taking the election results

by candidate and retabulating them as if the districts in the Plaintiffs' Precinct Plan had been in

place.  Under the at-large system voters cast ballots for nine places; only the first three places are

reported here.  Exhibit 6 contains the results of this reaggregation and shows a Latino/Hispanic

candidate winning Districts 1 and 2  (majority Latino/Hispanic VAP) with 58.8% and 63.8% of

first place votes, a Black candidate winning District 3 (majority Black VAP)  with 65.1% of the

first place votes and  Latino/Hispanic and Black candidates very competitive with each in

District 4 (majority Black/Hispanic/Latino VAP) with 46.8% and 46.3% of the first and second

place votes.  Black and Latino/Hispanic candidates are shown in bold. (Exhibit 1):

Exhibit 1[1]

| DISTRICT | 1st Place Candidate | Ballots Cast for 1st Place | Percent of Ballots Cast for 1st Place | 2nd Place Candidate | Ballots Cast for 2nd Place | Percent of Ballots Cast for 2nd Place | 3rd Place Candidate | Ballots Cast for 3rd Place | Percent of Ballots Cast for 3rd Place |
|---|---|---|---|---|---|---|---|---|---|
| 1 | **Tosado (Latino)** | 1,729 | 58.8% | Foley (White) | 1,230 | 41.9% | **Cortes (Latino)** | 1,078 | 36.7% |
| 2 | **Tosado (Latino)** | 936 | 63.8% | Foley (White) | 602 | 41.1% | **Williams (Black)** | 589 | 40.2% |
| 3 | **Williams (Black)** | 1,435 | 65.1% | **Lewis-Caulton (Black)** | 1,424 | 64.6% | **Tosado (Latino)** | 1,060 | 48.1% |
| 4 | **Tosado (Latino)** | 856 | 46.8% | **Williams (Black)** | 846 | 46.3% | Sarno (White) | 744 | 42.3% |
| 5 | Foley (White) | 2,082 | 55.6% | Moriarty-Mazza (White) | 1,993 | 53.3% | Rooke (White) | 1,884 | 50.3% |
| 6 | Foley (White) | 1,356 | 53.6% | Williams (Black) | 1,282 | 50.3% | Walsh (White) | 1,235 | 48.8% |
| 7 | Foley (White) | 2,252 | 54.9% | Sarno (White) | 2,216 | 54.1% | Kelly (White) | 2,194 | 53.5% |
| 8 | Foley (White) | 2,979 | 56.8% | Sarno (White) | 2,918 | 55.7% | Puppolo (White) | 2,833 | 54.1% |
| 9 | Sarno (White) | 2,468 | 63.2% | Ryan (White) | 2,030 | 51.9% | Foley (White) | 2,011 | 51.5% |

7.  None of the nine candidates elected to City Council in 2003 lived in Districts 1, 2, 3 or 4, the majority-minority districts of the precinct plan. One would have been in District 5, two in District 7, 4 in District 8 and two in District 9, all majority white districts in the precinct plan. The at-large election of 2003 yielded one Latino/Hispanic (Tosado) and one Black (Williams) on the City Council. Had the election been conducted under the precinct plan, and by extension, the Plaintiff's proposed plan, it is likely there would be two Latino/Hispanics, one Black and one district that might have elected either a Latino/Hispanic or a Black candidate.

---

[1]    Note: Vote totals do not include Precinct 5-B. This precinct's VAP is 50.9% White, 32.2% Black, 14.3% Latino and 2.6% Other.

Signed under the pains of perjury this  15th day of August, 2005.


_____
John E. Harmon