UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

ARISE FOR SOCIAL JUSTICE;                    )
¿OISTE?; NEW ENGLAND STATE-AREA              )
CONFERENCE OF THE NAACP;                     )
REV. TALBERT W. SWAN, II;                    )
NORMAN W. OLIVER; DARLENE                    )
ANDERSON; GUMERSINDO GOMEZ;                  )
FRANK BUNTIN; RAFAEL RODRIQUEZ;              )
and DIANA NURSE,                             )
                                             )
                    Plaintiffs,              )    Civil Action No. 05-30080 MAP
                                             )
v.                                           )
                                             )
CITY OF SPRINGFIELD and SPRINGFIELD          )
ELECTION COMMISSION,                         )
                                             )
                                             )
                    Defendants.              )
_____)

## JOINT PRETRIAL MEMORANDUM

Pursuant to Local Rule 16.5 and the Court's Order dated October 20, 2006, the parties submit the following Joint Pretrial Memorandum.

I.    **Concise Statement of Evidence**

A.    **Evidence To Be Offered By Plaintiffs**

Plaintiffs will introduce evidence that Springfield's at-large system of municipal government limits the opportunities for African American and Hispanic voters to participate in the political process in violation of Section 2 of the Voting Rights Act. 42 U.S.C. § 1973(b); *see also Uno v. City of Holyoke*, 72 F.3d 973, 981 (1st Cir. 1995). Plaintiffs' expert testimony will satisfy the three *Gingles* prerequisites for a *prima facie* violation of Section 2: (1) the minority group is sufficiently numerous and compact to

form a majority in a single-member district; (2) the minority group is politically cohesive, and (3) the majority votes sufficiently as a bloc so as usually to defeat the minority's preferences. *See Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986).

Expert witness John Harmon will testify regarding Plaintiffs' proposed nine-district plan for City Council and six-district plan for School Committee. His testimony will show that African Americans and Latinos are sufficiently numerous and geographically compact to constitute a majority in 4 of 9 single member districts. Specifically, his testimony will include evidence that:

1.   African American voters in Springfield are sufficiently numerous and compact to constitute a majority in at least one of nine City Council districts and in at least one of six School Committee districts.

2.   Hispanic voters in Springfield are sufficiently numerous and compact to constitute a majority in at least two of nine City Council districts and in at least one of six School Committee districts.

3.   In addition to one majority African American district and two majority Hispanic districts, a fourth district can be drawn in which African American and Hispanic voters combined constitute a majority.

Expert witness Richard Engstrom will testify regarding the voting patterns of African American, Hispanic, and white voters in Springfield. His testimony will demonstrate that:

1.   African American voters vote cohesively to support their preferred City Council and School Committee candidates.

LIBA/1756197.1

2.      Hispanic voters vote cohesively to support their preferred City Council and School Committee candidates.

3.      White voters vote sufficiently as a bloc to usually defeat African American and Latino-preferred candidates.

In addition, Plaintiffs' expert and fact witnessses will testify that the totality of the circumstances indicate that African American and Hispanic voters have less opportunity than white voters to participate in the at-large system and elect candidates of their choice, and that Plaintiffs' proposed 9-district plan for City Council and 6-district plan for School Committee will increase the opportunities for African American and Hispanic voters.  In particular, expert witness Douglas Amy will testify that past and present discrimination has likely had a negative effect on the turnout of African-American and Latino voters in Springfield, the at-large system is likely to have a negative effect on the electoral participation of these minority voters, and switching to a district-based system in Springfield, with several majority-minority districts, would very likely produce a strong increase in turnout by African-American and Latino voters.  Testimony of others will show that:

1.      The City has failed since at least 1992 to conform with Section 203 of the Voting Rights Act by failing to provide Spanish-language assistance to voters and by failing to provide Spanish-language translations of voting materials.

2.      African Americans and Hispanics in Springfield bear the effects of discrimination in areas including education, employment, housing, and

LIBA/1756197.1

health, which have hindered their ability to participate effectively in the
political process.

3.      African American and Hispanic candidates are usually defeated in City
Council and School Committee elections despite solid support from
African American and Hispanic voters.

B.      **<u>Evidence To Be Offered By Defendants</u>**

1.      Defendants will offer evidence from Dan Marrier, Mass GIS analyst, that
shows that minority persons in the City of Springfield are not sufficiently numerous and
geographically compact to constitute an effective majority in two African American and
two  Hispanic in a nine-single-member district plan or to constitute an effective majority
in more than one African American and one Hispanic district in a six-single member
district plan.

2.      Defendants will offer evidence from Dr. Thernstrom, Defendants' expert,
computations of turnout and candidate support, using election returns, Census data, and
registration data provided by the City of Springfield and the Commonwealth of
Massachusetts, and non-expert testimony showing  that the analysis provided by
Plaintiffs' expert, Dr. Engstrom, supports the conclusion that  Plaintiffs have not
proffered a nine-single-member district plan or a six-single member district plan that
would provide for  greater potential to elect African American and Hispanic
representatives than has been provided by the challenged method of election of election

3.      Defendants will offer evidence from Dr. Thernstrom, computations of
turnout and candidate support, using election returns, Census data, and registration data
provided by the City of Springfield and the Commonwealth of Massachusetts, and non-

4

expert testimony showing that the analysis provided by Dr. Engstrom and Plaintiffs supports the conclusion that factors other than white bloc voting accounts for lack of success of most minority candidates, including a consistent pattern of low voter turnout among minority voters in all elections, lack of adequate political cohesion among Hispanic and African American voters, and failure of minority candidates to seek non-minority vote.

4.      Defendants will offer evidence from Dr. Thernstrom, computations of turnout and candidate support, using election returns, Census data, and registration data provided by the City of Springfield and the Commonwealth of Massachusetts, and non-expert testimony showing that the analysis provided by Dr. Engstrom supports the conclusion that white persons do not usually vote sufficiently as a bloc to defeat candidates cohesively supported by minority voters and, in fact, white voters support the election of candidates strongly preferred by minority voters. Where white voters do not support minority candidates as strongly as do minority voters, Defendants will demonstrate that Plaintiffs cannot show and there is no evidence that racial animus has motivated the lack of support for certain minority candidates

5.      Defendants will offer evidence from Dr. Thernstrom, computations of turnout and candidate support, using election returns, Census data, and registration data provided by the City of Springfield and the Commonwealth of Massachusetts, and non-expert testimony showing that the analysis provided by Dr. Engstrom supports the conclusion that it is often lack of African American voter support for Hispanic candidates and Hispanic voter support for African American candidates that prevents certain minority candidates from being elected. Indeed, the above evidence and

testimony will show that white persons are more likely to support African American candidates than are Hispanic voters; and white persons are more likely to support Hispanic candidates than are African American voters

6.      Dr. Thernstrom and non-expert witnesses, as well as official documents filed in appropriate legal proceedings pursuant to the Voting Rights Act, will provide evidence to establish that Plaintiffs have not proffered adequate evidence to support a "totality of the circumstances" inquiry. Defendants will establish that Plaintiffs cannot show that as a legal and factual matter there is a history of voting related official discrimination in the State or in Springfield Massachusetts/ City of Springfield and cannot show that that voting is sufficiently racially polarized to constitute grounds to conclude that the at-large method of election "interferes" with the ability of minority persons to elect candidates of choice; that minority persons have not been provided with proportionate electoral opportunities and that the ability of minority voters to elect candidates of choice is inferior to that of white voters. Defendants will show that Plaintiffs cannot demonstrate that Springfield has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group; indeed, Defendants will show that the absence of these devices accounts for the minority electoral opportunities provided by the at-large method of election and distinguishes the City's method of electing members to the City Council and the School Committee from those found violative of Section 2. Defendants will show that Plaintiffs have failed to proffer evidence of a candidate slating process or the absence minority electoral success and minority membership on the City Council and the School Committee. While the socio-economic status of minority persons has, generally, been lower than that of white

persons in the City, Defendants will show that Plaintiffs have not provided evidence that it hinders their ability to participate effectively in the political process or is the result of a history of discrimination.  Indeed, various of the City's department heads and employees will provide evidence that the City and their respective departments are committed to providing for the fair distribution of city services and funds.  Indeed, in most cases, disproportionately more funds, attention, goals, priorities, initiatives, programs address particularized needs of minority students, persons, and citizens than do non-minority students, people, and citizens.  Defendants will show that Plaintiffs cannot provide evidence that racial appeals have typified election contests in the City of Springfield or that the City Council or the School Committee has not been responsive to the particularized needs of the various minority communities.  Finally, Defendants will show that the adoption and the maintenance of the current method of electing members to the City Council and the School Committee were supported by legitimate, "good-government" justifications and were not motivated by an intent to discriminate against minority persons then-residing in the City or minority persons who were to reside in the City.

7.      Dr. Thernstrom and Mr. Marrier will show that the current method of electing members to the City Council and the School Committee provides for greater opportunities than would a fairly drawn, constitutional, non-dilutive Section 2 benchmark for the City Council and the School Committee

8.      Dr. Thernstrom, computations of turnout and candidate support, using election returns, Census data, and registration data provided by the City of Springfield and the Commonwealth of Massachusetts, and non-expert witnesses show that minority

persons have been provided with proportional electoral opportunities for the City Council and the School Committee.  In addition, Dr. Thernstrom and Mr. Williams will provide evidence and testimony to show that all of the co-called advantages that accrue to the group whose members are the most numerous (as among the other racial or ethnic groups) in an at-large method of election, will or are available to be claimed by minority persons in the City of Springfield, since the City is – or will soon be – comprised of a plurality of Hispanic voting age persons and is, already, comprised of a majority of minority voting age persons. Any change to a single-member district method of election at this juncture would be retrogressive.

II.    **Plaintiffs' Proposed Uncontested Facts and Defendants' Objections**

1.    According to the 2000 United States Census, the City of Springfield has a total population of 152,082.

2.    According to the 2000 United States Census, 19.6 percent of the total population of the City of Springfield identified themselves as Black/African-American (alone) persons.

3.    According to the 2000 United States Census, 27.2 percent of the total population of the City of Springfield identified themselves as Hispanic/Latino (regardless of race) persons.

4.    According to the 2000 United States Census, 48.8 percent of the total population of the City of Springfield identified themselves as non-Hispanic white persons.

LIBA/1756197.1

5.      According to the 2000 United States Census, 4.0 percent of the voting age population of the City of Springfield identified themselves as some other race or two or more races.

6.      According to the 2000 United States Census, 56.2 percent of the voting age population of the City of Springfield identified themselves as non-Hispanic white persons.

7.      Out of nine current members of the Springfield City Council there is one Black/African-American, Bud Williams, and one Hispanic/Latino, Jose Tosado.

8.      Since 1963 the following four Black/African-Americans have served on the Springfield City Council:  Paul R. Mason (1968-1973; 1978-1983); Morris Jones (1985-1993); Bud L. Williams (1994-present); and Carol Lewis-Caulton (2000-2001), and these four individuals are the only Black/African-Americans elected to the Springfield City Council since 1963.

*[Defendants object to and do not admit to No. 8]*

9.      Jose F. Tosado is the first and only Hispanic/Latino elected to the Springfield City Council.

*[Defendants object to and do not admit to No. 9]*

10.      Jose F. Tosado was appointed to the City Council in January 2002, prior to his successful election campaign in 2003, and was thus able to campaign as an incumbent.

*[Defendants object to and do not admit to No. 10]*

11.      The only occasion when two African-Americans were elected to the City Council was the 1999 election.

*[Defendants object to and do not admit to No.11]*

12.    Currently three of the nine members of the Springfield City Council reside in Ward 7, two members reside in Ward 5, two members reside in Ward 6, one member resides in Ward 2, and one member resides in Ward 1.

*[Defendants object to and do not admit to No. 12, as irrelevant as a legal matter]*

13.    Outgoing City Councilor Angelo Puppolo resides in Ward 7 and will be replaced by James Ferrera III, who also resides in Ward 7.

14.    The only Hispanic/Latino candidates to be elected to the School Committee have been Cesar Ruiz, in 1981; Jose Tosado in 1999, and Carmen Rosa in 1993.

*[Defendants object to and do not admit to No. 14]*

15.    Currently there are no Hispanic/Latino members of the School Committee.

*[Defendants object to and do not admit to No. 15]*

16.    A ballot initiative question that appeared on the November 1997 city election ballot proposed a change to the method of electing the City Council such that eight (8) councilors would be elected from each of the City's eight wards, and three (3) councilors would be elected at large ("1997 Ballot Question").

17.    Of the persons who voted in the November 1997 city election, 51.4 percent voted in favor of the 1997 Ballot Question, while 36.5 percent voted against it, and 12.1 percent left the question blank.

18.    Of the persons who cast a vote either for or against the 1997 Ballot Question (excluding blanks), approximately 58 percent voted in favor of it.

19.     On January 20, 1998, the Springfield City Council voted against a home rule bill that, if passed, would have changed the composition of the City Council to eight (8) councilors elected from each of the City's eight wards, and three (3) councilors elected at-large.

*[Defendants object to and do not admit to No. 19]*

20.      On January 4, 1999, the Springfield City Council voted against an Act that would have changed the composition of the City Council to eight (8) councilors elected from each of the City's eight wards, and three (3) councilors elected at-large.

*[Defendants object to and do not admit to No.20]*

21.     On October 4, 1999, the Springfield City Council voted against an Act that would have changed the composition of the City Council to eight (8) councilors elected from each of the City's eight wards, and three (3) councilors elected at-large.

*[Defendants object to and do not admit to No. 21]*

22.     On October 4, 1999, the Springfield City Council voted against an Act that would have changed the composition of the City Council to eight (8) councilors elected from each of the City's eight wards, and five (5) councilors elected at-large.

*[Defendants object to and do not admit to No. 22]*

23.     On April 10, 2000, the Springfield City Council, after being presented with an Act that would have placed a binding ballot question on the November 2000 city election ballot regarding whether the composition of the City Council should be changed to eight (8) councilors elected from each of the City's eight wards, and three (3) councilors elected at-large, amended the Act to make the ballot question non-binding, and thereafter voted in favor of the Act.

11

*[Defendants object to and do not admit to No. 23]*

24.     On April 10, 2000, the Springfield City Council, after being presented with an Act that would have placed a binding ballot question on the November 2000 city election ballot to change the composition of the City Council to eight (8) councilors elected from each of the City's eight wards, and three (3) councilors elected at-large, passed an Act calling for a non-binding ballot question that would change the composition of the City Council to four (4) councilors elected from wards and five (5) councilors elected at-large.

*[Defendants object to and do not admit to No. 24]*

25.     Mayor Michael J. Albano refused to sign either of the Acts passed by the City Council on April 10, 2000, which refusal resulted in there being no ballot question, either binding or non-binding, placed on the November 2000 city ballot.

*[Defendants object to and do not admit to No.25]*

26.     On September 8, 2003, the Springfield City Council voted against an Act that would have changed the composition of the City Council to eight (8) councilors elected from each of the City's eight wards, and three (3) councilors elected at-large.

*[Defendants object to and do not admit to No.26]*

27.     On April 12, 2004, the Springfield City Council voted against a home rule bill that would have changed the composition of the City Council to eight (8) councilors elected from each of the City's eight wards, and three (3) councilors elected at-large.

*[Defendants object to and do not admit to No. 27]*

28.     On March 7, 2005, the Springfield City Council voted against an Act that would have placed on the 2005 city election ballot a binding referendum asking whether

the composition of the City Council should be changed to eight (8) councilors elected from each of the City's eight wards, and three (3) councilors elected at-large.

> [*Defendants object to and do not admit to No. 28*]

29.    Until 2004, the City of Springfield and/or the Springfield Election Commission never had provided bilingual training for Hispanic poll workers.

> [*Defendants do not admit to No. 29*]

30.    Since September 18, 1992, the City has been continuously covered under Section 203 of the Voting Rights Act, and has been required to provide in Spanish any registration or voting notice, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, that are available in English.

31.    Prior to September 2006, the City did not provide in Spanish copies of all registration and voting notices, forms, instructions, assistance, and other information relating to the electoral process, including ballots, that are available in English.

> [*Defendants do not admit to No. 31*]

32.    Prior to August 28, 2006, the City did not provide election information in Spanish on its website.

> [*Defendants do not admit to No. 32*]

33.    On August 29, 2006, the City entered into a consent decree with the United States of America that required the City to, *inter alia:*

a)    Ensure that both English and Spanish language election information, materials, and announcements provided by the City are made equally available to voters;

b)    Make trained bilingual (Spanish and English fluent) election personnel available to answer voting-related questions at all City office locations where election-related transactions are conducted by telephone without

13

cost during normal business hours and while the polls are open on election day;

    c)    Recruit, hire, and assign election officials able to understand, speak, write, and read English and Spanish fluently to provide effective assistance to Spanish-speaking voters at the polls on election days, at selected precincts as determined by an agreed-to formula.

    d)    Train election officials in the requirements of Sections 203 and 208 of the Voting Rights Act.

*[Defendants object to and dto not admit to No. 33 as a full and complete summary of the consent decree to which it refers]*

## Parties

34.    Plaintiff Rev. Talbert Swan, II is a Black/African-American registered voter and resident of Springfield.  [Answer ¶ 7]

*[Defendants do not object to No. 34, but cannot admit to named Plaintiff's assertion of residence in Springfield, since we do not have information or evidence supporting the assertion]*

35.    Norman Oliver is a Black/African-American registered voter and resident of Springfield, with a residence at 377 St. James Avenue, Springfield, MA 01109. [Answer ¶ 8]

*[Defendants do not object to No. 35, but cannot admit to named Plaintiff's assertion of residence in Springfield, since we do not have information or evidence supporting the assertion]*

36.    Plaintiff Gumersindo Gomez is a Hispanic/Latino registered voter and resident of Springfield, with a residence at 46 Laurel Street, Springfield, MA.  [Answer ¶ 9]

*[Defendants do not object to No. 36, but cannot admit to named Plaintiff's assertion of residence in Springfield, since we do not have information or evidence supporting the assertion]*

37.     Plaintiff Darlene Anderson is a Black/African-American registered voter and resident of Springfield, with a residence at 51 Amore Road, Springfield, MA 01109.

[Answer ¶ 10]

*[Defendants do not object to No. 37, but cannot admit to named Plaintiff's assertion of residence in Springfield, since we do not have information or evidence supporting the assertion]*

38.     Plaintiff Frank Buntin is a Black/African-American registered voter and resident of Springfield, with a residence at 190 Buckingham Street, Springfield, MA 01109.  [Answer ¶ 11]

*[Defendants do not object to No. 38, but cannot admit to named Plaintiff's assertion of residence in Springfield, since we do not have information or evidence supporting the assertion]*

39.     Plaintiff Raphael Rodriguez-Cruz is a Hispanic/Latino registered voter and resident of Springfield, with a residence at 76 Powell Avenue, Springfield, MA  01118.

[Answer ¶ 12]

*[Defendants do not object to No. 39, but cannot admit to named Plaintiff's assertion of residence in Springfield, since we do not have information or evidence supporting the assertion]*

40.     Plaintiff Diana Nurse is a Black/African-American registered voter and resident of Springfield, with a residence at 178 College Street, Springfield, MA 01109.

[Answer ¶ 13]

*[Defendants do not object to No. 40, but cannot admit to named Plaintiff's assertion of residence in Springfield, since we do not have information or evidence supporting the assertion]*

LIBA/1756197.1

41.     Among the duties of the Springfield Election Commission is that of ensuring that elections are properly managed and conducted pursuant to applicable city, state, and federal laws, regulations, and constitutional provisions. [Answer ¶ 15]

## Census Figures

42.     According to the 2000 Census, 18.1 percent of the voting age population of the City of Springfield identified themselves as Black/African American (alone), 21.8 percent identified themselves Hispanic/Latino, and 4 percent identified themselves as some other race or two or more races. [Memorandum Supporting Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction p. 7]

43.     According to the 2000 Census, Ward One is comprised of a total voting age population of 12,866 of whom 12.4 percent are Black/African American and 60.78% are Hispanic/Latino. [*See* Memorandum Supporting Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction 7]

44.     According to the 2000 Census, Ward Two is comprised of a total voting age population of 14,139 of whom 6.9 percent are Black/African American and 20.8 are Hispanic/Latino (regardless of race). [Memorandum Supporting Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction 7]

45.     According to the 2000 Census, Ward Three was comprised of a total voting age population of 12,414 of whom 19.3 percent are Black/African American and 37.4 percent are Hispanic/Latino. [Memorandum Supporting Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction 7]

46.     According to the 2000 Census, Ward Four is comprised of a total voting age population of 12,914 of whom 53.1 percent are Black/African American and 19.6

LIBA/1756197.1

percent are Hispanic/Latino (regardless of race).  [Memorandum Supporting Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction 7]

47.    According to the 2000 Census, Ward Five is comprised of a total voting age population of 13,764 of whom 24.1 percent are Black/African American and 9.13% are Hispanic/Latino.  [*See* Memorandum Supporting Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction 7.]

48.    According to the 2000 Census, Ward Six is comprised of a total voting age population of 14,033 of whom 7.8 percent are Black/African American and 11.9 percent are Hispanic/Latino (regardless of race).  [Memorandum Supporting Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction 7]

49.    According to the 2000 Census, Ward Seven is comprised of a total voting age population of 14,638 of whom 7.6 percent are Black/African American and 4.8 percent are Hispanic/Latino (regardless of race).  [Memorandum Supporting Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction 8]

50.    According to the 2000 Census, Ward Eight is comprised of a total voting age population of 13,285 of whom 16.5 percent are Black/African American and 14.7 percent are Hispanic/Latino (regardless of race)  [Memorandum Supporting Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction 8]

51.    Most Hispanics in the City of Springfield are U.S. citizens of Puerto Rican heritage.  [Expert Witness Report of Stephan Thernstrom, p. 6, n. 5]

52.    The 2000 United States Census reported that 51.2 percent of the total population of the City of Springfield identified themselves as one of the following: Black/African-American (alone), Asian (alone), and American Indian and Alaska Native

17

(alone), Native Hawaiian and other Pacific Islander (alone), some other race or two or more races, or as Hispanic/Latino (regardless of race).  [Answer ¶ 18]

53.    The 2000 United States Census reported 25,578 fewer persons identified themselves as non-Hispanic white, 233 more persons identified themselves as Black/African-American (alone), and 14,815 more persons identified themselves as Hispanic (regardless of race) than had in the 1990 Census in the City of Springfield. [Answer ¶ 17]

54.    The American Community Survey [the "ACS"] is a survey, rather than a full census, and ACS estimates may be off the mark because of sampling error.  [Expert Witness Report of Stephan Thernstrom, p. 16, n. 19]

> [Defendants object and to not admit to  No. 54, in the absence of the full context of Dr. Thernstrom's remarks, statement, and analysis]

55.     Demographic projections are subject to error.  [Stephan Thernstrom's Rejoinder to Rebuttal Reports of Douglas Amy and Richard Engstrom for *Arise for Social Justice v. Springfield* 10]

> [Defendants object and do not admit to No. 55, in the absence of the full context of Dr. Thernstrom's remarks, statement, and analysis]

## Adoption of the At-Large System

56.    Prior to the adoption of the at-large system for electing the City Council and School Committee, the City of Springfield was governed by an 18-person Common Council elected in partisan elections from the City's eight wards, and an eight-person Board of Aldermen elected in partisan elections from residency districts. [Memorandum Supporting Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction 10]

57.     Members of both the Common Council and the Board of Aldermen were elected from districts.  [Memorandum Supporting Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction 10]

*[Defendants object to and do not admit to No. 57 as factually incorrect]*

58.     For most of the decade preceding the adoption of the current electoral system in 1961, the Common Council had two black members.  [Expert Witness Report of Stephan Thernstrom ¶ 45]

*[Defendants object to and do not admit to No. 58, in the absence of the full context of Dr. Thernstrom's remarks, statements, and analysis]*

59.     The adoption of Plan A was supported by a majority of the voters in each of the City's wards except for Ward 4, the Ward with the largest number of African Americans.  In Ward 4, only 38.7% of the voters favored adopting Plan A. [Thernstrom Deposition Transcript 16]

*[Defendants object to and do not admit to No. 59, in the absence of the full context of Dr. Thernstrom's remarks, statements, and analysis]*

D.     **City Council**

60.     The Springfield City Council is composed of nine members, all of whom are elected for two-year, non-staggered terms.  [Answer ¶ 21]

61.     All nine members of the City Council are elected biennially in odd-numbered years.  [Answer ¶ 14]

62.     Elections for City Council are at-large, citywide.  [Answer ¶ 14]

63.     Voters may cast a ballot for as many as nine candidates for City Council. [Answer ¶ 21]

LIBA/1756197.1

64. The nine City Council candidates receiving the greatest number of votes are elected. [Answer ¶ 21]

65. As of January 1, 2007, the members of the City Council were William T. Foley, Rosemarie Mazza-Moriarty, Timothy J. Rooke, Domenic J. Sarno, Bruce W. Stebbins, Jose Tosado, Kateri Walsh, Bud Williams, and James Ferrera.

66. As of January 1, 2007, the only African American member of the City Council was Bud Williams.

67. As of January 1, 2007, the only Hispanic member of the City Council was Jose Tosado.

**School Committee**

68. The Springfield School Committee is composed of six members, who are elected for four-year staggered terms. In addition, Mayor Charles Ryan serves on the School Committee. [Answer ¶ 14]

69. Three of the six members of the School Committee are elected every two years in odd-numbered years. [Answer ¶ 14]

70. Elections for School Committee are at-large, citywide. [Answer ¶ 14]

71. Voters may cast a ballot for as many as three candidates, and the three candidates receiving the greatest number of votes are elected. [Answer ¶ 27]

72. As of January 1, 2007, the members of the School Committee were Thomas Ashe, Marjorie J. Hurst, Jennifer Murphy, Antonette Pepe, Michael Rodgers, and Kenneth Shea.

73. As of January 1, 2007, Marjorie Hurst was the only African American member of the School Committee.

74.    As of January 1, 2007, there were no Hispanic members of the School

Committee.

*[Defendants object to and do not admit to No. 74]*

**Numerosity and Compactness**

75.    Plaintiffs satisfy the requirement of the first *Gingles* test regarding

numerosity and compactness. [Thernstrom Rpt. p. 23]

*[Defendants object to No. 75, as an incorrect representation of Dr. Thernstrom's comments and analysis and is not an accurate representation of Plaintiffs' ability to carry their burden regarding the first <u>Gingles</u> precondition]*

76.    Plaintiffs' 9-district City Council plan yields one African American-

majority district; two Latino-majority districts; and one district in which African

Americans and Hispanics together form a majority.  [Thernstrom Rpt. p. 5]

*[Defendants object to No. 76, as an incorrect representation of Dr. Thernstrom's comment, statement, or opinion  and to the extent that it implies electoral opportunities]*

**Minority Cohesion and White Bloc Voting**

77.    Ecological regression is a generally accepted method for analyzing voting

patterns.  [Defendants' Response to Plaintiffs' First Request for the Production of

Documents, Response to Request No. 4]

78.    The estimates made by Dr. Engstrom using ecological regression and

presented in his Expert Report are valid estimates. [Thernstrom Deposition Transcript, p.

60, lines 7-13]

*[Defendants object to No. 78, as an incorrect representation of Dr. Thernstrom's comment, statement, or opinion]*

79.    White voters tend to prefer different candidates than African American

and Latino voters.  [Thernstrom Rpt. 55]

21

*[Defendants object to No. 79, as an incomplete representation of Dr. Thernstrom's comment, statement or opinion]*

80.    In 2002, Mr. Tosado was appointed to the School Committee to fill the vacancy created by Brian Santaniello's departure.  [Defendant's Response to Plaintiffs First Set of Interrogatories, Response to Interrogatories 9 and 10, n. 9]

81.    In 2002, Robert McCollum, an African American, was appointed to the School Committee to fill the vacancy created by Jose Tosado's departure.  [Defendant's Response to Plaintiffs First Set of Interrogatories, Response to Interrogatories 9 and 10, n. 9]

82.    Since the 1999, the following African American incumbents have lost their re-election bids:  Carol Lewis-Caulton (in the 2001 City Council race) and Robert McCollum (in the 1999 and 2003 School Committee races).

*[Defendants object and do not admit to No. 82, as an incomplete representation of all of the candidates who were not re-elected]*

83.    As groups, African American and Hispanic voters are likely to use fewer of their nine votes for City Council and three votes for School Committee than white voters.

*[Defendants do not admit to and object to No. 83 as without evidentiary foundation]*

84.    The 1999 City Council election was characterized by single-shot voting for Carol Lewis-Caulton.  [Memorandum Supporting Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction 27, n. 24]

*[Defendants object to and do not admit to No. 84 as an incomplete representation of assertion in Defendants' Memorandum]*

**Totality of the Circumstances**

85.    Black/African-Americans and Hispanic/Latinos have been subject to *de facto* discrimination in the City of Springfield, and in the past, race relations within the City of Springfield have been strained.  [Answer ¶ 39]

> *[Defendants object to and do not admit to No. 85 as an in complete representation of assertion in Defendants' Answer]*

86.    The 2000 Census indicated that the socio-economic circumstances of Black/African-Americans and Hispanic/Latinos are lower than those of Non-Hispanic white persons.  [Answer ¶ 39]

87.    The Voting Rights Act requires the provision of bilingual voting and registration-related materials, translators, and assistors of choice in certain jurisdictions covered under Section 203(c) of the Voting Rights Acts, 42 U.S.C. §1973. [Memorandum Supporting Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction 36]

88.    Since 1992, the City of Springfield has been subject to the requirements of Section 203(c) of the Voting Rights Act with respect to Spanish-language assistance and materials.

89.    Prior to 1963, the City of Springfield used a poll tax to determine the eligibility of citizens to participate in the electoral process.  [Defendants' Answers to Plaintiff's First Set of Interrogatories, *Swan v. City of Springfield*, C.A. No. 96-30242-MAP, Response to Interrogatory No. 20]

> *[Defendants object to and do not admit to No. 89, on the grounds that it is misleading, since it was the State of Massachusetts that required a poll tax and not the City of Springfield]*

LIBA/1756197.1

90.    At one time, the City of Springfield used a literacy test to determine the eligibility of citizens to participate in the electoral process.  [Defendants' Answers to Plaintiff's First Set of Interrogatories, *Swan v. City of Springfield*, C.A. No. 96-30242-MAP, Response to Interrogatory No. 18]

> *[Defendants object to and do not admit to No. 90; nor do they adopt the representation by a then-City attorney in a previous case]*

91.    Voter turnout tends to be lower among voters with lower income levels. [Thernstrom Deposition Transcript, p. 150, lines 12-16]

> *[Defendants object to and do not admit to No. 91, in the absence of the full context of Dr. Thernstrom's remarks, statements, and analysis]*

92.    Voter turnout tends to be lower among voters with lower levels of educational attainment.  [Thernstrom Deposition Transcript, p. 150, lines 12-16]

> *[Defendants object to and do not admit to No.92, in the absence of the full context of Dr. Thernstrom's remarks, statements, and analysis]*

93.    In the United States as a whole, and in Springfield in particular, African Americans and Hispanics tend to have lower incomes, higher poverty and unemployment rates, to perform less well in school, and to leave school earlier than whites.  [Thernstrom Rpt. 58; Memorandum Supporting Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction, 4]

94.    There is a "racial gap in learning" in the Springfield Public Schools. [Defendants' Response to Plaintiffs' First Request for the Production of Documents, Response to Request No. 18]

> *[Defendants object to and do not admit to No. 94 as an incomplete representation of Defendants' representation of Plaintiffs' assertion]*

LIBA/1756197.1

95.     African American and Hispanic Springfield Public School students do not perform as well in school as non-Hispanic white students.  [*See* Defendants' First Set of Interrogatories to Plaintiffs, Interrogatory No. 8]

*[Defendants object to and do not admit to No. 95]*

96.     Prior to 1974, Springfield schools were largely segregated by race. [*School Comm. of Springfield v. Bd. of Education*, 365 Mass. 215 (1974); *School Comm. of Springfield v. Bd. of Education*, 362 Mass. 417 (1972)]

[*Defendants object to and do not admit to No. 96 in the absence of the full text of the opinion  and findings of fact and because it is inaccurate*]

97.     Since 1974, Springfield has been under court order to maintain racial balance in its public schools.  [*School Comm. of Springfield v. Bd. of Education*, 365 Mass. 215 (1974)]

*[Defendants object to and do not admit to No. 97]*

98.     Until the 2006-07 school year, Springfield used busing to maintain racial balance in its public schools.

*[Defendants object to and do not admit to No. 98]*

99.     The School Committee voted in March 2005 to stop busing students and to adopt a "Boundary Plan" that would send students to neighborhood schools.

*[Defendants object to and do not admit to No. 99]*

100.     The racial and ethnic makeup of Springfield's municipal workforce does not mirror that of the population of Springfield as a whole.  [Defendants' Rule 26(a)(1) Disclosures 9 (Dan Hall, EEO Director)]

*[Defendants object to and do not admit to No. 100]*

25

101.    In 1973, in settlement of the case *Castro v. Beecher*, 365 F. Supp. 655 (D. Mass. 1973), the City entered a consent decree requiring the City to hire more minorities in the police and fire departments.  Thernstrom Rpt. ¶ 90.

> [*Defendants object to and do not admit to No. 101, in the absence of the full context of Dr. Thernstrom's remarks, statements, and analysis and because it does not adequately represent the factual and legal basis of the case and consent decree*]

102.    In 1978, the Supreme Judicial Court affirmed a finding of employment discrimination against the Springfield Board of Police Commissioners for failing to promote a black police officer because of his race.  [*Springfield Bd. of Police Comm'rs v. MCAD*, 375 Mass. 782 (1978)]

> [*Defendants object to and do not admit to No. 102*]

103.    In 1994, the Massachusetts Commission Against Discrimination found that the City's School Department had unlawfully discriminated against an African American applicant for a teaching position because of his race.  [*Hamilton v. Springfield School Dep't*, No. 87-SEM-0058, 1994 Mass. Comm. Discrim. LEXIS 1973 (June 20, 1994)]

> [*Defendants object to and do not admit to No. 103*]

104.    Tension between the Springfield Police and the City's African American community erupted in 1965, during the first of the five "long hot summers" of urban rioting that plagued the nation.  [Thernstrom Rpt. p. 53]

105.    Tension between the Springfield Police and the City's African American and Hispanic communities has recurred since the 1960s and continues to this day. [Thernstrom Rpt. p. 53]

LIBA/1756197.1

*[Defendants object to and do not admit to No.105, in the absence of the full context of Dr. Thernstrom's remarks, statements, and analysis]*

106.    Some members of minority communities have felt unwelcome at predominantly white political gatherings.  [Memorandum Supporting Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction p. 4]

*[Defendants object to and do not admit to No.106]*

**Efforts to Change At-Large System**

107.    As a general matter, as compared to at-large elections, it is easier, less costly, and less time-consuming to campaign in a single member district – particularly where the majority of the population in the district shares racial, ethnic, socio-economic, political, or religious attributes in common with the candidate.  [Answer ¶ 30]

108.    Single- and multi-member districts to remedy a Section 2 violation have proven an effective means of providing for the election of minority candidates, who have erstwhile had little or no access to the political process.  [Answer ¶ 31]

109.    A 1995 memorandum written by former City Solicitor Maurice Cahillane analyzing the implications of the case *Uno v. City of Holyoke* acknowledged that "[c]learly, any at-large system in a multiracial and diverse community must be considered at risk under the [Voting Rights Act] if elected representation of minorities is out of proportion to that of the voting age population."  [Carol Malley and Buffy Spencer, "Switch to Wards Would Be Costly, Complex, *Springfield Union News*, Jan. 26, 1997, at A1]

*[Defendants object to and do not  admit to No.109 and do not adopt any representation made by a former City Solicitor with no prior voting rights experience]*

110.    Over the past ten years there have been requests to adopt a method of election that included the election of some or all City Council members from single member districts.  [Answer ¶ 36]

111.    On March 7, 2005, the Springfield City Council voted against an Act that would have placed on the 2005 city election ballot a binding referendum asking whether the composition of the City Council should be changed to eight (8) councilors elected from each of the City's eight wards, and three (3) councilors elected at-large.  [Answer ¶ 38]

*[Defendants object to and do not admit to No. 111]*

III.    **Defendants' Proposed Issues of Fact and Plaintiffs' Objections**

Defendants' proposed issues of fact are attached hereto as Exhibit E.  Plaintiffs object to Defendants' proposed issues of fact because they were not provided to Plaintiffs for review until 4:45 p.m. on January 8, 2007.

IV.    **Jurisdictional Questions**

At this time, there are no jurisdictional questions to be decided by the Court.

V.    **Questions Raised By Pending Motions**

No motions are currently pending before the Court.  The parties anticipate filing motions *in limine* regarding the evidence described herein.

LIBA/1756197.1

VI.     **Issues of Law**

      **A. Plaintiffs' Statement:**

      1.     To prove their Section 2 claim, Plaintiffs must demonstrate that "as a result of the challenged practice or structure, [they] do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Thornburg v. Gingles*, 478 U.S. 30, 43 (1986) (*quoting* S. Rep. No. 97-417, 97th Cong.2d Sess. 28 (1982) (hereinafter "S. Rep."); *see also Uno v. City of Holyoke*, 72 F.3d 973, 980 (1st Cir. 1995) ("the critical question in a vote dilution case is whether minority voters have an equal opportunity to participate in the electoral process.").

      2.     To set forth a *prima facie* case of vote dilution under Section 2, Plaintiffs must satisfy the three *Gingles* preconditions:  numerosity and compactness; minority political cohesion; and white bloc voting.  *Id*.; *see also Uno*, 72 F3d. at 982.

      3.     To satisfy the numerosity and compactness precondition, Plaintiffs must demonstrate that African Americans as a group and Hispanics as a group each are sufficiently large and geographically compact to constitute a majority in single-member districts.  *Gingles*, 478 U.S. at 49.

      4.     To statisfy the minority political cohesion precondition, Plaintiffs must demonstrate that (1) African American voters are politically cohesive, and (2) Hispanic voters are politically cohesive.  *Gingles*, 478 U.S. at 49.  "A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim."  *Gingles*, 478 U.S. at 55.

5.      To satisfy the white bloc voting precondition, Plaintiffs must show that white voters vote sufficiently as a bloc to enable them, in the absence of special circumstances, usually to defeat African American-preferred candidates and Hispanic-preferred candidates.  *Gingles*, 478 U.S. at 49.  "In establishing this last circumstance, the minority group demonstrates that submergence in a white multimember district impedes its ability to elect its chosen representatives."  *Id*.

6.      The three *Gingles* factors, if proven, "give rise to an inference that racial bias is operating through the medium of the targeted electoral structure to impair minority political opportunities."  *Uno*, 72 F.3d at 983.  This inference is "strong" and "it will endure *unless and until* the defendants adduce credible evidence tending to prove that detected voting patterns can most logically be explained by factors unconnected to the intersection of race with the electoral system.  It is only when such evidence possesses convictive force that the inference of racial animus will be called into serious question."  *Uno*, 72. F.3d at 983 (emphasis in original).

7.      "[C]onvictive force," as used in *Uno*, means that it is not enough for the Defendants merely to offer some evidence that the voting pattern resulted from factors other than race.  To meet their burden of production, the Defendants must offer enough evidence to create "a legitimate question . . . whether nonracial factors adequately explain racial voting patterns. . . ."  *Id*.

8.      Even if the Defendants meet their burden of production, the original inference from proof of the three *Gingles* factors remains strong and contributes to the Plaintiffs' proof of their claim.  "Despite the allocation of the burden of proof [to the Plaintiffs], this framework imposes a high hurdle for those who seek to defend the

existing system despite meaningful statistical evidence that suggests bloc voting along racial lines." *Uno*, 72 F.3d at 983.

9. The existence of some white cross-over voting will not defeat a Section 2 claim. Rather, "a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting.'" *Gingles*, 478. U.S. at 55.

10. To satisfy the numerosity and compactness prong, the minority group need not constitute a numerical majority in a proposed district, provided that the group is "sufficiently numerous to have a significant impact at the ballot box most of the time." *Uno*, 72. F.3d at 991; *see also Metts v. Murphy*, 363 F.3d 8, 11 (2004) (*en banc*) (observing that "several Supreme Court opinions after *Gingles* have offered the prospect, or at least clearly reserved the possibility, that *Gingles*' first precondition . . . could extend to a group that was a numerical minority but had predictable cross-over support from other groups.").

11. The relevance of low turnout to a Section 2 claim depends on the specific facts and circumstances of the case. *Uno*, 72 F.3d at 987. Low turnout may be probative of vote dilution when it results from the interaction of the electoral system and the effects of past discrimination. *Id*. at 986-87. Plaintiffs "need not show that the sole cause of low numbers is the interaction between racial divisions in the community and identifiable elements of the electoral system. It is sufficient . . . that considerations implicating race contributed substantially to repressing minority participation." *Id*. at 987.

12. It is not necessary for Plaintiffs to demonstrate that African American and Hispanic candidates are defeated in every instance. *Gingles*, 478 U.S. at 75-76.

Plaintiffs need demonstrate only that the minority-preferred candidates are *usually* defeated.  *Id*. at 48-49.

13.     "[I]n a district where elections are shown usually to be polarized, the fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting."  *Gingles*, 478 U.S. at 57.

14.     In considering evidence that minority candidates have been elected, the Court also may take account of the circumstances surrounding minority candidates' success in those instances.  *Gingles*, 478 U.S. at 75-76.  Such evidence can include whether the candidates benefited from incumbency; the number of other candidates running against the minority candidates; the presence of bullet voting; the "order of preference" assigned by minority and majority-group voters to minority candidates; and whether minority candidates' successes may have been spurred on by the commencement of litigation under the Voting Rights Act.  *Gingles*, 478 U.S. at 57, 60-61, 76.

15.     "Establishing vote dilution does not require the plaintiffs affirmatively to disprove  every other possible explanation for racially polarized voting."  *Uno*, 72 F.3d at 983.  Ultimately, Plaintiffs must prove "that the three threshold preconditions (alone or in combination with the totality of the circumstances) are strong enough . . . that, notwithstanding the countervailing evidence of other causative agents mustered by the defendant, the record sustains a claim that racial politics – specifically, the interaction of race and the electoral system – have resulted in significantly diminished opportunities for minority participation in elective government."  *Uno*, 72 F.3d at 983-84.

16.     In addition to the three *Gingles* preconditions, other factors may be considered in determining whether the challenged structure violates Section 2.  For example:  (1) the history of voting-related discrimination in Springfield; (2) the extent to which Springfield has used voting practices or procedures that tend to enhance the opportunity for discrimination against African Americans and Hispanics; (3) the exclusion of African Americans and Hispanics from candidate slating processes; (4) the extent to which African American and Hispanic voters bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (5) the use of overt or subtle racial appeals in political campaigns, and (6) the extent to which African American and Hispanic candidates have been elected to public office.  *Gingles*, 478 U.S. at 44-45.  This list of factors is neither comprehensive nor exclusive, and "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other."  *Id*. at 45 (*quoting* S. Rep. at 29).

17.     When minorities are represented in elected government at proportions below the minority group's share of the voting age population, the disproportionality is probative evidence of a lack of equal opportunity for minorities to participate in the electoral process.  The degree of such evidence's probative value varies with the degree of disproportionality and with other factors.  *Johnson v. DeGrandy*, 512 U.S. 997, 1020-21 (1994).

18.     Before the new decennial census, states and municipalities operate under the legal fiction that the prior census numbers are accurate.  *Georgia v. Ashcroft*, 539

U.S. 461, 488 n. 2 (2003). *See also League of United Latin American Citizens v. Perry*, 1264 S. Ct. 2594, 2611 (2006) (Kennedy, J., concurring) (quoting *Georgia v. Ashcroft*).

**B.    Defendants' Statement:**

The following are Defendants' contested issues of law and include all of the issues of law inherent in the issues of fact attached hereto as Exhibit E:

1)  Whether African American and Hispanic persons and organizations can be joined as Plaintiffs in this challenge, pursuant to Section 2 of the Voting Rights Act, 42 U.S.C. 1973 ("Section 2") where it is the lack of Hispanic support for African American candidates and the lack of African American support for Hispanic candidates that contributes to the lack of success of certain minority candidates and where the creation of a nine single-member district plan would necessitate choosing between enhancing the electoral opportunities of African Americans or enhancing the electoral opportunities of Hispanics. Johnson v. DeGrandy, 512 U.S. 977, 1020 (1994).

2)  Whether Section 2 of the Voting Rights Act, 42 U.S.C. 1973 ("Section 2") and the subsequent cases interpreting it, establish that at-large elections constitute a *per se* violation of Section 2.  Thornburg v. Gingles, 478 U.S. 30, 46 (1986).

3)  Whether there can be a Section 2 violation where the majority or the largest group of eligible voters is not – or will not soon be – white and therefore there is no "submerge[ence of minority voters] in a white majority."  Thornburg v. Gingles, 478 U.S at 46.

4)  Whether there can be a Section 2 violation where white persons no longer constitute the majority of the voting age population or can claim "numerical superiority."  Thornburg v. Gingles, 478 U.S at 46.

LIBA/1756197.1

5) Whether there can be a Section 2 violation where both African American and Hispanic voting age persons are sufficiently numerous such that a Hispanic or African American candidate cohesively supported by Hispanic voting age persons or African American voting age persons, respectively, would receive an adequate number of votes to place among the "top" nine candidates in any City Council contest and among the top three candidates in any School Committee conducted over the last 15 years.  Thornburg v. Gingles, 478 U.S at  47.

6) Whether Johnson v. DeGrandy, 512 U.S. 997 (1994)(N.D. Fla. 1992) forecloses Plaintiffs' claim that the at-large method of electing members to the City Council and the School Committee violates Section 2 of the Voting Rights Act where Black/African American and Hispanic/Latino have been provided with proportional opportunities to elect candidates of choice and where the racial or ethnic identification of the actual membership of the Springfield City Council has most often been proportional to that Black/African American and/or Hispanic/Latino share of the total voting age population.

7)  Whether Section 2 has been violated where there are/were  proportional electoral opportunities, but the same minority-preferred candidates are elected. 42 U.S.C. 1973(b).  Johnson v. DeGrandy, 512 U.S. at 1014, n.11 (Souter, J.)

8)  Whether Section 2 has been violated where more minority persons could have been elected but where electoral opportunities have been provided "in substantial proportion to the minority's share of the voting age population."  Johnson v. DeGrandy, 512 U.S at 1013-1017 ("One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast").

9)  Whether Section 2 has been violated where there are/were proportional electoral opportunities and minority candidates were elected who were cohesively supported by minority voters, but who did/do not currently live in predominately minority neighborhoods.

10)  Whether Section 2 of the Voting Rights Act guarantees proportional representation or the election of certain – albeit minority preferred – candidates.  42 U.S.C. 1973(b).  Johnson v. DeGrandy, 512 U.S. at 1014, n.11

11)  Whether there can be a violation pursuant to Section 2 of the Voting Rights Act, 42 U.S.C. 1973, where there are insufficiently geographically compact concentrations of minority voters because the relevant minority group is geographically dispersed such that it is not possible to create districts with a sufficient proportion of minority voting age persons to provide for more opportunities to elect than does the challenge method of election.   Thornburg v. Gingles, 478 U.S. at 50.

12)  Whether the loss of political power through vote dilution is distinct from the mere inability of a particular candidate to win in an election.  Thornburg v. Gingles, 478 U.S. at 57.

13)  Whether "racial polarization should be seen as an attribute not of a single election, but rather of a polity viewed over time" and whether the analysis is "historical because the evil to be avoided is the subordination of minority groups in American politics and , not the defeat of individuals in particular electoral contests.  Thornburg v. Gingles, 478 U.S. at 57 (quoting Blacksher & Menefee 61; Note, "Geometry and Geography 200, n. 66.)

14)  Whether there is a threshold or maximum requirement for the number of elections that must be "studied," rather "the number of elections will vary with the pertinent circumstances" and the need to provide a "complete picture" of the electoral opportunities that the challenged practice has provided to minority persons.   Thornburg v. Gingles, 478 U.S. at 57, n.30.

15)  Whether, a 50 percent threshold for political cohesion is inappropriate where voters have nine choices and there has been no general election in which African American voters would have had to choose among African American and African American preferred candidates and could not have supported every African American candidate who competed for the City Council or the School Committee and no general election where Hispanic voters would have had to chose among Hispanic and Hispanic preferred candidates and could not have supported every Hispanic candidate who competed for the City Council or the School Committee.   Cf. <u>Thornburg</u> v. <u>Gingles</u>, 478 U.S at 55-58.

16)  Whether Hispanic voters are sufficiently politically cohesive to satisfy <u>Gingles</u> where the most Hispanic voter support that any Hispanic candidate has received is 79 percent (1991, School Committee) where voters had three choices and only one Hispanic candidate competed and 78.4 percent where voters had nine choices and there was only one additional Hispanic candidate competing.  Cf. <u>Thornburg</u> v. <u>Gingles</u>, 478 U.S at 58-59.

17)  Whether there is legally significant white bloc voting where, generally, white persons adequately support those minority candidates most preferred by minority voters to provide for their election and re-election and where minority persons have enjoyed significantly more than minimum or sporadic success – the standard enunciated in  <u>Thornburg</u> v. <u>Gingles</u>, 478 U.S at 60, 68.

18) Whether there can be legally significant white bloc voting where white voters "by virtue of their numerical superiority" have not regularly defeated minority preferred candidates, but rather have "defeated only half of the minority preferred candidacies in the last four elections (analyzed by Dr. Engstrom). <u>Thornburg</u> v. <u>Gingles</u>, 478 U.S at 48

19)  Whether there can be legally significant white bloc voting where unsuccessful minority candidates were not adequately supported by white voters "for reasons other than those which made

that candidate the preferred choice of the minority groups" and that are "wholly unrelated to racial animus." <u>Uno</u> v. <u>City of Holyoke</u>, 72 F.3d 973 (1st Cir. 1995).

20)  Whether there can be legally significant white bloc voting where it is the lack of Hispanic voter support that accounts for the loss of certain African American candidates.  <u>Thornburg</u> v. <u>Gingles</u>, 478 U.S at 50-51.

21)  Whether evidence that a certain minority candidate would have been elected had the election been conducted in a district in which he has long resided and which is comprised of a majority of persons of the same ethnicity and socio-economic circumstances demonstrates that the at-large method of election is dilutive, particularly where the minority candidate did not campaign outside of his neighborhood and did not otherwise seek votes from persons of a different race or ethnicity.  <u>Thornburg</u> v. <u>Gingles</u>,
478 U.S at 48.

22)  Whether there is any history of voting-related discrimination as to Hispanic persons where Hispanic persons have only resided in the City of Springfield in sufficient numbers since the 1980s.

23)  Whether the fact that the socio-economic circumstances of minority persons is/has been lower than it is for white persons establishes – as a matter of law -- a history of discrimination in Springfield and/or Massachusetts that has touched upon the right of minority persons to register, to vote, and to participate in the political process.

24)  Whether the fact that African American and Hispanic students perform less well on MCAS tests and drop out of school at a higher rate than white and Asian students; where there as been no *de jure* segregation and only some of the City's schools were deemed *de facto* segregated; where there is no evidence of discrimination in the provision of education; and where the improvement educational performance of minorities is among the Springfield Public School System's goals,

establishes – as a matter of law – a history of discrimination in education, which touches on the right of minority persons to participate fully in the political process.  Thornburg v. Gingles, 478 U.S at 44-45

25)  Whether a history of discrimination that hinders the ability of minority persons to participate in the political process is established by a showing of a 1965 demonstration in which charges of police brutality were raised but where city officials maintained a dialog with African American leaders throughout in an effort to reach a mutually agreed upon resolution, and where all officers found to use excessive or inappropriate force were disciplined or discharged.  Thornburg v. Gingles, 478 U.S at 44-45

26)  Whether a history of discrimination that hinders the ability of minority persons to participate in the political process is established – as a matter of law -- by a showing of several isolated incidents related to police misconduct that were resoundingly decried by Springfield elected officials, where offending police officer(s) were discharged or disciplined, and where there was no claim that the conduct was condoned or otherwise consistent with the Department of Police's Code of Ethical Conduct.  Thornburg v. Gingles, 478 U.S at 44-45

27)  Whether a history of discrimination that hinders the ability of minority persons to participate in the political process is established – as a matter of law –  where there is no claim that inadequate medical services have not been made available by the City and where reducing the incidence of the diseases, conditions, deaths and disabilities that disproportionately affect minority persons is chief among the goals of the City Health and Human Services Department.  Thornburg v. Gingles, 478 U.S at 44-45

28) Whether a history of discrimination that hinders the ability of minority persons to participate in the political process is established – as a matter of law –  where it is shown that fewer

African American and Hispanic persons own their own homes and have been able to qualify for a loan; that more African American and Hispanic persons (as compared to white persons) live in subsidized housing; and that Hispanic and African American persons tend to live in neighborhoods in which reside other persons of similar race, ethnicity, language spoken, or socio-economic status, where the City is committed to providing for more and better subsidized housing and non-subsidized housing, as well as assistance in financing and the selection and purchase of a home, and where the City does not restrict the persons who are recipients of such assistance to those who chose to remain in the predominately, historically minority-majority districts, thereby fostering neighborhood integration. Thornburg v. Gingles, 478 U.S at 44-45

29) Whether a history of discrimination that hinders the ability of minority persons to participate in the political process is established – as a matter of law—where there is evidence that African American and Hispanics are under-employed and where a greater proportion of African American and Hispanic persons are unemployed, where the City and the State provide job placement assistance and education and training and where the City is in the midst of a fiscal crisis due in part to the loss of businesses and industry located in and near the City, which is, in part, the cause of the un- or under-employment of many of the City's citizens.  Thornburg v. Gingles, 478 U.S at 44-45

30)  Whether there can be a determination that the political process have not been equally open to minority voters based upon a searching practical evaluation of past and present realities where the City has never had a majority vote, a numbered place, or a full-slate requirement or prohibited single shot voting or provided for the election of city officials to unusually long terms of office; where there is no candidate qualification fee and a minimal candidate qualification signature requirement for municipal office; where several of the staffmembers in the Office of the Election

Commission are fluent in Spanish; where vacancies on the City Council and the School Committee are filled by the tenth and fourth place (respectively) candidates in the most recent municipal election. <u>Thornburg</u> v. <u>Gingles</u>, 478 U.S at 44-45

31)  Whether Section 2 implicates a comparison between the electoral opportunities provided to members of a minority group by the current method of election and those provided by a hypothetical undiluted single-member district plan that serves to establish what Aought to be.@ <u>Colloton County Commission</u> v. <u>McConnell</u>, 201 F. Supp. 2d 618,   635 (D.S.C. 2002).

32)  Whether in a "Section 2 vote dilution suit, along with determining whether the Gingles preconditions have been met and whether the totality of circumstances supports a finding of liability, a court must find a reasonable alternative practice as a benchmark against which to measure the existing voting practice" -- in this case a fairly drawn, constitutional, nondilutive single-member district plan.  <u>Hall</u> v. <u>Holder</u>, 512 U.S. 874, 879 (1994)

33)  Whether an appropriate Section 2 benchmark plan can be created in a process that subordinated numerous traditional districting principles to race.  <u>Abrams</u> v. <u>Johnson</u>, 521 U.S. 74, 95-98 (1996).

34)  Whether an appropriate Section 2 benchmark nine single-member district plan for the election of members to the City Council is comprised of one district in which Hispanic voting age persons constitute 64.9 percent of the voting age population and two more districts in which the Hispanic proportion of the voting age population is greater than their share of the citywide voting age population, in addition to one district in which African American persons constitute 61.6 percent of the voting age population and two additional districts in which African Americans constitute a greater proportion of the voting age population than their citywide share of the voting age population; splits one precinct; and meets the ±5 percent deviation requirement.

41

35)  Whether Section 2 has been violated where the current method of election provides for as many – if not more -- electoral opportunities than does a fairly drawn, constitutional, nondilutive nine single-member district plan, where the current method of election has long provided for the election of one African American to the City Council and during the 2000-2001 term, two African Americans to the City Council and has provided for the election of one Hispanic person to the City Council in 2002, and provided for influence equal to the African American and Hispanic voting age population share of the citywide population in the election of all nine members of the City Council

36)  Whether an appropriate Section 2 benchmark six single-member district plan for the election of members to the School Committee is comprised of one district in which Hispanic voting age persons constitute 53.1 percent of the voting age population and one more districts in which the Hispanic proportion of the voting age population is greater than their share of the citywide voting age population, in addition to one district in which African American persons constitute 53.3 percent of the voting age population; splits one precinct; and meets the ±5 percent deviation requirement.

37)  Whether Section 2 have been violated where the current method of election provides for as many – if not more -- electoral opportunities than does a fairly drawn, constitutional, nondilutive six single-member district plan, where the current method of election has long provided for the election of one African American to the School Committee and during the 2002-2003 and 1998-1999 terms, two African Americans to the School Committee and has provided for the election of one Hispanic person to the School Committee 1981, 1993, and in 1999 and would have resulted in the election of a Hispanic candidate in 2005 had that candidate received the kind of cohesive support that the Hispanic City Council incumbent received, and provided for influence equal to the African

American and Hispanic voting age population share of the citywide population in the election of all six members of the School Committee

38) Whether the at-large method of electing members to the City Council and the School Committee dilutes the voting strength of African Americans and Hispanics and makes the election of minority preferred candidates harder than it ought to be. Thornburg v. Gingles, 478 U.S. at 46. Colloton County Commission v. McConnell, 201 F. Supp. 2d at 635.

39) Whether Plaintiffs' proposed nine single-member district plan constitutes an appropriate and legal remedy for a finding of dilution where it splits 35 precincts between two districts or among three districts; where 13 of the City's 17 neighborhoods are split between two and among three, four, and five districts; and where the City's eight wards are divided between two and among three and four districts and otherwise subordinates the City's traditional districting principles to race. Shaw v. Reno, 509 U.S. 630, 652 (1993) (Shaw I)(recognizing an "analytically distinct" equal protection claim for challenging an election district as a "racial classification@);  Miller v. Johnson, 515 U.S. 900, 916 (1995)(adopting the "predominant motivation" test for the threshold inquiry of whether a district constitutes a racial classification, which requires a showing that traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, were subordinated to racial considerations); and Bush v. Vera, , __ U.S. __,116 S. Ct. 1941, 1960-1961 (1996)(concluding if the State has a Astrong basis in evidence,@ for concluding that creation of a majority-minority district is reasonably necessary to comply with Section 2, and the districting that is based on race Asubstantially addresses the Section 2 violation,@. . .it satisfies strict scrutiny).

40) Whether Plaintiffs' proposed nine single-member district plan can constitute and appropriate Section 2 remedy where the racial bloc voting analysis of Plaintiffs' expert and the

Spanish surname turnout analysis conducted by Plaintiffs indicate that neither of the two Hispanic majority districts would provide for an opportunity to elect Hispanic candidates in the event that a white candidate competed in either of the two districts.

41)  Whether, as a legal matter, a determination of electoral opportunities can be based upon a prediction or hope that  Hispanic voter turnout and political cohesion will improve for those persons assigned to one of the two Hispanic majority districts, where there is no evidence from single-member district legislative elections that Hispanic turnout improves in a single-member district method of election.

42)  Whether Plaintiffs' proposed six single-member district plan constitutes an appropriate and legal remedy for a finding of dilution where it splits 30 precincts between two districts or among three districts; where 13 of the City's 17 neighborhoods are split between two or among three districts; where the City's eight wards are divided between two and among three, four and five districts; and where the implementation of the six single-member district plan and the nine single-member district plan in municipal elections would require 24 different ballots, and otherwise subordinates the City's traditional districting principles to race.  Miller v. Johnson, 515 U.S. at 916.

43) Whether Section 2 of the Voting Rights Act requires a method of election that would make it easier, less expensive, less time-consuming, and obviate the need to meet, listen to persons who live in other parts of the City who do not share the same racial or ethnic identities and who may not have the same goals and concerns, where successful minority candidates have raised adequate funds and did not need to expend their own money;  where the method of election is not otherwise more time-consuming, more expensive, or easier for white candidates; and where the City and the City Council and the School Committee are advantaged by the election of candidates who are familiar with the needs, concerns and issues of the various neighborhoods and communities in the City and

44

who consider the problems of one neighborhood the problems of the whole City.  <u>Johnson</u> v.

<u>DeGrandy</u>, 512 U.S. at 1020.

44)  Whether Section 2 of the Voting Rights Act requires a method of election that would

accommodate for and remove the advantage that accrues to those persons who turn out to vote at

significantly higher rate than do minority persons where there is no history of discrimination and no

structural barriers that prevent minority persons from turning out to vote and participating in the

political process.  .  <u>Thornburg</u> v. <u>Gingles</u>, 478 U.S at 44-45

45)  Whether Section 2 requires the adoption of a method of election that obviates the needs for

minority persons to "pull, haul, and trade to find common political ground, the virtue of which is

not to be slighted in applying a statute meant to hasten the waning of racism in American politics.

<u>Johnson</u> v. <u>DeGrandy</u>, 512 U.S. at 1020.

46)  Whether the Equal Protection Clause of the Fourteen Amendment is violated by the

current method of electing members to the City Council and the School Committee where there is

no evidence that discriminatory intent motivated the adoption or maintenance of the challenged

methods of election and where there is no claim of a racial classification that not narrowly tailored

to advance a compelling justification.  <u>Miller</u> v. <u>Johnson</u>, 515 U.S. at 916;  <u>Bush</u> v. <u>Vera,</u> , __ U.S.

at ___; 116 S. Ct. at 1960-1961.

LIBA/1756197.1

VII.     **Requested Amendments to the Pleadings**

Plaintiffs request that the pleadings be amended to correctly reflect the spelling of Plaintiff Raphael Rodriguez-Cruz's name.  Rodriguez-Cruz's name is spelled incorrectly on the Complaint as "Rafael Rodriquez."

VIII.    **Additional Matters To Aid In Disposition of the Case**

There are no additional matters at this time.

IX.      **Probable Length and Type of Trial**

Plaintiffs estimate that the trial will continue for approximately two weeks from 9:00 a.m. to 1:00 p.m. (see Pretrial Scheduling Order, dated Oct. 20, 2006).  This matter will not be tried to a jury.

Plaintiffs would not object should the Court decide to conduct the trial both morning and afternoon over a shorter time period.  Because Plaintiffs' counsel are based in Boston, conducting the trial over a shorter period would greatly reduce costs that may be shifted to Defendants in the event that Plaintiffs are awarded attorneys' fees.

X.       **Names and Addresses of Witnesses Who Will Testify At Trial**

A.       **Plaintiffs' Witness List**

Plaintiffs' Witness List, and Defendant's objections, is attached hereto at Tab A.

B.       **Defendants' Witness List**

Defendants' Witness List is attached hereto at Tab B.

Plaintiffs reserve the right to object to testimony by Defendants' witnesses based on Fed. R. Evid. 402, 802, and any other applicable Rules of Evidence.  Plaintiffs also reserve the right to object to witnesses Defendants have not identified previously in their pretrial disclosures pursuant to Fed. R. Civ. P. 26(a).

LIBA/1756197.1

In addition, Plaintiffs make the following specific objections to Defendants' witness list:

**Witness No. 9:  Roberta Schafer, Worcester Regional Research Bureau**. Plaintiffs object to the testimony of Roberta Schafer because it is not relevant to the claims at issues in this case.

**Witness No. 10:  Daniel Marrier, GIS Systems Analyst.**  Plaintiffs intend to object to any expert opinion evidence offered by Daniel Marrier.

**Witness No. 12:  Dr. Stephan Thernstrom.**  Plaintiffs will object to testimony by Dr. Thernstrom that exceeds the scope of his Expert Report and his deposition testimony, including any "assessment of inaccuracies inherent in racial bloc voting analysis where there is not turnout data by race and where voters have as many as nine choices."

**Witness No. 3:  Mayor Charles V. Ryan.**  Plaintiffs object to tesimony by Mayor Ryan regarding the history and adoption of the Plan A form of government, and the problems, difficulties, inefficiency and ineffectiveness of the pre-1960 form of City government and method of election because Plaintiffs do not contend that the adoption of Plan A was motivated by a racially discriminatory intent.

**Witness No. 16:  John "Bert" Russ.**  Plaintiffs object to the testimony of John "Bert" Russ because it is irrelevant, cumulative, and hearsay.  Among other things, Plaintiffs object to the testimony of Mr. Russ regarding Plaintiffs and Plaintiffs' counsel because it is irrelevant.

XI.    **Exhibit Lists**

   A.    **Plaintiffs' Exhibit List**

   Plaintiffs' Exhibit List, and Defendants' objections, is attached hereto at Tab C.

   B.    **Defendants' Exhibit List**

   Defendants' Exhibit List is attached hereto at Tab D.  Plaintiffs reserve the right

to object, based on Fed. R. Evid. 402, 802, and any other applicable Rules of Evidence, to

Defendants' exhibits at trial on the basis of the specific portion(s) offered and the

purpose(s) for which the exhibits are offered.  Plaintiffs have noted on Defendants'

Exhibit List in brackets their objections to specific exhibits, as follows:

   **Object**:  Plaintiffs intend to object to the exhibit.

   **Reserve**: Plaintiffs reserve the right to object once Defendants more specifically

identify the exhibit(s) and/or the portions of the exhibit(s) that they intend to use, and for

what purpose the exhibits will be introduced.

   **Never produced**:  Defendants have not produced the document(s) to Plaintiffs.

Plaintiffs reserve all rights to object upon reviewing the document(s).

   **Object -- Affidavit Material**:  Plaintiffs object because the material should be

presented in affidavit form, rather than in the format identified in the exhibit list.


<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as non-registered participants on
January 8, 2007.

                                   /s/ Paul E. Nemser

Respectfully submitted,

| | |
|---|---|
| ARISE FOR SOCIAL JUSTICE; ¿OISTE?; NEW ENGLAND STATE-AREA CONFERENCE OF THE NAACP; REV. TALBERT W. SWAN, II; NORMAN W. OLIVER; DARLENE ANDERSON; GUMERSINDO GOMEZ; FRANK BUNTIN; RAFAEL RODRIQUEZ; and DIANA NURSE, | CITY OF SPRINGFIELD and SPRINGFIELD ELECTION COMMISSION, |

By their attorneys,                                        By their attorneys,


\_\_\_\_/s/ Paul E Nemser_____                        \_\_\_\_\_/s/ Deanne Bogan Ross_____
Paul E. Nemser (BBO #369180)                          Edward Pikula (BBO # 39970)
Monica M. Franceschini (BBO #651208)                  Deanne Bogan Ross (BBO #555407)
GOODWIN PROCTER LLP                                   CITY OF SPRINGFIELD LAW DEPT.
Exchange Place                                        36 Court Street
53 State Street                                       Springfield, MA 01103
Boston, MA 02109                                      (413) 787-6085
(617) 570-1000


\_\_\_\_\_/s/ Nadine Cohen_____
Nadine Cohen (BBO # 090040)
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW OF
THE BOSTON BAR ASSOCIATION
294 Washington Street, Suite 443
Boston, MA 02108
(617) 988-0609


Dated:  January 8, 2007

<u>**Names and Addresses of Plaintiffs' Witnesses Who Will Testify At Trial:**</u>

Plaintiffs anticipate offering the testimony of the following witnesses as part of their affirmative case. Plaintiffs reserve the right to add witnesses to this list if additional witnesses become known to Plaintiffs, or if the testimony of additional witnesses is made necessary to rebut Defendants' case:

| Name | Contact Info. | Testimony |
|---|---|---|
| Douglas Amy | Mt. Holyoke College Skinner Hall, Room 110 South Hadley, MA 01075 413-538-2667 | Matters set forth in his affidavit(s) and report(s), and exhibits thereto; matters testified to during his deposition. |
| Richard Engstrom | UNC Center for Civil Rights School of Law The University of North Carolina at Chapel Hill CB #3380, Van Hecke-Wettach Hall Chapel Hill, NC 27599-3380 (919) 962-5106 | Matters set forth in his affidavit(s) and report(s), and exhibits thereto; matters testified to during his deposition. |
| John Harmon | Department of Geography Central Connecticut State University New Britain, CT 06050 860-832-2789 | Matters set forth in his affidavit(s) and report(s), and exhibits thereto; matters testified to during his deposition. |
| Darlene Anderson | 51 Amore Road Springfield, MA 01109 413-732-6701 | Her observations and experiences as a voter, participant in the political process, person of color, and community leader in Springfield; her observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Frank Buntin | 190 Buckingham Street Springfield, MA 01109 413-737-3954 | His observations and experiences as a voter, participant in the political process, person of color, and community leader in Springfield; his observations |

| Name | Contact Info. | Testimony |
|---|---|---|
| | | and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Erroll Campbell | 61 West Alvord Street Springfield, MA 01108 (413) 427-5600 | His observations and experiences as a voter, campaign worker, participant in the political process, person of color, and community leader in Springfield; his observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Elizabeth Cardona | Springfield School Department | Her observations and experiences as a voter, participant in the political process, person of color, and community leader in Springfield; her observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Massachusetts State Rep. Cheryl A. Coakley-Rivera | State House Room 146 Boston, MA 02133 (617) 722-2230 | Her observations and experiences as a State Representative, candidate for political office, voter, participant in the political process, person of color, and community leader in Springfield; her observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Clodovaldo Concepcion | 121 Mallowhill Road Springfield, MA 01129 (413) 783-4807 | His observations and experiences as a voter, candidate for political office, participant in the political process, person of color, and community leader in Springfield; his observations and experiences regarding discrimination against African |

2

| Name | Contact Info. | Testimony |
|---|---|---|
| | | Americans and Latinos in Springfield. |
| Alex Cortes | 224 Chapin Terrace Springfield, MA 01104 (413) 883-8177 | His observations and experiences as a voter, candidate for political office, participant in the political process, person of color, and community leader in Springfield; his observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Atiya Dangleben | MassVOTE 18 Tremont St. Boston, MA (617) 542-8683 | Her observations and experiences regarding poll monitoring in Springfield elections; her observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |

LIBA/1756256.1

| Name | Contact Info. | Testimony |
|---|---|---|
| Victor DaVila | 125 Marsden Street<br>Springfield, MA 01109<br>(413) 736-0374 | His observations and experiences as a voter, candidate for political office, participant in the political process, person of color, and community leader in Springfield; his observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Christine Densmore | 122 Thomas Street<br>Chicopee, MA 01013<br>413-883-1126 | Her observations and experiences as a poll monitor in Springfield elections; her observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Francisco Figueroa | 181 Hickory St.<br>Springfield, MA 01109<br>(413) 433-1847 | His observations and experiences as a voter, participant in the political process, and person of color in Springfield; his observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Maria Figueroa | 181 Hickory St.<br>Springfield, MA 01109<br>(413) 433-1847 | Her observations and experiences as a voter, participant in the political process, and person of color in Springfield; her observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Paul Foster | Regional Information Center<br>Pioneer Valley Planning Commission<br>26 Central Street<br>West Springfield, MA 01089<br>413-781-6045 | Demographic and economic analysis of Springfield; history of Springfield. |
| Gumersindo | 46 Laurel Street | His observations and |

| Name | Contact Info. | Testimony |
|---|---|---|
| Gomez | Springfield, MA 01107<br>413-731-0194 | experiences as a voter, candidate for political office, participant in the political process, person of color, and community leader in Springfield; his observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Carlos Gonzalez | Latino Chamber of Commerce<br>1655 Main Street, Suite 201<br>Springfield, MA 01101-4685<br>(413) 746-1989 | His observations and experiences as a voter, participant in the political process, person of color, and community leader in Springfield; his observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Alan Howard | 28 Amherst St.<br>Springfield, MA 01109<br>(413) 739-01015 | His observations and experiences as a voter, campaign worker, participant in the political process, person of color, and community leader in Springfield; his observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Carol Lewis-Caulton | 63 Navajo Rd.<br>Springfield, MA 01109<br>(413) 783-9513 | Her observations and experiences as a voter, candidate for political office, member of the Springfield City Council, participant in the political process, person of color, and community leader in Springfield; her observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Candace Lopes | 183 Dartmouth Terrace<br>Springfield, MA 01109<br>(413) 736-0520 | Her observations and experiences as a voter, candidate for political office, |

LIBA/1756256.1

| Name | Contact Info. | Testimony |
|---|---|---|
| | | campaign worker, participant in the political process, person of color, and community leader in Springfield; her observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Keely Malone | 208 Park Street<br>Easthampton, MA 01027<br>413-527-0919 | Her observations and experiences as a poll monitor in Springfield elections; her observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Rosemary Mazza-Moriarty | Springfield City Council | Her observations and experiences as a member of the Springfield City Council, voter, candidate for political office, participant in the political process, and community leader in Springfield; her observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Jose Molina | 70 Harrison Ave.<br>Apt. 1806<br>Springfield, MA 01103<br>(413) 330-1628 | His observations and experiences as a voter, poll worker, participant in the political process, person of color, and community leader in Springfield; his observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Helen Caulton-Harris | Springfield Department of Health and Human Services | Health and other social services provided by the City of Springfield; statistical information regarding health in the City of Springfield. |
| Diana Nurse | 178 College Street<br>Springfield, MA 01109<br>413-733-7659 | Her observations and experiences as a voter, participant in the political |

| Name | Contact Info. | Testimony |
|------|---------------|-----------|
| | | process, person of color, and community leader in Springfield; her observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Norman W. Oliver | 377 St. James Ave. Springfield, MA 01109 413-788-6142 | His observations and experiences as a voter, candidate for political office, participant in the political process, person of color, and community leader in Springfield; his observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Joseph Oliverio | 139 Eddy Street Springfield, MA 01104 413-732-0795 | His observations and experiences as a voter, campaign worker and participant in the political process and community leader in Springfield; his observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Gladys Oyolo | Springfield Language Election Program Coordinator | Her observations and experiences as Springfield Language Election Program Coordinator; her observations and experiences as a voter in Springfield; her observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Milagros "Terry" Rodriguez | New North Citizens Council 2383 Main St. Springfield, MA 01107 (413) 747-0090 | Her observations and experiences as a voter, participant in the political process, person of color, and community leader in Springfield; her observations and experiences regarding |

7

| Name | Contact Info. | Testimony |
|---|---|---|
| | | discrimination against African Americans and Latinos in Springfield. |
| Raphael Rodriguez-Cruz | 76 Powell Ave. Springfield, MA 01118 860-541-5052 | His observations and experiences as a voter, participant in the political process, person of color, and community leader in Springfield; his observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Carmen Rosa | 140 Atwater Terrace Springfield, MA 01107 (413) 539-2982 | Her observations and experiences as a voter, candidate for political office, participant in the political process, person of color, and community leader in Springfield; her observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Fred Rose | Pioneer Valley Project 235 Eastern Avenue Springfield, MA  01109 413-827-0781 | Springfield population, geography, economy, housing, employment, social services, government, and political process; African American, Latino and low-income residents of Springfield; responsiveness to the needs of minority communities in Springfield; history of Springfield. |
| Preston H. Smith, II, PhD | Mount Holyoke College Porter Hall, Room 117 50 College St. South Hadley, MA 01075 (413) 534-6806 | Historical race and housing patterns in Springfield; matters set forth in his affidavit in support of Plaintiffs' Motion for a Preliminary Injunction. |

LIBA/1756256.1

| Name | Contact Info. | Testimony |
|---|---|---|
| Massachusetts State Rep. Benjamin Swan | State House Room 466 Boston, MA 02133 (617) 722-2017 | His observations and experiences as a State Representative, candidate for political office, voter, participant in the political process, person of color, and community leader in Springfield; his observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Rev. Talbert Swan, II | P.O. Box 51163 Indian Orchard, MA 01151 413-273-5900 | His observations and experiences as a voter, participant in the political process, person of color, and community leader in Springfield; his observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Henry M. Thomas, III | Urban League of Springfield, Inc. 765 State Street Springfield, MA 01109 (413) 739-7211 [x 104] | His observations and experiences as a voter, participant in the political process, person of color, and community leader in Springfield; his observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Maria Idali Torres | U. Mass. School of Public Health and Health Services, 715 North Pleasant Street Arnold House Rm. 307 Amherst, MA 01003-9304 (413) 636-6207 | Her observations and experiences as a voter, participant in the political process, person of color, and community leader in Springfield; her observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Jose Tosado | Springfield City Council | His observations and experiences as a member of the Springfield City Council |

| Name | Contact Info. | Testimony |
|---|---|---|
| | | and Springfield School Committee, voter, candidate for political office, participant in the political process, person of color, and community leader in Springfield; his observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Henry Twiggs | 78 Westminster Street Springfield, MA 01109 413-246-4554 | His observations and experiences as a voter, participant in the political process, person of color, and community leader in Springfield; his observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Rev. W.C. Watson | Canaan Baptist Church of Christ 1430 Carew St. Springfield, MA 01104 413-739-5053 | His observations and experiences as a voter, participant in the political process, person of color, and community leader in Springfield; his observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Bud Williams | Springfield City Council | His observations and experiences as a member of the Springfield City Council, voter, candidate for political office, participant in the political process, person of color, and community leader in Springfield; his observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Darnell Williams | Urban League Of Eastern Massachusetts 88 Warren St. | His observations and experiences as a voter, participant in the political |

LIBA/1756256.1

| Name | Contact Info. | Testimony |
|---|---|---|
| | Roxbury, MA 02119<br>(617) 442-4519 | process, person of color, and community leader in Springfield; his observations and experiences regarding discrimination against African Americans and Latinos in Springfield. |
| Recordkeepers and others, as necessary. | N/A | Authentication of documents and/or establishment that documents are public or business records. |

**Defendants' Objections to Plaintiffs' Witnesses:**

1) Defendants object to the expert testimony of Dr. Harmon regarding the electoral opportunities provided by the plans that he was provided by Plaintiffs. Dr. Harmon was not provided the kind of information (racial bloc voting analysis) necessary to make an assessment of electoral opportunities and was otherwise unaware of the racial bloc voting analysis conducted by Plaintiffs' expert, Dr. Engstrom. Defendants further object to Dr. Harmon's qualifications to offer an opinion as to the electoral opportunities provided by Plaintiffs' proposed plans since he admitted in deposition that he has no knowledge of the relevance or the method of calculation of ecological regression analysis, as conducted by Dr. Engstrom. In addition, Defendants object to any testimony offered by Dr. Harmon regarding the method by which the redistricting plan was created and the degree to which it subordinated traditional districting principles or otherwise complied with the Equal Protection guarantees of the Fourteenth Amendment. Defendants do not object to Dr. Harmon testifying to the fact that he received a plan from Plaintiffs and "verified" the demographics and the deviation among districts using 2000 Census data.

2) Defendants object to the testimony of Paul Foster, Rev. W.C. Watson, and any other named or unnamed individual whose names have not been previously identified by Plaintiffs as among those persons with relevant information, provided in response to Defendants' request that Plaintiffs' identify all witnessed upon whom they may rely at trial, or who have been identified as among the witnesses that Defendants' might call at trial

3) Plaintiffs have identified Ms. Gladys Oyolo as among those witnesses whom they will call. Ms. Gladys Oyolo is an employee of the City of Springfield and therefore is not available in the absence of Defendants' counsel to sign or discuss an affidavit reflecting her direct testimony. She is, however, among the witnesses whom Defendants will call and is therefore available for cross-examination.

4) With regard to the testimony of Ms. Mazza-Moriarty, Mr. Bud L. Williams, Mr. Jose Tosado, and any other identified witness who is currently an employee or an elected official of the City of Springfield, we request that you contact the Law Department prior to soliciting from them direct testimony via affidavit. Defendants will call Mr. Williams and Mr. Tosado and, therefore, both will be available to Plaintiffs for cross-examination

11

LIBA/1756256.1

5) Defendants assert as to Plaintiffs' witnesses, the same basis for objections to witnesses and the scope of testimony as asserted by Plaintiffs with regard to Defendants' proposed witnesses.

12

**WITNESSES**

**A. Defendants will call the following witnesses**:

1)      Bud L. Williams
         Vice-President of the City Council

Personal election history; campaign and fund raising strategies; base of political support; knowledge of voting patterns and behavior; responsibilities and authority of the city council relative to the provision of services and allocation of resources to the various communities and neighborhoods in the City of Springfield; programs, actions, study committees for which Councilmember Williams takes particular responsibility or to which he is particularly committed; relationship with various neighborhood councils; position with regard to the adoption of single-member district method of election; opinion as to whether current method of election provides for reasonable opportunities to elect candidates of choice of minority voters; advantages of maintenance of at-large method of election in terms of enhancement of minority voting strength and political access; disadvantages of maintenance of at-large method of election; residence in Springfield – past, present, members of family, work-related; response to claim that he does not represent voters in Ward 3 and 4 (or other minority voters)

2)      Jose Tosado
         Former President of the City Council

Personal election history; campaign and fund raising strategies; base of political support; involvement in affairs, programs, and development of the community; responsibilities and authority of the city council relative to the provision of services and allocation of resources to the various communities and neighborhoods in the City of Springfield; campaign experiences with previous Hispanic candidates and Hispanic election history; programs, actions, study committees for which Councilmember Tosado takes particular responsibility or to which he is particularly committed; relationship with various neighborhood councils; his understanding of the relationship between low Hispanic turnout and the current method of election; residence in Springfield – past, present, members of family, work-related; response to claim that witness does not represent voters in Ward 1 and 3 (or other minority voters)

3)      Mayor Charles V. Ryan
         City of Springfield

Personal election history; campaign and fund raising strategies; history of adoption of Plan A form of government; problems, difficulties, inefficiency, and ineffectiveness of pre-1960 form of city government and method of election; observations of growth and changes in race relations among the City's diverse population; powers, responsibilities, and authority of office of Mayor in City of Springfield; goals, commitments, priorities of his mayoral administration; representation of particularized issues and concerns of minority community; facilitation and encouragement of communication from and

participation of citizens in city government; allocation and distribution of city's resources, services, and attention; connection with and residence in Springfield

4)      Dr. Joseph P. Burke
        Superintendent, Springfield Public School System

Goals, priorities with regard to the education of minority students; past, present, and proposed programs, policies, and resource allocation to address disparate academic achievement and drop-out rate of African American and Hispanic students; efforts to involve community and parents in the education of their children; response to Plaintiffs' claims that racial gap learning is due to lack of responsiveness, attention, minority teachers, and bi-lingual education, as well as to relatively poor facilities in and disparate allocation of resources to predominately minority schools

5)      Helen Caulton-Harris
        Director, Health and Human Services

Duties and responsibilities of Director of Department of Health and Human Services; programs, goals, initiatives, priorities of Department; source of funding; response to Plaintiffs' claims that higher incidence of teenage pregnancy, premature births, lower birth weight, infant mortality, drug and alcohol abuse, and incidence of HIV/AIDS due to lack of responsiveness of City and Department of Human Services

6)      Kathleen Lingenberg,
        Director of Housing and Neighborhood Services

Duties and responsibilities of Director of Department of Housing and Director; programs, goals, initiatives, priorities of Department; source of funding; initiatives and programs to encourage, facilitate, and support home ownership among minority persons in City of Springfield; history, function, facilitation and support of, and responsibility to neighborhood councils and civic associations; response to Plaintiffs' claims that the fact fewer African American and Hispanic persons own their own homes and have been able to qualify for a loan; that more African American and Hispanic persons (as compared to white persons) live in subsidized housing; and that Hispanic and African American persons tend to live in neighborhoods in which reside other persons of similar race, ethnicity, language spoken, or socio-economic status is due to the Department of Housing and Neighborhood Services lack of responsiveness

7)      Edward A. Flynn
        Police Commissioner

Duties and responsibilities of Chief of Police; re-organization of Police Department; new priorities, goals, programs, and changes in structure and function of Police Department; hiring, supervision and promotion practices and procedures; response to Plaintiffs' various and numerous charges of the Springfield Police discriminatory practices, procedures, and racial profiling in traffic stops; lack of responsiveness to the

particularized needs of minority community and diversity of the City's citizens, failure to allocate adequate and equal police resources to minority communities

8)      Gladys Oyola
        Spanish Language Election Program Coordinator

Duties and responsibilities as Coordinator;  prior practice with regard to the appointment of bilingual poll officials and response to the claim that complaints with regard to the lack of bilingual poll officials and signs and notices had been communicated to the Office of the Election Commission prior to 2006; 2006 election provision of bi-lingual materials, assistance, and poll worker,  as well as the training of poll officials; proceedings and formation of Spanish Language Advisory Committee; improvements in the provision of election day services and communication among and between poll officials, Election Commissioners, Election Commission staffmembers, members of the Law Department, and election captains; various election day practices including the process of counting provisional ballots and notification to voters and absentee balloting process; voter registration practices; Spanish surname analysis of turnout and registration

9)      Roberta Schafer
        Worcester Regional Research Bureau

Studies and research conducted by Worcester Regional Research Bureau related to turn-out and competitivess under current method of electing members to Worcester City Council; programs, goals, and priorities of Massachusetts Board of Education; State response to the racial gap in learning .

10)     Daniel Marrier
        GIS Systems Analyst

Districting alternatives available to Springfield within the context of a 6, 9, and 13 single-member districting plans and a 9-member minority-double member districting plan; the number of precincts, wards, neighborhoods split by Plaintiffs' proposed six and nine member districting plans; process and demographics of creating the Section 2 nine single-member district plan; demographics of the City

11)     Andrea Stone
        Paralegal, Law Department

Verification of various calculations, including, but not limited to, turnout, proportion of support among precincts and wards in the past eight elections

12)     Dr. Stephan Thernstrom
        Expert:  Professor, Harvard University

Assessment and critique of expert reports filed by Plaintiffs' expert; assessment of inaccuracies inherent in racial bloc voting analysis where there is no turnout data by race

and where voters have as many as nine choices; electoral opportunities provided by current method of election (relying upon Plaintiffs' expert analysis); history of discrimination in Springfield; assessment of sufficiency of evidence of "totality of circumstances" that Plaintiffs' proffered in their motion for and memorandum supporting preliminary injunction; strengths and advantages of current method of electing members to the City Council and the School Committee; disadvantages and weaknesses of a single-member district method of election; electoral opportunities that Plaintiffs' proposed six and nine single-member district plans would provide to minority voters; racial gap in learning

**B.  Defendants may call the following witnesses**:

1)        a) William T. Foley
          b) Timothy Rooke
          c) Kateri Walsh, President
             Members of the City Council

Personal election history; campaign and fund raising strategies, knowledge of voting patterns and behavior; representation of and familiarity with issues and concerns specific to minority communities; responsibilities and authority of the city council relative to the provision of services and allocation of resources to the various communities and neighborhoods in the City of Springfield; programs, actions, study committees for which witness takes particular responsibility or to which witness is particularly committed; relationship with various neighborhood councils; connection with and residence in Springfield – past, present, members of family, work-related; reaction to Plaintiffs' claims that City Council is not responsive to particularized needs of the minority communities and do not "represent" the persons in those wards in which witness does not live.

2)        Marjorie Hurst
          School Committee

Personal election history; campaign and fund raising strategies; knowledge of voting patterns and behavior; representation of and familiarity with the educational issues and concerns specific to minority communities; facilitation of communication with and provision of information to citizens of Springfield; responsibilities and authority of the School Committee relative to the provision of educational services, resources and facilities to the children of the City of Springfield; benefits of an at-large method of election with regard to a School Committee; connection with and residence in Springfield – past, present, members of family, work-related; reaction to and opinion of Plaintiffs' criticism that Springfield School System discriminates against minority students and fails to address the racial gap in learning

3)        Denise Jordan, Chairperson
          Chairman of the Springfield Election Commission

Duties and responsibilities, statutory authority of the Election Commission; federal and state laws that Commission has duty to enforce; responsibilities and duties associated with the conduct of city, state, and federal elections, including – but not limited to – the provision of bi-lingual materials and assistance, the training of poll officials, monitoring of elections, processing and remedying complaints, and casting provisional ballots; process by which candidates qualify to run for office; response to claim that the Election Commission had received prior to 2006 complaints concerning the lack of bilingual poll officials; prior-to-2006 practice of identifying and appointing poll officials; knowledge of election history of Hampden County House General Court District 12 and African American political organization

4)      Juan Rivera
        New North Citizen's Council

Description, demographics, socio-economics of neighborhood/community; history and function of neighborhood council/association; duties and responsibilities of president and other officers of council or association; method of election or appointment;  programs, goals, initiatives, priorities of council/association; source of funding; initiatives and programs to support economic growth of, safety and quality of life in respective neighborhoods, as well as communication among and electoral empowerment of citizens of neighborhood/community; role and experiences as liaison with City Council as a whole and/or individual members; accountability

5)      Orlando Santiago
        Candidate for School Committee

Campaign and fund raising strategies; familiarity with particularized needs of various neighborhoods and ethnic and racial diversity of  Springfield acquired during campaigning; strategies for empowering parents and fostering communication and participation in education of city's children; campaign assistance and support received from members of various neighborhoods, neighborhood councils, and community leaders; campaign platform and reason for seeking position on the School Committee; view of the causes of and solutions to the so-called "racial gap" in learning

6)      Keshawn Dodds
        Former Mayoral Aide

Duties and responsibilities as member of mayoral staff;  types of problems, concerns, issues have encountered in role as Mayoral Aide; familiarity with the neighborhoods to which individual is assigned; goals, priorities, programs, policies of current administration, particularly with regard to any particularized needs, issues of various "minority communities" in City of Springfield; efforts of administration to find commonalities among diverse population; any previous experiences that have contributed to individual's ability to serve as a liaison between various of the City's neighborhoods and the Office of the Mayor

7)    Rafael Nazario
      Mayoral Aide

Campaign and fund raising strategies; familiarity with particularized needs of various neighborhoods and ethnic and racial diversity of Springfield acquired during campaigning; support received from members of various neighborhoods, neighborhood councils, and community leaders; campaign platform and reason for seeking position on the City Council; duties and responsibilities as member of mayoral staff; types of problems, concerns, issues have encountered in role as Mayoral Aide; familiarity with the neighborhoods to which individual is assigned; goals, priorities, programs, policies of current administration, particularly with regard to any particularized needs, issues of various "minority communities" in City of Springfield; efforts of administration to find commonalities among diverse population; any previous experiences that have contributed to individual's ability to serve as a liaison between various of the City's neighborhoods and the Office of the Mayor; role and participation in 2006 election

8)    a) Teresa E. Regina
          Former Superintendents of School System
      b) Josh Bogin
          Director of Springfield Magnet School Program

History of goals, priorities with regard to the education of minority students; programs, policies, and resource allocation to address disparate academic achievement and drop-out rate of African American and Hispanic students; allocation of funding for capitol improvements and building new schools in minority communities; efforts, policies, programs, plans (past) for facilitating integration of schools; history of City's efforts (and litigation) to ensure diverse student populations in middle and elementary schools and equal educational opportunities, resources, school environments to all students

9)    Dean Jack McDevitt,
      Director of Institute on Race and Justice, Northeastern University

Programs, priorities, and practices that the Springfield Police have already implemented and will be implementing to better address the charge that there are "disparities in the issuance of citations and the incidence of searches by Springfield Police."

10)   Jose Claudio
      New North Citizens Council
      Chairman of the Advisory Committee

Springfield Spanish Language Advisory Committee proceedings, goals, citizen input; working relationship between Advisory Committee and Election Commissioners and staff; political organization in Hispanic community; strategies of improving Hispanic voter cohesion

11)     Henry Twiggs
        Chairman of Democratic City Committee

Campaign activities and strategies to elect Deval Patrick Governor and other minority candidates in Springfield; working relationship with Election Commission and role in identifying appropriate poll officials

12)     Bilingual poll officials, all of whom reside in the City of Springfield:
        a) Gladys Rivas-Martinez
            115 Lowell Street
        b) Kristine Gonzales
            17 Vaness Street
        c) Ana Andino
            145 Chapin Ter.
        d) Noemi Santiago
            1312 Page Blvd.
        e)  Racquel Serrano
            11 Moore Street
        f)  David Caceres
            26 Clayton Street, #1
        g)  Carlos Dias
            540 Chestnut Street
        h)  Joseph Pacheo
            48 Kings Lane

Duties and responsibilities of bilingual poll official; training; types of bi-lingual assistance provided and required in the polling places; knowledge of Hispanic community and language capabilities of population

13)     Police officers, assigned to polling places (2006)
        a)  Officer Louis Rosario
        b)  Lieutenant Edward Geier
        c)  Officer Rueben Borrero
        d)  Officer Carlo Landrau
        e)  Sergeant Phil Tarpey

Duties and responsibilities of police officer assigned to polling places; types of activities and assistance provided by police; assessment of the bilingual language program and handicap accessible voting machines; turnout and language capabilities of  voters

14)     Danny Hall
        Equal Employment Opportunity Director

Verification and authentication of biennial EE0-4 Reports, as well as the quarterly Municipal Workforce Reports and information provided therein; duties and

responsibilities of E.E.O. Director; goals, programs, initiatives to improve proportion and advancement of minority persons in municipal workforce; Affirmation Action Program adopted by the City of Springfield; response to Plaintiffs' claims that the extent to which the municipal work force does not mirror the population of the City is due to a lack of commitment to equal employment opportunities and/or discriminatory hiring and promotion practices

15)    Declarants in <u>United States</u> v. <u>City of Springfield,</u> C.A. No. 06-30123-MAP
      a) Anna Rodriquez
         36 Cabinet Street
      b) Jaime Dominquez
         82 Leyfred Ter.

Problems and concerns experienced in prior elections; experience in 2006 election with regard to the availability of bilingual assistance, signs, and information; manner and person who contacted declarant; instructions and explanation provided to declarant; method by which declaration solicited and recorded.

16)    John "Bert" Russ
      United States Department of Justice, Civil Rights Division, Voting Section

Terms of the Agreed Settlement Order in <u>United States</u> v. <u>City of Springfield</u>, C.A. No. 06-30123-MAP; efforts and programs undertaken by the City of Springfield for the 2006 election to better meet the prescriptions of Section 203 and 208 of the Voting Rights Act, 42 U.S.C. 1973aa-1a and 1973aa-6 with regard to the City's bilingual populations; response by City officials during and after the conduct of the elections to issues and concerns raised by federal observers, communicated by Mr. Russ to City staff and attorneys; relationship and role of named Plaintiffs and Plaintiffs' counsel in pursuit of charges brought against the City pursuant to Section 203 and 208; method of obtaining testimony of <u>United States</u> v. <u>City of Springfield</u> "declarants" identified by Plaintiffs in instant Section 2 action; Voting Section's position with regard to its past and present intention to intervene in the instant case (as frequently requested by Plaintiffs)

17)    Dashima Washington
      Paralegal, Law Department

Charts of residence and community contact, familiarity, and knowledge of members of City Council; responsiveness of City Council; verification and charts of records of programs, initiatives, zoning changes, allocation of resources that advantage various communities and neighborhoods; Human Relations Committee annual reports; activities during 2006 primary and general election

*Arise for Social Justice, et. al. v. City of Springfield*
**Civil Action No. 05-30080 MAP**

<u>List of Plaintiffs' Exhibits</u>

Plaintiffs reserve the right to amend, clarify, or supplement this list.

| Trial Exhibit Number | Date | Description | Exhibit Number | Bates Range(s) | Objection, If Any |
|---|---|---|---|---|---|
| 1 | Undated | City of Springfield Election Handbook, produced by Defendants in this case | Plaintiffs' PI Motion, Franceschini Aff. Ex.1 | | |
| 2 | 2006 | City of Springfield 2006 Election Handbook, produced by Defendants in this case | | | |
| 3 | Undated | Department of Public Health Reorganization Proposal, produced by Defendants in this case | | | |
| 4 | March 2003 | Springfield Planning Department, "Statistical Profile: Springfield and its Neighborhoods" | | SFP001656-SFP001727 | |
| 5 | 11/10/97 -1/20/98 | Records of the City of Springfield City Council regarding an act providing for the election for City Councilors, produced by Defendants in this case | | | |
| 6 | 12/7/97-1/4/98 | Records of the City of Springfield City Council regarding an act providing for the election for City Councilors, produced by Defendants in this case | | | |
| 7 | 2/27/98 | Memorandum from Michael R. Triggs to Eugene J. Mulcahy, Esq., produced by Defendants in this case | Plaintiffs' PI Motion, Franceschini Aff. Ex. 19 | | |
| 8 | 1999 | City of Springfield EEO-4 Report (1999), produced by Defendants in this case | | | |
| 9 | 8/15/99 | City of Springfield Department of Health and Human Services, "Health Update, A Profile of the AIDS Epidemic In the City of Springfield, MA, Second Edition 1999," produced by Defendants in this case | Plaintiffs' PI Motion, Franceschini Aff. Ex. 29 | | |

| Trial Exhibit Number | Date | Description | Exhibit Number | Bates Range(s) | Objection, If Any |
|---|---|---|---|---|---|
| 10 | 10/4/99 | Records of the City of Springfield City Council regarding an act providing for the election for City Councilors, produced by Defendants in this case | | | |
| 11 | 10/4/99 | Records of the City of Springfield City Council regarding an act providing for the election for City Councilors, produced by Defendants in this case | | | |
| 12 | 11/2/99 | City of Springfield Election Results, produced by Defendants in this case | | | |
| 13 | 4/10/00 | Records of the City of Springfield City Council regarding an act providing for the election for City Councilors, produced by Defendants in this case | | | |
| 14 | 4/10/00 | Records of the City of Springfield City Council regarding an act providing for the election for City Councilors, produced by Defendants in this case | | | |
| 15 | 9/1/00 | City of Springfield Department of Health and Human Services, "Health Update, Birth to Teens, Springfield, MA, 1991-1998," produced by Defendants in this case | | | |
| 16 | 2001 | City of Springfield EEO-4 Report (2001), produced by Defendants in this case | | | |
| 17 | 9/25/01 | City of Springfield Election Results, produced by Defendants in this case | | | |
| 18 | 11/6/01 | City of Springfield Election Results, produced by Defendants in this case | | | |
| 19 | 7/31/02 | City of Springfield Department of Health and Human Services, "Health Update, Pregnancies and Births Springfield, MA 1993-2000," produced by Defendants in this case | | | |
| 20 | 8/8/02 | City of Springfield Department of Health and Human Services, "Health Update, Birth to Teens, Springfield, MA, 1993-2000," produced by Defendants in this case | Plaintiffs' PI Motion, Franceschini Aff. Ex. 31 | | |

LIBA/1754773.1

| Trial Exhibit Number | Date | Description | Exhibit Number | Bates Range(s) | Objection, If Any |
|---|---|---|---|---|---|
| 21 | 8/8/02 | City of Springfield Department of Health and Human Services, "Health Update, Neighborhood Perinatal Indicators Springfield, MA, 1989-1999," produced by Defendants in this case | | | |
| 22 | 8/15/02 | City of Springfield Department of Health and Human Services, "Health Update, HIV/AIDS Epidemic in the City of Springfield, MA, Third Edition, 2002," produced by Defendants in this case | Plaintiffs' PI Motion, Franceschini Aff. Ex. 28 | | |
| 23 | 2003 | City of Springfield EEO-4 Report (2003), produced by Defendants in this case | | | |
| 24 | 9/8/03 | Records of the City of Springfield City Council regarding an act providing for the election for City Councilors, produced by Defendants in this case | | | |
| 25 | 9/16/03 | City of Springfield Election Results, produced by Defendants in this case | | | |
| 26 | 11/4/03 | City of Springfield Election Results, produced by Defendants in this case | | | |
| 27 | 4/12/04 | Records of the City of Springfield City Council regarding an act providing for the election for City Councilors, produced by Defendants in this case | | | |
| 28 | 8/23/04 | City of Springfield Department of Health and Human Services, "Health Update, HIV/AIDS 2004, Springfield, MA, Fourth Edition," produced by Defendants in this case | Plaintiffs' PI Motion, Franceschini Aff. Ex. 27 | | |
| 29 | 8/23/04 | City of Springfield Department of Health and Human Services, "Health Update, HIV/AIDS 2004, Springfield, MA, Fourth Edition" (alternative version), produced by Defendants in this case | | | |
| 30 | 9/22/04 | Springfield Public Schools, "Springfield MCAS Results Over Time 2000-2004" | Plaintiffs' PI Motion, Franceschini Aff. Ex. 4 | | |

| Trial Exhibit Number | Date | Description | Exhibit Number | Bates Range(s) | Objection, If Any |
|---|---|---|---|---|---|
| 31 | 2005 | City of Springfield Department of Health and Human Services, "Health Update, Pregnancies and Births, Springfield, MA, 1993-2005," produced by Defendants in this case | Plaintiffs' PI Motion, Franceschini Aff. Ex. 30 | | |
| 32 | 3/7/05 | Records of the City of Springfield City Council regarding an act providing for the election for City Councilors, produced by Defendants in this case | | | |
| 33 | 6/22/05 | Email from Deanne E. Ross to Andrea Stone, produced by Defendants in this case | Plaintiffs' PI Motion, Franceschini Aff. Ex. 20 | | |
| 34 | 11/8/05 | City of Springfield Election Results, produced by Defendants in this case | | | |
| 35 | 9/8/06 | Memorandum from Deputy Chief William J. Fitchet of the Springfield Police Department (SPD) to All Commanding Officers of the SPD re: quality of life resolutions, produced by Defendants in this case | | | |
| 36 | 9/19/06 | Springfield State Primary Election Statistics, Summary Report, produced by Defendants in this case | | | |
| 37 | 11/7/06 | Springfield State Election Precinct Report, produced by Defendants in this case | | | |
| 38 | 11/13/06 | SPD Internal Investigations Unit, Statistical Information re: IIU Complaints Received between 01/01/2006 and 11/13/2006, produced by Defendants in this case | | | |
| 39 | 11/13/06 | SPD Internal Investigations Unit, Statistical Information re: IIU Complaints Received between 01/01/2005 and 12/31/2005, produced by Defendants in this case | | | |
| 40 | 11/15/06 | Springfield Public Schools, AYP Improvement Chart, produced by Defendants in this case | | | |

| Trial Exhibit Number | Date | Description | Exhibit Number | Bates Range(s) | Objection, If Any |
|---|---|---|---|---|---|
| 41 | 5/2000 | Massachusetts Department of Education, "Report of 1999 Massachusetts and Local School District MCAS Results by Race/Ethnicity" | Plaintiffs' PI Motion, Franceschini Aff. Ex. 2 | | |
| 42 | 7/2001 | Massachusetts Department of Education, "Report of 2000 Massachusetts and Local School District MCAS Results of Race/Ethnicity" | Plaintiffs' PI Motion, Franceschini Aff. Ex. 3 | | |
| 43 | 11/2001 | Massachusetts Department of Education, "Dropout Rates in Massachusetts Public Schools 1999-00" | Plaintiffs' PI Motion, Franceschini Aff. Ex. 14 | | |
| 44 | 2002 | 2000 United States Census Tables: Sex by Employment Status for the Population 16 Years and Over (Black or African American Alone); Sex by Employment Status for the Population 16 Years and Over (Hispanic or Latino); and Sex by Employment Status for the Population 16 Years and Over (White Alone, Not Hispanic or Latino) | Plaintiffs' PI Motion, Franceschini Aff. Ex. 24 | | |
| 45 | 2002 | United States Census Tables: Tenure By Race of Householder; Tenure (Hispanic or Latino Householder); and Tenure (White Alone, Not Hispanic or Latino Householder) | Plaintiffs' PI Motion, Franceschini Aff. Ex. 25 | | |
| 46 | 2002 | 2000 United States Census Tables: Median Family Income in 1999 (Dollars) (Black or African American Alone Householder); Median Family Income in 1999 (Dollars) (Hispanic or Latino Householder); and Median Family Income in 1999 (Dollars) (White Alone, Not Hispanic or Latino Householder) | Plaintiffs' PI Motion, Franceschini Aff. Ex. 26 | | |
| 47 | 8/2002 | Massachusetts Department of Education, "Dropout Rates in Massachusetts Public Schools: 2000-01" | Plaintiffs' PI Motion, Franceschini Aff. Ex. 13 | | |

5

| Trial Exhibit Number | Date | Description | Exhibit Number | Bates Range(s) | Objection, If Any |
|---|---|---|---|---|---|
| 48 | 11/2003 | Pioneer Valley Planning Commission, "Owning a Place to Call Home: An Analysis of Fair and Subprime Lending in the Springfield Metropolitan Area" | Plaintiffs' PI Motion, Franceschini Aff. Ex. 23 | | Defendants object to the admission of this exhibit in the absence of testimony from the organization who created this analysis regarding the individuals who were responsible for this analysis, those individuals' education, experience, and expertise in the relevant field, the sources of information upon which they relied, and the purpose of the report. Plaintiffs have not listed any individual who is a member of the Commission as a potential witness |
| 49 | 2004 | Northeastern University Institute on Race and Justice "Massachusetts Racial and Gender Profiling Study Final Report" | Plaintiffs' PI Motion, Franceschini Aff. Ex. 21 | | Defendants object to the admission of this exhibit in the absence of testimony from the organization who created this analysis regarding the individuals who were responsible for this analysis, those individuals' education, experience, and expertise in the relevant field, the sources of information upon which they relied, and the purpose of the report |
| 50 | 4/2004 | Massachusetts Department of Education, "Dropout Rates in Massachusetts Public Schools: 2002-03" | Plaintiffs' PI Motion, Franceschini Aff. Ex. 12 | | |
| 51 | 6/2004 | Massachusetts Department of Education, "Grade Retention in Massachusetts Public Schools: 2002-03" | Plaintiffs' PI Motion, Franceschini Aff. Ex. 16 | | |

| Trial Exhibit Number | Date | Description | Exhibit Number | Bates Range(s) | Objection, If Any |
|---|---|---|---|---|---|
| 52 | 12/15/04 | Commonwealth of Massachusetts Commission Against Discrimination, Public Accommodations Complaint Form (Pastors' Council of Greater Springfield v. SPD) | Plaintiff PI Motion, Franceschini Aff. Ex. 17 | | Defendants object to the admission of this exhibit to demonstrate the truth of the matters asserted in the complaint; Defendants do not object to its admission to demonstrate only that a complaint was filed |
| 53 | 4/2005 | Massachusetts Department of Education, "Grade Retention in Massachusetts Public Schools: 2003-04" | Plaintiffs' PI Motion, Franceschini Aff. Ex. 15 | | |
| 54 | 6/2005 | Massachusetts Department of Education, "Progress Report on Students Attaining the Competency Determination Statewide and by School District: Classes of 2005 and 2006" | Plaintiffs' PI Motion, Franceschini Aff. Ex. 9 | | |
| 55 | 2006 | Massachusetts Department of Education, "MCAS Annual Comparisons for Springfield" | Plaintiffs' PI Motion, Franceschini Aff. Ex. 5 | | |
| 56 | 9/19/06 | Report by the United States Office of Personnel Management Observers Regarding Sept. 19, 2006 Springfield Election, Polling Place: Gentile Apartment Community Center | | | Defendants object to the admission of these reports in the absence of the underlying notes made by observers; testimony establishing the training and an assessment of the bilingual capabilities of each of the federal observers; the process by which observations are made and recorded by federal observers and "approved" by Department of Justice attorneys; in addition Defendants object to anything contained in the reports that is properly deemed hearsay. |
| 57 | 9/19/06 | Report by the United States Office of Personnel Management Observers Regarding Sept. 19, 2006 Springfield Election, Polling Place: Dunbar Community Center | | | Same as objection to Exhibit 56 |

LIBA/1754773.1

| Trial Exhibit Number | Date | Description | Exhibit Number | Bates Range(s) | Objection, If Any |
|---|---|---|---|---|---|
| 58 | 9/19/06 | Report by the United States Office of Personnel Management Observers Regarding Sept. 19, 2006 Springfield Election, Polling Place: Springfield Wesleyan Church | | | Same as objection to Exhibit 56 |
| 59 | 9/19/06 | Report by the United States Office of Personnel Management Observers Regarding Sept. 19, 2006 Springfield Election, Polling Place: Van Sickle School Gym | | | Same as objection to Exhibit 56 |
| 60 | 9/19/06 | Report by the United States Office of Personnel Management Observers Regarding Sept. 19, 2006 Springfield Election, Polling Place: Brooking Middle School | | | Same as objection to Exhibit 56 |
| 61 | 11/7/06 | Report by the United States Office of Personnel Management Observers Regarding Sept. 19, 2006 Springfield Election, Polling Place: Forrest Park Community | | | Same as objection to Exhibit 56 |
| 62 | 11/7/06 | Report by the United States Office of Personnel Management Observers Regarding Sept. 19, 2006 Springfield Election, Polling Place: Good Life Center | | | Same as objection to Exhibit 56 |
| 63 | 11/7/06 | Report by the United States Office of Personnel Management Observers Regarding Sept. 19, 2006 Springfield Election, Polling Place: Goodwill Industries | | | Same as objection to Exhibit 56 |
| 64 | 11/7/06 | Report by the United States Office of Personnel Management Observers Regarding Sept. 19, 2006 Springfield Election, Polling Place: Independence House | | | Same as objection to Exhibit 56 |
| 65 | 11/7/06 | Report by the United States Office of Personnel Management Observers Regarding Sept. 19, 2006 Springfield Election, Polling Place: Mason Square Fire Station | | | Same as objection to Exhibit 56 |
| 66 | 11/7/06 | Report by the United States Office of Personnel Management Observers Regarding Sept. 19, 2006 Springfield Election, Polling Place: Mason Square Library | | | Same as objection to Exhibit 56 |
| 67 | 11/7/06 | Report by the United States Office of Personnel Management Observers Regarding Sept. 19, 2006 Springfield Election, Polling Place: Pine Point Library | | | Same as objection to Exhibit 56 |

LIBA/1754773.1

| Trial Exhibit Number | Date | Description | Exhibit Number | Bates Range(s) | Objection, If Any |
|---|---|---|---|---|---|
| 68 | 11/7/06 | Report by the United States Office of Personnel Management Observers Regarding Sept. 19, 2006 Springfield Election, Polling Place: Rebecca Johnson School | | | Same as objection to Exhibit 56 |
| 69 | 11/7/06 | Report by the United States Office of Personnel Management Observers Regarding Sept. 19, 2006 Springfield Election, Polling Place: Kendall Place Hampton House | | | Same as objection to Exhibit 56 |
| 70 | 10/1/02 | Springfield Public Schools, Springfield, Massachusetts, "Distribution of American Indian, White, Black, Asian and Hispanic Pupils, Oct. 1, 2002" | | SFP01728 | |
| 71 | 10/1/03 | Springfield Public Schools, Springfield, Massachusetts, "Distribution of Native American, Asian, African American, Hispanic and White Pupils, Oct. 1, 2003" | | SFP01729 | |
| 72 | 10/1/03 | Massachusetts Department of Education, "2002-2003 Enrollment by Grade Report (District Level)" | | SFP01730-SFP01740 | |
| 73 | 10/1/03 | Massachusetts Department of Education, "2002-2003 Enrollment by Grade Report (School Level)" | | SFP01741-SFP01813 | |
| 74 | 10/1/04 | Springfield Public Schools, Springfield, Massachusetts, "Distribution of American Indian, White, Black, Asian and Hispanic Pupils, Oct. 1, 2004" | | SFP01814 | |
| 75 | 10/1/04 | Massachusetts Department of Education, "2003-2004 Enrollment by Grade Report (District Level)" | | SFP01815-SFP01825 | |
| 76 | 10/1/04 | Massachusetts Department of Education, "2003-2004 Enrollment by Grade Report (School Level)" | | SFP01826-SFP01896 | |
| 77 | 3/1/05 | Springfield Public Schools, Springfield, Massachusetts, "Distribution of Native American, Asian, African American, Hispanic Pupils and White March 1, 2005" | | SFP01897 | |

LIBA/1754773.1

| Trial Exhibit Number | Date | Description | Exhibit Number | Bates Range(s) | Objection, If Any |
|---|---|---|---|---|---|
| 78 | 10/2005 | Massachusetts Department of Education, "Dropouts Rates in Massachusetts Public Schools: 2003-2004" | | SFP01898-SFP01979 | |
| 79 | 10/1/05 | Massachusetts Department of Education, "2004-2005 Enrollment by Grade Report (District Level)" | | SFP01969-SFP01979 | |
| 80 | 10/1/05 | Massachusetts Department of Education, "2004-2005 Enrollment by Grade Report (School Level)" | | SFP01980-SFP02051 | |
| 81 | 2006 | Massachusetts Department of Education, "High School Dropouts 2004-05 Massachusetts Public Schools" | | SFP02052-SFP02057 | |
| 82 | 2006 | City of Springfield, MA, FY06 Action Plan submitted to U.S. Dept. of Housing and Urban Development. | | SFP02058-SFP02231 | |
| 83 | 6/2006 | Massachusetts Department of Education, "Progress Report on Students Attaining the Competency Determination Statewide and by School District: Classes of 2006 and 2007" | | SFP02232-SFP02287 | |
| 84 | 6/2006 | Massachusetts Department of Education, "Grade Retention in Massachusetts Public Schools: 2004-2005" | | SFP02288-SFP02343 | |
| 85 | 9/20/06 | Massachusetts Department of Education, "Spring 2006 MCAS Tests – Summary of State Results" | | SFP02344-SFP02383 | |
| 86 | 9/20/06 | Massachusetts Department of Education, "Press Release: Grade 10 Makes Significant Gains on 2006 MCAS Results for Grades 3-8 Show Flat Performance" | | SFP02384-SFP02385 | |
| 87 | 10/1/06 | Massachusetts Department of Education, "2005-2006 Enrollment by Grade Report (District Level)" | | SFP02386-SFP02396 | |
| 88 | 10/1/06 | Massachusetts Department of Education, "2005-2006 Enrollment by Grade Report (School Level)" | | SFP02397-SFP02470 | |
| 89 | 10/23/06 | Massachusetts Department of Education, "2006 MCAS Report (District) for Grade 10 Students (2006 Rules/Policies Applied)" | | SFP02471-SFP02483 | |

| Trial Exhibit Number | Date | Description | Exhibit Number | Bates Range(s) | Objection, If Any |
|---|---|---|---|---|---|
| 90 | 12/1/06-12/31/06 | Massachusetts Department of Housing and Community Development, Analysis of Impediments to Fair Housing Access and Action Steps to Mitigate Impediments: Draft for Public Comment | | SFP02484-SFP02621 | |
| 91 | 1988 | Mayor Neal's Housing Task Force Final Report: The Housing Problem in Springfield, 1988 and other documents regarding housing in Springfield, MA | | SFP001173-SFP001225 | Defendants object to the admission of this exhibit in the absence of testimony regarding the individuals who were responsible for this analysis, those individuals education, experience, and expertise in the relevant field, the sources of information upon which they relied, and the purpose of the report. Plaintiffs have not identified anyone of the participants of this "Task Force" as a potential witness |
| 92 | 9/10/97 | Springfield: A Community in Progress, An Update Prepared By Conflict Management Group | | SFP001226-SFP001324 | Defendants object to the admission of this exhibit in the absence of testimony from the organization who created this analysis regarding the individuals who were responsible for this analysis, those individuals' education, experience, and expertise in the relevant field, the sources of information upon which they relied, and the purpose of the report. Plaintiffs have not identified anyone from this organization as a potential witness |
| 93 | 1998 | U.S. Dept. of Justice, Bureau of Justice Statistics, Office Community Oriented Policing Services, Criminal Victimization and Perceptions of Community Safety in 12 Cities | | SFP001536-SFP001588 | |

| Trial Exhibit Number | Date | Description | Exhibit Number | Bates Range(s) | Objection, If Any |
|---|---|---|---|---|---|
| 94 | | Michael Konig, "A Study in Leadership: Springfield and Its Mayors, 1945 to Present" | | SFP001589-SFP001623 | Defendants object to this exhibit/study as to which there is no foundation and no information concerning Mr. Konig, the methodology used in making his observations, his education and experience, the sources upon which he relied; Mr. Konig was not identified as a potential witness |
| 95 | | Charts Regarding "Minorities Not Proportionally Represented on Springfield City Council" | | SFP001624-SFP001630 | Defendants object to the introduction of this exhibit in the absence of its author introducing it in trial, explaining the methodology, the sources of information upon which the "charts" relied, and the purpose for which it was created |
| 96 | | Illustrative Map, "Distribution of Springfield City Councilors Over Last 10 Years, 1995-2003 elections" | | SFP001631 | Defendants object to the introduction of this exhibit in the absence of its author introducing it in trial, explaining the methodology, the sources of information upon which the map relied, and the purpose for which it was created |
| 97 | 4/25/95 | Preston H. Smith, "Racial Segregation in Springfield and Holyoke: Historical and Current Trends," presented at Conference entitled Regional Approaches to Ending Housing Segregation | Plaintiffs' PI Motion, Aff. of Preston Smith | | Defendants object to this exhibit/study as to which there is no foundation and no information concerning Mr Smith, the methodology used in making his observations, his education and experience, the sources upon which he relied. Since Mr. Smith was identified as a non-expert witness, Defendants do not object to the introduction of his non-expert testimony at trial |

| Trial Exhibit Number | Date | Description | Exhibit Number | Bates Range(s) | Objection, If Any |
|---|---|---|---|---|---|
| 98 | 1972 | *School Comm. of Springfield v. Bd. of Education*, 362 Mass. 417 (1972) | | | |
| 99 | 1973 | *Castro v. Beecher*, 365 F.Supp. 655 (D. Mass. 1973) | | | |
| 100 | 1974 | *School Comm. of Springfield v. Bd. of Education*, 365 Mass. 215 (1974) | | | |
| 101 | 1974 | *Boston Chapter, NAACP, Inc. v. Beecher*, 371 F.Supp. 507 (D. Mass. 1974) | | | |
| 102 | 1974 | *Boston Chapter, NAACP, Inc. v. Beecher*, 504 (F.2d 1017(1st Cir. 1974) | | | |
| 103 | 1975 | *Boston Chapter, NAACP, Inc. v. Beecher*, 421 U.S. 910 (1975) | | | |
| 104 | 2/23/01 | *Wilder v. Diamond Cab Co.*, No. 97-SPA-0789, 2001 Mass. Comm. Discrim. LEXIS 178 (Feb. 23, 2001) | | | |
| 105 | 2/23/01 | *Carpenter v. Yellow Cab Co.*, No. 95-SPA-0033, 2001 Mass. Comm. Discrim. LEXIS 177 (Feb. 23, 2001) | | | |
| 106 | 4/24/04 | *Hancock v. Driscoll*, No. 02-2978, 2004 Mass. Super LEXIS 118 (Mass. Super. Ct. Apr. 24, 2004) | | | |
| 107 | 6/20/94 | *Hamilton v. Springfield School Dep't*, No. 87-SEM-0058, 1994 Mass. Comm. Discrim. LEXIS 73 (June 20, 1994) | | | |
| 108 | 2005 | *Hancock v. Comm'r of Educ.*, 443 Mass. 428 (Mass. 2005) | | | |
| 109 | | City of Springfield's Memorandum Pursuant to an Order for Further Briefing, *Bell et al. v. IBPO Local 364*, CA No. 3:04-30163-MAP (D. Mass) | | | |
| 110 | 8/30/06 | Agreed Settlement Order entered in *United States vs. City of Springfield, et al.*, 06-30123-MAP | | | |
| 111 | 9/13/06 | Revised Agreed Settlement Order entered in *United States vs. City of Springfield, et al.*, 06-30123-MAP | | | |
| 112 | 10/12/00 | Minutes of the Regular Session of the School Committee, produced by Defendants in this case | | | |

LIBA/1754773.1

| Trial Exhibit Number | Date | Description | Exhibit Number | Bates Range(s) | Objection, If Any |
|---|---|---|---|---|---|
| 113 | 2/21/02 | Minutes of the Working Session of the School Committee, produced by Defendants in this case | | | |
| 114 | 3/21/02 | Minutes of the Working Session of the School Committee, produced by Defendants in this case | | | |
| 115 | 9/19/02 | Minutes of the Working Session of the School Committee, produced by Defendants in this case | | | |
| 116 | 11/21/02 | Minutes of the Working Session of the School Committee, produced by Defendants in this case | | | |
| 117 | 4/3/03 | Minutes of the Special Meeting of the School Committee, produced by Defendants in this case | | | |
| 118 | 6/26/03 | Minutes of the School Committee Meeting, produced by Defendants in this case | | | |
| 119 | 6/30/04 | Municipal Workforce Report, City of Springfield Health and Human Services Dept., April 4 through June 30, 2004, produced by Defendants in this case | | | |
| 120 | 4/3/2006 | Springfield Police Dept., Statistical Information Regarding 2004 IIU Complaints as of March 3, 2006, produced by Defendants in this case | | | |
| 121 | 7/19/06 | Commonwealth of Massachusetts, Secretary of the Commonwealth Elections division, Memorandum to Local Election Officials and attachments, produced by Defendants in this case | | | |
| 122 | 12/17/90 | Commonwealth of Massachusetts, *Richmond v. Croson*, Public Hearings on M/WBEs, Report, Findings and Recommendations by the Massachusetts Commission Against Discrimination | | SFP02622-SFP02954 | Defendants object to the admission of this exhibit to establish the truth of the matters asserted; Defendants do not object to the admission of this exhibit to show that a hearing was conducted and findings were made as long as the document is properly authenticated |

14

| Trial Exhibit Number | Date | Description | Exhibit Number | Bates Range(s) | Objection, If Any |
|---|---|---|---|---|---|
| 123 | 2/1997 | MCAD, Project LEND Mortgage Lending Testing Project Funded by HUD, February 1997 | | SFP02955-SFP02962 | |
| 124 | | Maps illustrating nine district City Council plan described in John Harmon's affidavit | | | |
| 125 | | Maps illustrating six district School Committee plans described in John Harmon's affidavit | | | |
| 126 | | Data and maps indicating where present and former Springfield City Councilors live | | | Defendants object to this data and maps on relevancy and without testimony as to the source of the information and from the individual who created the data and the maps |
| 127 | 5/24/05 | Report on a Comprehensive Study of the Springfield Police Department from Carroll Buracker & Associates, Inc., produced by Defendants | Plaintiffs' PI Motion, Franceschini Aff. Ex. 18 | | Defendants object to the admission of this exhibit in the absence of testimony from the organization who created this report regarding the individuals who were responsible for this analysis, those individuals' education, experience, and expertise in the relevant field, the sources of information upon which they relied, and the purpose of the report. Plaintiffs have not identified anyone from the association who conducted this analysis as a potential witness |
| 128 | 7/17/65 | "Police Accused of 'Brutality' At Local Club," Springfield Daily News, July 17, 1965, at 1, 3 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 32 | | Defendants object to the introduction of newspaper articles to the extent that Plaintiffs intend that the articles establish the truth of the assertions incorporated therein. |
| 129 | 6/22/65 | "Representative O'Brien Backs Police," Springfield Daily News, July 22, 1965, at 1, 5 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 33 | | Same objection as to Exhibit 128 |

LIBA/1754773.1

| Trial Exhibit Number | Date | Description | Exhibit Number | Bates Range(s) | Objection, If Any |
|---|---|---|---|---|---|
| 130 | 7/27/65 | "Negroes Here Win Plea 7 Accused of Brutality Stay Out of Tension Area," Springfield Daily News, July 27, 1965, at 1, 9 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 34 | | Same objection as to Exhibit 128 |
| 131 | 7/27/65 | "Police Department Not Making Own Probe," Springfield Daily News, July 27, 1965, at 1, 4 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 35 | | Same objection as to Exhibit 128 |
| 132 | 7/27/65 | "Sworn Statements by Police Accused of Brutality Perused by Commissioners," Springfield Daily News, July 27, 1965, at 28. | Plaintiffs' PI Motion, Franceschini Aff. Ex. 36 | | Same objection as to Exhibit 128 |
| 133 | 10/16/69 | "Curfew to Be Lifted If City Remains Calm," Springfield Daily News, Oct. 16, 1969, at 1, 2 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 37 | | Same objection as to Exhibit 128 |
| 134 | 10/16/69 | "28 Plead Innocent in Disturbance," Springfield Daily News, Oct. 16, 1969, at 1, 2 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 39 | | Same objection as to Exhibit 128 |
| 135 | 11/5/69 | "Race Conflict Explodes at Tech High School," Springfield Daily News, Nov. 5, 1969, at 1, 2 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 40 | | Same objection as to Exhibit 128 |
| 136 | 11/7/69 | "Tech High Closed, Fights Erupt Outside," Springfield Daily News, Nov. 7, 1969, at 1 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 41 | | Same objection as to Exhibit 128 |
| 137 | 11/8/69 | "City Works to Pacify Its School," Springfield Daily News, Nov. 8, 1969, at 1, 2 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 42 | | Same objection as to Exhibit 128 |
| 138 | 9/24/71 | "9 Injured in Tech High Fighting," Springfield Daily News, Sept. 24, 1971, at 1 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 43 | | Same objection as to Exhibit 128 |
| 139 | 9/28/71 | "Police Keep watch on City's Schools," Springfield Daily News, Sept. 28, 1971, at 1, 2 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 44 | | Same objection as to Exhibit 128 |
| 140 | 9/28/71 | "Blacks Want Reply Within 72 Hours," Springfield Daily News, Sept. 28, 1971, at 1, 2 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 45 | | Same objection as to Exhibit 128 |
| 141 | 10/2/71 | "Police Will Keep Watch When High Schools Reopen," Springfield Daily News, Oct. 2, 1971, at 1, 2 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 46 | | Same objection as to Exhibit 128 |

| Trial Exhibit Number | Date | Description | Exhibit Number | Bates Range(s) | Objection, If Any |
|---|---|---|---|---|---|
| 142 | 8/27/75 | "Officer Slays Man in Break Attempt," Springfield Daily News, Aug. 27, 1975, at 1, 2 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 47 | | Same objection as to Exhibit 128 |
| 143 | 8/28/75 | "Mayor Issues Plea for Peace in City," Springfield Daily News, Aug. 28, 1975, at 1, 2 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 48 | | Same objection as to Exhibit 128 |
| 144 | 8/29/75 | "Latest Shooting Disturbs Anxious City Officials," Springfield Daily News, Aug. 29, 1975, at 1, 10 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 49 | | Same objection as to Exhibit 128 |
| 145 | 7/28/88 | Buffy Spencer & Sandra Constantin, "Police Face Accusation Of Brutality," Union-News July 28, 1988, at 1 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 50 | | Same objection as to Exhibit 128 |
| 146 | 7/6/94 | Brian Melley, "Chief To Send Police Party Probe To FBI," Union-News, July 6, 1994, at 1 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 53 | | Same objection as to Exhibit 128 |
| 147 | 7/6/96 | Michael McAuliffe & Carol Malley, "White Officer Linked To Call," Union-News, July 6, 1996, at A1 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 65 | | Same objection as to Exhibit 128 |
| 148 | 7/22/96 | D.L. Stephenson, "Racial Crisis Possible Says Albano," Union-News, July 22, 1996, at B1 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 67 | | Same objection as to Exhibit 128 |
| 149 | 11/10/96 | David Kelly, "Clash Of Race And Perception - Melee Stirs The Pot Of Discontent," Republican, Nov. 10, 1996, at A1 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 69 | | Same objection as to Exhibit 128 |
| 150 | 1/26/97 | Carol Malley & Buffy Spencer, "Switch to Wards Would Be Costly, Complex," Republican, January 26, 1997 at A1. | | SFP03126-SFP03130 | Same objection as to Exhibit 128 |
| 151 | 8/27/97 | Rhonda Swan, "FBI Agrees To Investigate NAACP Letter – Albano's Appeal Successful," Union-News Aug. 27, 1997, at A1 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 76 | | Same objection as to Exhibit 128 |
| 152 | 11/27/97 | Jack Flynn, "Officer Suspended 1 Year – Kicking Incident Prompts Decision By Commissioners," Union-News, Nov. 27, 1997, at A1 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 79 | | Same objection as to Exhibit 128 |
| 153 | 4/2/99 | Kevin Claffey, "City Pays Women In Spray Incident," Union-News, Apr. 2, 1999, at A9 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 81 | | Same objection as to Exhibit 128 |

17

| Trial Exhibit Number | Date | Description | Exhibit Number | Bates Range(s) | Objection, If Any |
|---|---|---|---|---|---|
| 154 | 6/6/99 | Peter Goonan, "City Reveals $700,000 Schoolfield Settlement - Result Of Paper's Suit," Republican, June 6, 1999, at A1 | Plaintiffs' PI Motion, Franceschini Aff. Ex. 82 | | Same objection as to Exhibit 128 |
| 155 | 8/22/06 | Map created by Daniel Marrier: "Springfield Language Proficiency Distribution (Percentage of Linguistically Isolated Households)," provided by Defendants | | | |
| 156 | 8/22/06 | Map created by Daniel Marrier: "Springfield Language Proficiency Distribution (Number of Linguistically Isolated Households)," provided by Defendants | | | |
| 157 | 9/10/97 | "Springfield: A CommUNITY in Progress," an Update prepared by Conflict Management Group | | SFP001226-SFP001324 | Defendants object to the admission of this exhibit in the absence of testimony from the organization who created this analysis regarding the individuals who were responsible for this analysis, those individuals education, experience, and expertise in the relevant field, the sources of information upon which they relied, and the purpose of the report |
| 158 | 4/24/04 | Peter Goonan, "Ryan Seeks Ward Representation," Republican at B1 | Tosado Deposition Exhibit 2 | | Same objection as to Exhibit 128 |

| Trial Exhibit Number | Date | Description | Exhibit Number | Bates Range(s) | Objection, If Any |
|---|---|---|---|---|---|
| 159 | 9/2006 | "A Demographic and Economic Analysis Of the City of Springfield" (Draft), prepared by the Pioneer Valley Planning Commission | | SFP02963-SFP03098 | Defendants object to the admission of this exhibit in the absence of testimony from the organization who created this analysis regarding the individuals who were responsible for this analysis, those individuals education, experience, and expertise in the relevant field, the sources of information upon which they relied, and the purpose of the report. Defendants are not aware that anyone from the "Project" have been listed as potential witnesses in this case |
| 160 | 2003 | Power Point Presentation, Massachusetts Perinatal Disparities Project, "Moving Data into Action at the Community Level" | | SFP03099-SFP03125 | Defendants object to the admission of this exhibit in the absence of testimony from the organization who created this "power point presentation" regarding the individuals who were responsible for this analysis, those individuals' education, experience, and expertise in the relevant field, the sources of information upon which they relied, and the purpose of the report. Defendants are not aware that anyone from the "Project" have been listed as potential witnesses in this case |

LIBA/1754773.1

| Trial Exhibit Number | Date | Description | Exhibit Number | Bates Range(s) | Objection, If Any |
|---|---|---|---|---|---|
| 161 | 12/11/03 | Pioneer Valley Planning Commission, "Owning a Place to Call Home: An Analysis of Fair and Subprime Lending in the Springfield Metropolitan Area" | | SFP03131-SFP03199 | Defendants object to the admission of this exhibit in the absence of testimony from the organization who created this analysis regarding the individuals who were responsible for this analysis, those individuals' education, experience, and expertise in the relevant field, the sources of information upon which they relied, and the purpose of the report |
| 162 | | City of Springfield, MA Analysis of Impediments to Fair Housing | | SFP03200-SFP03244 | |
| 163 | 10/1/03 | North End Strategic Plan, prepared for the North End Outreach Network (NEON) by the Center for Reflective Community Practice (CRCP) at MIT | | | Defendants object to the admission of this exhibit in the absence of testimony from the organization who created this analysis regarding the individuals who were responsible for this analysis, those individuals' education, experience, and expertise in the relevant field, the sources of information upon which they relied, and the purpose of the report |
| 164 | 2006 | Massachusetts Department of Education, "Springfield – Enrollment/Indicators" | | | |
| 165 | 2006 | Massachusetts Department of Education, "2006 MCAS Results by Subgroup – Springfield by Grade then Subject" | | | |
| 166 | 9/21/92 | Letter from Stephen H. Rosenbaum (Chief, Voting Section, Civil Rights Division, U.S. Department of Justice)to James Sullivan (Chairman, Election Commission, City of Springfield) regarding bilingual requirements of Section 203 of the Voting Rights Act, produced by Defendants in this case | | | |

| Trial Exhibit Number | Date | Description | Exhibit Number | Bates Range(s) | Objection, If Any |
|---|---|---|---|---|---|
| 167 | 8/31/04 | Letter from R. Alexander Acosta (Assistant Attorney General, U.S. Department of Justice, Civil Rights Division) to William Metzger (Springfield City Clerk) regarding minority language election information requirements of Section 203 of the Voting Rights Act, produced by Defendants in this case | | | |
| 168 | 7/19/06 | Letter from Wan J. Kim (Assistant Attorney General, U.S. Department of Justice, Civil Rights Division) to Edward M. Pikula (City Solicitor - Springfield) regarding filing of lawsuit on behalf of US against Springfield pursuant to Sections 203 and 208 of the Voting Rights Act, produced by Defendants in this case | | | |
| 169 | 8/2/06 | Complaint from *United States vs. City of Springfield, et al.*, 06-30123-MAP | | | Defendants object to the admission of this complaint to demonstrate the truth of the matters asserted; Defendants do not object to the introduction of the complaint to show that a complaint was filed before the Court in this case |
| 170 | 2003 | David Buchanan, Susan Shaw, Amy Ford and Merrill Singer, "Empirical Science Meets Moral Panic: An Analysis of the Politics of Needle Exchange," *Journal of Public Health Policy*, Vol. 24, Nos. 3/4 | | SFP03297- SFP03314 | Defendants object to this exhibit/study as to which there is no foundation and no information concerning Mr. Buchman, Ms Shaw, Ford, and Singer, the methodology used in making their observations and analysis, their respective education and experience, the sources upon which they relied. Defendants have not identified any of these individuals as among those that they intend to or may call as witnesses |

LIBA/1754773.1

| Trial Exhibit Number | Date | Description | Exhibit Number | Bates Range(s) | Objection, If Any |
|---|---|---|---|---|---|
| 171 | 4/2004 | Presentation by Susan Shaw, Juhem Navarro, Jim Vivian and Merrill Singer, Hispanic Health Council (Hartford, CT), "Results of the Community Attitudes Survey, Springfield MA, April 2004" | | SFP03315-SFP03328 | Same as objection to Exhibit 171, except that the authors of this presentation |
| 172 | 10/20/97 | Order of Springfield City Council, amending 1997 Rules and Orders of the City Council to add Rule 42, creating a 3-person Civil Rights and Race Relations Committee | | SFP001357 | |
| 173 | | Springfield Political Map Post Nov-2001 | | SFP000336 | Defendants object to the introduction of this exhibit in the absence of its author introducing it in trial, explaining the methodology, the sources of information upon which the "charts" relied, and the purpose for which it was created |
| 174 | 11/1998 | City of Springfield Election Results | | | |
| 175 | 11/1997 | City of Springfield Election Results | | | |
| 176 | | Tables containing data for Springfield City available from the following web pages for the Lewis Mumford Center for Comparative Urban and Regional Research, the University at Albany SUNY: http://mumford.albany.edu/census/data.html and http://mumford.albany.edu/census/integratedpages/IntegratedMSAEntrance.htm | | | Defendants object to the admission of this exhibit in the absence of testimony from the organization who created these tables,. regarding the individuals who were responsible for the analysis reflected in the tables, those individuals' education, experience, and expertise in the relevant field, the sources of information upon which they relied, and the purpose of the report. The author organization responsible for the data has not been listed as among Plaintiffs' witnesses. |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ARISE FOR SOCIAL JUSTICE; | ) | |
| ¿OISTE?; NEW ENGLAND STATE-AREA | ) | |
| CONFERENCE OF THE NAACP; | ) | |
| REV. TALBERT W. SWAN, II; | ) | |
| NORMAN W. OLIVER; DARLENE | ) | |
| ANDERSON; GUMERSINDO GOMEZ; | ) | |
| FRANK BUNTIN; RAFAEL RODRIQUEZ; | ) | |
| and DIANA NURSE | ) | Civil Action No. 05-30080-MAP |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| CITY OF SPRINGFIELD and SPRINGFIELD | ) | |
| ELECTION COMMISSION | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' LIST OF EXHIBITS**

**ELECTION COMMISSION**

Election Warden Handbook (undated)

Official elections returns (whole or in part; primary and/or general election) from the Springfield Office of the Election Commission for the following elections:  a)  1959; b) 1963; c)  1977;  d) 1981; e)  1987;  f) 1989;  1991; g) 1993; h)  1995; i) 1997; j) 1999; k) 2000; l)  2001; m) 2002; n) 2003; o) 2004; p) 2005; q) 2006 [RESERVE]

**PERSONNEL DEPARTMENT**

Affirmative Action Plan for Employment

**PLANNING DEPARTMENT**

Springfield and its Neighborhoods:  Statistical Profile dated March 2003

Springfield and its Neighborhoods:  Statistical Profile dated March 1993

**OFFICE OF HOUSING AND NEIGHBORHOOD SERVICES**

Listing of Neighborhood Councils/Organizations (dated 06/10/2005) [OBJECT]

HOME Allocations Citywide - 7/96 through present (dated 02/14/05) [OBJECT]

Consolidated Annual Performance & Evaluation Report -- Fiscal Year 2004-2005 [OBJECT, NEVER PRODUCED]

City of Springfield's Action Plan -- Fiscal Year 2006-2007

Homebuyer Workshop Outline (undated) [OBJECT]

U.S. Department of Housing and Urban Development -- HOME Investment Partnerships Program (HOME) Dashboard Report:  received by Mayor Ryan on September 29, 2006 [OBJECT]

Homebuyer Assistance Program -- revised 06/2006 [OBJECT, NEVER PRODUCED]

HAP, Inc., Programs and Services:  accessed from www.haphousing.org/programs/ on 11/10/2006 [OBJECT, NEVER PRODUCED]

Commonwealth of Massachusetts HOME American Dream Downpayment Initiative (ADDI) Buyer Assistance Application and Program Guidelines (updated June 2006) [OBJECT, NEVER PRODUCED]

Various webpages from the City of Springfield's website [RESERVE, OBJECT, NEVER PRODUCED]


**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Health Update:  Pregnancies and Births 1999 – 2005 [RESERVE]

Health Update:  Pregnancies and Births 1993 – 2000

Health Update:  Births to Teens  1993 - 2000

Health Update:  Births to Teens   1991 - 1998

Health Update:  Neighborhood Perinatal Indicators   1989 - 1999

Health Update:  Substance Abuse Treatment among Springfield Residents (2nd edition/October 1999)

Health Update:  Substance Abuse Treatment among Springfield Residents (3rd edition/October 2000)

Health Update:  The HIV/AIDS Epidemic in the City of Springfield (2nd edition, 1999)

Health Update:  The HIV/AIDS Epidemic in the City of Springfield (3rd edition, 2002)

Finding Solutions to Springfield's Oral Health Crisis (undated)

Report from the Springfield Mayor's Crusade against Cancer Community Forum (October 2003)

Department of Health and Human Services organizational chart (undated) [OBJECT]

Department of Health and Human Services Reorganization Plan (undated) [RESERVE]

Contract by and between City of Springfield's Department of Public Health and the Criminal Justice Organization of Hampden County, Inc. for a Health Care Access Coordinator, effective July 1, 2004. [OBJECT, NEVER PRODUCED]

Department of Health and Human Services Permit Fees Schedule (undated) [OBJECT]

EEO Report for The Department of Health and Human Services, for the period of 04/04/2004 thru 06/30/2004

City Wide Violence Prevention Task Force Report (date uncertain) [OBJECT, NEVER PRODUCED]

Department of Health and Human Services Job Descriptions (undated) [OBJECT]

Department of Health and Human Services budget for September 2004; and nine month budget for fiscal year 2005

## POLICE DEPARTMENT

A Management Study of the Springfield Police Department: Executive Summary Conducted by Carroll Buracker & associates, Inc., dated May 4, 2005

Inter-Departmental Correspondence 03/04/1992 and 12/21/2004 [RESERVE]

General Orders dated 03/15/2002 thru 01/11/2004 [RESERVE]

Protocol B dated November 19, 2001 [RESERVE, OBJECT]

Traffic Stop analysis 08/01/2005 thru 10/23/2006 [OBJECT]

Crime Analysis 2005 [RESERVE, OBJECT]

Internal Investigations Unit Statistical Information 01/01/2005 thru 12/31/2005

Inter-Departmental Correspondence dated from 05/05/2006 thru 11/07/2006 [RESERVE]

## SPRINGFIELD PUBLIC SCHOOLS

School Committee minutes for October 12, 2000; February 21, 2002; March 21, 2002; September 19, 2002; November 21, 2002; April 3, 2003; and June 26, 2003

June 21, 2005, memo from School Superintendent Dr. Joseph P. Burke regarding school improvement expenditures [OBJECT]

Springfield Public Schools' webpage; accessed from www.sps.springfield.ma.us on 12/18/2006 [OBJECT, NEVER PRODUCED]

Springfield Public Schools -- Mission and Goals for 2005-2008 [OBJECT, NEVER PRODUCED]

Springfield Public Schools -- Culture of Achievement (undated) [OBJECT, NEVER PRODUCED]

Springfield Public Schools -- Student and parent handbook 2006-2007 school year [OBJECT, NEVER PRODUCED]

Springfield Public Schools -- Pupil Progression Plan (undated) [OBJECT, NEVER PRODUCED]

Springfield Public Schools -- District Curriculum Accommodation Plan (undated) [OBJECT, NEVER PRODUCED]

Springfield Public Schools -- 2005-2006 NCLB District Report Card: accessed from www.sps.springfield.ma.us on 12/18/2006 [OBJECT, NEVER PRODUCED]

Springfield Public Schools -- MCAS Results Over Time 2000-2004: Authored by Dr. Joseph P. Burke, Superintendent, September 22, 2004

Step Up Springfield goals, dated 09/22/2004 [OBJECT, NEVER PRODUCED]

## CITY CLERK

Special Acts and Resolves for the City of Springfield:  1852 –1965, produced by the City Clerk, Wayman Lee, Esq.  [RESERVE]

Chapter and Related Acts, Massachusetts General Laws, Springfield Revised Ordinances, including Appendix I and II and index.  [RESERVE]

Copy of City of Springfield Manual, dated 1959, containing Rules and Orders of the City Council, "together with a list of City officers, committees, boards, commissions, and other information concerning the City of Springfield [OBJECT, NEVER PRODUCED]

Rules and Orders of the City Council, dated January 2, 1962 and signed by the City Clerk [OBJECT, NEVER PRODUCED]

Massachusetts General Laws, Chapter 44, Section 32.

Revised Ordinance of the City of Springfield 1956, the Charter of the City and the General Ordinances of the City, enacted as a whole February 4, 1957, effective March 1, 1957 [OBJECT, NEVER PRODUCED]

Massachusetts Acts, 1936, Chapter 140, "An Act Relative to the Time for Filing Nomination Papers for Candidates to be Voted for at City and Town Primaries

Massachusetts Acts of 1901, Chapter 147, "An Act to Amend the Charter of the City of Springfield Relative to the Election of Aldermen and Councilmen"

Massachusetts Acts of 1884, Chapter 303, "Am Act to Amend the Charter of the City of Springfield in Relation to the Election of Alderman"

Massachusetts Acts of 1877, Chapter 146, "An Act to Revise and Amend the Charter of the City of Springfield

Massachusetts Acts of 1852, Chapter 94, "Inhabitants of Springfield made a body corporate as the City of Springfield"

-----------------------------------------------------------------------------------------------------------------

## OTHER CITY DEPARTMENTS

Law Department inter office memo dated February 27, 1998; listing civil rights cases against the City

Commonwealth of Massachusetts, et al v. United States of America; U.S. District Court, District of Columbia; Civil Action No. 83-0945 [RESERVE]

June 16, 2005, letter from Patrick J. Sullivan, Director of Parks, Buildings and Recreation Management regarding document search [OBJECT]

June 15, 2005, facsimile transmission from the Department of Public Works regarding monies spent on road and sidewalks from 1996 thru the present [OBJECT]

---------------------------------------------------------------------------------------------------------------------

**Stephan Thernstrom, Ph.D.**

U.S. Census bureau, 2004 American Community Survey [RESERVE]

"Complex Justice:  The Case of Missouri v. Jenkins"  [OBJECT]

"Rejoinder to Rebuttal Reports of Douglas Amy, Ph.D. and Richard Engstrom, Ph.D. for Arise for Social Justice v. Springfield" (dated October 30, 2006) [OBJECT – AFFIDAVIT MATERIAL]

Spanish surname analysis and data for the November 1999; 2001;  2003; and 2005 elections [OBJECT]

"The Demise of Racial Districting and the Future of Black Representation" by Charles S. Bullock, III and Richard E. Dunn.  Emory Law Journal, Fall 1999;  48 Emory L.J. 1209 [OBJECT]

"New Perspectives on Latino Voter Turnout in the United States" by Benjamin Highton and Arthur L. Burris,  American Politics Research/ May 2002  pp. 285-306 [OBJECT]

"Turnout in Municipal Elections"  by Charles S. Bullock, III.  Published in Policy Studies Review, Spring 1990, Vol. 9, No. 3, pp 539-549 [OBJECT]

"Municipal Institutions and Voter Turnout in Local Elections"  by Zoltan L. Hajnal and Paul G. Lewis.  Urban Affairs Review, Vol. 38, No. 5, May 2003, pp. 645-668 [OBJECT]

"A Community's Total War Against Prejudice"  by Alice L. Halligan.  Journal of Educational Sociology, vol. 16, No. 6, United We'll Stand (Feb. 1943) pp. 374-380 [OBJECT]

"Minority Turnout and the Creation of Majority-Minority Districts"  by Kimball Brace; Lisa Handley; Richard G. Niemi; and Harold W. Stanley.  American Politics Quarterly, Vol. 23, No. 2, April 1995, pp. 190-203 [OBJECT]

"Political Talent Emerges in Suburbs: Communities Gain Potential Black Leaders, While City Loses Out"  by Gromer Jeffers, Jr.  the Dallas Morning News, June 29, 2005 [OBJECT]

"Expert Witness Report in Arise, et al v. City of Springfield, et al."  by Stephan Thernstrom, Ph.D.  May 24, 2006 [OBJECT – AFFIDAVIT MATERIAL]

Curriculum Vitae of Stephan Thernstrom, Ph.D. [OBJECT – AFFIDAVIT MATERIAL]

## ENGSTROM DEPOSITION EXHIBITS

"Enhancing Factors in At-Large Plurality and Majority systems: A Reconsideration"

"The Demise of Racial Districting and the Future of Black Representation" [OBJECT]

"Turnout in Municipal Elections" [OBJECT]

"New Perspectives on Latino Voter Turnout in the United States" [OBJECT]

"Municipal Institutions and Voter Turnout in Local Elections" [OBJECT]

"A Community's Total War Against Prejudice" [OBJECT]

## NEWSPAPER ARTICLES

Various articles from the Springfield newspaper [RESERVE]

"Event recognizes black politicians"   Azell Cavaan
        The Republican  02/25/2005 [OBJECT]

"Taxes, health top  councilor's agenda"  Peter Goonan
        Union-News  01/24/2000 [OBJECT]

"Councilor wants colleges to pay – In lieu of tax plan pitched" Peter Goonan
        Union-News  12/04/2000 [OBJECT]

"Mayor says no to taxing nonprofits"   Beatrice O'Quinn Dewberry
        Union-News  12/07/2000 [OBJECT]

"Tax rate decision follows weekend hearing"   Peter Goonan
        Sunday Republican   12/10/2000 [OBJECT]

"Tax plan would hurt nonprofits that aid city"   Staff
        Union-News  12/11/2000 [OBJECT]

"In-lieu-of-tax appeal opposed by mayor"   Bea Dewberry
        Union-News   12/15/2000 [OBJECT]

"Tax idea for nonprofits rejected"   Peter Goonan
        Union-News  12/19/2000 [OBJECT]

"Our candidate choices in Springfield elections"   Staff
        Union-News    10/31/2001 [OBJECT]

"Bickering councilors to meet"   Mary O'Shea
        Union-News    10/26/1996 [OBJECT]

"Drive aims to up Latino voting"   Natalia Munoz
        The Republican    03/27/2006 [OBJECT]

"Computer policy adopted"   Mary O'Shea
        Union-News    05/06/1997 [OBJECT]

"School board Oks computers for 2 members"   Mary O'Shea
        Union-News    05/24/1997 [OBJECT]

"Albano orders search for waste in school budget"   Carol Malley
        Union-News    06/04/1997 [OBJECT]

"3 councilors attack higher school bond – Call for commission revamp"    Carol Malley
        Union-News    07/23/1997 [OBJECT]

"Officials uphold computer policy"   Mary O'Shea
        Union-News    02/02/1998 [OBJECT]

"Raise bid revives computer issue"   Mary O'Shea
        Union-News    04/18/1998 [OBJECT]

"Councilor criticized for remarks – McCollum, Ryan at odds over pay raise, computer"
Mary O'Shea [OBJECT]
        Union-News    04/23/1998

"At $500 a head, McCollum fans turn out"  Mary O'Shea
        Union-News    10/27/1999 [OBJECT]

"School Committee expecting little upheaval despite vote"  Mary O'Shea
        Union-News    11/04/1999 [OBJECT]

"Event recognizes black politicians"  Azell Cavaan
        The Republican    02/25/2005 [OBJECT]


**BOOKS**

Thernstrom, Stephan and Thernstrom, Abigail, <u>America in Black and White,</u> pp 474-476
[OBJECT]

**MISCELLANEOUS**

Proposal Arise for Social Justice --    Request for $50,000 to educate low-income people on entitlement programs  2002 May 24 [OBJECT]

Political Flyer FOCUS (A Black Alliance) Supports Ryan for Mayor (undated) [OBJECT]

Campaign Finance Report 12/31/2005, Municipal Form   Orlando Santiago [OBJECT, NEVER PRODUCED]

Summary Report of Campaign Receipts and Expenditures Committee to Elect Carol Lewis-Coulton  10/31/2001 [OBJECT, NEVER PRODUCED]

US District Court Consent Decree  12/12/1994        Castro et al v Beecher et al

City Council Salaries and the Competitiveness of Elections: A Survey Worcester Regional Research Bureau 09/22/2005 [OBJECT, NEVER PRODUCED]

"'Enhancing' Factors in At-Large Plurality and Majority Systems: A Reconsideration", Richard Engstrom and Michael McDonald Electoral Studies, 12:4, 385-401        (1993)

Several copies of sample ballots in Spanish from the 2005 municipal election, provided by Rafael Nazario, 2005 candidate for City Council [OBJECT, NEVER PRODUCED]

Spanish surname analysis of turnout for the 1999, 2001, and 2003 elections conducted by Plaintiffs with letter dated July 25, 2006 to Deanne Bogan Ross from Anna-Marie Tabor, Goodwin Proctor [OBJECT]

Spanish surname analysis of July 2006 registration conducted by the Department of Justice, Civil Rights Division, Voting Section, with letter dated September 28, 2006 to Edward M. Pikula from John "Bert" Russ, Veronica S. Jung, Attorneys, Voting Section [OBJECT]

1990 Census data for Hampden County precincts provided by Election Data Services, Inc., 1225 I Street NW, Suite 700, Washington, D.C., entitled State of Massachusetts LED Review Commission [OBJECT, NEVER PRODUCED]

Springfield Police Department Procedures for Investigation and Disposition of Citizen Complaints, including locations designated to receive complaints in the City of Springfield, fax from Springfield Police Chief, November 20, 1998 [OBJECT, NEVER PRODUCED]

Deposition Testimony of Jose Tosado, October 18, 2005, in Arise for Social Justice v. City of Springfield, C.A. No. 05-30080-MAP [OBJECT – AFFIDAVIT MATERIAL]

Deposition Testimony of Bud L. Williams, October 19, 2005, in <u>Arise for Social Justice</u> v. <u>City of Springfield</u>, C.A. No. 05-30080-MAP [OBJECT – AFFIDAVIT MATERIAL]

Copies of the pleadings in <u>Commonwealth of Massachusetts, et al.</u> v. <u>United States of America</u>, C.A. No. 83-0945, produced by Paul A Lazour, who was the attorney of record for the Massachusetts Attorney General in the case, with letter dated October 26, 2006 to Deanne E.B. Ross from Paul A Lazour [OBJECT, RESERVE, NEVER PRODUCED]

Massachusetts Election Statistics, The Elections Division, Office of the Massachusetts Secretary of State, regarding certain legislative district contests and registered voters and turn-out, for the following years: 1980, 1982, 1984, 1986, 1988, 1990, 1992, 1994, 1996, and 1998 [RESERVE, OBJECT, NEVER PRODUCED]

United States Census data for the City of Springfield for 1960, 1970, 1980, 1990, and 2000. [RESERVE]

2000 Census Data – PL 94-171: Prepared by Massachusetts Voter Education Project [RESERVE]

1990 Census data for Springfield precincts, Election Data Services, Inc., provided by the Secretary of the Commonwealth, Elections Division [OBJECT, NEVER PRODUCED]

Voting Behavior in Springfield, a Statistical and Analytical Report, September 1973, Springfield Urban League

Voting Behavior in Springfield, a Statistical and Analytical Report, Second Edition, 1973-1982; Springfield Urban League

Pleadings in <u>United States of America</u> v. <u>City of Springfield</u>, C.A. No. 06-30123-MAP
   a) Agreed Settlement Order, September 15, 2006
   b) Selected excerpts of Transcript of TRO Hearing Held Before the Honorable Michael A. Ponsor, United States District Court Judge, August 28, 2006 [OBJECT]
   c) Opposition to Plaintiffs' Request for a Temporary Restraining Order or in the Alternative, for Preliminary Injunction, and Cross Motion for Preliminary Injunction and Order to Exclude, or in the Alternative Defer, Introduction of Declarations or Testimony, including Exhibits [OBJECT]
   d) Excerpts from Federal Observer Reports for September 2006 Election and November 2006 Election, with Notice of Filing, <u>United States</u> v. <u>City of Springfield</u>, 06-30123-MAP [RESERVE]
   e) Spanish Surname Analysis of Registration provided by Department of Justice, Civil Rights Division, Voting Section for 2005 and 2006 [OBJECT]

Election related materials, instructions, notices, information from 2006 election

a)  Springfield Election Handbook
b)  Copies of signs drafted by Election Commission and posted in polling places; copy of check list, requiring warden to attest to having posted all of the bilingual signs in prominent places in the polling place [RESERVE]
c)  Copies of notices published in Spanish-speaking media [OBJECT, NEVER PRODUCED]
d)  Index and copies of selected documents, forms, and information provided on http://www.springfieldcityhall.com/COS/elections/ by the Springfield Election Commission [OBJECT, NEVER PRODUCED]
e)  Index and copies of documents, forms, and information provided on http://www.sec.state.ma.us/ele/eleidx.htm by the Elections Division, Office of the Secretary of the Commonwealth [OBJECT, NEVER PRODUCED]
f)  Letter to police officers assigned to polling places for the 2006 elections, from City Solicitor Edward M. Pikula, dated September __, 2006. [OBJECT, NEVER PRODUCED]
g)  List of poll workers by polling place for the 2006 primary and general election, Office of the Election Commission, prepared by Ms. Gladys Oyolo, Spanish Language Election Program Coordinator [OBJECT]
h)  Expenditures (personnel, equipment, property) for the 2006 primary and general elections, prepared by Kathy Fleury, Election Commissioner [OBJECT, NEVER PRODUCED]
i)  Names of persons casting provisional ballots cast by voters in the 2006 primary and general election; names of those persons whose ballots were "counted" and those who were sent a voter registration application, compiled by Ms. Oyolo [OBJECT, NEVER PRODUCED]

Information regarding Declarants for the United States in United States v. City of Springfield) in the City of Springfield:  a)  records of voting histories of declarants compiled by Ms. Oyolo; and b) selected interview notes of declarants conducted by Ms. Oyolo after the November, 2006 election [OBJECT, NEVER PRODUCED]

Various notices, agendas, minutes of Spanish Language Advisory Committee meetings [OBJECT, NEVER PRODUCED]

From the Connecticut Valley Historical Museum and newspaper research at the Springfield Public Library, various 1959 newspaper articles and "advertisements" from the Springfield daily newspapers concerning the "Plan A" government referendum and a document entitled "Ideas for Springfield,"  Vol. I, No. 3, prepared by Robert Shanley, Joint Civic Agencies, Future Springfield, Inc., distributed by the Springfield City Library: Questions and Answers on Plan A (Strong Mayor Charter) [RESERVE, OBJECT, NEVER PRODUCED]

From the Connecticut Valley Historical Museum and newspaper research at the Springfield Public Library, various 1960's newspaper articles from the Springfield newspapers discussing efforts to provide for ward representation in the Plan A

government and concerning the 1963 referendum election advocating for a 8-5 method of election for the City Council. [RESERVE, OBJECT, NEVER PRODUCED]

Selected handouts, advertisements, notices provided by the Plaintiffs regarding the 1997 referendum election proposing an 8-3 method of election; selected newspaper articles provided by the Plaintiffs reporting on Plaintiffs' efforts to obtain passage by the City Council of an 8-3 method of election [RESERVE]

Expert Witness Report in <u>Arise for Social Justice</u> v. <u>Springfield</u>, of Dr. Stephan Thernstrom, May 24, 2006 [OBJECT – AFFIDAVIT MATERIAL]; Rejoinder to Rebuttal Reports of Douglas Amy and Richard Engstrom for <u>Arise for Social Justice</u> v. <u>Springfield</u>, October 30, 2006 [OBJECT – AFFIDAVIT MATERIAL]; curriculum vitae of Dr. Stephan Thernstrom; and selected excerpts from deposition of Dr. Thernstrom [OBJECT – AFFIDAVIT MATERIAL] in addition to documents cited, provided, and or relied upon by Dr. Thernstrom, including

a) Bullock , Charles S. III and Richard E. Dunn, "The Demise of Racial Districting and the Future of Black Representation," 48 <u>Emory Law Journal</u> (Fall, 1999) [OBJECT].

b) Data from United States Census Bureau's American FactFinder, http://factfinder.census.gov/home/staff/man.html [RESERVE].

c) Highton, Benjamin and Aurthur L. Burris, "New Perspectives on Latino Voter Turnout Rates in the United States," <u>American Politics Research</u>, Vol. 30, No. 3 (May, 2002) [OBJECT]

d) Gay, Claudine, <u>The Effect of Districts and Minority Representation on Political Participation in California</u>, (Public Policy Institute of California, 2001) [OBJECT]

e) Brace, Kimball, Lisa Handley, Richard G. Niemi, and Harold W. Stanley, "Minority Turnout and the Creation of Majority-Minority Districts," 23 <u>American Politics Quarterly</u> (April, 1995) [OBJECT]

f) Haiijnal, Zoltan L. and Paul G. Lewis, "Municipal Institutions and Voter Turnout in Local Elections," 38 <u>Urban Affairs Review</u> (2003) [OBJECT]

g) American Community Survey data for 2004 and 2005 for the City of Springfield, http://factfinder.census.gov/home/staff/man.html [RESERVE]

h) Newspaper articles:

i) "US Census Points to More Minorities," <u>The Republican</u>, Stan Freeman (May 10, 2006) [OBJECT]

ii) "Event Recognizes Black Politicians," <u>The Republican</u>, Azell Murphy Cavaan (May 10, 2006) [OBJECT]

iii) "Taxes, Health Top Councilor's Agenda," <u>Union-News</u>, Peter Goonan (January 24, 2000) [OBJECT]

iv) "Computer Policy Adopted," <u>Union-News</u>, Mary Ellen O'Shea (May 6, 1997) [OBJECT]

v) "At $500 a head, McCollum Fans Turn Out," <u>Union-News</u>, Mary Ellen O'Shea (October 27, 1999) [OBJECT]

      vi) "Drive Aims to Up Latino Voting," <u>Union-News</u>, Natalia Munoz (March 26, 2006) [OBJECT]
      v) "Hatred Still Haunts Many Lives, Minorities Face Bias Every Day," [reporter], <u>Sunday Republican</u> (October 16, 1994) [OBJECT]
      vi) "Political Talent Emerges in the Suburbs," Gromers Jeffrey, Jr. <u>Dallas Morning News</u>, June 29, 2005 [OBJECT]

i) Keyssar, Alexander, <u>The Right to Vote</u>: The Contested History of Democracy in the United States (Basic Books), Tables A4 and A9. [OBJECT]

k) Glazer, Nathan and Reeds Ueda, "Prejudice and Discrimination, Policy Against," Stephan Thernstrom, ed., Harvard <u>Encyclopedia of American Ethnic Groups</u> (Harvard University Press, 1980), 849. [OBJECT]

l) Halligan, Alice L., "A Community's Total War Against Prejudice," 16 <u>Journal of Educational Sociology</u> (February, 1943). [OBJECT]

m) Selected excerpts from Thernstrom, Stephan and Abigail Thernstrom, <u>America in Black and White: One Nation, Indivisible</u> (Simon and Schuster, 1997) [OBJECT]

n) Selected excerpts from Thernstrom, Abigail and Stephan Thernstrom, <u>No Excuses: Closing the Racial Gap in Learning</u> (Simon and Schuster, 2003) [OBJECT]

o) McClain, James S., "The Voting Right Act and Local School Boards: An Argument for Deference to Educational Policy in Remedies for Voting Dilution," 67 <u>Texas Law Review</u> (1988) [OBJECT]

p) Zeigler, H., E. Kehoe and J. Reisman, <u>City Managers and School Superintendents: Response to Community Conflict</u> (Praeger, 1985), 11. [OBJECT]

Expert Report of Professor John Harmon (March 9, 2006), curriculum vitae, Exhibits A and B, and excerpts from deposition transcript of John E. Harmon, PhD (April 7, 2006) [RESERVE]

Excerpts from deposition transcript of Douglas James Amy (April 21, 2006) [RESERVE], including excerpts from documents (exhibits) used during deposition obtained from Dr. Amy's website: http://www.mtholyoke.edu/acad/polit/damy [RESERVE]

      a) Amy, Douglas J., "What are Voting Systems and Why are They Important?"
      b) Amy, Douglas J., "What is Proportional Representation and Why do We Need This Reform?"
      c) Amy, Douglas J., "A Brief History of Proportional Representation in the United States"
      d) Amy, Douglas J., "How Proportional Representation Would Finally Solve Our Redistricting and Gerrymandering Problems"
      e) Amy, Douglas J, Robert Richie and Frederick McBride, "How Proportional Representation Can Empower Minorities and the Poor"
      f) Amy, Douglas J., "Fair Representation for Racial Minorities: Is Proportional Representation the Answer?"
      g) Hill, Steven, "A Voting Rights Act at War With Itself" [OBJECT]

Expert Report of Richard L. Engstrom, Ph.D.(March 8, 2006) [RESERVE]; Rebuttal Report of Richard L. Engstrom, Ph.D.(September 14, 2006) [RESERVE]; excerpts from deposition of Richard L. Engstrom, Ph.D. (April 19, 2006) [RESERVE]; curriculum vitae, and the following article produced in response to the document request that accompanied the deposition subpoena, as well as two deposition exhibits [RESERVE]:

a) Engstrom, Richard L. and Michael D. McDonald, "'Enhancing' Factors in At-Large Plurality and Majority Systems: A Reconstruction," <u>Electoral Studies</u> (1993), 12:4, 385-401

b) Engstrom, Richard L., Stanley A. Halpin, Jr., Jean A. Hill, and Victoria M. Caridas-Butterworth, "Louisiana," <u>Quite Revolution in the South, The Impact of the Voting Rights Act 1965-1990</u>, Chandler Davidson and Bernard Grofman, ed., Princeton University Press, (1994), 103-135.

c) Grofman, Bernard; Lisa Handley and Richard G. Niemi, <u>Minority Representation and the Quest for Voting Equality</u> (Cambridge University Press, 1992), 104. [OBJECT]

Various maps and redistricting plans created by MassGIS, Daniel Marrier, GIS Systems Analyst (made available at his October 31, 2006 deposition or subsequent to his deposition) [OBJECT]

    _) Demographic map of Springfield, with precinct and ward boundaries; African American voting age population [OBJECT]

    _) Demographic map of Springfield, with precinct and ward boundaries; Hispanic voting age population [OBJECT]

    _) Map of Springfield, neighborhoods [OBJECT]

    _) Plaintiffs' nine single-member district plans, with residence of incumbents, former incumbents, candidates, and named Plaintiffs, plus demographic data of plans [OBJECT]

    _) Plaintiffs' six single-member district plans, with residence of incumbents, former incumbents, candidates, and named Plaintiffs; plus demographic data of plans [OBJECT]

    _) Two-plan overview: Plaintiffs' nine single-member district plan and precinct boundaries; plus identification of the precincts that are split [OBJECT]

    _) Two plan overview: Plaintiffs' nine single-member district plan and ward boundaries [OBJECT]

    _) Two plan overview: Plaintiffs' nine single-member district plan and neighborhood boundaries; plus identification of neighborhoods split [OBJECT]

    _) Two-plan overview: Plaintiffs' six single-member district plan and precinct boundaries; plus identification of the precincts that are split [OBJECT]

    _) Two plan overview: Plaintiffs' six single-member district plan and ward boundaries [OBJECT]

    _) Two plan overview: Plaintiffs' six single-member district plan and neighborhood boundaries; plus identification of neighborhoods that are split [OBJECT]

    _) Partial eleven single-member district plan, with minority-majority districts boundaries, plus demographics of minority-majority districts [OBJECT]

    _) Nine single-member district plan that splits one precinct; plus demographic data of plans [OBJECT]

Fax transmittal sheet and letter from John "Bert" Russ, Esq. to Edward M. Pikula, Esq., dated January 5, 2007, Re: *United States v. City of Springfield*, 06-CV-30123. [RESERVE]

**DEFENDANTS' ISSUES OF FACT**

**Demographics**

1)  According to the 1960 Census, "white" persons represented 93.7 percent of the voting age population (104,012 persons) and "non-white" persons represented 6.3 percent of voting age population (7,026 persons) in the City of Springfield (7,026 persons).[1]

2)  According to the 1970 Census, "white" persons represented 89.7 percent of the voting age population (91,079 persons); "Negro" persons represented 9.9 percent of voting age population (10,008 persons); and persons of Spanish origin or descent represented 4.8 percent of the voting age population (4,822 persons) in the City of Springfield.[2]

3)  According to the Urban League of Springfield and the 1970 Census, the total population by ward was as follows:[3]

|  | **Ward 1** | **Ward 2** | **Ward 3** | **Ward 4** | **Ward 5** | **Ward 6** | **Ward 7** | **Ward 8** |
|---|---|---|---|---|---|---|---|---|
| *Total Pop.* | 10,901 | 26,140 | 17,760 | 11,948 | 18,294 | 16,223 | 24,118 | 38,521 |
| *Black TPop* | 09.8% | 00.6% | 12.9% | 64.5% | 45.9% | 00.7% | 00.4% | 03.8% |
| *Spanish-speaking TPOP* | 28.8% | 02.3% | 03.5% | 01.5% | 01.9% | 00.6% | 00.5% | 00.8% |

 *Voting Behavior in Springfield, A Statistical and Analytic Report*, September 1973, "prepared under the auspices" of the National Urban League Voter Registration-Education Project, Henry M. Thomas, III, Director (First Report)(Exhibit _)

4)  According to the 1980 Census, "white" persons represented 81.2 percent of the voting age population (89,603 persons); "Black" persons represented 13.9 percent of voting age population (10,008 persons); and persons of "Spanish origin" represented 6.0 percent of the population (6,621 persons) in the City of Springfield[4]

---

[1]In 1960, persons could identify themselves either as white or nonwhite.  Moreover the legal voting age was 21 years.

[2]In 1970, persons could identify themselves either as white or Negro (and other races) and separately were provided choices regarding country of origin.  Accordingly those identifying themselves as "white" or "Negro" did not exclude those also identifying themselves as "persons of Spanish origin or descent" or "persons of Puerto Rican birth and parentage."

[3]Black voting age population was provided by ward and precinct based upon 1970 Census

[4] In the 1980 Census, persons could identify themselves as belonging to a particular race, e.g., white or black (and other races) and could also identify themselves as "of Spanish origin." Accordingly, it does not appear that the data regarding the number of persons identifying themselves as white or black exclude those also identifying themselves as "of Spanish origin."

5)  According to the Urban League of Springfield and the 1980 Census the total population by ward was as follows:

|  | **Ward 1** | **Ward 2** | **Ward 3** | **Ward 4** | **Ward 5** | **Ward 6** | **Ward 7** | **Ward 8** |
|---|---|---|---|---|---|---|---|---|
| *Total Pop.* | 9,377 | 22,967 | 15,810 | 10,125 | 16,545 | 16,203 | 19,584 | 41,708 |
| *Black TPop* | 09.3% | 02.5% | 18.7% | 70.4% | 56.9% | 01.4% | 01.0% | 09.3% |
| *Spanish origin TPOP* | 65.1% | 09.4% | 10.6% | 10.2% | 07.6% | 02.3% | 00.8 | 01.9% |

*Voting Behavior in Springfield, A Statistical and Analytic Report*, Second Edition, 1973-1982, prepared by the Urban League of Springfield, Inc., Ronald E. Peters, Chairman, Board of Directors; Henry M. Thomas, III, President (Second Report).

6) According to the 1990 Census, "white" persons represented 69.6 percent of the voting age population (79,906 persons); "Black" persons represented 16.4 percent of voting age population (18,891 persons); and Hispanic persons (regardless of race) represented 12.8 percent of the population (14,711 persons) in the City of Springfield .[5]

7)  The following is the demographic data provided 1990 Census data for Springfield precincts, Election Data Services, Inc., provided by the Secretary of the Commonwealth, Elections Division[6]

| Ward | TPOP | % Black TPOP | % Hispanic TPOP |
|---|---|---|---|
| 1 | 19,688 | 11.1 | 60.6 |
| 2 | 19,695 | 34.9 | 08.8 |
| 3 | 19,546 | 18.6 | 26.2 |
| 4 | 19,595 | 59.4 | 17.9 |
| 5 | 19,580 | 25.9 | 09.7 |
| 6 | 19,502 | 03.5 | 04.9 |
| 7 | 19,697 | 05.6 | 02.0 |
| 8 | 19,684 | 16.6 | 08.5 |
| Total | 156,983 | 18.1 | 16.9 |

8)  According to the 2000  Census, 19.6 percent of the total population of the City of Springfield identified themselves as Black/African-American (alone); 27.2 percent identified themselves as Hispanic/Latino (regardless of race); and 4.3 percent identified themselves as some other race or as two or more races.

---

[5]The 1990 Census  provided data as to the number of persons who are non-Hispanic white or black (or any other racial group).  At this juncture, we have been unable to locate 1990 Census data by ward.

[6] This was the only 1990 census data that Defendants have been able to locate.  It does not include voting age population information

9)  According to the 2000 Census, 18.1 percent of the voting age population of the City of Springfield identified themselves as Black/African-American (alone), and 21.8 percent identified themselves as Hispanic/Latino (regardless of race), and 4.0 percent identified themselves as some other race or two or more races.

10).  Using the 2000 Census, the Massachusetts Voter Education Project (MassVote) derived the following:

| Ward | TPOP | % Black TPOP | % Hispanic TPOP | VAP | % Black VAP | % Hispanic VAP |
|------|------|--------------|-----------------|-----|-------------|----------------|
| 1 | 19,123 | 16.7 | 68.5 | 12,866 | 12.4 | 60.8 |
| 2 | 19,214 | 08.3 | 34.5 | 14,139 | 06.9 | 20.8 |
| 3 | 18,784 | 20.1 | 44.0 | 12,414 | 19.3 | 37.4 |
| 4 | 19,166 | 53.7 | 21.3 | 12,914 | 53.1 | 19.6 |
| 5 | 18,967 | 25.7 | 11.8 | 13,764 | 24.1 | 09.1 |
| 6 | 19,039 | 09.6 | 16.0 | 14,033 | 07.8 | 11.9 |
| 7 | 18,960 | 09.3 | 06.4 | 14,638 | 07.6 | 04.8 |
| 8 | 18,824 | 18.7 | 19.9 | 13,285 | 16.5 | 14.7 |
| Total | 152,082 | 19.6 | 27.2 | 108,055 | 18.1 | 21.8 |

11)  There are 17 neighborhoods in the City of Springfield: Indian Orchard, East Springfield, Liberty Heights/Atwater, Memorial Square, Brightwood, Metro Center, South End, Six Corners, Old Hill, McKnight, Bay, Upper Hill, Pine Point, Boston Road, Sixteen Acres, East Forest Park and Forest Park.  *Statistical Profile: Springfield and its Neighborhoods*, prepared by the Springfield Planning Department, May 1993 (Statistical Profile 1990)

12)  The following chart provides 1990 Census and 2000 Census data for these 17 neighborhoods, as well as the total population according to the 2000 Census:

| Hispanic Pop (regardless of race) | | | non-Hispanic Black Pop | | Total PoP |
|-----------------------------------|--|--|------------------------|--|-----------|
| **Neighborhood** | **1990 Census** | **2000 Census** | **1990 Census** | **2000 Census** | **2000 Census** |
| *Bay* | 18.0 | 28.2 | 67.3 | 60.3 | 4,256 |
| *Boston Road* | 04.8 | 15.7 | 12.8 | 17.0 | 3,670 |
| *Brightwood* | 78.2 | 85.2 | 10.3 | 06.2 | 3,936 |
| *East Forest Park* | 01.5 | 05.2 | 02.4 | 05.8 | 10,618 |
| *East Springfield* | 05.2 | 20.6 | 03.5 | 07.3 | 6,317 |
| *Forest Park* | 08.2 | 22.0 | 05.2 | 13.4 | 24,733 |
| *Indian Orchard* | 09.8 | 20.4 | 07.5 | 10.0 | 9,095 |

| Liberty Heights | 16.0 | 37.8 | 04.8 | 08.6 | 17,789 |
|---|---|---|---|---|---|
| McKnight | 18.3 | 26.7 | 57.8 | 52.6 | 4,881 |
| Memorial  Square | 81.3 | 84.7 | 03.9 | 06.0 | 4,889 |
| Metro Center | 30.2 | 44.8 | 19.3 | 20.7 | 6,038 |
| Old Hill | 25.3 | 37.4 | 62.2 | 53.8 | 4,557 |
| Pine Point | 08.8 | 19.1 | 28.6 | 31.8 | 0,286 |
| Six Corners | 34.1 | 47.6 | 31.2 | 24.5 | 7,688 |
| Sixteen Acres | 03.5 | 08.3 | 12.3 | 15.1 | 22,937 |
| South End | 34.1 | 62.2 | 18.0 | 11.1 | 3,223 |
| Upper Hill | 09.2 | 13.1 | 59.2 | 53.4 | 7,179 |

*Statistical Profile: Springfield and its Neighborhoods*, prepared by the Springfield Planning Department, March 2003 (Statistical Profile 2000)

13)  According to the 2000 Census, 68.3 percent of the Hispanic voting age population lives outside of Ward 1 and 48.2 percent live outside of Wards 1 and 3 and 65.5 percent of the African American voting age population lives outside of Ward 4.

14)  Accordingly, the steady integration of the neighborhoods throughout the City and the fact that significantly more than a majority of African Americans persons live outside of Ward 4 and significantly more than a majority of Hispanic voting age persons live outside of Ward 1 does not and will not support the creation of majority-minority single-member districts that provide to Hispanics persons opportunities to elect candidates of choice and to African Americans persons opportunities to elect candidates of choice that reflect each group's respective share of the population or that are equal to or greater than their ability to elect under the at-large method of election.

15)   The American Community Survey (conducted by the United States Census) estimated that in 2005 24.4 percent of the total and 21.0 percent of the voting age population was African American; 35.8 percent of the total and 30.4 percent of the voting age population was Hispanic; and 38.6 percent of the total and 45.3 percent of the voting age population was white in the City of Springfield.

16)  If this current growth trend among Hispanic voting age persons in the City of Springfield continues Hispanic voting age persons will constitute a plurality of the citywide voting age population by 2010, at which time whatever benefits an at-large method of election provides to the the group with the greatest number of voting age persons, will accrue to Hispanic voters.  This benefit would be greatly enhanced, if Hispanic and African Americans were to support the same candidates.

**Geographic compactness**

17)  Minority persons in Springfield are not sufficiently numerous and geographically compact to constitute a sufficient majority to provide for a reasonable opportunity to elect candidates of choice in two African American and two Hispanic single-member districts in a nine single-member district plan to provide for a reasonable opportunity to elect candidates of choice in each district in which the splitting of numerous precincts, wards, and neighborhoods does not render the plan unconstitutional

18)  Minority persons in Springfield are sufficiently numerous and geographically compact to constitute a sufficient majority to provide for a reasonable opportunity to elect candidates of choice in one African American and one Hispanic single-member districts in a nine single-member district plan.

19)  Minority persons in Springfield are not sufficiently numerous and geographically compact to constitute a sufficient majority to provide for a reasonable opportunity to elect candidates of choice in two African American and two Hispanic single-member districts in a six single-member district plan.

20)  It is unclear whether minority persons in Springfield are sufficiently numerous and geographically compact to constitute a sufficient majority to provide for a reasonable opportunity to elect candidates of choice in one African American and one Hispanic single-member districts in a six single-member district plan in which the splitting of numerous precincts, wards, and neighborhoods does not render the plan unconstitutional.

21)  Ecological regression analysis is less reliable where the only information about race or ethnicity is six-year old census data; where there is no voter turnout data by race or ethnicity; where voters have as many as nine choices and as few as no choices; and where there appears to be a correlation between race and the number of choices that are exercised by voters.

**Minority Political Cohesion and Participation**
*African American Political Cohesion*

22) As a factual matter, a 50 percent threshold for political cohesion is inappropriate where voters have nine choices and there has been no general election in which African American voters would have had to choose among African American candidates and could not have supported every African American candidate who competed for the City Council or the School Committee

23) According to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom, lack of sufficient African American political cohesion is attributable – in part -- to the defeat of the following African American candidates for the City Council:  Norman Oliver and Hamilton Wray in 2005; Hamilton Wray and Morris Jones in 2003, and Charles Rucks and Charles Stokes in 2001.

24)  According to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom and his 50 percent threshold for political cohesion, Mr. Oliver and Mr. Wray in 2005, Mr. Wray in

2003, and Mr. Stokes in 2001 were not the City Council candidates of choice of African American voters.

25) According to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom, lack of sufficient African American political cohesion is attributable – in part -- to the defeat of Ms. Desiree Parker in 2001, African American School Committee candidate.
.
26)  African American support for white candidates is among the reasons that Ms. Lewis-Caulton was not elected in 2001 and 2003, according to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom..

27)  African American support for white candidates is among the reasons that Mr. Wray was  not elected in 2005 and Charles Rucks was not elected in 2001 according to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom.

28)  African American support for white candidates is among the reasons that Mr. McCollum was not elected in 1999 and 2003,  according to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom.

### *Hispanic Political Cohesion*

29) As a  factual matter, a 50 percent threshold for political cohesion is inappropriate where voters have nine choices and there has been no general election in which Hispanic voters would have had to choose among Hispanic candidates and could not have supported every Hispanic candidate who competed for the City Council.

30)  According to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom, lack of sufficient Hispanic political cohesion is attributable, in part, to the defeat of  the following Hispanic City Council candidates:  Rafael Nazario and Clodo Concepcion in 2005; Alex Cortes in 2001 and 2003; and Jose Tosado in 1999.

31)  According to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom and Dr. Engstrom's 50 percent threshold for political cohesion, Mr. Nazario and Mr. Concepcion in 2005 were not candidates of choice of Hispanic voters.

32)  According to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom, lack of sufficient Hispanic political cohesion is attributable, in part, to defeat of  the following Hispanic School Committee candidates: Victor Davilia in 2003 and 2005 and Orlando Santiago in 2005.

### *African American/Hispanic Political Cohesion*

33)  African American and Hispanic voters prefer different candidates in Springfield City Council and School Committee elections, with the exception of minority incumbents, who receive significant support from all voters, according to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom.

34)  Dr. Engstrom's racial bloc voting analysis provides no evidence that Hispanic and African American voters are cohesive in the aggregate, i.e., support the same candidates, to the same or similar degree

35)  That African American and Hispanic persons in the City of Springfield may have issues, concerns, socio-economics in common is not evidence of political cohesion, but rather is evidence demonstrating the basis for political cohesion where it exists or should exist.

### *Hispanic Voter Turnout*

36)  Plaintiffs' Spanish surname analysis of voter turnout in the 1999, 2001, and 2003 elections showed that the proportion of Spanish surname voters turning out to vote ranged from 9.4 percentage points to 3.5 percentage points lower in Ward 1 than the Hispanic proportion of the voting age population which was 60.8 percent according to the 2000 Census.

37)  Plaintiffs' Spanish surname analysis of voter turnout in the 1999, 2001, and 2003 elections showed that the proportion of Spanish surname voters turning out to vote ranged from 17.4 percentage points to 12.0 percentage points lower in Ward 3 than the Hispanic proportion of the voting age population, which was 37.4 percent according to the 2000 Census.

38)  Plaintiffs' Spanish surname analysis of voter turnout in the 1999, 2001, and 2003 elections showed that the proportion of Spanish surname voters turning out to vote ranged from 6.8 percentage points to 12.3 percentage points lower in Ward 2 than the Hispanic proportion of the voting age population, which was 20.8 percent according to the 2000 Census.

39)  Plaintiffs' Spanish surname analysis of voter turnout in the 1999, 2001, and 2003 elections showed that the proportion of Spanish surname voters turning out to vote ranged from 7 percentage points to 10.9 percentage points lower in Ward 4 than the Hispanic proportion of the voting age population, which was 19.6 percent according to the 2000 Census.

40)  Plaintiffs' Spanish surname analysis of voter turnout in the 1999, 2001, and 2003 elections showed that the proportion of Spanish surname voters turning out to vote ranged from 5.7 percentage points to 8.3 percentage points lower in Ward 8 than the Hispanic proportion of the voting age population, which was 14.7 percent according to the 2000 Census.

41)  Massachusetts General Court House of Representative elections in Springfield demonstrate that single-member district elections do not generate greater turnout among  Hispanic voters

42)  In the 2006 general election in which Hispanic incumbent Rep. Rivera had opposition the turnout in Hampden District 12 was 25.3 percent of the registered voter population.

43)  Single-member district legislative contests in which Hispanic voters had an opportunity to elect a candidate of choice did not result in an increase in voter turnout.

44)  Voter turnout rates in Worcester, since the City adopted a 6-5 mixed method of election, demonstrates that it is at-large elections – rather than single-member district elections – that generate greater turnout among all voters, including minority voters.

45)  The failure of any Hispanic candidate to be elected (in the last eight elections) is attributable – in part – to lack of voter turnout among Hispanic voters.

46)  Since a Hispanic candidates of choice could have been elected to the City Council in 1999 and served on the Council since 2000 and Hispanic candidates was elected to the School Committee in 1993 and again in 1999,  it cannot be claimed that lack of electoral opportunities provided by the at-large method of election, is attributable to low turnout among Hispanic voters.  Moreover, according to Dr. Engstrom's racial bloc voting analysis of the past four elections,  the Hispanic candidates who have been elected have been the candidates most strongly preferred by Hispanic voters.

47)  There is no structural impediment preventing or discouraging Hispanic voters from turning out to vote.  As a factual matter, where there are no structural impediments and no history of discrimination touching on the right to vote, register, and participate in the political process, that minority persons chose not to vote does not constitute evidence that an election scheme is dilutive or require a districting accommodation in order to make it easier for certain candidates to be elected.

### African American Turnout

48)  In spite of Deval Patrick's extensive grass roots campaign (in 2006) and "get-the-vote-out" campaign, in Ward 4 – the only ward in which more than a majority of the voting age population is African American (according to the 2000 Census) – a mere 32.2 percent of the registered voter population turned out to vote, which was less that the citywide average turnout.  In contrast, a greater proportion of registered voters turned out to vote in the following four wards than the citywide proportion of registered voter turn out (39.5 percent):  Wards 2, 5, 6, and 7 – all of which were predominately white according to the 2000 Census.

49)  Massachusetts General Court House of Representative elections in Springfield demonstrate that single-member district elections do not generate greater turnout among  African American voters.

50)  The turnout among registered voters in the 2006 primary election Hampden District 11, in which African American incumbent Rep. Swan had opposition, was 20.3 percent of the registered voter population, which was identical to the turnout in the 2005 municipal election.

51)  Single-member district legislative contests in which African American voters had an opportunity to elect a candidate of choice did not result in an increase in voter turnout

52)  The failure of any African American candidate to be elected (in the last eight elections) is attributable – in part – to lack of voter turnout among African American voters.

53)  Since African Americans had long elected at least one candidate of choice to the City Council, it cannot be claimed that lack of electoral opportunities provided by the at-large method of election,

is attributable to low turnout among African American voters.  Moreover, according to the racial bloc voting analysis conducted by Dr. Engstrom, successful African American candidates were supported by virtually every African American voter who cast a ballot.

54)  There is no structural impediment preventing or discouraging African American voters from turning out to vote.  As a factual matter, where there are no structural impediments and no real history of discrimination touching on the right to vote, register, and participate in the political process, that minority persons chose not to vote does not constitute evidence that an election scheme is dilutive or require a districting accommodation in order to make it easier for certain candidates to be elected.

**White Bloc Voting**
***African American candidates***

55)  White voters do not vote sufficiently as a bloc to defeat candidates strongly preferred by African American voters, according to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom

56)  White vote accounts for a substantial proportion of the vote received by all most all of the African American candidates beginning in 1991, according to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom

57)  Accordingly, white voters have enabled the election of most African American candidates who have been cohesively supported by African  American voters, according to the racial bloc voting analysis conducted by Dr. Engstrom

58)  White support for African American City Council and School Committee candidates usually increases over elections, according to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom

59) According to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom, the following unsuccessful African American City Council candidates preferred by African American voters, who received at least 50 percent of the African American vote, were not elected because of low African American voter turnout, lack of African American political cohesion, and  lack of Hispanic support:   Charles Rucks in 2001 and  Morris Jones in 2003.

60) According to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom, the following unsuccessful African American School Committee candidates preferred by African American voters, who received at least 50 percent of the African American vote, were not elected because of low African American voter turnout, lack of African American political cohesion, and lack of Hispanic support:  Robert McCollum in 1999 and 2003 and Desiree Parker in 2001

61)  According to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom, the following African American preferred candidates (candidates who received at least 50 percent of the African American vote) were elected to the City Council:  Carol Lewis Caulton in 1999 and Bud

Williams in 1999, 2001, 2003, and 2005.  Accordingly white bloc voting did not prevent the election of these African American City Council candidates

62)  According to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom, preferred African American candidate Marjorie Hurst was elected to the School Committee in 2001 and 2005.   Accordingly white bloc voting did not prevent the election of African American School Committee candidate, Ms. Hurst.

63)  White bloc voting did not prevent the election of African American City Council candidates: Paul R. Mason in 1967, 1969, 1971, 1972, 1977, 1979, 1981, and 1983 and Morris Jones in 1985, 1987, 1989,  and 1991.

64)  White bloc voting did not prevent the election of African American School Committee candidates:  Ester McDowell and J. Arthur Hickerson in at-large pre-1961 School Committee contests, Walter English in 1971, Ronald Peters in 1979 and 1983, Candace Early Lopes in 1987, and Robert McCollum in 1991 and 1995.[7]

***Hispanic Candidates***
65).  White voters do not vote sufficiently as a bloc to defeat candidates strongly preferred by Hispanic voters, according to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom

66)  Accordingly, white voters have enabled the election of most Hispanic candidates for the City Council and the School Committee, who have been cohesively supported by Hispanic voters, according to the racial bloc voting analysis conducted by Dr. Engstrom

67)  White support for most Hispanic candidates for the City Council and the School Committee generally increases over elections, according to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom

68) According to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom, the following unsuccessful Hispanic City Council candidates preferred by Hispanic voters, who received at least 50 percent of the Hispanic vote, were not elected because of low Hispanic voter turnout, lack of Hispanic political cohesion, and lack of African American support:  Mr. Tosado in 2001 and Mr. Cortes in 2001 and 2003.

69) According to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom, the following unsuccessful Hispanic School Committee candidates preferred by Hispanic voters, who received at least 50 percent of the Hispanic vote, were not elected because of low Hispanic voter turnout, lack of Hispanic political cohesion, and lack of African American support:  Mr. Davilia in 2003 and 2005 and Mr. Santiago in 2005

---

[7] "Event Recognizes Black Politicians," Azell Murphy Cavaan, *The Republican* (February 25, 2005).

70) According to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom, preferred Hispanic candidate, Mr. Tosado was elected to the City Council in 2003 and 2005. Accordingly white bloc voting did not prevent the election of Hispanic City Council candidate, Mr. Tosado.

71) According to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom, Hispanic preferred candidate, Mr. Tosado was elected to the School Committee in 1999. Accordingly white bloc voting did not prevent the election of this Hispanic, first-time School Committee candidate.

72) White bloc voting did not prevent the election to the School Committee of Hispanic candidares Cesar Riuz in 1981 and Carmen Rosa in 1993.

***Minority Bloc Voting***

73) With the exception of Mr. Tosado, running as a City Council incumbent, a greater proportion of white voters than the proportion of African American voters have supported all Hispanic candidates for the City Council and the School Committee, according to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom

74) With the exception of Mr. Williams, running as a City Council incumbent, a greater proportion of white voters than the proportion of Hispanic voters have supported all African American candidates for the City Council and the School Committee, according to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom

75) Mr. Williams, running as an incumbent, received greater proportion of the white vote than the proportion of Hispanic vote in 2001, 2003, and 2005 City Council contests, according to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom

76) Mr. Tosado, in his first bid for election to the City Council, received a greater proportion of the white vote than the proportion of the African American vote, according to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom

77) African American incumbent member of the School Committee, Marjorie Hurst, has never received a greater proportion of the Hispanic vote than the proportion of the white vote, according to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom.

78) Lack of Hispanic cross-over voting is among the reasons for the lack of success of every African American candidate who was not elected to the City Council and School Committee, according to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom

79) Lack of African American cross-over voting is among the reasons for the lack of success of every Hispanic candidate who was not elected to the City Council and School Committee, according to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom

80).  White voters are more likely to support an African American candidate than are Hispanic voters and more likely to support a Hispanic candidate than are African American voters, according to the racial bloc voting analysis conducted by Plaintiffs' expert Dr. Engstrom.

81)  If current voting patterns, as analyzed by Dr. Engstrom, and as the proportion of Hispanic voting age persons increases, it will be the lack of Hispanic support for African American candidates that presents a greater obstacle for African American candidacies than lack of white voter support,.

**Totality of the Circumstances**

82)  The Plaintiff have not only failed to present facts to meet the three threshold *Gingles* conditions, but have failed to provide the evidence to demonstrate, given the "totality of the circumstances," based upon a searching practical evaluation of past and present reality and on a functional view of the political process, that the political process is not equally open to minority voter participation in the electoral process and to elect candidates of their choices.   Accordingly, the Plaintiffs have failed to present facts to sustain their burden under Section 2 of the Voting Rights Act.

*History of Voting Discrimination*

83)  Unlike most states in the decades before the Civil War (even those in the North), Massachusetts had no racial restrictions upon the franchise.  On the eve of the Civil War, it was one of only six of the 31 states then in the Union that allowed African Americans to vote.

84)  There is no history of voting related official discrimination in the Commonwealth of Massachusetts or in City of Springfield that prevented minority persons from registering to vote or from casting a ballot; that had as its purpose the intimidation of voters or denial of needed assistance; or that had the purpose and effect of diluting minority voting strength or denying minority voters the opportunity to elect candidates of choice.

85)  On September 23, 1983, a three-judge court, in <u>Commonwealth of Massachusetts, et al</u>. v. <u>United States of America</u>, C.A. No. 83-0945, C.A. No. 83-0945 (D.C.D.C. 1983) entered a judgment in favor of the Commonwealth of Massachusetts and concluded that the State of Massachusetts and the "covered" nine towns (Section 5 of the Voting Rights Act, 42 U.S.C. 1973c) had maintained no test or device in violation of 42 U.S.C. 1973b(c ) with the purpose or having the effect of denying or abridging the right to vote on account of race or color within 19 years preceding the filing of the "bailout" action.  The Court concluded that during the 19 year period preceding the filing of the action, no court of the United States had entered a "final judgment determining that any denials or abridgments of the right to vote on account of race or color have occurred in the nine towns through use of any test or device."

86)  M.G.L. Chapter 54, Section 13, requires that the Election Commission chose poll officials from among those nominated by the various ward caucus leaders and only permits the Election Commission to recruit poll officials if the ward caucus leaders fail to meet this obligation. Accordingly the Election Commission was limited to choosing among nominees of the ward caucus leaders.

87)  For the most part, only Gumersindo Gomez, the caucus leader of  Ward 1, nominated poll workers who were fluent in Spanish.  Accordingly, in previous elections, almost all of the poll workers in Ward 1, in which the greatest proportion of Hispanic voting age persons reside, have been fluent in Spanish.

88)  It has always been the policy and practice of the Springfield Election Commission, pursuant to Section 208 of the Voting Rights Act, 42 U.S.C. 1973aa-6 and applicable Massachusetts law, to permit voters with limited proficiency in English to receive assistance from an assistor of choice or to receive assistance by telephone from Spanish-speaking members of the Election Commission staff.

89)  Election Commission staff person (and future Spanish Language Election Program Coordinator), Gladys Oyolo, who had formerly served as a legislative aide to Rep. Cheryl Coakley-Rivera, knew that there were some Hispanic voters in non-Ward 1 precincts who had limited proficiency in English, but understood that these voters were accompanied by family members who assisted them in voting and that they preferred this arrangement.

90) Chairperson of the Election Commission, Election Commissioner John Ramirez, who is fluent in Spanish, and Election Commission staff,  Gladys Oyolo and Audelis Molina (both of whom are fluent in Spanish), did not receive complaints from anyone regarding the inability of Spanish-speaking voters, with limited proficiency in English, to vote or to receive assistance.

91)  If complaints about the lack of or requests for more bilingual assistance, signs, and notices had been communicated to the Office of the Election Commission staff or  members of the Election Commission, ward caucus leaders would have been encouraged to provide for more bilingual poll officials, the Election Commission Offices would have provided for more signs and notices in Spanish, and sought clarification of the apparent conflict between state and federal law from the Office of the Secretary of the Commonwealth.

92)  The Springfield Election Commission has always provided all officials signs, forms, notices, and information in Spanish that the Office of the Secretary of the Commonwealth made available.

93)  In the past, Rep. Cheryl Coakely-Rivera had requested that the City make available poll worker training materials in Spanish to facilitate training for poll workers who did not speak English.  The Election Commission accommodated her request, even though there is/was no legal obligation to appoint poll officials who are not adequately proficient in English.  Indeed, Department of Justice attorney John "Bert" Russ clarified that bilingual poll officials must be fluent in English as well as Spanish in order to provide for informed assistance to voters.

94)  As soon as the City was contacted by Department of Justice attorneys, concerning their view that the City needed to appoint more bilingual poll officials and make a more concerted effort to place Spanish-language notices and information in media relied upon by Springfield citizens with limited proficiency in English and in the polling places, the Election Commission immediately responded by contacting various Hispanic community leaders for assistance in identifying additional bilingual poll officials, conferring with Boston election officials regarding their experiences in recruiting, training and assigning more bilingual poll officials in elections conducted

in Boston, identifying appropriate media in which to publish information in Spanish, and providing a Spanish language translation of the information provided on the Election Commission's website.

95)  The City of Springfield signed an agreement with the United State Department of Justice, Agreed Settlement Order in <u>United States</u> v. <u>City of Springfield</u>, C.A. No. 06-30123-MAP,  to provide for a certain number of bilingual poll officials, based upon the number of Spanish surname voters; a Spanish Language Election Coordinator; an Advisory Committee; and more bilingual signs and notices.

96)  The City met the terms of the agreement with the Department of Justice in the 2006 primary and general election (within weeks of signing the agreement), in addition to totally restructuring the poll workers training and the poll worker handbook, providing for additional funding for training; purchasing cell phones for every polling places to ensure that poll workers would be able to contact the Office of the Election Commission without leaving the polling place; hiring election captains with the responsibility of visiting every polling place to ensure that all bilingual signs had been appropriately posted and  there were adequate bilingual poll officials; installing additional phone lines in the Election Commission Office to ensure that poll workers and voters would not experience any difficulty in contacting staff on election day, securing walkie-talkies to facilitate communication between the Office and Election Commissioners, hiring additional persons who are fluent in Spanish to answer telephones and provide information in the Office of the Election Commission on election day; appointing poll officials who were fluent in Vietnamese (even though the agreement did not require the provision of Vietnamese language assistance), and drafting numerous signs and notices in Spanish in addition to the signs and notices provided by the Office of the Secretary of Commonwealth to ensure that voters with limited proficiency in English were properly informed of their rights and understood the various voting procedures.

97)  Poll worker training included discussion and information about Section 203 and the importance of making available to voters bilingual voting related materials and providing voters with the opportunity to receive Spanish-language assistance from a designated poll worker; Section 208 and the importance of permitting the voter to receive requested assistance from the individual of his choosing and the right of every voter to refuse to permit a particular individual to assist him or her; the requirement that poll officials apply uniform procedures with respect to voters and show all voters regardless of race, color, ethnicity, or language abilities courtesy, patience, and otherwise refrain from any inappropriate comments; the availability of provisional ballots for those so entitled under Massachusetts law and HAVA; and the importance of ensuring that *every* qualified voter is provided with an opportunity to vote on election day and that no individual is turned away from a polling place unless and until he or she is redirected to the correct polling place and/or is offered the option of casting a provisional ballot.  In addition bilingual poll officials were provided information on election terminology and voting instructions in Spanish. Prior to the 2006 general election, the Office of the Election Commission provided training regarding the newly arrived handicap accessible, touch screen voting machines provided by the Office of the Secretary of the Commonwealth.

98) During the primary and municipal elections, two Springfield attorneys visited polling places, assisted staff in the Office of the Election Commission, and received and responded to calls from Department of Justice attorneys who had received information for federal observers regarding any

concerns or problems raised by Voting Section lawyers in the polling places to which observers were assigned.  Every complaint received by City attorneys and Election Commissioners and Election Commission staff was investigated and a remedy provided where appropriate.

99)  The Court in <u>United States</u> v. <u>City of Springfield</u>, C.A. No. 06-30123-MAP, did not rely upon declarations from persons, with limited proficiency, claiming to have been confused at the polling places or treated disrespectfully.[8]

100)  Those declarants in <u>United States</u> v. <u>City of Springfield</u>, C.A. No. 06-30123-MAP, who voted in the 2006 primary or general election were well satisfied by the numerous bilingual signs and notices that were posted in the polling places, the provision of bilingual assistance by poll officials, and the provision of information in Spanish in the Spanish-speaking media and on the Election Commission's website, concerning the 2006 election, polling place locations, status as a registered voter,  registration information and forms, a request for more qualified bilingual poll officials, and candidate qualification requirements, as well as contact information.

### *Existence of Polarized Voting*

101)  Voting is not sufficiently racially polarized to constitute grounds to conclude that the at-large method of election "interferes" with the ability of minority persons to elect candidates of choice

102)  That white, African American, and Hispanic persons often prefer different candidates does not – without more – establish the existence of legally significant racially polarized voting, where white persons do not vote sufficiently as a bloc to defeat candidates most preferred by minority voters; where white support for minority candidates generally increases each time the candidate competes for office; where lack of minority voter turnout and cohesion accounts for the failure of certain minority candidacies; where white persons owe their election to minority support; and where there is no evidence that racial animus motivated the lack of white support for minority candidates

### *Voting Practices to Enhance Discrimination and Existence of Candidate Slating Process*

103)  Springfield has not used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group in its City Council elections, including a majority vote requirement, a prohibition against single-shot voting, numbered posts, unusually long terms of office, and staggered terms.

104)  Use of staggered terms has provided for greater electoral opportunities in School Committee election. Once considered among the devices used to enhance discrimination, experts have begun to revisit this view and have found that staggered elections can provide for the election of more minority persons (approaching proportionality) where elections are determined by a plurality vote.[9]

---

[8] Transcript of TRO Hearing Held Before the Honorable Michael A. Ponsor, United States District Court Judge (August 28, 2006) at 8-11, 45,  53-54

[9] Engstrom, Richard L. and Michael D. McDonald, "'Enhancing' Factors in At-Large Plurality and Majority Systems:  A Reconstruction," <u>Electoral Studies</u> (1993), 12:4, 385-401

105).  The fact that the method of electing members to the Springfield City Council and School Committee does not include a majority vote requirement, a prohibition against single-shot voting, a full-slate requirement, and numbered posts distinguishes it from those at-large election schemes found violative of Section 2.

106)  The method of electing members to the City Council provides for minority electoral opportunities more akin to those provided by the various proportional election schemes, advocated by Plaintiffs' expert, Dr. Amy where nine candidates are elected by a plurality vote; where there is no full-slate requirement or a prohibition against single-shot voting; and where candidates have been elected with as little as one-third of the vote

107)  There has been no slating process associated with the conduct of City elections

***Past Discrimination Evidenced in Lower Socio-Economic Circumstances***.

108)  The lower socio-economic status of minority persons does not hinder their ability to participate effectively in the political process, where polling places are located in places convenient to the minority voters; bi-lingual voting materials and assistance is provided; there is no candidate qualification fee; registration is available by mail or at Welfare offices, DMV, and other providers of public services, various organizations provide transportation to the polls; neither minority candidate currently serving on the City Council has ever spent his own money to campaign for office; candidates with significant work-related commitments (50+ hours/week) have successfully competed for City Council; and minority candidates are welcomed and invited to political gatherings in predominately white neighborhoods

109)  There is no evidence that the present lower socio-economic circumstances of minority persons is the result of a history of discrimination

110).  Most all of the evidence produced by the Plaintiffs to support their claim of past discrimination do not implicate Hispanic persons and predate any significant Hispanic presence in Springfield  and therefore, the lower socio-economic circumstances of Hispanic persons cannot be attributed to a history of discrimination.

Race Relations

111)  The  racial demonstrations, referred to by Plaintiffs, associated with allegations of police misconduct with regard to a number of African Americans departing from the Octogaon Lounge on Rifle Street, early Sunday morning, occurred the summer of 1965 – the same period of time when violent and destructive racial conflict had erupted on the streets of Watts and television viewers across the country witnessed the brutal attack by Alabama State Police and local law enforcement of peaceful unharmed demonstrators in Selma , Alabama.  In stark contrast to the manner in which public demonstrations and demonstrators were "handled" across the county that summer, Springfield City officials maintained a dialogue with various African American leaders in efforts to resolve the issues and ultimately police officers who were determined to have overreacted were disciplined.  Indeed, at the close of each day of demonstrations on the steps of City Hall, the then-Mayor often joined in.  The National Guard was called into the City to ensure the safety of

demonstrators from "neutral" law enforcement officials as to whom there had not been claims of misconduct.

112) Prior to the summer of 1965, the City of Springfield was aware of growing racial tension and racial and ethnic diversity of its population and to that end had established a Human Relations Committee– the members of which assumed important roles as liaisons with the African American community and mediators in meetings between city officials and African American leaders during the summer of 1965 and subsequent events, in which issues of race appeared to have played a role.

<u>Police</u>

113) Recent police reorganization that provides for greater accountability, more police presence in neighborhoods, better use of crime-incidence data, and racial sensitivity training demonstrates the City's commitment to providing for the safety of all of its citizens and the nondiscriminatory enforcement of the laws and safety regulations applicable to the citizens of Springfield

114) The Springfield Police Department has established Department values, which include a commitment to preserving and advancing  the principles of democracy and respecting the rights guaranteed to each citizen by the Constitutions of the United States and the Commonwealth of Massachusetts; the preservation of human life (a goal that requires that the use of deadly force by the police must not only be justified under the law but must also be consistent with this philosophy and/or rationale of humane social control);  prevention of crime and the exercise of authority and responsibility necessary to apprehend persons who commit unlawful acts.

115) Among the goals to which the Police Department is committed is the improvement of the quality of life of the citizens of Springfield and the reduction of the fear of crime that is both real and perceived.

116) The Police Department is committed to providing a mechanism for the community to collaborate with the police both in identification of community problems and determining the most appropriate strategies for resolving them.  It is the view of the Springfield Police Department that because crime is not solely a police problem, it must be responded to as a community problem.

117) All members of the Springfield Police Department are responsible to the community they serve and to themselves for their conduct and performance.  Accordingly the Springfield Police Department is committed to being open and responsive to the needs and problems of the citizens of Springfield and to maintaining the highest standards of integrity and professionalism in all aspects of its operation.

118) The Police Department is guided in its actions by a Code of Ethics contained in rules and regulations as well as policies and procedures , which requires that all members conduct themselves both on and off duty, in a manner that is beyond reproach and that is reflective of the integrity of a police professional."  The Springfield Police Department is dedicated to maintaining a system designed to promote the highest level of discipline among its members.  The Springfield Police Department requires that its officers undergo racial sensitivity training and otherwise has a "zero" tolerance for conduct that is inconsistent with the Department's Code of Ethics and commitment

enforcing the laws in a fair and nondiscriminatory manner and to according all citizens regardless of race, ethnicity, language spoken, national origin, sexual preference, and disability, respect, sensitivity, and protection.

119)   The Springfield Police Department is further committed to employee excellence.  To that end, the Department seeks opportunities to improve officer safety, to promote maintenance of excellent health and morale for all, and to support its members by pursuing the finest training, technology, and equipment.  Accordingly, the Springfield Police is committed to maintaining is open, effective internal communications among its staff and police force.

120)  Recently gathered and processed data, information, and statistics concerning traffic stops in the City of Springfield do not provide evidence of a pattern and practice of traffic stops that are the product of impermissible race-based assumptions, but rather are the product of the circumstances, the racial and ethnic diversity and make-up of the population served, and the legal and factual basis for the stops.  Nevertheless, in an effort to assure minority persons in the City of Springfield that the traffic and criminal laws of the Massachusetts are being enforced in a non-discriminatory manner and to demonstrate the Department of Police's commitment to the communities it serves, the City has retained a consultant (Director of Institute on Race and Justice, Northeastern University) to ensure that police procedures, practices, and standards regarding and criteria supporting traffic stops are reasonable, fair, lawful, and responsive to the security needs of the citizens of Springfield

121)  There is no evidence of a pattern and practice of police misconduct or discriminatory treatment of minority citizens or failure to provide for the safety and security of all Springfield citizens equally and fairly.

122)  Even if it were proved that individual police officers have engaged in inappropriate conduct and violated the Department's rules of conduct, there is no causal connection between such isolated incidents of police misconduct and the lower socio-economic status of minority persons that would hinder the ability of minority persons to participate effectively in the political process.   Indeed, the police in Springfield have long assumed a positive and supportive role in the conduct of elections, frequently provide assistance, direction, and ensure that the vote tabulators are functioning properly in the polling places, that the privacy of the voting process is respected, and that security and integrity of the electoral process is guaranteed.

.Education
123)  The mission of Springfield Public School system  is to build a "Culture of Achievement" in all schools and in all classrooms that ensures the delivery of educational experiences in which all learner achieve success.  A Culture of Achievement means the creation of a system-wide focus – the goal of which is to maximize opportunities to learn so that all students can achieve.   To this end, teachers, support staff, aides, counselors, psychologists, doctors, nurses, social workers, and administrators in the Springfield Public School System believe and act in accordance with the belief that all learners can achieve.  All actions with, programs and support services for students and parents illustrate and confirm the commitment to the belief that all learners can achieve.  All resources focus on actualizing the belief that all learners can achieve.  Students learn continually and are surrounded by others who are also learning all the time in a culture that values curiosity, imagination, and educational achievement.

124)  Among the "Progress Indicators" for maximizing the performance of all students learners in the Springfield Public School System are i) a goal of 77 for the Composite Proficiency Index (2008) and a minimum of a 5 point increase for Reading and mathematics each year ii) an increase in the proficiency index for all African American and Hispanic students at a rate greater than for all students over the three year period, 2005-2008; iii) meeting the goal for all schools of a less than 10 percent failure rate on the MCAS and an overall increase in proficiency; iv)  a decline in the failing scores on MCAS Reading, Mathematics and Science for African American and Hispanic students at a rate that exceeds the rate for all students (2005-2008); iv) recruitment of "highly qualified" Math/Science teachers; v)  an increase -- at a rate greater that enrollment of all students --  in enrollment of African American and Hispanic students in higher level mathematics and science courses; vi) an increase in the proportion of Hispanic and African American students enrolled in higher mathematics and science courses; vii) reduction of the rate of ninth grade failure by 50 percent over the three year period 2005-2008; viii) an increase of the proportion of LEP/Bilingual students scoring advanced or proficient on the MCAS  with a goal of 50 percent of the students reaching "proficiency" by 2008; and ix) a decline in the number of students being served by special education programs, with a goal of equally the national average for urban schools (14 percent)

125)  Among the major strategies are i) to increase the availability of effective pre-school programs for Springfield students; ii) to fully implement, review, and continually assess a comprehensive Reading plan for all K-12 schools; iii) to fully implement, review, and continually assess a comprehensive Mathematics plan for all K-12 schools; iv)  to review and fully implement and assess a uniform, system-wide pupil progression policy for all K-12; v) to fully implement the Twilight School at all secondary schools and make the Extended Year Program mandatory; vi)  to fully implement "Step Up Springfield" as a campaign for public involvement in Springfield's proficiency goals; vii) to implement major features of the community-wide attendance plan; viii) to complete strategies designed to obtain OCR compliance, especially Service Teams plans, Behaviorally-Challenged Learners Plan, and others; ix) to develop and implement an "Articulation Plan" to ease the transition from Pre-K to K, elementary to middle school and middle school to high school;  x) to develop and implement a comprehensive community-wide plan to enhance School-to-Career opportunities, K-16; xi) to refocus professional development throughout the district to develop communities of learners at every school; and xii) to develop and institutionalize the International Baccalaureate Program and companion Pre-International Baccalaureate programs.

126)  As a result of these goals and focus, minority – in fact, all – Springfield Public School student performance on the MCAS has improved.   The relatively poorer average performance of African American and Hispanic students on standardized tests is attributable to a number of factors, including family support and expectations.  There is no evidence that the age of the school, the lack of computer access in the schools, the race or ethnicity of teachers, the racial and ethnic makeup of the student body are major factors in the quality of the educational services or the intellectual growth of the students

127)  Education funds in the City of Springfield, reserved for capital expenditures, have been invested in schools serving the minority community, where there are newly constructed schools and educational centers and significant building renovations.   That there remains some elementary schools throughout the City that need renovation and capitol improvements and that some of them are located in the minority community is not evidence of discrimination or a lack of commitment to

the education of minority students, since there remain elementary and middle schools in predominately white neighborhoods that are also in need of improvement or renovation.

128)  The Springfield Public School system was never subject to *de jure* segregation and the Springfield high schools and a number of the City's middle and elementary schools were not found to be the product of *de facto* segregation.  Judicial intervention in the 1970s with regard to the integration of those schools found to be the product of *de facto* segregation was necessary only to provide guidance as to the appropriate and best plan to ensure a racially balanced student population in every public school not to compel the City to adopt a plan.

Employment

129)  It has long been the policy of the City of Springfield not to discriminate – indeed, to take affirmative action to ensure that there is no discrimination -- against any employee or applicant for employment because of age, race, color, religion, national origin, disability, or political affiliation. Such "affirmative actions" include, but are not limited to, employment, promotion, demotion, transfer, recruitment, advertising, layoff or termination, rate of pay or other forms of compensation, medical and other benefits and selection of training including apprenticeships.

130)  The City recognizes and assumes the responsibility to affirmatively remedy any specific, identifiable claims of illegal and past discriminatory practices by the City, its various departments and agencies, employees, or agents.  It is the City goal for its workforce to reflect the racial composition of the work eligible and available population in the City of Springfield where there are appropriate job openings.  Likewise, it is the goal of the City for the proportion of women and individuals with disabilities in the City's workforce to reflect the eligible and available population in the City

131)  The City has adopted an Affirmative Action Plan  to implement its policy of equal opportunity in employment and has made a continuous effort to meet its goals to the extent that the goals do not constitute racial quotas in violation of the Equal Protection Clause

132)  There is no evidence that the underemployment of minority persons in the City of Springfield is due to discrimination, whereby minority candidates who are equally as qualified as white candidates are not hired because of their race, color, ethnicity, or the language spoken (where proficiency in English is not a legitimate criteria for employment).

Health

133)  It is the goal of  the Springfield Public Health Department to attend to the total health needs of the citizens of Springfield, which includes educating Springfield citizens and empowering them to take better care of themselves, as well as  preserving a proper physical environment that supports human life and enhances each individual's inherent abilities to respond and to act on their own behalf to ensure that all citizens of Springfield achieve and maintain a maximum level of functioning.

134)  Public health education; health screening services; increased administration, planning, research, and development; greater capacities for sanitary inspections, community field work,

epidemiological functions, violence prevention and other specialized health care provisions are the means by which the Springfield Public Health Department meets its commitment to supporting the health and well being of the citizens of Springfield

135)  Springfield's commitment to improving the health and provision of medical and psychological services to its citizens is illustrated by the various studies of the incidence of HIV/AIDs, low birth rate, lack of prenatal care, infant mortality, and drug and alcohol abuse in the City conducted by the Springfield Public Health and Human Services Department and relied upon in establishing goals and programs of the Department.

136)  In addition, the Springfield Public Health and Human Services Department is committed to addressing  the toll on the physical and mental health of Springfield residents exacted by violent and abusive behavior and to ensuring that all children and adults are properly immunized.  The Springfield Health and Human Services Department is committed to maintaining its various programs that screen for high blood lead levels among children and to better educating parents in assessing the home environment for sources of lead poisoning and to enforcing laws that require landlords to remove all lead paint from rental property in which children will be residing.

137)  The City provides, makes available, and/or provides information regarding prenatal care, treatment for HIV/AIDs, drug and alcohol rehabilitation programs, immunization programs, and health education.  The high incidence of HIV/AIDS, low birth rate, teenage pregnancy, lack of adequate prenatal care, infant mortality, and drug and alcohol abuse among minority persons is not attributable to discriminatory – or any other -- conduct on the part of the City of Springfield or failure to provide for appropriate health support and assistance services.

Housing

138)  Three main initiatives are identified in the Office of Community Development and the Office of Housing and Neighborhood Services' Consolidated Plan and guide the allocation of funding, priorities, and programming of  human capital, neighborhoods, and economic development  The Offices of Community Development and Housing and Neighborhood Services are committed to investing in residents of all income levels to enable them to lead healthy, productive lives; to offering support to households; and to building capacity of community-based organizations to better support vulnerable populations.

139)  The three areas of priority with regard to the goal of supporting, enhancing, and developing the "human capital" in the City of Springfield are i) youth services; ii) senior services; and iii) disabled persons.  Primary among of these priorities is the need to improve the educational and health outcomes of youth who are living in the proposed Neighborhood Revitalization Strategy Area (NRSA).  Community Development Block Grants and other funds are being directed to additional programs, including those who serve homeless persons, single parent families seeking affordable childcare, and programs for individuals with insufficient or no health insurance coverage. Funding is also be used to improve the efficacy of the outreach conducted and programs implemented by neighborhood groups for low and moderate income persons.

140)  The Offices of Community Development and Housing and Neighborhood Services are committed to enhancing the quality of life in Springfield's neighborhoods, including public places, infrastructures, and housing stock and ensuring that neighborhoods are good places to live, work, and recreate.  In furtherance of the goal of neighborhood enhancement, the City is contributing to the cost of rebuilding parks and recreation areas, the reconstruction of crumbling roads and sidewalks, and the clearance and demolition of dilapidated and blighted structures in low and moderate income neighborhoods.   Funds utilized to support programs and projects in this category are also being directed to additional programs and projects, including housing rehabilitation programs, code enforcement activities and homeownership and lead paint removal assistance programs.

141)  Because Springfield continues to be defined as a "high risk" community for lead poisoning due to the fact that 89.9 percent of the housing units were built prior to 1979,   Springfield has undertaken actions and programs to evaluate and reduce the number of housing unites containing lead-based hazards and to increase the inventory of lead-safe housing available to low and moderate income families, including (i) evaluation of lead hazards at each housing code inspection where children under six years of age reside; (ii) legal prosecution of property owners who fail to comply with orders to remedy lead hazards; and (iii) reapplying for funding from HUD's Office for Healthy Homes and Lead Hazard Control.

142)  The Offices of Community Development and Housing and Neighborhood Services is committed to expanding economic opportunities, particularly employment opportunities, for low and moderate income residents through efforts to attract, retain,  and expand small businesses in neighborhood business districts and larger commercial and industrial establishments throughout the City. Current programming will be and is being developed to eliminate the blight by attracting private investment and building a strong business community within each target district through the development of the basic business skills of existing micro enterprises and persons seeking to start micro-enterprises and identification of gaps that may be filled though attraction of new establishments.  Funding allocated for economic development is being directed to commercial district revitalization through targeted, data driven programming that will both achieve improvements to blighting influences in neighborhood commercial districts and increase the availability of businesses and services in neighborhood commercial districts.

143) More specifically, in order to further that goal of economic development, the City's current primary focus is on revitalization of key commercial districts in CDBG target areas:  the North End Main Street Corridor, the State Street Corridor, Walnut Street Corridor, and Indian Orchard Main Street Corridor.

144)  Neither Springfield nor the Commonwealth has enacted laws restricting where minority persons can live

145).  Historically, immigrant groups have tended to gravitate to neighborhoods in which persons of similar background, language, familial relations have resided.  This phenomenon is due in part to the fact that these segregated neighborhoods were often the location of affordable housing, the residence of other members of family, location of stores and other services that addressed particularized needs of immigrant or minority groups, populated by persons speaking the same

language, and were more "comfortable"  Notwithstanding, erstwhile predominately white neighborhoods are becoming more ethnically and racially diverse.  There is no recent evidence that minority families have not been welcomed into every neighborhood in the City.

***Racial Appeals and Responsiveness***

146)  Overt or subtle racial appeals have not typified recent political campaigns in Springfield. Where there have been (in the 1960's and 1970s), racial appeals, they have not resulted in the election of candidates who have utilized racial appeals to promote their own candidacy or undermine the candidacy of an opponent.

147)  The race of a particular minority candidate has never been an issue in the campaign;, i.e., the race or ethnicity of a candidates has never been used a reason not to vote for the minority candidate or as a reason to question the ability of a minority candidate, e.g., Paul Mason was elected to the City Council in 1968 and there is no evidence that his race was used as a reason not to support him.

148)  That issues that  implicated race, e.g., "busing", have been the subject of debate does not constitute the kind of "racial appeals" to which Congress intended that this "Senate factor" refer. Indeed, the first African American, Dr. English, was elected to the post-1961 School Committee in 1971  and re-elected in 1975 -- during which time busing students to schools not located in their neighborhood was an issue as to which judicial review was sought (1972).

149)  "Busing" and the integration of schools does not implicate the rights of Hispanics since it predated a significant presence of Hispanic population

150)  The City of Springfield has been responsive to the particularized needs of the minority communities – a fact that is facilitated by the at-large method of election that permits every member of the City Council and School Committee to respond to citizen calls from any community or neighborhood; that requires candidates to campaign citywide, familiarize themselves with the issues and particularized concerns of the various neighborhoods and racial and ethnic groups, and to be accountable to all of the City's citizens equally.

151)  Neighborhood councils serve as a liaison between the neighborhoods and the Council as to zoning issues.  The knowledge of these neighborhood councils with regard to zoning issues is an important source of information.  Officers of neighborhood councils are elected, reside in the neighborhood they services, have offices located within the neighborhood, and represent both business and residential interests of the community.  Accordingly, these neighborhood councils are more intimately aware of particularized zoning and other needs of neighborhood than would be a Councilmember who resided in neighborhood.

152)  There is no evidence that the City Council or the School Committee has been non-responsive to the issues and particularized concerns of the minority communities or did not consider of paramount importance the position of a minority community in making a decision.  There is no evidence of a pattern and practice of failure to adequately and fairly distribute services, support, and funding to the City's minority communities

153)  Even if it were true that minority persons did not receive their adequate share of municipal services and resources, it is irrelevant as to Plaintiffs' claims against the City Council since the City Council does not have the authority to appoint or fire City department heads responsible for the distribution of City services and resources.  All department heads report to the Mayor and are accountable to him.  The City Council, further, has no authority to veto all or any portion of the Mayor's budget, without his/her assent.

154)  Likewise where federal monies and funding support municipal services and education and where terms of federal grants determine the recipients and the nature of the expenditure, this allocation of services, resources and funds cannot constitute evidence of a lack of responsiveness on the part of the School Committee or various municipal department heads.

***Polices Underlying the Adoption and Maintenance of the Current Method of Election***
<u>Adoption of At-Large Method of Election</u>

155)  The policies supporting adoption of an at-large method of election are strong, legitimate, and justified and reflect the best interests of all citizens and conduct of City Council and School Committee

156)   Prior to 1961, Springfield's legislative body was bicameral, established by a 1852 charter, Chapter 94 of the Acts of 1852.  An 18-member Common Council was elected in partisan elections from the City's eight wards.  Two members were elected from Wards 1, 2, 5, 6, 7, and 8  and three members were elected from Wards 3 and 4 in partisan elections in which voters had two choices and the two candidates receiving the greatest number of voters were elected.   The eight-member Board of Aldermen was elected in partisan at-large elections from residency districts (wards).  The eight-member School Committee was elected in partisan at-large elections from residency districts (wards)

157)  The reasons for the adoption of the "Plan A" form of government were not pretexts for racial discrimination, but rather were a well reasoned response to difficulties encountered from the bi-cameral form of governance – chief among which was the failure of the pre-1961 Mayor to be provided with the executive duties and authority that "rightfully belonged" to that position  The pre-1961 form of government was further criticized as inefficient, on the grounds that there were two – rather than one -- legislative bodies that were required to vote to adopt, implement, or change programs, ordinances, services, contracts, allocation of funding, and/or expenditures.

158)  Among other problems, inefficiencies, or abuse of authority associated with the pre-1961 bicameral form of government and supporting the adoption of "Plan A" were the parochial views and ward-specific political allegiance and "pork barrel" politics that defined and described the way in which decisions were made, funds and services were allocated, and programs implemented and that resulted in wastefulness in the pre-1961 form of city government.  The pre-1961 City Council was criticized for lack of accountability.   Given the numerous committees, commissions, and boards conducting the "business" of the City and the general lack of oversight or direction from persons with skills, training, and education appropriate to the exercise of the City's duties and responsibilities,  it was charged that is was impossible to determine which members were responsible for errors in judgment, financial irresponsibility, lack of direction, and failure to follow

appropriate, prescribed procedures and to comply with the law.  Even where it was possible to identify the individual members of the Common Council who were responsible for a criticized action or inaction, the method of election that provided for election of members of the Common Council from wards foreclosed the ability of voters to convey – by means of the ballot box -- their assessment of the performance of an elected official who did not reside in the same ward as did the disgruntled voters.

159)  Among other problems, inefficiencies, or abuse of authority associated with the pre-1961 bicameral form of government and supporting the adoption of "Plan A" were the charges that the method of electing the Common Council engendered and supported  "ward politics," whereby "ward healers" assumed great power within each ward and solidified their re-election by granting "favors" and otherwise "providing" for their respective constituency.  Accordingly, Springfield ward elections were believed by many to support corruption, solidify incumbency, and squelch criticism.  Finally, the pre-1961 method of electing members to the Common Council provided for the election of members to the City Council with no citywide vision and no real knowledge of the needs and the different ethnic and racial groups residing in the various neighborhoods in the City.

<u>Maintenance of At-Large Method of Election</u>

160)  The policies supporting maintenance of the at-large method of election are strong and justified and reflect the best interests of all citizens and conduct of City Council and School Committee.

161)  The at-large method of electing members to the City Council and School Committee provides for greater influence and reasonable opportunities to elect candidates of choice for Black/African-American or Hispanic/Latino voters in the election of each and every member of these two governing bodies as compared to the influence and opportunities provided by a single-member district method of election or any alternative "proportional" election scheme.

162)  At-large elections foster the election of members of the City Council and School Committee who are committed to the best interests of the City as a whole and who are accountable to every voter in the City equally and without regard to race, ethnicity, and membership in a language minority group. Each member of the Springfield City Council and School Committee represents and is accountable to every voter in the City equally and without regard to race, ethnicity, and membership in a language minority group.  Citizens of the City of Springfield can consider every member of the Springfield City Council and School Committee their representative.

163)  A citizen of the City of Springfield is not constrained by any artificial division of the City into districts or a district-specific notion of accountability and is not limited to elected officials who live in his/her neighborhood as to whom he/she may criticize, praise or communicate or to whom he/she make requests and direct inquiries

164)  That successful candidates for the City Council and the School Committee must campaign citywide provides the opportunity – if not the requirement – for elected officials to become familiar with all of the neighborhoods and communities in the City of Springfield and with the racial and ethnical diversity of the City's population,  with each group's particularized needs, concerns, politics, goals, and view of the role of city government, and with the differences and commonalities

among and within these various racial and ethnic groups.

165)  At-large elections promote the building of political, racial, ethnic, and community coalitions and the identification of shared concerns, interests, and goals for the growth and development of the City of Springfield and the education of its children.  Springfield's citywide, at-large campaigns foster communication among and within the various racial, ethnic, language minority, and community groups – communication that empowers voters, fosters participation by citizens in government and civic affairs, and unifies rather than segregates, isolates, or balkanizes the citizens of Springfield.

166)  The maintenance of an at-large election scheme and rejection of a single-member or multi-member district alternative obviates the need to redistrict every decade to comply with the one-person; one-vote requirement, avoids the politics and partisanship of redistricting and advantage to incumbents acquired by their directing the adjustments to district boundaries; and forecloses the expense of challenges to the redistricting process and resulting redistricting plan on constitutional racial or partisan gerrymandering grounds.

167)  At-large elections simplify the administration of elections and discourages election fraud. Voter confusion is likely to attend the assignment of voters to different City Council, School Board, State Legislative, and United States House of Representatives districts due to the different size of these governing bodies, the different jurisdictional reach of each governing authority, and different constitutional and statutory requirements.

168)  The current method of election does not support a political climate of negative campaigning primarily because no one candidate specifically opposes another candidate.  Most candidates seem to realize that under Springfield's current method of election, negative campaigning directed at a particular candidate may adversely affect the candidate's future career on the City Council and ability to gain support for a particular measure, ordinance, rule, zoning change, or resolution, since his success does not mean – as it does in single-member district elections –that the other candidate at whom  he has flung dirt, was not elected.

169)  The current at-large method of electing members to the School Committee is particularly appropriate for the election of officials to govern the City's school system, since candidates elected at large are likely to have a broader vision of community needs than ward politicians, to better understand the concerns of professional educators, and to appreciate the need for consistency and coherency in educational policy and development.

<u>Rejection of a Single-Member District Method of election</u>

170)  The policies that support the City's continued reluctance to adopt a single-member district method of election are strong and justified and reflect the best interests of all citizens and conduct of City Council and School Committee and include the view, supported by compelling evidence, that  single-member district method of election will reduce voter turnout and result in significantly less competitive elections based upon the fact that it is harder for challengers to have a reasonable hope of unseating an incumbent district councilor rather than an at-large incumbent, since at-large candidates are in principle running for any one of the at-large seats, while a candidate for a district

councilor's seat must defeat the incumbent in that particular seat. Likewise just as incumbents in Congress typically have a large advantage over challengers, simply because of their opportunity to serve their constituents and win publicity as a result are greater, incumbent district representatives may win a reputation as defenders of the interests of respective districts or helpers to individual constituents and may, thereby, increase their advantage over challengers. In contrast, at-large councilors cannot easily claim credit for policies that benefit a particular bloc of City voters.

171)  The adoption of a single-member district method of election necessitates redistricting, where who wins is often determined before voters even go to the polls – sometimes many years before. The outcome is decided by those who draw the district lines. In a single-member plurality system, the power of the vote pales in comparison to the power to draw district lines.  In addition, this priority accorded to incumbency protection in the redistricting process may well have dilutive consequences should the City adopt the Plaintiffs' nine-single member district plan and a predominately white City Council has the responsibility of redistricting and redrawing district lines to reflect emerging minority population.

172)  A single-member district method of election sanctions a parochial view of the City and reinforces the notion that only that which occurs in or is a concern to the district/neighborhood/community in which a candidate resides is relevant or worthy of consideration.  Under a single-member district method of election, the problems, difficulties, and concerns of a community remain the problems, difficulties, and concerns of a community and are not the problems, difficulties, and concerns of the City as a whole.  A single-member district method of election supports an insular view and notion of society.

173)  A single-member districting plan institutionalizes the racial/ethnic/ socio-economic divisions and differences among persons in the City of Springfield.  The districts in a single-member district plan created with the purpose of providing electoral opportunities to a minority group, are, at best, racial classifications and are often identified as such, e.g., the "Hispanic district," "the white district."   Accordingly, a single-member district method of election will reinforce, if not enhance racially polarized voting patterns.

174)  A single-member district method of election for the Springfield City Council will remove the ability of a vast majority of citizens to vote for candidates who are racially or ethnically different; to view these racially and ethnically diverse candidates as representative of their interests as are those candidates with whom voters share a racial or ethnic identity.  A single-member district method of election will remove the ability of every citizen to impact the election of every candidate who serves on the City Council or School Committee.

175)  A single-member district method of election reduces the pool of qualified candidates.  A single-member district method of election will result in the election of a different kind of candidate and produce a governing body that is less able to work cooperatively together to solve citywide or community-specific problems or crises.

176) The adoption of a single-member district method of electing the City Council may well result in an even more powerful Mayor, who, unlike the members of the City Council, would be capable of marshalling support from the entire City and who would be the *only* elected official whom

citizens of the City of Springfield "shared."

177)   A single-member district method of electing members to the City Council may render the various neighborhood councils virtually powerless and subordinate to the political organization of the councilmembers in whose districts they are located.  A nine-member districting plan will necessarily split neighborhoods among and between districts and undermine that very important aspect of Springfield government -- neighborhood councils and associations -- and the ability of individuals to directly participate.

178)   In addition School Committee members elected at large are less likely to defend parochial neighborhood interests and to engage in factional conflict that impedes the educational process. School Committee members elected at large will be able to better provide for a fair and equitable distribution of educational services and capital expenditures based upon the needs of the students, rather than their ability to be re-elected by neighborhoods who were not beneficiaries of these services, because of lack of relative need.

<u>Advantage of At-Large Method of Election to Minorities</u>

179)   The at-large method of electing members to the City Council and School Committee will better support the growth of citywide minority political organizations that will be able to more effectively capitalize on the rapid increase in the proportion of minority persons in the City of Springfield and the fact that minority voting age persons constitute more than a majority of the voting age population.

180)   The at-large method of election provides minority persons residing outside of Wards 1 and 4 the opportunity to vote for and elect minority candidates who are elected to the City Council and School Committee.

181)   The at-large method of election will not artificially restrict (by means of the geography of their residence) the pool qualified minority candidates who are able to develop sufficient citywide support.

182)   Since most of the City's mayors have first been elected to the City Council.  The ability to attract votes from members of all of the various racial, ethnic, and religious groups is essential for any candidate with mayoral aspirations.  The election of candidates from wards or single-member districts will not provide the opportunity for minority candidates to establish a base of support sufficient to enable him to compete for the Office of Mayor, in which much of the power and authority to govern the City is vested.

183)   At-large elections ensure that members of the City Council (Black/African American, Hispanic/Latino and white) are accorded the respect and media attention that is accorded to all other citywide elected official

***Electoral Opportunities Provided by the At-Large Method of Election and the Extent to which Minorities Have Been Elected to the City Council and School Committee***

184) As the proportion of African American and Hispanic voting age population continues to increase in the City of Springfield, so, too, will their potential to elect candidates of choice to the City Council pursuant to the at-large method of election

185) Challenged at-large method of election has long provided the opportunity to elect at least one African American to the Springfield City Council

186) There is nothing that prevents African Americans from electing two African American candidates to the Springfield City Council as occurred in 1999

187) Based upon the average number of votes received by candidates "finishing sixth through ninth," African American voting age persons are sufficiently numerous to elect candidates of choice, whom they cohesively support to the City Council

188) The challenged at-large method of election has and will continue to provide the opportunity to elect one Hispanic member of the Springfield City Council

189) Based upon the average number of votes received by candidates "finishing sixth through ninth," Hispanic voting age persons are sufficiently numerous to elect candidates of choice, whom they cohesively support to the City Council

190) In only one election in the last eight elections, beginning in 1991, would an unsuccessful Hispanic candidate been elected had the election contest been determined by Ward 1 vote: Gumersindo Gomez in 1997.

191) In only one election, in the last eight elections, beginning in 1991, would an unsuccessful African American candidate been elected had the election contest been determined by Ward 4 vote:  Bud L. Williams in 1991

192) Minority persons—for the most part -- have been proportionately represented on the post-1961 School Committee and City Council.  According to the 1960 Census  6.3 percent of the voting age population was "non-white;" by  1968, 11 percent  (1 of 9) of the membership of  City Council was African American.  In 1970, the United States Census provided that  9.9 percent of the voting age population was identified as "Negro;"  during most of the 1970s, 11.1 percent  (1 of 9) of the membership of  the Springfield City Council was African American and from 1972-1975 16.7 percent (1 of 6) of the membership of the School Committee was African American.   In 1980, the United States Census provided  that 13.9 percent  of voting age population identified themselves as Black and 6.0 percent identified themselves as of "Spanish origin;" during the 1980s, 11.1 percent (1 of 9) of the membership of  the Springfield City Council was African America, 16.7 percent of the membership of the School Committee was African American, and between 1982-1985 16.7 percent of the membership of the School Committee was Hispanic. According to the 1990 Census, 16.4 percent of the voting age population identified themselves as (not Hispanic) Black; and 12.8 percent  identified themselves Hispanic  (regardless of race); during the 1990s, 11.1 percent  (1 of 9) of the membership of the City Council was African American and 16.7 percent of the membership of the School Committee was African American; between 1998 and 1999 22.2 percent (2 of 9) of the membership of the School Committee was

African American, and between 1994-1997 16.7 percent of the membership of the School Committee was Hispanic.  According to the 2000 Census, African Americans constituted 18.1 percent of the voting age population identified themselves as non-Hispanic African American and 21.8 percent identified themselves as Hispanic; during the 2000-2001 term of office, 22.2 percent (2 of 9) of the membership of the City Council was African American; currently 11.1 percent (1 of 9) of the membership of the City Council is Hispanic and 11.1 percent (1 of 9) is African American.  Between 2000-2001, 16.7 percent of the membership of the School Committee was Hispanic; between 2002-2003, 33.3 percent of the membership of the School Committee was African American and between 2000-2001 and 2003 to the present, 16.7 percent of the membership of the School Committee is African American.

193)  Minority voters have been provided with proportional electoral opportunities with regard to the School Committee and the City Council.  Had City Council candidate Mr. Concepcion received the support that Mr. Tosado received in Wards 1, 3, and 4 in the 2005 election, he would have received sufficient votes to place ninth in total votes received and earned a seat on the Council and 22.2 percent of the City Council would have been Hispanic.  Had School Committee candidate, Mr. Santiago received 164 more votes or the same Ward 1 and 3 support as Mr. Tosado received, he would have been elected and 16.7 percent of the membership of the School Committee would have been Hispanic.

194)  In the 2005 contest, Mr. Tosado and various North End political organizations did not support the candidacies of Mr. Concepcion and Mr. Santiago, because they believed that if more Hispanic candidates were elected, the pending instant Section 2 challenge could be dismissed or undermined.

195)  The number of minority persons elected to the City Council does not reflect the full extent of the electoral opportunities available to minority voters.  The  number of votes received by winning City Council candidates ranged from 11,657 to 8,222 in the 2005 election; accordingly, a candidate need only have received 8,223 votes to earn a seat on the City Council.  There was an adequate number of registered voters in each ward to elect in the 2005 election, a candidate who sought and received no votes outside the ward.  Since there were 4,648 Hispanic/Latino persons of voting age in Ward 3 and 7,820 Hispanic/Latino persons of voting age in Ward 1 (according to the 2005 Census), there was a sufficient number of potential Hispanic/Latino voters to have elected in 2005 as many Hispanic/Latino candidates of choice as were cohesively supported.  Since there were 2,552 Black/African American persons of voting age in Ward 3 and 6,860 Black/African American persons of voting age in Ward 4 (according to the 2000 Census), there was a sufficient number of potential Black/African American voters to have elected in 2005 as many Black/African American candidates of choice as were cohesively supported.

196)  Indeed, the number of minority persons elected to the City Council and the School Committee does not reflect the full extent of the electoral opportunities available to minority voters.  In no City Council or School Committee election between 1981 to the present, did the ninth place candidate received more votes than there were African American or Hispanic voting age persons (according to the relevant census data).

197)  The electoral opportunities in City Council elections when minority persons turn out to vote and are politically cohesive are even more enhanced by the fact that, according to the racial bloc voting analysis conducted by Dr. Engstrom, African American preferred candidates (receiving more than 50 percent of the African American vote) have received between 19.4 percent and 48.7 percent of the white vote in the last four elections and Hispanic preferred candidates (receiving more than 50 percent of the Hispanic vote) have received between 8.5 percent and 39.2 percent of the white vote.  In School Committee elections, Dr. Engstrom calculated that  African American preferred candidates (receiving more than 50 percent of the African American vote) have received between 13.0 percent and 45.8 percent of the white vote in the last four elections and Hispanic preferred candidates (receiving more than 50 percent of the Hispanic vote) have received between 8.4 percent and 38 percent of the white vote.

198)  Even a relatively unknown, first-time minority preferred candidate receives some white vote, according to the racial bloc voting analysis conducted by Dr. Engstrom.  In contrast, a first time African American preferred candidate has received as little as 3.4 percent of the Hispanic vote and a first-time Hispanic preferred candidate has received as little as 6.9 percent of the African American vote in the four elections analyzed by Dr. Engstrom.

**Section 2 Benchmark and an Assessment of Dilution**
*City Council*

199)  The following constitutes the Section 2 benchmark plan for the City Council, a fairly drawn, non-dilutive, constitutional nine single-member district plan,[10] which splits only one precinct, Precinct 7D and that meets a ±5 percent deviation "requirement" (but not "safeharbor"). Demographics of the Section 2 benchmark plan for the City Council are as follows:

| District | White VAP % | Black VAP % | Hispanic VAP % | Deviation % |
|----------|-------------|-------------|----------------|-------------|
| 1 | 23.2 | 10.4 | 64.9 | -1.4 |
| 2 | 69.2 | 06.9 | 21.9 | -0.4 |
| 3 | 33.9 | 22.3 | 40.9 | -2.2 |
| 4 | 14.6 | 61.6 | 22.1 | -0.2 |
| 5 | 50.3 | 33.4 | 14.0 | -1.3 |
| 6 | 68.9 | 10.0 | 15.5 | -1.8 |
| 7 | 80.2 | 09.1 | 07.4 | +4.9 |
| 8 | 82.7 | 10.1 | 05.4 | +4.9 |
| 9 | 73.8 | 11.5 | 13.0 | -2.6 |
| **otal** | **56.2** | **18.9** | **21.8** | **7.1** |

200)  The Section 2 benchmark for the City Council was created by combining the following precincts:  District 1 is comprised of Precincts 1A, 1B, 1C, 1D, 1E, 1F,  and 1H; District 2 is comprised of Precincts 2A, 2B, 1C, 2D, 2E, 2F, and 2G; District 3 is comprised of Precincts 1G, 3A, 3B, 3C, 3D, 3E, and 3F; District 4 is comprised of  Precincts 4A, 4B, 4C, 4D, 4E, 4G, and 4H; District 5 is comprised of Precincts 5A, 5B, 5C, 5E, 5F, 8C, and 8H; District 6 is comprised of Precincts 3G, 3H, 6A, 6B, 6C, 6D, and 6F; District 7 is comprised of Precincts 6E, 6G, 6H, 7A,

---

[10] See Holder v. Hall, 512 U.S. 874, 880 (1994); Growe v. Emison, 507 U.S. __, ___, 113 S.Ct. 1075, 1084.

7B, 7C, and part of 7D; District 8 is comprised of Precincts 5D, 5G, 5H, 7E, 7F, 7G, 7H, and part of 7D; District 9 is comprised of Precincts 2H, 8A, 8B, 8D, 8E, 8F, and 8G.  The underpopulated districts are those in which there is significant minority population and therefore are more likely to have greater population than indicated by the 2000 Census.

201) District 1 in the Section 2 benchmark plan for the City Council is comprised of a sufficient proportion of Hispanic voting age persons to constitute a reasonable opportunity to elect even where Hispanic turn-out and voter cohesion remain low.   In order to ensure that District 1 would provide an opportunity to elect Hispanic candidates of choice, Ward 1, Precinct G, in which a white incumbent resides, was reassigned from District 1 to District 3,.  White persons constitute 33.3 percent of the voting age population and Hispanic persons constitute 38.1 percent of the voting age population (according to the 2000 Census) in Precinct 1G, which includes the wealthy white Mattoon Street neighborhood that will become the home of the new federal courthouse development.  Accordingly, Precinct 1G has more "in common with" the other wealthy white enclaves that are located in Ward/District 3.  Leaving Precinct 1G in District 1 would jeopardize the ability of Hispanic persons to elect candidates of choices due to the inclusion of a white incumbent and a white population with significantly greater socio-economic advantages than the surrounding Hispanic neighborhoods – an important consideration even in a hypothetical districting plan.

202) District 3 in the Section 2 benchmark plan for the City Council constitutes a solid "influence" district – in which the Hispanic share of the voting age population is roughly equal to their share of the voting age population in the City at-large.  In order for District 3 to provide an opportunity to elect, Hispanic voting age persons would need to comprise at least 65 percent of the voting age population, based upon Dr. Engstrom's estimations of Hispanic voter cohesion and Plaintiffs' estimations of Spanish surname turnout.  Since it is not possible to reconfigure District 3 such that Hispanic persons constitute at least 65 percent of the voting age population, District 3 is more reasonably configured and considered a growth or influence district.

203) District 4 in the Section 2 benchmark plan for the City Council is comprised of sufficient African American population to provide for an opportunity to elect even where African American turn-out remains depressed as evidenced by the fact that only 32.2 percent of the registered voter population in Ward 4 turned out to vote in 2006 when the first African American Governor of Massachusetts was elected.

204) In District 5, African Americans in the Section 2 benchmark plan for the City Council is comprised 33.4 percent of the voting age population.  Where voters have only one choice as they would in a single-member district method of election and African American turnout remains depressed, there is no reason to believe that District 5 will provide to African Americans an opportunity to elect.  District 5 in both Plaintiffs' or Defendants' nine single-member district plan provides to African Americans significant electoral influence in excess of their share of the voting age population citywide.

205) Accordingly, Defendants' "fairly drawn nine single-member district plan" provides the opportunity to elect one African American candidate and one Hispanic candidate.  It further

provides for substantial African American influence in District 5 and District 3 and Hispanic voter influence in District 3, in excess of their respective shares of the voting age population.

206) Given that the at-large method of electing members to the City Council provides to minority voters the opportunity to elect at least one African American candidate and one Hispanic candidate and the ability to influence the election of every other candidate for the City Council equal to the respective minority groups' share of the registered voter population, the existing method of election provides for greater opportunities to elect than does the Section 2 benchmark City Council plan. Accordingly, there is no evidence that the existing method of election violates Section 2.

### School Committee

207) Plaintiffs proposed an alternative six single-member district plan that splits only one precinct and that meets a ±5 percent deviation "requirement." Since it does not appear that it is possible to substantially improve upon this plan without splitting numerous precincts, it is reasonable to consider Plan A the Section 2 benchmark for the School Committee. Demographics of the Plaintiffs' "Plan A" are as follows:

| District | White VAP % | Black VAP % | Hispanic VAP % | Deviation % |
|----------|-----------|-----------|--------------|-----------|
| 1 | 31.3 | 12.7 | 53.1 | +3.3 |
| 2 | 22.0 | 53.3 | 20.4 | -2.6 |
| 3 | 48.3 | 17.2 | 27.6 | +1.4 |
| 4 | 73.2 | 06.2 | 16.7 | -4.6 |
| 5 | 76.1 | 13.8 | 07.4 | -1.7 |
| 6 | 79.7 | 08.9 | 07.5 | +4.2 |
| **Total** | **56.2** | **18.9** | **21.8** | **8.8** |

208) Precinct 8H is split among Districts 2, 4, and 5. District 1 is comprised of Precincts 1A, 1B, 1C, 1D, 1E, 1F, 1G, 1H, 2B, and 3A. District 2 is comprised of Precincts 4A, 4B, 4C, 4D, 4E, 5B, 8C, and a portion of 8H. District 3 is comprised of Precincts 3B, 3C, 3D, 3E, 3F, 3G, 3H, 6A, and 6E. District 4 is comprised of Precincts 2C, 2D, 2E, 2R, 2G, 2H, 8A, 8D, 8E, 8F, and part of 8H. District 5 is comprised of Precincts 5C, 5D, 5E, 5G, 5H, 7F, 7G, 7H, 8B, and part of 8H. District 6 is comprised of Precincts 5F, 6B, 6C, 6D, 6F, 6G, 6H, 7B, 7C, 7D, and 7E

209) The Section 2 benchmark plan for School Committee will not provide for an opportunity to elect either a Hispanic candidate (District 1) or an African American candidate (District 2) if Hispanic and African American turnout remains depressed and Hispanic voter cohesion remains as Dr. Engstrom estimated it to be. However, in the event that no white candidates compete in District 1 and/or District 2, then, of course, both or either districts will elect a minority candidate of choice. Since there are no white School Committee incumbent candidates who reside in District 1 or District 2 and since these districts will be perceived as minority opportunity districts, it is possible that there will be no viable white opposition in either district as there has not been for some time in Hampden County House District 10 and 11, even though the proportion of the Hispanic voting age population and the African American voting age population, respectively, in

these districts is less than 50 percent.    Accordingly, Plaintiffs' six single-member district plan could provide an opportunity to elect one Hispanic and one African American candidate.

210)  Accordingly the Section 2 benchmark plan for School Committee provides the opportunity to elect one African American candidate and one Hispanic candidate at best and no minority candidates at worst.  It further provides for African American influence in District 3 and significant Hispanic voter influence in District 3, in excess of the African American and Hispanic share of the voting age population

211)  Since the existing method of election provides for the opportunity to elect at least one Hispanic and one African American candidates to the School Committee and influence over the election of all six members of the School Committee equal to the African American and Hispanic share of the voting age population, the existing method of election provides for greater opportunities to elect than does the Section 2 benchmark School Committee plan.  Accordingly, there is no evidence that the existing method of election violates Section 2.

**Proposed Remedies**
***Plaintiffs' Nine Single Member District Plan***
<u>Demographics</u>

212)  Plaintiffs have proposed the following nine single-member district plan for the election of members to the City Council

| District | White VAP % | Black VAP % | Hispanic VAP % | Deviation % |
|---|---|---|---|---|
| 1 | 29.2 | 13.5 | 54.0 | -2.1 |
| 2 | 24.8 | 18.1 | 54.1 | -2.0 |
| 3 | 16.0 | 58.0 | 21.2 | -4.2 |
| 4 | 41.1 | 38.5 | 16.4 | -4.5 |
| 5 | 71.2 | 06.8 | 19.1 | +2.1 |
| 6 | 73.5 | 12.1 | 11.4 | +3.9 |
| 7 | 83.1 | 09.1 | 05.1 | +0.5 |
| 8 | 84.0 | 06.5 | 05.6 | +2.7 |
| 9 | 63.6 | 10.6 | 17.9 | +3.8 |
| **Total** | **56.2** | **18.9** | **21.8** | **8.4** |

213)  The over-all deviation among the nine districts of Plaintiffs' proposed nine single-member district plan was less than 10 percent (according to the 2000 Census)

214)  There is significant evidence from which to conclude that race was the predominate motive in the creation of the minority-majority districts in Plaintiffs' nine single-member districting plan. Districts 1 and 2 was created by including  every contiguous Hispanic majority precinct and including in Districts 3 and 4, every contiguous African American majority precinct

<u>Racial Considerations and Subordination of Traditional Districting Principles</u>

215)  Racial consideration subordinated the traditional districting principle of minimizing the number of precincts that are split.  Plaintiffs' proposed nine-member districting plan splits 27 precincts between two districts.  Plaintiffs' proposed nine single-member districting plan splits an additional seven precincts among three districts

216)  Plaintiffs' proposed nine single-member district does not appear to be drawn with an awareness of the City's neighborhoods, even though the importance of neighborhoods and community representation is the asserted basis for Plaintiffs' preference for single-member district elections and minimization of the division of neighborhoods is important among the City's districting principles.  Only four of the City's 17 neighborhoods are wholly included within one district in Plaintiffs' proposed nine single-member district plan:  Brightwood, Indian Orchard, Pine Point, and South End.  Eight of the City's 17 neighborhoods are split between two districts in Plaintiffs' proposed nine single-member district plan:  Bay, Boston Road, East Forest Park, East Springfield, Liberty Heights, Memorial Square, Metro Center, and Old Hill.  Two of the City's 17 neighborhoods are divided among three districts in Plaintiffs' proposed nine single-member district plan:  McKnight and Upper Hill.  Two more of the City's 17 neighborhoods are divided among four districts in Plaintiffs' proposed nine single-member district plan:  Six Corners and Sixteen Acres.  Finally, the one neighborhood that Plaintiffs claim wields too much influence on the City Council – Forest Park – would continue to wield the same kind of influence, since five of the Plaintiffs' nine districts would include parts of Forest Park.  Accordingly, it would be possible, under Plaintiffs' proposed plan that more members of the City Council would reside in Forest Park than currently do.

217)  Indeed, as further evidence of the predominance of racial considerations, districts in which a majority of the voting age population was either African American or Hispanic (according to the 2000 Census), split more neighborhoods (between six and seven), than the districts in which white persons constitute a majority of the voting age population (between four and two)

218)  Plaintiffs' proposed nine single-member district does not appear to be drawn with an awareness of the City's wards, even though Plaintiffs have described what they want as "ward representation"  and all previous alternative methods of election and districting plans elected some or all members of the City Council from the City's eight wards.   Although it is presumed that one or two of eight wards would have to be divided in order to create a nine single-member district plan; nevertheless, Wards 1, 2, 7, and 8 are divided between two; Wards  3, 4, and 6 are divided among three districts; and Ward 5 is divided among four districts in Plaintiffs' nine single-member district plan

219)  There is overwhelming evidence that Plaintiffs' proposed nine single-member district plan subordinated the City's traditional districting principles to race.

Electoral Opportunities

220)  Assuming that the turn-out among Spanish surname voters (in Wards 1 and 3) remains as calculated by Plaintiffs, a majority of the voters casting a ballot in Districts 1 and 2 would not be Hispanic (Spanish surname).

221) Where voters only have one choice, there is no reason to believe that minority candidates would be able to rely upon the same proportion of white crossover votes that they received under the current method of election.

222) Applying Dr. Engstrom's estimations of Hispanic voter cohesion and white and African American cross-over voting for Hispanic candidates, only Mr. Tosado would have been elected had he run from Districts 1 or 2. Accordingly, no other Hispanic candidates than the candidate who has been elected at large, would have been elected from Districts 1 and 2 in Plaintiffs' proposed nine single-member district plan. Mr. Tosado does not reside in Districts 1 or 2 and a white incumbent does reside in District 1 in Plaintiffs' nine single-member district plan.

223) The ability of a Hispanic candidate to be elected in District 1 will be dependent upon the absence of white opposition, few Hispanic candidates splitting the Hispanic vote, and strong turn-out among Hispanic voters.

224) The ability of a Hispanic candidate to be elected in District 2 will be dependent upon the absence of white opposition, viable Hispanic candidate(s), and strong turn-out and political organization among Hispanic voters.

225) Given the political cohesion among African American voters (as estimated by Dr. Enstrom), it is likely that District 3 of Plaintiffs' nine single-member district plan will provide to African American persons an opportunity to elect candidates of choice.

226) While District 4 in Plaintiffs' nine single-member district plan may elect African American incumbent Bud L. Williams, it is doubtful that it would provide an opportunity to elect any other African American candidate. Mr. Williams' ability to be elected is properly deemed a contest effect and does not alter the conclusion District 4 will not provide an opportunity to elect African American candidates of choice.

227) Plaintiffs' nine single-member district plan guarantees that at least five of the nine members of the City Council will be white. In the remaining districts (Districts 5, 6, 7, 8, and 9) in Plaintiffs' nine single-member district plan, the white proportion of the voting age population is sufficiently greater than the proportion of African American or Hispanic persons that the loss of white population and increase in the number of minority voting age persons (estimated by the American Census Survey) is not likely to be sufficient to jeopardize any of the five districts' status as "safe white" districts.

228) That Plaintiffs' Spanish surname analysis of turnout indicates that the proportion of Spanish surname voters lags behind the proportion of Hispanic voting age persons (according to the 2000 Census) – particularly in areas outside the North End -- provides more evidence that even in the districts (Districts 5 and 9) in which the Hispanic persons constitute almost 20 percent of voting age population (according to the 2000 Census), there would be no opportunity for Hispanic persons (the fastest "growing" group as among white, African American and Hispanic persons) to elect candidates of choice and only minor influence as to a choice among white candidates

229) Plaintiffs' nine single-member district plan will cause minority persons to lose the significant political and electoral influence that they exert and will continue to exert, to an even greater extent, in future elections conducted pursuant to the current method of election

230) Plaintiffs' nine single-member district plan will provide for no more electoral opportunities in City Council elections than the current method of election has provided – and will continue to provide to an even greater extent as the minority proportion of the voting age population increases. Accordingly, Plaintiffs have proposed no remedy even if it were determined that the current method of electing members to the City Council violates Section 2 of the Voting Rights Act.

### Plaintiffs' Six Single-Member District Plan for the School Committee
Demographics

231) Plaintiffs proposed the following six single-member district plan, the demographics for which are as follows:

| District | White VAP % | Black VAP % | Hispanic VAP % | Deviation % |
|---|---|---|---|---|
| 1 | 21.8 | 14.6 | 61.2 | -2.7 |
| 2 | 21.1 | 55.1 | 19.6 | -3.3 |
| 3 | 71.8 | 07.6 | 17.9 | +4.2 |
| 4 | 73.0 | 15.9 | 08.0 | +0.04 |
| 5 | 75.3 | 09.6 | 10.0 | +3.9 |
| 6 | 62.4 | 11.2 | 21.0 | -2.1 |
| **Total** | **56.2** | **18.9** | **21.8** | **7.2** |

232) The over-all deviation among the six districts of Plaintiffs' proposed six single-member district is less than 10 percent (according to the 2000 Census)

Racial Considerations and the Subordination of Traditional Districting Principles

233) There is significant evidence to support the conclusion that race was the predominate motive in the creation of the minority-majority districts in Plaintiffs' six single-member districting plan. Plaintiffs' proposed six single-member district plan  was created by including in District 1 every contiguous Hispanic majority precinct and including in District 2, every contiguous African American majority precinct

234) Racial consideration subordinated the traditional districting principle of minimizing the number of precincts that are split. Plaintiffs' proposed six single-member districting plan splits 25 precincts between two districts.  Plaintiffs' proposed six single-member districting plan splits an additional five precincts among three districts.

235) In order to implement Plaintiffs' six single-member district plan for the School Committee and Plaintiffs' nine single-member district plan for the City Council, it will be necessary to have 24 different ballot combinations

236)  Plaintiffs' proposed six single-member district does not appear to be drawn with an awareness of the City's neighborhoods, even though the importance of neighborhoods and community representation is the asserted basis for Plaintiffs' preference for single-member district elections and minimization of the division of neighborhoods must be considered important among the City's districting principles.  Four of the City's 17 neighborhoods are wholly included in one districts in Plaintiffs' six single-member district plan:  Boston Road,  Brightwood, East Springfield, and Liberty Heights.  Eleven of the City's 17 neighborhoods are divided between two districts in Plaintiffs' six single-member district plan:  Bay, East Forest Park, Forest Park, Indian Orchard, Memorial Square, Metro Center, Old Hill, Pine Point, Six Corners, South End, and Upper Hill.  Two of the City's 17 neighborhoods are divided among three districts in Plaintiffs' six single-member district plan:  McKnight and Sixteen Acres.

237)  Indeed, as further evidence of the predominance of racial considerations, districts in which a majority of the voting age population was either African American or Hispanic (according to the 2000 Census), split more neighborhoods (seven), than the districts in which white persons constitute a majority of the voting age population (five)

238)  Plaintiffs' proposed nine single-member district does not appear to be drawn with an awareness of the City's wards, even though Plaintiffs have described what they want as "ward representation"  and previous alternative methods of election and districting plans – of which there have been few --  elected some or all members of the School Committee from some combination of the City's eight wards.  Although it is presumed that several  of eight wards would have to be divided in order to create a six single-member district plan; nevertheless, Wards 1 and 6 are divided between two School Committee districts; Wards 2, 5, 7, and 8  are divided among three School Committee districts, Ward 3 is  divided among four School Committee districts and Ward 4 is divided among five districts in Plaintiffs' six single-member district plan B for School Committee

239)  There is overwhelming evidence that Plaintiffs' proposed six single-member district plan subordinated the City's traditional districting principles to race.

Electoral Opportunities

240)  Assuming that the turn-out among Spanish surname voters (in Wards 1 and 3) remains as calculated by Plaintiffs, only a bare majority of the voters casting a ballot in District 1 would be Hispanic (Spanish surname).

241)  Where voters only have one choice, there is no reason to believe that minority candidates would be able to rely upon the same proportion of white crossover votes than they received under the current method of election.

242)  Applying Dr. Engstrom's estimations of Hispanic voter cohesion and white and African American cross-over voting for Hispanic candidates, only Mr. Tosado would have been elected had he run from District 1.  Accordingly, no other Hispanic candidates than the candidate who has been elected at large, would have been elected from District 1 in Plaintiffs' proposed six single-

member district plan.  Mr. Tosado does not reside in District 1 in Plaintiffs' six single-member district plan.

243)  On the other hand, since there is no white incumbent or former candidate who resides in District 1, and given the fact that 60 percent of the voting age population is Hispanic and District 1 will be viewed as a "Hispanic district," it is possible that District 1 will elect a Hispanic preferred candidate.

244)  It is reasonable to assume that District 2 would provide an opportunity to elect African American candidates, primarily because District 2 is largely comprised of Ward 4, in which is included a longstanding, historically African American  community; African American cohesion is extremely strong; African American political organization is sufficient to ensure that several African American candidates do not split the vote if opposed by a strong white candidate; and (for these reasons) it is not likely that District 2 will attract white opposition.

245)  Plaintiffs' six single-member district plan guarantees that at least four of the six members of the City Council will be white.  In the remaining districts (Districts 3, 4, 5, and 6) in Plaintiffs' six single-member district plan, the white proportion of the voting age population is sufficiently greater than the proportion of African American or Hispanic persons that the loss of white population and increase in the number of minority voting age persons (estimated by the American Census Survey) is not likely to be sufficient to jeopardize any of the four districts' status as "safe white" districts.

246)  Minority persons would lose the significant political and electoral influence that they exert and will continue to exert – to an even greater extent --in future elections conducted pursuant to the current method of election

247)  Plaintiffs' six single-member district plan will provide for no more electoral opportunities in School Committee elections than the current method of election has provided – and will continue to provide to an even greater extent as the minority proportion of the voting age population increases.  Accordingly, there is no remedy even if it were determined that the current method of electing members to the School Committee violates Section 2 of the Voting Rights Act.

**Lack of Discriminatory Purpose and Minority Support for Plan A and At-Large Method of Election**
*1959 Referendum*

248)  In 1959, while it is true that Paul Mason, who was an African American Republican, opposed Plan A, his opposition was based upon his concern for the amount of power that would be accorded to the mayor; the possibility that the City Council would be dominated by the Irish; and the fact that Plan A abolished partisan primaries for the election of members to the City Council and the School Committee

249)  Also among the concerns was the possibility that the at-large method of electing members of the City Council would result in the election of nine members – all of whom resided in one or two wards.  In response to the concern that members of the City Council would not reside in every

ward, proponents of "Plan A" argued that what was most important was whether the member of the City Council did a "good job" for the whole City. In addition, proponents of "Plan A" argued that if a councilmember discriminated in favor of certain wards (presumably the ward in which he lived), voters in the other seven wards would ensure that the councilmember was not returned to office. It was further argued that ward voters could "bullet vote" to ensure that a "representative" of their ward would be elected. Proponents of Plan A further argued that Boston had had success with citywide council elections and that no coalition of wards dominated the City Council.

250) In 1959 and again in 1963, there was some discussion and concern that at-large elections would not result in the election of "Negroes." Proponents of "Plan A," including Rev. Cobb, pastor of St. John's Congregational Church, argued that minority persons had been elected in other cities that had adopted at-large elections. Rev. Cobb cited Mrs. Ester McDowell's citywide election to the School Committee as evidence that a "Negro" could be elected at large. Rev. Cobb provided the additional example of Hartford's City Council, which had adopted non-partisan citywide elections and to which John C. Clark, Jr., "a Negro and a friend of many people in Springfield" had been elected. Rev. Cobb concluded: "[t]hese (and other) examples amply demonstrate for me how unrealistic are the fears (if any) and charge that "Plan A" may discriminate against minority groups. . . "Plan A" will attract more qualified men to run for public office and among these men will be Negroes and other minority groups. And it will be expected and hoped that the community will endorse and support them."

251) There is no indication that there were other African American leaders or elected officials who expressed concern about whether the at-large elections would provide for an opportunity to elect African American candidates. It does appear that it was of sufficient concern to citizens to require consideration and investigation as to whether at-large elections in other cities of comparable size in the area provided for the election of African Americans. There is no record of any elected official or proponent or even opponent of "Plan A" who claimed that an *advantage* of the at-large elections or the *motivation* for the adoption of at-large elections was that the change in the method of election would prevent the election of minority persons to the City Council or to the School Committee.

252) In the 1959 elections, electors were asked to vote "yes" or "no" with regard to "'Plan A' City Charter." According to the official records of the Springfield Election Commission, 52.9 percent of those persons turning out to vote in 1959 voted to adopt the "Plan A" form of government. The greatest proportion of the vote in each of the eight wards (including Wards 4 and 5) supported the adoption of "Plan A"

253) Citywide, 396 more voters left the referendum question blank related to the adoption of the "Plan A" form of government than rejected (or supported) the question. In four (Wards 1, 3, 4, and 6) of the eight wards, a greater proportion of the voters left blank the referendum question related to the adoption of the "Plan A" form of government than rejected (or supported) the question. Since Ward 4 has historically been predominately African American, it is reasonable to assume that a vast majority of African Americans either had no opinion or supported "Plan A, since 73.7 percent of the Ward 4 electors either voted for "Plan A" or left the question blank.

254) That Paul Mason, who was among the more vocal opponents of "Plan A," was not re-elected and another African American candidate, William A. Grant, was elected from Ward 4 provides evidence that a significant proportion of African American voters supported "Plan A" and did not anticipate that at-large elections would deny them the opportunity to elect candidates of choice.

255) Likewise, in Ward 5 (in which 46 percent of the population was African American by the 1970 Census), Tycho Peterson, Ward 5 white incumbent who was opposed to "Plan A," was defeated and two non-incumbents, were elected one of whom, W. Robert McDonald, was an African American.

256) That African American had been elected to the Common Council since 1928 and were elected in 1959, dispels the notion that the adoption of at-large elections for the City Council was a reaction to the election of African Americans to the Common Council and was motivated by any intent to deny African Americans an opportunity to be elected to the City Council.

### 1963 Referendum

257)   In the 1963 general election, Springfield electors were presented with a ballot initiative that would have increased the number of city councilors to 13.  The ballot initiative proposed that one member of the City Council would have been elected from each of the City's eight wards and five members elected at large ("8-5 mixed method of election").

258) The "fear of ward elections" appeared to be "at the heart of" the debate over the adoption of the 8-5 method of election proposed in 1963.  Proponents,  converts, and elected officials of the Plan A government argued that a return to ward elections would result in a return to "ward politics," since a ward-based method of election ensured the re-election of these "ward bosses" or political "strong men."  It was argued that "the same person who may be considered almost uneatable in a ward race might receive little proportionate support when his candidacy is scrutinized by voters throughout the city."  Even though the 8-5 method of election included an at-large component that would address some of the concerns expressed by the proponents of Plan A, this change was opposed based upon the view that "the segment of ward councilors would constitute a permanent majority voting block, and such a block would make its voting weight felt in a continual succession of 'back scratching' measures to relieve the continuous itch of ward demands."

259) The issue of whether the current method of election provided for an opportunity for African Americans and other minority persons to be elected at large did not appear to be an issue in the referendum conducted within two years of the implementation of Plan A..

260) According to the official records of the Springfield Election Commission, Springfield 50.1 percent of those persons turning out voted against the adoption of the 8-5 mixed method of election for the City Council (Question 2).  The initiative not only failed to receive support from a majority of those casting a ballot, but also resoundingly failed to receive the support of the required one-third of the registered voting population to render it binding.  Accordingly, only 11.6 percent of the registered voter population voted to change the at-large method of electing members to the City Council to an 8-5 mixed method of election and 29.0 percent of the registered voter

population voted against changing the at-large method of electing members to the City Council to an 8-5 mixed method of election.

261) Citywide 30.2 percentage points more people voted against the adoption of the 8-5 mixed method of election than voted for the change.   In each of the eight wards a greater proportion of those persons turning out voted against adopting the 8-5 mixed method of election for the City Council than voted for the 8-5 mixed method of election for the City Council.  In Ward 4, 9.6 percentage points separated those persons who voted for as voted against the 8-5 mixed method of election.

### *1977 Referendum*

262)  In the spring of 1997, a City Study Committee conducted five public hearings in different locations throughout the City. Chief among the topics discussed were the relative merits of ward representation as compared to at-large representation, as well as lengthening the term of office for the mayor.

263)  The question of "ward representation" was placed on the 1977 ballot.  Springfield voters considered two separate initiative questions that proposed a change in the method by which members of the City Council (Question 1) and the School Committee (Question 2) were elected to "district representation."  According to the official records of the Springfield Election Commission, 70.2 percent of those who cast a ballot either for or against "district representation," voted against "district representation" for the City Council (Question 1); 69.9 percent of those who cast a ballot either for or against "district representation," voted against "district representation" for the School Committee (Question 2).

264)  The 1977 referendum failed to receive the required support of one-third of the registered voter population since  08.2 percent of the registered electors voted for district representation" for the City Council and 08.0 percent of the registered electors voted for "district representation" for the School Committee;  42.3 percent of the registered voters cast ballots in the 1977 election.

265)  Citywide 61.8  percentage points more people voted against district representation for the City Council or left the referendum question (Question 1) regarding the adoption of "district representation" blank;  62.4 percentage points more people voted against district representation for the School Committee or left the referendum question (Question 2) regarding the adoption of "district representation" blank.   In Ward 4 (in which the 1970 Census reported that 64 percent of the total population was Black),  72.3 percent of those who turned out  voted against district representation for the City Council or left the referendum question (Question 1) regarding the adoption of "district representation" blank.   In Ward 4, 72.9 percent of those who turned out voted against district representation for the School Committee or left the referendum question (Question 2) regarding the adoption of "district representation" blank.   In Ward 5 (in which the 1970 Census reported that 46 percent of the total population was Black),  75.5 percent of those who turned out voted against district representation for the City Council or left the referendum question (Question 1) regarding the adoption of "district representation" blank.  In Ward 5,  75.9 percent of those who turned out voted against district representation for the School Committee or left the referendum question (Question 2) regarding the adoption of "district representation" blank

*1987 Referendum*

267)  On June 15, 1987, the City Council ordered the conduct of a referendum election based upon challenges to the "adequacy of the present at-large elective system for. . . the City Council" with regard to providing "representation. . .for separate geographic areas of the City." Accordingly, in 1987, Springfield electors were presented with a ballot initiative (Question 3) that would have required that some of the members of the City Council would have been elected at-large and other members elected from wards or districts ("mixed method of election").

268)  In each of the eight wards, more people comprised the group of those who voted against or left the referendum question regarding the adoption of the mixed method of election for the City Council blank.  Citywide 76.9 percentage points more people comprised the group of those who voted against the mixed method of election for the City Council or left blank the referendum question (Question 3) regarding the adoption of mixed method of election

269)  In Ward 5, 71.9  percent of those who turned out comprised the group of those who voted against the mixed method of election for the City Council or left blank the initiative question (Question 3) regarding the adoption of a mixed method of election blank.  As among the eight wards, the greatest proportion (83.2  percent) of the total ward vote comprised by the group of those who voted against the mixed method of election for the City Council or left blank the initiative question (Question 3) regarding the adoption of a mixed method of election was in Ward 4.

*1997 Referendum*

270)  In 1997, a ballot initiative proposed to change the method of electing the City Council and an increase in the size of the City Council.  Question 1 proposed an eleven-member council that consisted of one member elected from each of the City's eight wards and three members elected at large

271)  The various minority and civic organizations campaigned for the adoption of the 8-3 method of election, although unlike the earlier referenda elections there was little real debate and those who continued to support the at-large method of election were not sufficiently engaged to enter into any dialogue or to campaign.  Proponents of the 8-3 method of election based their support in 1997 for the 8-3 method of election – as they had in previous referendum campaigns -- on the fact that the then-current members of the City Council resided in four of the eight wards and that "5 Blacks and No Puerto Ricans" had been elected to the City Council since its inception in 1961.

272)  Proponents based their support for the 8-3 method of election on the view that an elector's vote for one candidate elected from a ward "counts more" than the elector's vote for nine candidates and unsupported claims that the current method of election provides "unfair advantage" to incumbents that "ward representation" would rectify by making longtime incumbents more vulnerable to challenge and more likely to elicit significant opposition in each election.

273)  Proponents based their support for the 8-3 method of election on the conclusion that the decreasing rate of turn-out among all of the voters and the disparately low turn-out among minority voters was attributable in large part to the current method of electing members to the City Council.  Proponents based their support for the 8-3 method of election on the claim that the at-large system is more prone to abuse by special interests because it takes big money to win city-wide elections."

274)  There was no publication or discussion of any analysis of the 8-3 method of election as to whether the wards as then-configured would provide an opportunity to elect at least one African American candidate and one Hispanic candidate.  At that time, the wards would have reasonably provided the opportunity to elect only one Hispanic and one African American candidate and could have easily resulted in the election of neither a Hispanic nor an African American candidate, given low turnout rates among minority voters.  In addition, minority candidates for the City Council had never finished among the "top" three candidates.

275) According to the official records of the Springfield Election Commission, a bare majority of those persons turning out voted for the adoption of  the 8-3 mixed method of election for the City Council.   The initiative failed to receive the requisite one-third support of the registered voter population necessary to constitute a binding referendum.  The voter turn-out in the 1997 referendum was 26.5 percent of the total registered voters for the City of Springfield.   Only 13.6 percent of the registered voters in the City of Springfield supported the initiative proposing the 8-3 mixed method of election for the Springfield City Council.

276)  While it seems likely that Question 1, proposing an 8-3 method of election for the City Council,  received strong support from minority voters, it is also likely that Question 1 received significant support from white voters, which provides evidence for the view that support of the 8-3 method of election was based primarily upon desire for more "direct neighborhood representation" than the current method of election was believed to provide.

277)  In spite of the concerted attempt on the part of various civic and minority organizations to ensure that an adequate proportion of the registered voter population turned out to provide for the requisite one-third registered voter requirement, 4,515 fewer voters turned out to vote in 1997 than turned out to vote in 1987,  9,934 fewer voters turned out to vote than voted in 1977, and 33,929 fewer voters turned out to vote than voted in 1959.

278)  Accordingly, while it is clear that the notion of single-member district representation has attracted support over the many years since the implementation of "Plan A," given the fact that it has achieved its greatest support during a period of time when minority persons stand ready to reap the electoral benefits thought to accrue to those who constitute the majority of voters and where the alternative method of elections would not provide for greater electoral opportunities, the source and the basis for the support for some form of ward representation cannot be attributed to a view that the current method of election is discriminatory or dilutive.

279)  There is no evidence that a discriminatory or dilutive motive supported the adoption or the maintenance of the current method of election, based upon the fact that wards with significant minority population did not support a change in the method of election until 1997 and the fact that

the proposed method of election in 1997 would not have provided minority persons with greater electoral opportunities than had been provided by the at-large method of electing the City Council. That there was much dialogue and debate before, during, and after each referendum regarding various concerns about the at-large method of election provides evidence that minority electoral opportunities were a concern to all voters and that voters would not have continued to support the at-large method of election if it had not provided reasonable opportunities to elect minority candidates to the City Council and the School Committee.  There is absolutely no evidence that the citizens or the political leaders in the City of Springfield adopted or maintained the at-large method of election as a means to deny minority persons the electoral voice to which they were entitled as citizens and pursuant to the Voting Rights Act.

**Neighborhood Representation and Residency**

280)  Minority members of the City Council and School Committee have strong ties to the minority communities and were candidates of choice as among those voters who share racial or ethnic characteristics.  Minority members of the City Council and  School Committee have/are committed to the betterment of the minority communities that have so cohesively
 supported them

281)  An elected official's residence does not define or delimit those communities in the City with which he/she is familiar, particularly where the official has lived in the City for most of his/her life, where the official have family and friends who live throughout the City, where the official has employment in the City of Springfield, where the official shops, recreates, attends church, participates in civic and political organizations in the City of Springfield, and where the official is concerned about the problems, issues, and concerns of all of the citizens of Springfield, regardless of where they live.

282) There is no evidence that the current or past City Councils or School Committees were less committed or interested  in the wards and neighborhoods in which members did not reside and failed to provide to these wards the services, funding, and assistance to which each neighborhood is due.