UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARISE FOR SOCIAL JUSTICE; ¿OISTE?; NEW ENGLAND STATE-AREA CONFERENCE OF THE NAACP; REV. TALBERT W. SWAN, II; NORMAN W. OLIVER; DARLENE ANDERSON; GUMERSINDO GOMEZ; FRANK BUNTIN; RAFAEL RODRIQUEZ; and DIANA NURSE, | |
| Plaintiffs, | Civil Action No. 05-30080 MAP |
| v. | |
| CITY OF SPRINGFIELD and SPRINGFIELD ELECTION COMMISSION, | |
| Defendants. | |

## TRIAL AFFIDAVIT OF PRESTON H. SMITH, II, Ph.D.

I, Preston H. Smith, II, Ph.D., hereby certify as follows:

1.     I am an Associate Professor of Politics at Mt. Holyoke College in South Hadley,

Massachusetts.  I have a Ph.D. from the University of Massachusetts in Political Science.  I

earned a B.A. from Howard University in 1978 with a major in History.  I am the Director of the

Community Based Learning Program at the Weissman Center for Leadership and the Liberal

Arts at Mount Holyoke.  My research specialties are class and housing issues within the black

community from 1940 until 1960, postwar black politics, and community development.  I helped

to develop Mount Holyoke's Community Based Learning Program and I teach a course in

Community Development.  Students enrolled in the Community Development course complete

internships at community-based organizations in Holyoke and Springfield.  I also teach courses

in American Politics; Politics of Black Urban Reform; and Racial Stratification and Urban Political Economy.

2.  I first became an Assistant Professor of Politics at Mount Holyoke in 1992.

3.  Attached hereto as Exhibit A is a true and correct copy of a paper I authored on racial segregation in Springfield and Holyoke (hereinafter the "Report"), which I presented at the Regional Approaches to Ending Housing Segregation conference on April 25, 1995 at the Holyoke War Memorial. My purpose in authoring the Report was to provide information concerning the prevalence of racial segregation in the Springfield Standard Metropolitan Statistical Area ("SMSA"). Specifically, I focused on housing discrimination and segregation based upon race in the Springfield SMSA.

4.  In the Report, I argue that "patterns of racial concentration in the region are not mainly the result of individual choice, but are shaped by individual and institutional discriminatory practices that force minorities to reside not only in designated cities – Springfield and Holyoke – but also in designated *sections* of those cities." Report, p. 2.

5.  I further concluded that the movement in the 1980s of Puerto Rican and Black/African American residents out of racially and ethnically concentrated neighborhoods in Springfield and into other areas of the city was more likely the result of spill-over and expansion of the size of those communities, than it was the result of racial integration or dispersion.

6.  I believe that the conclusions set forth in my Report remain true today. I have kept myself apprised of current academic literature on housing patterns and race.

7.  According to a 2003 study by the Pioneer Valley Planning Commission on mortgage lending practices in the Springfield Metropolitan Statistical Area, Black/African American and Latino loan applicants in the Springfield MSA have consistently higher denial

rates than white applicants, regardless of income level.  *See* Pioneer Valley Planning Commission, "Owning a Place to Call Home:  An Analysis of Fair and Subprime Lending in the Springfield Metropolitan Area" at iv (Dec. 2003) (Attached as Exhibit B).  The study found that high income African American and Latino applicants have denial rates three times higher than the denial rates for high income white applicants.  *Id.*

8.     Springfield's Analysis of Impediments (the "AI") observed that homeownership rates are lower in areas with large concentrations of ethnic and racial minorities.  Analysis of Impediments at 21 (attached as Exhibit C).

9.     For seven years, from approximately 1996 to 2003, I served on the Board of Directors of the Housing Discrimination Project, which now is called the Massachusetts Fair Housing Center.  The Massachusetts Fair Housing Center is dedicated to protecting the rights of all persons to fair and equal opportunities to secure safe and affordable housing.  During that period, I regularly heard complaints of housing discrimination by African Americans and Hispanics living in Springfield.

10.     My knowledge of the academic literature, my experience on the Board of Directors of the Massachusetts Fair Housing Center, my involvement with the Community Based Learning Program, and my experience teaching Community Development at Mt. Holyoke lead me to believe that there have been no significant changes in racially segregated housing patterns in Springfield or the causes of those patterns since I authored the Report.  I believe that Springfield's housing patterns continue to be shaped by individual and institutional discriminatory practices that force minorities to reside in certain sections of the City.

Signed under penalties of perjury, this ⟨8 day of January, 2007.

Preston H. Smith, II

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 2, 2007.

/s/ Paul E. Nemser

# EXHIBIT A

# Racial Segregation in Springfield and Holyoke:
## Historical and Current Trends

by
Preston H. Smith
Assistant Professor of Politics
Mount Holyoke College

Presented at Regional Approaches to Ending Housing Segregation conference, on April 25, 1995 at the Holyoke War Memorial.

*Please do not quote or cite without permission from the author.*

## Introduction

The major theme of this conference is to approach the issue of fair housing from a regional perspective. That means it is important not only to look at regional trends of housing segregation, but also to consider remedies that will have a regional impact. The regional approach to problems of desegregation is not very popular. Witness the recent ruling that found the state of Connecticut *not* responsible for minority children's separate and unequal education. This conference has presentations and workshops that address housing discrimination in a number of different categories including -- race, national origin, family status, disability, section 8 status, etc. In this presentation[1] I focus on housing discrimination and segregation based on race. I examine the residential patterns of African Americans and Puerto Ricans in the metropolitan Springfield area and within the cities of Holyoke and Springfield.[2]

The purpose of my talk is to provide some background and context to the prevalence of racial segregation in the region encompassing the Springfield SMSA (Standard Metropolitan Statistical Area) which includes the cities of Springfield, Holyoke, Chicopee and Westfield, and the towns of West Springfield, Longmeadow, East Longmeadow, Ludlow, and Agawam. The

---

[1] I like to acknowledge the research assistance provided by Jeannine Pinto, an intern at Housing Discrimination Project and a senior at Mount Holyoke College.

[2] Puerto Ricans who have been discriminated against use the national origin category to seek redress. It is a bit confusing since Puerto Ricans are technically citizens of the United States. The category of race is not completely accurate either since some Puerto Ricans identify as "white" thus the discrimination from whites would apparently be on another basis. For the purposes of my talk I will use the category of race to include both African Americans and Puerto Ricans when talking about housing discrimination and residential segregation.

bulk of my presentation though examines the residential patterns of African Americans and Puerto Ricans in Springfield and Holyoke. I argue that patterns of racial concentration in the region are not mainly the result of individual choice, but are shaped by individual and institutional discriminatory practices that force minorities to reside not only in designated cities -- Springfield and Holyoke -- but also in designated *sections* of those cities. One could argue that the initial settlement of black and Puerto Rican migrants in predominantly black and Puerto Rican areas occurs voluntarily for reasons of cultural and language familiarity. But I contend it is difficult to embrace this explanation for the slow outmigration from these predominantly minority neighborhoods especially when these communities are the poorest neighborhoods in their respective cities. When racial dispersion does occur it is usually into those neighborhoods that border on predominantly minority areas which may offer a slight upgrade in neighborhood quality.

## Current Racial Concentration in Springfield and Holyoke

If you look at the distribution of racial groups in the region, it is clear that Springfield and Holyoke contain a disproportionate number of blacks and Puerto Ricans. According to the 1990 Census: Holyoke houses 28.8% of all Latinos in the Springfield MSA. If you add the city of Springfield, both cities together hold 84.7% of all Latinos. As for blacks, 82.5% of all blacks in the region reside in Springfield. Comparatively the city only houses 28% of all whites in the region (US Census 1994).

The disparity in racial group distribution is stark when you compare the cities of Holyoke and Springfield with the surrounding cities and towns. Whereas blacks make up 19% of the

2

population of Springfield, they compose less than 2% in each of the surrounding cities and towns including: Chicopee (1.9%), West Springfield and Wilbraham (1.3% each), East Longmeadow (1%), Westfield (1%), Longmeadow and Agawam (.85% each). Latinos make up 17% of Springfield and 30% of Holyoke respective populations, but they range between less than 1% (in each town of East Longmeadow, Agawam, Wilbraham, Longmeadow respective populations) to 4% (Westfield; 3.6% in Chicopee; 2.8% in West Springfield; and 2% in Ludlow). From this statistical picture it is clear that Puerto Ricans and blacks are overrepresented in the cities of Holyoke and Springfield (US Census 1994).

Beyond regional disparities there are patterns of minority concentration *within* the cities of Springfield and Holyoke. In these two cities Puerto Ricans and blacks are concentrated within specific neighborhoods and geographical areas. Puerto Ricans in Holyoke are located in four neighborhoods -- the Flats, South Holyoke, Churchill and Downtown -- accounting for 74% of their total city population. In Springfield, Puerto Ricans are concentrated in the North End (Brightwood and Memorial Square and the western census tracts of Liberty Heights) making up 58% of their city population.[3] The neighborhoods of McKnight, Bay, Old Hill, Upper Hill and Six Corners encompass 60% of Springfield's black population. In contrast, East Forest Park is 2% black and 1% Latino, and East Springfield is 4% black and 5% Latino.[4]

At this point we might ask: What accounts for these spatial racial disparities in the

---

[3] If you add to those areas the contiguous neighborhoods of Metro Center, you get 68%; and if you add Puerto Ricans in Six Corners and Old Hill you get 81%; add South End you get 90% of the total city Puerto Rican population (Springfield Planning Department 1993).

[4] Also, Forest Park is 6% black and 8% Latino; Indian Orchard is 10% Latino and 8% black. Although Sixteen Acres is 13% black, it is only 4% Latino (Springfield Planning Department 1993).

region? Does "voluntary segregation" account for these disparities? Or can we detect historical and current institutional practices that produce regional and municipal racial segregation?

## National Patterns of Racial Segregation in the Post WWII period

One way of addressing the concentration of racial groups within designated areas of Springfield MSA's is to examine the historical and institutional factors which created racial segregation in cities across the country. In their book, *American Apartheid*, Douglas Massey and Nancy Denton identify policies and institutional dynamics after World War II that expanded black ghettos.[5] The ghettoes were created by pervasive discrimination within private housing markets during and after the Great Migration of southern blacks in the 1920s. Massey and Denton point out that what was distinctive about racial segregation after the Second World War was the role the federal government played "not only in maintaining the color line but in strengthening the walls of the ghetto" (1993, 42).

The basic shape of large-city black ghettos was in place by 1930. Despite the Great Depression, 400,000 rural blacks migrated to northern and southern cities by the end of the decade. Upon arrival to the cities blacks found severe housing shortages. These shortages resulted from the virtual end of housing construction during the Depression and the world war. But the housing scarcity was worse for blacks because of their restricted access to white areas of the city due to white racial hostility and discrimination. Therefore, black housing demands were mainly met by dividing large houses or converting basements, garages, and closets into

---

[5]This section is heavily indebted to the excellent chapter, "The Construction of the Ghetto" in Massey and Denton's important but flawed book.

4

kitchenette apartments. By 1940, "the ghetto had become an enduring, permanent feature of the residential structure of black community life..." (Massey & Denton 1993, 46).

After the war, pent up housing demand, surplus savings, and governmental mortgage subsidies fueled massive suburban residential construction. Whites fled the inner cities seeking single-family homes on spacious lots in the outlying areas beyond city limits. The new suburban residents demanded and received new highways from the federal government to transport them to work and shop downtown.

As whites left the inner cities they were partially replaced by southern black migrants. In the 1950s, 1.5 million blacks moved to cities followed by another 1.4 million in the 1960s. The proportion of blacks in cities often doubled between 1950 and 1970 creating large black pluralities and some black majority cities (Massey & Denton 1993, 45). Black in-migration, however, did not alter the basic shape of the ghetto. In fact, Massey and Denton demonstrate that instead "the combination of rapid white suburbanization and extensive black in-migration led to an unprecedented increase in the physical size of the ghetto during the 1950s and 1960s" (45). Racial segregation persisted despite the new racial demographic changes in urban areas. Indeed, these new patterns solidified and extended rigid racial boundaries into the metropolitan area. Massey and Denton found that the "white strategy of ghetto containment and tactical retreat before an advancing color line, institutionalized during the 1920s, was continued after 1945" (45). The only change they noted was the speed by which neighborhoods turned from white to black. The pattern of racial turnover had become so universal by this point that all urban neighborhoods could be categorized by their stage in the process of racial transition, namely, "all white, invasion, succession, consolidation, or all black" (46).

Massey and Denton identified three sets of actors that contributed to the creation of the ghettos in the postwar period. They include: a) white homeowners; b) real estate and financial institutions; and c) the federal government.

The racial prejudices of white homeowners and landlords has contributed significantly to denying minorities access to good and affordable housing. In fact, they argue that the permanence of ghettoes and barrios "rests on a foundation of long-standing white racial prejudice." Although there has been a change in attitudes by whites over time, many still feel it is their right to restrict black and brown people's access to their neighborhoods solely on the basis of race. Whites resist (sometimes violently) black and brown residence in their neighborhoods. If whites are unsuccessful in keeping minorities out of their neighborhoods then they leave. Furthermore, new white home-buyers avoid these neighborhoods "guaranteeing racial turnover and resegregation" (49).

The real estate industry's discriminatory behavior reinforced the individual prejudices of white property owners. Once restrictive racial covenants were struck down by a 1948 Supreme Court decision, real estate agents' practice of "racial steering" became more widespread. White real estate agents refused to sell blacks property in white neighborhoods. And they discouraged new white homeseekers from buying in neighborhoods that were experiencing racial transition. In Chicago during the 1950s, 84% of white realtors thought that blacks should be excluded from residing in white neighborhoods. Furthermore, some real estate agents engaged in "blockbusting" by exploiting the racial anxieties of white homeowners in these neighborhoods causing panic selling. These realtors bought homes from fleeing whites at below market rates, then sold them

6

to incoming blacks who had little alternative but to accept the exorbitant prices creating, of course, huge profits for the brokers. In addition to their own discriminatory behavior, the realtors reported widespread discrimination against black homeseekers in securing mortgage loans from banks and savings and loans. The attitudes and actions of individual white property owners and real estate and financial professionals created "systematic, institutionalized racial discrimination within urban housing markets" (51).

The discriminatory actions of white homeowners, realtors, and banks created the ghettoes in the first quarter of the twentieth century. After World War II though, the major factor in institionalizing this discrimination was the role played by the federal government. The federal government first got involved in urban housing markets by promoting homeownership as a way to stimulate the national economy with its Home Owners' Loan Corporation (1933). This agency provided financing (in the form of low interest loans) as a safety net to those homeowners in danger of default or to those who had already lost their homes through foreclosure allowing them to reacquire their properties. The HOLC's most significant legacy however came from its rating system of the investment potential of urban neighborhood which "initiated and institutionalized the practice of 'redlining'" (52). According to a scale of four categories based on a class and race hierarchy, black neighborhoods were rated the lowest category marking them unsuitable for investment capital.

The real estate industry had been using an informal ratings system since the 1920s, but the federal government through HOLC institutionalized this discriminatory practice. Although, the amount of money distributed by HOLC was small, it codified a rating system later adopted by private financial institutions which expanded the practice of the redlining of minority and

7

poor neighborhoods. During this period, black communities had to contend with both public and private disinvestment. (52).

The federal government followed HOLC with Federal Housing Administration (FHA) and Veteran's Administration (VA) programs that provided mortgage loans to veterans in the 1940s and 1950s. Both loan programs though adopted the underwriting practices of HOLC and denied many eligible blacks access to a federal guarantee making granting mortgages to blacks more risky and therefore, less likely to occur. According to the 1939 FHA *Underwriting Manual*, "if a neighborhood is to retain stability, it is necessary that properties shall continue to be occupied by the same social and racial classes" (quoted on p. 54). In addition to racial bias, these programs favored single family construction over multifamily housing rehabilitation by giving the latter less attractive financial terms. These loan programs had the largest impact on the shape of the metropolitan residential market generating a massive capital infusion into the housing industry after the war. It was through these programs that the federal government played the most important role in creating rapid suburbanization. The FHA and VA programs' preference for suburban construction "contributed significantly to the decline of the inner city by encouraging the selective out-migration of middle-class whites to the suburbs" (53) and thus, forever changing the racial character of the metropolitan area.

Blacks' desire for decent housing was suppressed in two directions. They could not secure government or private financing for settling in white neighborhoods because it would violate the principle of promoting racial homogeneity. Thus the suburbs were off limits to African Americans. But they also could not secure loans for purchasing or rehabilitating properties within inner cities since the ratings that affected investment potential was low. This

8

lack of loan capital meant minority owners could not maintain their properties or sell them "leading to steep declines in property values and a pattern of disrepair, deterioration, vacancy, and abandonment" (54).

Inner city deterioration facilitated by government loan programs created a spiral of decline in the 1950s. The influx of poor black migrants and the outmigration of more affluent whites generated new service demands creating a need for tax increases which in turn encouraged further white flight. In response to inner city decline, business managers and municipal government officials utilized federal urban renewal policies to clear slum areas that threaten downtown and elite white institutions, for example, hospitals and universities. Most of these blighted areas were inhabited by blacks causing many to rename these policies "Negro removal." External racial hostility forced the black residents displaced by slum clearance (and highway construction) to relocate in other ghetto areas contributing to *those* neighborhoods' decline by overcrowding the fragile housing stock and overwhelming neighborhood service capacity. Even new public housing projects which was designed to accommodate displaced blacks was restricted by white politicians and neighborhood activists to the black community. During this process of urban renewal blacks suffered a net loss of housing, and the "second ghetto" became a permanent feature of postwar city life.

The process of displacement of minorities and resegregation continues unabated today. Racial segregation thrives in our major cities creating the typical spatial configuration of a black central city surrounded by white suburbs (67). Denton and Massey still find that whites "continue to avoid neighborhoods located anywhere near established black areas, and they are highly sensitive to the number of black residents" in their own neighborhoods (81). In addition,

9

they found that affluent blacks were still largely limited to segregated housing markets inside and outside of the city. The authors argue that African Americans have been and still are the most segregated group in the United States. Perhaps not surprisingly, the most segregated group of Latinos are Puerto Ricans which the authors attribute to the African origins of this group. The historical and current existence of racial segregation argues powerfully for the continue significance of race when it comes to access to decent housing.

Now I would like to turn to the local history of African Americans and Puerto Ricans to see how it converges or diverges with these larger patterns. I will briefly sketch each group's population growth and residential patterns. Then I will highlight some local practices that are consistent with national trends in racial segregation.

## Local Racial Segregation of Blacks and Puerto Ricans

Blacks have a long history in the city of Springfield. Small numbers of blacks have lived in the city since antebellum times (Davis-Harris 1976). Recently, the greatest growth in the population came after 1940. Blacks migrated from the Carolinas which has supplied other Eastern seaboard cities. The African American population almost doubled between 1940 and 1950 from 3,212 to 6,334 (Davis-Harris 1976, 26; US Census 1952). It doubled again during the decade of the 1950s to 13,435. In 1950, blacks constituted only 3.9% of the city's population, but their proportion rose to 12.6% in 1970 (US Census 1952, 1962, 1972).

Blacks' residence in Springfield has historically been relegated to certain designated areas of the city. It appears that the Hill area has contained a significant portion of the black population for some time. But not unlike European immigrants before or Puerto Ricans after

10

them, there was a tendency for new black migrants to settle in the North End. In 1939, blacks resided mostly in the Hill area. The North End contained the second largest concentration of black families followed by a smaller collection in the South End (Springfield Council of Social Agencies [SCSA] 1942, 5). By 1960, though blacks were already concentrated in five neighborhoods -- McKnight, Bay, Upper Hill, Old Hill and Six Corners -- constituting 72.4% of the city's black population (US Census 1960). Urban renewal displaced many blacks from the North End dispersing them into the predominantly black neighborhoods of the Mason Square area (formerly named Winchester Square). This trend is evidenced by the reduction of the black population in the Metro Center (census tract 8012) from 1675 in 1960 to 1 in 1970. During the same time period the Upper Hill neighborhood (census tract 8017) increased from 557 to 3,351 residents (US Census 1960 and 1970).

Although blacks have not been locked into a huge ghetto, black families were contained in certain areas of the city. The small number of blacks in the city before 1960 exaggerates the residential mixture of the races in the census tracts. Instead of a single "black belt", African Americans lived in racial enclaves before 1960. Afterwards, blacks became more concentrated in the Mason Square area with 82% of all blacks in the city living there in 1970 (US Census 1970).

An early indication of segregated housing conditions came from a 1924 black newspaper advertisement seeking "colored families" for tenement apartments. In the same issue there was an item about a KKK cross-burning outside of Palmer which gives us some indication of the racial climate of surrounding communities at that time. More recent evidence comes from a study by the Springfield Council of Social Agencies in 1942 which interviewed two hundred

11

"representative Negroes." This report asserted that "ninety-five per cent of those interviewed stated that there was discrimination against Negroes in securing rentals" (SCSA 1942, 8). The complaints of those interviewed echo those made in larger cities during the time. They reported that "whole sections of the city" were closed to blacks. Moreover, when blacks did get access to formerly white occupied rentals they paid higher rents. In general, these respondents described blacks' housing conditions as "deplorable" (SCSA 1942, 9).

One respondent commented on the availability of FHA loans to blacks. He reports that

It is impossible for a Negro to build an F.H.A. house in Springfield because F.H.A. loans are available only in areas    in which values are high enough to warrant such a loan, and Negroes are not permitted to buy or rent in such areas. (SCSA 1942, 9)

Blacks were also denied access to public housing. Many black leaders sought public housing in order to move blacks out of dilapidated structures. Discriminated against by federal loan programs, blacks were also denied conventional loans from banks because of their alleged financial "irresponsibility" (SCSA 1942, 9).

During the 1960s, blacks protested the lack of employment opportunities, police brutality, and lack of affordable housing. A housing shortage for blacks was highlighted by a full-page newspaper ad seeking housing for families displaced by urban renewal. The ad was signed by citizens and sponsors of the Mayor's Minority Group Housing Committee which said there was "enormous difficulty in finding decent homes for people of minority groups despite the large number of apartments for rent and homes for sale in the city" (quoted in Bauer 1975, 140). So even though housing was available blacks did not have access to it even when they had been displaced because of city policy.

For an individual's experience, I interviewed an African American man who was born

12

and raised in Springfield. His experience may illustrate the form some discriminatory practices took in Springfield's housing market. He remembers living in the Old Hill area off Eastern Avenue after the World War Two. His family was the only black one residing on a block dominated by European immigrant, working class families. He remembers that the family had to get mortgage financing outside of the city in order to purchase the house. No Springfield bank would grant them the mortgage loan. This man had a similar experience as an adult looking to buy a home in the 1960s. He reports that the first four white realtors he and his wife enlisted only showed them houses in black neighborhoods. It was not until the fifth realtor that they were shown property in a white neighborhood. Subsequently, he and his wife became the first blacks to purchase a home on their block in Sixteen Acres (Interview 1995b).

A critical mass of Puerto Ricans had not arrive to Springfield and Holyoke until 1970. In 1960, there were only roughly 700 Puerto Ricans in Springfield and almost 100 in Holyoke (US Census 1960). Larger numbers of Puerto Ricans came to these cities in subsequent decades. The largest increase of Puerto Ricans in Springfield was over 14,000 which came in the 1980s. Holyoke's Puerto Rican population also experience its largest growth during the 1980s increasing by 7400. According to the 1990 census there were 26,528 Puerto Ricans constituting 17% of Springfield's population, and  13,202 in Holyoke, making up 30% of that city's population (Springfield Planning Department 1993).

Puerto Ricans who migrated to Springfield and Holyoke left behind widespread poverty and unemployment that resulted from United States economic policies in Puerto Rico. The first arrivals were agricultural migrant workers who worked in Connecticut River Valley tobacco farms seeking inexpensive housing. Subsequent migrants came to Springfield and Holyoke

13

looking for job opportunities in manufacturing. Unfortunately, they arrived when most industrial jobs had relocated to other parts of the country or had been shipped abroad. In addition, there was some internal migration when Puerto Ricans displaced by urban renewal in Springfield's North End moved to Holyoke (Bratt 1989, 207).

I mentioned before that Puerto Ricans in both cities are concentrated in designated areas. People seem more incline to believe that Puerto Ricans' segregation is voluntary because new migrants want the cultural and language familiarity of predominantly Puerto Rican communities. Extended family patterns in Puerto Rican communities necessitated apartments with three or more bedrooms which were not widely available in Puerto Rican neighborhoods. However, official efforts to address this need by relocating Puerto Rican families in a public housing project outside of the neighborhood backfired according to a 1972 study (US Commission on Civil Rights). These families soon move back to the neighborhood with their familiar churches, and stores (US Commission on Civil Rights 1972, 43). Clearly cultural familiarity is a factor as it is with most migrant groups. But how much of a factor? The report does not mention if Puerto Ricans were welcomed in their new environment. Nevertheless, housing discrimination has long been recognized as a barrier to more dispersion of Puerto Ricans citywide. In fact, the same study reported that "Puerto Ricans find that good housing often is not available to them, even if their income will permit it, when it is discovered that they are Puerto Ricans" (39). This is an good indication that while cultural familiarity is important for new migrants it is hard for long-term, more affluent residents to obtain housing outside the confines of Puerto Rican neighborhoods.

In Holyoke, as I mentioned before Puerto Ricans are overwhelmingly concentrated in

14

four neighborhoods with the largest number located in Churchill with currently over 4,000 people (Springfield Planning Department 1993). In particular, Puerto Ricans in the South Holyoke neighborhood suffered from a 1968 city plan to reindustrialize the area discouraging private investment in residential development. The resulting disinvestment contributed significantly to the decline of the neighborhood hurting its Puerto Rican residents. The drying up of capital led to housing deterioration and abandonment. Rundown buildings became prime candidates for arson which occurred on an increasing basis in the 1980s. The city was very slow in responding to arson suggesting that its stance was at best neglect, and at worst, a complicit desire to clear the land of both the blighted housing and its Puerto Rican inhabitants. Nueva Esperanza, a community development corporation building on the organizing efforts of earlier groups, fought the city's plan of reindustrialization seeking to preserve and enhance the residential character of the neighborhood. Despite tremendous odds, Nueva Esperanza has been successful in rehabilitating housing in the neighborhood. It also sought a fair housing plan that the city accepted after much foot dragging and pressure from the state community development agency. The existence of the fair housing plan suggested that this is a major concern of the Puerto Rican residents in South Holyoke, and other neighborhoods (Bratt 1989).


## Current Trends of Racial Segregation in the Springfield MSA

What is the current situation of racial segregation in Springfield and Holyoke? The racial concentration of Puerto Ricans and blacks in Springfield and Holyoke has lessened somewhat in the 1980s. There has been some movement of Puerto Ricans from Memorial Square, Brightwood, and parts of Liberty Heights. In 1980, these neighborhoods housed 58% of the

15

city's Puerto Rican population. In 1990, that percentage had decreased to 43%. (If you add the bordering neighborhoods of the Metro Center and South End the percentages change from 69% in 1980 to 55% in 1990.) Most of the movement seems to be into predominantly black neighborhoods of McKnight, Bay, Upper Hill, Old Hill, and Six Corners. Puerto Ricans now make up 32% of Six Corners population and 22% of the Old Hill population (they were 16% and 14% respectively in 1980) [Springfield Planning Department 1993]. The fact that the movement is into bordering neighborhoods and that these neighborhoods are poor suggest more a spill over from traditional Latino areas than unfettered residential dispersion. Perhaps, the main mode of resistance to Puerto Ricans' access to open housing according to a housing specialist in Springfield is the apparently neutral form of opposition to multifamily housing (Interview, 1995a). Whites' opposition can be couched in housing tenure terms when in fact they fear the poor and Puerto Rican tenants that these buildings attract. There has been some increases of Puerto Ricans in predominantly white neighborhoods of Indian Orchard, going from 3 to 9% of the population. Also, there was a fourfold increase of Puerto Ricans in Forest Park (albeit mostly in northern census tracts) in 1990. I should note however that Forest Park experienced the most white outmigration in the city from 1980 to 1990. In Holyoke, Puerto Ricans' concentration in the four neighborhoods decreased from 88% in 1980 to 74% in 1990. Still, this concentration is extremely high since Puerto Ricans constitute only 30% of the city's population.[6]

---

[6]These four neighborhoods contained 30.1% of the total population in Holyoke. If there was proportional distribution of all racial and ethnic groups in every neighborhood, then 30% of all Puerto Ricans not 74% would be located in these four neighborhoods (Springfield Planning Department 1993; US Census 1990).

16

African Americans' concentration in five neighborhoods in Springfield has decreased over time. These neighborhoods housed 70% of the black population in 1980 but decreased to 60% in 1990. Both Old Hill and McKnight neighborhoods had a net lost of black residents in the 1980s. Much of blacks' movement seems to be east into Pine Point, Sixteen Acres, and Forest Park with an overall increase of 2,442 residents. The largest movement of blacks was into Forest Park with over a thousand moving there in the 1980s. There was more modest movement of blacks into Indian Orchard, East Springfield and Liberty Heights (an overall increase of 869 people). But there was also westward movement into the poorer neighborhoods of the South End, Six Corners and the Metro Center (an increase of 1,580 people). So the picture is mixed. The movement of blacks into Forest Park and Sixteen Acres has been in those census tracts closest to the black community suggesting again an expanding black community rather than integration (Springfield Planning Department 1993).

The traditional measure of racial segregation has been the dissimilarity index which measures how much neighborhoods or census tracts deviate from citywide racial group proportions. In 1990, whites (including Hispanics) made up 69%; blacks (including Hispanics) constituted 19%; and Hispanics made up 17% of the city of Springfield. In looking at Springfield's neighborhoods from the 1990 census none represented citywide racial proportions. There are 7 neighborhoods that exceed the white citywide proportion of 69% -- going from 83% white in Liberty Heights/Atwater to 97% in East Forest Park. There are 8 neighborhoods that meet or exceed the black citywide proportion of 19% -- going from 19% black in the South End to 70% in the Bay neighborhood. There are 8 neighborhoods that exceed the Latino proportion of 17% -- with 18% Latino in Bay to 81% in Memorial Square (Springfield Planning

17

Department 1993).

There are not any neighborhoods that represent the citywide proportions of three groups but there are some that contain more proportional representation of two groups.

a. Pine Point is 63% white, 29% black, but only 9% Latino.
b. Liberty Heights/Atwater is 83% white, 16% Latino, but only 6%     black.
c. Sixteen Acres is 84% white, 13% black; but only 4% Latino.
d. South End is 55% white; 34% Latino; and 19% black.
(1990 Census)

Six Corners is the neighborhood with nearly equal proportions amongst the three groups: 41% white; 36% Latino; and 34% black. The Metro Center is 56% white; 30% Latino; and 21% black. These are poor communities (representing the 5th and 2nd highest percentage of families below poverty level; 6th and 11th highest percentage of residents who are unemployed; and 5th and 3rd lowest median family income) [Springfield Planning Department 1993].

What is the significance of detecting and correcting patterns of racial segregation? First and foremost, the principle of open and fair housing is a fundamental right of a democratic society. Also, racial segregation tends to lock blacks and Puerto Ricans into neighborhoods that are poor; jobless; consist of older housing stock and contain a majority renter-occupied dwellings suggesting less community land-use control. As a pragmatic matter, minorities have long recognized if they cannot get decent housing in their own neighborhoods because of private and public disinvestment they must integrate white ones to get access to better quality housing. There are some who advocate choosing either neighborhood revitalization or residential dispersion as the best vehicle for providing good housing to poor and minority residents. I believe our goal should be to give Puerto Rican and black citizens equal access to affordable and quality housing both *within and outside* of their communities and let them choose to stay or venture into a new

18

environment. The existence of systemic racial segregation suggests we are far from a color-blind society. We need affirmative remedies in the areas of housing, employment, and voting rights to reach our goal of becoming a multiracial democratic society.

# References

Interview (1995a). Subject A. April 7, 1995.

Interview (1995b). Subject B. April 8, 1995.

Bauer, F. (1975). *At the Crossroads: Springfield, Massachusetts, 1636-1975*. Springfield, MA: USA Bicentennial Committee of Springfield, Inc.

Bratt, R.G. (1989). *Rebuilding a Low-Income Housing Policy*. Philadelphia: Temple University Press.

Davis-Harris, J.G. (1976). *Springfield's Ethnic Heritage: The Black Community*. Springfield, MA: USA Bicentennial Committe of Springfield, Inc.

Demerath, N.J., III and, & Williams, R.H. (1992). *A Bridging of Faiths: Religion and Politics in a New England City*. Princeton, N.J. Princeton University Press.

Massachusetts Commission Against Discrimination. (1992). *Report on Civil Disorders: Could it happen here?* Boston: Massachusetts Commission Against Discrimination.

Massey, D.S. & Denton, N.A. (1993). *American Apartheid: Segregation and the Making of the Underclass*. Cambridge, MA: Harvard University Press.

Springfield Council of Social Agencies [SCSA]. (1942). *The Social Needs of Negroes in Springfield, Massachusetts*. Springfield, MA: Springfield Council of Social Agencies.

Springfield Planning Department. (1993). *Springfield and its Neighborhoods: Statistical Profile with Selected Population, Housing, Economic and Social Data from the 1990 U.S. Census. Statistical Profile*. Springfield, MA: Springfield Planning Department.

U.S. Census. (1952). *County and City Data Book: 1952*. Washington, D.C. Government Printing Office.

U.S. Census. (1960). *Census Tracts in Springfield-Chicopee-Holyoke, Mass., and Adjacent Area*. Washington D.C. Government Printing Office.

U.S. Census. (1962). *County and City Databook: 1962*. Washington, D.C. Government Printing Office.

U.S. Census. (1970). *Census Tracts in Springfield-Chicopee-Holyoke, Mass.-Conn., SMSA: 1970*. Washington, D.C. Government Printing Office.

U.S.Census. (1972). *County and City Databook: 1972*. Washington, D.C. Government Printing Office.

U.S.Census. (1980). *Census of Population and Housing (1980), Census Tracts. Springfield-Chicopee-Holyoke, Mass.-Conn. Standard Metropolitan Statistical Area*. Washington, D.C. Government Printing Office.

U.S.Census. (1983). *County and City Databook: 1983*. Washington, D.C. Government Printing Office.

U.S.Census. (1988). *County and City Databook: 1988*. Washington, D.C. Government Printing Office.

U.S.Census. (1992). *1990 Census of Population and Housing*. Summary Tape File 3A. CD90-3A-26. Washington, D.C.: Bureau of the Census (issued September 1992).

U.S.Census. (1994). County and City Data Book: 1994. Washington, D.C.: Government Printing Office.

United States Commission on Civil Rights. (1972). *Issues of Concern to Puerto Ricans in Boston and Springfield: A Report of the Massachusetts State Advisory Committee to the United States Commission on Civil Rights*. Washington D.C.: Government Printing Office.

21

# EXHIBIT B
## (Part 1)

# Owning a Place to Call Home:

## An Analysis of Fair and Subprime Lending in the Springfield Metropolitan Area



December 2003

Prepared by:

Regional Information Center
Pioneer Valley Planning Commission
26 Central Street
West Springfield, MA 01089

SFP03131

## EXECUTIVE SUMMARY

The Pioneer Valley Planning Commission (PVPC), as the designated regional planning agency for the Hampden and Hampshire county areas, strives to plan for and promote an environment in which business and residents can prosper together. One of the essential components for any region's success is homeownership, because it ties residents to their immediate communities while also providing economic opportunity and stability for individuals and families. PVPC decided to analyze fair and subprime lending in the Pioneer Valley after questions about mortgage lending practices arose during strategy sessions for the Plan for Progress, the region's economic development plan. Recent national economic developments, studies conducted by federal agencies, and studies of local practices in other regions reinforced our commitment to investigate this complex issue here in the Pioneer Valley.

The purpose of this study is to create a detailed analysis of the regional home lending market with an emphasis on fair lending practices and subprime lending. We examined lending market statistics for the Springfield Metropolitan Statistical Area (MSA) from 1996 through 2001. The analysis includes trends across the region and patterns of lending by census tract. The fundamental question driving our research is: *Do similar applicants receive similar treatment?* Equal access and fair treatment in the lending market are important for both disadvantaged residents and the vitality of the region's urban core because of the significant economic benefits of homeownership.

Analyzing data on the volume of loan applications and the rate of denial for mortgages provides valuable information regarding fairness. The two principal sources of data for this study are the U.S. Census Bureau and the annual release of Home Mortgage Disclosure Act records by the Federal Financial Institutions Examination Council. This study uses various methods to compare lending statistics of different loan applicants to provide the most objective, accurate, and thorough report possible. A complete explanation of data sources, definitions, and methods may be found in the Methodology section of the full report. The main sections of this report are 1) an overview of the regional lending market; 2) an analysis of fair lending based on trends and patterns in lending statistics by race, ethnicity, income, and geography; and 3) an examination of the subprime lending market.

SFP03132

### Regional Lending

Between 1996 and 2001, the regional lending market has grown in volume and value, which is encouraging news for the Springfield MSA. The impact of macroeconomic shifts and remarkable fluctuations in interest rates across the nation are evident in the local lending market. The market for refinance loans, for example, experienced dramatic changes over the years as homeowners responded to the opportunity for savings presented by record low interest rates in 1998 and 2001. Refinance applications more than doubled between 1997 and 1998 from 7,129 to 16,149. By 2001, at 20,758, the volume of refinance loan applications was almost three times the 1997 level and accounted for 61 percent of all home loan applications in the Springfield MSA. The volume of federally insured (FHA) and home improvement loan applications held constant between 1996 and 2001, while conventional loan application volume increased by 37.5 percent from 6,006 to 8,260.

The outcome of loan applications varied by type of loan. Most notably, the approval rate in the refinancing market fluctuated dramatically. Between 1998 and 2000 the approval rate for refinance loans dropped from 69 to 40 percent. Home improvement loans showed a consistently decreasing approval rate from 1996 to 2001 from 63 percent to 50 percent. Conventional loan approval rates showed slight change from year to year with a high of 83 percent in 2001 and a low of 78 percent in 1998. FHA loan approvals were consistently above 80 percent after an increase of 10 percent from 1996 to 1997.

The total value of all loans along with the average value of individual loans grew between 1996 and 2001. The total value of loans originated in the Springfield MSA increased 93 percent from roughly $1.1 billion in 1996 to about $2.2 billion in 2001. The total and average value of FHA, home improvement, and conventional loans increased steadily during this period. The average value of conventional home loans increased from $108,108 in 1996 to $116,185 in 2001. The exception to this trend was in the refinance market, which experienced multiple dramatic shifts in annual total value and a sharp dip in the average value of loans in 2000.

SFP03133

Following a national trend, the types of lending institutions that are doing business in the Pioneer Valley region also appear to be shifting. A comparison of loan application volumes for local lending institutions (defined as headquartered in the Pioneer Valley) and non-local lending institutions in 1997 and 2001 indicates that non-local lenders have increased their share of the lending market in the Springfield MSA. This development raises concern because of the notable differences in loan application outcomes between local and non-local institutions. Locally headquartered lenders had a loan approval rate of 85 percent in 1997 and 89 percent in 2001. In contrast, the loan approval rate for non-local institutions was significantly lower at 67 and 65 percent in 1997 and 2001, respectively. Because non-local lenders increased their control of the local market in 2001 and because they approved loan applications at a significantly lower rate, potential borrowers in 2001 had less access to institutions where they would be more likely to be approved for a home loan than they did in 1997.

### Fair Lending

The analysis of fairness in lending is based on the assumption that significant differences in loan outcomes among racial and ethnic groups and across communities indicate unfair lending practices. However, it is difficult to distinguish differential lending practices based on justifiable measures of risk and ability to pay from patterns of discrimination based on race. An applicant's credit history, employment, debt-to-cash ratio, and collateral are some of the legitimate factors that influence the outcome of loan applications. Therefore, before we even consider an applicant's race or ethnicity, we already know that as an applicant's income increases so does his or her likelihood of receiving a loan.

We used four methods to analyze the fairness of the lending market. These methods include: 1) surveying the volume of lending activity geographically, 2) analyzing loan outcomes by characteristics of loan applicants, 3) examining the market share of loan activity, and 4) comparing loan outcome ratios by census tract. A number of distinctive patterns in loan activity and outcomes in the lending market emerge from this investigation.

The first method compares the average number of loan approvals per year with the number of housing units in each census tract to measure the volume of lending activity. We found a striking

SFP03134

geographical pattern of loan activity throughout the region. Not only are census tracts with the lowest levels of loan activity concentrated in the urban core of Chicopee, Holyoke, and Springfield, but these census tracts are also concentrated within particular neighborhoods of the cities themselves. High levels of lending activity primarily appear in areas with the highest median incomes. This pattern is not surprising given the strong relationship between income and homeownership. However, people who live in communities composed predominantly of persons of color are disproportionately disadvantaged in the lending market because these communities also tend to have low median incomes.

Analyzing loan outcomes by applicant demographics uncovers perhaps the most striking finding of this study. Dramatic disparities emerge in the comparison of loan denial rates across racial and ethnic groups. As the data in the graph below demonstrates, African-American and Latino applicants consistently had higher loan denial rates than white applicants regardless of income level. Even high-income African-American and Latino applicants, those with the greatest ability to pay, are denied home loans three times more often than high-income white applicants. In fact, Latino and African-American applicants of all income levels experience higher



denial rates than all but the very lowest income white applicants. The denial rates of African-American and Latino applicants also do not decrease at the same rate at which denial rates for white applicant's decline. Note that white applicants have approximately a 15 percentage point difference in denial rates between the highest and lowest-income applicants. Latino applicants, on the other hand, have less than a 10 percentage point difference.

SFP03135

Evaluating the market distribution of applications and denials by race and ethnicity provides a third method to consider differences in the lending market. The share of loan denials for white applicants is less than their share of all applications. More specifically, white applicants represent nearly 70 percent of all loan applications completed in the Springfield MSA, but they represent only 45 percent of all loan denials. Meanwhile, the opposite is true for African-American and Latino applicants, whose share of loan denials is more than their share of applications.

The final method for examining fairness involves calculating a loan approval ratio—the total number of loans approved per loan denied from 1996 to 2001—in order to compare census tract characteristics to home loan application outcomes. This comparison, further supported by statistical testing, provides an opportunity to identify those factors that may or may not influence loan dispositions. The results of a partial correlation statistical analysis show that the percentage of persons of color for a particular census tract has a significant inverse relationship with the approval ratio—as the percent of persons of color rises, the ratio of loans approved to loans denied drops. Statistical testing also controls for other variables that may simultaneously influence the approval ratio. In other words, when factors such as income, age, and housing stock are controlled, the racial and ethnic characteristic of a census tract is a significant predictor of loan outcomes.

### Subprime Lending

Analysis of subprime lending is important in understanding the fairness of lending in the Pioneer Valley. Subprime lending is the practice of making higher interest rate loans to applicants who present additional risk to the lender. Between 1996 and 2001 the actual number of subprime lenders grew by 10, or 38 percent. Subprime lenders' share of applications grew steadily from 1996 to 2000 and then dipped in 2001. The percent of all lenders that were subprime, however, was about 25 percent at the beginning and end of the study period, indicating a similar rate of growth for prime and subprime lenders overall. Subprime lenders' share of refinance loan applications, their largest share of any single type of loan, did not follow the overall trend, but peaked in 1997 and 2000 when mortgage rates were higher than in previous years.

SFP03136

Subprime loan application outcomes and market shares of loan activity distinguish subprime and prime lending. Subprime approval rates are less than approval rates for all loans by at least 20 percentage points for every year of our study. In 2000, as the approval rate for all loans fell to a low of 59 percent, subprime approval rates increased to 37 percent after four years of decline starting from 41 percent in 1996. The subprime market share of loan originations was significantly less than that of subprime applications, indicating high loan denial rates from subprime lenders.

Refinance and conventional loan denial rates were consistently higher for subprime loans than prime loans. In 1997, the denial rate for all subprime conventional loan applications was 21 percent as compared to eight percent for prime conventional loan applications. The denial rate for all refinance subprime loans was 3.5 times that for prime lenders in 2001. Significant differences in denial rates also exist across income groups. In 1997, the denial rate for high-income applicants for subprime refinance loans (21%) was the same as for low-income applicants for prime refinance loans. In 2001, the denial rates for these same groups were higher, but remained similar, at 36 and 34 percent, respectively.

Significant patterns emerge when comparing census tracts with the highest and lowest subprime market share of loan activity, measured by the volume of subprime loan applications. Census tracts with high subprime shares of loan applications in 2001 had larger populations of persons of color, were younger, and had significantly lower incomes. Additionally, far less of the total housing stock was owner-occupied, and owner-occupied housing stock was of less value in census tracts with high subprime market shares. In 2001, all but one of the census tracts with the highest subprime market share of loan applications were located in Springfield, and the remaining census tract was in Holyoke. A similar trend of subprime loan activity concentrated in the urban core was also evident in 1997. In fact, a majority of the census tracts that had twice the average market share of subprime loan applications in 1997 also had twice the average in 2001.

The volume of subprime loan applications by census tract reflects, in part, where subprime lenders are actively marketing their product. As evidenced by the geographical concentration of subprime applications and the characteristics of these same areas, the data indicates that

SFP03137

subprime lenders may be targeting their efforts on low-income communities of color. The similarity of census tracts with high subprime loan activity in 1997 and 2001 suggests the on-going nature of these practices over time.

In conclusion, while this study may bring up many more unanswered questions, the goal is to provide a detailed description and thorough analysis of the regional home lending market. Significant patterns emerge through the evaluation of lending statistics that raise important questions and challenges for the region's residents, financial institutions, and political and economic leaders. Understanding the impact that unfair lending practices have on the continued success and vitality of the Pioneer Valley is essential in moving toward solutions. Our hope is that this study will initiate discussion addressing these issues, and will contribute to on going efforts to make the Pioneer Valley a place everyone can call home.

SFP03138

## Table of Contents

INTRODUCTION.................................................................................3

Goals and Questions.........................................................................5

METHODOLOGY.............................................................................7

Sources.............................................................................................7
Data Modifications............................................................................9
Definitions......................................................................................10
Measures........................................................................................13

REGIONAL LENDING.....................................................................15

Volume............................................................................................15
Outcomes........................................................................................16
Value...............................................................................................17
Institutions......................................................................................19

FAIR LENDING...............................................................................23

Lending Activity Ratio.....................................................................24
Denial Rates....................................................................................27
Market Distribution..........................................................................32
Approval Ratio.................................................................................34

SUBPRIME LENDING.....................................................................45

Subprime Volume............................................................................45
Subprime Outcomes........................................................................46
Subprime Value...............................................................................47
Subprime Trends.............................................................................48

APPENDIX.......................................................................................57

SFP03139

## INTRODUCTION

The Pioneer Valley Planning Commission (PVPC), as the designated regional planning agency for the Hampden and Hampshire county areas, strives to plan for and promote the continued growth and prosperity of businesses and residents across the region. As we began to orchestrate the revision of the region's economic development plan, the Plan for Progress, questions emerged region from discussions about urban investment regarding the fairness of the mortgage lending market in the Pioneer Valley. Concurrently, increasing national attention has been focused on this complex issue as a result of the proliferation of subprime lending in the 1990s and the increasingly negative impact of predatory lending.

Understanding and analyzing the "fairness" of mortgage lending is challenging for a number of reasons. A report published by the Urban Institute in 1999 identifies two characteristics of the lending market that contribute to the difficulty in measuring the prevalence of discrimination. The first characteristic is the complex series of stages that are involved in the lending process, which means that "discrimination could be occurring at any one or more of these, and it could take different forms at different stages."[1] The second characteristics identified by the Urban Institute is the "legacy of economic inequality between whites and minorities that still exists today...[and] includes racial and ethnic differences in characteristics that influence the creditworthiness of any mortgage applicant—income, accumulated wealth, property values in minority neighborhoods, and credit history."[2] Further complicating the issue is the challenge of distinguishing between justifiably different lending terms for borrowers with distinct risk factors and disparate treatment of borrowers based on characteristics unrelated to their credit worthiness.

A recent publication by the Federal Reserve Bank of Boston notes that "subprime lenders have been found to target people in particular communities and groups, regardless of their ability to

---

[1] Turner, Margaret Austin and Felicity Skidmore. "Mortgage Lending Discrimination: A Review of Existing Evidence." *The Urban Institute.* June 01, 1999. p. 3.
[2] Ibid., p. 3.

SFP03140

qualify for better loans."[3] While we found an abundance of national research, we found little analysis of the local lending market in the Pioneer Valley.

Equal treatment of loan applicants according to appropriate measures of loan worthiness is an important and vital component of the successful economic development of the Pioneer Valley. Homeownership provides individuals and families with economic opportunity and stability through the development of equity and credit, while also establishing their financial connection to the economic, social, and political life of the community. For example, the economic role of homeownership is significant because "the equity that has accumulated in homes is one of the largest components of U.S. household wealth."[4] Thus, while buying a home is a personal choice, the benefits of homeownership and the fairness of the home buying process have ramifications for the entire region's community and economic life. For these reasons, PVPC committed to conduct this study of the issue in the Pioneer Valley.

To the best of our knowledge, this study is the first of its kind to focus on the Pioneer Valley. We have developed the study with multiple target audiences in mind. Community and economic development organizations, the banking and lending industry, and local housing agencies will hopefully use the study to better understand lending market trends in the region and use that knowledge to plan for a better tomorrow. By presenting the data as clearly, objectively, and accurately as possible we hope to facilitate the ongoing process of improving the region's lending industry to serve all of our residents fairly and make this region a place for all to call home.

This report is organized into a number of sections. Beginning with a brief discussion of the goals and questions that guided the study, the report continues with a detailed methodological discussion. The Methodology section reviews the sources, data modifications, definitions, and measures that were used in data analysis and that are discussed throughout the report. The Regional Lending section provides a synopsis of the lending market to demonstrate the activity

---

[3] O'Sullivan, Stephen. "Predatory Lending: Attempts to Plug the Money Drain." *Communities and Banking*. Federal Reserve Bank of Boston. Spring 2003. V.14, n. 2.
[4] Connor, Glenn B., Thomas A. Durkin and Charles A. Luckett. Federal Reserve Board Division of Research and Statistics. April 1998. Accessed on 08/15/03 at: http://www.federalreserve.gov/Pubs/Bulletin/1998/199804lead.pdf.

- 4 -

and trends that characterize the Springfield MSA over the six-year study period. The Fair Lending section investigates questions of fairness by comparing the volume of loan activity and analyzing loan outcomes among applicants with different demographic characteristics and across geographical areas. The final section, Subprime Lending, assesses changes in the subprime lending market and provides a detailed comparison of subprime lending in 1997 and 2001.

*Goals and Questions*

The goal of this study is to analyze the Pioneer Valley region's lending market, detailing fair and subprime lending practices. The study examines lending market statistics throughout the Springfield Metropolitan Statistical Area (MSA) from 1996 through 2001.[5] This analysis includes overall trends in the region and patterns of lending by census tract. The following questions shaped our research:

> - What changes occurred in the lending market between 1996 and 2001 in terms of loan volume, outcomes, and value?
> - What is the market share of local banks and financial institutions compared to regional or national institutions?
> - Do lending statistics indicate differential lending practices based on characteristics of borrowers or communities?
> - What is the market share of subprime lenders and how has it changed between 1996 and 2001?
> - Does the market share of subprime lenders change based on the characteristics or geographic location of the borrower?
> - Are subprime lenders targeting certain groups of people or geographic areas in the Springfield MSA?

Simply stated, these questions reflect our goal to determine if similar applicants receive similar treatment. For example, while low-income applicants would be expected to have higher denial rates, justified by their lesser ability to pay, do all low-income applicants have similar loan outcomes regardless of other characteristics? Another important goal of this study is to gain a better understanding of the subprime loan market and to examine whether subprime lenders target certain groups more than others.

SFP03142

In providing a description and analysis of the lending market, we hope to contribute to the ongoing enhancement of mortgage lending practices, including the improvement of services to those groups or areas that have traditionally been underserved. Causal questions about why the lending market functions as it does are not addressed and conclusions about particular lending institutions are not made in this study.

---

[5] The Home Mortgage Disclosure Act requires the collection and release of lending data for metropolitan areas only. Data is not available for areas of the Pioneer Valley outside of the Springfield MSA; therefore, this study only includes communities within the Springfield MSA.

SFP03143

## METHODOLOGY

### Sources

The two principal sources of data used throughout this study are the U.S. Census Bureau and the annual release of Home Mortgage Disclosure Act (HMDA) records by the Federal Financial Institutions Examination Council (FFIEC). The U.S. Census Bureau releases a wide variety of data based on surveys completed every ten years.[6] The 1975 HMDA requires lenders to annually report the number and disposition of home loan applications.[7]

The HMDA data used in this study include disposition statistics for federally insured (FHA), conventional, refinance, and home improvement loans for single to four family residences and demographic information about applicants.[8] The FFIEC releases the information to regional depositories where it is available to the public at no charge. PVPC is a local depository for HMDA data.

The FFIEC compiles aggregate lending data for all Metropolitan Statistical Areas (MSA) in the United States.[9] The Springfield MSA, however, does not include all of the towns of the Pioneer Valley Region. The map on the following page shows all of the census tracts in the Hampden and Hampshire county areas as well as the Whately/Sunderland census tract in Franklin County. The shaded portions of the map represents the Springfield MSA.[10] In the following three cases, a town or city is part of a census tract that is not entirely included within the Springfield MSA.

- Census tract 0408 includes Whately and Sunderland, but only Sunderland is part of the Springfield MSA.
- Census tract 8130 encompasses Blandford, Chester, Granville, Russell, and Tolland, but only Russell is part of the Springfield MSA.

---

[6] Census information can be accessed by using the"American FactFinder" feature of the U.S. Census Bureau website at www.census.gov.
[7] 12 United States Code. §§ 2801-2810 (2003).
[8] Federal loan programs include Federal Housing Administration insured (FHA), Farm Service Agency or Rural Housing Service (FSA/RHS) and Veterans Administration guaranteed (VA). For simplicity, all Federal loan programs will be referred to as FHA in this report.
[9] Metropolitan Statistical Areas are defined by the U.S. Office of Management and Budget.
[10] The Springfield MSA includes Agawam, Amherst, Belchertown, Chicopee, Easthampton, East Longmeadow, Granby, Hadley, Hampden, Hatfield, Holyoke, Huntington, Longmeadow, Ludlow, Monson, Northampton, Palmer, Russell, South Hadley, Southampton, Southwick, Springfield, Sunderland, Ware, West Springfield, Westfield, Wilbraham and Williamsburg.

SFP03144

- Census tract 8226 includes Chesterfield, Goshen, Huntington, Westhampton, and Williamsburg, but only Huntington and Williamsburg are part of the Springfield MSA.

In these cases, the census data for the entire census tract were used with lending statistics for only the towns within the Springfield MSA. Demographic characteristics such as median income, race, ethnicity, household type, housing value, vacancy rate, housing units, and housing ownership for individual census tracts were taken from Summary File 3 of Census 2000.[11]



The Springfield Metropolitan Statistical Area (MSA)
Compared to Hampden and Hampshire Counties with Census Tract Boundaries

The Federal Depository Insurance Corporation (FDIC), along with the Office of Thrift Supervision (OTS), annually collect data on deposit balances. The data for the Hampden and

---

[11] Summary File 3 is sample data derived from the long-form surveys that are provided to 1 in 6 households and are available at: www.census.gov.

SFP03145

Hampshire county areas were utilized in this report to determine where lending institutions are based and how many offices they have in the region.[12]

*Data Modifications*

Aggregate lending statistics, released by the FFIEC, for the Springfield MSA were utilized to provide an overview of the activity and characteristics of the regional lending market. The FFIEC compiles aggregated data by income and race/ethnicity and these reports were used as a means to analyze of the "fairness" of the overall lending market.

At a more detailed level, the characteristics of individual census tracts were compared to HMDA lending statistics, also available by census tract. To make this comparison possible, however, a fraction of census tracts were manipulated. The manipulation of census tract data was necessary because HMDA data are based on census tract definitions from 1990, a number of which were changed for Census 2000. These changes were made with the intent of providing the most rational and accurate analysis possible given the constraints of the data.

The modifications included the consolidation of 8 census tracts into 4, the expansion of 7 census tracts into 14 and the renaming of 2 census tracts.[13] HMDA data were added together when two 1990 census tracts were merged for Census 2000 to create matching data. HMDA data were duplicated when 1990 census tracts were divided into two for Census 2000. The duplication of data slightly altered the picture of total lending activity in the individual census tract, but approval and denial rates remain unchanged. We felt this was the most accurate representation possible given the limitations of available data.

In addition to these changes, a small group of census tracts, which include the five colleges of Hampshire County, were omitted from our analysis. The vast majority of people in these census tracts are college students living on campus; therefore, very little household data are available for

---

[12] The information is presented in market share reports and is available online at www.fdic.gov.
[13] Consolidated 1990 census tracts include: 8010 and 8011.01 into 8011.01; 8105 and 8106.02 into 8106.02; 8219 and 8219.02 into 8219.02; 8221 and 8222 into 8222. Expanded 1990 census tracts are: 8104.02 into 8104.03 and 8104.04; 8129.00 into 8129.02 and 8129.03; 8132.01 into 8132.04 and 8132.05; 8132.02 into 8132.06 and 8132.07; 8134.02 into 8134.03 and 8134.04; 8201 into 8201.01 and 8201.02; 8202.01 into 8202.03 and 8202.04. Census

SFP03146

these census tracts.[14] The remaining eight colleges in the Springfield MSA occupy only portions of a census tract and, therefore, were not omitted.

Two types of census data were also modified for the purposes of consistency and statistical analysis. While much of the census data are provided in the form of percentages, household income and median home values are not. Because uniformity is preferred for statistical analysis, these two variables were converted to percentages of the median Springfield MSA values. To calculate this percentage, the median household income of an individual census tract was divided by the Springfield MSA median household income.

$$Percent\ of\ Springfield\ MSA\ Median\ Income = \frac{Census\ Tract\ Median\ Income}{Springfield\ MSA\ Median\ Income}$$

The result represents what percentage the household income of a census tract is in relation to the MSA median. For example, the median household income of the Springfield MSA is $40,740. Eighty percent of the median equals $32,592 ($40,740 multiplied by .8) and 120 percent of the median equals $48,888 ($40,740 multiplied by 1.2).

### Definitions

**Income.** The income data used to describe the MSA, census tracts, cities, and towns are from Census 2000. HMDA income data are presented as proportions of the MSA median. Since 1997 the FFIEC has compiled HMDA data using five income categories to describe borrowers income in relation to the MSA median: less than 50 percent, 50 to 79 percent, 80 to 99 percent, 100 to 119 percent and over 120 percent. For consistency and simplicity the categories will be referred to as follows: *low-income* indicates less than 50 percent of the MSA median, *moderate-income* specifies 50 to 79 percent of the MSA median, *middle-income* signifies 80 to 119 percent of the MSA median, and *high-income* corresponds to over 120 percent of the MSA median.[15]

---

tracts renamed from Census 1990 to Census 2000 include: 8104.11 changed to 8104.14 and 8129.12 changed to 8129.01.
[14] Omitted census tracts include: 8212.00 (Mount Holyoke College), 8220 (Smith College), 8208.02 (Hampshire College), 8204 (University of Massachusetts) and 8206 (Amherst College).
[15] In 1996, the FFIEC grouped low and moderate-income applicants together within the single category of less than 80 percent of the MSA median. This data is omitted when necessary for consistency.

SFP03147

**Subprime Lender/Lending.** The U.S. Department of Housing and Urban Development (HUD) uses a multi-faceted approach to identify and categorize lenders as subprime. The list of subprime lenders that HUD provides to the public was used in this report.[16] Subprime loans are loans that carry higher interest rates for applicants who present additional risk to the lender. Throughout this report, non-subprime lenders are referred to as "prime" lenders. These categories are not exact as both prime and subprime lenders make prime and subprime loans. Despite this inconsistency, the study utilizes the HUD categorization of lenders because actual subprime loans are not differentiated in the HMDA data.

**Predatory Lender/Lending.** The subprime market is often considered to serve as an umbrella or breeding ground for predatory lending. Defining practices that are predatory, however, is challenging. Edward M. Gramlich, member of the Federal Reserve Board, noted in 2000 that "no law administered by the Board has a statutory or regulatory definition of predatory lending."[17] Gramlich continues that predatory lending is interpreted broadly by some groups to mean loans with unfair terms according to the risk of lending to a particular applicant, while others interpret predatory lending narrowly as a set of specific practices by individual lenders. Loan terms that may be deemed predatory include balloon payments, negative amortization, prepayment penalties, mandatory arbitration, and certain insurance and financing plans. Sales practices related to predatory lending include manipulating borrowers to accept unaffordable or unusually high rates or fees through misinformation or aggressive sales tactics, taking unfair advantage of an applicants lack of understanding of loan terms, or making loans regardless of the borrowers' ability to pay.

Predatory lending is not directly analyzed in this study because of the loose definition of and inability to identify predatory loans. Noting the role of the subprime market in predatory lending, however, is valuable. A HUD publication from June 2000 entitled *Curbing Predatory Home Mortgage Lending* identifies several factors that contribute to the presence of predatory lending

---

[16] A detailed report of the methodology to determine subprime lending was forthcoming from the HUD at the time of publication. Information and datasets were accessed on or before November 20, 2003 at: http://www.huduser.org/datasets/manu.html.

[17] Letter from Edward M. Gramlich, Member of the Board, Federal Reserve to the Honorable Phil Gramm Chairman of the Committee on Banking, Housing and Urban Affairs. April 28, 2000. Accessed at: http://banking.senate.gov/docs/reports/prelend/fed.html on July 24, 2003.

SFP03148

within the subprime market. The report concludes that subprime borrowers may be more easily manipulated because of past issues obtaining credit, an immediate need for funds, and insufficient competition in communities with high subprime lending activity. Many of these communities are low-income and minority communities. [18] Meanwhile, the companies that provide subprime loans are not subject to the same federal regulations and oversight as are most prime lenders. The fact that about 70 percent of loans originating from the subprime market have prepayment penalties highlights the pervasiveness of predatory practices. [19]

**Race and Ethnicity.** Racial and ethnic categories may be defined in various ways. For Census 2000, the U.S. Census Bureau modified the options available for individuals to identify their race and ethnicity by allowing two or more races to be chosen along with the separate yes or no categorization of Hispanic/Latino. The FFIEC uses such categories as American Indian/Alaskan Native, Asian/Pacific Islander, Black, Hispanic, White, Other, Joint and Race Not Available to describe the racial and ethnic characteristics of applicants. The Census Bureau defines Hispanic and Latino as equivalent groups. Because of the complexity and different application of terms used by various data sources, defining a single set of terms helps clarify whom this report intends to describe. The terms used in this report include white and African-American representing 'white, not Hispanic' and 'black, not Hispanic.' The term Latino is used for both Latino and Hispanic. The report also uses the terminology of 'persons of color' to refer to individuals who are not identified as 'white, not Hispanic.'

**Types of Lending Institutions.** For purposes of this study, local banks are defined as institutions that have more than half of their branch offices within the Springfield MSA according to FDIC data. All other lending institutions are referred to as non-local. The number of applications, originations, approvals and denials for individual lending institutions is available through HMDA data. Lending statistics were aggregated for individual local lending institutions and then subtracted from the lending statistics for the entire Springfield MSA. This calculation allowed for local and non-local comparison and analysis of loan activity and outcomes.

---

[18] HUD-Treasury Task Force Report. *Curbing Predatory Home Mortgage Lending.* June 2000. p. 18. Accessed at: http://www.huduser.org/publications/hsgfin/curbing.html on September 12, 2003.
[19] Mortgage Information Corporation Loan Performance System, 1999 Q3 cited in: Curbing Predatory Home Mortgage Lending. HUD-Treasury Task Force on Predatory Lending. June 2000. p. 93.

SFP03149

*Measures*

**Lending Activity Ratio.** To investigate and understand the volume of lending activity across census tracts of different size, we compared the average number of loans approved per year with the number of housing units in each census tract. The result, referred to as the Lending Activity Ratio (LAR) throughout this report, indicates the average annual number of approvals per housing unit, by census tract. The ratio is determined using the following method. The average number of approvals per year from 1996 through 2001 is divided by the number of housing units in each individual census tract based on the Census 2000 definition. The following equation represents this calculation:

$$Lending\ Activity\ Ratio = \frac{\left(A_{1996} + A_{1997} + A_{1998} + A_{1999} + A_{2000} + A_{2001}\right)/6}{H}$$

A = Number of loan approvals

H = Number of housing units

For example, a lending activity ratio of .05 means that there was an average of one loan approved per year for every 20 housing units (1:20) or five loans approved per year for every 100 housing units.

For those census tracts that were expanded for Census 2000, an additional modification was necessary to compute the lending activity ratio, because the duplication of the HMDA data, in this case, led to inaccurate lending activity ratios. The number of approvals, therefore, was calculated as a proportion of the number of housing units between the two census tracts, yielding the same LAR for both census tracts.

**Approval Ratio.** We also created an aggregate ratio indicating the number of approvals per denial by individual census tract from 1996 through 2001. The following equation represents the calculation of the approval ratio:

$$ApprovalRatio = \frac{A_{1996} + A_{1997} + A_{1998} + A_{1999} + A_{2000} + A_{2001}}{D_{1996} + D_{1997} + D_{1998} + D_{1999} + D_{2000} + D_{2001}}$$

A = Number of Approvals

D = Number of Denials

SFP03150

This Approval Ratio indicates how many loan applications were approved for each loan application that was denied. For example, an approval ratio of 6.5 signifies that, from 1996 through 2001, 6.5 loans, on average, were approved for every loan that was denied.

The approval ratio was used for statistical analyses. Correlation tests, conducted using statistical software (SPSS), identified the statistical significance of patterns in lending by measuring the relationship between multiple independent variables and testing their influence on the dependent outcome variable. The dependent variables used include the approval ratio for all loans and the approval ratio for refinance loans. The independent variables included in our correlation calculations are: the percent of the populations that is white, not Hispanic; household median income as a percent of the Springfield MSA; the non-seasonal housing vacancy rate; median home values as a percent of the MSA median; and, the percent of owner-occupied housing.

SFP03151

## REGIONAL LENDING

Between 1996 and 2001, across the country, the home mortgage industry experienced remarkable fluctuations as a result of changes in the economy and record-breaking low interest rates. The impact of these macroeconomic shifts was evident in the Springfield Metropolitan Statistical Area (MSA). Refinance loan volume fluctuations, for example, were markedly larger than variations in other types of loans, reflecting the response of homeowners to the opportunity presented by low interest rates. The goal of this section is to provide an overview of the market as a context for understanding the subsequent discussion of fair and subprime lending. Various aspects of the market that are considered include the volume, outcome, and value of loan activity along with the characteristics of lending institutions.

### *Volume*

Figure 1 illustrates the number of loan applications completed for each type of loan between 1996 and 2001. Application statistics indicate how the demand for lending, represented by the number of people completing the application



process, has changed over time. Conventional loan applications steadily increased by 37.5 percent from 6,006 in 1996 to 8,260 in 2001. During this period, FHA and home improvement loan application numbers demonstrated stable levels of demand.

The number of applications for refinance loans, however, experienced drastic changes over the six years studied. Refinance applications more than doubled between 1997 and 1998 from 7,129 to 16,149. By 2001, at 20,758, the volume of applications was almost three times the 1997 level and accounted for 61 percent of the total number of home loan applications.

- 15 -

SFP03152

The total number of applications filed by year and by type of loan is compared to the fixed 30-year conventional mortgage rate in Figure 2. In 1998 and 2001, the mortgage rate was at record-breaking low levels of just under seven percent. The refinance loan market was most responsive to these changes. As mortgage rates hit record lows, the number of refinance loan applications increased dramatically (Figure 3). Predictably, low interest rates produced high demand for refinance loans as homeowners took advantage of the opportunity for long-term savings.



Figure 2: Total Loan Applications in the Springfield MSA & the 30-year Fixed Conventional Mortgage Rate



Figure 3: Total Refinance Loan Applications and the 30-year Fixed Conventional Mortgage Rate (1996-2001)

### Outcomes

Approval rates by type of loan, as seen in Figure 4, indicate how many of those who applied for loans were offered the opportunity to borrow money. As with application volume, the most dramatic change over time in approval rates is evident in the refinance lending market. Between 1998 and 2000 the approval rate for refinance loans dropped from 68.9 to 39.6 percent. This occurred at a time when the number of applications was falling. As fewer people were applying for refinance loans, even fewer applications were being approved. The rise in mortgage rates may in part explain this trend, as borrowing became more expensive. Home improvement loans showed a consistently decreasing approval rate from 1996 to 2001, while conventional loan

- 16 -

approval rates held steady. FHA loan approvals were consistent after a ten percent increase from

1996 to 1997. The high
approval rates for federally
insured loans (FHA) are
likely a result of the
safeguards built into these
programs and demonstrate
their success.



Figure 4: Springfield MSA Loan Approval Rates by Type of Loan (1996-2001)

Loan outcomes and the
total number of applications

are compared in Figure 5. The origination rate represents the percentage of applications that were
approved by the lending institution and accepted by the applicant. The denial rate indicates how
many applications were denied loans by the lending institutions out of the total number of loan
applications that were completed.

These rates are compared with the total number of applications further demonstrating lending
market supply and demand trends within the Springfield MSA. The origination rate steadily
declined from nearly 70 percent in 1996 to about 50 percent in 2000, after which it jumped to

about 60 percent in 2001.
The significant dip in the
origination rate coincided
with a decrease in demand
(and higher mortgage rates)
in 2000. The denial rate
remained below 20 percent
every year except 2000.



Figure 5: Loan Application Outcomes and Total Applications (1996-2001)

## Value

As the volume of applications and originations increased, so did the total value of loans over
time. Figure 6 illustrates the total value of loans originated by type of loan in the Springfield

- 17 -

SFP03154

MSA (dollar values are adjusted for inflation into 2001 dollars). Between 1996 and 2001, the total value of loans originated grew 93 percent from $1.14 billion in 1996 to $2.19 billion in 2001.

Part of the tremendous growth in the value of loans can be attributed to the dramatic increase in refinance loan activity. The total value of originated refinance loans increased 174 percent from $466 million in 1996 to $1.2



Figure 6: Total Value of Loans Originated by Type of Loan in 2001 Dollars (1996-2001)

billion in 2001. The total value of refinance loans hit a low of $256 million in 2000 as mortgage rates rose and refinance approval rates dipped. Conventional loans experienced more modest, but consistent growth with a 42 percent change over the six years from $508 million in 1996 to $724 million in 2001.

FHA and home improvement loans represent a smaller proportion of loan activity and, therefore, account for a fraction of the total value of loans originated. The value of FHA loans increased by 18 percent from $139 million in 1996 to $164 million in 2001 reaching its highest total value of $176 million in 1999. Home improvement origination values experienced the smallest percent change of seven percent with the lowest total value of $19 million in 1998 and the highest total

value of $25 million in 2001.

Figure 7 represents the average value of individual loans by type of loan (adjusted for inflation into 2001 dollars). While the



Figure 7: Average Value of Loans Originated by Type of Loan in 2001 Dollars (1996-2001)

- 18 -

SFP03155

average value for all types of loans increased from 1996 to 2001, refinance loans experienced the most variation in value over time. In 2000, when borrowing money was more expensive, the average value of refinance loans dropped to $83,540, the lowest of the six-year period. Conventional loans consistently had the highest average value from $108,108 in 1996 to $116,185 in 2001. FHA loans averaged a value of $99,244 in 1996 and steadily increased to $107,637 by 2001. The average value of home improvement loans increased from $16,047 to $22,560 over the six-year period.

*Institutions*

Changes in lending market trends also extend to the types of lending institutions that were doing business in the Springfield MSA. Comparing loan application volumes and outcomes for local and non-local lending institutions for 1997 and 2001 further enhances our understanding of the lending market as a whole.

Table 1 presents data on the actual number of applications and originations by type of lending institution. From 1997 to 2001, local institutions experienced a 54 percent increase in the volume of loan applications and a 60 percent increase in originations. Non-local institutions, however, had significantly larger increases in volume of both applications and originations with 120 and 109 percent changes respectively.

**Table 1: Volume of Loan Activity by Type of Institution**

|  | 1997 | 2001 | % Change |
|---|---|---|---|
| Local Lenders |  |  |  |
| Applications | 4,206 | 6,498 | 54% |
| Originations | 3,485 | 5,573 | 60% |
| Non-Local Lenders |  |  |  |
| Applications | 11,118 | 24,456 | 120% |
| Originations | 6,746 | 14,107 | 109% |

Figure 8 represents the local and non-local lenders' market share of applications and originations in 1997 and 2001. Local institutions had a larger share of originations than applications in both 1997 and 2001. Non-local institutions, however, increased their majority share of lending activity. From 1997 to 2001, non-local lenders' market share of applications increased from 73

SFP03156

Pioneer Valley Planning Commission

Owning a Place to Call Home

to 79 percent and their market share of originations increased from 66 to 72 percent. In other

words, in 1997, about one
in four people hoping to
secure a home loan
submitted an application to
a locally headquartered
lending institution. In 2001,
only one in five applicants
submitted a loan
application to a local
institution.



Figure 8: Market Share of Applications and Originations by Type of Lending Institutions (1997 & 2001)

Concern over the type of lending institution arises from the notable differences in loan
application outcomes between local and non-local lenders. Figure 9 facilitates a comparison of
approval and denial rates for local and non-local institutions. From 1997 to 2001, local banks
increased their approval rates from 85 to 89. This increase came at the same time that local banks
were losing market share (see Figure 8). Meanwhile, approval rates for non-local institutions

remained substantially
lower than for local
institutions. The non-local
lending approval rate
decreased slightly from 67
to 65 percent. In 2001 the
denial rate for non-local
institutions was 20 percent,
more than three times
higher than the 6 percent



Figure 9: Loan Application Outcomes by Type of Institution (1997 & 2001)

denial rate for local lenders. In comparing statistics from 1997 and 2001, local lenders had less
market share of applications and higher approval rates. This trend indicates that potential
borrowers, in 2001, had less access to the institutions where they were most likely to be
approved for a home loan than in 1997.

- 20 -

SFP03157

A number of trends and patterns emerge from analyzing the lending market and lending institutions in the Springfield MSA. Refinance loan volume, outcomes, and values fluctuated from 1996 through 2001 in response to dramatic changes in mortgage rates. While refinance loan applications and values hit record highs at the end of the study period in 2001, conclusions based on the 2001 levels of activity would not be prudent. Conventional loan activity, on the other hand, reflects a stable and consistently growing market. The much smaller FHA and home improvement lending markets maintained steady levels of activity and value. Non-local lenders increased their control over the regional market, which is concerning because non-local lending institutions deny applicants more often than local lending institutions.

Taken as a whole, the regional lending market grew in volume and value which is a positive indicator for the Pioneer Valley. Delving further into the details of lending practices, however, is essential in evaluating whether this growth has offered equal opportunity to all of our residents.

SFP03158

## FAIR LENDING

The Fair Housing Act of 1968 established a series of regulations to protect disadvantaged groups of people from housing discrimination.[20] As it relates to mortgage lending, prohibited activities include refusing to make or purchase a loan, refusing to provide loan information, or setting different terms or conditions for a loan based on race, color, national origin, religion, sex, familial status, or disability.[21]

Unfortunately, patterns of differential treatment in lending still exist some thirty-five years after this legislation passed as, "widespread evidence indicates that minority homebuyers are less likely than whites to obtain mortgage loans and, if they are successful, receive less favorable loan amounts and terms."[22] By reviewing lending data over a six-year period, this study compares and analyzes statistics to determine if variations exist by race and ethnicity, using geographical differences to further understand the issue. Significant differences in loan outcomes among racial and ethnic groups and across communities are an indicator unfair lending practices.

Before analyzing the fairness of lending in the Springfield MSA, it is important to address some of the realities of the home lending process that would hold true even if lending practices were completely fair. First, denial rates for home mortgages will decrease as an applicants income increases based on the assumption that an applicant's ability to pay, most often measured by income, is the single most influential factor in the loan approval process. Second, apart from income, other factors such as credit history or debt are legitimately relevant to obtaining a loan. Third, issues of housing stock—particularly age and condition—may influence the differences in denial rates between neighborhoods and communities.

This analysis of "fairness" includes surveying loan activity geographically, analyzing loan outcomes by characteristics of loan applicants, examining market share of loan activity, and comparing loan outcome ratios by census tract. Statistical analyses serve as an additional guide

---

[20] 42 United States Code §§ 3601-3607 (2003).
[21] Additional information is available at http://www.hud.gov/offices/fheo/FHLaws/index.cfm.
[22] U.S. Department of Housing and Urban Development Office of Policy Development and Research. "All Other Things Being Equal: A Paired Testing Study of Mortgage Lending." Final Report. April 2002.

SFP03159

to measure the influence of different factors on the probability of loan application outcomes. Statistical test results are presented to further support our conclusions about the regional lending market.

The data presented in this section demonstrate distinctive patterns in loan activity and outcomes across the lending market. Applicants of different races, ethnicities, or incomes are denied loans at vastly different rates. The most noticeable patterns include the following:

- Low rates of loan activity are geographically concentrated within the region's urban areas.
- Denial rates vary widely based on the race and/or ethnicity of the applicant regardless of income.
- The denial rates of white, Latino, and African-American applicants have different patterns and trends across income groups.
- The market distribution of applications and denials varies by race and/or ethnicity.
- Low rates of loan approvals as compared to loan denials are geographically concentrated within the region's urban areas.

*Lending Activity Ratio*

The lending activity ratio (LAR) compares the number of loans approved to the number of housing units within a particular geographical area. This ratio links the average annual volume of approved loans to the quantity of housing in one area, facilitating an evaluation of how lending activity in different areas compares to other areas in the region. In this study, lending data from 1996 to 2001 is used to calculate an average annual number of loans to compare to the number of housing units reported in Census 2000.

Map 1 displays the LAR by the 2000 census tract definitions and indicates that lending activity varied widely throughout the Springfield MSA. According to the data, all of the census tracts that have the lowest lending activity ratio (less than 2 loans annually per 100 housing units) are within the urban core of Springfield, Chicopee, and Holyoke. This low lending activity is further

SFP03160



Map 1: Average Annual Number of Home Loans per 100 Housing Units
1996 to 2001 by Census Tract

Less than 2 loans per 100 housing units
2 to 5 loans per 100 housing units
5 to 7 loans per 100 housing units
7 to 10 loans per 100 housing units
10 or more loans per 100 housing units

Community not a part of the Springfield MSA

concentrated within the cities themselves. Six adjacent census tracts in the North End, Metro Center, and South End of Springfield and a group of four census tracts in downtown Holyoke account for 10 of the 11 census tracts with the lowest lending activity ratio.

Communities with the highest lending activity ratio (10 or more loans per 100 housing units annually) include Longmeadow, Northampton, East Longmeadow, Hampden, Monson, Wilbraham, Belchertown, Ludlow, Easthampton, and Agawam. For some of these communities, significant population growth during the period of this study contributed to the high lending activity ratio. For example, Belchertown is one of the fastest growing communities in the Pioneer Valley. Considering the large number of new homes that have recently been developed, the high

SFP03161

Pioneer Valley Planning Commission ⏤ ⏤ ⏤ Owning a Place to Call Home

level of loan activity in Belchertown is not surprising. Three census tracts in Springfield (two in Sixteen Acres and one in Pine Point) and one census tract in Chicopee (the Burnett Road neighborhood) also had the highest lending activity ratio of 10 or more loans per 100 housing units.[23]

The pattern and concentration of lending activity in the Springfield MSA can largely be attributed to differences in household income, where communities of higher income have higher lending activity ratios. The



Figure 10: LAR and Median Household Income as Percent of Springfield MSA Median

relationship between household income and loan outcomes is predictable and does not, by itself, indicate a lack of fairness. Figure 10 is a bivariate scatterplot of the LAR and median household income for every census tract in the Springfield MSA. The upward sloping pattern of dots—demonstrating a positive linear relationship—indicates that as household income increases, so does the amount of lending activity. The R-square coefficient, also shown in Figure 10, equals

0.69, which indicates a fairly strong relationship between household income and the LAR.[24]

Figure 11 demonstrates the relationship between the median household income



Figure 11: Relationship of Racial Composition and Income by Census Tract in the Springfield MSA

---

[23] In some cases, large numbers of housing units in multi-unit apartment buildings, not captured in HMDA data, may explain low lending activity ratios.
[24] The R-squared value shown in Figure 10 indicates how well the relationship is explained by the linear model ($y = mx + b$). According to this model, the independent variable (x-axis) influences the outcome of the dependent variable (y-axis). The closer the R-squared value is to one, the better the model explains the relationship.

SFP03162

of census tracts in the Springfield MSA and their racial composition. During the study period, census tracts with high percentages of persons of color tended to have lower median incomes, while census tracts with the highest median incomes were predominantly white. This pattern residential segregation by race and income is important to consider when analyzing the activity of lending institutions. Because the LAR is lower in census tracts with lower median incomes, and because persons of color are concentrated in lower income neighborhoods, persons of color live in communities with disproportionately low lending activity. While less lending activity in communities of lower incomes may be justified because potential borrowers have less ability to pay, this pattern limits lower income individuals' and families' access to homeownership and the economic benefits it provides.

### Denial Rates

Studying the rates of loan application denials facilitates an analysis of the fairness of lending practices in the region by race and ethnicity. The denial rates discussed in this section include the statistics for all conventional, refinance, and FHA loans and are examined by race, ethnicity, and income to determine if differences exist across these groups.[25]

Figure 12 illustrates the denial rate for all applicants from 1996 to 2001 and demonstrates the predictable pattern that as income increases denial rates decrease. Overall, denial rates decrease steadily from 33.1 percent



Figure 12: Denial Rates for All Applicants in the Springfield MSA (1996-2001)

for low-income applicants to 11.2 percent for high-income applicants. The most significant difference in denial rates was between the low-income group, at 33.1 percent, and the moderate-

---

[25] Home improvement loans are excluded from this analysis because they are substantially different than the other home loan products and they do not address an applicant's ability to purchase a home.

SFP03163

income group, at 22.3 percent. Applicants of the two middle-income categories (80 to 99% and 100 to 119%) had the most similar denial rates of 17.3 and 16.0 percent, respectively.

Upon closer inspection, however, noticeable differences emerge in the lending statistics for applicants of different racial and ethnic groups. Figure 13 represents the denial rates for different racial and ethnic groups categorized by income.[26] As the data in Figure 13 show, African-American and Latino applicants had consistently higher denial rates than white applicants, regardless of income. High-income Latino and African-American applicants were denied home loans at roughly three times the rate of high-income white applicants. High-income white applicants had an average denial rate of 7.4 percent while high-income African-American and Latino applicants had average denial rates of 22.0 and 20.6 percent, respectively.

Denial rates for middle-income African-American and Latino applicants were approximately twice as high as white applicants with similar incomes. In the 80-99 percent income group, the denial rate was about 11.6 percent for



white applicants, 21.3 percent for Latino applicants, and 24.2 percent for African-Americans. At 100-119 percent of median income, white applicants were denied at a rate of 10.8 percent, Latino applicants at 22.6 percent, and African-American applicants at 25.0 percent.

Latino and African-American applicants of *all income groups* experienced higher denial rates than all but the lowest income white applicants. Moderate-income white applicants had a denial rate of 15.7 percent as compared to 22.0 percent for high-income African-American applicants and 20.6 percent for high-income Latino applicants.

---

[26] A complete table of data on applications and denials that are used to calculate denial rates can be found in the Appendix.

SFP03164

# EXHIBIT B
# (Part 2)

White applicants with different incomes also experienced more variation in loan outcomes than did African-American and Latino applicants with different incomes. In other words, denial rates for African-American and Latino applicants were more similar regardless of income than for white applicants. Denial rates for white applicants changed from 26.2 percent (low-income) to 7.4 percent (high-income), a 19 percentage point difference from lowest to highest income. Latino applicants experienced the least variation in denial rates with about an 8 percentage point change from 28.2 percent (low-income) to 20.6 percent (high-income). African-American applicants had the highest denial rates of any group ranging from 33.8 percent (low-income) to 22.0 percent (high-income) with a modest 12 percentage point difference from lowest to highest income applicants.

Despite the fact that, as a group, African-Americans did not have the lowest median household income according to Census 2000 data, African-American applicants consistently had the highest denial rates. Figure 14 provides median household income by race and ethnicity for the

Springfield MSA. Latino households have a significantly lower median income ($19,238) than African-Americans ($28,315), yet African-Americans consistently have the highest loan denial rates. These findings merit



Figure 14: Median Household Income by Race and Ethnicity (1999 Dollars)

further investigation to determine why African-American applicants have uniquely negative outcomes in the home lending process.

The FFIEC also provides aggregate data by race and ethnicity regarding the reason an application was denied.[27] Some of the reasons for denial include debt-to-income ratio,

---

[27] HMDA Aggregate Table 8-2: Reasons for denial of applications for conventional home-purchase loans, 1 to 4 family homes, by race, gender and income of applicant. HMDA Aggregate Table 8-3: Reasons for denial of applications for refinance loans on 1 to 4 family homes, by race, gender and income of applicant.

SFP03165

employment history, credit history, collateral and insufficient cash. In surveying this data, we did not find any significant difference by race or ethnicity in the reported reasons for loan denials. Therefore, the data do not reveal an explanation of differences in denial rates based on legitimate measures of loan worthiness, such as credit or employment history, that could explain differences among applicants with similar incomes and different racial or ethnic backgrounds.

A more detailed look at yearly denial rates for individual racial and ethnic groups provides additional insight into lending practices in the Springfield MSA. The following three graphs (Figures 15, 16, and 17) illustrate the denial rates of white, African-American, and Latino applicants for each of the six years of the study.

Figure 15 represents the denial rates for white applicants by income from 1996 to 2001. As the income of white applicants increases, their denial rates consistently decrease, as demonstrated by the downward sloping curves



Figure 15: Denial Rates for White Applicants by Income

of Figure 15. The highest denial rate in any single year for white applicants was 34 percent in 1997 for low-income applicants. The lowest denial rate was 5.9 percent for high-income white applicants in 1998. Denial rates for high-income white applicants never reached above 10.2 percent and the average denial rate was 7.6 percent. Meanwhile, the denial rates for low-income white applicants varied from 21.6 to 33.5 percent with an average denial rate of 26.2 percent.

Figure 16 illustrates the data on denial rates for African-American applicants by income from 1996 to 2001. Unlike aggregate data for African-American applicants from 1996 to 2001 and yearly data for white applicants, the denial rates for African-American applicants did not consistently decrease with increases in income. The highest denial rate for African-American applicants was 42.8 percent (low-income) in 1999 and the lowest denial rate was 11.6 percent

- 30 -

SFP03166

(high-income) in 1996.
African-Americans with
100-119 percent of median
income experienced a
denial rate between 19.7
and 30.5 percent, while
white applicants with
similar income had a denial
rate between 9.1 and 15.9
percent from 1996 to 2001.



Figure 16: Denial Rates for African-American Applicants by Income

The denial rate for high-income African-American applicants reached its highest point in 1999 at
30 percent, four times the average denial rate and three times the highest denial rate for high-
income white applicants. The lowest denial rate for high-income African-Americans was 11.6
percent (1996). In four of the six years of this study, denial rates for high-income African-
Americans were 20 percent or more.[28]

While Latino denial rates
were lower than those of
African-American
applicants, they were still
higher than white
applicants, as expressed
earlier in Figure 13. The
data presented in Figure 17
includes yearly denial rates



Figure 17: Denial Rates for Latino Applicants by Income

for Latino applicants by income. Resembling trends in the denial rates of African-American
applicants, Latino applicants did not consistently experience lower denial rates as their income
increased.

---

[28] The percent of African-American and Latino applicants, categorized as high income, is disproportionately smaller
than the percent of African-American and Latino applicants in general. The implication of this discrepancy means
that the sample size of high-income African-American and Latino applicants is smaller and may cause anomalies in
the denial rate statistics for high-income African-American and Latino applicants.

SFP03167

The variation in denial rates for low-income Latino applicants ranged from 21.9 to 33.3 percent, nearly equivalent to those for white applicants. High-income Latino applicants, on the other hand, had much higher denial rates than white applicants ranging from 11.6 percent in 1998 to a high of 32.3 percent in 2000.

The data on Latino applicants is perhaps the most striking in 2000 when low and high-income Latino applicants had only a single percentage point difference in denial rates (33.3 and 32.3 percent, respectively). The 32.3 percent denial rate is the highest in any single year of all high-income applicants of any group. Latino denial rates for 1999 are also atypical, as denial rates do not decline significantly for any income group except the highest.

Overall, the data available through the Home Mortgage Disclosure Act strongly indicates differential patterns in mortgage lending by income and race in the Springfield MSA. While the validity of different lending outcomes for applicants with higher or lower incomes is justifiable, the same cannot be said for race and ethnicity. The data demonstrate significant differences in denial rates of all African-American and Latino applicants. The differences are further highlighted when denial rates are categorized by race or ethnicity and income. Other factors that are not easily measured, such as credit history or amount of savings for a down payment, may account for some differences, but they are unlikely to explain such dramatic patterns. These findings are disconcerting and warrant attention.

### Market Distribution

Analyzing the market distribution of applications and denials provides another method to consider the differences in loan application activity and outcome. Comparing the percent of applications submitted by race/ethnicity to the percent of denials by race/ethnicity further demonstrates the discrepancies among racial and ethnic groups in the lending market.

Figures 18 and 19 illustrate the notable differences in market distribution by race and ethnicity. While white applicants represented nearly 70 percent of all applications made in the Springfield MSA between 1996 and 2001, they represented only 45 percent of all denials. On the other hand, African-American and Latino applicants accounted for a larger share of denials than of

SFP03168

applications. While African-Americans accounted for 4.2 percent of all applications, their share of denials was to 6.6 percent. Latino applicants' distributions were similar but somewhat less drastic with 4.6 percent of applications and 6.4 percent of denials. These discrepancies in market distributions by race and ethnicity are further evidence that African-American and Latino applicants are disproportionately denied home loans.

Another concern highlighted by Figures 18 and 19 is the lack of complete data collection on the race and ethnicity of applicants. The market share of applications and denials categorized as "Race Not Available" are sizeable. Race and ethnicity information was not available for almost forty percent of all loan applications that end in a denial. This is a significant portion of data that is simply unknown.



Figure 18: Percent of Applications by Race and Ethnicity (1996-2001)



Figure 19: Percent of Denials by Race and Ethnicity (1996-2001)

In writing for a proposed rule change, the Federal Reserve noted that "from 1993 to 2000 the proportion of home loan applications of all types with missing race or ethnicity data increased from about 8 percent to about 28 percent."[29] The Reserve also noted that some portion of the increase could be attributed to a rise in applications completed by phone.[30] The rule change, effective January 1, 2003, attempts to address this issue by requiring that telephone applicants be asked for their racial and ethnic information. Loan officers are required to tell the applicant that: 1) the information will not affect their loan application; 2) applicants are not required to provide the information; and 3) the information is for data collection purposes only.

---

[29] Board of Governors of the Federal Reserve System. 12 CFR Part 203. Regulation C; Docket No. R-1120. Proposed Rule. April 12, 2002.

SFP03169

Unfortunately, these later improvements in data collection do not benefit this study. Meanwhile, the statistics for the "Race Not Available" category were significant. As demonstrated in Figure 20, the denial rates for applications where race and ethnicity were not identified were the highest of any income group. In fact, the denial rate for low-income applicants for whom no racial or ethnic information was available was a startling 47.3 percent. Even high-income applicants in the

"Race Not Available" group had an exceptionally high denial rate of 27.2 percent which is five percentage points higher than the denial rate for high-income African-Americans who otherwise have the highest denial rates. While it is impossible to determine why



Figure 20: Denial Rates by Race and Ethnicity Including "Race Not Available" (1996-2001)

the denial rates were so high for "Race Not Available" applicants, or who these applicants were, these statistics are troubling because they allow for the possibility of deliberately discriminatory lending practices that cannot be tracked or investigated.

*Approval Ratio*

While data available from the Home Mortgage Disclosure Act does not include details of individual applicants and the outcome of their applications, it does provide detailed information on loan outcomes by census tract. Within the Springfield Metropolitan Statistical Area (MSA) there are 121 census tracts and Census 2000 data identifies the demographic and socio-economic characteristics of these census tracts. Comparing these characteristics to home loan application outcomes provides an opportunity to identify those factors that may or may not influence loan dispositions.

---

[30] The Federal Reserve did not speculate as to other factors that may contribute to the increase of applications that lack data on applicants' race and ethnicity. The lack of information is, however, not caused by incomplete

SFP03170

This analysis, however, does have some notable flaws. The most significant problem is that the Census 2000 data and HMDA data may not be describing the same group of people. Not all applicants currently live or will live in the neighborhood where they are purchasing property. For example, non-resident landlords might receive a loan to purchase a rental property outside of the community where they reside. Also, because the unit of observation is a census tract as opposed to an individual applicant or resident, only average characteristics are available and we cannot be certain that a loan applicant has the same characteristics as the average characteristic of the census tract where they are purchasing a home. Therefore, analysis of refinance loans alone was included because refinance loan applicants already own property in the particular census tract.

For purposes of this analysis we calculated a loan approval ratio for each census tract—the total number of loans approved per loan denied from 1996 to 2001. We created an approval ratio for all loan types and for refinance loans. In statistical terms the approval ratio is the dependent, or outcome variable and we expect the value of the approval ratio to be influenced by other factors, referred to as independent variables. We selected these independent variables based on our assessment of what factors might impact the approval ratio for home loans. We considered all of the following variables from Census 2000 data:

- Median household income;
- Median value of owner-occupied housing stock;
- Percent of households headed by single mothers;
- Percent of housing stock that is vacant and is not seasonal;
- Percent of the housing stock that is owner-occupied;
- Percent of the population that are persons of color;
- Percent of the population that is over 65;
- Percent of the population that is under 18; and,
- Poverty rate.

Among these variables, all but the percent of the population over age 65 had a statistically significant relationship to the total approval ratio. However, as you can see from Table 2, these

applications as an application must be completed to be defined as either denied or approved.

SFP03171

Pioneer Valley Planning Commission

Owning a Place to Call Home

variables are also strongly interdependent with one another. For example, with a correlation coefficient of -0.851, there is a very strong inverse linear relationship between household income and the poverty rate. This is not surprising given that the poverty rate is determined using household income statistics.

### Table 2: Loan Approval Ratio Partial Correlation

| | | Total Approval Ratio | Percent Persons of Color | Percent Male | Percent Under 18 | Percent 65 and Older | Percent Single Mothers | Non-Seasonal Vacancy Rate | Percent Owner Occupied | Poverty Rate | Median Owner Occupied Home Value | Median House-hold Income |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Approval Ratio | PC | 1.000 | -.595** | -.336** | -.551** | .064 | -.657** | -.592** | .354** | -.511** | .538** | .580** |
| | Sig. | | .000 | .000 | .000 | .486 | .000 | .000 | .000 | .000 | .000 | .000 |
| Percent Persons of Color | PC | -.595** | 1.000 | -.069 | .587** | -.448** | .866** | .697** | -.727** | .887** | -.347** | -.753** |
| | Sig. | .000 | | .455 | .000 | .000 | .000 | .000 | .000 | .000 | .000 | .000 |
| Percent Male | PC | -.336** | -.069 | 1.000 | .283** | .209* | .040 | .099 | .233** | -.034 | -.054 | .048 |
| | Sig. | .000 | .455 | | .002 | .021 | .666 | .281 | .010 | .711 | .554 | .598 |
| Percent Under 18 | PC | .551** | .587** | .283** | 1.000 | -.085 | .665** | .479** | -.175 | .523** | -.391** | -.376** |
| | Sig. | .000 | .000 | .002 | | .351 | .000 | .000 | .055 | .000 | .000 | .000 |
| Percent 65 and Older | PC | .064 | -.448** | .209* | -.085 | 1.000 | -.258** | -.246** | .402** | -.406 | -.111 | .201* |
| | Sig. | .486 | .000 | .021 | .351 | | .004 | .007 | .000 | .000 | .226 | .027 |
| Percent Single Mothers | PC | -.657** | .866** | .040 | .665** | -.258** | 1.000 | .738** | -.665** | .816** | -.461** | -.803** |
| | Sig. | .000 | .000 | .666 | .000 | .004 | | .000 | .000 | .000 | .000 | .000 |
| Non-Seasonal Vacancy Rate | PC | -.592** | .697** | .099 | .479** | -.246** | .738** | 1.000 | -.671** | .724** | -.340** | .718** |
| | Sig. | .000 | .000 | .281 | .000 | .007 | .000 | | .000 | .000 | .000 | .000 |
| Percent Owner Occupancy | PC | .354** | -.727** | .233** | -.175 | .402** | -.665** | -.671** | 1.000 | -.875** | .181** | .868** |
| | Sig. | .000 | .000 | .010 | .055 | .000 | .000 | .000 | | .000 | .047 | .000 |
| Poverty Rate | PC | -.511** | .887** | -.034 | .523** | -.406** | .816** | .724** | -.875** | 1.000 | -.267** | -.851** |
| | Sig. | .000 | .000 | .711 | .000 | .000 | .000 | .000 | .000 | | .003 | .000 |
| Median Owner Occupied Home Value | PC | .538** | -.347** | -.054 | -.391** | -.111 | -.461** | -.340** | .181** | -.267** | 1.000 | .478** |
| | Sig. | .000 | .000 | .554 | .000 | .226 | .000 | .000 | .047 | .003 | | .000 |
| Median Household Income | PC | .580** | -.753** | .048 | -.376** | .201* | -.803** | -.718** | .868** | -.851** | .478** | 1.000 |
| | Sig. | .000 | .000 | .598 | .000 | .027 | .000 | .000 | .000 | .000 | .000 | |
| PC = Pearson Correlation | | | | | | | | | | | | |
| Sig.= Significance (2-tailed) | | | | | | | | | | | | |
| ** Correlation is significant at the 0.01 level (2-tailed). | | | | | | | | | | | | |
| * Correlation is significant at the 0.05 level (2-tailed). | | | | | | | | | | | | |

Because our study is particularly concerned with the fairness of lending practices, our particular focus with this statistical analysis is assessing whether people of different racial or ethnic backgrounds experienced differential loan outcomes. For that reason, we calculated the partial correlation of the percent persons of color against the approval ratio when controlling for other

- 36 -

SFP03172

independent variables. In this case, we controlled for those variables with the strongest correlation to approval ratio and eliminated several variables that we believed duplicated the impact of other variables. The excluded variables are 1) poverty rate because of its close relationship to income, 2) percent single mothers also because of its relationship to income, and 3) percent over 65 because the correlation was not statistically significant.

The remaining independent variables include the percent of the population that is male, the percent of the population that is under 18, the housing vacancy rate, the percent of owner-occupied housing, median home value, and median household income. Table 3 represents the partial correlation between percent persons of color and the total approval ratio for all loan types when controlling for these independent variables. The results indicate that a statistically significant relationship (at the 0.01 level) remains between the percent persons of color and the home loan approval ratio by census tract. The negative value of the correlation coefficient (-0.2976) indicates that there is an inverse relationship—as percent persons of color increases, the approval ratio decreases.

**Table 3: Correlation Coefficient for All Loans**

|  |  | Total Approval Ratio | Percent Persons of Color |
|---|---|---|---|
| Total Approval Ratio | Correlation Coefficient | 1.0000 | -.2976** |
|  | D.F. | 0 | 113 |
|  | Sig. (2-tailed) |  | .001 |
| Percent Persons of Color | Correlation Coefficient | -.2976** | 1.000 |
|  | D.F. | 113 | 0 |
|  | Sig. (2-tailed) | .001 |  |

** Correlation is significant at the 0.01 level (2-tailed).
Controlling for: percent male, percent under age 18, non-seasonal vacancy rate, percent owner-occupied housing, median home value, and median household income.

When controlling for the same variables and assessing the relationship between percent persons of color and the *refinance* approval ratio, the strength of the relationship increases. As Table 4 illustrates, the correlation coefficient is -0.3313, somewhat larger than the coefficient for all applications. This finding further confirms the inverse relationship between approval ratios and percent persons of color. In fact, the significance level (0.000) for the refinance approval ratio indicates greater statistical significance of the correlation between the refinance approval ratio and the percent persons of color.

SFP03173

**Table 4: Correlation Coefficient for Refinance Loans**

|  |  | Total Approval Ratio | Percent Persons of Color |
|---|---|---|---|
| Refinance Approval Ratio | Correlation Coefficient | 1.0000 | -.3313** |
|  | D.F. | 0 | 112 |
|  | Sig. (2-tailed) |  | .000 |
| Percent Persons of Color | Correlation Coefficient | -.3313** | 1.000 |
|  | D.F. | 112 | 0 |
|  | Sig. (2-tailed) | .000 |  |
| ** Correlation is significant at the 0.01 level (2-tailed). | | | |
| Controlling for: percent male, percent under age 18, non-seasonal vacancy rate, percent owner-occupied housing, median home value, and median household income. | | | |

As noted previously, the HMDA data do not permit a complete and rigorous analysis of individual loan applicants and their results. This statistical testing and assessment of approval ratios by census tracts, therefore, serves as a proxy. These results should not be taken as the core of this report, but as a supplement to other findings. In particular, these results are consistent with and confirm our finding throughout this study that persons of color in the Springfield MSA have negative outcomes more often when applying for a home loan. This finding remains valid even when controlling for other factors, such as income and housing stock, which justifiably influence the lending process.

Using the statistical results as a guide, we can further our understanding of the lending market by comparing the approval ratios, median income and percent persons of color by census tract. The following figures provide a visual representation of the patterns of these variables throughout the Springfield MSA. Map 2 and 3 illustrate the data for the total approval and the refinance approval ratio, respectively, between 1996 and 2001. The darker shaded areas indicate more loan applications approved for each loan application that is denied. Please note that five census tracts in the Hampshire County region were omitted in this analysis and appear without shading on the maps.

Map 2 illustrates that the approval ratio for all loans varied geographically and indicates significant concentrations of high and low approval ratios. Census tracts with the lowest approval ratio (2 or fewer approvals per denial) are clustered together in Springfield and Holyoke. Chicopee also had one census tract with 2 or fewer approvals per denial. The urban core of

SFP03174

Springfield, Holyoke, and Chicopee contain all of the census tracts with the lowest approval ratio and also have the lowest median incomes within the Springfield MSA.



Map 2: Number of Loan Approvals per Denial
1996 to 2001 by Census Tract

The second lowest approval ratio category, representing a ratio between 2 and 3.5 approvals per denial, was more geographically dispersed than the lowest approval ratio. Two census tracts in Ware, two of the three census tracts in Palmer, two census tracts in Westfield, and a number of additional census tracts in Springfield, Holyoke, and Chicopee had the second lowest approval ratio.

Census tracts with the highest approval ratio (seven or more approvals per denial) in the Springfield MSA include Longmeadow, South Hadley, Hadley, Wilbraham, and Northampton. The census tracts of Longmeadow along with one Wilbraham census tract with the highest approval ratio border Springfield census tracts, which had significantly lower approval ratios.

- 39 -

SFP03175

Owning a Place to Call Home

East Longmeadow, Agawam, West Springfield, Ludlow, and South Hadley had similar patterns of approval ratios. In these cities, the census tracts that share a border with the urban core had lower approval ratios than other census tracts that are farther away.

Map 3: Number of Loan Approvals per Denial for Refinances
1996 to 2001 by Census Tract



Less than 2 approvals per denial
2 to 3.5 approvals per denial
3.5 to 5 approvals per denial
5 to 7 approvals per denial
7 or more approvals per denial

Community not a part of the Springfield MSA

Map 3 demonstrates that refinance loans had similar trends in lending practices. The approval ratios for refinance loans, however, were consistently lower throughout the region as compared to that for all loans. Wilbraham, Northampton and South Hadley maintained census tracts with the highest approval ratios while Longmeadow and Hadley approval ratios dropped slightly. While Palmer and Ware maintained the same approval ratios for refinance and all loans, other surrounding non-urban communities had lower approval ratios for refinance loans.

- 40 -

SFP03176

The trend of lower approval ratios in the urban core held true for refinance loans. Comparatively, more census tracts in urbanized communities had an approval ratio of 2 or less for refinance loans than for all loans. In other words, applicants in the urban core were generally less likely to be approved for a refinance loan than they were for a home purchase loan.

Comparing the approval ratios to demographic and income by census tract illustrates the link between loan application outcomes and income. Map 4 displays the median household income by census tract for the Springfield MSA. Not surprisingly, areas with lower median income had correspondingly lower approval ratios.

Map 4: Median Household Income as a Percent of the MSA Median
2000 by Census Tract



0 to $20,370 (below 50% MSA median)
$20,371 to $32,185 (50-79% MSA median)
$32,186 to $40,739 (80-99% MSA median)
$40,740 to $48,481 (100-119% MSA Median)
$48,482 or more (Over 120% MSA median)

Community not a part of the Springfield MSA

- 41 -

SFP03177

Even within the cities of Holyoke and Springfield, patterns of approval ratios and income are evident. Census tracts in the southern and eastern part of Springfield that have higher median incomes also have higher approval ratios. Holyoke and Chicopee census tracts of lower income and lower approval ratios are clustered together along the Connecticut River.

Interestingly, the median income of the four census tracts in Amherst represent all but the lowest income group, however, the approval ratios for these same four census tracts are consistently high (5 to 7). Northampton has three census tracts with median incomes of 80 to 99 percent of the Springfield MSA while maintaining a high approval ratio. Palmer, Ware, and areas in the urban core appear to have an opposite trend where higher income census tracts have lower approval ratios. For example, census tracts clustered in the southeast corner of Springfield have median incomes equivalent or similar to surrounding suburban communities but have significantly lower approval ratios than these suburban areas.

Map 5 shows the racial composition of the Springfield MSA by census tract according to the percentage of white residents. Many of the census tracts in the Springfield MSA are populated by 90 percent or more of white residents. Census tracts with less than 90 percent white residents are located in Amherst, Chicopee, Holyoke, Northampton, Springfield, West Springfield, and Westfield. Census tracts with less than 50 percent white residents are located only in Holyoke and Springfield.

The only census tract in Springfield with a high approval ratio (5 to 7 approvals per denial), located in East Forest Park, also has the highest median income (over 120%) and is over 90 percent white residents. Other high-income census tracts, located in East Forest Park and Sixteen Acres, had more persons of color and lower approval ratios. Census tracts along the northern border of Springfield in the neighborhoods of East Springfield and Indian Orchard were of middle-income (80-99%), between 60 and 80 percent white residents, and had the lowest approval ratio for all loan types.

Census tracts in Chicopee appear to exhibit a more positive pattern when comparing race, income, and approval ratios. For example, the two census tracts comprising Chicopee center



Map 5: Percent of the Population that is White
2000 by Census Tract

have low approval ratios (2 to 3.5 approvals per denials) but are of middle-income (80-99% of the Springfield MSA) and have high percentages of white residents. Meanwhile, three of the four census tracts in the western part of the city, on the Connecticut River, had similar approval ratios of 2 to 3.5 but had more persons of color and lower median incomes. Throughout Chicopee, the approval ratio remained more consistent regardless of racial composition.

Other inconsistencies exist in Easthampton, Northampton, Ware, and Palmer as these census tracts maintained higher approval ratios than expected relative to their income. All four of these communities had high percentages of white residents (90% or more), except for three census tracts in Northampton that were 80-90 percent white. The approval ratios in these communities remained high even for those census tracts with lower median incomes.

SFP03179

Throughout this analysis, a disturbing trend of differences between the lending statistics of white applicants and African-American and Latino applicants has emerged. Census tracts with lower median incomes and higher percentages of persons of color have less lending activity and drastically higher denial rates. Even high-income African-American and Latino applicants continue to be subjected to denial rates three times higher than their white counterparts. White applicants make up far less of the market share of denials than for applications. Moreover, the number of applications lacking race or ethnicity data is striking considering the tremendously high denial rates evidenced by this category. And, when the ratio of approvals to denials is controlled by many of the interrelated factors that influence the lending process, the relationship between race or ethnicity on loan outcomes remains significant. We hope that these findings provide a convincing argument that similar applicants do not receive similar treatment in the lending market of the Pioneer Valley. Furthermore, the need to address this issue is essential for the growth and prosperity of communities throughout the region.

SFP03180

## SUBPRIME LENDING MARKET

This final section provides an overview and analysis of the subprime lending market in the Springfield MSA. The overview includes an assessment of changes in subprime lending volume, outcomes, and value. The analysis focuses on subprime lending statistics for 1997 and 2001 to determine if subprime lenders target certain areas or groups. Evaluating differences in market share based on characteristics or location of applicants facilitates this analysis.

### Subprime Volume

Figure 21 displays the number of subprime and prime lenders and presents data on the percent of all lenders defined as subprime between 1996 and 2001. The actual number of subprime lenders grew by 10 (or 38%) over the six years studied. The actual number of subprime lenders and the percent of all lenders that are subprime peaked in 1998 at 53 subprime lenders and 36 percent of all lenders operating in the Springfield MSA. The actual number and percent of subprime lenders decreased steadily from 1998 until 2001. The percent of all lenders that are subprime was about 25 percent at the beginning and end of the study period.



This suggests a similar rate of growth for prime and subprime lenders during the six years of this study.

As the proportion of subprime lenders (as compared to all lenders) fluctuated over time, variations are also evident in the subprime lenders' market share of applications. Figure 22 demonstrates subprime lenders' market share of applications by type of loan from 1996 to 2001. The overall trend, represented by the line for total applications, is a gradual increase from 1996

SFP03181

to 2000. In 2001, when mortgage rates were extraordinarily low, the share of loan applications going to subprime lenders declined.



Figure 22: Subprime Market Share of Total Loan Applications by Type of Loan (1996-2001)

The volume of subprime FHA and refinance loan applications did not follow the overall subprime market trend. Subprime FHA loans fell from 12.2 percent in 1996 to close to zero in 1998 and onward. This decline is likely a result of strict FHA regulations that prevent subprime lending of Federal mortgage products. Subprime refinance loans had the most dramatic changes and the largest market share for any single type of subprime loan. Recall that refinance loan application numbers were lowest in 1996, 1997 and 2000 (see Figure 1). Subprime refinance loan application market share, on the other hand, peaked during 1997 and 2000 at 29.8 and 35.7 percent, respectively. Despite high mortgage rates in 1996, commonly associated with a high volume of subprime applications, subprime refinance loan application market share was about 18.0 percent; lower than the 21 percent level in 1998 and 2001 when mortgage rates were low.

*Subprime Outcomes*
Subprime loan application activity tends to be associated with lower approval and origination rates than prime lending activity because applicants for subprime loans often carry greater risk for the



Figure 23: Subprime Approval Rates Compared to Approval Rates for All Loans

lender. Figure 23 compares the approval rate for all loans and the approval rate for subprime loans alone. Subprime approval rates were less than approval rates for all loans by at least 20

- 46 -

SFP03182

percentage points every year of this study. Subprime approval rates declined from 41.5 percent in 1996 to 31.3 percent in 1999 and declined again from 37.0 percent in 2000 to 26.5 percent in 2001. The highest approval rates for all loans and subprime loans occurred in 1996 and were 73.4 and 41.5 percent, respectively.

Figure 24 compares the percent of lenders that are subprime with the share of applications and originations that are subprime. In evaluating this data, the subprime lenders' market share of loan applications was



substantially smaller than the percent of lenders that are subprime. Furthermore, the subprime lenders' share of originations was significantly less than that of applications. In other words, subprime lenders controlled less of the lending market than the number of subprime lending institutions would indicate, due in part to the low approval and origination rates associated with subprime lending. In 2000, for example, the percent of all lenders that were subprime was 28 percent, while the subprime origination market share was only about 11.1 percent.

*Subprime Value*

Figures 25 and 26 illustrate subprime lenders' market share of the dollar value of loan application outcomes for all loans (Figure 25) and for refinance loans (Figure 26). The market share of



subprime loan originations in dollar values remained less than 10 percent throughout the course of the study. Subprime lenders' market share of loan originations in dollar values reached its

- 47 -

SFP03183

highest level of 8.8 percent in 2000 and then fell sharply to 4.4 percent in 2001. Reflecting subprime lenders' lower approval rates, their market share of denied and withdrawn loan values is high. Subprime lenders, in 2001, accounted for 50 percent of the dollar value of withdrawn loan applications.

The subprime share of refinance loan dollar value is generally slightly higher and fluctuates to a greater extent than for other types of loans. As Figure 26 demonstrates, the subprime market share of refinance loan dollar value for



**Figure 26: Subprime Market Share of Refinance Loan Value (1996-2001)**

applications dramatically increases in 2000 to 40.4 percent, only four percentage points less than that for applications denied. Moreover, in 2000, subprime refinance loan originations account for 21.9 percent of the refinance origination dollar value in the lending market, a significantly higher proportion than for subprime loans of different types and during other years.

*Subprime Trends*

Comparing the denial rates of prime and subprime lenders for refinance and conventional loans indicates discrepancies in subprime lending market practices. Tables 5 and 6 present aggregated data on denial rates for refinance and conventional loans from ten prime and ten subprime lenders that have a significant market presence in the Springfield MSA.[31] Table 5 (1997) and Table 6 (2001) present lending data on the race/ethnicity and income of applicants. Because the data presented in Tables 5 and 6 represent a small sample of lending statistics, analysis and conclusions are limited. The purpose of including this information, however, is to show that the nationwide trend of high denial rates in subprime lending is prevalent in the Pioneer Valley as well.

---

[31] See Appendix for a list of lenders and additional data.

SFP03184

**Table 5: Subprime Application Volume (AV) & Denial Rates (DR) for 10 Leading Prime and Subprime Lenders by Race, Ethnicity and Income (1997)**

| | | Prime | | | | Subprime | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Refinance | | Conventional | | Refinance | | Conventional | |
| | | AV | DR | AV | DR | AV | DR | AV | DR |
| Race/Ethnicity | Am. Indian/Ak Native | 3 | 33% | 1 | 0% | 3 | 0% | 4 | 25% |
| | Asian/Pacific Islander | 13 | 15% | 24 | 13% | 5 | 60% | 3 | 0% |
| | African-American | 27 | 44% | 54 | 15% | 116 | 26% | 78 | 24% |
| | Latino | 24 | 54% | 81 | 21% | 54 | 26% | 81 | 15% |
| | White | 1277 | 9% | 1729 | 7% | 782 | 25% | 227 | 19% |
| | Other | 28 | 4% | 9 | 22% | 20 | 20% | 4 | 50% |
| | Joint (White/Minority) | 13 | 0% | 28 | 7% | 16 | 6% | 2 | 0% |
| | Race not Available | 99 | 45% | 26 | 50% | 395 | 29% | 92 | 25% |
| Income | Under 50% | 85 | 21% | 140 | 27% | 206 | 36% | 68 | 19% |
| | 50-79% | 260 | 17% | 449 | 11% | 418 | 26% | 178 | 21% |
| | 80-99% | 219 | 19% | 333 | 8% | 235 | 25% | 89 | 20% |
| | 100-119% | 198 | 13% | 263 | 6% | 182 | 24% | 63 | 25% |
| | Over 120% | 722 | 9% | 767 | 4% | 350 | 21% | 93 | 18% |
| | Total | 1484 | 13% | 1952 | 8% | 1391 | 26% | 491 | 21% |

**Table 6: Subprime Application Volume (AV) & Denial Rates (DR) for 10 Leading Prime and Subprime Lenders by Race, Ethnicity and Income (2001)**

| | | Prime | | | | Subprime | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Refinance | | Conventional | | Refinance | | Conventional | |
| | | AV | DR | AV | DR | AV | DR | AV | DR |
| Race/Ethnicity | Am. Indian/Ak Native | 23 | 30% | 3 | 33% | 8 | 63% | 0 | - |
| | Asian/Pacific Islander | 38 | 16% | 55 | 7% | 14 | 36% | 7 | 43% |
| | African-American | 69 | 33% | 62 | 6% | 217 | 36% | 55 | 45% |
| | Latino | 106 | 44% | 215 | 10% | 154 | 42% | 54 | 39% |
| | White | 3759 | 8% | 2249 | 5% | 1004 | 30% | 151 | 31% |
| | Other | 21 | 19% | 16 | 6% | 12 | 50% | 2 | 0% |
| | Joint (White/Minority) | 55 | 11% | 50 | 2% | 26 | 31% | 1 | 0% |
| | Race not Available | 416 | 33% | 75 | 33% | 1418 | 52% | 33 | 33% |
| Income | Under 50% | 166 | 34% | 196 | 16% | 357 | 51% | 22 | 41% |
| | 50-79% | 599 | 19% | 714 | 8% | 818 | 47% | 103 | 34% |
| | 80-99% | 595 | 15% | 393 | 6% | 491 | 39% | 70 | 36% |
| | 100-119% | 591 | 13% | 300 | 4% | 362 | 42% | 38 | 39% |
| | Over 120% | 2536 | 8% | 1122 | 3% | 825 | 36% | 70 | 33% |
| | Total | 4487 | 12% | 2725 | 6% | 2853 | 42% | 303 | 35% |

SFP03185

The denial rates of the sample of twenty lenders show significant differences between subprime and prime loan outcomes. Subprime denial rates were consistently higher for both refinance and conventional loans. In 1997, the denial rate for all subprime conventional loan applications was 21 percent as compared to eight percent for prime conventional loan applications (Table 5). In 2001, conventional loan denial rates for subprime applications were almost six times that of prime denial rates at 35 and six percent respectively (Table 6). While refinance denial rates were higher than conventional loan denial rates, the difference between prime and subprime denial rates for refinance loans was similar to that of conventional loans. In 1997, the subprime refinance loan denial rate was double that for prime refinance loans (Table 5). In 2001, the denial rate for all refinance subprime loans was 3.5 times that for prime lenders (Table 6). This growing disparity between prime and subprime lending denial rates is a concern as subprime lenders continue to have a strong presence in the Springfield MSA lending market.

Considering that the market share of applications demonstrates in part whom subprime lenders are targeting, another notable pattern emerges from the data. Tables 7 and 8 present the subprime market share of applications based on the application volume for conventional and refinance loans by race/ethnicity and income for 1997 and 2001, respectively. As with Tables 5 and 6, the sample size is small and the analysis is limited; however, the data is included in the report to initiate a discussion of patterns of activity by subprime lending institutions.

The high rates of subprime market share of refinance loan applications are alarming. In 1997 almost half (48%) of all refinance loan applications were submitted to subprime lenders. In 2001, nearly 2 in 5 (39%) applications went to subprime lenders. While the rate of subprime application activity decreases as income increases, the rate of subprime applications is high across all incomes. In 1997, 71 percent of low-income homeowners looking to refinance, applied for a subprime loan. During the same year, 52 percent of applicants with incomes of 80-99 percent of the Springfield MSA median and 33 percent of high-income homeowners applied for subprime loans. In 2001, similar trends are evident but the market shares were lower.

SFP03186

Pioneer Valley Planning Commission                                    Owning a Place to Call Home

**Table 7: Subprime Market Share of Applications Type of Loan for 10 Leading Prime and Subprime Lenders by Race, Ethnicity and Income (1997)**

| | | Conventional Loans | | | Refinance Loans | | |
|---|---|---|---|---|---|---|---|
| | | Application Volume | | Subprime Market Share | Application Volume | | Subprime Market Share |
| | | Prime | Subprime | | Prime | Subprime | |
| Race/Ethnicity | Am. Indian/Ak Native | 1 | 4 | 80% | 3 | 3 | 50% |
| | Asian/Pacific Islander | 24 | 3 | 11% | 13 | 5 | 28% |
| | African-American | 54 | 78 | 59% | 27 | 116 | 81% |
| | Latino | 81 | 81 | 50% | 24 | 54 | 69% |
| | White | 1729 | 227 | 12% | 1277 | 782 | 38% |
| | Other | 9 | 4 | 31% | 28 | 20 | 42% |
| | Joint (White/Minority) | 28 | 2 | 7% | 13 | 16 | 55% |
| | Race not Available | 26 | 92 | 78% | 99 | 395 | 80% |
| Income | Under 50% | 140 | 68 | 33% | 85 | 206 | 71% |
| | 50-79% | 449 | 178 | 28% | 260 | 418 | 62% |
| | 80-99% | 333 | 89 | 21% | 219 | 235 | 52% |
| | 100-119% | 263 | 63 | 19% | 198 | 182 | 48% |
| | Over 120% | 767 | 93 | 11% | 722 | 350 | 33% |
| | Total | 1952 | 491 | 20% | 1484 | 1391 | 48% |

**Table 8: Subprime Market Share of Applications Type of Loan for 10 Leading Prime and Subprime Lenders by Race, Ethnicity and Income (2001)**

| | | Conventional Loans | | | Refinance Loans | | |
|---|---|---|---|---|---|---|---|
| | | Application Volume | | Subprime Market Share | Application Volume | | Subprime Market Share |
| | | Prime | Subprime | | Prime | Subprime | |
| Race/Ethnicity | Am. Indian/Ak Native | 3 | 0 | 0% | 23 | 8 | 26% |
| | Asian/Pacific Islander | 55 | 7 | 11% | 38 | 14 | 27% |
| | African-American | 62 | 55 | 47% | 69 | 217 | 76% |
| | Latino | 215 | 54 | 20% | 106 | 154 | 59% |
| | White | 2249 | 151 | 6% | 3759 | 1004 | 21% |
| | Other | 16 | 2 | 11% | 21 | 12 | 36% |
| | Joint (White/Minority) | 50 | 1 | 2% | 55 | 26 | 32% |
| | Race not Available | 75 | 33 | 31% | 416 | 1418 | 77% |
| Income | Under 50% | 196 | 22 | 10% | 166 | 357 | 68% |
| | 50-79% | 714 | 103 | 13% | 599 | 818 | 58% |
| | 80-99% | 393 | 70 | 15% | 595 | 491 | 45% |
| | 100-119% | 300 | 38 | 11% | 591 | 362 | 38% |
| | Over 120% | 1122 | 70 | 6% | 2536 | 825 | 25% |
| | Total | 2725 | 303 | 10% | 4487 | 2853 | 39% |

SFP03187

The higher rates of subprime market share for refinance loans indicates, therefore, that subprime lenders targeted existing homeowners. The targeting of homeowners by subprime lenders is problematic and raises important questions regarding subprime mortgage lending. The practice of targeting homeowners through the refinance loan market is particularly alarming because predatory lending may be contributing to the high levels of subprime loan application activity. As discussed in the methodology section, predatory lending practices often occur within the subprime market. A HUD-Treasury Task Report identifies that: "in some low-income and minority communities, especially where competition is limited, predatory lenders may make loans with interest rates and fees significantly higher than prevailing market rates, unrelated to the credit risk posed by the borrower."[32] Other examples of the negative impact of predatory lending include their sales practices, such as loan flipping, or recommending refinancing when there is little or no benefit to the borrower. Homeowners may be enticed by a predatory lender's refinance offer to consolidate loans or because they are having trouble making payments. Predatory lenders, however, often set high origination fees that are incorporated into the loan increasing the total amount owed. The result is that homeowners believe refinancing is saving them money, when in fact, the opposite is true. This trend threatens the financial security of individuals and families, as homeownership is the primary investment of many people in the United States.

Further examination of the subprime market share of conventional and refinance loan applications indicates that patterns of differential treatment may also occur according to the race and/or ethnicity of the applicant. Across both years and types of loans, the market share of subprime applications is significantly higher for African-American and Latino applicants than for white applicants. More specifically, market shares range from 47 to 81 percent for African-American applicants, 20 to 69 percent for Latino applicants and 6 to 38 percent for white applicants. The differences in subprime market share of applications indicate that subprime lenders may be targeting persons of color.

A map of the market share of subprime loan applications by census tract further supports the conclusion that subprime lenders are targeting communities of color. Map 6 identifies the census

---

[32] HUD-Treasury Task Force Report. p. 72.

SFP03188

Map 6: Census Tracts with the Highest and Lowest Subprime Market Share of Loan Applications
2001



tracts with the highest (black shading) and lowest (gray shading) market share of subprime applications in 2001. The average subprime market share in 2001 for the Springfield MSA is 16 percent and the median is 15 percent. Table 9 provides additional detail about the characteristics of the census tracts highlighted in Map 6.

For the census tracts with concentrated subprime loan application activity in 2001, the subprime market share reached as high as 54 percent and had a median market share value of 40 percent; nearly three times higher than the Springfield MSA median market share of 15 percent. All of the census tracts with high subprime market share of applications were home to less than 50 percent white residents. The median percent of residents under 18 years of age was 34 percent as compared to the Springfield MSA median of 24 percent. The vacancy rate was twice that of the

SFP03189

Pioneer Valley Planning Commission                                    Owning a Place to Call Home

**Table 9: Characteristics of Census Tracts With the Highest & Lowest Market Shares for All Subprime Loan Applications (2001)**

| | Census Tract | Market Share | White | Under 18 | 65 and Over | Married Family | Single Mothers | Vacancy Rate* | Owner Occ. | Poverty Rate | Median HV** | Hshd Income |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Over Twice the Average Market Share (Black shading) | 8008.00 | 54% | 17% | 35% | 13% | 9% | 9% | 7% | 6% | 51% | 52% | 34% |
| | 8114 | 47% | 16% | 44% | 5% | 7% | 15% | 8% | 12% | 49% | 52% | 33% |
| | 8018 | 45% | 7% | 39% | 7% | 9% | 12% | 12% | 34% | 39% | 55% | 52% |
| | 8017.00 | 44% | 26% | 27% | 7% | 11% | 11% | 9% | 46% | 19% | 62% | 77% |
| | 8014.01 | 44% | 8% | 35% | 8% | 8% | 15% | 12% | 38% | 38% | 59% | 52% |
| | 8020 | 43% | 22% | 36% | 6% | 7% | 16% | 7% | 15% | 50% | 77% | 41% |
| | 8013.00 | 42% | 17% | 34% | 11% | 8% | 13% | 9% | 41% | 35% | 68% | 54% |
| | 8007.00 | 40% | 7% | 37% | 8% | 10% | 10% | 4% | 20% | 38% | 59% | 39% |
| | 8019 | 38% | 22% | 33% | 10% | 8% | 13% | 12% | 18% | 46% | 56% | 40% |
| | 8022 | 35% | 30% | 34% | 8% | 10% | 12% | 8% | 31% | 36% | 65% | 64% |
| | 8011.01 | 35% | 18% | 25% | 11% | 6% | 15% | 13% | 3% | 44% | 187% | 38% |
| | 8006.00 | 34% | 2% | 46% | 4% | 8% | 14% | 8% | 6% | 63% | 254% | 26% |
| | 8015.01 | 34% | 47% | 29% | 13% | 16% | 8% | 4% | 75% | 15% | 63% | 93% |
| | 8009.00 | 34% | 25% | 34% | 20% | 9% | 10% | 7% | 12% | 50% | 68% | 31% |
| | 8014.02 | 33% | 45% | 27% | 15% | 12% | 9% | 4% | 57% | 17% | 60% | 59% |
| | Median | 40% | 18% | 34% | 8% | 9% | 12% | 8% | 20% | 39% | 62% | 41% |
| | MSA (2000) | 15% | 78% | 24% | 14% | 46% | 9% | 4% | 62% | 14% | $123,600 | $40,740 |
| | Census Tract | Market Share | White | Under 18 | 65 and Over | Married Families | Single Mothers | Vacancy Rate* | Owner Occ. | Poverty Rate | Median HV** | Hshd Income |
| The Least Market Share (Gray Shading) | 8129.03 | 7% | 90% | 1% | 1% | 31% | 0% | 0% | 86% | 0% | 175% | 206% |
| | 8134.04 | 7% | 97% | 26% | 18% | 26% | 2% | 2% | 89% | 2% | 151% | 165% |
| | 8134.03 | 7% | 94% | 25% | 19% | 26% | 1% | 2% | 84% | 4% | 119% | 155% |
| | 8224.02 | 6% | 93% | 18% | 16% | 17% | 5% | 5% | 43% | 13% | 102% | 95% |
| | 8216.02 | 6% | 91% | 19% | 18% | 17% | 5% | 2% | 55% | 8% | 118% | 93% |
| | 8106.02 | 6% | 96% | 22% | 14% | 24% | 5% | 1% | 96% | 3% | 114% | 143% |
| | 8210.00 | 5% | 95% | 20% | 23% | 23% | 4% | 1% | 88% | 5% | 107% | 115% |
| | 8205.00 | 5% | 83% | 13% | 12% | 14% | 2% | 2% | 40% | 23% | 138% | 97% |
| | 8213.00 | 5% | 94% | 20% | 22% | 22% | 3% | 3% | 72% | 4% | 141% | 127% |
| | 8133.02 | 5% | 94% | 24% | 22% | 27% | 2% | 1% | 91% | 2% | 193% | 196% |
| | 8215.00 | 4% | 97% | 21% | 17% | 24% | 3% | 3% | 73% | 3% | 140% | 123% |
| | 8207.00 | 4% | 75% | 24% | 8% | 17% | 4% | 2% | 57% | 14% | 164% | 140% |
| | 8219.01 | 4% | 89% | 16% | 11% | 18% | 3% | 3% | 52% | 9% | 191% | 125% |
| | 8216.01 | 3% | 79% | 20% | 21% | 18% | 7% | 5% | 55% | 15% | 114% | 93% |
| | 8217 | 2% | 93% | 20% | 20% | 21% | 5% | 3% | 74% | 7% | 122% | 125% |
| | Median | 5% | 93% | 20% | 18% | 22% | 3% | 2% | 73% | 5% | 138% | 125% |
| | MSA (2000) | 15% | 78% | 24% | 14% | 46% | 9% | 4% | 62% | 14% | $123,600 | $40,740 |

* Non-Seasonal Vacancy Rate
**Median Home Value

- 54 -

Springfield MSA, while the rate of owner-occupied housing for high subprime application areas was about one-third (20%) of the Springfield MSA median (62%).

All in all, the census tracts with high market shares of subprime loan applications in 2001 had larger populations of persons of color, were younger, and had significantly lower incomes. The owner-occupied housing stock was of lesser value in census tracts with high subprime market share and far less of the total housing stock was owner-occupied. In 1997, similar trends were evident (see Appendix). In fact, of the 18 census tracts in 1997 and 15 census tracts in 2001 with twice the average market share of subprime loan applications, 10 of the census tracts appear on the list for both years.

Census tracts with the least amount of subprime market share in 2001 had a median market share of 5 percent with a lowest market share of two percent (8217) and a highest market share of 7 percent (8129.03). The median percent white was 93 for census tracts with the least amount of subprime market share of applications. The poverty rate in census tracts with low subprime application market share was almost one-third (5%) of that for the Springfield MSA (14%). Median owner-occupied home value was 138 percent and household income was 125 percent of the Springfield MSA median.

The data presented in the map and table indicate a trend in subprime lending. In this analysis, the market share of subprime applications demonstrates, in part, if subprime lenders are targeting certain areas or groups of people in the Springfield MSA because the volume of applications is a measure of where subprime lenders are actively marketing their product. Both the map and the tables indicate that subprime lenders appear to be targeting their efforts on low- income neighborhoods and communities of color.

The similarity in high subprime market share census tracts from 1997 and 2001 suggests the practice of targeting low-income areas and communities of color with subprime loans has continued over time. While this study is preliminary, it reveals that strong evidence exists and we hope this prompts further investigation and inquiries about how subprime lending contributes to the overall fairness of the lending market. For example, high loan denial rates among African-

SFP03191

American and Latino applicants is likely related, at least partially, to the practice of subprime lenders who target communities of color and deny applications at high rates than prime lenders. Understanding the impact of subprime lending is vital in making future policy decisions that enhance the fairness of all lending.

SFP03192

Pioneer Valley Planning Commission

Owning a Place to Call Home

# APPENDIX

Appendix Table 1: Lending Statistics for the Springfield Metropolitan Statistical Area

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | Percent Change 1996-2001 |
|---|---|---|---|---|---|---|---|
| **Loan Volume (# of Applications)** | | | | | | | |
| FHA, FSA/RHS, VA Mortgage | 1,955 | 1,844 | 1,790 | 2,117 | 1,872 | 1,936 | -0.97% |
| Conventional Mortgage | 6,006 | 6,351 | 6,881 | 8,036 | 8,363 | 8,260 | 37.53% |
| Refinance Loan | 7,541 | 7,129 | 16,149 | 14,351 | 9,515 | 20,758 | 175.27% |
| Home Improvement Loan | 2,677 | 2,558 | 2,661 | 3,032 | 3,358 | 2,836 | 5.94% |
| Aggregate | 18,179 | 17,882 | 27,481 | 27,536 | 23,108 | 33,790 | 85.87% |
| **Loan Volume (# of Loans Originated)** | | | | | | | |
| FHA, FSA/RHS, VA Mortgage | 1,401 | 1,505 | 1,467 | 1,717 | 1,464 | 1,522 | 8.64% |
| Conventional Mortgage | 4,702 | 4,773 | 5,053 | 5,933 | 6,045 | 6,234 | 32.58% |
| Refinance Loan | 4,783 | 3,953 | 10,251 | 7,304 | 3,074 | 11,924 | 149.30% |
| Home Improvement Loan | 1,465 | 1,187 | 1,106 | 1,245 | 1,149 | 1,111 | -24.16% |
| Aggregate | 12,351 | 11,418 | 17,877 | 16,199 | 11,732 | 20,791 | 68.33% |
| **Loan Outcome (Approval Rate)** | | | | | | | |
| FHA, FSA/RHS, VA Mortgage | 76.27% | 84.16% | 85.14% | 84.36% | 82.53% | 84.56% | 10.87% |
| Conventional Mortgage | 81.15% | 79.56% | 77.47% | 80.18% | 78.88% | 82.57% | 1.75% |
| Refinance Loan | 69.98% | 61.87% | 68.93% | 58.31% | 39.60% | 63.68% | -9.00% |
| Home Improvement Loan | 63.28% | 56.80% | 52.20% | 52.67% | 49.52% | 49.54% | -21.71% |
| Aggregate | 73.36% | 69.73% | 70.50% | 66.07% | 58.74% | 68.30% | -6.90% |
| **Total Assessed Value (Loans Originated) ($000s) (2001 $)** | | | | | | | |
| FHA, FSA/RHS, VA Mortgage | $139,041 | $146,009 | $148,036 | $175,579 | $148,156 | $163,824 | 17.82% |
| Conventional Mortgage | $508,325 | $519,024 | $557,617 | $668,489 | $654,875 | $724,300 | 42.49% |
| Refinance Loan | $466,812 | $386,107 | $1,080,677 | $692,708 | $256,803 | $1,281,222 | 174.46% |
| Home Improvement Loan | $23,509 | $20,731 | $19,070 | $23,140 | $21,364 | $25,064 | 6.62% |
| Aggregate | $1,137,686 | $1,071,871 | $1,785,401 | $1,559,916 | $1,081,199 | $2,194,410 | 92.88% |
| **Average Loan Value (Loans Originated) (2001 $)** | | | | | | | |
| FHA, FSA/RHS, VA Mortgage | $99,244 | $97,016 | $100,911 | $102,259 | $101,200 | $107,637 | 8.46% |
| Conventional Mortgage | $108,108 | $108,742 | $110,354 | $112,673 | $108,333 | $116,185 | 7.47% |
| Refinance Loan | $97,598 | $97,674 | $103,471 | $94,840 | $83,540 | $107,449 | 10.09% |
| Home Improvement Loan | $16,047 | $17,465 | $17,243 | $18,586 | $18,594 | $22,560 | 40.59% |
| Aggregate | 73.36% | 69.73% | 70.50% | 66.07% | 58.74% | 68.30% | -6.90% |

SFP03193

Pioneer Valley Planning Commission

Owning a Place to Call Home

Appendix Table 2: Lending Data by Type of Institution for FHA, Conventional and Refinance Loans

|  |  | Applications | Originations | Approved | Denied | Origination Rate | Approval Rate | Denial Rate |
|---|---|---|---|---|---|---|---|---|
| 1997 | Local Institutions | 4206 | 3485 | 3563 | 378 | 82.9% | 84.7% | 9.0% |
|  | Non-Local Institutions | 11118 | 6746 | 7453 | 2136 | 60.7% | 67.0% | 19.2% |
|  | Total | 15324 | 10231 | 11016 | 2514 | 66.8% | 71.9% | 16.4% |
| 2001 | Local Institutions | 6498 | 5573 | 5772 | 386 | 85.8% | 88.8% | 5.9% |
|  | Non-Local Institutions | 24456 | 14107 | 15893 | 5003 | 57.7% | 65.0% | 20.5% |
|  | Total | 30954 | 19680 | 21665 | 5389 | 63.6% | 70.0% | 17.4% |

- 58 -

SFP03194

Pioneer Valley Planning Commission

Owning a Place to Call Home

Appendix Table 3: Applications and Denials for All Loans by All Lenders in the Springfield MSA from 1996 to 2001

| Applicant Characteristic | 1996 | | 1997 | | 1998 | | 1999 | | 2000 | | 2001 | | Total | | Denial Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | D | A | D | A | D | A | D | A | D | A | D | A | D | |
| **Ethnicity** | | | | | | | | | | | | | | | |
| Amer. Indian/AK Native | 22 | 5 | 23 | 2 | 35 | 7 | 41 | 10 | 32 | 16 | 59 | 19 | 212 | 59 | 28% |
| Asian Pacific Islander | 109 | 16 | 141 | 20 | 210 | 25 | 178 | 27 | 197 | 43 | 272 | 37 | 1107 | 168 | 15% |
| African-American | 317 | 53 | 645 | 137 | 716 | 150 | 941 | 312 | 1147 | 326 | 1057 | 271 | 4823 | 1249 | 26% |
| Latino | 254 | 48 | 770 | 179 | 746 | 134 | 892 | 252 | 1179 | 291 | 1357 | 307 | 5198 | 1211 | 23% |
| White | 8630 | 736 | 11059 | 1455 | 16170 | 1412 | 14027 | 1707 | 11284 | 1621 | 18261 | 1734 | 79431 | 8665 | 11% |
| Other | 32 | 2 | 116 | 15 | 127 | 13 | 127 | 33 | 110 | 14 | 143 | 22 | 655 | 99 | 15% |
| Joint (White/Minority) | 178 | 18 | 192 | 25 | 255 | 20 | 208 | 46 | 231 | 38 | 364 | 30 | 1428 | 177 | 12% |
| Race Not Available | 936 | 275 | 1773 | 559 | 4336 | 1516 | 4032 | 1263 | 3781 | 1185 | 6447 | 2206 | 21305 | 7294 | 34% |
| **Income** | | | | | | | | | | | | | | | |
| Under 50% | n/a | n/a | 1266 | 426 | 1393 | 415 | 1602 | 509 | 1513 | 517 | 1791 | 640 | 7565 | 2507 | 33% |
| 50-79% | n/a | n/a | 3758 | 764 | 4470 | 855 | 4391 | 1038 | 4434 | 1093 | 5790 | 1348 | 22843 | 5098 | 22% |
| 80-99% | 2365 | 326 | 2419 | 373 | 3419 | 527 | 2988 | 570 | 3049 | 639 | 4440 | 804 | 18680 | 3233 | 17% |
| 100-119% | 2227 | 279 | 1964 | 294 | 3104 | 465 | 2845 | 483 | 2348 | 479 | 3696 | 588 | 16184 | 2588 | 16% |
| Over 120% | 5886 | 548 | 5312 | 535 | 10209 | 1021 | 8620 | 1050 | 6617 | 1006 | 12243 | 1336 | 48887 | 5496 | 11% |

A= # of Applications
D= # of Denials

SFP03195

Pioneer Valley Planning Commission

Owning a Place to Call Home

Appendix Table 4: Applications and Denials for All Loans by All Lenders in Springfield MSA from 1996 to 2001 (A = # of Applications, D = # of Denials)

| Applicants Race and Ethnicity by Income | 1996 A | 1996 D | 1997 A | 1997 D | 1998 A | 1998 D | 1999 A | 1999 D | 2000 A | 2000 D | 2001 A | 2001 D | Total A | Total D | Denial Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Under 50%** | | | | | | | | | | | | | | | |
| Amer. Indian/AK Native | n/a | n/a | 4 | 0 | 3 | 1 | 5 | 1 | 5 | 4 | 5 | 2 | 22 | 8 | 36% |
| Asian Pacific Islander | n/a | n/a | 12 | 4 | 13 | 3 | 20 | 7 | 24 | 7 | 12 | 6 | 81 | 27 | 33% |
| African-American | n/a | n/a | 93 | 23 | 81 | 17 | 154 | 66 | 161 | 62 | 120 | 38 | 609 | 206 | 34% |
| Latino | n/a | n/a | 146 | 32 | 108 | 29 | 177 | 52 | 177 | 59 | 219 | 61 | 827 | 233 | 28% |
| White | n/a | n/a | 784 | 263 | 725 | 157 | 782 | 192 | 691 | 182 | 811 | 201 | 3793 | 995 | 26% |
| Other | n/a | n/a | 8 | 1 | 13 | 2 | 10 | 5 | 12 | 3 | 13 | 3 | 56 | 14 | 25% |
| Joint (White/Minority) | n/a | n/a | 4 | 2 | 8 | 2 | 7 | 2 | 6 | 2 | 11 | 3 | 36 | 11 | 31% |
| Race Not Available | n/a | n/a | 215 | 101 | 442 | 204 | 447 | 184 | 437 | 198 | 600 | 326 | 2141 | 1013 | 47% |
| **50-79%** | | | | | | | | | | | | | | | |
| Amer. Indian/AK Native | n/a | n/a | 6 | 2 | 8 | 0 | 16 | 4 | 7 | 7 | 11 | 5 | 52 | 18 | 35% |
| Asian Pacific Islander | n/a | n/a | 34 | 6 | 50 | 6 | 38 | 5 | 63 | 16 | 64 | 8 | 248 | 41 | 17% |
| African-American | n/a | n/a | 264 | 57 | 259 | 56 | 317 | 108 | 422 | 115 | 343 | 94 | 1605 | 430 | 27% |
| Latino | n/a | n/a | 337 | 82 | 299 | 54 | 335 | 102 | 553 | 121 | 528 | 123 | 2052 | 482 | 23% |
| White | n/a | n/a | 2569 | 454 | 2866 | 370 | 2667 | 446 | 2394 | 436 | 3312 | 462 | 13808 | 2168 | 16% |
| Other | n/a | n/a | 28 | 7 | 34 | 7 | 34 | 7 | 25 | 4 | 26 | 4 | 147 | 29 | 20% |
| Joint (White/Minority) | n/a | n/a | 40 | 5 | 28 | 2 | 28 | 11 | 23 | 6 | 39 | 9 | 158 | 33 | 21% |
| Race Not Available | n/a | n/a | 480 | 151 | 926 | 360 | 956 | 355 | 944 | 388 | 1467 | 643 | 4773 | 1897 | 40% |
| **80-99%** | | | | | | | | | | | | | | | |
| Amer. Indian/AK Native | 4 | 1 | 4 | 0 | 7 | 0 | 8 | 2 | 5 | 2 | 9 | 3 | 37 | 9 | 24% |
| Asian Pacific Islander | 18 | 7 | 27 | 4 | 29 | 6 | 32 | 6 | 33 | 6 | 45 | 5 | 184 | 34 | 18% |
| African-American | 104 | 16 | 109 | 21 | 118 | 23 | 165 | 52 | 211 | 61 | 208 | 46 | 915 | 221 | 24% |
| Latino | 105 | 17 | 148 | 34 | 128 | 18 | 139 | 41 | 211 | 50 | 249 | 49 | 980 | 209 | 21% |
| White | 1863 | 205 | 1794 | 218 | 2423 | 223 | 1962 | 263 | 1914 | 274 | 2821 | 301 | 12777 | 1484 | 12% |
| Other | 4 | 0 | 28 | 1 | 16 | 3 | 23 | 6 | 17 | 2 | 22 | 5 | 110 | 17 | 15% |
| Joint (White/Minority) | 42 | 10 | 39 | 5 | 28 | 2 | 28 | 6 | 35 | 5 | 46 | 6 | 218 | 34 | 16% |
| Race Not Available | 225 | 70 | 270 | 90 | 670 | 243 | 631 | 194 | 623 | 239 | 1040 | 389 | 3459 | 1225 | 35% |
| **100-119%** | | | | | | | | | | | | | | | |
| Amer. Indian/AK Native | 4 | 1 | 3 | 0 | 2 | 0 | 8 | 2 | 3 | 1 | 3 | 1 | 23 | 5 | 22% |
| Asian Pacific Islander | 25 | 7 | 19 | 1 | 32 | 2 | 22 | 3 | 15 | 2 | 35 | 4 | 148 | 19 | 13% |
| African-American | 93 | 23 | 71 | 14 | 99 | 27 | 112 | 29 | 148 | 31 | 128 | 39 | 651 | 163 | 25% |
| Latino | 69 | 13 | 55 | 15 | 82 | 18 | 111 | 34 | 114 | 21 | 140 | 28 | 571 | 129 | 23% |
| White | 1786 | 162 | 1535 | 178 | 2245 | 195 | 2022 | 241 | 1520 | 242 | 2467 | 233 | 11575 | 1251 | 11% |
| Other | 2 | 0 | 7 | 1 | 13 | 1 | 17 | 5 | 13 | 2 | 17 | 3 | 69 | 12 | 17% |
| Joint (White/Minority) | 41 | 4 | 28 | 6 | 41 | 4 | 34 | 8 | 38 | 3 | 47 | 4 | 229 | 29 | 13% |
| Race Not Available | 207 | 69 | 246 | 79 | 590 | 218 | 519 | 161 | 497 | 177 | 859 | 276 | 2918 | 980 | 34% |
| **Over 120%** | | | | | | | | | | | | | | | |
| Amer. Indian/AK Native | 14 | 3 | 6 | 0 | 15 | 1 | 4 | 1 | 8 | 2 | 31 | 8 | 78 | 19 | 24% |
| Asian Pacific Islander | 66 | 2 | 49 | 5 | 86 | 8 | 66 | 6 | 63 | 12 | 116 | 14 | 446 | 47 | 11% |
| African-American | 120 | 14 | 108 | 22 | 159 | 23 | 193 | 57 | 205 | 57 | 258 | 54 | 1043 | 229 | 22% |
| Latino | 80 | 18 | 84 | 16 | 129 | 15 | 130 | 23 | 124 | 40 | 221 | 46 | 768 | 158 | 21% |
| White | 4981 | 369 | 4377 | 342 | 7911 | 467 | 6594 | 565 | 4765 | 487 | 8850 | 537 | 37478 | 2767 | 7% |
| Other | 26 | 2 | 45 | 5 | 51 | 3 | 43 | 10 | 43 | 3 | 65 | 7 | 273 | 27 | 10% |
| Joint (White/Minority) | 95 | 4 | 81 | 7 | 150 | 10 | 111 | 19 | 129 | 22 | 221 | 8 | 787 | 70 | 9% |
| Race Not Available | 504 | 136 | 562 | 138 | 1708 | 491 | 1479 | 369 | 1280 | 363 | 2481 | 662 | 8014 | 2179 | 27% |

SFP03196

Owning a Place to Call Home

Pioneer Valley Planning Commission

Appendix Table 5: Top Ten Prime and Subprime Lenders included in lending analysis

| Prime Lenders | Subprime Lenders | |
|---|---|---|
| 1997 & 2001 | 1997 | 2001 |
| Bank of WesternMass | 1st Consumers Mortgage Corporation | Aegis Mortgage Corporation |
| FirstMass/SIS | American Money Centers | Ameriquest Mortgage Company |
| Country Bank for Savings | Ameriquest Mortgage Company | Beneficial Corporation |
| Fleet National Bank | Commercial Credit Corporation | Citifinancial Services, Inc. |
| Florence Savings Bank | Equicredit Corp of America | Equity One, Inc. |
| People's Savings Bank | Green Point Mort Company | First Franklin Financial Corporation |
| United Cooperative | National Mortgage Corporation | Greenpoint Mortgage Funding, 1 |
| Westbank | Option One Mortgage Corporation | Household Finance Corporation |
| Westfield Bank | Security Funding Corporation | Nationscredit Financial Service |
| Woronoco Savings Bank | The Money Store | New Century Mortgage Corporation |

- 61 -

SFP03197

Pioneer Valley Planning Commission

Owning a Place to Call Home

Appendix Table 6: Denial Rates for 10 Leading Prime and Subprime Lenders by Race/Ethnicity and Income in 1997

| Income | Race/Ethnicity | Prime Refinance A | Prime Refinance D | Prime Refinance Denial Rate | Prime Conventional A | Prime Conventional D | Prime Conventional Denial Rate | Subprime Refinance A | Subprime Refinance D | Subprime Refinance Denial Rate | Subprime Conventional A | Subprime Conventional D | Subprime Conventional Denial Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Under 50% | Am. Indian/AK Native | 1 | 0 | 0% | 0 | 0 | - | 1 | 0 | 0% | 0 | 0 | - |
| | Asian/Pacific Islander | 1 | 0 | 0% | 3 | 2 | 67% | 0 | 0 | - | 0 | 0 | - |
| | African-American | 3 | 1 | 33% | 11 | 4 | 36% | 21 | 6 | 29% | 10 | 2 | 20% |
| | Latino | 2 | 1 | 50% | 23 | 6 | 26% | 10 | 3 | 30% | 17 | 0 | 0% |
| | White | 65 | 12 | 18% | 95 | 20 | 21% | 107 | 34 | 32% | 24 | 5 | 21% |
| | Other | 0 | 0 | - | 1 | 1 | 100% | 0 | 0 | - | 0 | 0 | - |
| | Joint (White/Minority) | 0 | 0 | - | 1 | 0 | 0% | 0 | 0 | - | 3 | 1 | 33% |
| | Race not Available | 13 | 4 | 31% | 6 | 5 | 83% | 66 | 32 | 48% | 17 | 6 | 35% |
| 50-79% | Am. Indian/AK Native | 1 | 0 | 100% | 0 | 0 | - | 3 | 3 | 100% | 0 | 0 | - |
| | Asian/Pacific Islander | 2 | 0 | 0% | 6 | 0 | 0% | 3 | 1 | 33% | 0 | 0 | - |
| | African-American | 10 | 2 | 20% | 25 | 2 | 8% | 42 | 11 | 26% | 37 | 12 | 32% |
| | Latino | 9 | 4 | 44% | 31 | 8 | 26% | 16 | 5 | 31% | 41 | 7 | 17% |
| | White | 214 | 31 | 14% | 373 | 32 | 9% | 215 | 53 | 25% | 63 | 9 | 14% |
| | Other | 1 | 0 | 0% | 1 | 1 | 100% | 5 | 3 | 60% | 2 | 1 | 50% |
| | Joint (White/Minority) | 1 | 0 | 0% | 4 | 0 | 0% | 6 | 0 | 0% | 1 | 0 | 0% |
| | Race not Available | 22 | 7 | 32% | 9 | 6 | 67% | 131 | 34 | 26% | 31 | 7 | 23% |
| 80-99% | Am. Indian/AK Native | 0 | 0 | - | 0 | 0 | - | 0 | 0 | - | 1 | 0 | 0% |
| | Asian/Pacific Islander | 2 | 1 | 50% | 5 | 1 | 20% | 1 | 0 | 0% | 0 | 0 | - |
| | African-American | 5 | 4 | 80% | 9 | 0 | 0% | 20 | 8 | 40% | 12 | 1 | 8% |
| | Latino | 6 | 4 | 67% | 13 | 2 | 15% | 10 | 2 | 20% | 13 | 2 | 15% |
| | White | 159 | 21 | 13% | 294 | 21 | 7% | 138 | 31 | 22% | 37 | 9 | 24% |
| | Other | 24 | 1 | 4% | 2 | 0 | 0% | 4 | 0 | 0% | 2 | 1 | 50% |
| | Joint (White/Minority) | 2 | 0 | 0% | 7 | 1 | 14% | 2 | 0 | 0% | 1 | 0 | 0% |
| | Race not Available | 21 | 10 | 48% | 3 | 1 | 33% | 60 | 17 | 28% | 23 | 5 | 22% |
| 100-119% | Am. Indian/AK Native | 0 | 0 | - | 0 | 0 | - | 0 | 0 | - | 0 | 0 | - |
| | Asian/Pacific Islander | 1 | 0 | 0% | 7 | 0 | 0% | 1 | 0 | 0% | 2 | 0 | 0% |
| | African-American | 2 | 1 | 50% | 4 | 0 | 0% | 10 | 1 | 10% | 8 | 1 | 13% |
| | Latino | 5 | 3 | 60% | 3 | 0 | 0% | 3 | 1 | 33% | 7 | 3 | 43% |
| | White | 177 | 15 | 8% | 244 | 15 | 6% | 114 | 27 | 24% | 39 | 11 | 28% |
| | Other | 2 | 0 | 0% | 0 | 0 | - | 1 | 0 | 0% | 0 | 0 | - |
| | Joint (White/Minority) | 10 | 7 | 70% | 4 | 1 | 25% | 1 | 0 | 0% | 7 | 1 | 14% |
| | Race not Available | 1 | 0 | 0% | 4 | 1 | 25% | 52 | 15 | 29% | 0 | 0 | - |
| Over 120% | Am. Indian/AK Native | 1 | 0 | - | 0 | 0 | - | 1 | 0 | 0% | 0 | 0 | - |
| | Asian/Pacific Islander | 7 | 1 | 14% | 7 | 0 | 0% | 0 | 0 | - | 11 | 3 | 27% |
| | African-American | 7 | 4 | 57% | 5 | 2 | 40% | 23 | 4 | 17% | 3 | 0 | 0% |
| | Latino | 2 | 1 | 50% | 11 | 1 | 9% | 15 | 3 | 20% | 0 | 0 | - |
| | White | 662 | 41 | 6% | 723 | 28 | 4% | 208 | 49 | 24% | 64 | 10 | 16% |
| | Other | 1 | 0 | 0% | 5 | 0 | 0% | 9 | 1 | 11% | 0 | 0 | - |
| | Joint (White/Minority) | 9 | 0 | 0% | 12 | 0 | 0% | 7 | 1 | 14% | 0 | 0 | - |
| | Race not Available | 33 | 17 | 52% | 4 | 0 | 0% | 86 | 17 | 20% | 14 | 4 | 29% |

SFP03198

Pioneer Valley Planning Commission

Appendix Table 7: Denial Rates for 10 Leading Prime and Subprime Lenders by Race/Ethnicity and Income in 2001

| Applicant Race and Ethnicity by Income | Prime Refinance | | | Prime Conventional | | | Subprime Refinance | | | Subprime Conventional | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | D | Denial Rate | A | D | Denial Rate | A | D | Denial Rate | A | D | Denial Rate |
| **Under 50%** | | | | | | | | | | | | |
| Am. Indian/AK Native | 1 | 0 | 0% | 0 | 0 | - | 2 | 1 | 50% | 0 | 0 | - |
| Asian/Pacific Islander | 0 | 0 | - | 1 | 0 | 0% | 1 | 1 | 100% | 0 | 0 | 0% |
| African-American | 8 | 5 | 63% | 6 | 0 | 0% | 38 | 14 | 37% | 8 | 4 | 50% |
| Latino | 13 | 7 | 54% | 66 | 4 | 6% | 34 | 18 | 53% | 2 | 1 | 50% |
| White | 122 | 32 | 26% | 105 | 19 | 18% | 119 | 36 | 30% | 7 | 3 | 43% |
| Other | 3 | 0 | 0% | 1 | 0 | 0% | 2 | 1 | 50% | 0 | 0 | - |
| Joint (White/Minority) | 0 | 0 | - | 0 | 0 | - | 3 | 1 | 33% | 0 | 0 | 0% |
| Race not Available | 19 | 13 | 68% | 17 | 9 | 53% | 158 | 109 | 69% | 3 | 1 | 33% |
| **50-79%** | | | | | | | | | | | | |
| Am. Indian/AK Native | 3 | 2 | 67% | 1 | 1 | 100% | 0 | 0 | - | 0 | 0 | - |
| Asian/Pacific Islander | 2 | 0 | 0% | 17 | 1 | 6% | 4 | 2 | 50% | 2 | 0 | 0% |
| African-American | 12 | 3 | 25% | 23 | 3 | 13% | 70 | 27 | 39% | 22 | 10 | 45% |
| Latino | 35 | 16 | 46% | 108 | 14 | 13% | 53 | 20 | 38% | 30 | 12 | 40% |
| White | 492 | 65 | 13% | 537 | 33 | 6% | 266 | 89 | 33% | 43 | 10 | 23% |
| Other | 3 | 1 | 33% | 4 | 0 | 0% | 3 | 1 | 33% | 0 | 0 | - |
| Joint (White/Minority) | 0 | 0 | - | 10 | 0 | 0% | 7 | 4 | 57% | 0 | 0 | - |
| Race not Available | 52 | 26 | 50% | 14 | 8 | 57% | 415 | 240 | 58% | 6 | 3 | 50% |
| **80-99%** | | | | | | | | | | | | |
| Am. Indian/AK Native | 2 | 1 | 50% | 1 | 0 | 0% | 2 | 1 | 50% | 0 | 0 | - |
| Asian/Pacific Islander | 5 | 1 | 20% | 11 | 1 | 9% | 2 | 1 | 50% | 0 | 0 | - |
| African-American | 14 | 5 | 36% | 19 | 0 | 0% | 41 | 9 | 22% | 13 | 7 | 54% |
| Latino | 17 | 9 | 53% | 25 | 1 | 4% | 24 | 11 | 46% | 16 | 6 | 38% |
| White | 497 | 48 | 10% | 322 | 16 | 5% | 178 | 54 | 30% | 30 | 9 | 30% |
| Other | 2 | 1 | 50% | 2 | 0 | 0% | 4 | 3 | 75% | 1 | 0 | 0% |
| Joint (White/Minority) | 11 | 3 | 27% | 2 | 0 | 0% | 2 | 0 | 0% | 1 | 0 | - |
| Race not Available | 47 | 21 | 45% | 11 | 6 | 55% | 238 | 113 | 47% | 10 | 3 | 30% |
| **100-119%** | | | | | | | | | | | | |
| Am. Indian/AK Native | 1 | 1 | 100% | 0 | 0 | - | 0 | 0 | - | 0 | 0 | - |
| Asian/Pacific Islander | 6 | 2 | 33% | 7 | 0 | 0% | 22 | 14 | 64% | 4 | 1 | 25% |
| African-American | 10 | 4 | 40% | 5 | 0 | 0% | 17 | 7 | 41% | 3 | 2 | 67% |
| Latino | 22 | 7 | 32% | 8 | 2 | 25% | 138 | 44 | 32% | 28 | 11 | 39% |
| White | 496 | 46 | 9% | 261 | 11 | 4% | 3 | 1 | 33% | 0 | 0 | - |
| Other | 0 | 0 | - | 2 | 0 | 0% | 3 | 2 | 67% | 0 | 0 | - |
| Joint (White/Minority) | 4 | 1 | 25% | 10 | 0 | 0% | 3 | 2 | 67% | 0 | 1 | 33% |
| Race not Available | 52 | 18 | 35% | 7 | 1 | 14% | 179 | 83 | 46% | 3 | 1 | 33% |
| **Over 120%** | | | | | | | | | | | | |
| Am. Indian/AK Native | 16 | 3 | 19% | 1 | 0 | 0% | 4 | 3 | 75% | 4 | 3 | 75% |
| Asian/Pacific Islander | 25 | 3 | 12% | 19 | 2 | 11% | 7 | 1 | 14% | 8 | 3 | 38% |
| African-American | 25 | 6 | 24% | 9 | 1 | 11% | 46 | 15 | 33% | 3 | 0 | 0% |
| Latino | 19 | 8 | 42% | 8 | 2 | 25% | 26 | 9 | 35% | 43 | 14 | 33% |
| White | 2152 | 120 | 6% | 1024 | 26 | 3% | 303 | 78 | 26% | 1 | 0 | 0% |
| Other | 13 | 2 | 15% | 7 | 1 | 14% | 0 | 0 | - | 0 | 0 | - |
| Joint (White/Minority) | 40 | 2 | 5% | 28 | 1 | 4% | 11 | 1 | 9% | 0 | 0 | - |
| Race not Available | 246 | 59 | 24% | 26 | 1 | 4% | 428 | 194 | 45% | 11 | 3 | 27% |

SFP03199

# EXHIBIT C

# CITY OF SPRINGFIELD, MA
# ANALYSIS OF IMPEDIMENTS TO FAIR HOUSING

## I.    INTRODUCTION & EXECUTIVE SUMMARY

In 1968 the United States Congress passed Title VIII of the Civil Rights Act, making acts of housing discrimination based on race, sex, national origin, religion, or ethnicity illegal. In 1998, Congress amended Title VIII to include discrimination against families with children and people with mental or physical illness.

The Assistant Secretary for Fair Housing and Equal Opportunity (FHEO) administers and enforces major legislation that ensures equal access to housing, guarantees equal opportunity in all HUD programs and prohibits, to a limited extent, discrimination in employment with respect to HUD programs.

According to HUD's Fair Housing Planning guide:

> Provisions to affirmatively further fair housing (AFFH) are principal and long-standing components of HUD's housing and community development programs. These provisions flow from the mandate of Section 808(e)(5) of the Fair Housing Act which requires the Secretary of HUD to administer the Department's housing and urban development programs in a manner to affirmatively further fair housing.

Through the programs that fall under the umbrella of HUD's Community Planning and Development division, HUD aims to "expand mobility and widen a person's freedom of choice." These programs include the Community Development Block Grant (CDBG), the HOME Investment Partnership program (HOME), Emergency Shelter Grant (ESG), and Housing Opportunities for Persons with AIDS (HOPWA).

According to the Fair Housing Planning guide, "the CDBG program contains a regulatory requirement to affirmatively further fair housing based upon HUD's obligation under Section 808 of the Fair Housing Act. The CDBG regulation also reflects the CDBG statutory requirement that the grantees certify that they will affirmatively further fair housing." Additionally, the HOME program regulation "states the statutory requirement from the Comprehensive housing Affordability Strategy (CHAS) that the jurisdictions must affirmatively further fair housing."

The CPD Department also requires CD grantees, including entitlement communities like Springfield, to document AFFH actions in annual performance reports that are submitted to HUD. Grantees must:

- Conduct an analysis to identify impediments to fair housing choice within the jurisdiction.

- Take appropriate actions to overcome the effects of any impediments identified through the analysis.

SFP03200

— Maintain records reflecting the analysis and actions taken to eliminate impediments to fair housing choice.

Therefore, the City of Springfield has analyzed impediments to fair housing in this report. Actions taken to eliminate these impediments will be detailed in the Consolidated Annual Performance and Evaluation Reports (CAPER) that are due to HUD in the September that follows each program year. Additional information about HUD's Fair Housing Planning requirements may be found on HUD's website at http://www.hud.gov/groups/fairhousing.cfm.

## A. Who Conducted the AI

In 2001, the City of Springfield conducted a Fair Housing Planning process, including the Analysis of Impediments described above. In 2003, the City of Springfield's Office of Community Development revised its Analysis of Impediments (AI) with the help of MBL Housing and Development, Inc. a consultant hired based on direction from HUD. During the fiscal 2005-2006 program year, the City of Springfield augmented this AI with additional analysis.

The Consultant and the City of Springfield utilized interviews and a public hearing to solicit input and feedback for this AI. In addition to include the DRAFT AI in the DRAFT FY04-05 CAPER that was distributed for public comment prior to submission to HUD, the City also solicited direct feedback from directors at the following organizations:

— Massachusetts Fair Housing Center (nee Housing Discrimination Project HDP)
— Anti Displacement Project
— Springfield Housing Authority
— HAP, Inc, a regional housing partnership
— Catholic Charities
— Massachusetts Department of Housing and Community Development
— Massachusetts Commission Against Discrimination
— MBL Housing and Development, an affordable housing development consulting firm
— Pioneer Valley Planning Commission
— Western Mass Legal Services

The City of Springfield received feedback from the Massachusetts Fair Housing Center (MFHC) and revised this AI to address the issues raised by MFHC. A copy of the 9/30/05 letter from MFHC is attached to the end of this document. Due to the fact that these rather substantial comments were received at the end of the public comment period for the FY04-05 CAPER, the City determined it would meet with MFHC (OCD staff meet with Director Jaime Williamson on 10/27/05 and then resubmit the revised document for public comment as part of the FY06-07 Action Plan process.

## B. Methodology

The framework for this AI is the "Suggested Format for the Analysis of Impediments" that is recommended by HUD in its Fair Housing Planning Guide.

2

SFP03201

In order to complete the AI, in 2003 the consultant reviewed the most recent statistical data, reviewed City and State policies and regulations, and conducted interviews with City officials and others knowledgeable about the local housing market.

In 2005, the Office of Community Development utilized interviews and held a public hearing to solicit additional feedback to augment and update the 2003 AI. The Office of Community Development also completed a comprehensive review of policies, practices and procedures that affect the location, availability, and accessibility of housing and assessed current residential patterns and conditions.

## C. How Funded

Community Development Block Grant (CDBG) funds allocated for administrative costs were used to fund the work conducted to complete this AI.

## D. Conclusions

### 1. IMPEDIMENTS FOUND

The following impediments to fair housing in Springfield were identified through this AI.

a. Lack of extensive amounts of undeveloped land.

According to the City's of Springfield Planning Department only approximately 3.4 percent or 0.7 square miles out of a total of 20.5 square miles of residential parcels in Springfield are developable at present (i.e. they do not contain any improvements/structures).

b. Imbalance between rental and homeownership in various neighborhoods.

Data analysis included in this AI indicates that although 49% of Springfield's housing stock is single family housing. In some neighborhoods that percentage exceeds 80%, while in the older, more urban neighborhoods with high concentrations of low and moderate income persons, minorities and/or persons with disabilities that rate falls to below 20%.

Homeownership rates mirror this pattern with the older urban neighborhoods averaging 5-20% of owner-occupancy vs. 67-86 % in outlying neighborhoods. Housing values and occupancy affordability correlate directly with these factors of stock and owner-occupancy.

c. Presence of deteriorated privately-owned properties that are vacant or not actively managed.

3

SFP03202

The results of a recent windshield survey of blighted properties in Springfield that are included as part of this AI indicate that blighting influences are predominately located in areas where homeownership rates are low and the boundaries of these areas overlap with areas where there is a large concentration of ethnic and racial minorities and low and moderate income persons.

d. Evidence of predatory lending, redlining and other discriminatory practices.

There is evidence that predatory lending and redlining are significant problems in Springfield, primarily concerning minority neighborhoods. In December 2003, the Pioneer Valley Planning Commission created a detailed analysis of the regional home lending market with an emphasis on fair lending practices and subprime lending. They examined lending market statistics for the Springfield SMSA from 1996 through 2001.[1] Analyzing loan outcomes by applicant demographics revealed that African-American and Latino applicants had consistently higher loan denial rates than white applicants, regardless of income level. Even high-income African-American and Latino applicants were denied home loans three times more often than white applicants.

Analysis of loan approval ratios – the total number of loans approved per loan denied from 1996 to 2001 – showed that the percentage of persons of color for a particular census tract has a significant inverse relationship with the approval ratio. Even when factors such as income, age, and housing stock are controlled, the racial and ethnic characteristic of a census tract is a significant predictor of loan outcomes.

PVPC's study found significant levels of subprime lending activity, with a concentration of such lending in the urban core census tracts of Springfield, areas with larger populations of persons of color. The study concluded that, "As evidenced by the geographical concentration of subprime applications and the characteristics of these same areas, the data indicates that subprime lenders may be targeting their efforts on low-income communities of color."

e. Existing patterns of segregation.

Springfield is a city of 17 distinct neighborhoods, a fact that has both positive and negative impacts. Much of Springfield's minority population has deep historical roots in particular neighborhoods. Within these ethnically based neighborhoods, residents feel a strong sense of community and can access shops, services, religious and social organizations.

Data analysis included in this AI indicates that within the City of Springfield minority concentration varies by neighborhood, but that the real disparities exist between Springfield and the other communities that are included as part of the

---

[1] Primary sources included the US Census and the Home Mortgage Disclosure Act records of the Federal Financial Institutions Examination Council.

SFP03203

Springfield Metropolitan Statistical Area (MSA), an areas that includes 27 cities and towns. Comparative data about indicates that the greater Springfield Metropolitan Statistical Area is ninth among 331 MSA's nationwide and that the dissimilarity index of white-Hispanic residential segregation and 65th for white/black segregation. The Springfield MSA includes suburban communities that are predominately white, while the area's minority population is concentrated in the urban core cities of Springfield and Holyoke. These patterns of segregation cross municipal boundaries and therefore cannot be addressed by City actions alone.

f.  Language barriers & cultural differences.

Language barriers and cultural differences were also identified another potential impediment to fair housing in this AI. Hispanics are the fastest growing minority group in Springfield, increasing by 55.8% according to the 2000 Census. The total number of Hispanics, 41,343, represents 27.2% of the City's population. The City and surrounding region has also seen a more recent influx of Southeast Asian and Russian immigrants. Language barriers can exacerbate discrimination in accessing rental housing, homeownership, and appropriate mortgage financing.

For Springfield's newest immigrant groups, those from Southeast Asia and the former Soviet republics, differences in how housing is accessed and financed can create barriers. For example, Southeast Asian immigrants are often not familiar with the standard American mortgage process for home ownership and prefer to work and save until they are able to buy with cash.

As is common with nearly all new immigrant groups, later arrivals tend to move into neighborhoods where others from their home country already live. This pattern creates interesting and diverse ethnic neighborhoods but also results in concentration of minority groups.

g.  The age of housing stock and the prevalence of lead-based paint hazards.

According to the analysis included in this AI the age of Springfield's housing stock and the prevalence of lead-based paint hazards are another impediment to fair housing in the city. Approximately 89% of Springfield's housing stock was built before 1979, and 36% was built before 1939. This is true for both renter and owner-occupied housing (87.7% of Springfield's rental housing and 91% of the owner-occupied was built before 1979). The age of the housing stock creates impediments to fair housing for several reasons. It means that much of the housing is in need of repair and expensive to operate, repair, and to maintain in good condition for both homeowners and rental property owners. The cost of maintaining older housing represents a barrier to homeownership for low and moderate-income buyers.

5

SFP03204

The age of the housing stock is also an impediment to fair housing for those with physical disabilities in that older housing is likely to contain physical barriers such as steep stairs, narrow passages and doorways, and small room sizes. The cost of and of making older housing accessible for those with disabilities limits the supply and availability of appropriate and affordable housing for many, especially those with limited income.

The age of the housing stock and corresponding significant presence of lead-based paint creates another impediment to fair housing. The Massachusetts Department of Public Health's Childhood Lead Poisoning Prevention Program lists Springfield as one of the "high risk" communities for childhood lead poisoning. The cost of addressing lead-based paint hazards limits the supply and availability of appropriate and affordable housing for many, especially families with small children and those with limited income.

2. **ACTIONS TO ADDRESS IMPEDIMENTS**

The City of Springfield will undertake the following actions to address the impediments to fair housing that were identified through this AI.

a. Encourage infill/new construction of units suitable for homeownership on the scattered plots of land that remain available for development, particularly in neighborhoods where the homeownership rate is low.

b. Implement balanced housing strategy; encourage homeownership throughout the city, with an emphasis on neighborhoods where homeownership rates are low and in neighborhoods that have little minority representation.

c. Pursue strategies to address abandoned properties through demolition and/or redevelopment.

d. Work with local lending institutions to do outreach to minority community to address the issue of predatory lending and housing repair scams.

e. Work with surrounding communities to identify and overcome barriers to the regional racial imbalance.

f. Continue to offer services, particularly first-time homebuyer education and counseling, fair housing education and credit counseling, in languages other than English (primarily Spanish) and target these programs to minorities.

g. Provide financing and other incentives for property owners to upgrade housing, address lead-based paint hazards and make reasonable accommodations for residents with disabilities.

6

   h. Work with City Departments and the SHA to ensure fair housing practices are in place.

   i. Implement a coordinated system for monitoring and investigating fair housing complaints submitted to HUD, MCAD and MFHC.

## II. *JURISDICTIONAL BACKGROUND DATA*

### A. Demographic and Income Data

The population of the City of Springfield has remained relatively consistent over the past twenty years. Today, the City is home to a population of 152,082 residents.

| | 1980 | 1990 | 2000 |
|---|---|---|---|
| **Springfield Population** | 152,319 | 156,983 | 152,082 |

Source: United States Department of Commerce, Bureau of the Census.

Although the number of residents has remained consistent, the profile of residents has changed significantly. One of the greatest changes to Springfield's population is the number of residents who live in poverty. While the income of residents lagged behind the balance of the Commonwealth in 1980, the gap widened in the 1980s and 1990s. In 2000, Springfield's median family income was 58.8% of that for the Commonwealth. The median income of the City has not kept pace with that of the region or the Commonwealth. This widening income gap has significant implications on every aspect of life within the city.

| **Median Family Income** | 1980 | 1990 | 2000 |
|---|---|---|---|
| Springfield | $ 16,607 | $ 30,824 | $ 36,285 |
| Hampden County | $ 19,596 | $ 31,100 | $ 49,257 |
| Massachusetts | $ 21,166 | $ 44,367 | $ 61,664 |
| % of Hampden County | 84.7% | 99.1% | 73.7% |
| % of Massachusetts | 78.5% | 69.5% | 58.8% |
| | | | |
| **Per Capita Income** | | | |
| Springfield | $ 5,819 | $ 11,584 | $ 15,232 |
| Hampden County | $ 6,731 | $ 14,029 | $ 19,541 |
| Massachusetts | $ 7,459 | $ 17,224 | $ 25,952 |
| % of Hampden County | 86.5% | 82.6% | 77.9% |
| %of Massachusetts | 78.0% | 67.3% | 58.7% |

Source: United States Department of Commerce, Bureau of the Census.

The number of families living below the poverty line increased significantly, as detailed in the bar graph below.

7

SFP03206



Families with Income Below Poverty Level 1980-2000

Source: Springfield Planning Department analysis of 1980, 1999 and 2000 US Census.

When depicted on a block group level (a subset of the census tracts used by the US Census department), low income and minority concentrations throughout the City are particularly evident. Called "areas of low-income concentration" and "areas of minority concentration," the City defines these areas as block groups where the concentration of the respective income or minority group is higher than the percentage of the same demographic group in the overall city population.

The following table overviews the percentages of citywide concentration that are used as the baseline in the racial minority and ethnicity concentration maps that follow. For reference, a blank map with the boundaries of all block groups in the City and a table with the data that served as the foundation for the concentration maps mentioned above.

8

SFP03207

Low and Moderate Income and
Minority Concentrations in Springfield, MA

| | POPULATION | PERCENT OF TOTAL CITY POPULATION |
|---|---|---|
| **INCOME** | | |
| Low or Moderate Income | 87,056 | 59.4% |
| **RACE** | | |
| Black and African American | 31,472 | 20.7% |
| American Indian and Alaska Native | 590 | 0.4% |
| Asian | 2,859 | 1.9% |
| Other/Multi Racial | 32,191 | 21.2% |
| Total Non White (incl. Black and African American, Asian, American Indian and Alaska Native, Native Hawaiian and Other Pacific Islander, and Other/Multi Racial) | 67,204 | 44.2% |
| **ETHNICITY** | | |
| Hispanic | 41,359 | 27.2% |

Source: United States Department of Commerce, Bureau of the Census.

Note: In the "Race" category the total number of Native Hawaiian and Other Pacific Islanders amounts to 98 or 0.1 percent of the Springfield population.

Within the City of Springfield minority population varies by neighborhood, but the disparities are not as great as those between Springfield and some of its neighboring communities.

Springfield is a city of 17 distinct neighborhoods, a fact that has both positive and negative impacts. Much of Springfield's minority population has deep historical roots in particular neighborhoods. Within these ethnically based neighborhoods, residents feel a strong sense of community and can access shops, services, religious and social organizations.

The City of Springfield is also the center of a Metropolitan Statistical Area that includes 27 other cities and towns. Comparative data about these communities and others in the United States indicates that the greater Springfield Metropolitan Statistical Area is ninth in the country in the dissimilarity index of white-Hispanic residential segregation and 65th for white/black segregation, out of 331 MSA's listed. The Springfield MSA includes suburban communities that are predominately white, while the area's minority population is concentrated in the urban core cities of Springfield and Holyoke. These patterns of segregation cross municipal boundaries and therefore cannot be addressed by City actions alone.

9

SFP03208

Percentage Minority and Ethnic Population in
Springfield, MA MSA Towns and Cities

| Community | Population | % Minority Race* | % Hispanic |
|---|---|---|---|
| Amherst | 34,874 | 20.7 | 6.2 |
| Belchertown | 12,698 | 3.8 | 1.6 |
| Chicopee | 54,653 | 10.2 | 8.8 |
| East Longmeadow | 14,100 | 2.3 | .9 |
| Easthampton | 15,994 | 4.5 | 2.1 |
| Granby | 6,132 | 3.2 | 1.2 |
| Hadley | 4,793 | 4.2 | 1.7 |
| Hampden | 5,171 | 1.7 | 0.6 |
| Hatfield | 3,249 | 2.0 | 1.0 |
| Holyoke | 39,838 | 34.2 | 41.4 |
| Huntington | 2,174 | 2.4 | 1.8 |
| Longmeadow | 15,633 | 4.7 | 1.1 |
| Ludlow | 21,209 | 4.2 | 6.5 |
| Monson | 8,359 | 2.3 | 1.2 |
| Montgomery | 654 | 2.0 | 0.8 |
| Northampton | 28,978 | 10 | 5.2 |
| Palmer | 12,497 | 3.2 | 1.2 |
| Russell | 1,657 | 2.5 | 1.5 |
| South Hadley | 17,196 | 6.0 | 2.4 |
| Southampton | 5,387 | 1.6 | 0.9 |
| Southwick | 8,835 | 2.6 | 1.7 |
| Springfield | 152,082 | 43.8 | 27.2 |
| Sunderland | 3,777 | 11.3 | 2.4 |
| Ware | 9,707 | 3.5 | 2.1 |
| West Springfield | 27,899 | 9.3 | 5.8 |
| Westfield | 40,072 | 5.3 | 5.0 |
| Wilbraham | 13,473 | 3.5 | 1.4 |
| Williamsburg | 2,427 | 2.1 | 0.7 |

Source: United States Department of Commerce, Bureau of the Census.

Note: "Minority Race" is defined as Black, Asian, American Indian, and Other/Multi Racial persons.

SFP03209

Census tract and block group data from the 2000 US Census indicates that the areas where there are high concentrations of racial and ethnic minorities and persons with disabilities overlap with the areas in the city where there is a high concentration of low and moderate income persons.

**Springfield, MA Census Tracts and Block Groups with High Concentrations of Low & Moderate Income Persons and High Minority Race Concentrations**



Note: "Minority Race" is defined as Black, Asian, American Indian, and Other/Multi Racial persons.

11

SFP03210

**Springfield, MA Census Tracts and Block Groups with
High Concentrations of Low & Moderate Income Persons and
High Concentrations of Hispanic Persons**



**Springfield, MA Census Tracts and Block Groups with
High Concentrations of Low & Moderate Income Persons and
High Concentrations of Disabled Persons**



SFP03211

Blank Map of Springfield with Boundaries of All Block Groups



13

SFP03212

## B. Employment data

The Springfield economy continues to lag significantly behind that of the state and the nation.

Like other cities in the northeast, Springfield's employment centers--primarily areas that had large concentrations of manufacturing jobs—have diminished in size and relative importance. The local economy is now a service-based economy that is heavily dependent on the Trade, Transportation, Utilities and the Education and Health Services sectors, as indicated in the employment data in the table below.

| Industry | Calendar Year Average | | | |
| | 2001 | 2002 | 2003 | 2004* |
|---|---|---|---|---|
| Construction | 2,309 | 2,192 | 1,943 | 1,726 |
| Manufacturing | 6,455 | 5,622 | 5,141 | 5,230 |
| Trade, Transportation and Utilities | 14,965 | 14,309 | 13,966 | 13,482 |
| Information | 2,299 | 2,083 | 2,255 | 2,018 |
| Financial Activities | 8,689 | 8,498 | 8,293 | 8,060 |
| Professional and Business Services | 7,757 | 7,277 | 6,348 | 6,310 |
| Education and Health Services | 24,755 | 25,610 | 26,369 | 26,728 |
| Leisure and Hospitality | 5,350 | 5,462 | 5,670 | 5,582 |
| Other Services | 3,983 | 4,394 | 4,869 | 5,054 |
| Public Administration | 3,363 | 3,308 | 3,047 | 2,877 |
| Total Employment | 79,925 | 78,755 | 77,901 | 77,117 |
| | | | | |
| Number of Establishments | 4,316 | 4,764 | 5,235 | 5,459 |
| Average Annual Wage | $37,115 | $38,288 | $39,649 | NA |
| Total Wages | $2,966,429,396 | $3,015,400,588 | $3,088,673,412 | $1,582,442,029* |

*Data for 2004 is for the first 6 months of the calendar year.

Source: Massachusetts Department of Employment and Training, Series ES 202; data is not seasonally adjusted. Data is based on place of employment not place of residence.

In addition, unemployment rates are high:

| | Springfield | Massachusetts | U.S. |
|---|---|---|---|
| 2004 | 6.5% | 5.1% | 5.5% |
| 2003 | 8.5% | 5.8% | 6.0% |
| 2002 | 7.4% | 5.3% | 5.8% |
| 2001 | 5.4% | 3.7% | 4.8% |
| 2000 | 4.4% | 2.6% | 4.0% |
| 1999 | 5.0% | 3.2% | 4.2% |

Source:  Massachusetts Department of Labor

14

SFP03213

Job opportunities for Springfield's low and moderate income residents have decentralized to locations all over the city and the region.

The increasing fragmentation of Springfield's employment centers is indicative of the de-concentration of job opportunities in the region for Springfield residents. The following map, based on the list of Springfield's largest employers that follows, indicates that Springfield's largest employers are scattered all over the City.

Springfield's Largest Employers Plotted by Headquarters Location



Neighborhoods
Home ownership rate <34%
Hispanic Concentration >27%
Minority Race Concentration >44%
Low mod income >50%

15

SFP03214

**Firms with more than 100 Employees in Springfield**

| Firm | Address | Firm | Address |
|---|---|---|---|
| American International College | 1000 State St | Merlo Worldwide Forwarding Inc | 100 Brookdale Drive |
| American Medical Response of Massachusetts | 595 Cottage St | Mental Health Association Inc | 995 Worthington St |
| Amtrak | 66 Lyman St | MML Investors Services, Inc., a division of MassMutual | 1414 Main Street |
| Arrow Security Co Inc | 237 Memorial Dr | New England Orthopedic Surgeons | 300 Birnie Ave Ste 201 |
| Astenjohnson Inc | 40 Progress Ave | Nu Visions Manufacturing LLC | 225 Carando Dr |
| Babson Capital Management LLC, a division of MassMutual | 1500 Main Street | Parkview Specialty Hospital | 1400 State St |
| Banknorth National Association | 1441 Main St | Performance Food Group | 340 Taylor St |
| Bay State Gas Company | 2025 Roosevelt Ave | Peter Pan Bus Lines Inc | 1776 Main St Ste 1 |
| Baystate Medical Center, Inc | 759 Chestnut St | R M Sullivan Transportation | 649 Cottage St |
| Behavioral Health Network | 342 Birnie Avenue | Reeds Landing | 807 Wilbraham Rd |
| Big Y Foods Inc | 2145 Roosevelt Ave | Richoo Junior Service Inc | 237 Memorial Dr |
| Center for Human Development/ Behavioral Network | 332 Birnie Avenue | Shriners Hospital For Children | 516 Carew St |
| Chapin Center | 200 Kendall St | Sisters of Providence Health System and Mercy Medical Center | 233 Carew St 271 |
| Diocese of Springfield | 65 Elliot St | Smith and Wesson | 2100 Roosevelt Avenue |
| Disability Management Services | 1350 Main St Ste 8 | Smurfit Stone | 320 Parker St |
| Durham School Services Inc | 99 Arnold Ave | Solutia, Inc. | 730 Worcester Street |
| Electro-Term-Hollingsworth, Inc. | 90 Memorial Dr Ste 4 | Springboard Technology | 1 Federal Street |
| F.L. Roberts & Co. Inc. | 93 West Broad Street | Springfield Anesthesia Service | 908 Allen St |
| Falcon Hotel Corp | 1 Monarch Pl Ste 25100 | Springfield College | 263 Alden St |
| Farmland Foods | 20 Carando Drive | Springfield Technical Community College (STCC) | 1 Armory Square |
| Filenes Department Store | 1655 Boston Rd | Springfield Wire Inc | 243 Cottage Street |
| First Student | 600 Berkshire Ave | Stop & Shop Companies, Inc | 470 North Main Street |
| Fontaine Bros Inc | 510 Cottage St | The Springfield Republican | 1860 Main St |
| Gaslie/Tieflex Industrial Products | 603 Hanose St | Transit Express | 2840 Main St |
| Goodwill Industries of the Springfield/Hartford Area, Inc. | 285 Dorset St | U S Security Associates Inc | 191 Chestnut St Ste 2a |
| Greater Springfield Senior Services | 66 Industry Ave Ste 9 | United Personnel Services Inc | 1331 Main St |
| Health New England Inc. | 1 Monarch Place, fl 15 | United States Postal Service | 1883 Main St Rm 146 |
| JC Penney Outlet | 1700 Boston Rd | Van-Pak Inc | 255 Cadwell Dr |
| Kim Center Adult Day Care Health, Leslie Educational Alternatives | 604 Cottage St | Verizon Communications Inc | 365 State St |
| KMART Corporation | 1277 Liberty St | Visiting Nurse Association | 50 Maple St |
| Life Laboratories | 299 Carew St | Wal-Mart | 1105 Boston Rd |
| Merritt International Inc | 1550 Main Street | West Street Inn, Multi Cultural Community Service Pioneer Valley | 1000 Wilbraham Rd |
| Martin Luther King Community Center | 108 Wilbraham Rd | Western Massachusetts Electric Company | 300 Cadwell Dr |
| MassMutual Financial Group | 1295 State St | Western New England College | 1215 Wilbraham Rd |
| Meadwestvaco Corporation | 2001 Roosevelt Ave | WGGB -TV | 1300 Liberty St |

Source:  Business West Magazine and calls to individual employers.

Limited public transportation options in the city further inhibit low and moderate income workers.  According to the 2000 US Census, workers living in block groups with high concentrations of both low and moderate income persons and ethnic and racial minorities are somewhat less likely to have access to their own private transportation.  In lieu of their own private transport to and from work, they car pool, utilize public transportation, bicycle or walk to work.  Additionally, according to the 2000 US Census patterns of travel times to work for individuals in these protected classes were not dissimilar from those of the workers residing in the balance of Springfield's neighborhoods.

Employment trends also indicate that small businesses will be the source of job opportunities in the future.  A study published by the US Small Business Administration recently reported that Springfield and Hampden County had the highest average level of new business start-ups in the country from 1990 through 2001.

A comparison of private employment in Springfield during the first six months of 2003 and the same data for the same period in 2004 indicates that while total private employment decreased by 0.5 percent, the total number of private firms in Springfield increased by 12.4 percent during the same period which points to the trend that small businesses are likely to be the source of job opportunities for Springfield residents in the future.

16

SFP03215

### Average Private Employment, Springfield, MA

| | Average Private Employment January -June | | | | Private Firms | | | |
|---|---|---|---|---|---|---|---|---|
| | 2003 | 2004 | % of Total 2004 | % Change 2003 to 2004 | 2003 | 2004 | % of Total 2004 | % Change 2003 to 2004 |
| Construction | 1,606 | 1,504 | 2.3% | -6.4% | 149 | 153 | 2.9% | 2.7% |
| Manufacturing | 5,246 | 5,230 | 8.1% | -0.3% | 154 | 150 | 2.8% | -2.6% |
| Trade, Transportation and Utilities | 11,339 | 10,972 | 17.0% | -3.2% | 709 | 713 | 13.3% | 0.6% |
| Information | 2,265 | 1,929 | 3.0% | -14.8% | 41 | 45 | 0.8% | 9.8% |
| Financial Activities | 8,377 | 8,043 | 12.5% | -4.0% | 329 | 334 | 6.2% | 1.5% |
| Professional and Business Services | 6,343 | 6,310 | 9.8% | -0.5% | 552 | 551 | 10.3% | -0.2% |
| Education and Health Services | 19,809 | 20,226 | 31.4% | 2.1% | 464 | 464 | 8.7% | 0.0% |
| Leisure and Hospitality | 5,043 | 5,180 | 8.0% | 2.7% | 315 | 320 | 6.0% | 1.6% |
| Other Services | 4,736 | 5,050 | 7.8% | 6.6% | 2,053 | 2,626 | 49.0% | 27.9% |
| TOTAL | 64,763 | 64,443 | 100.0% | -0.5% | 4,766 | 5,356 | 100.0% | 12.4% |

Source: Massachusetts Department of Employment and Training, Series: ES 202. Data is not seasonally adjusted; data is based on place of employment not place of residence.

Springfield-based, minority-owned businesses are not growing at the same rate as the overall small business community, however. Although they make up 20% of the total number of businesses in the City, Springfield-based, minority-owned businesses are seeing total receipts coming in at only $90,626,000 or 0.5 percent of total receipts of Springfield establishments in 1997.

| | Massachusetts, 1997 | | | Springfield, 1997 | | |
|---|---|---|---|---|---|---|
| | Minority Only | Total | Percent of Total | Minority Only | Total | Percent of Total |
| **Total Establishments** | | | | | | |
| Establishments | 39,039 | 537,150 | 7.3% | 1,582 | 7,914 | 20.0% |
| Total Sales and Receipts ($1, 000) | 6,980,154 | 517,291,479 | 1.3% | 116,508 | 17,052,367 | 0.7% |
| Sales and Receipts per Establishment ($000)* | $ 179 | $ 983 | | $ 74 | $ 2,155 | |
| **Establishments with Employees** | | | | | | |
| Establishments | 7,641 | 135,309 | 5.6% | 102 | 2,683 | 3.8% |
| Total Sales and Receipts ($1, 000)* | 6,133,900 | 498,376,149 | 1.2% | 90,626 | 16,868,908 | 0.5% |
| Sales and Receipts per Establishment ($000)* | $ 803 | $ 3,683 | | $ 888 | $ 6,287 | |
| Employees | 53,243 | 2,852,762 | 1.9% | 668 | 75,930 | 0.9% |

Source: US Economic Census, 1997 (note: More current data (2002 survey) will not be available until late 2005)

The paucity of developable industrial and commercial sites in Springfield also hinders the city's ability to attract and retain jobs for low and moderate income residents. In 2004, the lion share of building sales, land sales, lease activity and facility updates are taking place in suburban locations in towns along Springfield's periphery, which is largely due to the lack of developable industrial/commercial land in the city. According to CB Richard Ellis, the only additions to the inventory of industrial properties in the greater Springfield area are "build to suits." As a result, the CB Richard Ellis report says, the vacancy rate in industrial property decreased from 10 percent in 2002 to 9 percent in 2003 and continued to decline in 2004.[2]

---

[2] CB Richard Ellis Market Report, 2004

SFP03216

C.    **Residential Real Estate Availability**

This lack of available residential real estate, especially large tracts of land, for new housing construction is another potential impediment to fair housing as it limits development activity in the city.  According to the City's of Springfield Planning Department only approximately 3.4 percent or 0.7 square miles out of a total of 20.5 square miles of residential parcels in Springfield are developable at present (i.e. they do not contain any improvements/structures).

D.    **Housing profile**

According to the 2000 US Census, the City of Springfield, known as the City of Homes, has 61,172 units of housing.

To the issue of racial or ethnic disproportion in the overall housing market, the table below shows the proportions of all households in Springfield (owners and renters) with housing needs as identified by HUD's Comprehensive Housing Affordability Strategy (CHAS). Data is presented for various household income levels that related to the areas median household income. The final column presents the thresholds over which minority groups would be identified as having a disproportionate housing need relative to the population as a whole.

| Median Family Income | Total Households | Households with Any Housing Problem | % with Any Housing Problem | Disproportionate Need Threshold |
|---|---|---|---|---|
| < 30% MFI | 13,147 | 9,282 | 70.6% | 80.6% |
| 30.01-50% MFI | 8,468 | 4,979 | 58.8% | 68.8% |
| 50.01-80% MFI | 10,936 | 3,948 | 36.1% | 46.1% |
| > 80.01% MFI | 24,519 | 2,354 | 9.6% | 19.6% |

Source:  CHAS Data; 2000 US Census

The following table presents CHAS housing need data for ethnic and racial groups in Springfield.

18

SFP03217

| Median Family Income | Total Minority Households | Households with Any Housing Problem | % with Any Housing Problem | Disproportionate Need Threshold Exceeded? |
|---|---|---|---|---|
| BLACK NON-HISPANIC HOUSEHOLDS | | | | |
| < 30% MFI | 2,765 | 1,861 | 67.3% | No |
| 30.01-50% MFI | 1,850 | 1,252 | 68.1% | No |
| 50.01-80% MFI | 2,160 | 870 | 40.3% | No |
| > 80.01% MFI | 4,030 | 472 | 11.7% | No |
| ASIAN NON-HISPANIC HOUSEHOLDS | | | | |
| < 30% MFI | 170 | 135 | 79.4% | No |
| 30.01-50% MFI | 95 | 76 | 80.6% | Yes |
| 50.01-80% MFI | 110 | 45 | 40.9% | No |
| > 80.01% MFI | 359 | 60 | 16.7% | No |
| HISPANIC HOUSEHOLDS | | | | |
| < 30% MFI | 5,333 | 3,792 | 71.1% | No |
| 30.01-50% MFI | 2,354 | 1,389 | 59.0% | No |
| 50.01-80% MFI | 1,943 | 820 | 42.2% | No |
| > 80.01% MFI | 2,835 | 570 | 20.1% | Yes |

Source: CHAS Data; 2000 US Census

Based upon an analysis of HUD's CHAS data, two income groups of minority households were determined to have disproportionate housing needs. These two groups, as illustrated in the chart above, are Asian, non- Hispanic households with incomes between 30-50% of median and Hispanic households with incomes over 80% of median.

Further analysis of Springfield's housing stock indicates that Springfield has two distinct housing markets.

Overall, 49% of Springfield's housing stock is single family housing. Yet in some neighborhoods that percentage exceeds 80%; while in the older, more urban neighborhoods with high concentrations of low and moderate income persons, minorities and/or persons with disabilities that rate falls to below 20%.

Homeownership rates mirror this pattern with the older urban neighborhoods averaging 5-20% of owner-occupancy vs. 67-86 % in outlying neighborhoods. Housing values and occupancy affordability correlate directly with these factors of stock and owner-occupancy.

SFP03218



The increased demand for affordable single family homes in stable neighborhoods has also resulted in a significant rise in median sales prices.

### Median Sales Price, Residental Units Springfield MA

| Calendar Year | 1-Family | Condo | All Sales |
|---|---|---|---|
| 2005* | 126,500 | 66,000 | 133,000 |
| 2004 | 118,900 | 89,914 | 124,000 |
| 2003 | 105,000 | 78,500 | 105,000 |
| 2002 | 92,000 | 78,350 | 90,000 |
| 2001 | 84,900 | 74,113 | 80,500 |
| 2000 | 76,000 | 73,200 | 74,000 |
| %Change 2000-2004 | 56.4% | 22.2% | 67.6% |

Source:  The Warren Group

SFP03219

Low homeownership rates are prevalent in areas with large concentrations of low and moderate income persons and ethnic and racial minorities. The following map illustrates that the block groups that fall into the lowest percentage of homeownership are also areas of low-income concentration.

### Springfield, MA Census Tracts and Block Groups with High Concentrations of Low and Moderate Income Persons and Low Homeownership Rates



Neighborhoods
51-69 % Low Mod Income
70-100 % Low Mod Income
Home ownership rate <34%

SFP03220

Areas where there are high concentrations of persons in protected classes also correlate to areas with low-homeownership rates but not to the same degrees as that for low-income areas.

### Springfield, MA Census Tracts and Block Groups with High Concentrations of Low and Moderate Income Persons and Low Homeownership Rates



Legend:
- Neighborhoods
- Home ownership rate <34%
- Hispanic Concentration >27%
- Minority Race Concentration >44%
- Disabled Concentration >25%
- Low mod income >50%

22

SFP03221

Rental stock within Springfield is primarily pre-1940 stock in larger multi-family apartment blocks. Generally these properties are in need of modernization and in some cases significant rehabilitation. This stock has limited utility as housing for persons with disabilities.

The data identifies a rent burden for the majority of lower income rental households. In some categories, nearly 80% of the households experience a cost burden. Very low income elderly household are also likely to have disproportional housing costs. To meet these needs as well as those of vulnerable populations including the needs of the persons with HIV/AIDS and persons with disabilities, the City will target its housing resources towards the development of additional affordable rental units.



**City of Springfield**
Renter Occupied Housing

Indian Orchard 82

East Springfield 34

Boston Road 33

Pine Point 38

Liberty Heights 51

Bay 62

Brightwood 50

Memorial Square 84

McKnight 59

Upper Hill 54

Sixteen Acres 22

Metro Center 95

Old Hill 66

Six Corners 82

South End 65

East Forest Park 13

Forest Park 55

Percent of Renter Occupied Housing Units
13 - 38
38 - 55
55 - 66
66 - 96

23

SFP03222

While the City of Springfield has a relatively affordable housing market, the City struggles to meet the housing needs of its low and moderate income residents. Limited household income and an aged housing stock create an enormous demand for safe, affordable housing.

The Massachusetts Department of Housing and Community Development's Chapter 40B Subsidized Housing Inventory shows that 17.2 percent or 10,522 units of the City's total housing stock are subsidized to assist low-income residents, which far exceeds the State's goal of 10 percent affordability and is only surpassed by Aquinnah at 26.5 percent, Holyoke at 21.0 percent, Boston at 18.9 percent, and Chelsea at 17.6 percent. However, the public housing and tenant-based Section 8 certificate waiting lists indicate that there is continued demand for affordable housing in the City. The SHA oversees a total of 2,387 public housing units and an additional 2,675 units under contract through rental assistance programs. An additional 169 units under contract through rental assistance programs are currently under construction or under substantial rehabilitation.

The SHA waiting list currently contains 2,602 families, approximately 89.5 percent of which are considered to be extremely low-income families. Only a small percentage (1.2 percent) of waitlist households have incomes between 50-80 percent of median. This disproportionate representation highlights the severe shortage of housing units available to households below 30 percent of median. While elderly households represent a portion of the waitlist households, the majority (94 percent) of those on the wait list are families, 61.1 percent are Hispanic, and 33.1% are families with a disabled member.

SFP03223

The chart below provides a detailed breakdown of households on the SHA waitlist.

| Housing Needs of Families on the Waiting List | | | |
|---|---|---|---|
| | # of families | % of total families | Annual Turnover |
| Waiting list total | 2602 | | |
| Extremely low income <=30% AMI | 2330 | 89.5 | |
| Very low income (>30% but <=50% | 240 | 9.2 | |
| Low income (>50% but <80% AMI) | 32 | 1.2 | |
| Families with children | 1591 | 61.1 | |
| Elderly families | 186 | 7.1 | |
| Families with Disabilities | 862 | 33.1 | |
| Race/ethnicity (White) | 434 | 16 | |
| Race/ethnicity (Black) | 446 | 17 | |
| Race/ethnicity (Hispanic) | 1666 | 64 | |
| Race/ethnicity (Other) | 56 | 2 | |
| Characteristics by Bedroom Size (Public Housing Only) | | | |
| 1BR | 855 | 32 | 530 |
| 2 BR | 1049 | 40 | 535 |
| 3 BR | 597 | 22.9 | 530 |
| 4BR | 91 | 3.4 | 76 |
| 5 BR | 9 | 0.3 | 6 |
| 5+ BR | 1 | 0.03 | 2 |

Source: Springfield Public Housing Authority

25

The Springfield Housing Authority has undertaken an assessment of its need for accessible units (Section 504 compliance). In the assessment, a number of factors including current utilization and wait list needs were considered. The SHA determined that the current stock meets the current and anticipated demand. In the Springfield, MA MSA, however, subsidized housing units are not evenly distributed among the cities and towns, as indicated in the following table.

| Community | 2000 Census: Housing Units | % Subsidized Units 2005 |
|---|---|---|
| Amherst | 9,020 | 10.7 |
| Belchertown | 5,002 | 6.3 |
| Chicopee | 24,337 | 10.4 |
| E. Longmeadow | 5,350 | 7.6 |
| Easthampton | 7,058 | 7.3 |
| Granby | 2,288 | 3.0 |
| Hadley | 1,943 | 13.4 |
| Hampden | 1,843 | 3.5 |
| Hatfield | 1,420 | 3.6 |
| Holyoke | 16,180 | 21.0 |
| Huntington | 847 | 8.0 |
| Longmeadow | 5,832 | 7.3 |
| Ludlow | 7,815 | 2.2 |
| Monson | 3,184 | 5.8 |
| Montgomery | 254 | 0.0 |
| Northampton | 12,282 | 11.7 |
| Palmer | 5,371 | 7.6 |
| Russell | 634 | 4.6 |
| South Hadley | 6,757 | 4.9 |
| Southampton | 2,003 | 2.4 |
| Southwick | 3,488 | 4.7 |
| Springfield | 61,001 | 17.2 |
| Sunderland | 1,658 | 0.6 |
| Ware | 4,285 | 10.2 |
| W. Springfield | 12,196 | 3.2 |
| Westfield | 15,362 | 6.9 |
| Wilbraham | 5,021 | 4.5 |
| Williamsburg | 1,057 | 6.5 |

Source: Massachusetts Department of Housing and Community Development (DHCD)'s Chapter 40B Subsidized Housing Inventory.

SFP03225

D.    **Maps**

The City of Springfield utilizes maps throughout this AI to assist in showing housing/job/transportation relationships, areas of racial/ethnic integration and segregation and locations of housing choices are distributed throughout this document.

**E. Other Relevant Data**

**BLIGHT**

A recent windshield survey of blighted properties in Springfield yielded a list of 238 "abandoned" structures.  Primarily residential in nature, 89.1 percent or 212 of these sites were 1-4 family units.  Of the balance of the properties, 8 were large multi family site, and 18 were commercial or industrial facilities.  Just under 87 percent of the structures are privately owned.

A complaint list of requests to cleanup 589 sites with debris and/or overgrowth is another blighting influence that is concentrated in Springfield's low and moderate income and minority neighborhoods.  Of these sites, 147 are tax delinquent and 70% have multiple complaints.

The following map shows that these blighting influences are predominately located in areas where homeownership rates are low, which, as indicated in the maps above, overlap with areas were there is a large concentration of ethnic and racial minorities and low and moderate income persons.

27

SFP03226

**Springfield, MA Census Tracts and Block Groups with**
**Low Homeownership Rates**
**with Overlay of Recently Identified Boarded Up Buildings and Overgrown Parcels**



## LANGUAGE BARRIERS AND CULTURAL DIFFERENCES

Language barriers and cultural differences are another potential impediment to fair housing that can be identified through analysis of basic demographic and housing data. Hispanics are the fastest growing minority group in Springfield, increasing by 55.8% according to the 2000 Census. The total number of Hispanics, 41,343, represents 27.2% of the City's population. The City and surrounding region has also seen a more recent influx of Southeast Asian and Russian immigrants. Language barriers can exacerbate discrimination in accessing rental housing, homeownership, and appropriate mortgage financing.

For Springfield's newest immigrant groups, those from Southeast Asia and the former Soviet republics, differences in how housing is accessed and financed can create barriers. For example, Southeast Asian immigrants are often not familiar with the standard American mortgage process for home ownership and prefer to work and save until they are able to buy with cash.

As is common with nearly all new immigrant groups, later arrivals tend to move into neighborhoods where others from their home country already live. This pattern creates interesting and diverse ethnic neighborhoods but also results in concentration of minority groups.

## LEAD HAZARDS

Other potential impediments include the age of housing stock and the prevalence of lead-based paint hazards. 89% of Springfield's housing stock was built before 1979, and 36% was built before 1939. This is true for both renter and owner-occupied housing (87.7%

SFP03227

of Springfield's rental housing and 91% of the owner-occupied was built before 1979). The age of the housing stock creates impediments to fair housing for several reasons. It means that much of the housing is in need of repair and expensive to operate, repair, and to maintain in good condition for both homeowners and rental property owners. The cost of maintaining older housing represents a barrier to homeownership for low and moderate-income buyers.

The age of the housing stock is also an impediment to fair housing for those with physical disabilities in that older housing is likely to contain physical barriers such as steep stairs, narrow passages and doorways, and small room sizes. The cost of and of making older housing accessible for those with disabilities limits the supply and availability of appropriate and affordable housing for many, especially those with limited income.

The age of the housing stock and corresponding significant presence of lead-based paint creates another impediment to fair housing. The Massachusetts Department of Public Health's Childhood Lead Poisoning Prevention Program lists Springfield as one of the "high risk" communities for childhood lead poisoning. The cost of addressing lead-based paint hazards limits the supply and availability of appropriate and affordable housing for many, especially families with small children and those with limited income.

Springfield continues to be defined as a "high risk" community for lead poisoning by the Commonwealth's Department of Public Health. Springfield has a total of 61,172 housing units, 10.1 percent of these units were built before 1950 and are occupied by families living below the poverty level, putting them on the Lead Hazard High Risk List. Approximately 36.3% of the units in Springfield were built prior to 1940, and a full 89.9% were built pre-1979 – both indicators that the units are likely to contain lead-based products.

Springfield's population of 152,082 includes 20,083 children less than six years of age (Census, DPH). According to the 2000 U.S. Census, nearly 60% of the City's households are low or moderate income. According to U.S. Census data, there are 7,100 households living in poverty in Springfield or roughly 20% of the population.

The Lead Hazards section of Environmental Defense "Scorecard", which is co-sponsored by the Alliance to End Childhood Lead Poisoning, ranks census tracts by the potential lead hazards. When evaluated by "children under 5 living in poverty" "Scorecard's" summary of Lead Hazards documents the unmet need.

### SUMMARY OF LEAD HAZARDS – CITY OF SPRINGFIELD

| Neighborhood | Number Of Units at High Risk* | % of Total High Risk | Units Built Pre 1950 | Units With Low Income | Children Under 5 Living In Poverty |
|---|---|---|---|---|---|
| Bay | 240 | 3.9% | 700 | 450 | 200 |
| Boston Road | --- | --- | --- | --- | --- |

29

SFP03228

| | | | | | |
|---|---|---|---|---|---|
| Brightwood | 194 | 3.1% | 650 | 840 | 292 |
| East Springfield | 160 | 2.6% | 1,300 | 300 | 160 |
| East Forest Park | --- | --- | --- | --- | --- |
| Forest Park | 1,282 | 20.7% | 6,330 | 1,828 | 771 |
| Indian Orchard | 314 | 5.1% | 1,770 | 643 | 249 |
| Liberty Heights | 575 | 9.3% | 3580 | 1,350 | 563 |
| McKnight | 380 | 6.1% | 1,100 | 550 | 200 |
| Memorial Sq | 301 | 4.8% | 540 | 911 | 410 |
| Metro Center | 530 | 8.5% | 1,330 | 920 | 200 |
| Old Hill | 320 | 5.2% | 910 | 510 | 300 |
| Pine Point | 235 | 3.8% | 1,480 | 650 | 432 |
| Six Corners | 730 | 11.8% | 1,800 | 1,200 | 590 |
| Sixteen Acres | 216 | 3.5% | 850 | 709 | 344 |
| South End | 470 | 7.6% | 1,260 | 740 | 341 |
| Upper Hill | 260 | 4.2% | 1,500 | 330 | 270 |
| **TOTAL** | **6,207** | **100.0%** | **25,100** | **11,931** | **5,322** |

Source: Scorecard/Environmental Defense (Note: Due to differences in neighborhood boundaries between data sources, Scorecard's data cannot be directly correlated to income, race, ethnicity and disabled person concentrations in Springfield.)

*This measure is the number of housing units that were built before 1950 and are occupied by families living below the poverty level.

Note: For the minority concentration data a grey box indicates that the percentage is higher than the citywide average. In the low and moderate income persons column, a grey box indicates the concentration is greater than 50.

SFP03229

## III.   EVALUATION OF CITY'S CURRENT FAIR HOUSING LEGAL STATUS

**A. Fair housing complaints or compliance reviews where the Secretary has issues a charge of or made a finding of discrimination.**

The Massachusetts Commission Against Discrimination (MCAD) ensures equality of opportunity by enforcing the Commonwealth's anti-discrimination laws, MGL Chapters 151b and 272, through the resolution of complaints of discrimination in the areas of employment, housing, public accommodations, services, credit and education. The MCAD reports all fair housing related complaints to the Department of Housing and Urban Development as required under law. The table on the following pages lists housing discriminations regarding property in Springfield reported to HUD between January 1, 2000, and the present.

"Closure Type" and the "Respondent" information is summarized below. Of the 56 listed 33 reported incidences of housing discrimination were found to have no probable cause. The two (2) cases listing the City of Springfield as the respondent are classified as having no probable cause.

### Closure Type

| | |
|---|---|
| Active | 5 |
| Complainant Failed to Cooperate | 1 |
| No Probable Cause | 33 |
| Probable Cause Finding Active | 2 |
| Settled | 8 |
| Settled; Probable Cause | 2 |
| Withdrawn | 5 |
| | 56 |

### Respondent

| | |
|---|---|
| Private | 44 |
| Springfield Housing Authority | 10 |
| City of Springfield | 2 |
| | 56 |

31

SFP03230

Fair Housing Complaints or Compliance Reviews Filed with HUD
Springfield, MA
January 1, 2000 - present.

| Record | Respondent | Date Filed | Basis of Alleged Discrimination | Issue Description | Closure Type |
|---|---|---|---|---|---|
| 010002668 | Private | 02/07/00 | National Origin | Discrimination in terms/conditions/ privileges relating to rental | Withdrawn |
| 010005648 | Private | 02/23/00 | Disability | Discrimination in terms/conditions/ privileges relating to rental | No Probable Cause |
| 010004978 | Private | 03/10/00 | National Origin | Discriminatory refusal to rent | No Probable Cause |
| 010005238 | City of Springfield | 05/25/00 | Race, Color | Discrimination in terms/conditions/ privileges relating to rental | No Probable Cause |
| 010003148 | Private | 06/07/00 | Color, National Origin | Other discriminatory acts | No Probable Cause |
| 010003148 | Private | 06/07/00 | Color, National Origin | Discriminatory acts under Section 818 (coercion, etc.) | No Probable Cause |
| 010003878 | Springfield Housing Authority | 06/16/00 | National Origin | Discriminatory refusal to rent and negotiate for rental | No Probable Cause |
| 010003878 | Springfield Housing Authority | 06/16/00 | National Origin | Discriminatory terms, conditions, privileges, or services and facilities | No Probable Cause |
| 010004058 | Springfield Housing Authority | 07/13/00 | Disability | Discriminatory terms, conditions, privileges, or services and facilities | Settled |
| 010006498 | Private | 09/17/00 | Race, Harassment | Discrimination in terms/ conditions/ privileges relating to rental | No Probable Cause |
| 010006498 | Private | 09/17/00 | Race, Harassment | Discriminatory acts under Section 818 (coercion, etc.) | No Probable Cause |
| 010005958 | Private | 09/26/00 | National Origin, Family Status | Discriminatory refusal to rent | No Probable Cause |
| 010006278 | Private | 09/27/00 | Race, Color | Discrimination in terms/conditions/ privileges relating to rental | Withdrawn |
| 010100458 | Springfield Housing Authority | 10/10/00 | Disability | Discrimination in terms/conditions/ privileges relating to rental | Settled; probable cause finding 5/9/2001 |
| 010100458 | Springfield Housing Authority | 10/10/00 | Disability | Failure to make reasonable accommodation | Settled; probable cause finding 5/9/2001 |
| 010100298 | Private | 10/23/00 | National Origin | Discrimination in terms/conditions/ privileges relating to rental | No Probable Cause |

32

SFP03231

| Record | Respondent | Date Filed | Basis of Alleged Discrimination | Issue Description | Closure Type |
|--------|-----------|-----------|--------------------------------|-------------------|--------------|
| 010100298 | Private | 10/23/00 | National Origin | Discriminatory acts under Section 818 (coercion, etc.) | No Probable Cause |
| 010100888 | Private | 11/01/00 | Retaliation | Discriminatory acts under Section 818 (coercion, etc.) | Complainant failed to cooperate |
| 010100698 | Private | 11/08/00 | Disability | Discriminatory acts under Section 818 (coercion, etc.) | Withdrawn |
| 010101868 | Private | 01/31/01 | Race, Color | Discrimination in terms/conditions/ privileges relating to rental | No Probable Cause |
| 010101868 | Private | 01/31/01 | Race, Color | Discriminatory acts under Section 818 (coercion, etc.) | No Probable Cause |
| 010102028 | Private | 03/02/01 | Family Status | Discriminatory refusal to rent | Probable cause finding 9/6/2001; ACTIVE |
| 010102028 | Private | 03/02/01 | Family Status | Discriminatory refusal to rent and negotiate for rental | Probable cause finding 9/6/2001; ACTIVE |
| 010102218 | Private | 03/15/01 | Disability | Failure to make reasonable accommodation | No Probable Cause |
| 010102708 | Springfield Housing Authority | 05/25/01 | Disability | Failure to make reasonable accommodation | Settled |
| 010103018 | City of Springfield Dept. of Code Enforcement | 06/15/01 | National Origin | Discrimination in the appraising of residential real property | No Probable Cause |
| 010104008 | Private | 07/11/01 | Race | Discriminatory terms, conditions, privileges, or services and facilities | Withdrawn |
| 010200978 | Private | 01/03/02 | Disability | Discriminatory terms, conditions, privileges, or services and facilities | No Probable Cause |
| 010201238 | Springfield Housing Authority | 01/29/02 | National Origin, Disability, Family Status | Discriminatory refusal to rent and negotiate for rental | No Probable Cause |
| 010201478 | Private | 02/12/02 | Disability | Discriminatory terms, conditions, privileges, or services and facilities | No Probable Cause |
| 010202348 | Private | 04/30/02 | Family Status | Discriminatory refusal to rent | Settled |
| 010202358 | Private | 05/02/02 | National Origin | Discriminatory refusal to sell | Withdrawn |
| 010202678 | Private | 06/20/02 | National Origin | Discrimination in terms/conditions/ privileges relating to rental | No Probable Cause |
| 010203068 | Private | 08/06/02 | Race, Color, Family Status | Discriminatory refusal to rent and negotiate for rental | No Probable Cause |

SFP03232

| Record | Respondent | Date Filed | Basis of Alleged Discrimination | Issue Description | Closure Type |
|---|---|---|---|---|---|
| 010203068 | Private | 08/06/02 | Race, Color, Family Status | False denial or representation of availability | No Probable Cause |
| 010203068 | Private | 08/06/02 | Race, Color, Family Status | Otherwise deny or make housing available | No Probable Cause |
| 010203898 | Springfield Housing Authority | 10/02/02 | Disability | Failure to make reasonable accommodation | No Probable Cause |
| 010301168 | Private | 12/30/02 | National Origin | Discriminatory terms, conditions, privileges, or services and facilities | No Probable Cause |
| 010302808 | Private | 04/07/03 | National Origin, Family Status | Discriminatory refusal to rent | No Probable Cause |
| 010303058 | Private | 05/14/03 | Race | Discrimination in the purchasing of loans | Settled |
| 010303728 | Private | 06/30/03 | Race | Discrimination in terms/conditions/ privileges relating to rental | Settled |
| 010400628 | Springfield Housing Authority | 12/10/03 | Disability | Failure to make reasonable accommodation | Settled |
| 010401258 | Springfield Housing Authority | 01/14/04 | Race, Color, Disability | Discrimination in terms/conditions/ privileges relating to rental | No Probable Cause |
| 010402298 | Private | 04/15/04 | Race | Discriminatory financing (includes real estate transactions) | Settled |
| 010402458 | Private | 04/27/04 | Race | Discriminatory financing (includes real estate transactions) | Settled |
| 010403198 | Private | 06/29/04 | Race, Color, National Origin | Discrimination in the making of loans | No Probable Cause |
| 010403198 | Private | 06/29/04 | Race, National Origin | Redlining | No Probable Cause |
| 010404588 | Private | 09/24/04 | Family Status | Discrimination in terms/conditions/ privileges relating to rental | No Probable Cause |
| 010500798 | Private | 11/19/04 | Race | Discrimination in terms/conditions/ privileges relating to rental | No Probable Cause |
| 010503158 | Private | 04/01/05 | Race, Religion | Discriminatory financing (includes real estate transactions) | No Probable Cause |
| 010503318 | Private | 05/03/05 | Race | Discriminatory refusal to rent | No Probable Cause |
| 010504098 | Private | 06/02/05 | Race, Color | Discriminatory advertising, statements and notices | Active |

34

SFP03233

| Record | Respondent | Date Filed | Basis of Alleged Discrimination | Issue Description | Closure Type |
|---|---|---|---|---|---|
| 010504098 | Private | 06/02/05 | Race, Color | Discriminatory terms, conditions, privileges, or services and facilities | Active |
| 010504028 | Private | 06/10/05 | Disability | Failure to make reasonable accommodation | Active |
| 010503838 | Private | 06/14/05 | National Origin | Discrimination in terms/conditions/privileges relating to rental | Active |
| 010504468 | Private | 07/28/05 | Race, Color | Discriminatory terms, conditions, privileges, or services and facilities | Active |

**B. Fair housing discrimination suit filed by the Department of Justice or private plaintiffs**

-- NONE --

**C. Reasons for any trends or patterns**

As evidenced through the list above, no fair housing complaints or compliance reviews have been identified where the Secretary has issued a charge of or made a finding of discrimination in the last five years. Please note, however, that a very small percentage of discrimination is actually reported as most protected classes do not know that they have been discriminated against or do not know what constitutes discrimination.

**D. Discussion of other fair housing concerns or problems**

--NONE –

**IV.    *IDENTIFCATION OF IMPEDIMENTS TO FAIR HOUSING CHOICE***

**A. PUBLIC SECTOR**

1. ZONING AND SITE SELECTION

   A review of Springfield's zoning ordinances finds that they do not adversely affect the availability of housing for minorities, families with children, and persons with disabilities. However, the City's lack of extensive amounts of undeveloped land could constitute an impediment to new housing development.

2. NEIGHBORHOOD REVITALIZATION, MUNICIPAL AND OTHER SERVICES, EMPLOYMENT-HOUSING-TRANSPORTATION LINKAGE

35

SFP03234

A review of Springfield's public policies concerning the approval of sites for the construction of assisted or private housing indicate that they do not adversely affect the availability of housing for minorities, families with children, and persons with disabilities.

Springfield is a 300-year old city and, as is typical of many older cities, there is an imbalance between rental and homeownership in various neighborhoods, with multi-family rental housing concentrated in older neighborhoods close to the city center. Springfield has long been known as the "City of Homes," but the concentration of multi-family housing limits homeownership opportunities in certain neighborhoods. These neighborhoods are also the neighborhoods where minority populations are concentrated, as indicated in Section II Jurisdictional Background Data above. The Balanced Housing Strategy the City is currently working on will guide development and meet neighborhood needs in a manner that affirmatively furthers fair housing.

The City's first-time homebuyer program will be a key component of this Balanced Housing Strategy. The City of Springfield utilizes HOME funding to foster and promote homeownership in the City by allocating funds for the rehabilitation of existing houses or new, construction of single family houses to be marketed and sold to first-time homebuyers. These homebuyers must be income eligible under HOME program guidelines and, depending upon the amount of funding that was allocated for a project, must maintain the home as their primary residence to between 5 and 15 years.

The continued presence of privately-owned residential and commercial properties that are deteriorated, vacant and/or not actively managed, especially in neighborhoods in and around the center of the City, also has a detrimental effect on the housing market as a whole in some neighborhoods. The presence of these properties discourages responsible rental owners and potential homebuyers from investing in or improving other homes nearby. Current data about blighting influences in Springfield neighborhoods indicates that they are concentrated in the areas of the city that have low homeownership rates, and large concentrations of low and moderate income persons, minorities and, to a lesser degree, disabled persons.

Springfield is served by a regional transit authority that enables people to access housing and employment in various locations throughout the City and the region. However, the Pioneer Valley Transit Authority has reduced services over the past 6 months. The City continues to monitor these service reductions.

SFP03235

3. PHA AND OTHER ASSISTED/INSURED HOUSING PROVIDER TENANT SELECTION PROCEDURES; HOUSING CHOICES FOR CERTIFICATE AND VOUCHER HOLDERS

Tenant selection procedures at the Springfield Housing Authority appear to meet all fair housing requirements. The SHA maintains a community-wide waiting list with separate lists for public housing and the Section 8 Housing Choice Voucher Program and has a centralized admissions office. For Section 8 admissions, the SHA has established preferences for victims of domestic violence, residents who live and/or work in Springfield and for "elderly persons/families, disabled persons/families and displaced persons/families over other single persons"[3].

In Massachusetts the Department of Housing and Community Development (DHCD) also administers a statewide Section 8 Housing Choice Voucher Program through regional subcontractors. Those Springfield residents who participate in the Section 8 program administered by HAP, Inc. can use their vouchers anywhere in Massachusetts.

From 1997 through 2002, the Springfield Housing Authority and HAP, Inc. worked together on a Regional Opportunity Counseling Program that provided mobility counseling for Section 8 program participants and did outreach to owners of rental properties outside of areas of high concentrations of poverty. Since that program is no longer available, the SHA's new five year plan for fiscal years 2005 through 2009 states that they will provide voucher mobility counseling and that their monthly goal is to enlist one potential voucher landlord per month with a unit in a low poverty area. Unit information will be added to a database and made available to all clients. All new landlords who inquire about the Section 8 program will receive an information packet in the mail. At the time the five year plan was published, the Springfield Housing Authority's voucher homeownership program had 7 participants and planned to expand the program to 25 participants.[4]

4. SALE OF SUBSIDIZED AND AFFORDABLE HOUSING AND POSSIBLE DISPLACEMENT

The City of Springfield has worked aggressively to preserve privately-owned subsidized rental housing that is at risk due to expiring use restrictions or expiring project based rental assistance contracts. The City has worked with several resident groups to facilitate the sale of subsidized housing projects to resident-controlled organizations and continues to do so. Three of Springfield's largest subsidized family housing projects have been purchased by resident owned corporations: Allen Park (263 units) in 1994 and Spring Meadow (232 units) in 1997, and Cathedral Hill (48 units) in 2004. The City provided financial assistance which leveraged substantial investment of other state and federal funds to make these tenant buy-outs possible. Similar plans are currently being implemented to preserve Liberty Hill Cooperative Housing (88 units) through a major

---

[3] Springfield Housing Authority Annual Plan for Authority Fiscal Year ending 3/31/04
[4] Springfield Housing Authority Strategic Plan for Fiscal Years 2005-2009

SFP03236

redevelopment plan sponsored by the existing tenant cooperative. The City also supported and provided funding for the resident purchase and infrastructure rehabilitation of the Boston Road Mobile Home Park. With 302 homes, Boston Road is the largest urban mobile home park in the state and a critical housing resource for low and moderate income households in the community.

5. PROPERTY TAX POLICIES

A review of the City of Springfield's property tax policies for impediments that adversely affect fair housing choice indicates that there are no significant impediments to fair housing.

The City of Springfield has two different tax rates. Industrial/commercial property was taxed at $33.36 per $1,000, and residential property was taxed at $17.51 per $1,000. Tax revenue derived from property taxes (not including personal tax) breaks down in the following manner:

| | | |
|---|---|---|
| Industrial | 6.6 % |
| Commercial | 26.0 % |
| Residential | 67.4 % |

The City of Springfield's Assessor's Office also administers real estate tax exemption and abatements programs as allowed under Massachusetts law. Abatements are available through a process of appeals. In addition, exemptions to real estate taxes are governed under Massachusetts General Law Chapter 50 Sections 5. They are offered to persons who fall into one or more of the following categories: Blind, Veteran with a service connected disability, Surviving Spouse, Minor Child of Deceased Parent, Senior Citizens Age 70 or older, Hardship (as defined by legal statute and interpreted by the Massachusetts Department of Revenue).

6. PLANNING AND ZONING BOARDS

A review of the City of Springfield's Planning Board for impediments to fair housing choice indicates that there are no significant impediments to fair housing.

7. BUILDING CODES (ACCESSIBILITY)

As required by the Commonwealth of Massachusetts, the City of Springfield has adopted the Architectural Accessibility Barrier Standard, which is comprised of standards that are stricter than the requirements of the Americans with Disabilities Act. The standards apply to any new construction and any rehabilitation for which the costs exceed 30 percent of the assessed value of the property.

SFP03237

## B. PRIVATE SECTOR

### 1. LENDING POLICIES AND PRACTICES

There is evidence that predatory lending and redlining are significant problems in Springfield, primarily concerning minority neighborhoods. In December 2003, the Pioneer Valley Planning Commission created a detailed analysis of the regional home lending market with an emphasis on fair lending practices and subprime lending. They examined lending market statistics for the Springfield SMSA from 1996 through 2001.[5] In order to distinguish differential lending practices based on justifiable measures of risk and ability to pay from patterns of discrimination based on race, several different methods of analysis were used. Analyzing loan outcomes by applicant demographics revealed that African-American and Latino applicants had consistently higher loan denial rates than white applicants, regardless of income level. Even high-income African-American and Latino applicants were denied home loans three times more often than white applicants. Analysis of loan approval ratios – the total number of loans approved per loan denied from 1996 to 2001 – showed that the percentage of persons of color for a particular census tract has a significant inverse relationship with the approval ratio. Even when factors such as income, age, and housing stock are controlled, the racial and ethnic characteristic of a census tract is a significant predictor of loan outcomes.

PVPC's study found significant levels of subprime lending activity, with a concentration of such lending in the urban core census tracts of Springfield, areas with larger populations of persons of color. The study concluded that, "As evidenced by the geographical concentration of subprime applications and the characteristics of these same areas, the data indicates that subprime lenders may be targeting their efforts on low-income communities of color."

The PVPC study also documented that non-local lending institutions increased their share of the region's lending market during the period from 1997 to 2001. The loan approval rate for lenders based in the region was found in this stuffy to be considerably higher than that for non-local lenders. Some local banks are doing active outreach to first-time homebuyers, offering good affordable mortgage products, and participating in efforts such as the Massachusetts Housing Partnership's Soft Second Loan Program.

At a Pioneer Valley Summit on Fair Lending and Financial Literacy held on September, 23 2005, PVPC and partners presented their status of their work to develop and implementi a cohesive financial literacy and fair lending strategy for the region.

The proposed activities to be conducted as part of the strategy are:

1. Networking (lenders and nonprofits need to interact with each other so they may better serve the individuals in low income communities)
2. Volunteer income Tax Assistance (VITA) Sites and Banking Services

---

[5] Primary sources included the US Census and the Home Mortgage Disclosure Act records of the Federal Financial Institutions Examination Council.

SFP03238

3.  Financial Literacy Programs
4.  Educational Opportunities for Bankers and Realtors
5.  Marketing

As part of this summit, PVPC also reported the highlights of their update on Fair and Subprime Lending in the Pioneer Valley. The data presented clearly pointed to the fact that-- except for one census tract in a nearby city, areas with high shares of subprime lending are solely located in Springfield's poorest, least white neighborhoods.

The following key findings are excerpts from this report:

General Trends:
- "Refinancing responds most strongly to interest rate changes."
- "Loan approval rates are generally high, though lower for refinancing and home improvement loans."
- "Average value of home loans have remained steady."

Local Lenders:
- "Local Lenders are losing market share."
- "Local lenders have much lower loan denial rates than non-local lenders."

Denial Rates & Discrimination:
- "Denial rates, in general, correspond to applicant income."
- "African American and Hispanic borrowers are much more likely to be denied a home loan that a white borrower of the same income."
- "Applicants with no race identified face the highest denial rates, suggesting the possibility of discrimination masked by absent data."

Subprime Lending:
- "Subprime lenders have a substantial share of the home loan market."
- "Subprime lenders largest market share is in refinancing loans."
- "Subprime lending is concentrated in the region's poorest and least white communities."

## C. PUBLIC AND PRIVATE SECTOR

### 1. FAIR HOUSING ENFORCEMENT

The Massachusetts Fair Housing Center (nee Housing Discrimination Project), a private, non-profit fair housing enforcement organization that cites its goals as being to ensure equal access to housing regardless of race, ethnicity, gender or other characteristics which are frequently the basis for illegal discrimination. The organization's mission is to promote fair housing practices, as a specific aspect of their broader purpose of the elimination of prejudice and discrimination generally and in the housing market especially; to improve community relations; lessen neighborhood tensions and combat community deterioration; to cooperate with other groups in attain the forgoing objectives; and to carry out programs of research,

40

education, and dissemination to the membership and to the public in connection with any of the foregoing.

The organization reported that the top issues that generate discrimination complaints in Springfield are as follows (in order):

1. Race or national origin
2. Disability
3. Familial status
4. Section 8
5. Predatory lending

The mission of the Massachusetts Commission Against Discrimination's (MCAD's), another enforcement entity, is to enforcing the Commonwealth's anti-discrimination laws in employment, housing, public accommodations, credit, mortgage lending, and education. Established by Massachusetts General Law Chapter 151B, Section 3, the Commission enforces General Law Chapter 149, Section 105D, Chapter 151B, Chapter 151C, Chapter 272, Section 92A, Section 98 and Section 98A, and Chapter 111, Section 199A.

The Commission works to eliminate discrimination and advance the civil rights of the people of the Commonwealth of Massachusetts through law enforcement (filing of complaints, investigations, mediations and conciliations, hearings, and litigation) and outreach (training sessions, public education, and testing programs).

The Commission also reviews and advises the Governor's Cabinet Offices concerning the state's affirmative mandates in employment, housing, construction contracting, and minority and women business enterprises (Executive Order 452)

Partnerships with the US Department of Housing and Urban Development and the federal Equal Employment Opportunity Commission now account for more than half of the Commission's operating budget and partnerships with municipal human rights commissions bring MCAD services to local communities across the state.

## 2. INFORMATIONAL PROGRAMS

The City of Springfield, the Massachusetts Commission against Discrimination, and the Massachusetts Fair Housing Center (nee Housing Discrimination Project) all provide basic fair housing information to Springfield residents. (See Section V below)

## 3. VISITABILITY IN HOUSING

As indicated above, HOME-funded programs are subject to Federal laws governing accessibility for disabled persons. These standards are dictated by accessibility requirements that include detailed about who is protected by these standards and when these accessibility laws must be followed. HUD strongly encourages jurisdictions to incorporate "visitability" principles into

SFP03240

their accessible design and construction projects funded with HOME funds, in addition to those that are required.

According to HUD, housing that is "visitable" has a very basic level of accessibility that enables persons with disabilities to visit friends, relatives, and neighbors in their homes within a community. Visitability can be achieved for little cost, with the use of two simple design standards: (1) providing a 32-inch clear opening in all interior and bathroom doorways; and (2) providing at least one accessible means of egress/ingress for each unit.

At present, the City of Springfield encourages and welcomes HOME fund proposals that incorporate HUD's visitability standards into their design and construction features, but at this time the City does not make funding decisions based on whether visitability is a component of a proposed project.

D. There has been no determination of unlawful segregation or other housing discrimination by a court of a finding of noncompliance by HUD under Title VI of the Civil Rights Act of 1964 or Section 504 of the Rehabilitation Act of 1973. The Secretary of HUD has not issued a charge under the Fair Housing Act regarding assisted housing in Springfield.

## V. ASSESSMENT OF CURRENT PUBLIC AND PRIVATE FAIR HOUSING PROGRAMS AND ACTIVITIES

As detailed above, Springfield is served by the Massachusetts Commission Against Discrimination (MCAD) whose mission is to ensure equality of opportunity by enforcing the Commonwealth's anti-discrimination laws in employment, housing, public accommodations, credit, mortgage lending, and education. In addition to enforcement, MCAD also works to eliminate discrimination and advance civil rights through outreach (training sessions, public education, and testing programs). MCAD's only office outside of Boston is located in Springfield.

Western Massachusetts is also served by the Massachusetts Fair Housing Center (MFHC)(nee Housing Discrimination Project) a private nonprofit that focuses exclusively on housing discrimination. MFHC handles more than 200 discrimination complaints per year and conducts outreach to families at high risk of discrimination to make them aware of fair housing laws and illegal housing practices. MHFC's staff visit local social service agencies to present workshops on fair housing rights; teach first-time home buyers about their rights; counsel homeowners about their mortgages; and publish and distribute informative materials in four languages. MHFC also trains housing providers on the fair housing laws, to prevent discrimination before it occurs.

HAP, Inc., the region's housing partnership, was recently awarded a HUD Fair Housing Initiatives grant for a program year starting March 1, 2004. HAP will conduct fair housing education and outreach to members of protected categories, including homeless families and individuals, recent immigrants, first-time homebuyers, and those with disabilities. They will also provide fair housing education and training to rental property owners. HAP and Housing Discrimination Project work closely together and HDP will provide some services under the grant through a subcontracting arrangement.

SFP03241

The City through its Office of Housing and Neighborhood Services is redeveloping its fair housing plan delivery system so it may function more effectively to accomplish the goals established in this AI. An overview of results achieved though this new system will be included in the FY05-06 CAPER that will be submitted for public review and comment prior to submission to HUD in fall, 2006.

## VI. CONCULSIONS AND RECOMMENDATIONS

### 1.   IMPEDIMENTS FOUND

The following impediments to fair housing in Springfield were identified through this AI.

1. Lack of extensive amounts of undeveloped land.
2. Imbalance between rental and homeownership in various neighborhoods.
3. Presence of deteriorated privately-owned properties that are vacant or not actively managed.
4. Evidence of predatory lending and redlining.
5. Existing patterns of segregation.
6. Language barriers & cultural differences.
7. The age of housing stock and the prevalence of lead-based paint hazards.

### 2.   ACTIONS TO ADDRESS IMPEDIMENTS

The City of Springfield will undertake the following actions to address the impediments to fair housing that were identified through this AI.

a. Encourage infill/new construction of units suitable for homeownership on the scattered plots of land that remain available for development, particularly in neighborhoods where the homeownership rate is low.
b. Implement balanced housing strategy; encourage homeownership throughout the city, with an emphasis on neighborhoods where homeownership rates are low and in neighborhoods that have little minority representation.
c. Pursue strategies to address abandoned properties through demolition and/or redevelopment.
d. Work with local lending institutions to do outreach to minority community to address the issue of predatory lending and housing repair scams.
e. Work with surrounding communities to identify and overcome barriers to the regional racial imbalance.
f. Continue to offer services, particularly first-time homebuyer education and counseling, fair housing education and credit counseling, in languages other than English (primarily Spanish) and target these programs to minorities.
g. Provide financing and other incentives for property owners to upgrade housing, address lead-based paint hazards and make reasonable accommodations for residents with disabilities.
h. Work with City Departments and the SHA to ensure fair housing practices are in place.
i. Implement a coordinated system for monitoring and investigating fair housing complaints submitted to HUD, MCAD and MFHC.

SFP03242

FROM : HDP Inc       PHONE NO. : 4135339978       Sep. 30 2005  04:34PM P2

HOUSING
DISCRIMINATION
PROJECT, INC.



PROYECTO DE
DISCRIMINACION
EN LA VIVIENDA

September 30, 2005

Juan Gerena
36 Court Street
Room 313
Springfield, MA 01103

Dear Juan:

Thank you for sending me a copy of the draft for the City of Springfield's CAPER report. Unfortunately I was unable to attend the meeting on September 22, however I do have some concerns regarding the information provided which I have outlined below.

1. The lending community that the city seeks to work with has already publicly recognized that they have had difficulty in performing outreach within the minority community as is evidenced by their loss of market share in regards to home loans.

2. The PVPC study that is referred to recognizes that there may be discriminatory practices that exist within the local lending community. While they have indeed attempted to make changes they have not sufficiently demonstrated that they have resolved their own internal processes to eliminate these practices.

3. There is no plan that specifically addresses the existing patterns of segregation that exists within the City of Springfield. The City's First Time Homebuyer program is not a sufficient tool because it does not address the lack of available affordable housing in neighborhoods that have little or no minority representation.

4. There is no specific plan that addresses the issue of predatory lending or housing repair scams that occur within the city of Springfield.

5. The Springfield Housing Authority has consistently demonstrated that they engage in discriminatory practices as is evidenced by the number of complaints and settlements. There is no plan that addresses how this issue will be resolved.

6. While the City recognizes a need to educate the public regarding their fair housing rights a part-time staff member is not an adequate solution based on the size of the city

57 Suffolk Street, Suite 302, Holyoke, MA 01040
voice/TTY 413-539-9796 or 800-675-7309
Fax 413-533-9978
e-mail: hdp@the-spa.com

405 Main Street, Worcester, MA 01608
phone 508-799-7496
TTY 508-755-3260
Fax 508-752-5918

SFP03243

and the scope of problems that exist. Perhaps together we can formulate a more comprehensive plan that addresses the city's needs.

7. Under informational programs there is no information.

8. The number of complaints received by HUD is not a complete representation of fair housing cases/complaints because they do not always include the cases received by HDP.

I would be glad to speak to you or one of your representatives as to how the Housing Discrimination Project can assist you in meeting the fair housing needs of the city by creating a comprehensive plan that addresses the concerns noted above as well as the ones identified in the report. I would also like to contribute some of the research that has done by the Housing Discrimination Project.

Sincerely,

Jamie R. Williamson
Executive Director

45

SFP03244