UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARISE FOR SOCIAL JUSTICE;<br>¿OISTE?; NEW ENGLAND STATE-AREA<br>CONFERENCE OF THE NAACP;<br>REV. TALBERT W. SWAN, II;<br>NORMAN W. OLIVER; DARLENE<br>ANDERSON; GUMERSINDO GOMEZ;<br>FRANK BUNTIN; RAFAEL RODRIQUEZ;<br>and DIANA NURSE<br><br>        Plaintiffs,<br><br>v.<br><br>CITY OF SPRINGFIELD and SPRINGFIELD<br>ELECTION COMMISSION<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 05-30080-MAP<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY
## DENISE JORDAN, CHAIRMAN,
## SPRINGFIELD ELECTION COMMISSION

I, Denise Jordan, on oath, do hereby state as follows:

***Background, Education, Employment, Community Participation***
1) My name is Denise Jordan and I am the Chairman of the Springfield Election Commission. I have served on the Election Commission since 1997, first appointed by former Mayor Michael Albano. I live in Springfield, Massachusetts in East Forest Park, where I have recently moved within the last year. Prior to that I lived in Mason Square/McKnight neighborhood of Springfield. I have lived in Springfield my entire life with the exception of four years undergraduate college and two years working in Boston, Massachusetts. My father is Ray Jordan, the former state legislator from Hampden District 12 (now Hampden District 11). I grew up in the Mason Square area of Springfield. I attended Classical High School. I received a Bachelor of Science degree from Lincoln University in Political Science and a Masters Degree from American International College in Human Resource Development.

2) My job after graduation was as an affirmative action compliance officer for the Massachusetts Water Resource Authority 2 years. From March 1989 to 1999, I worked for the Massachusetts Department of Mental Retardation, beginning as a Worker's Compensation

Investigator and then later to a Worker's Compensation Manager. In 1999, I became an assistant affirmative action officer. Currently I work for the Executive Office of Health and Human Services (EOHHS) for the Commonwealth of Massachusetts where I serve as a civil rights officer, a position I have held since January 24, 2004. I work out of an office located in Palmer, Massachusetts and have the responsibility of traveling to and investigating complaints and providing assistance to and advocating for employees with claims discrimination in the various agencies of the EOHHS located in Western Massachusetts.

3) I also work four evenings a week and have since February 6, 2006 at American International College in a program that offers assistance, support, tutorial services, and counseling to First Generation College Students. We track the progress, through mid-term reports, of students who have self-identified on college applications as a "first generation college students." We provide a tutor program, assistance in procuring financial aid, and, otherwise, persons with whom to talk, ask advice, or "just hang out." This program is available to all first generation college students of any race or ethnicity.

4) Among my volunteer, community-based activities I serve as the president of the Academic, Athletic, Arts, Achievement Association (5 A's), which was founded in 1992 by my father and which provides a football program for young people, ages 8-14. There are currently about 260 boys and girls participating in the program. My father founded this program when Proposition 2 ½ resulted in the elimination of many of the after-school sports programs from the public school system for children of that age.

5) I also serve as the clerk on the Board of Directors of Future Works, a "One-Stop Career" Center located in the Springfield Technical Community College (STCC) Technology Park. Future Works is federal and state funded private organization that provides a wide range of services and resources to job seekers and employers in Hampden County. These services include job postings, free workshops in resume writing, interviewing, and salary negotiations. We also provide computers, FAX machines, phones and copiers for use by job seekers as well as access to trained professionals to assist members in their job search and career planning and management. In addition, Future Works provides a 2-day career seminar, during which information about the "most effective ways to get a job in today's job market" is discussed. There are career specialists available to provide assistance and a resource room in which there are job postings, employer directories, newspapers, information about New England employers, training institutions and community resources. Friday Welcome Meetings are in Spanish and English. Unfortunately the classes are provided in English only and non-English speaking job-seekers are encouraged to bring interpreters with them. There are, however, Spanish speaking members of the staff. Many of the services are free or available at a nominal rate ($10-$25). The three-hour training sessions in Word, PowerPoint, Excel, and Access are $50.

6) Since 2003, I am a member of the Board of Trustees of the Martin Luther King Charter School of Excellence and serve as the clerk. I am also one of the original founding charter members of the school, located in the Alden Baptist Church, serving grades K-2. We receive funding through and have been granted a charter by the Massachusetts Department of Education. We intend to add a grade each year of our charter. The emphasis of the schools is on more "direct, hands on" learning experiences for the children; smaller classes. We are required to

submit an Annual Report to the Department of Education and the public, which provides a comprehensive picture of the recently completed academic year, as it relates to its Accountability Plan goals and evidence regarding the three areas guiding charter school accountability: the success of the academic program; the viability of the organization, and the faithfulness of the school to the terms of its charter.

7) I have further been appointed by Mayor Ryan as Co-Chair of the Youth Commission for the City of Springfield. The Youth Commissioner provides a voice for the City's youth. The Youth Commission strives to help our community and youth create a better living environment by working with the mayor, city officials, and the media to create plans and goals for youth. They strive to empower youth by supporting youth programs that promote diversity. To that end we partnered with the Republican Newspaper's two city-wide Youth Summits.

8) I was the moderator in 2005 and 2006 of the City of Hope Summit: Empowering Parents, sponsored by the *Republican* in coordination with a number of other community agencies. Private, as well as business donations helped to fund these events.

a) Groups involved in the 2005 Summit ranged from grassroots organizations such as AWAKE (Alive With Awareness Knowledge and Empowerment) to Step Up Springfield, which, along with The Efficacy Institute are sponsoring the keynote presentation by Dr. Lourdes Ferrer, a nationally renowned education assessment specialist and motivational speaker. Mercy Medical Center organized a substance abuse workshop and contributed funds while Health New England is organizing a parental assistance workshop, including sponsoring the appearance on that panel of Dr. Anthony Wolf, a psychologist and author.
The Rev. Talbert W. Swan II, assistant executive director of Northern Educational Services, moderated a panel ("Death of a Dream") on efforts to turn young people away from violence. Motivational speaker and education consultant Ferrer talked to parents, students and educators about ways in which parents and others can work together as partners in their child's education ("School Pays"). James O'S Morton, executive director of the Massachusetts Career Development Institute, moderated a session ("Help Wanted") which provided opportunities for youth to pick up job applications. Tutorials on how to fill out a job application and how to present yourself during an interview were part of this panel. Organized by Mercy Medical Center, a panel ("Drug Antidotes") was moderated by Lisa Golembiewski, manager of outpatient substance abuse services at Providence Behavioral Health Hospital and an 18-year veteran who has helped families and youth through the crisis of drug abuse. Aimee Griffin Munnings, president of the New England Black Chamber of Commerce and organizer of the city's first annual prayer breakfast last month, moderate a panel ("Love Thy Neighbor"), which focused on ways in which the church can help nurture youth and be a catalyst for positive change. Daryl E. Moss, coordinator of the Drug Free Task Force, moderated a panel ("Community Counts") focusing on ways the community can unite to combat crime and other issues.
MaryLynn Ostrowski, health programs manager for Health New England, moderated a program ("Positive Parenting") featuring psychologist and author Dr. Tony Wolf. Dawn W. Rodgers, a guidance counselor at Roger L. Putnam Vocational and Technical High School, moderated a panel ("High on Education") in which representatives from local colleges talked about programs at their schools that help students with financial, academic, physical or other difficulties. Earl Brown, a city resident who organizes annual black college tours for local high school students,

talked about historically black colleges nationwide. Other panelists will include Jimmy Hester and Loren Wilder, a pair of Putnam graduates who garnered national attention when Cosby offered to pay their college tuition after hearing how the boys made education a priority while supporting themselves throughout high school.

b) Actor, comedian, community activist Bill Cosby asked if he could participate; accordingly Bill Cosby addressed the parent and the student attendees in the 2006 City of Hope Summit: Empowering Parents. This was a citywide event that was held at Western New England College (WNEC) when the enrollment was greater than the capacity at Commerce High School where it was originally scheduled to be held. Workshops were offered covered a range of topics similar to those in the preceding year. Mayor Ryan welcomed attendees and Orlando Santiago (2005 candidate for School Committee) addressed the gathering and shared parenting problems, issues, and strategies. Among the workshop moderators were Mary Kay Brown, Springfield School to Career Program; Myra D. Smith, vice-president of human resources at STCC; James O'S Morton, executive director of the Massachusetts Career Development Institute; Aimee Griffin-Munnings, executive director of the New England Black Chamber of Commerce; Darryl E. Moss, coordinator of the Mason Square Drug-Free Task Force; Julian Tynes, assistant general counsel for the state Executive Office of Health and Human Services; Brad A. Sperry, director of policy planning and research at the Regional Employment Board of Hampden County Inc.; and Beatrice O'Quinn Dewberry, staff writer for the *Republican.*

9) I also serve on the Board of Directors of the Regional Youth Employment Board for Hampden County, Inc. (REB), which is a business-led, non-profit corporation established by state and federal legislation and supported by local business, education, and labor leaders as the primary policy-making authority in developing workforce skills. Our only business is workforce development. The Regional Employment Board leads "a dynamic, efficient and integrated workforce development system" that promotes economic development and community growth, and is rooted in the principles of equity and increased access to workforce development services for employers and job seekers.

The Regional Employment Board plans, coordinates and oversees the growth and effective use of public and private investment in workforce development initiatives for quality jobs. The Board provides leadership in creating strategic alliances with business, government and community organizations to provide access to education, training and employment opportunities for all workers, especially for low income adults and youth, disadvantaged minorities and newcomers, dislocated workers, incumbent workers, and their families. To meet the challenge of increasingly complex workforce training needs, due to changing technologies and new skills, REB staff functions as conveners and brokers, constantly researching local labor market demands and developing appropriate strategic alliances among employers and training vendors to meet those needs.

10) I also serve on the Business Advisory Panel for the Massachusetts Rehabilitation Commission which addresses issues related to employment opportunities for persons with disabilities.

11) My college sorority, Delta Sigma Theta Sorority, Inc., (ΔΣΘ) has a graduate chapter in the area in which I am very active and participate in a variety of community outreach programs,

4

including mentoring and training. The sorority also concentrates on all issues relevant to the health, wellness and spirituality of African-American women and girls in the city of Springfield.

***Springfield Election Commission***

12) I have served as the Chair of the Springfield Election Commission since 1997. Currently the Commission is comprised of myself, John Ramirez, who speaks Spanish, a Republican delegate, Mary Kaufman, and Shannon Powers. All of the members are appointed by the Mayor and the applicable law prescribes the political party designation of the members. The position is largely volunteer, paying only a small yearly stipend. We do not report and are not accountable to the City Council.

13) I have always had an "open door" policy and meeting, likewise, have been open. I am well known in the community and try to make frequent appearances in the Office of the Election Commission. Ms. Gladys Oyola, who is the Spanish Language Coordinator worked with Rep. Cheryl Rivera for a number of years and is, likewise, known to and familiar with the various Hispanic community leaders. Indeed, Ms. Oyola's mother works in the New North Citizen's Council. Nevertheless, neither she nor I received any complaints (during our respective tenures with the Springfield Election Commission) of any problems related to the lack of adequate bilingual poll workers, bilingual notices and signage in the polling places, and other forms of bilingual assistance. Had I – or any other member of the Election Commission – received such requests we would have responded quickly as we did when Rep. Rivera requested Spanish language training materials so that persons who did not speak English could serve as poll workers. This request from Rep. Rivera and Mr. Gumersindo Gomez came with a week or so of the conduct of the election – well after poll workers had been appointed and trained. Nevertheless we complied with this request, in spite of the fact that we did not have any legal obligation to do so. I did have some concerns – which turned out to be well founded – that poll workers who did not speak English would not be able to provide the kind of assistance to voters that the City is required to provide under state and federal law.

14) I relied upon ward caucus leaders, as provided in state law, to identify persons to serve as poll workers, believing that they were in a better position to understand what the issues were for voters in their ward and to otherwise receive complaints or requests from voters. The persons whom Mr. Gomez, the Ward 1 Democratic Caucus leader, has nominated have almost always been bilingual persons. There have been some problems with some of the poll workers that he has nominated, including the fact that some that did not speak, understand, or read English and one, who I recall, was not entirely sober when he reported for "work" on the beginning of election day. Although Mr. Gomez has been extremely helpful in identifying and recruiting bilingual persons to serve as poll officials, he has, from time to time, attempted to "take over" the operation of the polls and the assignment of the poll workers from the Election Commission. Accordingly, while I respect the work that Mr. Gomez does in the North End, I do find his approach very unprofessional, antagonistic and unpleasant.

15) My understanding of the applicable law, M.G.L. c. 54, §13, is that we were constrained to choose poll officials from among those individual nominated by the ward caucus leaders and could only do our own recruiting where a caucus leader failed to identify an adequate number of qualified individuals to serve as poll workers. Accordingly, the "quality" of the poll officials

5

reflected the commitment of each ward caucus leader to providing adequately for election day support and assistance to voters. That we were required to choose among the nominees of the ward caucus leaders further accounts for the fact that many poll officials continued to be reappointed well after it should have been known to ward caucus leaders that such individuals did not have the skills or stamina or appropriate attitude to serve as poll workers – largely due to their advancing age. Even after we relayed complaints about certain poll workers to ward caucus leaders, they continued to re-nominate these individuals. Of course, part of the problem in Springfield and throughout the country is that it is difficult to recruit individual of pre-retirement age who are available and interested in working a 13-14 hour day for $75-$85 a day.

16) In elections prior to 2006, we provided as much information in Spanish as we provided in English regarding the election. A former Spanish-speaking member of the Commission routinely made announcements on the Spanish language radio. The truth is that we placed no notices in the media; rather the local newspaper, *The Republican,* routinely published articles about the upcoming election. We did not request that they provide this information or report on the election and we did not make any other attempts to provide information to any of the other racial, ethnic communities in the City. Although I whole-heartedly endorse the availability of more election and registration information to the City's residents, it was never the case that the Election Commission published or broadcast information in English that we did not make available in Spanish. It had always been my understanding – as it is in the African American and Vietnamese community – that the various Hispanic and civic organizations, like Arise for Social Justice, make information (in Spanish) about the upcoming election available to persons with limited proficiency in English, as well as providing sample ballots and sponsor candidate forums. But again, no one requested the publication, disseminations, or broadcast of more information in Spanish. Had such a request been made, I assure you, we would have provided whatever information by any means specified in Spanish to the City's Hispanic voters.

17) In response to the lawsuit and later to the terms of the Agreed Order of Settlement, the staff of the Election Commission and the Spanish Language Elections Coordinator, specifically, were able to recruit sufficient number of bilingual persons to meet most of the goals established by the Order of Settlement. The Spanish Language Coordinator established a relationship with Smith College, which provided students, fluent in Spanish, in the polling places on election day. We also attempted to recruit high school students and students from local colleges. In addition, we were able to locate and appoint as poll officials several individuals who were fluent in Vietnamese. We totally reworked our Warden's Handbook and revamped our training of poll officials which included in 2006 i) information about the city's bilingual election program and the importance of ensuring that all voters with limited proficiency in English are provided with bilingual assistance. Section 203 of the Voting Rights Act, 42 U.S.C. 1973aa-1a ("Section 203"); ii) information about the importance of posting all of the signs (in English and Spanish) provided and ensuring that no information provided in English in the polling place is not available in Spanish. Poll official training in 2006 emphasized the importance of providing to all voters reasonable and adequate assistance to enable them to cast a ballot that reflects their respective electoral choices. Poll official training in 2006 provided information about the right of all voters to an assistor of choice. Section 208 of the Voting Rights Act, 42 U.S.C. 1973aa-6 and about the federal observer program and the poll official's importance in ensuring that the terms of the Agreed Settlement Order in United States v. City of Springfield are met. Finally,

6

poll official training in 2006 included information about the appropriate conduct and deportment of the City's poll officials and the importance of being friendly, helpful, accommodating, and patient in all of their interactions with voters and any person seeking to vote in the polling place to which a poll official is assigned and stressed the importance of ensuring that every eligible voter is provided an opportunity to cast a ballot on election day. To that end, poll officials were instructed to use the cell phones -- provided for the first time in 2006 -- to call the Office of the Election Commission to ensure that a voter who is not registered to vote in the polling place to which the poll official is assigned is redirected to the correct polling place. I, myself, attended several of the training sessions. Other of the Election Commissions were assigned to be present during other of the training sessions.

18) For the first time, in the 2006 elections, six election captains were appointed and assigned to a sector of the City. Election captains were required to "visit" all of assigned polling places to ensure that (i) notices were adequately posted; (ii) there was no information provided in English that was not provided in Spanish; (iii) that adequate (bilingual and otherwise) poll officials were assigned to polling places; (iv) that polling places had sufficient supplies, including ballots, affirmation of residence forms, provisional ballots, and marking pencils; (v) that absentee ballots for each polling place were timely delivered; and (vi) that optical scanners were functioning properly.
In the 2006 general election, two of the Election Captains were fluent in English and Spanish and were able to "cover" polling places when bilingual poll officials were on lunch or dinner "break." The addition of election captains was proposed by the City of Springfield to better ensure that there was adequate communication between polling places and the Office of the Election Commission and to provide support and contemporaneous first-hand accounts of any problems that were encountered by voter or poll officials in the polling places.

19) For the 2006 elections, a total of __ persons, four of whom were fluent in Spanish, were assigned to the Office of the Election Commission to answer the telephones and provide to poll officials information with regard to (i) persons whose names do not appear on the voting lists for the polling place at which they are attempting to vote; (ii) directions to and identification of the polling place to which these voters are assigned; (iii) instructions as to how to assist voters in casting provisional or challenged ballots and how to complete affirmation of residence forms; (iv) directions as to the correct procedures to enable a voter who requested an absentee ballot to vote in-person on election day; and (v) operation of optical scanner. These additional Office of the Election Commission staff members were also available to provide information directly to voters with regard to their status as registered voters, the polling place to which they are assigned, directions to the correct polling place, and any other information that will facilitate the ability of voters to cast a ballot on election day.

20) Election Commission staff created numerous signs and notices (in English and Spanish)-- in addition to the few made available by the Office of the Secretary of the Commonwealth – to be posted in the polling places to better inform voters; we redrafted and greatly expanded our Warden's handbook. We convinced the Mayor to purchase cell phones for every polling place that did not have immediate access to a phone and to install additional phone lines in the Office of the Election Commission. Finally, Election Commissioners, armed with walkie-talkies traveled among poll places to ensure that all of the relevant procedures and state and federal

requirements were being followed; that bilingual assistance was being provided to voters; that each polling place had adequate supplies (and thereby forestall the problem Boston voters encountered due to lack of an adequate number of ballots); and to otherwise "trouble-shoot" where problems or disputes were reported.

21) In the 2006 general election, volunteers were enlisted and trained on the new handicap accessible, touch-screen voting machines, which were delivered (by the Office of the Secretary of the Commonwealth) to Springfield a little more than a week prior to the conduct of the general election. Volunteers were instructed to travel to the polling places to "turn on" the voting machines, provide instruction to wardens, poll officials, and police officers (who have demonstrated -- over the years -- a greater familiarity with the functioning of the optical scanner voting machines than have poll officials). We later were to learn that the Secretary of the Commonwealth was "testing" various models to determine which model would best meet the needs of Massachusetts voters.

22) I am proud of the work that my fellow commissioners and the staff (permanent and temporary) performed on election day. Did there continue to be some problems? Yes. Are these problems that we are committed to remedying in the next election. YES, of course. Now that it appears that we are free to recruit poll officials without reference to the wishes of ward caucus leaders,[1] we are currently re-evaluating long-time poll officials and will be recruiting "new" poll officials that better reflect the diversity of the City's population and who are able to retain instructions about the various procedures, e.g., provisional balloting and challenge balloting, and to completely understand the circumstances when a voter would be required to provide identification or to complete an affirmation of residence form and provide needed assistance and support. Most importantly, I am committed to ensuring that all of the poll officials appointed by the City fully and completely understand the importance of ensuring that every person (who shows up at a polling place on election day) is provided an opportunity to cast some kind of ballot and that it is his/her job to assist the voter in doing so.

23) Prior to the election, the members of the Election Commission investigated the complaints and claims made by the various declarants in the Section 203 challenge, United States v. City of Springfield. On the whole we concluded that many of the complaints were without significant merit. Indeed, it did not appear that anyone had been prevented from voting, but rather would have preferred to have had the assistance of bilingual poll officials. While we understood that

---

[1] I am not an attorney, but recognize that the state law, M.G.L. c. 54, §13, regarding the method by which poll workers are chosen controls unless is conflicts with the Voting Rights Act or the terms of the Agreed Order of Settlement in United States v. City of Springfield, C.A. No. 06-30123-MAP. Accordingly, it would not seem to me that we could recruit our own non-bilingual or other poll officials and, indeed, would be only required to recruit bilingual poll officials if the ward caucus leaders failed to nominate an adequate number. Nevertheless, ward caucus leaders are always slow in providing nominations and, accordingly, restrict the amount of time that the staff of the Office of Election Commission would have to recruit additional bilingual poll officials. Accordingly the Spanish Language Election Coordinator cannot afford to provide the ward caucus leaders the statutory prescribed time and deference to nominate poll officials. In addition, because the attitude of non-bilingual poll officials was an issue in the above suit, the Election Commission has undertaken to recruit bilingual poll officials and evaluate and replace longtime poll officials who are not functioning appropriately, appear to have insufficient ability to retain the various procedures and processes related to the conduct of elections, and are not otherwise patient, helpful, supportive, and friendly to voters. The Office of the Secretary of the Commonwealth has provided no guidance and otherwise has been conspicuously absent over the last six months.

not everyone in Springfield, residing outside of Ward 1, was fluent in English, it had always been our understanding that voters with limited proficiency in English preferred the privacy of receiving assistance from members of their family. We were further unable to determine that all of the declarants were registered to vote or had voted at the elections that they claimed to have voted. After the election, I asked the staff at the Election Commission to try to contact all of the declarants, for whom who we were able to find a telephone number or address, to find out whether they find the provision of bilingual notices and information in the Spanish-speaking media, the posting of numerous bilingual signs in the polling places, and the addition of many bilingual poll officials facilitated their ability to vote. Of the few who returned our calls, I was informed that the very few (5 or so) who returned our calls "appreciated" the bilingual assistance in its several forms before and after the election. I was further understood that several expressed some reservation about their declarations, in that their statements had been prompted to some extent. Indeed, I was told that Jose Gonzales, who had served as an aide to Mayor Albano, informed one of our staff members that his complaints related to elections conducted during Mayor Albano's tenure in office and were purportedly conveyed to the Secretary of the Election Commission during that period of time (only). I was told that he was satisfied with the bilingual assistance that was available in the polling place at which he voted in 2006.

### *Ray Jordan's 20 years in the State Legislature*

24) I am one of two daughters of former State Rep. Ray Jordan, so I do know something of the politics of the City and the Mason Square area of the City. My father "stepped down" because he felt that it was the appropriate time to do so and to give other candidates an opportunity to serve in the State Legislature. In 1993 he accepted an appointment by President Clinton to the position of Special Projects Coordinator for Region One with the Department of Housing and Urban Development. Prior to his first election as a Representative to the Massachusetts General Court, he was the Director of the African American Cultural Center at American International College. He first ran office in 1972 when he opposed white incumbents Anthony Scibelli and James Grimaldi in the Sixth Hampden County District in the Democratic primary. At that time two representatives were elected from the Sixth District and my father placed third receiving only 318 votes fewer than did Mr. Grimaldi.[2] The Sixth District at that time was comprised of Wards 3, 4, and 5.[3] Current Representative from Hampden District 11, Benjamin Swan ran unopposed in the Republican primary and received 719 votes fewer than James L. Grimaldi.[4]

25) In 1974, my father was elected as a Representative to the Massachusetts General Court from the 13th District, which was comprised of four Ward 4 precincts and seven Ward 5 precincts. Ben Swan, running as a Republican, opposed my father in the general. My father received 495 more votes than Mr. Swan received.[5] My father easily defeated Republican

---

[2] "Voting Behavior in Springfield, A Statistical and Analytic Report, September 1973." prepared by the Urban League of Springfield, Inc., Raymond A. Jordan, President, Board of Directors, ("Urban League Report I") at Table 4.

[3] According to Urban League Report I at Table 2, Black persons constituted 13 percent of the total population in Ward 3, 65 percent of the total population in Ward 4 and 46 percent of the total population in Ward 5. According to Urban League Report I, 35.5 percent of the population was Black in the Sixth Hampden District.

[4] Id. at Table 4.

[5] It appears that a redistricting occurred between the 1972 and 1974 elections. All legislative districts were "recreated" as single-member districts. Mr. Grimaldi lost the predominately African American precincts in the district (14th Hampden District) to which his residence was assigned. In the 14th Hampden district there was no

opposition in 1976. By the 1978 election, my father ran from the 12th Hampden District[6] and continued to easily defeat Republican opposition. During the time when the 12th Hampden District was comprised of portions of Wards 4, 5 and 7, I do remember one of my father's campaign slogans: "This District Is Not For Sale." I remember that the hardest campaign was the 1986 campaign when he was opposed in the Democratic primary by two candidates, including Francis Keough, members of the Springfield City Council. My father still received about a 1,000 votes more than Mr. Keough. In 1980, My father faced opposition in the Democratic primary, but defeated Joe Flynn by approximately 600 votes. [check the precincts included in 12th District] . Generally, my father had little or no opposition. I came to believe that it was attributed to my father's strong representation and leadership of his district during his twenty years of service. Few young African American potential candidates have jobs that would permit extended absences and none came from money, as I believe that many of their white counterparts do. There all also a number of successful young African American who are making high salaries, much more than that of a legislator, and are not willing or financially able to endure the pay-cut for such a demanding job. I continue to believe that to be true and accounts for the fact that my father's successor has not encountered viable challenges to his re-election.

26) As to my father's lack of opposition, I believe that that was largely the result of the fact that citizens/voters were satisfied with his job. Since he has left public office, I often hear people say – when something happens; when people believe that the city has not adequately and fairly provided services in the Mason Square area – "that that would not have happened if my father had still been in office." My father commanded respect and I believe that respect was essential to his ability to get "things done." While I grew up, my father would receive constituent calls from morning until midnight – even on the holidays, even on Christmas day. People (of every race and ethnicity) were always coming to our house. My father was a "people person" and he perceived that constituent services were "the job." In my capacity as a civil rights officer, I travel extensively throughout the Commonwealth, I am always amazed when people from the Berkshires or the eastern parts of the State ask me if I am related to Ray Jordan. They always tell me what a great politician he was and how he was always a strong advocate for people in his district and beyond. Those testaments speak to his reputation and the legacy he left that have folks still talking about his work some twenty years later.

*Mason Square Neighborhood Representation*

---

incumbent and it was comprised of seven Ward 3 precincts, two ward 4 precincts, one Ward 6 precinct and three Ward 7 precincts. Likewise, Mr. Scibelli fortuitously found that he had been included in a district in which there were no incumbents and which was assuredly majority white with one Ward 7 precinct, seven Ward 6 precincts and five Ward 3 precincts – in contrast to the Sixth Hampden District.

[6] It appears that another redistricting occurred between the 1976 and 1978 elections. Rep. Jordan was assigned to the 12th Hampden District, which was comprised of six Ward 4 precincts, seven Ward 5 precincts and four Ward 7 precincts. Without 1980 Census data by precinct available it is difficult to estimate the proportion of the population of the 12th Hampden District who were African American. In 1978, "Voting Behavior in Springfield, Massachusetts: A Statistical and Analytical Report," Urban League of Springfield, Inc. October 1983 ("Urban League Report II") at Appendix XXIII, Black persons constituted 69 percent of the population in Ward 4, 55.3 percent of the population in Ward 5, and virtually none of the population in Ward 7. At the least, it is reasonable to assume that the district had proportionately fewer African American voters than it did in its 1974-1976 iteration.

27) I have not really thought through the issue of ward representation carefully, but I do support some method of election that would provide for the election of someone who lives in Mason Square/Ward 4. It is important to have someone who is totally accountable to the persons in the neighborhoods included in Ward 4. The Mason Square neighborhoods have meaning to most African Americans who have lived in Springfield for any period of time. I would say most African Americans (or their parents) residing in the City would have been a member of this community at some time. I myself moved to East Forest Park recently, but still consider Mason Square as home.

a) I believe that it would be easier to "get rid of" elected officials who are elected from a ward and are not providing requisite services to its constituents. On the other hand, I recognize that there is/has not been real opposition in legislative district elections and most of the African American candidates who compete in various contests and who reside in Ward 1 are older. At this juncture there does not seem to be a pool of younger, qualified African American candidates who reside in Ward 4 and who could bring new ideas and enthusiasm to election contests conducted in Ward 4.

b) Also while I believe that it would be preferable to have someone living in Ward 4 to defend and advocate for the interests of those living in Ward 4, I do worry that a lone voice on the City Council may not be able to accomplish much if he did not claim the kind of respect that my father did and where no other member of the City Council would have any incentive to attend to and be responsive to the needs of those residing in Ward 4. Ward representation might make it easier for people and elected officials from other parts of the City to dismiss – if not ignore -- the problems and issues of citizens residing in Mason Square. I also am aware that a greater proportion of the African American population in the City lives outside Ward 4 than lives in Ward 4. On the other hand, it has always been true that the African American elected official(s) represents all African Americans in the City – even where they do not reside in the African American elected official's district. I know that was the case during my father's terms and I am the expectation still holds true in the black community.

28) It is my opinion that a number of white candidates would not have been elected if it were not for African American vote. With regard to Ms. Carol Lewis-Caulton's defeat, it was my thought that she had run as a "ticket" with mayoral candidate Paul Caron and her success was therefore tied to his success. But Mayor Michael Albano defeated Mr. Caron and Ms. Lewis-Caulton was similarly defeated, despite a job well done. I think the lack of interest, apathy that prevents greater turnout among African American and lack of "investment" in the political process is because folks don't see any personal gains and don't always understand the big picture or the indirect impacts. The fact that little more than 30 percent of the registered voters in Ward 4 turned out to vote for the first African American to be elected as Governor is probably due to the view that what happens in Boston and who is elected as Governor will not have any impact upon the life of the individual citizen; will not help him/her get a job; will not provide for a standard of living that is secure, comfortable and a neighborhood in which it is safe to raise children. I do admit that African American voters do demonstrate some inconsistency, since it has long been true that significantly more African Americans turn out to vote for president than vote in local elections -- even though the president is not elected by popular vote.

Signed under the penalties of perjury this 2 day of February, 2007.

_____
Denise Jordan