UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARISE FOR SOCIAL JUSTICE;<br>¿OISTE?; NEW ENGLAND STATE-AREA<br>CONFERENCE OF THE NAACP;<br>REV. TALBERT W. SWAN, II;<br>NORMAN W. OLIVER; DARLENE<br>ANDERSON; GUMERSINDO GOMEZ;<br>FRANK BUNTIN; RAFAEL RODRIQUEZ;<br>and DIANA NURSE<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SPRINGFIELD and SPRINGFIELD<br>ELECTION COMMISSION<br><br>Defendants. | Civil Action No. 05-30080-MAP |

## DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY
## JOSE TOSADO, 2006 PRESIDENT,
## SPRINGFIELD CITY COUNCIL

I, Jose Tosado, on oath, do hereby state as follows:

***Employment and Educational Background***
1) My name is Jose Tosado and I am a member of the Springfield City Council. In 2006 I served as president of the City Council. I have served on the City Council for the past five years. I graduated from Commerce High School in Springfield. After my service in the Navy, I attended Westfield State College on the GI bill and received a Bachelors Degree in Psychology and a Masters Degree in social work from University of Connecticut.

2) I am currently employed as the Springfield Site Director of Massachusetts Department of Mental Health, located on 310 State Street, serving all of Springfield, as well as Longmeadow, East Longmeadow, Wilbraham, and Hampden. Tosado Dec. at 1 and Tosado Dep.at 23. Prior to my employment with the Department of Mental Health, I worked as an adjustment counselor for the Springfield Public Schools; as clinical director of the Johnson Mental Health Center; and program director for Latino adjudicated youth offenders for Gandara Mental Health Center. Deposition of Jose Tosado, in Arise for

Social Justice v. City of Springfield, C.A. No. 05-30080-MAP (October 18, 2005)("Tosado Dep.") at 20-22. My wife has recently retired from the Springfield Public School system where she was employed during her 30 year-tenure as a special education teacher, in administration, and as a crisis intervention counselor. Declaration of City Councilmember Jose Tosado, exhibit in Memorandum Supporting Defendants; Opposition to Plaintiffs' Motion for a Preliminary Injunction, Arise for Social Justice v. City of Springfield ("Tosado Dec.") at 1.

***Residences and Community Connections***

3) I currently live Birch Glen Drive, Springfield, Massachusetts 01119 in the Sixteen Acres neighborhood (Ward 5). Although Sixteen Acres was and continues to be a predominately white community, I have not encountered "any problems with any of my neighbors." Tosado Dep. at 30. I have resided at this address for the last 27 years. Prior to moving to Sixteen Acres, I lived at 55 Bay Street in the McKnight area of the City ( ), as an adult, which at the time and currently is predominately African American. Tosado Dep.at 27.

4) I have lived in Springfield, Massachusetts most of my life with the exception of my military service. I was, however, born in Puerto Rico. My parents emigrated to Springfield, Massachusetts when I was one years old. I grew up in the North End, one of nine children – six of whom continue to reside in the City. My family first on Ferry Street and later 47 Bradford Street – a street that no longer exists. Ward 1 has comprised the North End for many years. When my family first moved to the North End in 1955, it was a "mixed neighborhood of families, Greeks, French, and a growing Hispanic presence." Tosado Dep. at 28. We were one of the first Hispanic families to live in the North End. Tosado Dep.at 11. My parents owned a restaurant in the North End, which was one of the first and few (at the time) Hispanic restaurants in the City. Tosado Dep.at 14. Sometime in the 1970s, my father opened a variety store, located in what was then called Winchester Square (now Mason Square, Ward 4); he had been bored with retirement. At that time, my parents resided on Bay Street in Ward 4. My father was murdered in the variety store in the course of a robbery on January 11, 1980. Tosado Dep. at 15.

5) Of my eight siblings, five (Theresa, Ramona, Eileen, John, and Shirley) continue to reside in the City of Springfield. Two more (Edward and Fred) lived in Springfield until very recently, but have since moved outside the Ciy  Tosado Dep.at 12-20.
a) My oldest sister lives in Sixteen Acres on Wrentham Street (Ward 8) and is a social worker with the Department of Social Services.
b) Another of my sisters continues to live in the North End and currently resides on Clayton Street (Ward 1). Her husband works for the Parks and Recreation Department for the City of Springfield.
c) Another sister lives in the McKnight neighborhood on Dartmouth Street (Ward 4) and works for Housing Allowance Program (HAP, Inc.), which has established a housing partnership in Hampden and Hampshire Counties
d) Another sister lives in Hungry Hill on Los Angeles Street (Ward 2).

e) One of my brothers lives in Sixteen Acres on Wrentham Street (Ward 8) and works as a police officer for the City of Springfield.
f) My two other brothers had lived in Sixteen Acres, but have recently moved outside the City
h) I have a sister who lives in Westfield, but works at the Springfield District Court, located on 50 State Street, as a court clerk; and her husband works as a police officer for the town of Westfield

6) I consider myself to be connected to and to fully understand the issues and the concerns of those residing in Ward 1, even though I no longer live there. I do not believe that my commitment to persons living in Ward 1 is compromised by the fact that I live elsewhere in the City. I am in the North End/Ward 1 daily. My barber is in the South End; and the restaurants, grocery store, travel agent, flower shop that I frequent are all located in the North End. My family and I still attend the same church as I did growing up: Old Souls Church in the North End. I remain an active member of that church community. Because I grew up in the North End and my parents were well known in that community my strongest neighborhood ties remain to the North End neighborhoods. The charitable work that I sponsor is in and for North End residents and recently includes a "free Christmas dinner" and a "coat give-away"

## *Connections and Networking*

7) I, along with Mr. Alejandro formed the Latino Breakfast Club as a means toward developing "networking opportunities for other Latinos." Mr. Alejandro, through his contacts was able to recruit persons and organizations to address the Club at monthly breakfast meetings and discuss "issues that affected [the Latino] community," as well as providing "opportunities for other Latino who are professionals in their own fields to get to know each other so if they need something" they know appropriate persons to contact. Tosado Dep.at 49-50.

a) Among the issues that were discussed in these meetings were the various health, education and employment problems or issues that have significantly impact the Hispanic community. Tosado Dep.at 50-51.
b) "Discrimination" was not a topic of discussion and Mr. Tosado considers it to be no more a problem in Springfield than it is throughout the country. Tosado Dep.at 51.
c) Although "electoral politics" was not something with which the Club concerned itself, it did participate with a number of other organizations in the voting rights lawsuit that had been brought in the 1990s. Actual the four or five members that founded the club decided among themselves that they would join the lawsuit, based upon their view that Latinos were unable "to gain access to elected office." Tosado Dep.at 53-56.

8) I believe that in order to be elected to the City Council it is necessary to have contacts with the various ethnic and racial groups throughout the City, as well as strong contacts with those of the same racial or ethnic group. Multi-ethnic, racial, and neighborhood contacts are essential to provide for "exposure." Tosado Dep.at 43-44. "[Y]ou can do very well within your particular ethnic group, and you can be invited to their houses for coffee hours and they can do fund-raisers for you, but other ethnic groups can bring you

into their neighborhood and introduce you and have coffees hours for you and give you exposure. . .to other sections, not only ethnic groups, but other sections of the city." Tosado Dep.at 44. Indeed, I feel that this kind of "exposure" is no more or no less important than raising campaign funds – "like the chicken and the egg." Tosado Dep.at 44-45. According to Mr. Tosado, no one ward can "carry any candidate in a citywide election to win a seat;" it is necessary for candidates to have a broad base of support.

9) In my case, I had served on numerous volunteer organizations prior to my having run for office, including Springfield School Volunteers, the City's Racial Balance Committee during the time when "busing [was] first introduced to the City; a special education task force; and the Pioneer Valley Planning Commission . Tosado Dep.at 46-47. In addition I served as a trustee to the Baystate Medical Center. Tosado Dep.at 46. I do not feel that service on these committees is necessarily essential to a successful citywide candidacy, but the exposure helps establish a wide geographic, socio-economic, racial and ethnic base of support. On the other hand, I want to emphasize that my service had "nothing to do" with an interest in running for public office – since at the time of my service, I had no plans to run for public office. In fact, these "organizations [s]ought [me] out because they want[ed] Latinos on their boards for representation, and they tend to go out and look for someone that's. . .an upstanding citizen. . .well educated, known in the community. . . ." Unfortuntely, "there's few of us so I tended to get called a lot for membership in some of these organizations." Tosado Dep.at 48.

***Previous Campaign Experiences***
10) The first time that I ran for office in 1999 was not my first experience with campaigning or with Springfield politics. I worked on Mayor Albano's campaign in 1995 "[h]elp[ing] organize stand-outs, spread[ing] the word. . .[as a] worker." Tosado Dep.at 32.

a) Prior to that time, I worked on Jimmy Carter's presidential campaign in 1976. I had just "got[ten] out of the Navy" and was encouraged to become more politically active by a friend, Miguel Rivas. Tosado Dep.at 33. In addition, I worked on the Scott Harshbarger and Michael Dukakis gubernatorial campaigns." In many of the large campaigns on which I worked I was an "invisible worker" Tosado Dep.at 35.
b) I also worked on the various campaigns (mayoral and congressional) of Richard Neal, who had also grown-up in the North End. Tosado Dep.at 34
c) I worked on various campaigns for Miguel Rivas (1981 City Council contest, placing 13th with soon-to-be City Councilor Morris Jones placing 14[th]); Richard Mundo (1983 Primary Election for City Council), Carmen Rosa (1993 School Committee elections). Of the three Hispanic candidates, only Ms. Rosa was elected. Tosado Dep.at 35-36. In addition, I worked on Luis Garcia's campaigns (1997 School Committee election; 1995 City Council contest).
d) I assisted Mr. Eliezer Cortes in his 2001 City Council campaign, in which I first competed for City Council. Mr. Cortez placed thirteenth as among 14 candidates. Tosado Dep.at 37. I further assisted Mr. Cortes in his second bid for City Council in 2003 election, in which I competed as an appointed incumbent. Tosado Dep.at 37. Mr. Cortez placed seventeenth as among 18 candidates.

11) In 2005, I did not actively assist first-time Hispanic candidates, Rafael Nazario and Clodo Concepcion (City Council) in 2005. I did not specifically endorse Orlando Santiago's candidacy for School Committee. Since all three candidates do not now live in Ward 1, they would have needed the endorsement or assistance of a candidate who has been supported by Ward 1 voters or a community leader in order to secure the Ward 1 vote. I believe that it is necessary for a Hispanic candidate to receive a significant proportion of the Ward 1 vote in order to be elected. It was my understanding that various persons in the Hispanic community were concerned that if another Hispanic candidate were elected to the City Council or the School Committee, this lawsuit would be jeopardized. At the time of the 2005 election, the City Council had not voted to send the 8-5 method of election to a referendum vote. The 8-5 method of election provides for the election of one member from each of the eight wards and five members elected at large.

*Election History*
12) In 1999 I ran for a position on the School Committee. I placed second in the number of votes received. This was the first time I had sought elective office. In 2001 – in the middle of my School Committee term -- I ran for the City Council. I placed tenth in total votes, receiving 1,235 fewer votes than the candidate who placed ninth.

13) In 2002 I was appointed, as the candidate placing tenth in the last election, to the City Council to fill the unexpired term of Brian Santinello, who resigned from the City Council to take a job with the City. I was replaced on the School Committee by fourth place candidate, Robert McCollum. I was elected to the City Council in 2003, placing third in total votes received. In those previous elections I have "carried" Ward 1. I have not asked voters to single-shot vote for me, although I do believe that many Hispanic voters utilize a limited voting strategy . It is my belief that I also received significant support from the City's white and African American voters, whose support I sought.

14)   In 2005, I was re-elected, placing fourth in total votes received. In 2006, I was elected City Council President by members of the City Council

15). I had been made aware that my success in School Committee and City Council elections has been viewed by some as a "problem" with regard to the pursuit of this challenge. I do know that various persons have tried to maintain that my success was the product of white support and endorsement or that I do not represent the interests of voters in Ward 1 or Hispanic voters generally.  While I continue to support some form of ward representation, I do not think it should be achieved by misrepresentation of the facts.  I have always received significant support from Ward 1 voters; I seek the support of Ward 1 voters. Ward 1 and Hispanic voters, generally, are the base of my political support. I have received a greater proportion of the Ward 1 vote in every contest in which I have competed than has any candidate (including Mr. Gumersindo Gomez) who has run for City Council in the last eight elections.  I am committed to issues of importance and concern to the Hispanic community. While on the School Committee I

formed an ad hoc committee to investigate the increasingly high rate of Hispanic drop-outs.

***Campaign Strategies***

16) Actually, my campaign begins with my family and friends – which in my case, is a pretty good start. Tosado Dec. at 2.

17) My campaign strategy involves little more than meeting the people and providing the voters an opportunity to get to know me. I campaigned throughout the City in all four elections in which I have sought office. Tosado Dec. at 2. In approaching people in my house-to-house; neighborhood-to-neighborhood campaigns, I "made people look "beyond my skin." I identified issues and concerns that were shared by all of the voters and residents in the City, e.g., employment, quality of life. I also emphasized my honesty and the integrity. Tosado Dec. at 2. I attended events, debates, "meet-the-candidate" gatherings in predominately white, African American, as well as Hispanic communities. Tosado Dec. at 2. I never felt unwelcome in the events that occurred in predominately white or African American neighborhoods.

18) Specifically, I "target" various groups of people and build and rely upon a base of support. Prior to and after an election I identify– based upon election records provided by the Office of the Election Commission – the precincts where the greatest number of voters turnout, as a general matter, and the precincts, wards, neighborhoods, in which I have received my greatest support. Tosado Dep.at 75-77. These are the people whom I target in my election campaigns. Accordingly, in my door-to-door campaigning, I make sure that I target areas of high voter turn-out, like Ward 7. My campaign volunteers have used literature drops. I do "targeted mailings" generally to voters whom I identify from the voter lists.

19) Although I think meeting people and providing voters with an opportunity to get to get to know me as essential, it is also important to establish a committee to raise money and conduct fund raisers.  Tosado Dep.at 61. My committee has "vigorously raised funds and sought sponsorship from a variety of people throughout the City (Black, white, and Latino alike)." This has proved successful and I have been able to use the television and the print media to campaign and bring my message to the voters of Springfield." Tosado Dec. at 2.

a) In my first bid for public office in 1999, my committee raised approximately $30,000. Money was raised by conducting a number of fundraisers in various restaurants throughout the City. I did not spend his own money in my 1999 campaign for School Committee. My election made me the third Hispanic to be elected to the School Committee.  Tosado Dep.at 63-65.
b) In 2001, when I ran for City Council, my committee again raised approximately $30,000. Again, in 2001, I did not spend any of my own money. Tosado Dep.at 69-70. Actually, I have not heard of any other candidates who have been required to spend their own money. Tosado Dep.at 70.

20) I believe that what "set [me] apart" from other Hispanic candidates and accounts for my successful candidacies was my longtime residence in the City; my age (then 45 years of age) and life experiences; his contacts -- developed over a lifetime – throughout the City; my wife's contacts as a teacher and administrator in the Springfield School System; the size of my immediate and extended family; and contacts acquired through my childrens' education, sports, and other activities. Tosado Dep.at 68-69.

21) It is not my opinion that unsuccessful minority candidacies are attributable – solely or predominately -- to race or lack of access. On the other hand, I acknowledge that conducting a citywide campaign involves a huge commitment of time, money, and resources and that campaigns conducted in a ward or district in which the candidate resides and among the candidate's neighbors and family would considerably easier. Because a ward-based campaign presents a much less daunting commitment of time and resources and requires only that the candidate have contacts in a more limited area of the City, I do believe that "ward" elections might attract more candidates. Although I am not convinced that subsequent ward elections will attract as many candidates once the incumbent has established himself within the district that he represents. In contrast, under the current method of election, first-time candidates as myself do not really have to challenge or campaign against a specific longtime population incumbent and do not have to defeat a popular incumbent in order to be elected. Also at-large elections make it feasible for candidates to assist one another or aid or support one another's campaign.

a) I believe that Mr. Cortez (2001 and 2003) and Mr. Mundo (1983) did not win because they were not from Springfield and therefore did not have sufficient contacts, were unable to raise sufficient money (as a result of the absence of contacts, longtime friends and neighbors and family in Springfield) to "run a well organized campaign to get the message out." Tosado Dep.at 38-39
b) I believe that Edgar Alejandro's failure to be elected in 1991 was attributable in part to his being from New York, although "he had a big circle of friends. He was from East Forest Park. . .[and] was a hockey coach at Cathedral High School." Tosado Dep.at 41-42. Indeed, I feel that his lack of success was due in part to his not having adequate contacts among members of the North End Hispanic community." Tosado Dep.at 63
c) I do believe that it is essential for a Hispanic candidate to seek and receive support and, otherwise, be known to voters in Ward 1. I do believe that that was one of the difficulties face by Mr. Concepcion in 2005 – he lives and has been active in Ward 5 and was not as well known in Ward 1 and 3.
d) I do not believe that the reason that Hispanic candidates have been unsuccessful is because they have not had the advantage of first being appointed to commissions or committees. As I recall, Mr. Cortez had been appointed to a citywide commission; Mr. Garcia had served on the Liquor Commission; and Mr. Alejandro had served on the Parks Commission. Tosado Dep.at 45.
e) On the whole, I believe that any reasonably qualified minority candidate with significant ties in Springfield could be successful if he worked as hard as I do in campaigns and could raise adequate funds with which to campaign.

***Turnout***

22) I am not convinced that the at-large method of election has anything to do with the fact that the lowest turnout is in Wards 1, 3, and 4. Tosado Dep.at 80. I further am not convinced that single-member districts or "ward representation" would result in greater turnout among minority persons. Tosado Dep.at 81-82. Rather, I believe that the advantage of "ward representation" is that it provides for a "higher likelihood that someone from that ward can gather sufficient support to win an election independent of the numbers," i.e., whether or not the turnout among minority persons in the neighborhood actually improved. Tosado Dep.at 81-84.

23) I "d[o] not know it to be true" that "ward representation system" would "result in more Latino voters coming out to vote." "I don't know what the reasons are for voter apathy." Tosado Dep.at 84. A ward-based elections will, however, make it easier for Hispanic candidates to win, since it will not be necessary to "get the Hispanic vote out" in order to be successful, since they will not be "competing" with other areas of the City where voters routinely turnout out in greater numbers.

***Comparative Advantages of at-Large and Ward Representation***
24) I have proposed and the City Council has adopted a resolution calling for a referendum election in which a method of election would be proposed in which one member would be elected from each of the City's eight wards and five members would be elected at-large ("8-5 method of election"). While it is true that I would be required in Plaintiffs' proposed nine single-member district plan to compete for re-election in a district in which the proportion of Hispanic persons of voting age is significantly less than it is citywide, I am not concerned that I would not be re-elected, because I have "built up" significant citywide support over the last four elections and believe that I would have a good chance at being successfully elected in any of the City's wards or the Plaintiffs' districts.

25) As to my support for the 8-5 method of election, I believe that it is important to include on the City Council members who are elected from wards as well as those who are elected at-large. I believe that much will be lost where no members of the City Council are accountable to the City and all of its citizens and where no candidates would be required to campaign in all of the communities. I know that my having to campaign citywide has "assisted me in my ability to be an effective member of the Springfield City Council, since it has provided me with an opportunity to familiarize myself with other areas of the City in which neither I nor my family and friends live and to acquaint people in these neighborhoods with me, my goals, priorities, and values." Tosado Dec. at 2.

26) I feel strongly that an all-single-member district method of election would deprive all of the Hispanic persons who do not live in Ward 1 an opportunity to vote for a Hispanic candidate for the City Council. It is my guess that at least 70 percent of the Hispanic population does not reside in Ward 1. I believe that this number is increasing as more Hispanic persons and young families move to other parts of and other neighborhoods in the City. A ward representation method of election that did not provide for any candidates elected at large would exclude non-Ward 1 Hispanic persons from the political process to the extent that they would not be able to vote for a Hispanic candidate

who was elected to the City Council. I think that geographic limitation to the reach and extent of Hispanic representation would do a great disservice to all Hispanics who live in the City. We do not give up our ethnic identity because we move. My opinion is not based upon the view that white candidates cannot represent Hispanic interests or that Hispanic candidates – as myself—cannot represent white interests or even that there is much that differentiates the concerns, issues, priorities of white, Hispanic, and African American families. We all want the same things: good education for our children, safe neighborhoods, a decent job and nice house, a good quality of life, low taxes. Rather, I do think that it is important to many Hispanic citizens to see Hispanic persons representing their interests. I do think that the electoral success of Hispanic candidates helps Hispanic citizens to feel more connected to the city government. In addition, I think that I bring a perspective to the Council that others do not

27) My support of the 8-5 method of election was not based upon an assessment or a belief that this method of election would result in greater proportional representation of minority persons. Rather, I proposed and continue to support an 8-5 method of election because it would provide for some "neighborhood representation" and would make it easier for a Hispanic candidate living in Ward 1 to be elected. In proposing the 8-5 method of election I did not consider the fact that incumbent Bruce Stebbins (white) resides in Ward 1, but assume that he would have at least as good a chance to be re-elected as would a Hispanic candidate and a greater chance to be re-elected if the Ward 1 Hispanic vote is split among several Hispanic candidates. Although I am aware that Mr. Stebbins resides in one of the Hispanic-majority districts in Plaintiffs' nine single-member district plan, I would still recommend some adjustments to the ward boundaries, should the 8-5 method of election be adopted by a majority of those persons voting, to ensure that the disparately wealthier white neighborhood in and around Mattoon Street, the new federal court house and the quadrangle are reassigned to Ward 3 where there would be a greater community of interest as among other similar white enclaves located in that ward and to make sure that Ward 1 does provide for the election of a Hispanic candidate.

Signed under the penalties of perjury this 5th day of January, 2007.

Jose Tosado