UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ARISE FOR SOCIAL JUSTICE; | ) | |
| ¿OISTE?; NEW ENGLAND STATE-AREA | ) | |
| CONFERENCE OF THE NAACP; | ) | |
| REV. TALBERT W. SWAN, II; | ) | |
| NORMAN W. OLIVER; DARLENE | ) | |
| ANDERSON; GUMERSINDO GOMEZ; | ) | |
| FRANK BUNTIN; RAFAEL RODRIQUEZ; | ) | |
| and DIANA NURSE | ) | Civil Action No. 05-30080- |
| MAP | ) | |
|      Plaintiffs, | ) | |
| | ) | |
|   v. | ) | |
| | ) | |
| | ) | |
| CITY OF SPRINGFIELD and SPRINGFIELD | ) | |
| ELECTION COMMISSION | ) | |
| | ) | |
|      Defendants. | ) | |
| | ) | |

## DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY
## EDWARD A. FLYNN, POLICE COMMISSIONER
## CITY OF SPRINGFIELD

1) My name is Edward A. Flynn and I am currently serving as the Police Commissioner for the City of Springfield. Prior to my assuming command in the City of Springfield, I served as Secretary of Public Safety under Massachusetts Governor Mitt Romney (beginning in 2003). As Secretary of Public Safety I was responsible for the management of a variety of public safety agencies, boards, and commissions, including the Massachusetts State Police, the Department of Corrections, the National Guard, the Department of Fire Services, the Parole Board, and the Massachusetts Emergency Management Agency. I also served as the chief advisor to the Governor on homeland security. Prior to my appointment as Secretary of Public Safety, I served for five years as the Chief of Police in Arlington County, Virginia. In that capacity I was instrumental in the recovery effort at the Pentagon after the September 11, 2001 terrorist attack and in the fall of 2002, I participated in the sniper shootings investigation in the Washington DC area. I began my career in the Jersey City Police Department, where I was promoted through the ranks of officer, sergeant, lieutenant, captain and inspector. I served as the Chief of Police in Braintree and subsequently Chelsea, Massachusetts. In Chelsea I helped lead the city out of state-imposed receivership to designation as an All American

City. I am a fellow of the congressionally chartered National Academy of Public Administration, a member of the Police Executive Research Forum and a past recipient of the prestigious Gary Hayes Memorial Award for Police Leadership. I hold a Bachelor of Arts degree in history from LaSalle University in Philadelphia, a Masters Degree in Criminal Justice from John Jay College of Criminal Justice in New York. In addition, I have completed all course work in the Ph.D. program in criminal justice from the City University in New York. I am a graduate of the FBI National Academy, the National Executive Institute and was a National Institute of Justice Pickett Fellow at Harvard's Kennedy School of Government.

2) The Police Commissioner is the police chief executive and as such I am responsible for approximately 450 officers and 100 civilian employees. In March 2006 I was appointed by the Finance Control Board and Mayor to serve as the Police Commissioner. I report to the Mayor (and Finance Control Board). The City Council has no direct supervisory authority with regard to the Police Commissioner or the Police Department , although members of the City Council may make suggestions, voice criticism, or issue praise to the Mayor about my performance as Police Commissioner or the functioning of the Police Department. As I understand it, the Mayor, however, is under no obligation to act upon these suggestions or criticisms. Unlike the predecessor Police Chief, which was a civil service position, as an appointee of the Mayor, I am accountable to the public by means of the biennial mayoral elections.

*Values, Mission, and Code of Ethics*
3) Upon my arrival in 2006, I reviewed the values and mission statement that had been provided by the previous Police Administration that articulated the Department's "philosophy of policing and its overall goals."[1] Springfield Police Department General Order 100.5 (March 15, 2001), which was mandated for and applicable to all employees of the Police Department, provided that "[t]hese values, when taken together, reflect those qualities of our community and in our lives that we cherish and dedicate our service to uphold." The mission of the Springfield Police Department established in GENERAL ORDER 100.5 is to "provide public safety and to contribute to the quality of live for the citizens of the City of Springfield by protecting, serving and working with the community to develop philosophies, which promote equity and establish partnership between citizens and police to enhance law enforcement, aid in prevention of crime and preserve the public peace."

4) The Springfield Police Department established in General Order 100.5, "Department Values," which are committed to preserving and advancing the principles of democracy and respecting "the rights guaranteed to each citizen by the Constitutions of the United States and the Commonwealth of Massachusetts." General Order 100.5 further provided

---

[1] The information provided regarding the Department's goals, mission, values, code of ethics, policies and procedures predated my administration, which is less than a year old. As a general matter I have endorsed these precepts and the Department has continued to function pursuant to these values, code of ethics, and procedures and policies. Since my arrival, I have been reviewing and reconsidering these "guidelines" and as time progresses, I may make revisions or additions to these principles, procedures, and policies as I think is appropriate and warranted and as better reflects the ethos of the Police Department under my direction and the manner in which officers and other personnel exercise their responsibilities and duties.

that "[t]he Springfield Police Department places its highest value on the preservation of human life." Accordingly, General Order 100.5 proscribed deadly force by the police unless "justified under the law [and] consistent with th[is] philosophy and/or rationale of humane social control." "The prevention and aggressive response to crime" was identified as among the values of the Police Department. In this way, the Police Department strove to facilitate the improvement of the quality of life of the citizens of Springfield and the reduction of the fear of crime "that is both real and perceived." General Order 100.5 further provided that the Springfield Police Department is committed to "providing a mechanism for the community to collaborate with the police both in identification of community problems and determining the most appropriate strategies for resolving them." The Springfield Police Department viewed "[c]rime [as] not solely a police problem," but rather "a community problem."

5) Finally, General Order 105 provided that all members of the Springfield Police Department are responsible for their conduct and performance to the community they serve and to themselves. Accordingly the Springfield Police Department is committed to being "open and responsive to the needs and problems of the citizens of Springfield." The Springfield Police Department is committed to maintaining "the highest standards of integrity and professionalism in all aspects of its operation." General Order 105 provided that "[t]he Department is guided in its actions by a Code of Ethics" and "expects that all members will conduct themselves both on and off duty, in a manner that is beyond reproach" and that is reflective of "the integrity of a police professional." General Order 105 further provided that the Springfield Police Department is "dedicated to maintaining a system designed to promote the highest level of discipline among its members [and]. . . to employee excellence." To that end, the Department committed itself to seeking "opportunities to improve officer safety, [to] promote maintenance of excellent health and morale for all, and [to] support its members by pursuing the finest training, technology, and equipment." Accordingly, as among the goals identified in General Order 105, is "open, effective internal communications."

6) By General Order, dated March 15, 2001, the Springfield Police Department established a Code of Ethics that recognized that it was necessary for the Police Department to "uphold a high standard of ethical behavior" in order to "maintain a partnership with the community and create professionalism," Springfield Police Department "identified five basic ethical standards in policing for its officers," which "reflect the Department's organizational values. . .[B]y not accepting unethical behavior" from its officers and staff, the community is provided a basis for trust and support. For the Springfield Police Officer, "ethical policing offers a personal and professional satisfaction and increases [the officer's] reputation in the organization and community."

7) The following Code of Ethics was provided to all of its officers to "assist them in making ethical decisions and judgments during the course of their law enforcement career." Violations of the Code of Ethics constitutes "misconduct subject to disciplinary action."

a) "The officers of the Springfield Police Department will provide fair and open access to police services." Every member of the Springfield community is entitled to the same protection from the police. "By adhering to this ethical standard of behavior to provide fair and open access to police services all officers of the Department will avoid favoritism, discrimination, and/or neglect of services." Discrimination or the "withholding of police services and/or the misuse of authority by an officer against any individual because of age, sex, race, color, marital status, or handicap, previous police history, location of the call, and/or status of victim either directly or indirectly, while acting in any capacity as an officer of the Springfield Police Department is prohibited and will not be otherwise tolerated. "An officer's use of discretion is limited to the information available to the officer at the time and exercised within the law." The "withholding of services or misuse of authority constitutes abuse and mistreatment of another person" and "is prohibited and constitutes malfeasance, misfeasance, and/or nonfeasance."

b) "The officers of the Springfield Police Department will strive to uphold the public trust." In order to maintain the public trust, all officers of this Department are required to act in "an ethical, humane, and judicious manner." Public trust is "that social contract between the police Department and the community where the community trusts its appointed officers to perform law enforcement functions" that citizens are not permitted to do."

c) The officers of the Springfield Police Department are required to "perform their law enforcement function within the framework of maintaining the public's safety and security." Accordingly, "[i]n circumstances where the potential hazard to the individual and/or community outweighs the need to take law enforcement action, all officers of th[e] Department are required to act in a manner that maintains the public's safety and security.

d) The officers of Springfield Police Department are committed to and understand the importance of teamwork. "Each officer of the Police Department has an obligation to act as part of a team with other officers in the Department and other criminal justice officials, and should give the cooperation that he/she expects to receive in turn."

e) All officers of the Springfield Police Department are required to act "without taking particular favoritism and without taking advantage of his/her authority."

***Policies and Procedures in Exercise of Duties***
8) My review of the  Springfield Police Department policies and procedures further provided that "[i]t is the policy of the Springfield Police Department that an officer's force response must be objectively reasonable in consideration of the officer's perception of the risk/threat presented and the officer's perception of the subject's action(s). Guidelines, policies, procedures, and definitions are provided in Springfield Police Department General order 100.20 (March 31, 2001) and violations of this order are "considered misconduct subject to disciplinary action."

a) "An officer may use that level of non-deadly force that is objectively reasonable to bring an incident and/or subject under control" – to effect an arrest, protect the officer or another person from physical harm, restrain or subdue a resistant subject, and to bring an unlawful situation safely and effectively under control.

b) An officer is authorized to use deadly force to i) "[p]rotect the officer and/or another person(s) from unlawful attack," which is perceived by the officer to constitute an immediate threat of death or serious physical injury; ii) "prevent the escape of a fleeing violent felon who[] the officer has probable cause to believe will pose a significant threat of death or serious physical injury," but only when the "force employed [would create[] no substantial risk of injury to innocent persons." An officer is authorized to use deadly force to render harmless an animal that presents "a clear and immediate danger of death or serious injury to a human being" or when the animal is so seriously injured "that humanity requires its removal from suffering."

c) An officer is permitted to use deadly force only when the officer is confronted by an assaultive act that reaches the ultimate degree of danger. An officer is permitted to use deadly force only when his/she perceives the highest degree of threat towards his/her or another's safety, i.e., a reasonable assessment that if the situation were allowed to continue the officer or another could be seriously injured or killed. Under these circumstance requiring a "maximized system of defense," deadly force tactics include vehicular pursuit and/or use of service weapons

d) An officer is permitted to de-escalate, stabilize, or escalate his/her response "based upon his/her risk assessment and the perceptions of the subject's degree of compliance or non-compliance."

e) To further instruct and guide police officers, force tactics in each of the five force levels (Level One: the compliant subject; Level Two: the resistant (passive) subject; Level Three: the resistant (active) subject; Level Four: the assaultive (bodily harm) subject; and Level Five: the assaultive (serious bodily harm) subject) have been provided in the Use of Force Model. Police officers have been trained in all tactics identified and described. A police officer is permitted to use a tactic not identified in the Use of Force Model only when it is "objectively reasonable as it relates to the officer's risk assessment and the subject's actions

9) Likewise these policies and procedure indicated that the use of personal weapon, authorized baton, and/or other impact/weapons are subject to prescribed Departmental procedures and practice guidelines. Violations of these guidelines and procedures are considered misconduct and, as such, constitute grounds to invoke disciplinary action. Personal weapon tactics are permitted to be used only to "defend against and ultimately stop and control a subject who the officer perceives as consistent with Level Four (assaultive, bodily harm) or higher on the Springfield Police Department Use of Authority Model."

a) Officers are instructed to avoid strikes to the "parts of the human body [that] are more vulnerable to serious injury if struck with enough force"

b) A police officer is permitted to use "his/her authorized baton as an impact weapon on a non-compliant subject when he/she perceives the subject as consistent with Level Four (assaultive, bodily harm) or higher on the Springfield Police Department Use of Authority Model."

c) All officers are required to complete a basic baton qualification course and are required to maintain a "continued degree of proficiency"

d) A police officer is permitted to use other than an authorized impact weapon only in exigent circumstances; such use will be subject to review by the Chief of Police.
e) When a subject, who been struck with an impact weapon, has been secured, the police officer is required to provide for first aid or other medical attention where appropriate and the subject is to be continually monitored for a reasonable period of time after the "initial strike."

10) Springfield Police Department General Order 500.10 (March 15, 2001) established the policy and procedure regarding force utilization and qualifications procedures for authorized firearms. Violations of this order constitute misconduct subject to disciplinary action. "Regardless of the nature of the crime or the justification for firing at a suspect, officers [are required to] remember that their basic responsibility is to protect the public." Accordingly, a police officer is not permitted to fire under conditions that would subject bystanders or hostages to death or possible injury, except to "preserve life or prevent serious bodily injury."

a) An officer does not shoot with the intent to kill, but rather has been instructed to "target that area of the body [that] will allow the greatest chance of stopping the deadly threat."
b) As general matter, firing from a moving vehicle is prohibited unless in defense of the officer or another "from death or serious physical injury."
c) Alarm shots are permitted only where necessary to protect the officer or others from immediate threat of death or serious bodily injury and/or to prevent a crime where the suspects' actions place persons in jeopardy of death or serious bodily injury. In contrast warning shots are not permitted.
d) "An officer's decision to draw or exhibit a firearm should be based on the tactical situation and the officer's reasonable belief there is significant risk that the situation may escalate to the point where deadly force may be justified" and is required to secure or holster the firearm as soon as the officer determines that the use of deadly force is not necessary. Justification for the use of deadly force is limited to the facts as reasonably known or perceived by the police officer at the time that he/she decides to shoot.
e) A police officer is not permitted to shoot at an individual who flees when called "to halt on mere suspicion and who simply runs away to avoid arrest." A police officer is not permitted to fire at a "fleeing felon" if there is any doubt, in the mind of the officer, that the individual did not commit the felony or "where there is any doubt that the person whose arrest is sought will cause death or serious bodily injury to others if apprehension is delayed."
f) A police officer is required to utilize "extreme caution with respect to the use of deadly force against youthful offenders."
g) A police officer must complete a "basic qualification course as determined by the Springfield Police Academy" prior to carrying a department firearm and must qualify in the use of his/her firearm once a year.

11) The use of Oleoresin Capsicum ("OC") spray has been another alternative available to a police officer when he/she perceives the suspect to be at least a "Level Three" subject. The Springfield Police Department has issued guidelines and procedures for the

use of OC spray, General Order 500.60, and violation of these guidelines or procedures constitutes misconduct subject to disciplinary action. Except in exigent circumstances, a police officer is not permitted to use OC spray where there is an unreasonable risk to the suspect, where there is an open flame or where the suspect is operating a motor vehicle. The police officer must provide some indication to other officers present of his/her intention to use OC spray, which should be discharged in short bursts, no fewer than 4 feet from the suspect, targeting the suspect's face. As soon as the subject is distracted or submits to an officer's authority, the police officer is required to terminate the use of OC spray. Once the suspect has been subdued, the police officers must i) ensure that the subject is able to breath; ii) move the suspect away from contaminate air; and iii must monitor the suspect "and act to calm the individual through verbal directions." Should there be abnormal effects or the suspect requests it, medical attention must be provided. Other assistance, as required, must be provided to the suspect upon his arrival at the station.

12)  General Order 600.20 (January 11, 2004) requires the filing of reports and various review procedures where police officers are have used deadly force and non-deadly force tools.

13) The Springfield Police Department has also issued guidelines and procedures with regard to the restraint, searching and transportation of subjects in custody, General Order 500.80 (March 31, 2001), and violation of these guidelines or procedures constitutes misconduct subject to disciplinary action.

a)  "The restraining of a subject in custody by use of a restraining device, material or instrument around the neck, or [by] secure[ing] the hand and feed to the rear in a "hog-tying" style, is strictly prohibited." Metal handcuffs or flex-cuffs are used to secure a subject, who is placed into custody. Leg restraints are used when the police officer perceives that there is a risk of flight and when the subject is held in lock-up and is being removed from the booking area.
b)  Police officers are permitted to conduct a pat-frisk for weapons on either reasonable suspicion that the arrestee is unlawfully armed or on a reasonable belief that the arrestee is armed and dangerous. More invasive searches are permitted only in limited circumstances
c)  Strip searches are permitted in certain circumstances where there is probable cause to believe that the arrestee is concealing contraband or weapons on his/her body. The privacy of the arrestee should be respected at all times and the search should comply with basic hygienic procedures and professional practices. Strip searches should be conducted by as few sworn officers of the same sex as the arrestee as possible
d)  Manual body cavity searches should be conducted only where there is "a strong showing of particularized need supported by a high degree of probable cause." A search warrant is required for body cavity search and can be performed only by a doctor or other "professionally trained medical personnel." The privacy of the arrestee should be respected as much as possible, under the circumstances, and the search should comply with basic hygienic procedures and professional practices.

e) All subjects are required to be transported only in Department vehicles and prohibited in those vehicles, e.g., police motorcycle, mounted unit, canine vehicle, police bicycle, where an unnecessary hazard to the subject would result.

f) A juvenile is not permitted to be transported in the same department vehicle as an adult suspect unless there is an identifiable need or exigent circumstances. Likewise a male suspect is not permitted to be transported in the vehicle as a female suspect unless there is an identifiable need or exigent circumstances.

g) Police officers are not permitted to leave prisoners unattended at any time during transport. While police officers should check to ensure that prisoners are properly secured, they are not permitted to handcuff the prisoner to any part of the car. Prisoners should be "secured with the vehicles passive restraint system."

h) Police officers are required to "[i]nspect the transporting vehicle's area of contact with the subject prior to and after transporting for weapons and/or contraband."

i) "Any necessary medication or medical devices should be transported with, but not in possession of, the prisoner." (March 4, 1992). "When a prisoner is in need of medical care he should be transported to a medical facility prior to being brought to the station."

14) It has been the policy of the Springfield Police Department to "respond without delay to all calls for services, while maintaining the utmost regard for the safety of all persons." The dispatching of all police units originates from or is controlled by the dispatch center and constitutes "orders from the chief of police." There are two types of response to assignments: routine and emergency.

a) Routine response is defined as "responding directly to the assignment while obeying all traffic laws and controls." Emergency warning devises are not used during a routine response.

b) Emergency response is defined as "responding as quickly as is safely possible to the assignment." Emergency warning devices should used to facilitate safe and rapid response. Officers may operate the vehicle in excess of the speed limit or contrary to "traffic control devises" as long as he/she pays due consideration to the safety of persons and property.

c) In addition, to an emergency response to an assignment, a Springfield Department of Police officer is permitted to operate a department vehicle in emergency response mode when conducting a motor vehicle stop or when initiating or continuing a vehicular pursuit. Not only should emergency warning equipment be used in emergency response mode and but also due care for the safety of all persons should exercised.

15) In conducting a motor vehicle stop, it is required that the officer's actions must be objectively reasonable based on the perceived circumstances and the subject's actions. . .Force used to affect a motor vehicle stop must be commensurate (or equal) with the purpose or reason for the stop. During a motor vehicle stop, there must be at least one police officer present, who is identifiable such. Police officer's badge must be clearly visible or identification must be provided. Prior to approaching on foot a vehicle that has been stopped, the police officer should notify the dispatcher of the relevant information. Likewise, the dispatcher must be notify when the stop has been "completed"

16) A vehicular pursuit is authorized only where i) the officer knows or has probable cause to know that the subject operating the vehicle has committed or will commit a serious felony or violent crime; ii) the subject has or is presenting immediate threat of serious bodily harm to the officer or others by operation of the vehicle; iii) the subject is operating a department vehicle; or iv) the subject exhibits the intention to avoid apprehension by refusing to stop while operating a motor vehicle.

a) The officer's actions must be "objectively reasonable based on the perceived circumstances."
b) "The decision to initiate a vehicular pursuit is required to be based upon the operating officer's conclusion that the need to apprehend the subject outweighs the immediate or potential danger to the public should the suspect remain at large.
c) A vehicular pursuit should be terminated when i) "the level of public danger outweighs the necessity for apprehension;" ii) environmental or roadway conditions substantial increase the danger of the pursuit; iii) primary or secondary vehicles lose sight of the pursued vehicle for an extended period of time; iv) later apprehension can be easily accomplished; v) immediate medical assistance is needed by anyone as a result of the pursuit and a secondary vehicle is not available to provide assistance; vi) the officer is unfamiliar with the area and can no longer provide the dispatcher with information as to his/her location; and v) when the pursuit vehicle has equipment failure

17) It is the policy of the Springfield Department of police to "use all reasonably necessary means to determine if a person is in need of medical attention when [his/her] health or safety is in question." This includes forced entry when reasonably required by circumstances, including i) attempted rescue of people from a burning building; ii) "seeking an occupant reliably reported as missing;" iii) assisting unattended young children; iv) "seeking a person reliably known or believed to be seriously ill or injured."

a) Prior to a forced entry, the responding officer is required to use "all reasonable means to determine whether there is someone inside the dwelling requiring aid," including i) knocking on all doors and waiting for a response; ii) checking for unlocked doors or windows; iii) speaking to neighbors or relatives; iv) checking for evidence of non-residency, e.g., "a build up of mail or newspapers;" v) requesting dispatch to call the individual; vi) determining if anyone in the "area" has a key; vii) looking through all of the accessible windows; and viii) checking the garage for a vehicle.
b) Where the responding officer remains unable to determine whether there is someone inside the residence requiring assistance, a forced entry should be undertaken based upon "all of the available evidence, weighing the damage necessary against the probability that someone requiring aid being inside." If circumstances permit, a supervisor should make the final decision as to whether to effect a forced entry.
c) A forced entry should be made in a "manner causing as little damage as possible," and should be conducted by uniformed police, who should loudly announce their presence. If no one is found needing aide, "officers will leave a note identifying themselves and detailing their actions and the reasons therefore. . . .Prior to leaving the scene the officers must secure the dwelling as well as possible."

18) The Springfield Police Department has further established guidelines and procedures regarding response to biological hazardous materials calls. Springfield Police Department Protocol (November 19, 2001). The purpose of the protocol is "to provide guidelines and directions to officers when responding to the handling of calls for possible hazardous biological materials (i.e., anthrax)." In addition, police may be called upon to investigate suspicious items or substances found or delivered to private businesses, homes, public buildings, and open areas.

### Procedures for Filing Complaints

19) The Springfield Police Department has established the following locations to receive Springfield Police Citizen Complaint forms: South End Citizens Council; New North Citizens Council; Indian Orchard Citizens Council; Urban League; Springfield Action Commission; Springfield Office of NAACP; Clerk's Office in City Hall; and the Springfield Police Department. Persons at these locations are available to assist the complainant in completing and filing the required form. Complaints in written form assure uniform procedural follow-up. Telephone complaints and complaints communicated in letters are advised of the filing procedure and provided with a compliant form, which requires information regarding the complainant, location and time of the incident, the name, rank, and I.D. number (if known) of the officer about whom the complaint is being made. It is necessary for the complaint to be completed by the complainant, witnessed by an adult, and filed in person at the identified locations authorized to receive complaints. Complaints such as alleged discourtesy are characterized as minor and "settled informally" by the then-Chief/current Commissioner or his/her designee. Complaints of a more serious nature are required to be investigated by a senior officer within 30 days after receipt of complaint and a report filed with the then-Chief/current Commissioner.

20) Prior to 2006, the Chief was required to "acquaint the Board of Police Commissioners with all of the facts." The Board of Police Commissioners were required to call for a formal hearing or take appropriate action, without a hearing. Within seven "working" days, the complainant was required to be notified, in writing, of the decision or contemplated action, including a formal hearing. If the complainant submitted a written request to the Board of Police Commissioners presenting "new evidence" within 10 days of having received notification of the Board of Police Commissioners' determination, an informal conference with the Board of Police Commissioners was required to be allowed. The Board of Police Commissioners was required to provide a statement of its decision upon reconsideration.

21) Currently, each complaint is investigated and appropriate follow up actions taken. The Police Department has initiated a systematic procedure for logging in of all citizen compliments and complaints of police officer conduct.

a) The procedures by which complaints are investigated internally, however, are governed in part by the terms of the International Brotherhood of Police Officers of the 364 (IBPO) contract, Article 6 and Springfield Police Supervisors Association (SPSA) contract, Article 5. Among other things, these contracts prescribe that interdepartmental

charges must be filed within 90 days of the alleged offense or "the date the City became aware of the alleged offence, whichever is later," unless "a later date is mutually agreed upon by the parties." IBPO Contract at §6.04 and SPSA Contract at §5.02. Grievance Procedures established in Article 5 (IPBO Contract) have yet to be renegotiated to reflect the elimination of the Police Commission as the authority responsible for the final resolution of complaints. It is expected that a civilian oversight committee would have some role in the resolution of or review of the internal investigations conducted in response to citizen complaints. The City is currently in the process of making a determination as to the form, membership, and scope of authority of such committee. See, infra at ¶27.

b) At this juncture, I, as Police Commissioner, have the authority to make a final determination with regard to a complaint filed against an officer and the appropriate disciplinary action – if any – that should be taken.

c) If a citizen has a complaint or if (s)he would like to compliment an employee, he can fill out the appropriate form and either mail it or drop it off at the Internal Investigation Unit Office at 130 Maple St.. Complaints can be filed as to actions by any Police Department employee. During normal business hours, complaint forms can be obtained and/or filed at the following locations: City Hall, 36 Court Street, Clerks Office; Indian Orchard Citizen Council, 117 Main Street, Indian Orchard; NAACP, 25 St. James Ave.; New North Citizen Council, 2383 Main St.; South End Citizen Council, 507 Main Street; Springfield Police Dept., 130 Pearl Street (24 hours), the Urban League, State Street; and All Community Police Sector Offices. In addition, the Springfield Police Department is distributing a current citizen compliment and complaint process booklet in Spanish.

### *Springfield Police Department Staffing, Assignments, and Services*

22) As of February, 2005, when the Finance Control Board commissioned a Study of the Springfield Department of Police (Management Study of the Springfield Police Department), the Springfield Police Department was staffed with 552 positions, which include 460 sworn positions and 92 civilian employees. The sworn positions included one chief, two deputy chiefs, nine captains, 16 lieutenants, 44 sergeants, and 388 police officers. In 2005, the Springfield Police Department's budget was approximately $7.4 less than the 2002 budget. The Springfield Police Department had received a substantial number of grants to fund various initiatives. In the 1990s, the Department received grants in funding 112 police officers. At the time of the Study, the Chief of Police was responsible for the day-to-day operation of the Police Department; the Chief of Police's "relationship" with the Office Mayor was defined and delineated by Civil Service.

23) Prior to March, 2006, The Board of Police Commissioners ("Police Commission") consisted of five members appointed by the Mayor for three-year terms. Few, if any members of the Police Commission had law enforcement backgrounds or training. The only requirement appears to be that no more than three commissioners could be members of the same political party. The Police Commission controlled personnel appointments and the management of the Department; maintained a detailed account of expenditures; and heard complaints. Few municipalities of the size of Springfield have/had a Police Department that was managed, directed by a commission comprised of political appointees (for three year terms) – whose participation in the operation of the Police

Department was a part-time commitment. The 2005 Management Study and an earlier study (1996) found that role that the Police Commission played in the administration of the Police Department was extremely problematic and over the years lent itself to administration that was often politically motivated, inscrutable to officers and staff and therefore responsible for an exceedingly poor morale among staff and officers. While at the time the Study was conducted and for the past several years, a majority of the members of the Police Commission had been minority persons and community "stakeholders" were satisfied with its performance since Mayor Ryan's election, all were concerned that a subsequent mayor may not appoint a commission that was representative of and responsive to the community. Accordingly, important among the criticisms of the Police Commission was its lack of accountability to the public.

### 2005 Management Study of Police Department and Goals and Strategies for Addressing Problems Identified

24) In May, 2005, a Management Study of the Springfield Police Department was completed and provided criticisms, recommendations, and assessment regarding the following: i) police needs of the community; ii) type and distribution of emergency demands, e.g., crimes, traffic accidents, and services requests; iii) the level and quality of police services; iv) public information; v) education and services activities; vi) staffing policies; vii) response times; viii) relationships with community and law enforcement groups; ix) organizational structure; x) the relationship between line and staff units in the Department; xi) chain of command; xii) crime and workload; xiii) comparison with other police agencies; xiv) strengths and accomplishments of the department; xv) mission; xvi) standards; xvii) polices and procedures that govern normal operating conditions and extraordinary situations; xviii) internal communications, i.e, written directives; xix) budgets; xx) internal controls and mechanism to ensure compliance with rules, regulations, and procedures; xxi) labor-Management relations; xxii) physical conditioning and appearance; xxiii) career development; xxiv) promotion; xxv) evaluation; xxvi) compensation; xxvii) patrol; xxviii) criminal investigations; xxix) traffic; xxx) community service programs; xxxi) records Management; xxxii) statistical reporting; xxxiii) use of technology; xxxiv) property and evidence control; and xxxv) equipment and facility needs

25) The Study was comprised of eight phases: i) data collection; ii) interviews; iii) observations and fact finding; iv) analysis of data; v) comparative analysis; vi) development of alternatives; vii) preparation of a comprehensive report and oral briefing The Springfield Police Department was requested to provide very specific information related to i) crime and workload; ii) efficiency; iii) staffing; iv) manuals; v) job descriptions; vi) response time information; vii) model programs; viii) organizational structure; xix) vehicles; and xx human resources Management practices. The Study team interviewed various police personnel; various federal, state, and municipal prosecutors; business officials and developers; beat Management coordinators; officials of the Springfield Finance Department and Law Department; and community leaders and other residents. In addition the Study team conducted numerous "on-sight" investigations of police practices and procedures and the City's neighborhoods, including the central business district.

26) In general, the Management Study identified the following problems within the Springfield Police Department: i) low morale due; ii) pay and benefits; iii) accountability and lack of consistency; and iv) friction and tension in the hierarchy Based in large part on recommendations of the Study Committee the position of chief of police was removed from Civil Service and the person of the Chief of Police was retired to the Cape, with significant benefits and severance pay. A police commissioner, who had direct control over the Springfield Police Department and who directly reported to the Mayor, was appointed. It was felt that, by making the Police Commissioner subject to mayoral appointment, the public could be heard every two years – in mayoral contests – as to their view of the success or lack thereof of the Police Commissioner's administration of the Police Department. I was appointed Police Commissioner in March, 2006 and the Police Commission was abolished.

27) In May, 2006, the City entered into a settlement agreement regarding a complaint that had been filed by the Pastors' Council in the City of Springfield. Prior to my arrival an investigation had been conducted that included the production of records and witnesses by the City of Springfield. In addition, Dean Jack McDevitt provided "input" in the form of expert opinion. The Settlement Agreement reiterated the fact of my appointment as Police Commissioner and the abolishment of the Police Commission. It also provided for the establishment and implementation of a "citizen review board," with "the assistance of Dean McDevitt." Terms of the agreement provided that Dean McDevitt assist in the development of "a citizen review board and a process that has integrity and is perceived as fair and [is] viewed positively. . .by both the community and the police." Dean Jack McDevitt was officially retained by the City of Springfield in November, 2006, along with Dr. Amy Farrell, and will be making recommendations with regard to a civilian review board and "a program" that meets the following requirements: "1) community awareness; 2) transparency; 3) timely investigations; and respected community representatives." Their final report is "due" February, 2007. They will be reviewing models of various civilian oversight boards throughout the country, as well as interviewing community leaders, members of the Police Department, key players and stakeholders. I am committed to the creation of some kind of a civilian oversight board; I believe that such a citizens' panel will provide for greater communication between the Police Department and the community and will assist in creating an atmosphere of trust and cooperation, which is essential to the operation of an effective Police Department that meets its obligation to preserve the peace and provide security to the citizens of Springfield.

28) Among my goals and priorities as the Police Commissioner is the improvement of accountability, morale, management of police personnel, officers and citizen safety, job performance, the quality of life of the citizens of Springfield, and planning capabilities for deployment, programs, and budgeting. In addition, I am committed to enhancing teamwork among staff and operational personnel, capabilities for planning and policymaking, interaction with residents and community groups, coordination with other police agencies, staffing of specialized patrols, and participation by members of the community in crime prevention activities. Specifically, I am committed to addressing

and remedying many of the problems identified by the Management Study and to
implement any of the recommendations.

a)  The Springfield Police Department is implementing better and more accurate
methods, procedures for reporting crime.
b)  The Springfield Police Department is implementing a formalized case Management
system for criminal investigations, establishing solvability factors, and developing
automated system that would connect the work of one bureau or division with work of
another
c)  The Springfield Police Department is initiating a process to collect, report, and
evaluate clearance rates for various crimes; establishing a process by which to assess the
efficiency of officers in investigations; and re-evaluating staffing as data becomes
available
d)  The Springfield Police Department is preparing and updating job descriptions of
specific assignment and providing a list of duties to employees, civilian and sworn
personnel.
e)  The Springfield Police Department is establishing a formal job evaluation process for
all ranks
f)  The Springfield Police Department is committed to developing a Police Department
Policy and Procedures Manual that clearly defines written directives, organizational
structure, chain of command, functions, General Orders, objectives, and job descriptions,
as well as a section on Rules and Regulations, which will be/is being updated after
consideration of the observations and suggestions in the Management Study Report

29)  The Springfield Police Department is committed to increasing police presence, i.e.,
patrol, in the various neighborhoods.  To that end, the Springfield Police Department is
redesigning and/or expanding the number of sectors to more closely correspond to
workload and developing patrol sector profiles that detail the required actions by patrol
officers on each shift in a particular sector.  Sergeants will be transferred from dispatch
and desk jobs to street patrol.  In response to the fact that Springfield Police Department's
fleet is "very substandard" and is comprised of many police vehicles with more than
100,000 miles, the Springfield Police Department and the City of Springfield have added
new police cars to the fleet and are establishing a written Vehicle Replacement Plan that
may contemplate downsizing.  The City and the Springfield Police Department may
consider other alternatives, including leasing.

30)  To improve the 9-1-1 service and to address non-emergency citizen use of 9-1-1
method of communicating with police, the Springfield Police Department is hiring more
civilian dispatchers to make available for patrol duties,  police officers who had been
assigned to dispatch and promoting the use of a seven digit telephone number for non-
emergencies.  The Springfield Police Department is developing a communication and
dispatch manual that includes all personnel operational and administrative activities.

31)  The Springfield Police Department is committed to increasing the crime analysis
function in the Police Department and, to that end, may civilianize one or more of the
officer positions and hire a civilian planner to conduct research and planning for new

programs and technology. Crime analysts will meet with detectives and patrol officers during shift changes to exchange information. Patrol, traffic, street crimes unit and criminal investigations commanders and their on-duty staff will meet weekly.

32) The Springfield Police Department is making changes with regard to the property and evidence functions, including civilianizing officer positions, developing manuals and job descriptions, and assuring that a computer system connects all three property rooms and Record Management System. In addition, some changes in the booking and detention lock up procedures are being initiated, including providing training and developing a manual.

33) The Springfield Police Department and the City of Springfield is in the process of upgrading Human Resource Management (HRM) services which focus on minority and women applicants, training, evaluations, promotions, investigation of internal complaints, and issues related to sick leave, injured-on-the-duty leave, and career development. Accordingly, the Springfield Police Department is initiating a structured and targeted program designed to attract racial/ethnic and gender minorities for both officers and cadet positions to enhance the presence of racial/ethnic and gender minorities in supervisory positions. It is my goal that the Springfield Police Department and those who are promoted to the rank of captain, lieutenant, and sergeant should reflect the diversity of the citizens of the City of Springfield. Unfortunately, due to budget constraints and hiring freezes, I have not yet been in the position to hire additional police officers. With regard to promotion practices – and even internal disciplinary procedures – to some extent, I am constrained by the Police Union contracts and civil service procedures. In the third quarter of 2006, 13 percent of the staff of the Springfield Police Department were African American and 15.8 percent were Hispanic.

34) The Springfield Police Department is implementing an alternative response plan, i.e., telephone reporting that assures that a police officer will be dispatched to any offense where the victim requests an officer. The Springfield Police Department is committed to providing public education and training for personnel participating in the program.

35) In order to make more sworn, trained police officers available for peacekeeping and community safety duties, the Springfield Police Department is in the process of hiring more civilians to assume clerical, administrative, record keeping jobs, as well as the Management of computer networks and laptops. In addition, the Springfield Police Department is undertaking significant internal reorganization to provide for a more efficient administration and greater accountability

***Specific Initiatives, Changes, Reorganization, Accountability***
36) On June 9, 2006, I established a Neighborhood Task Force (NTF) (AO # 06-141) that consisted of the Street Crime Unit and the Narcotics Bureau. The activities of these two units will "be coordinated with each other and with uniformed police personnel assigned to the districts. The NTF will engage in a variety of crime control, order maintenance and fear reduction tactics. It will be guided by crime data as well as neighborhood priorities."

a) The Narcotics Bureau personnel assigned to the NTF focus on street level drug enforcement, while the Street Crime Unit personnel focus on robberies, gang-related activity, and quality of life issues. Traffic unit officers focus and coordinate their enforcement efforts with the deployments of NTF units.

b) These efforts are neighborhood oriented and coordinated and information is "shared within the task force and with patrol. Joint roll calls including members from both units have been instituted and that at least one NTF supervisor now attend patrol roll call. Where there are overlapping shifts both patrol roll calls are being attended by at least one supervisor from NTF.

37) On the same day I ordered a "steady assignment of patrol officers to patrol sectors" as well as the "steady assignment of supervisors to geographic subdivisions, hereinafter referred to as districts." These policing districts are comprised of currently existing sectors that had followed neighborhood boundaries.

a) These district assignments are to be "interim steps" in the development and support of "a community-based, problem-oriented, data driven organization."

b) It is my plan that these districts will ultimately be the 24-hour responsibility of "a senior manager." In the interim, however, a lieutenant is "the responsible commander for a district on a shift basis" and is "the accountable commander for all crime and quality of life issues in a district that occur during the hours of his/her shift assignment." In turn, certain squad lieutenants "have sergeants assigned to the district who will assist in supervising and directing the activities of officers whose sectors make up that district."

c) Importantly, lieutenants attend all community meetings in their district that occur on their watch and "make appropriate use of the community-policing officers assigned to them." District lieutenants work with the Neighborhood Task Force "on both crime and disorder 'hot spots.'" In addition, these lieutenants share information between districts and shifts "so as to coordinate crime control, order maintenance and fear reduction tactics."

d) District lieutenants are responsible for identifying, through data analysis, those locations, e.g., specific addresses, street corners, or neighborhoods, that "generate disproportionately high levels of activity" and for designing and implementing appropriate responses, using all available resources "in a coordinated manner with the watch commander and appropriate special unit commanders."

e) Because, "[t]he neighborhoods of this city need an assertive police presence that addresses in a professional manner the crime, disorder, and fear inducing behaviors unique to each one, the lieutenants have been assigned the duty of ensuring that "this happens on their watch."

38) On September 8, 2006, I issued Department and Inter-Departmental Correspondence (AO #06-211), "to be read at all roll calls for three consecutive days," entitled "Quality of Life Resolutions." The communication began by asserting that [t]he Springfield Police Department is committed to reducing crime, fear, and disorder in the City of Springfield. . . .All three determine the quality of life for our residents. It is therefore the obligation of the police to address quality of life issues. . .A major determinant of a city's quality of

life is the level of disorderly behavior that occur in public spaces. . .It is clear that the perception of crime and disorder, as well as the objective reality, are creating a climate of fear in the city that is affecting its chances of social and economic revitalization."

a) To that end, Police Commissioner Flynn designated the "Central business district, downtown, and the South End" as the neighborhoods in most need of attention from the police. Police officers were instructed to be "vigilant and recognize the importance of immediate and consistent engagement with individuals committing disorderly, disruptive, and menacing public acts." Hourly "park and walk" of these areas, as well as foot patrol of these locations, was ordered.

a) I stressed the importance of being "vigilant" and of recognizing "the importance of immediate and consistent engagement of individuals observed in disruptive or menacing public conduct," e.g., public urination and drinking, trespassing after notice, aggressive panhandling.    I further emphasized the need to flexible and utilize informal control techniques where possible and to resort to arrest and other enforcement tools for the more serious cases.
c) I underscored the need for the police to be "visible and engaged with the public." I concluded that [a]lthough it would be easy to set a 'zero tolerance' to every offense, experience has shown that there is usually an exception, and intelligent use of discretion needs to take precedence over strict adherence to an arrest or 'citation in every case' police.

39) On November 7, 2006, I issued a Department Reorganization Plan (GO # 06-001). The strategy for the Springfield Police Department is "to reduce the levels of crime, disorder, and fear in [the] City" by a "community-based, problem-oriented and data driven approach."

a) According to the my directive "community based" is interpreted to "mean that th[e] police department will focus on neighborhoods as the basic building-block" of its organizational structure and its policing strategy." Neighborhoods are understood to face similar issues, e.g., "crime, disorder, and fear," as well as some issues unique to each neighborhood. The Springfield Police Department is committed to being responsive to the manner in which each neighborhood has prioritized its concerns.
b) "Problem-oriented policing" requires the Springfield Police Department to "assertively take steps to prevent crime and proactively manage conditions that breed disorder and that create a climate of fear."
c) "Proactive prevention requires the use of problem-solving, [which requires] scanning the environment for spokes and trends of activity, the careful analysis of crime and calls-for-service data, the development of responses to the identified problems and an assessment of the effectiveness of these responses.
d) Problem-orientation recognizes the need to look beyond an incident to examine the underlying conditions that breed disorder and crime in specific places and the development of robust plans of action to address those conditions." Successful problem-solving requires coordination among departments and units and collaboration with other

criminal justice, social service, and governmental agencies, as well as non-governmental services providers and neighborhood groups.
e) "Data-driven strategies" require the Springfield Police Department "to develop and enhance its ability to analyze crime, disorder and fear indicators, to provide that analysis to operational units and to measure the impact of the activities of those units." This demands a system of accountability. "Crime mapping and call analysis will continue to be the basis for weekly command meetings that will focus the attention of all department units on conditions of each neighborhood." The elements of "comp-stat" process will drive the discussions in these command meetings: "accurate and timely intelligence, rapid deployment, effective tactics, and relentless follow-up and assessment."

40) The new structure of the Springfield Police Department provides for four Divisions, each of which is supervised by a Deputy Chief of Police, who reports directly to the Commissioner. Three of the Deputies will head geographic police divisions (North Division, Central Division, and South Division) and "will have 24-7 responsibility for managing policing activities in their area, as well as total authority for utilizing personnel assigned to a geographic area to meet that area's policing requirements." The fourth Deputy will command an Operational Support Division, responsible for managing the Department's investigative operations and tactical support units: Vice Control, Criminal Investigation, Family Services, Tactical Operations

a) Further reorganization establishes a Customer Service Unit, which will function as "a one stop shop for the public seeking copies of reports or applying for licenses and permits and registering for certain activities." An Administration and Finance Division Director will supervise Finance and Personnel, the Supply Unit, Academy Training, Technology, and Research and Standards.
b) A separate order will follow outlining the process for personnel assignments and a more specific description of the responsibilities of the new and old bureaus, sections, and units in order to better inform the staff and facilitate the process of application for and appointments to the various positions.
c) Staff meetings were held in November for interested supervisors to provide for greater information.

### *Traffic Stops*
41) Of concern to me, as the Commissioner of Public Safety for the Commonwealth of Massachusetts and the Police Commissioner for City of Springfield are the findings in the 2004 Massachusetts Racial and Gender Profiling Study, which was authorized by the Massachusetts Legislature to identify "communities that appear to have engaged in racial and gender profiling so that these communities can be required to collect additional information. . .in an effort to determine if the documented disparities are based on race or ethnicity." The study was not intended to provide a finding that racial profiling in traffic stops did – or did not – exist in any of the communities in Massachusetts, but rather indicated those communities that should conduct further investigation.

a) The study looked at 366 law enforcement agencies and made an assessment based upon 16 measures that were studied. Of the 355 law enforcement agencies, 249 had

evidence of a racial disparity in at least one of these 16 measures. As Commissioner of Public Safety, I ordered all of the 249 agencies to collect additional data for a one-year period. Ninety-five of those agencies appealed to the Attorney General, who upheld my order as to 247 agencies; two were "excused" due to size of town and lack of population. were required to comply with the Commissioner's request. I met significant opposition from the Massachusetts Police Chief Association, which called for my resignation.
b) Significant among my achievements in this regard was the creation of a mandatory reporting (citation) form, to be used statewide, that provided adequate information from which a jurisdiction could make an assessment of the degree to which traffic stops evidence a racial disparity that can be attributable to improper motive and disparate treatment of citizens based upon race.

42) In my role as Police Commissioner for the City of Springfield I have continued to collect and analyze data provided by these forms for the City of Springfield. Analysis of this data has not demonstrated the kind of racial disparities in traffic stops that give rise to an inference that racial considerations "play" an improper, in appropriate, or unlawful role in traffic stops in the City of Springfield at present. Should date collected and analyzed in the future produce a different result, I am committed to addressing the issue and providing appropriate remediation, reassessment of policies and procedures, and retraining of police officers. As the following demonstrates the proportion of white, African American, and Hispanic persons who are stopped is directly related to the circumstances in which the stop is initiated:

a) During the period August 1, 2005 to October 23, 2006, of the 20,381 traffic stops, 49.8 percent of the individuals stopped were white; 21.3 percent were African American and 26.5 percent were Hispanic; and 1.4 percent were Asian American.
b) During the thirteen month period of time, August 1, 2005 to August 31, 2006, there were 20,381 traffic stops of which 380 (or 1.9 percent) were investigatory stops, of which 30 percent were stops of African American persons, 33 percent were stops of Hispanic persons, and 36 percent were of white persons
c) During the thirteen month period of time, August 1, 2005 to August 31, 2006, there were 20,381 traffic stops of which 82 (or 0.4 percent) were motor assist/courtesy stops, of which 27 percent were stops of African American persons, 33 percent were stops of Hispanic persons, and 46 percent were of white persons
d) During the thirteen month period of time, August 1, 2005 to August 31, 2006, there were 20,381 traffic stops of which 2,917 (or 14.3 percent) were registration or inspection violation stops, of which 26 percent were stops of African American persons, 33 percent were stops of Hispanic persons, and 40 percent were of white persons
e) During the thirteen month period of time, August 1, 2005 to August 31, 2006, there were 20,381 traffic stops of which 772 (or 3.8 percent) were equipment violation stops, of which 28 percent were stops of African American persons, 39 percent were stops of Hispanic persons, and 31 percent were of white persons
f) During the thirteen month period of time, August 1, 2005 to August 31, 2006, there were 20,381 traffic stops of which 4,895 (or 24.0 percent) were for speeding, of which 18 percent were stops of African American persons, 18 percent were stops of Hispanic persons, and 61 percent were of white persons

g) During the thirteen month period of time, August 1, 2005 to August 31, 2006, there were 20,381 traffic stops of which 89 (or 0.4 percent) were calls-for-service stops, of which 2 percent were stops of African American persons, 22 percent were stops of Hispanic persons, and 49 percent were of white persons

h)  During the thirteen month period of time, August 1, 2005 to August 31, 2006, there were 20,381 traffic stops of which 188 (or 0.9 percent) were violations of city ordinance stops, as to which no data as to the racial/ethnic distribution of those stopped is available

i)  During the thirteen month period of time, August 1, 2005 to August 31, 2006, there were 20,381 traffic stops of which 5,075 (or 24.9 percent) were "other traffic violation" stops, of which 20 percent were stops of African American persons, 50 percent were stops of Hispanic persons, and 47 percent were of white persons

j)  During the thirteen month period of time, August 1, 2005 to August 31, 2006, there were 20,381 traffic stops of which 45 (or 0.2 percent) were BOLO (Be On the Look Out) stops, of which 35 percent were stops of African American persons, 44 percent were stops of Hispanic persons, and 20 percent were of white persons

k)  During the thirteen month period of time, August 1, 2005 to August 31, 2006, there were 20,381 traffic stops of which 15 (or 0.07 percent) were warrant stops, of which 30 percent were stops, as to which there is no racial/ethnic data as to those subject to a warrant

l)  During the thirteen month period of time, August 1, 2005 to August 31, 2006, there were 20,381 traffic stops of which 5,913 (or 29 percent) were stops associated motor vehicle crashes, of which 22 percent were stops of African American persons, 25 percent were stops of Hispanic persons, and 51 percent were of white persons

43)  As relevant to those who are subject to traffic stops are the proportion of those arrested for motor vehicle theft.  During the period of time, October 20, 2005 to October 20, 2006, 19.2 percent were white, 34.6 percent were African American and 46.2 percent were Hispanic.  In contrast, the distribution of "victim" of car theft are somewhat more equally distributed among the racial and ethnic groups with 37.5 percent are white; 23 percent were African American; 34.2 percent were Hispanic.

44)  Although somewhat less relevant to motor vehicle stops but indicative of the race and ethnicity of the persons that police would be looking for as suspects in street robberies, of the 171 arrests for street robberies occurring between October 20, 2005 and October 20, 2006, 13.5 percent were white persons; 30.4 percent were African American; 53.8 percent were Hispanic; and 1.8 percent were Asian American.  In contrast, of the 841 victims of street robbery, 41.0 percent were white; 17.7 percent were African American; 36.4 percent were Hispanic; and 3.1 percent were Asian Americans.

### Community Policing and Participation
45)  The Springfield Police Department has long provided for a variety of means, programs, specialized personnel, and units to establish a "presence" in the various communities in order to ensure safety and to prevent crime; to establish a working, positive relationship with members of the various neighborhoods, including at-risk youths; to provide opportunities to better educate and inform citizens; and to respond to particular events, crises, and/or emergencies.  The Management Study team  found the

"list of programs implemented by the Department. . .impressive" and found "[t]he participation by citizens in Beat Management Teams. . . a very good program. The Management Study team, further, found "strong support from some community leaders for more officers in the Community Policing Units."

46) "The most crucial initiative to come as a result of implementing citywide community policing is the creation of our nine neighborhood based Beat Management Teams. These teams, composed of neighborhood stakeholders and officers, meet at least monthly and have proven to be heard. Beat Management Teams provided for continual contact and communication between citizens and officers and help each entity to better understand the other. Trust is not easy to build and is easily lost. The Beat Management Teams have been the 'spark' from which many initiatives have developed . The people who live in and work in the community are the most aware of the real issues and problems and the police recognize the citizens as valuable and underutilized resources."    The nine sector Beat Management Teams are the cornerstone of Springfield's law enforcement partnership.  Officers are assigned to neighborhoods and meet regularly with Beat Management Teams and the general community to discuss "localized problem solving. The lines of communication have opened in both directions from a trickle to a floodgate."

47)  The Police Department's "9-1-1 Emergency response officers have undergone extensive training in community policing philosophy and resources and are being further channeled into the community policing style of policing." [The Springfield Police Department] ha[s] decentralized so each sector has at least one office in the community. Each community policing team officer is a member of the neighborhood (sector) Community Policing Beat Management Team made up of police officers, private citizens, government agencies, business owners and managers, clergy, youth groups, neighborhood leaders and other stakeholder. Together they work to identify neighborhood issues and develop strategies to resolve the issues. They work in partnership using the problem solving model to respond to crime issues and quality of life issues."

48)  " Built on [the Police Department's] highly successful Beat Management Teams, the Community Justice Program was instituted.  In this program other law enforcement agencies (The District Attorney, Sheriff, Parole, and Probation Departments) have assigned their personnel to our neighborhoods."  Community Justice Program "has allowed a total decentralization of law enforcement resources. Monthly strategy and information sharing meetings are held for each sector with the partner. Partners include Community Prosecutors (Assistant District Attorney's), Community Corrections (Deputy Sheriffs), and Neighborhood Based Probation and Parole Officers. This integrated multi-agency sector based team approach to identifying and solving law enforcement and community problems has been well received by the citizens and law enforcement/prevention professionals. Members of our Beat Teams, citizens and officers, can communicate with the neighborhood prosecutors regarding criminals they consider predators to the neighborhood. The underlying concept of prisoners on work release to the neighborhood supports reentry and decreases recidivism. Probationers and parolees are more effectively supervised with coordinated effort at prevention."

49) "Springfield's highly successful Citizen Police Academy was developed by a committee of citizens and police and provides an opportunity for citizens to learn about policing in Springfield. "Topics include the role of the police department, communication, team building, the law diversity, policies, citizen involvement opportunities and prevention activities. These informed citizens can use the information to instruct others and help to dispel some of the misconceptions concerning police officers. The citizens have learned from the police and the police have learned from the citizens. Trust is built . Many graduates continue to be active in our Bear Management Teams and related prevention efforts.   This fifteen week program. has graduated 15 classes and a total of over 350 participants" and generally have a wait list of those individuals interested in participating.

50)  Cop Shop, the Citizen Police Academy for high school students, has graduated over 300 students and has helped build trust and understanding. The Cop Shop is eight week program, sponsored and supported by both the Police Department and the Springfield School Department.   "This is a 'get to know the police', career exploration, mentor program which incorporates careers in law enforcement and criminal justice at the city, state, and federal level. Variety of classroom presentations and field trips have contributed to the popularity of this initiative. This program has empowered high school youth to get involved in the community and several have taken the police cadet and the police officer exam. This initiative is a recipient of the Steven Spinner award, an award by educators which applauds innovative teaching methods."   Currently the program has been suspended due to the illness of the instructor, but will be reactivated upon the health of the instructor.

51)  The Cops and Kids after school program offers at-risk students an opportunity to "hear the anti-drug, anti-gang, and anti-violence message." "This initiative is carried out at our mounted police stables where Police Department mounted officers and horses are used as tools to promote positive role models and self esteem.  This after school program provides for class room training giving an anti-drug , anti-smoking, anti-gang, and anti-alcohol message loosely based on the national D.A.R.E. program. Over a hundred and fifty middle school students have graduated from this program. This is a seven week, after school, program which culminates in the graduates riding a police horse, under the watchful eye of a police officer and receiving a video tape of their graduation and riding adventure."

52)  The Police Department's "innovative Joseph Budd Youth Assessment Center offer juveniles, who surface with law enforcement problems, assessment, intervention and referrals to appropriate agencies."   The Joseph A. Budd Center is a collaboration of the Springfield Public Department and other major youth serving agencies. Partners include: the Springfield Police Department Youth Aid Bureau, the Student Support Officers, the Gang Suppression Unit, the Springfield School Department, the Department of Social Services, the Department of Youth Services, and the Center for Human Development. The Center "services youth that surface with law enforcement problems. In addition to normal booking procedures, investigators gather data relative to health, school, and home, issues relating to drugs, sexual abuse, and domestic violence. From the intake

information the child can be directly and immediately referred to the appropriate agency
for assistance and intervention."

53) "Chaplains on Call involves area religious leaders from a variety of denominations
organized and on call twenty four hours a day to respond and assist the police and
citizens in difficult situations. When necessary, the police can activate the Chaplain on
Call Program and a call is placed to the pager. The chaplain responds and offers what
ever is appropriate to the situation. This program has provided comfort to the families of
violent crime victims, murder victims, accidental death victims, suicide and hostage
situations."

54)  Project Safe Neighborhood has compiled data and information to further the work of
the Springfield Community Engagement.  The overall problem thus identified was the
lack of unified response including passive acceptance by Mason Square community
stakeholders of street level drug dealing and gang related violence.  The Mason Square
community is comprised of four neighborhoods: Bay, McKnight, Old Hill, and Upper
Hills and has the "highest number of shots fired in Springfield."  In Mason Square
firearms related violence involving gang activity and drug dealing has been on the rise.

a)  Project Safe Neighborhood developed a series of responses to address the conditions
that give rise to and support the problems that confront Mason Square,  including
informing residents of the various educational opportunities available to them; educating
citizens concerning gun laws; mobilization of residents, clergy, business, and
government; activating neighborhood crime watch program; developing intervention
strategies for youth dealers; expanding DARE programs; organizing clean-up/fix-up
campaigns; eliminating "hiding" areas; promoting parent education and support services;
and creating a safe neighborhood representative council
b)  Among the other strategies and programs recommended and supported by Project
Safe Neighborhood include encouraging police to apply their  resources to the locations
and time where they are actually needed; engaging local businesses in the creation of
summer jobs programs and career mentoring and the support of the Springfield Public
Schools in these endeavors; creating after-release programs; researching and securing
funding for various programs; arresting and prosecuting high-ranking gang figures;
retaining security services and install more security cameras in high-risk areas; holding
area meeting with police to support better communication between law enforcement and
citizens; increasing coordination among police, probation, parole, sheriff and prosecutors;
publicly identifying violators; and identifying certain areas of the City as "high crime
spots."
c)  At this juncture the Violence Prevention Taskforce is working with Project Safe
Neighborhoods.  They have received a grant to continue their work; the Martin Luther
King Community Center is the fiscal agent.

 Signed under penalties of perjury this 8th day of February, 2007

POLICE  COMMISSIONER  EDWARD  A.  FLYNN

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing "Defendants' Affidavit of Direct Testimony

Edward A. Flynn, Police Commissioner, City of Springfield" has been served on the following

counsel of record on the 8th day of February 2007, via the ECF system and will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Nadine Cohen, Esquire
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
OF THE BOSTON BAR ASSOCIATION
294 Washington Street, Suite 443
Boston, Massachusetts 02108

Paul E. Nemser, Esquire
J. Anthony Downs, Esquire
Monica M. Franceschini, Esq.
GOODWIN PROCTOR LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109


Edward M. Pikula (BBO #399770)
    City Solicitor
Deanne Bogan Ross (BBO #555407)
City of Springfield
Law Department
36 Court Street, Room 210
Springfield, Massachusetts 01103