UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARISE FOR SOCIAL JUSTICE;<br>¿OISTE?; NEW ENGLAND STATE-AREA<br>CONFERENCE OF THE NAACP;<br>REV. TALBERT W. SWAN, II;<br>NORMAN W. OLIVER; DARLENE<br>ANDERSON; GUMERSINDO GOMEZ;<br>FRANK BUNTIN; RAFAEL RODRIQUEZ;<br>and DIANA NURSE<br><br>        Plaintiffs,<br><br>    v.<br><br>CITY OF SPRINGFIELD and SPRINGFIELD<br>ELECTION COMMISSION<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 05-30080-MAP<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY
## DR. STEPHAN THERNSTROM, DEFENDANTS' EXPERT WITNESS
## PART 1 OF 5

I, Dr. Stephan Thernstrom, on oath, do hereby state as follows:

**Expert Qualification**

1) I received my doctorate in the History of American Civilization from Harvard University in 1962, and am currently the Winthrop Professor of History at Harvard. Much of my research, writing, and teaching over the past four decades has focused on the history of ethnic and racial groups in the United States. My research, teaching, and other professional activities have given me a degree of expertise on the history of discrimination against ethnic and racial minorities in American society, and have equipped me to assess evidence bearing upon the issue of what constitutes discriminatory treatment.

2) Although I teach in a history department, my training and research have regularly crossed the boundaries of the various social sciences, particularly political science, sociology, demography, and economics. I am best described as a quantitative social historian. Early in my career I won fellowships from the Social Science Research Council and the Joint Center for Urban Studies, and was a member of the Mathematical Social Science Board. In recent years I have given papers at meetings of the American Political Science Association (twice), the American Sociological Association, the Population Association of America, and the Washington Statistical Society.

I have written extensively about contemporary social issues as well as the more remote past. I have considerable familiarity with the history of Massachusetts cities, having written two books on Boston and one on Newburyport. See attached curriculum vitae.

3) Among my publications/books relevant to this inquiry: No Excuses: Closing the Racial Gap in Learning, Simon and Schuster, 2003 (with Abigail Thernstrom); Beyond the Color Line: New Perspectives on Race and Ethnicity, Co-editor (with Abigail Thernstrom), Hoover Institution Press, 2002; American in Black and White: One Nation, Indivisible, Simon and Schuster, 1997 (with Abigail Thernstrom); Harvard Encyclopedia of American Ethnic Groups, Editor, Harvard University Press, 1980; The Other Bostonians: Poverty and Progress in the American Metropolis, 1980-1970, Harvard University Press, 1973; and Poverty and Progress: Social Mobility in a 19th Century City, Harvard University Press, 1964. In addition, I have authored numerous scholarly articles . See my vitae.

4) I am familiar with the provisions of the Voting Rights Act, and I have served as a consultant or expert witness in thirteen other voting rights cases, in California, Colorado, Florida, Georgia, Michigan, and North Carolina and am currently serving as an expert witness in two cases in Wyoming and California.

5) I am being compensated at a rate of $300 per hour for my work in this case.

6) My charge was to assess whether the testimony of the expert witnesses retained by Plaintiffs, Dr. John Harmon, Dr. Douglas Amy, and Dr. Richard Engstrom, makes a persuasive case that the method of election the city of Springfield, Massachusetts employs to select the members of its City Council and School Committee violates Section 2 of the Voting Rights Act. I am not a lawyer and am not qualified to make judgments about the requirements of the law. Instead, I will set forth what I understand to be the criteria considered by courts in such cases, and will offer my expert opinion as to value of the social science testimony that has been submitted by Plaintiffs.

**Changing Demographics**
7) The formulaic references to "minorities" and the "white majority" that abound in the material produced by Plaintiffs are deeply problematic because they ignore the rapidly changing demographic landscape of the city. Today, one can see a certain irony in the concern of Plaintiffs' expert, Dr. Amy, about "minority voters living in predominately white at-large districts." In fact, *Springfield no longer has a white majority in its voting age population*, and the at-large district in which its elections are currently held cannot accurately be characterized as *"predominately white."*

8) Examination of demographic evidence that Plaintiffs ignore indicates that to speak of a "white majority" in Springfield today is to use an oxymoron. The 2000 Census found that only 48.8 percent of the city's residents were non-Hispanic whites, down from 63.6 percent a mere decade before. In terms of total population—though not voting age population—whites were already a minority in the city in 2000.

9) The only hard data about the racial/ethnic composition that plaintiffs have provided is based on 2000 Census figures. Unfortunately, though, those estimates are of very little value by now,

because they are based on a census conducted seven years ago. In many cases, data seven years old would still be a reasonable approximation of current realities, but not in this instance. Springfield has been undergoing a sweeping demographic transformation.[1] The remarkable growth of the Hispanic population and the flight of non-Hispanic whites from the city renders obsolete the facile minority-majority dichotomy that plaintiffs assume. The 2005 American Community Survey findings, made available in September, 2007, further underscore my point (see Table 1).[2] Over the past thirty-five years, the number of non-Hispanic whites living in Springfield has dropped precipitously from 138,000 to less than 57,000. The Latino population has soared from a little over 5,000 to more than 52,000, and the number of African American residents of the city has jumped by 15,000. The white share of the total has dropped stunningly, from 84.1 percent to 38.6 percent, and the Latino share has multiplied many times over, rising from 3.3 percent to 35.8 percent. The black share has doubled, rising from 12.6 percent to 24.2 percent. In just the past five years from 2000 to 2005, the white fraction of the total dropped from 48.8 percent to 38.6 percent, while the Latino share rose from 27.1 percent to 35.8 percent. All of the talk in plaintiffs' expert reports about the "white majority" was outmoded by 2000. The white share of the population had already dropped below 50 percent. Whites were only a plurality, and a rapidly shrinking one.

10) When I wrote my initial report a few months ago[3], the latest available demographic data were from the 2004 American Community Survey.[4]  On the basis of the figures that it that provided, I projected that whites were only 41.6 percent of the total population in 2006. Now the 2005 American Community Survey findings have been released, it is evident that my projection underestimated the rapidity of change. The actual figure for whites in 2005 was only 38.6 percent, a mere three points above the 35.8 percent Latino share.

Table 1. Population Change in Springfield, 1970-2006

[1] These population changes have recently caught the eye of the Springfield press; see Stan Freeman, "U.S. Census Points to More Minorities," The Republican, May 10, 2006. The story correctly notes that minorities are by now the majority in Springfield. However, it makes the wildly exaggerated claim that minorities accounted for 78 percent of the city's population in 2004. No source is provided, but the only official 2004 data I know of are the American Community Survey data that are the basis of my discussion. The correct figure for non-Hispanic whites in 2004 was 44 percent, so the total for the various minority groups was 56 percent, not 78 percent.

[2] The value of the ACS data is discussed in Exhibit B-3, Declaration of David R. Ely, Memorandum of Points and Authorities in Support of United States' Motion for a Temporary Restraining Order, or in the Alternative, a Preliminary Injunction, United States v. City of Springfield, C.A. No. 06-30123-MAP (D. Mass. 2006).

[3] In May I wrote: The Census Bureau's 2004 American Community. . . revealed that the Latino share of the Springfield population rose sharply, from 27.2 percent to 30.1 percent. between 2000 and 2004. The black proportion edged up a bit, from 21.0 to 21.6, and the category of Other (Asians, American Indians, and people reporting more than one race) expanded from 3.0 to 4.2 percent. The white population, by contrast, continued to shrink. Long the overwhelming majority in Springfield, non-Hispanic whites first became a minority of the total population in 2000, amounting to 48.8 percent of the total. Over the next four years, their share dropped further, to 44.0 percent. If the 2000-2004 rate of decline continued to 2006, the current figure would be 41.6 percent; by 2010 it would have fallen to just below 37 percent."

[4] Data are at the Census Bureau's American FactFinder site. The American Community Survey is an on-going survey that asks the questions included in the Long Form of the 2000 Census, so it allows the findings of the Decennial Census to be updated annually. Since the ACS is a survey rather than a full census, estimates may be off the mark because of sampling error. In the case of these figures for Springfield , the lower bound estimate for the non-Hispanic white population in 2004 was 42.6 percent, the upper bound estimate 45.3. The chance that the true figure falls outside of the upper and lower bounds was 0.1

A. Numbers

|  | Total | Non-Hispanic White | Hispanic | Black |
|---|---|---|---|---|
| 1970 | 163,916 | 137,899 | 5,456 | 20,630 |
| 1980 | 152,319 | 112,467 | 13,804 | 25,219 |
| 1990 | 156,983 | 99,869 | 26,528 | 30,064 |
| 2000 | 152,082 | 74,291 | 41,343 | 34,863 |
| 2005 | 146,948 | 56,673 | 52,571 | 35,521 |
| 2006 projected | 145,921 | 53,150 | 54,817 | 35,653 |

B. Percent distribution

|  | | Non-Hispanic White | Hispanic | Black |
|---|---|---|---|---|
| 1970 | | 84.1 | 3.3 | 12.6 |
| 1980 | | 73.8 | 9.1 | 16.6 |
| 1990 | | 63.6 | 16.9 | 19.2 |
| 2000 | | 48.8 | 27.1 | 22.9 |
| 2005 | | 38.6 | 35.8 | 24.2 |
| 2006 projected | | 36.4 | 37.6 | 24.4 |

1970-1990 from U.S. Bureau of the Census, *Historical Census Statistics On Population Totals By Race, 1790 to 1990, and By Hispanic Origin, 1970 to 1990, For Large Cities And Other Urban Places In The United States,* Working Paper No. 76 (2005), Table 22, Massachusetts-Race and Hispanic Origin for Selected Large Cities and Other Places. 2000-2005 figures from the 2000 Census and the 2005 American Community Survey, as provided on the Census Bureau's American FactFinder website. For 2000-2005, African Americans include single-race blacks plus those who reported being black and of some other race as well. In 2000, 2,903 of the blacks included in the total were of mixed race, and in 2005 1,939. My projection for 2006 assumes that the rate of population change for each group between 2000 and 2005 and assumed continued at the same pace for another year.

11) This figure is a more than a year old by now. Using the same projection method, we can estimate the racial/ethnic mix of the population for 2006. If the 2000-2005 rate of change continued, by the time of this writing whites are not even a plurality of the total; Hispanics already outnumber them today by roughly 1,600. If these trends continue, the 2010 Census will find that only three out of ten residents of Springfield are white, and nine out of twenty will be Latino.

12) Of course the population figures most pertinent to voting rights issues are not the totals but those for the voting age population, persons 18 or older. The age structures of the white, Latino, and black populations differ somewhat, with a higher proportion of children under 18 in the two latter groups. Therefore, the non-Hispanic white share of the VAP has fallen less dramatically than their share of the total population. The same general trend, though, shows up in the data on the composition of the voting age population. The white share of the VAP of the city dropped precipitously, from 89.7 percent to 54.3 percent in 2000 (Table 2). The black share, 9.9 percent in 1970, doubled over the next three decades. The Hispanic share grew even more impressively, quadrupling between 1970 and 2000.

13) These trends did not slow between the time of the 2000 Census and the 2005 American Community Survey. By 2005, the ACS numbers reveal, whites had lost their majority status in the VAP as well as in the population as a whole. They accounted for only 45.3 percent of Springfield residents old enough to be eligible to vote, and by 2006, I estimate, the figure fell to 43.5 percent. By 2010, I project, Hispanics will have a plurality of the VAP, and will outnumber whites by a couple of percentage points.

Table 2. The Changing Racial/Ethnic Composition of the Springfield Voting Age Population, 1970-2010

|                | Non-Hispanic White | Hispanic | Black | Other |
|----------------|--------------------|----------|-------|-------|
| 1970           | 89.7               | 4.8      | 9.9   |       |
| 1980           | 81.2               | 6.0      | 13.9  |       |
| 1990           | 69.6               | 12.8     | 16.4  | 1.2   |
| 2000           | 54.3               | 21.9     | 19.6  | 4.3   |
| 2005           | 45.3               | 30.4     | 21.0  | 3.3   |
| 2006 projected | 43.5               | 32.1     | 21.3  | 3.1   |
| 2010 projected | 36.3               | 38.9     | 22.4  | 2.4   |

[1970-2000 figures as given in Memorandum Supporting Defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction," 5 ff.; 2005 from American Community Survey. The projections for 2006 and 2010 are derived by assuming that the 2000-2005 rate of change will continue for the rest of the decade. These numbers slightly underestimate the African American VAP in 2005 and thereafter, because the ACS provides tabulations with the age breakdown needed to enumerate the VAP only for those who classified themselves as single-race black. This leaves out approximately 2,000 residents who were black and of some other race as well.]

14) Demographic projections, it must be recognized, are fallible. But it is noteworthy that if a similar projection of white migration out of the city and of Latino migration into it had been made in 1990 or 2000, it would have been well off the mark because both of these trends have been *accelerating*. My initial projections for 2005 on the basis of ACS data collected just the year before were inaccurate because they considerably underestimated the pace of demographic change.

15) Dr. Amy is thus misguided in placing Springfield today in the category of "predominately white at-large districts."

a) Dr. Amy was apparently unaware of these profound demographic shifts when he prepared his report in this case. My initial report made it impossible for him to ignore them any longer. Unfortunately, though, his main response has been to make some cosmetic changes. His original report is filled with assertions about the allegedly unfair advantages Springfield's electoral system gives to the "white majority." The word "plurality" never appears in that initial report. And when Dr. Amy was asked in deposition whether voter turnout could be expected to rise when whites became a minority and blacks and Latinos together had become the new majority in the voting age population, Dr. Amy answered with an unambiguous yes: "The studies I've looked at, particularly for combined Latino and black districts, show that voter turnout goes up for both blacks and Latinos in those kinds of combined districts."[5]

b) Plaintiffs are mistaken, I think, in demanding a classic civil rights remedy—districted rather than at-large elections—in a context in which it no longer makes sense. Springfield today has no white majority. It has only a white plurality, and two large and rapidly growing racial minorities. One of these minorities, Latinos, will outnumber whites before much longer and become the new plurality population. We have to wonder if the concept of white racial bloc voting, developed in contexts in which a solid white majority of the population used a particular method of election to

---

[5] Deposition of Douglas James Amy, April 21, 2006, ¶179-181.

veto minority-preferred candidates, can reasonably be applied in such a different setting as this. The white plurality does not have the demographic weight to defeat minority-preferred candidates on its own; if minorities unite behind a candidate, he or she will win. Under Springfield's current electoral rules, it usually does not require much more than *one third* of the total vote to win a seat on the City Council.

16). These new demographic realities have vital implications for this case. If, as Plaintiffs insist, a) districted elections best serve *minority* interests, and if b) at-large elections stack the deck in favor of the *majority,* it seems counterproductive for the black and Latino residents of Springfield to demand a shift to a districted electoral system *now*. Since they together form a new minority-majority, they are in a position to reap the allegedly unfair rewards at-large voting systems provide to the majority, if they can agree on common political objectives. All they need to do is to register and vote at a level roughly equal to that of whites.

17) The changes in electoral methods Plaintiffs seek might have the unwitting effect of turning the clock back—of enabling local whites to hang on to power longer than they would have otherwise been able to do. When whites dominate in the local population, a cynic might say, they will employ at-large elections that make it hard for minority candidates to win. But when demographic change reduces the white majority to a minority, then whites will suddenly find new urgency in protecting minority interests and suddenly discover the virtues of districted elections. Acceding to Plaintiffs' demand may allow white candidates who could not place in the top nine in a citywide contest to gain office by winning in a majority-white district. Five of the nine districts in the Harmon Plan were solidly white in 2000, according to the census data Dr. Harmon used. And in a sixth district (#4) they likely would make up a majority of actual voters.

18) Districted elections might result in initial white control of six of the nine council seats, a two-thirds share for a group that is not much more than 40 percent of the population today. If that is how it works out, then we would have a solidly white council that would be making the decision as to how district lines will be redrawn to reflect population shifts after the 2010 census. Inevitably the majority of council members would feel the temptation to pack minorities into a few districts and to fragment minority populations that couldn't be packed, so as to keep their own seats safe. The only remedy for this would be another costly and time-consuming Voting Rights Act challenge. One strong reason for continuing the current at-large system is thus that it does not afford local elected officials this opportunity to play districting games. At present, it is easy for any group in Springfield to field candidates, and to mobilize voters behind their candidacies. Each vote has equal weight, and all you need do is to assemble enough votes to be among the nine winners. I suspect that the current at-large system of choosing council members is likely to be more sensitive to demographic change, and more likely to reward the emerging minority majority in Springfield with greater representation on the council, than a system that crudely apportions representation according to which groups manage to capture a majority of the votes in nine separate districts.

**Minority Turnout**
19) Low minority turnout, especially low Latino turnout, distinctly limits the political power of these groups. Plaintiffs, though, contend that this is the *result* of the at-large electoral system employed in Springfield. That position is argued by Dr. Amy. He confidently claims that "it is

very likely that a switch to ward-voting in Springfield...would serve to substantially increase turnout among African-American and Latino voters."[6]   To support this claim, he cites studies showing that turnout is higher in proportional representation elections—contests he defines as those involving large, multimember districts from which election is possible with much less than a majority of the votes—than it is in contests waged in single-member districts.  And yet he is *testifying in favor of requiring that the Springfield City Council and School Committee be elected from single-member districts.*

20)  It is particularly striking that Dr. Amy displays such enthusiasm for districted elections in Springfield when his own scholarly writings are so sharply critical of elections held in single-member districts. In an essay on his web site titled "What are Voting Systems and Why are They Important?," Dr. Amy declares that districted elections result in "poor turn-out, dull campaigns, and alienated voters."[7] His Rebuttal Report claims just the opposite.  Although he concedes that districted systems may become "unresponsive" as a result of population shifts, Dr. Amy claims that the solution is simple. The system "can be made more responsive," he assures us, "through the redistricting process."[8] This blithe assurance is hard to square with what he has to say as a scholar writing on his website. In "How Proportional Representation Would Finally Solve Our Redistricting and Gerrymandering Problems," Dr. Amy declares that "redistricting is a political disaster - an enormous political train wreck that occurs every ten years. It is a process full of partisan rancor, naked power grabs, unfair representation, and millions of dollars in legal costs. It is an example of American politics at its worst - and all made possible by our single-member district electoral system."[9]

21)  The current method of election in Springfield is actually on the proportional representation end of the electoral continuum. Under the current system, each voter can cast up to nine ballots, but is also free to bullet vote.  It does not require anything close to a majority of the votes cast to win. In the 13 city elections since 1981, candidates with as little as 32.5 percent of the total have won, and the average share won by the last candidate to make it into the winning circle has been 40.8 percent.[10]

22)   In his rebuttal report, Dr. Amy has denied my contention that the system under challenge in this case is at "the proportional representation end of the electoral system continuum." Indeed, he claims that it at the "opposite end of the continuum from PR systems when it comes to how fair and representative they are."[11] I strongly disagree with this assertion. What most strikes me about Dr. Amy's discussion is that comparing at-large, multi-ballot systems with proportional representation schemes is beside the point. The pertinent question, in my opinion, is exactly where on the continuum *districted elections*—ones in which you can cast only one vote and the choice is limited to candidates who reside in your district—fall. Dr. Amy has posed the wrong question.

---

[6] Expert Report of Douglas Amy, ¶25.

[7] http://www.mtholyoke.edu/acad/polit/damy/BeginnningReading/why_are_voting_systems_important.htm

[8] Amy Rebuttal Report, ¶8.

[9] http://www.mtholyoke.edu/acad/polit/damy/articles/redistricting.htm

[10] Calculations of proportion and number of the vote received by 9th place candidate for City Council in all elections beginning in 1981 provided to Plaintiffs in Defendants' Supplemental Rule 26(a)(1) Documents and Request for Plaintiffs' Supplemental Rule 26(a)(1) Document

[11] Rebuttal Report of Douglas J. Amy, Ph.D., ¶2.

The plaintiffs, after all, have not proposed a PR system like that used in Cambridge, for example; their plan is for a nine-member City Council elected by district. A PR system, Dr. Amy asserts, is ideal because it may "allow groups with as low as 5% or 10% of the vote to elect some representatives." Perhaps so, though it would only be the case if the elective body in question were much larger than the Springfield City Council. If the council had only nine members, the electoral prospects of a group that made up only 5 percent of the electorate would be very poor. Again, though, the alternative to the current system is not a proportional representation scheme. It is the districted plan that the plaintiffs have designed.

23) Another contradiction between Amy the scholar and Amy the expert witness concerns what they have to say about the impact of electoral structure on voter turnout. In the Springfield case, Dr. Amy expresses confidence that shifting to districted elections will significant increase minority turnout, even though the scholarly articles he presents on his site contend that districted elections reduce turnout, engender voter apathy, and stifle political competition. Materials on his site indicate that he is not even so sure that the adoption of his political panacea, Proportional Representation, produces big increases in turnout. Although many proponents of this idea predicted it would stimulate voter interest and heighten turnout, Dr. Amy concedes that the literature reveals "little correlation between voting systems and the degree of voter participation." The largest influence on turnout, these studies found, was "local factors," not the type of electoral system.[12] There seem to be two Dr. Amys, and the one who has shown up for this case is remarkably different from the one who writes scholarly books and articles.

24) Dr. Amy briefly reviews the political science literature bearing on the issue of minority turnout. I have read some of the items he uses, and did a brief search that produced others that he did not choose to cite. His appraisal of the literature seems a little slanted to me. His account of the study by Matt Barreto, for example, gives the impression that it proves that Mexican Americans in Southern California were far more likely to turn out to vote when they lived in districts in which they were a majority. One has to wonder how confidently we can generalize from Mexicans in California to Puerto Ricans in Massachusetts; these groups vary a good deal, in political behavior and much else.[13] More troubling, what Dr. Amy calls Barreto's "robust and unambiguous" results, when inspected carefully, might better be described as fairly trivial and somewhat ambiguous. In fact, Barreto found that living in a Latino-majority district was *negatively* correlated with turnout—by -.015—in the 1996 elections. In 1998, the difference was tiny but in the other direction—a trivial +.04. In 2000, it was +.059, still far from what would usually be considered a powerful effect. In any event, the study did not actually test the effects of switching from one electoral system to another; it merely compared those Latinos who happened to reside in districts in which they were a majority to those in districts in which they were a minority. It thus lumps together all California political districts with a Latino majority, whatever their electoral system.

25) The Claudine Gay monograph Dr. Amy relies upon again rests entirely upon California data, and deals with Mexican Americans, not Puerto Ricans. A further limitation is that it dealt exclusively with voting for the U.S. House of Representatives, not for municipal officers. Turnout

---

[12] http://www.mtholyoke.edu/acad/polit/damy/articles/Brief%20History%20of%20PR.ht

[13] Benjamin Highton and Arthur L. Burris, "New Perspectives on Latino Voter Turnout Rates in the United States," American Politics Research, vol 30, no 3 (May, 2002), 285-306.

is almost always higher in Congressional elections than in local ones, and we cannot assume that racial differences in local elections mirror those in contests for Congress. Gay did not find that living in a Congressional district with a minority majority had uniformly positive effects on minority voter turnout. Black turnout, for example, was 1.5 percent lower than the African American statewide average in districts with a Latino majority.[14] In any event, this is a cross-sectional analysis was confined entirely to the 1994 elections, and it did not address the effects of *changing from at-large to districted elections*. All Congressional elections are conducted by district. Since California's Mexican Americans were then in the early stages of political mobilization, and many were residing in newly-drawn districts that had been created following the 1990 Census, this study tells us nothing about the *longer-term* effects of residing in districts of varying racial composition. It cannot refute the hypothesis that "any structural change may temporarily heighten voting levels" but that they subsequently drop to their previous level.[15]

26) Dr. Amy's description of the 1995 Kimball Brace et. al. article that he cites in support of his argument also seems somewhat misleading to me. The analysis reported there shows a complex and confusing pattern; the concluding sentence of the paper declares that "it seems clear that, by itself, the creation of new minority districts after the 1990 census ***will not have a strong, consistent effect on minority turnout***."[16] Another study, not mentioned by Dr. Amy, suggests that any turnout gains following a shift to districted elections are temporary, and that the longer-term impact is to reduce turnout because a districted system results in fewer competitive races.[17]

27) A judicious recent review of what is currently known about "Municipal Institutions and Voter Turnout in Local Elections," by Hajnal and Lewis, also ignored by Dr. Amy, suggests that the literature in fact demonstrates that methods of election to city councils have little impact on voter turnout.[18] It is possible, the authors suggest, that at-large elections tend to depress turnout by distancing leaders from their local constituencies. But it is equally possible that at-large elections "draw residents' attention to larger citywide concerns that propel them to vote."[19] Both are plausible hypotheses, and the two effects may well cancel each other out. Hajnal and Lewis cite a 2001 study that found that "the method of council election had no effect on turnout." The authors' own statistical study of California municipal elections found that cities with districted elections had *lower* turnout rates for the voting-age population, but somewhat <u>higher</u> rates among registered voters. They were unable to explain this anomaly, but neither effect was very strong. The authors conclude that electoral structures have very little influence on turnout, and that by far the most important reform that could increase turnout dramatically is holding all municipal elections at the same time as national and state-level contests.[20]

---

[14] Claudine Gay, <u>The Effect of Minority Districts and Minority Representation on Political Participation in California</u> (Public Policy Institute of California, 2001) 50.

[15] Charles S. Bullock III, "Turnout in Municipal Elections," 9 <u>Policy Studies Review</u> (Spring, 1990), 546.

[16] Kimball Brace, Lisa Handley, Richard G. Niemi, and Harold W. Stanley, "Minority Turnout and the Creation of Majority-Minority Districts," 23 <u>American Politics Quarterly</u> (April, 1995), 201. Emphasis added.

[17] Bullock,"Turnout in Municipal Elections," 546-547.

[18] Zoltan L. Haijnal and Paul G. Lewis, " Municipal Institutions and Voter Turnout in Local Elections," 38 Urban <u>Affairs Review</u> (2003), 645-668.

[19] <u>Ibid.</u>, 649.

[20] <u>Ibid.</u>, 661-662.

28) It must be said that Dr. Amy's credibility in assessing the literature fairly has been called into question. In his report and his deposition, he informed us that minority turnout can be expected to rise when blacks and Latinos together make up a combined majority of the voting age population of an electoral unit. He abandoned that view in his rebuttal report, without citing new studies that might legitimately lead him to change his position.

29) If his new position is correct, then it follows that future turnout levels in Springfield are likely to be depressingly low for all groups, because demographic change means that no single group will have a majority at the city-wide level, and there likely will be fewer and fewer wards dominated by a single group. If no group forms a majority in most of the districts that would be created under plaintiffs' plan, then presumably the turnout of all of them will be depressed. The Spanish surname analysis performed by the U.S. Department of Justice with 2005 and 2006 data demonstrates the rapid dispersion of Latinos across the city since 2000 (these tables are included in Appendix A below.) Only one of the eight wards today has fewer than 1,000 Hispanics of voting age. Of the 64 precincts, just one has fewer than 50 Latino adult residents, and only 10 more have less than 100. When Dr. Amy speculates about the positive effects of living in a political unit dominated by members of the same ethnic/racial group, he mistakenly assumes that Springfield's Latinos are largely confined to solidly Hispanic barrio areas.

30) Certainly Dr. Amy is right that low Latino turnout on election day is a significant barrier impeding the group's political advance. Information on voter turnout in the 2005 and 2006 elections provided by the Springfield Election Commission, linked to the Department of Justice's Spanish surname evidence, indicates that turnout was far below the city average in the most heavily Latino wards (1 and 3), and that it was well above the city average in those wards with the fewest Latinos (5, 6, and 7). The same pattern held for prior elections as well. (See the tables given in the Appendix).

31) Dr. Amy's remedy, though, is not persuasive. He thinks that low turnout is a function of poverty and educational levels, but that carving the city up into districts in which Latinos will be a majority is the solution. As I have argued above, he is apparently unaware of the wide dispersion of Springfield's Latinos, dispersion that has been increasing since 2000. He also ignores a body of political science literature that suggests an alternative solution. The low registration and turnout of poor and minority citizens can be substantially increased, some scholars maintain, by political mobilization campaigns of various sorts. A 1989 volume by Michael Avey contends that "the major reason for low turnout today is lack of political mobilization."[21] Springfield's Latinos certainly do need to get more involved in politics if they are to win a larger share of political

---

[21] Michael Avey, *The Demobilization of American Voters* (Greenwood, 1989, as quoted in David Niven, "The Mobilization Solution? Face-to-Face Contact and Voter Turnout in a Municipal Election," 66 *Journal of Politics* (August 2004). Niven reports that a mobilization drive before a Florida municipal election increased turnout by 5 points, and a similar drive in New Haven raised turnout by 9 points. Additional support for the mobilization model is offered in Daron Shaw, Rodolfo de la Garza, and Jongho Lee, "Examining Latino Turnout in 1996," 44 *American Journal of Political Science* (2000), 338-346. The central finding here is that "the most distinctive feature of Latino voting in 1996 was the significant and positive effect of contacting by a Latino group, which suggests that mobilization efforts may be critical to eradicating the turnout gap and incorporating Latinos into the existing party system. Additional support for this finding is to be found in Melissa R. Michelson, "Getting out the Latino Vote: How Door-to-Door Canvassing Influences Voter Turnout in Rural Central California," 25 *Political Behavior* (2003), 247-263.

office. But it cannot be accomplished by a legal order that ends at-large voting and puts half or more of them into districts in which they are greatly outnumbered by members of other groups.

32) A massive get-out-the-vote campaign focused on Springfield's Latinos would be more empowering for the community than carving out one or two Latino rotten boroughs, which might elect Hispanic candidates whose total vote is much smaller than that of losing candidates in other districts with equal populations but higher turnout. This is especially important because there are many levels of government in the United States. Latinos may be elected to the city council with very low turnout in their districts, if the district lines are drawn to guarantee it. But the failure to mobilize a larger fraction of the group will mean that Latinos will have little voice in the selection of state and federal representatives and senators and the President of the United States. It also and delay the day when they will be able to elect a Latino mayor of Springfield.  Increased participation at all levels of government cannot be accomplished by a court order to restructure local elections. Indeed, a court-ordered restructuring of local elections might increase rather than diminish voter passivity and reduce turnout.

**Assessment of Plaintiffs' Section 2 Burden**
33) The starting point for Voting Rights Section 2 challenges is consideration of the so-called Gingles factors. These are the three threshold conditions that minority plaintiffs must demonstrate before other circumstances can be considered. The minority (1) must be sufficiently large and geographically compact to constitute a majority in a single-member district; (2) it must be politically cohesive; and (3) the white majority must vote sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate.[22] If plaintiffs succeed in demonstrating that these three conditions are met, the inquiry then turns to a broader question: whether "the totality of the circumstances" indicates that the challenged electoral system in the jurisdiction operates so that voters in the protected class have less chance than other voters to elect the candidate of their choice. I will first address whether plaintiffs' experts have offered solid evidence that meets the three prongs of the Gingles formula. Then I will evaluate their efforts to establish that the totality of circumstances indicates a violation.

*The size and compactness of the minority population of Springfield*
City Council
34) The report submitted by Dr. Harmon deals with the first of the three Gingles prongs. The organization, MassVote, devised the Plaintiffs' Plan for a City Council elected from nine districts, and Dr. Harmon apparently was brought in to give the plan his stamp of academic approval. According to his calculations, the proposed plan would yield two districts with a Latino majority in the voting age population, and one with a black majority. A fourth district, he suggests, would have a combined black/Latino majority and would likely elect a candidate of color; this is highly doubtful, as we shall see shortly.[23]

35) If you interpret the Gingles standard as merely requiring that districts in which minorities form a majority of the VAP *can be* devised, the Harmon Report suffices to pass the test. But we cannot assume that the mere adoption of districted elections will provide Springfield's minorities

---

[22] Paraphrased from Thornburg v. Gingles, 478 U.S. 30, 49-51, 106 S. Ct. 2752, 92 L. Ed. 2d 25 (1986).

[23] Expert Report of John Harmon, Appendix A, Exhibits 4-6.

with "a greater opportunity to elect council members of their choice."[24]  A close look at the
Harmon Plan makes me doubtful that it would have this effect.

36) Although Springfield has substantial black and Latino populations, amounting to almost half
of the total in 2000, they are not packed into overwhelmingly minority neighborhoods isolated
from the white population of the city.  Although Plaintiffs have complained that Springfield is
"segregated," the difficulty they experienced in trying to carve it up into reliably Latino or black
districts suggests that charge is mere hyperbole.  Allowed to create an electoral map *de novo*, with
census data revealing the racial composition of every block in the city to guide them, Plaintiffs
drew lines with the sole aim of creating the maximum number of minority-majority districts.  And
yet they were unable to produce any districts in which as many as six out of ten eligible voters
belonged to a particular minority group.

37) In enforcing the Voting Rights Act, it was once the practice of the Voting Section of the U.S.
Department of Justice to insist on the creation of "supermajority" districts that had at least a *65
percent* share of the protected minority in question.[25]  Such supermajorities were necessary, it was
thought, because a history of official discrimination touching on the right to vote in the
jurisdiction had resulted in markedly lower minority registration and turnout rates.  This notion is
no longer widely accepted in the DOJ or the courts, but it nonetheless revealing that this level of
concentration is impossible to engineer in Springfield.  Dr. Harmon's plan yields one black-
majority district, #3, but only 58 percent of its residents are African American.  It creates two
Latino-majority districts, #1 and 2, but neither is more than 54 percent Hispanic.  In another
district, #4, blacks and Latinos together form a majority, but whites are a plurality, with 41
percent.  Given the lack of cohesion between African Americans and Latinos in Springfield,  see,
infra, ¶¶56-134 , it seems highly probable that this district would elect a white candidate to its seat
on the council.

38)  The Harmon plan does not create *even one* supermajority minority district with a
concentration of at least 65 percent of either blacks or Latinos.  The minority populations of
Springfield are simply too broadly dispersed and intermixed to allow it.  Therefore, it seems
doubtful that Dr. Harmon is right in claiming that his two Latino-majority districts will elect
Latinos, the black-majority district a black, and the mixed District #4 one or the other. They may
not. Evidence suggests that racial differences in turnout in local elections are large enough to
require that any district created to provide minority voters the opportunity to elect a candidate be
comprised of more than 54 percent of voting age persons from the group. In the 2005 City Council
race, for example, turn-out in the three most heavily Latino precincts in the city (1A, 1B, and 1C)
ranged from 14.6 to 17.5 percent.  In the three precincts with the highest concentration of African
Americans (4B, 4E, and 4H), turnout was between 16.5 and 23.4 percent.  In sharp contrast,
turnout for the entire Seventh Ward, heavily white, was 45.4 percent, and it was as high as 87.6
percent in precinct 7H.[26]  If turnout differences of this magnitude were to show in the proposed

---

[24] Supplemental Report of John Harmon, ¶2.

[25] Charles S. Bullock III and Richard E. Dunn, "The Demise of Racial Districting and the Future of Black
Representation," 48 Emory Law Journal (Fall, 1999), 1213-14.

[26] "2005 November Election: Proportion of Voters Supporting Candidates—City Council," a document produced by
the city. Lest it be thought that the 2005 election was aberrant, another city document provides ward-level breakdowns
for the 2001 and 2003 elections and the pattern looks much the same. Note, though, that the data here indicate the

Harmon districts, it is unlikely that a majority of the actual voters in the district would be members of the minority group the plan was devised to empower. It therefore cannot be assumed that minority voters will in fact be able to elect candidates of their choice.

School Committee

39) Dr. Harmon also proposes two alternative plans for districted elections for the School Committee. The one that splits precincts creates one district that is 61.2 percent Latino and another that is 55.1 percent African American. The other, that respects existing precinct lines except in the case of Precinct 8-H, has even weaker concentrations of the groups that it was intended to benefit, producing one that is 53.3 percent black and another that is 53.1 percent Hispanic. Whether the latter margins are sufficient to elect candidates from those groups seems questionable, especially in the case of Latinos, thanks to their low turnout rate. Note that the incumbent black member of the School Committee does not live in the African American district and that Mr. Santiago, who missed winning a seat in 2005 by only 164 votes, lives outside the Latino district.

40) The adoption of either of these districted plans, it seems to me, will restrict rather than expand the opportunities of minority voters to influence the governance of the city's schools. The goal of having one Latino and one African American on the School Committee has already been reached in Springfield in recent years, and sometimes exceeded, and there is every reason to believe that in the future the at-large system will produce *at least* that much representation and probably more. The block-based plan Plaintiffs prefer will create three districts that are well over 70 percent white and one that is 62.35 percent white, so the odds are that four of the six seats will be held by non-Hispanic whites in the near future. Under the precinct-based plan, white concentrations are even greater in three districts, and in the fourth the white plurality is large enough (48.32 percent) to make a white victory likely. Plaintiffs thus would place an artificial ceiling on minority representation, limiting them to 33 percent of the seats though they are already a majority of Springfield's voting age population. This seems to me regressive rather than progressive.

41) In sum, Plaintiffs can be said to have satisfied the minimal requirement of the first <u>Gingles</u> test. It is indeed possible to create electoral districts in Springfield that will have an African American or a Latino majority in their voting-age populations. Whether it is desirable to do so is another matter. Much of what Plaintiffs' experts have said in support of this scheme seems to me quite misguided. The old civil rights remedy, which assumes that districted elections best protect the voting rights of racial minorities, is of dubious relevance in communities in which whites are

---

(continued...)

turnout rates of particular precincts. That they vary in accord with the racial composition of the precinct is not direct evidence of who voted and who did not. It should be noted that one possible source of disproportionately low Latino turnout in Springfield is that some voting-age members of the group are not citizens. This is not the crucial source of Hispanic political weakness in Springfield that it is in most parts of the country, because most Latinos in the city are Puerto Ricans, who are U.S. citizens whether born in Puerto Rico or on the Mainland. But they are not <u>all</u> Puerto Rican. The 2000 Census found that 6,092 of the city's 41,3343 Hispanics were not Puerto Ricans; 630 were Mexicans, 232 were Cubans, and 5,230 were "other Hispanic." No information is available on the citizenship status of these 6,092 people, but it cannot be assumed that all—or even most—were U.S. citizens. Data are from Census Bureau's American FactFinder <http://factfinder.census.gov/home/saff/main.html>.

no longer the majority group, and thus cannot use their demographic majority to rule as they please without regard for minority interests.

### *Minority political cohesion and the issue of white bloc voting in Springfield*

42) A showing that a minority population is sufficiently large and compact to constitute a majority in a single-member district is only one necessary condition and far from a sufficient one. Plaintiffs must also establish that the minority in question is politically cohesive, and that its political wishes are usually rendered irrelevant because whites in the community vote as a bloc to keep minority-preferred candidates from winning. Whites, it must be shown, usually "veto" the candidates preferred by minority voters. The expert report submitted by Dr. Richard Engstrom is the primary source of evidence on both of these issues. The two—minority cohesion and white bloc voting—are so closely intertwined that I will comment on both in the course of assessing Dr. Engstrom's work. The decisive question, as I understand it, is whether plaintiffs have established that "the voting community" of Springfield is *"driven by racial bias"* and whether "the challenged electoral scheme allows that bias to dilute the minority population's voting strength."[27] Or, in the words of another appellate court, whether the racial cleavages to be found in the jurisdiction *"are deep enough to defeat minority-preferred candidates time and again."*[28] I don't believe that Dr. Engstrom makes a persuasive case that the local political process under challenge here is properly described in those terms.

### How Accurate Are Plaintiffs' Estimates of Voting Patterns and Behavior in this Case?

43) In order to make an assessment of minority political cohesion and white bloc voting, it has long been the practice to rely upon ecological regression analysis of election returns to provide some estimation as to how many minority voters supported minority and white candidates and how many white voters supported minority and white candidates. In assessing the value Dr. Engstrom's statistical analysis in this case, I start with a crucial and undeniable point that is too often forgotten in voting rights litigation. *We simply do not know how any individual voters in this city actually voted* in any of elections covered in Dr. Engstrom's report. The elementary reason is that all public elections in the United States since the late-nineteenth century have been conducted by means of the secret ballot. All of Dr. Engstrom's measurements of how groups voted, calibrated to one decimal place, are only *estimates*, estimates based on certain assumptions that cannot be independently verified.

44) If we don't know how any individual actually voted in the privacy of the polling booth (or at home with an absentee ballot), how then can we claim to know how entire *groups* of Springfield's residents voted, as Dr. Engstrom purports to? The only relevant evidence that he has to work with is information about: a) How many votes were cast for each candidate in each precinct; and b) What the racial composition of the voting-age population of each precinct was at the time of the U.S. Census of 2000.

45) To generate his estimates, Dr. Engstrom calculated the statistical relationship between *a)* and *b)*. He made inferences about how groups of people must have voted on the basis of the precinct-to-precinct variation in the distribution of the votes and in the racial mix. No other variable

---

[27] Nipper v. Smith, 39 F.3d 1494, 1524-25 (emphasis added).

[28] Uno v. City of Holyoke, 72 F.3d 973, 983 (emphasis added).

known to influence voting behavior—education, occupation, income, religion, and a variety of personal preferences—was entered in his ecological regressions. Dr. Engstrom's analysis does not *prove* that Springfield's residents voted as they did because of their race; it *assumes* that their race determined their political behavior, and generates estimates of how they *would have voted* if that assumption were correct. Dr. Engstrom knows how many votes each candidate won in each precinct; he then allocates those to the different racial groups in each precinct on the basis of his formula for the city as a whole. Race is the only thing that matters on election day in Dr. Engstrom's tables because it is the only independent variable that he employed in generating his estimates.

46) There is a method of checking the accuracy of ecological regression estimates that has frequently been used in voting rights cases, homogeneous precinct analysis. If you examine precincts that are composed almost entirely of voters of one race, the results are fairly direct evidence about how that racial group voted *in those places* (though not necessarily how they voted in less homogeneous neighborhoods, of course.) Dr. Engstrom made a stab at doing this, but in the Springfield elections at issue here the confirming power of homogeneous precinct analysis is extremely limited. First, a mere *six* of the several dozen precincts in the city qualify as homogeneous, defined as having a group concentration of 90 percent or more. (This again reminds us of the broad dispersal of racial groups across Springfield's neighborhoods.) And since those homogenous precincts are by definition very unusual in their racial composition, it is reasonable to suspect that the social characteristics and political behavior of the people living in them are not typical of people living in racially more mixed areas of the city. Furthermore, not one of those six homogeneous precincts is dominated by either African Americans or Hispanics, so the method yields no findings at all about the voting behavior of the groups for whose benefit this complaint has been brought. The value of Dr. Engstrom's report depends upon the validity of estimates derived from ecological regression.

47) In his Rebuttal Report, Dr. Engstrom dismissed my suggestion that homogenous precinct analysis is a method of "checking the accuracy of ecological analysis." He responds: "Not at all." It is "simply a second measurement technique. If two different measurement techniques result in similar estimates, the confidence one can have in the estimates is enhanced." Dr. Engstrom seems to be saying that getting the same result from the two different methods will make one more confident about the accuracy of the estimates, but that this does not mean that one method serves as a "check" on the other. This seems to me a distinction without a difference. If using the other method enhances (or reduces) one's confidence in estimates generated by the other, it sure sounds like a "check" to me.

48) Are these estimates accurate enough to calibrate the level of racial cohesiveness and racial polarization in Springfield elections with any precision? In at least a few instances, they are just plain wrong beyond all argument. Candidate Lewis-Caulton, for example, certainly could not possibly have won 106.4 percent of the black vote in 1999, for example, or 101.3 percent in 2003.[29] In four of the other elections considered by Dr. Engstrom, mathematically impossible estimates of the black vote were also generated.[30] Dr. Engstrom, strangely, offers no explanation for these impossible results. It is tempting to dismiss them as minor glitches, and to assume that

---

[29] Engstrom Report, Tables 1 and 3.

[30] Ibid., Tables 4, 5, 6, and 8.

they mean that the true figure must have been 100 percent or very close to it. But can be sure of that? How do we even know that he got the rank order of minority-preferred candidates right? Ms. Lewis-Caulton was the top choice of black voters in the 1999 City Council contest, Dr. Engstrom's Table 1 indicates. But since 106.4 percent is an unattainable level of group support, is it even certain that Ms. Lewis-Caulton was supported by more black voters than was Mr. Williams, whose estimated level of black support was 93.3 percent? The same question applies to the estimated black vote for these two candidates in 2003.

49) In these half a dozen instances, we know with certainty that Dr. Engstrom's results are wrong, because they are logically impossible. The troubling and difficult question is whether this problem is in fact confined to these few conspicuous cases, or whether all of the other numbers generated by Dr. Engstrom are similarly suspect. Perhaps they are all considerably off the mark but we only can be sure they are erroneous when they exceed 100 percent. I don't know. But these anomalies suggest to me that all of Dr. Engstrom's estimates must be taken with more than a few grains of salt.

50) Dr. Engstrom's use of tests of statistical significance might be thought to address the issue of accuracy. The asterisks in his tables, he tells us, indicate that the probability that the differences between whites and blacks or whites and Latinos displayed in his tables are the result of chance is less than .05.[31] This statement about statistical tests seems to me incomplete and deceptive formulation. It would be more accurate to say that the odds that the differences are attributable to chance are less than .05 only if it is indeed true that voting behavior in these Springfield elections was entirely determined by race and race alone. When his estimates are off the mark, as some of them indisputably are, it might be the work of mere chance. But since it happens with the African American vote in six out of the eight contests under inspection, one has to wonder what the odds are that chance operates so frequently to yield overestimates of black voting for black candidates. It may not be mere chance, but rather evidence that voters did not behave in accord with his assumptions—evidence that his model does not correspond with reality. His statistical tests cannot do anything at all to validate the model itself.

a) Dr. Engstrom's statistical tests simply do not demonstrate that his estimate of how a minority group voted in a particular election will be due to chance only 5 percent of the time. He takes a correlation between the proportion of group members in the various precincts and the vote for various candidates, and assumes that the votes received by particular candidates in that precinct were cast by group members and not by others. We do not *know* that this assumption is correct, and the statistical test does nothing to substantiate the assumption upon which the whole analysis rests: that members of groups vote exactly the same way across all precincts.

b) Indeed, there are particularly strong grounds for doubting that it is correct in communities experiencing the kind of demographic transformation Springfield has undergone. Dr. Engstrom's analysis depends entirely upon two sets of numbers. One is the record of how many votes given to each candidate at the precinct level in each election. The other is population data from the 2000 Census that tells him the racial/ethnic composition of each precinct. But when he analyzes elections in 2003 and 2005, he still uses the racial and ethnic data collected in 2000. It happens that between 2000 and 2005, the non-Hispanic share of the VAP dropped by 18 percent, and the

---

[31] Ibid, footnote 4.

Latino proportion soared by 38 percent. Yet Dr. Engstrom purports to be able to determine precisely how each racial/ethnic group voted on the basis of the correlation of the 2005 vote by precinct with the racial/ethnic composition of that precinct *five years earlier*. If there were many fewer whites and many more Hispanics in the electorate by 2005, as there most certainly were, the voting estimates generated by his model ***cannot*** be accurate. This same objection would also apply, with somewhat less force, to Dr. Engstrom's analysis of the 2003 election.

51) Yet another problem, even more serious perhaps, applies to all of Dr. Engstrom's estimates. His model relates precinct-level variations in votes to the racial and ethnic composition of the voting age population of those precincts at the time of the 2000 Census. But we know that there are group differentials in actual turnout on election day. Dr. Engstrom's model assumes equal turnout rates for all racial/ethnic groups. As I noted in ¶11 of my original report, turnout varies sharply across precincts, with the most heavily Latino areas having rates far below the city-wide average. Hispanics in Springfield are much less likely to cast a ballot on election day than whites are, a point strongly emphasized in both of the reports submitted by Dr. Amy. To the extent to which that is true, it follows that Dr. Engstrom must have severely underestimated the level of white (and in some precincts black) support for Latinos. Even if Latino support for all Hispanic candidates had reached 100 percent, if only a small fraction of Latinos actually voted it follows that many of the actual votes received by Hispanic candidates must have come from elsewhere. Inman precincts, those votes had to have come from whites. Suppose, to take an absurd extreme case, that Latinos boycotted an election altogether. Dr. Engstrom, relying upon the racial/ethnic composition of each precinct in 2000 and the number of votes cast for each candidate, would still offer an estimate of how the Latino vote was distributed across candidates. The data entered into his equations do not include any information about whether any of the members of a group actually voted at all. In this example, all votes garnered by Hispanic candidates would necessarily have come from non-Hispanics, but Dr. Engstrom's estimates would not reveal that.

52) An additional complication that could bias his results comes from the fact that Springfield's voters may cast a ballot for as many as nine candidates, each for each seat on the council. Dr. Engstrom has no evidence as to whether there are systematic racial/ethnic differences in the number of ballots cast. There is evidence, however, that the proportion of blank ballots has been higher in predominantly minority wards than in largely white wards. In the 2005 city council elections, for example, 45.7 percent of the choices available to voters who turned up at the polls in Ward 1 were unexercised, and 44.6 percent of the choices in Ward 4. In Ward 7, by contrast, only 31.1 percent of the possible choices were unexercised. I do not see how it possible to estimate what proportion of the ballots cast for candidate X in precinct Y came from whites, blacks, or Latinos when we do not know if the typical white, black, or Hispanic voted for just one candidate, for a full slate of nine, or somewhere in between. Or, of course, if they didn't vote at all.

53) Dr. Engstrom's use of statistical tests here, it should be noted, contrasts sharply from their routine application in survey research. When a polling organization administers questions to a representative sample of a population, the researcher can say with confidence that the estimated level of support for presidential candidate X will be accurate within a margin of error of + or -3% 95 out of 100 times. The estimates such surveys provide come from responses by the individuals surveyed. They are direct evidence, and the chance of their being erroneous is determined by sample size, assuming that the model itself corresponds perfectly to social reality.

54) *Dr. Engstrom, however, has no direct evidence* about how individuals voted. Instead, he has inferred how members of different racial groups would have voted *if* their political behavior had corresponded perfectly to his racially deterministic core assumption. He has no direct measure at all of how much the actual behavior of Springfield's voters conformed to his model. That is the key question about his estimates, and t-tests provide no help in answering it. The tests merely tell us whether the numbers in the cells are large enough to make it highly unlikely that the black-white or Latino-white differences in the estimates are due merely to chance.

55) Dr. Engstrom asserts that it is contradictory of me to suggest that his estimates are open to serious question, and must be viewed with more than a few grains of salt, and yet to have accepted them for purposes of this litigation and to have quarreled with the interpretations he has given them.[32] I see no contradiction. I do not perform such analyses myself, and I agree with the city's judgment that having an expert political scientist running the same numbers Dr. Engstrom worked with would not add materially to our understanding of the issues. Even if we accept his estimates, they do not in fact demonstrate that white bloc voting has "usually" been strong enough to "defeat the minority-preferred candidate."[33] My complaint about Dr. Engstrom's work is two-fold:

a) He seems to think that his estimates are more accurate than they actually are.
b). Even if we accept them in the absence of an alternative, I argue, his empirical findings do not sustain the interpretations he places upon them.

What Estimates—if Accurate—Reveal about Minority Cohesion and White Bloc Voting in Springfield, 1999-2005
56) Let us assume now, for the sake of argument, that Dr. Engstrom's estimates of group voting patterns are at least roughly accurate. If they are, what story do they tell? Dr. Engstrom provides a detailed gloss on his findings. I read his numbers differently. As I see it, they support three conclusions:

a) Blacks in Springfield are fairly cohesive politically; Hispanics are much less so.
b). The two groups are not at all cohesive with *each other*.
c) . Black-preferred or Latino-preferred candidates are *not* regularly defeated as a result of white bloc voting. Substantial numbers of whites in fact vote for these candidates, and account for a sizable share of the votes they attract. Minority candidates who lost usually had less than solid backing from their own racial group, and very little support from the other non-white group.

*2005; City Council*
57) In 2005, the black and Hispanic incumbents, Mr. Williams and Mr. Tosado, were both reelected, and each racial group had two unsuccessful candidates. The most striking feature of this contest is that none of the four losing minority candidates had the backing of even a slight majority of their own group. Oliver won just 42 percent of the black vote, Wray 35. Similarly, Nazario got just under 45 percent of the Latino vote, and Conception a mere 20.6 percent. None

---

[32] Engstrom Rebuttal Report, ¶11.

[33] *Thornburg v. Gingles*, 478 U.S. 30 (1986) at 49,

of the four can really be considered the minority-preferred candidate. Their failure was not the result of white bloc voting but of the lack of cohesive support from their own community.

58) In the 2005 council races, as in earlier elections, Latino voters were distinctly less likely to support black candidates than white voters were—a difference of 4.6 points in the case of Williams, 2.3 for Oliver, and 8.1 points for Wray. Similarly, whites gave more support to Latino candidates than blacks did in two of three cases. Whites were 5.4 points more likely than blacks to back Nazario , and Conception by a huge 18.1 points. The only exception was with the incumbent council member Tosado, who had a very strong 39.2 percent support from whites and 3 points more from blacks.

59) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Tosado was the candidate preferred by Hispanic voters; he, however, also received significant support from both white and African American voters

a) According to the ecological regression analysis conducted by Dr. Engstrom, , Mr. Tosado received 76.4 percent of the Hispanic vote.
b) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Tosado received 42.1 percent of the African American vote,
c) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Tosado received 39.2 percent of the white vote.
d) According to the ecological regression analysis conducted by Dr. Engstrom and assuming that Hispanic voters constituted at least 19 percent of those persons who turned out to vote in the November 2005 election, Mr. Tosado received more white votes than Hispanic votes.
Bud Williams

60) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Williams was the candidate of choice of and was cohesively supported by African American voters; he received more support from white voters than from Hispanic voters

a) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Williams received 102.2 percent of the African American vote.
b) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Williams received 29.8 percent of the Hispanic vote.
c) According to the ecological regression analysis conducted by Dr. Engstrom, William Foley received a greater proportion of Hispanic vote than did Mr. Williams
d) According to the ecological regression analysis conducted by Dr. Engstrom, Rosemarie Mazza-Moriarty received a greater proportion of Hispanic vote than did Mr. Williams
d) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Williams received 34.2 percent of the white vote
e) According to the ecological regression analysis conducted by Dr. Engstrom and assuming that African Americans constituted at least 17 percent of the registered voters in the 2005 election, Mr. Williams received more white vote than African American vote

61) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Concepcion was not a candidate preferred by Hispanic voters

a) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Concepcion received 20.6 percent of the Hispanic vote

b) According to the ecological regression analysis conducted by Dr. Engstrom, all six white incumbents received more support from Hispanic voters than did Mr. Concepcion

c) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Concepcion received more support (36.4 percent) from white voters than he did from Hispanic voters.

d) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Concepcion received 18.3 percent African American support

62) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Nazario was not a candidate strongly preferred or cohesively supported by Hispanic voters

a) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Nazario received only 44.9 percent of the Hispanic vote

b) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Nazario received a greater proportion of white vote (15.6 percent) than African American vote (10.2 percent)

63) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Wray was not preferred and cohesively supported by African American voters

a) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Wray received only 35.0 percent of the African American vote

b) According to the ecological regression analysis conducted by Dr. Engstrom, three white incumbent candidates (William Foley, Rosemarie Mazza-Mariarty, and Kateri Walsh) received more African American vote than did Mr. Wray

c) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Wray received a greater proportion of white vote (23.0 percent) than Hispanic vote (14.9 percent)

d) According to the ecological regression analysis conducted by Dr. Engstrom, only four (of the eighteen) candidates received less Hispanic support than did Mr. Wray

64) According to the ecological regression analysis conducted by Dr. Engstrom,  Mr. Oliver was not strongly preferred and cohesively supported by African American voters

a) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Oliver received 42.0 percent of the African American vote

b) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Oliver was not a candidate strongly preferred or cohesively supported by African American voters.

c) According to the ecological regression analysis conducted by Dr. Engstrom, incumbent Kateri Walsh received a greater proportion of the African American vote than did Mr. Oliver

d) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Oliver received a greater proportion of white vote (18.9 percent) than Hispanic vote (16.6 percent)

e) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Oliver received less Hispanic support than did each of the six white incumbents

**DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY
DR. STEPHAN THERNSTROM, DEFENDANTS' EXPERT WITNESS
PART 2 OF 5**

65) There is evidence that failure to exercise all nine electoral choices was among the causes of losses of minority candidates in the City Council contest

a) That Mr. Tosado placed fourth and Mr. Williams placed sixth among nine candidates does not support the claim that minority single-shot voting was necessary to ensure their election
b) Neither Mr. Tosado nor Mr. Williams requested that minority (or any other) supporters single-shot vote for him.

66) African American support for Ms. Kateri Walsh accounts for her success. According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Walsh received a greater proportion of African American support (45.0 percent) than white support (43.4 percent); she received 23.5 percent of the Hispanic vote. According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Walsh and Mr. James F. Ferrara (tenth place candidate for City Council) both received 43.4 percent of the white vote. Mr. Ferrara, however, received only 3.0 percent of the African American vote and 19.0 percent of the Hispanic vote

67) Minority support for incumbent Timothy Rooke was important in his re-election. According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Rooke received 23.2 percent of the African American vote and 21.0 percent of the Hispanic vote. Had Mr. Wray and/or Mr. Concepcion received cohesive support from African American and Hispanic voters, the minority support received by Mr. Rooke would have been crucial in his re-election

68) The failure of four of the six minority candidates to qualify for election to the Springfield City Council can reasonably be attributed to a number of factors – none of which implicate the current method of election

a) Low turn-out in predominately majority-minority wards accounts for loss of certain minority candidates
b) Lack of politically cohesive support of minority voters for certain minority candidates accounts for their loss
c) That some minority candidates received adequate white support to guarantee their election provides evidence that minority candidates can attract adequate white vote

69) Rather than preventing the election of candidates of choice of minority voters, non-Hispanic white wards (white voters) have supported and otherwise enabled the election of every Black/African American candidate to have garnered more than 50 percent of the African American support (according to Dr. Engstrom's ecological regression analysis) and or 50 percent of the Ward 4 vote

a) White bloc voting did not prevent the election of Mr. Williams, who was the only candidate of choice of African American voters
b) Rather than preventing the election of candidates of choice of minority voters, white voters have supported and otherwise enabled the election of every Hispanic candidate to have garnered more than 50 percent of the Hispanic vote (according to Dr. Engstrom's ecological regression analysis) in the 2005 election.

c)  White bloc voting did not prevent the election of Mr. Tosado, who was the only candidate of choice of Hispanic voters.
d)  Loss of  Mr. Concepcion and Mr. Nazario,  who did not receive a majority of the Hispanic vote (according to Dr. Engstrom's ecological regression analysis), cannot be attributed to white bloc voting; they were not candidates preferred by Hispanic voters
e)  Loss of  Mr. Wray and Mr. Oliver,  who did not receive a majority of the African American vote (according to Dr. Engstrom's ecological regression analysis), cannot be attributed to white bloc voting; they were not candidates preferred by African American voters

*2003; City Council*
70)  In 2003, Mr. Williams was reelected, and Ms. Lewis-Caulton again failed, slipping to 12th place. Her share of the white vote dropped 12 points; her Latino share dropped even more precipitously, to just one vote in 25.  By then, Ms. Lewis-Caulton was a very familiar face on the ballot, and closer acquaintance evidently did not increase her attractiveness to white or Latino voters. Latinos were much less likely to support any of the three black losing candidates than whites were—22 percentage points less likely with Lewis-Caulton, 7 points with Morris Jones and 8 points with HamiltonWray.  They were also 15 points less likely than whites to back the black winner, Mr. Williams.

71)  According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Williams was the candidate of choice of and was cohesively supported by African American voters; he received more support from white voters than from Hispanic voters

a)  According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Williams received 96.7 percent of the African American vote – 5.5 percentage points smaller proportion of the African American vote than Mr. Williams received in 2005
b)  According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Williams received 20.7 percent of the Hispanic vote – 9.1 percentage points smaller proportion of the African American vote than Mr. Williams received in 2005.
c)  According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Williams received less Hispanic vote than did three white incumbents
d)  According to the ecological regression analysis conducted by Dr. Engstrom, William Foley received a greater proportion of Hispanic vote (26.9 percent) than did Mr. Williams; Angelo Puppolo received a greater proportion of Hispanic vote (21.4 percent) than did Mr. Williams; and Rosemarie Mazza-Moriarty received a greater proportion of Hispanic vote (27.3 percent) than did Mr. Williams
e)  According to the ecological regression analysis conducted by Dr. Engstrom,  Mr. Williams received 35.7 percent of the white vote – 1.5 percentage points more white support than Mr. Williams received in 2005
f)  According to the ecological regression analysis conducted by Dr. Engstrom and assuming that African Americans constituted at least 17 percent of the registered voters in the 2003 election, Mr. Williams received more white vote than African American vote

72)  According to the ecological regression analysis conducted by Dr. Engstrom, Plaintiffs' expert, Ms. Lewis-Caulton was the candidate of choice of and was cohesively supported by African

American voters; she received significantly more support from white voters than from Hispanic voters

a)  According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Lewis-Caulton received 101.3 percent of the African American vote
b)  According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Lewis-Caulton received 4.6 percentage points more African American vote than did Mr. Williams even though Mr. Williams received a greater proportion of the Ward 4 vote (2.1 percentage points) and Mr. Williams received a greater proportion of the vote in two of the three Ward 4 precincts in which African American persons constitute greater than 60 percent of the voting age population (according to the 2000 Census)
c) According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Lewis-Caulton received only 3.6 percent of the Hispanic vote – a significantly smaller proportion of the Hispanic vote than was received than any other candidate
d) According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Lewis-Caulton received 25.9 percent of the white vote – 9.8 percentage points less white vote than Mr. Williams received

73)  According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Wray was not preferred and cohesively supported by African American voters

a)  According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Wray received only 31.9 percent of the African American vote; in 2005 he was estimated to have received 3.1 percentage points more African American vote than he received in 2003
b)  According to the ecological regression analysis conducted by Dr. Engstrom, three white incumbent candidates William Foley, Rosemarie Mazza-Mariarty, and Kateri Walsh,  received more African American vote than did Mr. Wray – just as they did in 2005
c)  According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Wray received  15.1 percent of the white vote; in 2005 Mr. Wray was estimated to have received 8 percentage points more white support
d) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Wray received 7.1 percent of the Hispanic vote; in 2005 Mr. Wray was estimated to have received 7.8 percentage points more Hispanic support
e) According to the ecological regression analysis conducted by Dr. Engstrom, only Ms. Lewis-Caulton received less Hispanic support than did Mr. Wray

74)  According to the ecological regression analysis conducted by Dr. Engstrom,  Mr. Jones was supported by African American voters, but was not their first and second most preferred candidates

a)  According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Jones received 69.7 percent of the African American vote, even though he only received 45.2 percent of the Ward 4 vote and 29.5 percent of the Ward 3 vote
b)  Even assuming the accuracy of Dr. Engstrom's estimations of African American support,  30.3 percent of the African American voters did not cast one of their nine ballots for Mr. Jones – one of only three African American candidates for City Council

c) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Williams received 27 percentage points more support from African American voters than did Mr. Jones and Ms. Lewis-Caulton received 31.6 percentage points more support from African American voters than did Mr. Jones

d) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Jones received 19.4 percent of the white vote

e) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Jones received 12.4 percent of the Hispanic vote

f) The only two candidates to receive less Hispanic support than did Mr. Jones, according to the ecological regression analysis conducted by Dr. Engstrom, were also African American (Mr. Wray and Ms. Lewis-Caulton)

68. Mr. Tosado won impressively in 2003, placing third overall. The only other Latino in the race, Mr. Cortes lost badly. In part, it was because few whites (12.7 percent) and even fewer blacks (9.5 percent) backed him. But it is also telling that he won only a thin majority of the votes from his own community—55 percent. This minimal level of Latino cohesion was as much a cause of the Cortes defeat as the lack of support for him from either white or black voters.

75) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Tosado was the candidate preferred by Hispanic voters; he, however, also received significant support from both white and African American voters

a) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Tosado received 78.4 percent of the Hispanic vote; in 2005 Mr. Tosado's support among Hispanic voters decreased by 2 percentage points as compared to 2003

b) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Tosado received 44.6 percent of the African American vote; in 2005 Mr. Tosado's support among African American voters decreased by 2.5 percentage points as compared to 2003

c) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Tosado received 38.0 percent of the white vote; in 2005 Mr. Tosado's support among white voters increased by 1.2 percentage points as compared to 2003

d) According to the ecological regression analysis conducted by Dr. Engstrom and assuming that Hispanic voters constituted at least 19 percent of those persons who turned out to vote in the November 2005 election, Mr. Tosado received more white votes than Hispanic votes.

76) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Cortes was candidate preferred by Hispanic voters, although he did not receive as cohesive Hispanic support as Mr. Tosado received

a) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Cortes received 56.5 percent of the Hispanic vote, although he only received 41.9 percent of the Ward 1 vote and 25.2 percent of the Ward 3 vote

b) According to the ecological regression analysis conducted by Dr. Engstrom, 43.5 percent of the Hispanic voters did not cast a ballot for Mr. Cortes

c) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Cortes received 12.6 of the white vote

d) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Cortes received 9.8 percent of the African American vote
e) According to the ecological regression analysis conducted by Dr. Engstrom, eight white candidates received more African American support than did Mr. Cortes
f) According to the ecological regression analysis conducted by Dr. Engstrom, only white non-incumbent candidates received less African American support than did Mr. Cortes.

77) There is evidence that failure to exercise all nine electoral choices was among the causes of losses of minority candidates in the City Council contest

a) That Mr. Tosado placed third and Mr. Williams placed seventh among nine candidates does not support the claim that minority single-shot voting was necessary to ensure their election
b) Of the minority candidates, however, it appears that only Mr. Jones would have been in a position to be elected had he received greater African American cohesion
c) Had African American persons selectively limited their vote, Ms. Lewis-Caulton could have been elected. According to Dr. Engstrom's estimations of support, Ms. Lewis-Caulton would have been elected had Ms. Walsh and Ms. Mazza-Moriarty not received minority support
d) African American (and to a lesser extent, Hispanic) support of Ms. Kateri Walsh accounts for her success; according to the ecological regression analysis conducted by Dr. Engstrom, Ms. Walsh, a non-incumbent, received 39.8 percent of African American vote, 49.8 percent of the white vote, and 15.9 percent of the Hispanic vote.
e) Minority support of Ms. Mazza-Moriarty, in her first bid for election, accounts for her success; according to the ecological regression analysis conducted by Dr. Engstrom, Ms. Mazza-Moriarty received 49.5 percent of the white vote, 34.9 percent of the African American vote and 27.3 percent of the Hispanic vote

78) The failure of four of the six minority candidates to qualify for election to the Springfield City Council can reasonably be attributed to a number of factors – none of which implicate the current method of election

a) Low turn-out in predominately majority-minority wards accounts for loss of certain minority candidates
b) Lack of politically cohesive support of minority voters for certain minority candidates accounts for their loss
c) That some minority candidates received adequate white support to guarantee their election provides evidence that minority candidates can attract adequate white vote
79) Rather than preventing the election of candidates of choice of minority voters, white voters have supported and otherwise enabled the election of a Black/African American candidates strongly preferred by African American voters and white voters have supported and otherwise enabled the election of the Hispanic candidate most preferred by Hispanic voters (according to Dr. Engstrom's ecological regression analysis)

80) It was not lack of white voter support that prevented Ms. Lewis-Caulton from being elected

a) Ms. Lewis-Caulton received little Hispanic voter support
b) There is evidence that Hispanic and African American turn-out was proportionately (and significantly) less than white turn-out

c) That Ms. Lewis-Caulton had earlier received greater white support and had been elected provide evidence that white voters were not "opposed" to supporting Ms. Lewis-Caulton (on account of race)

81) It was not lack of white voter support that prevented Mr. Jones from being elected

a) Since Mr. Jones had been elected four times when African Americans constituted a smaller proportion of the population than in 2003, there is no evidence that white persons were "opposed" to supporting Mr. Jones (on account of race)
b) According to Dr. Engstrom's ecological regression analysis, Mr. Jones' candidacy would have been significantly advanced had he received the same kind of African American cohesive support as did Ms. Lewis-Caulton and Mr. Williams
c) Mr. Jones received little Hispanic voter support; less Hispanic support than white support (according to Dr. Engstrom's ecological regression analysis)
d) There is evidence that Hispanic and African American turn-out was proportionately (and significantly) less than white turn-out

82) Loss of Mr. Wray, who did not receive a majority of the African American support (according to Dr. Engstrom's ecological regression analysis) cannot be attributed to white bloc voting; he was not a candidate preferred by African American voters

83) It was not lack of white voter support that prevented Mr. Cortes from being elected

a) Mr. Cortes was not strongly supported by Hispanic voters (according to Dr. Engstrom's ecological regression analysis) Mr. Cortes may not even have received a majority of the Hispanic vote if Dr. Engstrom has slightly overestimated Mr. Cortes' support among Hispanic voters and would not be a candidate of choice of Hispanic voters
b) Mr. Cortes' candidacy would have been significantly advanced had he received the same kind of cohesive support from Hispanic voters as Ms. Lewis-Caulton and Mr. Williams received from African American voters
c) Mr. Cortes received little African American voter support
d) There is evidence that Hispanic and African American turn-out was proportionately (and significantly) less than white turn-out

*2001; City Council*
84) In 2001, only one of four black candidates (Mr. Williams, Ms. Lewis-Caulton, Charles Rucks and Charles Stokes) won—Mr. Williams. But Ms. Lewis-Caulton's effort to win reelection did not fail because of dwindling white support. To the contrary, she won 38.3 percent of the white vote, up 27 percent (8.1 percentage points) from the previous contest. She once again did dismally among Hispanics, with an infinitesimal increase of 0.6 percent over the miserable 10.5 percent she polled the first time around. The only group whose support for her may have weakened was African Americans. It is obviously impossible to believe that she got 106.4 percent of the black vote in 1999, but her apparent drop to 96.3 percent, falling behind Williams, may be meaningful. If so, even this slight decline in black cohesion was a serious blow to her candidacy.[34]

---

[34] Ms. Lewis-Caulton loss of support may have been the result of her one-person crusade to force nonprofit employers in the city to make in-lieu-of-tax payments on tax-exempt properties. She was outvoted 8 to 1 on this issue. She also

85) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Williams was the candidate of choice of and was cohesively supported by African American voters; he received significantly more support from white voters than from Hispanic voters

a) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Williams received 99.6 percent of the African American vote

b According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Williams received 2.9 percentage points less African American support in 2003 than he did in 2001 and 2.7 percentage points more African American support in 2005 than he did in 2001

c) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Williams received 48.7 percent of the white vote

d) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Williams received 13 percentage points less white support in 2003 than he did in 2001 and 14.5 percentage points less white support in 2005 than he did in 2001

e) According to the ecological regression analysis conducted by Dr. Engstrom and assuming that African Americans constituted at least 17 percent of the registered voters in the 2001 election, Mr. Williams received 1.8 times more white vote than African American vote

f) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Williams received less Hispanic vote than did three white incumbents

g) According to the ecological regression analysis conducted by Dr. Engstrom, four white incumbent candidates received more Hispanic support than did Mr. Williams

h) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Santaniello received 28.2 percent of the Hispanic vote; Mr. Foley received 27.2 percent of the Hispanic vote; Ms. Mazza-Moriarty received 26.2 percent of the Hispanic vote; and Mr. Puppolo received 24.5 percent of the Hispanic vote

86) According to the ecological regression analysis conducted by Dr. Engstrom, Plaintiffs' expert, Ms. Lewis-Caulton was the candidate of choice of and was cohesively supported by African American voters; she received significantly more support from white voters than from Hispanic voters

a) According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Lewis-Caulton received 96.3 percent of the African American vote

b) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Williams received 3.3 percentage points more African American vote than did Ms. Lewis-Caulton

c) According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Lewis-Caulton received 1.7 percentage points more African American vote in 2001 than she did in 2003.

e) According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Lewis-Caulton received only 11.1 percent of the Hispanic vote

---

(continued...)

challenged tax incentive deals the city had made to attract business; Peter Goonan, "Taxes, Health Top Councilor's Agenda," Union-News, January 24, 2000.

55554 ver. 3

f) According to the ecological regression analysis conducted by Dr. Engstrom, only African American candidates Mr. Rucks and Mr. Stokes received a smaller proportion of the Hispanic vote than did Ms. Lewis-Caulton

g) According to the ecological regression analysis conducted by Dr. Engstrom and assuming that African American persons constituted at least 17 percent of those who turned out to vote, Ms. Lewis-Caulton received at least 1.4 percent more white votes than African American votes

87) If a "bloc" exercised a "veto" over Ms. Lewis-Caulton's candidacy, it was Latinos; whites were 3.5 times as likely as Hispanics to vote for Lewis-Caulton. If Engstrom's calculations are correct, 88.9 percent of Latinos failed to vote for Lewis-Caulton, even though they were allowed to exercise no less than <u>nine</u> choices. The third prong of the <u>Gingles</u> test is that "the white majority votes sufficiently as a bloc to enable it...usually to defeat the minority's preferred candidate."[35] The problem for Ms. Lewis-Caulton was not so much her lack of white support as her lack of Latino support.

a) According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Lewis-Caulton received 7.5 percentage points more Hispanic support in 2001 than she did in 2003

b) According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Lewis-Caulton received 38.3 percent of the white vote

c) According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Lewis-Caulton received 10.4 percentage points less white support than Mr. Williams received

d) According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Lewis-Caulton received 2.6 percentage points less white support in 2003 than she did in 2001 and 8.3 percentage points more white support in 2001 than she received in 1999. Accordingly, loss of white support was not the cause of Ms. Lewis-Caulton's failure to be re-elected in 2001.

88) According to the ecological regression analysis conducted by Dr. Engstrom, although Mr. Rucks was supported by African American voters, he was their third choice as among the 14 candidates

a) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Rucks received 77.4 percent of the African American vote

b) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Rucks received 20.7 percent of the white vote

c) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Rucks received only 3.4 percent of the Hispanic vote

d) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Rucks received the least amount of Hispanic support as among the 14 candidates

89) According to the ecological regression analysis conducted by Dr. Engstrom, although Mr. Stokes did not receive cohesive support from African American voters and was not their candidate of choice

---

[35] 478 U.S. at 50.

a) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Stokes received 45.5 percent of the African American vote

b) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Williams received 54.1 percentage points more support from African American voters than did Mr. Stokes

c) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Lewis-Caulton received 50.8 percentage points more support from African American voters than did Mr. Stokes

d) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Rucks received 31.9 percentage points more support from African American voters than did Mr. Stokes. That Mr. Rucks received 9.7 percentage points more Ward 3 vote could be attributed to his having received significantly greater African American vote than did Mr. Stokes

e) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Stokes received 10.0 percent of the white vote – the second smallest proportion of the white vote received by a 2001 City Council candidate

f) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Stokes received 6.5 percent of the Hispanic vote

g) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Rucks was estimated to have received 3.9 percentage points smaller proportion of Hispanic vote than did Mr. Stokes, even though Mr. Rucks received 3.9 percentage points more Ward 1 vote than Mr. Stokes

90) Hispanic candidates were in the field in 2001. The top one, Mr. Tosado, had already won a citywide election for School Committee two years earlier, and he narrowly missed winning in this race, placing tenth in the field. Again, his loss cannot be blamed on white bloc voting. He got a solid 36.4 percent backing from whites. If support at that level is tantamount to "vetoing" a minority candidate, then African Americans vetoed him even more emphatically; their level of support was 19 percent below (7.0 percentage points) the white level. Black bloc voting, if it can be called that, was more of an obstacle for him than white bloc voting. It is particularly striking that African Americans gave more of their votes to two victorious white candidates (Santaniello and Foley) than they did to Mr. Tosado. Furthermore, the Hispanic community was not united behind him. Only three out of four Latinos cast a ballot for him, even though they had nine votes to use. Contrast this with the 96-100 percent share of black votes won by the top two black candidates in this series of contests.

91) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Tosado, was the candidate preferred by Hispanic voters and received more white support than African American support

a) According to the ecological regression analysis conducted by Dr. Engstrom, , Mr. Tosado received 78.4 percent of the Hispanic vote

b) According to the ecological regression analysis conducted by Dr. Engstrom, , Mr. Tosado received 3.4 percentage points more Hispanic vote in 2003 than in 2001 and 1.4 percentage points more Hispanic vote in 2005 than in 2001

c According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Tosado received only 29.4 percent of the African American vote

d According to the ecological regression analysis conducted by Dr. Engstrom, , Mr. Tosado received 15.2 percentage points more African American vote in 2003 than in 2001 and 12.7 percentage points more African American vote in 2005 than in 2001

e ) According to the ecological regression analysis conducted by Dr. Engstrom, two white candidates received more African American vote than did Mr. Tosado:  Mr. Foley (31.1 percent) and Mr. Santaniello (34.1 percent) in the 2001 election.

f) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Tosado received 20.7 percent of the white vote in the 2001 election and 17.3 percentage points more white vote in 2003 than in 2001

g) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Tosado's white support increased in the 2001, 2003, and 2005 elections

h) According to the ecological regression analysis conducted by Dr. Engstrom and assuming that Hispanic voters constituted at least 19 percent of those persons who turned out to vote in the November 2005 election, Mr. Tosado received more white votes than Hispanic votes.


92)   According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Cortes was the candidate preferred by Hispanic voters, although he did not receive as cohesive Hispanic support as did Mr. Tosado


a) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Cortes received 67.9 percent of the Hispanic vote, although he only received 48.3 percent of the Ward 1 vote and 24.4 percent of the Ward 3 vote

b) Even assuming the accuracy of Dr. Engstrom's analysis, 32.1 percent of the Hispanic voters did not cast one of their nine ballots for Mr. Cortes – one of only two Hispanic candidates for City Council

c) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Cortes received 7.1 percentage points less Hispanic vote than did Mr. Tosado

d) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Cortes received 18.5 percent more Hispanic vote in 2001 than he did in 2003

e) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Cortes received 6.9 percent of the African American vote

f) According to the ecological regression analysis conducted by Dr. Engstrom, every candidate received more African American support than  did Mr. Cortes

g) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Cortes received 2.9 percentage points more African American vote in 2003 than he did in 2001

h) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Cortes received 8.5 percent of the white vote -- 4.1 percentage points more white vote in 2003 than he did in 2001

i) Accordingly, since Dr. Engstrom's estimations provide that Mr. Cortes received less Hispanic vote and more white and African American vote in 2003 than he did in 2001, then the fact that he received .9 percentage point greater proportion of the total vote in 2003 must be attributable to increased white and African American support


93)  There is evidence that failure to exercise all nine electoral choices was among the causes of losses of minority candidates in the City Council contest

a) According to the Dr. Engstrom's ecological regression analysis, had Mr. Tosado received the same proportion of Hispanic support as Mr. Williams received African American support he would have been elected to the City Council

b) It is fair to assume that Mr. Tosado's failure to receive the support of 25 percent of the Hispanic population was due, in part, to Hispanic voters' choices to single-shot vote for other candidates

c) According to the Dr. Engstrom's ecological regression analysis, had Mr. Puppolo not received the Hispanic support (and to a lesser extent the African American support), Mr Tosado would have won, even if his support among Hispanic or African American voters did not change

d) Likewise, had African American persons selectively limited their vote, Ms. Lewis-Caulton would easily have been elected

e) According to Dr. Engstrom's estimations of support, Ms. Lewis-Caulton would have been elected had Mr. Santaniello, Ms. Mazza-Moriarty, Mr. Rooke, Mr. Puppolo, Mr. Sarno, Mr. Ryan, and Mr. Kelly not received minority voter support

f) According to Dr. Engstrom's estimations of support, white candidates received between 31.1 percent (Foley) and 12.8 percent (Ryan) of the African American vote and white candidates received between 28.2 percent (Santaniello) and 16.1 percent (Kelly) of the Hispanic vote

g) Hispanic and African American support of Mr. Puppolo accounts for his having received more votes than Ms. Lewis-Caulton and Mr. Tosado

h) Minority support of Mr. Kelly accounts for his having received more votes than Ms. Lewis-Caulton and Mr. Tosado

94) Rather than preventing the election of candidates of choice of minority voters, predominately non-Hispanic white wards (white voters) have supported and otherwise enabled the election of the Black/African American candidate most preferred by African American voters (according to Dr. Engstrom's ecological regression analysis)

a) It was not lack of white voter support that prevented Ms. Lewis-Caulton from being re-elected

b) Had Ms. Lewis-Caulton received the kind of Hispanic voter support has had Mr. Santaniello, Mr. Foley, and Ms. Moriarty, she would have been elected (according to Dr. Engstrom's ecological regression analysis)

c) There is evidence that Hispanic and African American turn-out was proportionately (and significantly) less than white turn-out

d) Ms. Lewis-Caulton's candidacy would have been advanced had she received the same kind of African American support that she received in 2003

e) It was not lack of white voter support that prevented Mr. Tosado from being elected. Had Mr. Tosado received a similar proportion of Hispanic support as the African American support received by Mr. Williams and Ms. Lewis-Caulton, he would have won

f) It was not lack of white voter support that prevented Mr. Rucks from being elected. Mr. Rucks' candidacy would have been advanced had he received the same kind of cohesive African American support that Mr. Williams and Mr. Lewis-Caulton received (according to Dr. Engstrom's ecological regression analysis). Mr. Rucks received little Hispanic support; indeed, Mr. Rucks received significantly less Hispanic support than white support (according to Dr. Engstrom's ecological regression analysis)

g) Since Mr. Stokes was not a candidate strongly preferred by African Americans, white bloc voting cannot be attributed to his loss. Fewer than 50 percent of the African American voters cast ballots for Mr. Stokes (according to Dr. Engstrom's ecological regression analysis). Mr. Stokes

received little Hispanic support – less Hispanic support than white support (according to Dr. Engstrom's ecological regression analysis)
h)  It was not lack of white voter support that prevented Mr. Cortes from being elected. Mr.Cortes' candidacy would have been advanced had he received the same kind of cohesive support from Hispanic voters as Mr. Williams and Mr. Lewis-Caulton received (according to Dr. Engstrom's ecological regression analysis)  from African American voters
i)  Mr. Cortes received little Hispanic support; indeed, Mr. Cortes received significantly less African American support than white support (according to Dr. Engstrom's ecological regression analysis)

*1999; City Council*
95) In 1999, blacks won two seats on the City Council, as close to proportional representation as one could come.  (They were 19.6 percent of the voting-age population and won 22.2 percent of the seats.)  These two black winners attracted substantial support from whites (38.7 percent for Mr. Williams and 30.2 percent for Ms. Lewis-Caulton). Ms. Lewis-Caulton, though, had virtually no Latino support (a mere 10.5 percent).[36]  According to the ecological regression analysis conducted by Dr. Engstrom,  both Mr. Williams and Ms. Lewis-Caulton were the candidates of choice of and was cohesively supported by African American voters

96) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Williams was the candidate of choice and cohesively supported by African American voters.  In addition, a sufficient number of white voters supported Mr. Williams to guarantee his election.

a) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Williams received 93.3 percent of the African American vote
b) According to the ecological regression analysis conducted by Dr. Engstrom of the 1999, 2001, 2003, and 2005 election, the 1999 election was the only election in which Mr. Williams was estimated to have received less than 95 percent of the African American vote
c)  According to the ecological regression analysis conducted by Dr. Engstrom,  Mr. Williams received 38.7 percent of the white vote
d) According to the ecological regression analysis conducted by Dr. Engstrom,  in 2001 Mr. Williams received  10 percentage points greater proportion of the white vote than he did in 1999; 3 percentage points smaller proportion  of the  white vote than he did in 2003; and 4.5 percentage points smaller proportion of the white support than he did in 2005
e)  According to the ecological regression analysis conducted by Dr. Engstrom and assuming that African Americans constituted at least 17 percent of the registered voters in the 1999 election, Mr. Williams received 1.6 times more white vote than African American vote

97)  According to the ecological regression analysis conducted by Dr. Engstrom, Plaintiffs' expert, Ms. Lewis-Caulton was the candidate of choice of and was cohesively supported by African American voters; she received significantly more support from white voters than from Hispanic voters

---

[36] Engstrom report, Table 1.

55554  ver. 3

a) According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Lewis-Caulton received 106.4 percent of the African American vote

b) According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Lewis-Caulton received 13.3 percentage points more African American vote than did Mr. Williams, even though Mr. Williams received 1.2 percentage points greater proportion of the Ward 4 vote and 15.5 percent greater proportion of the Ward 3 vote than Ms. Lewis-Caulton

c) According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Lewis-Caulton received 10.1 percentage points more African American vote in 1999 than she did in 2001; 3.1 percentage points more African American vote in 1999 than she did in 2003

d) According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Lewis-Caulton received 30.2 percent of the white vote

e) According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Lewis-Caulton received 8.5 percentage points less white support than Mr. Williams received

f) According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Lewis-Caulton received 5.5 percentage points more white support in 2001 than she did in 1999; 4.3 percentage points more white support in 1999 than she did in 2003

g) According to the ecological regression analysis conducted by Dr. Engstrom and assuming that African American persons constituted at least 17 percent of those who turned out to vote, Ms. Lewis-Caulton received more white votes than African American votes

98) There were no Hispanic candidates in the 1999 city council race. But the only two contestants who got the backing of a majority of Latinos—Foley and Santaniello—both won. Indeed, every candidate who got more than 36.5 percent of the Hispanic vote was actually elected. The 1999 election results, therefore, provide no support for the claim that white voters exercised a "veto" over the choices of black or Latino residents. Both black candidates won, giving them a proportional share of the seats. And no candidate preferred by as many as 36 percent of Latino voters failed to win.

c) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Williams received 43.1 percent of the Hispanic vote

d) According to the ecological regression analysis conducted by Dr. Engstrom of the 1999, 2001, 2003, and 2005 election, the 1999 election was the only election in which Mr. Williams was estimated to have received more than 30 percent of the Hispanic vote

c) According to the ecological regression analysis conducted by Dr. Engstrom of the 1999, 2001, 2003, and 2005 election, the 1999 election was the only election in which Mr. Williams was estimated to have received more Hispanic vote than white vote

d) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Williams received less Hispanic vote than did the six white incumbents

e) According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Lewis-Caulton received only 10.5 percent of the Hispanic vote

f) In the 1999 election contest, Ms. Lewis-Caulton receives less Hispanic vote than did every other candidate – including Ms. Garde, who withdrew, and Ms. Walsh, who conducted a write-in campaign

g) According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Lewis-Caulton received .5 percentage points more Hispanic support in 2001 than she did in 1999; 6.9 percentage points more Hispanic support in 1999 than she did in 2003

h) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Foley received 57.4 percent of the Hispanic vote and was a candidate of choice of Hispanic voters
i) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Santaniello received 50.8 percent of the Hispanic vote and was a candidate of choice of Hispanic voters
j) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Sarno received 48.8 percent of the Hispanic vote and therefore was the third preferred candidate of Hispanic voters
k) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Puppolo received 47.0 percent of the Hispanic vote and was a candidate of choice of Hispanic voters
l) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Kelly received 46.6 percent of the Hispanic vote
m) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Ryan received 43.6 percent of the Hispanic vote

99)    Since both of the minority candidates were elected, the 1999 election contest provides no evidence that the current method of electing members to the City Council does not provide to minority persons a reasonable opportunity to elect candidates of choice

100)    Rather than preventing the election of candidates of choice of minority voters, predominately non-Hispanic white wards and/or white voters have supported and otherwise enabled the election of the Black/African American candidates supported by African American voters (according to Dr. Engstrom's ecological regression analysis)

101)    Rather than preventing the election of candidates of choice of minority voters, predominately non-Hispanic white wards and/or white voters have supported and otherwise enabled the election of the white candidates (Mr. Foley and Mr. Santaniello) cohesively supported by Hispanic voters (according to Dr. Engstrom's ecological regression analysis)

*In sum, 1999-2005 City Council contests*
102)    The problem that minority candidates in Springfield most need to worry about, this evidence suggests, is not a veto of their candidacy by whites voting as a bloc. Dr. Engstrom's analysis clearly reveals that whites do not vote as a bloc in opposition to minority or minority-preferred candidates. In these four elections, the minority candidates with the strongest backing within their own communities typically won the votes of 35-40 percent of the whites who went to the polls. Indeed, in 2001 Mr. Williams came close to capturing majority support among whites, garnering the support of 48.7 percent of them.
103) Dr. Engstrom's tables also suggest that white cohesiveness behind white candidates for the council has been declining in recent years. In 1999, 3 white candidates got more than 60 percent of the white votes, and 4 more between 50 and 60 percent. In 2001, 8 white candidates got over 60 percent. In 2003, though, just one white in the race won over 60 percent, with another 5 receiving between 50 and 60 percent. In 2005, only one white exceeded the 60 percent mark and barely so at that (Sarno with 60.5 percent ). And just 3 more fell between 50 and 60 percent; they were at the bottom of that bracket, with 50.5, 52.1, and 52.2 percent. This is particularly striking because in 2005 only six white candidates were in the field, so each could have gotten 100 percent support from whites. This decline in white cohesiveness mirrors what was happening in the minority

communities at the same time, with one candidate getting strong backing but none of the other minority candidates getting close to half of the vote of their ethnic compatriots.

*2005; School Committee*
104) In 2005, the African American incumbent, Ms. Hurst, was the top vote-getter in the field, with apparent unanimous support from blacks and from nearly half of white voters. Latinos alone were unreceptive to her candidacy. Both Hispanics in the race went down to defeat. But Mr. Santiago would have ended up in third place, and hence have won, had he gotten a mere 164 more votes than he did. If he had gotten the same share of the Latino vote in that race as Mr. Tosado won in that year's City Council race (76.4 percent), as opposed to the 66.9 percent he did receive, he likely would have won.[37] The other Hispanic running, Mr. Davila, had only a weak majority of Latinos behind him, and considerably less support than Santiago did from both whites and African Americans.

105) According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Hurst was the candidate of choice of and cohesively supported by African American voters; she also received significant white support

a) According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Hurst received 110.6 percent of the African American vote
b) According to the ecological regression analysis conducted by Dr. Engstrom, no other candidate received more than 30.1 percent of the African American vote
c) According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Hurst received significantly more white vote (45.8 percent) than Hispanic vote (23.5 percent)
d) According to the ecological regression analysis conducted by Dr. Engstrom and assuming that African American voters constituted at least 17 percent of those persons who turned out to vote in the November 2005 election, Ms. Hurst received approximately 1.7 percent more white votes than African American votes.

106) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Santiago was the candidate preferred by Hispanic voters but did not receive the same proportion of Hispanic support as did Mr. Tosado

a) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Santiago received 66.9 percent of the Hispanic vote
b) While Mr. Santiago was, therefore, the candidate most preferred and cohesively supported by Hispanic voters, he received 11.5 percentage points less Hispanic vote than did Mr. Tosado
c) According to the ecological regression analysis conducted by Dr. Engstrom, 33.1 percent of Hispanic voters did not use one of their three votes to support Mr. Santiago, one of two Hispanic candidates for School Committee
d) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Santiago received 33.2 percent of the white vote

---

[37] Gumersindo Gomez, one of the named Plaintiffs in this case, was quoted in the local newspaper as attributing Mr. Santiago's narrow defeat solely to "the Latino community's lackluster participation in elections"; Natalia Munoz, "Drive Aims to Up Latino Voting," Union News, March 26, 2006.

e) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Santiago received a smaller proportion of the African American vote (30.1 percent) than white vote
f) Mr. Santiago received only 1 percentage point less white support than did Mr. Williams who placed sixth as among City Council candidates

107) According to the ecological regression analysis conducted by Dr. Engstrom, while Mr. Davalia was a candidate preferred by more than a majority of the Hispanic voters, he did not receive the Hispanic support that Mr. Santiago received

a) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Davilia received 56.2 percent of Hispanic support, even though he only received 45.6 percent of the Ward 1 vote and 34.9 percent of the Ward 3 vote
b) Even assuming the accuracy of Dr. Engstrom's analysis, 43.8 percent of Hispanic voters did not cast one of their three ballots for Mr. Davilia, one of two Hispanic candidates for School Committee
c) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Davilia received more support from white voters (24.2 percent) than he received from African American voters (21.6 percent).
d) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Davilia received less African American and white support than did Mr. Santiago

108) According to Dr. Engstrom's ecological regression analysis and assuming that at least 19 percent of the voters at the 2005 election were Hispanic, had Mr. Rodgers not received minority (predominately Hispanic) voter support he would not have placed third among the five candidates and would not have defeated Mr. Santiago.  Likewise, assuming that at least 19 percent of the voters at the 2005 election were Hispanic, had Mr. Shea not received such significant minority voter support he, too, may not have received more votes than did Mr. Santiago

109) It, further, does not appear to have been necessary for Hispanic voters to forego supporting Mr. Davalia in order to assure Mr. Santiago's success

110) According to the ecological regression analysis conducted by Dr. Engstrom and the official election returns, lack of white support was not the cause of Mr. Santiago's failure to be elected to School Committee

a) Mr. Santiago would have been elected had he garnered as much cohesive Hispanic support as had Mr. Tosado
b) Mr. Santiago would have been easily elected had he garnered as much cohesive Hispanic support as the proportion of African American support received by Mr. Hurst and Mr. Williams
c) Mr. Santiago would have been elected had a greater proportion of Hispanic voters turned out to vote

111) According to the ecological regression analysis conducted by Dr. Engstrom and the official election returns, lack of white support was only one of the causes of Mr. Davalia's failure to be elected to School Committee

a) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Davilia was not strongly supported Hispanic voter. If, however, Dr. Engstrom has slightly overestimated Mr. Davilia's support, he would not have been the candidate preferred by Hispanic voters.
b) Mr. Davalia's candidacy would have been enhanced had he garnered as much cohesive Hispanic support as had Mr. Tosado
c) Mr. Davalia would have been elected had he garnered as much cohesive Hispanic support as the proportion of African American support received by Mr. Hurst and Mr. Williams
d) Mr. Davalia's candidacy would have been enhanced had a greater proportion of Hispanic voters turned out to vote

112) Rather than preventing the election of candidates of choice of minority voters, predominately non-Hispanic white voters have supported and otherwise enabled the election of the Black/African American candidate (Ms. Hurst) who was cohesively supported by African American voters(according to Dr. Engstrom's ecological regression analysis).
113) White bloc voting did not prevent the election of the African American candidate (Ms. Hurst) preferred by African American voters.

*2003; School Committee*
114) In 2003, Mr., McCollum ran once again (having run for School Committee and lost in 1999 and won in 1991 and 1995), but came in fourth in a race in which only the top three win. He was backed overwhelmingly by African Americans once again, and got over a third of the white vote as well, up 5 points over his previous run. But his support from Latinos plunged from 23.7 percent to a mere 7.3 percent. The one Latino candidate had strong but far from overwhelming backing from his own community (66.6 percent) but very little from other groups.

115) According to the ecological regression analysis conducted by Dr. Engstrom, , Mr. McCollum was the candidate of choice of and cohesively supported by African American voters

a) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. McCollum received 95.3 percent of the African American vote
b) According to the ecological regression analysis conducted by Dr. Engstrom, no other candidate received more than 35 percent of the African American vote
c) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. McCollum received significantly more white vote (34.3 percent) than Hispanic vote (7.3 percent)
d) According to the ecological regression analysis conducted by Dr. Engstrom and assuming that African American voters constituted at least 17 percent of those persons who turned out to vote in the November 2005 election, Mr. McCollum received approximately 1.4 percent more white votes than African American votes.

116) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Davilia was a candidate preferred by more than a majority of the Hispanic voters

a) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Davilia received 66.6 percent of Hispanic support – 10.4 percentage points more than Dr. Engstrom estimated that he received in 2005

b) According to the ecological regression analysis conducted by Dr. Engstrom, even though Mr. Davilia was the only Hispanic candidate for School Committee, 33.4 percent of the Hispanic voters did not cast one of their three votes for Mr. Davilia, the only Hispanic candidate running for School Committee

c) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Davilia received 8.8 percentage points more support from African American voters in 2005 than he received in 2003 (12.8 percent).

d) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Davilia received 15.8 percentage points more white support in 2005 than he did in 2003 (8.4 percent).

117) Limited or single-shot voting could have been used by African American persons to enhance Mr. McCollum's bid for re-election.  According to Dr. Engstrom's ecological regression analysis, Mr. McCollum would have been re-elected had African American voters not provided Ms. Murphy and Ms. Pepe with as much support (28.7 percent and 34.4 percent) as he estimated that they received

118) According to the ecological regression analysis conducted by Dr. Engstrom and the official election returns, it would not have been necessary for more white persons to support Mr. McCollum in order to support his re-election.  Rather, greater turn-out and more political cohesion among African American voters would have provided for Mr. McCollum's re-election, as well as greater Hispanic support and turnout would have provided for Mr. McCollum's re-election

119) According to the ecological regression analysis conducted by Dr. Engstrom and the official election returns, lack of white support was only one of the causes of Mr. Davilia's failure to be elected to School Committee

a) Mr. Davilia's candidacy would have been enhanced had he garnered as much cohesive Hispanic support as had Mr. Tosado received

b) Mr. Davilia candidacy would have been enhanced had he garnered as much cohesive Hispanic support as the proportion of African Americans who supported  Mr. McCollum

c) Mr. Davilia's candidacy would have been enhanced had a greater proportion of Hispanic voters turned out to vote

d) Mr. Davilia's candidacy would have been enhanced had a greater proportion of African Americans supported him

*2001; School Committee*

120) In 2001, the incumbent black member of the School Committee, Ms. Hurst, won reelection. Almost 43 percent of whites backed her, but only 18.4 percent of Latinos.  The other African American in the race, Ms. Parker, got less than 60 percent backing from blacks and very little from either whites or Latinos. There were no Latino candidates

121)  According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Parker was preferred by more than a majority of the African American voters

a)  According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Parker received 59.6 percent of the African American vote, even though she received only 37.5 percent of

the Ward 4 vote and 24.1 percent of the Ward 3 vote and 24.3 percent of the Ward 5 vote and did not receive more than 50 percent of the vote in any precinct

b) Even assuming that Dr. Engstrom's estimations are accurate, 40.4 percent of the African American voters did not cast one of their three ballots for Ms. Parker one of only two African American candidates for School Committee

c) According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Parker received 45.9 percentage points smaller proportion of the African American vote than did Ms. Hurst

d) According to the ecological regression analysis conducted by Dr. Engstrom, Ms. Parker received marginally more white vote (13.0 percent) than Hispanic vote (12.3 percent)

122) Rather than preventing the election of candidates of choice of minority voters, predominately non-Hispanic white wards (white voters) have supported and otherwise enabled the election of the Black/African American candidate most preferred by African American voters (according to Dr. Engstrom's ecological regression analysis)

a) It was not lack of white voter support that prevented Ms. Parker from being elected.   Ms. Parker's candidacy would have been advanced had she received the same kind of cohesive African American support that Ms. Hurst received (according to Dr. Engstrom's ecological regression analysis).

b) In addition, there is evidence that Hispanic and African American turn-out was proportionately (and significantly) less than white turn-out.

c) There is some evidence that Dr. Engstrom over-estimated Ms. Parker's support and she, therefore was not a candidate who received a majority of the African American vote; accordingly white bloc voting was not the cause of Ms. Parker's loss

*1999; School Committee*
123)  In 1999, one Latino and one black candidate were in the field vying for the three seats to be filled at that election.  The Latino, Mr. Tosado, won, with 79 percent backing from Hispanics and 38 percent support from whites. Black voters were rather cool towards this minority candidate, supporting him at a distinctly lower level (8.3 points less) than whites did.

124)  According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Tosado was the candidate preferred by Hispanic voters

a)  According to the ecological regression analysis conducted by Dr. Engstrom, , Mr. Tosado received 79.0 percent of the Hispanic vote

b)  According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Tosado received 29.7 percent of the African American vote

c)  According to the ecological regression analysis conducted by Dr. Engstrom, Mr. Tosado received 38.0 percent of the white vote

d)  According to the ecological regression analysis conducted by Dr. Engstrom and assuming that Hispanic voters constituted at least 19 percent of those persons who turned out to vote in the November 2005 election, Mr. Tosado received more white votes than Hispanic votes.

125)  The only African American in the race, Mr. McCollum, lost, despite the fact that he was a long-term incumbent. Why he lost is unclear. Since Dr. Engstrom regrettably did not analyze the

**DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY**
**DR. STEPHAN THERNSTROM, DEFENDANTS' EXPERT WITNESS**
**PART 3 OF 5**

earlier elections in which he was the winner, we do not know the level of his previous support from the city's racial groups. But virtually all African Americans voted for him in 1999, compared with only 29.3 percent of whites and even fewer Latinos. Since black support could not have been any higher in his previous winning campaigns, he must have lost votes from whites, Latinos, or both. It is hard to see this loss as racially motivated; his race had not changed since the earlier elections that he won. The obvious new factor at work is that Mr. McCollum had gotten a great deal of bad publicity in the local press, over issues too complex and murky to go into here.[38] His loss, in any event, did not deprive African Americans of representation on the School Committee. There already was a black member of the board, elected to a four-year term in the previous election.

126) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. McCollum was the candidate of choice of and cohesively supported by African American voters

a) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. McCollum received 100.8 percent of the African American vote – 5.5 percentage points more African American vote than he received in 2003

b) According to the ecological regression analysis conducted by Dr. Engstrom, no other candidate in the 1999 School Committee contest received more than 30 percent of the African American vote

c) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. McCollum received 29.3 percent of the white vote in 1999 – 5 percentage points smaller proportion of the white vote than Mr. McCollum received in 2003

d) According to the ecological regression analysis conducted by Dr. Engstrom, Mr. McCollum received 23.7 percent of the Hispanic vote in 1999 – 16.4 percentage points greater proportion of the Hispanic vote than Mr. McCollum received in 2003

e) According to the ecological regression analysis conducted by Dr. Engstrom and assuming that African American voters constituted at least 17 percent of those persons who turned out to vote in the November 2005 election, Mr. McCollum received more white votes than African American votes.

127) Robert McCollum's election history began in 1987 when he ran for City Council, placing fifteenth among 18 candidates. He was not alone in this frustrated first attempt, Anthony Ravosa, William Boyle, and Antonette Pepe ran for the first time in 1987 and likewise were not successful, but would be successful in subsequent forays into Springfield politics.

128) In 1989, both Mr. Robert McCollum and Ms. Marjorie Hurst ran for the first time for the School Committee. Ms. Hurst placed fourth and Mr. McCollum placed fifth as among five candidates for School Committee. Two incumbents were re-elected: Allene Begley Curton (first elected in 1985) and Kenneth Shea, who was also first elected in 1985, after an unsuccessful attempt in 1981.

---

[38] The issues included a question about the propriety of his taking home a computer belonging to the School Department and his holding what the press described as "a fancy last-minute fund-raiser that likely set a record in municipal politics with a $500 entry fee"; Mary Ellen O'Shea, "Computer Policy Adopted," Union-News, May 6, 1997; Mary Ellen O'Shea, "At $500 a Head, McCollom Fans Turn Out," Union-News, October 27, 1999.

129) Mr. McCollum was elected to the School Committee in 1991, placing third among five candidates. In the 1991 election contest, an African American and a white incumbent competed against three non-incumbents.

a) One of the incumbents, Candace Early Lopes (African American), who was elected in 1987, placed fourth in the 1991 School Committee contest.
a) In 1991, Mr. McCollum received 47.1 percent of the total vote in that election – 13 percentage points greater proportion of the total vote than he had received in 1989. Indeed, Mr. McCollum received 6,911 more votes in 1991 than he had in 1989
b) In 1991, Mr. McCollum received the greatest proportion of the ward vote (51.7 percent) from Ward 7. Mr. McCollum also received the greatest number of votes from Ward 7, in which the 1990 Census reported that 5.6 percent of the population was African American.
c) Ward 7 votes represented 22.9 percent of Mr. McCollum's total vote in 1991. Mr. McCollum received 12.5 percentage points more Ward 7 vote in 1991 than in 1989 and 1,477 more Ward 7 votes in 1991 than he received in 1989

130) In 1995, Mr. McCollum was re-elected in an election in which 4,095 more voters cast ballots than in 1991. All three incumbents were re-elected and an African American challenger placed fifth among five voters, receiving only 23.1 percent of the vote. In 1995, Mr. McCollum received 48.5 percent of the total vote in that election – 1.4 percentage points greater proportion of the total vote than he had received in 1991. Likewise, Mr. McCollum received 2,450 more votes in 1995 than he had in 1991

*In sum, voting patterns in Springfield*
131) A few generalizations emerge from this narrative. First, Latinos in Springfield are distinctly less cohesive than African Americans.

132) In addition, Blacks and Hispanics are not cohesive with each other in Springfield. If anything, they are more distinct from each other in their political preferences than whites are from either group. Plaintiffs seek to obscure this unmistakable reality in their artful discussion of "crossover voting among Hispanic and African American voters."[39] "At times," they inform us, "Hispanic candidates have garnered significant crossover support from African American voters…. Likewise, at times, African American candidates for City Council have received crossover support from Hispanic voters." Well, yes. We could also say accurately that the weather in Springfield in January is "at times" quite mild. But only rarely, and almost never in comparison with the weather in Miami or San Diego. The question to me is how the level of crossover voting between African Americans and Latinos compares to the level of voting across racial lines by whites.

133) A quick review of the eight elections analyzed by Dr. Engstrom will provide the answer. These elections together had 18 black candidates in the field. Latinos gave *less support than whites did for 17 of these 18* African American contenders. Fewer comparisons can be made between the levels of black vs. white support for Latino candidates, because not as many Hispanics have run for these bodies. But *in 8 of the 11 cases, Latinos won a higher share of the*

---

[39] Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction, 15-16.

*white vote than of the black vote.*[40] From this point of view, it seems somewhat anomalous that this complaint has been brought by parties who claim to represent the interests of both the African American and Latino residents of Springfield. The evidence on voting behavior provided by Plaintiffs' own expert suggests that these two racial communities appear to be adverse parties in fact.

134) Finally, the level of white political cohesion behind particular candidates does not strike me as very high, and seems to be declining over time. There were many instances in which anywhere from a third to almost half of whites cast a ballot for a minority candidate. Furthermore, the defeat of minority candidates in these elections was never the simple result of white bloc voting against them. Losers typically had less than overwhelming backing in their own communities, and also had less support from the other non-white group than from whites. If the correct standard to use in judging the magnitude of white racial bloc voting is that it is consistently high enough "*to defeat minority-preferred candidates time and again,*" the record shows that this was not characteristic of recent elections in Springfield. As I have already suggested, it is doubtful that the concept of white bloc voting even applies in settings in which whites are only a plurality of the voting age population, and lack the demographic weight to veto minority-preferred candidates whenever they wish to.

Rebuttal and Rejoinder

135) In his rebuttal, Dr. Engstrom objects to my criticism of the loose use of the concept of "racial polarization"—the notion that two racial groups are politically "polarized" if their voting patterns are not identical.[41] I have never seen cross-tabulations of voting behavior by social characteristics that did not reveal differences in every indicator. Dr. Engstrom, though, vigorously denies that "race is just another social cleavage." He quotes approvingly other investigators who conclude that "the racial divide in political aspirations and demands is really racial."

136) Dr. Engstrom and I have a very different understanding of American history. I think that he has succumbed to a certain racial mysticism. Of course there are sharp black-white differences in political preferences that are not reducible simply to "differences in income, or educational attainment or anything else." But it is also true that there are many religious, regional, family status, and age differences that are not reducible to social class either. Jews do not vote the same way as Mormons, even when they are of identical socioeconomic status. Following Dr. Engstrom's logic, we would have to conclude that religious differences are "really" religious. And regional differences are "really" regional, because they are not reducible to "differences in income, or educational attainment or anything else." Who knew?

137) Furthermore, the current highly distinctive political behavior of African Americans is not unique, nor has it always been so distinctive. African Americans were 90 or more percent Republican until the New Deal. From the late 1930s to 1964 they leaned Democratic, but not very strongly. Just 61 percent voted Democratic for President in 1956, and 70 percent in 1960.[42] Since

---

[40] It is not clear how many of these differences are statistically significantly. Unfortunately, and somewhat strangely, Dr. Engstrom applied t-tests to only the black-white and Latino-white differences and ignored the black-Latino differences discussed here.

[41] Engstrom Rebuttal Report, ¶19 and 20.

[42] Thernstrom, *America in Black and White*, 124.

1964, roughly nine out of ten blacks have pulled the Democratic lever. This, though, does not establish that race is a social characteristic unlike any other. Irish Catholics, after all, were just as heavily Democratic from the 1850s to the 1960s as blacks are today.

138) Perhaps more important, Dr. Engstrom seems to be living in a biracial, black-white political universe that may exist in his city of residence, New Orleans, but surely does not in Springfield, Massachusetts. The dynamic demographic group in Springfield is the Latinos, and the fundamental issue in this case is whether a districted system of electing the city council and school committee would help to empower Hispanics. Yet Latinos are not a "race," and they are not treated as such by the federal government. They are officially classified as an "ethnic group" both by the Census Bureau and the Office of Management and Budget, whose Directive #15 sets forth the official racial and ethnic classifications that must be used by all federal agencies in compiling data. On the U.S. Census, the distinction between race and ethnicity is adhered to strictly. The race question on the census forms does not give respondents the opportunity to declare themselves to be of Hispanic, Latino, Mexican-American, Cuban "race." Glance at any of the dozens of tables with data about Hispanics in the *Statistical Abstract of the United States* and you will see that every one of them includes a footnote saying "persons of Hispanic/Latino origin may be of any race." Indeed, 48 percent of the people who identified themselves as Hispanic on the 2000 Census reported that their race was white, and that is an underestimate because of the poor construction of the race and Hispanic identity questions.[43]

139) More to the point in a voting rights case, Latinos are not politically monolithic, and their political leanings are currently closer to those of whites than to those of blacks. President Bush, for example, got as much as 44 percent of the Hispanic vote in 2004. Latino partisan preferences have been highly variable in recent decades, with the percent voting for a Democratic presidential candidate ranging from lows of 56 percent in 1980 and 2004 to a high of 72 percent in 1996.[44] The Latino vote is up for grabs in a way that the black vote is certainly not. Thus it would be hard to argue that the political behavior of Latinos is "really racial."

140) Finally, Dr. Engstrom devotes several paragraphs to our differing interpretations of recent elections in Springfield. I must express my surprise at a novel and dismaying argument that he now advances. How would these elections have turned out, he asks, if only black or if only Latino votes were counted? This seems to me a bizarre criterion to introduce into the argument. I cannot claim legal expertise, but I have never heard of a voting rights case in which plaintiffs contended that the legal standard by which to judge vote dilution was whether or not the outcome of an election would have been different if three separate elections—one for whites only, one for blacks, and one for Latinos—had been held instead. This is certainly not what the framers of the Voting Rights Act had in mind. It would be a gross perversion of a law designed to end political

---

[43] U.S. Bureau of the Census, *Overview of Race and Hispanic Origin, 2000*, 2000 Census Brief (March 2003), 10. For an explanation of why the census race question is framed in a manner that underestimates the number of Latinos who regard themselves as white, see Stephan Thernstrom, "American Ethnic Statistics," in Donald L. Horowitz and Gerard Noiriel, eds.,*Immigrants in Two Democracies; French and American Experience* (New York University Press, 1992), 100,110.

[44] David Leal *et.al.*, "The Latino Vote in the 2004 Election," *PSOnline*, <www.apsanet.org>, 41. Leal argues that the 44 percent estimate, derived from exit polls, is substantially biased upward. Even if true, it contrasts radically with the pattern for African Americans.

segregation to interpret it as requiring a new form of political segregation, with "reserved seats" for each group.

**Totality of the Circumstances**

141) I now turn to the "Senate factors" that are to be considered in judging whether the "totality of circumstances" in this case suggests that the electoral system employed by the City of Springfield violates the Voting Rights Act.

***The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process.***

142) The Voting Rights Act was initially enacted in 1965 because southern states then had a long history of deliberately depriving their African American citizens of the right to vote and to hold public office. Keeping blacks from political power was the cornerstone of an elaborate edifice of public policies designed to keep African Americans separate from and subordinate to whites. In voting rights litigation in southern jurisdictions today, there can be no argument about the existence of a history of official discrimination that kept people from the polls on the basis of their race. The history is clear, and the issue is whether the effects of that historical pattern continue to warp the politics of the community.

143) The city of Springfield is a political subdivision of the Commonwealth of Massachusetts. Any appraisal of its treatment of minority citizens must begin with a general comment about the historical role of Massachusetts in the struggle for racial equality. During the American Revolution, the Commonwealth of Massachusetts became the first of the states to abolish slavery, by a decision of the Supreme Judicial Court in 1780. Furthermore, unlike most states in the decades before the Civil War (even those in the North), Massachusetts never had any racial restrictions upon the franchise. On the eve of the Civil War, it was one of only six of the 31 states then in the Union that allowed blacks to vote.[45] In addition, in 1855 the Massachusetts legislature enacted a law barring public schools from using race or religion as a basis for admitting students, the "first state statute to outlaw racially discriminatory practices at a state institution."[46] Massachusetts again led the nation as the first to make racial discrimination in public places illegal, in 1865.[47]

144) The Commonwealth continued to be among the nation's leaders in more recent civil rights struggles. In 1946 it created the Massachusetts Commission Against Discrimination, just a year after New York State established the nation's first powerful public agency devoted to eradicating racial discrimination in employment. Within a few years, the jurisdiction of the MCAD was extended to cover discrimination in education as well as employment.[48] Massachusetts again was the first in the nation to enact a law designed to eliminate racial imbalance in the public schools, in 1965. The Commonwealth continues to spend substantial sums to support programs designed to promote racial integration in the schools, including large-scale city-to-suburb busing programs in Springfield and in Boston.

---

[45] Alexander Keyssar, The Right to Vote: The Contested History of Democracy in the United States (Basic Books, 2000), Tables A.4 and A.9.
[46] Nathan Glazer and Reed Ueda, "Prejudice and Discrimination, Policy Against," in Stephan Thernstrom, ed., Harvard Encyclopedia of American Ethnic Groups (Harvard University Press, 1980), 849.
[47] Ibid., 852.
[48] Ibid., 854.

145) Massachusetts and/or the City of Springfield have enacted no laws--as were enacted in Alabama--restricting voter assistance (established in 1893 and abolished in 1988, Harris v. Siegelman, 695 F. supp. 517 (M.D. Ala. 1988)); no literacy tests, no voucher system (established in 1901 and abolished in 1965 by the Voting Rights Act); long residency requirements (established in 1901 and abolished in 1972, Dunn v. Blumstein, 405 U.S. 330 (1972)); no petty crime provision (established in 1901 and abolished in 1985, Underwood v. Hunter, 730 F.2d 614 (11th Cir. 1984) aff'd 471 U.S. 222 (1985)); no white primaries (established in 1902 and abolished in 1944, Smith v. Allwright, 321 U.S. 649 (1944)); no unfettered registrar discretion in judging applicant's interpretation of state and federal constitutions (established in 1946 and abolished in 1949, Davis v. Schnell, 81 F. Supp. 872 (S.D. Ala. 1949) aff'd 336 U.S. 933 (1949)); and provided for no court prepared educational tests (established in 1951 and abolished in 1964, a variety of cases brought against counties in Alabama)

146) Massachusetts and/or the City of Springfield have enacted no laws, rules, or regulations – as were enacted in Georgia – making payment of taxes a prerequisite to vote (established in 1868 and abolished in 1931 by Georgia law); providing for long durational residency requirements (enacted in 1868, lengthened in 1873 and abolished in 1972 , Abbot v. Carter, 356 F. Supp. 280 (N.D. Ga. 1972); requiring grand jury appointment of the school board (established in 1872 and abolished gradually by local referendums in individual counties – 1992 statewide); providing for white primaries (established by white primaries and abolished in 1945, King v. Chapman, 62 F. Supp. 639 (M.D. Ga. 1945); establishing disenfranchising offenses (established in 1877 and upheld in Kronlund v. Honstein, 327 F. Supp. 71 (N.D. Ga. 1971); requiring registration by race (established in 1894 and still required); providing for literacy, good character and understanding tests (established in 1908 and abolished in 1965 by the Voting Rights Act); including a "grandfather clause" restricting registration (established in 1908 and abolished in 1915 by Georgia law); requiring property ownership (established in 1908 and abolished in 1945 by Georgia law); establishing a county unit system (established by party rules, late in the nineteenth century, by statute in 1917 and abolished in 1963, Gray v. Sanders, 372 U.S. 368 (1963); establishing a "thirty-question" test (established in 1949 and abolished by the Voting Rights Act in 1965; and finally majority vote and numbered vote requirement (established in the late nineteenth century as a local option, replaced by statute county and statewide in 1964, operative in municipalities in 1968 and still in use).

147) Massachusetts and/or the City of Springfield have enacted no laws, rules, or regulations – as were enacted in Mississippi – providing for a literacy test that required an applicant to be able to read and understand any section of the state constitution (1890); amended to read and write any section and give a reasonable interpretation (1955) (established in 1890 and abolished by the Voting Rights Act in 1965); mandating durational residence requirements: two years in the state and one year in the precinct, amended to one year in the state and six months in the precinct 1962 (initially established in 1890 and abolished in 1972 by Graham v. Waller, 343 F. Supp. 1 (S.D. Miss. 1972)(three-judge court)); requiring dual registration in county and with municipal clerk (established in 1892 and abolished in 1984, 1987 by Mississippi State Chapter, Operation PUSH v. Allain, 674 F. Supp. 1245 (N.D. Miss. 1987), aff'd 932 F.2d 400 (5th Cir. 1991); providing for white primaries (established in 1907 and abolished in 1947, Smith v. Allwright, 321 U.S. 649 (1944)); requiring party loyalty oaths (established in 1947 and abolished in 1987 by Mississippi legislature); requiring "citizenship understanding tests" (established in 1955 and abolished by the Voting Rights Act in 1965); prohibiting satellite registration (established in 1955 and abolished in

1965 by the Mississippi legislature in an effort to avoid coverage under Section 5 of the Voting Rights Act, 42 U.S.C. 1973c ("Section 5"); providing for a "good moral character" test (established in 1960 and abolished in 1965 by the Mississippi legislature in an effort to avoid coverage under Section 5; and requiring newspaper publication of names of applicants for registration and procedures for challenging the moral character of an applicant (established in 1962 and abolished in 1965 by the Mississippi legislature in an effort to avoid coverage under Section 5)

148)  Article 20 of the Amendments of the Massachusetts Constitution that provided, in part, that "[n]o person shall have the right to vote. . .who shall not be able to read the constitution in English language, and write his name. . . ." As of November 1, 1968, M.G.L. 51, Section 1, embodied this language requiring the same as a qualification to vote. While there was no evidence that this provision was used as a "test or device" and otherwise prevented persons from registering, who could not read English and write their name, the Attorney General, in accordance with Section 4(b) of the Voting Rights Act , as amended by the 1970 Amendments, determined that on November 1, 1968, Massachusetts had maintained a voting test or device as defined by Section 4(c) of the Voting Rights Act, 42 U.S.C. 1973c.

149)  The Massachusetts Legislature amended the State's election law eliminating the literacy requirements as a prerequisite to voting in any election conducted in the Commonwealth of Massachusetts, effective June 10, 1971. 1971 Mass. Acts 382, Section 1. In August of 1970, the Massachusetts Attorney General Francis X. Bellotti had "offered an opinion to the Secretary of State indicating that the Voting Rights Act's prohibition against the use of "tests and devices" had rendered Article 20 of the Amendment of the Massachusetts Constitution "no longer effective." Application of "this Article became effective" upon receipt. 1970/71Op. Atty. Gen. No. 5, Rep. A.G., Pub. Doc. No. 12 at 40 (1970).

150)  It was determined that fewer than 50 percent of voting age persons as determined by the United States Census, residing in the following towns had voted in the November, 1968 presidential election: Amherst, Ayer, Belchertown, Bourne, Harvard, Sandwich, Shirley, Sunderland, and Wrentham. As a result, only these towns in Massachusetts were "qualified" pursuant to 42 U.S.C. 1973b(c ), to be covered by Section 5 of the Voting Rights Act which required the maintenance of a test of device with respect to voting and less than 50 percent participation in the 1968 presidential contest.

a)  Massachusetts argued, with respect to the nine towns covered by Section 5, that the inclusion of institutional populations, "rather than discriminatory voting practices" accounted for the determination that less than 50 percent of the voting age population had cast a ballot in the 1968 presidential election.
b)  Pursuant to Section 5, on December 1976, Attorney General Bellotti submitted for preclearance all of the election law changes for the included towns (with the exception of Amherst, which retained private counsel) during the years 1968 through 1976. The United States Attorney General did not interpose an objection. Likewise in 1977, Attorney General Francis X. Bellotti submitted for Section 5 preclearance, on behalf of the Commonwealth and the included town (except Amherst) election law changes for 1977. Again the United States Attorney General interposed no objection. In 1981 on December 1976, Attorney General Bellotti submitted for

preclearance all of the election law changes for the included towns (with the exception of Amherst, which retained private counsel) during the years 1978 through 1980. The United States Attorney General did not interpose an objection.

151) When, in 1982 Congress amended the Voting Rights Act, extending the application of Section 5 for another 25 years, the State of Massachusetts on behalf of the towns of Amherst, Ayer, Belchertown, Bourne, Harvard, Sandwich, Shirley, Sunderland, and Wrentham filed suit on March 31, 1983, in the District Court of the District of Columbia for a determination that the state and included towns had not maintained a test or a device with the purpose or effect of denying or abridging the right of citizens to vote on account of race, color, or in contravention of the guarantees of the Voting Rights Act within 19 years preceding the filing of the action. Commonwealth of Massachusetts, et al. v. United States of America, C.A. No. 83-0945 (three-judge court). The three judge panel consisted of D.C. Circuit Judge J. Skelly Wright and District Court Judges  Harold Greene and Charles Richey.

152)  After Massachusetts' "bailout" action was filed, the United States Department of Justice, Civil Rights Division, Voting Section, undertook an investigation "to determine whether there was an indication that the literacy test authorized by Amended Article XX of the Massachusetts Constitution and M.G.L. Ch. 51, §§1, 44,. . .had been used in the nine towns during the 19 years preceding" and had the purpose or effect of denying or abridging the right to vote on account of race or color."  Declaration of Gerald W. Jones, Chief, Voting Section, Civil Rights Division, United States Department of Justice, Pursuant to 28 U.S.C. 1746.

a)  The investigation conducted by the Department of Justice involved numerous interviews with officials in the Secretary of State's office and the Attorney General's office, former and current town officials who have had responsibility for voter registration and the conduct of elections; "Black, Hispanic, Cape Verdian and other racial minorities" who were residents of the "covered" towns, and "persons who would be expected to hear about the registration and election problems faced by minorities, e.g., the League of Women Voters, military personnel, clergy, college and university personnel, legal services offices, civil rights groups, staff and members of the Civil Rights Commission, NAACP officials, and the Massachusetts Commission Against Discrimination."  Id. at 2.
b)  Chief Gerald Jones concluded that the "above interviews revealed no information indicating that a voting test or device, as defined under Section 4(c ) of the Voting Rights Act, has been used in the nine towns during the nineteen years preceding the filing of this action for the purpose or with the effect of denying or abridging the right to vote on account of race or color.  Similarly, a search of the Department of Justice files failed to reveal that any complaint has been received by the Department during the past nineteen years alleging racial discrimination in the registration or voting process in those nine towns."  Id. at 3.
c)  As a result, of the investigation, the United States Attorney General concluded that there was "no reason to believe that a voting test or devise within the meaning of Section 4(c ) of the Voting Rights Act of 1965, has been used in the nine towns during the nineteen years preceding the filing of this action for the purpose or with the effect of denying or abridging the right to vote on account of race or color."  Id.

153) On September 23, 1983, the three-judge court entered a judgment in favor of the Commonwealth of Massachusetts, et al., after Plaintiffs and Defendants filed a motion for judgment and order on the grounds that there was "no dispute as to the facts or law which form the basis of the requested relief." Order and Judgment, Commonwealth of Massachusetts, et al. v. United States of America, C.A. No. 83-0945, C.A. No. 83-0945 (D.C.D.C. September 23, 1983)(three judge court), at 2.

a) The Court concluded that the "covered" nine towns had maintained no test or device in violation of 42 U.S.C. 1973b(c ) with the purpose or having the effect of denying or abridging the right to vote on account of race or color within 19 years preceding the filing of the action.
b) The Court concluded that during the 19 year period preceding the filing of the action, no court of the United States had entered a "final judgment determining that any denials or abridgments of the right to vote on account of race or color have occurred in the nine towns through use of any test or device." Id. at 3
c) Accordingly, the Court suspended the application of Section 5 to the nine towns, but retained jurisdiction for five years after the date of the judgment. Id. at 4.
d) During the five years of jurisdiction of the D.C. District Court (three judge court), the United State Attorney General did not file any motion alleging that a test or device had been used in these names towns, for the purpose or with the effect of denying or abridging the right to vote on account of race or color. Id

154) Massachusetts thus has had no history of official racial discrimination that deprived its minority residents of the right to register, to vote, or to otherwise participate in the democratic process. And it does have a history of using the powers of government to protect minority citizens from discrimination. This is not to suggest that it has been a racial paradise. No American community fits that bill; indeed, no community in any multi-racial society in the world fits that bill.[49] But the purpose of this first Senate factor, as I understand it, is to distinguish political jurisdictions that historically did their best to deprive their minority residents of access to the democratic process from those that did not. Selma, Alabama, for example, clearly belongs in the former category. Equally clearly, Springfield does not.

155) Plaintiffs have submitted no persuasive evidence to support a claim that Springfield has a tainted history of official discrimination that limited the voting rights of minority residents. Casually dismissing what they term "old election data" as irrelevant, they have sought to obscure the clear record of black political success in Springfield from the late 1920s through the 1950s. How it could be true that discrimination against blacks deprived them of the right to participate in the political process when African Americans were more than proportionally represented on the Common Council for most of these years? They continued to be well represented on both the City Council and the School Committee thereafter.

156) Plaintiffs' efforts to establish that Springfield has a history of official discrimination touching on the right to vote are cursory at best. Virtually the only reference they provide to anything that happened in the community before 1961 is a newspaper article quoting a local black minister who complained in 1933 that "would-be office holders" showed "a certain eagerness" to

---

[49] On the pervasiveness of racial and ethnic friction around the globe, see Donald L. Horowitz's magisterial Ethnic Groups in Conflict (University of California Press, 1985).

"carry out favors" to impress black voters "just before election time," but after being elected did nothing about "elementary human rights denied us openly."[50] It is not clear what "elementary human rights" the minister had in mind. But this testimony is certainly <u>not</u> evidence of "official discrimination" that "touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." To the contrary. It clearly demonstrates that blacks were an integral part of the local political community, and that candidates eagerly solicited their votes.

157) An additional suggestive bit of historical evidence about the presence or absence of "official discrimination" by Springfield public officials in the period before the 1960s is an article a Springfield public school administrator published in a national education journal in 1943.[51] Called "A Community's Total War Against Prejudice," it reported that in 1939 the National Conference of Christians and Jews, a liberal organization devoted to religious and racial tolerance, asked the Superintendent of the Springfield Public Schools to launch a program "for the teaching of democracy in Springfield." He agreed enthusiastically, and thoroughly revamped the city's schools in an effort to "eradicate blind and intolerant attitudes" in the student body. Furthermore, since "many of the prejudices, biases, and undemocratic attitudes evident among the children" were "reflections of forces and factors outside the school, such as the home, the street, the club, and sometimes even the church," the program sought to " reach the parents and the adult world which conditioned the child's environment and thinking." This effort would today be called "multicultural education," education designed to show that American society is a complex ethnic and racial mosaic, and that all of its constituent parts deserved mutual respect and fair treatment. To reach beyond the school, the program sponsored public forums, a film series focused on the problems of "racial, religious, and economic minorities," adult evening classes focused on "social, economic, and political problems," and nonpartisan political meetings just before the November elections. In addition, it commissioned studies of "the social and economic conditions of the Negro population in Springfield" and of "the conditions of domestic workers employed in private homes," and used the School Placement Bureau to combat "discrimination in employment."

158) To determine the impact of this "total war on prejudice" would require far more research time than I have at present. It is obvious that no program in the public schools, even one that made strenuous efforts to reach the broader adult public, could completely eradicate deep-seated racial prejudices. But the question that Senate Factor #1 raises is not whether there was any prejudice and discrimination in the community—no city in the United States in the 1930s and 1940s would have had a completely clean bill of health on that score. The issue is whether the political jurisdiction whose voting practices are the subject of a voting rights complaint engaged in "official discrimination" that restricted the political opportunities of minority residents. Not only has no such evidence been presented. The existence of a public program billed as a "total war on prejudice" indicates that at least some Springfield public officials in those years were actively working to combat racial discrimination and advance the civil rights of African American members of the community, and were able to devote public resources to do so.

---

[50] "Hatred Still Haunts Many Lives" Minorities Face Bias Every Day," October 16, 1994 <u>Sunday Republican.</u>

[51] Alice L. Halligan, "A Community's Total War Against Prejudice," 16 <u>Journal of Educational Sociology</u> (February, 1943), 374-380.

159) It could be argued, of course, that feel-good social uplift efforts like these are feeble palliatives that amount to very little. But historian Walter Jackson has shown that the crusade against prejudice that was carried out by groups like the National Conference of Christians and Jews and the Progressive Education Association in the 1930s and 1940s did have clear positive effects. By 1945, roughly 300 organizations working to improve race relations had been formed in the United States; by 1950 the figure had jumped to more than 1,350. It is no coincidence that public opinion polling data from the period reveal that racially prejudicial attitudes in the nation were declining sharply well before *Brown v. Board*.[52] The Springfield Public Schools, it is clear, displayed a strong commitment to racial tolerance by joining in this effort.

160) Evidence of the proceedings of the Human Relations Committee that the City of Springfield created in 1961 further supports the view that issues of race were of concern and that there were efforts to provide for greater communication and to redress discriminatory practices by and to provide education of the applicable civil rights laws to private individuals, businesses, landlords, banks, etc. in the 1960s and 1970s.[53] "The increase in racial tension during and after World Ward

---

[52] Walter A. Jackson, Gunnar Myrdal and America's Conscience: Social Engineering and Racial Liberalism, 1938-1987 (University of North Carolina Press, 1987), 279-283. The polling evidence to support this point is reviewed in Thernstrom and Thernstrom, America in Black and White, 102-104, 140-141.

[53] These documents, various annual reports of the Human Relations Commission ("Commission" or "HRC"), were only made available to me a week before this affidavit was completed. I have made a quick review of their contents and will include a discussion of some of the projects in the years that will not be addressed in Mayor Ryan's testimony. I understand that the documents had been made available in Swan, et al. v. City of Springfield, et al., 96-30242-MAP (D. Mass.). I had been aware of the existence of these documents a number of months ago, but understood that the City was having difficulties in relocating the originals of these documents. I further understand that Mayor Ryan would discuss some of the projects of the Commission that occurred during his tenure in office. Accordingly I offer the following brief summary of projects, concerns, initiatives, and programs in the years beginning with 1969. I was not provided with any annual reports more recent than 1973.

The 1969 Annual Report of the Human Relations Commission reported that the members of the Commission meet with the Police Commission to work toward the goal of expanding methods for recruiting minority officers, assignments of police at social events, human relations training programs for police, and police-sponsored programs for underprivileged children. In addition, then- Mayor Freedman requested Commission to establish a means for minorities to voice complaints about city government. Of course, during this period of time, a great deal of the attention of the Education Subcommittee was committed to issues related to the racial balance of the City's schools. In 1971, the Education Subcommittee remained primarily involved in the issue of the racial imbalance of the schools and worked toward have teacher training on racial issues, the creation of parent-teacher and teacher-student groups; enlisted the support of a "Flying Squad of Clergy" to help resolve tension in the streets during school riots; provided for counselors in Forest Park Drop In Center; established small "black-white" encounter groups in schools and professional trained leaders for large "fish bowl" group instruction to deal with hostilities in a verbal – rather than physical manner; efforts to recruit qualified minority personnel in schools; and sponsored the development of ethnic relations programs in the middle and high schools. The Commission further recommended "police training in human relations." In 1972, the Human Relations Commission conducted 18 citizen "complaint" sessions to make city administration more aware of minority issues; developed a proposal to expand housing market for minorities with central referral service; studied high-risk insurance rates in certain areas; supported of Spanish-American Union rent strike for rent increases on Bradford St; developed strategies in coordination with admissions offices of AIC, Western New English College, Springfield College to attract greater minority student enrollment; studied the clash between Classical/Technical students; and initiated a campaign for Metco funding. By 1973, there were no major public racial conflicts or civil disturbances reported; the Commission still felt that there were latent tensions that the City needed to address. For that reason, the Commission shifted focus from crisis intervention to the study of "situations of tension and discrimination" and to making recommendations to agencies and the prevention of inter-group tensions. Members of the Human Relations Commission met with Police Commission with regard to the procedures for

II alerted American communities to the need for a type of community agency that would counteract discrimination, reduce racial and religious tensions and direct the community toward the establishment of productive intergroup, interracial and interreligious relations. The Detroit race riots of 1943 and other similar episodes not only made it clear that municipal governments were unprepared to deal with this problem but that, in addition, 'brotherhood' programs and the distribution of 'goodwill' literature were not in themselves sufficient to grapple with the factors and forces that generate intergroup tensions. Moreover, many were beginning to conclude that the "educational" approach to the problem of discrimination, while valuable, had insufficient capacity by itself to effect the enforcement of civil rights in areas affecting large numbers of people in education, employment, and housing."[54] Accordingly, in 1961 Mayor Thomas O'Connor and the

---

(continued…)

handling complaints against police officers. Mayor Freedman approved $30K for services in Drug Abuse Treatment and the Jaime Alvarez project for development of minority business enterprise. In addition the Commission provided technical assistance to Urban League and the School Department to develop attitudinal assessment instruments; served as resource for agencies developing programs aimed at resolving problems of racial imbalance in schools; and investigated complaints of discrimination in employment, housing, police misconduct made available through a "Complaint Center."

On the whole, while these reports reveal a city that had racial issues and tensions, it does not provide support for a claim that the City – the government or its citizens – were not concerned about these issues. Rather it demonstrates that the City government and many of the citizens were committed to providing support, programs, assistance to address the underlying causes of racial unrest and socio-economic disparities. It should be noted that during this period of time an African American had been elected to the City Council (1967) and the School Committee (1971)

[54] In an Ordinance, Human Relations Commission, undated ("Ordinance"), the powers and the duties of the Commission were specifically enunciated:
a) The Commission was charged with the authority and responsibility to "promote understanding and respect among all racial, religious and nationality groups, and also to prevent and eliminate discriminatory practices against any such groups." Ordinance at 1.
b) The Commission was charged with the authority and responsibility to "disseminate information and educational materials and reports which will assist in the elimination f prejudice, intolerance, intergroup tensions, and discrimination. . .[and to] [p]romote programs in community education and information with the objective of achieving better human relations. Id. at 2.
c) The Commission was charged with the authority and responsibility to "receive, investigate, and mediate complaints of alleged discrimination because of race, creed, color or national origin and eliminate such practices through the process of conference, conciliation and persuasion" except where Massachusetts Commission Against Discrimination had jurisdiction with regard to such complaints of discrimination. Id.
d) The Commission was charged with the authority and responsibility to "inquire into incidents of tension and conflict among or between various racial, religious and nationality groups and to take such action as may be designated to alleviate such tensions and conflicts." Id.
e) The Commission was charged with the authority and responsibility to "recommend to the Mayor and City Council the enactment of ordinances and other legislation or action as in the judgment of the Commission w[ould] eliminate the conditions [that] cause these practices." Id.
f) The Commission was charged with the authority and responsibility to "[i]nvestigate alleged discrimination by any city official or city agency against any individual, corporation, association or racial, religious, or ethnic groups and to develop such programs and techniques designed to bring about the elimination of such discrimination." Id. In addition, the Commission was authorized to "act in an advisory capacity to the Mayor, City Council, or any Commission or Department in respect to city plans (sic) or the operations of any city department where questions of differences between citizens involving racial, religious, and national matters arise." Id
g) The Commission was charged with the authority and responsibility to "serve as a resource and consultant to various groups and agencies in the community and [to] cooperate in educational campaigns devoted to the elimination of prejudice, racial or area tensions, intolerance or discrimination." Id

City Council established by ordinance a Human Relations Commission, which was originally composed of 21 civic and religious leaders who served at the discretion of and were appointed by the Mayor. While the number of members changed over the years, the mayor retained the sole authority to appoint and discharge members.

161) The Commission was established by ordinance charged with the authority and responsibility to generally promote understanding and respect among all racial, religious and nationality groups, and also to prevent and eliminate discriminatory practices against any such groups; to disseminate information and educational materials and reports which will assist in the elimination of prejudice, intolerance, "intergroup tensions," and discrimination and to promote programs in community education and information with the objective of achieving better human relation; and to receive, investigate, and mediate complaints of alleged discrimination because of race, creed, color or national origin and eliminate such practices through the process of conference, conciliation and persuasion" except where the Massachusetts Commission Against Discrimination had jurisdiction with regard to such complaints of discrimination.[55]

162) The members of the Commission assumed an active role during the summer of 1965 with regard to the demonstrations that occurred as a reaction to an incident at a local nightclub in which there were charges that the police used excessive force in dispersing a crowd of African Americans.

163) In addition, in 1963, the Mayor established an Office of Intergroup Relations and appointed Dr. Walter English (African American), Director. Although Springfield in 1963 had not yet "been marred by serious displays of overt antagonism" among the racial and ethnic groups in the City, "the potential" for such conflict was present, as well as "an opportunity to develop a society in which its corporate life is consistent with the principles of religion and democracy."

164) In sum, to meet their burden of showing a history of discrimination that touched upon the right to register, vote, and otherwise participate in the political process, all that Plaintiffs offer to substantiate their claim that Springfield had a sordid history of racial discrimination, is a scrapbook of newspaper stories and similar materials. None were written before 1965. What do they amount to? Not much. They do reveal that tension between the police and the black

---

(continued...)

h) The Commission was charged with the authority and responsibility to "hold conferences, hearings, and other special meetings in the interest of constructive resolution of racial, religious, and national group tensions, prejudice, and discrimination occasioned thereby." Id. at 2-3.

i) The Commission was charged with the authority, on behalf of the City, to "accept grants and donations from foundations and others for the purpose of carrying out its functions." Id. at 3.

j) The Commission was charged with the responsibility to "consult with and maintain relations with surrounding cities and towns and [to] cooperate with them in the development and implementation of programs designed to foster good human relations." Id

k) The Commission was charged with the authority to "issue such rules and regulations for the conduct of its business as are necessary to carry out the purpose of this ordinance." Id

[55] Id.

community erupted in 1965, during the first of the five "long hot summers" of urban rioting that plagued the nation, and that racial tensions have sometimes recurred in the city since then. This, of course, could be said for just about every city in the United States, and it does not suffice to establish that there was official, state-sponsored discrimination that deprived Springfield's minorities of their political rights.

165) That some African Americans in Springfield were and are highly critical of the police certainly does not prove that the police department and city officials who have authority over it were necessarily at fault. Racial tensions over policing, after all, exists in cities that are governed by African Americans—Detroit, New Orleans, and the District of Columbia, for example. Washington's 1991 Mt. Pleasant riot erupted after a black police officer shot a Salvadorean immigrant, which escalated into widespread looting and burning of properties by both Latino and black youth. Was D.C.'s largely black police force motivated by racial bias against Latinos, and working to keep a subordinate group unrepresented in city government from claiming its legitimate rights? It seems very doubtful to me, and I would require more than a few newspaper articles containing that charge to convince me.   Similarly, whether the Springfield police force has been and continues to be guilty of discriminatory practices, as Plaintiffs allege, is far too complex an issue to settle on the basis of newspaper stories that quote witnesses who cannot be cross-examined.

166) In any event, the question at issue here is whether the alleged police bias can be said to have "touched the right of members of the minority group to register, to vote, or to otherwise participate in the democratic process." Plaintiffs have not shown why we should conclude that. Why would well-publicized episodes of alleged police brutality reduce minority participation in elections?  If anything, we might expect it to have the opposite effect, inspiring unusually high minority turnout at the polls. In a community in which minorities have unfettered access to the ballot and the opportunity to run for office, demands for changes like more minority law enforcement officers and the creation of a community review board overseeing the police should be a powerful tool to mobilize minority turnout.

167) Conspicuously absent from this collection of several dozen items that are supposed to provide support for Plaintiffs' claims about racial bias in Springfield is evidence of discrimination against the city's largest group, Latinos. Why are there no indications of friction between the police and the Hispanic residents of the city? Why no reports of civil rights protests by local Latino organizations? Since a principal rationale for the present complaint is that Latinos have been unable to win their "fair share" of offices under the current electoral system, it would seem essential for Plaintiffs to prove that Latinos have been the victims of official discrimination that deprived them of equal opportunities to participate in the political process. I suspect that it is absent from the record here because such evidence simply does not exist.

168) In addition, Plaintiffs assert that the adoption of the at-large voting system in 1961 was somehow an example of official racial discrimination.[56] This assertion is offered without a shred of supporting evidence. Plaintiffs ignore the fact that the new system, Plan A, was adopted after winning the approval of the city's voters. It was endorsed by a majority in every ward in the city,

---

[56] Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction, 18.

including the one in which most of Springfield's African Americans then resided (Ward 4). Furthermore, a proposal to expand the City Council to 13 seats and to elect some members from districts and some at-large went before the voters in 1963; it was rejected in every ward, again including Ward 4.[57]

169) Plaintiffs cite as evidence of official discrimination a 1973 consent decree in which the city agreed to seek to hire more minorities in the police and fire departments.[58] It seems questionable to me whether signing on to this consent degree amounted to an admission that the city had discriminated against minority applicants to these jobs, as opposed to a mere pledge by the city it would try harder to hire qualified minorities in these positions.  As it turns out, the challenge was brought against the Civil Service Administrator and related to the content of the civil service exam that determined eligibility for employment in the Police Department and Fire Department of Springfield – among numerous other jurisdictions, including Boston.  The consent decree did establish general racial quotas – that arguably are unconstitutional under the law as currently defined and interpreted by the Supreme Court. It is, of course, no simple matter to meet racial hiring quotas in law enforcement. Whether there was in fact a large untapped supply of minority applicants who wanted these jobs and were able to pass the requisite civil service examination – in its re-written and reconceived form -- is open to question.  Even if one chooses to view the city in the most unfavorable possible light in its handling of this issue, in any event, it is hard to see how this issue could have any impact on *minority participation in the political process*, which is the focus of this Senate factor. Plaintiffs need to do more than refer to instances of alleged discrimination; they must link the discrimination to *political participation*.

170)  In short, Plaintiffs have not made a serious and sustained attempt to demonstrate that official discrimination against minorities in the city of Springfield has had the impact on their political participation that the first Senate Factor specifies. Some of their expert reports do make allegations about discrimination in education, employment, and housing, of course, but these reports pertain to Senate Factor #5, and will be considered at the appropriate point below.

### *The extent to which voting in the elections of the state or political subdivision is racially polarized.*
171) Although I have expressed some doubt about the validity of Dr. Engstrom's estimates, I assume that they are sufficient to demonstrate that whites, blacks, and Latinos in Springfield have different political preferences, and that, to varying degrees, they tend to vote for different candidates.  It would be astonishing it that were not the case. Divide Americans into groups on the basis of any social characteristic you can think of—sex, religion, income, occupation, marital status, educational attainment, suburban vs. central city residence, region, and countless others— and you will find distinct political differences between them.  So too with race.

172). But we never hear of "sexually polarized" or "religiously polarized" or "educationally polarized" voting.  The term "polarization" has a negative emotional charge, and seems to be used almost exclusively in connection with race.  To say that voting in some city is "racially polarized"

---

[57] Calculations of proportion of voter support by ward for the 1959, 1963, 1977, 1987, and 1997 Referendum elections provided to Plaintiffs in Defendants' Supplemental Rule 26(a)(1) Documents and Request for Plaintiffs' Supplemental Rule 26(a)(1) Document and  have been supplied as exhibits in this case

[58]  Ibid., 30.

implies that its politics are warped by racism. But the implication is false, because it would be impossible to find any American city in which whites, blacks, and Latinos displayed identical levels of support for particular candidates or political parties. Part of the reason is that these racial groups differ, on the average, in many other social characteristics that influence political behavior—income, for example. In addition, studies of voting behavior have found racial differences that persist after other related variables are controlled for, just as they have found religious and regional differences even after other variables are controlled.

173) The important question about voting behavior in litigation like this, I would think, is whether the level of racial bloc voting is high enough to repeatedly bring about the defeat of candidates who are strongly preferred by members of a minority group, suggesting that the political process is tainted by or driven by racial animus. My long commentary on what I think Dr. Engstrom's tables show contends that this was not the case for Springfield in the elections of 1999-2005, and the record of minority electoral success in the community before that points to the same conclusion.

*The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.*

174) Springfield has not had a majority vote requirement, anti-single shot provision, or any other voting practice or procedure that arguably facilitated discrimination against minorities. Indeed, it conducts at-large elections in a manner that approximates the proportional representation plans favored by political scientists like Dr. Amy. The field of candidates is large; voters are free to vote for as many as nine or to pick only one or two favorites; by bullet voting, minority voters can reduce the minimal number of votes needed to place ninth or better.

175) On the other hand, Dr. Amy complains that "minority voters living in predominately white at-large districts" sometimes have to "bullet vote," to "use only one of their votes to support a single minority candidate." Majority whites, by contrast can use all of their votes if they choose.[59] In Dr. Amy's view, this is terribly unfair. Perhaps I misunderstand him, but he seems to think that it is somehow undemocratic that 80 percent of the electorate has a greater voice in picking city officials than 20 percent of the electorate. In cities in which whites are greatly outnumbered by African Americans—Detroit or Atlanta, say—whites would doubtless feel the same need to bullet vote in at-large elections. So what? Surely Dr. Amy would not prefer an at-large system in which bullet voting was prohibited. The opportunity to bullet vote is widely assumed to be an important protection of minority rights. That is why the existence of an anti-single shot provision in elections is one of the symptoms of a race-driven political process specifically listed in the "Senate factors." I presume that Dr. Amy is not really suggesting that 20 percent of the voters should be able to elect as many candidates of choice as the other 80 percent. Dr. Amy's discussion of this whole matter is, in any case, irrelevant because it ignores the new demographic realities that I discussed at length above. By now, Springfield's non-Hispanic whites are not a majority of the voting age population; they have a bare plurality of the total, and will lose that status before the decade is over.

176) In terms of this factor, the only line of argument that Plaintiffs can offer is that an at-large electoral system is by definition an "unusually large election district." But that would assume that

---

[59] Amy Report, ¶20.

the Voting Rights Act was intended to bar this form of election altogether, and it is clear that the authors of the Senate Report had no such intention.[60]

***Whether there is a candidate slating process that has denied members of the minority group have been denied access to that process***

177) I have not seen any indication that any candidate slating process exists in Springfield.

***The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.***

178) The reports of Plaintiffs' expert, Dr. Amy, and Dr. Smith focus on this factor. Their efforts to demonstrate that the level of racial discrimination in Springfield is high, and that it hinders the ability of minorities to participate in the political process are hasty, superficial, and thoroughly unconvincing.

179) Dr. Amy begins (Step 1) by asserting that voter participation is strongly related to various measures of socioeconomic status, and that this does much to explain why blacks and Latinos in Springfield have lower participation rates than whites.[61] Remarkably, though, he made no attempt to gather any information about racial differentials in rates of voter registration and turnout in Springfield. He simply assumed "for the purposes of this report" that such was the case. I have seen evidence suggesting that he is wrong about registration rates but right about turnout rates. It is curious, though, that he made no effort to compile the relevant evidence.

180) Step 2 of Dr. Amy's argument is to note that in the United States as a whole and in Springfield in particular, African Americans and Hispanics tend to have lower incomes, higher poverty and unemployment rates, to do less well in school and leave it earlier than whites.[62] All true enough.

181) With Step 3, though, we leave the realm of fact for the realm of ideologically-driven speculation. What is the cause of these disparities? Dr. Amy maintains that they "are undoubtedly due in part to racial discrimination and housing segregation."[63] This may appear "undoubtedly" true to Dr. Amy, but we need to know more about the reasoning and evidence that led him to this conclusion. All he provides in the report is a summary of material from one textbook by an economist, a citation to one scholarly article, and allusions to two other titles.

182) The first glaring weakness of Dr. Amy's discussion of this issue is that none of the work he cites in support of his claims about discrimination refers specifically to Springfield, Massachusetts. Allegations of discrimination in voting rights cases, as I understand it, cannot depend upon broad generalizations about "historical societal discrimination without bringing this

---

[60] Thernstrom, Whose Votes Count?, 228-230.

[61] Amy Report, ¶6 and 7.

[62] Ibid., ¶8-9.

[63] Ibid., ¶1o.

history home to this case."[64] Dr. Amy has not brought his charges about discrimination home to Springfield, and that seems to me a crippling flaw in his report.

183) Furthermore, the task of determining the extent to which certain racial disparities are the result of discrimination in educational institutions, the labor force, or other arenas is exceedingly complex, and scholars continue to disagree sharply about these matters. Dr. Amy cites a handful of authors, and a less than representative handful at that. In the past decade I have published two books (written jointly with my wife Abigail) that address these issues, one a broad synthesis covering racial issues in the latter half of the twentieth century, the second an analysis of the racial gap in K-12 achievement.[65] In both of works we review a massive body of evidence, and conclude that the level of racial discrimination has declined sharply in American society since the 1950s, partly because of the proliferation of federal and state anti-discrimination legislation and partly because of the dramatic changes in white racial attitudes that made possible the passage of such legislation. I would not claim that our views represent the scholarly consensus, but neither is there a consensus in support of Dr. Amy's very different views. Few serious scholars would follow him in assuming without investigation that racial disparities must be caused by racism or racial discrimination.

*Education and Employment*

184) Although Dr. Amy tosses in some statistics pertaining to the performance of Springfield students on recent MCAS texts, he does not explore the possible sources of these racial disparities. In recent years I myself have devoted a good deal of time examining the MCAS results. They indeed reveal sharp racial disparities; the issue is what causes them. I reject Dr. Amy's simplistic equation of disparities with discrimination. Does he believe the white teachers of Springfield treat their black and Latino pupils unfairly? He offers no evidence of this. For his claim of discrimination to be true, Dr. Amy or the Plaintiffs would have to show that there are programs, educational services, assistance, and support that the Springfield Public School System makes available to white (and Asian American) students and denies to African American and Hispanic students. It is not enough to say that the quality of education is not what is could be or should be; that would not account for why one or two groups of students perform better than members of one or two other groups, even though all of which are exposed to the same local schools.

185) Black children tend to perform much less well in school than their white and Asian counterparts—by the age of 17 they read and do math problems at the eighth-grade level, on average. Why? The assumption that it must be the fault of racism cannot be supported by research. Since my most recent book focused on this topic, I can say with confidence that the social science literature does not include convincing studies that support Dr. Amy's claims. If he thinks the problem is racist teachers, he needs to explain the dismal level of African American test scores in the public schools of places like Detroit, Atlanta, and the District of Columbia, all of which have predominantly black teaching staffs. A very different explanation is offered in the volume my wife and I have written on this subject

---

[64] LULAC v. Clements, 1993 WL 319087 (5th Cir.(Tex.)), at 12.

[65] Stephan Thernstrom and Abigail Thernstrom, America in Black and White: One Nation, Indivisible (Simon and Schuster, 1997); Abigail Thernstrom and Stephan Thernstrom, No Excuses: Closing the Racial Gap in Learning (Simon and Schuster, 2003).

**DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY
DR. STEPHAN THERNSTROM, DEFENDANTS' EXPERT WITNESS
PART 4 OF 5**

186) In our work, <u>No Excuses: Closing the Racial Gap in Learning</u>, we find little evidence of racism in our public schools today. Nor do we find support for the common claim that per pupil spending is less for minority than for white children, or that racially imbalanced schools impede learning. Differences in family structure are a major source of the problem; the high incidence of female-headed families among African Americans and Puerto Ricans is a definite drag on school performance. So too are aspects of black peer-group culture, such as the regrettable equation of doing well in school with "acting white."

.

187) Dr. Amy's account of the alleged role of racism in creating disparities in income and educational achievement seems to me quite unsophisticated. For example, he cities studies that supposedly find blacks with "identical job qualifications with whites" earning less. The only studies that reach that conclusion are those that employ a grossly inadequate measure of "job qualifications," such as years of school completed. African Americans with a high school diploma and no further education, for example, do indeed earn less than whites with the same level of educational attainment. But measuring education by years spent warming a seat makes no sense. When instead education is measured by performance on a standard instrument like the Armed Forces Qualification Test, blacks in fact earn as much or more than whites *with the same educational skills*. Many sociologists take the same view as Dr. Amy, but more sophisticated work on such questions has been done by economists, and most of them share my perspective. Furthermore, it is extremely strange for a social scientist to discuss this question without any reference to large-scale federal, state, and local affirmative programs in employment and public contracting, which have been found to discriminate against white and Asian males in particular.

*Housing*
188) Another piece of expert testimony related to alleged discrimination in Springfield has been provided by Dr. Preston Smith, whose affidavit charges that the residential patterns of racial groups in the Springfield SMSA (which includes Holyoke, Chicopee, and other nearby cities) "are not the result of individual choice" but are "shaped by individual and institutional discriminatory practices...."[66] To support this charge, he attaches an unrevised, unpublished paper delivered at a conference some eleven years ago, "Racial Segregation in Springfield and Holyoke: Historical and Current Trends."

189) It is not surprising that this paper was never published in a scholarly journal. It is not a work of serious scholarship. It is a brief essay, a mere 19 pages, and most of them do not focus on Springfield at all; much of it is devoted to an uncritical summary of Massey and Denton's standard book, <u>American Apartheid</u> (1993), a work I consider deeply flawed. The paper includes no data for the period since 1990, and thus cannot tell us anything about the sweeping demographic transformation of Springfield over the past fifteen years. The loss of approximately 25,000 white residents in the 1990s alone and the entry of many thousands of Latinos since 1990 must have reshaped the racial profile of the city's neighborhoods, but Dr. Smith has nothing to tell us about that.
190) Dr. Smith's brief account of black residential concentrations in Springfield before the 1960s does make a plausible case that white resistance to having black neighbors substantially limited

---

[66] Affadavit of Preston H. Smith, 4,

the housing choices available to African Americans at that time, and is one reason why many of them lived in racial enclaves. However, he fails to address what has happened since the 1960s, with the sharp decline in white racism across the society and passage of strong laws outlawing racial discrimination in real estate rentals and sales. The only specific evidence of discrimination against blacks in the Springfield real estate market the paper provides is for the 1960s or earlier, four decades ago at a minimum. He thinks that it is someho0w evidence of discrimination that blacks made up 19 percent of the population of Springfield but less than 2 percent in Chicopee, West Springfield, etc. in 1990. But he offers no evidence that African Americans living in Springfield would have preferred to dwell in Chicopee and were able to afford the move, but were barred from doing so by racial bias in the real estate market. An abundance of polling data in recent years has established that only a tiny fraction of black city-dwellers would be willing to move into a neighborhood or community with hardly any black neighbors, exactly what a move to Chicopee or West Springfield would have entailed.[67]

191) Dr. Smith also challenges the common view that Puerto Ricans, like other Hispanic groups and most immigrants from earlier periods of our history, tend to cluster residentially because ethnic neighborhoods provide them a valuable refuge from the unfamiliar larger society. Identifiably Puerto Rican neighborhoods did not develop primarily because of external prejudice, according to this perspective; they emerged for the same reason that "Little Italies," and "Germantowns" did. The immigrant ghetto facilitated the adjustment of newcomers to American society. Dr. Smith asserts that this doesn't apply to Puerto Rican residential concentrations, but provides no evidence to support his assertion.[68] I have not seen evidence specifically on Puerto Ricans, but recent polling data indicates that few Latinos wish to live in neighborhoods with hardly any other Hispanic residents."[69] The proportion is particular high among those who are not fluent in English.

192) It is unfortunate that Dr. Smith took no notice of developments in Springfield's neighborhoods since 1990. If he had, he might have been able to resolve a puzzle in the record for this case. Dr. Smith insists that the city was strongly segregated by race as of 1990. And yet after the 2000 Census, which revealed that the city's two major minority groups together had become a majority of the population, Plaintiffs were unable to draw create a single supermajority voting district, indeed not a single district that was as much as 60 percent African American or Latino. That would seem to suggest that the shift from a majority-white to a majority-minority city was accompanied by a considerable increase in racial mixing at the neighborhood level.

***Whether political campaigns have been characterized by overt or subtle racial appeals.***
193) I see no evidence from Plaintiffs to establish that racial appeals have recently been made in campaigns. This is not to say that issues that related to race—mandatory busing of children to secure racial balance in schools, for example—have played no role in political campaigns.

---

[67] Some of this evidence is assembled in Thernstrom and Thernstrom, America in Black and White, 225-230. A more recent Gallup poll, from 2003, found that just 4 percent of the African Americans surveyed said that they would prefer to live in a neighborhood made up "mostly" of people of a different race; The Gallup Organization, Civil Rights and Race Relations, 2004, 76.

[68] For a classic statement of this view, see Nathan Glazer and Daniel P. Moynihan, Beyond the Melting Pot: The Negroes, Puerto Ricans, Jews, Italians, and Irish of New York City, 2nd edition (MIT Press, 1970), 86-136.

[69] The 2003 Gallup poll cited in note 53 above found that only 11 percent of Hispanics preferred neighborhoods made up "mostly" of people of a different race.

Inevitably, public controversies affect debates over public policy in the course of electoral contests. It is impressive, though, that the voters of Springfield have not provided much support for candidates who have attempted to exploit racial issues. The best example was the 1963 mayoral campaign.

194) In 1963 election, Mayor Ryan's opponent, John Pierce Lynch, declared in a press conference that Ryan's position on the requirement for racial balance in the City's schools would result in African American students being bused to schools in predominately white communities and white students being bused to schools in predominately African American communities and that he was a "rubber stamp for the NAACP." A group of ministers, priest, and rabbis immediately denounced Lynch, in an article in which the headline read: "Clergymen Deplore Racism in City Election."[70] The article proclaimed that "whenever a candidate for public office makes a statement which has a divisive effect, one which tends to increase racial tensions at a time when this can be least afforded, the synagogues and churches speak with one voice: 'This is evil.' To seek office at the expense of social morality is wrong; to stir up prejudices and set man against his brother is wrong; to speak without regard for the truth is bearing false witness – and is wrong."[71] In the end, the *Springfield Daily News*, which had never been among Mayor Ryan's supporters since he defeated former Mayor Thomas O'Connor in 1961, withdrew its initial endorsement of Lynch, as did the Greater Springfield Labor Council, because of Lynch's "interjection of the racial issue into the campaign."[72] The reaction of the public to this tactic resulted in the softening of the anti-busing posture of two School Committee candidates who had polled well in the primary.

195) On the eve of the election Lynch ran a full-page advertisement with accompanying picture of African American students exiting a bus, presumably to attend a school in a predominately white neighborhood, implying that busing had already begun under Ryan's leadership. The Lynch ad asked citizens which school was next – listing a number of elementary schools located in predominately white neighborhoods.[73] Despite this emotional appeal, on election day Ryan defeated Lynch by nearly three to one.[74]

196) There is no evidence a candidate's racial/ethnic identity has been used as an issue in an election campaign.

***The extent to which members of the minority group have been elected to public office in the jurisdiction and the degree to which minority persons have been proportionately represented***
197) One of the noteworthy things about Dr. Engstrom's statistical analysis of group voting behavior is that it is restricted to a mere six-year period, from 1999 to 2005. Springfield has had a significant minority population for many decades, so it seems odd to confine the temporal scope of the voting analysis to just yesterday and the day before yesterday, as it were. In one of their submissions to the Court, Plaintiffs defend Dr. Engstrom's decision to ignore history in favor of

---

[70] "Clergymen Deplore Racism in City Election, *Springfield Daily News*, October 25, 1963, pg 1; "City Clerics Rap Racism in Election," Springfield Union, October 26, 1963 pg. 1.

[71] Ibid.

[72] "Negro Groups Urge CLU Drop Lynch Backing, IUE Aide Assails Racial Stand; Ryan Foe Affirms Charge."

[73] "ANOTHER RYAN LIE! Bussing has Already Started!, *Springfield Daily News*, November 4 1963, pg 25 and November 4, 1963 pg 25.

[74] "Ryan Reelection Swamps Lynch," *Springfield Union*, November 6, 1963, pg 1 (headline)

current events by asserting that "the relevant data to analyze vote dilution is not to be found in the results of elections held twenty, thirty and forty years ago."[75] They speak dismissively of "old election data," as if it should all be deep-sixed in the basement of some musty archive. That old stuff, they assume, couldn't possibly have any bearing on the question of whether or not the electoral deck in Springfield is stacked against minority elements of the population.

198) This is a curious claim, coming just one paragraph after one that bluntly (and falsely) asserts that "at no time in the last 44 years" have Hispanics had proportional representation on the Springfield City Council. To support a charge that certain electoral practices have diluted the minority vote for no less than 44 years, it is precisely "old election data" (and old demographic data) that require analysis. In fact, the most cursory examination of this 44-year time span would have revealed that for most of this period the voting age Latino population of the city was too small for them to have had any claim to a seat on the City Council by the standard of proportional representation.[76] They did have a voice in politics, like all other voters in the city. They had the same access to the polling booth, and the same opportunity to cast up to nine votes in the city council elections and three in those for the school committee. But there were too few of them to ensure that their candidates of choice would win. They did have proportional representation on the council, as much representation as their numbers warranted. The problem was that their numbers did not warrant that they have a seat.

199) Perhaps Plaintiffs chose to overlook "old election data" because they reveal something that knocks a major hole in their case. In fact, the pre-1999 electoral history of Springfield reveals plainly that African Americans have a very long and impressive record of electoral success in the city. Table 3 sums it up for the period preceding the adoption of the current electoral system in 1961. As far back as the late 1920s, when whites outnumbered blacks in the Springfield population by almost 50:1, an African American was elected to a seat on the 18-person Common Council, and from 1938 on there was always a black on the council. Indeed, for most of the decade preceding the adoption of the current electoral system in 1961, the council had two black members. So blacks were *overrepresented* quite substantially. No African American served on the eight-person Board of Aldermen, but their share of the population was too small to consider them lacking proportional representation on that body. Even though the city's black population doubled in the 1950s, the black proportion in 1960 was well below the 12.5 percent level that would have "entitled" them one of the eight seats.

Table 3. Black Members of the Springfield Common Council (18 members), 1926-1961, and the African American Share of the Total Population

|  | Term | Percent Black of |
| --- | --- | --- |

---

[75] "Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction," 5.

[76] Census data on Hispanics are not available before 1970, because the category was not used in prior censuses. But in that year Latinos were just 4.8 percent of the voting age population of Springfield, and 6.0 percent in 1980. Only in 1990 did their share reach 12.8 percent. That was the first year in which having proportional representation—not, of course, a requirement of the Voting Rights Act—would have given them one of nine seats on the council, if they registered and voted at the same rate as other elements of the local population, and if they were strongly cohesive politically. Both of these issues will be considered further below. Suffice it to say here that Hispanics in recent elections have not ranked very high on either turnout or cohesion, and there is no reason to believe that the situation was markedly different in earlier years.

| | of Office | the Population | |
|---|---|---|---|
| Alford H. Tavernier | 1928-1931 | 1930 | 2.1 |
| J. Clifford Clarkson | 1938-1943 | 1940 | 2.1 |
| James H. Higgins | 1944-1949 | | |
| Paul R. Mason | 1950-1959 | 1950 | 3.8 |
| Rodman G. Johnson | 1952-1957 | | |
| William A. Grant | 1960-1961 | 1960 | 7.5 |
| W. Robert McDonald | 1960-1961 | | |

Council membership from Azell Murphy Cavaan, "Event Recognizes Black Politicians," The Republican, February 25, 2005; Census data as reported in U.S. Census Bureau, Historical Census Statistics on Population Totals by Race, 1790 to 1990, and by Hispanic Origin, 1970 to 1990, for Large Cities and Other Urban Places in the United States, Population Division, Working Paper No. 76, 2005, Table 22.

---

200) This information cannot be dismissed as mere ancient history. A proper inquiry into the merits of a Voting Rights Act complaint must be, in part, an historical inquiry. It is hardly a coincidence that the very first of the "Senate factors" is "the extent of any *history* of discrimination…that touched on the right of members of the minority group to register, to vote, or otherwise to participate in the political process." Or that the Gingles Court called for a practical evaluation of *the past* and present realities…."[77] It simply cannot be true that African Americans living in the city in the 1930s, 1940s, and 1950s were the victims of discrimination *that operated so as to diminish their right "to register, to vote, or otherwise to participate in the political process*." However much racial prejudice and discrimination there may -- or may not -- have been in Springfield, it manifestly did not have the negative *political effects* the Senate Judiciary Committee spoke of. The clear record of early black success in Common Council races decisively refutes that contention.

201) For a few years after the 1961 restructuring of city government, the City Council had no black member. But, as Table 4 reveals, in 1967 Paul Mason, who had served on the Common Council throughout the 1950s, captured a seat and held it for 11 years spread over the period 1968-1984. Starting in 1985, with the election of Morris Jones, the council has always had a black member, and briefly (in 2000-2002) it had two African Americans.

202) As to the School Committee, J. Arthur Hickerson served for a year (1961), elected at-large under the pre-1961 change in the form of government, followed by Dr. Walter English for the years 1972 to 1977. Recently, further evidence has been made available to me that seems to indicate that an African American candidate had been elected at-large (from a residency district) to the pre-1961 School Committee – Ester McDowell. Since 1980, at least one black has always sat on the committee, and for a few years it was two, when Robert McCullom and Marjorie Hurst served simultaneously. One seat out of six would amount to proportional representation for a group that was 16.4 percent of the VAP in 1990 and 18.4 percent in 2000.

---

[77] 1982 Senate Judiciary Report, as quoted in Abigail Thernstrom, Whose Votes Count? Affirmative Action and Minority Voting Rights (Harvard University Press, 1987), 195; 478 U.S. at 45. Emphasis added in both quotations.

Table 4. African American and Latino Members of City Council and School Committee, 1961-2006

| | Term of office | Percent Black of VAP | |
|---|---|---|---|
| **African Americans** | | | |
| CITY COUNCIL | | | |
| | | | |
| Paul R. Mason | 1968-1973 | 1970 | 9.9 |
| | 1978-1984 | 1980 | 13.9 |
| Morris Jones | 1985-1993 | 1990 | 16.4 |
| Bud L. Williams | 1994-present | 2000 | 18.4 |
| Carol Lewis-Caulton | 2000-2002 | | |
| | | | |
| SCHOOL COMMITTEE | | | |
| | | | |
| J. Arthur Hickerson | 1961 | | |
| Walter English | 1972-1976 | 1970 | 9.9 |
| Ronald Peters | 1980-1986 | 1980 | 13.9 |
| Candace Lopes | 1988-1992 | 1990 | 16.4 |
| Robert McCollum | 1992-2000 | | |
| | 2002-2004 | 2000 | 18.4 |
| Marjorie Hurst | 1998-present | | |
| | | | |
| **Latinos** | Term of Office | Latino percent of VAP | |
| CITY COUNCIL | | | |
| Jose Tosado | 2002-present | 2000 | 21.8 |
| | | | |
| SCHOOL COMMITTEE | | | |
| Cesar Ruiz | 1982-1985 | 1980 | 6.0 |
| Carmen Rosa | 1994-1997 | 1990 | 12.8 |
| Jose Tosado | 1999-2002 | | |

Information on African Americans from Cavaan, "Event Recognizes Black Politicians; data on Latinos from the Springfield City Clerk.

203) Latinos arrived in Springfield in large numbers only within the past two to three decades. As was the case with earlier American immigrant groups, they did not immediately develop political muscle commensurate with their numbers, in Springfield or anywhere else. The group is still in the early stages of its political mobilization, as is evident from its low turnout rate and the lack of consensus support behind Latino candidates. It is hardly surprising that Latinos have been somewhat underrepresented among elected officials in Springfield thus far, just as the Irish were in Boston in the 1840s and the Italians in New York were around 1910. As recently as 1970, Latinos accounted for just 4.8 percent of the voting age population of the city, and not much more than that—6 percent—in 1980. It is impressive, therefore, that a Latino served a term on the School Committee as early as the 1980s, and another in the 1990s. In both of these cases, the

Latino share of the voting age population at the time of their victory was well below the 16.6 percent share that one seat out six represented.

204) The third Hispanic elected to the School Committee, Jose Tosado in 1999, entered politics at a time when Latino numbers had risen further and the group was learning to exert its political muscle more effectively. Unlike his two Hispanic predecessors on the School Committee, who served one term and retired from public life, Tosado had larger ambitions, and used the School Committee as a launching pad to reach higher office. In his first run for City Council, in 1999, he narrowly missed; the next time, in 2003, he won easily, placing third among the nine winners. Ironically, the adoption of Plaintiffs' Plan for districted elections may cut short his promising career by severing him from his base in the Latino community; his current place of residence is outside the two Latino-majority districts that Plaintiffs propose, and he would not be eligible to run for the council from either one.

205) Summing up the import of this evidence, I would say that Section 2 vote dilution cases typically involve communities in which minorities have never, or not until very recently, been able to elect members of their group to office, suggesting that the local political process has been tainted by racism. In the case of African Americans in Springfield, such a claim seems completely unwarranted. The election of a Latino to the School Committee as early as 1982, followed by two others in the next decade, suggests to me that the deck was not stacked against them either, in spite of the fact that a Hispanic person does not currently serve on the School Committee, particularly, where, as here, the failure to elect a Hispanic candidate is almost solely attributable lack of Hispanic turnout and political cohesion.

***Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.***
206) Plaintiffs have offered little evidence to suggest a lack of proper responsiveness to the particularized needs of either African Americans or Latinos on the part of Springfield's elected officials. Of course this factor cannot mean that local officials must accept any and all demands emanating from people or organizations who claim to speak for a minority group. A democratic polity cannot be governed by the wishes of any minority component of the population. If we mean by responsiveness that public officials do not display insensitivity to the concerns voiced by a historically disadvantaged group, and provide a proper forum in which to explore such issues, I think the record of Springfield holds up well. Since the behavior of law enforcement officials features prominently in Plaintiffs' complaints, it is important to note that the city is in the process of reorganizing the Police Department and has appointed a new Police Commissioner. In addition, the Police Commission, which predates this reorganization and which had considerable power to review and sanction police conduct, had a majority of its members drawn from the city's minority population.[78]

207) More important is the fact that the Police Commissioner is appointed and reports to the Mayor – and not the City Council. Likewise, the various department heads, including Housing and Neighborhood Services and Health and Human Services, are appointed by and report to the Mayor. Nor does the School Committee have the authority to determine whether and where new

---

[78] Memorandum Supporting Defendant's Opposition to Plaintiffs' Motion for a Preliminary Injunction, 40.

school construction will be located and which old schools will be renovated. Rather the School Building Commission -- all the member of which are appointed by the Mayor--has that authority. Virtually all of the members of every commission, department, committee in the City are appointed by and serve at the discretion of the Mayor. Accordingly, charges that the City is not providing adequate housing or health services or that schools in the minority communities are older and less well equipped than schools in the white neighborhoods cannot properly be seen as evidence of a lack of responsiveness on the part of the City Council or the School Committee, even if these claims were true – which they are not. Given the broad scope of the power and authority of the Mayor of Springfield and the nature of the Plaintiffs' various complaints, it is perplexing that Plaintiffs are demanding the adoption of a method of election that will constrain minority political organizations to the areas in which these groups are most strongly concentrated, and will not encourage the development of minority candidates with citywide support sufficient to compete for Mayor.

*Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous and relative advantages of current method of election and a single-member district method of election.*
208) Several newspaper articles about the adoption of Plan A government in 1961, from the collection in the Connecticut Valley Historical Society, have recently been made available to me. They shed light valuable on why the current system was chosen. Among the arguments for Plan A government, which would provided to the Mayor extraordinary power and for the at-large election of members to the City Council and the School Committee, was the view that the pre-1961 method of electing members to the Common Council led to the election of Common Council candidates who had no citywide vision. [79] Proponents argued that there was no political incentive on the part of members of the Common Council to support programs, initiatives, services, and funding that would serve any other ward other than the ward from which they were elected.

a) In addition, the argument was made that the fact that the Board of Aldermen and Common Council (City Council, collectively) provided for the election of between three and four members to the City Council, who resided in each of the City's eight wards,[80] resulted in the election of unqualified persons to the Board of Aldermen and Common Council, persons lacking in the skills, character, and intelligence necessary to fulfill the duties and responsibility with which the City Council was charged. Because the pool of candidates for the Common Council was limited to the wards from which they were elected, it was argued that – in some cases – the City government did not have access to all of the City's many, young, well qualified men and women who had constituted the City's post-war boom population.
b) Many argued that the method of electing the Common Council engendered and supported "ward politics," whereby "ward healers" assumed great power within each ward and solidified their re-election by granting "favors" and otherwise "providing" for their respective constituency. Accordingly, Springfield ward elections were believed by many to support corruption, solidified incumbency, and squelched criticism

---

[79] I understand that these newspaper articles have been designated as exhibits in this case.

[80] Two members of the Common Council were elected from Wards 1, 2, 5, 6, 7, and 8; three members were elected from Wards 3 and 4. Elections for the Board of Aldermen were at-large but from residency districts (wards). Accordingly between three or four members of the City Council (Common Council and Board of Aldermen) resided in each of the eight wards.

209) The question of whether an at-large method of election would frustrate the ability of minority groups in the City to elect candidates of choice was not avoided, as it would likely have been had the "real" motive for the adoption of Plan A been the dilution of African American voting strength (there were virtually no Hispanic persons living in Springfield in 1959). The question was raised by Paul Mason, an African American, who was an incumbent member of the Common Council from Ward 4. But Mason apparently did not speak for the large numbers of African Americans residing in Ward 4, because he lost the next election to a black challenger. Furthermore, a white incumbent member of the Common Council who opposed Plan A was defeated by a non-incumbent African American candidate in Ward 5, against suggesting that the city's black community did not view the shift to at-large elections with alarm. The plurality of the voters in every ward supported Plan A, including Ward 4 and Ward 5 and a solid majority of the voters in every ward either supported Plan A or had no opinion, i.e., left the referendum question blank.

210) Addressing the question of whether the at-large election would prevent or undermine the ability of minority persons to elect candidates of choice, a local black minister, Reverend Charles E. Cobb, argued that minority candidates had been elected in other cities that had adopted at-large elections. He cited Mrs. Ester McDowell's recent citywide election to the School Committee as evidence that a "Negro" could be elected at large. He provided the additional example of Hartford's City Council, which had adopted non-partisan citywide elections and to which John C. Clark, Jr., "a Negro and a friend of many people in Springfield" had been elected. Rev. Cobb was reported in a newspaper article to have concluded that "these (and other) examples amply demonstrate for me how unrealistic are the fears (if any) and charge that Plan A may discriminate against minority groups. . . Plan A will attract more qualified men to run for public office and among these men will be Negroes and other minority groups. And it will be expected and hoped that the community will endorse and support them."

211) Dr. Amy did no research on the 1959 adoption of Plan A. Instead he conjured up a thoroughly specious comparison between Springfield and various southern communities in the years immediately following the passage of the Voting Rights Act in 1965.[81] It is true that when the VRA opened polling places to African Americans, some southern jurisdictions responded by shifting from districted to at-large elections so as to curb the influence of new black voters. But what does this analogy have to do with the circumstances in Springfield, Massachusetts? My original report in this case demonstrated, I believe, that the history of minorities in Springfield politics bears no resemblance to that of African Americans in the Jim Crow South, and Dr. Amy's rebuttal report failed to offer a word to challenge my historical discussion.

212) In fact, this crucial element of a totality of circumstances argument is entirely absent from plaintiffs' case. Not a shred of available evidence suggests that the adoption of the current system nearly half a century ago was motivated by a desire to suppress minority political influence. The minority population was too small to be a threat to anyone, and the overwhelming white majority was well accustomed to seeing minority office-holders. The history of Georgia and Mississippi, the two states Dr. Amy mentions specifically, bears zero resemblance to that of the Commonwealth of Massachusetts.

213) Two further points about this. First, it should also be noted that the tactics southern whites used to evade the mandate of the Voting Rights Act were not confined to shifting electoral

---

[81] Amy Rebuttal Report, ¶3.

systems from districted to at-large elections. In some southern communities, existing districted systems were manipulated in a way to prevent the newly-enfranchised black majority from dominating the county governing body. If Springfield shifts to districted elections for the city council and school committee, the change might likewise work to preserve the political dominance of the shrinking, soon-to-disappear, white plurality.

214) In addition, it is important to recognize that there are many different kinds of at-large systems. Those adopted in the South after 1965, in an effort to dilute black voting power, had features like numbered places, majority vote requirements, anti-single shot provisions, and four-year staggered terms. The "Senate factors" listed in the 1982 Senate Judiciary Committee Report made specific reference to these features. The Justice Department and the courts were instructed to pay attention to them in evaluating whether a voting rights violation had occurred. The very inclusion of factor #3 in the list of "Senate factors" was a clear recognition that at-large elections are not *per se* dilutive of the minority vote. The Springfield system does not include any of these suspect features, another important point that Dr. Amy ignores in making this comparison.

215) I do not think that the policy underlying Springfield's current electoral system is tenuous in the least. A strong case can be made that it is superior to the districted system proposed by Plaintiffs, and better serves both the interest of the minority communities of the city and the broader public interest.

216) The at-large system of election for both the City Council and the School Committee, first of all, provides individual voters with a very wide range of choices—as many as nine votes in the case of the council. Minority voters can spread their support as widely as they choose, and in fact do often vote across racial lines, according to Dr. Engstrom's estimates. Whites running for office have a strong interest in listening to minority voters and responding to their needs; their votes count just as much as those of anyone else. Political self-interest requires that candidates of all race campaign throughout the city, and do not write off whole sections as enemy territory to be avoided. With districted elections, campaigns will necessarily become more parochial. Candidates who are not elected citywide will surely not waste the time and money to campaign outside their districts or to familiarize themselves with the particularized concerns of people not residing in their districts.

217) Plaintiffs flamboyantly characterize the Springfield system "a discriminatory winner-take-all voting method."[82] This colorful formulation makes no sense to me. Under the voting method proposed by Plaintiffs, the elections conducted in each district would be winner-take-all contests. Each voter would have only one vote to cast, and those in the minority would be on the losing side. The current at-large method of election, in my estimation, is much less of a winner-take-all system, because if offers *wider choices* to voters than a districted system does. There are nine winners in the citywide contest, and each voter is free to cast as many as nine ballots. They also have the right to cast just one or two—to bullet vote—which reduces the total number of votes required to place among the top nine. Under the current electoral rules, a very high proportion of the city's voters will have voted for *some* winners. If a sense of connection to the officers who govern the city is desirable, more voters feel that connection today than would be the case under a

---

[82] Complaint, Request for Injunctive Relief and Jury Demand, ¶47.

districted system. Under Plaintiffs' proposed SMD plan, a large fraction of the population would lose that connection because they hadn't supported any winning candidate.

218) The issue in this case is whether the plan for nine single-member city council districts demanded by the plaintiffs will yield fairer results than the current system. I very much doubt it. Do districted elections really guarantee more adequate representation for minority groups? One need only glance at the current composition of the Massachusetts Congressional delegation to see that the answer in some cases is most certainly no. In the 2004 elections, 61.6 percent of Massachusetts voters cast their ballot for the Democratic presidential candidate. In the ten districted elections that determined who would sit in the U.S. House of Representatives, though, Democrats swept the board, capturing 100 percent of the seats.[83] If a PR system had been employed instead of a districted plan, Republicans likely would have captured three or four of the ten seats. This is precisely the point that Dr. Amy makes in his scholarly writing, but one he strangely seems to have forgotten when speaking as an expert witness.

219) Dr. Amy charges that at-large elections of the type used in Springfield "can allow the political faction with the majority or plurality of supporters to win all the contested seats—shutting out minorities completely."[84] Theoretically, perhaps, but theorizing is a poor substitute for facts. Minorities in Springfield have not been shut out "completely" under the system used for most of the past half century, even when their share of the electorate was much smaller than it is now. Dr. Amy's claim that "in the past, the at-large system has usually denied representation to virtually *all* of the Black and Hispanic voters" has no foundation in fact.[85] The tables developed by Dr. Engstrom show that a good many members of both minority groups have voted for candidates who were elected, including many white candidates they found attractive. Furthermore, the remedy proposed by plaintiffs in this case—districted elections—can also shut out minorities completely, as has been the case for Republicans in recent Congressional elections in Massachusetts.[86]

220) Dr. Amy insists that "at-large elections disempower more minority voters than district

---

[83] U.S. Bureau of the Census, *Statistical Abstract of the United States: 2006* (U.S. Government Printing Office, 2006), Tables 388 and 391.

[84] Amy Rebuttal Report, ¶2.

[85] Amy Rebuttal Report, ¶7.

[86] As an interesting aside, among the concerns about Plan A was that it provided for non-partisan elections in which the political party of the candidate would not even be identified on the ballot and Republicans – whose numbers were rapidly dwindling – feared that it would mark the end of their ability to elect their "candidates of choice." The concern that Republicans might encounter in maintaining a presence on the City Council after the adoption of Plan A was another of the concerns of Paul Mason, who was a Republican. Ward 4 had always voted Republican, but by 1959, the Republican party was not the political party of choice for African Americans in Springfield, as evidenced by the fact that there were more than twice as many Democrats voting in the Ward 4 primary in 1959 as there were Republicans and the fact that neither of the two African American persons who were elected to the Common Council in 1959 were Republicans. As it turned out, however, the non-partisan election format of Plan A advantaged and breathed new life into the Republican party in the 1960s. Beginning in 1961, in spite of the fact that Democrats outnumbered Republicans by two-to-one, Republicans constituted a majority on the City Council. Many attributed this Republican success to the view that the Republican party was more "united." Accordingly to some newspaper analysis, "with no party designations on the ballot, [the Republican party was] able to apply its strength with greater effect in citywide elections." This provides evidence that from the beginning the at-large method of election, provided to any "minority" group who were cohesive and turned out to vote the opportunity to elect candidates of choice.

elections."[87] But I believe that the evidence in the record establishes that minority voters in Springfield have not been "disempowered." Nor is it the case that minorities will manifestly have far greater political power if the districted plan plaintiffs propose were to be adopted. In the political history of the city, minority votes have counted, both in electing minority candidates and in determining which white candidates would win. All voters have had the possibility of influencing the outcome of all races.

221) One further drawback of shifting to districted elections is that it is likely to increase racially polarized voting. Under the current electoral system, Dr. Engstrom's tables suggest, substantial numbers of voters cross racial lines in casting their ballots, with whites voting for African Americans and Latinos, blacks voting for whites, and Latinos voting for whites. (Fewer blacks vote for Latinos and vice versa.) Shifting to a districted system, with only one vote for the City Council and School Committee, will make such choices less common. In a black or Latino-dominated district, whites are likely to rally behind one white candidate, and to hope that more than one minority candidate will emerge to split the minority vote. Likewise, blacks and Latinos residing in those districts will feel that the top priority is to elect of their own, and only their top priority matters in a districted system. Structuring elections to heighten the racial identity of the electorate hardly seems likely to reduce racial friction, to produce governing bodies that act for the common good, to and "hasten the waning of racism in American politics."[88]

222) The likely consequences are suggested in a May 21, 2006 news story on the reelection of Ray Nagin as mayor of New Orleans. It reported a comment by a local political analyst who said that "the bottom line is we ended up with the mayor who represents the demography of the city."[89] This is a pernicious standard, in my view. If it becomes the norm in America, we won't need elections; a census will do, because everyone will vote for one of their own, with "their own" in strictly racial terms.[90] Fortunately, the voters of Los Angeles did not follow that rule when they elected Tom Bradley mayor, a city in which African Americans were less than a fifth of the population. Nor did the voters of Seattle, which had an even smaller black population when they picked Norman Rice as mayor, or the voters of Virginia when they elected Doug Wilder as governor.[91] But Plaintiffs wish to draw lines across the map of Springfield to engineer electoral outcomes dictated by racial demography. I can easily imagine Springfield having a black or Latino mayor in the foreseeable future. It is significantly harder to conceive of it, though, if the city adopts a system of districted elections in which minority officeholders win with little white support and have no experience campaigning outside their own minority-majority districts.

---

[87] This is the heading given to the brief section that consists of ¶7 of the Amy Rebuttal Report.

[88] Johnson v. DeGrandy, 512 U.S. 997, 1020 (1994)(Souter, J. writing for the majority)

[89] Michelle Roberts, "Mayor Nagin Re-Elected in New Orleans," May 21, 2006, on AccessNorthGa.com.

[90] The dangers of creating electoral systems that heighten racial consciousness and lead elections to amount to little more than censuses are brilliantly discussed in Horowitz, Ethnic Groups in Conflict.

[91] For further evidence on this point, see Thernstrom and Thernstrom, America in Black and White, 295-297. More recent examples of African Americans winning political office in a heavily white communities include the election of Bobbie Mitchell as mayor of Lewisville and of Bernetta Henville-Shannon as mayor of The Colony, both small suburbs of Dallas with minuscule black populations; Gromers Jeffrey, Jr., "Political Talent Emerges in the Suburbs," Dallas Morning News, June 29,2005. These victorious candidates certainly did not "represent the demography of the city" in which they lived, and a good thing it was.

223) The different logic underlying districted versus at large elections continues to operate after the ballots are counted. It influences how council and school committee members actually govern. Under the current system, most members of the two governing bodies cannot safely disregard demands emanating from the African American or Latino communities; voters from those groups need to be kept happy. The need to demonstrate responsiveness will only grow, of course, as demographic change continues. The white majority is already gone; in time whites will not even be the plurality. With districted elections, by contrast, members of governing bodies will be most responsive to the people who elected them, who will be far more racially homogenous than the city population as a whole.

224) Districted elections tend to produce candidates who are less moderate and centrist than Mr. Tosado and Mr. Williams. Unlike current minority office-holders in Springfield, candidates running within a district that has a particular racial mix have no incentive to appeal across racial and ethnic lines to voters outside the district. Ardent supporters of Louis Farrakhan or David Duke, as it were, are far more likely to win an election in a racially homogenous ward than they are to be victorious in an at-large contest in the city as a whole. At-large candidates have an incentive to look for votes everywhere, and tend to moderate their positions accordingly. Under the current at-large system it makes sense for a white candidate residing in the affluent 7th Ward to campaign in heavily black or Latino areas, and to show up at events sponsored by Latino and African American organizations and such groups as the League of Women Voters and the PTA. Minority candidates likewise feel the same pressure to reach out beyond their immediate neighbors. The system encourages racial crossover voting on election day, and produces a governing body with a broader grasp of the public interest and more legitimacy than one elected by a method that rewards insularity and parochialism.

225) This point applies with particular force to the School Committee, which has not been the focus of much discussion in any of the materials in the record. A School Committee whose members are elected from balkanized districts to represent the parochial interests of the voters of those districts will be likely to distribute educational resources by means of horse trading, and will be less influenced by considerations of the common good. Proposals to spend more money on tutorial programs in schools in the less advantaged districts, for example, would likely command more support from a governing body elected at large.

226) At-large elections are particularly appropriate in the choice of officials to govern the school system because they are the best way to balance the need to have schools accountable to the public with the desire of educators to be free of political interference. Candidates elected at-large, it can be plausibly argued, would have a broader vision of community needs than ward politicians, would better understand the concerns of professional educators, would be more likely to appreciate the need for "consistency and coherency in educational policy development," and less likely to engage in bitter factional conflict that would impede the educational process.[92] As of 1985—I was not able to locate more recent figures—73 percent of the nation's school boards were picked by means of at-large elections. Seventeen states used this method exclusively, and another 26 employed it to some degree.[93] Of Massachusetts cities with populations of 35,000 or more,

---

[92] James S. McClain, "The Voting Rights Act and Local School Boards: An Argument for Deference to Educational Policy in Remedies for Vote Dilution," 67 Texas Law Review (1988), 165.

[93] H. Zeigler, E. Kehoe, and J. Reisman, City Managers and School Superintendents: Response to Community Conflict (Praeger, 1985), 11.

Fall River, Fitchburg, Lowell, Lynn, New Bedford, Quincy, Revere, Salem, Waltham, and Worcester are among those who currently elect all of their School Committee members at large. And in Holyoke, Everett, Leominster, Chelsea, and Lawrence, members of the School Committee are picked via a mixed method of election that includes some at-large seats.[94] It would be particularly unwise, in my view, to shift to a districted system for electing the body that governs the city's public schools.

## Assessment of Electoral Opportunities with the Section 2 Benchmark

227) In "Section 2 vote dilution suits, along with determining whether the Gingles preconditions have been met and whether the totality of circumstances supports a finding of liability, a court must find a reasonable alternative practice as a benchmark against which to measure the existing voting practice" -- in this case a fairly drawn, constitutional, nondilutive single-member district plan."[95] A Section 2 violation will be found where the challenged method of election provides for fewer electoral opportunities than does the Section 2 benchmark, which in this case would be a fairly drawn, constitutional, nondilutive nine single-member districting plan for City Council and a six single-member district plan for School Commission. Plaintiffs' have proposed a nine single-member district plan -- that relies upon 2000 Census data[96] – presumably to demonstrate that the challenged method of election for the City Council provides for fewer electoral opportunities  than would a fairly drawn, *constitutional*, nondilutive nine single-member district plan.

### Plaintiffs' Proposed Nine Single-Member District City Council Plan

228) Plaintiffs have repeatedly dismissed issues related to evidence that their proposed nine single-member district plan is – or may be—unconstitutional because it subordinates traditional districting principles to racial considerations, and neither narrowly tailored nor warranted by a compelling public interest.[97] We have no way of learning first-hand what role that race played in the construction of the districted plans supplied by Plaintiffs; the person responsible has not made available. the individual who created the nine single-member district plan.[98] There is evidence, however, that race trumped the traditional districting principle of minimizing the number of precincts that are split. Minimization of the number of precincts that are split is common among districting principles of virtually any jurisdiction faced with the prospect of informing voters of election district changes, designating new polling places, realigning precincts and, in some case, obtaining state approval of such realignment.  The issue in these Shaw cases is not whether these

---

[94]Information from MassVote.net.

[95] Hall v. Holder, 512 U.S. 874, 879 (1994)

[96] There is no mid-decade  precinct-level data that reflects census counts or estimations available.

[97] Shaw v. Reno, 509 U.S. 630, 652 (1993) (Shaw I)(recognizing an "analytically distinct" equal protection claim for challenging an election district as a "racial classification@);  Miller v. Johnson, 515 U.S. 900, 916 (1995)(adopting the "predominant motivation" test for the threshold inquiry of whether a district constitutes a racial classification, which requires a showing that traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, were subordinated to racial considerations); and Bush v. Vera, , __ U.S. __,116 S. Ct. 1941, 1960-1961 (1996)(concluding if the State has a Astrong basis in evidence,@ for concluding that creation of a majority-minority district is reasonably necessary to comply with Section 2, and the districting that is based on race Asubstantially addresses the Section 2 violation,@. . .it satisfies strict scrutiny).

[98] Rather, Plaintiffs offer the testimony of Dr. Harmon who did not create the plan, did not direct the creation of the plan, and no knowledge as to what criteria were used in the creation of the nine single-member district plan.  All that he did was to verify the demographics of the districts in Plaintiffs' nine single-member district plan.

changes could be accomplished in a "computer age," but rather whether the constitution permits racial considerations, i.e., the creation of a districts comprised of a certain proportion of minority voters sufficient to guarantee the election of minority candidates, to predominate and subordinate traditional redistricting consideration. Any benchmark plan must be constitutional.[99] Plaintiffs' proposed nine single-member districting plan splits 27 precincts between two districts. Plaintiffs' proposed nine single-member districting plan splits an additional seven precincts among three districts.

229) Plaintiffs' proposed nine single-member district does not appear to be drawn with an awareness of the City's officially designated neighborhoods,[100] even though the importance of neighborhoods and community representation is the asserted basis for Plaintiffs' preference for single-member district elections. It is therefore fair to say that minimization of the division of neighborhoods is important among the City's districting principles and it is reasonable to expect that neighborhoods would object to being split among and between various election districts in such a manner as to constitute only a small portion of the population in any election district. Under Plaintiffs' proposed nine single-member district plan only two neighborhoods are wholly included in a district; seven neighborhoods are split between two districts; three neighborhoods are split among three districts each; and five neighborhoods are split among four districts each.

230) Indeed, as further evidence of the predominance of racial considerations in Plaintiffs' proposed plans, districts in which a majority of the voting age population was either African American or Hispanic (according to the 2000 Census), split more neighborhoods (between six and seven), than the districts in which white persons constitute a majority of the voting age population (between five and two)

231) Plaintiffs' proposed nine single-member district does not appear to be drawn with an awareness of the City's wards, even though Plaintiffs have described what they want as "ward representation" and all previous alternative methods of election and districting plans elected some or all members of the City Council from the City's eight wards. Although it is obvious that one or two of eight wards would have to be divided in order to create a nine single-member district plan, Wards 1 and 8 are divided between two districts; Wards 2, 6, and 7 are divided among three districts; Ward 3 among four districts; and Wards 4 and 5 are divided among five districts in Plaintiffs' nine single-member district plan.

232) Plaintiffs' proposed nine single-member district plan clearly subordinated the City's traditional districting principles to race and cannot be used as a Section 2 benchmark. Even if it could be used as a Section 2 benchmark, as discussed supra, it is unlikely that Plaintiffs' proposed nine single-member district plan will provide for more than one opportunity to elect Hispanic candidates and one opportunity to elect African American candidates of choice. Accordingly, the Plaintiffs' plan would provide for no more – and possibly fewer -- electoral opportunities than the current method of election provides to minority persons in the City of Springfield

---

[99] Abrams v. Johnson, 521 U.S. 74 (1997)(an unconstitutional plan cannot serve as a benchmark).

[100] The Planning Department and various other department of the City government recognize 17 neighborhoods in Springfield. Boundaries for these neighborhood are adjusted every decade to comply with precinct changes. Maps of these changes are publicly available.

a) Given the low Hispanic turnout and political cohesion, it is not certain that both Hispanic majority districts (Districts 1 and 2) will elect a Hispanic candidate, particularly where there are several Hispanic candidates opposed by one white candidate, who can attract African American and white support and unlikely that the district that includes portions of the South End (District 2) in which there is extremely low Hispanic turnout and lack of cohesive support for minority candidates will elect a Hispanic candidate under any circumstances.
b) Likewise, only one district (District 3) is comprised of a majority of African American voting age persons and is likely to provide for an opportunity to elect an African American candidate. c) The fourth minority-majority district (District 4) is comprised of a combined majority of minority voting age persons. But since white persons constitute the greatest proportion of the voting age population in the district and there is no evidence that Hispanic and African American voters will support the same candidates, there is no reason to believe that District 4 will elect an African American (or minority) preferred candidate.

233) One other piece of evidence that requires evaluation here is Dr. Harmon's attempt to simulate how 2003 City Council election would have turned out if had been conducted under the Plaintiffs' Proposed City Council Plan.[101] According to him, this exercise establishes that two Latinos, one black, and a fourth minority candidate, either black or Hispanic, would have been elected to the council. Dr. Harmon's estimates, presented in his Exhibit 1 of his report, strike me as fanciful and of no evidentiary value whatever. Taken at face value, his calculations reveal that Mr. Tosado would have won no fewer than *three seats* on the council under the Plaintiffs' Precincts Plan, not just the one he actually captured on election day. But he could only run in one district, of course. If it had been District 1, Dr. Harmon's estimates indicate that the heavily-Latino District 2 would have elected a white candidate, Mr. Foley, the second-place finisher. But Mr. Foley would not have been available to serve; having finished first in Districts 5, 6, 7, and 8, he presumably would have taken one of those seats. In District 4, without Mr. Tosado as a choice, the winner would have been Mr. Williams. But he wouldn't have been eligible, having already won in District 3, so perhaps the District 4 seat would have gone to the white who took third place, Mr. Sarno.

234) Compounding the absurdity of an already absurd exercise, Dr. Harmon concedes that none of the nine candidates elected to the council in 2003 lived in Districts 1, 2, 3, or 4, the four proposed minority-majority districts. Unless they sold their homes and moved into one of these districts, neither Mr. Tosado nor Mr. Williams would have been eligible to run in them. Plaintiff's Plan would have forced Mr. Lewis and Mr. Tosado to compete for seats in majority-white districts, if they chose to run at all. If shifting to districted elections heightens racial consciousness and increases the tendency of voters to choose candidates of their own race, as I believe that it would, neither Mr. Lewis nor Mr. Tosado would win in these circumstances.

235) It should be obvious that one cannot blithely take the results of an election conducted under certain rules and use them to estimate how it would have turned out if conducted under radically different rules. How voters behave when they are allowed to cast nine votes for candidates across

---

[101] Actually, Dr. Harmon's reaggregation analysis was not based upon the nine single-member district plan provided in his report, Exhibit A, but rather was based upon another nine single-member district plan that did not split precincts. This latter plan was not provided in his report and nothing is known about the demographics of the districts other than they are "similar" to the plan that he proposed. Expert Report of John Harmon, Exhibit B, at ¶4.

an entire city cannot tell you who they would pick if they had just one choice, a choice confined to the district in which both they and the candidate reside. Dr. Harmon's assertion that Districts 1 and 2 would have elected a Latino assumes that the strong support Mr. Tosado attracted there was a generic vote for a Latino candidate, and had nothing to do with his record of achievement and personal qualities. If Mr. Tosado had not been available to run in one of the two majority-Latino districts, Dr. Harmon assumes, then some other Latino would done just as well. Likewise with Mr. Williams, who placed first in District 3, second in District 4, and third in District 2. Dr. Harmon assumes Williams' numbers measure the generic black vote, and would have gone to other blacks if he had not been on the ballot. This is far from certain. White, blacks, and Latino voters in Springfield all seem quite capable of distinguishing among candidates from the same racial group, and give them very different levels of support. Their political choices are influenced by race, of course, but not dictated by race and race alone.

### Section 2 Benchmark Nine Single-Member District City Council Plan
236) I have very recently been provided with a nine single-member district plan, see Affidavit of Daniel Marrier at ¶21, which split only one precinct and which provides for one district in which Hispanics constitute 64.9 percent of the voting age population and another district in which African American constitute 61.6 percent of the voting age population. There is an additional district in which Hispanic persons constitute 40.9 percent of the voting age population (including many of the South End Hispanic majority precincts) and an additional district in which African American persons constitute 33.4 percent of the voting age population. In none of the remaining five districts do African Americans or Hispanic persons constitute a greater proportion of the district population than their respective proportion of the citywide population.

237) The Section 2 benchmark provides for the opportunity to elect one Hispanic candidate and one African American candidate and significant voter influence for Hispanic and African American voters in one other district each. The current method of election provides for the opportunity to elect and has elected at least one – if not two – African American candidates and at least one – if not two – Hispanic candidates and influence in the election of every other candidate equal to each minority group's respective share of the citywide population. It is my opinion that the current method of election provides for greater opportunities than does the Section 2 benchmark

### Plaintiffs' Proposed Six Single-Member District School Committee Plan
238) Plaintiffs have proposed two six single-member district plans – one which splits one precinct and one, in which, precinct boundaries appeared to be wholly disregarded. Plaintiffs appear, however, to rely upon the electoral opportunities provided by the plan that splits numerous precincts to demonstrate that the current method of election provides for more electoral opportunities than does a fairly drawn, nondilutive, *constitutional* six single-member district plan. Plaintiffs' proposed six single-member districting plan splits 25 precincts between two districts and an additional five precincts among three districts

239) In addition, it does not appear that Plaintiffs' proposed six single-member districting plan was drawn with an awareness of the City's neighborhoods or the goal of keeping neighborhood populations "together" as much as possible; Plaintiffs' proposed plan provides that only two neighborhoods are wholly included in a district; nine neighborhoods are divided between two

districts; three neighborhoods are divided among three districts, each; and one neighborhood is divided among four districts.

240) It does not appear that Plaintiffs' proposed six single-member district was drawn with an awareness of the City's wards or the goal of trying to minimize the number of wards that were split among or between districts. I recognize that a number of the eight wards would have to be divided in order to create a six single-member district plan; nevertheless, in Plaintiffs' six single-member district plan, Wards 1, 2, and 6 are divided between two School Committee districts; Wards 5, 7, and 8; are divided among three School Committee districts. Ward 3 is divided among four School Committee districts and Ward 4 is divided among five districts.

241) In addition, in order to implement Plaintiffs' proposed six single-member district plan at the same election as the nine single-member district plan—to maintain the practice of electing representatives to the City Council and School Committee at the same time during the municipal election—it would be necessary to create 25 different ballots, representing all of the different combinations of City Council-School Committee districts.

242) Plaintiffs' proposed nine single-member district plan subordinated the City's traditional districting principles to race and cannot be used as a Section 2 benchmark. Even if it Plaintiffs' six single-member district plan were determined to be the appropriate Section 2 benchmark, it provides for the opportunity to elect one Hispanic candidate (District 1, in which Hispanics constitute 61.2 percent of the voting age population) and one African American candidate (District 2, in which African American constitute 56.8 percent of the voting age population.) There are no additional districts in which the Hispanic proportion of the voting age population is greater than the Hispanic share of the citywide voting age population and  no additional districts in which the African American proportion of the voting age population is greater than the African American share of the citywide voting age population

243)  The current method of election has elected one – and sometimes – two African Americans to the School Committee and has elected one Hispanic to the School Committee.  Indeed, one Hispanic candidate would be serving on the School Committee had Hispanic voters supported him as strongly as they had supported the incumbent Hispanic member of the City Council.  In addition, the current method of election provides to minority voters political influence equal to their share of the voting age population in the election of every other candidate elected to the School Committee.  Accordingly, the current method of election provides for greater opportunities than does Plaintiffs' proposed plan which provides for the opportunity to elect one Hispanic candidate and one African American candidate and less minority electoral influence than each group's share of the citywide voting age population.

### Section 2 Benchmark Six Single-Member District School Committee Plan
244) Plaintiffs' six single-member district plan that split only one precinct provides for one district in which Hispanics constituted 53.1 percent of the voting age population and another district in which African American constitute 53.3 percent of the voting age population.  There is an additional district in which Hispanic persons constitute 27.6 percent of the voting age population (including many of the South End Hispanic majority precincts) and an additional district in which African American persons constitute 18.0 percent of the voting age population.

Given the disparately low turnout among minority voters and lack of political cohesion among Hispanic voters, Dr. Engstrom's analysis would suggest that neither minority-majority district would provide to African American and Hispanic voters an opportunity to elect candidates of choice; it would provide only some electoral influence in two districts each. If so, the current method of election provides for far greater opportunities to elect minority candidates than Plaintiffs' proposed plan.

**Availability of Electoral Opportunities for All Minority Voters**

245) This voting rights complaint seeks to expand the political opportunities available to the African American and Latino residents of Springfield. Thus we must ask what proportion of the black and Latino residents of the city would experience the alleged benefits of living in districts in which their group is a majority. How would a court order requiring districted elections for the Springfield City Council and School Committee affect the typical African American or Hispanic member of the community? What proportion of the people in the two groups would in fact find themselves in districts in which their group is dominant? Plaintiffs appear to assume that it would be a very substantial majority of the minority population. Although Dr. Harmon's report does not provide these percentages, it fortunately includes the raw data from which they may be calculated. The results of the calculation are stunning, in my view.

246) One new district, #3, would have an African American majority of 58 percent, as Dr. Harmon's tables reveal. But *a mere 31 percent of the city's black people* would live in it! Almost 70 percent of the city's African Americans will lose the opportunity they now have to cast nine ballots, and to vote for any black or other candidate they find attractive. Only 31 percent will gain the compensating advantage that Plaintiffs' plan is supposed to provide—the advantage of living in a district they dominate demographically. The rest of the city's black residents will be confined to voting in balkanized, race-driven districts in which they will be a minority. Note that Dr. Engstrom has estimated that 100 percent of the city's blacks voted for a black candidate who was elected in 2005 (Mr. Williams); under Plaintiffs' proposed SMD, less than a third of Springfield's African Americans will live in a district that will likely afford them an opportunity to cast a ballot for a black who will win.

247) A similar point applies to Latinos as well, to a somewhat lesser degree. Plaintiffs' Plan would create two Hispanic-majority districts, #1 and 2. Those two together, though, would contain a bare 50.8 percent of the city's Hispanics residents of voting age.[102] Half of the city's Latinos, therefore, will lose a voice that they now have—the opportunity to vote for a fellow Latino or anyone else from another district, to bullet vote or to make several picks. Plaintiffs' Plan strips them of all but one vote, and requires that it be made within the district even if the candidate who most appeals to them happens to reside outside it. Again, according to Dr. Engstrom, 76.4 percent of the city's Latinos voted for a Latino candidate who won in 2005; under Plaintiffs' plan, the proportion who will have the pleasure of being on the winning side will likely drop by 25 points, to only half. Is this really progress?

248) In sum, under the districted plan proposed by plaintiffs, each voter can cast just one ballot for city council or school committee, and his or her choice will be restricted to candidates who

---

[102] Calculated from Expert Report of John Harmon, Appendix A, Exhibit 5.

**DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY
DR. STEPHAN THERNSTROM, DEFENDANTS' EXPERT WITNESS
PART 5 OF 5**

reside in the district. This restructuring of the rules of the game will inevitably make politics more parochial. Under the status quo, all of the Latinos and African Americans of the city can vote not only for candidates living in their neighborhood but for a member of their group who lives at the other end of town, and/or for whites they see as sensitive to their needs and hopes, wherever they happen to live. Elections by district would artificially reduce the supply of minority candidates with strong qualifications, because only residents of the district would be eligible to run. The pool of potential leaders across the city as a whole will inevitably be stronger than the pool within any one district. A number of Latino and black leaders who have held office in Springfield have lived outside the boundaries of the proposed Hispanic- and black-majority districts, so that they would be deprived of a significant share of their electoral bases. The flight of so many whites from the city in recent years, discussed further below, has opened up housing in previously white areas to blacks and Hispanics, and many of the potential new leaders of those groups are likely to be those moving outside the initial areas of group concentration.[103]

249) This narrowing of the choices available to minority voters would be less serious if the vast majority of them resided in districts in which their concentrations were so strong that they very likely could elect a candidate of their choice. Dr. Amy appears to assume that such is the case in Springfield, but it certainly is not. In fact, if we accept the 2005 and 2006 Spanish surname tabulations that the U.S. Department of Justice made use of in its Section 203 suit against the city, the Latino population of the city today is much more widely dispersed than plaintiffs appear to grasp. The only solidly Hispanic ward in the city (#1, whose registered voters were 66.8 percent Latino in 2006) contained a mere 29.9 percent of Springfield's Hispanics (see tables attached in Appendix A below). Another 19.8 percent lived in Ward 3, which was 49 percent Latino. It is doubtful that Ward 3, which equates closely to the proposed District 2, will elect a Latino in the near future because of its exceedingly low turnout rate. In 2005 the turnout rate was a mere 13.2 percent, fully 20.4 points below the city average. If elections were held in the existing wards, seven out of ten of the city's Latinos would be "disempowered," in the sense that they would have no opportunity to vote for a Latino candidate who would likely win. Assuming that non-Hispanic whites in District 2 turn out at a much higher rate than Latinos, as they have in the past, the result of enacting plaintiffs' plan would leave the number of Hispanics on the city council unchanged; there would still be only one. The only difference is that it would not be the Latino candidate currently serving on the council, because he does not live in the proposed "safe" District 1.

250) Possibly the districting of the city will enhance the electoral opportunities of a few of those minority residents who live in districts in which they form a majority and who had not supported either of the minority candidates who currently serve on the City Council. But what about all the others who will not? This remedy may be worse than the disease, because it will diminish the electoral opportunities of the very large numbers of minorities who would not find themselves within such districts. All of Springfield's residents today live in what might be considered a city-wide "influence district"; all are free to cast a ballot for each seat that is being contested, and there are enough blacks and Latinos in the city for their vote to matter a lot and to elect as many candidates of choice as they cohesively support. Possibly a single-member districting plan for the election of members of the City Council may benefit specific candidates and provide an easier,

---

[103] Defendant's Memorandum Supporting Defendant's Opposition to Plaintiffs' Motion for a Preliminary Injunction, ¶11.

less costly means of election to the council. But will a single-member district plan really increase the electoral opportunities afforded to all minority voters? Or will it only result in the election of different minority candidates, rather than more minority candidates?

**Changing Demographics and Electoral Opportunities**

251) Now that it is undeniable that non-Hispanics whites have lost their majority status in Springfield's adult population, Dr. Amy has desperately back-pedaled. In his rebuttal report, he suddenly discovered the term "plurality," and recast all of his claims about the "majority" so as to refer to the "majority or plurality." This seems suspiciously convenient. In his report and his deposition, Dr. Amy contended that the political science literature revealed that if minority voters are a majority in an electoral unit, minority turnout will increase. Subsequently, without citing any new literature in support, he contended that a mere plurality could hang on to power because the existence of a white plurality depressed the turnout of those who together form a minority-majority. Dr. Amy's change of position on this point may help to shore up plaintiffs' case in the face of new demographic data that undermine it. But I do not believe he has provided any intellectual justification for it.

252) Can a small and rapidly shrinking white plurality of the voting-age population, one destined to last only a few years more, continue to dominate local politics? If the present electoral system is left in place, it is very doubtful. Under the current electoral system, a white plurality would lose most or all of its seats on the City Council if blacks and Latinos formed a "people of color" coalition, or at least did some horse-trading to obtain votes for each other's preferred candidates. In his deposition, Dr. Amy notes that this is quite possible. Although he didn't know whether blacks and Latinos were cohesive in Springfield, he declared that "he had seen information in other parts of the country that showed cohesion." But all that we can be sure of is that in the past elections studied by Dr. Engstrom the two groups demonstrated very little political cohesiveness, if his estimates are indeed accurate. Projecting the pattern of the recent past into the future seems highly questionable in this case, because such a coalition in the past would not have had the potential power it clearly has today. It makes more sense now than ever before, and it could happen.

253) There are such coalitions in other places. New York City's African American Congressman Charles Rangel, for example, has been repeatedly reelected from the Fifteenth District, even though blacks are only 31 percent of its population and Latinos are 48 percent.[104] It is not clear that there are vital black-Latino differences on any of the issues that come before the council, and they do have powerful social class interests in common, as groups whose income and educational levels are well below the average for non-Hispanic whites, a point that plaintiffs have made. Such a coalition across racial/ethnic lines would be easier to construct under the current at-large system than it would be under the balkanized districted system plaintiffs call for, which is constructed with the aim of creating separate safe districts dominated by one of the two minority groups.

254) Furthermore, a white plurality could sweep the city council races only *if* white voters refused to vote for any minority candidate, which has not been the case in the elections analyzed by Dr. Engstrom, and *if* the number of white candidates could somehow be limited to nine. If the white

---

[104] Michael Barone and Richard E. Cohen, *The Almanac of American Politics: 2006* (The National Journal, 2006), 1196.

vote were split among more than nine contenders, or if some whites voted for black or Latino candidates, this scenario of Dr. Amy would never come to pass. Some whites have always voted for some minority candidates in the past, and the field of white candidates has been larger than nine. Thus it seems far-fetched to conjure up such an unlikely development in speculating about the future. In any event, there would be only a small window of time in which this might occur, because even the white plurality is destined to last but a few years more.

255) Dr. Amy continues to insist that it is somehow unjust that a plurality of the voters can cast all nine of their allowed ballots without any penalty, while minorities cannot.[105] I still cannot follow his logic. A group with a plurality of 36 percent, in a city with two other groups of 32 percent each could only dominate if the other two groups had completely different interests and never united behind any common candidates. It is more likely in such circumstances that all three groups would bullet vote, to maximize the chance that some of their most favored candidates would win.

256) Furthermore, my demographic analysis indicates clearly that Latinos will be a plurality of the VAP by the end of this decade (Table 2). If they can mobilize politically to bring their turnout levels up to those of whites, then the position of the two groups will be reversed. Whites will not be able to "use 100 percent of their voting power," and will need to bullet vote. And Hispanics will be able to "use 100 percent of their voter power." If the current electoral system gives great power to a plurality of the electorate, why should it be changed just when a new plurality is about to emerge? Wouldn't that amount to changing the electoral system to check the power of an emerging minority group?

**Conclusion**

257) It would be one thing if race-driven districting had the overwhelming support of the racial groups in whose names it is carried out. But the legal process, with a few plaintiffs backed by a few organizations, is ill-suited to determine what the wishes of ordinary African Americans and Latinos actually are. A rare piece of national polling evidence raises serious questions about minority preferences in this matter. A 2001 national survey by the Washington Post, the Kaiser Family Foundation, and Harvard's Kennedy School of Government asked two questions about the proper role of race in drawing Congressional districts, and the answers are reproduced in Table 5.

258) This survey found, remarkably, that little more than a quarter—27 percent—of African Americans believed that race should be taken into account at all in drawing Congressional district lines, and an even smaller proportion of Hispanics—just 13 percent. What is more, when the results were broken down more finely, it turned out that a mere 11 percent of blacks thought that race should be a "major factor" in structuring elections and just 7 percent of Latinos.

---

[105] Amy Rebuttal Report, ¶9.

Table 5. Public Opinion on the Proper Role of Race in Districting Decisions, 2002

"In order to elect more minorities to public office, do you think race should be a factor when boundaries for U.S. Congressional voting districts are drawn, or should it not be a factor?"

|  | should be | should not be | Don't know |
|---|---|---|---|
| White | 8 | 90 | 2 |
| African Am | 27 | 70 | 3 |
| Hispanic | 13 | 83 | 4 |
| Asian | 17 | 78 | 5 |

[Source: Washington Post/Kaiser Family Foundation/Harvard University, Race and Ethnicity in 2001: Attitudes, Perceptions, and Experiences, Table 39B. Table 39C provides the finer breakdowns mentioned in the text above.]

---

259) Of course the universe from which the sample was drawn was the United States, not Springfield. It dealt with Congressional elections, not municipal elections. Nonetheless, these findings seem to me to raise a serious question about whether we can assume that Plaintiffs in this case do truly speak for the ordinary members of the racial groups that they claim to represent.[106] Racial consciousness may be a lot higher among the political elite and civil rights organizations than it is among the rank-and-file. In my view, the low level of support for race-based districting coming from ordinary black and Latino voters is a good thing. I am doubtful about the wisdom of restructuring political systems in a manner calculated to produce a more racialized politics. It does not seem to be reliable recipe to "hasten the waning of racism in American politics."[107] It will move us in precisely the opposite direction.

Signed under the penalties of perjury this 7th day of February, 2007.

Dr. Stephan Thernstrom

---

[106] Plaintiffs rely upon the results of the 1997 referendum to support their claim that citizens of Springfield—particularly Latinos and African Americans— want to change the method by which members of the City Council and School Committee are elected. Plaintiffs claim that 58 percent of those who voted in 1997 supported a change to a 8-3 method of election. Complaint at ¶37. Plaintiffs simply ignore the fact that 12.1 percent of those who cast ballots in that election had no opinion as whether the City should adopt an 8-3 method of election. Accordingly, 51.4 percent of those who cast ballots in the 1997 election voted to change the method of election. More importantly, only 13.6 percent of the registered voters supported the change to the 8-3 method of election. Memorandum Supporting Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction at ¶21.
[107] Johnson v. DeGrandy, 512 U.S. 997, 1020 (1994)(Souter, J. writing for the majority)

**DR. STEPHAN THERNSTROM, DEFENDANTS' EXPERT WITNESS**

**EXHIBIT A**

**1999 Election**

Spanish surname analysis and data provide by Plaintiffs (letter dated July 25, 2006 from Anna-Marie L. Tabor to Deanne Bogan Ross)
Voting age population data as provided by 2000 Census
Turn-out data provided by the Springfield Election Commission

| Precinct | Total # Hispanic VAP | % of Hispanic VAP | # of Voters Who Turned Out | # of Spanish Surnamed Voters who Turned Out | % of Spanish Surnamed Voters who Turned Out |
|---|---|---|---|---|---|
| Ward 1 | 7,820 | 60.8 | 1,530 | 786 | 51.4 |
| Ward 2 | 2,946 | 20.8 | 3,076 | 261 | 08.5 |
| Ward 3 | 4,648 | 37.4 | 1,110 | 171 | 15.4 |
| Ward 4 | 2,536 | 19.6 | 1,371 | 119 | 08.7 |
| Ward 5 | 1,257 | 09.1 | 2,499 | 98 | 03.9 |
| Ward 6 | 1,666 | 11.9 | 2,454 | 87 | 03.5 |
| Ward 7 | 701 | 04.8 | 3,766 | 72 | 01.9 |
| Ward 8 | 1,954 | 14.7 | 1,701 | 111 | 06.5 |
| **Total** | **23,528** | **21.8** | **17,507** | **1,705** | **09.7** |

55586

DR. STEPHAN THERNSTROM, DEFENDANTS' EXPERT WITNESS

EXHIBIT B

**2001 Election**

Spanish surname analysis and data provide by Plaintiffs (letter dated July 25, 2006 from Anna-Marie L. Tabor to Deanne Bogan Ross)
Voting age population data as provided by 2000 Census
Turn-out data provided by the Springfield Election Commission

| Precinct | Total # Hispanic VAP | % of Hispanic VAP | Total # of Registered Voters | # of Voters Who Turned Out | # of Spanish Surnamed Voters who Turned Out | % of Spanish Surnamed Voters who Turned Out | % of Turn-out |
|---|---|---|---|---|---|---|---|
| 1A | 1,227 | 85.9 | 1,420 | 499 | 369 | 73.9 | 36.2 |
| 1B | 1,224 | 85.8 | 1,303 | 417 | 318 | 76.9 | 33.2 |
| 1C | 1,217 | 88.6 | 1,280 | 342 | 286 | 83.6 | 27.6 |
| 1D | 909 | 56.0 | 1,400 | 575 | 209 | 38.2 | 41.7 |
| 1E | 810 | 48.1 | 932 | 232 | 176 | 57.5 | 25.4 |
| 1F | 935 | 59.8 | 1,104 | 367 | 128 | 38.8 | 33.8 |
| 1G | 747 | 38.1 | 971 | 220 | 56 | 15.9 | 23.8 |
| 1H | 751 | 41.6 | 1,442 | 314 | 128 | 37.9 | 22.8 |
| Ward 1 | 7,820 | 60.8 | 9,852 | 2,966 | 1,670 | 56.3 | 31.0 |
| 2A | 479 | 28.6 | 1,144 | 196 | 48 | 20.1 | 36.5 |
| 2B | 482 | 28.1 | 1,453 | 588 | 195 | 18.8 | 40.9 |
| 2C | 482 | 28.4 | 1,556 | 708 | 105 | 24.7 | 47.4 |
| 2D | 353 | 19.5 | 1,412 | 701 | 96 | 13.0 | 50.1 |
| 2E | 311 | 16.9 | 1,448 | 809 | 80 | 10.6 | 55.8 |
| 2F | 450 | 25.2 | 1,640 | 704 | 97 | 16.9 | 43.2 |
| 2G | 152 | 08.2 | 1,599 | 839 | 53 | 04.7 | 52.9 |
| 2H | 237 | 13.4 | 1,553 | 715 | 65 | 09.9 | 46.2 |
| Ward 2 | 2,946 | 20.8 | 11,805 | 5,260 | 739 | 14.0 | 46.8 |

| Precinct | Total # Hispanic VAP | % of Hispanic VAP | Total # of Registered Voters | # of Voters Who Turned Out | # of Spanish Surnamed Voters who Turned Out | % of Spanish Surnamed Voters who Turned Out | % of Turn-out |
|---|---|---|---|---|---|---|---|
| 3A | 743 | 43.7 | 1,256 | 349 | 68 | 27.8 | 28.0 |
| 3B | 792 | 50.5 | 915 | 235 | 59 | 17.0 | 26.1 |
| 3C | 651 | 44.1 | 788 | 204 | 34 | 15.9 | 25.9 |
| 3D | 645 | 46.1 | 852 | 165 | 52 | 34.0 | 19.4 |
| 3E | 510 | 32.9 | 943 | 288 | 71 | 24.7 | 30.1 |
| 3F | 509 | 32.0 | 986 | 278 | 40 | 14.6 | 28.4 |
| 3G | 436 | 29.1 | 1,032 | 283 | 51 | 20.6 | 27.8 |
| 3H | 362 | 22.1 | 967 | 328 | 52 | 13.3 | 34.3 |
| Ward 3 | 4,648 | 37.4 | 7,739 | 2,130 | 427 | 20.0 | 27.7 |
| 4A | 396 | 24.8 | 1,250 | 434 | 31 | 08.5 | 35.0 |
| 4B | 379 | 23.9 | 1,219 | 445 | 73 | 09.7 | 36.3 |
| 4C | 447 | 30.0 | 1,157 | 311 | 58 | 15.8 | 26.8 |
| 4D | 263 | 16.2 | 727 | 223 | 16 | 10.1 | 30.7 |
| 4E | 371 | 24.7 | 831 | 261 | 43 | 15.7 | 32.1 |
| 4F | 141 | 06.8 | 551 | 169 | 32 | 06.7 | 30.3 |
| 4G | 372 | 25.5 | 1,145 | 308 | 29 | 08.2 | 27.0 |
| 4H | 167 | 10.5 | 937 | 346 | 22 | 04.7 | 37.7 |
| Ward 4 | 2,536 | 19.6 | 7,817 | 2,497 | 304 | 12.2 | 32.1 |

55587

| Precinct | Total # Hispanic VAP | % of Hispanic VAP | Total # of Registered Voters | # of Voters Who Turned Out | # of Spanish Surnamed Voters who Turned Out | % of Spanish Surnamed Voters who Turned Out | % of Turn-out |
|---|---|---|---|---|---|---|---|
| 5A | 222 | 13.4 | 1,071 | 345 | 20 | 05.7 | 33.0 |
| 5B | 225 | 14.3 | 1,337 | 564 | 42 | 09.8 | 42.3 |
| 5C | 181 | 11.8 | 1,270 | 541 | 40 | 07.1 | 42.8 |
| 5D | 127 | 07.1 | 1,385 | 712 | 28 | 03.2 | 53.0 |
| 5E | 188 | 10.6 | 1,495 | 635 | 61 | 06.7 | 42.3 |
| 5F | 155 | 08.2 | 1,581 | 744 | 37 | 04.6 | 46.9 |
| 5G | 82 | 04.7 | 1,649 | 844 | 25 | 04.8 | 51.3 |
| 5H | 77 | 04.3 | 1,501 | 858 | 23 | 03.5 | 57.0 |
| Ward 5 | 1,257 | 09.1 | 11,289 | 5,243 | 276 | 05.3 | 46.7 |
| 6A | 432 | 28.4 | 1,310 | 419 | 52 | 12.9 | 33.1 |
| 6B | 186 | 09.5 | 1,664 | 682 | 31 | 04.6 | 41.5 |
| 6C | 173 | 09.5 | 1,372 | 634 | 25 | 04.1 | 46.9 |
| 6D | 55 | 02.9 | 1,458 | 769 | 12 | 01.5 | 53.4 |
| 6E | 312 | 19.4 | 1,111 | 421 | 54 | 13.3 | 38.1 |
| 6F | 219 | 13.2 | 1,163 | 395 | 36 | 04.3 | 34.9 |
| 6G | 201 | 11.5 | 1,549 | 815 | 27 | 03.1 | 54.5 |
| 6H | 88 | 04.9 | 1,596 | 752 | 38 | 05.8 | 46.6 |
| Ward 6 | 1,666 | 11.9 | 11,223 | 4,887 | 275 | 05.6 | 44.2 |

55587

| Precinct | Total # Hispanic VAP | % of Hispanic VAP | Total # of Registered Voters | # of Voters Who Turned Out | # of Spanish Surnamed Voters who Turned Out | % of Spanish Surnamed Voters who Turned Out | % of Turn-out |
|---|---|---|---|---|---|---|---|
| 7A | 104 | 05.8 | 1,533 | 908 | 34 | 03.1 | 59.8 |
| 7B | 55 | 03.0 | 1,695 | 1,142 | 25 | 02.0 | 67.7 |
| 7C | 70 | 03.8 | 1,625 | 921 | 20 | 01.6 | 57.7 |
| 7D | 78 | 04.3 | 1,526 | 797 | 17 | 02.9 | 52.2 |
| 7E | 201 | 13.4 | 1,208 | 528 | 30 | 06.0 | 42.0 |
| 7F | 58 | 03.2 | 1,547 | 913 | 18 | 0.2 | 59.1 |
| 7G | 77 | 04.2 | 1,456 | 849 | 27 | 02.9 | 58.1 |
| 7H | 58 | 02.6 | 866 | 491 | 14 | 02.7 | 57.5 |
| Ward 7 | 701 | 04.8 | 11,456 | 6,549 | 185 | 02.8 | 57.3 |
| 8A | 195 | 11.5 | 1,242 | 493 | 39 | 09.8 | 39.9 |
| 8B | 227 | 13.9 | 1,384 | 581 | 40 | 08.5 | 42.4 |
| 8C | 296 | 18.1 | 1,304 | 578 | 50 | 08.9 | 45.2 |
| 8D | 413 | 29.0 | 1,094 | 325 | 58 | 14.6 | 31.2 |
| 8E | 203 | 11.7 | 1,029 | 341 | 18 | 04.8 | 33.1 |
| 8F | 143 | 07.8 | 1,424 | 608 | 42 | 07.3 | 42.6 |
| 8G | 130 | 07.3 | 1,491 | 675 | 31 | 06.8 | 45.6 |
| 8H | 347 | 22.9 | 1,181 | 467 | 63 | 14.0 | 39.5 |
| Ward 8 | 1,954 | 14.7 | 10,149 | 4,068 | 341 | 08.4 | 40.5 |
| **Total** | **23,528** | **21.8** | **200,143** | **32,304** | **4,217** | **13.1** | **42.0** |

55587

5

## DR. STEPHAN THERNSTROM, DEFENDANTS' EXPERT WITNESS

### EXHIBIT C

55588

**2003 Election**

Spanish surname analysis and data provide by Lawyer=s Committee
Voting age population data as provided by 2000 Census
Turn-out data provided by the Springfield Election Commission

| Precinct | Total # Hispanic VAP | % of Hispanic VAP | Total # of Registered Voters | # of Voters Who Turned Out | #of Spanish Surnamed Voters who Turned Out | % of Spanish Surnamed Voters who Turned Out | % of Turn-out |
|---|---|---|---|---|---|---|---|
| Ward 1 | 7,820 | 60.8 | 11,505 | 2,509 | 1,319 | 52.6 | 21.8 |
| Ward 2 | 2,946 | 20.8 | 11,512 | 4,622 | 642 | 13.9 | 40.1 |
| Ward 3 | 4,648 | 37.4 | 8,175 | 1,772 | 363 | 20.5 | 21.7 |
| Ward 4 | 2,536 | 19.6 | 9,275 | 2,420 | 233 | 09.6 | 26.1 |
| Ward 5 | 1,257 | 09.1 | 11,131 | 4,372 | 225 | 05.1 | 39.3 |
| Ward 6 | 1,666 | 11.9 | 11,179 | 4,286 | 228 | 05.3 | 38.3 |
| Ward 7 | 701 | 04.8 | 11,609 | 5,828 | 153 | 02.6 | 50.2 |
| Ward 8 | 1,954 | 14.7 | 10,017 | 2,960 | 265 | 09.0 | 29.5 |
| **Total** | **23,528** | **21.8** | **85,550** | **28,769** | **3,428** | 11.9 | **33.6** |

55588

# DR. STEPHAN THERNSTROM, DEFENDANTS' EXPERT WITNESS

## EXHIBIT D

**Comparison of 2005 and 2006 Spanish Surname Analysis and Data,**
as provided by Voting Section, Civil Rights Division, Department of Justice in United States v. City of Springfield, C.A. No. 06-30123-MAP (D. Mass. 2006)
Voting age population data as provided by 2000 Census

| Precinct | 2000 Census | | 2005 | | | 2006 | | |
|---|---|---|---|---|---|---|---|---|
| | Total # Hispanic VAP | % of Hispanic VAP | Total # of Registered Voters | # of Spanish Surnamed Voters | % of Spanish Surnamed Voters | Total # of Registered Voters | # of Spanish Surnamed Voters | % of Spanish Surnamed Voters |
| 1A | 1,227 | 85.9 | 1,330 | 633 | 76.4 | 1,379 | 1,130 | 81.9 |
| 1B | 1,224 | 85.8 | 1,214 | 598 | 79.5 | 1,218 | 1,031 | 84.7 |
| 1C | 1,217 | 88.6 | 1,314 | 541 | 82.6 | 1,270 | 1,092 | 86.0 |
| 1D | 909 | 56.0 | 1,435 | 548 | 48.8 | 1,477 | 867 | 58.7 |
| 1E | 810 | 48.1 | 1,040 | 388 | 53.8 | 1,074 | 671 | 62.5 |
| 1F | 935 | 59.8 | 1,283 | 406 | 52.5 | 1,378 | 874 | 63.4 |
| 1G | 747 | 38.1 | 1,436 | 296 | 36.4 | 1,455 | 638 | 43.9 |
| 1H | 751 | 41.6 | 986 | 505 | 57.6 | 1,040 | 571 | 54.9 |
| Ward 1 | 7,820 | 60.8 | 10,038 | 3,915 | 39.0 | 10,291 | 6,874 | 66.8 |
| 2A | 479 | 28.6 | 1,187 | 286 | 28.7 | 1,186 | 512 | 43.2 |
| 2B | 482 | 28.1 | 1,422 | 345 | 24.2 | 1,415 | 466 | 32.9 |
| 2C | 482 | 28.4 | 1,287 | 297 | 26.6 | 1,306 | 521 | 40.0 |
| 2D | 353 | 19.5 | 1,338 | 256 | 18.6 | 1,361 | 363 | 26.7 |
| 2E | 311 | 16.9 | 1,515 | 246 | 15.7 | 1,508 | 383 | 25.4 |
| 2F | 450 | 25.2 | 1,321 | 282 | 23.2 | 1,369 | 497 | 36.3 |
| 2G | 152 | 08.2 | 1,422 | 140 | 09.5 | 1,431 | 200 | 14.0 |
| 2H | 237 | 13.4 | 1,305 | 194 | 13.9 | 1,298 | 262 | 20.2 |
| Ward 2 | 2,946 | 20.8 | 10,797 | 2,046 | 18.9 | 10,874 | 3,204 | 29.5 |

| Precinct | 2000 CENSUS | | 2005 | | | 2006 | | |
|---|---|---|---|---|---|---|---|---|
| | Total # Hispanic VAP | % of Hispanic VAP | Total # of Registered Voters | # of Spanish Surnamed Voters | % of Spanish Surnamed Voters | Total # of Registered Voters | # of Spanish Surnamed Voters | % of Spanish Surnamed Voters |
| 3A | 743 | 43.7 | 1,201 | 323 | 43.4 | 1,257 | 654 | 52.0 |
| 3B | 792 | 50.5 | 1,147 | 291 | 45.1 | 1,178 | 710 | 60.3 |
| 3C | 651 | 44.1 | 1,022 | 229 | 34.4 | 1,096 | 558 | 50.9 |
| 3D | 645 | 46.1 | 1,026 | 269 | 45.8 | 1,056 | 586 | 55.5 |
| 3E | 510 | 32.9 | 1,131 | 263 | 36.1 | 1,187 | 563 | 47.4 |
| 3F | 509 | 32.0 | 1,249 | 244 | 31.0 | 1,301 | 577 | 44.4 |
| 3G | 436 | 29.1 | 1,078 | 279 | 39.5 | 1,088 | 547 | 50.3 |
| 3H | 362 | 22.1 | 1,069 | 179 | 23.5 | 1,097 | 350 | 31.9 |
| Ward 3 | 4,648 | 37.4 | 8,923 | 2,077 | 23.6 | 9,260 | 4,545 | 49.0 |
| 4A | 396 | 24.8 | 1,261 | 163 | 18.4 | 1,286 | 381 | 29.6 |
| 4B | 379 | 23.9 | 1,273 | 187 | 19.6 | 1,281 | 319 | 24.9 |
| 4C | 447 | 30.0 | 1,114 | 201 | 29.6 | 1,180 | 453 | 38.4 |
| 4D | 263 | 16.2 | 1,021 | 148 | 19.8 | 1,015 | 278 | 27.4 |
| 4E | 371 | 24.7 | 1,088 | 220 | 28.1 | 1,143 | 385 | 33.7 |
| 4F | 141 | 06.8 | 585 | 45 | 11.5 | 458 | 84 | 18.3 |
| 4G | 372 | 25.5 | 1,339 | 161 | 16.9 | 1,316 | 358 | 27.2 |
| 4H | 167 | 10.5 | 1,130 | 119 | 13.7 | 1,185 | 189 | 16.0 |
| Ward 4 | 2,536 | 19.6 | 8,811 | 1,244 | 11.7 | 8,864 | 2,447 | 27.7 |

55589

3

| Precinct | 2000 CENSUS | | 2005 | | | 2006 | | |
| | Total # Hispanic VAP | % of Hispanic VAP | Total # of Registered Voters | # of Spanish Surnamed Voters | % of Spanish Surnamed Voters | Total # of Registered Voters | # of Spanish Surnamed Voters | % of Spanish Surnamed Voters |
|---|---|---|---|---|---|---|---|---|
| 5A | 222 | 13.4 | 1,078 | 109 | 13.3 | 1,110 | 217 | 20.0 |
| 5B | 225 | 14.3 | 1,279 | 146 | 12.4 | 1,285 | 224 | 17.4 |
| 5C | 181 | 11.8 | 1,215 | 110 | 10.2 | 1,245 | 221 | 17.8 |
| 5D | 127 | 07.1 | 1,257 | 60 | 04.1 | 1,270 | 87 | 06.9 |
| 5E | 188 | 10.6 | 1,424 | 184 | 12.9 | 1,469 | 224 | 15.3 |
| 5F | 155 | 08.2 | 1,481 | 141 | 08.9 | 1,479 | 149 | 10.1 |
| 5G | 82 | 04.7 | 1,455 | 104 | 06.1 | 1,437 | 91 | 06.3 |
| 5H | 77 | 04.3 | 1,451 | 87 | 05.2 | 1,450 | 96 | 06.6 |
| Ward 5 | 1,257 | 09.1 | 10,640 | 941 | 09.2 | 10,745 | 1,309 | 12.2 |
| 6A | 432 | 28.1 | 1,150 | 209 | 25.9 | 1,167 | 424 | 36.3 |
| 6B | 186 | 09.5 | 1,344 | 86 | 06.3 | 1,343 | 151 | 11.2 |
| 6C | 173 | 09.5 | 1,384 | 153 | 11.4 | 1,384 | 211 | 15.3 |
| 6D | 55 | 02.9 | 1,433 | 59 | 03.8 | 1,393 | 53 | 03.8 |
| 6E | 312 | 19.4 | 1,079 | 171 | 19.3 | 1,105 | 328 | 29.7 |
| 6F | 219 | 13.2 | 1,216 | 144 | 14.4 | 1,232 | 232 | 18.8 |
| 6G | 201 | 11.5 | 1,322 | 102 | 08.6 | 1,317 | 214 | 16.3 |
| 6H | 88 | 04.9 | 1,337 | 101 | 06.8 | 1,342 | 117 | 08.7 |
| Ward 6 | 1,666 | 11.9 | 10,265 | 1,025 | 09.3 | 10,283 | 1,730 | 16.8 |

| Precinct | 2000 CENSUS | | 2005 | | | 2006 | | |
| | Total # Hispanic VAP | % of Hispanic VAP | Total # of Registered Voters | # of Spanish Surnamed Voters | % of Spanish Surnamed Voters | Total # of Registered Voters | # of Spanish Surnamed Voters | % of Spanish Surnamed Voters |
|---|---|---|---|---|---|---|---|---|
| 7A | 104 | 05.8 | 1,406 | 107 | 06.7 | 1,422 | 141 | 09.9 |
| 7B | 55 | 03.0 | 1,624 | 64 | 03.1 | 1,605 | 61 | 03.8 |
| 7C | 70 | 03.8 | 1,549 | 71 | 03.8 | 1,553 | 56 | 03.6 |
| 7D | 78 | 04.3 | 1,436 | 55 | 03.1 | 1,421 | 85 | 06.0 |
| 7E | 201 | 13.4 | 1,247 | 136 | 11.9 | 1,308 | 224 | 17.1 |
| 7F | 58 | 03.2 | 1,452 | 55 | 03.4 | 1,476 | 54 | 03.7 |
| 7G | 77 | 04.2 | 1,547 | 77 | 04.1 | 1,530 | 79 | 05.2 |
| 7H | 58 | 02.6 | 788 | 52 | 05.4 | 774 | 39 | 05.0 |
| Ward 7 | 701 | 04.8 | 9,602 | 617 | 06.4 | 11,089 | 739 | 06.7 |
| 8A | 195 | 11.5 | 1,130 | 149 | 13.3 | 1,145 | 195 | 17.0 |
| 8B | 227 | 13.9 | 1,198 | 172 | 15.2 | 1,233 | 246 | 20.0 |
| 8C | 296 | 18.1 | 1,324 | 186 | 15.6 | 1,337 | 286 | 21.4 |
| 8D | 413 | 29.0 | 1,112 | 183 | 23.6 | 1,133 | 442 | 39.0 |
| 8E | 203 | 11.7 | 969 | 133 | 15.8 | 980 | 213 | 21.7 |
| 8F | 143 | 07.8 | 1,183 | 144 | 14.4 | 1,207 | 188 | 15.6 |
| 8G | 130 | 07.3 | 1,501 | 154 | 10.4 | 1,493 | 239 | 16.0 |
| 8H | 347 | 22.9 | 1,185 | 222 | 28.1 | 1,205 | 337 | 28.0 |
| Ward 8 | 1,954 | 14.7 | 9,602 | 1,343 | 14.0 | 9,733 | 2,146 | 22.0 |
| Total | 23,528 | 21.8 | 80,125 | 13,208 | 16.5 | 81,139 | 22,994 | 28.3 |

55589

# DR. STEPHAN THERNSTROM, DEFENDANTS' EXPERT WITNESS

## EXHIBIT E

**2005 Election**

Spanish surname analysis and data provide by Voting Section, Civil Rights Division, Department of Justice in <u>United States</u> v. <u>City of Springfield</u>, C.A. No. 06-30123-MAP (D. Mass. 2006)
Voting age population data as provided by 2000 Census
Turn-out data provided by the Springfield Election Commission

| Precinct | Total # Hispanic VAP | % of Hispanic VAP | Total # of Registered Voters | # of Spanish Surnamed Voters | % of Spanish Surnamed Voters | # of Reg. Voters Turned out | % of Turn-out |
|---|---|---|---|---|---|---|---|
| 1A | 1,227 | 85.9 | 1,330 | 633 | 76.4 | 218 | 16.4 |
| 1B | 1,224 | 85.8 | 1,214 | 598 | 79.5 | 212 | 17.5 |
| 1C | 1,217 | 88.6 | 1,314 | 541 | 82.6 | 192 | 14.6 |
| 1D | 909 | 56.0 | 1,435 | 548 | 48.8 | 359 | 25.0 |
| 1E | 810 | 48.1 | 1,040 | 388 | 53.8 | 119 | 11.4 |
| 1F | 935 | 59.8 | 1,283 | 406 | 52.5 | 239 | 18.6 |
| 1G | 747 | 38.1 | 1,436 | 296 | 36.4 | 205 | 14.3 |
| 1H | 751 | 41.6 | 986 | 505 | 57.6 | 108 | 11.0 |
| Ward 1 | 7,820 | 60.8 | 10,038 | 3,915 | 39.0 | 1,652 | 16.2 |
| 2A | 479 | 28.6 | 1,187 | 286 | 28.7 | 310 | 26.1 |
| 2B | 482 | 28.1 | 1,422 | 345 | 24.2 | 566 | 39.8 |
| 2C | 482 | 28.4 | 1,287 | 297 | 26.6 | 348 | 28.0 |
| 2D | 353 | 19.5 | 1,338 | 256 | 18.6 | 464 | 34.7 |
| 2E | 311 | 16.9 | 1,515 | 246 | 15.7 | 597 | 39.4 |
| 2F | 450 | 25.2 | 1,321 | 282 | 23.2 | 386 | 29.2 |
| 2G | 152 | 08.2 | 1,422 | 140 | 09.5 | 556 | 39.1 |
| 2H | 237 | 13.4 | 1,305 | 194 | 13.9 | 411 | 31.5 |
| Ward 2 | 2,946 | 20.8 | 10,797 | 2,046 | 18.9 | 3,638 | 33.7 |

55590

| Precinct | Total # Hispanic VAP | % of Hispanic VAP | Total # of Registered Voters | # of Spanish Surnamed Voters | % of Spanish Surnamed Voters | # of Reg. Voters Turned out | % of Turn-out |
|---|---|---|---|---|---|---|---|
| 3A | 743 | 43.7 | 1,201 | 323 | 43.4 | 175 | 14.6 |
| 3B | 792 | 50.5 | 1,147 | 291 | 45.1 | 129 | 11.3 |
| 3C | 651 | 44.1 | 1,022 | 229 | 34.4 | 116 | 11.4 |
| 3D | 645 | 46.1 | 1,026 | 269 | 45.8 | 126 | 12.3 |
| 3E | 510 | 32.9 | 1,131 | 263 | 36.1 | 143 | 12.6 |
| 3F | 509 | 32.0 | 1,249 | 244 | 31.0 | 167 | 13.4 |
| 3G | 436 | 29.1 | 1,078 | 279 | 34.5 | 139 | 12.9 |
| 3H | 362 | 22.1 | 1,069 | 179 | 23.5 | 186 | 17.4 |
| Ward 3 | 4,648 | 37.4 | 8,923 | 2,077 | 23.6 | 1,181 | 13.2 |
| 4A | 396 | 24.8 | 1,261 | 163 | 18.4 | 312 | 24.7 |
| 4B | 379 | 23.9 | 1,273 | 187 | 19.6 | 260 | 20.4 |
| 4C | 447 | 30.0 | 1,114 | 201 | 29.6 | 191 | 17.2 |
| 4D | 263 | 16.2 | 1,021 | 148 | 19.8 | 175 | 17.1 |
| 4E | 371 | 24.7 | 1,088 | 220 | 28.1 | 180 | 16.5 |
| 4F | 141 | 06.8 | 585 | 45 | 11.5 | 105 | 18.0 |
| 4G | 372 | 25.5 | 1,339 | 161 | 16.9 | 301 | 22.5 |
| 4H | 167 | 10.5 | 1,130 | 119 | 13.7 | 264 | 23.4 |
| Ward 4 | 2,536 | 19.6 | 8,811 | 1,244 | 11.7 | 1,788 | 20.3 |

| Precinct | Total # Hispanic VAP | % of Hispanic VAP | Total # of Registered Voters | # of Spanish Surnamed Voters | % of Spanish Surnamed Voters | # of Reg. Voters Turned out | % of Turn-out |
|---|---|---|---|---|---|---|---|
| 5A | 222 | 13.4 | 1,078 | 109 | 13.3 | 274 | 25.4 |
| 5B | 225 | 14.3 | 1,279 | 146 | 12.4 | 329 | 25.7 |
| 5C | 181 | 11.8 | 1,215 | 110 | 10.2 | 322 | 26.5 |
| 5D | 127 | 07.1 | 1,257 | 60 | 04.1 | 516 | 41.1 |
| 5E | 188 | 10.6 | 1,424 | 184 | 12.9 | 443 | 31.1 |
| 5F | 155 | 08.2 | 1,481 | 141 | 08.9 | 551 | 37.2 |
| 5G | 82 | 04.7 | 1,455 | 104 | 06.3 | 576 | 39.6 |
| 5H | 77 | 04.3 | 1,451 | 87 | 05.2 | 654 | 45.1 |
| Ward 5 | 1,257 | 09.4 | 10,640 | 941 | 09.2 | 3,665 | 34.5 |
| 6A | 432 | 28.1 | 1,150 | 209 | 25.9 | 255 | 22.2 |
| 6B | 186 | 09.5 | 1,344 | 86 | 06.3 | 512 | 38.1 |
| 6C | 173 | 09.5 | 1,384 | 153 | 11.4 | 544 | 39.3 |
| 6D | 55 | 02.9 | 1,433 | 59 | 03.8 | 623 | 43.5 |
| 6E | 312 | 19.4 | 1,079 | 171 | 19.3 | 275 | 25.5 |
| 6F | 219 | 13.2 | 1,216 | 144 | 14.4 | 301 | 24.8 |
| 6G | 201 | 11.5 | 1,322 | 102 | 08.6 | 435 | 32.9 |
| 6H | 88 | 04.9 | 1,337 | 101 | 06.8 | 493 | 36.9 |
| Ward 6 | 1,666 | 11.9 | 10,265 | 1,025 | 09.3 | 3,438 | 33.5 |

| Precinct | Total # Hispanic VAP | % of Hispanic VAP | Total # of Registered Voters | # of Spanish Surnamed Voters | % of Spanish Surnamed Voters | # of Reg. Voters Turned out | % of Turn-out |
|---|---|---|---|---|---|---|---|
| 7A | 104 | 05.8 | 1,406 | 107 | 06.7 | 653 | 46.4 |
| 7B | 55 | 03.0 | 1,624 | 64 | 03.1 | 956 | 58.9 |
| 7C | 70 | 03.8 | 1,549 | 71 | 03.8 | 739 | 47.7 |
| 7D | 78 | 04.3 | 1,436 | 55 | 03.1 | 631 | 43.9 |
| 7E | 201 | 13.4 | 1,247 | 136 | 11.9 | 313 | 25.1 |
| 7F | 58 | 03.2 | 1,452 | 55 | 03.4 | 664 | 45.7 |
| 7G | 77 | 04.2 | 1,547 | 77 | 04.1 | 373 | 24.1 |
| 7H | 58 | 02.6 | 788 | 52 | 05.4 | 690 | 87.6 |
| Ward 7 | 701 | 04.8 | 11,049 | 617 | 06.4 | 5,019 | 45.4 |
| 8A | 195 | 11.5 | 1,130 | 149 | 13.3 | 331 | 29.3 |
| 8B | 227 | 13.9 | 1,198 | 172 | 15.2 | 310 | 25.9 |
| 8C | 296 | 18.1 | 1,324 | 186 | 15.6 | 382 | 28.9 |
| 8D | 413 | 29.0 | 1,112 | 183 | 23.6 | 179 | 16.1 |
| 8E | 203 | 11.7 | 969 | 133 | 15.8 | 186 | 19.2 |
| 8F | 143 | 07.8 | 1,183 | 144 | 14.4 | 356 | 30.1 |
| 8G | 130 | 07.3 | 1,501 | 154 | 10.4 | 418 | 27.9 |
| 8H | 347 | 22.9 | 1,185 | 222 | 28.1 | 313 | 26.4 |
| Ward 8 | 1,954 | 14.7 | 9,602 | 1,343 | 14.0 | 2,475 | 25.8 |
| **Total** | **23,528** | **21.8** | **80,125** | **13,208** | **16.5** | **22,856** | **33.6** |

55590

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing "Defendants' Affidavit of Direct Testimony Dr

Stephan Thernstrom, Defendants' Expert Witness" has been served on the following counsel of

record on the 8th day of February 2007, via the ECF system and will be sent electronically to the

registered participants as identified on the Notice of Electronic Filing (NEF).

Nadine Cohen, Esquire
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
    OF THE BOSTON BAR ASSOCIATION
294 Washington Street, Suite 443
Boston, Massachusetts 02108

Paul E. Nemser, Esquire
J. Anthony Downs, Esquire
Monica M. Franceschini, Esq.
GOODWIN PROCTOR LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109

Edward M. Pikula (BBO #399770)
    City Solicitor
Deanne Bogan Ross (BBO #555407)
City of Springfield
Law Department
36 Court Street, Room 210
Springfield, Massachusetts 01103

55554 ver. 3