UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARISE FOR SOCIAL JUSTICE; <br> ¿OISTE?; NEW ENGLAND STATE-AREA <br> CONFERENCE OF THE NAACP; <br> REV. TALBERT W. SWAN, II; <br> NORMAN W. OLIVER; DARLENE <br> ANDERSON; GUMERSINDO GOMEZ; <br> FRANK BUNTIN; RAFAEL RODRIQUEZ; <br> and DIANA NURSE <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF SPRINGFIELD and SPRINGFIELD <br> ELECTION COMMISSION <br><br> Defendants. | Civil Action No. 05-30080-MAP |

# DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY
## JACK MCDEVITT, ASSOCIATE DEAN
## OF RESEARCH AND GRADUATE STUDIES, CENTER FOR CRIMINAL JUSTICE POLICY RESEARCH, NORTHEASTERN UNIVERSITY

I, Dean Jack McDevitt, on oath, do hereby state as follows:

*Background, Education*
1) My name is Jack McDevitt and I am the Associate Dean of Research and Graduate Studies, College of Criminal Justice, Northeastern University. I direct the Program for the College of Criminal Justice including the activities of the PhD in Criminology and Justice Studies. I am also responsible for coordinating all research activities at the College and direct two research centers: the interdisciplinary Institute on Race and Justice and the Center for Criminal Justice Policy Research (2000-present). I received a Bachelors of Art in Political Science from Stonehill College and a Masters of Public Administration from Northeastern University. My fields of interest and specialization are: Race and Justice Studies, Research Methodology and Statistics, and Criminal Justice Organizations. Among the courses that I have taught are: Juvenile Justice Administration, Criminal Justice Administration, Criminology, Diversity in the Criminal Justice System, and Research. I have numerous publications, articles, books chapters, and books.

55597

2) Among the reports – in addition to the Massachusetts Racial and Gender Profiling Report (with Dr Amy Farrell, Erica Pierce, Carsten Andreisen) Report to Massachusetts Executive Office of Public Safety May 2004 -- as to which I have been among the authors: New Challenges in Confronting Racial Profiling in the 21 Century (with Amy Farrell and Jana Rumminger) Soros Open Society Foundation Spring 2005; Wakefield Workplace Violence Final Report, September 1, 2004 (with Jack Greene, Mary Yee, Jen Paniello) Presented to Massachusetts Executive Office of Public Safety; Rhode Island Traffic Stop Statistics Act Final Report (with Amy Farrell, Shea Cronin and Erica Pierce Rhode Island Attorney General June 2003; Safety and Security at the Olympic Games in Salt Lake City (with Jack Greene, Scott Decker, Vince Webb, Tim Bynum, Pete Manning, Jeff Rojek, Sean Varanno, Bill Terrill For the Office of Domestic Preparedness Dec 2002; and "A Resource Guide on Racial Profiling Data Collection Systems: Promising Practices and Lessons Learned" with Amy Farrell and Deborah Ramirez, Bureau of Justice Assistance, Summer 2000. For and about Boston, I have been among the authors issuing the following reports: "Boston Police Department's Strategic Planning Process Phase One" Final Report to the National Institute of Justice grant # 95-IJ-CX 0063 (with Michael Shively, Susan Bennett, Jennifer Balboni, and Micheal Buerger) July 1999; "Boston Update '94: A New Agenda for a New Century" (with Joseph R. Barresi and Joseph Slavet), A Special Report, the John W. McCormack Institute of Public Affairs, April 1994; "Report of the Boston Police Department Management Review Committee" (with Edward Tobin and Glenn Pierce), Submitted to Mayor Ray Flynn, January 14, 1992; "The Character of Racial Incidents in Boston 1983 – 1987" final report submitted to The Boston Foundation, January 1988; "Boston's Move to Foot Patrol: The Implementation and Impact of a Major Patrol Reallocation Strategy," (with William Bowers, Jonathan Hirsch and Glenn Pierce), Final Report submitted to the National Institute of Justice Control Theory Program – December, 1985; and "Evaluation of Effectiveness of Justice Resource Institute's Neighborhood Crime Prevention Program in Boston," (with Glenn Pierce and Nancy Baird) Report submitted to Justice Resource Institute – September, 1983; and "Public Safety Needs and Victimization Experience of Residents and Employees of Fenway Section of Boston," Report submitted to Street Safe Project of the Boston Fenway Program – March, 1983

*Racial Profiling Study*
3) I, along with my colleagues, Dr. Amy Farrell, Lisa Bailey, Carsten Anderson, and Erica Pierce, were the authors of the 2004 Massachusetts Racial and Gender Profiling Study. This study was "commissioned" by state statute, Chapter 228 of the Acts of 2000, "An Act Providing for the Collection of Data Relative to Traffic Stops" and "was intended to [produce] data necessary for a statewide assessment of racial and gender profiling with the overall aim of identifying and eventually eliminating any instances of profiling." My Institute in Northeastern University received the contract to conduct the investigation and to analyze information provided by the Registry of Motor Vehicles to record "data on the race, gender, and search status of individuals receiving a citation or a warning for the period of time April 1, 2001 and June 30, 2003."[1] The study that we produced in 2004, Massachusetts Racial and Gender Profiling Study, Final Report, May 4, 2004 ("Report") was intended as a "beginning" and not an end. The study was not intended to provide a finding that racial profiling in traffic stops did – or did not –

---

[1] Massachusetts Racial and Gender Profiling Study, Final Report, May 4, 2004 ("Report") at 1. This did represent an expansion of the period of time during which the Chapter 228 required analysis and was in response to the fact that RMV provided data for a much longer period of time.

exist in any of the communities in Massachusetts, but rather indicated those communities that should conduct further investigation.

a) "Racial disparities in citations can result from a number of factors. . ., [including] [b]ias on the part of an individual officer. . ., department deployment decisions, targeted enforcement actions[,] or by differential rates of traffic violations." Report at 2. For example, [i]n some communities, police commanders may assign a larger number of officers to a particular neighborhood because that neighborhood has more crime and thus an increased need for police services." Accordingly where there is an increased police presence, it is more likely that persons living in those neighborhoods will be subject to traffic stops where police engage in traffic enforcement as part of their normal patrol activities. Id. at 2.

b) In addition, it is important to reassert that while this data provided evidence of a correlation between race, ethnicity, and gender and traffic stops, it did not – nor could it have – "identify motives involved in individual traffic stops, citations or other enforcement decisions." Id.

c) We studied 366 law enforcement agencies and make an assessment based upon 16 measures that we studied. Specially we looked at four population groups: Nonwhite. Black, Hispanic, and Nonwhite male and four measures: i) resident citations; ii) driving population; iii) search disparities; and citations vs. warnings. Of the 355 law enforcement agencies, 249 had evidence of a racial disparity in at least one of these 16 measures. Then-Commissioner of Public Safety, Edward Flynn (the current Police Commissioner for Springfield) pursuant to the legislation ordered all of the 249 agencies to collect additional data for a one-year period. Ninety-five of those agencies appealed to the Attorney General, who that all but two (due to size of town and lack of population) were required to comply with the Commissioner's request. It is worth noting that Commissioner Flynn met with opposition from the Massachusetts Police Chief Association, which, at some point, called for his resignation. As I understand it, primary among the reasons for the opposition to the additional year of information gathering was that it would require additional paperwork – where forms were required to be completed (where they had not been previously required) for stops that resulted in either "verbal and written warnings."

*Citizen Oversight Process*
4) My history with Springfield dates back to the hearings and investigation conducted pursuant to complaint filed by the Pastors' Council of Springfield with the Massachusetts Commission Against Discrimination. I provided "input" in the form of expert opinion. As part of the Settlement Agreement (May, 2006) between the City of Springfield and Pastors' Council, I was to be retained to assist in the development of a "citizen review board" and a process of reviewing citizen complaints that "has integrity and is perceived as fair and viewed positively. . .by both the community and the police." Chief, among the "elements" of such a "successful program involving a citizen review board," was/is the following: "1) community awareness; 2) transparency; 3) timely investigations; and 4) respected community representatives."

a) Prior to 2006, the Police Commission oversaw the general operation of the Police Department, including hiring, firing, promoting and final determinations as to complaints made against various members of the Springfield Police Department. Members of the Springfield Police Commission were appointed by the Mayor . This "arrangement" where an appointed Police Commission controlled personnel appointments and was so involved in the management

3

of the Department was relatively rare in a city of the size of Springfield and, generally, considered not to be an arrangement that would produce the most effective policing operations.
b) The Chief of Police was a position subject to civil service and therefore was not directly accountable to any Springfield elected officials and, accordingly, citizens' dissatisfaction could not be expressed in the polls.

5) I have been retained by the City of Springfield in November, 2006, along with Dr. Amy Farrell to discuss and make recommendations on a "Civilian Review Board." Our final report is "due" March 31, 2007 and we will be reviewing models of various civilian oversight boards throughout the country, as well as interviewing community leaders, members of the Police Department, key players and stakeholders. We will be "identify[ing] successful strategies for agencies that are similar to Springfield in size and organizational structure and history." To that end, I will continue to meet with "local stakeholders to identify needs and the strengths and challenges of previous oversight practices, including "command staff and rank and file personnel from the Springfield Police Department," City officials, "[c]ommunity representatives and other stakeholders including members of the Parish Council," and members of the previous Police Commission."

a) Since that time, Dr. Farrell and I have met with the Police Commissioner, Deputy Chiefs, the Police Union representatives, the Mayor, and members of the City Council and all are committed to and support the creation of some kind of civilian oversight board.
b) We have begun to conduct meetings with community. On January 25, 2007, we had our first meeting with community leaders and citizens. Those in attendance and others have been encouraged to gather citizen groups and make arrangements to speak with Dr. Farrell and me. Among the things that were considered was the scope of authority of the citizens' oversight board and manner in which its members would be chosen (and trained).
c) While these kinds of meetings inevitably give "air" to various second and third hand reports of police misconduct, it is not the purpose or the intent of these meetings to identify, investigate, or make any determination regarding the validity of these complaints or to make any evaluation of the degree to which the Police Department fulfilled or met its duties and responsibilities to protect and secure the safety of the citizens of the City of Springfield – in the past or in the present. Our role is to suggest a model for a citizen's oversight board and other measures that would best provide for better communication between police and citizens and an atmosphere of trust and cooperation. In the case of out investigation, real problems as well as the perception of problems are relevant to our inquiry and will inform our recommendations.
d) Ultimately, however, the Mayor will determine the model for a civilian oversight boards that the City will adopt, as well as the degree to which determinations of the civilian review board will be binding upon the Police Commissioner.

6) There are four distinct models for civilian oversight boards used throughout the country: i) external board that conducts investigations and recommends discipline; ii) external board that reviews police-conducted investigations; iii) external board that review investigations conducted by monitors; and iv) combinations that might include a monitor and a citizen review plan. "Research on citizen oversight has consistently shown that agencies must develop models that meet the needs, history and culture of the local community."

7) In Boston, after conducting a study and assessment similar to Springfield's, we recommended that Boston appoint an ombudsman and a pool of trained persons – five of whom the ombudsman could call to constitute a panel to review a particular complaint. Training would include attendance to the Citizen's Police Academy and instruction as to the manner in which an investigation of a complaint ought to be conducted, the nature of evidence that should be gathered, and the kinds of information that should be included in a report. Such a citizen oversight panel would review the file compiled by the Department of Internal Affairs and could request additional information, render different findings and make alternative recommendations. Boston did not adopt our recommendations in full but has announced that most of our recommendations will be incorporated into the ultimate model the City will adopt. To this date Boston has not implemented a civilian oversight model but has hired three persons to serve as ombudspersons. Indeed, few cities in this area have a citizen complaint review process – even cities with significant minority population. It is to the credit of Springfield, that it is committed to the creation of some form of a civilian oversight process.

8) Finally, I would like to note that among the problems that we have identified in the few days of our meetings with elected officials, representatives of the Police Department, and citizens is the fact that the many positive, productive, community-based activities in which the Police are involved receive very little attention. But as often is the case, many positive programs, initiatives, inter-actions with the community are erased in the minds of the public by one negative action by one Police officer.. Accordingly, among my recommendations will be some kind of sustained initiative to inform the community about allegations of police misconduct, the investigations of those allegations to prevent them from obscuring the positive initiatives that the Police Department has accomplished and the many in which the safety and security of the City's citizens have been protected. It is hoped that a civilian oversight process will provide that kind of balanced representation and reassure citizens that problematic behavior or police conduct will be addressed appropriately and all reasonable efforts will be expended to prevent its reoccurrence.

Signed under penalties of perjury this 9 day of February, 2007

Dean Jack McDevitt

5

**DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY
JACK MCDEVITT, ASSOCIATE DEAN
OF RESEARCH AND GRADUATE STUDIES, CENTER FOR CRIMINAL
JUSTICE POLICY RESEARCH, NORTHEASTERN UNIVERSITY**


**EXHIBIT A**

*Jack McDevitt*
*7 Beaver Brook Dr.*
*Holliston Mass 01746*

**Scope of Services**
In the last ten years progressive law enforcement agencies nationwide have heeded public calls for openness and transparency. Police leaders, academic experts and national police organizations have endorsed the use of civilian oversight as a way to increase trust between local police agencies and their community. Without argument, civilian oversight into the investigation of complaints and use-of-force incidents is quickly becoming a national standard for policing in the United States. In fact, the Bureau of Justice reports that by 2005, 79% of those police agencies with 1,000 or more officers have civilian complaint review processes in place in their agency. Conversely, agencies who have resisted any external review have in many cases found the investigative authority of the department removed and displaced entirely to an external body. Research on citizen oversight has consistently shown that agencies must develop models that meet the needs, history and culture of the local community. To assist the City of Springfield in developing a civilian oversight process, Dean Jack McDevitt and Dr. Amy Farrell will provide technical assistance through the following services.

**PHASE I: National Review**
- Review national best practices in civilian oversight
- Identify successful strategies for agencies that are similar to Springfield in size, organizational structure and history.

**PHASE II: Local Needs Assessment**
- Meet with local stakeholders to identify local needs and the strengths and challenges of previous oversight practices. Meetings could include:
    - Command staff and rank and file personnel from the Springfield Police Department
    - Officials from the City of Springfield
    - Community representatives and other stakeholders including members of the Parish Council
    - Members of the previous Police Commission

**PHASE III: Recommendations**
- Develop a set of recommendations for increasing Civilian oversight in the Springfield Police Department

- Present the recommendations to City officials, Police Officials and the Community in a manner proscribed by Mayors Office

**Project Schedule**

The project will be completed over the period January 2006 – September 2006

**Project Costs**

The total costs for the project will be $24,000 which represents a 16 day commitment from each Dean McDevitt and Dr Farrell at $750 day. These costs include personnel time, travel, materials and other associated project related expenses.

_____  _____
Jack McDevitt                                        Amy Farrell
SS# 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                                   SS#

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing "Defendants' Affidavit of Direct Testimony Jack McDevitt, Associate Dean of Research and Graduate Studies, Center for Criminal Justice Policy Research, Northeastern University" has been served on the following counsel of record on the 9th day of February 2007, via the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

> Nadine Cohen, Esquire
> LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
>    OF THE BOSTON BAR ASSOCIATION
> 294 Washington Street, Suite 443
> Boston, Massachusetts 02108
>
> Paul E. Nemser, Esquire
> J. Anthony Downs, Esquire
> Monica M. Franceschini, Esq.
> GOODWIN PROCTOR LLP
> Exchange Place
> 53 State Street
> Boston, Massachusetts 02109

_____
Edward M. Pikula (BBO #399770)
   City Solicitor
Deanne Bogan Ross (BBO #555407)
City of Springfield
Law Department
36 Court Street, Room 210
Springfield, Massachusetts 01103