UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARISE FOR SOCIAL JUSTICE;<br>¿OISTE?; NEW ENGLAND STATE-AREA<br>CONFERENCE OF THE NAACP;<br>REV. TALBERT W. SWAN, II;<br>NORMAN W. OLIVER; DARLENE<br>ANDERSON; GUMERSINDO GOMEZ;<br>FRANK BUNTIN; RAFAEL RODRIQUEZ;<br>and DIANA NURSE | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 05-30080-MAP<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>)<br>) |
| CITY OF SPRINGFIELD and SPRINGFIELD<br>ELECTION COMMISSION | )<br>)<br>) |
| Defendants. | )<br>) |

**DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY
MAYOR CHARLES V. RYAN,
CITY OF SPRINGFIELD**

I, Charles V. Ryan, on oath, do hereby state as follows:

**Background, Civic Involvement**
1) My name is Charles Ryan and I am the Mayor of Springfield and have been since
2004.   I was born and raised in the City of Springfield, as was my wife. Indeed, my
family's history in Springfield dates back to 1850s. I attended Classical High School and
then served in the army for over a year. I graduated from  Georgetown University and
Boston College Law School. I practiced law in Springfield and raised a family of 11
children. In 1959 I was the Chairman of the New Springfield Committee and
spearheaded the adoption of Plan A. I served as the first Mayor of Springfield under the
Plan A form of government from 1962-1967.  In 1968-1969 I was a visiting professor of
Urban Affairs at Springfield College.

2) I have always been very involved in the City of Springfield and committed to its
progress and its citizens. Between 1976-1984, I served as president and chairman of
Springfield Central.    I was the first lay person to be elected as chairman of Elms
College Board of Trustees. I was co-chairman of a $5,000,000 fund drive for Sisters of

St. Joseph (1998-2000). In 1994-1995, I served as chairman of Citizens Against Casino Gambling and in 2003 became the chairman of the City Council Library Study Committee that investigated the closing of several of the City's libraries and the sale of the newly renovated Mason Square Library.

**Pre-1961 Bicameral Form of Government**

3)   Prior to 1961, Springfield's legislative body was bicameral, established by a 1852 "home grown" charter, Chapter 94 of the Acts of 1852.

4) The Charter provided for a 18-member Common Council ("Lower Board"), which was elected in partisan elections from the City's eight wards. Two members were elected from Wards 1, 2, 5, 6, 7, and 8 in partisan elections in which voters had two choices and the two candidates receiving the greatest number of voters were elected. Three members were elected from Wards 3 and 4 in partisan elections in which voters had three choices and the three candidates receiving the greatest number of voters were elected. The eight-member Board of Aldermen ("Upper Board") was elected in partisan at-large elections from residency districts (wards).

5) Prior to 1961, the Common Council and the Board of Aldermen (City Council, collectively) had significant administrative authority, in addition to its traditional legislative powers. The City Council had extensive powers of appointment with regard to most non-civil service department heads, as well as boards and commissions charged with the authority and responsibility of conducting the "business" of the City and providing various services to its citizens. In fact, the City Council, by a 2/3 vote of the Board and the Common Council could establish a new board or commission. Chapter 94 of the Acts of 1877, Section 38. The pre-1961 City Council had the power to enact ordinances and make all appropriations, enter into contracts, hire contractors and architects; order and oversee "million dollar operations;" authorize the sale of bonds; establish election districts. Indeed, the City Council was under no obligation to choose the "lowest bid" when awarding city contracts. The pre-1961 City Council had the power to remove the Mayor by a 2/3 vote of both the Board of Aldermen and the Common Council.

6) Prior to 1961, the Mayor had limited authority to appoint department heads or to direct or oversee the operation of the various City departments, in many cases; the Mayor had no authority to enter into contracts or to determine the allocation of public funds and services. The pre-1961 Mayor had no oversight authority with regard to capital expenditures and construction and renovation of public buildings.

7) Accordingly, chief among the complaints about the pre-1961 form of government was that the Mayor was not provided with the executive authority that rightfully belonged to that position. At the time, most cities in the United States of the size of Springfield had either a strong-mayor form of government or a council-city manager form of government and the two approaches were believed to be the best form of municipal government. In each of these cities, the mayor or the city manager was the chief executive officer and was provided with sufficient powers to conduct the "business" of the City.

8) During the year preceding the 1959 vote on the Plan A form of government, contract abuses were frequently cited as evidence of wastefulness and wrongdoing of the pre-1961 City Council.

9) More specifically, the City Council not only had a history of making very bad, ill-considered, wrongful decisions.    At the time the most compelling contemporaneous example of the "ineptness" of the City Council was the construction of Duggan Junior High School – the construction of which was overseen by six different City Property Committees, all of whom had a "hand" in the selection of contractors.  There were charges that City Property Committees failed to award the site contract to the lowest bidder.  There were significant cost overruns due to conflicting directions and requirements as to grading and elevation of the site that had formerly been a dump.
In the end, it was deemed impossible to determine which of the six City Property Committees and/or who among the members were responsible.

10)  The pre-1961 City Council was criticized for lack of accountability.  Given the numerous committees, commissions, and boards conducting the "business" of the City and the general lack of oversight or direction from persons with skills, training, and education appropriate to the exercise of the City's duties and responsibilities,  it was impossible to determine which members were responsible for errors in judgment, financial irresponsibility, lack of direction, malfeasance, and failure to follow appropriate, prescribed procedures and comply with the law.

11) Even where, on some few occasions, it was possible to identify the individual members of the Common Council who were responsible for a criticized action or inaction, the method of election that provided for election of members of the Common Council from wards foreclosed the ability of voters to convey – by means of the ballot box -- their assessment of the performance of an elected official who did not reside in the same ward as did the disgruntled voters.  In essence, only about 40 percent of the members of the City Council were accountable to the individual voter

**Plan A Form of Government**
12)  In 1959, I chaired the New Springfield Committee (NSC or "Committee"), which was comprised of between 15-18 citizens from "all walks of life," including management, labor, government, education, clergy, for the purpose of advancing a strong mayor form of government in the City of Springfield – Plan A.

13) Plan A form of government, M.G.L. c.43, §§46-55, established a mayor-council form of government.  Plan A provides for a mayor with significant powers executive and administrative powers elected in non-partisan elections every two years.  Under Plan A the Mayor is the chief executive officer and, as such, is expected to ensure that all laws are faithfully enforced.

14)  As the chief executive and administrative officer, the Mayor supervises and coordinates various departmental programs.  Under Plan A the Mayor has the power to appoint and remove all department heads without City Council approval as well as members to the City's numerous boards and commissions.  Under "Plan A," the Mayor appoints members to the Board of Appeals, the Board of the Park Commission, the Board of the Fire Commission, Board of the

Police Commission, the Personnel Commission, the Board of Public Welfare, and the Public Utilities Commission. The Mayor also appoints the City Treasurer (elected by the people prior to 1961)

15) Under Plan A the Mayor has the authority to enter into contracts and to enforce or execute contracts on behalf of the City. Under Plan A, the Mayor is the primary policy maker.

16) As chief financial officer, the Mayor has the power and responsibility to submit the annual budget and to supervise the expenditure of funds in accordance with the terms of the budget. Finally, the Mayor is the ceremonial head of the City, and, as such, is required to attend numerous public functions.

17) Plan A provides for a nine-member City Council, elected at large in non-partisan elections to two-year, non-staggered terms. The City Council is vested with the power to cut, but not raise, the Mayor's budget. Under Plan A the City Council retained the power to pass ordinances and make appropriations, to authorize the sale of bonds, and to establish voting districts.

18) Plan A also abolished several boards and commissions, including the two most controversial: the City Property Committee and the Board of Supervisors. These were the committees that gave enormous expenditure power to the Council.

19) Plan A provides for a six-member School Committee, elected at-large in non-partisan elections to four year, staggered terms, with the Mayor serving as the seventh member and chairman of the School Committee. M.G.L. c.43, §31. Under "Plan A, the School Committee retained its financial autonomy and the scope of its authority. Under "Plan A, the School Committee assumed the authority for maintenance of the schools

20) In 1959, there was not a "plan" available, as among the those alternative forms of municipal governance adopted by the State Legislature, that provided for an elected mayor and a City Council elected entirely from wards or single-member districts. Rather, for example, Plans D and E provide for a council-city manager form of government. Plan B provided for a mixed method of election in a mayor-council form of government.

21) The New Springfield Committee recruited over a thousand of volunteers who went door-to-door to collect signatures to place the question of the adoption of Plan A on the ballot. In the end, 739 petitions were presented to the Election Commission on which there were the signatures of 14,453 Springfield voters – almost twice as many signatures as were required. .

22) I, as chairman of the Committee, in addition to others, including William G. O'Hare, director of the Bureau of Government Research at the University of Massachusetts, Stuart G. Waite, the only member of the City Council to have endorsed the Plan A form of government, and Rev. Charles E. Cobb, publicly debated with opponents of the change in numerous forums. Significant among the opponents of the change were the members of the Common Council and Board of Aldermen, including Paul R. Mason, an African American, Theodore W. Bamforth, Genario Sarno, and Tycho Peterson, and Alderman Victor W. White, as well as Street

Superintendent James J. Sullivan, who was a particularly vocal opponent of "Plan A, largely because, under "Plan A, the Street Superintendent would be appointed by and report to the Mayor and would no longer be in a position to do "favors" for various members of the City Council

23) The proponents of Plan A asserted that the advantages were that it would i) clearly define responsibility in administration and in over-all policy planning; ii) separate administrative from legislative functions; iii) utilize "the short ballot" principle in elections; and iv) lend itself to prompt executive and administrative action, with the requisite accountability.

a) In addition, proponents of Plan A argued that election of the members of the City Council in at-large elections provides for the election of candidates whose prime consideration is what is best for the city as a whole – and not for just one neighborhood or community or ward
b) Proponents of Plan A claimed that city-wide elections were a more representative system than ward elections by providing for the opportunity to vote for all of the members of the City Council, rather than ten or eleven of the 26 members of the pre-1961 City Council. Under "Plan A, voters would have 100 percent representation on the City Council rather than 40 percent under the pre-1961 form of government
c) During the period of time when Plan A was debated and adopted, the leading municipal research organization, the National Municipal League, recommended, in its model city charter, non-partisan, at-large election. Indeed, in 1959, more than half of all American cities with populations in excess of 5,000 persons had non-partisan, at-large elections for the city's legislative body.

24) Chief among the criticisms and concerns voiced by opponents of Plan A was the amount of power that would be provided to the Mayor. In response to these concerns, proponents of Plan A argued that the City Council had investigatory authority and could "block" irresponsible proposals and the media and civic organizations would "throw a spotlight on any arbitrary administrative actions." Further, the Mayor was restricted by civil service in the removal of some of the department heads who are qualified under Civil Service or, in the case of the School Superintendent, are elected by the School Committee. Finally, the Mayor's decisions and leadership would be/is subject to public scrutiny every two years

25) Also among the concerns was the possibility the at-large method of electing members of the City Council would result in the election of nine members – all of whom resided in one or two wards. In response to the concern that members of the City Council would not reside in every ward, proponents of Plan A argued that what was most important was whether the member of the City Council did a "good job" for the whole City – in which case it would not matter where councilmembers resided. Indeed, the fact that members of the City Council would have the "betterment of the entire city at heart" was among the strong arguments supporting the adoption of "Plan A." In addition, proponents of Plan A reasoned that if a councilmember discriminated in favor of certain wards (presumably the ward in which he lived), voters in the other seven wards would ensure that the councilmember was not returned to office. Mr. O'Hare argued that Boston had had success with citywide council elections and that no coalition of wards dominated the City Council

5

26) Of concern to Paul Mason, member of the Common Council, was that Irish Americans would dominate a City Council elected at large due to his belief that the dominant political element in the City was Irish. He argued that members of the Common Council, who were elected at-large, had "French, Jewish, Italian, Negro, and Yankee backgrounds."

27) In response to a concern that the at-large method of election would not provide an opportunity for African Americans – or any other ethnic minority group – to elect candidates of choice, Rev. Charles E. Cobb (African American), pastor of St. John's Congregational Church, and a member of NSC, argued that minority persons had been elected in other cities that had adopted at-large elections.

a) Rev. Cobb cited Mrs. Esther McDowell's citywide election to the School Committee as evidence that a "Negro" could be elected at large.
b) Rev. Cobb provided the additional example of Hartford's City Council, which had adopted non-partisan citywide elections and to which John C. Clark, Jr., "a Negro and a friend of many people in Springfield" had been elected.
c) Rev. Cobb was reported to have concluded that "these (and other) examples amply demonstrate for me how unrealistic are the fears (if any) and charge that Plan A may discriminate against minority groups. . . Plan A will attract more qualified men to run for public office and among these men will be Negroes and other minority groups. And it will be expected and hoped that the community will endorse and support them."

28) There was no elected official or proponent or even opponent of Plan A who claimed that an *advantage* of the at-large elections or the *motivation* for the adoption of at-large elections was that they would prevent the election of minority persons to the City Council or to the School Committee. In general, Rev. Cobb, as with other proponents of "Plan A," argued that what was of greater importance than "the ethnic characteristics of the members of the City Council," was "their ability to provide good, honest, efficient government for all citizens of Springfield. . ."

29) Another focus of concern was the elimination of partisan elections, which had provided to Republicans candidates the advantage of little opposition in primary elections. Two Republican candidates competed against two Democratic candidates in the general election for Common Council in Wards 1, 2, 5, 6, 7, and 8 and the three Republican candidates and three Democratic candidates competed in the general election in Wards 3 and 4.

30) The remainder of the concerns regarding "Plan A' related to the status of municipal employees and department heads under Civil Service and a variety of other implementation and transitional concerns.

### *The 1959 Referendum and Election*
31) In 1959, Springfield voters were asked to vote "yes" or "no" with regard to "Plan A City Charter".

32) According to the official records of the Springfield Election Commission, 52.9 percent of those persons turning out to vote in 1959 voted to adopt the Plan A form of government (Question 1).

| Ward | Yes, Plan A | | No, Plan A | | Blank | | Total | |
|------|------|------|------|------|------|------|------|------|
| | # | % | # | % | # | % | # | % |
| Ward 1 | 1,963 | 48.4 | 847 | 20.9 | 1,246 | 30.7 | 4,056 | 20.9 |
| Ward 2 | 5,495 | 53.9 | 2,501 | 24.5 | 2,198 | 21.6 | 10,914 | 24.5 |
| Ward 3 | 3,207 | 47.7 | 1,484 | 22.1 | 2,037 | 30.3 | 6,728 | 22.1 |
| Ward 4 | 1,405 | 38.7 | 961 | 26.5 | 1,263 | 34.8 | 3,629 | 26.5 |
| Ward 5 | 2,579 | 53.7 | 1,225 | 25.5 | 1,003 | 20.9 | 4,807 | 25.5 |
| Ward 6 | 3,118 | 56.0 | 1,208 | 21.7 | 1,245 | 22.3 | 3,571 | 21.7 |
| Ward 7 | 5,609 | 63.0 | 1,731 | 19.4 | 1,564 | 17.6 | 8,905 | 19.4 |
| Ward 8 | 6,260 | 62.1 | 2,008 | 19.9 | 1,805 | 17.9 | 10,073 | 19.9 |
| Total | 29,636 | 54.9 | 11,965 | 22.2 | 12,361 | 22.9 | 53,962 | 22.2 |

a) The greatest proportion of the vote in each of the eight wards supported the adoption of Plan A
b) In Wards 2, 4, and 5, a smaller proportion of the ward voters than the citywide proportion of voters supported Plan A

33) That only two incumbent Aldermen and three incumbent members of the 18 member Common Council were re-elected provides additional support for the view that citizens across the City heartily embraced a change in the form of municipal government and rejected the bicameral form of government and those who were elected and served in the bicameral City Council

34) It is clear to me that a vast majority of African Americans either had no opinion or supported "Plan A, since 73.7 percent of the Ward 4 electors either voted for Plan A or left the question blank. Ward 4 has historically been predominately African American and the 1970 Census, as reported by the Urban League in *Voting Behavior in Springfield, Statistical & Analytic Report Second Edition 1962-1973*, Urban League of Springfield, Inc. (Urban League Report I) at Table 2, provided that 65 percent of the total population in Ward 4 was African American.

7

35)    In addition, the fact that Paul Mason, who was among the more vocal opponents of "Plan A," was not re-elected and another African American candidate, William A. Grant was elected from Ward 4 provides evidence that a significant proportion of African American voters supported Plan A and rejected concerns expressed by Mr. Mason that the at-large election would result in an all-Irish City Council.

36) At the time of the 1959 election, Ward 5 also had a significant African American population; the 1970 Census, as reported in Urban League Report I at Table 2, provided that 46 percent of the total population in Ward 5 was African American. Accordingly, that African American supported Plan A is further evidenced by the fact that 53.7 percent of the Ward 5 vote supported Plan A. In addition, that an additional 20.7 percent of the Ward 5 vote left the question blank, i.e., had no opinion as to whether Plan A should be adopted, supports the view that a vast majority of African American citizens were not opposed to Plan A.

37) In addition, in Ward 5, Tycho Peterson, Ward 5 incumbent (white) who opposed to Plan A was defeated and two non-incumbents were elected, one of whom, W. Robert McDonald, was an African American.

### 1963 Initiative Proposing a 8-5 Mixed Method of Election for the City Council
38) The debate did not end with the 1959 referendum regarding the at-large method of election. On the other hand, little concern regarding whether Plan A provided too much power to the Mayor and/or too little power to the City Council survived the 1961 elections. Sometime after 1961, the State Legislature adopted a "Plan F" option for municipalities, which provided for a strong mayor and a City Council elected from single-member districts in partisan elections.

39) The debate regarding at-large elections continued – in part -- because in the first election in 1961, no members of the Springfield City Council resided in Wards 1, 2, 4, and 5. The failure to elect candidates from Wards 1, 4 and 5 may have been due in part to the fact that the total population in Wards 1, 3, 4, 5, and 6 constituted less than one-eighth (12.5 percent) of the City's total population. At that time, the wards had not been redrawn for a number of decades. Baker v. Carr, 369 U.S. 1986 (1991) had just been decided and there was, therefore, no standard for assessing compliance with the one-person; one-vote requirement. More importantly, since no candidates were elected from these wards, there was no legal obligation to try to equalize the population in the wards. The failure to elect candidates from Wards 1, 2, and 4 was due, in part, to the lack of candidates, residing in those wards, competing for one of the nine positions on the City Council

 40) In 1963, State Representative Arthur McKenna, who resided in Ward 1, and State Representative Saul Simmons proposed and obtained passage of legislation to "put the question" of an 8-5 mixed method of election for the City Council on the ballot, which would provide for the election of eight members from wards and three members elected at large. As in 1959, debate followed the passage of this legislation and preceded the conduct of the referendum election. A group of "influential citizens" organized to fight against the passage of the ward representation referendum and formed a committee entitled "The Save Plan A

Committee," ("Committee") which reflected their "main" argument that the adoption of an 8-5 method of election for the City Council would "endanger Plan A."

41) The gains that the City had made under Plan A were stressed. Members of the "new" City Council argued that "the city as a whole has gained 'immeasurably' from the switch on a ward-by-ward basis."

a)  For example, those advocating for "no change" enumerated the "benefits accruing to Ward 3" since 1961 – in the absence of a member of the City Council who resided in Ward 3, which included new road and sewer construction, new sidewalk construction, comprehensive street resurfacing (with downtown street resurfacing scheduled for the spring of 1963, the year of the referendum), a new field house, a new baseball diamond, and new hockey rink, and new filters for wading pools at Ruth Elizabeth and Emerson Playgrounds.  In addition, the City Hall Annex – "previously a blight on the ward" – was "spruced up" and a portion of the building was made available to the Golden Age Club.
b)  Likewise, member of the City Council and co-chair of the Committee, Eileen P. Griffin, asserted that a list of capital improvements since 1961, indicated that "residents of Ward 5 have made out very well under the Plan A form of city government," in spite of the fact that no member of the City Council resided in Ward 5.  Among the benefits to Ward 5 were new roads and sewer construction, the resurfacing of 42 streets, replacement of five additional arteries, new baseball diamonds at the Greenaway and Margaret Ells Schools, a new soccer field in Blunt Park, a new neighborhood playground on Acorn Street, and a new wading pool at the Adams Playground, new playground activities at the Greenaway School.

42)  In the 1963 general election, Springfield electors were presented with a ballot initiative that would have increased the number of city councilors to 13 and proposed an 9-5 method of election.

43) According to the official records of the Springfield Election Commission, Springfield only 19.9 percent of those persons turning out voted *for* the adoption of the 8-5 method of election for the City Council (Question 2).   Likewise, Question 1, which, proposed an annual payment of $2,500 to members of the City Council, was resoundingly defeated.

44)  The initiative not only failed to receive support from a majority of those casting a ballot, but also resoundingly failed to receive the support of the required one-third of the registered voting population to render it binding. M.G.L. c. 43, §42.  The total voter registration in the City was 78,481 and over-all turn-out in the 1963 election was 58 percent according to Urban League Report I at 21.   Accordingly, only 11.6 percent of the registered voter population voted to change the at-large method of electing members to the City Council to an 8-5 mixed method of election

45)  In every ward, more voters left blank the referendum proposing an 8-5 mixed method of election  as compared to those who voted for the change in the method of electing members to the City Council

**Mayoral Administration:  1961-1967**

*1961-1963 Term*

46) In 1961 I was elected the first mayor under Plan A. During my first two years in office city employees received a much needed pay raise, citizens received a substantial tax cut, and the City invested in numerous capital improvements such as street repaving, road and sewer construction. Specifically, about 30 times more miles of streets were repaved during my first two years than had in the previous four years. During my first two years many large investments were made by private enterprise. Indeed, Springfield was listed among the top cities for economic growth by the United Business Service, a confidential investors guide, which stated that Springfield was the third in the nation in construction increases.

a) In addition, I undertook the construction of a significant number of units in Forest Park that were designated as housing for the elderly. I further initiated an "unprecedented" park improvement program that resulted in a "major" expansion in recreational facilities and activities in order to "catch up on a backlog of neglected needs in this area."
b) In 1962, I assisted Golden Agers in obtaining a Drop-In Center at the City Hall Annex at 68 Court Street, which had previously been "an eyesore." In addition neighborhood centers were established at Winchester Square, Forest Park, and Sixteen Acres.
c) During my first term of office, I also reorganized the Health Department in order to facilitate the exercise of its full potential, including a "concentrated drive against unsafe and unsanitary housing conditions in the Memorial Square area."
d) During my first term of office, Kiley Junior High School and Tiffany Elementary School was completed; Trade High School expansion and Bowles Elementary School were under construction; and a site for Brightwood Elementary School was chosen. In addition I initiated a significant school rehabilitation program

47) During that first term of office I had begun working with the NAACP to address *de facto* segregation in certain of the City's schools. By September, 1963, the School Committee of which the Mayor is the chairman, voted to "seek educationally sound' measures to correct "racial concentrations." The NAACP asked that the Mayor establish September 1964 as a target date for implementing changes. While I supported this proposal it was voted down by a majority of the members of the School Committee.

48) "The increase in racial tension during and after World Ward II alerted American communities to the need for a type of community agency that would counteract discrimination, reduce racial and religious tensions and direct the community toward the establishment of productive intergroup, interracial and interreligious relations." Report-Springfield Human Relations Commission, January 1962 at 1. Accordingly, 1961, a Human Relations Commission ("HRC") was established by ordinance. The Commission was originally composed of 21 civic and religious leaders who served at the discretion of and were appointed by the Mayor. While the number of members changed over the years, the mayor retained the sole authority to appoint and discharge members.

49) I wholeheartedly endorsed the work of the Human Relations Commission and asked that they clarify their purposes and goals. The Human Relation Commission was based

upon the principle that "prejudice and discrimination against any individual or group because of race, color, creed, national origin or ancestry is inimical to our American tradition of equality of opportunity for all, and contrary to the public welfare and good order." An Ordinance, Human Relations Commission, undated ("Ordinance") at 1. The powers and the duties of the Commission were specifically enunciated :

a) The Commission was charged with the authority and responsibility to "promote understanding and respect among all racial, religious and nationality groups, and also to prevent and eliminate discriminatory practices against any such groups." Ordinance at 1.
b) The Commission was charged with the authority and responsibility to "disseminate information and educational materials and reports which will assist in the elimination f prejudice, intolerance, intergroup tensions, and discrimination. . .[and to] [p]romote programs in community education and information with the objective of achieving better human relations. Id. at 2.
c) The Commission was charged with the authority and responsibility to "receive, investigate, and mediate complaints of alleged discrimination because of race, creed, color or national origin and eliminate such practices through the process of conference, conciliation and persuasion" except where Massachusetts Commission Against Discrimination had jurisdiction with regard to such complaints of discrimination. Id.
d) The Commission was charged with the authority and responsibility to "inquire into incidents of tension and conflict among or between various racial, religious and nationality groups and to take such action as may be designated to alleviate such tensions and conflicts." Id.
e) The Commission was charged with the authority and responsibility to "recommend to the Mayor and City Council the enactment of ordinances and other legislation or action as in the judgment of the Commission w[ould] eliminate the conditions [that] cause these practices." Id.
f) The Commission was charged with the authority and responsibility to "[i]nvestigate alleged discrimination by any city official or city agency against any individual, corporation, association or racial, religious, or ethnic groups and to develop such programs and techniques designed to bring about the elimination of such discrimination." Id. In addition, the Commission was authorized to "act in an advisory capacity to the Mayor, City Council, or any Commission or Department in respect to city plans (sic) or the operations of any city department where questions of differences between citizens involving racial, religious, and national matters arise." Id
g) The Commission was charged with the authority and responsibility to "serve as a resource and consultant to various groups and agencies in the community and [to] cooperate in educational campaigns devoted to the elimination of prejudice, racial or area tensions, intolerance or discrimination." Id
h) The Commission was charged with the authority and responsibility to "hold conferences, hearings, and other special meetings in the interest of constructive resolution of racial, religious, and national group tensions, prejudice, and discrimination occasioned thereby." Id. at 2-3.
i) The Commission was charged with the authority, on behalf of the City, to "accept grants and donations from foundations and others for the purpose of carrying out its functions." Id. at 3.

11

j) The Commission was charged with the responsibility to "consult with and maintain relations with surrounding cities and towns and [to] cooperate with them in the development and implementation of programs designed to foster good human relations." Id

k) The Commission was charged with the authority to "issue such rules and regulations for the conduct of its business as are necessary to carry out the purpose of this ordinance." Id

50) Important among the accomplishments of the Human Relations Commission during my first term of office was its sponsorship of a conference on religion and race. The Conference involved the delegates from each church in a series of workshop discussions in the areas of housing, employment, education, civic and social action, youth development, recreation and leisure time, and government.

51) In addition the HRC, working with me, attempted to clarify and liberalize the practices of the building trades unions as they applied specifically to non-whites, based upon the exclusion of non-whites from both union rolls and apprenticeship opportunities.

52) In addition, I assisted the HRC, and at the request of Father Santiago Nunez, to secure a facility for the Spanish-speaking community, which would serve as an Information Center, as well as a place for "these citizens to congregate, socialize, and develop a community sense, which should greatly increase their happiness and competence."

53) I also created a Minority Group Housing Commission, which focused on the problem of locating decent, safe, and sanitary housing for all. The Housing Resources Subcommittee held meetings with representatives of the Springfield Apartment Owners Association to establish mutual areas of understanding of the problems of both landlords and tenants. The Housing Resources Subcommittee obtained names of those persons listing rentals which prohibited tenants on the basis of race and/or national origin from the the Springfield Redevelopment Authority ("SRA") and encouraged the Director of the SRA. to visit those landlords to explain the law. These visits resulted in a significant reduction in the number of landlords who were violating the law and prohibiting tenants on the basis of race or national origin.

54) The Juvenile Delinquency Commission had not met since 1959. I filled the vacancies on the Commission and the Commission determined that the Community Council should continue the assistance that it has rendered and conduct a survey of "youth serving agencies in the city to determine the breadth and nature of delinquent behavior among [the City's] youth." Id

55) I established the Office of Intergroup Relations in July 15, 1963 and appointed Dr. Walter English (African American), Director. Although Springfield had not yet "been marred by serious displays of overt antagonism" (in 1963) among the racial and ethnic groups in the City, I recognized that "the potential" for such conflict was present. In addition, I recognized another potential – "an opportunity to develop a society in which

its corporate life is consistent with the principles of religion and democracy." To that end the Office of Intergroup Relations was established and a Director appointed whose duties would include "responsibility for providing professional advice and assistance in the planning and development of policies and programs of the Human Relations Commission, the Juvenile Delinquency Commission, and the Mayor's Committee on Minority Group Housing, and for providing professional leadership in executing and coordinating these policies and programs." Annual Report, The Office of Intergroup Relations, 1963 ("1963 Annual Report") at 2. The Director was charged with the responsibility of conducting "seminars, classes, and conferences; serv[ing] as speaker, panelist, and discussion leader; prepar[ing] educational material, news releases, publications, and pamphlets; appear[ing] on television and radio programs; and otherwise interpret[ing] and promot[ing] the policies, programs, and activities of commissions served

### *1963 Campaign for Re-election*

56) In my 1963 campaign for re-election I was opposed by Harvard educated John Pierce Lynch, who served as country register of deeds and had served as a state legislator. This was Lynch's third mayoral contest and in the beginning months of the campaign, he appeared to be relying upon support from a number of "disgruntled" citizens who had lost the patronage jobs that they enjoyed under the pre-Plan A government. Lynch, however, received only 35 percent of the vote in the primary and I received about 55 percent of the vote. Lynch was looking for an effective means of attacking my impressive first term record. The two primary School Committee candidates who won the most votes were Vincent MiMonaco and Rose Marie Coughlin, who based their campaign on their opposition of any form of mass bussing of students from one school to another. In addition, he may have been influenced by an overwhelming victory in the Boston School Committee primary election of Louise Day Hicks who was denounced by the NAACP for refusal to consider *de facto* segregation charges as to the Boston School System. On October 25, 1963, Lynch declared that I was a "rubber stamp of the NAACP" and warned the electorate that my re-election would mean that "thousands of white children" would be bussed to schools in predominately "Negro" neighborhoods and "hundreds of Negroes" would be bussed to schools located in predominately white neighborhoods. He further characterized my agreement with the NAACP proposal for a 1964 deadline for the implementation for reforms as a "grandstand play to get the Negro vote." I was not as concerned about the election as I was by the fear that this kind of "dynamite could damage the whole community."

57) On October 26, 1963, the banner headline in the *Springfield Union* read, "Clergymen Deplore Racism in City Election." The article included the following statement from the clergy: "As religious leaders of the city, we recognize our prime concern with the spiritual well-being of the individual and moral climate of the community at large. Since each person has the privilege and responsibility of choice in regard to voting, the religious leaders have for the most part refrained from entering controversy which may exert an influence on behalf of a political candidate. However, whenever a candidate for public office makes a statement which has a divisive effect, one which tends to increase racial tensions at a time when this can be least afforded, the synagogs and churches speak

13

with one voice: 'This is evil.' To seek office at the expense of social morality is wrong; to stir up prejudices and set man against his brother is wrong; to speak without regard for the truth is bearing false witness – and is wrong." In the end, the *Springfield Daily News*, which had never been among my supporters since I defeated former Mayor Thomas O'Connor in 1961, withdrew its endorsement of Lynch as did the Greater Springfield Labor Council because of his "interjection of the racial issue into the campaign.

58) Less than 24 hours before the 1963 general election, Lynch published a full page advertisement that provided: "Another Ryan Lie!. . .Bussing has Already Started." These heavy black type headlines were accompanied by a picture of African American children stepping from a school bus in from of a school in a white middle class neighborhood. Lynch posed the question: "Which School is Next on the Ryan-NAACP List? Glcikman? Kensington Ave.? Sumner Avenue? The children in the picture were being sent to a nearby school to alleviating overcrowding in the school to which they had been assigned. Lynch reprinted the ad on Tuesday morning – election day.

59) I defeated Lynch by a nearly 3 to 1 margin. I felt that it was a "tribute to the community that it recognized that such a sensitive area as race relations should not have been exploited in a political campaign.

### The Issue of Race: Summer of 1965 and My Record
60) During my first tenure as mayor I appointed the first (David Duncan) African American Police Commissioner; the first (Willie Wright) and the second (Morris Jones) African American to the Springfield Housing Authority; the second African American (Leroy Clayborne) as Park Commissioner, who provided to African American greater access to public parks and gold courses in the City; and the first (Douglas Jenkins) African American Director of Housing. Dr. Walter English was appointed the first chairman of the Office of Intergroup Relations. When Dr. English resigned another African American, Chester Gibbs, was appointed chairman. I hired the first African American to work in the Mayor's office, as my personal secretary.

61) At the 1964 Democratic Convention, I, along with Ruth Batson, an African American delegate from Boston, were the only two Massachusetts Democratic delegates out of a delegation of approximately 100 people to vote to accept the Black Freedom Delegates from Mississippi so that they could vote at the Convention. In fact, I was the only one of the delegation to come forward and second Ms. Batson's motion to seat the Mississippi delegation. .

62) The Director and the Office of Intergroup Relations continued their work in a year of federal civil rights legislation "and resistance of extremists in both northern and southern sections of the country." Annual Report, The Office of Intergroup Relations, 1964 ("1964 Annual Report") at 1. Dr. English concluded then that "[i]n July as in January, the assertion can be repeated that the potential for overt antagonisms is still present, and to overlook or to minimize it would be foolhardy. The price of a healthy climate is the maintenance of our collective concern and dedicated labor – and it must be paid."

63). Because of the overlapping areas in which the Human Relations Commission and Minority Group Housing Committee functions, they agreed to a merger and expansion, which was accomplished by City Council ordinance and Mayor approval. Five separate subcommittees were established within the Human Relations Commission. Id. at 2. Each subcommittee had a chairman and three commissioners "especially qualified in the particular field." Each subcommittee conducted its own meetings and the sub-chairmen met monthly with the Director and the Commission chairman. Id. In this way the areas of focus "though interrelated are now more clearly defined." Id.

64) A second gathering of the participants of the Conference on Religion and Race of Greater Springfield was held on January 12, 1964 – at which time proposals that had been made at the first meeting by workshop leaders were presented to a group of over 800 clergy and lay delegates to "receive and ratify them as a basis for action." Id. These recommendations were sent to the churches and synagogues and constituted the basis of programs conducted by these groups. Id. In addition, Dr. English met with church heads, school officials, and the members of the Steering Committee "in this significant effort of the religious bodies to deal effectively with tensions arising from religious and racial differences." Id.

65) And then early Sunday morning the summer of 1965, in the parking lot of a night club (the Octagon Lounge) on Rifle Street predominately frequented by African Americans, several African Americans were arrested when the crowd would not disperse after the club had closed. The next day, African American leaders claimed police brutality and called for me to fire – without hearing or investigation – several police officers (I recall that there were eight). In the weeks that followed I regularly met with African American leaders and ministers and attempted to reconcile the allegations of police brutality with information I had been provided by the Police Chief. Indeed, I often personally participated in the demonstrations – arm in arm with the protestors -- on the steps of the City Hall at the end of the work day.

66) Years later – although not at the time – I was criticized for calling in the National Guard to monitor a demonstration that was planned by protestors supporting the firing of the police officers.   I did not – nor does any mayor in the Commonwealth of Massachusetts – have the authority to call the National Guard. The decision to call the National Guard to protect and safeguard the citizens of the City of Springfield and their First Amendment right to march and to protest was made by then-Governor Volpe, with the advice of Lieutenant Governor Eliot Richardson, Attorney General Edward Brooke, and myself. The decision was made at a time when demonstrations in large cities across the country were erupting in fire, destruction, and death – ignited by a singular or isolated act of violence that had gone unchecked. We all felt that the National Guard was necessary to ensure that there were a sufficient number of "peacekeepers" present to protect the rights and the safety of those demonstrating as well as the rest of the community. Further, I felt that since it was police conduct that was at issue, use of the Springfield Police Department to "monitor" the demonstration had the potential to further "displease" the demonstrators.

67) In Dr. English's Annual Report, The Office of Intergroup Relations, 1964 ("1965 Annual Report") at 1 he reported that the activities of the 1965 comprised "two distinct phases in the area of human understanding and interaction." During the period of January to June there were many "constructive programs." Id. "It was during this period that significant activity began to develop in the fields of housing, employment, and community organizations.

a) A group of private citizens, brought together by the Housing Committee of the Human Relations Commission, began to plan for the creation of a corporation for the rehabilitiation of homes and the consequent stabilizations of neighborhoods." Id. The "corollary purpose" of this undertaking was to "demonstrate that this project [wa]s one which c[ould] be undertaken by other groups with both social and financial gain." Id. b) With regard to the development of employment opportunities, "many conferences were held with representatives of the Governor's Equal Opportunity Program and officials of the Springfield Joint Civic Agencies ("JCA"), culminating in the JCA's adoption of the role of sponsoring agent for enrolling local firms and businesses into that comprehensive plan." Id. "In addition, to promote the growth and understanding and creative social action in the community at large, a Speakers' Bureau was organized with plans. . .for its maximum utilization in the programs of many clubs and groups in the Greater Springfield area."

68) "With the month of July came a dramatic turn of direction, however. The precipitating action was an incident at a local night club, where 18 persons were arrested. Charges were made that the police were guilty of using brutal methods, which initiated a serious of demonstrations, marches, sit-ins at the City Hall, more arrests, more charges, etc., extending over the next several weeks." Id. at 2. "The Human Relations Commission called on all its members to drop their respective committee functions and concentrate on the job of mediating the conflict between demonstrators and the city government." Id.

a) While Dr. English acknowledged that the atmosphere was one of "doubt, suspicion, fear, and suppressed hostility," it felt that the "reversal [wa]s not a permanent one." Dr. English felt that "[n]ot only [wa]s it an understandable reaction of a community where traditional concepts have been challenged, but clearly mark[ed] a point from which a new start must be made. Id. That there were "riots" throughout the country that summer, had the effect of challenging the values and biases of those who had "given of themselves and their energies to projects and discussion groups." Id. b) Nevertheless, by the end of the year (1965). Dr. English felt confident that there were "a wealth of opportunities for the city of Springfield to move ahead in the business of creating a community where improved intergroup relations will be a watchword, not a catchword" – a job that could be, but must be done. Id.

69) In 1966, the Housing Subcommittee of the Human Relations Committee met with the Springfield Redevelopment Authority, Springfield Housing Authority, representatives from Massachusetts Commission Against Discrimination and the NAACP. Hearings were held at Dunbar Community Center regarding housing problems

and discriminatory practices by leasers and sellers. In addition, discussions were held with realtors to ensure more equitable treatment and practices with regard to minority families. The Employment Subcommittee held a "Job Opportunities Day" on March 26, 1966 at Springfield College Field House, in which 50 companies participated. The Education Subcommittee focused on the issue of the racial imbalance in the schools and the minority dropout rate.

70) 1967, the Employment Subcommitte of the Human Relations Committee conducted its second annual Job Opportunity Day, which attracted 60 industrial, business, government agencies, educational institutions, and hospitals. There were 800 attendees and publicity and invitations were provided in English and in Spanish. In addition, a municipal fair employment program was conducted and civil service information for jobs was provided. A list of "Negro" and Puerto Rican college students was compiled to whom information on job opportunities was provided. Opportunities for union apprentice programs were explored. Housing Subcommittee assisted aggrieved persons file housing complaints with the Massachusetts Commission Against Discrimination and made numerous presentations of community groups regarding the Fair Housing laws. In addition the Housing Subcommittee met with Springfield Housing Authority to discuss the new lease-scattered housing program. An affirmative action program was discussed with the Board of Realtors and members of the subcommittee lobbied for state funding for rental assistance and public housing programs. The Public Information subcommittee published a newsletter that was distributed by Springfield Herald. The Community Organization Subcommittee conducted public meetings to discuss areas of the City in which there was significant racial unrest. The Education Subcommittee discussed public school policies for pupil suspensions with Superintendent, reviewed the School Committee's plan to ease racial imbalance, issued a position paper as to the School Committee's plan and opposed attempts to repeal Racial Imbalance Act.

**Mayoral Administration: 2004-Present**
71) In 2003 I ran again for Mayor of Springfield. I ran in 2003 – for many of the same reasons that I fought for Plan A government in 1959 and ran for election the first time in 1961 – because I saw abuse and I saw corruption; and the victims were the citizens of Springfield. In 2003, the City was in the midst of a fiscal crisis. After I was elected, I discovered that the fiscal crisis was not of a nature that would permit the City to extract itself without outside assistance. I went to Boston asking for money. What I got was a loan and a Finance Control Board, which is comprised of five members: three members appointed by the Massachusetts Secretary of Finance and Administration, the president of the City Council and the Mayor. It is the goal of the Finance Control Board to effectively implement a sound recovery plan to secure the long-term financial stability of the City of Springfield.

***Provision of Bilingual Assistance***
72) As an attorney and an elected official over a period of more than 55 years, it has long been my understanding that M.G.L. Chapter 54, Section 13, requires that the Election Commission to choose poll officials from among those nominated by the various ward caucus leaders and only permits the Election Commission to recruit poll officials if

the ward caucus leaders fail to meet this obligation. Accordingly the Election Commission, whose members I currently appoint, was limited to choosing among nominees of the ward caucus leaders.

73) At no time, prior to July 18, 2006, had my office, the Law Department, or the Office of the Election Commission been informed that our interpretation of M.G.L. Chapter 54, Section 13 was in conflict with Section 203 of the Voting Rights Act, 42 U.S.C. 1973aa-1a. My initial resistance and hesitation to enter into a consent decree which was offered by Department of Justice attorneys on their first visit was motivated by a number of factors, including, in large part, the fact that Department of Justice attorneys threatened to create a record of various voters who were confused at the polls and/or were not able to receive bilingual assistance from poll officials and of hearsay testimony about allegedly rude poll officials that would undermine the City's ability to defend the instant challenge, in which the Department of Justice had no interest intervening. Once I was fully apprised of the City's obligation that superseded our responsibility to follow state law prescribed voting procedures, I was and remain fully committed to providing bilingual assistance to Hispanic voters who are not proficient in English; to identifying, hiring, and training an adequate number of bilingual poll officials; placing notices and providing information in Spanish regarding registration, election procedures, and candidate qualification requirements in Spanish language media relied upon by the Hispanic population; and ensuring that the City was in receipt of and made available all of the Spanish language materials, i.e., ballots, registration forms, absentee ballot application forms, provisional ballot information, polling place signs, that the Secretary of Commonwealth has made available to the various municipalities in Massachusetts.

74) I would further like to note that I was informed that none of the members of the Election Commission recall receiving complaints from Representative Cheryl Rivera or anyone else regarding the inability of Spanish-speaking voters, with limited proficiency in English, to vote or to receive assistance. Indeed, during that period of time, I met with Rep. Rivera on many occasions regarding other matters; in none of those meetings did she request changes in the method of recruitment and training of poll officials or complain about the conduct of past elections. In the past, Rep. Rivera had requested that the City make available poll worker training materials in Spanish to facilitate training for poll workers who did not speak English. The Election Commission accommodated her request, even though there is/was no legal obligation to appoint poll officials who are not adequately proficient in English and the request was made within a week of the conduct of the election – after all poll officials had been appointed and received training . Had Rep. Rivera. made the kind of assertions that she made in United States v. City of Springfield, C.A. No. 06-30123-MAP, I would have directed the Election Commission staff to insist that ward caucus leaders recruit and nominate more poll workers who were fluent in Spanish and English and seek some guidance from the Massachusetts Secretary of the Commonwealth with regard to the ability of members of the Election Commission to recruit poll workers not nominated by ward caucus leaders to provide for greater bilingual assistance to voters in non-Ward 1 precincts.

75) Prior to the City's entering into the Agreed Order of Settlement, United States v. City of Springfield, C.A. No. 06-30123-MAP (September 15, 2006), I appointed Jose

Claudio, Chairman of the Advisory Committee and I designated Ms. Gladys Oyola, the Spanish Language Election Cordinator, with the responsibility of conducting outreach, and recruiting significantly more bilingual poll workers than had previously served as poll workers in City elections. In addition, all of the information and forms available on the Election Commission website was made available (prior to the Agreed Order) in Spanish with the assistance of Ms. Oyola, the Director of Community Development, Juan Gerena and a member of his staff who are all fluent in Spanish. Indeed, there was no provision, requirement, or procedure that was provided in the Agreed Order of Settlement that the Election Commission, Law Department, Spanish Language Coordinator and the Office of the Mayor were not already in the process of implementing or had already implemented. I welcomed and did not oppose the deployment of federal observers to monitor our elections and provide to us information that would assist in our efforts to facilitate voting on election day for persons with a limited proficiency in English.

76) In a very short period of time, we all but met our goal for bilingual poll officials; we conducted training sessions for poll officials prior to the primary and the general election; we created numerous signs and notices (in English and Spanish)-- in addition to the few made available by the Office of the Secretary of the Commonwealth – to be posted in the polling places to better inform voters; we redrafted and greatly expanded our Warden's handbook. We purchased cell phones for every polling place that did not have immediate access to a phone and we installed additional phone lines in the Office of the Election Commission and hired more bilingual staff to answer phones and provide information on election day. We hired – for the first time – Election Captains assigned to a group of polling places and responsible for visiting these sites several times a day to provide lunch or dinner coverage and supplies where needed; to ensure that voters with limited proficiency in English were provided with adequate assistance and appropriate procedures were being followed with regard to provisional balloting and the state law requirement that an affirmation of residence forms must be completed prior to voting where the voter had neglected to return the state census card that year and had otherwise failed to respond to additional notices. Attorneys from the Law Department received calls from Department of Justice attorneys and immediately investigated complaints or concerns with regard to events, procedures in a particular polling place. They further "visited" polling places throughout the day to ensure that the terms of the Agreed Order of Settlement were being met. The Spanish Language Coordinator established a relationship with Smith College, which provided students, fluent in Spanish, in the polling places on election day.  In addition, we were able to locate and appoint as poll officials several individuals who were fluent in Vietnamese. The Spanish Language Advisory Committee has had three meetings and has initiated a dialog that I anticipate will be fruitful. The Election Commission and the Spanish Language Coordinator have investigated all complaints, including those of the declarants in United States v. City of Springfield and taken remedial action. Some poll officials have been "fired."

77) In a letter dated January 5, 2007, from John "Bert" Russ and Veronica Jung, Attorneys from the Voting Section of the Department of Justice to Edward M. Pikula, City Solicitor, Department of Justice attorneys lauded the Springfield Election Commission, stating that "[s]ince the entry of the Court's Order on September 15, the

City has made significant improvements in its assignment of bilingual workers." Department of Justice attorneys further provided that the "new bilingual poll workers made a remarkable contribution" and that "[f]ederal observers reported numerous instances of poll workers providing assistance in Spanish to voters."

78) I am committed -- as is the Election Commission -- to ensuring that all voters are provided an opportunity to cast a ballot that accurately reflects his/her choices and that is accurately "counted." One of the unanticipated benefits of the Section 203 challenge is that it required us to review longstanding election day practices and make some changes in procedures, personnel, and training. Voting is the bedrock of a democratic society and every voter should have equal electoral access.

### 8-5 Method of Election Proposal
79) On October 2, 2006, then-President of the City Council, Jose Tosado, and I sponsored an ordinance calling for a change in the method of electing members to the City Council and the School Committee that would be submitted to a referendum vote in the 2007 election and implemented – if passed -- for the 2009 election. This Ordinance called for the election of one member of the City Council from each of the City's eight wards and five members elected at-large. It further provided for the election of one member of the School Committee from each of four super-wards (formed by combining two wards: Wards 1 and 3; Wards 4 and 5; Wards 2 and 8; and Wards 6 and 7) with two members elected at-large. Only the City Council would increase in size. In addition, we recommend that the State Legislature provide that the referendum would be binding where a majority of the voter supported the change – rather than 2/3 of the registered voters as required by state law.

80) While it is true that I have opposed "ward representation" in the past years, I now support providing the citizens of Springfield with an opportunity to adopt an alternative method of election that provides for the election of some members of the City Council and the School Committee from wards. Over the years, candidates who live in certain wards have not been elected; indeed, no candidates who reside in a couple of those wards have even run for election to the City Council or the School Committee. This, I feel, has resulted in a perception that certain groups of people – certain neighborhoods – have not been represented and/or not included in City government and the electoral process. It may well be that that perception accounts for the low voter turnout, particularly in the minority communities, and the general non-participation of certain groups in the political process. It is for these reasons that I proposed the 8-5 method of election.

81) My support of the 8-5 method of election for the City Council and/or the 4-2 method of election for the School Committee is NOT based upon a belief that the current method of election is discriminatory or does not provide to African American and Hispanic persons a reasonable opportunity to elect their fair share of candidates of choice. I do not believe – nor have I ever believed – that only white candidates can represent white voters; or only African American candidates can represent African American voters; or only Hispanic candidates can represent Hispanic voters; or that only residents of Forest Park can represent the interests of the other residents of Forest Park; or that only residents

of Brightwood can represent the interests of the residents of Brightwood; or that only residents of McKnight can represent the interest of the residents of McKnight. While I appreciate the communities represented by the various neighborhoods in the City of Springfield, I would be loathe to support any change in a method of election that would convey to or foster a view by the citizens of Springfield that what happens in one neighborhood or among one group of citizens is not of issue to or a concern of all of the neighborhoods and all of the groups of citizens

### Equitable Distribution of City Services, Responsiveness, and Lack of Discriminatory Intent

82) I stand on my record of city services, programs, initiatives that provide for the City's citizens equitably, based upon need.

83) I have personally known every mayor in the City of Springfield beginning with Daniel Brunton in 1945. I have also personally known every member of the City Council beginning in 1955. I have never known any one of those individuals to have exhibited bias, prejudice, or any intent to discriminate based upon race, ethnicity, national origin, language spoken, religious affiliation, disability, or sexual preference. During that period of time, no ordinance, change in government structure or method of election, candidate qualification, program, distribution of City services, initiative, policy, activity, capital expenditures, public school assignments, curricula, school graduation requirements, or city employment procedures and promotion criteria was ever enacted for the purpose of discriminating against any racial or ethnic group in the City of Springfield.

Signed under penalties of perjury this 9th day of February, 2007

Mayor Charles V. Ryan

**DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY**
**MAYOR CHARLES V. RYAN**
**CITY OF SPRINGFIELD**

**EXHIBIT A**

*Political  Advertisement Political  Advertisement*  SPRINGFIELD, MASS., DAILY NEWS, WEDNESDAY, OCTOBER 30, 1968    25

# LET'S FACE FACTS!





**IF 800 NEGRO STUDENTS ATTEND THIS SCHOOL . . .**

## AND

**800 WHITE STUDENTS GO TO THIS ONE . . .**



## THERE IS ONLY ONE WAY TO HAVE 400 WHITE STUDENTS AND 400 NEGRO STUDENTS ATTEND EACH:

### IS





# BUSSING

HEN CHARLES RYAN VOTED ON SEPT BER 19 TO "TAKE WHATEVER ACTION IS NEC-ESSARY TO ELIMINATE RACIAL CONCEN-TRATION IN THE SCHOOLS . . . EFFECTIVE SEPTEMBER, 1964,"

# CHARLES RYAN VOTED FOR BUSSING!

# LYNCH Is Opposed To Bussing

# LYNCH IS FOR BETTER NEIGHBORHOOD SCHOOLS

# LAUNCH REAL PROGRESS WITH LYNCH

Richard A. Leary
15 Wilton St.

**DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY**
**MAYOR CHARLES V. RYAN**
**CITY OF SPRINGFIELD**

**EXHIBIT B**

SEVEN CENTS
EVERYWHERE

# THE SPRINGFIELD UNION

THE WEATHER
By U. S. Weather Bureau
Showers Today
Fair Tomorrow

VOL. 100, NO. 263 — Second-class Postage Paid at Springfield, Mass. — SPRINGFIELD, MASS., WEDNESDAY MORNING, NOVEMBER, 6, 1963 — 36 PAGES — $21.00 A Year

# RYAN REELECTED, SWAMPS LYNCH

## *Russians Release U. S. Convoy*

### Army Trucks Roll Again as Reds Give In

**Allies Present United Stand, Refuse to Bow to Soviet Demands for Head Count; Reason for Moscow's Action Still Not Clear**

BERLIN (Wednesday) (AP)—A U. S. Army convoy drove into West Berlin today after a two-day war of nerves with the Russians on the Berlin Autobahn. It passed through the last Soviet checkpoint outside the city without hindrance.

BERLIN (Wednesday) (UPI)—The Soviet Union backed down early today in the face of Allied unity and determination and permitted a U. S. Army convoy to move toward Berlin through East Germany. The convoy had been blocked with Soviet troops and armor since 9:01 a. m. Monday.

**Russians Yield**

The convoy started moving after Soviet authorities dropped demands that the 44 American soldiers in 12 trucks get out of the vehicles to be counted or lower the tailgates so that the Russians could inspect the cargo.

The Russians showed the first signs of backing down in the confrontation when they allowed French and British army convoys to pass along the 110-mile Autobahn from Berlin to West Germany although both joined the United States in refusing to

### School Board Jobs Won by DiMonaco And Mrs. Coughlin

**Bogan and Davidson, Both Backers of Mayor Ryan, Are Defeated; Dimauro, Vice-Chairman, Tops Balloting With 24,881 Votes**

Two of the three School Committee incumbents were upset by a former school committeeman and a businesswoman in the school board election Tuesday.

**DiMonaco Makes It**

Vincent DiMonaco, who served on the board from 1955 through 1959 but lost twice since then, was elected to a four-year term with Mrs. Rose Marie Coughlin, wife of former School Committeeman Francis P. Coughlin.

Theodore E. Dimauro, School Committee vice-chairman, was re-elected by a big majority. He topped the balloting with 24,881 votes.

Defeated in bids for re-election were William H. Davidson and Robert T. Bogan, who finished fourth and fifth respectively in the field of six candidates. Syl-

*See SCHOOL BOARD*
*Page Twenty-seven*

### Sullivan, Akerman Win Council Posts

**Newcomers Join Seven Incumbents Named for Second Term; Fradet Again Tops Vote**

The seven City Council incumbents received a resounding vote of confidence in being returned to office for a second term under Plan A. They finished in the top seven places, according to unofficial election returns Tuesday night.

**Two Others Named**

Joining the incumbents will be John M. Sullivan, executive director of Springfield Redevelopment Authority, and Paul C. Akerman, a former city assessor. Councilors Frank Auchter and Gerald T. Teehan did not seek re-election.

The addition of Sullivan and Akerman, both Democrats, tipped the party alignment from 5 to 4 Republican to 5 to 4 Democrat.

**Ward Lines at Stake**

Although Plan A elections are conducted throughout the city at large, the switch to a Democratic majority has significance because the new council may redraw the city's ward lines, an opportunity which comes every 10 years and which can affect state representative districts in this city, Currently, six of the eight

*See SULLIVAN*
*Page Twenty-seven*

**Referendum Issues**

### Mayor, Wife Flash Victory Smiles



Mayor Ryan's hand is raised in victory by his wife outside his campaign headquarters at 17 Elm St. Tuesday night. Ryan was returned to office in a landslide that gave him a nearly three-to-one victory over Register of Deeds John Pierce Lynch.

### NEW MAYORS ARE NAMED IN

### Key National Contests Taken by Democrats

## Unofficial Tab Gives Mayor 32,063 Votes To 11,909 for Rival

### Mayor Pledges Same Type of Administration

Returned to office with the Plan A strong-mayor form of municipal government, Mayor Ryan promised the city "another two years of the same" type of administration in a victory speech at his campaign headquarters Tuesday night.

The mayor said he interpreted the landslide vote that swept him back in office as a "mandate" from the electorate and an indication that the people are satisfied with his record.

"We're going to keep the city of Springfield moving forward," he said.

Standing on a platform in his

*See MAYOR PLEDGES*
*Page Twenty-seven*

### LONGMEADOW ZONE PETITION IS TROUNCED

### 449-to-103 Vote Rejects Multiple Residence Proposal

LONGMEADOW—A proposal to allow multiple residence construction in this town met sudden death Tuesday night. Voters squelched the proposal, 449 to 103. The vote killed a petition to have the proposed zoning apply to the present business zone on the south side of Williams St.

**700 at Meeting**

A special town meeting acted on a warrant of 11 articles in Longmeadow High School gymnasium. About 700 attended.

### Incumbent Returned for Second Term; Margin Seen Resounding Defeat For Racial Issue

Mayor Charles V. Ryan Jr. was swept into a second term in Springfield election balloting Tuesday.

He topped his challenger, Hampden County Register of Deeds John P. Lynch, by almost three to one. The unofficial totals gave Ryan 32,063 votes to Lynch's 11,909.

Ryan's victory was evident after returns started to come in. It came so overwhelmingly that Lynch conceded an hour after the polls closed.

His defeat marked the failure of the racial issue he injected late in the campaign, arising out of the claim of the local chapter of the National Association for the Advancement of Colored People that if more than half of the pupils in any public school are colored, that constitutes "de facto segregation." The association has called on the School Committee to see to it that this proportion is not exceeded.

**Hammers at Issue**

Lynch charged in the campaign that Mayor Ryan favored meeting the NAACP demand by transporting children by school busses out of the school district in which they lived.

Lynch hammered hard at the issue, amid the protests of church and civil rights leaders. Ryan failed to carry with him two incumbent school committeemen who had supported him on the committee, Robert T. Bogan and William H. Davidson.

*See RYAN RE-ELECTED*
*Page Twenty-five*

### BOSTON MAYOR ELECTED AGAIN

**DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY**
**MAYOR CHARLES V. RYAN**
**CITY OF SPRINGFIELD**

**EXHIBIT C**

SPRINGFIELD, MASS., DAILY NEWS, MONDAY, NOVEMBER 4, 1963     25

Political Advertisement Political Advertisement Political Advertisement Political Advertisement Political Advertisement Political Advertisement Political Advertisement Political Advertisement

# ANOTHER RYAN LIE!

## BUSSING HAS <u>ALREADY STARTED!</u>

 

## TODAY – IT'S MEMORIAL SCHOOL IN EAST FOREST PARK

# WHICH SCHOOL IS NEXT ON THE RYAN - NAACP LIST?

GLICKMAN?

KENSINGTON AVE.?

TALMADGE?

BRUNTON?

TIFFANY?

ROBERT MORRIS?

SUMNER AVE.?

WASHINGTON ST.?

WHITE ST.?

# LYNCH OPPOSES BUSSING!

# LAUNCH REAL PROGRESS WITH LYNCH

John Pierce Lynch, 77 Drexel Street

**DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY**
**MAYOR CHARLES V. RYAN**
**CITY OF SPRINGFIELD**

**EXHIBIT D**

Political Advertisement Political Advertisement Political Advertisement Political Advertisement Political Advertisement Political Advertisement Political Advertisement Political Advertisement Political Advertisement

# ANOTHER RYAN LIE!

## BUSSING HAS <u>ALREADY STARTED!</u>

 

# TODAY — IT'S MEMORIAL SCHOOL IN EAST FOREST PARK



# WHICH SCHOOL IS NEXT ON THE RYAN - NAACP LIST?

GLICKMAN?

KENSINGTON AVE.?

TALMADGE?

BRUNTON?

TIFFANY?

ROBERT MORRIS?

SUMNER AVE.?

WASHINGTON ST.?

WHITE ST.?

# LYNCH OPPOSES BUSSING!

# LAUNCH REAL PROGRESS WITH LYNCH

John Pierce Lynch, 77 Drexel Street

**DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY**
**MAYOR CHARLES V. RYAN**
**CITY OF SPRINGFIELD**

**EXHIBIT E**

Case 3:05-cv-30066-MAP   Document 124-6   Filed 02/09/2007   Page 2 of 3

ond-class Postage Paid
at Springfield, Mass.

## ...es Her Bit to Aid UF Drive



Spencer, 15, daughter of Mr. and Mrs. Charles E. ...cer of 24 Webber St., waves a handful of bills she col... ...d for the 1963 United Fund-Red Cross campaign. Sally over the job of soliciting her street for the drive when ...nother was taken ill and was unable to do it. Sally col... ...lected a total of $47.57 for the United Fund.

...ing contributors to give to ...re-a-year United Fund-Red ...campaign was an easy task ...ly.

...young miss did the job, she turned in her report to ...ited Fund she had collected of $47.57 for the drive. Al... she contacted only the few on her own street, she was ...o turn in an excellent re...

...ed if she found the task of ...ing contributions to the ...l Fund campaign difficult, ...plied that it was just the ...te.

...was easy," she said. "I ...asked people to give and did. Everyone I asked was ...nice to me. I really was ...all when one of the women ...ed for a contribution gave ...0. Two other nice ladies on ...treet each contributed $10. ...but it was easy to ask ...contributions to the United ...because I think most people ...the good that is done with ...money they give," Sally add...

### UNITED FUND
### RED CROSS
### 1963

...on... ...   To Date:
Oct. 26  p. 1

## BULLETIN

### Pact at Westinghouse

PITTSBURGH (AP) — The AFL-CIO International Union of Electrical Workers (IUE) announced early today accept-ance of a new labor contract with the Westinghouse Electric Corp.

An IUE spokesman said the decision to accept a new three-year pact for its 30,000 members at 28 Westinghouse plants across the country was made at a lengthy session of the union's Westinghouse conference board.

## CITY CLERICS RAP RACISM IN ELECTION

### Statement Follows Lynch Accusation Ryan NAACP 'Rubber Stamp'

A statement deploring racism in political campaigns was re-leased by city clergymen Friday afternoon within hours after ma-yoral candidate John Pierce Lynch accused Mayor Ryan of being a "rubber stamp" of the National Association for the Ad-vancement of Colored People.

**Branded Divisive**

". . . Whenever a candidate for public office makes a statement which has a divisive effect, one which tends to increase racial tensions at a time when this can be least afforded, the syna-gogs and churches speak with one voice, 'This is evil,'" stated the steering committee for the city's forthcoming Conference on Race and Religion.

The conference has been in-dorsed by Most Rev. Christopher J. Weldon, bishop of the Roman Catholic Diocese of Springfield; Rt. Rev. Robert Hatch, bishop of the Protestant Episcopal Di-

**See CITY CLERICS**
**Page Twenty-seven**

## BAPTISTS TOLD TO RE-EXAMINE CHURCH GOALS

### Holyoke Parley Asked to See if Projects Are Self-Serving

HOLYOKE—A Baptist leader called on the churches of Amer-ica Friday night to be courage-ous enough to examine their budgets with a "careful eye for the disparity between money spent on self-serving activities and that spent in behalf of the world."

**Willing to Sacrifice?**

Rev. Howard R. Moody of Judson Memorial Church, New York City, speaking to several hundred clergy and lay leaders attending the 161st annual meet-ing of the Massachusetts Bap-tist Convention, asked "Where is the Baptist church, or any church, willing to forego its beautiful new building and as-sume new responsibilities to-ward its fellow men?"

The two-day conference is be-ing held in the Second Baptist Church, Holyoke, Friday night's program was held in the War Memorial Building.

## POST OFFICE BACKS DOWN IN RACE ROW

### 3 Negroes Lose Dallas Promotions, but Go to Top of List

WASHINGTON ⑨—The dis-puted leapfrog promotion of three Negroes in the Dallas, Tex., Post Office has been "re-scinded because of a legal tech-nicality, the Post Office De-partment announced Friday.

**To Have First Call**

But a department spokesman said the three men, who were

# HURRICANE
# NORTHWAR...
# STAY OUT

## *Nuclear Carrier F... Dealt Knockout I...*

### McNamara Acts to Avoid Delay, but Does Not Rule Out Possible Use In Future Ships

WASHINGTON (UPI) —Defense Secretary Rob-ert S. McNamara Friday ordered the Navy to pro-ceed immediately with the construction of another su-per aircraft carrier with conventional rather than nuclear power.

**To Avoid Delay**

A Pentagon announcement said "this decision was moti-vated by a desire to avoid further delay, and does not pre-judge the larger question of the application of nuclear power to the Navy's surface vessels in the future."

McNamara first informed the Navy of his decision on Oct. 11, but at that time agreed to re-consider it.

The original notification was followed two days later by the resignation of Navy Secretary Fred Korth and the appoint-ment of Paul Nitze to succeed him effective Nov. 1.

**Boosts Total**

The new carrier will bring to eight the total of U. S. Navy flattops in the 60,000-ton class. Six are in service and a seventh is under construction at New-port News, Va.

In addition, the Navy has the 72,500-ton nuclear-powered En-terprise, which cost $480 million. The Navy expects the new

**See NUCLEAR CARRIER**
**Page Three**

## SEVEN RESCUED FROM FLOODED GERMAN MINE

### Time Gets Rough...



Unless six-year-old Cary Melnyk of ... Acres is a mechanical genius, he w... setting his clock back this weekend ... in New England, however, Daylight ... history and Eastern Standard Time ... ginning 2 a. m. S...

## More Funds As Fire Per...

Legislature Asked to Ap...



Friday night, as part of the Keith, chairman of the board; president of the Council for Bond, president of SC corpogher education by private busi-

# City Clerics Rap Racism In Election

### Continued From Page 1

ocese of Western Massachusetts, Russell Williams, executive secretary of the Council of Churches of Greater Springfield, and leading rabbis of the community.

"As religious leaders in this city," stated the steering committee, "we recognize our prime concern with the spiritual wellbeing of the individual and moral climate of the community at large.

**Have Held Back**

"Since each person has the privilege and responsibility of choice in regard to voting, the religious leaders have for the most part refrained from entering any controversy which may exert an influence on behalf of a political candidate.

"To seek office at the expense of social morality is wrong; to stir up prejudice and set man against his brother is wrong; to speak without regard for the truth is bearing false witness and is wrong."

"We are currently planning a conference in which men and women of different religions will come together to communicate, understand and act on those problems in which race plays a part and for which the City of Springfield is rightfully concerned.

**Good Taste Asked**

"We deplore any act or statement by anyone, whether public official or private citizen, which tends to create or promote ill feeling or misunderstanding.

"We hope that any campaign will be conducted in the real meaning of truth, good taste, fair play, confining itself to issues which are for the moral and social betterment of all, regardless of race, color or creed."

In Lynch's statement, the accused Mayor Ryan of making a "grandstand play" to attract Negro votes on the de facto segregation issue.

In a School Committee meeting last month, Ryan voted with the majority of the school board to recognize "racial condensation" in the public schools as undesirable.

He also supported a motion to set a target date of September, 1964, for corrective measures. This motion was defeated 5 to 2, with Mayor Ryan and Mrs. Dorothy Robinson in the minority.

ble" backing to all Democratic candidates in a drive to elect a Democratic City Council in proportion to the majority percentage the party holds in the electorate of the city.

Foley, who was the leading proponent of the city committee's backing of all Democratic candidates in the election, charged that the party held almost a 3 to 1 majority among the voters and that a City Council of that proportion should be elected.

In an motion-filled speech, Foley accused the city committee leadership of failure to take a stand and said he would fight personally to give all the Democratic candidates backing at the Wednesday meeting.

**May Be Dropped**

Foley's meeting is expected to be dropped, however, since the full committee indorsed the entire slate of candidates. But the most significant factor he cited in prompting the members to the indorsement is expected to remain a major item in the coming election:

Foley reminded the committee that the next City Council will be responsible for redrawing the ward lines of the city and that "if a Republican majority continues in the next council, the Gerrymandering of wards to the advantage of Republicans could well jeopardize the Democratic state representative and senatorial seats in Springfield."

But the indorsement was not easily won. Despite the unanimous label put on the final vote, the battle over the issue was severe and reflected a deep split among factions of the committee, especially between the executive officers and the general delegate body.

**"Emergency Session"**

Early in the meeting, chairman Robert Donnellan told the delegates that the executive committee had met in an "emergency session" a few nights earlier and voted not to indorse any candidates.

Donnellan said the decision reflected the fact that many of the candidates either do not recognize the city committee or participate in its functions. Others expressed concern that some of the so-called Democrats actually allegiance was in the independent or Republican camps.

The announcement came under attack from two fronts, both of which aroused emotionally-charged accusations that someone was trying to run the committee without allowing the general membership a vote.

**Quorum Doubted**

One of these attacks was on the basis that the executive committee did not have a quorum at its emergency session and that some unauthorized persons voted at that time. This ended eventually in some finger-waving, nose-to-nose shouting that "a change will be made" and the retort, "Just try it, just try it."

The other battle front, of which Foley was a leader, was on the question of whether the full membership of the executive committee had the final authority over the question of indorsement. Donnellan at first stated that constitutional authority rested with the executive committee, but with an overwhelming disagreement, he agreed to let the vote go to the full body.

Before this could be achieved,

**Opens Way**

Lynch indicated Friday that Ryan's indorsement of a deadline for corrective measures opened the way for the transporting of Negro students by the hundreds across the city into (predominantly white schools) . . . and transporting white students by the thousands into (predominantly Negro schools).

The NAACP education committee and other Negro leaders have claimed repeatedly that other measures to relieve de facto segregation can be found besides mass transportation. Alteration of school district lines and care in the location of future schools are among measures to be considered.

The steering committee includes Dr. Walter English, city intergroup relations specialist; Rev. Charles E. Cobb of St. John's Congregational Church; Rabbi Moses Cohen of Beth El Temple, Msgr. Walter C. Connell, vicar general of the Catholic diocese of Springfield; Rabbi Samuel H. Dresner of Beth El Temple; Venerable Harry H. Jones, archdeacon of the Episcopal diocese; Rabbi Herman Snyder; Sinai Temple; Rev. David P. Welch, editor of the Catholic Observer; Rev. D. Edward Wells, Mount Calvary Baptist Church; Russell Williams, acting executive secretary of the Council of Churches of Greater Springfield; and Rev. Hugh Wire, North End Area Ministry.

# French Women's Group Meets in Holyoke Today

Western Massachusetts Division of Federation Feminine Franco-Americaine will hold a luncheon this noon in Yankee Pedlar Inn in Holyoke honoring Mrs. Leo Levesque of Springfield, national president of the organization, and federation officers attending the seventh congress in Holyoke. Mrs. Alice Lemieux Levesque of Nashua, N. H., will speak.

Miss Clementine Poirier of Springfield, director of the Western Massachusetts regional committees, has announced that French public speaking contest for students in parochial and public schools from Grade 8 through college will take place Sunday, Nov. 3, at 2 in St. Joseph Church hall, Springfield

however, it was necessary for the chairman to call a recess as tempers flared fiercely. When the vote finally was recorded a strong majority shouted approval. A quick second motion moved it to unanimous approval.

**Follows Debate**

The vote on backing of the ward representation came following an enthusiastic, but not so heated, debate lead by Gerald F. Teehan, a proponent of the bill, and Douglas Cummings, who is in favor of retaining the present Plan A form of city government.

The Democratic candidates indorsed by the committee were:

For mayor, John Pierce Lynch and Charles V. Ryan, Jr.; and for School Committee, Robert T. Bogan, Sylvester F. Burke, Rose Marie Coughlin, Vincent DiMonaco and Theodore E. Dimauro.

For City Council, Paul C. Akerman, Joseph Bonavita, John J. Connolly, Armando G. Dimauro, Thomas P. Foley, Eileen P. Griffin, James L. Grimaldi, Charles J. Higgins, Frank S. L'Annunziata and John M. Sullivan.

Lynch predicted that next year's tax rate would increase "because he (Mayor Ryan) had failed to bring in new industry.

The men were among 22 of the 26 candidates seeking office at the Nov. 5 election who attended a political forum sponsored by the East Forest Park Civic Association, Inc. An estimated 130 spectators attended the program held in Wachogue Community Church.

Mayor Ryan asked to be the first speaker, saying he had other meeting to attend. He comment on the tax rate was in answer to a spectator's question.

Lynch arrived after the mayor had left. His tax rate hike prediction was made as part of prepared talk. In answer to a question, Lynch said he would move to bring in new industry by hiring a trained man to administer the Industrial Development Commission, a city agency deactivated by Mayor Ryan.

**City Council**

Comments from City Council candidates included:

Incumbent Lloyd W. Fran revealed that although he was appointed to a three-member council committee, to serve as liaison with the Springfield Redevelopment Authority, the committee agreed to have Councilor Eileen P. Griffin attend most of the SRA meetings and to "report back" to himself and Councilor Gerald T. Teehan.

Asked how taxable property would be put back into the newest area, Fradet replied study was first being made the best uses for the land. "The [SRA] have all kinds of questions. They are coming out their ears. It would be foolhardy to give to location just anybody," Fradet said.

Miss Griffin added that the ban renewal program was nearing ahead of schedule.

Incumbent Armando G. Dimauro was against ward representation in the council as favor of councilors being imbursed for their expenses.

Incumbent Philip M. Walsh said he was against ward representation and in favor of salaries for councilors.

Frank S. L'Annunziata was against both ward representation and salaries for councilors.

Incumbent James L. Grimaldi favored hiring a professional

# Botulism Scare Communica For Grocer

The latest botulism scare this area underscores the need for an effective communication network among the city's grocery stores, Dr. Lowell Bell health commissioner, said Friday night.

**Stock Checked**

None of the liver paste which caused a botulism death in Canada Friday has found its way to Springfield stores, Dr. Bell said, but the urgency of tracking down possible dangerous food products in the future is evident he said.

The Health Department proposes that the city's grocers set up a communications network similar to the type used

**DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY**
**MAYOR CHARLES V. RYAN**
**CITY OF SPRINGFIELD**

**EXHIBIT F**

# NEGRO GROUPS URGE CLU DROP LYNCH BACKING

## IUE Aide Assails Racial Stand; Ryan Foe Affirms Charge

A request that the Greater Springfield Labor Council, AFL-CIO, withdraw its indorsement of mayoral candidate John P. Lynch was made Sunday night by the Council of Negro Organizations, through its chairman, Roger Williams.

### Sends Telegram

A similar statement came Sunday from Herman W. Carter, New England civil rights director of the International Union of Electrical Workers, AFL-CIO, and an international representative. He sent Lynch a telegram telling him that he could not support his candidacy.

The action came in a continuing reaction to Lynch's statement last week that Mayor Ryan's policy has been "a rubber stamp of the NAACP line" and to Lynch's invitation of Boston School Committeewoman Louise D. Hicks to speak at his rally Saturday night. Mrs. Hicks opposed the Boston Charter of the National Association for the Advancement of Colored People in her successful candidacy this fall.

Lynch continued the same attack Sunday night in a speech to about 50 persons at a cocktail party in the Oaks Banquet House.

He maintained that transporting children across school district lines was not the answer to deficiencies in education.

**See NEGRO GROUPS Page Six**

---

# Negro Groups Urge CLU Drop Lynch Backing

### Continued From Page 1

which he laid to the lack of adequate buildings and equipment. He said Ryan was in favor of transporting to solve racial imbalance problems and he challenged the mayor to debate him on the issue.

### Deplored by Churches

Leaders of churches in the city have decried the injection of race into the campaign and the NAACP has pointed out it has not recommended transporting children around the city to solve racial imbalance problems.

The statement from the Council of Negro Organizations said that Lynch's invitation to Mrs. Hicks placed Lynch "as a racist who hopes to win election by pitting black against white."

The CNO also noted in its request that the labor council withdraw its indorsement of Lynch that at least some of Lynch's campaign literature bore no union label.

Carter, in his telegram to Lynch, asked, "Do you find it necessary to use the Negro as a pawn to get elected to the office of mayor?"

The invitation to Mrs. Hicks, Carter said, showed Lynch condones "the Hicks type of thinking and acting . . ."

### Cannot Support

"Due to your recent position, I cannot support your candidacy and must further use all influence I have with other unions and civil rights groups to defeat you," Carter said.

In his speech at the cocktail party, Lynch noted that Ryan had seconded the motion for implementing a report made by a subcommittee of the School Committee, which had investigated racial imbalance complaints. The committee in its vote declared that racial concentration did exist in some schools and that the School Committee should work to solve the problem. However, a motion, supported by Ryan, to set Sept. 1, 1964 as a date for implementation of a solution was defeated.

"There are no two answers," Lynch said. "It would mean bussing children from one part of the city to another."

Lynch said the money that would be used for transportation should be put into improving schools. He said that Ryan had voted against asking Washington for federal funds for textbooks in Hooker Street and Howard Street Schools. Bussing, Lynch

said, was not the answer to the problem. The only answer is in improving the schools, he said.

### Says Ryan Subservient

He charged that Ryan was subservient to the NAACP. "He's their boy," he said. "When they tell him something, it's done."

Lynch again issued a challenge to a television debate, but "bussing" was at the top of his list of issues Sunday night. After it, he put urban renewal, unemployment and the lack of new industry as issues for debate, the three he had listed last week.

Representatives of the two candidates met last week to arrange a television debate. The meeting ended in an impasse when the Lynch representatives refused to accept Lynch's record as register of deeds as an issue.

In other reaction to Lynch's statements over the weekend, Rev. Charles E. Cobb, minister of St. John's Congregational Church, said he hoped that Lynch would discover "on Nov. 5 that Springfield is not susceptible to the racism and demagoguery he has sought to engender in his desperate and perhaps final effort to be mayor of Springfield. Mr. Lynch is a political luxury that the city of Springfield cannot afford."

Rev. Paul A. Fullilove, pastor of the Third Baptist Church, said Lynch's action was "unwise." It changes the impression many Negro people had of Lynch, Mr. Fullilove said.

---

Oct. 28, 1965 p. 1 26

**DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY**
**MAYOR CHARLES V. RYAN**
**CITY OF SPRINGFIELD**

**EXHIBIT G**



Oct. 31, 1963
p. 25

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing "Defendants' Affidavit of Direct Testimony Mayor Charles V. Ryan, city of Springfield" has been served on the following counsel of record on the 9th day of February 2007, via the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Nadine Cohen, Esquire
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
    OF THE BOSTON BAR ASSOCIATION
294 Washington Street, Suite 443
Boston, Massachusetts 02108

Paul E. Nemser, Esquire
J. Anthony Downs, Esquire
Monica M. Franceschini, Esq.
GOODWIN PROCTOR LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109

Edward M. Pikula (BBO #399770)
   City Solicitor
Deanne Bogan Ross (BBO #555407)
City of Springfield
Law Department
36 Court Street, Room 210
Springfield, Massachusetts 01103