UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARISE FOR SOCIAL JUSTICE; <br> ¿OISTE?; NEW ENGLAND STATE-AREA <br> CONFERENCE OF THE NAACP; <br> REV. TALBERT W. SWAN, II; <br> NORMAN W. OLIVER; DARLENE <br> ANDERSON; GUMERSINDO GOMEZ; <br> FRANK BUNTIN; RAFAEL RODRIQUEZ; <br> and DIANA NURSE <br>        Plaintiffs, <br><br> v. <br><br><br> CITY OF SPRINGFIELD and SPRINGFIELD <br> ELECTION COMMISSION <br><br>        Defendants. | Civil Action No. 05-30080-MAP |

### DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY
### DOMENIC J. SARNO, SPRINGFIELD CITY COUNCIL

I, Domenic Sarno, on oath, do hereby state as follows:

***Background, Education, Employment, Neighborhood Connections***
1) My name is Domenic J. Sarno and I am – and have been since 2000 – a member of the Springfield City Council. I live with my wife and children on Carroll Street in Forest Park (Ward 6) in a racially and ethnically mixed neighborhood, in which reside Latinos, Vietnamese, and Muslims. I was born in Springfield. I lived with my younger brother and sister in Forest Park in several houses on Dickinson Street and Oakland Street. Both my father and mother were born in Italy. My father came to the United States with his father and a younger brother when he was 11-13 years old. My father lived in the Six Corners neighborhood. My mother came to this country when she was in her 20's after her mother – for whom she had been caring – died, to join other members of her extended family who lived in Springfield (South End). I was baptized in Mt. Carmel Church located in the South End. My father has been a barber for nearly fifty years and worked in shops in downtown and in Six Corners. He currently operates a barber shop on Dickinson Street, from which my mother offers her services as a seamstress.

2) I attended public schools in Springfield: Frederick Harris Elementary School (briefly) and White Street and Washington Elementary Schools. My young brother was bussed to Deberry Elementary School in Mason Square. I was bussed to Kiley Junior High School and attended the High School of Commerce, which had, when I attended, a diverse, but predominately minority student body. My interest in politics began at a relatively early age when I was elected freshman and junior class president of the High School of Commerce. I attended American International College and Westfield State and received a Bachelors of Arts Degree in Psychology. Throughout my childhood, high school, and college, I count among my friends, my classmates, and teammates African Americans, Hispanics, Italians, Irish, Polish. . . . I have always considered team sports an effective way in which racial stereotypes and prejudices can be challenged, if not eliminated. Some of the friendship I made playing sports have continued to adulthood.

3) Prior to college I had a variety of part-time jobs including working at Zayres and several local retail establishments – some of which were owned and operated by members of my extended family. In addition, I worked with kids – not much younger than I was – in a South End recreational youth program. During college I worked for a self-employed contractor installing flooring in homes and businesses throughout the City. My first post-college job was as a Housing Inspector for the City of Springfield Code Enforcement Department and was assigned to the North End, South End, and Six Corners as among others neighborhoods.

4) I had known Mary Hurley since I had been a teenager and worked on a number of her campaigns. When she was elected mayor -- the first and only female mayor of the City of Springfield – I served as a mayoral aide and provided constituent services in all of the neighborhoods throughout the City. Later, during her tenure, I was appointed the Deputy Director of Code Enforcement when the "building" and "housing" functions were merged. I think that it is fair to say that Mayor Hurley gave me my "first break" – recognizing my political and public service aspirations.

5) Desiring a job that provided more opportunity to provide direct assistance and support, I accepted a position as a senior job development specialist with the Hampden County Workers' Assistance Program ( which no longer exists, but has been "replaced" by Future Works) and provided assistance, retraining, and employment counseling to workers of every race and ethnicity, blue-collar to executive, who had been laid off. It was a nationally recognized program and was extremely rewarding to be able to provide assistance to persons at a time of great need; most workers had families to support at the time that they were laid off.

6) In 1992 I accepted a job from Bill Bennett, the District Attorney, that required me to develop a juvenile community services program. After witnessing the "revolving door" of juvenile crimes and delinquency, Mr. Bennett felt that a program that provided assistance and support to juveniles who had been arrested or had otherwise passed through the doors of the Office of the District Attorney was necessary and might be as effective a means of preventing crime and the "development" of adult "violators of the law" as other, more traditional forms of law enforcement. For the next six years I

developed a juvenile community accountability program that provided me the opportunity to work with youths living in the City's various neighborhoods. I further served as the District Attorney's liaison with the police and also arranged with a variety of other states for fugitive rendition.

7) In 2002 I accepted the position of the Executive Director of the South End Community Center, which had been having a great deal of difficulty remaining a viable organization and was suffering from a significant absence of funding and ineffective leadership

a) Since I have "taken over," the South End Community Center has been providing a number of services to the residents of the area – almost all of which are either Hispanic or African American – including youth development programs; a creative "hip hop" program conducted by a dance instructor and counselors for female juvenile offenders on probation; the only boxing program in the area, Tyie Thomas Dance Center, and Charlie Youmans' (Springfield Police Officer) Karate and Self-Defense Workout Studio. In addition we have a computer lab and a satellite office of the Department of Youth Services. We also serve as Zanetti School's "good neighbor" by providing our field house/gymnasium for their daily recreational needs.
b) In coordination with the Hampden County Sheriff's Department the community service South End crew, responsible for clean-up along Main Street and the South End, works out of the Center.
c) We also work with the North End Community Center and the Martin Luther King Center in a triangle youth program that provides middle school students opportunities for positive youth development with an anti-violence message.
d) A staff of 12-15 full and part-time persons work for the Center, in addition to numerous volunteers. Almost all of my staff are either Hispanic or African American – much as the population to whom we provide services.
e) It is our goal at the South End Community Center to provide a supportive safe haven to any person who walks through our doors. We are located in the old Armory Building (often referred to as the "castle') on Howard Street, which is very near the Zanetti School. The Center had been in a horrible state of disrepair when I first assumed the position of Executive Director.
f) We function in partnership with the City of Springfield and the Hampden County Sheriff's Office and are dependent upon grants and donations to provide for the wide range of services, programs, and facilities that are offered and that we hope to offer in the future. Accordingly, I spend a great deal of my time in the Center developing funding sources for more positive, preventative youth programs and "staying on top of our 100 year old physical plant.

***Election to and Service on the City Council***
8) I first ran for the City Council in 1997. This was my first bid for elective office. I did not win. I received 860 fewer votes than Barbara Garde, who placed ninth and was a three-term incumbent. Incumbent Raipher Pellegrino was not re-elected and Angelo Puppolo was elected for the first time to the City Council -- his second City Council contest. I received 37.2 percent of the city vote and received more than 50 percent of the

vote in only one ward – Ward 6, in which I live. I received my second greatest proportion of the ward vote from Ward 3. First-time candidates Daniel Kelly and Carol Lewis-Caulton were also not successful -- although we all would be in the next election. I was not deterred and understood that few persons are successful their first bid for elective office.

9) I ran again in 1999 and received 56.3 percent of the vote. I received more than 50 percent of the vote in every ward with the exception of Wards 1 and 4. In Ward 1, I received 48.6 percent of the vote. As among all of the candidates I received the greatest proportion of the Ward 6 and Ward 3 vote. I placed second as among the candidates; longtime incumbent William Foley placed first. I campaigned in every neighborhood and attended candidate forums, "coffees," and any and every other event that provided me an opportunity to meet the citizens of Springfield. I did not focus my efforts on any particular neighborhood but did rely upon the assistance of friends and neighbors and colleagues. I understand that the analysis conducted by Plaintiffs' expert, Dr. Richard Engstrom suggests that I was the candidate of choice of Hispanic voters. I will tell you that I have always actively sought the support of both Hispanic and African American voters.

10) In 2001, I received only 46.9 percent of the vote in an election in which there was significantly greater voter turnout than in the previous elections, presumably as a result of a heated mayoral contest . I placed seventh among the candidates competing, due, in part, to some controversial positions (as to which my opposition has subsequently been proven to be well grounded) that I took in my first term of office. Fellow incumbent, Carol Lewis Caulton was not re-elected. Newcomer and daughter of the Clerk of Courts, Rosemarie Mazza-Moriarty, was elected for the first time and first-time City Council candidate Jose Tosado placed tenth. I received more than 50 percent of the ward vote in Wards 6 and 7. It was a particularly divisive campaign for mayor between then-Mayor Michael Albano and Paul Caron, state legislator. It does seem that a candidate's alignment with Mr. Caron, was a disadvantage in the 2001 election contest.

11) In the 2003 primary election, I placed first among all of the candidates. In 2003, I placed second among the candidates, but received only 47.8 percent of the citywide vote. No candidate received more than 50 percent of the citywide vote. Again I received more than 50 percent of the vote from Wards 6 and 7. I received 49.0 percent of the vote from Ward 3; only Jose Tosado received a greater proportion of the Ward 3 vote (50.9 percent).

12) In 2005, an election in which there was usually poor voter turnout, I placed first among all of the candidates, receiving 51.0 percent of the citywide vote and was the only candidate to receive more than 50 percent of the vote. Again, I received more than 50 percent of the ward vote in Wards 2, 3, 5, 6, and 7. As among all of the candidates, which included three Hispanic candidates and three African American candidates, I received the greatest proportion of the precinct vote in five of the nine Ward 3 precincts. I recall that a newspaper article reported that I received the greatest proportion of the vote – as among all of the candidates – in at least 90 percent of the precincts.

13) I regularly receive calls from the various neighborhood councils and often attend neighborhood council meetings (even when my attendance is not requested). I have worked with all of the neighborhood councils, representing virtually all of the neighborhoods in the City. I believe that these neighborhood counsels provide a vital service and an informed knowledge of the issues and concerns of each of the neighborhoods that is generally superior to the understanding of one elected official/resident. I seek their input even where the issue relates to the neighborhood in which I live or work.

a) I have supported funding for projects "across the City" -- not just those projects that benefit the neighborhood in which I currently live or the neighborhoods where I have routinely received the greatest support. I have worked with Rep. Cheryl Rivera on the passage of home-rule legislation to target drag racing, which has recently been a particular problem in the North End and has represented a real safety hazard for innocent bystanders and homeowners in certain locations where these races have been occurring. The legislation provided for harsher penalties for those found in violation. This was a five-year "effort."

b) I am further working to try to expand the "drug-free" zones to community centers, churches, mosques, and synagogues, since there are many more alternative sites for education and care of children than just schools. I am committed to the notion that the City's schools should provide all students with a safe and secure learning environment. I have further worked with various school officials to provide for better means and programs to curtail truancy in all of the school in the City. I am committed to the City's public education program; indeed, my children attend public schools.

c) I pride myself in the fact that persons residing in all of the neighborhoods throughout the City solicit my help and feel that I am a member of the City Council who will listen and respond and will try to do whatever is possible to assist them. I can honestly say that I have never felt more beholden or accountable to or more interested in the issues and concerns of the neighborhood in which I currently live – as compared to the other 16 neighborhoods in this City.

***Support for an Alternative Method of Electing Members to the City Council***

14) I have supported the "8-5" method of election proposed by the Mayor and Jose Tosado in 2006. Indeed, I had previously voted for an 8-5 method of election, which failed to pass by a 6-3 vote. In fact, I have twice proposed a 5-4 method of election and have supported some of the other mixed at-large, ward representation schemes that have been proposed to the City Council. I feel reasonably confident that a majority of the voters in 2007 will support this proposed change to a 8-5 mixed method of electing members to the City Council, based upon the fact that the 8-3 mixed method of election received good support in 1997 among all of the wards.

a) My support for alternative mixed methods of elections is not based upon a view that African Americans or Hispanic persons are not able to elect their fair share of members to the City Council, but rather because it appears that a significant number of citizens are interested in a change that would provide for the election of some members of the City

5

Council from neighborhoods and a less costly, time consuming, and less exhausting alternative "path" for election to the City Council. I believe that low voter turnout among minority persons accounts, in part, for the fact that more minority candidates have not been elected to the City Council. I am concerned about the degree to which some minority persons do not seem to be engaged in the political or electoral process or appear to be "disconnected" from the City and its government. I would be anxious to work with community or civic leaders to encourage voter turnout and participation and a greater sense of empowerment among the City's minority persons and youth.

b) It is my hope that the fact that it would only be necessary to campaign amongst a candidate's neighbors and friends and family and the ability to conduct an effective (for the ward-based contests), competitive campaign without having to raise the kind of money that at-large city council candidates have invested in campaigning will attract some "new" first-time candidates and more interest among voters in certain wards where turnout has been very low. I am not as convinced that once an incumbent has establishment him/herself in a ward, that the increases in interest and turnout will be sustained. To be clear, however, while I would never argue that conducting a citywide campaign was not time consuming, resource intensive, expensive, and exhausting, I do NOT believe that it is easier for white candidates than it is for minority candidates. I further do not believe that it is necessarily easier for white candidates to raise money. I do not think that it is easier for unknown white candidates to attract white vote than it is for first-time minority candidates to attract white vote.

c) Accordingly, I support the 8-5 method of election rather than an all-ward method of election because of my concern that an all-ward method of election would all-but foreclose communication among persons of different races, ethnicity, educational background, socio-economic circumstances, religions, national origin, language spoken – residing in different neighborhoods and wards. In the end, we are still all citizens of Springfield and, I believe, that Springfield will only thrive to the extent that we do not isolate ourselves in our own neighborhoods; that we do not see only racial, ethnic, language, religious, socio-economic differences and divisions; that we feel a responsibility for the quality of life of every citizen of the City of Springfield – not just our neighbors.


15) I do not, however, support an all-ward based method of election. I continue to believe that it is important that some of the members of the City Council are elected from the city at-large and have a prospective that requires an assessment of what is best for the city as a whole. In days of limited resources, it is important that there are members of the City Council who are able (politically) to make determinations based upon greatest need and not upon re-election prospects and reactions from a small group of constituents.

a) Under a single-member district method of election in which no representatives of the City Council were elected at-large, the Mayor – who already has significant powers – would become even more powerful as the only official elected from the city as a whole.
b) An all ward-based election scheme would mean that a candidate would only be required to campaign in his/her election district, which would be comprised of approximately 1/9[th] of the City's population. I do not believe that it would be good for

city government if none of the members of the City Council were required to campaign in every neighborhood; that none were required to solicit the vote of every citizen in Springfield and to listen to the issues, concerns, suggestions, and criticisms of every citizen of the City

c) Among the other reasons that I do not support an all-ward method of election, is that qualified and committed minority candidates who do not live in Wards 1, 3, and 4 might be shut out of the political process and the City would be deprived of their services, ideas, leadership, and contribution. I do not believe that it is necessary to currently live in a neighborhood to adequately represent the interests of that neighborhood or group of people. I also do not believe that only African American candidates can represent African American voters; Hispanic candidates can represent Hispanic voters, and white candidates can represent white voters. I would hate for the City to implement any method of election that was based upon this view. That is not to say that the racial and ethnic make-up of the City Council should not reflect that of the city. I think that the City Council's work would be enhanced by a more diverse (racially, ethnically, socio-economically, educationally, and politically) membership, which I believe will follow the rapid increases in the proportion of minority persons in the City of Springfield.

16) There are many conflicting considerations with regard to the preferability of an at-large method of election as compared to a single-member district method of election or a mixed method of election. I welcome the debate, dialog, and exchange of ideas; I am open to compromise and conciliation. I do object to the representation by those who support ward representation that those who would favor maintaining the current method of election or the adoption of an 8-5 method of election are motivated by a discriminatory purpose or are opposed to having more minority persons elected to the City Council. As a result of this kind of labeling of those who support the at-large method of election, debate has been stifled and there has been no real analysis as to whether the desire for neighborhood representation might – in the end – provide for less opportunities for minorities persons to be elected to the City Council.

17) I think that the Plaintiffs' representation of the question of the best and most fair method of electing members to the City Council as simple and its solution self-evident does a disservice to all of the voters of Springfield – most particularly to minority voters, who stand to loose the most by any change in the method of election. If the real issue is low turnout, I am not sure that "ward representation" will remedy this, particularly since the turnout in legislative contests does not appear to be significantly greater (and sometimes less) than is the turnout in municipal elections. It seems to me that the reasons that people do not turnout to vote are far more complex than a method of election. If the real issue is that minority persons have "given up" on municipal government because of lack of employment, adequate housing, and police protection, nothing will be gained by challenging the way members of the City Council are elected, because the City Council has little or no authority to address, remedy, or rectify these situations and a change in the membership of the City Council will provide no remedies.

18) For myself, I can honestly say that political self-interest has not motivated my opposition to an all-ward-based method of election (and Plaintiffs' nine single-member

district plan). I have always "done well" among the voters of Ward 6 – the same voters against whom I would have to compete in Plaintiffs' proposed districting plan. My concern is based upon my assessment of what is in the best interests of all of the City's citizens and what will best promote the growth and revitalization of this City – my home.

Signed under the penalties of perjury this 13th day of February, 2007.

                                                           Domenic J. Sarno