UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARISE FOR SOCIAL JUSTICE;<br>¿OISTE?; NEW ENGLAND STATE-AREA<br>CONFERENCE OF THE NAACP;<br>REV. TALBERT W. SWAN, II;<br>NORMAN W. OLIVER; DARLENE<br>ANDERSON; GUMERSINDO GOMEZ;<br>FRANK BUNTIN; RAFAEL RODRIQUEZ;<br>and DIANA NURSE<br><br>Plaintiffs,<br><br>v.<br><br><br>CITY OF SPRINGFIELD and SPRINGFIELD<br>ELECTION COMMISSION<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 05-30080-MAP<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY
GLADYS OYOLA, SPANISH LANGUAGE PROGRAM COORDINATOR
CITY OF SPRINGFIELD**

I, Gladys Oyola, on oath, do hereby state as follows:

1) My name is Gladys Oyola and I am currently serving as the Spanish Language
Program Coordinator. I have worked in the Office of the Election Commission, as a staff
supervisor, for the past 3 years. Beginning in 1992, for four years, I worked for the
Election Commission and left from 1992 to 1994 to attend the University of
Massachusetts at Amherst and after two years to serve as the office manager for Bilingual
Collegiate Program at the University of Massachusetts that provided support, assistance,
and guidance to bilingual college students. During that same period of time, I also served
as a legislative aide to Rep. Anthony Scibelli (Hampden District 10) one summer. I
worked for Rep. Cheryl Coakley-Rivera, as a legislative aide beginning in 1998, when
she was first elected to the State House of Representatives. Later I served as her Chief
of Staff. As a legislative aide I had "constituent driven responsibilities" including direct
assistance, dissemination of information, and voter registration. I also did legislative
research and also was frequently required to issue statements to the press on Rep.
Rivera's behalf and respond to media inquiries directed to her. As Rep. Rivera's
legislative aide I was required to interact with, obtain information from, and convey

issues and concerns of Rep. Rivera's constituents to various state agencies. Finally, I regularly dealt with community based and faith based organizations. This was a particularly exciting time, since this was Rep. Coakely-Rivera's first election to the Massachusetts General Court. There was much to learn about how to "negotiate" within the political environment of the Massachusetts House of Representative. As a result of these responsibilities and the fact that I grew up in the Brightwood section of Springfield, I am very familiar with the various Hispanic neighborhoods throughout the City and the Hispanic community, religious, and civic leaders. I am also familiar and have frequently worked with other racial communities throughout the City and their leaders

2) I graduated from Cathedral High School as one of a handful of Hispanic students. I attended Westfield State College and the University of Massachusetts. I am fluent in English and Spanish. My mother and father were both born in Puerto Rico and immigrated to Massachusetts in 1974. In fact, Spanish was always spoken in the home. My fluency in Spanish has been very helpful – if not essential -- in much of my work. Rep. Coakley-Rivera does not speak Spanish fluently, but represents the North and South End Hispanic communities, among whom are many citizens with limited proficiency in English. My work for the University of Massachusetts Bilingual Collegiate Program, as well as Rep. Scibelli (Rep. Rivera's predecessor) required that I interact with, provide assistance to, and understand the issues and concerns of the Hispanic communities of Wards 1 and 3. .

**Registration and Voting Procedures**
***Board of Election Commissioners, Secretary to the Election Commissioners***
3) The position of Secretary to the Election Commission is held by Kathy Fleury, a 26 year City employee – 25 years of which have been spent in the Office of the Election Commission.

4) The Board of Election Commissioners is comprised of four individuals, who serve for four-year terms and who are appointed by the Mayor and including a representative of both political parties. It is the responsibility of the Election Commission to ensure that elections are properly "managed and conducted" in accordance with applicable federal, state, and local laws and with the terms of the Agreed Order of Settlement, United States v. City of Springfield, C.A. No. 06-30123-MAP (September 15, 2006). Currently, the chairman of the Election Commission is African American, Denise Jordan, who is the daughter of Rep. Raymond Jordan, but who is also a leader in the African American community, in her own right. In addition, one of the members is Hispanic and fluent in Spanish and English, John Ramirez. Another of the members of the Election Commission is a member of the Republican party (Mary Kaufman).

5) Members of the Election Commission take an active role in the conduct of election on election day and travel to various of the polling places to address reported problems, deliver supplies, clarify applicable procedural requirements and to otherwise provide support. Two of the members of the Election Commission (Ms. Jordan and Mr. Ramirez) are members of the Spanish Language Election Program Advisory Committee

6) The Secretary and the Board of Election Commissioners is responsible for the administration, supervision, coordination of elections for which the City has responsibility, and related activities. Working with the Board of Election Commissioners the responsibilities of the Secretary include establishing policies and making decisions concerning the conduct of general and primary elections, recounts, the annual census of municipal residents (as required by the Commonwealth); registration of voters; and creation and maintenance of voting lists. In addition, the responsibilities of the Secretary include administering, supervising, coordinating, and implementing (the only full-time members of the Board of Election Commissioners) the above enumerated duties, policies, and practices. The Secretary is also responsible for ensuring that registration and elections are conducted in accordance with the applicable state and federal laws and the Board of Election Commissioners are appropriately informed. The Secretary further supervises a small full-time clerical staff and a large short-term staff of clerks, election officials, and volunteers

7) Specific duties and responsibilities of the Secretary to the Board of Election Commissioners acting on half of the Board of Election Commissioners include all of the practices, procedures, and activities that support the conduct of an election and registration of voters consistent with applicable state and federal laws

a) Specific duties and responsibilities of the Secretary to the Board of Election Commissioners acting on behalf of the Board of Election Commissioners include preparation of agenda for and maintenance of the minutes of the meetings of the Board of Election Commissioners; administration of policies, decisions, and directives of the Board
b) Specific duties and responsibilities of the Secretary to the Board of Election Commissioners acting on behalf of the Board of Election Commissioners include finalization of drafts (for printing) of ballot labels and ballots
c) Specific duties and responsibilities of the Secretary to the Board of Election Commissioners acting on behalf of the Board of Election Commissioners include certification of the adequacy of candidate nomination papers
d) Specific duties and responsibilities of the Secretary to the Board of Election Commissioners acting on behalf of the Board of Election Commissioners include assignment and supervision of election officials during election-day activities, selection and contracting of polling places; supervision of the distribution to polling places and setting up of voting machines and privacy booths, certification of final election results, issuance of certificate of nomination or election
e) Specific duties and responsibilities of the Secretary to the Board of Election Commissioners acting on behalf of the Board of Election Commissioners include determining whether the requirements for recount have been met, conducting recounts and certifying of the results
f) Specific duties and responsibilities of the Secretary to the Board of Election Commissioners acting on behalf of the Board of Election Commissioners include supervision and oversight of the registration of voters to ensure that applicable laws are enforced and registration practices are equally available to United States citizens regardless of race, ethnicity, and language spoken

g) Specific duties and responsibilities of the Secretary to the Board of Election
Commissioners acting on behalf of the Board of Election Commissioners include
supervision of the annual compilation of the lists of active and inactive voters and the list
of municipal residents
h) Specific duties and responsibilities of the Secretary to the Board of Election
Commissioners acting on behalf of the Board of Election Commissioners include
ensuring that accurate and adequate information concerning the conduct of elections,
registration, candidate qualification, the annual census procedures is made available to
the public and provided to the media

***Spanish Language Election Program Coordinator***
8)  Pursuant to the Agreed Settlement Order in <u>United States</u> v. <u>City of Springfield</u>, C.A.
No. 06-30123-MAP, I was appointed the Spanish Language Election Program
Coordinator.

a) Among the requirements for the Spanish Language Election Program Coordinator is
that (s) he is fluent in English and Spanish (written and oral); familiar with election
procedures and laws and with the various neighborhoods throughout Springfield; and has
a good working relationship with various of the political, social, civic, and racial and
ethnic leaders in Springfield
b) Spanish Language Election Program Coordinator has numerous responsibilities, most
of which are specifically provided in the Agreed Settlement Order and include i)
developing the Spanish election glossary to ensure uniform use of election terminology;
ii) implementing and overseeing Spanish-language publicity programs; iii) training and
recruiting the bilingual poll officials, including assessing the language capabilities of poll
officials, reviewing the bilingual poll officials' "performance" in past elections; iv)
participating in Advisory Committee meetings, which includes assisting in the
identification of individuals to serve, attending Advisory Committee meeting, and
reporting to the Committee on status, successes and failures of Spanish Language
Election Program
c) Spanish Language Election Program Coordinator has the responsibility of
implementing Advisory Committee suggestions or providing explanation why
suggestions cannot be adopted
d  Spanish Language Election Program Coordinator has the duty to solicit assistance from
Advisory Committee members and attendees in recruiting appropriate poll officials and
in disseminating information regarding voting and registration
e)  Spanish Language Election Program Coordinator has the responsibility of complying
with the terms of the Agreed Settlement Order, including meeting reporting requirements
to Department of Justice, Civil Rights Division, Voting Section and investigating
election-related complaints and reporting on outcome of investigation and remedial
action proposed (where appropriate)
f)  Spanish Language Election Program Coordinator has the responsibility of
implementing all other aspects of the Spanish Language Election Program, including
assessment of the need for more outreach and educational programs.  Outreach and
educational programs that are being considered by the Language Coordinator involve
informing voters of various voting and election-day procedures, including provisional

4

and challenged ballots and about the operation and use of all voting machines, e.g., new touch-screen and "old" optical scanner voting "machines."  Among the outreach and educational programs that are being considered by the Language Coordinator are registration drives, meetings with and presentations to various community groups regarding election-related issues, including ensuring the integrity of elections and encouraging greater participation among members of certain minority groups

***Registration and Eligibility to Vote***
9)  Massachusetts state law establishes eligibility requirements for voter registration. There are three requirements for voter registration in City of Springfield, Massachusetts: United State citizenship; residency in Springfield, Massachusetts (for any length of time); and 18 years of age before the next election

10)  The following persons are not eligible to vote:  persons who are incarcerated in a correctional facility due to a felony conviction and persons who are under "guardianship." M.G.L. ch. 51, §1

11)  The following persons are eligible to vote:  i)  residents of Massachusetts who were convicted of a felony, but who have been released and are currently on parole; ii) persons whose last or present domicile is/was Massachusetts and who are currently incarcerated on a non-felony conviction; iii) Persons whose last or present domicile is/was Massachusetts and who are confined to a correctional facility awaiting trial on a felony charge;  iv) persons whose last or present domicile is/was Massachusetts and who are either absent from State or absent from the city or town of residence and "in the active service of the armed forces or in the merchant marine of the United States, or a spouse or dependent of such a person."  M.G.L. ch. 50, §1 (definition:  Specially Qualified Voters)

12) The registration form in Massachusetts requires the following information:  name, former names (where this is not first time registering to vote), current street address, mailing address, birth date, party affiliation (or "unenrolled" if no party chosen), former registration address (if any), date, and last four digits of social security number or driver's license number or "none"

13)  Massachusetts law provides for a number of ways in which an eligible individual may register to vote, including registration by mail.  Registration forms are available in the following locations:  i) on Secretary of Commonwealth and Springfield Election Commission (Springfield City Hall) websites; in Spanish in the City of Springfield and on Springfield Election Commission and Secretary of the Commonwealth websites; iii) a number of agencies in the City of Springfield:  Department of Transitional Assistance, Massachusetts Commission for the Blind, Massachusetts Commission for the Deaf and Hard of Hearing, Department of Mental Health, Department of Mental Retardation, Massachusetts Rehabilitation Commission,  Division of Medical Assistance, and WIC; and iv) at all colleges, universities, high schools, and vocational schools.  In addition, a National Voter Registration form is available on applicable federal government websites, as well as through various Secretaries of State websites.

14)  An eligible person may register in-person at Election Commission Office for City of Springfield.  Registration forms are available in Spanish.  Election Commission Office is open from 9:00 – 4:00 weekdays.  There are two bilingual members of the Election Commission staff available to assist persons with limited proficiency in English.  Where voter provides last four digits of social security number or driver's license number it is not necessary for voter to provide identification.  Registrant may request assistance from members of the Election Commission staff or is permitted to receive assistance in completing the application from an individual of the registrant's choosing

15)  An eligible person may register in-person at the Registry of Motor Vehicles by "checking" the box on the driver's license form indicating the applicant desire to become a registered voter in the City of Springfield.   Individuals needing bilingual assistance, are encouraged to register in person in the Office of the Election Commission, where a bilingual staffperson will be available to assist them.  Failure of persons attempting to register at the Registry of Motor Vehicles occurs when the appropriate "box is not checked," although other information is provided.  Voters are informed that if they do not receive communication from the Office of the Election Commission within two weeks, they should call and check on their status as registered voters.

16)  An individual who registered by mail or at the Registry of Motor Vehicles is notified if the Election Commission determines that the affidavit of registration is incomplete or the individual is not qualified to be a registered voter and provide him with "a reasonable opportunity to remedy the defects in his affidavit." M.G.L. ch. 51 §47.

17)  A voter can check his registration status in the following ways:  Election Commission website  (Spanish language version available); Secretary of the Commonwealth website (Spanish language version available); and by telephone to the Springfield Election Commission  (two Election Commission staff persons are fluent in English and Spanish)

18)  Two registrars or other delegates of the Office of the Election Commission will register a physically disabled voter at his residence upon application received by the Election Commission no later than the "third day before the last day for registration of voters." M.G.L. ch. 51, §42(A).

19)  Massachusetts law establishes eligibility requirements to vote in Springfield elections.

a)  Only individuals who are registered to vote at least 20 days prior to the conduct of a primary or general election are eligible to vote.

b)  A "Specially Qualified Voter" may still vote even where the voter has registered to vote less than 20 days prior to the conduct of an election where the individual is a "new citizen" and registeres before 4:00 p.m. the day before the conduct of the election and presents his naturalization papers. M.G.L. ch. 51, §50.

c) A registered voter, who moves within the City, remains eligible to vote at former address, until information about new residence is received by the Office of the Election Commission

d) Where a registered voter moves within the State he remains able to vote in state and federal elections in the city or town of his former residence "until the expiration of six months from such removal." M.G.L. ch. 51, §1.

e) Voters whose name appears on the "inactive" voting list remains eligible to vote in an election in Springfield

20)  Massachusetts law establishes requirements that must be met prior to purging and reassigning voters to the "Inactive" voting list

a) In order to remain on or be returned to the "Active" voting list, a voter is required to return a completed annual city census card, M.G.L. ch. 51, §4, or return subsequent notification from the Office of the Election Commission sent to those who did not return the annual city census form or complete an affirmation of residence form at the polling place or at the Office of the Election Commission.

b) The Office of the Election Commission is troubled by this provision that presents otherwise appropriately registered voters additional obstacles prior to voting because of their failure to comply with a purely administrative, non-voting related requirement of state law.  For our part we have provided a Spanish language translation of the information and questions on the annual census forms – in the absence of the Office of the Secretary of the Commonwealth providing us with bilingual census forms.  In addition, this year we are trying to respond to this obligation by sending census reporting forms (with return receipt) to owners of property – including multi-family properties -- and requiring them to provide information about those persons residing on their property. Since it appears that it is predominately minority persons who fail to respond, we are hopeful that this process will result in fewer minority persons being designated as "inactive" voters for failure to have completed the requisite census form.  Efforts to encourage Rep. Cheryl Coakley-Rivera and Rep. Benjamin Swan (Election Commission chairman, Denis Jordan) and MassVote and other voting rights organizations to sponsor legislation to remove this requirement have erstwhile been unavailing.

c) It is not necessary for an elector to vote in any or all elections in order to maintain his status as an "Active" voter

d) A voters may not be removed from the "Active" voting list where he continues to complete and return the annual census forms to the Office of the Election Commission, unless i) the voter died; ii) a duplicate copy of an affidavit or registration from a registrar of another city or town is received by Office of the Election Commission; iii) a change of address form from the Registry of Motor Vehicles is received by the Election Commission indicating that the individual's residence is no longer in the City or the voter requests or confirms in writing that he has moved to another City

e) A voter may not be removed from the "Inactive" voting list unless i) the voter died; ii) a duplicate copy of an affidavit or registration from a registrar of another city or town is received by Office of the Election Commission; iii) a change of address form from the Registry of Motor Vehicles is received by the Election Commission indicating that the individual's residence is no longer in the City; iv) the voter requests or confirms in writing that he has moved to another City; and v) the voter failed to vote in the last two

biennial state elections and voter failed to respond to notification by mail by Election Commission of voter's "eligibility" to be removed by the voting list. M.G.L. Ch. 51 §37A.

21) The Springfield Election Commission has never purged voters on the basis of race or ethnicity and has always applied the applicable laws uniformly to all voters regardless of race or ethnicity or personal knowledge or connections. Indeed, we have often expended efforts – in excess of that which is required by state law – to confirm a voter's continued residence in the City so as not to assign a voter "inactive" status unless necessary.

***Dissemination of Information and Notification***
22) Information (in English and Spanish) about (i) the location of the Office of the Election Commission; (ii) members of the Board of Election Commissioners; (iii) responsibilities and duties of the Board of Election Commissioners; (iv) the telephone number of and hours during which the office of the Election Commission is open; (v) the poll workers' handbook and attached appendices; (vi) election returns; (vii) the yearly election calendar; (viii) an application for registration; (xix) public documents that are available at the Election Office and charge for these documents is available on Election Commission website.

23) The website for the Elections Division for the Massachusetts Secretary of the Commonwealth provides the following: (i) how to register to vote; (ii) voter registration form request; (iii) National Voter Registration form; (iv) state election returns; (v) information about the Help American Vote Act; (vi) Massachusetts registered voter enrollment (1948-2004); (vii) Massachusetts Statewide Ballot measures (1919-2004 (viii) how to request a recount; (ix) how to run for office on a sticker or write-in campaign; (x) how to accept the Community Preservation Act; (xi) how to run for state office; and (xii) information about previous elections;

24) Information about the polling place to which a voter is assigned is provided at the time of registration in-person at the Office of the Election Commission; in the notification (by mail) from the Election Commission confirming the individual's status as a registered voter; Election Commission website, which provides a link to "Mapquest," which will provide a map and directions to the correct polling place; or by telephone to the Office of the Election Commission (English and Spanish)

25) Information regarding the upcoming election is provided to the public in the City of Springfield in a number of ways in English and Spanish.

a) *The Republican* routinely covers different aspects of the every election in the form of articles, including information about registration deadlines and candidate qualification deadlines.
b) The Office of the Election Commission has published information and notices in Spanish in *El Pueblo Latino, El Dialogo, and Elite Magazine* and on Radio, [WTCC and WSPR] and the local cable access channels.

8

c) Members and attendees of Advisory Committee (for Spanish Language Election Program) meetings disseminate information about the upcoming election to the various civic and community organization they represent

d) Information is provided on Election Commission website (English and Spanish): absentee balloting application form, relevant date for primary and general elections

e) Information is provided on Office of the Secretary of the Commonwealth website: (i) state election dates; (ii) how to place a public policy question on the 2006 state election ballot; (iii) voting for military and overseas US citizens; (iv) court approved state representative districts; (v) A Guide to State Ballot Question Petitions; (vi) Federal Voting Assistance Program; (vii) video demonstrations (English and Spanish) for voting equipment; (viii) Massachusetts Congressional District map; and (xix) how to apply for an absentee ballot;

f) Notices in English and Spanish have been posted in a number of locations in the various neighborhoods in which a significant population of whom speak Spanish.

g) The active recruitment of many bilingual poll officials have served as a means to provide members of the Hispanic (and Vietnamese) community information about the upcoming election

h) The active recruitment of poll officials in the African American community to replace longtime poll officials who are no longer effective and do not retain sufficient knowledge of the applicable procedures has served as a means to provide information about upcoming election to voters in all minority communities

i) The Office of the Election Commission has recently received relevant information about registration and the conduct of elections in Vietnamese from the Office of the Secretary of State and will be distributing this information to the several Vietnamese civic and community organizations.

26) Sample ballots are made available by the Office of the Election Commission and various civic and political organizations provide citizens with ballots on which are marked the candidates endorsed by the organization

27) A number of signs (in English and Spanish), in addition to those provided by the State, were created by the Election Commission and displayed in the polling places in prominent locations to better inform the voters

a) The following sign (in English and Spanish) was posted near the entrance to the polling place and/or near the check-in table

---

**Provisional Ballots**

If you are not permitted to vote a regular ballot,
Ask poll official for information about provisional ballots.

---

---

**Assistance**

Spanish language assistance is available

It is your right to receive assistance from anyone of your choosing.

---

**Identification**

You will be asked to show identification when you check-in

If you registered to vote by mail after January 1, 2003 and have not voted since

-or-

If your name is on the "inactive" voter list

Acceptable forms of identification will include your name and registration address, but need not include a photo identification, e.g, current utility bill, payroll check, government document, bank statement, as well as current and valid driver's license

---

**"Inactive" Voting List**

If your name is on the "inactive" voting list, you may still vote today

You must provide identification with your address

-and-

You must sign an "affirmation of residence" form

You will then be given a ballot and your name will be returned to the "active" voting list

---

b)  A sample ballot (in English and Spanish) was posted near the entrance of the polling place or near the check-in table

c)  The following sign in Spanish was posted on the check-in table

> **CHECK-IN**
>
> **Assistance**
>
> If you need or would like Spanish language assistance
>
> Just point to the sign when it is your turn to check-in
>
> Please give your name to the poll official

d)  A sign (in English and Spanish, provided by the State) illustrating how to mark ballot was placed in the area where the voting stations were set up

e)  The following signs (in English and Spanish) was posted near the voting stations

> **Everybody Makes Mistakes**
>
> If you have made a mistake or mis-marked your ballot
>
> or voted for more than one candidate for a particular office
>
> Return "spoiled" ballot to poll official at vote tabulator and you will receive a new ballot

> **Assistance**
>
> Having trouble reading the print on the ballot or understanding the ballot choices?
>
> Not sure how to mark the ballot or whether you have marked the ballot correctly?
>
> Just ask any poll official for assistance

f)  The following sign in English and Spanish was posted near the optical scanner/voter tabulator.

> STOP HERE
> Insert completed ballot in Vote Tabulator
>
> Wait until poll official has told you that your ballot has been read and counted
>
> You may need to mark another ballot if you have voted for too many candidates for an office
>
> We want to make sure that your votes are counted

11

g) A sign that read "Depósita Su Papelta Aqui" was taped above the directions on the optical scanner (voting tabulator) which provided "Insert Ballot Here"

h) The following sign in Spanish was placed on or near the check out table

> **CHECK-OUT**
> Please give your name to the poll official

> **Citizen Comments**
>
> We are interested in learning about your voting experience today
>
> Please complete the Citizen Comment form on the Election Commission website at
> Springfieldcityhall/COS/elections
> or
> Call the Office of the Election Commission at
> 413-787-6190

i) The following sign: "VOTE AQUÍ" was placed at the entrance of the polling place

28) Ballots, registration forms, and absentee ballot applications and forms are provided by the Commonwealth of Massachusetts. Accordingly, Spanish language versions of these were available as soon as they were provided by the Office of the Secretary of the Commonwealth.

29) The terms of the Agreed Settlement Order did not require the provision of any Vietnamese notices, publications, signs, information, and poll officials. Nevertheless, the Office of the Election Commission did make available information in Vietnamese requested from and eventually received by the Office of the Election Commission, as well as ballots, in polling places where a reasonable number of Vietnamese voters (who may not be proficient in English) were assigned

***Election officials, interpreters, volunteers, and staff***
30) The City of Springfield is committed to ensuring that its poll and election officials represent the diversity of the population in the City. Pursuant to the Agreed Settlement Order in United States v. City of Springfield, C.A. No. 06-30123-MAP (D. Mass.), the City of Springfield is committed to hiring poll officials, more than one-third of whom are bilingual

12

31) Prior to 2006, the City of Springfield complied with state law in its recruitment of poll officials.   M.G.L. c. 54, §13. The Election Commission was required to choose poll officials from among those nominated by the various ward caucus leaders.  The Election Commission was only permitted by applicable state law to recruit poll officials if the ward caucus leaders failed to meet this nomination obligation.  Only the ward caucus president (Gomersindo Gomez) for Ward 1 consistently nominated Spanish speaking poll officials.

32)  M.G.L. c. 54, §13  continues to be the state law with regard to the appointment of poll officials and the City has yet to receive any formal communication from the Office of the Secretary of the Commonwealth that the City is permitted to recruit additional bilingual poll officials where ward caucus leaders do not identify sufficiently qualified bilingual individuals to serve as poll officials.  Efforts to encourage Rep. Cheryl Coakley-Rivera and Rep. Benjamin Swan to sponsor legislation to change this archaic provision has also, thus far,  been unavailing.

33)  Pursuant to the Agreed Settlement Order, the City of Springfield has recruited and is continuing to recruit bilingual poll officials (fluent in English and Spanish) with a goal of 135 bilingual poll officials "distributed" among the 64 polling places according to a "formula" provided in the Agreed Settlement Order.  In every polling place where there are 70-174 registered Spanish surname voters, at least one bilingual poll official will be assigned

a)  Only five precincts (Precinct 6D, 7B, 7C, 7F, and 7H) are not required to have any bilingual poll officials
b)  Ten precincts (Precincts 4F, 5D, 5F, 5G, 5H, 6B, 6H, 7A, 7D, and 7G) will be assigned one bilingual poll official
c)  In every polling place where there are 174-349 Spanish surname voters, at least two bilingual poll officials are to be assigned
d)  In every polling place where there are more than 350 Spanish surname voters, at least three bilingual poll officials are to be assigned
e)  Three bilingual poll officials are required to be assigned to the following precincts:  all of the precincts in Ward 1; Precincts 2A, 2B, 2C, 2D, 2E; all of the precincts in Ward 3; and Precincts 4A, 4E, and 4G.
f)  Generally, more than three bilingual poll officials have been and will continue to be assigned to Ward 1 precincts – thanks to the assistance provided by ward caucus leader, Gumersindo Gomez in identifying bilingual poll officials.

34)  In the 2006 primary election in the City of Springfield, about 130 (Spanish-English) poll officials were recruited; at least 80  were available to be assigned to polling places[1]; 4 bilingual (Vietnamese-English) poll officials were assigned to polling places;  3 bilingual poll officials were assigned to duties as election captains, and roving poll officials

---

[1] It is difficult to be more accurate, since some persons who were not qualified under Massachusetts law to serve as poll workers, worked as "interpreters" but were paid as poll workers.  In addition, a few city employees worked as poll officials, but were not paid in addition to their City salary.

13

35) In the 2006 general election more bilingual poll officials were recruited and some of the older poll officials were replaced; Smith College Spanish-speaking students and others not qualified to serve as poll officials served as bilingual interpreters in the polling place.
a) In the 2006 general election in Springfield, 94 bilingual (English-Spanish) poll officials and 33 bilingual interpreters were assigned to polling places
b) The only precincts to which bilingual poll officials were not assigned in the 2006 general election in Springfield were 4F, 6D, 7B, 7C, 7F, and 7H.
c) In the 2006 general election in Springfield, 5 bilingual (Vietnamese-English) poll officials were assigned to Precincts 3F, 3G, 3H, 5F, and 6C.
d) In the 2006 general election in Springfield, 21 of the bilingual (English-Spanish) poll officials served either as a warden or a clerk in the polling places to which they were assigned.

36) For the first time, in the 2006 elections, six election captains were appointed and assigned to a sector of the City. Election captains were required to "visit" all of assigned polling places to ensure that (i) notices were adequately posted; (ii) there was no information provided in English that was not provided in Spanish; (iii) that adequate (bilingual and otherwise) poll officials were assigned to polling places; (iv) that polling places had sufficient supplies, including ballots, affirmation of residence forms, provisional ballots, and marking pencils; (v) that absentee ballots for each polling place were timely delivered; and (vi) that optical scanners were functioning properly.
In the 2006 general election, two of the Election Captains were fluent in English and Spanish and were able to "cover" polling places when bilingual poll officials were on lunch or dinner "break." The addition of election captains was proposed by the City of Springfield to better ensure that there was adequate communication between polling places and the Office of the Election Commission and to provide support and contemporaneous first-hand accounts of any problems that were encountered by voter or poll officials in the polling places.

37) In the 2006 general election, a number of volunteers were enlisted and trained on the new handicap accessible, touch-screen voting machines, which were delivered (by the Office of the Secretary of the Commonwealth) to Springfield a little more than a week prior to the conduct of the general election. Volunteers were instructed to travel to the polling places to "turn on" the voting machines, provide instruction to wardens, poll officials, and police officers (who have demonstrated -- over the years -- a greater familiarity with the functioning of the optical scanner voting machines than have poll officials)

38) For the 2006 elections, a total of six additional persons for a total of ten persons, five of whom were fluent in Spanish, worked in the Office of the Election Commission answering the telephones and providing poll officials information with regard to (i) persons whose names do not appear on the voting lists for the polling place at which they are attempting to vote; (ii) directions to and identification of the polling place to which these voters are assigned; (iii) instructions as to how to assist voters in casting provisional or challenged ballots and how to complete affirmation of residence forms; (iv) directions

14

as to the correct procedures to enable a voter who requested an absentee ballot to vote in-person on election day; and (v) operation of optical scanner. These additional Office of the Election Commission staff members were also available to provide information directly to voters with regard to their status as registered voters, the polling place to which they are assigned, directions to the correct polling place, and any other information that will facilitate the ability of voters to cast a ballot on election day.

39) The Springfield Board of Election Commissioners continues to work with the various ward caucus leaders, among whom is named Plaintiff Gumersindo Gomez and Henry Twiggs, to provide names of eligible, qualified persons to serve as poll officials. Both have proved to provide invaluable assistance in recruiting bilingual poll officials and other poll officials who reflect the age, race, ethnicity of the voters in the City of Springfield.

40) The Springfield Board of Election Commissioners is committed to hiring (and replacing older) poll officials with individuals who better represent the diversity (age, race, ethnicity) of the population in Springfield and to ensuring that all poll officials have sufficient abilities, knowledge of voting procedures, and temperament sufficient to provide adequate assistance and support to voters

41) It is the responsibility of the Board of Election Commissioners to train the poll officials; it is the responsibility of the Spanish Language Elections Coordinator to train bilingual poll officials to ensure that all applicable federal and state laws and procedures are followed and every qualified elector is provided with an opportunity to cast an informed ballot. Poll official training in 2006 provided information about the duties and responsibilities of (i) wardens, (ii) clerks; (iii) inspectors; and (iv) bilingual poll officials

a) Poll official training in 2006 provided information about the city's bilingual election program and the importance of ensuring that all voters with limited proficiency in English are provided with bilingual assistance. Section 203 of the Voting Rights Act, 42 U.S.C. 1973aa-1a ("Section 203")
b) Poll official training in 2006 provided information about the importance of posting all of the signs (in English and Spanish) provided and ensuring that no information provided in English in the polling place is not available in Spanish
c) Poll official training in 2006 emphasized the importance of providing to all voters reasonable and adequate assistance to enable them to cast a ballot that reflects their respective electoral choices
d) Poll official training in 2006 provided information about the right of all voters to an assistor of choice. Section 208 of the Voting Rights Act, 42 U.S.C. 1973aa-6.
e) Poll official training in 2006 included information about the federal observer program and the poll official's importance in ensuring that the terms of the Agreed Settlement Order in United States v. City of Springfield are met
f) Poll official training in 2006 included information about the appropriate conduct and deportment of the City's poll officials and the importance of being friendly, helpful, accommodating, and patient in all of their interactions with voters and any person seeking to vote in the polling place to which a poll official is assigned.

g) Poll official training in 2006 stressed the importance of ensuring that every eligible voter is provided an opportunity to cast a ballot on election day. To that end, poll officials were instructed to use the cell phones -- provided for the first time in 2006 -- to call the Office of the Election Commission to ensure that a voter who is not registered to vote in the polling place to which the poll official is assigned is redirected to the correct polling place.

42) Poll official training in 2006 included information about various routine voting procedures, as well as (i) provisional balloting and (ii) casting a challenged ballot

a) Poll official training in 2006 included information about the difference between the active and "inactive" voting list (blue), application of the identification requirement and the various alternatives where voters are not in possession of appropriate identification; and the completion of the affirmation of residence form.
b) Poll official training in 2006 included information about the operation of the optical scanner, the types of mistakes that would cause the vote tabulator to reject a ballot, including undervoting, and overvoting, and the importance of respecting the privacy of the ballot
d) Poll official training in 2006 included information about counting absentee ballots in the polling place and the procedures where a voter who has applied for an absentee ballot wishes to vote in person on election day and/or cancel his absentee ballot
e) Poll official training in 2006 included information about the importance of permitting voters to refer to sample ballots and an explanation of the state law prohibiting the display of campaign materials in the polling place
f) Poll official training in 2006 included explanation of new communication and reporting requirements to better inform the Election Commission.
g) Bilingual poll officials and/or clerks were required to report on appropriate forms the number of and information concerning voters who were (i) in need of bilingual assistance; (ii) cast a provisional ballot; (iii) required to provide identification; (iv) completed an affirmation of residence form prior to voting; (v) redirected to the polling place to which the Election Commission confirmed that they were assigned; and (vi) required to cast a challenged ballot
h) Wardens and clerks were informed that they were responsible for ensuring that the Election Commission and its staff were informed of all election day activities, problems, challenges, and shortage of staff or supplies. Cell phones were provided to facilitate this communication requirement
i As before, poll official training provided explanation of procedures and requirements regarding the opening and closing of the polls, including vote tabulation.

*Meeting goals for assignment of bilingual*
43) In a letter dated January 5, 2007, from John "Bert" Russ and Veronica Jung, Attorneys from the Voting Section of the Department of Justice to Edward M. Pikula, City Solicitor, Mr. Russ and Ms. Jung concluded that "[s]ince the entry of the Court's Order on September 15, the City has made significant improvements in its assignment of bilingual workers." Although we did not entirely meet their revised goals for placement of bilingual poll officials that arose from their Spanish surname analysis of 2006

registration, the Department of Justice attorneys acknowledged that we did meet the goal of assigning at least one bilingual workers in 54 of the 59 "covered" precincts.

a) Our failure to recruit, train, and assign poll workers to the 59 "covered" precincts was due to lack of time and not to a lack of commitment to meeting whatever the goals that the Department of Justice established. This is not to say that I do not question the Department of Justice's Spanish surname analysis, since if it accurately reflected the increase in Spanish surname voters in the City of Springfield, the Election Commission would have had to purge from the election role at least 8,772 number of non-Spanish surname voters.

b) The Department of Justice attorneys acknowledged that the "new bilingual poll workers made a remarkable contribution" and that "[f]ederal observers reported numerous instances of poll workers providing assistance in Spanish to voters." The bilingual poll workers who left at 2:00 p.m.—as noted in the January 5, 2007 letter -- and who did not return involved the daughter and friend of Jenny Gonzales, who is extremely active in the Hispanic community and is among those who often bring a number of voters to the polls and assist them in voting. We have received no further communication from the two young women (or their mother) as to why they left, except that they were "bored."

c) Mr. Russ and Ms. Jung "commended the City for its efforts in September and November to assign Vietnamese-speaking workers in several precincts with growing Vietnamese population" and to make available ballots and other information in Vietnamese.

d) While Mr. Russ and Ms. Jung recognized the City's efforts to provide for election material and signs in English and Spanish, they noted the several polling places in which we were not able to send bilingual provisional ballot applications due to our failure to receive an adequate number from the Office of the Secretary of the Commonwealth prior to the election. Mr. Russ and Ms. Jung, however, noted that provisional ballot information was provided in English and Spanish by the November, 2007 election.

e) Likewise, the fact that many poll officials were not trained on the handicap accessible voting machines was due to the fact the Secretary of the Commonwealth did not provide these machines until less than two weeks before the general election and the fact that many did not work properly. I understand that these voting machines were leased by the Commonwealth and they are presently being evaluated as to machines that best meet the needs of Massachusetts voters. In some polling places, e.g., Mary K. Lynch School (Precinct 5C) however, poll officials found the machines very helpful, voters were able to and said that they"enjoyed" using them, and, indeed, some non-handicapped voters chose to use the machines to obviate having to wait for open voting stations in which to mark their ballot.

f) Mr. Russ and Ms. Jong noted an instance where a poll official expressed hostility as to the need for bilingual assistance and poll officials. As noted by Mr. Russ and Mr. Jung, that individual was not re-appointed as a poll official, even though our investigation showed that the federal observers had misunderstood her remarks as hostile, when, in fact, they merely were an expression of confusion.

g) Some of the difficulties and problems identified by Department of Justice attorneys, i.e, failure to offer provisional ballots to voters who were not re-directed to the correct

17

polling place, were, quite honestly, due to the age of the poll workers – many of whom have served as poll workers for many, many years and did not seem to "absorb," internalize, and implement the information and directions provided in the two mandatory training sessions.    We are currently re-evaluating longtime poll officials with regard to the far greater demands that were and will be placed upon them.  To that end we are attempting to identify and recruit more poll officials who more accurately reflect the racial, ethnic, and age diversity of the City's population and who will be "easier" to train and instruct as to the correct procedures with regard to provisional ballots, challenged ballots, when voters are required to provide identification, and the efforts that must be expended to attempt to determine the correct polling place to which a voter is assigned.

44) Pursuant to a request by Rep. Cheryl Coakley-Rivera in 2004, Affidavit (Declaration) of Massachusetts State Representative Cheryl Rivera, Plaintiffs' Motion for a Preliminary Injunction, Arise for Social Justice v. City of Springfield, C.A. No. 05-30080 MAP, at 2-3, the Springfield Election Commission provided a Spanish translation for its then-election handbook and conducted a Spanish language training session.

a)  Even though there is no legal requirement mandating that persons with limited proficiency be provided with an opportunity to serve as poll officials, the Election Commission complied with Rep. Rivera's request to facilitate training for non-English-speaking friends and family whom Ward Chairman Gumersindo Gomez had insisted serve as poll officials in Ward 1.
b)  The Election Commission has seen abandoned the practice of providing Spanish language training for poll officials based upon the interpretation of Section 203 that requires bilingual poll officials, fluent in both English and Spanish, assist voters with limited English proficiency.  There was concern that poll officials who were not fluent in English would not provide voters with the kind of assistance that Section 203 requires. The United States Department of Justice has since confirmed that Section 203 of the Voting Rights Act, 42 U.S.C. 1973aa-1a requires poll officials to be fluent in English and Spanish, because the goal of this requirement is the provision of appropriate assistance to voters (and not equal opportunity for non-English speaking persons to work as poll officials).

### Absentee Balloting
45) Massachusetts law establishes the eligibility requirements for casting an absentee ballot
a)  A registered voter who asserts that he will be absent on election day from the city or town in which he is registered is permitted to cast an absentee ballot
b)  A registered voter who asserts that he has a physical disability that prevents him from voting at the polling place on election day is permitted to cast an absentee ballot
c)  A registered voter who asserts that he cannot vote on election day due to religious beliefs is permitted to cast an absentee ballot
d)  A person or spouse or member of the family of a person on active duty in the military whose last domicile was Massachusetts is permitted to cast an absentee ballot even though he is not registered to vote in Massachusetts.

e) A person who is a specially qualified voter is permitted to cast an absentee ballot under certain circumstances

f) As a practical matter, a registered voter will be permitted to cast an absentee ballot where he asserts that he is unable to vote in-person on election day.

46) Massachusetts law establishes the application procedure for requesting and/or being provided an absentee ballot

a) Prior to receiving an absentee ballot application, a registered voter must complete an absentee ballot application , which can be obtained in a number of different ways: i) a registered voter can call the Springfield Election Commission and request an application for absentee ballot; ii) a family member can call the Springfield Election Commission and request an application for absentee ballot; iii) an application for absentee ballot may be "downloaded" from Election Commission website; and iv) an application for absentee ballot may be "downloaded" from Secretary of the Commonwealth website.

b) In addition, overseas military personnel and members of family of military personnel can complete Federal Post Card Application available through the military and online.

c) Absentee ballot application can be obtained in-person at the Office of the Election Commission or will be hand-delivered to designated health care facilities by designee of Office of the Election Commission

d) An absentee ballot will be automatically provided to registered voter or specially qualified voter by Office of the Election Commission without receipt of contemporaneous application  where a registered voter has indicated on absentee ballot application that absentee ballots should be mailed to voter for every election occurring in the year in which the original application is made

e) Absentee ballots must be sent for two years where absentee ballot applicant is an active member of the military or member of family of military personnel and application is made by federal post card application

f) Absentee ballots will be automatically mailed to disabled person who is unable to cast a ballot at the polling place where the Office of the Election Commission is in receipt of a letter from doctor of disabled voter attesting to voter's permanent inability to cast a ballot at the polling place

47) Absentee ballot application requires the following information:  name, address, address where ballot is to be sent, where a primary and voter is an "unenrolled" voter, party ballot request, and signature.  Absentee ballot application for a voter may be requested and completed by member of voter's family

48) Massachusetts law provides for several alternatives available to the voter once an absentee ballot has been received

a) Voter may complete the ballot and mail to the Office of the Election Commission

b) Voter may complete ballot and hand deliver it to the Office of the Election Commission prior to noon the day before the election

c) Voter may bring completed ballot to the polling place to which he is assigned

d) Voter, who does not return the absentee ballot to the Office of the Election Commission, may vote in person at the polling place to which he is assigned

e) A voter may cancel an absentee ballot at the polling place to which he is assigned if his ballot has not yet been "counted' at the polling place
f) Voter may vote in person at the polling place to which he is assigned if his returned absentee ballot has been rejected as defective

49) Massachusetts law prescribes the requirements for a properly completed absentee ballot
a) It is not necessary for an absentee ballot to be notarized
b) A voter may receive assistance in marking the absentee ballot, but assistor must print his name and voter's name on brown ballot envelope, provide the reason for the assistance, and sign his name as assisting person
c) Absentee ballot applications and ballots are available in Spanish

50) An absentee ballot may be requested, application completed, and ballot marked at the same time where voter applies in-person at the Office of the Election Commission after Office of the Election Commission is in receipt of printed ballots

***Election day voting practices and procedures***
51) Any reasonable request for assistance or an assistor of choice by a voter is granted by poll officials.

52) Poll officials assist voters who need and/or request help in reading the ballot, marking the ballot, completing affirmation of residence forms or provisional ballots, inserting the ballot in the optical scanner, and identifying problems where the optical scanner rejected a ballot.

53) Poll officials understand that assistance cannot include suggestions as to the best qualified candidate, the positions espoused by a candidate, the organizations who have endorsed a particular candidate and any interpretation of a referendum question, initiatives, or constitutional amendments other than the explanations provided by the governmental authority proposing the referendum question. Poll officials can answer simple factual questions about a candidate, where the poll official was knowledgeable. Poll officials otherwise refrain from comment, representation of the candidate's position on a policy issue, or any other discussion of one candidate's qualifications as compared to another candidate

54) Poll officials permitted an "assistor of choice" who is not a poll official to render any kind of assistance, including marking the ballot. Poll officials can ask the voter whether he/she wished that the indicated individual assist him/her and/or whether the voter wanted the assistor to mark the ballot for him/her.

55) Poll officials permit an "assistor of choice" to respond to inquiries by the voter regarding candidates who the voter should support. Poll officials understand that, generally, they do not have the authority to dictate or question the nature and the scope of the assistance provided by an "assistor of choice." Where there is *clear evidence* that an assistor, who is not a member of the voter's family, does not appear to be respecting the

**DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY**
**GLADYS OYOLA, SPANISH LANGUAGE PROGRAM COORDINATOR**
**CITY OF SPRINGFIELD**
**PART 2 OF 4**

choices of the voter or the assistor is not providing the voter with an opportunity or sufficient information to make electoral choices and/or is voting the ballot without any direction from the voter, poll officials have the responsibility to challenge the provision of assistance and assure themselves that the voter's wishes are being respected.

56) Poll officials are prohibited from doing or saying anything to the voter or to anyone in the polling place that could be construed as challenging the voter's right to assistance or the "assistor of choice." Poll officials are informed that such comments or conduct constitute grounds for removal.

57) Bilingual poll officials provide assistance to a voter with limited proficiency in English. Even where a voter does not request assistance, but rather appears to have difficulty in understanding English, poll officials offer bilingual assistance to the voter.
a) Bilingual poll officials provided assistance in "checking-in," "casting a ballot, and "checking-out." Poll officials ensure that assistance is available and provided where requested. Bilingual poll officials provide assistance in understanding why the voter's name is not on the voting list; whether the voter should cast a provisional ballot; the directions to the polling place to which the voter is assigned; provisional balloting procedures; why the voter is being asked to provide identification; what forms of identification are acceptable; why it is necessary for a voter to complete an affirmation of residence form; what the voter can do if he/she has not yet return an absentee ballot or wishes to cancel an absentee ballot already cast; what it means when a person challenges his/her right to vote and what the voter will be asked to do; and the alternative procedure for casting a regular ballot where the voter's name appears on the "inactive" voting list and the voter does not have appropriate identification. Poll officials offer bilingual assistance as to these more complicated and less familiar voting procedures to voters who did not experience any trouble understanding English with regard to the far simpler procedures of checking-in or casting a ballot.

58) Upon request, the bilingual poll official will read ballots to voters. Where the bilingual poll official is asked by the voter to mark the ballot, the bilingual poll official only marks the ballot as instructed by the voter. The bilingual poll official will not mark the ballot for the voter unless this kind of assistance was specifically requested by the voter.

59) Generally, voters in Springfield, Massachusetts are not required to provide identification prior to voting. In the 2006 primary election, there was a report that poll officials in one polling place were requiring identification from every voter. City Solicitor Ed Pikula, who spent 2006 primary and general election days traveling to different polling places, immediately contacted these poll officials and instructed them to comply with the procedures provided in the training materials that prescribed identification only for inactive voters and certain voters who had registered by mail since January 2003

a) Voters, whose names appear on the "Active" Voting List are NOT required to provide identification

21

b) Voters, whose names appear on the "Inactive" Voting List are required to provide identification, but will be permitted to vote a challenged ballot that will be counted on election day, if voter does not have acceptable identification

c) Voters, whose names appear on the "Inactive" Voting List, must complete an affirmation of residence form which requires the voter to provide the same information that would have been provided had he returned the annual state census form.

d) Voters who registered by mail in Massachusetts on or after January 1, 2003 are, generally, required to provide identification, Help America Vote Act, Title III, Section 303(b), 42 U.S.C. 15483(b), except where the vote has provided the last four digits of his social security number or his driver's license number and the Election Commission has verified information that the voter provided on his mail-in application

e) A voter who registered by mail in Massachusetts on or after January 1, 2003 and has not yet voted may still *not* be required to provide identification the first time he votes where the voter provides  a copy of appropriate identification with the mail-in registration or at any time after registration

60) Acceptable identification need not include a picture and need not be a driver's license, but must include the voter's name and address, including utility bill, but not cell phone bill; government document like a paycheck stub; recent bank statement

61) Several alternatives are available and/or applicable where a voter's name is not on the list for the polling place. In all cases, the Office of the Election Commission was called to ascertain the polling place to which the voter was assigned

a) Where the Office of the Election Commission informs the poll official that the voter was assigned to another polling place, poll official explain to voter that he is registered to vote at another location,  provides directions to the correct polling place, and is told the name of the Election Commission staff person who confirmed his assignment to another polling place should the voter encounter any difficulty at the polling place to which he had been redirected. Further, the voter is told that he could cast a provisional ballot, but should understand that, under state law, his ballot would not be counted if it were not cast in the polling place to which he had been assigned

b) Where the Office of the Election Commission informed the poll official that the voter was not assigned to any polling place and there was no record of his having registered to vote, voter was informed that he could cast a provisional ballot.

c) Where voter chooses to cast a provisional ballot, appropriate assistance by the bilingual poll official and/or the warden is provided to the voter in understanding the process, completing the necessary forms, providing the requested information, and marking his ballot.

d) Once voter has completed the provisional balloting procedure, poll official locates the Secretary of the Commonwealth's toll free number on the information sheet provided to the voter upon his departure. Poll official further provides the telephone number of the Springfield Office of the Election Commission and the number of the ballot that the voter had cast and the appropriate ward and precinct information. The poll official explains to the voter that he could contact the Secretary of Commonwealth or the Springfield Office of the Election Commission to determine whether his vote had been counted.

62) Poll officials ensure that every ballot was counted and the privacy of the ballot and voting process is respected.

a) Poll official explains to the voter the manner in which he should insert the ballot into the optical scanner and the voter will be informed by the poll official that/when the voter's ballot was counted.
b) Where the scanner rejects the ballot, the poll official will explain or provide a description of some of the reasons that the ballot might have been rejected. Assistance in correcting or marking another ballot is offered and another ballot is made available to the voter to re-mark
c) Where the scanner indicates that the voter had "under-voted," poll official explain to the voter that the optical scanner had indicated that the voter did not make a choice in any of the election contests. Where the voter indicates that it was his/her intention not to vote for any of the candidates, voter will be asked to reinsert the ballot. Where the voter indicated that (s)he had intended to cast a ballot in some or all of the election contests, voter will be permitted to return to the voting station and mark the ballot accordingly. Poll official will offer assistance and provide explanation as to the correct method of marking the ballot
d) Where the scanner indicates that the voter has "over-voted," poll official explains to the voter that the optical scanner had indicated that the voter voted for too many candidates in one or more contests and therefore the voter's choice in those contests in which (s)he has voted for too candidates will not "count." Voter is provided with another ballot and the poll official offer assistance and provide explanation as to the correct number of candidates for whom the voter is permitted to cast a ballot in each contest. [2]
e) Poll officials understand that they were not to take the ballot from the voter or to look at the voter's ballot unless the voter has asked that the poll official look at the ballot or the voter has given the ballot to the poll official to determine why the ballot was been rejected by the optical scanner or why the scanner has indicated that the voter had "overvoted" or had "undervoted."

63) In the 2006 primary election, a very popular Republican candidate (Bruce Lees) conducted a write-in campaign for clerk of courts opposed by a Democratic candidate and a Democratic incumbent. Democratic and Republic voters wrote-in Mr. Lees' name. Write-in votes (Bin 1 and Bin 2 ballots) were counted by "hand" by a group of poll officials assembled at the Office of the Election Commission for the purposes of counting write-in votes. It was the duty of these poll officials to determine the intent of the voter.

a) In the 2006 primary election, where a voter connected the arrows next to the space where a voter had written-in a candidate, the optical scanner "counted" all of the non-write-in votes, but deposited the ballots in Bin 1.

---

[2] Although state law prescribes once a voter has "spoiled" three ballots, (s)he is not permitted an additional ballot, poll officials in Springfield were instructed not to place a limitation on the number of ballots a voter may "spoil" before achieving a ballot that will be counted as the voter intended. Poll officials were instructed to offer assistance where it appeared that the voter was experiencing difficulty in marking a ballot correctly.

b)  In the 2006 primary election, where a voter neglected to connect the arrows next to the space where the voter had written-in a candidate, the optical scanner "counted" all of the non-write-in votes and deposited the ballot in Bin 2
c)  In the 2006 primary election, poll officials reviewed all of the Bin 2 ballots to ensure that the write-in choices of voters who intended to write-in a vote but neglected to "connect the arrows" was counted where the intent of the voter was clear.

64)  In the 2006 general election where one of the memory pacs for one of the vote tabulators/optical scanners was not functioning properly, a form was devised to facilitate the process of counting ballots "by hand."

a)  Various persons who had assisted with the operation of the handicap, touch screen voting machines, election captains, Election Commissioners, and Election Commission staff persons were enlisted to count the ballots.  Among those counting ballots were white, African American, and Hispanic persons.
b) The process was conducted in public and was observed by one of the City attorneys. The process was conducted after the close of the polls.
c)  Voter choices were announced and recorded.
d)  Two attorneys from the Deval Patrick gubernatorial campaign, who had expressed a concern about the "counting" process, were informed when the ballots would be counted and were informed that they or a representative could observe or monitor the process.

***Candidate Qualifications and Vacancies***
65)  In the 1991 election, voters had the opportunity to change the method by which vacancies were filled on the City Council and on the School Committee. Question 1 proposed that "the tenth place finisher in the most recent election automatically fill the vacancy in the Council." Question 2 proposed that "the tenth place finisher in the most recent election automatically fill the vacancy in the School Committee." [3]

a)  The change in the method of filling vacancies on the City Council was supported by an overwhelming proportion of the voters, who "had an opinion":
69.8 percent supported the change. Of the total number of voters casting ballots, 30.7 percent supported the change; 13.2 percent opposed the change; and the remainder of the voters left the ballot question blank.
b)  The change in the method of filling vacancies on the School Committee was supported by an overwhelming proportion of the voters, who "had an opinion":
69.5 percent supported the change. Of the total number of voters casting ballots, 30.5 percent supported the change; 13.4 percent opposed the change; and the remainder of the voters left the ballot question blank

66)   Since the passage of this provision, two minority candidates have been advantaged by this change: Jose Tosado (in 2002) and Robert McCollum (in 2002).  Since non-

---

[3] The official records of the Springfield Election Commission did record Question 2 as proposing that the "tenth place finisher" fill a vacancy on the School Committee.  It is assumed that it is a typographical error on the "hand typed" 1991 election records and the 1991 referendum proposed that the fourth place finisher fill a vacancy on the School Committee.

incumbent minority candidates are/were often among those who have "just missed" qualifying for election to the City Council and the School Committee and the prior procedure for filling vacancies would not have provided the same opportunities to minority candidates of choice as did the at-large method of election where voters had nine choices.

67)  In 1989, the Springfield City Council ordered the Mayor to seek passage by the General Court of special legislation requiring that candidates must produce the signatures of 200registered voters in order to qualify for election.  Prior to that time, it had been even less.

68)  The Springfield Election Commission has never required that candidates pay a fee for the "first copy" of voter registration records

### *Polling Places*
69)  Among the considerations in choosing a polling place is its i) convenience to persons in the precinct who may not have private transportation; ii) the availability of public transportation; iii) handicap accessibility; iv) adequate parking and space for outside-the-polls-election-day-campaign activities  In addition, consideration is given to choosing a place where all voters, regardless of race, ethnicity, national origin, language spoken, feel comfortable and welcomed.

70)  The location of polling places is reviewed every year, with consideration to the availability of alternate sites, complaints and difficulties encountered in the previous elections, and compliance with applicable handicap accessibility regulations and laws.

### Pre-1997 City Council Election History
### *1979 City Council Election*
71)  Mr. Morris Jones (African American), first ran for the City Council in the1979 municipal election in which 38.9 percent of the registered voters cast ballots.  Mr. Jones placed eleventh of 17 candidates; African American persons constituted 13.9 percent of the voting age population (according to the 1980 Census).

a)  Mr. Jones received 24.5 percent of the vote in the 1979 municipal election; the ninth place candidate received 39.6 percent of the vote – 3,942 more votes than did Mr. Jones
b)  Mr. Jones received 13.3 percent of his vote from Ward 4.  According to  to the Urban League Report II, Appendix XXIV, 69.8 percent of the Ward 4 population was African American and 34.4 percent of the registered voters cast ballots.  Mr. Jones received a comparable proportion of his total vote from Ward 7, the total population of which was less than 1 percent African American according to the Urban League Report II, Appendix XXIV.
c)  Mr. Jones received 19.3 percent of his vote from Ward 5.  According to  to the Urban League Report II, Appendix XXIV, 55.7 percent of the Ward 5 population was African American and 42.6 percent of the registered voters cast ballots.

d) Mr. Jones received 16.8 percent of his vote from Ward 2. According to the Urban League Report II, Appendix XXIV, 2.3 percent of the Ward 2 population was African American and 42.3 percent of the registered voters cast ballots.

72) In the 1979 municipal City Council election, longtime African American incumbent, Paul R. Mason (African American), placed eighth, receiving 44.0 percent of the total vote.

a) Mr. Mason received 44 fewer Ward 4 votes than did Mr. Jones; Ward 4 votes represented 7.0 percent of Mr. Mason's total vote.
b) Mr. Mason received 79 more Ward 5 votes than did Mr. Jones; Ward 5 vote represented 11.4 percent of the total vote received by Mr. Mason.
c) Mr. Mason received 18.7 percent of his total vote from Ward 7 voters.

73) In the 1979 municipal City Council election, Cesar Ruiz (Hispanic), who was elected to the School Committee in 1981, placed twelfth among 17 candidates, receiving 24.4 percent of the vote. Hispanic persons constituted 6.0 percent of the voting age population (according to the 1980) in the City of Springfield

a) Mr. Ruiz received 6.5 percent of his total vote from Ward 1 voters. According to Urban League Report II, Appendix XXIV, 60.9 percent of the population in Ward 1 was Hispanic and 35.4 percent of the registered population turned out to vote
b) Mr. Ruiz received 21.7 percent of his total vote from Ward 7 voters. According to Urban League Report II, Appendix XXIV, less than one percent of the population in Ward 7 was Hispanic and 44.5 percent of the registered voter population turned out to vote

*1981 City Council Election*
74) In the 1981 City Council Election, Mr. Jones placed fourteenth among 18 candidates and in which 58.3 percent of the registered voters cast ballots.

a) Mr. Jones received 24.5 percent of the vote in the 1981 municipal election -- 331 more votes than he received in 1979, but 10,414 fewer votes than Mr. Mason received.
b) Mr. Jones received 12.0 percent of his vote from Ward 4. According to the Urban League Report II, Appendix XXVI, 71.1 percent of the Ward 4 population was African American and 45.3 percent of the registered voters cast ballots. Mr. Jones received 48 fewer Ward 4 votes in 1981 than he did in 1979. Mr. Jones received a comparable proportion of his total vote from Ward 7, the total population of which was 1.1 percent African American according to the Urban League Report II, Appendix XXVI and in which 64.9 percent of the registered voter population turned out to vote.
c) Mr. Jones received 14.2 percent of his total vote from Ward 5. According to the Urban League Report II, Appendix XXVI, 58.1 percent of the Ward 5 population was African American and 51.3 percent of the registered voters cast ballots.
d) Mr. Jones received 16.8 percent of his total vote from Ward 2. According to the Urban League Report II, Appendix XXVI, 2.8 percent of the Ward 2 population was African American and 62.3 percent of the registered voters cast ballots

26

75) In the 1981 municipal City Council election, longtime African American incumbent, Paul R. Mason, placed ninth, receiving 43.1 percent of the total vote.

a) Mr. Mason received 167 more Ward 4 votes than did Mr. Jones; Ward 4 voters represented 5.7 percent of Mr. Mason's total vote – 1.3 percentage points smaller proportion of his total vote than he received from Ward 4 in 1981.
b) Mr. Mason received 332 more Ward 5 votes than did Mr. Jones; Ward 5 vote represented 8.2 percent of the total vote received by Mr. Mason – 3.2 percentage points smaller proportion of his total vote than he received in 1981 from Ward 5 voters..
c) Mr. Mason received 19.2 percent of his total vote from Ward 7 voters and 17.1 percent of his total vote from Ward 2 voters.

76) In the 1981 municipal City Council election, Miguel Rivas (Hispanic), on whose campaign Mr. Tosado worked, placed thirteenth among 18 candidates, receiving 18.5 percent of the vote.

a) Mr. Rivas received 9.6 percent of his total vote from Ward 1 voters. According to Urban League Report II, Appendix XXVI, 69.3 percent of the population in Ward 1 was Hispanic and 53.2 percent of the registered voters turned out to vote
b) Mr. Rivas received 17.3 percent of his total vote from Ward 2 voters. According to Urban League Report II, Appendix XXVI, 10.2 percent of the population in Ward 2 was Hispanic and 62.3 percent of the registered voters turned out to vote
c) Mr. Rivas received 16.1 percent of his total vote from Ward 7 voters. According to Urban League Report II, Appendix XXVI, less than one percent of the population in Ward 7 was Hispanic and 64.9 percent of the registered voters turned out to vote

77) One other minority candidate, Harold F. Langford (African American), competed in 1981 City Council election and placed fifteen as among the 18 candidates.

*1983 City Council Election*
78) Mr. Jones placed tenth among 18 candidates and received 804 fewer votes than the candidate placing ninth, in the 1983 City Council election, in which 6,641 fewer voters turned out to vote in 1983[4] than did in 1981 and in which Mr. Mason did not compete for re-election

a) Mr. Jones received 33.7 percent of the vote in the 1983 municipal election; the ninth place candidate received 36.1 percent of the vote.  Mr. Jones received 4,443 more votes in 1983 than he received in 1981
b) Mr. Jones received 8.5 percent of his vote from Ward 4. According to the Urban League Report II, Appendix XXVII, 71.7 percent of the Ward 4 population was African

[4] The Urban League Report II includes information about elections from 1973-1982. Accordingly, no registration information is available at the Springfield Election Commission. The Secretary of the Commonwealth publishes registration and turnout information regarding state and federal elections conducted on "even numbered" years. No other registration information was available

27

American in 1982.  Mr. Jones received 149 more Ward 4 votes in 1983 than he did in 1981.

c)  In contrast to the 1979 and 1981 elections, Mr. Jones received 16.8 percent of his total vote from Ward 7, the total population of which was 1.2 percent African American according to the Urban League Report II, Appendix XXVII in 1982.  Mr. Jones received 1,013 more Ward 7 votes than he received in 1981.

d)  Mr. Jones received 13.8 percent of his total vote from Ward 5.  According to the Urban League Report II, Appendix XXVII, 59.4 percent of the Ward 5 population was African American in 1982.  Mr. Jones received 584 more Ward 5 votes in 1983 than he received in 1981.

e)  Mr. Jones received 17.6 percent of his total vote from Ward 2.  According to the Urban League Report II, Appendix XXVII, 3.0 percent of the Ward 2 population was African American in 1982.  Mr. Jones received 834 more Ward 2 votes in 1981 than he received in 1983.

79)  In the 1983 City Council election two other minority candidates competed for office. Mr. Harold Langford competed again and placed fourteenth among 18 candidates, receiving 661 more votes in 1983 than he received in 1981.  Mr. Carlos Lopes placed last among all of the candidates.

### 1985 City Council Election

80)  Finally in 1985, Mr. Jones was elected to the City Council, placing seventh among 17 candidates, although he received 227 fewer votes in 1985 than he received in the 1983 election in which 10,487 fewer voters cast ballots than did in 1983.

a)  Mr. Jones received 48.3 percent of the vote in the 1985 municipal election and received fewer vote from predominately African American wards and more vote from predominately white wards than he received in 1983.

b)  Mr. Jones received 8.5 percent of his vote from Ward 4.  According to  the Urban League Report II, Appendix XXVII, 71.7 percent of the Ward 4 population was African American in 1982.  Mr. Jones received 110 more Ward 4 votes in 1983 than he did in 1985.

c)  Mr. Jones received 11.2 percent of his total vote from Ward 5.  According to the Urban League Report II, Appendix XXVII, 59.4 percent of the Ward 5 population was African American in 1982.  Mr. Jones received 309 fewer Ward 5 votes in 1985 than he received in 1983.

d)  On the other hand, Mr. Jones received 20.6 percent of his total vote from Ward 7 – 3.8 percentage points greater proportion of his total vote than he received from Ward 7 voters than in 1983.  Mr. Jones received 374 more Ward 7 votes in 1985 than he received in 1983.  The total population of Ward 7 was 1.2 percent African American according to the Urban League Report II, Appendix XXVII in 1982.

e)  Mr. Jones received 19.9 percent of his total vote from Ward 2.  According to the Urban League Report II, Appendix XXVII, 3.0 percent of the Ward 2 population was African American in 1982.  Mr. Jones received 210 more Ward 2 votes in 1985 than he received in 1983.

81) Only one other minority candidate ran for election in the 1985 election, Ms. Carmacita Jones (African American), who finished sixteenth among 17 candidates. Antonette Pepe (current member of the School Committee), in her first bid for elective office, placed thirteenth among 17 candidates

### 1987 City Council Election

82) Mr. Jones was re-elected and placed eighth among 18 candidates in the 1987 City Council election, in which 1,975 more voters cast ballots than did in the 1985 election. The 1990 Census reported that 13.9 percent of the voting age population was African American.

a) Mr. Jones received 43.7 percent of the vote in the 1987 municipal election – 4.6 percentage points smaller proportion of the total vote and 175 fewer votes than he received in 1985

b) Mr. Jones received 12.6 percent of his vote from Ward 4,[5] in which, according to the 1990 Census,[6] 59.4 percent of the total population was African American.

c) On the other hand, Mr. Jones received 18.9 percent of his total vote from Ward 7, in which the 1990 Census reported that 5.6 percent of the total population was African American

d) Mr. Jones received 15.1 percent of his total vote from Ward 2, in which the 1990 Census reported that 34.9 percent of the total population was African American.

e) Mr. Jones received 12.9 percent of his total vote from Ward 5, in which the 1990 Census reported that 25.9 percent of the total population was African American

83) Only one other minority candidate ran for election in the 1987 election, Mr. Robert McCollum, who finished 15 among 18 candidates. This was his first bid for elected office. Mr. McCollum received 15.2 percent of the vote.

84) In the 1987, Kateri Walsh was elected to the City Council. Although this was Ms. Walsh's first bid for office, her husband had been elected to the City Council in 1973 and again in 1975. Mr. Walsh was among two white incumbents who were not re-elected in 1977.

---

[5] It appears that the City redistricted its wards between the 1985 and 1987 elections, equalizing the number of precincts in each of the wards. Since Wards 4 and 5 had fewer precincts and voters in 1985 than in 1987, comparison would be misleading, if not meaningless. Since Wards 2 and 7 had more precincts and voters in 1985 than in 1987, comparison would be likewise misleading. It also appears that in equalizing the population, only one African American majority district resulted, Ward 4, in addition to Ward 3, in which 34.9 percent of the population is African American.

[6] The only 1990 Census data by ward or precinct was obtained from the Office of the Secretary of the Commonwealth, in a document created by Election Data Services. Total population by race was provided for the 1990 precincts. Given the fact that the report indicated that the deviation among the precincts was ±5 percent, it is likely that they were redistricted after the release of the 1990 Census and were, therefore, different (to some extent) than were the 1987 precincts. For that reason, caution should be exercised in relying upon 1990 Census information with regard to the 1987 election.

85) The 1987 election was the second time that Antonette Pepe ran for election. She finished thirteenth of 18 candidates. She was not successful until 2003, when she ran for School Committee.

86) The 1987 election was the first time William J. Boyle sought elective office. He finished eleventh of 18 candidates. He ran again in 1989 and was elected, placing fourth among candidates. Mr. Anthony Ravosa sought elective office for the first time in 1987 and placed tenth of 18 candidates. He, too, was elected in 1989, placing ninth among 18 candidates.

### *1989 City Council Election*
87) Relative to the other candidates, Mr. Jones performed even better in the 1989 election, than he did in 1987. In the 1989 City Council election, Mr. Jones placed sixth among 18 candidates and received 504 more votes in 1989 than he received in 1987. In the 1989 election there were 641 more voters casting ballots than in the 1987.

a) Mr. Jones received 44.5 percent of the vote in the 1989 municipal election -- .8 percentage points greater proportion of the total vote than he received in 1987
b) Mr. Jones received 12.2 percent of his vote from Ward 4 in which, according to the 1990 Census, 59.4 percent of the total population was African American. Mr. Jones received less than .5 percentage points greater proportion of his total vote from Ward 4 in 1987 than he did in 1989
c) Mr. Jones received 18.9 percent of his total vote from Ward 7, in which the 1990 Census reported that 5.6 percent of the total population was African American. Mr. Jones received the same proportion of his total vote from Ward 7 voters in the 1987 election as he did in the 1989 election
d) Mr. Jones received 15.2 percent of his total vote from Ward 2, in which the 1990 Census reported that 34.9 percent of the total population was African American. Mr. Jones received virtually the same proportion of his total vote from Ward 2 voters in the 1987 election as he did in the 1989 election
e) Mr. Jones received 11.1 percent of his total vote from Ward 5, in which the 1990 Census reported that 25.9 percent of the total population was African American. Mr. Jones received 1.8 percentage points greater proportion of his total vote from Ward 5 in 1987 than he did in 1989

88) This was Bud L. Williams (African American) first bid for elective officer, having previously served as Mr. Jones' campaign manager. Mr. Williams placed tenth among the 18 candidates, receiving 39.9 percent of the total vote. Mr. Williams received 1,183 fewer votes than did Mr. Jones and only 270 votes fewer than the candidate who placed ninth.

a) Mr. Williams received 14.6 percent of his vote from Ward 4 in which, according to the 1990 Census, 59.4 percent of the total population was African American. Mr. Williams received 99 more Ward 4 votes than did Mr. Jones in the 1989 election.

b) Mr. Williams received 19.0 percent of his total vote from Ward 7, in which the 1990 Census reported that 5.6 percent of the total population was African American. Mr. Jones received 220 more Ward 7 votes than did Mr. Williams in the 1989 election
c) Mr. Williams received 10.9 percent of his total vote from Ward 2, in which the 1990 Census reported that 34.9 percent of the total population was African American. Mr. Jones received 606 more Ward 2 votes than did Mr. Williams in the 1989 election
d) Mr. Williams received 15.1 percent of his total vote from Ward 5, in which the 1990 Census reported that 25.9 percent of the total population was African American. Mr. Williams received 275 more Ward 5 votes than did Mr. Jones in 1989.

89) In the 1989 election, two white incumbents were defeated: Vincent Dimonaco, who had been served on the City Council since 1971, and Mitchell Ogulewicz, who had served on the City Council since 1983. Five-term member of the City Council, Mary Hurley was elected mayor (having run unopposed), and first time candidate Ray Dipasquale was elected to the City Council.

### *1991 City Council Election*
90) In contrast to the 1989 City Council contest, the 1991 City Council contest attracted several African American candidates, in addition to Mr. Jones: named Plaintiff Frank Buntin, 1981 and 1983 candidate Harold F. Langford, Bud Williams, and Darnell Williams. One Hispanic candidate, Edgar Aleyandro, a hockey coach at Cathedral High School, and a named-Plaintiff in the 1996 case, <u>Swan</u> v. City of Springfield, C.A. No. 96-30242-MAP, ran for election in 1991.

a) Longtime member (first elected in 1979) of the City Council, Robert T. Markel ran successfully for Mayor of Springfield in 1991
b) Community activist and first time candidate, Barbara Garde placed fourth "behind" incumbents Kateri Walsh, Francis Keough, and Brian Santaniello.
c) Third-time candidate Antonette Pepe placed fourteenth among the 18 candidates in 1991. She received 1,587 more votes in 1991 than she received in 1987.

91) Mr. Jones was re-elected, placing ninth among 18 candidates, seven of whom were incumbents. Mr. Jones received 38.6 percent of the vote and 1,452 more votes in 1991 than he received in 1989. That Mr. Jones received 5.9 percentage points smaller proportion of the total vote in 1991 as compared to 1989 is attributable to the fact that 7,715 more voters cast ballots in the 1991 election than did in the 1989 election.

a) Mr. Jones received the greatest proportion of the ward vote from Ward 4, receiving 57.5 percent of the Ward 4 vote. According to the 1990 Census, 59.4 percent of the total population of Ward 4 was African American.
b) The Ward 4 vote represented 11.3 percent of the total vote received by Mr. Jones in the 1991 election.
c) Mr. Jones received 58 more Ward 4 votes in 1991 than he received in 1989
d) Only Bud Williams received a greater proportion of the Ward 4 vote than did Mr. Jones.

31

e) Mr. Jones received 36.8 percent of the Ward 7 vote. According to the 1990 Census, 5.6 percent of the total population of Ward 7 was African American.

f) Ward 7 vote represented 19.9 percent of the total vote received by Mr. Jones in the 1991 election

g) Mr. Jones received 407 more Ward 7 votes in 1991 than he received in 1989

h) Mr. Jones received 38.2 percent of the Ward 2 vote. According to the 1990 Census, 39.4 percent of the total population of Ward 7 was African American.

i) Ward 2 vote represented 14.8 percent of the total vote received by Mr. Jones in the 1991 election

j) Mr. Jones received 168 more Ward 2 votes in 1991 than he received in 1989

k) Mr. Jones received 38.7 percent of the Ward 5 vote. According to the 1990 Census, 25.9 percent of the total population of Ward 5 was African American.

l) Ward 5 vote represented 13.8 percent of the total vote received by Mr. Jones in the 1991 election

m) Mr. Jones received 509 more Ward 5 votes in 1991 than he received in 1989

n) Mr. Jones received the smallest proportion of the ward vote from Ward 1 voters – 30.4 percent. According to the 1990 Census, 60.6 percent of the total population of Ward 1 was Hispanic and 11.1 percent was African American. Ward 1 vote represented on 5.9 percent of Mr. Jones' total vote.

92) Mr. Bud Williams, in his second bid for election, finished tenth again as among 18 candidates. He received 36.5 percent of the total vote in 1991 – 3.4 percentage points smaller proportion of the total vote than he received in the 1989 election. On the other hand, Mr. Williams received 1,971 more votes in 1991 than he received in 1989

a) Mr. Williams received the greatest proportion of the ward vote from Ward 4, receiving 66.2 percent of the Ward 4 vote. According to the 1990 Census, 59.4 percent of the total population of Ward 4 was African American.

b) He received 216 more Ward 4 votes than did Mr. Jones.

c) The Ward 4 vote represented 13.7 percent of the total vote received by Mr. Williams in the 1991 election.

d) Mr. Williams received 175 more Ward 4 votes in 1991 than he received in 1989

e) Mr. Williams received 32.8 percent of the Ward 7 vote. According to the 1990 Census, 5.6 percent of the total population of Ward 7 was African American.

f) Ward 7 vote represented 18.7 percent of the total vote received by Mr. Williams in the 1991 election

g) Mr. Williams received 340 more Ward 7 votes in 1991 than he received in 1989

h) Mr. Jones received 277 more Ward 7 votes than did Mr. Williams in 1991

i) Mr. Williams received 33.9 percent of the Ward 2 vote. According to the 1990 Census, 39.4 percent of the total population of Ward 2 was African American.

j) Ward 2 vote represented 13.8 percent of the total vote received by Mr. Williams in the 1991 election

k) Mr. Williams received 565 more Ward 2 votes in 1991 than he received in 1989

l) Mr. Jones received 209 more Ward 2 votes than did Mr. Willams in the 1991 election

m) Mr. Williams received 39.6 percent of the Ward 5 vote. According to the 1990 Census, 25.9 percent of the total population of Ward 5 was African American.

n) Ward 5 vote represented 14.9 percent of the total vote received by Mr. Williams in the 1991 election

o) Mr. Williams received 272 more Ward 5 votes in 1991 than he received in 1989

p) Mr. Williams received the smallest proportion of the ward vote from Ward 1 voters – 27.5 percent. According to the 1990 Census, 60.6 percent of the total population of Ward 1 was Hispanic and 11.1 percent was African American. Ward 1 vote represented on 5.6 percent of Mr. Williams' total vote

93) In Mr. Edgar Aleyandro's first/last bid for elective office, he finished twelfth in 1991, receiving only 788 fewer votes than did longtime former incumbent, Mitchell Ogulewiez, who finished eleventh. Mr. Aleyandro received 32.3 percent of the total vote.

a) The greatest proportion of the ward vote that Mr. Aleyandro received was from Ward 1 voters – 41.4 percent. According to the 1990 Census, 60.6 percent of the total population of Ward 1 was Hispanic.

b) Ward 1 vote represented 9.6 percent of the total vote received by Mr. Aleyandro in the 1991 election

c) Mr. Aleyandro received a greater proportion of the Ward 1 vote than did any other 1991 candidate. As among all 18 candidates, Mr. Boyle received the second greatest proportion of the Ward 1 vote – 40.3.

d) As among the Ward 1 precincts (Precincts 1A, 1B, 1C, and 1E) in which the 1990 Census indicated that at least 57 percent of the total population was Hispanic, Mr. Aleyandro received 45.2 percent, 64.1 percent, 61.9 percent, and 25.1 percent, respectively, of the precinct vote.

e) Mr. Aleyandro received more than 50 percent of the precinct vote in one additional Ward 1 precinct: Precinct 1D, in which the 1990 Census reported that 55.5 percent of the total population was Hispanic.

f) Mr. Aleyandro also received a relatively significant proportion of the Wards 6 and 7 vote.

g) Mr. Aleyandro received 38.8 percent of the Ward 7 vote. According to the 1990 Census, Hispanic persons constituted only 2.0 percent of the total population in Ward 7. Ward 7 vote represented 25.1 percent of the total vote that he received.

h) Mr. Aleyandro received 37.5 percent of the Ward 6 vote. According to the 1990 Census, Hispanic persons constituted only 4.9 percent of the total population in Ward 6. Ward 6 vote represented 19.0 percent of the total vote that he received.

i) Mr. Aleyandro received more than 35 percent of the precinct vote in Precincts 6A (39.7 percent), 6B (44.3 percent), 6D (35.7 percent), 6E (36.2 percent), 6G (41.3 percent), and 6H (37.5 percent). The 1990 Census reported that less than 6 percent of the total population was Hispanic in Precincts 6B, 6D, 6E, 6G, and 6H; in Precinct 6A, the 1990 Census reported that 13.1 percent of the total population was Hispanic.

j) Mr. Aleyandro received more than 35 percent of the precinct vote in Precincts 7A (36.8 percent), 7B (41.8 percent), 7C (48.2 percent), 7D (35.9 percent), 7E (37.3 percent), 7F (36.9 percent), and 7G (37.1 percent). In none of the Ward 7 precincts did the 1990 Census report that more than 4 percent of the total population was Hispanic.

k) Mr. Aleyandro received only 28.0 percent of the Ward 3 vote. According to the 1990 Census, 26.2 percent of the total population was Hispanic and 18.6 percent of the population was African American..

l) Eleven other 1991 candidates received a greater proportion of the Ward 3 vote than did Mr. Aleyandro, including Mr. Bud Williams, who received 35.4 percent of the Ward 3 vote.

m) Ward 3 vote represented 6.2 percent of the total vote received by Aleyandro in the 1991 election.

n) Mr. Aleyandro received more than 35 percent of the precinct vote in Precinct 3C, in which the 1990 Census reported that 25.6 percent of the total population was Hispanic

o) The only ward to have provided to Mr. Aleyandro a smaller proportion of its vote that Ward 3, was Ward 4, in which African American constituted 59.4 percent of the total population and Hispanic constituted 17.9 percent of the total population.

p) Mr. Aleyandro received 17.1 percent of the Ward 4 vote. The Ward 4 vote represented 4.0 percent of Mr. Aleyandro's vote in the 1991 election

q) The only candidate to be elected who received less Ward 4 vote was Michael Albano, who had been elected to the School Committee in 1985, after failing to qualify for the general election for City Council in 1973. Mr. Albano served as mayor from 1996 to 2003.

94) Named Plaintiff Frank Buntin finished sixteenth among 18 candidates in his first bid for elective office in 1991. Mr. Buntin received only 17.2 percent of the total vote.

a) Mr. Buntin would not have won had he only competed in Ward 4, since he received less of the Ward 4 vote than was received by Mr. Jones, Mr. Williams, Mr. Langford, and Mr. Darnell Williams. Indeed, Mr. Buntin received less than half of the Ward 4 vote.

b) The second greatest proportion of the ward vote that Mr. Buntin received came from Ward 5 voters – 20.1 percent. Ward 5 votes represented 16.1 percent of the total vote that he received.

c) Mr. Buntin received the fewest votes from Ward 1 voters – 301 votes. According to the 1990 Census, 60.6 percent of the total population was Hispanic and 11.1 percent was African American.

95) Third time candidate African American candidate, H.F. Langford, received 19.0 percent of the total vote, finishing sixteenth among 18 candidates. He did receive 131 more votes in 1991 than he received in 1983 and 191 more votes than he received in 1981. He received 50.6 percent of the Ward 4 vote. He would not have won had he competed only in Ward 4, since he placed fourth in Ward 4 among the 18 candidates.

96) First time African American candidate Darnell Williams finished thirteenth among 18 candidates, receiving 26.2 percent of the total vote in 1991 election

a) He received 54.8 percent of the Ward 4 vote, but did not receive the greatest proportion of the Ward 4 vote, finishing third in Ward 4 as among the 18 candidates. Ward 4 vote represented 15.8 percent of Mr. D. Williams total vote.

b) Mr. D. Williams also received a significant proportion of the Ward 5 vote – 35.2 percent. According to the 1990 Census, African Americans constituted 25.9 percent of the African American population in Ward 5. Ward 5 vote represented 18.5 percent of the total vote that Mr. D. Williams received.

c) On the other hand, Mr. D. Williams received the greatest number of votes from Ward 7 voters. Ward 7 votes represented 19.8 percent of his total vote.

d) Mr. D. Williams received the fewest votes from Wards 1 and 3 – 413 votes and 768 votes, respectively. According to the 1990 Census, African American constituted 11.1 percent of the total population and Hispanics constituted 60.6 percent of the total population in Ward 1. According to the 1990 Census, African American constituted 18.6 percent of the total population and Hispanics constituted 26.2 percent of the total population in Ward 3.

e) Ward 1 vote represented 4.8 percent of the total vote that Mr. D. Williams received in 1991. Mr. D. Williams received 16.8 percent of the Ward 1 vote. Only two white non-incumbents and Mr. Langford and Mr. Buntin received a smaller proportion of the Ward 1 vote than did Mr. D. Williams in the 1991 election.

f) Ward 3 vote represented 6.7 percent of the total vote that Mr. D. Williams received in 1991. Mr. D. Williams received 24.6 percent of the Ward 3 vote. The same two white non-incumbents and Mr. Langford and Mr. Buntin received a smaller proportion of the Ward 3 vote than did Mr. D. Williams in the 1991 election.

***1993 City Council Election***

97) In the 1993 city council election, four African American and no Hispanic candidates competed for the City Council. Eight incumbents ran for re-election. Ms. Walsh did not seek re-election but rather opposed incumbent Mayor Robert T. Markel for Mayor.

a) Two incumbents were defeated: Mr. Morris Jones and Mr. Francis Keough, who had served on the City Council since 1983.

b) Three non-incumbents were elected: Mr. Bud Williams, Mr. Timothy Ryan, son of the current Mayor, and Mr. Raipher Pellegrino.

98) Mr. Jones was defeated, placing tenth among 17 candidates. Mr. Jones received 41.6 percent of the total vote. Mr. Jones received 669 fewer votes in 1993 than he had in 1991, but 3.1 percentage points greater proportion of the total vote in 1993 than he had in 1991, attributable to the fact that 4,051 fewer voters cast ballots in 1993 than had in 1991.

a) Mr. Jones received the greatest proportion of the ward vote from Ward 4, receiving 58.9 percent of the Ward 4 vote. According to the 1990 Census, 59.4 percent of the total population of Ward 4 was African American.

b) The Ward 4 vote represented 9.9 percent of the total vote received by Mr. Jones in the 1993 election.

c) Mr. Jones received 239 fewer Ward 4 votes in 1993 than he received in 1991

d) Only Bud Williams received a greater proportion of the Ward 4 vote than did Mr. Jones.

e) Mr. Jones received 39.2 percent of the Ward 7 vote. According to the 1990 Census, 5.6 percent of the total population of Ward 7 was African American.

f) Ward 7 vote represented 19.3 percent of the total vote received by Mr. Jones in the 1991 election

g) Mr. Jones received 204 fewer Ward 7 votes in 1993 than he received in 1991

h) Mr. Jones received 40.5 percent of the Ward 2 vote. According to the 1990 Census, 40.5 percent of the total population of Ward 2 was African American.

i) Ward 2 vote represented 17.1 percent of the total vote received by Mr. Jones in the 1993 election

j) Mr. Jones received 187 more Ward 2 votes in 1993 than he received in 1991

k) Mr. Jones received 41.7 percent of the Ward 5 vote. According to the 1990 Census, 25.9 percent of the total population of Ward 5 was African American.

l) Ward 5 vote represented 14.4 percent of the total vote received by Mr. Jones in the 1993 election

m) Mr. Jones received 24 fewer Ward 5 votes in 1993 than he received in 1991

n) Mr. Jones received the smallest proportion of the ward vote from Ward 1 voters – 35.5 percent. According to the 1990 Census, 60.6 percent of the total population of Ward 1 was Hispanic and 11.1 percent was African American. Ward 1 vote represented on 5.9 percent of Mr. Jones' total vote. Mr. Jones received 13 fewer Ward 1 votes in 1993 than he received in 1991

99) Mr. Bud Williams, in his third and successful bid for election finished ninth among 17 candidates. He received 48.9 percent of the total vote in 1993 – 12.4 percentage greater proportion of the total vote than he received in the 1991 election.

a) Mr. Williams received the greatest proportion of the ward vote from Ward 4, receiving 75.2 percent of the Ward 4 vote.   No other candidate received a greater proportion of the Ward 4 vote. According to the 1990 Census, 59.4 percent of the total population of Ward 4 was African American.

b) Mr. Williams received 329 more Ward 4 votes than did Mr. Jones.

c) The Ward 4 vote represented 10.8 percent of the total vote received by Mr. Williams in the 1993 election.

d) Mr. Williams received 2,093 more votes in 1993 than he received in 1991.

e) Mr. Williams received 45.9 percent of the Ward 7 vote. According to the 1990 Census, 5.6 percent of the total population of Ward 7 was African American. In 1993, Mr. Williams received a 13.1 percentage point increase in the proportion of the Ward 7 vote as compared to 1991.

f) Ward 7 vote represented 19.2 percent of the total vote received by Mr. Williams in the 1993 election

g) Mr. Williams received 466 more Ward 7 votes in 1993 than he received in 1991.

h) As among the ward vote received by Mr. Williams in the 1993 election, Ward 7 voters cast the greatest proportion of Mr. Williams' total vote.

i) Mr. Williams received 46.9 percent of the Ward 2 vote. According to the 1990 Census, 39.4 percent of the total population of Ward 7 was African American. In 1993, Mr. Williams received a 13.0 percentage point increase in the proportion of the Ward 2 vote as compared to 1991.

36

j) Ward 2 vote represented 16.9 percent of the total vote received by Mr. Williams in the 1993 election

k) Mr. Williams received 565 more Ward 2 votes in 1993 than he received in 1991

l) Mr. Williams received 328 more Ward 2 votes than did Mr. Jones in the 1993 election

m) Mr. Williams received 54.3 percent of the Ward 5 vote. According to the 1990 Census, 25.9 percent of the total population of Ward 5 was African American. In 1993, Mr. Williams received a 14.7 percentage point increase in the proportion of the Ward 5 vote as compared to 1991.

n) Ward 5 vote represented 15.9 percent of the total vote received by Mr. Williams in the 1993 election

o) Mr. Williams received 458 more Ward 5 votes in 1993 than he received in 1991

p) Mr. Williams received 520 more Ward 5 votes than did Mr. Jones in the 1993 election

q) Mr. Williams received the smallest proportion of the ward vote from Ward 1 voters – 39.3 percent. According to the 1990 Census, 60.6 percent of the total population of Ward 1 was Hispanic and 11.1 percent was African American. Ward 1 vote represented on 6.2 percent of Mr. Williams' total vote

100) Named Plaintiff Norman Oliver, in his first bid for election, finished fifteenth among 17 candidates in 1993. Mr. Oliver received 20.0 percent of the total vote.

a) Mr. Oliver would not have won had he only competed in Ward 4, since he received less of the Ward 4 vote than was received by Mr. Jones, Mr. Williams, and Mr. D. Williams. Indeed, Mr. Oliver received only 32.5 percent of the Ward 4 vote.

b) The second greatest proportion of the ward vote that Mr. Oliver received came from Ward 5 voters – 22.6 percent. Ward 5 votes represented 16.2 percent of the total vote that he received.

c) Mr. Oliver received the greatest number of votes from Ward 7 voters, who represented 18.1 percent of the total vote received by Mr. Oliver. The second greatest number of votes received by Mr. Oliver came from Ward 5 voters.

d) Mr. Oliver received the fewest votes from Ward 1 voters – 344 votes. According to the 1990 Census, 60.6 percent of the total population was Hispanic and 11.1 percent was African American. Only two white non-incumbents received less Ward 1 vote than did Mr. Oliver

101) Second time candidate Darnell Williams finished eleventh among 17 candidates, receiving 30.6 percent of the total vote in 1993 election.

a) In 1993 Mr. D. Williams received a 4.4 percentage point increase in the total vote that he received as compared to 1991.

b) Mr. D. Williams received 58.3 percent of the Ward 4 vote, but did not receive the greatest proportion of the Ward 4 vote, finishing third in Ward 4 as among the 18 candidates. Mr. D. Williams received 342 fewer Ward 4 votes than did Mr. B. Williams

c) Ward 4 vote represented 13.4 percent of Mr. D. Williams' total vote.

d) Mr. D. Williams received 183 fewer Ward 4 votes in 1993 than he received in 1991

e) In contrast, in 1993 Mr. D. Williams received a 3.5 percentage point increase in the proportion in the Ward 4 vote as compared to the Ward 4 vote that he received in 1991

37

f) Mr. D. Williams continued to receive a significant proportion of the Ward 5 vote –
39.0 percent. According to the 1990 Census, African Americans constituted 25.9 percent
of the African American population in Ward 5.

g) Ward 5 vote represented 18.3 percent of the total vote that Mr. D. Williams received.

h) Mr. D. Williams received 23 more Ward 5 vote in 1993 than he received in 1991 and
a 3.8 percentage point increase in the proportion of the Ward 5 vote (as compared to
1991)

i) As in the 1991 election, Mr. D. Williams received the greatest number of votes from
Ward 7 voters in 1993.

j) Ward 7 votes represented 17.5 percent of Mr. D. Williams' total vote in 1993.

k) Mr. Williams received 161 fewer Ward 7 votes in 1993 than he received in 1991, but
a 1.2 percentage point increase in the proportion of Ward 7 vote (as compared to 1993)

l) Mr. D. Williams received the fewest votes from Wards 1 and 3 – 601 votes and 568
votes, respectively. According to the 1990 Census, African American constituted 11.1
percent of the total population and Hispanics constituted 60.6 percent of the total
population in Ward 1. According to the 1990 Census, African American constituted 18.6
percent of the total population and Hispanics constituted 26.2 percent of the total
population in Ward 3.

m) Ward 1 vote represented 6.8 percent of the total vote that Mr. D. Williams received in
1993. Mr. D. Williams received 29.0 percent of the Ward 1 vote. Four white non-
incumbents, one incumbent (Mr. Keough), and Mr. Oliver received a smaller proportion
of the Ward 1 vote than did Mr. D. Williams in the 1993 election.

n) Ward 3 vote represented 6.4 percent of the total vote that Mr. D. Williams received in
1993. Mr. D. Williams received 31.1 percent of the Ward 3 vote. The same four white
non-incumbents, one white incumbent, and Mr. Oliver received a smaller proportion of
the Ward 3 vote than did Mr. D. Williams in the 1991 election.

*1995 City Council Election*
102) The 1995 City Council contest attracted several African American candidates, Mr.
Jones and Mr. Williams, and Ms. Etta Hill. One Hispanic candidate, Luis Garcia also ran
for the City Council. The 1995 City Council election attracted significantly more voters
than did the election in 1993 contest, in which 8,147 fewer voters cast ballots than did in
1995

a) Two-term member of the City Council, Michael Albano, ran successfully for Mayor
of Springfield in 1995. Accordingly only eight incumbents sought re-election.

b) One incumbent was defeated, Anthony Ravosa (first elected in 1989), and one white
first time candidate, Timothy Rooke was elected. Ms. Barbara J. Garvey, who had
campaigned for "Plan A" and had previously served in the City Council 1974 through
1977, placed ninth among 18 candidates.

103) Mr. Bud Williams was re-elected finishing fourth among 18 candidates. He
received 50.2 percent of the total vote in 1995 – only 1.6 percentage greater proportion
of the total vote than he received in the 1993 election, when he placed ninth.

a) Mr. Williams received the greatest proportion of the ward vote from Ward 4, receiving 82.2 percent of the Ward 4 vote.  According to the 1990 Census, 59.4 percent of the total population of Ward 4 was African American.

b) No other 1995 City Council candidate received a greater proportion of the Ward 4 vote.

c) In fact, no white candidate received a proportion of any ward vote greater than 61 percent

d) Mr. Williams received 467 more Ward 4 votes than did Mr. Jones in 1995.

e) Mr. Williams received  542 more Ward 4 votes than did Ms. Hill in 1995.

f) The Ward 4 vote represented 11.2 percent of the total vote received by Mr. Williams in the 1995 election.

g) Mr. Williams received 580 more Ward 4 votes in 1995 than he received in 1993.

h) Mr. Williams received 44.6 percent of the Ward 7 vote.  According to the 1990 Census, 5.6 percent of the total population of Ward 7 was African American.  In 1993, Mr. Williams received a  percentage point increase in the proportion of the Ward 7 vote as compared to 1991 and 942 more Ward 5 votes in 1995 as compared to 1993.

i) Ward 7 vote represented 17.7 percent of the total vote received by Mr. Williams in the 1995 election

j) Mr. Williams received 466 more Ward 7 votes in 1993 than he received in 1991.

k) As among the ward vote received by Mr. Williams in the 1995 election, Ward 7 voters cast the greatest proportion of Mr. Williams' total vote.

l) Mr. Williams received 44.7 percent of the Ward 2 vote.  According to the 1990 Census, 39.4  percent of the total population of Ward 7 was African American.

m) Ward 2 vote represented 14.8 percent of the total vote received by Mr. Williams  in the 1993 election

n) Mr. Williams received 372 more Ward 2 votes in 1995 than he received in 1993

o) Mr. Williams received 455 more Ward 2 votes than did Mr. Jones in the 1995 election

p) Mr. Williams received 56.2 percent of the Ward 5 vote.  According to the 1990 Census, 25.9 percent of the total population of Ward 5 was African American.  In 1995, Mr. Williams received a 1.9 percentage point increase in the proportion of the Ward 5 vote as compared to 1993.

q) Ward 5 vote represented 17.1 percent of the total vote received by Mr. Williams in the 1995 election

r) Mr. Williams received 942 more Ward 5 votes in 1995 than he received in 1993

s) Mr. Williams received 1,024 more Ward 5 votes than did Mr. Jones in the 1995 election

t) Mr. Williams received the smallest proportion of the ward vote from Ward 1 voters – 42.8 percent.  According to the 1990 Census, 60.6 percent of the total population of Ward 1 was Hispanic and 11.1 percent was African American.  Ward 1 vote represented only 6.4 percent of Mr. Williams' total vote

104)  Mr. Jones was unable to "win back" his seat on the City Council, again placing tenth among 18 candidates.  Mr. Jones received 37.0 percent of the total vote.

a) Mr. Jones received 1,680 more votes in 1995 than he had in 1993, but 4.7 percentage points greater proportion of the total vote in 1995 than he had in 1993, attributable to the fact that more voters cast ballots in 1995 than had in 1993.

b) Indeed, Mr. Jones received 1,011 more votes in 1995 than he had in 1991, when he placed ninth and was elected.

c) Mr. Jones received his greatest proportion of the ward vote from Ward 4, receiving 63.9 percent of the Ward 4 vote. According to the 1990 Census, 59.4 percent of the total population of Ward 4 was African American.

d) The Ward 4 vote represented 11.9 percent of the total vote received by Mr. Jones in the 1995 election.

e) Mr. Jones received 442 more Ward 4 votes in 1995 than he received in 1993 and 203 more Ward 4 votes in 1995 than he received in 1991

f) Only Bud Williams received a greater proportion of the Ward 4 vote than did Mr. Jones.

g) Mr. Jones received 30.5 percent of the Ward 7 vote. According to the 1990 Census, 5.6 percent of the total population of Ward 7 was African American.

h) Ward 7 vote represented 16.6 percent of the total vote received by Mr. Jones in the 1995 election

i) Mr. Jones received 57 more Ward 7 votes in 1993 than he received in 1995 and 261 more Ward 7 votes in 1991 than he received in 1995.

j) Mr. Jones received 37.3 percent of the Ward 2 vote. According to the 1990 Census, 40.5 percent of the total population of Ward 2 was African American.

k) Ward 2 vote represented 16.8 percent of the total vote received by Mr. Jones in the 1995 election

l) Mr. Jones received 245 more Ward 2 votes in 1995 than he received in 1993 and 432 more Ward 2 vote than he received in 1991

m) Mr. Jones received 38.1 percent of the Ward 5 vote. According to the 1990 Census, 25.9 percent of the total population of Ward 5 was African American.

n) Ward 5 vote represented 15.8 percent of the total vote received by Mr. Jones in the 1995 election

o) Mr. Jones received 438 more Ward 5 votes in 1995 than he received in 1993 and 414 more Ward 5 votes in 1995 than he received in 1991.

p) Mr. Jones received the smallest proportion of the ward vote from Ward 1 voters – 32.1 percent. According to the 1990 Census, 60.6 percent of the total population of Ward 1 was Hispanic and 11.1 percent was African American. Ward 1 vote represented on 6.4 percent of Mr. Jones' total vote. Mr. Jones received 148 more Ward 1 votes in 1995 than he received in 1993

105) African American candidate, Etta Hill finished twelfth among 18 candidates in her first bid for elective office in 1995. Ms. Hill received 28.0 percent of the total vote.

a) Ms. Hill would not have won had she only competed in Ward 4, since she received less of the Ward 4 vote than was received by Mr. Jones and Mr. Williams. Ms. Hill did, however, receive 61.0 percent of the Ward 4 vote in 1995. Ward 4 vote represented 15.1 percent of the total vote received by Ms. Hill in the 1995 contest

**DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY**
**GLADYS OYOLA, SPANISH LANGUAGE PROGRAM COORDINATOR**
**CITY OF SPRINGFIELD**
**PART 3 OF 4**

b) The second greatest proportion of the ward vote that Ms. Hill received came from Ward 5 voters – 33.5 percent. Ward 5 votes represented 18.4 percent of the total vote that she received.

c) Ms. Hill received the smallest proportion of the ward vote from Ward 3, in which she received only 2.7 percent of the vote in 1995. According to the 1990 Census, African Americans in Ward 3 comprised 18.6 percent of the total population and Hispanic persons comprised 26.2 percent of the total population.

d) Ms. Hill received the fewest votes in 1995 from Ward 1 – 512 votes. According to the 1990 Census, 60.6 percent of the total population was Hispanic and 11.1 percent was African American.

e) Ms. Hill received the greatest number of votes from Ward 7, from which she received 26.2 percent of the vote and 18.8 percent of her total vote in 1995.

106) In Mr. Luis Garcia's first bid for elective office, he finished sixteenth in 1995. Mr. Garcia received 25.2 percent of the total vote.

a) The greatest proportion of the ward vote that Mr. Garcia received was from Ward 1 voters – 55.0 percent. According to the 1990 Census, 60.6 percent of the total population of Ward 1 was Hispanic.

b) Ward 1 vote represented 16.2 percent of the total vote received by Mr. Garcia in the 1995 election

c) Mr. Garcia received a greater proportion of the Ward 1 vote than did any other 1995 candidate. As among all 18 candidates, Mr. Boyle received the second greatest proportion of the Ward 1 vote – 49.1 percent

d) Mr. Garcia received the greatest number of votes from Ward 2. According to the 1990 Census, Hispanic persons constituted only 8.8 percent of the total population. Ward 2 votes represented 17.5 percent of his total vote.

e) Mr. Garcia received the second greatest number of votes from Ward 7 – 14.4 percent of his total vote. According to the 1990 Census, 2.0 percent of the total population of Ward 7 was Hispanic.

f) Mr. Garcia received only 27.2 percent of the Ward 3 vote in 1995 and the fewest votes as among the eight wards. According to the 1990 Census, 26.2 percent of the total population was Hispanic and 18.6 percent of the population was African American. Ward 3 vote represented 6.8 percent of the total vote received by Garcia in the 1995 election.

g) The ward to have provided to Mr. Garcia the second fewest votes was Ward 4, in which African American constituted 59.4 percent of the total population and Hispanic constituted 17.9 percent of the total population.

h) Mr. Garcia received 32.9 percent of the Ward 4 vote. The Ward 4 vote represented 9.0 percent of Mr. Garcia's vote in the 1995 election

i) The only candidate to be elected who received less Ward 4 vote than did Mr. Garcia was Ms. Garvey and Mr. Rooke.

## Pre-1997 School Committee Election History
### *Robert McCollum*
*1987 City Council Election*

107) Robert McCollum's election history began in 1987 when he ran for City Council, placing fifteenth among 18 candidates. He was not alone in this frustrated first attempt,

41

Anthony Ravosa and William Boyle, ran for the first time in 1987 and Antonette Pepe ran for the second time and likewise were not successful, but would be successful in subsequent forays into Springfield politics.

*1989 School Committee Election*

108) In 1989, both Mr. Robert McCollum and Ms. Marjorie Hurst ran for the first time for the School Committee. Ms. Hurst placed fourth and Mr. McCollum placed fifth as among five candidates for School Committee. Two incumbents were re-elected: Allene Begley Curton (first elected in 1985) and Kenneth Shea, who was also first elected in 1985, after an unsuccessful attempt in 1981.

a) In 1989, Mr. McCollum received 34.1 percent of the total vote in that election, while Ms. Hurst received 41.1 percent of the vote. The candidate (Ms. Curto) finishing third received 45.3 percent of the vote.
b) In 1989, Mr. McCollum received the greatest proportion of the ward vote – as among the eight wards -- from Ward 4 – 46.3 percent. According to the 1990 Census, 59.4 percent of the population in Ward 4 was African American.
c) Ward 4 vote represented 11.3 percent of his total vote in 1989
d) Nevertheless, Ms. Hurst received 74.7 percent of the Ward 4 vote in 1989 and finished first among candidates in Ward 4.
e) In 1989, Mr. McCollum received the greatest number of votes from Ward 7, in which the 1990 Census reported that 5.6 percent of the population was African American.
f Ward 7 votes represented 24.1 percent of Mr. McCollum's total vote in 1989.
g) Mr. McCollum received 39.2 percent of the Ward 7 vote in 1989
h) In 1989, Mr. McCollum received the second greatest number of votes from Ward 6, in which the 1990 Census reported that 3.5 percent of the total population was African American.
i) Ward 6 voters represented 14.6 percent of Mr. McCollum's vote in 1989
j) In Ward 6, Mr. McCollum received 31.4 percent of the vote in 1989.
k) Mr. McCollum received the fewest votes from Ward 1, in which the 1990 Census reported that 11.1 percent of the population was African American and 60.6 percent was Hispanic
l) Ward 1 vote represented only 6.6 percent of Mr. McCollum's total vote in 1989
m) In 1989, Mr. McCollum received 28.4 percent of the Ward 1 vote.
n) Mr. McCollum received the second fewest votes from Ward 3, in which the 1990 Census reported that 18.6 percent of the total population was African American and 26.2 percent was Hispanic
o) Ward 3 vote represented 6.8 percent of Mr. McCollum's total vote in 1989
p) Mr. McCollum received 31.5 percent of the Ward 3 vote.

*1991 School Committee Election*

109) The third time was the charm and Mr. McCollum was elected to the School Committee in 1991, placing third among five candidates. In the 1991 election contest, an African American and a white incumbent competed against three non-incumbents.
a) One of the incumbents, Candace Early Lopes, who was elected in 1987, placed fourth in the 1991 School Committee contest.

42

b) The white incumbent placed first as among five candidates in 1991
c) In 1991 7,715 more voters cast ballots than had in 1989 and 8,356 more voters than in 1987, when Ms. Lopes was elected

110) In 1991, Mr. McCollum received 47.1 percent of the total vote in that election – 13 percentage points greater proportion of the total vote than he had received in 1989. Indeed, Mr. McCollum received 6,911 more votes in 1991 than he had in 1989

111) In 1991, Mr. McCollum received the greatest proportion of the ward vote from Ward 7. Mr. McCollum also received the greatest number of votes from Ward 7, in which the 1990 Census reported that 5.6 percent of the population was African American.

a) Mr. McCollum received 51.7 percent of the Ward 7 vote in 1991
b) Ward 7 votes represented 22.9 percent of Mr. McCollum's total vote in 1991.
c) Mr. McCollum received 12.5 percentage points more Ward 7 vote in 1991 than in 1989
d) Mr. McCollum received 1,477 more Ward 7 votes in 1991 than he received in 1989

112) In 1991, Mr. McCollum received the second greatest proportion of the ward vote from Ward 4 – 51.4 percent. According to the 1990 Census, 59.4 percent of the population in Ward 4 was African American.

a) Mr. McCollum received 5.1 percentage points greater proportion of the Ward 4 in 1991 than he received in 1989 and 308 more votes in 1991 than he received in 1989
b) Ward 4 vote represented 8.3 percent of his total vote in 1991

113) In 1991 as in 1989, Mr. McCollum received the second greatest number of votes from Ward 6, in which the 1990 Census reported that 3.5 percent of the total population was African American.

a) Ward 6 voters represented 16.2 percent of Mr. McCollum's vote in 1991
b) In Ward 6, Mr. McCollum received 46.8 percent of the vote in 1991.
c) In 1991, Mr. McCollum received 15.2 percentage points greater proportion of the Ward 6 vote than he did in 1989.
d) In 1991, Mr. McCollum received 1,250 more Ward 6 votes than he received in 1989.

114) In 1991, Mr. McCollum received the fewest votes from Ward 1 and the smallest proportion of the ward vote from Ward 1, in which the 1990 Census reported that 11.1 percent of the population was African American and 60.6 percent was Hispanic

a) Ward 1 vote represented only 4.8 percent of Mr. McCollum's total vote in 1991
b) In 1991, Mr. McCollum received 30.2 percent of the Ward 1 vote.

115) In 1991, Mr. McCollum received the second fewest votes from Ward 3 and the second smallest proportion of the ward vote (as among the eight wards) that Mr.

McCollum received. According to the 1990 Census, 18.6 percent of the total population was African American and 26.2 percent was Hispanic in Ward 1

a) Ward 3 vote represented 6.8 percent of Mr. McCollum's total vote in 1991
b) Mr. McCollum received 44.6 percent of the Ward 3 vote in1991.

*1995 School Committee Election*
116) In 1995, Mr. McCollum was re-elected in an election in which 4,095 more voters cast ballots than in 1991. All three incumbents were re-elected and an African American challenger placed fifth among five voters, receiving only 23.1 percent of the vote.

117) In 1995, Mr. McCollum received 48.5 percent of the total vote in that election – 1.4 percentage points greater proportion of the total vote than he had received in 1991. Likewise, Mr. McCollum received 2,450 more votes in 1995 than he had in 1991

118) In 1995, Mr. McCollum received the greatest proportion of the ward vote from Ward 4 – 65.6 percent. According to the 1990 Census, 59.4 percent of the population in Ward 4 was African American.

a) Mr. McCollum received 14.2 percentage points greater proportion of the Ward 4 in 1995 than he received in 1991 and 99 more votes in 1995 than he received in 1991
b) Ward 4 vote represented 9.4 percent of his total vote in 1991

119) As in 1991, Mr. McCollum received the greatest number of ward votes from Ward 7, in which the 1990 Census reported that 5.6 percent of the population was African American.
a) Mr. McCollum received 49.5 percent of the Ward 7 vote in 1995
b) Ward 7 votes represented 20.5 percent of Mr. McCollum's total vote in 1995.
c) Mr. McCollum received 132 more Ward 7 votes in 1995 than he received in 1991

120) Mr. McCollum received the second greatest number of votes from Ward 5, in which the 1990 Census reported that 25.9 percent of the total population was African American.

a) Ward 5 voters represented 16.3 percent of Mr. McCollum's vote in 1995
b) In Ward 5, Mr. McCollum received 51.3 percent of the vote in 1995.
c) In 1995, Mr. McCollum received 2.1 percentage points greater proportion of the Ward 5 vote than he did in 1991.
d) In 1995, Mr. McCollum received 689 more Ward 5 votes than he received in 1991.

121) Again, Mr. McCollum received the fewest votes from Ward 1 and the smallest proportion of the ward vote from Ward 1, in which the 1990 Census reported that 11.1 percent of the population was African American and 60.6 percent was Hispanic

a) Ward 1 vote represented only 6.2 percent of Mr. McCollum's total vote in 1995
b) In 1995, Mr. McCollum received 40.3 percent of the Ward 1 vote.

44

122) In 1995, Mr. McCollum received the second fewest votes from Ward 3, in which the 1990 Census reported that 18.6 percent of the total population was African American and 26.2 percent was Hispanic

a) Ward 3 vote represented 6.5 percent of Mr. McCollum's total vote in 1995
b) Mr. McCollum received 49.5 percent of the Ward 3 vote in 1995.

*1999 School Committee Election*
123) After "bad press," related to a $2,200 school computer than Mr. McCollum had taken home and refused to return unless the members of the School Committee received a raise, issues related to his services on the School Building Commission, and some questions related to the $500-a-plate fund raising function to which various building contractors were invited, Mr. McCollum was not re-elected in 1999. "Computer Policy Adopted," Mary Ellen O'Shea, *Union-News* (May 6, 1997); "School Board OKs Computers for 2 Members," Mary Ellen O'Shea, *Union-News* (May 24, 1997); "3 Councilors Attack Higher School Bond," Carol Malley, *Union-News* (July 23, 1997); "Raise Bid Revives Computer Issue," Mary Ellen O'Shea, *Union-News* (April 18, 1998); "Councilor Criticized for Remarks – McCollum, Ryan at Odds Over Pay Raise," Mary Ellen O'Shea, *Union-News* (April 23, 1998); and "At $500 a head, McCollum Fans Turn Out," Mary Ellen O'Shea, *Union-News* (October 27, 1999).

a) In the 1999 election, three incumbents competed, but only one was returned to office, Beth Conway. Neither Joseph Bernard, who was first elected in 1995, nor Mr. McCollum were re-elected, placing fifth and fourth respectively.
b) In the 1999 election, 19,715 fewer voters cast ballots than had in 1995,
c) In the 1999 election, Hispanic candidate, Jose Tosado and white candidate, Thomas Ashe were elected. For each candidate, it was his first bid for office.

124) In 1999, Mr. McCollum received 8.1 percentage points smaller proportion of the total vote than he had received in 1995; and 5.4 percentage points smaller proportion of the total vote than he had received in 1991.

a) Mr. McCollum received 11,041 fewer votes in 1999 than he did in 1995.
b) Mr. McCollum received 8,601 fewer votes in 1999 than he did in 1991.

125) While it appears that Mr. McCollum did not lose African American support, i.e., the proportion of African Americans turning out to vote, he appears to have lost support from Hispanic and white persons and received significantly fewer African American votes.

a) In 1999, Mr. McCollum received 7.1 percentage points greater proportion of the Ward 4 vote than he had in 1995. According to the 1990 Census, African Americans represented 59.4 percent of the total population in Ward 4.
b) Nevertheless, Mr. McCollum received 729 fewer Ward 4 votes in 1999 than he had received in 1995.

45

c) Indeed, had Mr. McCollum received the 729 more Ward 4 votes that he received in 1995, he would have received more votes than the candidate finishing third.

d) In 1999, Mr. McCollum received 33.7 percentage points smaller proportion of the Ward 7 vote than he received in 1995. According to the 1990 Census, African Americans represented 5.6 percent of the total population in Ward 7.

e) In 1999, Mr. McCollum received 8.7 percentage points smaller proportion of the Ward 6 vote than he received in 1995. According to the 1990 Census, African Americans represented 3.5 percent of the total population in Ward 6.

f) In 1999, Mr. McCollum received 7.2 percentage points smaller proportion of the Ward 5 vote than he received in 1995. According to the 1990 Census, African Americans represented 25.9 percent of the total population in Ward 5.

g) In 1999, Mr. McCollum received 4.2 percentage points smaller proportion of the Ward 3 vote than he received in 1995, but 618 more Ward 3 votes than in 1995. According to the 1990 Census, African Americans represented 18.6 percent of the total population and Hispanics represented 26.2 percent of the total population in Ward 3.

h) In 1999, Mr. McCollum received 6.5 percentage points smaller proportion of the Ward 1 vote than he received in 1995, but 581 more Ward 1 votes than in 1995. According to the 1990 Census, African Americans represented 11.1 percent of the total population and Hispanic represented 60.6 percent of the population in Ward 6.

126) There is no evidence that Mr. McCollum's apparent loss of white vote was due to racial animus, particularly given his past history of significant support from voters in predominately white wards. It is also not true that the 1999 election demonstrated that he, as an African American, was more vulnerable to loss of white confidence than were white incumbents, since a white incumbent was also no re-elected and indeed, received fewer votes than did Mr. McCollum

*2003 School Committee Election*
127) In 2002, Mr. McCollum was appointed to the School Committee to fill the unexpired term of Mr. Jose Tosado. He ran for re-election in 2003, in which 16,858 more voters turned out to vote than did in 1999. In 2003, two incumbents, Mr. Ashe and Mr. McCollum ran for re-election. Mr. McCollum received 38.3 percent of the vote, placing fourth among six candidates

a) Mr. McCollum received 4,120 more votes in 2003 than he received in 1999.
b) Mr. McCollum, however, received 1.5 percentage points smaller proportion of the total vote than he received in 1999.

128) While it appears that Mr. McCollum continued to receive African American support, he, nonetheless, lost some African American support but regained some of his Wards 5 and 7 support. He appears to have lost even more support from Hispanic voters.

a) In 1999, Mr. McCollum received 10.3 percentage point greater proportion of the Ward 4 vote than he did in 2003. According to the 1990 Census, African Americans represented 59.4 percent of the total population in Ward 4.

b) In 2003, Mr. McCollum received 4.5 percentage points greater proportion of the Ward 7 vote than he received in 1999. According to the 1990 Census, African Americans represented 5.6 percent of the total population in Ward 7.

c) In 2003, Mr. McCollum received 1.1 percentage points greater proportion of the Ward 5 vote than he received in 1999. According to the 1990 Census, African Americans represented 25.9 percent of the total population in Ward 5.

d) In 1999, Mr. McCollum received 4 percentage points greater proportion of the Ward 6 vote than he received in 2003. According to the 1990 Census, African Americans represented 3.5 percent of the total population in Ward 6.

e) In 1999, Mr. McCollum received 7 percentage points greater proportion of the Ward 3 vote than he received in 2003. According to the 1990 Census, African Americans represented 18.6 percent of the total population and Hispanic persons represented 26.2 percent of the total population in Ward 3.

f) In 1999, Mr. McCollum received 16.4 percentage points greater proportion of the Ward 1 vote than he received in 2003. According to the 1990 Census, African Americans represented 11.1 percent of the total population and Hispanic represented 60.6 percent of the population in Ward 6.

g) Indeed, Mr. McCollum received a greater proportion of the Ward 1 vote in 1989 than he received in 2003. In no other ward did the proportion of Mr. McCollum's support decrease to less than he received in 1989.

h) Mr. McCollum lost by only 597 votes, which he could have received had he received a greater proportion of the Ward 4 (or even Ward 1 or Ward 3) vote. According to Mr. Bud Williams, Mr. McCollum could have made up the deficit if he had more aggressively campaigned

129) There is no evidence that his loss of white vote was due to racial animus, particularly given his past history of significant support from voters in predominately white wards and the fact that he appeared to gain white support in 2003 as compared to 1999.

### *Candace Early Lopes*
#### *1987 School Committee Election*
130) In the 1987 election, only one incumbent ran for re-election. Accordingly two non-incumbents were elected. Ms. Lopes placed third among six candidates. She received 36.1 percent of the vote.

131) In 1987, Ms. Lopes received the greatest proportion of the ward vote and the greatest number of votes from Ward 4. According to the 1990 Census, 59.4 percent of the population in Ward 4 was African American.

a) Ward 4 vote represented 17.8 percent of Ms. Lopes' total vote in 1987.
b) Ms. Lopes received 74.1 percent of the Ward 4 vote in 1987.

132) In 1987, Ms. Lopes received the second greatest number of votes from Ward 7, in which the 1990 Census reported that 5.6 percent of the population was African American.

47

a) Ms. Lopes received 17.4 percent of her total vote from Ward 7 in 1987.
b) Ms. Lopes received 31.9 percent of the Ward 7 vote in 1987.

133) In 1987, Ms. Lopes received the second greatest number of her vote from Ward 5, in which the 1990 Census reported that 25.9 percent of the total population was African American.

a) Ward 5 voters represented 13.7 percent of Ms. Lopes' total vote in 1987.
b) In Ward 5, Ms. Lopes received 41.6 percent of the vote in 1987.

134) In 1987, Ms. Lopes received the fewest votes from Ward 1, in which the 1990 Census reported that 11.1 percent of the population was African American and 60.6 percent was Hispanic

a) Ward 1 vote represented only 7.6 percent of Mr. McCollum's total vote in 1987.
b) In 1987, Ms. Lopes received 35.6 percent of the Ward 1 vote.

135) In 1987, Ms. Lopes received the second fewest votes from Ward 3, in which the 1990 Census reported that 18.6 percent of the total population was African American and 26.2 percent was Hispanic

a) Ward 3 vote represented 8.5 percent of Ms. Lopes' total vote in 1987.
b) Ms. Lopes received 37.0 percent of the Ward 3 vote in1987.

*1991 School Committee Election.*
136) Ms. Lopes ran for re-election in 1991, as one of two incumbents in a field of five candidates, among whom was Mr. McCollum. Ms. Lopes received 44.9 percent of the vote in the 1991, but placed fourth among five candidates

a) In 1991, Ms. Lopes received 5,916 more votes than she received in 1987.
b) In 1991, Ms. Lopes received 8.8 percentage points greater proportion of the total vote than she received in 1987, when she won.
c) Ms. Lopes received 710 fewer votes than did Mr. McCollum, who placed third.

137) In 1991 as in 1987, Ms. Lopes received the greatest proportion of the ward vote from Ward 4. According to the 1990 Census, 59.4 percent of the population in Ward 4 was African American.

a) Ward 4 vote represented 11.6 percent of Ms. Lopes' total vote in 1991.
b) Ms. Lopes received 68.6 percent of the Ward 4 vote in 1991.
c) Ms. Lopes received 5.5 percentage points greater proportion of the Ward 4 vote in 1987 than she did in 1991. On the other hand, she received 132 more Ward 4 votes in 1991 than she received in 1987.
d) Ms. Lopes further received a greater proportion and 429 more of the Ward 4 vote than did Mr. McCollum in 1991.

138) In 1991 Ms. Lopes received the greatest number of votes from Ward 7, in which the 1990 Census reported that 5.6 percent of the population was African American.

a) Ms. Lopes received 19.3 percent of her total vote in 1991.
b) Ms. Lopes received 41.6 percent of the Ward 7 vote in 1991.
c) Ms. Lopes received 9.7 percentage points greater proportion of the Ward 7 vote in 1991 than she received in 1987. She also received 1,313 more Ward 7 votes in 1991 than she received in 1987.
d) Ms. Lopes received 692 fewer voters than Mr. McCollum did in 1991. Ms. Lopes received 10.1 percentage points smaller proportion of the Ward 7 vote than did Mr. McCollum.

139) In 1991, Ms. Lopes received the second greatest number of votes from Ward 6, in which the 1990 Census reported that 3.5 percent of the total population was African American.

a) Ward 6 voters represented 16.2 percent of Ms. Lopes' total vote in 1991.
b) In Ward 6, Ms. Lopes received 44.3 percent of the vote in 1991
c) Ms. Lopes received 10.9 percentage points greater proportion of the Ward 6 vote in 1991 than she did in 1987. Ms. Lopes received 1,063 more Ward 6 votes in 1991 than she did in 1987.
d) Ms. Lopes, however, received only 121 fewer Ward 6 votes than did Mr. McCollum in 1991.

140) In 1991, Ms. Lopes received the second greatest proportion of the ward vote from Ward 5, in which the 1990 Census reported that 25.9 percent of the total population was African American.

a) Ms. Lopes received 49.0 percent of the Ward 5 vote in 1991
b) Ms. Lopes received 15.0 percent of her total vote from Ward 5 in 1991.
c) Ms. Lopes received 7.4 percentage points greater proportion of the Ward 5 vote in 1991 than she received in 1987. Likewise, she received 1,004 more Ward 5 votes in 1991 than she received in 1987.
d) Ms. Lopes, however, received only 10 fewer Ward 5 votes than Mr. McCollum received in 1991

141) In 1991, Ms. Lopes received the fewest votes from Ward 1, in which the 1990 Census reported that 11.1 percent of the population was African American and 60.6 percent was Hispanic

a) Ward 1 vote represented only 6.3 percent of Ms. Lopes' total vote in 1991.
b) In 1991, Ms. Lopes received 36.4 percent of the Ward 1 vote.
c) Ms. Lopes, however, received 183 more Ward 1 vote than did Mr. McCollum in 1991.

142)  In 1991, Ms. Lopes received the second fewest votes from Ward 3, in which the 1990 Census reported that 18.6 percent of the total population was African American and 26.2 percent was Hispanic

a)  Ward 3 vote represented 7.3 percent of Ms. Lopes' total vote in 1991.
b)  Ms. Lopes received 45.8 percent of the Ward 3 vote in 1991.
c)  Ms. Lopes received 28 more Ward 3 votes than did Mr. McCollum.

### Carmen Rosa
#### 1993 School Committee Election
143)  Carmen Rosa was elected to the School Committee in 1993, her first bid for elective office.  She became the second Hispanic persons to be elected to the School Committee.

a)  Ms. Rosa placed first among six candidates, two of whom were incumbents in the 1993 election in which 28,852 voters cast ballots.
b)  Indeed, Ms. Rosa was the only candidate to have received more than 50 percent of the vote in 1993 – she received 54.0 percent of the vote.

144)  In 1993, Ms. Rosa received the greatest proportion of the ward vote from Ward 4, in which the 1990 Census reported that 17.9 percent of the total population was Hispanic and 59.4 percent was African American.

a)  Ms. Rosa received 8.5 percent of her total vote from Ward 4 voters on 1993.
b)  Ms. Rosa received 65.3 percent of the Ward 4 vote in 1993.
c)  No other candidate received more than 28 percent of the Ward 4 vote in 1993

145)  In 1993 Ms. Rosa received the second greatest proportion of the ward vote from Ward 1, in which the 1990 Census reported that 60.6 percent of the population was Hispanic

a)  Ms. Rosa received 60.8 percent of the Ward 1 vote in 1993
b)  Ward 1 vote represented 8.1 percent of the total vote received by Ms. Rosa in 1993
c)  No other candidate received more than 30 percent of the Ward 1 vote in 1993.

146)  In 1993 Ms. Rosa received the greatest number of votes from Ward 7, in which the 1990 Census reported that 2.0 percent was Hispanic.

a)  Ms. Rosa received 19.1 percent of her total vote from Ward 7 voters in 1993
b)  Ms. Rosa received 50.2 percent of the Ward 7 vote in 1993.
c)  No other candidate received more than 43 percent of the Ward 7 vote in 1993

147)  In 1993, received the second greatest number of votes from Ward 2, in which the 1990 Census reported that 8.8 percent of the total population was Hispanic.

a) Ms. Rosa received 16.2 percent of her total vote from Ward 2 voters in 1993

b) Ms. Rosa received 49.6 percent of the Ward 2 vote in 1993.
c) Ms. Rosa received at least 3.3 percentage points greater proportion of the Ward 2 vote than was received by any other candidate.

148) In 1993, Ms. Rosa received 55.9 percent of the vote from Ward 3, in which the 1990 Census reported that 26.2 percent of the total population was Hispanic. Ward 3 vote represented 6.6 percent of the total vote received by Ms. Rosa.

149) In 1993, Ms. Rosa received more than 50 percent of the vote in every ward with the exception of Ward 2, in which she received 49.6 percent of the total vote.

a) No candidate received at least 50 percent of the vote in any ward, with the exception of incumbent Ms. Begley-Curto who received 51.1 percent of the Ward 6 vote.
b) Nevertheless, Ms. Rosa received a greater proportion of the Ward 6 vote than did Ms. Begley-Curto.
c) Accordingly, Ms. Rosa placed first among the six candidates in every ward.

150) In 1993, Ms. Rosa placed first in every precinct with the exception of Precincts 2C, 2G, 5G, 5H, 6A, 6B, 6D, 6E, in which she placed second and Precinct 7G in which she placed third.

151) Ms. Rosa did not run for re-election in 1997.

***Cesar Riuz***
*1981 School Committee Election*

152) The first Hispanic person to be elected to the School Committee was Cesar Riuz in 1981; according to the 1980 Census 6,621 people in Springfield were "of Spanish origin."

153) The following information with regard to the 1981 election was obtained from official election records of the Springfield Election Commission and *Voting Behavior in Springfield, Statistical & Analytic Report Second Edition 1973-1982*, Urban League of Springfield, Inc. (Urban League Report II)

|  | Ward 1 | Ward 2 | Ward 3 | Ward 4 | Ward 5 | Ward 6 | Ward 7 | Ward 8 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Total Population | 9,225 | 22,650 | 15,615 | 9,943 | 16,370 | 16,201 | 19,131 | 42,027 | 151,160 |
| Voting Age TPOP | 5,277 | 17,230 | 12,240 | 6,380 | 14,937 | 12,482 | 14,800 | 30,724 | 110,458 |
| Registered Voters | 2,507 | 12,529 | 5,525 | 3,492 | 5,572 | 7,055 | 12,383 | 18,965 | 68,068 |
| Turn-out B Voters | 1,334 | 7,836 | 2,931 | 1,580 | 2,857 | 4,189 | 8,036 | 11,038 | 39,701 |
| Turn-out Reg. Voters | 53.2 | 62.3 | 53.1 | 45.3 | 51.3 | 59.4 | 64.9 | 58.2 | 58.3 |
| Black TPOP | 853 | 632 | 3,011 | 7,067 | 9,518 | 235 | 210 | 4,098 | 25,674 |
| Black TPOP % | 09.3 | 02.8 | 19.3 | 71.1 | 58.1 | 01.5 | 01.1 | 09.8 | 17.0 |
| Hispanic TPOP | 6,396 | 2,309 | 1,766 | 1,117 | 1,340 | 401 | 164 | 822 | 14,804 |
| Hispanic TPOP % | 69.3 | 10.2 | 11.3 | 11.2 | 08.2 | 02.5 | 00.8 | 2.0 | 09.8 |
| Ruiz B % Ward Vote | 44.0 | 12.8 | 34.1 | 39.0 | 39.2 | 38.1 | 41.3 | 38.5 | 37.9 |
| Ruiz -- # Ward Vote | 587 | 2,575 | 1,000 | 616 | 1,120 | 1,597 | 3,319 | 4,250 | 15,064 |

154)  In 1981, Mr. Riuz ran for School Committee and was elected, placing third among a field of six candidates, with 37.9 percent of the vote,  .

a)  Only one of the six candidates running for election was an incumbent
b)  Mr. Riuz was the only Hispanic or minority candidate.
c)  Kenneth Shea and William T. Foley, both white, ran for the first time for the School Committee in 1981
d)  Mr. Foley placed first with 49.4 percent of the vote.

155)  Mr. Riuz ran for City office on only one previous occasion, 1979, when he ran for City Council

a)  In the 1979 City Council contest, Mr. Riuz received 24.4 percent of the vote and placed 12th among 17 candidates.
b)  In the 1981 City Council contest, Mr. Riuz received 2.4 times as many votes as he received in 1979.

156)  Mr. Riuz received the greatest proportion of the ward vote from Ward 1 vote in 1981, in which 69.3 percent of the total population was Hispanic (Urban League Report II)

a)  Mr. Riuz received 44 percent of the Ward 1 vote.
b) On the other hand, Mr. Riuz received the fewest votes from Ward 1 voters.  Ward 1 voters represented only 3.9 percent of the total vote received by Mr. Riuz in 1981

c) Mr. Riuz received substantially more Ward 1 vote than did any of the other five
School Committee candidates – 20 percentage points greater proportion of the Ward 1
vote than did the candidate (incumbent, Miriam R. Nelen) receiving the second greatest
proportion of Ward 1 votes.

d) As among the 1981 City Council and School Committee candidates, two City Council
candidates received more Ward 1 support than Mr. Riuz, who received 587 Ward 1 votes

e) Miguel Rivas, Jr. received 822 Ward 1 votes, but placed 13th as among City Council
candidates

f) Then-incumbent member of the City Council, Richard E. Neal received 606 Ward 1
votes.

g) Then-incumbent member of the City Council, Vincent Dimonaco received 575 Ward
1 votes.

h) In 1981, Mr. Riuz received 84.6 percent of his total vote from wards in which a
majority of the population was white, according to 1980 Census (Urban League Report
II)

i) In 1981, Mr. Riuz received the greatest number of votes from Ward 8 voters, almost
88 percent of whom were reported to be white, according to 1980 Census (Urban League
Report II). Ward 8 voters constituted 28.2 percent of the total vote received by Mr. Riuz.

j) In 1981, Mr. Riuz received the second greatest proportion of the ward vote from Ward
7, in which the Urban League Report II reported that less than 1 percent of the total
population was Hispanic.

k) Mr. Riuz further received the second greatest number of votes from Ward 7 voters in
1981.

l) Mr. Riuz received 22.0 percent of his total vote from Ward 7 voters in 1981

m) Mr. Riuz received the third greatest number of votes from Ward 2 voters, 87 percent
of whom were reported to be white, according to 1980 Census (Urban League Report II).
Mr. Riuz received 17.1 percent of his total vote in 1981 from Ward 2 voters

n) Mr. Riuz received 67.3 percent of his total vote from Ward 2, 7, and 8 voters.

o) Mr. Riuz received the second smallest number of votes from Ward 4, in which 71.1
percent of the total population was African American (Urban League Report II).

p) Mr. Riuz received 4.1 percent of his total vote from Ward 4 voters in 1981

q) Mr. Riuz received 39 percent of the Ward 4 vote.

r) Mr. Riuz did not run for re-election in 1985.

**Turnout and Competitiveness in Legislative Single-Member District Contests:
Hampden County Districts for Representatives in the Massachusetts General Court**
*Redistricting, Communities of Shared Interest and Incumbency Protection*
157) Only two Massachusetts House of Representatives (of General Court) district are
wholly comprised of Springfield population. Four of the remaining five are comprised of
a  small portion of the City population combined with a larger portions surrounding
Hampden County towns/cities.

a) The Second Hampden County district is comprised of two Springfield precincts, along
with the towns of Hampden, Longmeadow, and Monson, as well as to precincts of East
Longmeadow

b) The Sixth Hampden County district is comprised of one Springfield precinct, as well as five Chicopee precincts and the town of West Springfield

c) The Seventh Hampden County district is comprised of three Springfield precincts, one Chicopee precinct, 2 Belchertown precincts, and the town of Ludlow. Prior to the 2000 redistricting, the Seventh Hampden County district had not included a portion of Springfield. The longtime representative from the Seventh Hampden District was chairman of the House redistricting committee and, by all reports, former Representative Finnernan's "right hand man"

d) The Ninth Hampden County district is comprised of sixteen Springfield precincts and one precinct in the City of Chicopee

e)    The Tenth Hampden County district is comprised of sixteen Springfield precincts

f) The Eleventh Hampden County district is comprised of seventeen Springfield precincts

g) The Twelfth Hampden County district is comprised of nine Springfield precincts, two East Longmeadow precincts, and the town of Wilbraham.

158) The 2000 redistricting process for the Hampden County districts was directed by Rep. Petrolati and the rest of the Springfield State House of Representatives delegation. There were no public hearings in Springfield and I am not aware that there was any effort to receive input from various citizens or community leaders prior to redistricting or concerning any "draft" districting plans.

159) Of the nine members of the Springfield legislative delegation, which is comprised of the seven Representatives, who represent at least one precinct in the City of Springfield and the two State Senators,  only three were residents of the City of Springfield, prior to the 2006 election. Beginning in 2007, three are residents of the City of Springfield. The legislative delegation is  responsible for gaining passage of any act or ordinance adopted by a town or city that does not have home rule – as Springfield does not.

### *Competitiveness in Legislative Single-Member Districts*
<u>Hampden County District 11</u>
160) In Hampden County District 11 (formerly Hampden County District 12, prior to 2000 redistricting), which has long been represented by an African American and is largely comprised of Ward 4 voters, only two different persons have served as the Representative from that district:  Benjamin Swan (1994 to the present) and Raymond Jordan, Jr. (1974 to 1994).

a) Indeed, Rep. Jordan had Democratic primary opposition in only two elections between 1980 – 1993.  In the1980 Democratic primary, Jordan received more than twice as many votes as his opponent.  In the 1986 Democratic primary he received 1.3 times as many votes as did the candidate finishing second.

b) Rep. Jordan had Republican opposition in 1980, 1992, and 1994.  In the1980 general election Rep. Jordan received more than twice as many votes as his Republican opponent. In the 1992 general election, Rep. Jordan received 1.8 times as many votes as did his

George Vasquez. Rep. Rivera received 2.5 times as many votes as did Mr. Vasquez in 2004 and more than five times as many votes as Mr. Vasquez received in 2006.

***Turnout in Legislative Single-Member Districts as Compared to At-Large Municipal Elections***

*Hampden County District 11*

162) The following chart provides 2006 primary data regarding the number of registered voters and the turnout in Hampden County District 11, as well as information regarding the racial make-up of the district (according to the 2000 Census).

| Precinct | 2006 Primary Election | | | 2000 Census | | |
|---|---|---|---|---|---|---|
| | # Reg. Voters[7] | # Voters[8] | % Turnout | # VAP | # Black VAP | % Black VAP |
| 3A | 1,267 | 140 | 11.1 | 1,699 | 379 | 22.3 |
| 3D | 1,059 | 97 | 09.2 | 1,398 | 422 | 302 |
| 3E | 1,188 | 113 | 09.5 | 1,548 | 495 | 49.5 |
| 4A | 1,290 | 264 | 20.5 | 1,597 | 665 | 41.6 |
| 4B | 1,283 | 258 | 20.1 | 1,585 | 984 | 62.1 |
| 4C | 1,187 | 173 | 14.6 | 1,488 | 857 | 57.6 |
| 4D | 1,011 | 167 | 16.5 | 1,623 | 945 | 58.2 |
| 4E | 1,147 | 176 | 15.3 | 1,504 | 957 | 63.6 |
| 4F | 463 | 111 | 24.0 | 2,069 | 394 | 19.0 |
| 4G | 1,319 | 316 | 24.0 | 1,460 | 868 | 59.5 |
| 4H | 1,201 | 293 | 24.4 | 1,588 | 1,190 | 74.9 |
| 5A | 1,108 | 268 | 24.2 | 1,651 | 898 | 54.4 |
| 5B | 1,298 | 249 | 19.2 | 1,572 | 506 | 32.2 |
| 5E | 1,497 | 376 | 25.1 | 1,768 | 438 | 24.8 |
| 5F | 1,467 | 438 | 29.9 | 1,893 | 609 | 32.2 |
| 7A | 1,422 | 440 | 30.9 | 1,795 | 145 | 08.1 |
| 8C | 1,339 | 293 | 21.9 | 1,637 | 561 | 34.3 |
| **Total** | **20,546** | **4,172** | **20.3** | **27,875** | **11,313** | **40.6** |

163) In the 2006 primary Hampden County District 11 turnout among the District 11 voters was 20.3 percent. The 2006 primary election presented then-gubernatorial candidate Deval Patrick his most significant opposition and the incumbent Rep. Swan faced his only opposition in the 2006 election.

---

[7] Information concerning the number of Democratic registered voters by precinct was not included on the official elections returns for the 2006 primary election contest. There are few registered Republicans in the precincts included in Hampden County District 11 – the only voters not eligible to vote in the Democratic primary election. Unenrolled voters are permitted to chose a political party ballot, but are returned to their "unenrolled" status at the close of the primary election. Nevertheless, it is fair to say that among Democratic and "unenrolled" registered voters, the turnout was marginally greater than 20.3 percent. Likewise the turnout among Democratic and "unenrolled" registered voters in those precincts with predominately white voters, is likely to be greater still, since there are more Republican voters in those precincts.

[8] Includes Democratic, Republican, and Unenrolled voters.

Republican opponent. In the 1994 general election, Rep. Jordan received 3.5 times as many votes as did his Republican opponent.

c) Although, Rep. Swan had Democratic primary opposition in six primary elections since his election in 1994, in no contest did an opponent receive a particularly significant proportion of the vote

d) In the 1994 Democratic primary in which incumbent Jordan did not compete, Mr. Swan was opposed by three candidates and received 43.2 percent of the vote, with the three other candidates spitting the remainder of the vote. In the 1998 Democratic primary Rep. Swan received more than three times as many votes as did the candidate finishing second. In the 2002 primary election, Rep. Swan received more than twice as many votes as did the candidate (City Councilor Bud Williams) finishing second. In the 2000 primary election, Rep. Swan received 1.8 times more votes than his two opponents combined; and 3.2 times more votes than the candidate finishing second.

e) Rep. Swan was opposed in the 2006 primary election after the newspaper and the media had criticized him for not paying his taxes. Nevertheless, Rep. Swan received 1.8 times as many votes as the African American candidate finishing second in a field of three candidates

f) Rep. Swan had Republican opposition only once in the 2004 election in which he received 3.6 times as many votes as his Republican opponent received

*Hampden County District 10*
161) In Hampden County District 10, only two different persons have served as Representative from that district: Anthony Scibelli and Cheryl Coakley-Rivera.

a) Virtually from the beginning of time, Rep. Scibelli represented the constituents of Hampden County District 10. Indeed, Rep. Scibelli was the longest serving member of the Massachusetts House of Representatives

b) During the period of time 1980-1998, Rep. Scibelli had Democratic opposition only twice– only once was his opposition Hispanic, in spite of the fact that Hampden County District 10 had become (over that period of time) increasing Hispanic and decreasingly Italian.

c) In the 1980 primary election Rep. Scibelli received 1.3 times as many votes as his opponent. In the1998 primary election Rep. Scibelli received more than twice as many votes as his Hispanic opponent and former member of the Springfield School Committee (elected in 1981).

d) During the period of time 1980-1998, Rep. Scibelli was opposed by a Republican opponent only once. In the1992 general election Rep. Scibelli received 1.3 times as many votes as his opponent

e) Rep. Scibelli died before the 1998 general election (but after he had defeat a Hispanic opponent in the primary election). Representative Cheryl Coakley-Rivera was "elected" to replace Rep. Scibelli in a Democratic caucus; her main opposition was Carlos Gonzales

f) Rep. Rivera has never been opposed in a Democratic primary.

g) Rep. Rivera has been opposed by Republican and/or Independent candidates in two general elections: 2006 and 2004. In both situations her Republican opposition has been

164) In contrast, in 2005 municipal election, in which turnout citywide was unusually low, turnout in Ward 4 was 20.3 percent. On the other hand, in 2005, turnout in Precincts 5A, 5B, and 5E, and 5F, was 25.4 percent, 25.7 percent, 31.1 percent, and 37.2 percent. According to the 2000 Census, only Precinct 5A – as among the Ward 5 precincts – is comprised of a majority of African American persons of voting age.

165) The 2005 election was a general election as to which there was no primary City Council contest and the 2006 election to which the comparison is made is a primary election. The Democratic primary in Hampden County District 11 election determined the winner, particularly where, as here, there was no Republican opposition in District 11, and therefore the ability of a voter to impact the results of an election contest was the greatest

a) Accordingly, in 2006, the turnout was not greater in the single-member district elections in Hampden County District 11
b) In the 2006 Democratic primary Hampden Hampden County District 11 election, of those nine precincts in which the proportion of turnout was greater than the district-wide average, only four were comprised of a proportion of African American voting age persons in excess of the district-wide average – 40.6 percent.
c) The turnout in the 2006 primary election in Hampden County District 11 varies little from those other elections in which Rep. Swan was opposed in the primary election. Indeed, in four of the other primary elections (2002, 2000, 1998, and 1994) in which Rep. Swan had opposition, fewer voters turned out to vote than did in 2006. Fewer voters turned out in the 1994 primary election, in which Rep. Jordan did not seek re-election (and there was, therefore, an "open seat"), than did in 2006.

*Hampden County District 10*
166) The following chart provides data regarding the number of registered voters and the turnout in Hampden County District 10 in the 2006 general election, as well as information regarding the racial make-up of the district (according to the 2000 Census).

| Precinct | 2006 General Election | | | DoJ Estimates for 2006 | | 2000 Census | |
|---|---|---|---|---|---|---|---|
| | # Reg. Voters | # Voters | % Turnout | # Spanish Surname | % Spanish Surname | # Hispanic VAP | % Hispanic VAP |
| 1A | 1,476 | 402 | 27.2 | 1,130 | 81.9 | 1,227 | 85.9 |
| 1B | 1,253 | 331 | 26.4 | 1,031 | 84.7 | 1,224 | 85.8 |
| 1C | 1,289 | 241 | 18.7 | 1,092 | 86.0 | 1,217 | 88.6 |
| 1D | 1,485 | 491 | 33.1 | 867 | 58.7 | 909 | 56.0 |
| 1E | 1,087 | 223 | 20.5 | 671 | 62.5 | 810 | 48.1 |
| 1F | 1,409 | 325 | 23.1 | 874 | 63.4 | 935 | 59.8 |
| 1G | 1,470 | 328 | 22.3 | 638 | 43.9 | 747 | 38.1 |
| 1H | 1,061 | 219 | 20.6 | 571 | 54.9 | 751 | 41.6 |
| 3B | 1,188 | 201 | 16.9 | 710 | 60.3 | 792 | 50.5 |
| 3C | 1,105 | 183 | 07.5 | 558 | 50.9 | 651 | 44.1 |
| 3F | 1,321 | 302 | 22.9 | 577 | 44.4 | 509 | 32.0 |
| 3G | 1,110 | 241 | 21.7 | 547 | 50.3 | 436 | 29.1 |
| 3H | 1,114 | 292 | 26.2 | 350 | 31.9 | 362 | 22.1 |
| 6A | 1,178 | 336 | 28.5 | 424 | 36.3 | 432 | 28.1 |
| 6E | 1,141 | 394 | 34.5 | 328 | 29.7 | 186 | 19.4 |
| 6G | 1,320 | 558 | 42.3 | 214 | 16.3 | 173 | 11.5 |
| **Total** | **20,007** | **5,067** | **25.3** | **10,582** | **N/A** | **11,361** | **44.5** |

167) In Hampden County District 10, Rep. Rivera has had Republican opposition in the general election. Turnout in general elections is always greater than in primary elections in Springfield.

a) In the 2006 general election, however, the turnout was 25.3 percent.
b) In the 2001 municipal election, the turnout in Ward 1 was 31.0 percent. As among the five Ward 3 precincts, the average turnout was 28.5 percent, and as among the Ward 6 precincts, the average turnout was 41.9 percent.
c) In contrast, in the 2003 municipal election, turnout in Ward 1 was 21.8 percent. As among the five Ward 3 precincts, the average turnout was 19.9 percent; however, as among the Ward 6 precincts, the average turnout was 32.5 percent.
d) In the 2006 general election in Hampden County District 10, as among the precincts in which the turnout was greater than the district-wide average, only three of the precincts were comprised of a proportion of Hispanic voting age persons in excess of the district-wide proportion of Hispanic voting age persons (44.5 percent)
e) It is only in the years in which there was a presidential contest, that there has been significant increase in the turnout in Hampden County District 10.

168) The Department of Justice provided us with an analysis of Spanish surname registered voters (2006) to guide my allocation of bilingual poll officials. To the extent that these estimations are accurate it would appear that Spanish surname closely replicates – if not exceeds -- the 2000 Census data for Hispanic voting age persons. In some of the precincts – Precincts 3F and 3G; 6E and 6G there are now more Spanish surname registered voters than there were Hispanic voting age persons in 2000. In every

precinct except Precincts 1A, 1B, and 1C, the proportion of Spanish surname registered voters is greater than the proportion of Hispanic persons of voting age according to the 2000 Census

### Voter Support
### Hampden County District 11

169)  The following chart provides the total number of voters in each of the precincts included in Hampden County District 11, the number of votes received by Rep. Benjamin Swan and the proportion of the total vote received by Rep. Swan in the 2002, 2004, and 2006 Democratic primary election in which he had opposition

| Precinct | 2006 Primary | | | 2004 Primary | | | 2002 Primary | | | 2000 Census |
|---|---|---|---|---|---|---|---|---|---|---|
| | # Dem. Voters | # Votes Swan | % Votes Swan | # Dem. Voters | # Votes Swan | % Votes Swan | # Dem. Voters | # Votes Swan | % Votes Swan | % Black VAP |
| 3A | 125 | 57 | 49.6 | 58 | 39 | 70.9 | 119 | 61 | 61.0 | 22.3 |
| 3D | 92 | 45 | 55.6 | 21 | 18 | 94.7 | 76 | 50 | 74.6 | 302 |
| 3E | 106 | 58 | 60.4 | 51 | 43 | 86.0 | 95 | 68 | 77.3 | 49.5 |
| 4A | 257 | 144 | 59.3 | 78 | 64 | 85.3 | 241 | 164 | 71.9 | 41.6 |
| 4B | 256 | 159 | 66.8 | 88 | 74 | 86.1 | 266 | 186 | 98.7 | 62.1 |
| 4C | 169 | 111 | 67.7 | 53 | 43 | 84.3 | 188 | 121 | 66.9 | 57.6 |
| 4D | 164 | 109 | 72.2 | 51 | 50 | 98.0 | 166 | 116 | 72.5 | 58.2 |
| 4E | 172 | 94 | 61.4 | 46 | 29 | 64.4 | 189 | 123 | 66.9 | 63.6 |
| 4F | 111 | 55 | 51.9 | 25 | 19 | 79.2 | 91 | 61 | 70.9 | 19.0 |
| 4G | 309 | 176 | 59.9 | 136 | 107 | 82.3 | 258 | 152 | 63.1 | 59.5 |
| 4H | 292 | 164 | 60.7 | 70 | 60 | 88.2 | 224 | 160 | 73.8 | 74.9 |
| 5A | 251 | 138 | 56.8 | 62 | 43 | 74.1 | 200 | 139 | 72.0 | 54.4 |
| 5B | 238 | 123 | 54.7 | 58 | 35 | 64.8 | 178 | 83 | 48.8 | 32.2 |
| 5E | 350 | 145 | 47.4 | 111 | 72 | 69.2 | 279 | 131 | 49.3 | 24.8 |
| 5F | 365 | 144 | 43.9 | 116 | 73 | 71.6 | 323 | 187 | 62.3 | 32.2 |
| 7A | 383 | 115 | 33.9 | 146 | 81 | 61.8 | 360 | 156 | 46.2 | 08.1 |
| 8C | 276 | 125 | 48.8 | 66 | 43 | 66.2 | 238 | 142 | 63.7 | 34.3 |
| **Total** | **3,916** | **1,962** | **51.0** | **1,236** | **893** | **73.0** | **3,491** | **2,100** | **61.0** | **40.6** |

### 2002 Primary Election

170)  In the 2002 primary Rep. Swan received the greatest proportion of the precinct vote from Precinct 4B (98.7 percent), in which the 2000 Census reported that 62.1 percent of the voting age population was African American.  In Precinct 4F, in which the 2000 Census reported that African American only constituted 19.0 percent of the voting age population, Rep. Swan received 70.9 percent of the vote.

171)  In every precinct included in House District 10, with the exception of Precinct 4H, Rep. Swan received a greater proportion of the precinct vote than the proportion of the voting age population who were African American (according to the 2000 Census) in the 2002 primary election.

a) In every precinct with the exception of Precincts 4C, 4D, 4E, and 4G, Rep. Swan received greater than 15 percentage points greater proportion of the vote (in each precinct) than the proportion of the voting age population who were African American (according to the 2000 Census) in that precinct. In Precincts 4C, 4D, 4E, and 4G, the 2000 Census reported that more than 57 percent of the voting age population was African American

b) The three precincts in which there was the greatest disparity between the proportion of the vote received by Rep. Swan and the proportion of the voting age population who were African American (according to the 2000 Census) were Precincts 3A, 3B, and 7A. The disparity ranged from 38 percentage points to 44.6 percentage points. The African American proportion of the voting age population ranged from 8.1 percent to 30.2 percent.

172) In the 2002 primary election, Rep. Swan received 1.1 percentage points smaller proportion of the vote than the proportion of the voting age population who were African American (according to the 2000 Census) in Precinct 4H.

a) As among all 64 precincts, Precinct 4H had the greatest proportion of African American persons of voting age (according to the 2000 Census) – 74.9 percent

b) Rep. Swan received 73.8 percent of the Precinct 4H vote.

173) In the 2002 primary election, Rep. Swan received the greatest number of votes from Precinct 5F, in which the 2000 Census reported that 32.2 percent of the voting age population was African American. Rep. Swan received the fewest votes from Precinct 3D, in which the 2000 Census reported that 30.2 percent of the voting age population was African American.

a) Rep. Swan received less than 100 votes from each of the three Ward 3 precincts included in Hampden District 11, Precinct 4F, and 5B. In these five precincts, the African American proportion of the voting age population ranged from 19.0 percent to 49.5 percent.

b) Rep. Swan received more than 150 votes in six precincts: Precincts 4A, 4B, 4G, 4H, 5F, and 7A. The African American proportion of the population in these six precincts ranged from 08.1 percent to 74.9 percent.

2004 Primary Election

174) As in the 2002 primary election, in the 2004 primary election, Rep. Swan received the greatest proportion of the precinct vote from Precinct 4B (98.0 percent), in which the 2000 Census reported that 62.1 percent of the voting age population was African American. In Precinct 4F, in which the 2000 Census reported that African American only constituted 19.0 percent of the voting age population, Rep. Swan received 79.2 percent of the vote.

175) In every precinct included in Hampden County District 10, Rep. Swan received a greater proportion of the precinct vote than the proportion of the voting age population who were African American (according to the 2000 Census) in the 2004 primary election.

**DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY**
**GLADYS OYOLA, SPANISH LANGUAGE PROGRAM COORDINATOR**
**CITY OF SPRINGFIELD**
**PART 4 OF 4**

a) In every precinct with the exception of Precincts 4E and 4H, Rep. Swan received greater than 15 percentage points greater proportion of the vote (in each precinct) than the proportion of the voting age population who were African American (according to the 2000 Census) in that precinct. In Precincts 4E and 4H, the 2000 Census reported that more than 63.6 percent of the voting age population was African American
b) The five precincts in which there was the greatest disparity between the proportion of the vote received by Rep. Swan and the proportion of the voting age population who were African American (according to the 2000 Census) were Precincts 3A, 3D, 4A, 4F, 5E, and 7A. The disparity ranged from 43.7 percentage points to 60.5 percentage points. The African American proportion of the voting age population ranged from 8.1 percent to 41.6 percent.
c) In the 2004 primary election, Precinct 4E had the smallest disparity between the proportion of the precinct vote that Rep. Swan received and the proportion of the voting age population who were African American. The 2000 Census reported that 63.6 percent of the voting age population was African American.

176) In the 2004 primary election, Rep. Swan received the greatest number of votes from Precinct 4G, in which the 2000 Census reported that 59.6 percent of the voting age population was African American. Indeed, Rep. Swan received more than 100 votes in only one precinct – Precinct 4G.

a) Rep. Swan received the fewest votes from Precinct 3D, in which the 2000 Census reported that 30.2 percent of the voting age population was African American.
b) Rep. Swan received less than 50 votes from each of the three Ward 3 precincts included in Hampden District 11; Precincts 4C, 4E, and 4F; and Precincts 5A, 5B, and 8C. In these nine precincts, the African American proportion of the voting age population ranged from 19.0 percent to 63.6 percent.
c) Rep. Swan received greatest number of votes from Precinct 4B, 4G, and 7A – ranging from 107 to 74. The African American proportion of the population in these three precincts ranged from 08.1 percent to 62.1 percent.

2006 Primary Election
177) In the 2006 primary election, Rep. Swan received the greatest proportion of the precinct vote from Precinct 4D (72.2 percent), in which the 2000 Census reported that 58.2 percent of the voting age population was African American.

a) In Precinct 4F, in which the 2000 Census reported that African American constituted only 19.0 percent of the voting age population, and in which Rep. Swan had received a proportion of the vote in excess of 70 percent in the 2002 and 2004 primary election, Rep. Swan received 51.9 percent of the vote.
b) In the 2006 primary election, Rep. Swan received less than 35 percent of the precinct vote in only one precinct: Precinct 7A, in which the 2000 Census reported that only 8.1 percent of the voting age population were African American. This represented a 27.9 percent point reduction in the proportion of the vote that Rep. Swan received from Precinct 7A voters as compared to the 2004 primary election.

178)  In every precinct included in Hampden County District 10, with the exception of Precincts 4E and 4H, Rep. Swan received a greater proportion of the precinct vote than the proportion of the voting age population who were African American (according to the 2000 Census) in the 2006 primary election.

a)  In Precinct 4E, in which the 2000 Census reported that 63.6 percent of the voting age population was African American, Rep. Swan received 2.2 percentage points smaller proportion of the precinct vote than the proportion of the voting age population who were African American (according to the 2000 Census).
b)  In Precinct 4H, in which the 2000 Census reported that 74.9 percent of the voting age population was African American, Rep. Swan received 14.2 percentage points smaller proportion of the precinct vote than the proportion of the voting age population who were African American (according to the 2000 Census).
b)  The disparity between the proportion of voting age African Americans and the proportion of the precinct vote received by Rep. Swan was not greater than 40 percentage points in any precinct – as it had been in a number of precincts in past primary elections
c)  The six precincts in which disparity between the proportion of the vote received by Rep. Swan and the proportion of the voting age population who were African American (according to the 2000 Census) exceeded 20 percentage points were:  Precincts 3A, 3D, 4F, 5B, 5E, and 7A.  The disparity ranged from 22.5 percentage points to 27.3 percentage points.  The African American proportion of the voting age population ranged from 8.1 percent to 32.2 percent.

179)  In the 2006 primary election (just as in the 2002 and 2004 primary election), Rep. Swan received the greatest number of votes from Precinct 4G,  in which the 2000 Census reported that 59.6 percent of the voting age population was African American.

a)  In 2006 primary election Rep. Swan received the fewest votes from Precinct 3D, in which the 2000 Census reported that 30.2 percent of the voting age population was African American.
b)  Rep. Swan received less than  60 votes from each of the three Ward 3 precincts included in Hampden District 11 and Precinct 4F.   In four precincts, the African American proportion of the voting age population ranged from 19.0 percent to 49.5 percent.
c)  Rep. Swan received more than 150 votes in three precincts – Precincts 4B,  4G,  and 4H.  The African American proportion of the population ranged from 59.5 percent to 62.1 percent.

*Hampden County District 10*
180)  The following chart provides the total number of voters in each of the precincts included in Hampden County District10, the number of votes received by Rep. Cheryl Coakley-Rivera and the proportion of the total precinct vote received by Rep. Rivera in the 2004 and 2006 general election in which she had opposition.

| Precinct | 2004 General Election | | | 2006 General Election | | | 2000 Census | |
|---|---|---|---|---|---|---|---|---|
| | # Voters | # Votes Rivera | % Votes Rivera | # Voters | # Votes Rivera | % Votes Rivera | # Hispanic VAP | % Hispanic VAP |
| 1A | 627 | 435 | 70.0 | 402 | 284 | 71.0 | 1,227 | 85.9 |
| 1B | 554 | 389 | 71.0 | 331 | 263 | 80.0 | 1,224 | 85.8 |
| 1C | 546 | 288 | 53.0 | 241 | 129 | 54.0 | 1,217 | 88.6 |
| 1D | 791 | 543 | 69.0 | 491 | 372 | 76.0 | 909 | 56.0 |
| 1E | 447 | 301 | 68.0 | 223 | 168 | 76.0 | 810 | 48.1 |
| 1F | 553 | 388 | 71.0 | 325 | 252 | 78.0 | 935 | 59.8 |
| 1G | 579 | 378 | 66.0 | 328 | 239 | 73.0 | 747 | 38.1 |
| 1H | 428 | 280 | 66.0 | 219 | 166 | 76.0 | 751 | 41.6 |
| 3B | 405 | 286 | 71.0 | 201 | 156 | 78.0 | 792 | 50.5 |
| 3C | 387 | 257 | 67.0 | 183 | 135 | 74.0 | 651 | 44.1 |
| 3F | 483 | 307 | 64.0 | 302 | 216 | 72.0 | 509 | 32.0 |
| 3G | 430 | 309 | 72.0 | 241 | 184 | 77.0 | 436 | 29.1 |
| 3H | 507 | 328 | 65.0 | 292 | 218 | 75.0 | 362 | 22.1 |
| 6A | 601 | 391 | 65.0 | 336 | 213 | 64.0 | 432 | 28.1 |
| 6E | 604 | 409 | 68.0 | 394 | 282 | 72.0 | 186 | 19.4 |
| 6G | 858 | 578 | 68.0 | 558 | 387 | 70.0 | 173 | 11.5 |
| **Total** | **8,800** | **5,867** | **67.0** | **5,067** | **3,664** | **78.5** | **11,361** | **44.5** |

2004 General Election

181) In 2004, Rep. Rivera received the smallest proportion of the precinct vote from Precinct 1C (53.0 percent), in which the 2000 Census reported that 88.6 percent of the voting age population was Hispanic.

a) In the other hand, Rep. Rivera received the greatest proportion of the precinct vote from Precinct 3G (72.0 percent), in which the 2000 Census reported that 29.1 percent of the voting age population was Hispanic.
b) Rep. Rivera received a greater (or equal) proportion of the precinct vote than the proportion of the vote that she received districtwide (67.0 percent) from the following Precincts: 1A, 1B, 1D, 1E, 1F, 3B, 3C, 3G, 6E, and 6G. In only two of these 10 precincts, was the proportion of Hispanic persons of voting age greater than 67.0 percent. In only three precincts was the proportion of Hispanic persons of voting age greater than 55 percent (according to the 2000 Census).

182) In the 2004 general election, Rep. Rivera received the greatest number of votes from Precinct 6G, in which Hispanic persons constituted only 11.5 percent of the voting age population (according to the 2000 Census). Rep. Rivera received the fewest votes from Precinct 3C, in which Hispanic persons constituted 44.1 percent of the voting age population

a) Rep. Rivera received 47 percent of her total vote from the six precincts in which Hispanic persons constituted less than 30 percent of the voting age population (according to the 2000 Census)

63

b) Rep. Rivera received 40 percent of her total vote from the six precincts in which Hispanic persons constitute more than 50 percent of the voting age population (according to the 2000 Census)

2006 General Election
183) As in 2004, in 2006, Rep. Rivera received the smallest proportion of the precinct vote from Precinct 1C (54.0 percent), in which the 2000 Census reported that 88.6 percent of the voting age population was Hispanic.

a) In contrast, Rep. Rivera received the greatest proportion of the precinct vote from Precinct 1B (80.0 percent), in which the 2000 Census reported that 29.1 percent of the voting age population was Hispanic.
b) Rep. Rivera received at least 70 percent of the precinct vote from all of the 16 precincts with the exception of Precinct 1C and Precinct 6A in which 28.1 percent of the voting age population was Hispanic (according to the 2000 Census).
c) In only one (Precinct 6A) of the seven precincts in which less than 45 percent of the voting age population was Hispanic (according to the 2000 Census), did Rep. Rivera receive less than 70 percent of the precinct vote – 64 percent.
d) In only two of these 14 precincts in which Rep. Rivera received greater than 70 percent of the precinct vote, was the proportion of Hispanic persons of voting age greater than 70 percent. In only four precincts in which Rep. Rivera received greater than 70 percent of the precinct vote, was the proportion of Hispanic persons of voting age greater than 55 percent (according to the 2000 Census).

184) As in the 2004 general election, in the 2006 general election Rep. Rivera received the greatest number of votes from Precinct 6G, in which Hispanic persons constituted only 11.5 percent of the voting age population (according to the 2000 Census). Rep. Rivera received the fewest votes from Precinct 1C, in which Hispanic persons constituted 88.6 percent of the voting age population (according to the 2000 Census).

a) Rep. Rivera received 41 percent of her total vote from the six precincts in which Hispanic persons constituted less than 30 percent of the voting age population (according to the 2000 Census)
b) Rep. Rivera received 40 percent of her total vote from the six precincts in which Hispanic persons constitute more than 50 percent of the voting age population (according to the 2000 Census)

**Personal Reflections**
185)    Puerto Rican persons that I know maintain close ties with family and friends in Puerto Rico and frequently visit and stay with family for several weeks at a time. Indeed, my grandmother "retired" to Puerto Rico. To some extent, for many – particularly those born in Puerto Rico – their home will always be Puerto Rico – and only secondarily Springfield. I know that I will be bringing my one-year old daughter to Puerto Rico sometime soon – and frequently -- to meet her extended family. That is as important to me as ensuring that she grows up as fluent in Spanish as she is in English. I frequently encourage my father to speak in Spanish to his grandson, since I believe that it is

64

important to raise children who not only appreciate their heritage and cultural roots in Puerto Rico, but also the language that provides that necessary connection and facilitates a greater understanding of who we are and where our families comes from.

186) Because of the relative proximity of Puerto Rico to Springfield, we – unlike other immigrant groups – have not had to give up citizenship and seeing friends and family to come to the United States to live. For that reason it may be that some – particularly those born in Puerto Rico -- feel less "connected to" Springfield; less engaged in the politics. It is easy to believe that whatever happens in City Hall or in Boston or in Washington, D.C. will have very little impact on an individual's life – particularly for those who barely "get by." I am not convinced that whether an election is conducted from a single-member district or citywide or statewide or even countrywide makes that much difference; after all the greatest turnout in the Hispanic community – as is true among almost every other group or community across the country – is in the presidential contest in which the winner is not determined by popular vote.

187) As for my family, we vote in every election.   My mother always insisted that unless you voted, you were not entitled to complain about an elected official or the functioning of government. My mother, who has worked at the New North Neighborhood Council for at least 20 years  and Rep. Cheryl Coakley-Rivera's mother (previous director) and other staffmembers at the New North Neighborhood Council had for many years routinely called voters in the community prior to and during election day to encourage them to vote and to offer and provide transportation as needed.

188) I understand the desire among the Plaintiffs for a method of election that would ensure that someone is elected to the City Council who still lives in the North End/ Ward 1. It is very likely that some member of the family of every Puerto Rican in the City has lived in the North End at some period of time. The North End is a community of great importance to Hispanics in the City.  In fact, it is my desire to buy a house in Brightwood (Ward 1) – the neighborhood in which I grew up and in which my parents continue to live. Brightwood residents have a great sense of community and, contrary to generalization about the North End, it is among the "safest"  neighborhoods in the City. The problem is that no one moves or sells their house; you pretty much have to wait until a homeowner dies.

189) While I believe that the election of an individual currently residing in the North End would have great symbolic value to Hispanics,  I do worry that concentration on "representation" of persons in the North End ignores the fact that many, many Hispanic persons live elsewhere in the City and may have as strong a desire that someone elected to the City Council will represent their interests as do those persons residing in the North End. The Department of Justice's suit against the City reminded me, as Spanish Language Election Coordinator and staff supervisor for the Springfield Election Commission, of that fact and cautioned that these persons should not be forgotten by the City and by any process that relates to voting and access to the political and electoral process.

Signed under penalties of perjury, this 14 day of February, 2007.

Gladys Oyola

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing "Defendants' Affidavit of Direct Testimony

Gladys Oyola, Spanish Language Program Coordinator, City of Springfield" has been served on

the following counsel of record on the 14th day of February 2007, via the ECF system and will

be sent electronically to the registered participants as identified on the Notice of Electronic Filing

(NEF).

> Nadine Cohen, Esquire
> LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
> OF THE BOSTON BAR ASSOCIATION
> 294 Washington Street, Suite 443
> Boston, Massachusetts 02108
>
> Paul E. Nemser, Esquire
> J. Anthony Downs, Esquire
> Monica M. Franceschini, Esq.
> GOODWIN PROCTOR LLP
> Exchange Place
> 53 State Street
> Boston, Massachusetts 02109


> _D. E. B. Ros_
> Edward M. Pikula (BBO #399770)
> City Solicitor
> Deanne Bogan Ross (BBO #555407)
> City of Springfield
> Law Department
> 36 Court Street, Room 210
> Springfield, Massachusetts 01103

55582 VER. 5