UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARISE FOR SOCIAL JUSTICE;<br>¿OISTE?; NEW ENGLAND STATE-AREA<br>CONFERENCE OF THE NAACP;<br>REV. TALBERT W. SWAN, II;<br>NORMAN W. OLIVER; DARLENE<br>ANDERSON; GUMERSINDO GOMEZ;<br>FRANK BUNTIN; RAFAEL RODRIQUEZ;<br>and DIANA NURSE<br><br>      Plaintiffs,<br><br>v.<br><br>CITY OF SPRINGFIELD and SPRINGFIELD<br>ELECTION COMMISSION<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 05-30080-MAP<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY
BUD L. WILLIAMS, VICE-PRESIDENT,
SPRINGFIELD CITY COUNCIL**

I, Bud L. Williams, on oath, do hereby state as follows:

***Employment and Educational Background***
1) My name is Bud L. Williams and I currently live at 71 Joanne Road, Springfield, Massachusetts 01119 with my wife, Gloria, in the Pine Point neighborhood (Ward 5). I have resided at this address for the last 28 years.  Deposition of Bud L. Williams, in Arise for Social Justice v. City of Springfield, C.A. No. 05-30080-MAP (October 19, 2005)("Williams Dep."), at 15.  Declaration of City Councilmember Bud L. Williams, Memorandum Supporting Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, in Arise for Social Justice v. City of Springfield, C.A. No. 05-30080-MAP (August 1, 2005)("Williams Dec."), at 1.  I would estimate that currently the Pine Point neighborhood is about "40 percent minority," but was about 10 percent minority when my wife and I first moved there. Williams Dep. at 16. Neither my wife nor I experienced any difficulties with neighbors when we first moved to Pine Point and do not know of any other minority neighbors that experienced any difficulty.

2) I attended Trade High School (Putnam Vocational High School); Springfield Community College, Westfield State College, and UMass, where I received my Masters Degree in Education. Even though focus of a Trade High School education was the provision of education and experience appropriate for employment or apprenticeship in a particular "trade," I nonetheless, decided to pursue post high school education

3) Prior to October 1, 2006, when I retired, I worked as court probation officer at the Springfield District Court, located on 50 State Street and in that capacity I meet "thousands" of people who reside in all of the different neighborhoods in the City. Williams Dep. at 11-12. After college I taught at DeBerry, Homer, and Armory Street Schools and served as a substitute teacher in schools throughout the City. Ms. Gloria J. Williams, my wife, is – and has been for 10 years -- an elementary school principal at the Frank H. Freedman elementary school located on 90 Cherokee Drive. Prior to the time, she was a teacher in the Springfield School System.

***Community Associations and Familiarity***
4) I have lived in Springfield, Massachusetts all my life. He was born in the North End (Ward 1) in a family of 10 children, all of whom have remained in Springfield. Williams Dec. at 1. Williams Dep. at 13. At the time that my family and I lived in the North End it was "a melting pot. . .with poor Irish, poor Jewish, poor Germans, poor Blacks, and a few Hispanics. . . it was predominately. . .poor." Williams Dep. at 14. With urban renewal, my family, along with other "black families," were transplanted. We were "fortunate enough to move to Ward 4 which is on Bay Street," in Mason Square in the McKnight, Upper Hill, or Bay neighborhood. Williams Dep. at 13-15.

5) All of my eight brothers or sisters live in Springfield. Williams Dec. at 1. My brothers and sisters reside in the North End, Mason Square neighborhood and Pine Point.

6) I am a member and chairman of the Board of Trustees of the Mt. Zion Baptist Church, 368 Bay Street (Ward 4). Williams Dep. at 21. I was a member of and served on the Board of Trustees of the Urban League located on 765 State Street (Ward 4), as well as the Salvation Army Board of Community Directors at 840 Boston Road and the Minority Business Association. Williams Dep. at 21.

7) In addition, I was appointed to the Youth Commission by then Mayor Neal in the "late 80's," coached basketball for 30 years at the William M. DeBerry School at 670 Union Street – an association with the DeBerry School that began when I was 19 and I worked as a recreation director in the summer recreation program conducted at that school. I was among those responsible for Dunbar Community Center, 33 Oak Street (Ward 3). Williams Dep. at 22-23. I was a member of an organization that was called the Springfield Action Commission, which is now called Springfield partners and serves "poor citizens of Springfield." Williams Dep. at 26.

8) I continue to have significant and regular contact with persons residing in Ward 4 (in spite of the fact that I no longer live in Ward 4). "I go to church in Ward 4. My barber shop is in Ward 4. My mother-in law lives in Ward 4. My cousins live in Ward 4. My

tailor lives in Ward 4. Williams Dep. at 104. As explained, much of family still resides in Ward 4.

***Election History and Previous Campaign Experiences***
9) Prior to my first bid for office I worked "at an early age"on Paul Mason's campaigns for City Council. I worked "in the trenches just . . .holding signs, passing out literature" on the mayoral campaigns of Richard Neal and Judge Freedman and the state legislature campaigns of Ray Jordan and the congressional campaign of Richard Neal. In addition, prior to my bid for office, I worked on and was campaign manager of Morris Jones' campaign. Williams Dep. at 24.

10) I was encouraged to seek political office by Paul Mason "the father of black politics in the City of Springfield," as well as members of my church, "people in the community," young persons whom I coached in basketball." Williams Dep. at 26.

11) I was first elected in 1993, placing seventh in votes received. That was my third time competing for a position on the City Council. In 1991, I received 846 fewer votes than the incumbent who finished ninth. I was not discouraged by my failure to be elected in 1989 and 1991; few candidates are elected the first time that they run.

12) I have generally finished between third and sixth in total votes received in the six election contests in which I have competed since 1993. In every election I have "carried" Ward 4. It is also my belief that I receive significant support from white voters throughout the City and that my support among white voters has increased as compared to 1989 and 1991. I seek support from Hispanic and white citizens

***Projects and Committees***
13) In 1997, Mr. Williams sponsored the creation of a Race and Human Relations Subcommittee in order "to create a dialogue." Williams Dep. at 63. . By order dated October 20, 1997, an additional standing committee, composed of three members, was added to Rule 42: Civil Rights and Race Relations Committee. It was/is the purpose of the committee to "act as a conduit for information and an active sponsor for programs addressing issues within the City government and. . . among[] employees and citizens. The committee will suggest appropriate legal and social guidelines for a mediation process and will help define problems and direction in assisting individuals and organizations so that all citizens of the City will be part of the understanding process and will work in conjunction with boards and commission of the Mayor."

a) "We used to have a black Jewish coalition here, Rabbi Gerlin, years ago. We used to have Judge Freedman. . .I just felt that if we had a race relations committee, the City Council could entertain those race issues when they came up; police brutality, racial profiling. . . ." I strong believe that it is important to maintain a dialog among the various racial, ethnic, socio-economic groups in the City. Williams Dep. 63-64
b) One year, I believe that I served as the chair. Among the things that the subcommittee has addressed were the "Greer incident" and the ticketing of minority drivers in the City. I recall that I "called for racial sensitivity training in the police department." Williams

3

Dep. at 64-65. Even though the Police Department does not report to the City Council and the Police Commissioner is not appointed by the City Council, I believe that there has been some response to our suggestion and there has been some sensitivity training for police. I strongly supported retaining Dean Jack McDevitt, one of the "authors" of the Northeastern University study on racial profiling across the Stat, to ensure that inappropriate criteria are not used as a basis for traffic stops.

14) That the needle exchange program, which I currently support, has not been adopted is not the product of the racial make-up of the City Council or an issue as to which racial and ethnic groups are divided. There was "tremendous opposition in the black community from the clergy to needle exchange," which accounted for my earlier opposition to the program. Williams Dep. at 71. I feel that it would be inappropriate to "paint everyone with the same brush" and conclude that minority elected officials will necessarily support a needle exchange program or that white persons will not or that white persons do not support the program because it will assist Hispanic and African American persons, predominately. Williams Dep. at 70.

15) Among the projects in which I have been involved as a member of the City Council was "[n]eighborhood revitalization, . . .zone changes to special permits." Williams Dec. at 59. Recently the City Council approved a zone change that permitted a take-out window in a new Hispanic restaurant in Six Corners. It is my belief that it is this kind of assistance to minority-owned and run businesses that do the most to "create wealth in the minority community." Williams Dec. at 58-60.

16) I regularly meet with neighborhood groups and neighborhood councils. Williams Dep. at 102. [At the time of the deposition] I had just met with the Old Hill Neighborhood Council the night before with the purpose of assisting them in "build[ing] wealth and creat[ing] programs" that foster economic growth and "get[ting] blighted houses torn down," and generally adopting programs to "uplift the community." Williams Dep. at 102. Indeed, I regularly meet with various neighborhood councils or attend meetings. It has been a good way for me to ensue that I remain "in touch" with the various neighborhood councils and understand their particularized issues and concerns. I "try to work my way around the City." Williams Dep. at 104.

a) It is my opinion that the City Council's relationship with the various neighborhood councils is "good."
b) It is my view that the neighborhood associations play "a vital role." Williams Dep. at 104. I have always "used them as [the] eyes and ears [of] the City Council." Williams Dep. at 104. The neighborhood councils "bring a lot of issues before the council" in part because the central power and responsibility of the City Council is "zone changes and special permits." Williams Dep. at 104.
c) I am hesitant to consider any zone changes where the proponent has not first discussed the change with the appropriate neighborhood council. Williams Dep. at 104-105.

17) I believe that my record speaks for itself as to my commitment and responsiveness to the particularized issues and concerns of African Americans who live throughout the City and to the neighborhoods comprising Wards 3 and 4.

***Campaign Strategies***

18) My campaign strategy was to "[g]et all [of] my family involved first. Williams Dep. at 27. Indeed, my campaign manager (in 1989) was his brother-in-law, Earl Little. I "lit dropped every neighborhood in the City of Springfield," as well as had "standouts. I went to Mr. Williams explained that he "tr[ies] to work [his] way around the City." Williams Dep. at 104. "every event [that] I could go to whether it was a Jewish affair, an Irish affair, a black affair." Basically, I went out and met people. . Williams Dep. at 27. In my first bid for office, I "knock[ed] on doors, [went] to churches different ethnic affairs, coffee hours, stags, Jack and Jill parties. . .meet and sh[oo]k hands with people. Williams Dep. at 27-28.

19) The campaign strategy I employ has remained basically unchanged in the eight City Council election contests in which I have competed. I rely heavily on door-to-door campaigning in white, African American, and Hispanic neighborhoods. I have volunteers for "stand-outs" at which I try to make personal appearances. I do not recall ever receiving a negative reception from white persons or predominately white organizations. I am not aware of any minority candidates who have experienced any difficulty with having minority persons "standing out" in predominately white neighborhoods. My campaign workers have experienced no problems. Williams Dep. at 35.

20) I put more emphasis on "meeting people and hustling and doing all the events, and knocking on doors and going door-to-door" than on raising money. Williams Dep. at 27-28. I believe that "door-to-door" is still the most effective way to campaign

21) I began my fund raising efforts in 1989 "with my family." I had and still have $10 fund raisers, which I calls "people part[ies]." I usually have these $10 fund raisers at the Family Kitchen (Ward 4). I think that it is important to provide an opportunity for as many people as possible – regardless of their means, availability of recourses and time – to get involved in/ to feel committed to a candidate's campaign. While those $10 campaign contributions directly translate into votes; the $500. contribution from a business may not. Williams Dep. at 28-29.

22) In addition, in order to generate campaign funds, I "go through the phone book and. . .look at names [to whom I] send correspondence." Williams Dep. at 29. In this way, I targets lawyers and insurance people. Williams Dep. at 29-30.

23) I do not use my own money to run for office. Williams Dep. at 30. I do not believe in using my own money with which to campaign.

24) Even running as a non-incumbent in 1989, I believe that I raised an amount of money comparable to what other candidates raised. I do not think that I lost because I

5

had not raised enough money. Williams Dep. at 30-31. In my 2003 campaign, I recall having raised about $20,000-23,000.

25) I target my "base which is [the] black community." Williams Dep. at 31. I strongly believe that I have to get my "base first before I go anyplace else." Williams Dep. at 31. Essentially, I target African American and poor people, most of whom reside in Wards 1, 3, 4, and some of 5. Williams Dep. at 34-35. By and large, "the core" of my campaign is black people. Williams Dec. at 34.

26) Nevertheless, it is essential for a successful minority candidate to get white support; it is essential for a white candidates to get minority voter support. I know that I need white support in order to win. "Everybody needs everybody." Williams Dep. at 37. I do not believe that the method of election is discriminatory because minority candidates need to attract white support and white candidates need to attract minority support in order to win. It would only be a problem if minority candidates were not able to attract sufficient white support to provide for their election.

***White Support for Minority Candidates; Minority Support for White Candidates***
27) It is my view that "blacks tend to vote for blacks in a greater degree than whites vote for whites." Williams Dec. at 54. Accordingly, minority candidates have an advantage in that viable candidates are able to count on a fair proportion of the vote of those who are members of the same minority group as is the candidate; largely unknown white candidates cannot really count on anyone's votes. First-time white candidates with weak name recognition have just as much trouble attracting white vote as do African American and Hispanic candidates.

28) I believe that there are white candidates who would not have been elected had it not been for minority vote, specifically Brian Santaniello, Rosemarie Mazza-Moriarty, Timothy Rooke, Angelo Puppolo, Domenic Sarno, Timothy Ryan, and Daniel Kelly not received minority voter support in 2001; Kateri Walsh and Rosemarie Mazza-Moriarty in 2003. Williams Dep. at 38.

29) It is further my belief and experience that white voters will support a minority candidate, with whose qualifications, positions, and priorities they have become familiar through the kinds of campaign activities in which a successful candidate should engage. Williams Dec. at 2. In fact, I am unaware of any circumstances in which an articulate and qualified minority candidate, who made a concerted effort to attract white vote, who attended and participated actively in the "meet and greets" and campaign forums in predominately white neighborhoods, did not receive a fair portion of the white vote.

30) With regard to Ms. Lewis-Caulton's failure to be elected in 2001, I did think that Ms. Lewis-Caulton could have done a little more with regard to her campaign. Williams Dep. at 72. Campaign Expenditure record forms indicate that Ms. Lewis-Caulton left $4,660.24 in campaign funds unspent. Form CDF: Summary Report of Campaign Receipts and Expenditures; Massachusetts Office of Campaign and Political Finance.

a) It is my opinion that failure of African American voters to turn out cost Ms. Lewis-Caulton the election. Williams Dep. at 72-73; 76-77.
b) Ms. Lewis-Caulton would have been elected had African Americans provided significant support to Ms. Mazza-Moriarty and Ms. Walsh.
c) It is further my opinion that Ms. Lewis-Caulton would have been elected had she received more Hispanic support, although I do not really know whether Ms. Lewis-Caulton actively solicited Hispanic votes.
d) In my opinion, there is absolutely no reason that two or may three African American candidates could be elected to the City Council in 2007.
31) I do not believe that Mr. Robert McCollum's loss in the School Committee contest was due to any issues related to race. Mr. McCollum's refusal to return the school's computer system and the manner in which he handled that issue was foolish and cost him the support of voters in Springfield. Mr. McCollum was not the only incumbent defeated in that election. Mr. McCollum further did not campaign as vigorously as he should/could have. In previous elections Mr. McCollum had always received strong support in predominately white precincts. In my experience it is unwise to "take for granted" your support among any voters.

32) In 1997, I was not aware that Mr. Gumersindo Gomez did much campaigning or participated in any of the candidate forums, gatherings, "meet-and-greets" in neighborhoods outside of Ward 1.

***Minority Voter Turnout and Candidacies***
33) I do not think that my failure to get elected in 1989 can be attributable to a "concern about having two African Americans city councilors," but rather to the black community, who did not turn out to vote in sufficient numbers. Williams Dep. at 33. While I do not -- and would never -- deny the existence of racial issues in the City and across the country, I do not believe that I lost in 1989 and in 1991 because I was Black. I believe that it takes time for a candidate to become known by a sufficient number of persons to elect him in a citywide campaign. Few candidates are elected the first time that they run.

34) Lower rates of turnout among minority voters is one of the things that minority candidates must consider in targeting a sufficient number of voters to ensure his election.

35) It is my view that African Americans in the Northeast where there were never restrictions on the vote simply do not turnout to vote in local, state, or federal elections, while African American turnout in the South is significantly greater where there were many restrictions on the vote and other forms of voter intimidation. Williams Dec. at 55.

36) Minority persons have not been discouraged to run because they view their electoral and campaign burden more onerous that white candidates. Williams Dep. at 80

***Support for Current Method of Electing Members to the City Council***
37) I have not and do not favor or support a change in the method of election. It is my belief that at-large elections do not dilute the voting strength of either African American or Hispanic voters. In 1999, two African Americans (including myself) were elected to

7

the City Council and I see no impediment – except for hard work – that would prevent at least two African Americans serving on the City Council throughout the years to come. It is my belief and experience that white voters will support a minority candidate, with whose qualifications, positions, and priorities they have become familiar through the kinds of campaign activities I have listed. Williams Dec. at 2.

38) Most of the City's mayors have first been elected to the City Council. The ability to attract votes from members of all of the various racial, ethnic, and religious is essential for any candidate with mayoral aspirations. The election of candidates from wards or single-member districts will not provide the opportunity for minority candidates to establish a base of support sufficient to enable him to compete for the Office of Mayor, in which much of the power and authority to govern the City is vested. Williams Dec. at 2-3; Williams Dep. at 90-93. Even if a method of election were adopted that provided for the election of candidates from only single-member districts and therefore no candidate, incumbent member of the City Council, would have a citywide advantage, minority persons would still encounter more difficulty in mounting a citywide campaign, in part, because of the fact that the turnout in predominately white wards has been greater than the turnout in predominately minority wards and white candidates would have access to a longstanding citywide political organizations and voters with greater political involvement. Williams Dep. at 94. Where there is only a single-member district method of electing members to the City Council, School Committee and Massachusetts General Court, African Americans and Hispanics might not develop or maintain a citywide political organization where only a few districts provided an opportunity to elect Hispanic and/or African American candidates.

39) It is my belief that the adoption of a single-member district method election will result in an even more powerful Mayor, since there will be no members of the City Council with the kind of citywide support that the Mayor will be able to marshal.

40) It is my understanding that various localities are "doing away with [single-member] district [elections, because they] polarize[] communities." Williams Dep. at 56. Under a single-member district method of election, minority persons are no longer "part of the fabric" of society. Minority neighborhoods and viewpoints are more easily dismissed where only one or two members of multi-member governing body represent their interests. Mr. Williams explained: "Just like Roxbury and Boston. . .when a councilor from Roxbury calls a press conference nobody shows up because he doesn't represent the city." Williams Dep. at 56.

41) I believe that single-member districts will enforce a separateness and a sense that what happens in the minority neighborhoods does not affect and/or does not need to concern those residing in predominately white neighborhoods, as well as a view that what happens in the minority neighborhoods does not affect the city as a whole. Williams Dep. at 58. This is particularly detrimental in Springfield, a city in crisis with limited resources.

42) I believe, in face of the growth of the minority population in the City, that the adoption of ward-type representation will not benefit the African American or Hispanic voters and may only secure a white-majority membership on the City Council long after minority persons are able to elect a majority of the Springfield City Council. Williams Dec. at 3. In essence, I believes that the "politics" and the steady increase in the proportion of the population who are "brown," will "take care of the system," and provide minority persons with as many electoral opportunities as there are viable, qualified minority candidates. Williams Dep. at 96.

43) Another reason that I do not support a all single- member district method of election, is that all African American do not live in Ward 4. In fact, more than half of the African American population lives outside of Ward 4. I would further expect that even more African Americans will live outside of the Ward 4 in the years to come as the neighborhoods become more and more integrated. An all-single-member district method of election would deny to minority voters the opportunity to vote for and be represented by minority candidates residing in a district/ward other than the ward in which he lives. Williams Dep. at 95; 107. In addition, the adoption of a single-member district method of election would "water down" the at-large voting strength of minority persons who live throughout the City, but not in sufficient concentrations to provide for single-member district electoral opportunities. Williams Dep. at 98.

44) It is my belief that a single-member district method of election would create "pothole politics" and create "ward bosses" through whom "everything has to filter." Williams Dep. at 106-107. Prior to 1961, if a citizen needed to "do anything [he] must go through [the ward bosses]." Williams Dep. at 107. "Ward representation" fostered "bickering between different councilors" and "pork barrel politics," which was based upon the exchange of support for one councilor's project for the support of another councilor's project and the refusal to support one councilor's project if that councilor had not supported the project of another councilor. Williams Dep. at 107. This "stagnate[d]" the City where elected officials were only concerned about "their particular voting populations, as opposed to being worried about the total city." Williams Dep. at 107. I have real concerns that what happened to the pre-1961 city government would "resurface" with the adoption of a single-member district method of election. Williams Dep. at 108.

45) Finally, I believe that most of African American and Hispanic persons who live in Springfield share his beliefs regarding the City's at-large method of election and do not support Plaintiffs claims. Williams Dec. at 3. Mr. Williams arrived at this view by "talking to people in the streets and supermarkets and coffee shops, church[es], wakes, stags, birthday parties, cookouts." Id.

46) I am also concerned that the various neighborhood councils will be rendered powerless and subordinate to the political organization of the councilmembers in whose districts they are located. A nine-member districting plan will necessarily split neighborhoods among and between districts and undermine a very important aspect of Springfield government and the ability of individuals to directly participate in it.

Williams Dec. at 3. Williams Dep. at 105. If there was a single-member district method of election, I believe that there would be some "turf problems" and little need for the kind of "advocacy" these neighborhood councils provide. Williams Dep. at 105-106.

47) I further believe that the districting plan proposed by the Plaintiffs will dilute the voting strength of African American voters and it will secure white control of the City Council long after white voters have lost their numerical superiority. I believe that the current method of election provides for more opportunities than does Plaintiffs' proposed plan and does not artificially limit the number of African American electoral opportunities even as the proportion of African Americans in the City increases. For that reason, I strenuously object to it.

48) The neighborhood councils have provided an excellent means for more persons to participate in their government and to make decisions about and have a role in the development, growth, vitality of their respective neighborhoods. I am also concerned that the various neighborhood councils will be rendered powerless and subordinate to the political organization of the councilmembers in whose districts they are located. A nine-member districting plan will necessarily split neighborhoods among and between districts and undermine a very important aspect of Springfield government and the ability of individuals to directly participate in it.

49) Finally, I believe that most of African American and Hispanic persons who live in Springfield share my beliefs regarding the City's at-large method of election and do not support Plaintiffs claims. Of the Plaintiffs who have remained closely connected to and reside in the City, their commitment to so-called "ward representation" is genuine – although misguided – and thirty years too late. Given timing of this challenge – when minority persons are on the brink of reaping all of the benefits that an at-large method of election provides to the group with the most members -- I have wondered whether there are other citizens behind this move than those who have brought this challenge.

50) I do not favor or support a change in the method of election as an improvement over the current method of election. Williams Dec. at 2; Williams Dep. at 85. It is my belief that at-large elections does not dilute the voting strength of either African American or Hispanic voters. Williams Dec. at 2. My past and very recent support of the 8-5 method of election was "[i]n the spirit of compromise," which would not necessarily provide for more electoral opportunities to minority persons. Williams Dep. at 85-86; 88-89.

Signed under the penalties of perjury this 13 day of February, 2007.

*Bud L. Williams* (signature)
Bud L. Williams

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing "Defendants' Affidavit of Direct Testimony, Bud L. Williams" has been served on the following counsel of record on the 14th day of February 2007, via the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Nadine Cohen, Esquire
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW OF THE BOSTON BAR ASSOCIATION
294 Washington Street, Suite 443
Boston, Massachusetts 02108

Paul E. Nemser, Esquire
J. Anthony Downs, Esquire
Monica M. Franceschini, Esq.
GOODWIN PROCTOR LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109

_____
Edward M. Pikula (BBO #399770)
City Solicitor
Deanne Bogan Ross (BBO #555407)
City of Springfield
Law Department
36 Court Street, Room 210
Springfield, Massachusetts 01103