UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARISE FOR SOCIAL JUSTICE; ¿OISTE?; NEW ENGLAND STATE-AREA CONFERENCE OF THE NAACP; REV. TALBERT W. SWAN, II; NORMAN W. OLIVER; DARLENE ANDERSON; GUMERSINDO GOMEZ; FRANK BUNTIN; RAFAEL RODRIQUEZ; and DIANA NURSE | ) ) ) ) ) ) ) ) Civil Action No. 05-30080-MAP ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| CITY OF SPRINGFIELD and SPRINGFIELD ELECTION COMMISSION | ) ) ) |
| Defendants. | ) ) ) |

**DEFENDANTS' AFFIDAVIT OF DIRECT TESTIMONY
THOMAS J. YARSLEY, DESIGNER OF BOUNDARY SCHOOLS
ZONING PLAN, SPRINGFIELD PUBLIC SCHOOL SYSTEM**

I, Thomas J. Yarsley, on oath, do hereby state as follows:

1) My name is Thomas J. Yarsley and I have been retained by the Springfield School Committee for the past thee years, in part to "craft a plan for re-formulating the zoning schemes used for students' school assignments and transportation eligibility determinations." Boundary Schools Zoning Plan, Revision A (*date*)("Boundary Plan"), at 5. I am an independent consultant. My germane background is in Systems design, including but not limited to software.

***Objectives, Constraints, and Definitions***

2) School Committee goals were to i) provide equitable resources to every school in order to ensure that we deliver a high-quality educational program in every school in Springfield; ii) attain an enrollment – in every school -- that reflects the ethnic balance of the entire city's student population, to the greatest practicable extent; iii) lower transportation costs; iv) maximize walkers / minimize riders; v) remove uncertainty regarding school assignments and increase parental involvement; and vi) decrease middle-class flight from the city's schools. Id. What was given or an unalterable

existing conditions/constraints were school locations, school enrollment capacities, non-homogeneous geographic ethnic distributions (residences), and non-linear ethnic enrollments across the city-wide grade structure.

3) Among conflicting goals were "deterministic school assignments" -- where a student lives determines where he goes to school -- versus "probabilistic school assignments" -- assignment based upon factors that include one or more elements of probability or chance. Likewise, purely proximate schools (within safe walking distance) could be in conflict with ethnic balance enrollment targets. Biasing the Plan in favor of ethnic balance targets could result in exclusion of proximate potential enrollees, in order to permit/attain enrollment of non-proximate ethnicities.

a) Mitigations of these conflicts included satellite school zones (deterministic but not proximate) or limited elements of parental choice, which might include a local school (deterministic and proximate) or "partner" school (deterministic and not proximate) and magnet schools (probabilistic; may or may not be proximate).
b) Since not all of Springfield's neighborhoods are ethnically heterogeneous, a strict proximity-enrollment scheme might not always result in the desired ethnic balance within each school's enrollment. Consequently, conflicting goals were resolved in a manner that effected greater ethnic diversity within each school, than would be achieved under a purely proximate Plan.
c) The re-zoning boundary-design process that I designed in collaboration with Dan Warwick, Assistant Superintendent, attempted to address – and I believe resolved – these conflicting goals and constraints. Id. at 5-6.

4) The ground rules for designing the proximate elements of a school zoning plan were that the existing student transportation policies of the Springfield School Department must be respected and could not otherwise be altered, i.e., the rules that the Springfield School District had established as to how far a student would be required to walk to school, based upon school-grade and the route limitations of such a walk, could not be – and were not – altered; . Id. at 6.

5) The desired outcomes were as follows:  School assignments would be deterministic – where a student lives would determine which school that student is eligible to attend, regardless of that student's ethnicity.  School zones would be designed so as to maximize the number of students who would be eligible to attend a *proximate school* – one that is within safe-path walking distance of their respective transportation addresses.  Outcomes were intended to minimize the extent of – and the cost of – student bus transportation. Finally, school zones would be designed so as to produce ethnically-balanced school enrollments, to the greatest practicable extent. Id. at 7.

### Prior School Assignment Procedure and Practice
6) Prior to the Springfield School Committee instructing the Springfield School Department to produce a new school-assignment zoning plan, a "Controlled Choice Plan" established the method and criteria by which students were assigned to schools throughout the City.  In 2004 the City was divided into three attendance zones.  Prior to

55643

that, the City had been divided into six attendance zones ("Limited Choice Plan"). Parents of students were asked to rank-order their preferences of the schools within the zone in which parents/children resided. However, individual students were assigned to schools on an ad hoc basis, with racial/ethnic identity being a principal controlling factor. Students would be assigned to parent-preferred schools only to the extent that parent preferences were compatible with the schools' individual needs with respect to available seating capacity and to the racial/ethnic makeup of the cohorts at the respective schools. Thus, two next-door-neighbor applicants could seek enrollment at the same school; at the same time. Their respective chances of being assigned to their preferred schools would be a direct consequence of their respective racial/ethnic identities.

In spite of the practices described above, many schools were far from achieving established goals of "racial balance." Ten of 31 elementary schools failed to achieve racial balance targets under the 3-zone Plan. The Boundary Plan design reduced that number to eight. In addition, 75% of the students were bussed to schools; some students were subject to bus rides longer than one hour in duration (each way), in a City that is only 7.4 miles East to West and 6.2 miles North to South, and where the longest straight-line distance between any two locations is 8.2 miles. The annual budget dedicated to (non-special-needs) transportation was as much as $8 million, as recently as 2003-2004. As indicated by declining school enrollments, families of school-age children were leaving the city. An often-cited reason for this "flight" was that Springfield's previous method of school assignment provided no certainty regarding the school(s) to which their children would be assigned. Parents/families were unable to exercise any *real* school choice by using the method most common to communities throughout the United States: by moving to a specific neighborhood to take advantage of its proximity to certain schools/to ensure that their children would be able to attend preferred (and often) neighborhood schools.

7) Among some parents of Springfield, there was a reluctance to change schools. Most evident among African American families, there was such widespread affinity for "busing" that it defensibly could be characterized as an association that could be paraphrased thusly: "bussing is the best way to ensure equal-quality (i.e. 'better') schools – and thus equal educations – for all students." There also was a concern that under a new school assignment scheme, the burden of busing would fall disproportionately upon minority students. As the evidence shows, that concern was completely unfounded.

Equality issues aside, some parents actually found attraction in lengthy school bus rides as a manifestation of pre-school-day and after-school-day child care. This phenomenon came to be characterized as "multi-million-dollar, yellow-rolling-daycare." Paradoxically, because transportation home was provided only immediately after the close of school, students with no alternative transportation home were not able to take advantage of assigned-school after-school-hours programs that provide children with academic and social enrichment – in lieu of mere supervised time away from home in a traveling vehicle. Adoption of an assignment paradigm that emphasizes assignments to predominately local schools would permit children to attend after-school programs before

walking home for dinner – it would be a triple win: daycare, enrichment, and lower transportation costs.

***Design Methodologies***

8) At the time that the School Committee tasked the Springfield School Department ("Department") with producing a new school-assignment zoning plan, I already was engaged in work with the Department's Student Transportation Group, to computerize the locating and transportation-routing of all students in the City. The Department's Re-zoning Task Force elected to employ those existing resources – including myself – in the creation and execution of the re-zoning design process. The resultant process utilized a Prospective Population ("ProPop") student database that was based upon the known current addresses of actual, enrolled students, and was configured to represent the grade-specific enrollment demands of those real students for the 2005-2006 academic year. Id. at 7.

a) The process of re-zoning the city requires having good student address data and racial demographic data, so that one can locate every student in the system, on an electronic map of the city. This in turn requires reliable address data and a reliable e-map. Id. at 8.
b) The population database that was assembled to represent the next year's prospective student body was created by taking the 2004-2005 student body, "promoting" each student by one year, excluding the "graduated" seniors, and duplicating the kindergarten population for the subsequent year, but with unique student identification numbers. Id. It is very important to understand that for the purposes of re-zoning, these ProPop database students represented addresses in the city – not individual students in need of assignment. The resultant re-zoning would associate addresses with schools; it would not associate students with schools. Students would become associated with (assigned to) schools exclusively as a consequence of living at a given (school-associated) address.

9) In determining which ProPop students would be walk-eligible to which schools, no new schools were considered in this plan. After matching each un-enrolled student's grade to the grade offerings of each school in the City, each student's address was matched to one of the unique addresses in a Distance Master Table, which provided a computation of the safe-walking distances from each unique address to each school in the City. These values were compared in a table of allowable walking distances (by grade/school structure), and determinations were made – for each school – with respect to whether or not that student was eligible to walk to that school. The total number of grade-applicable public schools to which a student would be walk-eligible was defined as that student's "FlexFactor." Some students were walk-eligible to several schools; a few were not walk-eligible to any. Id. at 9.

10) Beginning with the students with the lowest non-zero FlexFactor, students were designated as candidate enrollees for one school, based upon i) the enrollment demands of the school; ii) the ascending rank-ordered safe-path walking distance of the potential enrollees; and iii) the ethnicity of the potential enrollees. In this way, no student who otherwise could walk to a school would be "bumped" from that school's candidate enrollment population by another student who lived even closer to that school, but who

also had the flexibility to walk to yet another school. Id. at 9. This process step maximized the number of students who became designated as candidates to attend some school that was within walking distance of their Transportation Address.

a) The process required that students with the lowest FlexFactors were designated first, because if they were not ultimately assigned to their only walkable school, they would need to be bussed to their assigned school. "Thus, the "more-flexible" students had to "wait in line" to receive their candidate school designations, with the most-flexible students designated last.

b) The objective of this step was "don't turn any could-be walker into a bus-rider." Id.

c) The process does have a significant limitation: it is geographically symmetric; it yields candidate zones that exhibit the same maximum walk-in distance in all directions to/from the school. Although it serves as a useful starting point for school-zone boundary definition, real-world boundaries require that their design process exhibit the flexibility to include asymmetric configurations. Such geometry permits adjacent boundary zones to remain fully contiguous, thus preventing the formation of interstitial between-zone "ribbons" of non-walk students.

Thus, FlexFactor process had to be "abetted by an accommodation of the constraints of geography." Id.

11) The Parent Information Center supplied an enrollment capacity figure for each school. Existing enrollment data was captured and analyzed.

a) "Various ethnic designations were consolidated; the ProPop student ethnic data fields were appended to reflect one of three values: Hispanic, African American, or white. The data was aggregated by grade level, city-wide, with the "goals" for the respective proportion of the student population that would/should be members of each of the three ethnic/racial groups provided as a proportion of the total student population.

b) An aggregated grade-structure calculation yielded the "percentage-makeups" of the K-5, K-8, and 6-8 schools, city-wide. These figures became the ethnic enrollment 'targets' for every school, by its grade structure." Id. at 9-10.

c) "City-wide student enrollment was compared with city-wide enrollment capacity." A target "load factor" of 95 percent of asserted capacity was derived, and it became an initial enrollment target." Id. at 10.

d) "Each participating school's asserted capacity was multiplied by this target load factor; the derived value comprised the "Pan-Ethnic Draw" for that school, i.e., the desired number of students of all ethnicities, combined." Id.

e) "This PanEthnicDraw value then was multiplied by the three earlier-derived ethnic percentage-makeup numbers. This yielded three enrollment targets for each school – one for Hispanics; one for blacks; one for whites. (Actually, this operation was performed on a grade-by-grade basis.) These numbers comprised the three Ethnic Draw values for each school, respectively. . . [and] represent[ed] a 'perfect' school enrollment [of] 95 percent of asserted capacity, and an ethnic makeup that [wa]s exactly reflective of the city-wide ethnic makeup of the cohort group of the sample population." Id. at 10.

f) "Later in the process, the within-zone projected enrollments were benchmarked against these *optimum* values expressed in this Demand Table. An arithmetic variance of

55643

± 15 percent from 'optimum' was set as the target enrollment tolerance." This was a "critical design-point" of the Plan. Schools whose projected enrollments fell within the allowable tolerance limits of the optimum target values were determined to be "in compliance" and the others were determined to be "not in compliance." Id.
g) Essentially, this [wa]s "an ethnic-balance-sensitive, school-capacity-driven, enrollment-'pull' paradigm." Id.

12) The matching process began with consideration of the schools in which the population of within-walking-distance potential enrollees represented the highest multiple of their capacity-limited enrollments. These schools were the ones whose boundaries were required to be limited by enrollment capacity, but not by walk-in distance limitations. For example, Brookings, with 5,216 walk-eligible K-8 students, and a capacity of only 535 students, is a good example of a school in which the guaranteed-enrollment proximate boundary must be made quite small, so as to avoid over-enrollment. Id. at 10.

a) A custom software application was written, to make use of the FlexFactor values and the EthnicDraw values and was then used to designate students as candidate enrollees, until the schools' enrollment targets were achieved. "The resultant 'straw-man enrollments' were used to define first-order geographic parameters for prospective school zone boundaries. These distance-symmetric boundaries were drawn on the Department's e-map." Id.
b) Additional boundaries were drawn, representing the outer limits of the maximum-walkout-distance "tree diagrams" for each school. Considered in pairs, the two sets of boundaries represented minimum/maximum geographic possibilities for each prospective "Proximate school zone." Id. at 11.
c) The boundary lines were adjusted, to eliminate overlapping areas between adjacent boundaries and to ensure that they yielded populations that were within the respective schools' enrollment capacity limits. "As the boundaries were adjusted, they were polled continuously, to track the ethnic makeup of the bounded populations." Id.
d) "Maintaining the contiguity of adjacent boundary zones was of critical importance; failure to do so would [have] result[ed] in the creation of meandering, ribbon-like areas of ride-eligible students, between and among the walk-eligible proximate school zones. Respecting the existence of designated pedestrian streetscape hazards was another critical factor in locating the boundary lines." Id.
e) In addition, entire street segments were included in one zone or another; boundary lines were not permitted to split streets at non-intersection locations. This resulted – in my opinion – in clearly understandable boundary definitions that were not ambiguous, and that respected and maintained contiguous neighborhoods to the extent practicable. Id.
f) After resolving all of these proximate (near-to-the-school) boundary issues, many un-assigned areas remained on the e-map – as was anticipated. Indeed, the FlexFactor-determination process identified 935 K-8 students whose transportation addresses were not within the maximum-allowable safe-path walking distance of any grade-appropriate participating school. These students would have to be bussed to some school under any circumstances. Id.

55643

g) Additionally, school capacity limitations also prevented the enrollment of some students in any proximate school. In those cases, these students' addresses were added to the "must-be-bussed" pool regions on the e-map. Id.

h) The must-be-bussed regions were divided into contiguous "ridership areas" ("RA"). Each RA was designed with the same boundary constraints, as described above, to yield a target population of 56 students (±14), i.e., the desired passenger load for one full-size school bus. Each RA was characterized by ethnicity, and its data was appended to a school enrollment Demand Table. Id.

i) "Next, the various RAs were matched with schools whose proximate zones failed to yield their target enrollment limits. This process began with the schools that needed the fewest additional students; these schools often required just one busload, so the ethnic makeup of that RA group needed to be a close match for the ethnic demands of those schools. The process progressed, through schools needing greater and greater numbers of students." Id. "Wherever possible, multiple adjacent RAs were assigned to the same school. . to avoid 'buckshot zoning' and to permit greater future flexibility in designing transportation for the aggregated satellite school zones." Id.

13) After completion of this iterative process, the resultant boundaries – and their consequential school assignments – [represented] the Plan at "full penetration," or "what things would look like if it were implemented in September without any Legacy ('grand-fathering') policy," [as well as] what things would look like after the expiration of any Legacy policy." Id.

a) In some instances, this process yielded fully-populated schools that achieved ethnic balance targets and where 100 percent of the schools' enrollments was comprised of walk-eligible students. Id.

b) In other instances (excepting Magnet schools) in which "the proximate boundary did not yield the desired low-limit quantity of any of the three ethnic-balance groups, one or more satellite boundary zones were created, for the purposes of allocating school capacities and of ensuring greater ethnic diversity." Id. Unlike the "controlled choice" plan, however, while children might be bussed to a school some distance from their home, all neighborhood students age-eligible for a particular school would be bussed to the same school – irrespective of the race of the student.

14) The initial (2005-2006) Boundary Plan report included a map for each school, showing its proximate zone and its satellite zone(s), if any. Tabular data was incorporated, showing the schools' projected enrollments, disaggregated by ethnic group. For purposes of comparison, the schools' current ethnic enrollment data was presented with the projected numbers. The tables included the numbers and percentages of walkers and riders anticipated under the new Plan, both by ethnic group and as disaggregated data. Id. at 21-117.

*"Highlights" of the Plan*

15) "The Plan does not alter any existing School Department transportation-eligibility rules. All changes in individual student ride-eligibility status are a consequence of altered school enrollment assignments." Nevertheless, under this Plan, the vast majority

of Springfield's public school students attend a school that is within safe-path walking distance of their homes. Id. at 15.

a) Under this Plan (2005-2006), 77 percent of all elementary school students walk to a proximate school; 23 percent of all students ride to school. These numbers can, however, change as a consequence of the geographic distribution of magnet school enrollees. Because the entire available magnet school enrollment capacity comprises only 5 percent of the asserted capacity of the 30 Plan-participating elementary schools, the "number change" is not/would not be significant. "Further, the Plan double-accounts for transportation for the full complement of 634 magnet students. Thus, actual savings have been greater than – rather than less than – those presented in the tabular data. Id.

b) Under this Plan, 74 percent of all middle school students walk to a proximate school; 26 percent of all students ride to school. Those numbers can change, in part as a consequence of the geographic distribution of special program enrollees. The entire available special enrollment capacity comprises about 15 percent of the asserted capacity of the 6 Plan-participating middle schools, and, therefore, the "number change" is not/would not be significant. Again, because "the Plan double-accounts for transportation for the full complement of 898 magnet students, . . . [the] actual savings are greater than – rather than less than – those inferred from the tabular data." Id.

c) In my opinion, "this Plan is extraordinarily equitable in its effects upon walkers and riders of each ethnic group. The variances between the percentages of actual walkers versus the groups' target percentages are 1.0 percent, 1.3 percent, and 2.3 percent for Hispanics, blacks, and whites, respectively." In other words, no ethnic group is disproportionately targeted for walk/ride treatment under this Plan." Id.

Ethnic balance considerations under the new Plan

16) In addition to the fact that 13 of the 25 Plan-participating non-magnet elementary schools never again would see even a single school bus under this Plan, the ethnic balance elements of the Plan "are impressive in their own right." Id. at 15.

a) "Under the present 3-zone Controlled Choice Plan, 10 elementary schools were out-of-compliance with the ±15 percent tolerance limit as compared to the proportion of the total population of the three ethnic groups considered by the Plan. Under the new Plan, however, that number was reduced to 8." Id at 15

b) The 3-zone Controlled Choice Plan was, however, designed to support a tighter ±10 percent tolerance limit. By that measure, 21 of 31 elementary schools were out-of-compliance" under the "Controlled Choice Plan" goal. Even though the new Plan was designed to a ±15 percent tolerance, the new Plan fares better than did the former plan pursuant to a ±10 percent tolerance analysis: only 14 schools are out-of-tolerance by that stricter measure – a 33% improvement over the 21 of the former Plan. Id

c) At the middle school level, both the former Plan and the new Plan demonstrate full compliance with the ±15% tolerance. Id.

17) "Thus, concerns that a 'neighborhood schools-like' scheme would result in segregated schools have proved to be unfounded." Id., see id at 21-117.

School Bussing Reductions Under the New Plan

18) At the elementary school level, the number of regular school busses dedicated to transporting students to the 30 Plan-participating schools were anticipated to be reduced from 118 to 62 under this Plan, which would have resulted in a "net savings" of 56 school busses. Id. at 16. At the middle school level, the number of regular school busses dedicated to transporting students to the six Plan-participating schools would have been reduced from 81 to 42, resulting in a net savings of 39 busses. Id. at 16.

19) "At first glance, the disparity in the number of busses required at the elementary and middle school levels could lead one to conclude that the higher of the two figures would apply to fleet needs, thus limiting capturable savings – in essence, the middle school tier would be burdened with surplus bus capacity, in order to ensure ample capacity for the elementary school tier. But a declaration of – and a resignation to – 'excess' capacity fails to consider the Plan's consequent alternatives that are available to Springfield at the high school tier of service." Id.at 16-17.

a) Specifically, since Springfield had utilized the Pioneer Valley Transit Authority (PBTA) bus system to provide transportation services to 1,511 students or 27 school bus loads, it has been possible to deploy[] the 'excess' capacity of the middle school tier, against the PVTA-contracted requirements at the high school tier. Thus, instead of paying for idle bus capacity on the high school and middle school tiers, the yellow school busses have been put into multiple-tier service, and the resultant savings in fees presently paid to the PVTA have been captured by the city.

b) At a contract fee of $275 per bus, per school day, a 60-bus reduction of the fleet of full-size yellow school busses would result in a $2,970,000.00 annual savings to the city. A much more modest 40-bus reduction would yield a $1,980,000.00 annual savings. These savings, further, did not account for potential consequent reductions in fees paid to the PVTA, which had cost the city an average of $454 per student, per year or a total of $685,994.00 per year.

c) Some of the savings in transportation costs were lost when the School Committee decided that it was in the best interests of high school students to begin the school day later based upon studies that had purported to demonstrate that adolescents were not as productive or intellectually-engaged earlier in the morning. Nevertheless, in the 2005-2006 school year, the City saved $1.8 million in non-special-needs school busing costs.

***Implications of the Legacy Policy for 2005-2007***

20) Initial projection of student enrollment profiles and consequent transportation cost savings – considered under this Boundary Schools Plan -- were those that would have been obtained under the "full penetration" of the Plan. The School Committee – as anticipated – adopted a Legacy Transportation Policy available to students for a period of two years (2005-2007).

21) In 2004, a Legacy Policy had been established. It provided for continued matriculation and transportation services for students whose school assignments had been made under the previous 6-zone Limited Choice Plan. Specifically, a student who was ineligible for transportation services under the 2004-2005 3-zone Plan, but who had been

55643

eligible for such services under the previous 6-zone Plan, remained eligible for those services, provided that the student did not change schools, and that the student did not change his/her transportation address.

b) Under the 2004 policy, however, no bus transportation eligibility existed for non-conforming student school assignments, as a consequence of a parental enrollment request that was the result of sibling enrollment considerations. Thus, where an older sibling's transportation-services status to a given school was "grand-fathered," a newly-enrolled younger siblings had no ride-eligibility to that same school. As a result, a great many unauthorized-ridership situations existed across the system largely based upon the fact that the boarding of busses was not restricted, because students do not carry identification cards and busses continued to follow their old routes to far-away destinations.

22) As a corollary to the Boundary Plan, in 2005 the School Committee adopted two "Legacy Policies." The first is a "Legacy Enrollment Policy." It provides for the continued enrollment of "Legacy students" in instances where:

- the student's parent(s) expressed in writing by May, 2005, their desire to have their child remain enrolled at his/her earlier-assigned "Legacy school"
- the student continuously remains enrolled at his/her Legacy school – i.e. s/he does not withdraw for any reason, nor does s/he become promoted to a grade not offered at that school
- the student remains resident at the street address at which s/he was resident – and which was captured in the official school department student record database – at the end of the 2004-2005 school year

The second is a "Legacy Transportation Policy." It provides for continuation of bus transportation through the end of the 2006-2007 school year, provided that:

- the student remains eligible under the Legacy Enrollment Policy, above
- the student was eligible for transportation from their Legacy address to their Legacy school, under the previous school assignment plan, at the end of the 2004-2006 school year

a) Children in grades K through 8 who are registering for school for the first time or who are returning to school after having un-enrolled for any reason are assigned to their Boundary school – regardless of the school assignments of any siblings – excepting students who:

- Are assigned to a specific school, based upon programmatic considerations (low-incidence SPED, ELL, etc.)
- Have an older sibling who:
  - lives at the same address as the student seeking assignment
  - is assigned to a Magnet school
  - will remain assigned to that Magnet school at the time that the student seeking assignment first will attend that same school, if so assigned

  Such students may be "pulled in" to the older sibling's Magnet school, provided that Magnet-allocation seating space is available at that student's grade level

b) Accordingly, over the 2005-2007 school years, the City was required to transport as many as 4,000 students in excess of those who otherwise would have been walk-eligible to attend a neighborhood school.

c) With the expiration of the Legacy Transportation Policy, parents whose children remain eligible under the Legacy Enrollment Policy will become responsible for providing any and all transportation to/from their children's Legacy schools – effective at the end of the current 2006-2007 academic year. Each such parent was identified and – as a condition of their child's continued enrollment at his/her Legacy school – was required to sign an Agreement that states:

- I and my child, <StudentName>, still reside at <LegacyAddress>
  (If this is not your address, contact the Parent Information Center immediately, at 413-787-7276)
- I want <StudentFirstName> to continue to attend <SchoolName> after the end of the 2006-2007 academic year (if <he/she> remains eligible to do so)
- I understand that school bus Legacy transportation will not be available to <ShortName>, beginning in September of 2007, so if my child currently is eligible for such transportation,<he/she> will not be eligible in September.
- As a condition of <StudentFirstName>'s continued enrollment at <ShortName>, I will ensure that <he/she> will arrive at <SchoolName> on time, each school day, and that <he/she> will depart <SchoolName> on time, each day, and I will be responsible for providing all transportation for my child
- I understand that if any of the above conditions are not met, <StudentFirstName> will be re-assigned to <his/her> Boundary school

23) As a result of the Legacy Policies, the city has continued the service of 35 excess buses at a two-year cost of $3.5 million – compared to what would have been expended if the Boundary Plan had been put in place without any Legacy transportation policy.

24) On a positive note, the problem of unauthorized ridership that attended the 2004 legacy policy has declined precipitously under the Boundary Schools Plan, largely because the pattern of existing bus routes has been altered drastically, and busses are not routed to neighborhoods in which there are no eligible riders.

*Results*
25) The Plan, as designed, achieves the stated objectives of the School Committee. It is a deterministic ("guaranteed enrollment") school-assignment plan that balances the often-conflicting constraints of proximate ("within-walking-distance") schools, ethnic balance, and schools' limited enrollment capacities.

a) Under this Plan, for the current academic year, 80 percent of all elementary school students are eligible to enroll at a public school that is within safe-path walking distance of their transportation addresses and 78 percent of middle school students are eligible to enroll at a public school that is within safe-path walking distance of their transportation addresses. Id. at 20. Consequently, beginning with the 2007-2008 academic year, non-special-needs transportation costs will have been reduced by in excess of $3 million per year, recurring.

26) Each school has a Proximate Zone boundary. Grade-eligible students whose transportation address lies within this boundary are entitled to enroll at that school.

55643

Eleven elementary schools draw their entire enrollment from their proximate zone, i.e., every student is eligible to walk to those schools. Twenty elementary schools have one or more associated Ridership Areas, in addition to their Proximate (walk-in) zones. Grade-eligible students whose transportation address lies within such RAs are entitled to enroll at that RA's associated Boundary school. Id. Five elementary schools (besides Zanetti) are city-wide 30-percent-of-capacity Magnet schools. As such, in addition to those schools' native Boundary students, selected students from across the entire city also are enrolled at those five schools.

27)  Since institution of the Boundary Plan, school attendance has increased significantly. While it would be speculative to assert that this improvement is caused solely by adoption of the Plan, the improvement absolutely discredits Plan opponents' assertions that the Plan would cause increased absenteeism.

28)  Schools also report that parental involvement has improved significantly since institution of the Plan. While it would be speculative to assert that this improvement is caused solely by adoption of the Plan, the improvement absolutely discredits Plan opponents' assertions that the Plan would cause widespread alienation among parents who were not allowed to "choose" their child's school.

*Conclusion*

29)  I have seen no credible evidence that any provision or result of the Boundary Plan comprises racial discrimination of any type. In fact, I believe that this Plan would survive the strictest scrutiny of the currently-constructed U.S. Supreme Court, because it does not predicate any child's school assignment upon his/her race; it assigns students based upon their residence addresses, regardless of their asserted racial-ethnic characteristics.

All of the evidence gathered thus far supports an assertion that the Plan is performing as designed, and that it is meeting each of the goals/objectives that were defined by the School Committee before the Plan was designed.

Signed under the penalties of perjury this _14_ th day of February, 2007.

Thomas J. Yarsley

55643

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing "Defendants' Affidavit of Direct

Testimony Thomas J. Yarsley, Designer of Boundary Schools Zoning Plan, Springfield

Public School System" has been served on the following counsel of record on the 14th

day of February 2007, via the ECF system and will be sent electronically to the registered

participants as identified on the Notice of Electronic Filing (NEF).

UNDER LAW

Nadine Cohen, Esquire
LAWYERS' COMMITTEE FOR CIVIL RIGHTS

    OF THE BOSTON BAR ASSOCIATION
294 Washington Street, Suite 443
Boston, Massachusetts 02108

Paul E. Nemser, Esquire
J. Anthony Downs, Esquire
Monica M. Franceschini, Esq.
GOODWIN PROCTOR LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109

55643