**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ─────────────────────────── ) | |
| ARISE FOR SOCIAL JUSTICE; ) | |
| ¿OISTE?; NEW ENGLAND STATE-AREA ) | |
| CONFERENCE OF THE NAACP; ) | |
| REV. TALBERT W. SWAN, II; ) | |
| NORMAN W. OLIVER; DARLENE ) | |
| ANDERSON; GUMERSINDO GOMEZ; ) | |
| FRANK BUNTIN;  RAFAEL ) | |
| RODRIGUEZ; and DIANA NURSE, ) | Civil Action No. 05-30080 MAP |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| CITY OF SPRINGFIELD and ) | |
| SPRINGFIELD ELECTION COMMISSION, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ─────────────────────────── ) | |

**PLAINTIFFS' PRELIMINARY PROPOSED FINDINGS OF FACT**

Plaintiffs respectfully submit the following preliminary proposed findings of fact. Plaintiffs reserve their right to amend, revise, and supplement these proposed findings after the conclusion of trial.

This document consists of three principal parts:  a summary of the proposed findings, with cross-references to the more detailed findings that follow (pages 2-12); a section of detailed proposed findings (pages 13-198); and a conclusion (pages 198-200).

In addition, although this document does contain some limited discussion of issues of law, plaintiffs will separately submit a trial brief addressing certain legal issues more fully.

1

<u>**SUMMARY OF DETAILED FINDINGS OF FACT**</u>

**I.    PLAINTIFFS HAVE ESTABLISHED THE *GINGLES* PRECONDITIONS**

<u>**Racially Polarized Voting**</u>

1.    Plaintiffs' evidence establishes the existence of racially polarized voting in Springfield in elections for City Council and School Committee.  Latinos and African Americans vote cohesively, and white bloc voting usually defeats Latino and African American candidates of choice.  (See paragraphs 67-110 *infra*).

2.    Dr. Richard Engstrom's analysis of the eight most recent City Council and School Committee elections demonstrates racially polarized voting.  The candidate preferences of Springfield voters in the elections in which they have been presented with a choice between or among African American, Latino, and/or white candidates have been consistently divided along racial and ethnic group lines.  African American voters demonstrate, through their voting behavior, a preference for African American candidates, and Latinos likewise demonstrate a preference for Latino candidates.  White voters, however, prefer white candidates, and the lack of white support for these minority candidates usually results in the white voters vetoing these choices.  Trial Affidavit of Richard L. Engstrom ("Engstrom Aff") ¶ 9.[1]

<u>**Cohesion**</u>

3.    For the past four City Council and School Committee elections:  (1)  Latino voters have cohesively supported Latino candidates, and (2) African American voters have cohesively supported African American candidates.  In general, Latinos and African Americans have cohesively supported their respective candidates of choice.  (See paragraphs 79-84 *infra*.).

---

[1] All trial affidavits are cited by last name of affiant, or when necessary, by first and last name of affiant.

LIBA/1760998.1

**White Bloc Voting**

4.      With overwhelming consistency white voters have preferred white candidates for City Council and School Committee, and this white bloc voting usually results in defeat of the candidates preferred by Latino and African American voters.  (See paragraphs 85-110, *infra*)

5.      According to Dr. Engstrom's analysis, support of 50% or more from white voters has been a near-guarantee of victory for white candidates for City Council and School Committee, yet no candidate of color received 50% white support in the eight elections analyzed by Dr. Engstrom.  Among the elections that Dr. Engstrom analyzed, 94% of the candidacies where the (invariably white) candidate received 50% or more of the white vote were successful. By contrast, only 33% of Latino candidacies in which the candidate received 50% or more of the Latino vote were successful and only 50% of the African American candidacies in which the candidate received 50% or more of the African American vote were successful.

**Compactness and Numerosity**

6.      Springfield's Latino and African American voting age populations are sufficiently large and geographically compact to be able to elect representatives of their choice in a system based on single-member districts.  (See paragraphs 111-149, *infra*).

7.      Plaintiffs' proposed district plan for City Council has two majority Latino districts, one majority African American district and one majority Latino/African American district with 38% African American voting age population (VAP).

8.      Plaintiffs' proposed district plan for School Committee has one majority Latino district and one majority African American district.

9.      Plaintiffs' proposed district plans for City Council and School Committee will increase Latino and African American opportunities to elect candidates of their choice.  (See paragraphs 715-755, *infra*).

**Proof of the *Gingles* Preconditions Creates a Strong Inference of Voting Dilution**

10.      Proof of the *Gingles* preconditions entitles plaintiffs to a strong inference that the at-large system in Springfield diluted the voting power of Latinos and African Americans in violation of Section 2 of the Voting Rights Act.

**II.     THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES DILUTION OF MINORITY VOTING POWER, AND A VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT**

11.      The strong inference from the *Gingles* preconditions, together with plaintiffs' proof of the totality of the circumstances, demonstrates that racial politics have resulted in significantly diminished opportunities for minority participation in elective government in Springfield.  In particular, plaintiffs have offered persuasive evidence pertaining to the majority of the Senate factors.  They have also demonstrated that low turnout in communities of color is the result of the interaction of the electoral system and past and present discrimination and is therefore probative of vote dilution.

**Senate Factors**

**The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process.  (See Section VI, pages 34-52).**

12.      Springfield has not provided adequate assistance and information to Spanish-speaking voters with limited English proficiency.  For example, there have been inadequate numbers of Spanish–speaking poll workers.  This has adversely affected Latino voters' ability and incentive to vote.

13.    Latino voters have also experienced other discriminatory treatment touching on their right to vote, such as receiving hostile comments from poll workers for speaking Spanish, being removed from voter rolls, and being given voting-related materials poorly translated into Spanish.

14.    A history of discrimination in Springfield has led to court orders requiring the desegregation of the public schools and the hiring of minority police officers and firefighters, and this discrimination has hindered Latino and African American participation in the democratic process.

**The extent to which voting in the elections of state or political subdivision is racially polarized.  (See Sections VII, pages 52-64)**

15.    The expert testimony of Dr. Richard Engstrom establishes racially polarized voting.

16.    Many of plaintiffs' witnesses describe the experience of communities of color with racially polarized voting in Springfield.

**The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.  (See Section VIII, pages 64-67)**

17.    Springfield's at-large system in effect creates a large-sized election district, covering approximately 32 square miles.  This works against Latino and African American candidates who are likely to have less time and less money than white candidates.

18.    Latino and African American voters have experienced problems with voting registration, being removed from the voting lists, and not being offered provisional ballots.

**The extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process.  (See Section IX, pages 67-122)**

19.    Latinos and African Americans in Springfield continue to bear the effects of past and present discrimination, and there are presently wide disparities in the following areas: (a) Income (see paragraphs 294-299, *infra*); (b) Education (see paragraphs 300-374, *infra*); (c) Police relations, police behavior, and enforcement disparities (see paragraphs 375-430, *infra*); (d) Employment (see paragraphs 431-458, *infra*); (e) Housing (see paragraphs 459-508, *infra*); (f) Health and health care (see paragraphs 515-533, *infra*).

20.    This discrimination has hindered the effective participation of Latinos and African Americans in the political process.  Lower socioeconomic status, for example, is linked to lower turnout, as well as difficulties in mounting effective political campaigns.  See paragraphs 644-714, *infra*.

**Whether political campaigns have been characterized by overt or subtle racial appeals.  (See Section X, pages 122-124)**

21.    In the 1960's, political campaigns were characterized by racial appeals.

22.    More recent appeals are more subtle, such as occurred in the controversy over needle exchange.

**The extent to which members of the minority group have been elected to public office in the jurisdiction.  (See Section XI, pages 124-127)**

23.    The City Council has been and remains to this day a political stronghold of Springfield's white voters.  Only two persons of color currently serve on the nine-member City Council:  Jose Tosado (Hispanic) and Bud Williams (African-American).  Mr. Tosado is the only Latino to have served on City Council.

24.    In the last 10 years, more than half of Springfield's City Councilors have come from just one of the city's eight current wards, Ward Seven.  Ward Seven has the largest percentage of white voters and the highest household income.

25.    No Latino has served on the School Committee since 2002.

6

26.     Latinos and African Americans are not represented on City Council and School Committee in proportion to their presence in the voting age population.

27.     According to defense expert Thernstrom, Latinos represent almost 33% of the VAP and African Americans almost 22% of the VAP.

28.     For Latinos, this proportion roughly translates into 3 City Council seats and 2 School Committee seats.

29.     For African Americans, this proportion roughly translates into 2 City Council seats and 1-2 School Committee seats.

**Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the member of minority group.  (See Section XII, pages 126-147)**

30.     There has been a significant lack of responsiveness on the part of elected officials to the particularized needs of Springfield's minorities in many areas, including:  (a) City services; (b) Police-community relations, and policing in general; (c) Education; (d) Zoning; (e) Racially insensitive remarks made by a member of the Mayor's staff; (f) Needle exchange; (g) minority-owned small businesses; (h) Lack of Spanish language assistance in City government and public schools.

31.     Marjorie Hurst, a Springfield School Committee member who is African American, published an article on February 15, 2007, entitled "I Know Why The Caged Bird *Screams*:  Why More Minority Representation Is Desperately Needed On The Springfield School Committee"  (Plaintiffs' Exhibit 206).  The article describes in detail how the Springfield educational system has been unresponsive to the needs of African Americans and Latinos and points to the lack of minority representatives on the School Committee as an explanation.

**Low Turnout by Communities of Color Is Probative of Voting Dilution** (See Section XIII, pages 147-165).

32.     Considerations of race and ethnicity, including discrimination and the effects of the at-large system, contribute substantially to low turnout by people of color in Springfield. Thus, low turnout is evidence of voting dilution—not, as defendants contend, a nonracial explanation for the failure to elect candidates of color to City Council and School Committee.

33.     Testimony of Dr. Douglas Amy and others links the effects of past and present discrimination to diminished Latino and African American participation in the political process.

34.     Turnout is related to income and education levels. Minority income and education levels in Springfield are much lower than the levels for whites, and these disparities are the result of past and present discrimination.

35.     Turnout would likely be higher in a district system than in the existing at-large system.

36.     Low minority turnout is related to the perceived unresponsiveness of city government. Latinos and African Americans feel despair and disaffection with city government in general and with the voting system in particular.

37.     Latinos and African Americans, as voters and potential candidates, feel they cannot win in the at-large system, which contributes to low turnout and to diminished participation in the political system in general.

38.     Latino voters have had to contend with serious impediments to voting because of inadequate assistance at the polls for Spanish speakers, which has suppressed turnout among Latinos.

8

### III.    PLAINTIFFS' PROPOSED DISTRICT PLANS ARE AN APPROPRIATE REMEDY FOR THE SECTION 2 VIOLATION

**A District Remedy Would Increase Opportunities To Elect Minority Candidates Of Choice** (See Section XIV, pages 165-175)

39.    A single-member district system, such as that which plaintiffs propose, will provide greater opportunities to elect minority candidates to City Council and School Committee than does the at-large system.

40.    Studies demonstrate that, as a rule, the electoral opportunities for minority candidates are considerably better in single-member district elections than in at-large elections.

41.    Plurality-majority systems, such as at-large voting, are designed to grant representation to only the largest group of voters.  They do so by creating a much higher threshold, often requiring 40% of the vote or higher for candidates to get elected.  This arrangement usually strongly underrepresents minority factions.

42.    At-large systems are known for being unresponsive to demographic change, and Springfield's system has been unresponsive, as the disproportionate representation of Latinos and African Americans on City Council and School Committee shows.

43.    It is harder for Latinos and African Americans to win in the city-wide at-large system than it would be in a district-based system.

44.    A city-wide at-large system requires that the candidate organize, become known, and campaign across the City.  This requires considerable time and money and necessitates that the candidate focus on the white vote.

45.    A campaign in a district system would require less time and money and would place less of an emphasis on appealing to whites.  A district system would encourage face-to-face campaigning, enable voters to get to know the candidates better, and give voters more of a stake in the election.

LIBA/1760998.1

46.     Black and Latino voter participation is likely to increase significantly under the plaintiffs' plan – particularly in the three districts in which each group would constitute a majority of the VAP.

47.     The conclusion that plaintiffs' proposed district plan presents greater electoral opportunities for Latinos and African Americans than does the at-large system stands despite defendants' argument that non-Hispanic whites are declining in number and may no longer constitute a majority of the VAP in Springfield.

48.     Whites do not need to constitute a *majority* in an at-large election system in order to successfully prevent Blacks or Latinos from electing their preferred candidates – they need only make up a *plurality* of the voters.

49.     Defendants' expert's population projections do not predict that Latinos will constitute a majority or that African Americans will constitute a majority of the VAP in the near future.

50.     Furthermore, numerous socio-economic factors along with the at-large system have combined to suppress voter turnout for minorities in Springfield.  This is unlikely to change overnight.  The advantage enjoyed by whites in terms of voter participation means that even when the white community no longer constitutes a majority of the voting age population, it might still be able to turn out a majority of the voters on election day, and thus continue to dominate in these elections.

**Plaintiffs' District Plans Are Based On Districting Principles Other Than Race (See Section XV, pages 175-177)**

51.     Contrary to defendants' arguments, plaintiffs' district plans take into account a number of principles beside race:  compactness, shape, contiguity, and rough equality of

10

population size (one-person, one-vote).  They also follow census blocks and, in a number of places, marked streets.

52.     Census blocks are an appropriate basis for voting districts.  They are smaller and therefore more stable units than neighborhoods.

53.     Neighborhood boundaries are not a required basis for designing voting districts. There is disagreement about the locations and borders of Springfield's neighborhoods, and those borders frequently change.

54.     Administrative units such as Springfield's eight wards do not readily lend themselves to use for designing plans for a nine-person City Council or a six-person School Committee where such plans adhere to principles of shape, contiguity, and one-person, one-vote.

## IV.    OTHER ISSUES

### Nonracial Factors Do Not Explain White Bloc Voting In Springfield (See Section XVI, pages 178-187)

55.     Defendants have not proffered significantly probative evidence, possessing convictive force, that "whites voted as a bloc for reasons wholly unrelated to racial animus."  *See Veccinos de Barro Uno v. City of Holyoke*, 72 F.3d 973 at 981, 983.

56.     Plaintiffs' affidavits demonstrate that race/ethnicity was a significant factor contributing to the defeat of minority-preferred candidates.

### Lack Of Cohesion Between Latinos And African Americans Is Not The Cause Of Minority Candidates' Inability To Get Elected (See Section XVII, pages 187-194)

57.     Defendants' arguments that lack of cohesion between Latino and African American voters contribute to the failure to elect Latino and African American candidates should be rejected.

58.     The key issue is whether white bloc voting is a substantial factor explaining the defeat of Latino and African American candidates.  Plaintiffs have no obligation to show that

white bloc voting was the sole cause of such defeats. *See Uno*, 72 F.3d at 983 ("establishing vote dilution does not require the plaintiffs affirmatively to disprove every other possible explanation for racially polarized voting.")

59.    Plaintiffs have shown cohesion among Latino voters and among African American voters, and plaintiffs have shown white bloc voting.

60.    Plaintiffs are not required to demonstrate cohesion between Latino and African American voters.

61.    The at-large system itself has created obstacles to African American support of Latino candidates, and Latino support of African American candidates, and encourages bullet voting.

62.    Latinos and African Americans share common interests and concerns, and, in a district-based system, would be more likely to vote cohesively.

**Limited Electoral Success By Minority Candidates Does Not Negate The Pervasiveness Of White Block Voting (See Section XVIII, pages 194-198)**

63.    Defendants are wrong that the elections of Jose Tosado, Bud Williams, and other minority candidates show that racial politics are not a significant factor diminishing electoral opportunities.

64.    The successes of these few minority candidates are generally attributable to exceptional or unusual circumstances.

**The 2006 Gubernatorial Election and Other Elections For State Representatives Are Not Relevant.**

65.    Defendants' arguments that any conclusions regarding Springfield's City Council and School Committee can be drawn based on the outcome of the 2006 Gubernatorial Election, or any other elections for State Representatives, have no basis in fact or law, and should be rejected.

## DETAILED FINDINGS OF FACT

66.     Plaintiffs have established that the at-large election system in Springfield, in interaction with the social and historical conditions of discrimination, has operated to cause an inequality in opportunity for Latino and African American citizens to elect their preferred candidates for City Council and School Committee. Plaintiffs have further shown that a single member district system would enable Latinos and African Americans to enjoy greater representation, more in keeping with their numbers in the population.

## PLAINTIFFS HAVE ESTABLISHED THE THREE *GINGLES* PRECONDITIONS

## V.     RACIALLY POLARIZED VOTING

67.     There is racially polarized voting in Springfield that usually results in the defeat of Latino and African American candidates of choice, and thus, the second and third *Gingles* preconditions are satisfied.

68.     Dr. Richard Engstrom is an eminently qualified and experienced expert in the field of analyzing the relationship between election systems and the ability of minority voters to participate fully in the political process and to elect representatives of their choice. He is, in particular, an expert in techniques of analyzing racially polarized voting. Engstrom Aff. ¶¶ 1-3.

69.     In assessing the extent to which the candidate preferences of the African American and Latino voters differed from those of the other (predominantly white) voters in these elections, Dr. Engstrom derived estimates of group support for candidates through ecological regression analysis. This procedure, which employs data for all of the precincts in Springfield, is one of the two estimation procedures approved for this purpose by the United States Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30, at 52-53 (1986). Engstrom Aff. ¶ 8.

70.     The other procedure approved in *Gingles* is homogeneous precinct, or extreme case, analysis, which can be applied in Springfield to estimate only the preferences of the other

13

(essentially white) voters. Homogeneous precinct analyses simply report the percentage of the voters supporting a candidate or set of candidates within the precincts in which a particular group constitutes over 90 percent of the voting age population. There are no such African American or Latino precincts in Springfield and therefore this procedure cannot be used to estimate the candidate preferences of those groups. There are six precincts, however, in which other voters constitute over 90 percent of the voting age population, and Dr. Engstrom reported the levels of support for the various candidates in these essentially white precincts. Engstrom Aff.¶ 8. Dr. Engstrom's homogeneous precinct analysis figures were closely consistent with the results of his regression analysis. *See* Engstrom Aff. Tables 9 and 10 (at pages 58-60).

71.     Defendants have not asserted that Dr. Engstrom made any errors in his performance of the regression analysis or homogeneous precinct analysis, and defendants have offered no comparable calculations of their own, including any rival regression analysis or homogeneous precinct analysis.

72.     Overall Dr. Engstrom concluded: The candidate preferences of Springfield voters in the elections in which they have been presented with a choice between or among African American, Latino, and/or white candidates have been consistently divided along racial and ethnic group lines. African American voters demonstrate, through their voting behavior, a preference for African American candidates, and Latinos likewise demonstrate a preference for Latino candidates. These preferences are not shared by the white voters, however, and their lack of support for these minority candidates usually results in the white voters vetoing these choices. Engstrom Aff. ¶ 9. The results of Dr. Engstrom's analyses of these elections are reported in Dr. Engstrom's Tables 1 through 8 (at pages 50-57).

**Racially Polarized Voting for City Council**

73.     The candidate preferences in city council elections among the groups analyzed are clearly polarized along group lines.  There is an unmistakable preference within each group for candidates from within that group.  This occurred in each of the four elections.  Minority candidates preferred by voters within their group were vetoed by the rest of the electorate in every election except the city council election in 1999.  In that election two African Americans were elected.  This was not repeated however in the 2001, 2003, or 2005 elections, in which only one African American, a long term incumbent, was able to win a seat.  The African American who had won the ninth seat in 1999 by a small margin was vetoed in 2001 and again in 2003, despite the extremely high levels of African American support for her.  Latinos did not elect a Latino candidate until the 2003 election, when a Latino that had been appointed to the council earlier that year was elected.  This candidate was reelected in 2005.  Engstrom Aff. ¶ 37.

74.     Minority candidates have failed to win one of the nine council seats despite receiving high levels of support from their respective groups.  For example, in 2003 Ms. Lewis-Caulton received a vote from virtually all of the African American voters but failed to win a seat, while in 2001 she received a vote from 96.3 percent of them and also failed to win a seat.  In 2001 Mr. Tosado received a vote from an estimated 75 percent of the Latino voters and failed to win a seat.  The highest white support for a losing white candidate was, in contrast, an estimated 52.9 percent for Mr. Ryan in 2003.  Engstrom Aff. ¶ 38.

75.     The lowest level of African American support for a winning African American candidate was for Mr. Williams in 1999, 93.3 percent.  The lowest Latino support for a winning Latino candidate was for Mr. Tosado in 2005, 76.4 percent.  In contrast, Mr. Stebbins, a white candidate, was elected in 2005 with as few as 47.1 percent of the white voters voting for him. Engstrom Aff. ¶ 39.

**Racially Polarized Voting for School Committee**

76.     Voting in the at-large school committee elections reveals a pronounced tendency for the voters of the respective groups to prefer candidates from within their group.  As in the city council elections, both African American and Latino candidates preferred by their respective groups were usually vetoed by the white voters.  Engstrom Aff. ¶ 52.

77.     Minority candidates have failed to win one of the three school committee seats at issue in these elections despite receiving high levels of support from their respective groups.  For example, in 1999 Mr. McCollum received a vote from virtually all of the African American voters but failed to win a seat.  In 2005 Mr. Santiago received a vote from an estimated 66.9 percent of the Latino voters and failed to win a seat.  The highest white support for a losing white candidate was, in contrast, an estimated 49.4 percent for Mr. Rodgers in 2001.  Engstrom Aff. ¶ 53.

78.     The only African American to win a seat on the school committee over these four elections was Ms. Hurst, who won a seat in 2001 and 2005, in both of which she received a vote from virtually every African American voter.  Among Latino candidates, only Mr. Tosado won a seat, in 1999, when he received a vote from an estimated 79.0 percent of the Latino voters.  In contrast, Ms. Pepe, a white candidate, was elected in the 2003 election with an estimated 49.0 percent of the white voters voting for her.  Engstrom Aff. ¶ 54.

**_Gingles_ Preconditions – Cohesion**

79.     Plaintiffs have demonstrated that, for the past four city council and school committee elections:  (1)  African American voters have cohesively supported African American candidates; and (2) Latino voters have cohesively supported Latino candidates.  In general, Latinos and African Americans have cohesively supported their respective candidates of choice.

80.     Latinos have cohesively supported Latino candidates for City Council.

16

    a.    In 1999, there was no Latino candidate.  Engstrom Aff. Table 1 (page 50).

    b.    In 2001, Latinos gave 75% of their support to Tosado and 67.9% to Cortes.  Neither was elected.  Engstrom Aff. Table 2 (page 51).

    c.    In 2003, Latinos gave 78.4 of their support to Tosado and 56.5% to Cortes.  Only Tosado was elected.  Engstrom Aff. Table 3 (page 52).

    d.    In 2005, Latinos gave 76.4% of their support to Tosado.  Their second choice was Nazario at 44.9%.  Only Tosado was elected.  Engstrom Aff. Table 4 (page 53).

81.    Latinos have cohesively supported Latino candidates for School Committee.

    a.    In 1999, Latinos gave 79% of their support to Tosado.  He was elected.  Engstrom Aff. Table 5 (page 54)

    b.    In 2001, there was no Latino candidate.  Engstrom Aff. Table 6 (page 55).

    c.    In 2003, Latinos gave 66.6% of their support to Davila.  He was defeated.  Engstrom Aff. Table 7 (page 56).

    d.    In 2005, Latinos gave 66.9% to Santiago and 56.2% to Davila.  Both were defeated.  Engstrom Aff. Table 8 (page 57).

82.    African Americans have cohesively supported African American candidates for

City Council.

    a.    In 1999, African Americans gave Lewis Caulton 106.4% of support, and gave Williams 93.3%.  Both were elected.  Engstrom Aff. Table 1 (page 50).

    b.    In 2001, African Americans gave Williams 99.6% of their support, and gave Lewis-Caulton 96.3% and Rucks 77.4%.  Only Williams was elected.  Engstrom Aff. Table 2 (page 51).

    c.    In 2003, African Americans gave Lewis-Caulton 101.3% of their support, and gave Williams 96.7%, and Jones 69.7%.  Only Williams was elected.  Engstrom Aff. Table 3 (page 52).

    d.    In 2005, African Americans gave Williams 102.2% of their support.  Oliver was their fourth choice at  42%.  Only Williams was elected.  Engstrom Aff. Table 4 (page 53).

83.    African Americans have cohesively supported African American candidates for

School Committee.

    a.    In 1999, African Americans gave McCollum 100.8% of their
        support.  Engstrom Aff. Table 5 (page 54).

    b.    In 2001, African Americans gave Hurst 105.5% of their support
        and gave Parker 59.6%.  Engstrom Aff. Table 6 (page 55).

    c.    In 2003, African Americans gave McCollum 95.3% of their
        support.  Engstrom Aff. Table 7 (page 56).

    d.    In 2005, African Americans gave Hurst 110.6% of their support.
        Engstrom Aff. Table 8 (page 57).

84.    Rep. Cheryl Coakley-Rivera's state representative district is predominantly

Hispanic, and she gets overwhelming support among Hispanic voters.  Coakley-Rivera Aff. ¶ 5.

### *Gingles* Preconditions – White Bloc Voting

85.    With overwhelming consistency white voters have preferred white candidates,

and this white bloc voting usually results in defeat of the candidates preferred by African

American and Hispanic Voters.

### White Preference

86.    Whites have consistently preferred white candidates for City Council.

    a.    In 1999, whites preferred white candidates for the top 9 spots
        (range: 38.9-66.2%).  Engstrom Aff. Table 1 (page 50).

    b.    In 2001, whites preferred the only 8 white candidates for the top 8
        spots (range: 61.7-68.4%).  Williams was the 9th choice for white
        voters.  Engstrom Aff. Table 2 (page 51).

    c.    In 2003, whites preferred white candidates for the top 9 spots
        (range: 49.5-62.5%).  Engstrom Aff. Table 3 (page 52).

    d.    In 2005, whites preferred white candidates for the top 8 spots
        (range: 43.4-60.5%).  Tosado was the 9th choice of white voters.
        Engstrom Aff. Table 4 (page 53).

87.    Whites have preferred white candidates for School Committee.

> a. In 1999, whites preferred white candidates for the top 3 spots (range 41.5-77.3%). Engstrom Aff. Table 5 (page 54).
>
> b. In 2001, whites preferred white candidates for the top 3 spots (range: 49.4-66.8%). Engstrom Aff. Table 6 (page 55).
>
> c. In 2003, whites preferred white candidates for the top 4 spots (range: 41.8-69.4%). Engstrom Aff. Table 7 (page 56).
>
> d. In 2005, whites preferred the only two white candidates for the top 2 spots (range: 53.2-60.2%). Hurst was the third choice for white voters. Engstrom Aff. Table 8 (page 57).

88.     That is, for City Council and School Committee elections from 1999-2005, except for Tosado in 2005, whites invariably preferred white candidates to the candidates of color.

### Defeat of Minority Candidates

89.     Minority-preferred candidates are regularly defeated in elections for City Council and School Committee.

#### Latino Candidacies

90.     From 1999-2005, there have been nine Latino candidacies for City Council and School Committee in which the candidate received at least 50% of the Latino vote. Of those nine, six candidacies resulted in the candidate's defeat. The only successful candidacies were three by Tosado.

91.     For City Council:

> a. In 2001, 0 of 2 Latino candidates who received at least 50% of the Latino vote were elected. Engstrom Aff. Table 2 (page 51).
>
> b. In 2003, 1 out of 2 Latino candidates who received at least 50% of the Latino vote were elected. Engstrom Aff. Table 3 (page 52).
>
> c. In 2005, 1 out of 1 Latino candidate who received at least 50% of the Latino vote was elected. Engstrom Aff. Table 4 (page 53).

92.     For School Committee:

a. In 1999, 1 out of 1 Latino candidate who received at least 50% of the Latino vote was elected. Engstrom Aff. Table 5 (page 54).

b. In 2003, 0 out of 1 Latino candidate who received at least 50% of the Latino vote was elected. Engstrom Aff. Table 7 (page 56).

c. In 2005, 0 out of 2 Latino candidates who received at least 50% of the Latino vote was elected. Engstrom Aff. Table 8 (page 57).

### African American Candidacies

93. From 1999-2005, there have been 14 African American candidacies for City Council and School Committee in which the candidate received at least 50% of the African American vote. Of those 14, seven candidacies resulted in the candidate's defeat. All but one of the successful candidacies involved Williams or Hurst.

94. For City Council:

a. In 1999, 2 out of 2 African American candidates who received at least 50% of the African American vote were elected. Engstrom Aff. Table 1 (page 50).

b. In 2001, 1 out of 3 African American candidates who received at least 50% of the African American vote was elected. Engstrom Aff. Table 2 (page 51).

c. In 2003, 1 out of 3 African American candidates who received at least 50% of the African American vote was elected. Engstrom Aff. Table 3 (page 52).

d. In 2005, 1 out of 1 African American candidate who received at least 50% of the African American vote was elected. Engstrom Aff. Table 4 (page 53).

95. For School Committee:

a. In 1999, 0 out of 1 African American candidates who received at least 50% of the African American vote were elected. Engstrom Aff. Table 5 (page 54).

b. In 2001, 1 out of 2 African American candidates who received at least 50% of the African American vote were elected. Engstrom Aff. Table 6 (page 55).

   c.  In 2003, 0 out of 1 African American candidates who received at least 50% of the African American vote were elected. Engstrom Aff. Table 7 (page 56).

   d.  In 2005, 1 out of 1 African American candidates who received at least 50% of the African American vote were elected. Engstrom Aff. Table 8 (page 57).

96. Minority-preferred (50%+) candidates have been defeated for City Council in 2 of the last 4 elections:

   a.  In 2001, Lewis-Caulton, Rucks, Tosado, and Cortes were defeated. Engstrom Aff. Table 2 (page 51)

   b.  In 2003, Lewis-Caulton, Jones, and Cortes were defeated. Engstrom Aff. Table 3 (page 52).

97. At least one minority preferred (50%+) candidate has been defeated for School Committee in each election:

   a.  In 1999, McCollum was defeated. Engstrom Aff. Table 5 (page 54).

   b.  In 2001, Parker was defeated. Engstrom Aff. Table 6 (page 55).

   c.  In 2003, McCollum and Davila were defeated. Engstrom Aff. Table 7 (page 56).

   d.  In 2005, Santiago and Davila were defeated. Engstrom Aff. Table 8 (page 57).

**<u>White Voting Power</u>**

98. Whites have had voting power sufficient to elect white candidates and defeat candidates of color.

99. Almost without exception, candidates who received 50% or more of the white vote were elected to City Council and School Committee.

100. For School Committee, this was true for all such candidates in every election. Engstrom Aff. Tables 5-8 (pages 54-57). For City Council, it was true for all candidates in 1999,

2001 and 2005.  Engstrom Aff. Tables 1, 2, 4 (pages 50, 51, 53).  It was true for 5 out of 7 candidates in 2003.  Engstrom Aff. Table 3 (page 52).

101.    Only white candidates received 50% or more of the white vote.  Engstrom Aff. Tables 1-8 (pages 50-57).

102.    In sum, there were 34 candidacies in which the candidate received 50% or more white support in the elections analyzed by Dr. Engstrom.  In each instance, the candidate was white.  32 of 34 (94%) of these candidacies were successful.  This contrasts with 3 of 9 (33%) successful candidacies for Latinos who received 50% or more Latino support and 7 of 14 (50%) successful African American candidacies who received 50% or more African American support. Engstrom Aff. Tables 1-8 (pages 50-57).

103.    Except for Williams (48.7%) in 2001 when there were only 8 white candidates, no candidate of color has received 40% or more of the white vote for City Council.  Engstrom Aff. Tables 1-4 (pages 50-53).

104.    Hurst has twice received over 40% white support for School Committee, but in 2005 there were only 2 white candidates.  Engstrom Aff. Tables 5-8 (pages 54-57).

105.    No candidate who received 30% or less of the white vote was elected to City Council or School Committee from 1999-2005.  Engstrom Aff. Tables 1-8 (pages 50-57).

106.    For City Council, this included 50%-preferred candidates of choice for African Americans and Latinos:  Rucks in 2001, Lewis-Caulton and Jones in 2003, Cortes in 2001 and 2003.  Engstrom Aff. Tables 2-4 (pages 51-53).

107.    For School Committee, this included 50%-preferred candidates of choice for African Americans and Latinos:  McCollum in 1999, Parker in 2001, Davila in 2003 and 2005. Engstrom Aff. Tables 5-8 (pages 54-57).

22

108.     Candidates of color with 75%-100% support from the candidate's group have been defeated, *see, e.g.*, Engstrom Aff. Table 2 (page 51) (Tosado, Rucks, Lewis-Caulton), yet white candidates among the top 9 choices of white voters have been elected with less than 50% white support, *see, e.g.,* Engstrom Aff. Table 4 (page 53) (Rooke, Stebbins, Walsh).

109.     The current at-large system allows for the dilution of votes for minority candidates.  Mazza-Moriarty Depo. 67:21-23; 68:15-24; 69:1-5.

110.     The at-large election system prevents qualified Hispanic candidates from being elected.  Tosado Depo. 57:10-16.

## *Gingles* Precondition – Numerosity and Compactness

111.     Springfield's Latino and African American voting age populations are sufficiently large and geographically compact so as to be able to elect representatives of their choice in a single member district system.

112.     Dr. John Harmon is a qualified and experienced expert in geography, including the use of census data in computer mapping and Geographic Information Systems (GIS) as applied to municipal planning and census planning.  Harmon Aff. ¶¶ 4-5.

113.     Dr. Harmon has concluded that Plaintiffs' proposed nine-district City Council Plan and six-district School Committee Plans create African American and Latino districts that are sufficiently large and geographically compact so as to provide greater opportunity for African Americans and Latinos to elect representatives of their choice.

114.     The City Council Plan contains two majority Latino districts, one majority African American district, and one majority Latino/African American district with 38% African American voting age population.

115.     The School Committee Plan contains one majority Latino and one majority African American district.

116.    Defendants do not dispute the accuracy of any of Dr. Harmon's maps or demographic tabulations.  Indeed, defense expert Thernstrom confirms that Dr. Harmon's plans meet the *Gingles* test to the extent that it requires drawing electoral districts with Latino or African American majorities in voting age population:  "In sum, Plaintiffs can be said to have satisfied the minimal requirement of the first <u>Gingles</u> test.  It is indeed possible to create electoral districts in Springfield that will have an African American or a Latino majority in their voting age populations."  Thernstrom Aff. ¶¶ 34, 41.

**<u>City Council Plan</u>**

117.    Dr. Harmon has examined the Plaintiffs' proposed nine-district City Council plan (the "Nine District Plan") and determined that it is possible to draw several reasonably compact majority-minority districts.  Harmon Aff. ¶ 6 and Exhibit 3.  The Nine District Plan is illustrated in Exhibit 3.



**Exhibit 3**
**Proposed City Council Districts**
**Plaintiff's Plan**

118.    The districts in the Nine District Plan meet the constitutional requirements of one person-one vote; they are within the ±5% deviation from ideal population.  Harmon Aff. ¶ 6(a).

119.    Upon visual inspection, there are no problems of shape with the districts in Plaintiffs' Nine District Plan.  Harmon Aff. ¶ 6(b).

120.    Latino/Hispanics and Blacks constitute the majority voting age population in four districts in the Nine District Plan.  The Nine District Plan has two majority Latino/Hispanic districts (Districts 1 and 2), one majority Black City Council district (District 3), and one additional majority Black/Latino/Hispanic district (District 4), in which Blacks constitute more

25

than double their VAP in the City as a whole.  These four districts form a contiguous cluster in central Springfield.  Harmon Aff. ¶ 6(c).

121.    The four districts are geographically compact.  *See* Harmon Aff. ¶¶ 6(a), 33, and Exhibit 3.

122.    The demographics of each of the districts in Plaintiffs' Nine District Plan is summarized in the following table:

| Exhibit 6 | | | | |
|---|---|---|---|---|
| DISTRICT | Percent White VAP | Percent Black VAP | Percent Latino/Hispanic VAP | Percent Black + Latino/Hispanic VAP |
| 1 | 29.21% | 13.45% | **54.02%** | 67.47% |
| 2 | 24.80% | 18.10% | **54.14%** | 72.24% |
| 3 | 16.03% | **58.02%** | 21.17% | 79.19% |
| 4 | 41.11% | 38.47% | 16.42% | **54.89%** |
| 5 | 71.24% | 6.83% | 19.11% | 25.94% |
| 6 | 73.47% | 12.09% | 11.44% | 23.53% |
| 7 | 83.09% | 9.12% | 5.13% | 14.25% |
| 8 | 83.99% | 6.50% | 5.62% | 12.12% |
| 9 | 63.55% | 10.58% | 17.94% | 28.52% |
| | | | | |
| VAP % | 56.21% | 18.09% | 21.78% | 39.87% |

123.    Dr. Harmon computed the Black VAP for these districts by including only single race, non-Hispanic Blacks.  This provides a conservative estimate of the Black population.  It also ensures that there will be no double-counting between the Latino/Hispanic VAP and the Black VAP, so that combinations of totals are not inflated.  Harmon Aff. ¶ 19.

124.    Dr. Harmon computed Latino/Hispanic VAP by counting only individuals who indicated that they were Hispanic or Latino.  This ensures that there will be no double-counting between the Latino/Hispanic VAP and the Black VAP, so that combinations of totals are not inflated.  Harmon Aff. ¶ 19.

LIBA/1760998.1

125.    Defense witness Daniel Marrier confirmed the accuracy of Dr. Harmon's work. Marrier Depo. at 35-36.

126.    Mr. Marrier did not offer a nine-district City Council plan based upon preserving the borders of Springfield's wards or neighborhoods.

127.    Mr. Marrier did not offer a City Council plan that he contended improved upon Dr. Harmon's plan.

128.    City Council incumbent Bud Williams resides in District 4 in Plaintiffs' proposed nine single-member district plan, in which 39.5 percent of the voting age population was African American, according to the 2000 Census.  Marrier Aff. ¶ 19(d).

129.    Dr. Harmon also created a second nine-district plan based on precincts (the "Precinct-Based Nine District City Council Plan") for purposes of conducting a reaggregation of voting data from the 2003 City Council election.  Harmon Aff. ¶ 20.  The precinct-based City Council plan created by Harmon is similar to the Plaintiffs' proposed districts, in that: (1) Blacks and Latino/Hispanics make up the majority of the voting population in four of the districts (Districts 1, 2, 3, and 4); (2) there is one majority Black district (District 3), two majority Latino/Hispanic districts (Districts 1 and 2), and one additional majority Black/Latino/Hispanic district (District 4); (3) the remaining 5 districts are majority white; and (4) the districts meet the Constitutional requirement of one person, one vote, as all districts are within ±5% of the ideal district population.  Harmon Aff. ¶ 21.

130.    Dr. Harmon used the Precinct Based Nine District City Council Plan to reaggregate the 2003 at-large City Council.  This involved taking the election results by candidate and retabulating them as if the districts in the Plaintiffs' Precinct Plan had been in place.  Harmon Aff. ¶ 22.

131.     Harmon Exhibit 8 contains the results of the reaggregation analysis for the first

three places in the City Council election under Plaintiffs' precinct-based plan:

**Exhibit 8[2]**

| DISTRICT | 1st Place Candidate | Ballots Cast for 1st Place | Percent of Ballots Cast for 1st Place | 2nd Place Candidate | Ballots Cast for 2nd Place | Percent of Ballots Cast for 2nd Place | 3rd Place Candidate | Ballots Cast for 3rd Place | Percent of Ballots Cast for 3rd Place |
|---|---|---|---|---|---|---|---|---|---|
| 1 | **Tosado (Latino)** | 1,729 | 58.8% | Foley (White) | 1,230 | 41.9% | **Cortes (Latino)** | 1,078 | 36.7% |
| 2 | **Tosado (Latino)** | 936 | 63.8% | Foley (White) | 602 | 41.1% | **Williams (Black)** | 589 | 40.2% |
| 3 | **Williams (Black)** | 1,435 | 65.1% | **Lewis-Caulton (Black)** | 1,424 | 64.6% | **Tosado (Latino)** | 1,060 | 48.1% |
| 4 | **Tosado (Latino)** | 856 | 46.8% | **Williams (Black)** | 846 | 46.3% | Sarno (White) | 744 | 42.3% |
| 5 | Foley (White) | 2,082 | 55.6% | Moriarty-Mazza (White) | 1,993 | 53.3% | Rooke (White) | 1,884 | 50.3% |
| 6 | Foley (White) | 1,356 | 53.6% | Williams (Black) | 1,282 | 50.3% | Walsh (White) | 1,235 | 48.8% |
| 7 | Foley (White) | 2,252 | 54.9% | Sarno (White) | 2,216 | 54.1% | Kelly (White) | 2,194 | 53.5% |
| 8 | Foley (White) | 2,979 | 56.8% | Sarno (White) | 2,918 | 55.7% | Puppolo (White) | 2,833 | 54.1% |
| 9 | Sarno (White) | 2,468 | 63.2% | Ryan (White) | 2,030 | 51.9% | Foley (White) | 2,011 | 51.5% |

132.     Under the reaggregation, a Latino/Hispanic candidate wins Districts 1 and 2 with

58.8% and 63.8% of the first place votes; a Black candidate wins District 3 with 65.1% of the

first place votes; and both Hispanic/Latino and Black candidates are very competitive in District

4, with 46.8% and 46.3% of the first and second place votes.  Harmon Aff. ¶ 22.

133.     None of the nine candidates elected to City Council in 2003 lived in Districts 1, 2,

3 or 4 of the Plaintiffs' precinct-based plan.  One would have lived in District 5, two in District

---

[2]     Note: Vote totals do not include Precinct 5-B.  This precinct's VAP is 50.9% White, 32.2% Black, 14.3% Latino and 2.6% Other.

LIBA/1760998.1

7, 4 in District 8 and two in District 9, which all are white-majority districts in the precinct plan. The at-large election of 2003 yielded one Latino/Hispanic (Tosado) and one Black (Williams) on the City Council. Had the election been conducted under the Plaintiffs' precinct-based plan, it would have created a significant opportunity to elect two Latino/Hispanics, one Black, and either a Latino/Hispanic or a Black candidate in District 4. Harmon Aff. ¶ 23.

### School Committee Plans

134.    Dr. Harmon examined two six-district School Committee plans created by Plaintiffs, one based on precincts (the "Precinct-Based Six District Plan"), and the second based on census blocks (the "Census Block-Based Six District Plan"). Harmon Aff. ¶ 26.

135.    Both plans produce one majority Latino/Hispanic VAP district and one majority Black VAP district.

### Precinct-Based Six District Plan

136.    Plaintiffs' Precinct-Based Six District Plan is illustrated in Harmon Exhibit 9.

29



Exhibit 9 – Six District School Committee Plan Using Precincts

137.    Upon visual inspection, there appear to be no problems of shape with the proposed districts in the plan.  Harmon Aff. ¶ 29(c).

138.    Because there are 64 precincts in Springfield, the precinct-based plan necessarily splits one precinct.  Precinct 8-H is split among proposed districts 2, 4, and 5.  Harmon Aff. ¶ 26.

139.    The demographics of the six districts are displayed in the following table:

**Exhibit 10 - Voting Age Population - Six District BOE Plan Using Precincts**

| District | Total | Absolute Deviation from Ideal | Percentage Deviation from Ideal | Voting Age Population | White VAP% | Black VAP% | Asian VAP% | Native Amer./ Pac. Islander VAP% | Latino/ Hispanic VAP% | Other VAP% |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 26,170 | 823 | 3.25% | 17,953 | 31.33% | 12.73% | 1.13% | 0.18% | **53.05%** | 1.59% |
| 2 | 24,696 | -651 | -2.57% | 16,117 | 22.03% | **53.29%** | 1.25% | 0.38% | 20.42% | 2.64% |
| 3 | 25,694 | 347 | 1.37% | 17,728 | 48.32% | 17.18% | 4.21% | 0.37% | 27.61% | 2.32% |
| 4 | 24,184 | -1,163 | -4.59% | 17,625 | 73.16% | 7.23% | 1.02% | 0.27% | 16.74% | 1.57% |
| 5 | 24,921 | -426 | -1.68% | 18,869 | 76.08% | 13.78% | 1.14% | 0.20% | 7.35% | 1.45% |
| 6 | 26,417 | 1,070 | 4.22% | 19,763 | 79.68% | 8.90% | 2.50% | 0.16% | 7.50% | 1.26% |
| | | | | | | | | | | |
| Total | 152,082 | | | 108,055 | | | | | | |
| Ideal Population | 25,347 | | | | | | | | | |

140.    The plan yields one black majority VAP district, District 2, which is 53.29% Black, and one majority Latino/Hispanic district, District 1, which is 53.05% Latino/Hispanic. All of the districts in the Precinct-Based Six District Plan fall within +/- 5% of the ideal population.  Harmon Aff. ¶ 27.

### **Census-Based Six District Plan**

141.    Plaintiffs' Census-Based Six District Plan is illustrated in Harmon Aff. Exhibit 11.

LIBA/1760998.1



Exhibit 11 – Six District BOE Plan Using  Blocks

142.    Upon visual inspection, there appear to be no problems of shape with the

proposed districts in the plan.  Harmon Aff. ¶ 29 (c).

143.    The demographics of the Census Block-Based Six District Plan are displayed in

the following table:

**Exhibit 12 - Voting Age Population - Six District BOE Plan Using Blocks**

| District | Total | Absolute Deviation from Ideal | Percentage Deviation from Ideal | Voting Age Population | White VAP% | Black VAP% | Asian VAP% | Native Amer/ Pac. Islander VAP% | Latino/ Hispanic VAP% | Other VAP% |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 24,662 | -685 | -2.70% | 15,761 | 21.77% | 14.57% | 0.70% | 0.21% | **61.16%** | 1.60% |
| 2 | 24,517 | -830 | -3.27% | 16,052 | 21.13% | **55.08%** | 1.15% | 0.40% | 19.63% | 2.61% |
| 3 | 26,399 | 1,052 | 4.15% | 19,184 | 71.79% | 7.55% | 0.99% | 0.26% | 17.91% | 1.50% |
| 4 | 25,356 | 9 | 0.04% | 19,168 | 72.97% | 15.92% | 1.27% | 0.23% | 8.04% | 1.57% |
| 5 | 26,324 | 977 | 3.85% | 19,494 | 75.33% | 9.55% | 3.48% | 0.20% | 9.79% | 1.65% |
| 6 | 24,824 | -523 | -2.06% | 18,396 | 62.35% | 11.16% | 3.44% | 0.24% | 20.96% | 1.85% |
| | | | | | | | | | | |
| Total | 152,082 | | | 108,055 | | | | | | |
| Ideal Population | 25,347 | | | | | | | | | |

144.    The Census Block-Based Six District Plan yields one majority Latino/Hispanic VAP district, District 1, which is 61.16% Latino/Hispanic.  It also yields one majority Black VAP district, District 2, which is 55.08% Black.  Harmon Aff. ¶ 28.

145.    While either the Precinct-Based Six District Plan or the Census-Block Based Six District Plan would improve the possibilities of the election of Latino/Hispanic and Black candidates to the Springfield School Committee, the plan based on Census blocks is more effective for a Latino/Hispanic candidate.  Harmon Aff. ¶ 29(d).

146.    Defense witness Daniel Marrier confirmed the accuracy of Dr. Harmon's work. Marrier Depo. at 35-36.

147.    Mr. Marrier did not offer a six-district School Committee plan based upon preserving the borders of Springfield's wards or neighborhoods.

LIBA/1760998.1

148.    Mr. Marrier did not offer a School Committee plan that he contended improved upon Dr. Harmon's plan.

149.    Changing to a ward election system with majority-minority districts would significantly increase the opportunity for minority representation on the City Council and School Committee.  Harmon Aff. ¶¶ 6(d), 31, 32; Amy Aff. ¶ 34.  For a fuller discussion of the issue of electoral opportunities, see Paragraphs 715-755, *infra*.

**Strong Inference of Improper Voting Dilution**

150.    Dr. Engstrom's testimony establishes that racially polarized voting is present in Springfield, and white bloc voting regularly defeats Latino and African American candidates of choice.  This satisfies the second and third *Gingles* preconditions.

151.    Dr. Harmon's testimony establishes that Latinos and African Americans are sufficiently numerous and geographically compact that it is possible to draw districts that would increase opportunities to elect minority candidates of choice.

152.    Proof of the three *Gingles* preconditions gives rise to a strong inference that "racial bias is operating through the medium of the targeted electoral structure to impair minority political opportunities." *Uno,* 72 F.3d at 983.

## TOTALITY OF THE CIRCUMSTANCES

153.    The totality of the circumstances demonstrates dilution of minority voting power, and a violation of Section 2 of the Voting Rights Act.

154.    Taking into account the strong inference arising from plaintiffs' proof of the *Gingles* preconditions, and also taking into account the totality of the circumstances, including but not limited to the Senate factors, "the record sustains a claim that racial politics – specifically, the interaction of race and the electoral system – have resulted in significantly

diminished opportunities for minority participation in elective government." *Uno*, 72 F.3d at 983-84.

## VI.    SENATE FACTOR: THE EXTENT OF ANY HISTORY OF OFFICIAL DISCRIMINATION IN THE STATE OR POLITICAL SUBDIVISION THAT TOUCHED THE RIGHT OF THE MEMBERS OF THE MINORITY GROUP TO REGISTER, TO VOTE, OR OTHERWISE TO PARTICIPATE IN THE DEMOCRATIC PROCESS.

### Lack of Spanish-Speaking Poll Workers, Lack of Effective Spanish Language Assistance and Other Problems at the Polls

155.    There has been an inadequate number of Spanish-speaking poll workers, and there have been other forms of voting-related discrimination against Latinos in Springfield.  In general, Springfield has not made adequate provisions for Spanish-speaking voters with limited English proficiency.

### Evidence of Violations of Section 203 of the Voting Rights Act

156.    Springfield has been subject to the requirements of Section 203 of the Voting Rights Act with respect to Spanish-speaking voters since 1992.  *See* City of Springfield, Massachusetts Election Handbook, Sept. 2006 (Pl. Ex. 2) at 59.

157.    23.9 percent of Springfield's population speaks Spanish at home.  Pioneer Valley Planning Commission, "A Demographic and Economic Analysis of the City of Springfield" (final version, dated Sept. 2006) (Pl. Ex. 159A and Foster Aff. Ex. B) at 15.

158.    In 1992 the Department of Justice ("DOJ") sent a letter to the Springfield Election Commission notifying the Commission that the City was subject to the bilingual requirements of Section 203 of the Voting Rights Act.  *See* Letter from Stephen H. Rosenbaum (Chief, Voting Section, Civil Rights Division, U.S. Department of Justice) to James Sullivan (Chairman, Election Commission, City of Springfield) re: bilingual requirements of Section 203 of the Voting Rights Act, September 21st, 1992 (Pl. Ex. 166); Complaint by Alberto Gonzales et

35

al, *U.S. v. City of Springfield*, August 2nd, 2006 ("DOJ Complaint") (Pl. Ex. 169); Revised

Agreed Settlement Order, *U.S. v. City of Springfield*, September 13th, 2006 ("Revised Agreed

Settlement Order") (Pl. Ex. 111).

159.    DOJ sent correspondence to the City of Springfield in 2002 and 2004 regarding

their bilingual election requirements; and DOJ also requested data from Springfield in 2004 and

2005. *See* Letter from R. Alexander Acosta (Assistant Attorney General, U.S. Department of

Justice, Civil Rights Division) to William Metzger (Springfield City Clerk) re: minority language

election information requirements of Section 203 of the Voting Rights Act, August 31st, 2004

(Pl. Ex. 167); Letter from Wan J. Kim (Assistant Attorney General, U.S. Department of Justice,

Civil Rights Division) to Edward M. Pikula (Springfield City Solicitor) re: lawsuit ("Kim

Letter") (Pl. Ex. 168); DOJ Complaint (Pl. Ex. 169); Revised Agreed Settlement Order (Pl. Ex.

111).

160.    DOJ notified the City of Springfield on July 19, 2006 that would it be filing a

lawsuit against the City for violations of Sections 203 and 208 of the Voting Rights Act offering

to negotiate a consent decree with the City to remedy the violations. *See* Kim Letter (Pl. Ex.

168). The DOJ Complaint contained, *inter alia*, the following allegations:

> a.    Spanish speaking voters in Springfield have faced difficulties and
> rude treatment at the polls. In some cases, Spanish speaking voters
> have left the polls without casting a ballot due to the absence of
> bilingual assistance and interference by poll workers and others in
> the voters' selecting the assistors of their choice. *See* Kim Letter
> (Pl. Ex. 168); DOJ Complaint (Pl. Ex. 169 ¶ 11).
>
> b.    In conducting elections in Springfield, Defendants have failed to
> provide effective election-related information and assistance to
> Spanish speaking voters, as required by Sec. 203 of the Voting
> Rights Act, by failing to recruit, appoint, train and maintain an
> adequate pool of bilingual poll officials capable of providing
> Spanish speaking voters with necessary and effective language
> assistance. *See* DOJ Complaint (Pl. Ex. 169 ¶ 13).

      c.     The City of Springfield has failed to provide effective election related information and assistance in Spanish to Spanish-speaking voters, as required by Section 203, by failing to provide certain election related information, including but not limited to information publicizing elections, in a manner that ensures Spanish speaking voters throughout the city have an opportunity to be informed about election related activities. *Id.* at ¶ 14.

161.    DOJ brought suit against the City of Springfield for

      a.     the failure to provide Spanish speaking citizens Spanish language election information and assistance in violation of Section 203 of the Voting Rights Act, *id.*;

      b.     failure to allow voters the assistors of their choice in violation of Section 208 of the Voting Rights Act, *id.* at ¶ 18, including prohibiting assistors of choice from providing assistance to Spanish-speaking voters with limited English proficiency, *id.* at ¶ 18a, and failing to accurately and adequately instruct poll workers on their duty to permit voters who need assistance to obtain assistance from any person of the voters' choice, *id.* at ¶ 18b.

162.    The City of Springfield entered into a comprehensive Agreed Settlement Order with the Department of Justice to remedy violations of Section 203 and Section 208 of the Voting Rights Act arising from the City's election practices and procedures, particularly as they affect Spanish-speaking voters of Springfield. *See* Agreed Settlement Order, *U.S. v. City of Springfield*, August 30th, 2006 (Pl. Ex. 110); Revised Agreed Settlement Order (Pl. Ex. 111).

163.    The City of Springfield is permanently enjoined from failing to provide Spanish-language materials and information as required by Section 203 of the Voting Rights Act. *Id.*

164.    The City of Springfield is permanently enjoined from failing to allow any voter who requires assistance to be given assistance by a person of the voter's choice. *Id.*

**Plaintiffs' Affidavit Testimony Similarly Shows Lack of Spanish Speaking Poll Workers, Lack of Effective Spanish Language Assistance, and Other Problems at the Polls**

165.     State Representative Coakley-Rivera has heard numerous complaints from her constituents and other concerned citizens of Springfield regarding the election process.  On many occasions over the years, she has brought election-related issues to the attention of city officials, including officials in the elections office and representatives of the Mayor's office.  Coakley-Rivera Aff. ¶ 20.

166.     Rep. Coakley-Rivera has raised election related issues with the City, including the following: the need to hire full-time bilingual staff in the elections office who have contact with the minority community; the need to appoint a Hispanic Elections Commissioner; the increased need for bilingual poll officials throughout the city to provide language assistance to voters; the importance of training those bilingual poll officials; and the unacceptable rude, hostile, and unwelcome treatment of minority voters both inside and outside the polling place.  Coakley-Rivera Aff. ¶ 21.

167.     Within the last several years, the City did address two particular issues Rep. Coakley-Rivera raised:  they hired a full-time bilingual employee in the elections office who had contacts for outreach in the Hispanic community, and they appointed the first-ever Hispanic Elections Commissioner.  The City did not take such steps on their own, but rather in response to Rep. Coakley-Rivera's continued, external pressure on them to do so. Coakley-Rivera Aff. ¶ 22.

**Lack of Bilingual Poll Workers**

168.     Until the U.S. Department of Justice filed suit against the City in 2006, the City never made any effort to recruit bilingual poll officials.  It was only through the foresight and leadership of the New North Citizen's Council, a community advocacy group serving the Hispanic community in the North End, that Spanish-speaking, bilingual poll officials were

recruited to work the polls on election day.  The City did not contact and encourage those

officials; the NNCC was responsible.  Interestingly, Ward 1 is the only ward in the city, with few

exceptions, to have had bilingual poll officials regularly in the last several elections, despite the

fact that a strong majority of the Hispanic voting age population of the city now resides outside

of Ward 1.  Coakley-Rivera Aff. ¶ 23.

169.    Throughout her years as a State Representative, Cheryl Coakley-Rivera has talked

with numerous voters who have had trouble at the polls because of the lack of Spanish-speaking

poll officials.  She has talked to many poll officials who have told her there need to be Spanish-

speaking poll officials working at their polling place to help voters who need language

assistance.  Forest Park is one area that Rep. Coakley-Rivera recalls having problems.  Coakley-

Rivera Aff. ¶ 13.

170.    Victor Davila has observed and experienced problems that many Hispanic voters

face on election day.  For several years, starting in about 1996, he volunteered to help campaign

for certain candidates on election day, or to bring voters to the polls on election day.  When he

was a candidate in 2003 and 2005, Davila spent a lot of time around polling locations on election

day.  Davila Aff. ¶ 25.

171.    In 1998, he volunteered to bring voters to the polls on election day.  He observed

at a polling location a Hispanic woman who spoke only Spanish who had brought with her

someone to translate for her so that she could vote.  The poll worker would not allow the

translator to accompany the woman into the voting booth.  Davila intervened and told the poll

worker that she should allow the translator to accompany the woman into the voting booth.  The

poll worker would not allow it, and instead insisted that a police officer accompany the woman

in the voting booth.  Davila Aff. ¶ 26.

172.    As long as Davila can remember there has been a lack of Spanish speaking poll workers. When he voted in 2005, he did not see any Spanish speaking poll workers where he voted, at the Central High School. Davila Aff. ¶ 28.

173.    Carlos Gonzalez has frequently taken Latinos with limited English proficiency to the polls and has observed Latinos having problems because of the lack of Spanish-speaking poll workers. His affidavit details several such incidents in 2004 and 2005. Gonzalez Aff. ¶¶ 24-30.

174.    For many years, Springfield failed to provide bilingual training for poll workers. Although Springfield has just recently begun to conduct such training, training has not been adequate. For example, poll workers have not been properly trained to inform voters who are not fluent in English of their right to cast provisional ballots. Gomez knows of several instances in which non-English speaking voters were not told that they could cast provisional ballots. Instead, they were told that they could not vote at all. Gomez Aff. ¶¶ 12, 16.

175.    There has been a lack of bilingual poll workers. In the past, the City has assigned non-bilingual poll workers who live outside of Ward 1 to the Ward 1 polling places. Gomez Aff. ¶ 14.

176.    In April 2004, Gomez became the President of the Democratic Committee for Ward 1. As President, he is involved in the selection of the Ward 1 poll workers. To his knowledge, prior to the November 2004 election the city never provided bilingual training for poll workers. Gomez Aff. ¶¶ 11, 18.

177.    During the 2004 election, Maria Idalí Torres went to the polling location at Our Lady of Hope and saw a line of Latino voters who did not know where to go or what to do. These voters were speaking with each other primarily in Spanish and appeared visibly confused. She did not see any poll workers who spoke Spanish or who offered assistance to these voters in

40

Spanish.  However, she saw and heard a white, elderly female poll worker say out loud to the

voters who were speaking in Spanish, "We are in America," in a loud and hostile tone.  The

election materials and instructions, including the Voter's Bill of Rights, were in English only.

Torres did not see any materials translated in Spanish.  Torres Aff. ¶ 8-9.

178.    Prior to the Department of Justice lawsuit, in all the elections that Torres voted in

Ward 2, she never saw any Spanish-speaking poll workers.  She often saw Spanish-speaking

voters bring friends and family members to help them vote because there were no poll workers

available to provide language assistance.  She also saw poll workers repeatedly ask Latino voters

for their names, and having trouble understanding Latino voters when they stated their names.

She has seen delays at the check-in line caused by these types of communication problems.  On

several occasions, she has intervened, translating for Latino voters who did not have anyone else

to translate for them.  Torres Aff. ¶ 11.

179.    In 2006, to satisfy the requirements of the consent decree in the case filed against

the City by the U.S. Department of Justice, City election officials tried to take bilingual poll

workers from Gomez's list in Ward 1 and put them in wards in other parts of the City.  Gomez

had to object and insist that the Ward 1 poll workers stay in Ward 1, and that the City get Ward

Committee Presidents in other wards to recruit their own bilingual poll workers.  Gomez Aff.

¶ 21.

180.    Spanish-speaking people may not understand that they can vote or that Spanish

language assistance is currently available.  Santiago Aff. ¶ 3.

### Failure to Offer Provisional Ballots (*see also infra*, ¶¶ 276-287, regarding Problems with Voter Registration)

181.    In Ward 4, Candice Lopes has regularly seen people who were turned away and

told they could not vote because their names were not on the voter registration list.  These people

were not offered provisional ballots, or told that they had the option to vote by provisional ballot.

Lopes estimates that at least once every other year, in the time it takes her to stand in line to

check in with the poll worker before voting, she has seen someone turned away and not offered a

provisional ballot. It has also been Lopes' observation that poll workers are not well informed

about the rules, and what voters are and are not permitted to do. In 2006, Lopes observed that

this situation had somewhat improved. Nevertheless, for many years it has been Lopes'

observation that poll workers were most often under-educated about voting rules and procedures,

and voters' rights. It seems that there has always been a lot of voter confusion, and confusion

among poll workers, on election day in Springfield. Lopes Aff. ¶ 26.

182.    It has been Lopes' observation that the people who are turned away and not

offered provisional ballots are generally minorities. African Americans and Hispanics in

Springfield, in general, tend to be poorer and more transitory than whites in Springfield. In

addition, many Hispanics in Springfield do not speak English well. This combination of a lack

of language skills, and moving residences more frequently than most leads to many African

Americans and Hispanics either not receiving the yearly census forms as they should, or not

understanding those forms when they receive them. As a result, Lopes believes, and it is the

belief in the minority community in general, that minorities in Springfield are disproportionately

removed from the voting lists because of failure to receive and/or return their census forms.

Lopes Aff. ¶ 27.

183.    Davila has frequently seen Hispanic voters who are told they are not on the voter

list when they think they are registered to vote. He also has frequently seen that poll workers

would not even make an effort to check the inactive voter list when a Hispanic voter did not

appear on the active voter list. Before 2006, he never saw a poll worker offer a voter a

provisional ballot after telling the voter that his or her name was not on the voter list.  Since

1996, he estimates that he has seen hundreds of voters who were both turned away because their

names did not appear on the voter list, and not offered provisional ballots.  He has seen poll

workers treat Hispanic voters with indifference, and rarely go out of their way to try to help

Hispanic voters whose names do not appear on the voter list, or who otherwise have difficulties

at the polls because they require assistance voting, or understanding the materials.  Davila Aff.

¶ 27.

184.    As a candidate, Davila was at a distinct disadvantage in that he had to be

concerned not only with getting votes, but also with whether people would be able to exercise

their right to vote.  Davila Aff. ¶ 29.

### Rude Treatment of Hispanic Voters

185.    Minority voters in the City of Springfield continue to experience rude, hostile and

unwelcome treatment at the polls that suppresses their desire to participate fully in the electoral

process.  Based on the complaints Rep. Coakley-Rivera has received, this treatment may very

well result from the lack of bilingual poll officials, cultural insensitivity, or merely lack of

official training on proper election procedures and language assistance.  Coakley-Rivera Aff.

¶ 25.

186.    Gonzalez has had experience with poll workers making rude or degrading

remarks to people with limited English proficiency.  Gonzalez Aff. at ¶ 31.

187.    Ward 1 voters who are not fluent in English have been treated by poll workers in

a way that discourages them from voting.  Gomez has heard non-bilingual poll workers use a

tone of voice with Spanish-speaking voters that is very discouraging.  When Spanish-speaking

voters have asked Gomez for help, and he has tried to talk with non-bilingual poll workers on

these voters' behalf, the poll workers have used a discouraging tone of voice with Gomez as well.  Gomez Aff. ¶¶ 13, 17.

188.    When Gomez has seen poll workers in Ward 1-B being unhelpful to Hispanic voters, more often than not, those poll workers were not Hispanic, nor were they residents of Ward 1.  Gomez Aff. ¶ 15.

189.    There have been numerous problems on election day with white poll workers treating minority voters disrespectfully.  The city has generally hired white poll workers who did not provide appropriate assistance to voters and discouraged African Americans and Latinos from voting.  Henry Twiggs, Ward 4 Democratic Party Chairman has received numerous complaints from minority voters about how poorly they were treated when they attempted to vote.  He has tried to work with city officials to bring in new poll workers who will treat voters respectfully.  Twiggs Aff. ¶ 11.

### Inadequate Translations of Voting Related Materials

190.    The 2005 annual Census form contained Spanish translations that were inaccurate and confusing.  Torres Aff. ¶¶ 16-26.

191.    The top of the census form states in English, "Important Legal Document – Annual Street Listing."  The Spanish translation is so grammatically incorrect that it would not make sense to the average person.  Torres had difficulty providing a literal translation of the Spanish, because it is written so poorly, but she said it would be something approximating "Information system for registering voters as a form of validating an annual listing of streets." Torres Aff. ¶ 20.

192.    The translations on the 2005 Census form for first, middle, and last name are also confusing.  The Spanish word for last name, "Apellido," is spelled incorrectly.  The word used

for first name, "Sufijo," is a Spanish word used in Spain, but not in Puerto Rico, and would not

be understood by an average Puerto Rican reader.  The word used commonly in Puerto Rico for

first name in "nombre."  Confusingly, the translation on the survey for "middle initial is given as

"Nombre Inicial."  The correct translation for "middle initial" is simply "inicial."  Torres Aff.

¶ 21.

193.    The translation of the phrase, "New Address if Moved" also is incorrect.  The

correct translation would be, "Dirección nueva si se ha mudado."  Instead, the form says,

"Dirección nueva si hay de dirrection," which means, "new address if there is address."  Torres

Aff. ¶ 22

194.    The English words underneath the signature line state, "Signature of Respondent."

The Spanish version states "Firma de Demandado."  "Demandado" does not mean respondent.  It

means a person who is being sued.  Torres Aff. ¶ 23.  Instead of stating, "Signed under penalties

of perjury," the Spanish version states, "Signed under the sadness of perjury."  Torres Aff. ¶ 24.

195.    A confusing Spanish-language census form has adverse consequences for Latino

voters.  According to the 2005 Census form, failure to respond "shall result in removal from the

active voting list and may result in removal from the voter registration rolls."  Pl. Ex. 177.

### Lack Of Spanish Voting Information

196.    Before the 2006 election, Molina had never seen Spanish translations of election

materials at voting locations.  Molina Aff. ¶ 8

197.    Although Gomez regularly listens to two Spanish language radio stations, and

regularly reads three Spanish-language newspapers, he has never seen or heard any City notices

about elections in Springfield's Spanish-language media.  Gomez Aff. ¶¶ 19, 20.

198.    Torres reads the Spanish language newspaper, *El Pueblo Latino*, and listens to the Spanish-language radio programs on a regular basis.  Prior to 2006 she never saw or heard any election-related public service announcements sponsored by the City in any of the Spanish-language newspapers or radio stations.  Until 2006, the City's official website published all information about elections in English only.  In 2006, Torres went online in order to download voter registration forms so that she could help register Spanish-speaking voters, but she saw that there were no Spanish-language voter registration forms available online.  Torres Aff. ¶ 10.

199.    Over the years, Rep. Coakley-Rivera has seen very little dissemination of election information by the City, if any.  She looks through each issue of the Spanish newspapers, *El Pueblo Latino* and *El Perdico*, and listens to the two Spanish radio stations, 1270 and 1490 AM and has never seen or heard anything published or produced by the City in either of those types of media regarding elections.  She did not see or hear any City announcements in the Spanish-language media in 2006.  Coakley-Rivera Aff. ¶ 15.

**Poll Monitoring of the 2004 Election Revealed Significant Problems**

200.    For the November 2004 election, MassVOTE organized poll monitors for certain polling sites around Springfield.  Reports completed by Christina Densmore, Tory Field and Keely Malone (Exhibit A to the Trial Affidavit of Atiya Dangleben) indicate that there were voting problems in several precincts involving voters leaving the polls without voting; voters being given wrong information; voters having language problems; voters asked for ID when not necessary; voters not told about provisional ballots, and voters at wrong polling location.  Monitors also indicated that the poll workers did not reflect the language, age or ethnic diversity of the neighborhood and that there was no Spanish translation provided in predominantly Spanish neighborhoods.  Dangleben Aff. ¶¶ 8, 10, 14-15.

201.    In 2004, Keely Malone, volunteering with MassVOTE as a poll monitor at the Brookings School, Ward 3-E in Springfield, made the following observations, and had the following experiences.  *See infra* ¶¶ 202-212.

202.    African American voters were repeatedly turned away without having the opportunity to cast a ballot because their names were not on the list or they did not have identification.  Malone Aff. ¶ 7.

203.    There was confusion among poll officials as to whether a second ballot could be offered if a voter made a mistake on their first ballot.  *Id.*

204.    When a voter's name was not found on the list, they were sent to the lead poll official, an older, Anglo woman, and some discussion occurred.  After several voters were turned away, one African American poll official asked Malone whether the voters were supposed to be able to do something else if they were not on the list, so that they could vote.  Malone assumed she was referring to a provisional ballot, but Malone just told her she could not get involved because her job was to only record what occurred.  *Id.* ¶ 8.

205.    After seeing a few voters turned away without casting a ballot, Malone turned her attention to what the lead poll official was saying.  Malone heard her say to the next three or four voters who were not on the list, that unless they had the letter they received in the mail confirming they were registered to vote, they could not vote there.  Malone ultimately left the polling place to help the voters who were being turned away.  *Id.* ¶ 9.

206.    Once outside the school, Malone told a few of the voters who had just been turned away that they had a right to at least cast a provisional ballot and they should not leave without being given the opportunity to do so.  As a monitor, Malone had been given a hotline number to call if she witnessed a big crisis on election day.  Because she was so concerned, Malone

borrowed a cell phone, called that number, and reported what she had seen. She then went back into the school. *Id.* ¶ 10.

207. Shortly thereafter, someone Malone did not recognize walked into the polling place and talked to the lead poll official. Malone overheard that individual saying to the lead poll official that provisional ballots should be offered if the voter was not on the registration list and that if a voter makes an error on a ballot, they should be offered a second ballot. In response, the poll official said something like, "How come no one told me about these changes?" After that, poll officials began offering provisional ballots to voters. This change in procedure took place at approximately 6:00 p.m. *Id.* ¶ 11.

208. Numerous times thereafter, Malone heard the poll officials complaining, "it's not like it used to be," or "the procedures have changed," or "I don't know what's going on." *Id.* ¶ 12.

209. Another incident Malone observed later on during her shift was when a Latino voter in her 50's came into the polling place along with a younger, Latino individual in her 20's. As they were both checking in, the younger voter said, "Can't I help my mother vote?" and there was some confusion among the poll officials as to whether this was allowed. Ultimately, the poll officials let the daughter help, but only after some discussion between the two officials at the table. It appeared the poll officials did not know whether this was allowed. *Id.* ¶ 13.

210. During the time Malone was monitoring, there also seemed to be a fair amount of confusion as to whether the voters had put their paper ballots into the correct counting machine. There was not much room in the polling site, anyway, and with the two poll tables on each side, voting booths in the middle and two counting machines, along with poll officials and voters trying to get in out of the cold, it was easy to see why there was chaos. *Id.* ¶ 14.

48

211.    A large number of voters, mainly Latino and African American, showed up to vote at the school, said they had voted there before, but were not allowed to vote that day.  The poll workers told some of these voters that their polling place had changed, and that they should have been notified of the change.  Malone did not mark these incidents on her report, because she was led by the poll workers to believe that the voters had made a mistake in coming to the Brookings School.  However, some voters would come in and that location would have been the second or third place they had tried that day.  One person was sent by the poll workers to another polling location, but returned to Brookings School after he was told at the other polling location that his correct polling location was the Brookings School.  *Id.* ¶ 15.

212.    Malone did see white individuals coming in to vote, but she did not see any of them having the same kind of problems mentioned above.  Malone distinctly remembers that difference in treatment because after the initial problems, she began to focus on whether voters of all races were treated the same.  There seemed to exist a sort of camaraderie between the white poll officials and the white voters, that was not the same with minority voters.  *Id.* ¶ 16.

### The 2006 Election:  Monitoring Reports Show Continued Problems

213.    On November 7th, 2006, Election monitors from the U.S. Department of Justice's Voting Rights Program Office working at Springfield polling locations witnessed and documented several problems involving racial insensitivity and hostility.  *See infra* ¶¶ 214-224.

214.    At the Mason Square Library polling location, monitors reported that the inspectors and interpreter showed a lack of concern for voters as a whole and were "incompetent."  The interpreter and inspector wandered around the room, and one poll worker fell asleep, leading most work to be pushed onto the warden and policemen.  The translator did not get up from her seat to assist any Spanish speaking voters, and the police officer attempted to

49

interpret Spanish, but was not fluent. The officer spoke in a combination of English and Spanish. The police officer performed 95% of the duties that the clerks should have performed. *See* Report by the United States Office of Personnel Management Observers Regarding Nov. 7, 2006 Springfield Election, Polling Place: Mason Square Library (Pl. Ex. 66) at 22A, 22B.

215.    At the same polling station, the police officer, who was not trained to assist with the ballot, did not inform the voter that the voter could vote for more than one candidate for an office. Pl. Ex. 66 at 27.

216.    None of the poll workers at the Pine Point Library polling location spoke Spanish. A poll worker told a voter that if they needed language assistance, they should use the disability assistance machine, since it explained everything in both English and Spanish. Poll workers also gave out the wrong ballots, and the machine began rejecting the ballots. *See* Report by the United States Office of Personnel Management Observers Regarding Nov. 7, 2006 Springfield Election, Polling Place: Pine Point Library (Pl. Ex. 67) at 22A.

217.    At the Rebecca Johnson School polling location in Springfield, observers reported that voters had trouble finding the polls because no signs were placed in the area approaching the polling site. Only one small sign existed, measuring 8 1/2 inches by 11 inches, on the entry door, reading "VOTE-AQUI." *See* Report by the United States Office of Personnel Management Observers Regarding Nov. 7, 2006 Springfield Election, Polling Place: Rebecca Johnson School (Pl. Ex. 68) at 22B.

218.    Additionally, at this site, poll officials refused to grant a provisional ballot until someone placed a call to City Hall. Pl. Ex. 68 at 19.

219.    An elderly African-American woman was repeatedly turned away at the polls, even though she returned with a note by the clerk saying "Please do not turn away again." Still,

50

they poll workers told her she was on an "inactive" list and that she should vote at the Raymond

Sullivan Center. She was not offered a provisional ballot. *See* Report by the United States

Office of Personnel Management Observers Regarding Sept. 19, 2006 Springfield Election,

Polling Place: Van Sickle School Gym (Pl. Ex. 59) at 22C.

220.    At this same poll site, a Spanish speaking inspector reported harassment by a

voter. A voter was directly in front of a Spanish inspector and interpreter named Ermelinda

Cardona. Before asking the voter for any information, the voter said, "I want to know since

when Puerto Ricans have the right to vote. If they don't know how to read and write they should

not be here. This is bullshit." Pl. Ex. 59 at 22G.

221.    At the Good Life Center polling place, poll workers were told to ask a voter for

ID if the person "has a baby face," or says he or she lives outside of Springfield. If that is the

case, the poll worker will ask City Hall and then verify the address with some form of ID. *See*

Report by the United States Office of Personnel Management Observers Regarding Nov. 7, 2006

Springfield Election, Polling Place: Good Life Center (Pl. Ex. 62) at 20.

222.    At the Brooking Middle School polling place, referring to voters needing

language assistance, a White poll worker named Helen Haskell remarked "I don't know why

'they' are here and they start speaking Spanish." She told a Bilingual Inspector that "if they're

American citizens they should speak English and shouldn't need interpreters." *See* Report by the

United States Office of Personnel Management Observers Regarding Sept. 19, 2006 Springfield

Election, Polling Place: Brooking Middle School (Pl. Ex. 60) at 22C.

223.    When a Hispanic voter came in, a White Inspector told the voter to wait a little

while, and another voter came after him but voted in front of him. When a federal observer

spoke to the voter, the voter said "this happens all the time, every year—the voter is always asked to wait to vote every year."  Pl. Ex. 60.

224.    Poll workers at the Brooking Middle School location were poorly trained, and an inspector mentioned that training could be improved by providing an example of what should be done in case voters become upset.  Only after the City Attorney, Ed Pikula, spoke with Helen Haskell, did Haskell stop making offensive comments.  Pl. Ex. 60 at 22E.

### Poll Tax and Literacy Test

225.    At one time, the City of Springfield used a poll tax to determine the eligibility of citizens to participate in the electoral process.  Defendants' Answers to Plaintiff's First Set of Interrogatories, *Swan et. al. v. City of Springfield*, C.A. No. 96-30242-MAP, Response to Interrogatory No. 20.

226.    At one time, the City of Springfield used a literacy test to determine the eligibility of citizens to participate in the electoral process.  Defendants' Answers to Plaintiff's First Set of Interrogatories, *Swan et. al. v. City of Springfield*, C.A. No. 96-30242-MAP, Response to Interrogatory No. 18.

## VII.    SENATE FACTOR:  THE EXTENT TO WHICH VOTING IN THE ELECTIONS OF THE STATE OR POLITICAL SUBDIVISION IS RACIALLY POLARIZED.

227.    Dr. Richard Engstrom's testimony establishes the existence of racially polarized voting in Springfield.  *See* Paragraphs 67-108, *supra*.  In addition, there is other evidence of polarization.  *See infra* ¶¶ 228-272.

228.    Latino candidates are unable to get large support across the city.  Tosado Depo. 36:21-22.

229.    Jose Tosado was one of the founders of the Latino Breakfast Club and was one of the people who made the decision to have the Latino Breakfast Club be a plaintiff in the first lawsuit in the 1990's challenging the at-large election system, because Latinos were unable "to gain access to elected office." Tosado Aff. ¶ 7; 7(c).

230.    Gonzalez helped Jose Tosado campaign for City Council, and he also supported Orlando Santiago's campaign for School Committee. When campaigning for Tosado, Gonzalez would sometimes help with "standouts" where several people would stand on a corner at a busy intersection holding signs for Tosado. On several occasions, people driving by in their cars yelled derogatory statements toward the Latino community, and racial epithets, out their windows at the group. Gonzalez Aff. ¶ 13

231.    At least some minority candidates have not been elected because white people didn't vote for them because they were minority. People bring their bias to how they vote and who they will support. Some people may not support a candidate because of their race. Mazza Moriarty Depo. 72:15-24; 73:1-20.

232.    It is very difficult for African American and Latino candidates to get white people to support and vote for them. It hasn't been possible to win an at-large election for City Council or School Committee in Springfield without getting support from the white community. You could get all the minority votes and still not win the election unless you get a significant number of white votes. Talbert Swan Aff. ¶ 3.

233.    The white wards of Springfield have not supported African American candidates. Whites have voted to defeat most African American candidates. Twiggs Aff. ¶ 6.

234.    Candidates of color have had a difficult time getting elected to Springfield's City Council and School Committee under the at-large election system. With rare exceptions, there

53

was never more than one African American elected at a time.  Generally the African American candidates elected were well known in the white community.  Thomas Aff. ¶ 3.

235.    African Americans and Latinos do not have access to many of the established social and business organizations such as the Rotary Club, Exchange Club and Chamber of Commerce that generally support white candidates.  *Id*. ¶ 7.

236.    African American candidates get a cold response in the white neighborhoods and they are not taken seriously.  *Id*. ¶ 14.

237.    Most often minorities in Springfield are being asked to vote for white people they do not know or have a relationship with other than during campaign time.  The minority candidates who run often times are limited in their ability to attract white voters because of their lack of access to the business community that funds campaigns and because of limited opportunity for social access across racial and ethnic lines.  This is due to segregated housing patterns, worship patterns, education and employment patterns in Springfield.  *Id*. ¶ 19.

238.    To get elected, African American candidates have had to establish allegiances with whites, as the majority of voters have been white.  African American candidates must focus on white voters in order to win.  Thus the structure of the at-large system has inhibited allegiances between African Americans and Latinos.  *Id*. ¶ 33.

239.    To get elected, African American and Latino candidates need support from the predominantly white areas of Forest Park, East Forest Park, Sixteen Acres, East Springfield and Indian Orchard.  It was always difficult for minority candidates to get a foothold in these white neighborhoods.  Sometimes whites say they will support you, but in fact never vote for you if you are African American. Darnell Williams Aff. ¶ 10.

240.     There appears to be an unwritten rule that only one African American at a time could serve on the City Council.  This was true for many years.  There was only one term when there were two African Americans serving at the same time in recent history.  People seemed to feel that one African American was enough.  Darnell Williams Aff. ¶ 11.

**Carol Lewis-Caulton**

241.     Sometime toward the beginning of Carol Lewis-Caulton's 1997 campaign, Lewis-Caulton had a conversation with a Massachusetts state legislator about her candidacy for City Council.  The state legislator advised Lewis-Caulton that she should not campaign with Black men, as it was her impression that it would hurt her candidacy because white voters would find Black men threatening or intimidating.  Lewis-Caulton Aff. ¶ 6.

242.     During each of Lewis-Caulton's campaigns for City Council, Mr. Errol Campbell, an African-American man, has worked as Lewis-Caulton's campaign manager.  In addition, several other African-American men regularly helped with Lewis-Caulton's campaigns.  Lewis-Caulton Aff. ¶ 7.

243.     At the beginning of the 1997 campaign, Lewis-Caulton regularly appeared with Campbell and with other African-American men, while campaigning.  At some point during the 1997 campaign, Campbell and Lewis-Caulton decided that Campbell, and other African-American men, would not attend certain campaign events in predominantly white neighborhoods.  Lewis-Caulton noticed that her reception in predominantly white neighborhoods was different when she appeared either alone, or with her sister, who often accompanied her while campaigning, than it was when she appeared with Campbell or with other African-American men.  When Lewis-Caulton was accompanied by African-American men in predominantly white neighborhoods, she felt that she was received much less openly due to behavior that she perceived as race-based.  Lewis-Caulton did not have the same feeling when

55

she was accompanied by African-American men in predominantly African-American or Latino/Hispanic neighborhoods. Campbell believed that Lewis-Caulton's campaign was adversely affected by his presence in predominantly white neighborhoods. Lewis-Caulton Aff. ¶ 8; Campbell Aff. ¶ 5.

244.    Before making the decision to stop attending certain events, Mr. Campbell had regularly attended debates and other campaign events with Ms. Lewis-Caulton in predominantly white neighborhoods, as well as in predominantly African-American and Latino/Hispanic neighborhoods. When Campbell attended events in predominantly white neighborhoods, he frequently felt unwelcome due to behavior that he perceived as race-based. For example, during the 1997 City Council campaign, he attended a debate with Ms. Lewis-Caulton at the Goodwill Center in Ward 5, which is in a predominantly white neighborhood. Campbell felt generally unwelcome at that debate, and noticed his presence affected Ms. Lewis-Caulton's reception; in particular, he noticed that people attending the debate tended not to approach Ms. Lewis-Caulton if he was standing with her, but that people freely approached her if he was not nearby. Campbell never felt unwelcome because of his race when attending campaign events in predominantly African-American and Latino/Hispanic neighborhoods. Campbell Aff. ¶ 6.

245.    For the remainder of the 1997 campaign, Campbell frequently did not appear with Ms. Lewis-Caulton when she campaigned in predominantly white neighborhoods. Ms. Lewis-Caulton and Campbell employed this strategy with greater frequency during the 1999, 2001, and 2003 campaigns than they had during the 1997 campaign. For example, during the 1999 campaign, Campbell did not attend a debate held at Our Lady of Mercy in Ward 2, and he also did not attend a campaign event at the Frederick Harris School in Ward 7, both of which are in predominantly white neighborhoods. Campbell continued, during the 1999, 2001 and 2003 City

Council campaigns, to attend campaign events and to appear with Ms. Lewis-Caulton in predominantly African-American and Latino/Hispanic neighborhoods. Campbell Aff. ¶ 7.

246.    After losing the 1997 campaign, Mr. Campbell and Ms. Lewis-Caulton decided that they would employ the strategy of limiting Lewis-Caulton's appearance with African-American men in predominantly white neighborhoods with greater frequency. Mr. Campbell and other African-American men rarely accompanied Lewis-Caulton in predominantly white neighborhoods during the 1999, 2001 and 2003 campaigns. Lewis-Caulton Aff. ¶ 9.

247.    Additionally, Mr. Campbell and Ms. Lewis-Caulton decided that African-American men should not appear at "stand-outs" for Lewis-Caulton in predominantly white neighborhoods. At a stand-out, volunteers would typically hold Lewis-Caulton's campaign signs and wave at passers-by in busy intersections. Mr. Campbell started organizing stand-outs during the 1999 campaign, and continued to do so during the 2001 and 2003 campaigns. For about one month before election day, volunteers would do about three stand-outs per week for Lewis-Caulton, each at a different location in Springfield. For stand-outs in predominantly African-American or Latino/Hispanic neighborhoods, Mr. Campbell and other African-American men would participate. Generally, Mr. Campbell did not have difficulty recruiting African-American or Latino/Hispanic volunteers to appear at stand-outs. For stand-outs in predominantly white neighborhoods, Mr. Campbell would generally not participate; instead, he would go to the location of the stand-out to distribute campaign signs to the volunteers, but would wait in his car. Mr. Campbell had difficulty recruiting enough white supporters from Springfield to appear at stand-outs for Lewis-Caulton. After continued difficulty recruiting white volunteers from Springfield, Mr. Campbell began to recruit white individuals from outside of Springfield to participate in stand-outs in predominantly white neighborhoods. African-American men only

participated in stand-outs in predominantly white neighborhoods when there were not enough white volunteers.  Lewis-Caulton Aff. ¶ 10; Campbell Aff. ¶ 8.

248.    Carol Lewis-Caulton, an African-American city councilwoman, received 98 per cent of the black vote and yet was not reelected.  Bud Williams Depo. 72:8-73:9.

### **Victor Davila**

249.    Davila believes that if Springfield elected its School Committee members from districts, instead of at-large, he would have won his campaigns.  He believes that he had strong support from Latino voters, but did not have the support of Springfield's white voters.  Davila Aff. ¶ 20.

250.    Victor Davila has observed the campaigns of other Hispanic candidates in Springfield and has seen them encounter the same difficulties as he encountered.  In 2005, Orlando Santiago ran for School Committee.  Santiago was retiring from his position as a correctional officer when he ran, and had the advantage of being able to campaign full time. Santiago ran a very good campaign, and finished fourth in 2005.  He had very strong support in the Latino community.  But, like Davila, he also did not have enough support from white voters to be elected.  *Id*. ¶ 21.

### **Candice Lopes**

251.    When Candice Lopes ran for re-election in 1991, she lost.  Lopes believes that her loss can be attributed, in large part, to the fact that she supported the school superintendent at the time, Peter Negroni.  Mr. Negroni was Springfield's first Hispanic school superintendent.  Mr. Negroni was perceived in Springfield as protecting and defending, and being an advocate for, African American and Latino students, and, for this reason, was not popular in Springfield's white community.  Negroni's actions as they related to African American and Latino students

58

received a lot of attention in the community that year. Lopes' challenger, Beth Conway, did not support Negroni, and she won the School Committee seat that year instead of Lopes. Ms. Conway is white. Lopes Aff. ¶ 15

252.    In 1991, when Candice Lopes lost her re-election campaign, she had greater support in areas that were predominantly African American, and much less support in areas that were predominantly white. Lopes believes that the 1991 election for School Committee was a very racially polarized election. *Id*. ¶ 16

### **Other Candidates**

253.    The city's at-large election system disadvantages people of color by making it virtually impossible for them to be elected to the City Council or School Committee. There have been many Hispanic candidates for City Council and School Committee with strong support among Hispanic voters who failed to win because they did not get a significant percentage of the white vote, including Gumersindo Gomez, Alex Cortes, Orlando Santiago, Edgar Alejandro, and Rafael Nazario. Coakley-Rivera Aff. ¶ 6.

254.    Edgar Alejandro ran a strong campaign for City Council in 1991, but he did not win. More recently, Orlando Santiago ran a very strong campaign for School Committee. He had a lot of support in the Latino community, but he did not have enough white support to win. Other strong Latino candidates who were not able to win on account of their ethnicity include Carlos Lopez and Miguel Rivas in the 1980s, Gumersindo Gomez in 1997, and Alex Cortes in 2001 and 2003. These candidates had strong support among Latino voters, but did not have the support that they needed from white voters in order to win. Torres Aff. ¶¶ 47-49.

255.    Charles Rucks had very strong support among African-American voters in his City Council races, but he still lost. He was a strong candidate, too. His family has lived in

Springfield for a very long time.  He is a product of the Springfield public schools, and he attended a military academy and served in the military.  He did not win because despite his strong credentials, he did not have enough support outside the African-American community. Lewis-Caulton Aff. ¶ 23.

256.    When Rep. Ben Swan ran for Mayor in 1991 and 1993, he lost each election because he was not able to get enough white votes, although he won Ward 4 which is majority African American.  Ben Swan Aff. ¶¶ 23, 26.

257.    White voters generally vote as a bloc to defeat minority candidates.  For example, the only precinct Rep. Ben Swan loses consistently is one in Ward 7, which has the highest number of white voters.  Talbert Swan Aff. ¶10.

258.    When Henry Twiggs campaigned with African American candidates in predominantly white neighborhoods he encountered a lack of support from white voters.  In Ward 7 when knocking on doors he had the door slammed in his face by white voters.  When he was handing out literature at a factory gate, white workers threw their flyers in his face or on the ground.  Twiggs Aff. ¶ 5.

259.    In about 1970, Henry Payne, a very popular African American ran for State Representative.  He had been an all-star basketball player at Commerce High School and was very well known and well liked and respected throughout Springfield.  He had great support in the African American community but was not able to get the support from the white community necessary for him to get elected.  Although he was well liked in the white community when he was a star athlete, whites would not vote for him when he ran for public office.  *Id*. ¶ 7.

260.    The times African American candidates got the support of white voters were when they were perceived to be Irish because of their names, and voters did not know they were

of color.  Rev. Ron Peters, a Black minister, got elected to the School Committee because he did not have his picture on his campaign literature and many voters thought he was white.  He only served one term and was then defeated.  Twiggs Aff. ¶ 8.

261.    Paul Mason, an African American, was able to get elected to the Springfield City Council in the 1960s because he was known to the white community.  His uncle donated land to the City, which became Mason Square, and Paul Mason got elected because of his family connections and his ability to appeal to the white community.  Not many African American candidates have those family connections and reputation in the white community to allow them to win in a citywide election.  Thomas Aff. ¶ 4.

262.    Frank Buntin ran for City Council two times and for School Committee two times.  Despite getting a lot of votes from the African American community he was not able to win the white vote and thus was not able to get elected.  Under the at-large election system, the minority vote is weakened because all the whites come out and vote for the white candidates, making it much easier for them to win.  Even today, when whites are not the majority in Springfield anymore, they are still the voting majority and can still more easily win citywide elections than minority candidates.  Buntin Aff. ¶ 3.

263.    Generally it has been very difficult for African American and Latino candidates to win citywide elections in Springfield.  When Robert McDonald ran for City Counsel, he won the primary because people thought he was Irish.  After he won and the newspaper published his picture and people saw he was African American, he lost the election. Most of the African American candidates who have won have been viewed as the "safe" candidates, those who were perceived as less threatening to the white majority.  *Id.* ¶ 4.

LIBA/1760998.1

264.    Many of the African American candidates who lost were more qualified than the white candidates who won.  African American candidates with Ph.D's and master's degrees have lost to white candidates with just a high school diploma.  For example, Charles Rucks, an African American, was defeated for City Council because white people wouldn't vote for him despite the fact that he was very qualified and grew up in Springfield.  He graduated from Annapolis and was well-educated, yet couldn't attract enough of the white vote to win.  Jesse Parks, a very qualified African American candidate for School Committee, had a Ph.D and was the head of a Department at Springfield College.  He was defeated because he did not get enough white votes, while Fran Coughlin, a less qualified white candidate with just a high school diploma, was elected.  Buntin Aff. ¶ 5.

265.    When Frank Buntin ran for City Council a white candidate who was also running asked him to take her around his African American neighborhood to introduce her to voters and she took Mr. Buntin around her white neighborhood.  She got a good reception in the African American community, but Frank Buntin got a much less cordial reception in her neighborhood.  One white voter came up to them and told the white candidate "you've got my vote" and pointedly ignored Mr. Buntin.  *Id*. ¶ 6.

266.    When Frank Buntin ran for Springfield City Council the Springfield newspaper came out with an editorial saying that the voters should pick one of  the African American non-incumbents. This was indicative of the attitude of the majority of whites in Springfield that there should be only one minority on the City Council at a time.  Buntin Aff. ¶ 2.

267.    Darnell Williams ran for Springfield City Council in 1991 and 1993 and  ran for State Representative in 1994.  He did not win either of the City Counsel elections despite receiving the majority of the African American vote.  Darnell Williams Aff. ¶ 4.

268.    When Darnell Williams ran for City Council, despite being very qualified by virtue of his education, having a Master's in Education from Boston University, being a community leader and serving in many city positions, he felt that people in the white community marginalized him because he was African American.  Darnell Williams Aff. ¶ 11.

269.    When Darnell Williams ran for City Council in 1991, the Springfield *Union-News* declined to endorse a particular African American challenger, suggesting instead that voters pick one of the four African American non-incumbents running that year.  They endorsed more than one white incumbent but yet would not endorse more than one African American challenger. *Id.* ¶ 12.

270.    Bud Williams' political "base" is the black community and the "core" of his campaign is black people.  Bud Williams Aff. ¶ 25; Bud Williams Depo. 31:21-23; 36:1-3.

**Other Indications of Racial Polarization**

271.    There is a perception and belief in the Latino community that Springfield has significant race divisions.  For example, the local newspaper, the Springfield *Republican*, is available on a website called MassLive.com.  MassLive.com posts stories from the newspaper on its website, and for many stories allows people who are users of the site the opportunity to post comments about the stories on the website.  Carlos Gonzalez frequently sees that people have posted racist comments on the website.  For example, in response to articles about the Puerto Rican parade, there were many derogatory comments posted about Puerto Ricans and Hispanics.  Gonzalez has seen comments posted on the website that blame crime on Hispanics in Springfield, and that blame the City's problems on Hispanics.  Gonzalez Aff. ¶ 12(k).

272.    One of the reasons that it is difficult for minority candidates to receive votes from white voters is that Springfield is a very segregated city.  While Springfield is physically

63

segregated in the sense that there are areas of the city that are predominantly either African American, Hispanic or white, the segregation extends far beyond neighborhood lines, and into social venues and organizations, places of worship, and community organizations. In Candice Lopes' experience, it is very uncommon to see white residents of Springfield socializing with minority residents of Springfield. Divisions based on race and ethnicity are commonly seen throughout the city. For example, there are certain restaurants in downtown Springfield that tend to be frequented by whites, and certain restaurants in the same area that tend to be frequented by African Americans. These restaurants are located in the same general vicinity, not in areas where there is a high residential concentration of people of one race or ethnic group. Lopes Aff. ¶ 23.


**VIII. SENATE FACTOR: THE EXTENT TO WHICH THE STATE OR POLITICAL SUBDIVISION HAS USED UNUSUALLY LARGE ELECTION DISTRICTS, MAJORITY VOTE REQUIREMENTS, ANTI-SINGLE SHOT PROVISIONS, OR OTHER VOTING PRACTICES OR PROCEDURES THAT MAY ENHANCE THE OPPORTUNITY FOR DISCRIMINATION AGAINST THE MINORITY GROUP.**

**Geographic Size**

273. The city-wide at large system is tantamount to the creation of a very large election district. Springfield covers approximately 32 square miles. *See US Census Bureau American Fact Finder: Tables – Massachusetts Population, Housing Units, Area and Density, 2000*; available at http://factfinder.census.gov/servlet/GCTTable?_bm=y&-geo_id=04000US25&-_box_head_nbr=GCT-PH1&-ds_name=DEC_2000_SF1_U&-format=ST-7.

274. In a ward-based system, a candidate can canvass an entire district in an election cycle. Harmon Aff. ¶ 31. It simply is not possible to reach the same proportion of potential voters city-wide in an at-large system. Harmon Aff. ¶ 31. Reducing the geographic and population size of the electoral geography from the entire City to a single ward or district

facilitates fact-to-face, direct contact between minority candidates and potential voters.  Harmon Aff. ¶ 31.

275.    Because the City of Springfield is a large geographic area, it is very difficult to reach the number of voters that one needs to reach in order to run an effective campaign without spending a lot of money on radio, television and newspaper advertisements.  Davila Aff. ¶ 11.

**Voter Registration Issues** (*see also*, *supra*, ¶¶ 181-184, regarding Failure to Provide Provisional Ballots)

276.    Since he moved to Springfield in 1996, Gonzalez has had problems with voter registration and has observed other Latinos having problems.  Gonzalez Aff. ¶¶ 18-19.

277.    He himself had a problem in September 2006.  Even though he votes in every election, he had been taken off the voter list and had to vote a provisional ballot.  Gonzalez Aff. ¶ 20

278.    When he worked in the Mayor's office from 1996-2002, he often received complaints from Latinos who had been told they were not on the voter list and they did not understand why.  Rarely if ever had they been offered provisional ballots.  He saw these same problems when he volunteered at the polls on election days.  *Id*. ¶ 21.

279.    Gonzalez  reported these problems to the Election Commission, but he continued receiving the same kinds of complaints, including complaints about the lack of help in Spanish at the polls.  *Id*. ¶ 35.

280.    In his affidavit, Gonzalez gives specific examples of reporting such complaints to the Election Commission.  *Id*. ¶¶ 36-37.

281.    People being taken off of the voter registration lists either without reason, or for improper reasons, is a chronic problem in Springfield.  *Id*. ¶ 22.

282.    One of the election problems in Springfield is the high number of voters who do not return the annual census forms, resulting in their being taken off the active voting list and put on the "Blue List" or inactive voting list.  When people are on the Blue List they are told by the poll workers that they have to present two forms of ID in order to vote.  Many voters, especially Latino and African American voters, come to the polls without ID.  If they are sent home they often do not come back to vote.  Henry Twiggs called for a meeting in 2005 to discuss this problem with Springfield election officials, but the problems were not resolved.  Some of the new wardens reported to Twiggs that in the November 2006 election there were long lines because there were so many inactive voters.  In fact, in Ward 4C there were more inactive voters than active voters. Twiggs Aff. ¶ 12.

283.    African American and Latino voters often call and write Henry Twiggs telling him that despite the fact that they vote in every election they are taken off the active voting list and have a hard time voting.  The annual census system keeps qualified voters of color from exercising their right to vote.  *Id*. ¶ 13.

284.    Up until 1974 the only place people could register to vote in Springfield was in City Hall, during regular business hours.  This prevented many African Americans who had no flexibility in their jobs from registering to vote.  In addition, transportation limitations were also a barrier to registration.  In 1973 Henry Thomas proposed that voter registration be more accessible and suggested that librarians in the City's libraries be permitted to register people to vote.  When this was done, voter registration in the communities of color increased.  Thomas Aff. ¶ 15.

285.    African Americans have been disproportionately purged from the voter lists and have often been denied the ability to vote when they went to the polls.  *Id*. ¶ 17.

66

286.    Voters whose names are on the "inactive" list are subject to additional requirements in order to vote.  They are asked to show identification that has their name and the address where they are registered to vote.  If the address on the ID does not match the registration address, then the Office of the Election Commission staff must confirm the identity.  In addition, if the voter is not in possession of appropriate identification, then the warden must formally "challenge" the voter's right to cast a ballot.  The challenged voter is taken aside and administered an oath.  The warden then instructs the voter to record his or her name on the back of a ballot.  The warden also records his or her name and the nature of the challenge, "failure to provide identification."  Only then may the voter vote the ballot.  Pl. Ex. 2 at 33, 45.

287.    The City's 2006 Election Handbook acknowledges that "any challenge to a voter's right to cast a ballot is likely to be distressing to a voter."  Pl. Ex. 2 at 46.

## IX.    SENATE FACTOR:  THE EXTENT TO WHICH THE MEMBERS OF THE MINORITY IN THE STATE OR POLITICAL SUBDIVISION BEAR THE EFFECTS OF DISCRIMINATION IN SUCH AREAS AS EDUCATION, EMPLOYMENT AND HEALTH, WHICH HINDER THEIR ABILITY TO PARTICIPATE EFFECTIVELY IN THE POLITICAL PROCESS.

**Broad Disparities**

288.    "Defendants do not deny…that as a general matter Black/African-Americans or Hispanic/Latinos [sic] persons have been subject to *de facto* discrimination in the City of Springfield or that in the past race relations within the City of Springfield have been strained or that they cannot be improved in the future."  Answer ¶ 39.

289.    "[M]any African American and Latino residents face similar challenges relating to widespread poverty and not having enough resources to get by day-to-day.  There is not enough affordable housing in Springfield.  The Section 8 wait list is very long.  Housing is becoming increasingly substandard, but rents remain too high for many people to afford.

67

Unemployment is a significant problem in Springfield, especially among people of color."

Bewsee Aff. ¶ 10.

290.    There is a history of discrimination in Springfield both in the attitude of many

white people towards people of color and in such areas as housing, employment, education and

police relations.  Henry Twiggs Aff. ¶ 14.

291.    Springfield has a history of discrimination as evidenced by the annual reports of

its Human Relations Commission which engaged in activities relating to discrimination in

housing; employment; health care; hate crimes and education.  Pl. Exs. 183; 187; 188; 189 at 4-6,

113; 190 at 2, 9, 12-13, 23; 191 at 1, 6; 192 at 1, 24, 30; 193 at 5, 15, 18-21; 195 at 17.

292.    Springfield's African American population has a history of "living in social and

economic segregation with hostility and despair manifested through riots, violence and unrest."

*See* Human Relations Commission, Springfield, MA Annual Report, 1966 (Pl. Ex. 188) at

Postscript.

293.    Discrimination is a problem in the city of Springfield.  Molina Aff. ¶ 18.

**Income Disparities**  (*See also infra*, ¶ 649)

294.    Defendants admit that "the 2000 Census indicated that the socio-economic

circumstances of Black/African-Americans and Hispanic Latinos are lower than those of Non-

Hispanic white persons."  Answer ¶ 39.

295.    Springfield's white residents earn significantly more than either Latino or African

American residents.  Median income for white, non-Hispanic and non-Latino families was

$48,159.  This was more than double the median family income for Hispanic or Latino families,

which was only $19,076.  The figure for Black/African American families was $29,820.  *See*

2000 United States Census Tables Regarding Median Family Income (Pl. Ex. 46).

LIBA/1760998.1

296.    Unemployment rates are similarly disparate, at 5.4% for whites, 9.9% for Blacks/African Americans, and a staggering 16.1% for Hispanic and Latino workers.  *See* 2000 United States Census Tables Regarding Employment Status (Pl. Ex. 44).

297.    Poverty rates are higher among children and among people of color in Springfield.  North End Strategic Plan, October 1, 2003, Prepared for the North End Outreach Network by the Center for Reflective Community Practice at MIT ("North End Strategic Plan") (Pl. Ex. 163 and McDowell Aff. Ex. B.) at 5.

298.    The North End is known as the poorest community within Springfield and contains the poorest census tract in the Commonwealth.  North End Strategic Plan (Pl. Ex. 163 and McDowell Aff. Ex. B.) at 7.

299.    Springfield's per capita income in 1999 was $15,232, ranking it 348 out of 351 municipalities in the State, and its median household income that year was $30, 417, ranking it 344 of 351.  *Hancock v. Driscoll*, No. 02-2978, 2004 Mass. Super. LEXIS 118 (Mass. Super. Ct. Apr. 24, 2004) ("Hancock Findings") (Pl. Ex. 106) at *237-8.

**Education Disparities**  (*See also infra*, ¶¶ **650-652**)

**Broad Disparities**

300.    For School Committee member Marjorie Hurst's perspective on, "why minority representation is desperately needed on the Springfield School Committee," *see infra*, paragraphs 569-583.

301.    Defendants have acknowledged the existence of a "racial gap" in education in Springfield.  *See* Memorandum Supporting Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction at 41.

302.    Superintendent Burke told the School Committee in 2002 that the Springfield schools are failing to give black and Hispanic children access to the education they deserve and

need to succeed.  He stated that underachievement by minority students is a very serious problem, that the school system is to blame, and that the system has not succeeded in providing minority students, especially Hispanic students, with equal access to an education. *See* Feb. 21, 2002 Minutes of the Working Session of the School Committee (Pl. Ex. 113) at 1-2.

303.    The North End has the lowest educational attainment of any community in the City, with a high school completion rate of only 50%.  North End Strategic Plan (Pl. Ex. 163 and McDowell Aff. Ex. B) at 7.

304.    Latinos have the lowest rates of acceptance into college; and the highest rates of truancy.  Tosado Depo. 50:21-24; 51:1-4.

305.    On average, 1.5 percent of Hispanic males and 1.9 percent of Hispanic females obtain graduate degrees.  This is much less than whites and blacks.  Pl. Ex. 159A at 19.

306.    There have been problems with teacher disparity in education.  There is a large achievement gap between blacks and whites, reflected in MCAS scores, dropout rates, and high school graduation rates.  Williams Depo. 61:2-18.

307.    The education system in Springfield has a long and blatant history of segregation and discrimination.  The schools were under a court order that required busing to desegregate Springfield's separate and unequal school system.  Today the Springfield system is over 80% minority.  The school system has failed children of color.  There are many illiterate and under educated minorities living in Springfield today.  This manifests itself through the high dropout rates among students (50% of the students entering high school do not graduate in the Springfield school system), high unemployment rates, high crime levels, low employment rates and a lack of civic participation.  Thomas Aff. ¶ 27.

308. Henry Thomas has been an appointed member of the State Board of Education for the past five and a half years, and is familiar with the education problems in Springfield. Springfield is one of the worst performing school districts in the Commonwealth with some of the lowest MCAS scores and highest dropout rates. Springfield schools are consistently classified as underperforming schools. Thomas Aff. ¶ 26.

309. There is discrimination in the education system in Springfield. There is a clear achievement gap between minority students in Springfield and white students, both in Springfield and statewide as evidenced by lower test scores and graduation rates. There is also discrimination in the allocation of resources to minority schools. Minority schools do not receive the resources necessary to meet the needs of the student population they serve. Many of these schools were neglected over the years and students have particular needs that are not being met. When there are cuts in the school budget, all schools may get cut the same amount, but the minority schools with the greatest needs are harmed the most. In addition there are not sufficient numbers of minority teachers in the Springfield schools. Darnell Williams Aff. ¶ 19.

310. Certain aspects of Springfield's "racial gap" in education were recently detailed by Superior Court Judge Botsford in *Hancock v. Driscoll*, No. 02-2978, 2004 Mass. Super. LEXIS 118 at *486 (Mass. Super. Ct. Apr. 26, 2004) (Pl. Ex. 106). In *Hancock*, plaintiffs alleged that the Commonwealth was failing its constitutional obligation to educate its children. After trial, Judge Botsford issued a comprehensive report on the state of public education in Springfield and three other "focus" school districts. Judge Botsford concluded that although "the inadequacies of the educational program provided in (Springfield) . . . . are many and deep," she was most troubled by "the fact, reflected in all the MCAS scores, that for children with learning disabilities, children with limited English proficiency, racial and ethnic minority

children, and those from low-income homes, the inadequacies are even more profound."  2004

Mass. Super. LEXIS 118 at *486.  Although Judge Botsford's ultimate recommendations were

not adopted by the Supreme Judicial Court, her findings of fact were accepted and accorded

"great deference" by the Supreme Judicial Court in *Hancock v. Comm'r of Educ.*, 443 Mass. 428,

433 (Mass. 2005).

### MCAS Disparities

311.    In Springfield public schools, a considerable racial gap in learning exists between

African-American and Latino students on the one hand, and White students on the other.  White

students consistently outperform African-American and Latino students on the Massachusetts

Comprehensive Assessment System ("MCAS") exams.  *See infra* ¶¶ 312-322.

312.    Data from grades 4, 8 and 10 for the years 1999 and 2000 reveal that Springfield's

Hispanic/Latino and Black/African American students underperformed white students in every

MCAS category – English Language Arts, Mathematics, Science & Technology, and History &

Social Science.  *See* Mass. Dept. of Educ., *Report of 1999 Massachusetts and Local School

Districts MCAS Results by Race/Ethnicity* (May 2000) (Pl. Ex. 41) at A-34, B-28, C-25; Mass.

Dept. of Educ., *Report of 2000 Massachusetts and Local School District MCAS Results

Race/Ethnicity* (July 2001) (Pl. Ex. 42) at A-28 – A-29, B-24 – B-25, C-22 – C-23.  *See also*

Springfield Public Schools, *Springfield MCAS Results Over Time 2000-2004* (Sept. 22, 2004)

(Pl. Ex. 30) at 9-20.

313.    From 2001-2004, the majority of Springfield's students have fallen into the

"Needs Improvement" and "Failing" or "Warning" categories on many portions of the MCAS

test.  *See* Mass. Dept. of Educ., *MCAS Annual Comparisons for Springfield* (Pl. Ex. 55).  Given

that the combined Hispanic and African American student population in Springfield's public

schools was approximately 76-78% from 2002-2004, this poor overall performance is

particularly striking.  *See* Springfield Public Schools, Springfield, Massachusetts, *Distribution of American Indian, White, Black, Asian and Hispanic Pupils, Oct. 1, 2002* (Pl. Ex. 70); Springfield Public Schools, Springfield, Massachusetts, *Distribution of Native American, Asian, African American, Hispanic and White Pupils, Oct. 1, 2003* (Pl. Ex. 71); Springfield Public Schools, Springfield, Massachusetts, *Distribution of American Indian, White, Black, Asian and Hispanic Pupils, Oct. 1, 2004* (Pl. Ex. 74).

314.    In Springfield public schools, between 2000 and 2004, African-American students performed at an "Advanced or Proficient" level 28% of the time on the MCAS English Language Arts portion, compared to White students' 48% rate. *See* Springfield Public Schools: *Springfield MCAS Results Over Time, 2000-2004* by Dr. Joseph P. Burke, Superintendent, September 22, 2004 (Pl. Ex. 30) at 10.

315.    According to Springfield Public Schools: *Springfield MCAS Results Over Time, 2000-2004* by Dr. Joseph P. Burke, Superintendent, between 2000 and 2004:

a.    Hispanic students performed at "Advanced/Proficient" levels 19% of the time on the MCAS English Language Arts portion, compared to White students' 48% rate.  Pl. Ex. 30 at 10.

b.    African-American students scored at a "Warning/Failing" level 23% of the time on the MCAS English Language Arts portion, compared to White students' 13% rate.  Pl. Ex. 30 at 11.

c.    34% of Hispanic students scored at a "Warning/Failing" level on the MCAS English Language Arts portion, compared to White students' 13% rate. *Id.*

d.    9.4% of African-American students scored at an "Advanced/Proficient" level on the MCAS Math portion. Approximately 7% of Hispanic students scored at this level.  By comparison, 28% of White students performed at an "Advanced or Proficient" level.  Pl. Ex. 30 at 12.

e.    28.8% of African-American 7th and 8th graders scored at an "Advanced/Proficient" level, 47.4% at the "Needs Improvement" level, and 22.8% at the "Warning/Failing" level.  Pl. Ex. 30 at 13.

LIBA/1760998.1

f.    19.4% of Hispanic 7th and 8th graders taking the English Language Arts exam scored at the "Advanced/Proficient" level, 42.4% at the "Needs Improvement" level, and 36.8% at the "Warning/Failing" level.  Pl. Ex. 30 at 14.

g.    22.6% of the African-American 10th graders taking the English Language Arts exam scored at the "Advanced/Proficient" level, 34.8% at the "Needs Improvement" level, and 43.2% at the "Warning/Failing" level.  Pl. Ex. 30 at 15.

h.    11.8% of Hispanic 10th graders taking the English Language Arts exam scored at the "Advanced/Proficient" level, 30.8% at the "Needs Improvement" level, and 55.8% at the "Warning/Failing" level.  Pl. Ex. 30 at 16.

i.    16% of African-American 4th graders taking the MCAS Math exam scored at the "Advanced/Proficient" level, 49.8% at the "Needs Improvement" level, and 33.6% at the "Warning/Failing" level.  Pl. Ex. 30 at 17.

j.    13.2% of the Hispanic 4th graders taking the MCAS Math exam scored at the "Advanced/Proficient" level, 44.8% at the "Needs Improvement" level, and 41.4% at the "Warning/Failing" level. Pl. Ex. 30 at 18.

k.    9.2% of the African-American 10th graders taking the MCAS Math exam scored at the "Advanced/Proficient" level, 23.4% at the "Needs Improvement" level, and 66.2% at the "Warning/Failing" level.  Pl. Ex. 30 at 19.

l.    6.4% of the Hispanic 10th graders taking the MCAS Math exam scored at the "Advanced/Proficient" level, 19.4% at the "Needs Improvement" level, and 73.4% at the "Warning/Failing" level. Pl. Ex. 30 at 20.

316.    In Springfield public schools, between 2000 and 2004, White student scores outpaced those of African-American students in MCAS English Language Arts by an average 13.32%.  Pl. Ex. 30 at 33.

317.    In Springfield public schools, between 2000 and 2004, White student scores led those of Hispanic students in MCAS English Language Arts by an average of 22.86%.  Pl. Ex. 30.

318.     In Springfield public schools, between 2000 and 2004, the White-Black gap in MCAS Math scores averaged 18.8%, and the White-Hispanic gap averaged 23.9%.  Pl. Ex. 30.

319.     African-American and Hispanic students in Massachusetts have attained the Competency Determination at lower rates than their White counterparts.  For the class of 2006, 86% of African-American students, and 87% of Hispanic students attained the Competency Determination, compared to 97% of the White students.  *See* Massachusetts Department of Education: "Progress Report on Students Attaining the Competency Determination Statewide and by School and District: Classes of 2006 and 2007," Table 4 (Pl. Ex. 83) at 9.

320.     In the 2005-2006 school year:

>     a.     Of the African-American 8th graders in Springfield taking the Math portion of the MCAS, 1% scored at the "Advanced" level, 7% at the "Proficient" level, 21% at the "Needs Improvement" level, and 72% at the "Warning/Failing" level, compared to 6%, 16%, 29%, and 49%, respectively, for White 8th graders.  *See* 2005-2006 District Report Card – Springfield, Grade Level 8 – Mathematics (Pl. Ex. 205) at 8.

>     b.     Of the Hispanic 8th graders in Springfield taking the Math portion of the MCAS, 0% scored at the "Advanced" level, 3% at the "Proficient" level, 19% at the "Needs Improvement" level, and 77% at the "Warning/Failing" level, compared to 6%, 16%, 29%, and 49%, respectively, for White 8th graders.  Pl. Ex. 205.

>     c.     Of the African-American 8th graders in Springfield taking the Science and Technology portion of the MCAS, 0% scored at the "Advanced" level, 5% at the "Proficient" level, 39% at the "Needs Improvement" level, and 56% at the "Warning/Failing" level, compared to 2%, 20%, 43%, and 35%, respectively, for White 8th graders.  Pl. Ex. 205 at 9.

>     d.     Of the Hispanic 8th graders in Springfield taking the Science and Technology portion of the MCAS, 0% scored at the "Advanced" level, 3% at the "Proficient" level, 27% at the "Needs Improvement" level, and 70% at the "Warning/Failing" level, compared to 2%, 20%, 43%, and 35%, respectively, for White 8th graders.  Pl. Ex. 205 at 9.

e.   Of the African-American 10th graders in Springfield taking the English Language Arts portion of the MCAS, 2% scored at the "Advanced" level, 28% at the "Proficient" level, 43% at the "Needs Improvement" level, and 27% at the "Warning/Failing" level, compared to 13%, 40%, 29%, and 18%, respectively, for White 10th graders.  Pl. Ex. 205 at 10.

f.   Of the Hispanic 10th graders in Springfield taking the English Language Arts portion of the MCAS, 1% scored at the "Advanced" level, 19% at the "Proficient" level, 41% at the "Needs Improvement" level, and 39% at the "Warning/Failing" level, compared to 13%, 40%, 29%, and 18%, respectively, for White 8th graders.  Pl. Ex. 205 at 10.

g.   Of the African-American 10th graders in Springfield taking the Math portion of the MCAS, 3% scored at the "Advanced" level, 18% at the "Proficient" level, 29% at the "Needs Improvement" level, and 50% at the "Warning/Failing" level, compared to 18%, 24%, 32%, and 26%, respectively, for White 8th graders.  Pl. Ex. 205 at 11.

h.   Of the Hispanic 10th graders in Springfield taking the Math portion of the MCAS, 3% scored at the "Advanced" level, 11% at the "Proficient" level, 31% at the "Needs Improvement" level, and 55% at the "Warning/Failing" level, compared to 18%, 24%, 32%, and 26%, respectively, for White 8th graders.  Pl. Ex. 205 at 11.

321.   Latinos have the lowest scores on standardized tests.  Tosado Depo. 50:21-24;51:1-4.

322.   In 2003, there were an estimated 1136 students in the twelfth grade, only 73% of whom had passed the MCAS exam and were eligible for a high school diploma.  As of September of 2003, 77% of the seniors had passed the MCAS and achieved a competency determination; the statewide percentage was 95%. (Hancock Findings at *306)

**Dropout Rates**

323.   Hispanic/Latino students consistently have, by far, the highest high school dropout rates in Springfield, and the Black/African-American high school dropout rate is also

high. During the 2002-2003 school year, 11.1% of Latino students dropped out, and 7.0% of African-American students dropped out, while only 5.8% of white students dropped out.

324.    The Hispanic high school dropout rate in Springfield has been higher than African-American and white dropout rates. During the 2000-01 school year the the Latino/Hispanic high school dropout rate was 11.2%, the African-American rate was 5.3% and the white rate 6.8%; during the 1999-2000 school year the Latino/Hispanic high school dropout rate was 9.5%, the African-American dropout rate was 4.2% and the white rate 3.7%. *See* Mass. Dept. of Educ., *Dropout Rates in Massachusetts Public Schools: 2002-03* (April 2004) (Pl. Ex. 50) at 63; Mass. Dept. of Educ., *Dropout Rates in Mass. Public Schools 2000-2001* (Aug. 2002) (Pl. Ex. 47) at 55; Mass. Dept. of Educ.*, Dropout Rates in Mass. Public Schools 1999-2001* (Nov. 2001) (Pl. Ex. 43) at 68.

325.    In 1999-2000, at Springfield public schools, African-American students dropped out at a rate of 4.2 %, Hispanics at 9.5%, with Whites at 3.7%. *See* Pl. Ex. 43 at 58.

326.    In 2002-2003, at Springfield public schools, African-American students dropped out at a rate of 7%, Hispanics at 11.1%, and Whites at 5.8%. *See* Pl. Ex. 50 at 63.

327.    For Springfield High School students in the class of 2006, the African-American graduation rate was 50.8%, with a dropout rate of 31.5%, and 0.2% permanently excluded, compared to 65.7%, 24.9%, and 0%, respectively, for Whites. *See* Massachusetts Department of Education, 2006 Graduation Rate Report (DISTRICT) for Black or African-American *4-Year Graduation Rate* (Pl. Ex. 179) at 3, 11.

328.    For Springfield High School students in the class of 2006, the Hispanic graduation rate was 42.7%, with a dropout rate of 40.9%, and 0% permanently excluded, compared to 65.7%, 24.9%, and 0%, respectively, for Whites. Pl. Ex. 179 at 6, 11.

329.    Latinos have the highest rate of dropouts.  Tosado Depo. 50:21-24;51:1-4.

330.    There is an increasingly high rate of Hispanic dropouts in the Springfield schools.
Jose Tosado Aff. ¶ 15.

331.    The number of Hispanic males without a high school diploma sharply increased
by 11.9 percent from 2003 to 2004.  Pl. Ex. 159A at 19.

332.    In general, approximately 60% of students who begin ninth grade do not graduate
with their class four years later.  The dropout rate in 2000-2001 was 8%, as compared to a
statewide rate of 3.5%.  Hancock Findings at *113.

**Repeating Grades**

333.    Springfield's African-American and Hispanic students are also held back to repeat
grades at much higher rates than white students:  during the 2003-2004 school year, 7.5% of
African-American students and 8.9% of Hispanic students repeated grades, compared to 5.2% of
white students.  Data from the 2002-2003 school year reveals the same pattern, with 6.6% of
African-American students and 8.5% of Hispanic students repeating grades, compared to 4.7%
of white students.  *See* Mass. Dept. of Educ., *Grade Retention in Massachusetts Public Schools:
2003-2004* (Apr. 2005) (Pl. Ex. 53) at Appendix B, 7; Mass. Dept. of Educ., *Grade Retention in
Massachusetts Public Schools:  2002-2003* (June 2004) (Pl. Ex. 51) at Appendix A, 8.

334.    In the 2004-2005 school year, in Springfield, public schools retained African-
American students at a rate of 5.9%, Hispanic students at 6.0%, and 1.7% for white students.
*See* Massachusetts Department of Education, "Grade Retention in Massachusetts Public Schools:
2004-2005," June, 2006 (Pl. Ex. 84) at 1, 21.

**Language barriers**

335.    The percentage of students who are limited English proficient in the Springfield
Public Schools has varied over the past decade, but generally the rate has been at least double

LIBA/1760998.1

that of Massachusetts, with 13.7 percent of students meeting such a classification in 2005.  A similar varied but recently growing trend can be seen in the population of students whose first language is not English. Although the overall percentage of students in this category showed a decline from 1994 to 2002, the numbers are again on the rise in correspondence with a statewide rise in students fitting this description. During the 2005-2006 school year 20.3 percent of Springfield's student population reported their first language as one other than English.  Pl. Ex. 159A at 31.

336.    A much larger percentage of students in Springfield Public Schools are classified as limited English proficient, low income or special needs by the Department of Education. Research indicates that students from these groups, on average, face more barriers to academic success than students without these attributes.  Pl. Ex. 159A at 38.

**Busing, Neighborhood Schools and the School Boundary Plan**

337.    The School Department has cut bus services, and children must walk as far as two miles to school.  This has a disproportionate impact on Latino and African American students who are forced to walk in areas with high crime rates and bad sidewalks.  Bewsee Aff. ¶ 24.

338.    The change from busing to neighborhood schools has resulted in many Latinos believing that their only choices are to send their children to some of the worst schools in Springfield.  Gonzalez Aff. ¶ 12(g).

339.    Parents of color are generally opposed to the new school boundary plan, which will provide for more neighborhood schools.  Many parents fear that the schools in the white parts of Springfield will get more resources, the best teachers, and better equipment and supplies. Talbert Swan Aff. ¶ 29.

340.    The City recently proposed a new School Plan changing the boundaries of the school districts and permitting neighborhood schools. Out of 31 elementary schools in

Springfield, 21 are considered racially isolated and therefore in violation of state's Racial Imbalance Law. While the new plan improves the number to 14 schools out of 31 being out of compliance the new plan will not sufficiently improve the racial imbalance in the system and will not change the poor quality of education in the schools serving African American and Latino children. Thomas Aff. ¶ 29.

341.    The State Board of Education approved the City of Springfield's new boundary plan on the condition that there would be a committee in place to monitor the implementation and determine if there was a negative impact on racial balance as a result of the new boundary plan. Henry Thomas, a member of the State Board of Education, has not seen any evidence that this monitoring committee has been put into place nor has the Board of Education received any reports from such a monitoring committee. Thomas Aff. ¶ 29.

342.    Frank Buntin worked very closely with Orlando Santiago, a Latino parent who is Vice President of the PTO at Central High School, to oppose the new boundary plan for the Springfield schools. Both Buntin and Santiago believe that this plan will further segregate the Springfield schools and will not increase the quality of education for African American and Latino children. Buntin Aff. ¶ 15.

**Unequal Allocation of Resources**

343.    In 2002, Marjorie Hurst told the School Committee that most of the performing schools in Springfield were located in predominantly white areas of the City. September 19, 2002 Minutes of the Working Session of the School Committee (Pl. Ex. 115) at 3.

344.    There is discrimination in the allocation of resources for the schools in Springfield. When the City obtained 90% reimbursement for school construction and renovation, the money went primarily to the white schools. For instance, the Homer School in Mason Square in an African American neighborhood was in deplorable condition. Sewage was

80

backing up into the cafeteria; windows were broken and couldn't be opened; part of the building was freezing and part was a sauna – yet instead of using state money to repair this school the City allocated the money to renovate the Frederick Harris School in the white neighborhood of E. Forest Part, where six City Councilors lived.  Talbert Swan Aff. ¶ 27.

345.    When the City built a new school in Mason Square, it cut corners and did shoddy work, resulting in windows that couldn't open and failure to install a planned air conditioning system.  The school was uninhabitable, and students had to be moved out.  Talbert Swan Aff. ¶ 28.

### Springfield's Minority Student Population

346.    The overwhelming majority of students in the Springfield public schools are African American and Latino.  In the 2006-2007 school year, African American and Latino students comprise more than 75% of the Springfield student body.  Mass. Dept. of Educ., Springfield -- Enrollment/Indicators (Pl. Ex. 204).  Therefore, minority students are disproportionately impacted by conditions in Springfield's public schools.

347.    A large number of Springfield schools have been classified as underperforming. *See* Nov. 21, 2002 Minutes of the Working Session of the School Committee (Pl. Ex. 116) at 2 (Superintendent Burke told School Committee that principals sent out 12,198 letters to parents whose children were attending underperforming schools).

348.    Demographically, Springfield schools have seen a 13 percent decrease in the enrollment of white students over the past 12 years.  At the same time the Hispanic student population has increased by 13.2 percent, while the African American student population declined by 4.2 percent.  In 2005, overall, the share of Springfield's enrollment consisting of students of color was about three times that of the state of Massachusetts.  Pl. Ex. 159A at 31.

81

349.    As of December 2002, the ethnic distribution of actively enrolled students in Springfield public schools was as follows: 0.18% American Indian, 2.37% Asian, 28.48% African-American, 47.15% Hispanic, and 21.82% White. *See* Springfield Public Schools: Distribution of American Indian, White, African-American, Asian and Hispanic Pupils. October 1, 2002; Corrected Copy December 24th, 2002 (Pl. Ex. 70).

350.    As of October 2004, the ethnic distribution of actively enrolled students in Springfield public schools was as follows: 0.19% American Indian, 2.51% Asian, 27.90% African-American, 49.92% Hispanic, and 19.48% White. *See* Springfield Public Schools: Distribution of American Indian, White, Black, Asian and Hispanic Pupils. October 1, 2004 (Pl. Ex. 74).

351.    As of March 2005, the ethnic distribution of actively enrolled students in Springfield public schools was as follows: 0.17% American Indian, 2.49% Asian, 28.06% African-American, 50.06% Hispanic, and 19.22% White. *See* Springfield Public Schools: Distribution of American Indian, White, Black, Asian and Hispanic Pupils. March 1, 2005 (Pl. Ex. 77).

352.    In the 2006-07 school year, for grades K-8, the ethnic distribution of actively enrolled students in Springfield public schools was as follows: 25.5% African-American, 2.1% Asian, 49.9% Hispanic, 0.1% Native American, 18.3% White, and 4.1% Multi-Race, Non-Hispanic. *See* Massachusetts Department of Education, Enrollment/Indicators by Race/Ethnicity 2006-2007 (Pl. Ex. 204) at 1.

353.    Today, a large majority of minority children are termed special education students. Yet, most of the students who are placed in out of district private special ed schools, are white. Buntin Aff. ¶ 8.

82

## Additional Findings of the *Hancock* Court

354.    In the 2002-2003 school year approximately 19.2% of Springfield's students were special education students compared to 15.2% statewide.  Hancock Findings at \*100, \*133.

355.    In the 2002-2003 school year 71.2% of Springfield students were eligible for free or reduced price lunch compared to  26.2% statewide. *Id*. at \*100.

356.    Springfield cannot afford to provide public school preschool education to all eligible students.  Springfield has also not been able to implement fully the curriculum frameworks in its public preschool program for the children who do attend, largely because of a lack of money for resources such as books and markers. *Id*. at \*243.

357.    The Forest Park Middle School building is 106 years old and classes are taught in the coat rooms, custodial area, supply rooms, locker rooms and in the basement.  The school's library books are not up to date and there is no librarian.  The school has no science or language lab. The school lacks the resources to properly implement the Massachusetts curriculum frameworks.  Many of the programmatic problems at Forest Park are typical of Springfield's other middle schools. *Id*. at \*252-3..

358.    A significant number of students in Springfield in the fifth grade and up read two and one-half or more years below grade level. *Id*. at \*257..

359.    In 2002-2003, 19.2 – 19.4% of all students in Springfield were special education students. *Id*. at \*290..

360.    In 2003 the Superintendent of Springfield schools estimated that approximately 60% of students who begin ninth grade do not graduate with class four years later. *Id*. at \*304..

361.    Springfield's drop out rate for the 2000-2001 year was 8%, compared to a statewide rate of 3.5%. *Id*.

362.    As of June 2003 only 73% of twelfth grade students in Springfield had passed MCAS and were eligible for a high school diploma. As of September 2003, 77% of the class of 2003 had passed MCAS; the statewide percentage was 95%. *Id*. at *305..

### Teachers and Resources

363.    Many teachers do not want to teach at the lowest performing schools and the children at those schools have the least experienced teachers. As the overwhelming majority of the student body in Springfield is African American and Latino, the poor quality of education most impacts minority students and contributes to their lower socio-economic status and lower participation rates in the electoral system. Thomas Aff. ¶ 28.

364.    Springfield lacks the necessary professional development for special education teachers and the necessary support for general education teachers who teach students with disabilities. Most special education teachers at the high school level are not certified in content areas such as chemistry, biology, and math. Hancock Findings at *294-5.

365.    Springfield has difficulty implementing the math curriculum framework due to lack of certified staff and resources such as current textbook. *Id*. at *261.

366.    Springfield has difficulty attracting certified math teachers and also has difficulty retaining such teachers, which has an adverse impact on its ability to implement the math curriculum framework. *Id*. at *263.

367.    The school libraries do not meet the MSMLA standards of books per students, and a full 87% of the libraries fall below the actual statewide average of 17.3 books per student. *Id*. at *278.

### Poor Facilities

368.    There are significant issues of overcrowding in many of Springfield's elementary, middle and high schools.  Further, Springfield has major problems with respect to maintenance and repair of school buildings.  Hancock Findings at *302.

### Historical Discrimination in Education

369.    Until a series of lawsuits forced Springfield to desegregate its schools by implementing busing in 1974, Springfield's schools were largely segregated by race.  *See School Comm. of Springfield v. Bd. of Education*, 365 Mass. 215 (1974) (finding that Springfield had not achieved racial balance in its public schools) (Pl. Ex. 100); *School Comm. of Springfield v. Bd. of Education*, 362 Mass. 417 (1972) (same) (Pl. Ex. 98).

370.    When Carol Lewis-Caulton was in junior high school in Springfield in the late 1950s, she wanted to go to Technical High School because she knew that she wanted to become a nurse.  At that time, a very small percentage of the students in the Springfield public schools were African-American.  Lewis-Caulton's counselor, who was white, was trying to push her towards Putman High School, which was a trade school.  It would have been much harder for Lewis-Caulton to become a nurse if she had attended Putnam.  That was something that happened a lot to minorities in the Springfield school system at that time.  Students who wanted to go to Technical or Classical High School would be pushed to go to trade school instead.  Lewis Caulton Aff. ¶ 3.

371.    In the 1960's African Americans went to court to challenge the Springfield School Department's actions in assigning them to segregated schools.  The Court found there was racial segregation in the schools and the School Department was ordered to change the method of assigning students to schools.  Ben Swan Aff. ¶ 30.

372.    In 1958 when Rep. Ben Swan transferred his children from a predominantly black school to a predominantly white school, they were kept back a grade, and he was told by the white school that the black school "doesn't meet our standards."  Ben Swan Aff. ¶ 38.

373.    There is a long history of school segregation in Springfield.  The NAACP went into Federal Court in the 1960's and then state court in the 1970's to desegregate the schools. The schools in the minority community were inferior to schools in the white community – inferior buildings, old books and few supplies and unqualified teachers.  Frank Buntin Aff. ¶ 7.

**Other**

374.    Minority students are most affected by enforcement of truancy rules.  According to the remarks of NAACP representative Janina Milleet to the School Committee, 70% of Springfield truants are minorities.  Nov. 21, 2002 Minutes of the Working Session of the School Committee (Pl. Ex. 116) at 1.


**Police Relations, Police Behavior and Enforcement Disparities**

**Broad Disparities**

375.    In 1998, African-American residents expressed a much higher dissatisfaction rate with local police (24%) than White residents (10%), while only 76% expressed satisfaction, compared to 90% of White Residents.  Pl. Ex. 116 at 25.

376.    In 1998, African-Americans were victims of violent crime (85/1000) and property crime (468/1000) at a higher rate than Whites (69/1000 for violent crime; 349/1000 for property crime) and the city average (78/1000 for violent crime; 365 for property crime).  *See* U.S. Dept. of Justice, Bureau of Justice Statistics, Office Community Oriented Policing Services, Criminal Victimization and Perceptions of Community Safety in 12 Cities, Table 1 (Pl. Ex. 93) at 3.

**Police Brutality, Harrassment of Minorities, and Racial Tensions with Police**

86

377.    There have been problems with police brutality and racial profiling in Springfield. Williams Depo. 60:14-19.

378.    Several witnesses recall the 2004 incident of police brutality involving the school principal, Douglas Greer.  *See, e.g.,*  Buntin Aff. ¶ 14; Thomas Aff. ¶ 24.  According to Carol Lewis-Caulton, for example, there is an ongoing problem in Springfield with police brutality against the minority community.  This has been a problem for as long as Lewis-Caulton can remember.  When Lewis-Caulton was a member of the Police Commission from approximately 2005-2006, she had the opportunity to hear many complaints about police brutality.  One incident that came before the Commission during Lewis-Caulton's term involved a school principal who went into a diabetic coma while sitting in his car at a gas station.  An attendant at the station called the police.  When the principal failed to respond, the police officers allegedly pulled him through the window of his car and beat him.  The police officers told the Commission that they used force against the principal because they believed him to be in a drug-induced state, but Lewis-Caulton did not find the police officers' testimony credible.  A majority of the Police Commission believed the police officers, and no charges were brought against them.  Lewis-Caulton Aff. ¶ 20.

379.    There is a long and troubling history of police brutality against African Americans and Latinos in Springfield, as well as a history of no accountability.  The police officer involved in the Ben Schoolfield shooting was allowed to return to the force.  An officer who was videotaped kicking a suspect in the head also was allowed to return.  The officers who responded when a school principal went into a diabetic coma in his car at a gas station, and who broke his car window, dragged him through, and manhandled him were not punished by the City.  These

87

incidents are well known in the community and lead many people to believe that it is pointless to complain about incidents of misconduct.  Bewsee Aff. ¶ 13.

380.    There is a long history of police brutality by the Springfield Police Department against African Americans.  The Pastors' Council of Greater Springfield filed a complaint at the Massachusetts Commission Against Discrimination (MCAD), alleging that the police department has engaged in a continuous pattern and practice of physical abuse and disparate treatment towards individuals based on their race and color.  Talbert Swan Aff. ¶ 31.

381.    In 1996 Rev. Swan's Church, the Solid Church of God and Christ, held a church service commemorating the bombings of the black churches in the South.  They were sending people to help re-build one of the churches.  During the service Rev. Swan received a voice message on the Church answering machine in a disguised black voice mocking the church bombings and saying, "I'm just a dumb nigger like you are."  The call was traced, and it turned out to be a white Springfield Police Officer who made the call from the public safety office of Western New England College. Talbert Swan Aff. ¶ 33.

382.    Rev. Swan has received numerous racially harassing and threatening calls.  When he was pressing charges against the white police officer who made the harassing call to the church, he received a call from someone who said that if he didn't drop the charges the "White Aryan Nation will blow up you and your church and start all sorts of s…. in Springfield.  So do what you are told and drop the f…….g  charges."  Talbert Swan Aff. ¶ 34.

383.    In the 1950's there was widespread and open racial discrimination in Springfield. The police enforced the law in a discriminatory manner and engaged in racially motivated brutality against African Americans.  Ben Swan Aff. ¶ 4.

384.    There is continued police harassment and mistreatment of African Americans and Latinos in Springfield.  Ben Swan Aff. ¶ 43.

385.    Recently two African American women alleged that they were roughed up by a white, off-duty police officer who called them racial epithets. *Id*.

386.    Rep. Ben Swan receives numerous complaints from his African American and Latino constituents about being stopped and harassed by the police in Springfield.  People complain about being stopped by the police just for being black or Latino, being harassed and sometimes beaten, and unfairly arrested.  *Id*. ¶ 44.

387.    The police are more likely to charge people in the City's communities of color with loitering or other offenses that generally are not enforced against white residents who live in predominantly white areas of the city.  Bewsee  Aff. ¶ 12

388.    The Springfield police have a tense relationship with the Latino community.  This results in part from their lack of understanding of Puerto Rican culture.  For example, when the weather is warm, Puerto Rican men often gather and socialize on street corners.  This is a common practice in Puerto Rico, and men of Puerto Rican heritage who live in Springfield have continued the tradition in Springfield.  In Springfield, the police treat these men as though they are causing trouble.  Torres Aff. ¶¶ 65-66.

389.    The police often racially profile Hispanics and African-Americans, asking them for identification on the street for no reason and treating them very rudely if they ask why they are being stopped or searched.  Molina has seen this happen to homeless people in front of City Hall and around the neighborhood.  There is a perception in the Hispanic community that you will be charged with resisting arrest or assault and battery if you ask questions about why you are being stopped.  Molina Aff. ¶ 24.

89

390.    On one occasion, Molina saw police officers grab an African-American homeless man who was resting on the street near a gas station, search him against his will, and push him into the police cruiser, leaving all of his belongings behind.  Though the man talked back to the officers, he did not attempt to touch them.  Molina has also seen police officers kick an African-American homeless man in front of City Hall.  Molina Aff. ¶¶ 25-26.

391.    In about 1997, while Errol Campbell was NAACP secretary, he published a letter in the Springfield newspaper criticizing the decision to suspend, rather than fire, a police officer whose dogs had bitten a young girl, and who had abandoned his post to secure his dogs before seeking medical assistance for the girl.  Soon after the letter was published, Campbell received a letter mailed to him in a Springfield Police Department envelope stating that a dog should bite him, and that "What goes around comes around.  It will be coming around to you," or words to that effect.  The person who wrote the threatening letter to Campbell never was identified.  Campbell Aff. ¶ 3.

392.    When Henry Twiggs was a Legislative Aide to Rep. Ben Swan, he received many complaints from African Americans in Springfield about police brutality.  He also has received complaints from people in his capacity as Ward 4 Democratic Party Chair.  Twiggs Aff. ¶ 14.

393.    Henry Thomas served as a member and as Chairman of the Springfield Police Commission from approximately 1990 until 1996 and is very familiar with police practices.  He very strongly disagrees with Defendants' statement that, "There is no evidence of a pattern and practice of police misconduct or discriminatory treatment of minority citizens or failure to provide for the safety and security of all Springfield citizens equally and fairly."  Thomas Aff. ¶ 22.

394.    Henry Thomas' father was involved in a very public police brutality case in the mid-1950's.  At that time there was a pattern of police beating black male patrons who were leaving black clubs at night.  The NAACP formed a Watch Group and sent out members to monitor the conduct of the police at the black clubs.  One night when Mr. Thomas was serving as part of an NAACP Watch Group he himself was beat up by the police and arrested.  It became a well-publicized case.  The charges against him were dropped but there were never any sanctions brought against the white officers who beat and arrested him.  Thomas Aff. ¶ 23.

395.    Both before, during and after Henry Thomas' tenure on the Police Commission, there have been innumerable incidents of police mistreatment and abuse of African Americans and Latinos, and a failure to discipline white officers involved in such incidents.  Thomas Aff. ¶ 24.  The following are just a few of the incidents Henry Thomas remembers:

   a.    When Benjamin Schoolfield, a black man, was killed by a white Springfield police officer in 1994, a group of police officers held a "ham party" to congratulate the officer.   A "ham party" is a vestige of the Jim Crow South, where a white person is celebrated for killing a black person by being given a ham.  *Id*.

   b.    In 1997, a tourist from out-of-town videotaped a Springfield police officer kicking a black suspect.  *Id*.

   c.    When Morris Jones was on the City Council, immediately after he voted against the Quinn Bill which provides educational benefits to police officers, the police put out an all points bulletin for Councilman Jones' car, allegedly for being illegally parked behind City Hall.  The next morning Councilman Jones' car was trashed in front of his house.  It was commonly believed that the police were responsible and had vandalized the car to retaliate against Jones for his vote on the Quinn Bill.  Jones was the only African American on the City Council at the time.  The white officer who put out the all points bulletin was initially suspended but was later reinstated. *Id*.

   d.    In 1996, a number of African American and Hispanic youths complained that they had been mistreated by the police during an incident outside of the Nubian Athletic Club.  *Id*.

e.     Recently, two young African American women were beaten at a bar and were called racial slurs, including the "n" word. The white police officer involved in that incident had several complaints made against him in the past, yet is still working. *Id.*

396.    The consistent pattern of African American citizens being subjected to abusive police power, usually with no accountability, has eroded public confidence not only in the Springfield Police Department but also in the entire political system. In addition, because police officers are visibly present at polling locations, many African Americans and Latinos are further intimidated from exercising their vote. *Id* at 25.

397.    There is a history of racial animosity and harassment by the Springfield police department against African Americans and Latinos. There is extensive racial profiling with many minorities getting stopped by the police while driving for no reason. Buntin Aff. ¶ 13.

398.    When Frank Buntin worked for the U.S. Department of Housing and Urban Development, he was stopped by the Springfield police and told he ran a red light, when he didn't. When the white officer saw his federal government sticker, he said "you're one of those big shots." Mr. Buntin asked for his badge number and he became enraged. Buntin felt very threatened and felt like he might be shot. Two other police officers came by and Mr. Buntin later filed a complaint. A month later he was informed that they determined the police officer had done nothing wrong. *Id.*

399.    Darnell Williams has first hand experience with and knowledge of discrimination in Springfield in the areas of housing, employment, education and health. He was particularly involved in speaking out against discrimination by the police department. Police brutality, harassment and intimidation of people of color have been a long-standing and serious problem in Springfield. Darnell Williams tried to get the U.S. Department of Justice to withhold federal

funds from the city until the police department ended its brutal and discriminatory practices. Darnell Williams Aff. ¶ 17.

400.    Tensions in community-police relations have been a matter of concern in Springfield. *See* Human Relations Commission, Springfield, MA Annual Report, 1968 (Pl. Ex. 190) at 22-23.

401.    The black community called a rally on September 18, 1968, as result of alleged brutality by two off-duty officers employed by King's Department Store in an altercation at that store. After the rally there were incidents and charges that the police used undue force. *See* Pl. Ex. 190 at 23.

402.    From 1965 through at least 1969 there was an increase in the number of complaints of police brutality. In 1968 there were 29 complaints reported to the Human Relations Commission. *See* Human Relations Commission, Springfield, MA Annual Report, 1969 (Pl. Ex. 191) at 5.

403.    Springfield's history includes the hardening of attitudes on the issue of alleged police brutality. *See* Annual Report of the City of Springfield Office of Intergroup Relations, 1965 (Pl. Ex. 187).

404.    People are afraid to initiate contact with police or report police misconduct because they fear they'll be harassed themselves. They also feel that it is pointless to complain. Bewsee Aff. ¶¶ 11-13.

405.    The 2004 Massachusetts Racial and Gender Profiling Study "was intended to [produce] data necessary for a statewide assessment of racial and gender profiling with the overall aim of identifying and eventually eliminating any instances of profiling." Defendants' McDevitt Aff. ¶ 3. The report is attached to Plaintiffs' McDevitt Aff. as Exhibit B (Pl. Ex. 49).

93

a.   Racial disparities in citations can result from a number of factors including bias on the part of an individual officer. Def. McDevitt Aff. ¶ 3a.

b.   The data from the 2004 Massachusetts Racial and Gender Profiling Study provided evidence of a correlation between race, ethnicity, gender and traffic stops. Def. McDevitt Aff. ¶ 3b.

c.   For Springfield, the study showed disparities based on race and ethnicity in traffic citations to residents, driving population, searches, and citations and warnings. Pl. Ex. 49 at 59, 72, 85, 98.

406.   As of May 2005, there were fourteen civil rights cases pending against the Springfield police. *See* Carroll Buracker & Associates, Inc., *Report on a Comprehensive Study of the Springfield Police Department* (May 4, 2005) ("Buracker Report") (Pl. Ex. 127) at 361.

407.   The Conflict Management Group, a Harvard-affiliated consulting firm, prepared a report for the City of Springfield dated September 10, 1997, entitled "Springfield: A CommUNITY in Progress." *See* Heen Aff., Ex. B (Pl. Ex. 92). This report refers expressly and by implication to an atmosphere of increased racial tensions in Springfield in 1996 and describes a process aimed at "1. healing and reconciliation for past concerns, 2. managing current and ongoing tensions, and 3. creating and moving toward a vision for the future." Strained relations between police and communities of color are a central subject of the report. Finding ways to improve such relations also occupies much of the report. Pl. Ex. 92 at SFP001233, SFP 001235-9, SFP001244-5, SFP001247, SFP001251, SFP001253-4.

408.   Among the recommendations mentioned in the 1997 Conflict Management Group report was to "explore a restructuring of the police commission to include more civilian oversight." Pl. Ex. 92 at SFP001251. Years later, the issue of civilian oversight remains unresolved.

409.   Part of a proposed settlement of the MCAD complaint filed by the Pastors' Council of Springfield, alleging a long standing pattern and practice of racially discriminatory

94

conduct by the Springfield Police, includes the hiring of Jack McDevitt, Associate Dean of

Research and Graduate Studies, Center for Criminal Justice Policy Research at Northeastern

University, to assist in the development of a "a citizen review board" and a process of reviewing

citizen complaints against the police.  Def. McDevitt Aff. ¶4.

### <u>Over The Years, There Has Been Much Press Coverage Of Racial Tension Related To Police Harrassment of Minorities</u>.

410.    In 1965, charges of police brutality and massive demonstrations followed an

altercation between police and a predominantly black crowd at the Octagon Lounge in

Springfield.  *See* Pl. Exs. 128-132 (newspaper articles)**.**

411.    In 1969, police clashed with welfare rights and anti-war protestors, resulting in

more than two dozen arrests, several injuries, and a city-wide curfew.  *See* Pl. Exs. 133-134

(newspaper articles).

412.    In 1969, numerous Springfield Technical High School students were injured when

fighting broke out between black and white students, leading police to respond to the scene in

full riot gear.  *See* Pl. Exhibits 135-137.  Race-related violence escalated to the point that

spectators were banned from high school basketball games.  *See* Pl. Ex. 138, "9 Injured in Tech

High Fighting," *Springfield Daily News*, Sept. 24, 1971, at 1.

413.    In 1971 more race-related violence at Technical High School touched off a 12 day

crisis, resulting in police officers in riot gear stationed outside of the city's four public high

schools.  The *Springfield Daily News* reported that the incident began when a group of "some 35

whites, none of them students at Technical and most armed with rocks, gathered behind the St.

Michael's Cathedral rectory in the parking lot . . . . [and] attacked a group of 'six or seven'

blacks."  *See* Pl. Exhibits 138 – 141 (newspaper articles); Plaintiff's Ex. 138, "9 Injured in Tech

High Fighting," *Springfield Daily News*, Sept. 24, 1971, at 1.

414.    In 1975, the fatal police shooting of an Hispanic man "unleashed a storm of protest from the city's Puerto Rican community."  A second fatal police shooting of an unarmed Hispanic robbery suspect touched off rioting in Springfield's predominantly Hispanic North End. *See* "Officer Slays Man in Break Attempt," *Springfield Daily News*, Aug. 27, 1975 (Pl. Ex. 142) at 1, 11; "Mayor Issues Plea for Peace in City," *Springfield Daily News*, Aug. 28, 1975 (Pl. Ex. 143) at 1, 2.

415.    In 1988, the Springfield branch of the NAACP held a press conference to call attention to police brutality and racism.  As a basis for the accusations, the NAACP cited several complaints, including: (1) a complaint by a 15-year-old black youth who said that five police officers placed a trash can over his head and hit it with sticks and other objects, played Russian roulette with him, and threw firecrackers at him; (2) an incident in which a black man was kicked and punched by police so badly that he later was hospitalized; and (3) complaints about strip search incidents in the Mason Square area.  Buffy Spencer and Sandra Constantin, "Police Face Accusation of Brutality," *Union-News*, Jul, 28, 1988 (Pl. Ex. 145)  at 1, 5.

416.    In 1994, following an investigation into a "Welcome Back" party held for a white police officer who shot and killed an African American youth, Benjamin Schoolfield, Police Chief Ernest M. Stelzer announced that the results of the investigation would be forwarded to the state attorney general and the FBI.  Brian Melley, "Chief to Send Police Party Probe to FBI," *Union-News*, Jul. 6, 1994 (Pl. Ex. 146) at 1, 9.

417.    In settlement of claims arising from the 1994 Schoolfield shooting, the City agreed to pay Schoolfield's family $700,000.  Peter Goonan, "City Reveals $700,000 Schoolfield Settlement" *Republican*, June 6, 1999 (Pl. Ex. 154) at A1, A7.

418.    In 1996, Deputy Police Chief Daniel Spellacy apologized to the black community for an incident in which a white, on-duty police officer placed a crank telephone call to a black church making light of church burnings in the South.  Mayor Albano stated in response to the incident that "[t]he community has a lot of work to do on racism," and that the city could face a crisis if it didn't take steps to improve race relations.  Michael McAuliffe and Carol Malley, "White Officer Linked to Call," *Union-News*, Jul. 6, 1996 (Pl. Ex. 147)  at A1; D.L. Stephenson, "Racial Crisis Possible Says Albano," *Union-News*, Jul. 22, 1996 (Pl. Ex. 148) at B1.

419.    In 1996, Mayor Albano acknowledged that "[t]his is a city that has been slow to respond to civil rights in minority hiring and new schools in inner cities."  Pl. Ex. 148 at B1.

420.    In November 1996, following a melee at the Nubian Athletic Club between 50 state and city police officers and a group of hundreds of Latino and African American teenagers, Mayor Albano described tension between minority youth and police as a "demonstrated fact." "We've known racism exists in Springfield and it's not confined to the police department," he stated.  "The black and Latino community have a right to be concerned."  David Kelly, "Clash of Race and Perception – Melee Stirs the Pot of Discontent," *Republican*, Nov. 10, 1996 (Pl. Ex. 149) at A20.

421.    The City paid $100,000 to an 81-year-old woman and her granddaughter to settle claims arising out of a June 12, 1996 incident in which the police used pepper spray against the women.  Kevin Claffey, "City Pays Women in Spray Incident," *Union-News*, Apr. 2, 1999 (Pl. Ex. 153) at A1, A9.

422.    In August 1997, Mayor Albano made a personal appeal to U.S. Attorney Donald K. Stern to investigate an unsigned, typed letter sent to Errol Campbell, secretary of the Springfield branch of the NAACP, which was enclosed in an envelope with the police

department's return address and stated, "What goes around comes around. It will be coming around to you." Albano said that the letter had further exacerbated race relations in the city. Rhonda Swan, "FBI Agrees to Investigate NAACP Letter – Albano's Appeal Successful," *Union-News*, Aug. 27, 1997 (Pl. Ex. 151) at A1.

423.    In November 1997, the Police Commission voted to suspend Patrolman Jeffrey M. Asher for one year without pay for kicking a black suspect during a videotaped arrest. The commissioners found that Asher had violated department rules by using more force than necessary. Jack Flynn, "Officer Suspended 1 Year – Kicking Incident Prompts Decision by Commissioners," *Union-News*, Nov. 27, 1997 (Pl. Ex. 152) at A1, A11.

### Commissioner Flynn

424.    Commissioner Flynn is a polarizing figure. His focus is on improving the quality of life in the downtown area. He has sought to clear that area of homeless people and has disparaged homeless people. He has also made polarizing remarks about crime victims. His remarks send a message that not everyone's safety is equally valued. This is especially true for Latinos and African Americans. Bewsee Aff. ¶¶ 14-15.

### Poor Complaint Procedures

425.    According to Springfield Police Commissioner Edward A. Flynn, the Springfield Police Department does not accept citizen complaints by telephone or by letter. Complainants must complete a Springfield Police Citizen Complaint form, which requires information regarding the complainant, location and time of the incident, and the name, rank, and identification number, if known, of the officer about whom the complaint is being made. Complaints must be completed by the complainant, witnessed by an adult, and filed in person at one of the locations established to receive citizen complaints. Flynn Aff. ¶ 19.

LIBA/1760998.1

426.    It is the policy of the Springfield Police Department that "[c]omplaints such as alleged discourtesy are characterized as minor and 'settled informally'" by Commissioner Flynn or his designee.  *Id*.

427.    Prior to 2006, the Board of Police Commissioners (the "Police Commission") was charged with investigating citizen complaints.  The Police Commission consisted of five civilian members appointed by the Mayor for three-year terms.  *See Id*. at ¶¶ 21, 23.

428.    The Police Commission was abolished when Commissioner Flynn was appointed in March 2006.  *Id*. at  ¶ 23.

429.    The procedures by which complaints are investigated are governed by the terms of the IBPO contract, which, according to Commissioner Flynn, "have yet to be renegotiated to reflect the elimination of the Police Commission as the authority responsible for the final resolution of complaints."  *Id*. at ¶ 21(a).

430.    Commissioner Flynn states that until the contract is renegotiated, "I, as Police Commissioner, have the authority to make a final determination with regard to a complaint filed against an officer and the appropriate disciplinary action – if any – that should be taken."  *Id*. at ¶ 21(b).

**Employment Discrimination and Disparities**

**Broad Disparities**

431.    Latinos have one of the highest unemployment rates.  They have low wages, needing to work more than one job to make ends meet.  Tosado Depo. 51:5-9.

432.    Whites dominate the labor force, especially in sales and office and management, professional, and related occupations.  A plurality of Springfield's Hispanic workers work in a service occupation.  Many black workers are in management, professional and related industry

99

occupations; however, an almost equal number of black workers are found in service occupations.  Pl. Ex. 159A at 27.

### The Police and Fire Departments

433.    The Springfield Finance Control Board commissioned an independent report, released in May 2005:  Carroll Buracker & Associates, Inc., *Report on a Comprehensive Study of the Springfield Police Department*  (May 4, 2005) ("Buracker Report").  *See* Pl. Ex. 127 at 1. *See also* Flynn Aff. ¶ 22 ("the Finance Control Board commissioned a Study of the Springfield Department of Police" in February 2005.  The report is entitled, "Management Study of the Springfield Police Department").  The Buracker Report:

a. Concludes the Springfield Police Department lacks diversity, and its promotions process is viewed as political and unfair.  *See* Buracker Report (Pl. Ex. 127) at xvi, xvii, xix, xxxi, xxxiv, xxxv.

b. Notes that there are no black or women officers assigned to the 'Community Policing Unit,' observes that this "contradicts the very meaning of community policing," and recommends requesting a written report on the lack of black and women officers assigned to the 'Community Policing Unit.'  *See id.* at xix, xxxiv, 135, 145, 155.

c. Notes that the Training Division, or Police Academy is, and has been, comprised almost entirely of white males.  *See id.* at xvii, 338-39.

d. Repeatedly notes the lack of diversity in the Department, and recommends recruiting minorities and women, and enhancing the presence of minorities in supervisory positions.  *See id.* at xvi, xvii, xix, xxxi, xxxv, 372, 374.

e. Notes that "[m]any promotional decisions are . . . viewed as political and unfair," that the last two promotions were of white males.  *See id.* at xvi, 333-34.

f. Notes that there are 7 MCAD cases and 2 discrimination cases currently pending against the Springfield Police Department.  *See id.* at 364.

100

g.    Recommends distribution of a "current citizen compliment and complaint process booklet in Spanish language." *See id.* at xxxii, 378.

434.    Henry Thomas served on the Springfield Fire Commission from approximately 1976 to 1979 and for a time was the Chair.  Up until that time it had been the Fire Commission's practice not to appoint as firefighters any blacks or Latinos who had arrest records – although it was only convictions that should have been considered as grounds for non-appointment.  White applicants were not treated the same way.  There were cases of white applicants who were appointed to firefighter positions despite having arrests for Driving While Intoxicated (DWI) and for domestic abuse.  During Henry Thomas' tenure the first African American and Latino firefighters in Springfield were appointed.  Thomas Aff. ¶ 10.

435.    There is a history of employment discrimination in the City of Springfield, particularly within the police and fire departments.  There has been very little promotion of African Americans throughout the city, and there are very few supervisory police officers and firefighters.  Talbert Swan Aff. ¶19.

## **Consent Decrees**

436.    For over thirty years, the Springfield police department has operated under a federal consent decree mandating the promotion of racial balance in hiring of officers.  *See Castro v. Beecher*, 365 F. Supp. 655 (D. Mass. 1973) (Pl. Ex. 99).

437.    Likewise, the Springfield fire department operates under its own federal consent decree.  *See Boston Chapter, NAACP, Inc. v. Beecher*, 371 F. Supp. 507 (D. Mass. 1974), *aff'd*, 504 F.2d 1017 (1st Cir. 1974), *cert. denied*, 421 U.S. 910 (1975) (Pl. Ex. 101).

438.    The Springfield Police Department has not met its goals for the hiring of minority police officers to fairly reflect the diversity of the population it serves, as set forth in the *Castro*

*v. Beecher* Consent Decree, despite the fact the Consent Decree has been in effect since the 1970's. Hall Aff. ¶¶ 23, 27.

439.    There is a history of employment discrimination in the City's police and fire forces, as evidenced by the *Castro v. Beecher* and *NAACP v. Beecher* cases, which resulted in Consent Decrees requiring minority hiring. Even though those decrees have been in effect for over 30 years, the Springfield Police and Fire Departments have not yet achieved parity, and the percentages of Africans Americans and Latinos do not reflect their percentages in the community. As of 2003, the combined percentage of Black/African American and Hispanic police officers in the Springfield Police Department was 32.7%. In the third quarter of 2006, only 13% of the staff of the Springfield Police Department were African American, and only 15.8% were Hispanic. By comparison, according to the 2000 Census, 48.2% of Springfield's population is either African American or Hispanic. Thomas Aff. ¶ 9 and Flynn Aff. ¶ 33.

440.    The Springfield police and fire departments are predominantly white despite being under consent decrees requiring them to hire minorities. Buntin Aff. ¶ 12.

**Springfield Schools**

441.    The professional staff at Springfield schools is 85% white. *See* Oct. 12, 2000 Minutes of the Regular Session of the School Committee (Pl. Ex. 112) at 6.

442.    There is a history of employment discrimination in the City of Springfield within the school department. Recently it was revealed that Black school principals were being paid less than comparable white principals. Talbert Swan Aff. ¶ 19.

443.    In 1994, the Massachusetts Commission Against Discrimination found that the City's School Department had unlawfully discriminated against an African American applicant for a teaching position because of his race. The complainant had "a very heavy southern accent typical of African Americans from the South." The MCAD found that the City's articulated fear

that "students might mimic the Complainant" was evidence of unlawful racial stereotyping by the City. The MCAD concluded that the City's stated reason for not hiring the complainant – "poor verbal communications" – was a discriminatory pretext for the City's "aversion to his accent and manner of speaking that is directly related to race." *Hamilton v. Springfield School Dep't*, No. 87-SEM-0058, 1994 Mass. Comm. Discrim. LEXIS 73 (June 20, 1994) (Pl. Ex. 107) at *4, *7, *15-*16.

444.    Both within the School Department and in other city departments and agencies, there are few African Americans and Latinos in high-level strategic positions. When the few appointments of African Americans or Latinos have been made it has been because of community pressure. Twiggs Aff.¶ 16.

445.    Within the last month or so the Springfield School Department elevated many people to supervisory positions. Out of 70 to 80 appointments there has been not one African American male promoted and only two African American females promoted. Twiggs Aff. ¶ 15.

446.    The city of Springfield has few employees of color and very few if any people who speak Spanish. Even today 80% of the teachers in the school system (which has a minority enrollment of 80%) are white. There was one Black teacher, Lucille Gibbs, who applied to be a principal, and each time she was turned down by the School Committee. Many Blacks have had difficulty being hired as teachers in the Springfield school system. Frank Buntin Aff. ¶ 11.

### Other Employment Discrimination and Disparities

447.    The City of Springfield has not met its Affirmative Action goals with regard to hiring as set forth in its Affirmative Action Plan. Hall Aff. ¶ 12.

448.    Recent appointments made by the Finance Control Board have not been in compliance with the City's "Affirmative Action procedures, processes and goals." *Id.*

449.     There have been problems in employment, related to race, in Springfield.
Williams Depo. 60:20-22.

450.     Minorities have had minimal access to public sector jobs in Springfield, and they
have been cut out of private sector jobs as well.  Up until the 1950s Mass Mutual Life Insurance
Co., a major employer in the City had never hired a Black person.  Thomas Aff. ¶ 11.

451.     Because of their lower incomes, many African Americans and Latinos do not own
cars and are thus unable to get to jobs located outside of the city of Springfield.  In addition,
many African Americans and Latinos do not have computers and cannot access the Internet to
search for jobs.  *Id.* ¶ 12.

452.     Many major employers in Springfield, like Mass Mutual and Monarch Insurance
Companies, either refused to hire blacks altogether or if they did hire them, black men were only
permitted to work in the mailroom and black women in maintenance.  Ben Swan Aff. ¶ 33.

453.     Supermarkets did not hire blacks, and when they did, it was usually as baggers.
When a black person became a manager it was noteworthy.  Banks did not hire black tellers.  *Id.*
¶ 34.

454.     The City of Springfield itself has a poor record of hiring minorities.  When Mayor
Ryan hired a black secretary in the 1960's it was considered a big deal.  Even today there are few
African Americans in prominent position in city government.  *Id.* ¶ 35.

455.     In 1996 the Mayor enacted an Executive Order requiring that 25% of the contracts
with and services to the City of Springfield be with minority and women-owned businesses.
There was supposed to be monthly reporting to determine if this goal was being met.  This Order
has never been enforced, and the City has not met its goals regarding contracting with minority
vendors.  The city has continued to give contracts to white owned companies that do not comply

104

with the order.  Minority owned businesses never benefited, even on major public projects like the Federal Courthouse and the Basketball Hall of Fame.  Talbert Swan Aff. ¶ 16.

456.    The City of Springfield has a history of not giving city contracts to African American businesses.  For instance, an African American company has repeatedly bid on the City's towing contract.  Despite having the low bid they have not been awarded the contract. Just recently, the Control Board rejected a bid from the company.  The general feeling in the African American community is that it doesn't matter how qualified you are, or how low your bid, the city will not award you the business contract.   Twiggs Aff.¶ 17.

457.    The City does not have a good record of employing people of color, especially in upper level management positions. There are only two people of color  in management positions in the City.  Talbert Swan Aff. ¶ 20.

458.    The African American community sought to have the Mayor appoint a person of color as Director of the Massachusetts Career Development Institute (MCDI) a major agency serving the Black community.  Instead  Mayor Albano appointed the former white police chief, who had no experience with the minority community and who later was indicted.  *Id*. ¶ 18.

**Housing Discrimination and Disparities**

459.    There have been problems with housing in Springfield, related to race. Williams Depo. 60: 23-24; 61: 1.

### Mortgage Lending Discrimination

460.    Black/African-Americans and Hispanics in Springfield are subject to discrimination in home mortgage lending.  In a report analyzing lending practices in the Springfield Metropolitan Statistical Area[3] from 1996 to 2001, the Pioneer Valley Planning

---

[3]    The "Springfield Metropolitan Statistical Area" includes Springfield and other surrounding cities and towns. *See* Ex. 23 at 9 n.8, 10.

Commission found "a disturbing trend of differences between the lending statistics of white applicants and African-American and Latino applicants."  *See* Pioneer Valley Planning Commission, *Owning a Place to Call Home:  An Analysis of Fair and Subprime Lending in the Springfield Metropolitan Area* (Nov. 2003) (Pl. Ex. 48) at 46.  Specifically, the report found:

461.    "African-American and Latino applicants had consistently higher denial rates than white applicants, regardless of income.  High-income Latino and African-American applicants were denied home loans at roughly three times the rate of high-income white applicants.  High-income white applicants had an average denial rate of 7 percent while high-income African-American and Latino applicants had average denial rates of 22 and 21 percent respectively."  *Id.* at 30.  *See also* Smith Aff. ¶ 7.

462.    "Denial rates for middle income African-American and Latino applicants were about twice as high as white applicants with similar incomes."  Pl. Ex. 48 at 30.

463.    "Latino and African-American applicants of *all income groups* experienced higher denial rates than all but the lowest income white applicants.  Moderate-income white applicants had a denial rate of 16 percent as compared to 22 percent from high-income African-American applicants and 21 percent for high-income Latino applicants."  *Id.*

464.    In 1997, African-American applicants for refinancing on prime loans in the Metropolitan Springfield area were denied nearly five times as frequently as their White counterparts.  Hispanic applicants were denied six times as frequently as White applicants.  For conventional loans, the African-American denial rate was over twice that of Whites, and the Hispanic denial rate was three times the rate of Whites.  *Id.* at 51.

465.    In 2001, African-American applicants for refinancing on prime loans in the Metropolitan Springfield area were denied four times more frequently than their White

counterparts.  In 2001, Latinos applying for applying for Prime loan refinancing were denied five and a half times as frequently as their White counterparts.  *Id.* at 51, Table 6.

466.    There is a documented four-to-one turndown ratio for Blacks compared to whites for mortgages, and the rate probably is even higher for commercial loans.  This results in inequality in peoples' ability to own a home or run a business in Springfield.  When people have less of a stake in the city as evidenced by owning a home or business, they often do not have the same incentive to participate in the electoral system.  Thomas Aff. ¶ 31.

467.    There is a history of redlining in Springfield and a history of mortgage lending discrimination by banks resulting in lower homeownership rates for African Americans and Latinos.  This impacts the ability of people of color to accumulate wealth, which would provide them greater opportunity to run for citywide office.  Talbert Swan Aff. ¶ 22.

**Disparities in Home Ownership**

468.    The city's white, non-Hispanic residents are much more likely to be homeowners than either Black or Hispanic residents.  Pl. Ex. 159A at 68.

469.    Nearly 20,000 of the city's owner-occupied housing units are occupied by white, non-Hispanic households, more than double the number of the city's other racial groups combined. In contrast, the Black and Hispanic populations of the city are renters of nearly twice as many properties as the white, non-Hispanic population.  *Id*.

470.    Furthermore, the white, non-Hispanic residents of the city are much more likely to live in single-family detached homes than nearly any other racial group. More than 60 percent of white, non-Hispanic households live in single-family homes, compared to less than 35 percent of Black households and less than 20 percent of Hispanic households. Nearly 20 percent of the

LIBA/1760998.1

city's Hispanic households live in housing units in 3 and 4 unit structures, a higher percentage than for any other group. *Id.*

471.    Relating housing and households to transportation, nearly 31 percent of Hispanic households do not have a vehicle available to them, compared to 24.5 percent of Black households and only 11.4 percent of white, non-Hispanic households. *Id.*

472.    According to 2000 Census data, the renter-occupied housing rate among Black/African American households in Springfield is 61.5%. The rate for Hispanic households is even higher, at 79.1%. By contrast, only 34.6 of all white households rent their homes. *See* United States Census Tables: *Tenure By Race of Householder; Tenure (Hispanic or Latino Householder); and Tenure (White Alone, Not Hispanic or Latino Householder)* (Pl. Ex. 45).

### Racial Segregation in Housing

473.    In 1967, the Mayor issued a report on housing stating that there was discrimination in the metropolitan Springfield housing market, noting that "[s]uch discrimination has the effect of artificially narrowing the market of many families who are economically capable of moving into different dwellings in different neighborhoods" and calling on the Human Relations Commission to educate people in the Greater Springfield area as to the harmful effect of housing discrimination. Human Relations Commission, Springfield, MA Annual Report, 1967 (Pl. Ex. 189) at 5.

474.    Springfield has a history of racial segregation in housing, resulting in segregated neighborhoods. Ben Swan Aff. ¶ 31.

475.    In the 1950's African American families were prevented by white residents from buying and renting homes in certain neighborhoods. *Id.* ¶ 4.

476.    When a white college student rented an apartment on State Street for herself and her black roommate, she was threatened with eviction when the landlord found out the roommate was black.  Ben Swan Aff. ¶ 31.

477.    In the 1960's Action For Equality tested for and fought against housing discrimination in Springfield.  *Id*. ¶ 32.

478.    Blacks could not obtain public housing in Springfield in certain developments such as Reed Village.  *Id*. ¶ 39.

479.    There is a history of housing discrimination in Springfield.  When Frank Buntin first moved to Springfield and was teaching in the schools he went to the housing authority to inquire about housing.  He wanted to live in a white neighborhood because the housing was better – but was not permitted to.  When he told the principal of his school of his problems finding housing he said "my other colored teaches never had a problem finding a place to live." Buntin eventually moved into veterans housing and was one of only three Black families living there.  A Black doctor was denied housing at Amore Village, a predominantly white single-family area, and he filed a complaint.  The newspaper ran an editorial saying that housing discrimination does take place in Springfield.  There is now a Health Center in Mason Square named after the doctor.  Recently, a white Housing Authority director was appointed, despite the fact that the majority of people in public housing are Black and Hispanic.  Buntin Aff. ¶ 9.

480.    "[P]atterns of racial concentration in [the Springfield Standard Metropolitan Statistical Area] are not mainly the result of individual choice, but are shaped by individual and institutional discriminatory practices that force minorities to reside not only in designated cities – Springfield and Holyoke – but also in designated *sections* of those cities."  Preston Smith Aff.

¶ 4; Preston H. Smith, "Racial Segregation in Springfield and Holyoke: Historical and Current Trends" (dated Apr. 25, 1995) ("Smith Report") (Pl. Ex. 97 and Smith Aff. Ex. A) at 2.

481.    Puerto Ricans and Blacks are overrepresented in the City of Springfield, compared to the surrounding cities and towns.  Smith Report at 2-3.

482.    There are patterns of minority concentration within the city of Springfield.  As of the early 1990s in Springfield, Puerto Ricans were concentrated in the North End making up 58% of their city population.  If you add to those areas the contiguous neighborhoods of Metro Center, you get 68%; and if you add Puerto Ricans in Six Corners and Old Hill you get 81%; add South End you get 90% of the total city Puerto Rican Population (Springfield Planning Department 1993).  *Id.* at 3.

483.    As of the early 1990s, the neighborhoods of McKnight, Bay, Old Hill, Upper Hill and Six Corners encompassed 60% of Springfield's black population.  In contrast, East Forest Park was 2% black and 1% Latino, and East Springfield was 4% black and 5% Latino.  Forest Park was 6% black and 8% Latino; Indian Orchard was 10% Latino and 8% black.  Sixteen Acres was 13% black, and only 4% Latino (Springfield Planning Department 1993).  *Id.*

484.    A study by the Springfield Council of Social Agencies in 1942 which interviewed two hundred "representative Negroes" asserted that "ninety-five per cent of those interviewed stated that there was discrimination against Negroes in securing rentals."  They reported that "whole sections of the city" were closed to blacks.  Moreover, when blacks did get access to formerly white occupied rentals they paid higher rents.  In general, these respondents described blacks' housing conditions as "deplorable."  One respondent commented on the availability of FHA loans to blacks.  He reported that:  "It is impossible for a Negro to build an F.H.A. home in Springfield because F.H.A loans are available only in areas in which values are high enough to

110

warrant such a loan, and Negroes are not permitted to buy or rent in such areas." Blacks were also denied access to public housing. Many black leaders sought public housing in order to move blacks out of dilapidated structures. Discriminated against by federal loan programs, blacks were also denied conventional loans from banks because of their alleged financial "irresponsibility." *Id. at* 11-12 (internal citations omitted).

485.    During the 1960s, blacks protested the lack of employment opportunities, police brutality, and lack of affordable housing. A housing shortage for blacks was highlighted by a full-page newspaper ad seeking housing for families displaced by urban renewal. The ad was signed by citizens and sponsors of the Mayor's Minority Group Housing Committee which said there was "enormous difficulty in finding decent homes for people of minority groups despite the large number of apartments for rent and homes for sale in the city." So even though housing was available blacks did not have access to it even when they had been displaced because of city policy. *Id.* at 12 (internal citations omitted).

486.    Smith interviewed an African American man who was born and raised in Springfield whose experience may illustrate the form some discriminatory practices took in Springfield's housing market. He remembers living in the Old Hill Area off Eastern Avenue after World War Two. His family was the only black one residing on a block dominated by European immigrant, working class families. He remembers that the family had to get mortgage financing outside of the city in order to purchase the house. No Springfield bank would grant them the mortgage loan. This man had a similar experience as an adult looking to buy a home in the 1960s. He reports that the first four white realtors he and his wife enlisted only showed them houses in black neighborhoods. It was not until the fifth realtor that they were shown property in

LIBA/1760998.1

a white neighborhood. Subsequently, he and his wife became the first blacks to purchase a home on their block in Sixteen Acres. *Id.* at 12-13 (internal citations omitted).

487.    Housing discrimination has long been recognized as a barrier to more dispersion of Puerto Ricans citywide. *Id.* at 14.

488.    The fact that Latinos in Springfield have moved into bordering neighborhoods and that these neighborhoods are poor suggested a spill over from traditional Latino areas rather than unfettered dispersion. *Id.* at 16.

489.    The movement of blacks into Forest Park and Sixteen Acres has been in those census tracts closest to the black community suggesting again an expanding black community rather than integration. *Id.* at 17.

490.    The traditional measure of racial segregation has been the dissimilarity index which measures how much neighborhoods or census tracts deviate from the citywide racial group proportions. In 1990, whites (including Hispanics) made up 69%; blacks (including Hispanics) constituted 19%; and Hispanics made up 17% of the City of Springfield. In looking at Springfield's neighborhoods from the 1990 census none represented citywide racial proportions. *Id.* at 17-18.

491.    The movement in the 1980s of Puerto Rican and Black/African American residents out of racially and ethnically concentrated neighborhoods in Springfield and into other areas of the city was more likely the result of spill-over and expansion of the size of those communities, than it was the result of racial integration or dispersion. Smith Aff. ¶ 5.

492.    Springfield's Analysis of Impediments (the "AI") observed that homeownership rates are lower in areas with large concentrations of ethnic and racial minorities. Smith Aff. ¶ 8;

City of Springfield, MA Analysis of Impediments to Fair Housing (Pl. Ex. 162 and Smith Aff. Ex. C) at 21.

493.    For seven years, from approximately 1996 to 2003, Preston Smith served on the Board of Directors of the Housing Discrimination Project, which now is called the Massachusetts Fair Housing Center.  The Massachusetts Fair Housing Center is dedicated to protecting the rights of all persons to fair and equal opportunities to secure safe and affordable housing.  During that period, Smith regularly heard complaints of housing discrimination by African Americans and Hispanics living in Springfield.  Smith Aff. ¶ 9.

494.    Smith believes that there have been no significant changes in racially segregated housing patterns in Springfield or the causes of those patterns since he authored the Smith Report.  Springfield's housing patterns continue to be shaped by individual and institutional discriminatory practices that force minorities to reside in certain sections of the City.  Smith Aff. ¶ 10.

495.    There were 7 neighborhoods that exceeded the white citywide proportion of 69% -- going from 83% white in Liberty Heights/Atwater to 97% in East Forest Park; there were 8 neighborhoods that met or exceeded the black citywide proportion of 19% -- going from 19% black in the South End to 70% in the Bay neighborhood.  There were 8 neighborhoods that exceeded the Latino proportion of 17% -- with 18% Latino in Bay to 81% in Memorial Square. Smith Report 17-18 (internal citations omitted).

496.    In 1988, the mayor's "Executive Housing Task Force" reached essentially the same conclusion as Professor Smith, stating in its report:  "Patterns of concentrated racial occupancy in housing have developed over a period of decades.  These housing patterns have resulted from not only past discrimination, but also from apparently neutral practices that are

actually discriminatory in effect." The Mayor's report also concluded that a "city and regional commitment to providing affordable housing on an open occupancy basis must be made if we are to change what most people have come to accept as normal, that is, the concentration of minority groups in certain neighborhoods." *See* Richard E. Neal & Kevin Kennedy, *Mayor Neal's Housing Task Force Final Report: The Housing Problem in Springfield, 1988* (Dec. 15, 1988) (Pl. Ex. 91) at 23.

497.    The Lewis Mumford Center for Comparative Urban and Regional Research at the University of Albany, State University of New York, in conjunction with the Initiative on Spatial Structures in the Social Sciences at Brown University, has published data from the "Mumford Center Census 2000 Project" under the title "Metropolitan Racial and Ethnic Change 2000." These data, including data concerning Springfield, Massachusetts, are based on the 2000 Census and other information, and they are published at the website for the Mumford Center Census 2000 Project. See http://mumford.albany.edu/census/data.html. The data were assembled by and under the direction of Professor John Logan of Brown University. Logan Aff. ¶ 2, 5, 7.

498.    Among the Mumford data are a list of "segregation scores" for people of all ages in 331 metropolitan areas in the 2000 Census. See Logan Aff. Ex. B (Pl. Ex. 176) at SFP03338, which corresponds to a page with the following internet address:

http://mumford.albany.edu/census/WholePop/WPsort.html.

499.    These segregation scores are based on a "dissimilarity index." The dissimilarity index is defined at the above webpage (by clicking the hyperlink, "view description"), as follows: "The dissimilarity index measures whether one particular group is distributed across census tracts in the metropolitan area in the same way as another group. A high value indicates that the two groups tend to live in different tracts. D ranges from 0 to 100. A value of 60 (or

above) is considered very high. It means that 60% (or more) of the members of one group would need to move to a different tract in order for the two groups to be equally distributed. Values of 40 or 50 are usually considered a moderate level of segregation, and values of 30 or below are considered to be fairly low." Pl. Ex. 176 at SFP03338.

500.    Page SFP03339 of Logan Aff., Ex. B (Pl. Ex. 176) shows that, sorting the 331 metropolitan areas by dissimilarity scores for whites versus Hispanics, the Springfield metropolitan area has a score of 63 and is rated the 9th most segregated metropolitan area among the 331. For whites versus African Americans, Springfield's dissimilarity score is 64. Pl. Ex. 176 at SFP03339.

501.    Pages SFP03329-30 of Logan Aff., Ex. B (Pl. Ex. 176), evaluate "neighborhood inequality" in the City of Springfield. They show average Latino and African American households in Springfield live in neighborhoods with significantly lower income than whites do, and in neighborhoods with higher poverty, with lower rates of college education and professional workers, with higher unemployment, with more vacant housing, and with a lower rate of home ownership than whites do.

502.    Pages SFP03331-35 of Logan Aff., Ex. B (Pl. Ex. 176), show that these disparities between people of color and whites are not explained fully by differences in income class. For example, "the average poor white household lives in a neighborhood where the median household income is $32,719, but the average poor black household lives in a neighborhood where the median household income is $26,162." The average poor Hispanic household lives in a neighborhood where the median household income is even lower: $21,479. Pl. Ex. 176 at SFP03333.

**Other Housing Disparities and Discrimination**

503.    New development in Springfield is focused on the downtown areas and the entertainment district and not on the communities of color.  Western New England College gives directions in its brochure that deliberately avoids Springfield's neighborhoods.  The Basketball Hall of Fame originally in the heart of the African American community at Springfield College, was moved into the downtown area, with a special exit off the highway so as to avoid the neighborhoods of color.  Talbert Swan Aff. ¶ 21.

504.    The city has neglected city owned buildings in the black and Latino communities, permitting them to fall into disrepair.  This is true of both the Alexander V. Mapp building in Mason Square, formerly used by the Urban League, and the South End Community Center in Ward 1, used by the Latino community.  The Latino community has been pushing to have the community center renovated, yet white members of the City Council have sought to close it down completely saying it is a health hazard.  City facilities in white areas, such as the Nathan Bill Community Center in Sixteen Acres, are in much better condition.  *Id*. ¶ 23.

505.    Public housing developments in white neighborhoods are in much better condition than the public housing in communities of color.  For instance, the Allen Park Senior housing development in predominantly white Forest Park is in much better condition than other public housing.  *Id*. ¶ 24.

506.    The Assistant to the Executive Director of the Control Board has wanted to tear down blighted properties in the section of Ward 1 known as Hollywood, which is primarily Latino.  These properties are mostly owned by the city and the problems have been created by the city saturating this neighborhood with low income and subsidized housing and not keeping it in proper repair.  *Id*. ¶ 25.

116

507.    There has been a history of housing discrimination in Springfield, making it difficult for minorities to buy homes.  As a result of lack of job opportunities and the lack of homeownership opportunities, African Americans had little opportunity for wealth creation, thus precluding them from accumulating the resources necessary to run a citywide campaign. Thomas Aff. ¶ 11.

508.    Despite the fact that the majority of people in public housing and Section 8 housing in Springfield are African American and Latino, recently three new white members were appointed to the Springfield Housing Authority Board.  Buntin Aff. ¶ 10.

**Other Patterns of Discrimination and Disparities**

509.    In two recent decisions issued on the same day, the MCAD found that the Diamond Cab Company and the Yellow Cab Company both discriminated against African American customers on the basis of race by refusing to provide taxi service unless the customers paid their fares in advance.  In *Diamond Cab*, the MCAD specifically found that the driver's reasons for demanding prepayment – that he felt uncomfortable given the circumstances surrounding the "pickup" and his belief that "you people don't like to pay" – were "rooted in racial stereotypes and bias."  Among other sanctions, the MCAD found it necessary to order both companies to submit a driver and management non-discrimination program to the MCAD for approval. *Wilder v. Diamond Cab Co.*, No. 97-SPA-0789, 2001 Mass. Comm. Discrim. LEXIS 178 (Feb. 23, 2001) (Pl. Ex. 104) at *9-*10; *Carpenter v. Yellow Cab Co.*, No. 95-SPA-0033, 2001 Mass. Comm. Discrim. LEXIS 177 (Feb. 23, 2001) (Pl. Ex. 105).

510.    Funding from Springfield's Health and Human Services Department and from the department of Community Development goes disproportionately to white entities.  There are clear disparities in funding for minority-based agencies.  Talbert Swan Aff. ¶ 17.

511.    The African American community sought to have the Mayor appoint a person of color as Director of the Massachusetts Career Development Institute (MCDI), a major agency serving the Black community.  Instead, Mayor Albano appointed the former white police chief, who had no experience with the minority community and who later was indicted.  Talbert Swan Aff. ¶ 18.

512.    Springfield is supposed to have a Human Relations Committee.  Rev. Swan asked the current Mayor to appoint him to the committee, but was never appointed.  In fact the Human Relations Committee has never met and is basically defunct, another indication of the City's lack of concern about race relations and discrimination.  *Id.* ¶ 35.

513.    According to documents produced by Defendants, between 1987 and mid-2005, at least 88 civil rights lawsuits were filed against the City of Springfield.  Memorandum from Michael R. Triggs to Eugene J. Mulcahy, Esq. re: Civil Rights Cases, dated Feb. 27, 1998 (Pl. Ex. 7); Email exchange between attorneys and paralegal for Defendants, with attachment (Pl. Ex. 33).

514.    Incarceration rates in the North End are high, with 10% of the community passing through the Hampden County Correctional Center each year.  North End Strategic Plan (Pl. Ex. 163 and McDowell Aff. Ex. B) at 7.

**Health Care Discrimination and Health Disparities**

**HIV/AIDS Disparities**

515.    As of January 2004, Blacks/African-Americans and Hispanics accounted for more than 80% of Springfield residents known to be living with HIV/AIDS.  *See* Springfield Dept. of Health and Human Servs., *Health Update, HIV/AIDS 2004, Springfield, MA, Fourth Edition* (Aug. 23, 2004) (Pl. Ex. 29) at 9.

516.    More specifically, 53% of those with HIV/AIDs were Hispanic, 28% were Black, and 18% were white.  *See id.*  The race/ethnicity make-up of people living with HIV/AIDS in Springfield at the beginning of January, 2004 differs considerably from the race/ethnicity make-up of the adult population of the city," which, according to the 2002 Census, was 20% Black, 27% Hispanic, and 49% white.  *See id.  See also* Springfield Dept. of Health and Human Servs., *Health Update, HIV/AIDS Epidemic in the City of Springfield, MA, Third Edition, 2002* (Aug. 15, 2002) (Pl. Ex. 22) at 8 (reporting that, as of July 1, 2002, Hispanics accounted for 53%, Blacks/African-Americans for 29%, and whites for 18% of Springfield residents known to be living with HIV/AIDS).

517.    Between 1982 and 1999 in Springfield, the percentage of Hispanic Springfield residents diagnosed with AIDS increased dramatically (from 27% of the total to 49%); in contrast, the percentage of whites diagnosed with AIDS dramatically decreased (from 37% of the total to 13%) during the same time period.  *See* Springfield Dept. of Health and Human Servs., *Health Update, A Profile of the AIDS Epidemic In the City of Springfield, MA, Second Edition 1999* (Pl. Ex. 9) at 11.

518.    The Latino community has the highest rates of infection with HIV and AIDS across the state; particularly Hispanic numbers are the fastest growing segment.  Tosado Depo. 50:9-17.

519.    There appears to be a correlation between race and HIV/AIDS.  In 2005, 809 persons living with HIV/AIDS were Hispanic, 416 were African American, and 238 were white. Caulton-Harris estimates that, including persons not in care, there were 1959 Springfield residents living with HIV/AIDS in 2005.  Springfield has the fourth highest rate of HIV/AIDS in the Commonwealth of Massachusetts.  Caulton-Harris Aff. ¶¶ 9-10.

520.    The North End is the center of the HIV epidemic in Greater Springfield.  North End Strategic Plan (Pl. Ex. 163 and McDowell Aff. Ex. B) at 7.

### Pregnancy and Birth Statistics Reveal Disparities

521.    In Springfield, between 1998-2002, high perinatal disparities existed between African-Americans and Whites.  African-American babies were two to three times more likely to experience very low birth weight, low birth weight, and feto-infant death than White babies. Stereotyping by members of the medical community, and racism in general, contributed to differing medical treatment, which helped create significant perinatal disparities.  *See* Karin Downs, et. al., Massachusetts Perinatal Disparities Project, "Moving Data into Action" (Pl. Ex. 160A; Karin Downs Aff. Ex. B).

522.    Between 1999 and 2002, Black and Hispanic newborns suffered from low birth weight and very low birth weight more often than white newborns.  *See* Springfield Dept. of Health and Human Servs., *Health Update, Pregnancies and Births, Springfield, MA, 1993-2005* (Pl. Ex. 31) at 6, 22-24.

523.    Springfield's 1989-2002 Black and Hispanic infant mortality rates were higher than white infant mortality rates during the same time period.  *See id.* at 26.  During that time period, "the average annual Black infant mortality rate in Springfield has been more than double the White infant mortality rate in the City."  *See id.* at 6, 26.

524.    Black and Hispanic infants in Springfield are less likely to be born to mothers who used adequate prenatal care:  in 2002, only 67% of Black and Hispanic mothers used prenatal care adequately, as compared to 85% of white mothers.  *See id.* at 16-17, 19.

525.    Teenage pregnancy from 1993 to 2000 was more common among Black and Hispanic teens than among white teens.  And, just as in the adult population, Black and Hispanic teen mothers were less likely to adequately use prenatal care than white teen mothers, and were also more likely to give birth to babies who suffered from low birth weight than were white teen mothers.  *See* Springfield Dept. of Health and Human Servs., *Health Update, Birth to Teens, Springfield, MA, 1993-2000* (Aug. 8, 2002) (Pl. Ex. 20) at 7, 11, 14.

526.    There appears to be a correlation between race and infant mortality in Springfield. Of the 117 infant deaths in Springfield between 1993 and 2000, 66 were African Americans, 62 were Hispanic, 47 were white, and 2 were Asian.  Between 1993 and 2000, the average annual infant mortality rate per 1,000 live births was 14.5 for African Americans, 9.1 for Hispanics and 6.3 for whites.  Between 2000 and 2004, the average annual infant morality rate per 1,000 live births has decreased and is 12.4 for African Americans, 6.4 for Hispanics, and 3.7 for whites. Caulton-Harris Aff. ¶ 4(b).

527.    There appears to be a correlation between race and incidence of teen pregnancy in Springfield.  Caulton-Harris ¶ 15.

**Other Health Disparities and Discrimination**

528.    Twenty percent of families in the North End report that at least one member of the household suffers from asthma.  North End Strategic Plan (Pl. Ex. 163 and McDowell Aff. Ex. B) at 7.

529.    The Latino community has early childhood health issues because of the lack of insurance and access to adequate health care.  Tosado Depo. 50:17-20.

530.    Children in Springfield have numerous serious health issues, including alcohol and marijuana abuse, poor nutrition, high obesity rates, a large percentage of sexually active middle school age children, high teenage pregnancy rates and numerous students who are HIV positive or living with adults who are HIV positive.  (Hancock Findings at *108).

531.    Springfield has some of the highest indices for depression, obesity, infant mortality, stress and hypertension, which adversely affect the African American and Latino communities. Thomas Aff. ¶ 36.

532.    Drug use has a disproportionate impact on Springfield's African-American and Latino communities.  Lewis-Caulton Aff. ¶ 14.

533.    There are disparities in health in the minority communities in Springfield, including high infant mortality rates, higher asthma rates and other health problems, which are disproportionately more prevalent in African American and Latino communities. Darnell Williams Aff. ¶18.


X.    **SENATE FACTOR:  WHETHER POLITICAL CAMPAIGNS HAVE BEEN CHARACTERIZED BY OVERT OR SUBTLE RACIAL APPEALS**

534.    During the 1960's School Committee campaigns were dominated by the debate over busing to achieve racial equality in the schools.  Candidates who supported busing were not elected to the School Committee.  Ben Swan Aff. ¶ 7.

535.    The 1963 mayoral and School Committee campaigns were characterized by overt racial appeals.  Ryan Aff. ¶¶ 56-59.

536.    Mayor Charles Ryan's 1963 opponent in his campaign for re-election, John Pierce Lynch declared that Ryan was "a rubber stamp of the NAACP" and warned the electorate that Ryan's re-election would mean that "thousands of white children" would be bussed to schools in predominately "Negro" neighborhoods, and "hundreds of Negroes" would be bussed to schools located in predominately white neighborhoods.  Lynch further characterized Ryan's agreement with the NAACP proposal for a 1964 deadline for the implementation for reforms as a "grandstand play to get the Negro vote."  Ryan Aff. ¶ 56.

537.    Less than 24 hours before the 1963 general election, Lynch published a full page advertisement that provided:  "Another Ryan Lie! . . . Bussing has Already Started."  These heavy black type headlines were accompanied by a picture of African American children stepping from a school bus in front of a school in a white middle class neighborhood.  Lynch posed the question: "Which School is Next on the Ryan-NAACP List?  Lynch reprinted the ad on Tuesday morning - election day.  Ryan Aff. ¶ 58; Ryan Aff. Exs. C, D.

538.    Lynch also published an advertisement stating, "Let's Face Facts!  If 800 Negro students attend this school . . . and 800 white students go to this one . . . there is only one way to have 400 white students and 400 negro students attend each:  is bussing . . . Charles Ryan voted for bussing!  Lynch is opposed to bussing!"  Ryan Aff. Ex. A.

539.    The two primary School Committee candidates who won the most votes were Vincent MiMonaco and Rose Marie Coughlin, who based their campaign on their opposition of any form of mass bussing of students from one school to another.  Ryan Aff. ¶ 56.

540.    In 1998, a group called the Citizens Against Needle Exchange ("CANE") emerged in opposition to needle exchange, after the City Council voted 5-4 to establish a needle

exchange program.  CANE's campaign was racist, both in content and execution, because it promoted negative racial stereotypes about drug users.  Bewsee Aff. ¶¶ 36-37.

## XI.  SENATE FACTOR:  THE EXTENT TO WHICH MEMBERS OF THE MINORITY GROUP HAVE BEEN ELECTED TO PUBLIC OFFICE IN THE JURISDICTION.  *See also supra* ¶¶ 67-108 (Dr. Engstrom's conclusions regarding racially polarized voting, cohesion, and white bloc voting).

541.    Latinos and African Americans have been underrepresented in municipal government, particularly in recent years.  *See generally* Thernstrom Aff.¶ 201, Table 4.

### Latinos Are Not Proportionally Represented

542.    Latinos have not been and are not now proportionately represented on City Council.

<blockquote>

a.    No Latino served on City Council before Jose Tosado was appointed in 2002, and he is the only Latino member.

b.    As of the 2000 census, Latinos represented 21.8% of VAP. Engstrom Aff. at 3, n.1.  This is roughly a proportion of 2/9 of the City Council.

c.    According to Thernstrom ¶ 12, Table 2, Latinos represented 30.4% of the VAP in 2005, and are projected at 32.1% of the VAP in 2006, and 38.9% of the VAP in 2010.

d.    Therefore, even with Tosado in place, Latinos' VAP share was and is worth roughly an additional 2 seats on City Council.

</blockquote>

543.    Latinos are not now proportionately represented on School Committee.

<blockquote>

a.    The School Committee has 7 members, including the mayor.

b.    As of the 1990 census, Latinos represented 12.8% of VAP—a proportion close to 1/7 (14.2%).

c.    Carmen Rosa was on the School Committee for one term, 1993-1997, but was defeated because she advocated for minorities (see, e.g., Lopes Aff. ¶ 20; *infra* 787-790)

d.    As of 2000, Latinos represented 21.9% of VAP—a proportion of 1.5/7.

</blockquote>

e.  Tosado was elected to School Committee in 1999, but he served only half of his term before he was appointed to City Council.

f.  Since Tosado moved to City Council in 2002, no Latino has served on School Committee.

g.  According to Thernstrom Table 2, Latinos represented 30.4% of the VAP in 2005, and are projected at 32.1% of the VAP in 2006, and 38.9% of the VAP in 2010.

h.  Therefore, by now, Latinos' VAP share is worth in excess of 2 seats on School Committee (28.6%), and they have had none for roughly 5 years.

**African Americans Are Not Proportionally Represented**

544.  African Americans have not been and are not now proportionately represented on City Council.

a.  Except for 2000-2001, when Bud Williams and Carol Lewis-Caulton both sat on City Council, there has never been more than one African American city councilor.

b.  As of the 2000 census, African Americans represented 18.1% of VAP, proportionate to 1-2 seats on City Council (closer to 2).

c.  According to Thernstrom Table 2, African Americans represented 21% of the VAP in 2005, and are projected at 21.3% of the VAP in 2006, and 22.4% of the VAP in 2010.

d.  Therefore, at least since 2005, African Americans' share has been roughly proportional to 2/9.

e.  Williams continues to be the only African American city councilor.

545.  Because the School Committee has 7 members, proportionate representation for African Americans would be 1-2 members, and since 2000, they have sometimes had only one.

a.  From the time of the 2000 census forward, Hurst has been on School Committee, and therefore African Americans have had at least 1/7 representation; that is, 14.3%. From 2002 to the end of 2003 McCollum was appointed to replace Tosado, so there were two African Americans on School Committee.

b.  In 2000, African Americans represented 18.1% of VAP.

LIBA/1760998.1

c.    African Americans now represent about 21% of VAP, according to Thernstrom Table 2, roughly proportionate to 1-2 seats on School Committee.

**Defendants Have Recognized Lack of Proportional Representation of Minorities**

546.    A 1995 confidential memorandum written to Springfield city officials by City Solicitor Maurice Cahillane and obtained by the *Springfield Union News* concluded that it would be impossible to predict the outcome of a Voting Rights Act suit challenging the city's at-large system, but that "[c]learly, any at-large system in a multiracial and diverse community must be considered at risk under the statute if elected representation of minorities is out of proportion to that of the voting age population."   Carol Malley and Buffy Spencer, "Switch to Wards Would Be Costly, Complex," *Republican*, Jan. 26, 1997 (Pl. Ex. 150) at A12.

547.    In 1996, Mayor Albano stated, "There has never been an African-American mayor and only one African-American at a time has served on the City Council and there have been no Hispanics . . . . That tells me there is something wrong with the process."  Pl. Ex. 148, D.L. Stephenson, "Racial Crisis Possible Says Albano," *Union-News*, Jul. 22, 1996 at B1.

**XII.    SENATE FACTOR:  WHETHER THERE IS A SIGNIFICANT LACK OF RESPONSIVENESS ON THE PART OF ELECTED OFFICIALS TO THE PARTICULARIZED NEEDS OF THE MEMBERS OF MINORITY GROUPS.**

**State Representatives' Involvement In City Government Due to City's Lack of Responsiveness**

**State Representative Benjamin Swan**

548.    Rep. Ben Swan's office regularly receives complaints from his constituents about city services, including police-community relations, police response times, potholes, trash dumping, the assessor's office, and water and sewer issues.  Rep. Swan believes he receives more complaints about city issues than other State Representatives because his constituents

perceive the Springfield City Council and School Committee to be unresponsive to their needs. Ben Swan Aff. ¶ 46.

549.    Rep. Ben Swan believes his constituents are more comfortable bringing their complaints to him because he is African American and because many people do not have a City Councilor from their neighborhood.  In addition, in order for Ben Swan's constituents to visit members of the City Council or School Committee they would have to go outside of their neighborhood to downtown Springfield, whereas his district office is in the community.  Ben Swan Aff. ¶¶ 47, 48.

550.    Latinos and African Americans don't feel that anyone represents them on City Council.  African Americans call Ben Swan when they need assistance more than they call on City Council or School Committee members.  Bewsee Aff. ¶ 18.

### State Representative Cheryl Coakley-Rivera

551.    Because the interests of Cheryl Coakley-Rivera's district are not represented on the City Council or the School Committee, the City Council and School Committee fail to address issues that are important to her constituents.  They address other issues in ways that are harmful to Coakley-Rivera's constituents.  Coakley-Rivera Aff. ¶ 28.

552.    As a result, Coakley-Rivera often finds herself trying to intervene on her district's behalf in city issues, including zoning, policing, and education.  When she describes this involvement to her colleagues in the House of Representatives, they respond with surprise and indicate that they are not similarly involved in municipal government.  *Id.* ¶ 29.

553.    The concentration of billboards in Rep. Cheryl Coakley-Rivera's district is higher than the concentration elsewhere in the city.  In 2001, when she first took up the issue with the City Council, her district had 107 of the 247 billboards in the city.  That year, she served on a

city-wide Billboard Ordinance Review Committee to consider options for regulating new billboards. At that time, there was no limit on the number of billboards that could be erected in Springfield. This lack of regulation was due to the fact that the areas most affected by the billboards were not represented on the City Council. Coakley-Rivera Aff. ¶ 30.

554. If Rep. Cheryl Coakley-Rivera's district had been represented on the City Council, it would not have been necessary for her to speak to the City Council about billboards in her district, because the City Councilor representing the district would have been able to speak on behalf of the residents of the district. *Id*. ¶ 32.

555. Rep. Cheryl Coakley-Rivera receives complaints from constituents about a lack of effective policing in her district. Beginning around 2001, young people regularly engaged in drag racing along Main Street in the North End. The police did not stop the offenders. In 2003, the Governor signed into law a home rule bill that Rep. Coakley-Rivera co-sponsored giving Springfield police the power to confiscate offenders' cars prior to holding a forfeiture hearing. Soon thereafter, the drag racing stopped. Rep. Coakley-Rivera's intervention played an important role in addressing this issue but would not have been necessary if her district had been represented on the City Council. *Id*.. ¶¶ 33, 34, 35.

556. Of the four senior centers in Springfield none were located in Rep. Coakley-Rivera's predominantly Latino district until late 2006, after her repeated requests. *Id*. ¶ 36.

557. Rep. Coakley-Rivera's predominantly Hispanic district contains a disproportionate amount of Springfield's industrial development and environmental hazards. This development is more easily accomplished in her district, because there is no one on the City Council to speak on behalf of the residents with respect to zoning issues. The bus terminals for Peter Pan and the Pioneer Valley Transit Authority are located in her district, and Peter Pan also

maintains a repair facility there.  There is a very high concentration of auto repair shops.  The recycling center is located in the district.  The district also contains a large number of warehouses that serve as the center of the City's trucking industry, a junkyard and the Chicopee jail is located within a one mile radius.  Coakley-Rivera Aff. ¶ 37.

558.    There are unusually high principal turnover rates at three schools located in Rep. Coakley-Rivera's  predominantly Hispanic district – the Germán Gerena Community School, the Chestnut Accelerated Middle School, and the Brightwood School.  In the last five years, there have been approximately fifteen different principals and vice principals at these three schools.  A large number of the students at these schools live in the district, and the turnover rates are a serious concern among Rep. Coakley-Rivera's  constituents.  Their concern is growing because as the busing era ends, an even greater number of children in the district are attending these three schools.  The School Committee has neglected this problem because none of the School Committee members are from this district.  *Id.*. ¶ 38.

559.    All of these schools have performed extremely poorly on the MCAS and two of them were looked at to potentially be taken over by the State Department of Education.  *Id.*

560.    Rep. Coakley-Rivera believes School Committee has neglected her district because no one from the district is on School Committee.  *Id.*

561.    Coakley-Rivera has been involved in trying to remedy the lack of Spanish Speaking poll workers, and other related voting problems.  *Id.* ¶¶ 20-24.

**Racially Insensitive Remarks Made By Members of City Government**

562.    Rep. Coakley-Rivera has personally complained to Mayor Ryan about racially insensitive remarks made by his Chief of Staff, Michelle Webber.

LIBA/1760998.1

563.    In 2004 she called to speak with the Mayor and was told by Webber that he was meeting with a "towel head." She had never heard this term before and asked Webber what she meant. She explained that the Mayor was meeting with a Muslim man to discuss a recent incident in which a Muslim business owner had been stabbed at his store. There was a lot of concern that this incident had been racially-motivated. Coakley-Rivera Aff. ¶ 42.

564.    In approximately July 2004 Rep. Coakley-Rivera received complaints from two African American city employees about other insensitive remarks made by Webber. Webber told these two employees that she would not attend the Puerto Rican Day Festival because she did not want to catch AIDS. *Id.* ¶ 43.

565.    Rep. Coakley-Rivera complained to Mayor Ryan about these incidents. To her surprise, he subsequently promoted Webber from his Aide to his Chief of Staff. *Id.* ¶ 44.

566.    In 2006 an employee in the Springfield Housing Department complained to Rep. Coakley-Rivera that Ms. Webber referred to an African American employee and a Hispanic employee as "morons," and advised someone with a question to consult a white employee instead. *Id.* ¶45.

### State Legislators Have a History of Involvement in City Government

567.    State legislators' role in advocating for city services for communities of color predates Rep. Swan and Rep. Rivera. According to Election Commissioner Denise Jordan, since her father, Ray Jordan, left the state legislature after 20 years of service, "I often hear people say – when something happens; when people believe that the city has not adequately and fairly provided services in the Mason Square area – 'that would not have happened if my father had still been in office.'" Jordan Aff. ¶ 26.

### Lack of Responsiveness Related to Education

568.    On February 15, 2007, School Committee member Marjorie Hurst published an article called "I Know Why the Caged Bird *Screams*" (emphasis in original), in which she explains in detail "Why More Minority Representation Is Desperately Needed On The Springfield School Committee."  Marjorie J. Hurst, *I Know Why the Caged Bird Screams*, Afro-Am Point of View, February 15, 2007 ("Hurst Article") (Pl. Ex. 206).

569.    Hurst states, "When you don't have representation, you don't have a voice. Decisions get made without any real reflection on how they will affect minority students."  Hurst Article ¶ 1.

570.    When the leadership at the top is White, as is [the Springfield School] superintendent and both assistant superintendents, there is a White bias that permeates the decision-making on the day-to-day basis.  Hurst Article ¶ 2.

571.    According to Hurst, it is natural to have more of a vested interest in and a better understanding of the culture of which you are a part, no matter how much you might protest otherwise.  Hurst Article ¶ 2.

572.    According to Hurst, having a school system that is at least 80% minority being run by an all-White administration at the top, with only one minority person in a policy-making position is simply not acceptable.  Hurst Article ¶ 3.

573.    According to Hurst, *One* person is *not* enough to ask *all* the questions that need to be asked.  *One* person is *not* enough to *get* all the answers that need to be gotten.  *One* person is not enough to stay on top of *all* the *fast* moves that are made without knowledge of or consideration for their effects on the 80%.  And *one* person is *not* enough to get a majority vote each time it is needed to make a difference.  Hurst Article ¶ 4 (emphasis in original).

LIBA/1760998.1

574.     The boundary school plan was implemented in March 2005, was nothing more than a move back to neighborhood schools renamed – the same neighborhood school plan that meant the **"have"** schools in the **"have"** neighborhoods get the **"have"** students and the **"have not"** neighborhoods get the **"have not"** students, while the education in those schools remains inequitable.  Hurst Article ¶ 5 (emphasis in original).

575.     A high school Waiting List policy adopted in March 2005 set criteria that would have had a disproportionately negative impact on minority students being able to get into the high school of their choice.  It was passed at one of the few school committee meetings that Marjorie Hurst, the only minority member of the School Committee, missed.  This policy would have guaranteed that the current high school of choice, Central, would have continued to have an unnaturally high number of White students far beyond their proportion in the school system.  It was necessary for Ms. Hurst to enlist the assistance of all four Springfield minority elected officials (Representatives Benjamin J. Swan and Cheryl Rivera and City Councilors Bud L. Williams and Jose Tosado) in order to get this policy rescinded.  Hurst Article ¶ 6.

576.     The one alternative high school, formerly know as Springfield High School, that was fortunate enough to be sited in one of the newly-constructed buildings, Van Sickle Middle School, with a minority population of 86.3% and **a White population of 10.6%,** was forced to move in September, 2006 to make a way for the new EL (Expeditionary Learning) Gates program with **a White population of 29.8%** and a minority population of 67%.  When it was known from the start that there would not be enough space at Van Sickle to house this program when it reached its full capacity of students.  Hurst Article ¶ 7 (emphasis in original).

577.     The White population in the Springfield Schools – is 18%.  Yet, there is a White population of 29.8% in the "elite" school EL Gates.  Hurst Article ¶ 7.

578.     In February, 2007, the superintendent announced a plan to close Duggan

Expeditionary Learning Middle School to the mostly minority community surrounding that

school, downsizing the school to 450 and transferring those remaining Duggan kids to van

Sickle, so that the EL Gates program that displaced the alternative high school can move to the

bigger building.  Hurst Article ¶ 8.

579.     Marjorie Hurst is at a loss to understand how there can be a proportionately higher

percentage of White students (29.8%) enrolled in the elite EL Gates program, than there are

White students in the entire system (18%) – unless we are selectively marketing the program.

Hurst Article ¶ 8.

580.     There are many inequities faced by Hispanic students, especially LEP (limited

English proficient) students.  Marjorie Hurst has asked questions on behalf of the Hispanic

population of students and she says it seems like we have borrowed from the military's, "Don't

Ask, Don't Tell" policy.  Hurst Article ¶ 9.

581.     Statistics show that this academic year, of Springfield's four traditional high

schools, 304 LEP students were assigned to the High School of Science and Technology, 197

were assigned to the High School of commerce, 130 were assigned to Putnam Vocational

Technical High School, and **49** were assigned to the most highly-sought after and coveted high

school in the city, Central.  Hurst Article ¶ 9 (emphasis in original).

582.     Ms. Hurst has stated that there are obviously some very real implications in these

statistics that are not being addressed by the administration.  Hurst Article ¶ 9.

583.     With regard to education in general, Latinos feel like no one in government is

paying attention to educational problems plaguing Latino young people.  For example, Latinos in

Springfield see that the dropout rate among Latino students is extremely high, and feel efforts

being made to address the problem are not decreasing the dropout rate. Part of the problem lies with the fact that there are no Latinos on the School Committee, and no one who understands the Latino community, and its unique needs. If there were a Latino on the School Committee, there would be greater Latino parental involvement in their children's education. Gonzalez Aff. ¶ 12(h).

584.    At least ten times, Gomez has gone with families to meet with school principals to serve as a translator. Gomez Aff. ¶ 44.

585.    Until very recently, there were only two School Department employees who were Hispanic, but none of Puerto Rican heritage. This was a concern for the Puerto Rican community. Gomez and other Hispanic community representatives thought that a Puerto Rican Assistant Superintendent would better understand Puerto Rican culture and help the School Department to serve the Puerto Rican community more effectively. When they asked Superintendent Burke to hire a Puerto Rican Assistant Superintendent, he told them that he could not find anyone qualified. The Hispanic group decided to recruit someone from Puerto Rico to work in the Springfield schools. They recruited Denise Pagan Vega. Superintendent Burke agreed to hire her, but the School Department would not pay her enough money to cover the cost of moving to Springfield. The other community leaders and Gomez raised about $10,000 to cover her moving costs. She arrived around August or September 2006. In Gomez's view Pagan Vega would not have come if the private citizens in the community had not recruited her and raised the money to bring her; had they left it up to the City, nothing would have changed. Gomez Aff. ¶¶ 45-49.

**Lack of Responsiveness to Needs of Minority Neighborhoods**

586.    There are sharp contrasts between the North End and adjacent neighborhoods with respect to safety, sidewalk repair, and general upkeep.  North End Strategic Plan (Pl. Ex. 163 and McDowell Aff. Ex. B) at 4.

587.    Many neighborhoods are not represented on the City Council and thus do not have a voice.  Mazza-Moriarty Depo. 39:21-24; 40:1-2.

588.    Many of the City Councilors are more interested in protecting their seats than in their responsibility to open up the political process and guarantee equal representation for all neighborhoods. Mazza-Moriarty Depo 60: 11-24; 61:1-17. Mazza-Moriarty Depo. Exhibit 3.

589.    City Councilor Rosemarie Mazza-Moriarty believes that Ward Representation for the City Council and School Committee is a crucial part of moving Springfield forward.  Mazza-Moriarty Depo. 63:1-7; Mazza-Moriarty Depo. Exhibit 4.

590.    The at-large system disenfranchises minority voters because minority leaders don't believe a candidate can represent them properly without living in their neighborhood. Mazza-Moriarty Depo. 43:1-11.

591.    The Indian Orchard neighborhood has never had a representative on the city council and as a result not enough funds have been dedicated to that neighborhood to keep it revitalized.  Some neighborhoods, such as Indian Orchard, the North End (until recently) and the South End, do not have a voice or are not represented on the City Council.  Mazza-Moriarty Depo. 34:24; 35:1-8; 39: 21-24; 40:1-24; 41:1-4.

592.    It is a common belief among Latinos in Springfield that they do not have a voice in City government.  Latinos also believe that they live in the worst neighborhoods in the City, and that their neighborhoods receive fewer City services than other neighborhoods.  A large

segment of Latinos in Springfield live in one of the poorest sections of the state, the North End. Gonzalez Aff. ¶ 12(f)

593.    Gomez believes, and there is a perception in the Hispanic community as a whole, that the City is not responsive to the needs of the Hispanic community.  In Gomez's experience, it is very unusual for members of the City Council and School Committee to visit the North End outside of the campaign season.  Gomez Aff. ¶¶ 30-31.

594.    Street paving, sidewalk repairs, trash collection, and snow plowing are inadequate in Ward 1 and are worse in Ward 1 than in other parts of the city.  *Id*. ¶ 32.

595.    In areas where the residents are predominantly Hispanic, city services are poor, and the government is unresponsive.  Molina Aff. ¶ 11.

596.    The roads in the Hispanic area on Main Street, from Carew Street to the area around Baystate Hospital, are in very bad shape.  There is also a lot of trash on the ground in the Hispanic area.  Trash collection and pot-hole repair services are practically non-existent there, while the city plants flowers in the downtown section of Springfield.  *Id*..

597.    There are many abandoned houses in the Hispanic neighborhoods and City Hall does nothing to help renovate these buildings.  *Id*..

598.    Molina's impression, and the impression of many other Hispanics, is that the police only go to the Hispanic neighborhoods to make arrests, never to do anything nice for the community.  As a result, people turn to their churches for support instead.  *Id*..

599.    The City Council will only pay attention to the concerns of the Hispanic community if many people organize and go to City Hall to complain.  Even then, Hispanic concerns are not addressed.  Molina Aff. ¶ 11.

136

600.    Segregation in Springfield is also seen in the frequency with which politicians visit minority communities.  Most of the elected officials in Springfield do not live in areas of the city that have high concentrations of minority residents.  Those elected officials therefore are not exposed to the daily problems facing those communities, and while they may visit for campaign purposes, their exposure to those areas of the city is much more limited than their exposure to more affluent, and predominantly white areas of the city, where they tend to socialize, go to church, and attend to the everyday necessities of life, like going to the grocery store or the bank.  As a result, many everyday concerns of African Americans and Hispanics in Springfield are overlooked and not adequately addressed, including things like neighborhood safety, the provision of public services, and law enforcement.  In addition, because City Councilors and School Committee members do not, for the most part, live in predominantly minority areas of the city, there is a feeling in the African American and Hispanic communities that their needs are not recognized and/or ignored.  Lopes Aff. ¶ 24.

601.    Whites are disproportionately represented on the City Council.  The one African American councilor and the one Latino councilor representing the interests of the African American and Latino communities in Springfield, most often have to compromise in order to get any measures passed that respond to the specific needs of those communities. Darnell Williams Aff. ¶ 21.

**Lack of Responsiveness to Issues Important to Minority Communities**

602.    The majority of white elected officials have been unresponsive to the needs and concerns of the minority community.  This is particularly true on the issues of ward representation, needle exchange and police brutality, but these are not the only issues.  Talbert Swan Aff. ¶ 14.

603. In 1997 the City Council established a sub-committee on Civil Rights and Race Relations. No City Councilors showed up to the first meeting. Yet when the white City Councilors came to a candidates' forum in the African American community they boasted about the Civil Rights and Race Relations sub-committee. But in fact no one was ever appointed to head the sub-committee because no City Councilor wanted to chair the committee and the sub-committee never held meetings. Talbert Swan Aff. ¶ 15.

### Lack of Responsiveness Regarding Needle Exchange

604. A survey of Springfield residents found that support for needle exchange is strongest among Hispanics and weakest among whites, and that people were more likely to support needle exchange the more people they knew with HIV. *See Results of the Community Attitudes Survey, Springfield, MA, April 2004* (Pl. Ex. 171 and Shaw Aff. Ex. B) at SFP03327.

605. In the late 1990s, Springfield had the thirteenth highest per capita HIV infection rate in the country. Intravenous drug use was the leading cause of infection in the city. Massachusetts had passed a state law allowing the establishment of five pilot programs for needle exchange, and communities such as Northampton implemented such programs. Bewsee Aff. ¶ 34.

606. Intravenous drug use is an issue that particularly affects the African American and Latino communities in Springfield. In the white community, where drug abuse and addiction is more hidden, drug addiction is not seen as a public health issue. It is seen as either a criminal justice issue or an issue of morality. *Id*. ¶ 35.

607. Needle exchange is an issue that is very important in both the Hispanic community and the African American community because so many people have HIV/AIDS. Most white voters in Springfield do not support needle exchange. Gomez Aff. ¶ 50.

138

608.    Springfield's Public Health Council declared a state of emergency on account of the HIV/AIDS crisis.  In 1998, the City Council voted 5-4 to establish a needle exchange program.  Bewsee Aff. ¶ 36.  Almost immediately, a group called Citizens Against Needle Exchange ("CANE") emerged in opposition to needle exchange.  CANE's campaign was racist, both in content and execution, because it promoted negative racial stereotypes about drug users.  CANE attempted to gather enough signatures to place a referendum on the ballot regarding needle exchange, but they did not succeed.  Nonetheless, the question somehow ended up on the ballot as a nonbinding initiative.  The City voted in opposition to the needle exchange program, although Wards 1 and 4 voted in support of the program.  Even though the needle exchange referendum was nonbinding, the City Council subsequently voted 5-4 to rescind its prior vote, with the Council's sole African American, Bud Williams, joining the nay votes.  The needle exchange program was stopped from going forward in Springfield.  Bewsee Aff. ¶ 37.

609.    HIV/AIDS is another area in which the City, including the City Council, has failed to respond to the needs of the minority community.  The City has failed to create a city-wide plan to address the HIV/AIDS crisis.  Torres Aff. ¶ 52.

610.    Springfield's HIV/AIDS crisis disproportionately affects Latinos and African Americans.  According to the City, of the 475 City residents living with AIDS as of January 1, 2004, 30% were black and 52% were Latino.  Of the City residents living with HIV as of January 1, 2004, 27% were Black and 55% were Latino.  *City of Springfield Department of Health and Human Services, Health Update:  HIV/AIDS 2004* (4th ed. 2004) (Pl. Ex. 29) at 10.  These numbers are greater than the two groups' shares of the population.  According to the 2000 Census, 19.6% of Springfield residents are black, and 48.8% of Springfield residents are Latino.  *Id.* ¶ 53.

611.    Needle exchange is an important tool for addressing the spread of HIV/AIDS in Springfield.  As of January 1, 2004, three out of every seven Springfield residents infected with HIV/AIDS was infected through injection drug use.  Needle exchange could reduce the rate of infection by intravenous drug use, and as a result, reduce the overall infection rate.  Torres Aff. ¶ 55 and Pl. Ex. 29 at 5.

612.    In September 2004, Maria Idalí Torres met with a group of City Councilors from the Council's Committee on Health and Safety to discuss that Latinas are disproportionately affected by HIV/AIDS.  They never took on the issue, and continued to look the other way as services to poor people in Springfield were cut.  Torres Aff. ¶ 54.

613.    In 2006, the state implemented a program that permits pharmacies across the state to sell syringes over-the-counter.  Bewsee Aff. ¶ 38.

614.    CANE's nonbinding referendum on needle exchange resulted in the City Council voting to oppose a measure that was supported by many African American and Latino voters, while Arise's binding referendum on ward representation failed to push the City Council to act to change the at-large election system.  Bewsee Aff. ¶ 39.  In each instance, the City Council was more responsive to the interests of the white community than to communities of color.

615.    Springfield's at large city council system worked in favor of CANE's successful efforts to win mayoral approval for a referendum on needle exchange.  A majority of the City Council members live in predominantly white and wealthier neighborhoods, which are less affected by intravenous drug use and by HIV/AIDS.  Bewsee Aff. ¶ 40.

**Lack Of Responsiveness Regarding Ward Representation**

616.    Ward representation is an issue that is particularly important to minority voters, because it would increase their ability to elect candidates of their choice to city government. Lewis-Caulton Aff. ¶ 15.

617.    The 1997 ballot initiative that would have changed the existing at-large system to a system based on 8 wards, with three at-large members, received the most support in Wards 1 and 4, which are predominantly Latino and African American, and the least support in Ward 7, which is predominantly White.  Bewsee Aff. ¶¶ 29, 32.

618.    Ward representation is an issue important to both the African American and Hispanic communities in Springfield today.  Ben Swan Aff. ¶ 22.

619.    Ward representation is an issue that concerns the minority community.  Gomez Aff. ¶ 53.

620.    Ward representation is one of the needs and concerns of the minority community that the majority of white elected officials in Springfield have been unresponsive to.  Talbert Swan Aff. ¶ 14.

621.    Ward representation is strongly favored by Latinos and African Americans because it would improve their representation on City Council.  Torres Aff. ¶ 51.

622.    Changing the method of election from at-large to a system based on wards or districts was one of the key issues in both of Victor Davila's campaigns for School Committee. Davila Aff. ¶¶ 18, 19.

623.    A change to a district-based system would give people who live in predominantly minority areas of the City much greater motivation to vote because they would feel like someone was paying attention to their problems.  *Id*. ¶ 24.

624.    Turnout would increase if the City were to switch to a system of ward representation for electing members of the City Council and School Committee because Latinos living in predominantly Latino districts would feel there was someone they could go to who would respond to their particular needs and concerns.  Gonzalez Aff. ¶ 12(a).

625.    A switch from the current at-large method of election to a district-based method of election would make African Americans and Hispanics in Springfield feel like they have a reason to vote, and a voice in City government.  Lopes Aff. ¶ 21.

626.    A ballot initiative question that appeared on the November 1997 city election ballot proposed a change to the method of electing the City Council such that eight councilors would be elected from each of the City's eight wards, and three councilors would be elected at large ("1997 Ballot Question").  Of the persons who voted in the November 1997 city election, 51.4 percent voted in favor of the 1997 Ballot Question, while 36.5 percent voted against it, and 12.1 percent left the question blank; of the persons who cast a vote either for or against the 1997 Ballot Question (excluding blanks), approximately 58 percent voted in favor of it.  *See* Nov. 1997 Springfield Election Results (Pl. Ex. 175).

627.    On January 20, 1998, the Springfield City Council voted against a home rule bill that, if passed, would have changed the composition of the City Council to eight councilors elected from each of the City's eight wards, and three councilors elected at-large.  *See* Records of the City of Springfield City Council Regarding an Act Providing for the Election for City Councilors, Nov. 10, 1997 – Jan. 20, 1998 (Pl. Ex. 5).

628.    On several subsequent occasions, the City Council defeated measures that would have changed the composition of the City Council to eight councilors elected from each of the City's eight wards, and three councilors elected at-large.  *See, e.g.*, Records of the City of

Springfield City Council Regarding an Act Providing for the Election for City Councilors, dated

Sept. 8, 2003 (Pl. Ex. 24); Records of the City of Springfield City Council Regarding an Act

Providing for the Election for City Councilors, dated Apr. 12, 2004 (Pl. Ex. 27); Records of the

City of Springfield City Council Regarding an Act Providing for the Election for City

Councilors, dated Mar. 7, 2005 (Pl. Ex. 32).

### Lack Of Responsiveness To Minority-Owned Small Businesses

629.     The City has not been responsive to the needs of Latino small businesses in the

City, while it has been responsive to the needs of other businesses in Springfield.  For example,

the Latino Chamber of Commerce has requested financial assistance from the Mayor and Control

Board.  The requested funds, if received, would have been used to educate and assist Latinos

who want to start their own businesses, or who want to grow their existing businesses to new

levels.  The City has provided financial assistance to the Greater Springfield Chamber of

Commerce.  Gonzalez has been told by City employees that Latino businesses should ask the

Greater Springfield Chamber of Commerce for assistance.  Historically, however, Latinos have

not gone to the Greater Springfield Chamber of Commerce for assistance or services.  Gonzalez

attributes Latinos' lack of willingness to seek assistance from the Greater Springfield Chamber

of Commerce to language and cultural differences.  Gonzalez Aff. ¶ 6.

### Lack of Responsiveness in Police Services and Law Enforcement

630.     The police do not respond quickly when people in Ward 1 need help.  There is a

perception among Hispanic residents that the police come to Ward 1 to give the law-abiding

people who live there a hard time and not to fight crime.  Gomez Aff. ¶ 33.  There is a perception

in the Hispanic community that if you complain about the police, the police will harass you.

This stops many people from making complaints about incidents with the police.  Gomez's

affidavit reports several varieties and instances of police unresponsiveness. Gomez Aff. ¶¶ 34-39.

631.    Molina has had very negative experiences calling 911. Spanish-speaking operators are not available and the English speaking operators did not attempt to understand him. On one occasion, Molina's neighbor punched, kicked and broke his door after he had complained to the neighbor's wife about noise in the building. Molina and his wife called 911 because they were afraid of the neighbor. The police did not arrive until an hour later because the operator did not understand Molina and said there were no Spanish-speaking operators available to take his call. Molina Aff. ¶ 18.

632.    Molina has also had negative experiences with non-bilingual police officers. Non-bilingual officers do not try to understand people with accents or who do not have a large English vocabulary. On one occasion, Molina went to the Police Precinct on Pearl Street to obtain a phone number at which to call the police in non-emergency situations. The officers gave him a hard time and finally just told him to call 911. According to Molina it is very unpleasant to try to speak to the police officers when one does not speak English well. They do not listen very well. Only the Hispanic police officers try to give attention to Hispanic community members. *Id*. ¶ 20.

633.    On two occasions when Torres called 911, the City's emergency services were almost completely nonresponsive. Torres Aff. ¶ 67.

634.    In approximately 1992 or 1993, Torres could see from her window that someone was stealing the license plate off her car. She called the police while the theft was in progress. The operator told Torres that she would not take her report over the telephone. She told Torres that she would have to go to the police station to make a complaint. Torres complained about

this incident at a Police Commission meeting.  She never received a response to her complaint.
Torres Aff. ¶¶ 68-69.

635.    On a later occasion in the 1990s, Torres called 911 to report that someone was
breaking into a car on her street.  The operator asked Torres, "Does the person look Hispanic?"
Torres responded, "What is a Hispanic person supposed to look like?"  Torres explained that she
could only see the back of the thief's head and could not identify the thief's race or ethnicity.
Despite her call to report the robbery while it was in progress, the police never responded.  *Id*. ¶
70.

636.    White candidates often get elected because they promise that they will do things
for the African American and Latino communities.  However, when they get elected, they do not
keep their promises.  Many white politicians have been unresponsive to the needs and concerns
of the communities of color.  The indifference to the widespread police brutality and harassment
and excessive use of force on African Americans is one example.  The city simply never took
effective action to deal with this issue.  Darnell Williams Aff. ¶¶ 13, 20.

637.    Crime in the minority communities is ignored whereas crime in the downtown
areas is of grave concern to the city.  When, as happens often, there are gunshots in the African
American community, we hear nothing from the Mayor.  When there was a shooting in the
quadrangle area downtown, the Mayor held a press conference.  When a Latino storeowner was
murdered there was no mention of it by the Mayor.  When a white storeowner was murdered
downtown, the Mayor beefed up police presence and authorized the use of unlimited overtime.
Talbert Swan Aff. ¶ 32.

**Lack of Spanish Language Assistance in City Government**

638.    Gomez has never seen the City Council provide Spanish-language assistance at their meetings.  When he attends meetings, he sometimes has to translate for people attending the meetings who speak only Spanish.  As far as Gomez is aware, Jose Tosado is the only City Councilor who speaks fluent Spanish, and no one on School Committee speaks fluent Spanish. Neither the City Councilors nor School Committee members have staff to provide Spanish language services. Gomez Aff. ¶¶ 41-43.

639.    The City does not provide any translation services at City Council meetings. Some time ago, Torres brought a group of community members to a City Council meeting to ask the Council to send a resolution to President Clinton and to Congress about the U.S. military exercises in Vieques, Puerto Rico.  Some of the testimony at that meeting was given in Spanish, and the people giving the testimony had to provide interpreters themselves so that the City Council members who cannot speak Spanish could understand what they were saying.  The language barrier discourages Latino citizens with limited English proficiency from attending public meetings.  Torres Aff. ¶¶ 60, 61.

640.    There are also insufficient Spanish language services available to residents using City services.  To the extent that anyone is available to translate, it is usually those few city employees who are Latino.  This puts an unfair burden on them because they have other jobs to do.  *Id*. ¶ 62.

641.    When Gonzalez worked at City Hall, he observed that there was a lack of Spanish speaking City employees, and as a result, it was often difficult for Latinos with limited English skills to receive the assistance they required at City Hall.  He saw many people with limited English skills having such difficulties.  Even though it was not part of his job description as

146

assistant chief of staff to the Mayor, Gonzalez was often taken away from duties in the Mayor's office to help translate for people with limited English skills.  Gonzalez Aff. ¶ 15.

642.     When Gonzalez worked at City Hall he also noticed that there were very few City Hall employees who lived in Springfield's predominantly Latino neighborhoods.  This fact, combined with the lack of Spanish language skills of City employees, made many Latino residents of Springfield uncomfortable seeking assistance or services from the City.  Gonzalez Aff. ¶ 16.  Molina also observes that very few City Hall employees are bilingual, and among the bilingual personnel at City Hall and in all city services, many are English dominant and do not speak Spanish well.  He reports incidents of being made to feel uncomfortable and being kept waiting unnecessarily.  Molina Aff. ¶¶ 21-23.

643.     Candice Lopes does not remember seeing an African American working at the election office in Springfield.  Now, after many years, there is finally one Hispanic person, who speaks Spanish, working in the election office.  It has been Lopes' observation over the years that the City is lacking in employees who speak Spanish and who can adequately communicate with city residents whose first language is not English.  Lopes Aff. ¶ 25.

## XIII.  The Discrimination And Disparities Described Herein Contribute To Diminished Participation By Latinos And African Americans In The Political Process.

644.     Low minority voter turnout in Springfield is probative of vote dilution because it results from the interaction of the electoral system and the effects of past discrimination.  Plaintiffs "need not show that the sole cause of low numbers is the interaction between racial divisions in the community and identifiable elements of the electoral system.  It is sufficient . . . that considerations implicating race contributed substantially to repressing minority participation." *Uno*, 72 F.3d at 986-87.

### Dr. Amy's Conclusions Regarding Turnout and Vote Dilution

645.    Dr. Douglas Amy is a political scientist at Mt. Holyoke College with strong expertise in voting systems and voting behavior.  Dr. Amy has given opinions on issues of turnout by people of color, as well as opinions on the current plurality-based at-large system in Springfield and on the likely effects of a change to a district-based system.  Amy Aff. ¶¶ 1, 4.

646.    Turnout is related to income and education levels.  Minority income and education levels in Springfield are much lower than the levels for whites, and these disparities are the result of past and present discrimination.  *Id.* ¶ 4.

647.    A great deal of research over the last 50 years has confirmed the relationship between socioeconomic status (SES) and voter turnout.   Briefly speaking, the higher the income, the more likely someone is to vote; and the higher the education level achieved, the more likely someone is to turn out.  It is thought, for example, that those with higher incomes have more time and energy to pay attention to politics, collect information on candidates, and so on.  Those who are well-off also have a larger stake in society and thus presumably a larger stake in the outcome of elections as well.  *Id.* ¶ 6.

**Income differences in Springfield**

648.    It is highly likely that these socioeconomic factors are a significant cause of lower turnout rates in Springfield.  Census data show that African Americans and Latinos living in Springfield have significantly lower incomes than non-Hispanic white residents.  In 1999, the median family income for Latino families was $19,076, and for African-American families it was $29,820.  This stands in stark contrast to the $48,159 earned by the median white family in Springfield during that year.  Poverty rates for minorities in Springfield are also significantly higher:  26.1% for Blacks and 43.3% for Hispanics compared to 13.0% for whites.  Census data show that unemployment rates for African Americans are almost twice that of whites, and the

148

unemployment rate for Latinos is almost three times that of whites.  Amy Aff. ¶ 7.  *See also*

Harmon Aff. ¶ 31.

### Disparities in Education

649.    Nationally, the education levels of Latinos and Blacks lag substantially behind

that of whites.  Eighty-nine percent of non-Hispanic whites graduate from high school, compared

to rates of 80% and 57% for Blacks and Latinos respectively.  The racial discrepancies are even

higher for those who graduate from college.  Amy Aff. ¶ 8.

650.    This same large disparity between the educational achievements of minorities and

whites also exists in Springfield.  78.4% of whites in that city have a high school degree or

higher, compared to 75.1% for Blacks and 50.6% for Latinos.  And among whites, 18.4% have a

bachelor's degree or higher, while that figure is 13.3% and 5.9% for Blacks and Latinos

respectively.  Moreover, in 2002-03, the dropout rate for African-American students in

Springfield was 7.0% and for Hispanic students was 11.1%.  This contrasted with a dropout rate

of 5.8% for white students.  Minority students also have a higher rate of grade retention – being

forced to repeat a grade.  The grade retention rate for African-American students in Springfield is

6.6%, and for Latinos is 8.5%.  The rate for white students is 4.7%.  *Id*. ¶ 8.

### Disparities in MCAS Scores

651.    Data indicate considerable racial and ethnic differences in the performance of

Springfield children on the Massachusetts Comprehensive Assessment Systems (MCAS).  Black

and Hispanic students in Springfield have performed worse than white students on every

category of the MCAS test at every grade level.  For example, in 2004 in Springfield, only 35%

of Black students and 26% of Hispanic students were "advanced or proficient" in English

Language Arts, compared to 54% of white students.  Minority student test results in Springfield

are similar for the mathematics portion of the MCAS tests; in 2004 13% of Black students and

11% of Hispanic students were "advanced or proficient" compared to 30% of white students.

MCAS results from 1999-2000 for Springfield illustrate the significant achievement gap between

African-American students and Hispanic students on the one hand and white students on the

other. Similar disparities are seen in the 2006 MCAS results for Springfield. The Springfield

public school system has also recently recognized this achievement gap. Amy Aff. ¶ 9.

**Disparities in Income and Education are Due in Part to Discrimination**

652.    These disparities in income and education are due in part to past and present

discrimination against Latinos and African Americans and to housing segregation. Amy Aff.

¶ 10. This is well-recognized in academic literature.

653.    For example, in one of the seminal works in this area, *The Economics of Poverty

and Discrimination*, Bradley Schiller found considerable evidence for continuing levels of racial

discrimination in American public schools. Minority children are frequently segregated into

their own schools, with poor teachers, limited curriculums, lower budgets, and unequal facilities.

The predictable results are lower levels of achievement and higher dropout rates. Importantly,

these unequal educational opportunities inevitably lead to unequal economic opportunities.

Education is an important form of human capital that individuals bring to the market place, and it

has a major effect on career opportunities and income levels. *Id*.

654.    Schiller also found that the income levels of racial and ethnic minorities are not

only hindered by discrimination in education, but also by lingering discrimination in the labor

market. Employers sometimes refuse to hire minority applicants either because they themselves

are prejudiced, or simply because they fear triggering the prejudices of their customers or of

white employees. For example, a recent study by the National Bureau of Economic Research

found that applicants for jobs in Boston and Chicago that submitted resumes with very white

sounding names (such as Greg or Emily) got 50% more callbacks from employers than those applicants who submitted resumes with very African-American sounding names (such as Lakisha or Jamal). The authors of this study, along with Schiller, conclude that racial and ethnic discrimination continues to play a role in the job market and in producing the lower incomes of minority workers. Amy Aff. ¶ 11.

655.    Many researchers beside Schiller have come to similar conclusions about the continuing effects of discrimination on the educational and occupational achievements of different racial groups in the United States. See for example, Thomas M. Shapiro, *The Hidden Cost of Being African American* (New York: Oxford University Press, 2004), and Gary Orfield, *Schools More Separate: Consequences of a Decade of Resegregation* (Cambridge, MA: Harvard University Civil Rights Project, 2001). Amy Aff. ¶ 12.

656.    Defendants' expert takes the position that racism and discrimination do not play a part in causing the disparities in economic and educational achievement for minorities in Springfield. The position that Defendants' expert takes on these issues is in fact an extreme one and one not shared by most scholars. Amy Aff. ¶ 54.

657.    Even beyond Schiller, Shapiro, and Orfield, there is a considerable literature concerning the forms of discrimination and the various disadvantages that minorities face both in labor markets and in education. *Id*. ¶ 46 & n.44.

**Discrimination in Labor Markets**

658.    A large number of studies show that minorities who have identical job qualifications with whites have more trouble getting interviews, getting hired, and getting promotions. So, at every stage of the employment process bias is at work. This kind of discrimination does not necessarily have to be rooted in explicitly racist attitudes by employers.

151

Researchers have found that some employers have unconscious stereotypes of minorities. Black males, for instance, are perceived as being less energetic workers and as having an "attitude" that makes them less likely to be compliant to management control. In addition, employers who do not themselves have racial biases, may nevertheless fail to hire minorities because they fear that their employees or their customers would not feel comfortable with these workers. Amy Aff. ¶ 47.

659.    Many businesses have chosen to move out of inner-city minority neighborhoods and relocate to the suburbs. Lack of reliable transportation then restricts minorities' access to these jobs. Also, studies have shown that many job opportunities are filled, not by formal procedures like advertising, but through informal communications through networks of workers and friends. These informal social networks are often racially constituted, so minorities often simply do not hear about the same job openings as whites do – another factor that restricts their employment opportunities. *Id.* ¶ 48.

660.    There are a number of studies covering various regions in the country that have established that racial disparities in income and employment are due in some measure to the continuing bias, discrimination, segregation, and disadvantages faced by minorities in the labor market. Dr. Thernstrom notes that none of these studies were conducted in Springfield and suggests that this is a problem. But in fact we do see the very same evidence of racial economic disparities in Springfield that we see in the rest of the country – lower income, higher unemployment, and higher rates of poverty for minorities. So it is certainly reasonable to conclude that the same discriminatory forces that are helping to cause these disparities on the national level are also at work in the city of Springfield. Indeed, to suggest that something completely different is going on in Springfield to account for these disparities – to assert that

LIBA/1760998.1

racial discrimination is not playing a role in these local problems – is highly implausible.  Amy Aff. ¶ 49.

### Discrimination in Education

661.    Thernstrom is one of the few scholars who maintain that racism, segregation, and discrimination are playing no role in creating racial disparities in educational achievement.  Dr. Thernstrom claims that such disparities can be attributed to other factors, particularly cultural values and family structure.  Amy Aff. ¶ 50.

662.    Although scholars in this area do often cite a variety of factors that help to explain why minority children do not do as well in school as white children—for example, culture, poor nutrition, poor health, and lack of housing stability—most scholars also include various forms of discrimination among the factors causing racial disparities in educational achievement.  They observe that minority children are increasingly segregated into their own schools, that there are large disparities in school funding, that teachers sometimes have lower expectations of minority students, that tracking can become a form of racial discrimination, and so on.  *Id.*

663.    Discrimination plays not only a direct role in causing disparities in educational achievement, but also an indirect role.  It is a contributing cause to many of the other factors that are working to the disadvantage of minority students.  For example, the existence of poor nutrition, poor health and housing instability for minority students is directly related to the fact that minority families are more likely to be poor – and this poverty is caused in part by discrimination in the labor market.  Amy Aff. ¶ 51.

664.    Even if one puts much of the blame for disparities in educational achievement on "culture," as Dr. Thernstrom does, that does not mean that discrimination is not playing a significant role in this problem as well.  For instance, even if Black families put less value on education, this is most likely due in part to past and present discrimination.  *Id.* ¶ 52.

665.    In *Class and Schools:  Using Social, Economic and Educational Reform to Close the Black-White Achievement Gap,* Richard Rothstein observes that "throughout U.S. history, many black students who excelled in school were not rewarded in the labor market for their effort," and that "labor market discrimination, even for black workers who test scores are comparable with those of white workers, continues to play an important role" especially for high school graduates.  He cites abundant evidence that this labor market discrimination continues, including a series of successful employment discrimination suits, and studies that show that employers are more likely to hire white applicants over Black applicants with identical qualifications.  He concludes that "as long as racial discrimination exists in the labor market, the average academic achievement of black students will be lower than the average achievement of white students, simply because many black students (especially males), who see that academic effort has less of a payoff for them than it has for whites, can be expected to respond by reducing their effort." Amy Aff. ¶ 52.

**Other Evidence That Socio-Economic Factors Affect Turnout**

666.    The lower socio-economic status of African Americans and Latinos contributes to their lower participation in the political process.  The lower socio-economic circumstances of African Americans and Latinos in Springfield are the result of a history of discrimination in employment, housing, education, health care, police mistreatment and the criminal justice system.  Thomas Aff. ¶ 8.

667.    Because most Blacks from Springfield migrated here from the South, they have a history where they were deliberately discouraged and prevented from registering to vote and from voting.  People registered to vote and voted at great personal risk.  This history of intimidation and violence when exercising their right to vote still has a residual impact on many

Blacks, which has an inhibiting affect with regard to Black participation in the electoral process today.  Thomas Aff. ¶ 18.

668.    Many people of color have the misperception that they cannot vote if they have been convicted of a felony.  A higher percentage of the African-American and Latino community have criminal records, so this confusion disproportionately affects these groups.  Bewsee Aff. ¶ 16.

669.    Voters in Rep. Cheryl Coakley-Rivera's district have, on average, a much lower level of educational attainment than voters who live in parts of the City where turnout is higher. Employment opportunities are not nearly as good for voters in her district, and their access to secure, affordable housing is limited.  As a result of these factors and others, residents who live in Rep. Coakley-Rivera's district tend to be more transient than residents in other parts of the City.  This makes it more difficult for them to vote because of the requirements that they re-register (if they previously lived outside Springfield) or notify the Elections Department of their new address each time they move.  Coakley-Rivera Aff. ¶ 18.

670.    The low voter turnout among voters in Rep. Coakley-Rivera's district is not a function of the fact that many are Hispanic, or that many are from Puerto Rico.  Puerto Rican culture places a high value on voter participation.  Voter turnout is so high in Puerto Rico that the island practically shuts down on Election Day.  *Id*. ¶ 19.

671.    Educating the population on the impact of participating in the voting process is important for minority voter turnout.  Mazza-Moriarty Depo. 58:14-22.

**Turnout Would Likely Be Higher in a District System Than in the Existing At-Large System**

672.    Studies described by Dr. Amy have found, in general, a clear tendency for turnout among African Americans and Latinos to be lower when they live in predominately non-

Hispanic white districts than it is when they live in majority-minority districts. Taken as a whole, the studies point to a strong likelihood that living in white districts does suppress minority voter turnout. As one study found, "residing in majority-Latino districts ultimately has a positive effect on the propensity of Latino voters to turn out." Amy Aff ¶¶ 17-18.

### Reasons for Racial Differences in Turnout

673.    **Less incentive to participate.** "It is well documented that minority voters living in white-dominated single-member or at-large districts usually have very little chance to elect the candidate of their choice. A determined white majority can often routinely frustrate minority voters. This consistent lack of positive results from voting tends to undermine voters confidence in the efficacy of voting and in the legitimacy of government." Amy Aff. ¶ 22.

674.    **Type of district affects effort to mobilize voters.** "Efforts by minority political leaders, minority community leaders, and minority organizations like the NAACP can help boost voter turnout in target areas. However, in majority white districts, it may make little sense to expend scarce political resources in this way." Amy Aff. ¶ 23. *See also* Harmon Aff. ¶ 31.

675.    Arise has conducted several campaigns to increase voter turnout. It is easier to convince Springfield voters to participate in state elections than in city elections. In state elections, people have a sense of ownership because they vote for their State Representative and their State Senator. This element is missing in the city elections. Bewsee Aff. ¶ 28.

676.    Face-to-face contact between a candidate and a voter is very likely to increase the probability that a voter will vote. Minority organizations would have an easier time organizing in smaller districts, rather than city-wide, particularly in majority/minority districts. Harmon Aff. ¶ 31.

677. Turnout among Hispanic voters would increase if the City used districts to elect the City Council and School Committee, instead of using an at-large system. The closer people are to the candidates, the more they participate. Coakley-Rivera Aff. ¶ 17.

678. Ward representation would create increased participation and minority voter turnout, which will in turn increase chances for minority representation. Mazza-Moriarty Depo. 46: 8-13; 56:15-21; 69:8-23.

679. In at-large elections people are not motivated to vote when they see a slate of 18 candidates that they know nothing about and have never met. Mazza-Moriarty Depo. 59:8-17.

680. Despite recent changes increasing access to voter registration, many African Americans are so pre-occupied with economic survival issues that they do not have the time to pay attention to electoral politics. They have been disconnected from the political process for a long time, and have not seen improvement in their economic condition through the electoral system. In time this could change if the system were changed to a district representation system. Thomas Aff. ¶ 16.

**Perceived Unresponsiveness Of City Government Contributes To Low Minority Turnout**

681. Many Latinos do not vote because they think their vote is useless, and are very discouraged by the at-large system. In the North End, there is the sense in the community that nobody in government cares about what happens in the North End. For example, in the North End there have been problems with a lack of police presence, and many residents feel like the police are only reactive, and are not proactively working to keep the North End safe. It is not uncommon to hear in the white community that if someone is going to the North End, they should drive through, lock their doors, and not stop. There has also recently been a lack of a fire station in the North End. Because people in the North End do not feel like anyone pays attention to their problems, they have very low motivation to vote. A change to a district-based system

would give people who live in predominantly minority areas of the City much greater motivation to vote because they would feel like someone was paying attention to their problems. Davila Aff. ¶ 24.

682.    Turnout among Latinos would increase if the City were to switch to a system of ward representation for electing members of the City Council and School Committee because Latinos living in predominantly Latino districts would feel like there was someone they could go to who would respond to their particular needs and concerns. Gonzalez Aff. ¶ 12(a).

683.    If Latinos felt that they had a voice in City government related to these everyday issues, like education in general, neighborhood schools, police presence, sidewalk repairs, and basic services in their neighborhoods like trash collection and street cleanliness, street and sidewalk repairs, and landscape beautification, Latinos would be more motivated to vote and to actively participate in the political process. *Id*. ¶ 12(i).

684.    African American and Hispanic voters in Springfield tend to not turn out in large numbers because they are discouraged and feel like their votes do not matter. A switch from the current at-large method of election to a district-based method of election would make African Americans and Hispanics in Springfield feel like they have a reason to vote, and a voice in City government. Lopes Aff. ¶ 21.

685.    Latino turnout is relatively low in Springfield because people are discouraged by the at-large system, and because there is a history of minorities in the City not being represented in government. The current City Council does not represent the interests of the Latino community. Election information has not always been provided in Spanish. Many candidates do not bother making an effort to convey their political platform to the Spanish-speaking

community.  People have given up.  There is a chronic problem that needs to be fixed.  Torres
Aff. ¶¶ 12, 14.

686.    Mayor Charles Ryan observes that, over the years, candidates who live in certain
wards have not been elected; indeed, no candidates who reside in a couple of those wards have
even run for election to the City Council or the School Committee. This, Ryan feels, has resulted
in a perception that certain groups of people - certain neighborhoods - have not been represented
and/or not included in City government and the electoral process.  It may well be that that
perception accounts for the low voter turnout, particularly in the minority communities, and the
general non-participation of certain groups in the political process.  Ryan Aff. ¶ 80.

687.    The at-large election system has resulted in many Springfield neighborhoods not
having a representative on the City Council.  This causes voters to feel alienated from the
political process.  All areas of the city need to have representation.  Ben Swan Aff. ¶ 51.

688.    People in both the Latino and African American communities are disaffected with
the schools.  This contributes to low voter turnout because people feel voting doesn't make a
difference in the quality of the schools in Springfield.  Talbert Swan Aff. ¶ 30.

689.    Communities of color perceive the existence of racial hostility and/or insensitivity
by City employees.  Coakley-Rivera Aff. ¶¶ 42-45.

690.    There are black voters who feel disaffected with government on many levels.
Bud Williams Depo. 81: 24; 82:1-19.

691.    The African American community in Springfield has been consistently neglected
in terms of the provision of adequate city services, public safety, employment and education.  As
a result of this disinvestment and history of discrimination, many African Americans feel
hopeless that things will improve and do not believe that elected officials will help their

community. This discourages them from participating in the electoral process. For those African Americans who have engaged with the electoral system, the fact that African American candidates cannot get elected in at-large elections makes them feel that their votes do not really make a difference. Thomas Aff. ¶ 20.

692. Because of a history of corruption in Springfield, as seen in the recent indictments of public housing officials and other government personnel, many African Americans and Latinos think politicians care only about getting money for themselves and their friends and do not really care about helping poor people like them. This further discourages them from voting. *Id*. ¶ 21.

693. African Americans and Latinos often don't bother voting because the same people get into office and they never do anything for them. Talbert Swan Aff. ¶ 12.

694. It is important for Hispanic citizens to see Hispanic persons representing their interests. The electoral success of Hispanic candidates helps Hispanic citizens feel more connected to city government. Hispanics bring a perspective to the City Council that others do not. Tosado Aff. ¶ 26.

**Minorities' Belief That They Cannot Win In The At-Large System Contributes To Reduced Political Participation, Including Low Turnout**

695. There is a belief within the Hispanic community that Hispanic candidates cannot win elections because of the at-large system. Most people think that it requires too much money, that it is extremely difficult to raise money from within the Hispanic community, and that even with financial resources it is very difficult to get white voters to accept Hispanic candidates. Most people in the Hispanic community believe that the only way a Hispanic candidate will be elected is if he or she does not have an accent, and has very moderate political views such that he or she is not viewed as being an advocate for issues that are more important to the Hispanic

160

community than they are to the white community.  In other words, it is a common belief that a candidate needs to "act and speak white" in order to be elected.  Having run twice for the School Committee, Victor Davila also has come to this conclusion.  Davila Aff. ¶ 8.

696.    If Springfield used wards to elect City Council members, Gomez would have been elected to the City Council in 1997.  The at-large system makes it more difficult for Hispanic candidates to win as compared to white candidates, because most white voters in Springfield will not vote for Hispanic candidates, and because poverty in the Hispanic community makes it more difficult for Hispanic candidates to raise enough money to run successful at-large campaigns. Gomez has not run for public office since 1997.  After his experience in that campaign, he does not believe that he has an equal opportunity to compete on equal terms with white candidates under the at-large system.  The at-large system has also discouraged many other Hispanics from running for election to the City Council and the School Committee.  Gomez Aff. ¶¶ 9-10.

697.    Most Latinos strongly support Latino candidates for City Council and School Committee, but that they feel like voting is a useless exercise because the white voters of the City – who are the most numerous group of voters – generally do not cast votes for Latino candidates.  Latinos in Springfield believe that, in general, white voters are unlikely to cast votes for Latino candidates, and instead generally cast their votes for white candidates.  Gonzalez Aff. ¶¶ 12(b), 12(d).

698.    Latinos in Springfield also believe that Springfield's white voters are comfortable voting for one African American candidate, and one Hispanic candidate for City Council, so long as those candidates do not appear to be advocating too strongly in favor of minorities in Springfield, or take positions that are important to minority communities but not as important to

the white community, such as bilingual education. The Latino community does not think that white voters vote for more than one Latino person in any given election contest. Gonzalez Aff. ¶ 12(e).

699.    Hispanics have been discouraged from running for City Council or School Committee because they believe that it would be virtually impossible for them to win. Coakley-Rivera Aff. ¶ 7.

700.    After not winning re-election in 2001, and then losing again in the 2003 election, Carol Lewis-Caulton ultimately concluded that the at-large system would prevent her re-election to the City Council, and decided not to run again after the 2003 election. Lewis-Caulton believes that she would have been re-elected to the City Council, but for the at-large system. Lewis-Caulton Aff. ¶ 12.

701.    There is a general feeling in the African-American community in Springfield that it is futile for an African-American candidate to run for City Council in the at-large system, because of the cost of running an at-large campaign, and because voters in the City of Springfield tend to vote along racial and ethnic lines. Sometimes white voters have given enough support to one minority candidate to enable his or her election: for example, Bud Williams, or before him, Morris Jones. In general, special and unusual circumstances are necessary for minority candidates to win, such as when Lewis-Caulton won in 1999. Lewis-Caulton Aff. ¶ 13.

702.    From the 1960's to the 1980's African Americans did not run for City Council because they did not believe that white voters would vote for them and that it would therefore be impossible to win under the at-large system. Ben Swan Aff. ¶¶ 8, 17-19.

703.    For an African American or Latino to win an at large election in Springfield they need to have great name recognition.  But even candidates who were well known and well respected in the community, like Charles Rucks, Mo Jones and Frank Buntin, have lost.  Because so many minority candidates have lost, it discourages other potential candidates from running.  It also discourages voters from coming out to vote.  Talbert Swan Aff. ¶ 37.

704.    The at-large system discourages candidates from running for election because they are turned off by the challenge of running citywide and the amount of money one needs to raise to win.  Mazza-Moriarty Depo. 38: 12-24; 39: 1: 43:18-24; 44:1-9; 67:14-20.

705.    Because the at-large system has operated to make it more difficult for African Americans and Latinos to elect candidates of their choice, many have simply not participated in the political process, believing that their vote will not make a difference.  Low minority voter turnout speaks to the disenfranchisement of minority voters who have felt disconnected from the political system in Springfield for a long time.  Thomas Aff. ¶ 13.

706.    Because of the years of discrimination in many aspects of their lives and their inability to elect candidates of their choice, African Americans have often felt it futile to vote.  They were made to feel that their votes don't count.  This view is reinforced by the repeated defeat of minority candidates and the ability to elect very few African American candidates on a citywide, at-large basis.  Darnell Williams Aff. ¶ 22.

**Inadequate Assistance At The Polls For Spanish Speakers Has Suppressed Latino Turnout**

707.    There is no question that the kinds of discriminatory policies and practices described in the declarations in the DOJ case as taking place in Springfield would have a discouraging effect on voter turnout by Hispanic citizens.  The more difficulties and potential abuse that voters face at the polls, the less inclined they will be to vote.  Amy Aff. ¶ 58.

708.    These kinds of problems at the polls in Springfield are another factor that helps to explain the generally lower level of voter turnout by minorities in Springfield, especially Hispanics. Amy Aff. ¶ 59.

709.    More Hispanics would vote if there were more Spanish-speaking poll workers. There are many voters who have been turned off from voting and who don't do it anymore because they have not been able to get help in Spanish from poll workers. There is a need for Spanish-speaking poll workers throughout the city because there are high concentrations of Puerto Ricans who don't speak English well and they live throughout Springfield. Gonzalez Aff. ¶¶ 38, 39.

710.    Based on Torres' conversations with Latino voters who do not speak Spanish and with Latino community leaders in Springfield, Torres believes that Latino voters who do not speak English have felt uncomfortable and less motivated to vote because there have not been Spanish-speaking poll workers to help them at the polling place. Torres Aff. ¶ 11.

711.    Bilingual poll officials, and those representative of the racial diversity of Springfield, are important to ensure that voters of color and those with limited English skills can effectively participate in the electoral process. Because of the language and cultural issues, the process itself can be very intimidating to voters. Limited English-speaking voters who have gone to the polls and have had difficulty because poll officials do not speak Spanish, or who have faced hostile or rude treatment, may never return to vote again. Potential voters who have limited English skills are often unsure about what they may encounter at the polls, and thus err on the side of not voting. Coakley-Rivera Aff. ¶12.

712.    Rep. Coakley-Rivera has spoken with many Hispanic individuals who have limited English abilities and are registered to vote, but fail to turn out because of the lack of

information about the election, the candidates, where to go, and what to do, and because there is

no assurance that there will be anyone available at the polls to help them in their native Spanish

language should they not understand the process or have trouble with the ballot.  Coakley-Rivera

Aff. ¶ 14.

713.    Registration and turnout rates among Hispanics would significantly increase if

there were more bilingual poll officials working on election day and if more information was

disseminated in Spanish by the City prior to and on election day.  *Id*. ¶ 16.

714.    **Lack of information about candidates.**  Most Hispanic voters are not well-

informed about the candidates when they go to vote because there is a lack of available Spanish-

language information about the candidates.  Candidates do not visit the Hispanic neighborhoods

unless they are involved in the Hispanic community.  They also do not spend much money

campaigning in the Spanish-language media.  As a poll worker, Molina has seen Hispanic voters

inquiring about the best candidates when they arrive at the polls.  "Some Hispanic voters feel as

though they live on the moon because of their lack of access to information."  Molina Aff. ¶ 9.


### PLAINTIFFS' PROPOSED DISTRICT PLANS ARE AN APPROPRIATE REMEDY FOR THE SECTION 2 VIOLATION

**XIV.  A Single-Member District System Will Provide Greater Opportunities To Elect Minority Candidates To City Council And School Committee Than Does The At-Large System.**

715.    The vast majority of studies that have compared the electoral opportunities for

minority candidates in at-large versus single-member district arrangements in cities have shown

that single-member districts provide *much better* opportunities.  Amy Aff. ¶ 33.

716.    E.g., Karnig and Welch examined the success of Black candidates for city council

in cities with mixed systems – having both some at-large and some district seats.  They found

that Black representation was much higher under single-member district arrangements. The representation ratio (the percentage of Black city council members divided by the percentage of the city's black population) was .952 in district elections – nearly exactly proportional. The representation ratio for at-large elections was barely half of that, .499. Moreover, district elections failed to produce any Black representation only 14% of the time, while at-large elections resulted in no Blacks being elected 72% of the time. Amy Aff. ¶ 33.

717.    Such findings clearly demonstrate that, as a rule, the electoral opportunities for minority candidates are considerably better in single-member district elections than in at-large elections. *Id.*

718.    Plurality-majority systems, such as at-large voting, are designed to grant representation to only the largest group of voters. They do so by creating a much higher threshold, often requiring 40% of the vote or higher for candidates to get elected. This arrangement usually strongly underrepresents minority factions. And among plurality-majority systems, at-large voting is commonly considered to be the most unfair to minority groups. In particular, at-large elections can allow the political faction with the majority or plurality of supporters to win all the contested seats – shutting out minorities completely. Consider, for example, a city where the largest political faction represents 45% of the voters, and two minority factions represent 25% and 30% respectively. If the largest group votes as a bloc for all its candidates, it will win all of the seats – a patently unfair and unrepresentative outcome. *Id.* ¶ 26.

719.    In Dr. Amy's opinion, adopting plaintiffs' districting plan would significantly increase the opportunity for Black and Hispanic voters to elect candidates to the City Council. *Id.* ¶ 34.

720.    Under the plan, Hispanics would make up the majority of the voting age population in Districts 1 and 2.  This would give this minority community a much better chance to elect candidates of their choice than they now have under current at-large arrangements.  *Id*.

721.    District 3, which would have a majority of Black voters, would also see a significantly increased opportunity to elect a Black city councilor.   In Dr. Amy's view, Black voters would also have an improved opportunity to elect a Black city councilor in District 4, where they would make up 38% of the voters, and in which Latinos would constitute 16%.  *Id*.

722.    Black and Latino voter participation is likely to increase significantly under the plaintiffs' plan – particularly in the three districts in which each group would constitute a majority of the voting age population.  This conclusion is entirely consistent with the scholarly literature on the effects of districting on minority voter turnout.  *Id*.

723.    An inherent characteristic of at-large systems is to be *insensitive* to demographic change.  *Id*. ¶ 35.

724.    Responsiveness refers to how well changes in voter strength are translated into changes in representation.  In a very responsive system, as the number of voters in a particular political group grows, so does its share of representation.  *Id*.

725.    At-large systems are known for being *unresponsive*.  In this system, a minority political group may increase from 10% to 30% of the voters, but its number of representatives would most probably *not change at all* – it would still be unlikely to elect any representatives.  This is the definition of unresponsiveness.  *Id*.

726.    District systems may also be unresponsive – but they have the advantage of being able to be made more responsive through the redistricting process.  As the relative strength of groups change, districts can be redrawn to ensure changes in representation as well.  For

example, if a minority group like Latinos were ever to become a majority in Springfield, there would be substantial political pressure to create a district system that reflected their new political position. *Id.*

727.    Dr. Thernstrom claims to be concerned that the district plan offered by the plaintiffs will leave some minority voters in majority white districts, thus denying them political influence. And yet he also claims that although Blacks and Latinos are currently outnumbered by whites in the at-large voting system, this does not diminish their ability to influence elections. He cannot have it both ways – if he believes that some minorities will be at a political disadvantage by living in single-member districts dominated by whites, he must acknowledge that all minorities are at similar disadvantage in an at-large district dominated by whites. *Id.* ¶ 45.

728.    A successful African American or Latino candidate from one district would would likely advocate for the interests of all African Americans or Latinos in the City. It has always been true that the African American elected official(s) represents all African Americans in the City—even where they do not reside in the African American elected official's district. Jordan Aff. ¶ 27(b).

729.    A district-based system would enhance political opportunities for minorities. See generally Bewsee Aff. ¶¶ 19-22.

**Springfield's At-Large System Has Been Insensitive To The Dramatic Demographic Changes That Have Taken Place In Recent Years**

730.    From 1990 to 2000, Springfield lost 3.12% of its population. The population fell from 156,983 to 152,082. Most of that decline was due to a decrease in the number of white residents, which fell from 99,869 to 74,291, a decrease of 25.61%. In 1990, white males made

up 63.62% of the population, but by 2000 that proportion had dropped to 48.85%.  Harmon Aff.
¶ 7.

731.    The Latino/Hispanic population grew very rapidly between 1990 and 2000, from 26,528 to 41,343, growth of 55.85%.  More than one in four city residents is Latino/Hispanic, and because of the relatively young age of this group, even with no continued migration, it can be expected to grow in the future both absolutely and as a proportion of population.  *Id.* ¶¶ 8, 11.

732.    The Black population in Springfield grew more slowly between 1990 and 2000, from 28,484 in 1990 to 29, 831 in 2000, a change of 4.73%.  The proportion of the Black population also grew slightly from 18.1% in 1990 to 19.6% in 2003.  Id. ¶ 9.

733.    A very large majority (85.26%) of Springfield's Latino/Hispanic population is from Puerto Rico and therefore are U.S. citizens.  *Id.* ¶ 10.  *See also* Thernstrom Aff. ¶ 38, n.26 ("most Latinos in the City are Puerto Ricans, who are U.S. citizens").

734.    The defense expert Thernstrom estimates that Latinos represented 30.4% of the VAP in 2005, and are projected at 32.1% of the VAP in 2006, Thernstrom Aff. ¶ 12, Table 2; furthermore, he estimates that African Americans represented 21% of the VAP in 2005, and are projected at 21.3% of the VAP in 2006, *id*.

### It Is Harder For Minorities To Win In A City-Wide At-Large System

735.    It takes more time and money to become known and to organize city-wide than within a district.  Because the City of Springfield is a large geographic area, it is very difficult to reach the number of voters that one needs to reach in order to run an effective campaign without spending a lot of money on radio, television and newspaper advertisements.  Davila Aff. ¶ 11.

### Lack Of Financial Resources Available To Minority Candidates Makes Running City-Wide An Impediment To Election

736.    Latino and African American communities are not adequate sources of funding for successful campaigns.  Tosado Depo. 39:19-23; 40:1-15.

737.    The at-large system disadvantages Latino and African American candidates because of the all-important role played by financial resources in the at-large system.  Hard work is not enough to win at-large.  White people have more established networks of family, friends and colleagues who tend to have more financial assets.  In the at-large system, you must be able to reach enough people so that you will be one of the top 9 vote-getters out of a field of up to 18, and maybe more than that in the primary.  You can do that in a few ways.  It helps if you have a high profile going into the election, and white people have had the opportunity to build those kinds of positive profiles more easily.  In addition, it costs a lot of money to reach all the people in the city.  There are approximately 150,000 people in the city, too many to reach with volunteers.  You have to reach everyone either by direct mail or through the mass media, and that costs a lot of money.  This disadvantages people of color.  Bewsee Aff. ¶ 26.

738.    In 2003, when Alex Cortes ran for City Council, he was focused on the issues, but could not compete because he did not have the financial resources to get his message to the entire city.  Because he did not have money to buy newspaper ads, he issued press releases to try to get information about his campaign into the paper.  The newspaper was not interested in

covering his press releases, however.  He was very well known where he lived because of his work on neighborhood issues including housing rehabilitation and the neighborhood watch. Despite all of his efforts, he was not able to win the support of the city's white voters, and he was not elected.  Bewsee Aff. ¶ 27.

739.    Business leaders in the Hispanic community believe that it is very difficult for Hispanic candidates to win at large elections.  For this reason, combined with the fact that most Hispanic residents of Springfield are not well off, most Hispanic business leaders are verbally encouraging to Hispanic candidates, but are unwilling to put a lot of monetary support behind Hispanic candidates.  Davila Aff. ¶ 9.

740.    In general, the Hispanic community in Springfield is poor, which makes it extremely difficult for Hispanic candidates to raise the funds necessary to finance an effective campaign.  Victor Davila found it very difficult to raise money in the Hispanic community, and nearly impossible to raise money in the white community in Springfield.  Most of the monetary support Davila received from whites came from people who live outside the City of Springfield. *Id.* ¶ 10.

741.    It is significantly more expensive to run an at-large campaign than a ward campaign.  In a district election it would be possible for a candidate to reach voters by knocking on every voter's door.  In a city-wide election it is not feasible for a candidate to knock on every voter's door.  In order to reach voters all across the city candidates in an at-large election need to purchase expensive TV, radio and newspaper advertisements.  These expenses make campaigning too expensive for many African American and Latino residents who might otherwise run for office.  Ben Swan Aff. ¶ 20.

742.    Though Springfield has many Hispanic and African-American communities, minority candidates do not win elections because the at-large system prevents them from winning.  The candidates with the most money are able to campaign the most and can place the most ads in the big Anglo newspapers.  The Hispanic candidates cannot compete because the Hispanic communities are very poor and cannot donate a lot of money.  If the system was a ward representation system, the Hispanic and Black candidates could win by campaigning in their own communities.  With the at-large system, the candidates with the most money have an advantage. It is Molina's impression that Anglo voters have a hard time voting for minority candidates because they like to look out for their own interests.  A Hispanic voter has to rely on winning Hispanic votes alone.  Because Anglo people will not vote for Hispanic candidates, the result is that the same Anglo politicians stay in control for many years.  Molina Aff. ¶ 10.

743.    It is very difficult for candidates of color to raise enough money to run a viable citywide campaign.  Businesses are reluctant to contribute to campaigns that they think won't win.  Talbert Swan Aff. ¶ 2.

744.    People are discouraged from running because they don't think they can raise the money necessary to run.  Mazza-Moriarty Depo. 44: 5-9.

745.    When Darnell Williams ran for City Council in Springfield the biggest impediment to his election was being able to get his message out across the city, particularly to the white community.  The most effective way to do that was through TV and newspaper ads, which cost significant sums of money.  Many African American and Latino candidates do not have the funds available to buy costly TV and print media advertising and thus it is very difficult for them to get the visibility they need to be elected citywide.  It is also more difficult for African American and Latino candidates to raise money for campaigns because their supporters, who are

mainly other African Americans and Latinos, cannot make large contributions. Darnell Williams Aff. ¶ 6.

746. Conducting a city-wide campaign involves a huge commitment of time, money and resources. Campaigns conducted in a ward or district would be considerably easier. Ward elections may attract more candidates. Tosado Aff. ¶ 21.

747. City Councilor Rosemarie Mazza-Moriarty was able to get elected the first time she ran because she had extensive connections in city politics: her grandfather was a city councilor and state representative; her family is well known in Springfield; and she is related to former Mayor Michael Albano. Mazza-Moriarty Depo. 10:8-19; 11:2-8; 19:12-14,18-21.

748. City Councilor Mazza-Moriarty's election demonstrates the need to raise lots of money to win. She raised and spent roughly $30,000 in her campaign. She hosted, among other things, a $100/head fundraiser   She paid between $5,000-$10,000 for television ads and several thousand for newspaper ads). She also did mailings to seniors, women voters, registered voters, and a separate Ward 2 mailing as part of her campaign. Mazza-Moriarty Depo. 20:17-21; 21:20-23; 23:2-13; 27:11-24; 28: 1.

## Other Disadvantages of the At-Large System for Minorities

749. Because of the racial and ethnic segregation of Springfield's neighborhoods, and because minority neighborhoods have a lower economic and social status, people of color who seek to run for City Council or School Committee have little opportunity to develop a political base outside of their own community. Segregation and discrimination in Springfield have precluded minority candidates from accessing the political, business and social networks that would allow them to run competitive campaigns in the city as a whole. Thomas Aff. ¶ 6.

750.    Most African American and Latino candidates do not have the connections and name recognition in the white areas of Springfield.  Many in the white community vote for those whose names they know, who are related to people they know or who have been in office for years.  Without money, connections, name recognition and visibility, it is virtually impossible for candidates of color, particularly first time candidates, to win citywide elections in Springfield.  Many persons of color wanted to run for City Council or School Committee but chose not to because they thought it would be futile.  Darnell Williams Aff. ¶ 7.

751.    In order for African Americans or Latinos to win an at large election they must have the endorsement of the newspaper and the prominent white business and political leaders.  These endorsements are very difficult for African Americans and Latinos to obtain, even if they are well qualified for political office.  *Id.* ¶ 8.

752.    A ward-based election system would diminish the adverse impact of low minority turnout.  Such a system would provide a higher likelihood that someone from a ward with large minority population would be able to gather sufficient support even if turnout among minority persons in the neighborhood did not actually improve.  In particular, a ward-based system will make it easier for Hispanic candidates to win since the Hispanic candidates and their supporters will not be competing with candidates and voters from other parts of the city where turnout has routinely been higher.  Tosado Aff. ¶¶ 22, 23.

753.    The current City Council and School Committee are not representative of the racially and ethnically diverse population that resides in Springfield.  African Americans and Latinos would be able to get elected in greater numbers in district elections and there would be more qualified candidates running.  Darnell Williams Aff. ¶ 15.

LIBA/1760998.1

**Changing Demographics In Springfield Do Not Negate The Conclusion That Plaintiffs' Proposed District Plans Would Increase Opportunities To Elect Latino And African American Candidates Of Choice.**

754.    Whites do not need to constitute a *majority* in an at-large election system in order to successfully prevent Blacks or Latinos from electing their preferred candidates – they need only make up a *plurality* of the voters.  Even assuming whites today make up only about 47.8 percent of VAP, as Dr. Thernstrom suggests, they still far outnumber the number of either Latino or African-American voters and will be able to unfairly dominate the elections in an at-large system.  Even given current trends in population growth, whites in Springfield will continue to be the plurality of voters for many years to come.  Amy Aff. ¶ 28.

755.    Furthermore, numerous socio-economic factors along with the at-large system have combined to suppress voter turnout for minorities in Springfield.  This is unlikely to change overnight.  The advantage enjoyed by whites in terms of voter participation means that even when the white community no longer constitutes a majority of the voting age population, it might still be able to turn out a majority of the voters on elections day, and thus continue to dominate in these elections.  *Id*. ¶ 30.

**XV.    Plaintiffs' District Plans are Based on Criteria Beside Race**

756.    Plaintiffs' district plans reflect considerations of shape, contiguity, and equal size. They follow census blocks or precinct boundaries.  Harmon Aff. ¶¶ 6, 33, and Ex. B.  *See also* Harmon Aff. ¶¶ 26-29.

**Census Blocks Are An Appropriate Basis for Voting Districts**

757.    City Council and School Committee districts could be drawn using several different "building blocks," pieces of varying size geography that can be aggregated to construct the districts.  There is nothing inappropriate about using census blocks.  Harmon Aff. ¶ 39.

758.    Because there are 64 precincts in Springfield, any 6-district School Committee plan or 9-district City Council plan must cut at least some precincts.  All School Committee and City Council plans presented by Plaintiffs and Defendants in this case split precincts. Furthermore, although precincts have distinct and agreed boundaries, they are not permanent and change with each decennial census.  *Id.*

**Neighborhood Boundaries Are Not Required To Be The Basis For Voting Districts**

759.    Defendants are incorrect in their assertion that voting districts should be based on neighborhood boundaries.  Unlike voting districts, neighborhoods usually have indistinct boundaries and often overlap significantly.  Where a neighborhood starts or ends often depends on whom you ask, where you ask and when you ask.  Harmon Aff. ¶ 34.

760.    Springfield's neighborhood boundaries are not fixed.  *Id.* ¶¶ 36-37.

761.    Uncertainty regarding Springfield's neighborhoods is reflected in the fact that different departments of City government use different lists of neighborhoods to guide their operations.  *Id.* ¶ 35.

762.    People who do not live in a neighborhood may participate in civic life there, whereas voters may only participate in the voting district in which they live.  For example, at least one of Springfield's neighborhood councils, the Forest Park Civic Association, will accept members from any location.  *Id.* ¶ 34.

763.    The division of the city into voting districts would in no way restrict the number of council members to whom neighborhood groups could direct their requests.  Many neighborhood issues can have a city-wide effect, and local groups will attempt to influence any decision-maker that has a role.  If a neighborhood group has an issue that relates to a specific Council member, the group can appeal to that council member.  *Id.* ¶ 38.

764.    Each of Plaintiffs' nine proposed City Council districts would contain at least one neighborhood council or association.  Harmon Aff. ¶ 36.

765.    A shift to a district-based system would not have any effect on the role that neighborhoods play in City life.  A district-based system would eliminate the dominance that certain neighborhoods like Ward 7, (which is home to several City Council and School Committee members) currently play in Springfield politics.  Coakley-Rivera Aff. ¶ 41.

766.    While Springfield does have some specific neighborhoods, there is no contradiction between having City Council elections by district and maintaining neighborhood councils.  Twiggs Aff. ¶ 10.

767.    Many of Springfield's neighborhoods do not have real boundaries or divisions, and it is unclear where one neighborhood starts and another stops.  Not everyone identifies by a specific neighborhood.  More people identify by the general area of Springfield, such as the Hill, the North End, Downtown and the South End.  Dividing these so-called neighborhoods into nine voting districts would not negatively impact people's participation in city council elections.  Thomas Aff. ¶ 35.

768.    The Springfield Planning Department prepared a statistical summary of the 2000 Census Data and noted that they were unable to base their data on the official boundaries of Springfield's neighborhoods, because the Census Bureau no longer used neighborhoods as the basis of its data, but rather census blocks.  Thus one cannot accurately compare the neighborhood data from 1990 to that of 2000.  All but one of the City's 17 neighborhoods were affected by this change in reporting of data.  *See* Springfield Planning Department, "Statistical Profile: Springfield and its Neighborhoods" March 2003 (Pl. Ex. 4) at SFP001659.

## OTHER ISSUES

**XVI.  Defendants' Arguments That Whites Voted as a Bloc for Reasons Wholly Unrelated to Racial Animus Should be Rejected.**

**Race/Ethnicity Has Been a Significant Factor Contributing to the Defeat of Minority-Preferred Candidates.**

769.    Whites do not vote for minority candidates who are perceived as advocating for the minority's interests, rather than as middle of the road, and successful minority candidates like Jose Tosado hold moderate political views.  Lopes Aff. ¶ 19; Davila Aff. ¶ 8; Torres Aff. ¶ 42.

770.    Being African American or Hispanic is a disadvantage for candidates for City Council and School Committee in Springfield.  There is a perception among African Americans in Springfield that white voters are not as comfortable voting for African American candidates as they are voting for white candidates.  Successful minority candidates tend to hold very middle of the road political beliefs, and that, as soon as a minority politician takes a stand that seemingly advocates specially for the minority community, there is a white backlash against that politician.  Candice Lopes personally experienced this white backlash in her 1991 run for re-election to the School Committee.  Lopes Aff. ¶ 19.

### Victor Davila

771.    White voters treated and viewed Victor Davila differently than white candidates because he is Latino.  During both of his campaigns for School Committee, he frequently heard comments from white potential voters about his accent.  Some would comment that he has a thick accent.  Others would ask directly whether he was a candidate who would represent the Hispanic community only, or whether he would also represent the rest of the City.  He felt like he had to constantly try to convince white voters that he was not just a candidate for Latinos, and that white voters wanted to know whether he would represent them, or represent Latinos.  Davila Aff. ¶ 3.

772.    In short, he felt he had to be as "non-Latino" as possible when addressing white potential voters in order for them to accept him as a legitimate candidate.  He had to try to appear as neutral as possible about issues where there was potential disagreement between the white and Latino communities, and he had to be very cognizant of the way he dressed, his mannerisms, his accent, and whether or not he spoke Spanish in the presence of potential white voters.  Davila Aff. ¶ 4.

773.    If Davila advocated for positions that were important to Latino voters, like opposing a switch to neighborhood schools, he felt he had to constantly explain and defend that position with potential white voters, even though many white voters held the same opinion.  He got the feeling that many potential white voters did not believe him when he told them he was interested in advocating for issues that are important to the entire city.  He believes that much of their skepticism arose from the fact that there are distinct opinions held in both communities about certain issues, and disagreements regarding those issues.  More importantly, he believes that their skepticism arose from the fact that they perceived him as Hispanic first, before anything else.  *Id.* ¶ 5.

774.    Many of the comments and concerns Davila would hear from white voters about issues facing Springfield's schools had racial undertones.  For example, many Latinos were opposed to neighborhood schools because they thought it would result in their children attending inferior schools.  Many white voters were also opposed to a switch to neighborhood schools, but for different reasons – they were concerned that their children would be attending particular schools with high Latino student populations.  Therefore, even though whites and Latinos tended to agree that they did not want neighborhood schools, Davila felt that many white voters did not support him on that particular issue because he came to the same conclusion they did for

different reasons, and they therefore saw him as a candidate for Latinos instead of as a candidate for the city.  Davila Aff. ¶ 6.

775.    Davila heard many comments from white voters about how best to teach English to students whose primary language is Spanish.  He felt that a lot of these comments had derogatory racial undertones.  Many white potential voters who supported English immersion would make comments about how Latino students need to speak English because they are in America.  Even though Davila agreed that Latino students need to speak English, and to learn to do so well to be successful, he did not believe that English immersion was the most effective way to achieve that goal.  As a result, he believes he did not have the support of many white voters on this issue.  *Id.* ¶ 7.

776.    Davila believes that he lacked support among white voters because he appeared too Hispanic to them.  *Id.* ¶ 20.

### Carol Lewis-Caulton

777.    Carol Lewis-Caulton was a very strong City Councilor for the minority community in Springfield, but she was only elected for one term.  When she was a City Councilor she represented the minority community and she spoke out on issues that concerned the minority community, such as needle exchange and ward representation.  She was elected to City Council once, in 1999, but she ran three additional times and lost, including when she ran as an incumbent in 2001.  She lost because she did not have enough support from white voters. Gomez Aff. ¶ 53.

778.    Carol Lewis-Caulton is the only African-American woman ever elected to the City Council.  Campbell Aff. ¶ 4; Lewis-Caulton Aff. ¶ 5.

779.    As a City Councilor and candidate, Ms. Lewis-Caulton was in favor of demanding payments in lieu of taxes from large nonprofits in the City.  The large nonprofits – Western New

England College, Springfield College, Baystate Medical Center, and American International College – have been expanding and taking more land out of Springfield's tax base. This makes it harder for the City to provide services to its residents. Payments in lieu of taxes is an issue that is particularly important to the minority community. The minority community as a whole is less well-off than the white community and relies on the City to provide social services. Also, because many minorities are poor, they cannot afford to move out of the City as services are cut, and as residential property taxes increase to compensate for taxes lost because of property taken by large nonprofits. Several political insiders in the City – former Mayor Albano, Sheriff Michael Ashe, District Attorney William Bennett – do not presently live in the City. They do not have to worry about the expansion of large nonprofits in Springfield causing services where they live to be cut back, or causing their residential tax bills to increase. It a problem for the people who continue to live in the City. The Springfield Finance Control Board has recognized the importance of payments in lieu of taxes and recently reached an agreement with Baystate Medical Center pursuant to which Baystate will make payments to the City. Campbell Aff. ¶¶ 9-11; Lewis-Caulton Aff. ¶ 16.

780. When Lewis-Caulton was on the City Council, she supported implementing a needle exchange program in Springfield. Lewis-Caulton supported needle exchange because scientific research indicates that it saves people's lives. When Lewis-Caulton was on the City Council, she worked in Northampton, as she does now. Northampton has a needle exchange program, so Lewis-Caulton has been able to see that many of the potential problems identified by opponents to needle exchange are not real. In Lewis-Caulton's experience, people are more likely to support needle exchange if they know people who are drug dependent or work in human services. Drug use has a disproportionate impact on Springfield's African-American and Latino

communities.  While there is support for needle exchange among many groups in Springfield, support among African-Americans and Latinos is especially strong because these communities have a better understanding of how needle exchange can benefit people they regularly interact with, or even just see on the street.  Lewis-Caulton Aff. ¶ 14.

781.    Lewis-Caulton also supported ward representation as a Councilor.  Lewis-Caulton was one of the initial signers of the first petition for ward representation.  Ward representation is an issue that is particularly important to minority voters, because it would increase their ability to elect candidates of their choice to city government.  *Id*. ¶ 15.

782.    Truancy was another City issue on which Lewis-Caulton played a lead role. There was a requirement that students attend school for a certain number of days to get credit for the year.  Unfortunately, the schools were not keeping accurate attendance records.  They also were not keeping track of when students brought in notes from their parents explaining their absences.  The proposed reforms involved enforcement by the police, which raised particular concern among African-American and Latino parents.  Because of a history of police brutality in the African-American and Latino communities, African-American and Latino parents were concerned about the effect that police enforcement would have on their children.  This concern was exacerbated by the knowledge that school attendance records were inaccurate.  *Id*. ¶ 17.

783.    The City Council has the power to approve certain kinds of permits.  New permit approvals end up having a disproportionate impact on communities with mixed zoning.  For example, Wards 1 and 4 are not strictly residential.  They also tend to be less wealthy, and they have a higher proportion of minority residents.  *Id*. ¶ 18.

784.    When Lewis-Caulton was a councilor, if residents told her that a permit would hurt their neighborhood, she would listen to the residents and consider their concerns.  In her

experience, some councilors seemed to care more about the permit applicant than they did about the residents of the affected neighborhood. Lewis-Caulton Aff. ¶ 19.

785.    Maria Idalí Torres worked on Lewis-Caulton's 2003 City Council campaign. Torres believes one reason Lewis-Caulton was defeated in 2003 and also in 2001 was because she had a track record from her days on the City Council of being very independent, including on issues that are important primarily to minority voters. Lewis-Caulton tried to make the Council focus on issues that are important to minority voters. Torres Aff. ¶ 31.

786.    Another reason for Lewis-Caulton's defeat in 2003 was that she did not have the money or other resources to take time off from her regular job to campaign full time, which is crucial for minority candidates in order for them to gain sufficient white support to be elected. Like most minority candidates, however, Lewis-Caulton could not make that financial sacrifice. *Id.* ¶ 32.

### Carmen Rosa

787.    Carmen Rosa was elected to the School Committee in 1993. While she was on the School Committee, Rosa gave a talk to high school students about the nature of racism. Many members of the white community were upset about her remarks, and she lost a lot of political support in the white community as a result. In the African American community, in contrast, there was a sense that what she had said in her talk to the high school students was accurate. Lopes Aff. ¶ 20.

788.    There was a perception in the City that Carmen Rosa was Italian and not Hispanic. She has light skin, she moved here when she was very young and she speaks very good English. During her campaign, she did not present herself as a Hispanic candidate. Rosa was on the School Committee for one term only. Her political career ended when she still was on the School Committee and she gave a speech about racism. She said something to the effect

LIBA/1760998.1

of, "racism is a disease of the white race." The speech was very controversial. After that speech, she would not have won election again because white voters no longer supported her. Gomez Aff. ¶¶ 57-58.

789.    Carmen Rosa was elected to the School Committee because people did not know that she was Hispanic. She was a newcomer to politics, and people did not know much about her. Because of her name, many voters thought that she was Italian. Campbell Aff. ¶ 13.

790.    Carmen Rosa gave a speech about racism while she was a School Committee member. In the speech, she said something to the effect of, "racism is a disease of white people." The Springfield Union-News turned against her after this incident. Other elements of the white-dominated political establishment that had supported Rosa's candidacy in 1993 followed the lead of the Union-News and also turned against her. It was as if the City were saying, there are some things that you just shouldn't talk about. *Id*. ¶ 14.

**The 2005 Election Involved Exceptional Circumstances**

791.    The level of interest in City politics has decreased since the Finance Control Board was created. There is a perception that the elected officials do not have the real power in the City. Voters are less interested in participating in elections. Some people who might run for City Council or School Committee are discouraged because they believe that the job has no power. Gomez Aff. ¶ 27.

792.    In 2005 many people of color did not come out to vote because of the widespread corruption that had taken place in Springfield. The head of the Housing Authority was indicted for bilking money that was supposed to go to improving the housing for the tenants and a loan fund meant for disadvantaged businesses was diverted. The head of the Massachusetts Career Development Institute (MCDI), the job training program that primarily serves African American and Latino residents of Springfield, was indicted for improprieties. The community of color felt

184

that money earmarked for low-income people and programs was being used for the personal gain of the white people in charge of those programs. In addition, the lawsuit and the sense that the at large system may soon be changed may have kept certain people from running in the 2005 election. Talbert Swan Aff. ¶ 38.

793.    In the 2005 election many voters did not come out to vote because there was not a serious contest for the Mayor's race. In addition, the City Council positions were downgraded by the Control Board and several people told Henry Twiggs they would not be interested in running for City Council because it did not have any real power. Twiggs Aff. ¶ 18.

794.    In 2005 voters were turned off to the electoral process because of the cloud of public impropriety and corruption. City officials were indicted for preying on the limited resources that were supposed to be dedicated to low income communities and communities of color. Thomas Aff. ¶ 37.

795.    The 2005 election was after the lawsuit was filed.

**The 2006 Gubernatorial Election And Other Elections For State Representatives Do Not Show That African American And Hispanic Candidates Can Be Elected In Sufficient Numbers To Springfield's City Council And School Committee**

796.    One cannot reach any conclusions about the opportunities for African Americans to succeed in city politics by looking at Deval Patrick's success in 2006. The governor's race is very different from City races because the governor's race is partisan. This difference was especially important in 2006, because there was a national movement favoring Democrats over Republicans. Campbell Aff. ¶ 12.

797.    Maria Idalí Torres was involved in Patrick's campaign. Patrick began his campaign approximately 2 years before the election. He was able to devote an extraordinary amount of time to meeting voters and building a grassroots campaign. He was able to do this because of his personal wealth, an advantage most minority candidates do not have. One cannot

draw any conclusions about whether minorities in Springfield have an equal opportunity to elect candidates of their choice to the City Council and School Committee based on the success of Deval Patrick's candidacy for governor. Torres Aff. ¶ 33.

798.    In fact, there were times when Torres found that the governor's race was negatively impacted by the same types of racial divisions that characterize politics in Springfield more generally. *Id.* ¶ 34.

799.    In 2006 Torres attended the Ward 2 Democratic Caucus, where Ward 2 chose its delegates to the state Convention. The major issue before the party that year was who would win the nomination for governor. The Ward 2 Democratic Caucus was held in Our Lady of Hope, which is a Catholic church that has historically been a center for the Irish American community. A senior center is located in the church, and attendance at the senior center is largely Irish American. The church is used as a polling place on election day. *Id.* ¶¶ 35, 36.

800.    Torres and eight other Patrick supporters joined together to form a slate of delegates to compete against another slate that supported Tom Reilly. Seven members of the Patrick slate were either African American or Latino, and two were white. The Reilly slate was larger and consisted of seven men, seven women, and alternates. The Reilly slate was entirely white except for one African-American alternate. *Id.*. ¶ 38.

801.    The attendance at the Caucus was overwhelmingly white. A large proportion of the attendees were seniors who were affiliated with the senior center at Our Lady of Hope. *Id.* ¶ 39.

802.    The caucus participants voted to elect the Reilly slate. As a result, no African Americans or Latinos from Ward 2 were selected at the Democratic Caucus to attend the

Convention as voting delegates (although one alternate delegate on the Reilly slate was African American).  Torres Aff. ¶ 40.

803.    The state Democratic Party has a process by which members of the party who are racial minorities and who were not selected to be delegates through their local Ward caucuses may apply to become add-on delegates.  Torres applied to the state party to become an add-on delegate, along with the other African American and Latino delegates who had run on the Patrick slate.  All became delegates through the add-on process.  Without the add-on process, however, the slating process at the Ward level would have shut them out of the state Convention.  *Id*. ¶ 41.

## XVII. Lack Of Cohesion Between Latinos And African Americans Is Not The Cause Of Minority Candidates' Inability To Get Elected

804.    The key issue is whether white bloc voting is a substantial factor explaining the defeat of Latino And African American candidates.  Plaintiffs have no obligation to show that white bloc voting was the sole cause of such defeats.  *See Uno*, 72 F.3d at 983 ("establishing vote dilution does not require the plaintiffs affirmatively to disprove every other possible explanation for racially polarized voting").

805.    Plaintiffs have shown cohesion among Latino voters and among African American voters, and plaintiffs have shown white bloc voting.

806.    Plaintiffs are not required to demonstrate cohesion between Latino and African American voters.

## The At-Large System Itself Has Created Obstacles For African American Support Of Latino Candidates, And Latino Support Of African American Candidates, And Encourages Bullet Voting

807.    Minority voters use bullet voting in municipal elections so that they can elect their preferred candidates.  In this respect, the at-large system pits Latino voters and African American

voters against each other. Latinos bullet vote for their preferred candidates, who are Latino; while African American voters vote for their preferred candidates and not for the Latino-preferred candidates. *See infra* ¶¶ 808-820.

808.    Electoral scholars have noted a problem faced by minority voters living in predominately white at-large districts: they are discouraged from supporting all the candidates they would like to see on the city council. Often the most rational and effective strategy for minority voters in an at-large system is to "bullet vote" – to use only one of their votes to support a single minority candidate. Otherwise, if they use the multiple votes they have in an at-large system, there is a good chance that one of their other votes will help another candidate get elected instead of their most preferred one. In contrast, members of the white majority voting bloc can use all of their votes – safe in the knowledge that most or all of their chosen candidates will win office. This bullet-voting strategy to which minorities must often resort means that these voters will ultimately have less overall impact on who is elected to the city council than white voters who cast all their votes. This necessity of bullet voting also helps to explain why there appears to be little cohesiveness between Black and Latino voters in Springfield. When members of each group have to restrict themselves to one vote, they obviously are unable to cast votes in support of the other group's candidates. Amy Aff. ¶ 21.

809.    The need for bullet voting has unfair political consequences for minorities. As Dr. Thernstrom acknowledges, minorities are forced to bullet vote in order to maximize their chances of winning any representation at all in an at-large system. This strategy unfairly lessens their potential overall impact on city elections. Whites who can safely cast all nine of their votes have more opportunities to exert control over who fills city council seats than minorities who cast only one vote. The unfairness is obvious: someone who casts nine votes has more power to

affect election outcomes than someone who casts one vote. Whites are able to use 100% of their voting power in Springfield at-large elections, while minorities are forced to restrict themselves to using a small fraction of their voting power. Amy Aff. ¶ 36.

810.    Many Hispanic voters utilize a limited voting or single-shot strategy. Tosado Aff. ¶ 13.

811.    It is crucial for minority voters to use bullet voting in municipal elections so that they can elect their preferred candidates. In this respect, the at-large system pits Latino voters and African American voters against each other. Latinos bullet vote for their preferred candidates, who are Latino; while African American voters vote for their preferred candidates and not for the Latino-preferred candidates. Coakley-Rivera Aff. ¶ 9.

812.    Maria Idalí Torres has advocated for Latino voters to use fewer than nine votes in the City Council election. For example, when she worked on Carol Lewis-Caulton's 2003 campaign, she was featured on a radio advertisement asking voters to vote for Lewis-Caulton, Jose Tosado, and Alex Cortes for City Council. She states that using fewer than nine votes increases the chances that Latino voters will elect candidates who are responsive to the Latino community. While white voters may use all nine of their City Council votes and may support a wide variety of candidates without jeopardizing the election of their most favored candidates, minority voters do not have this luxury, and must bullet vote instead. Torres Aff. ¶ 15.

813.    It is a common belief in the Hispanic community that in order to elect a candidate that will be responsive to the needs of the Hispanic community, voters must vote for only one candidate, or for only the Hispanic candidates. Many Hispanic voters vote only for Hispanic candidates, or only for one Hispanic candidate. There is the sense that, if you vote for more than

one candidate, you are casting a vote or votes against the person who you really want to be elected.  Davila Aff. ¶ 23.

814.    Latino candidates for political office in Springfield, as well as Latino community leaders, will often encourage voters to bullet vote, or use only one or two of their votes in favor of either themselves (in the case of candidates) or in favor of Latino candidates in general.  There is a common belief in the Latino community in Springfield that bullet voting, or using fewer than one's total available votes, is the only way to elect candidates who will stand up for issues that are important to the Latino community.  Gonzalez Aff. ¶ 12(j).

815.    Every year, the Ward 1 Democratic Committee prepares a slate to give to voters on election day.  They generally include on their slate all of the Hispanic candidates who are running for office.  They include other candidates as well if they think that they will support the issues that concern Hispanic voters.  The Ward 1 Democratic Committee slate usually has fewer than 9 names listed for City Council.  This is because Hispanic voters are at a disadvantage in the at-large system, and if they use less than 9 votes, they can have a greater impact on the election.  There are usually fewer than 9 people running who the Committee thinks will be responsive to the Hispanic community.  Most Hispanic voters do not use all of their votes.  Gomez never has used all nine of his votes, because he wants to use his votes only to support candidates who will be responsive to the needs of his community.  As long as Gomez can remember, Hispanic voters in Springfield have used bullet voting to try to have a greater impact on elections.  Gomez Aff. ¶¶ 22, 23, 25.

816.    Candice Lopes frequently urges African American voters to "bullet vote" or use only one or two of their available votes to vote for those candidates that they think will represent them well (usually the African American candidate(s)), and she has observed others do the same.

190

Lopes tells people that using one, or a few, of one's available votes will multiply the power of their vote. Lopes believes that many African Americans bullet vote, or use many fewer than their available votes, because they believe it is the only way they have a chance of electing candidates of their choice. Lopes Aff. ¶ 22.

817.    The at-large election system has made it harder for the African American and Latino communities to work together. Because it is so difficult for any candidates of color to get elected under the at large election system, the African American and Latino communities have been focused on electing their own candidates, and have less incentive to work together. Talbert Swan Aff. ¶ 5.

818.    The at-large system has promoted bullet voting where African Americans vote for the African American candidate and Latinos vote for the Latino candidate. Henry Thomas has at times recommended that people bullet vote in order to have a better chance of electing candidates of their choice. When minorities vote for more than one candidate they sometimes actually give up the power of their vote. Twiggs Aff. ¶ 9.

819.    The at-large system has kept African Americans and Latinos from working together because each group has concentrated on trying to get votes from their own community. Darnell Williams Aff. ¶ 14.

820.    Darnell Williams  at times recommended that African Americans bullet vote in order to have a better chance of getting elected because they are generally not successful in getting votes from the white community. *Id*. ¶ 9.

**Latinos And African Americans Share Common Interests And Concerns, And, In A District-Based System, Would Be More Likely To Vote Cohesively**

821.    African Americans and Latinos have concerns about similar issues, including the quality of the public schools, dropout rates, illiteracy, infant mortality, treatment and prevention

of substance abuse, housing, employment in city government and ward representation. Ben Swan Aff. ¶¶ 22, 23.

822.    Hispanics have supported Rep. Ben Swan in his elections. He campaigns in the Hispanic community using sound trucks that broadcast in Spanish and distributes campaign materials in Spanish. *Id*. ¶ 28.

823.    There is no doubt in Rep. Ben Swan's mind that district elections would bring Latinos and African Americans together to elect candidates who best represent their common interests. *Id*. ¶ 50.

824.    In a district system where a large number of both African Americans and Latinos are concentrated in particular districts, the groups would have more incentive to work together. On a district level candidates run against each other and this will help to create coalitions between African Americans and Latinos where the groups come together to elect a minority candidate. Talbert Swan Aff. ¶ 6.

825.    There has been cohesion among Latinos and African Americans in the Mayor's race, where both communities heavily supported Linda Melconian. In this one to one race Latinos and African Americans came together to support the same candidate. This did not happen in the City Council election because people did not feel they could have the same impact on a nine seat at large race. *Id*. ¶ 7.

826.    African Americans and Latinos do have similar interests and have come together on specific issues. They came together on the issue of choosing a new School Superintendent in 1990, holding meetings to discuss how to have input in the selection process and get a seat at the table. Blacks and Latinos have similar concerns and want the same things around issues involving crime, unemployment, health care and education. If there were district elections for

City Council and School Committee, it would bring the African American and Latino communities together. Within the bounds of a particular district, the groups' common interests and similar perspectives on issues would be even more evident than they are when viewed from a city-wide perspective, and organizing the communities around such issues would be easier. Talbert Swan Aff. ¶ 8.

827.    African American and Hispanic residents across the city share common interests on many issues, including poverty reduction, housing quality, city services, health care, and the frequency of asthma and diabetes. Coakley-Rivera Aff. ¶ 39.

828.    African American and Hispanic residents who live in the same Springfield neighborhoods work together when they believe that the City Council is not being responsive to their neighborhoods' needs. For example, African American and Hispanic residents work together to improve housing quality, to push for sidewalk and street repairs, and to urge the city to demolish condemned buildings. *Id.* ¶ 40.

829.    African Americans and Latinos in Springfield share similar concerns regarding education, housing, employment, health care, police brutality and the ability to elect candidates of their choice under an at-large election system. African American and Latino organizations have worked together to address concerns common to both communities. Most recently, the African American and Latino community came together to oppose the new boundary plan for the Springfield public schools which both communities fear will decrease the quality of education for African American and Latino students. Thomas Aff. ¶ 34.

830.    African Americans and Latinos in Springfield share many common concerns particularly in the area of education. Both communities are concerned with low test scores, high drop out rates, lack of academic achievement and equity issues. Buntin Aff. ¶ 15.

831.    Frank Buntin worked on Orlando Santiago's campaign for School Committee.  He encouraged people in the African American community to vote for him because he believed he would make a good School Committee member and would seek to improve education for all children.  Buntin Aff. ¶ 16.

832.    A district representation system would increase cooperation between the Latino and African American communities.  It would give candidates greater visibility in the community and provide greater interest in obtaining more city services and resources for the neighborhoods.  Darnell Williams Aff. ¶ 16.

## XVIII. The Electoral Successes Of Jose Tosado, Bud Williams, And A Few Other Minority Candidates Generally Reflect Extraordinary Or Unusual Circumstances.

833.    There is a perception in the City that there is only room for one African American and one Latino on the City Council at a time.  Latinos and African Americans are discouraged from running because they think that they would be competing against Jose Tosado and Bud Williams for the Latino and African American seats.  Because Tosado and Williams have been in office a long time, it is easy for them to raise money to pay for their next campaign.  Other Latinos and African Americans decide not to run because they do not believe that they can raise enough money to have a chance against Tosado and Williams.  Gomez Aff. ¶ 62.

834.    Jose Tosado's success in Springfield politics is exceptional.  He wins because he has a strong base of white voter support from his neighborhood.  This, combined with the support he has in Coakley-Rivera's district, is what allows him to win.  Coakley-Rivera Aff. ¶ 8.

835.    Jose Tosado was appointed to the City Council and has always run for City Council as an incumbent.  He got fundraising help from the Latino Breakfast Club.  Gomez Aff. ¶ 59.

836.    Jose Tosado is the only Hispanic candidate who has had success in Springfield politics in recent memory.  Tosado is an exception because of some unusual circumstances.  First, Tosado was not elected to the City Council, he was appointed, and so he has always run for the City Council as an incumbent.  Second, he has very long-standing community ties, a very large family, many of whom work in government positions, and he has also spent much of his career working in government jobs.  His ties to the existing Springfield government power structure have helped him to raise money, and have given him an air of legitimacy among white voters.  Davila Aff. ¶ 22.

837.    Jose Tosado has been a successful candidate because he has penetrated the predominantly white political establishment, has moderate political views, and has been more successful than most Latino candidates at raising money.  He is an exception in the Latino community, in part because he was born here, has a large family network, and because he has spent much of his career in government service positions.  Torres Aff. ¶ 42.

838.    A key to Tosado's success was his appointment to the City Council by Mayor Albano.  As a result of the appointment, Tosado always has run for City Council as an incumbent.  Most Latino candidates do not have the benefit of connections to people who are already in important political positions in Springfield, as Tosado did when he was appointed by Mayor Albano.  Tosado's association with popular white politicians like Mayor Albano has increased his acceptability among white voters.  *Id.* ¶ 43.

839.    It is harder for minority non-incumbents to gain white voter support than it is for white non-incumbents to gain white voter support.  Voters in Springfield are familiar with the incumbents.  If they have to choose between two candidates who they do not know, they are

likely to vote along racial lines.  In particular, white voters are more likely to choose a white non-incumbent over a Latino or African American non-incumbent.  Torres Aff. ¶ 44.

840.    Gomez believes that Bud Williams wins elections because he has enough support from the white community to win.  He has a large family and longstanding ties in Springfield. He ran twice and lost before he was elected.  Gomez Aff. ¶ 60.

841.    Both Tosado and Williams have been adopted by the predominantly white political establishment in Springfield, and this helps them to get enough support from white voters to win elections.  This political establishment has not helped other minority candidates in the way that it helps Tosado and Williams.  *Id*. ¶ 61.

842.    Bud Williams, even more than Tosado, has been able to penetrate the predominantly white political system in Springfield because of his involvement in the correctional system.  Williams has worked as a probation officer, and he has ties to the Sheriff's office and the District Attorney's office that, like Tosado, increase his acceptability among white voters.  Torres Aff. ¶ 45.

843.    Some unique factors contributed to Carol Lewis-Caulton winning a seat on the City Council in 1999.  In particular, one woman incumbent decided not to run for re-election, and did not submit nomination papers.  A second woman incumbent withdrew from the race after the deadline for submitting nomination papers for certification had passed, but before the election.  Because of the second incumbent candidate's late withdrawal, additional candidates could not be added to the ballot for that election.  Due to the two women incumbents' decisions not to seek re-election, there were no women incumbent candidates running for City Council by election day.  Lewis-Caulton won the ninth and final seat on the City Council in the 1999 election, by a very small margin.  Lewis-Caulton Aff. ¶ 11.

196

844.    In general, special and unusual circumstances are necessary for minority candidates to win, such as when Carol Lewis-Caulton won in 1999.  Lewis-Caulton Aff. ¶ 13.

845.    In 1987 Candice Lopes ran for School Committee and won.  There were several unusual circumstances that year that contributed to her win.  First, there were two vacant seats on the School Committee that year because two incumbents had decided not to run, and therefore two out of three seats had to be filled by newcomers.  In addition, Lopes was the only woman running for School Committee that year.  There was one other sitting member of the School Committee who was a woman, and, according to Lopes, at the time it seemed important to voters to have at least two women members of the School Committee.  Finally, Lopes had a base of political supporters and people who helped with her campaign because she had been involved with Springfield politics for approximately a dozen years at that point.  Lopes Aff. ¶ 14.

846.    In 1991, Bob McCollum, who is African American, won the third and final seat on the School Committee.  Special circumstances contributed to his election.  In 1991, McCollum was an incumbent, having been selected by joint convention of the City Council and School Committee.  He did not win his initial bid for the seat in 1989.  In addition, many people who did not know or had not met McCollum thought that he was white because of his name, and because he lived in Ward 7 in an area that is not predominantly African American.  Lopes personally observed people's surprise when they learned that he was African American, because they had assumed he was white.  *Id*. ¶ 17.

847.    Morris Jones had success as an African-American City Councilor because Springfield voters are willing to vote for one African-American.  Still, Jones lost his bid for reelection in 1993.  That was the year that the City rejected the Quinn Bill, which would have increased pay for police officers on the basis of their education levels.  Jones voted against the

LIBA/1760998.1

Quinn Bill, and it failed. That night, after the City Council meeting, an all-points bulletin was broadcast to the entire police force, telling officers to look out for Jones' car. Jones' car was vandalized that night. That incident was the turning point in Jones' political career, because the police are very powerful in Springfield politics. Jones was not able to run successfully again. Lewis-Caulton Aff. ¶¶ 21-22.

848.    Maria Idalí Torres worked on Carmen Rosa's 1993 School Committee campaign. Torres Aff. ¶ 6. She believes that Rosa's campaign was exceptional for several reasons.

> a.    First, Rosa was able to quit her job and campaign full time for a year and a half before the election. This time was very important to her success. Because minorities in Springfield as a group are more likely to be economically disadvantaged than whites, it would be difficult for most prospective minority candidates to devote so much time to campaigning. Time off is absolutely crucial, however, because unless white voters personally meet a minority candidate, they are unlikely to vote for a minority candidate over a white candidate. This is especially the case for minority candidates who are not incumbents, because a white voter is more likely to choose an unknown white candidate over an unknown minority candidate. Torres Aff. ¶ 29.

> b.    Second, there was confusion about Rosa's ethnicity. Many voters believed that Rosa was Italian rather than Latino. Torres knows this because she was with Rosa when voters asked her whether she was Italian. *Id*. ¶ 30.

## CONCLUSION

849.    Plaintiffs' evidence establishes the three *Gingles* preconditions.

850.    Plaintiffs' proposed district plans, as validated and verified by Dr. Harmon, demonstrate that it is possible to draw reasonably compact majority-minority districts that would increase electoral opportunities for Latino and African American candidates for City Council and School Committee.

a. For City Council, the proposed plan contains two majority Latino district, one majority African American district, and one majority Latino/African American district, with African Americans comprising 38% of the VAP.

b. For School Committee, the proposed plans contain one majority Latino district and one majority African American district.

851. For the eight elections analyzed by Dr. Engstrom, his analysis consistently demonstrates that Latinos prefer Latino candidates, African Americans prefer African American candidates, and whites prefer white candidates. This establishes minority cohesion and white bloc voting. Furthermore, the analysis shows that white bloc voting regularly defeats Latino and African American candidates of choice.

852. This proves the three *Gingles* preconditions and gives rise to a strong inference that racial bias is operating through the medium of Springfield's at-large electoral structure to impair minority opportunities. *See Uno*, 72 F.3d at 983.

853. Plaintiffs' proof of the *Gingles* preconditions creates a strong inference that considerations of race/ethnicity contribute substantially to the defeat by white bloc voting of Latino and African American candidates of choice. Plaintiffs also have proven, among other things, official discrimination concerning voting; racially polarized voting; the large geographic size of the City of Springfield; deep racial and ethnic disparities that were caused by discrimination; and a serious lack of city government responsiveness to the particularized needs of Latinos and African Americans—all of which hinder Latino and African American participation in the political process, including by suppressing turnout. The totality of plaintiffs' proof demonstrates that race and ethnicity caused Latinos and African Americans to be unable to elect their candidates of choice in Springfield's at-large system.

LIBA/1760998.1

854.    Defendants have not offered significantly probative evidence, possessing convictive force, that whites voted as a bloc for reasons wholly unrelated to race.  *See Uno*, 72 F.3d at 981, 983.  Therefore, the inference from the *Gingles* preconditions remains in full force. *Id*. at 983.

855.    The combination of that inference and the totality of the circumstances establishes that racial politics in Springfield resulted in significantly diminished opportunities for Latinos and African American participation in elective government

856.    The testimony of Dr. Amy and of lay witnesses demonstrates that race contributed substantially to repressing minority participation in Springfield's electoral system.  In particular, past and present discrimination, City government's lack of responsiveness, and the adverse effect of the at-large system itself have resulted in lower minority turnout and political participation.

857.    Latinos and African Americans are underrepresented on the City Council and School Committee given their presence in the voting age population.

858.    In sum, plaintiffs have proven that there has been a lack of equal electoral opportunity for Latinos and African Americans in Springfield, on account of their race, in violation of Section 2 of the Voting Rights Act.

LIBA/1760998.1

Respectfully submitted,

ARISE FOR SOCIAL JUSTICE; ¿OISTE?; NEW
ENGLAND STATE-AREA CONFERENCE OF
THE NAACP; REV. TALBERT W. SWAN, II;
NORMAN W. OLIVER; DARLENE ANDERSON;
GUMERSINDO GOMEZ; FRANK BUNTIN;
RAFAEL RODRIQUEZ; and DIANA NURSE

By their attorneys,


    /s/ Paul E. Nemser
Paul E. Nemser (BBO #369180)
Monica M. Franceschini (BBO #651208)
Anna-Marie L. Tabor (BBO #662364)
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109
(617) 570-1000



    /s/ Nadine Cohen
Nadine Cohen (BBO #090040)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW OF THE BOSTON BAR
ASSOCIATION
294 Washington Street, Suite 443
Boston, MA 02108
Dated:  February 27, 2007          (617) 988-0609

201

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 27, 2007.

_____/s/ Paul E. Nemser_____

LIBA/1760998.1