**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ARISE FOR SOCIAL JUSTICE;<br>¿OISTE?; NEW ENGLAND STATE-AREA<br>CONFERENCE OF THE NAACP;<br>REV. TALBERT W. SWAN, II;<br>NORMAN W. OLIVER; DARLENE<br>ANDERSON; GUMERSINDO GOMEZ;<br>FRANK BUNTIN; RAFAEL RODRIQUEZ;<br>and DIANA NURSE<br>　　　　　　　　　　Plaintiffs,<br>v.<br><br>CITY OF SPRINGFIELD and SPRINGFIELD<br>ELECTION COMMISSION<br>　　　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 05-30080-MAP |

**OPPOSITION TO MOTION TO COMPEL PRODUCTION OF DOCUMENTS**
**AND INTERVIEW WITNESSES AND**
**CROSS MOTION FOR PROTECTIVE ORDER**

Now come the Defendants in the above-captioned case, and OPPOSE the "Emergency" Motion to Compel Production of Documents and Interview Witnesses and respectfully request that this Court DENY the plaintiffs' motion and issue a protective order for the Defendants from the production and provision of testimony.

As grounds therefore, Defendants state that the request is disingenuous and untimely, seeks irrelevant information, and would constitute an unreasonable interference with the operation of the City's government. As such, the information request is overly broad, or compliance with such a request would be unduly burdensome.

In support, Defendants state as follows:

I.　　Disingenuous and Untimely Motion

The incidents discussed in the Coakley-Rivera Affidavit date back as far as approximately three years ago, yet the allegations did not come to light in this case until

the news report on February 2, 2007 which publicized that the Plaintiffs would be filing an Affidavit with the court claiming racially insensitive remarks were made by a Mayoral staff member, Michelle Webber, and such an affidavit was filed immediately after the exclusive TV news report. Defendants complained to this court that the adverse publicity created by the timing and nature of the information released to the press had a substantial likelihood of materially prejudicing the adjudication of this matter. Now, as indicated by the circumstances discussed below, the Plaintiffs file this motion as an attempt to benefit from their unfair trial tactics.

Specifically, the parties appeared before the court for a pretrial conference on January 26, 2007. At that time, no issue was raised by the Plaintiffs as to the need for discovery as to any type of complaint concerning Michelle Webber. The Plaintiffs admit in their motion that they have been aware of the allegations contained in the Affidavit of Cheryl Coakley-Rivera since "approximately the end of January." (See page 7 of Plaintiff's Motion).

A joint pre-trial memorandum was filed in this case on January 8, 2007. Plaintiffs' witness list asserted that Cheryl-Coakly Rivera would testify to:

> Her observations and experiences as a State Representative, candidate for political office, voter, participant in the political process, person of color, and community leader in Springfield; her observations and experiences regarding discrimination against African Americans and Latinos in Springfield. (Ex. A to Pretrial Memo)

When Defendants complained about the unprofessional manner in which Plaintiffs' lawyers allowed the dissemination of the Coakly-Rivera Affidavit prior to its filing with the court, (as noted in Defendants' Opposition to Plaintiffs Motion to establish an deadline for filing Affidavits), Plaintiffs submitted to the court a copy of an email

dated February 5, 2007 referring to the pre-trial memorandum and claiming that "we made a disclosure of the subject matter of her testimony sufficient to cover the contents of her affidavit. Defendants did not object to the disclosure- for example, by requesting additional specificity" (See Ex. E to Plaintiffs Motion for Leave to Respond to Allegations of Misconduct.)

The disingenuous nature of the instant motion is indicated by the inconsistency in the statements and the fact that, while the Attorneys from Goodwin Proctor previously claimed in the email of February 5, 2007 that the Defendants should not have been surprised by the contents of the Affidavit, they now assert that they have an "Emergency" need to obtain further information on these same allegations. It is particularly inconsistent with the contents of the email suggesting that if Defendants wanted to know more they should have "request[ed] more specificity", implying they kniew more details at the time of filing the pre-trail memorandum, which contradicts their vague statement that they knew about the allegations since "approximately the end of January."

As previously indicated to this Court by the Defendants, the allegations contained in the Coakley-Rivera Affidavit appeared calculated to poison the well of witnesses against the Defendants and interfere with Defense Counsel's ability to prepare for trial while diverting resources to the due diligence required to investigate the allegations. Such tactics are prohibited by the Rules of Professional Conduct. While Plaintiffs' Attorneys, in a motion for leave to respond to Defendants' opposition, denied misconduct on the grounds that Cheryl Coakley-Rivera, rather than an attorney with an appearance in the case, was responsible for the leak of the Affidavit to the press prior to its filing as a public record. Such blame on the witness does not necessarily clear the Plaintiffs'

attorneys from misconduct. See Mass. R. Prof. C. 8.4(a) ("It is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another"). Under the circumstances, the Plaintiffs should not be allowed to take unfair advantage of their misconduct by claiming that it has created an "emergency" of their own making.

## II.    Information Sought is Irrelevant

Fed.R.Civ.P. 26(b) provides that only relevant matters may be the subject of discovery: "where the relevance of information sought in discovery proceedings is questionable and the request is overly broad, or compliance with such a request would be unduly burdensome, discovery of the requested information will be denied." *Moore's Federal Practice,* Vol. 4, p. 26-431. Under a fair reading of the Plaintiffs' memoranda, and based on the case law relied on by Plaintiffs, the information sought possesses little or no relevance. Accordingly, the Court should find that a refusal to provide the information is proper and a protective order should issue.

Plaintiffs contend in their motion to compel production that the documents and testimony they are seeking is evidence relevant to the "totality of the circumstances." Specifically, Plaintiffs allege that the City government's "reaction" to complaints regarding Ms. Webber illustrates "a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." Citing *Goosby v. Town of Hempstead*, 956 F. Supp. 326, 346 (E.D.N.Y. 1997); *Cottier v. City of Martin*, 2006 U.S. Dist. LEXIS 88214 at 51 (D.D.D, December 5, 2006); *Bone Shirt v. Hazeltine*, 336 F.Supp. 2d 976, 1043 (D.S.D 2004). A review of each case shows the Plaintiffs are misapplying those cases to the facts at hand.

The facts in *Goosby* are not on point. In that case plaintiffs contended the at-large system for electing Town Board members violated Section 2. With regard to the Senate factor of "unresponsiveness" the Court found "that the Town Board has been unresponsive to various needs of the black communities in the Town." *Goosby* at 343. As such, evidence was introduced as to the lack of responsiveness of members of the Town Board in certain particularized situations. The difference here is that unlike *Goosby*, where the evidence concerned the lack of responsiveness of members of the Town Board which was the subject of the litigation, Webber has no causal relationship to the City Council or School Committee as an elected or appointed official, the bodies at issue here.

Similarly, in the *Cottier* case, the issue of responsiveness focused on the elected members of the at-large City Council and their responsiveness, rather than any other elected official. The Plaintiffs cite to the case as support that the Sheriff's unresponsiveness to perceived discrimination which he was aware of was at issue, when in fact the court in *Cottier* found that the unresponsiveness was based in the City Council's unresponsiveness. The court noted that:

> [T]he Martin City Council could terminate the law enforcement contract, thereby diminishing the sheriff's department's budget. The court finds that this empowered the City Council to exert pressure on Sheriff Waterbury. Indeed, the City Council utilized this power later when it disagreed with the actions of Sheriff Cummings. . . ... There is no evidence, however, that the City Council used this power to influence Waterbury as a result of Indian complaints. *Cottier* --- F.Supp.2d ----, 2006 WL 3499804 (D.S.D. December 05, 2006) at 18.

Similarly, with regard to the *Bone Shirt* case, again, the evidence focused on the responsiveness of the Legislative body. The evidence which was considered involved that

the history of bills before the Legislature that indicated the Legislature was largely unresponsive to the needs of Native Americans. *Bone Shirt* at 1042-1046.

The foregoing cases show that the relevant inquiry involves the "unresponsiveness" of the body at issue, and not the responsiveness of the an unrelated actor, such as a Mayoral staffer. As noted in the previous discussion of the Plaintiffs' case law, a reasonable interpretation of *Thornburg v. Gingles*, 478 U.S. at 45, elicits that a Voting Rights Act inquiry does not relate to any elected officials other than those whose method of election has been challenged. See discussion *supra* citing *Goosby v. Town of Hempstead*, 956 F. Supp. 326, 346 (E.D.N.Y. 1997); *Cottier v. City of Martin*, 2006 U.S. Dist. LEXIS 88214 at 51 (D.D.D, December 5, 2006); *Bone Shirt v. Hazeltine*, 336 F.Supp. 2d 976, 1043 (D.S.D 2004).

Ms. Webber, as Chief of Staff, acts as the Mayor's office manager; the Mayor appointed her, she reports to the Mayor and only the Mayor can discipline her. She does not report to any other individual, department, committee, agency – and certainly not to the City Council or the School Committee. Plaintiffs' claim that the Mayor's position as Chairman of the School Committee is sufficient nexus is without merit. Unlike the cases relied on by Plaintiffs as precedent, there are no votes by the School Committee as a body which Plaintiffs rely upon as evidence of unresponsiveness.  No evidence shows that Webber played any role in blocking, or even influencing any School Committee action. Furthermore, the outcome of this case will not affect the method of election of the Mayor, and will not change the role of the Mayor on the School Committee.

It is well established that "legislative reapportionment is primarily a matter for legislative consideration and determination" rather than the court.  *Reynolds v. Sims*, 377

U.S. 533, 586 (1964).   Where a Court is forced to undertake reapportionment, where the legislative body has failed its responsibility and duty, Courts have been cautioned to proceed "circumspectly," *Connor v. Finch*, 421 U.S. 407, 414-415 (1977), and in a manner that is "free from any taint of arbitrariness or discrimination." *Roman v. Sincock*, 377 U.S. 695, 710 (1965).   Accordingly, the Voting Rights Act reaches its limits where the proposed districting plan and method of election is not of the governing body's creation and not the result of its balancing of local and political considerations with statutory and constitutional requirements.

The Affidavits and Exhibits submitted to the court by the Defendants show responsiveness to particularized needs of the minority community. With regard to the Webber circumstances, as indicated by prior pleadings as well as in the Affidavit of the City's Equal Opportunity Administrator, Dan Hall, the City has procedures in place which were responsive. Moreover, the Hall Affidavit reveals that the facts in this case with regard to Webber have no causal relationship to the City Council or School Committee.

As noted in previous pleadings (Defendants' Opposition to Motion to Set Deadline) the allegations that the Mayor's Chief of Staff, Michelle Webber, made racially insensitive remarks came to light on Friday evening February 2, 2007.  This came as a result of news reports of an affidavit that was later filed by State Representative Cheryl Coakley-Rivera in a federal lawsuit alleging that the City's method of electing City Councilors and School Committee persons was improper. *Arise for Social Justice v. City of Springfield*. The Mayor requested on February 6, 2007, that City Solicitor Edward Pikula conduct an internal investigation for purposes of potential discipline.

As noted by the Dan Hall Affidavit, Hall's duties as the City's Equal Opportunity Administrator include monitoring the City's employment practices, and handling internal complaints dealing with discrimination and harassment. In addition, Hall assists with the recruitment of people in protected categories to help the City reach its goals of diversity in the workplace. (Ex. A - Hall Aff. ¶ 1)

The City of Springfield Affirmative Action Plan sets forth its policy of equal opportunity in employment, to all qualified persons regardless of race, color, age, sex national origin, disability, or membership in any lawful organization and to maintain a non-hostile working environment free from all forms of unlawful discrimination or intimidation.  Under the sexual harassment policy, harassment in any form is unlawful and will not be tolerated by the City. Any employee who violates this policy is subject to disciplinary action up to and including discharge. (Ex. A - Hall Aff. ¶ 2).

With regard to the allegations concerning Michelle Webber, while no formal complaint has been filed by any employee concerning Ms. Webber statements pursuant to the City's Affirmative Action Plan and policies contained therein, the City's duty to promptly investigate the allegations in a fair and expeditious manner was triggered by the public disclosure made by State Representative Cheryl Coakley-Rivera. (Ex. A - Hall Aff. ¶ 3).

Under the City's Affirmative Action Plan, an investigation was conducted into the allegations in such a way as to maintain confidentiality to the extent practicable and required by the policy.  The investigation included private interviews, the details of which are not subject to public dissemination under law, due to their nature as personnel information. This privacy and confidentiality helps foster an atmosphere where

employees are willing to come forward, and it should be noted that the employees interviewed cooperated fully. (Ex. A - Hall Aff. ¶ 5).

Before the investigation was complete, Webber resigned her position in a letter to the Mayor dated February 21, 2007 which she authorized the Mayor to release publicly. (Copy attached as Exhibit B)  The investigation was closed February 22, 2007 without a final determination being reached. (Ex. A - Hall Aff. ¶ 6).

Subsequent to the investigation, the Mayor requested that City Solicitor Pikula and Hall meet with Personnel Director Marilyn Montagna and her staff to develop and implement a program of annual diversity training. A meeting has occurred and the process has been initiated. The training will provide every employee with information on cultural sensitivity and highlight the value of differences in the workplace. Continued emphasis will be placed on the internal and external processes available to employees who feel they have been discriminated against as well as the obligations of Supervisors to report complaints, and the resolution of issues in a confidential, prompt and fair manner to alleviate any concerns that an employee has about potential retaliation. (Ex. A - Hall Aff. ¶ 7).

Under the Rules of Civil Procedure applicable to discovery, the Court may deny a motion to compel further deposition when the Court deems further questions will be irrelevant. *Commercial Union Ins. Co. v. Westrope*, 730 F.2d 729, 732 (11th Cir. 1984). While the City contends that the information in the form of documents and testimony is not relevant for purposes of this case, even if there is some minimal discovery standard which requires the provision of information, the Affidavit of Dan Hall and pleadings filed

in this case contain all of the information with regard to the City's "reaction" to the allegations. Further inquiry is not likely to lead to the discovery of admissible evidence.

As noted in cases where a long history of discrimination is prevalent (for example Native American cases) such evidence has been held to be "far from dispositive." *Bone Shirt* at 1029. Moreover, courts have not been persuaded by particular witnesses anecdotes about perceived slights at the polls. *Id.* Those cases in which historical discrimination was deemed relevant, purposeful efforts were made to deny Native Americans the right to vote. *Id.*

As noted in *Burton v. City of Belle Glade,* 178 F. 3d 1175, 1198 (11th Cir. 1999), evidence of housing discrimination which had segregated the African-American Community was insufficient to establish a Voting Rights Act violation because it did not present "evidence of any discrimination with respect to *voting*."

In *Solomon v. Liberty County*, 957 F. Supp. 1522, 1559 (N.D. Fla. 1997) the court acknowledged a long track record of discrimination including significant socioeconomic disparities, the effects of which remain in the present. Moreover, the Court noted "lingering prejudice on the parts of whites even in their official capacity . . . did not touch the issues involved in a determination of whether the Voting Rights Act is being violated. The *Solomon* court noted:

> Notwithstanding the remaining vestiges of official discrimination in Liberty County, there is no evidence that the ability of Blacks to participate in the political process has been hindered by that discrimination.
> *Id.*

Based on the applicable case law noted above, the lack of any causal connection here between the allegations concerning Michelle Webber and the method of electing

School Committee and City Council candidates points out the irrelevance of such matters, and warrants denial of the Plaintiffs' motion and entry of a protective order.

III.     Unreasonable Interference

The Plaintiffs' attorneys have moved to compel production of documents regarding complaints that various individuals have made to the City and requested permission to interview several current employees of the City. (Motion p. 1). As to any such documents that exist, if at all, they were made with regard to an investigative report made for the purpose of potential discipline of an employee.

Federal courts have determined that disciplinary reports are a component of an employee's personnel records, and should be so regarded in judging whether they are subject to disclosure. See, e.g., *Federal Labor Relations Auth. v. United States Dep't of the Navy,* 966 F.2d 747, 761 (3d Cir.1992) (disciplinary records considered part of personnel records); *Schonberger v. National Transp. Safety Bd.,* 508 F.Supp. 941, 943 (D.C.1981) (information concerning disciplinary action considered part of individual's personnel file); *Associated Dry Goods Corp. v. NLRB,* 455 F.Supp. 802, 815 (S.D.N.Y.1978) (employment applications, educational attainments, disciplinary records, work evaluations, and similar material characterized as "essence" of personnel file).

State courts have also concluded that disciplinary reports are part of an individual's personnel information. See, e.g., *Oregonian Publ. Co. v. Portland Sch. Dist. No. 1J, supra* at 401, 987 P.2d 480 ( "'personnel files' would usually include information about a teacher's education and qualifications for employment, job performance, evaluations, disciplinary matters or other information useful in making employment decisions regarding an employee" ); *Pivero v. Largy,* 143 N.H. 187, 189-190, 722 A.2d

11

461 (1998) ( " 'Personnel file' means any and all personnel records created and maintained by an employer and pertaining to an employee including and not limited to employment applications, internal evaluations, disciplinary documentations, payroll records, injury reports and performance assessments, whether maintained in one or more locations ..." ); *Swinton v. Safir,* 93 N.Y.2d 758, 762, 697 N.Y.S.2d 869, 720 N.E.2d 89 (N.Y.1999) (record of disciplinary charges and their resolution by dismissal considered part of personnel file). To our knowledge no appellate court has reached a contrary conclusion.

In *Wakefield Teachers Ass'n v. School Committee of Wakefield***,** 431 Mass. 792, 731 N.E.2d 63 (2000) the SJC held that a disciplinary report was "personnel information" and was therefore absolutely exempt from disclosure under the public records statute. As such, any reports prepared in relation to the investigation must be exempt from disclosure as a public record.  As noted in the *Wakefield* case, disclosure could interfere with the operation of government:

> The Legislature clearly balanced competing public policy considerations that we shall not second-guess. The exemption from disclosure of personnel files and information has, among other benefits, the protection of the government's ability to function effectively as an employer. As the judge perceptively noted: "It would not be unreasonable to conclude that disclosure of this sensitive and careful investigation and analysis would make the same kind of investigation and analysis difficult, if not impossible, in the future. An assurance of confidentiality to those who voluntarily participate in such investigations likely produces candor." Indeed, in this case, the superintendent noted that the teacher "cooperated fully" with the investigation. Were the teacher concerned that his cooperation would result in public disclosure, we question whether his cooperation would have been as forthcoming. *Id.*

12

In the present case, as noted in the Affidavit of Hall, investigations of this nature are necessarily confidential, and the process resulted in full cooperation of employees. As indicated in the *Wakefield* case future investigations in Springfield could be jeopardized if this confidentiality is breached.

In addition, the applicable statutory exemption prohibits disclosure of "intimate details of a highly personal nature" and the types of information disclosed in an investigation of this nature would fall into this category exempted by G.L. c. 4, § 7, Twenty-sixth (c) as "materials or data relating to a specifically named individual, the disclosure of which may constitute an unwarranted invasion of personal privacy." See *Connolly v. Bromery, supra* at 663-664, 447 N.E.2d 1265 (evaluations of instructors by students should be considered part of teacher's "personnel [file] or information" and are exempt from disclosure).

Moreover, *ex parte* interviews of the persons involved may constitute professional misconduct. "In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." Mass.R.Prof.C. 4.2, 426 Mass. 1402 (1998), and its predecessor, S.J.C. Rule 3:07, Canon 7, DR 7-104(A)(1), as appearing in 382 Mass. 786 (1981). (rule prohibits attorneys from communicating with a represented party in the absence of that party's attorney). Rule 9.1(h) of the Massachusetts Rules of Professional Conduct, 426 Mass. 1432 (1998), defines "[p]erson" to include "a corporation, an association, a trust, a partnership, and any other organization or legal entity."

In *Messing, Rudavsky & Weliky, P.C. v. President & Fellows of Harvard College*, 436 Mass. 347, 764 N.E.2d 825 (2002) the SJC considered an appeal from a finding of attorney misconduct with regard to the extent to which the no-contact rule permits *ex parte* communications between an opposing attorney and the current employees of an organization represented by counsel. The SJC held that the rule bans contact only with those employees who have the authority to "commit the organization to a position regarding the subject matter of representation." See *Johnson v. Cadillac Plastic Group, Inc.,* 930 F.Supp. 1437, 1442 (D.Colo.1996); Restatement (Third) of Law Governing Lawyers, *supra* at § 100 comment (e). See also Ethics 2000 Commission Draft for Public Comment Model Rule 4.2 Reporter's Explanation of Changes (Feb. 21, 2000) (recommending deletion of the third category of the comment). The employees with whom contact is prohibited are those with "speaking authority" for the corporation who "have managing authority sufficient to give them the right to speak for, and bind, the corporation." *Wright v. Group Health Hosp.*, supra at 201, 691 P.2d 564.

The SJC in *Messing* stated that "[t]he interests of the organization are adequately protected by preventing contact with those employees empowered to make litigation decisions, and those employees whose actions or omissions are at issue in the case." *Messing* at 834.

In the present case, the Plaintiffs have requested permission to interview identified current employees who they believe have lodged complaints regarding racially insensitive remarks made by Ms. Webber or "other members of City Government." (Plainitiffs' motion at p. 6). In the alternative, the Plaintiffs have requested permission to depose these individuals. The purported purpose of the interviews and/or depositions is to

determine whether "Plaintiffs should subpoena certain individuals to testify at trial." (Plaintiffs' motion at p. 7).

It is unclear whether any of the employees would fall under the categories of witnesses exempted by *Messing*, but even if Plaintiffs are allowed to interview or depose the individuals listed, the notion that they should be subpoenaed to discuss any complaints with regard to Ms. Webber would not justify the interview.

A reasonable interpretation of *Thornburg v. Gingles*, 478 U.S. at 45, allows for an inquiry under the Voting Rights Act that does not relate to any elected officials other than those whose method of election has been challenged. See discussion *supra* citing *Goosby v. Town of Hempstead*, 956 F. Supp. 326, 346 (E.D.N.Y. 1997); *Cottier v. City of Martin*, 2006 U.S. Dist. LEXIS 88214 at 51 (D.D.D, December 5, 2006); *Bone Shirt v. Hazeltine*, 336 F.Supp. 2d 976, 1043 (D.S.D 2004). See also *Burton v. City of Belle Glade,* 178 F. 3d 1175, 1198 (11th Cir. 1999)(evidence unrelated to voting insufficient to establish violation of VRA); *Solomon v. Liberty County*, 957 F. Supp. 1522, 1559 (N.D. Fla. 1997) (evidence unrelated to voting insufficient to establish violation of VRA).

A determination of non-responsiveness is intended to provide supportive evidence that the method by which a governing body is elected has not resulted in the election of candidates of choices of minority voters, or candidates who are committed to addressing the needs of a minority community.  Congress never intended by the 1982 Amendments to the Voting Rights Act, to authorize a free-wheeling inquiry into the degree to which every elected official in a jurisdiction is responsive to the needs of members of the minority community in an effort to show that the method by which a handful of officials are elected is dilutive.  If this was the standard, trials would devolve into an inquiry of

every insensitive remark make by any appointee. As such, this would render the scope of admissible proof a "Serbonian bog" and a dimension unimagined by Judge Selya.  See *Vecinos De Barrio Uno v. City of Holyoke*, 72 F.3d  at 977.   Simple legal precepts require a causal link; the Voting Rights Act requires no less.

The Plaintiffs are attempting to devolve this case, which is a legitimate inquiry into the method by which members of the City Council and the School Committee are elected, into a means and a forum for issues wholly unrelated to the issues raised in this challenge, at the expense of the citizens of the City. The evidence in this case should remained focused on the facts of legal consequence in this matter, and not racially divisive statements unrelated to the election of City Councilors and School Committee persons and unrelated to the responsiveness of those bodies.

WHEREFORE, based upon the above, as supported by the Affidavit of this opposition and cross motion, with Exhibits, the Motion should be denied, and Defendants should be granted a protective order with regard to the documents and interviews sought.

Dated:  February 28, 2007

Respectfully submitted.

S/S

_____
Edward M. Pikula, BBO #399770
City Solicitor
CITY OF SPRINGFIELD LAW DEPATMENT
36 Court Street
Springfield, Massachusetts 01103
Telephone:        (413) 787-6085
Telefax:           (413) 787-6173

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Appearance has been served on the following counsel of record on the 28th day of February 2007, by electronic filing

S/S

_____
Edward M. Pikula, Esq.

16

**OPPOSITION TO MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND
INTERVIEW WITNESSES AND
CROSS MOTION FOR PROTECTIVE ORDER**

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARISE FOR SOCIAL JUSTICE;<br>¿OISTE?; NEW ENGLAND STATE-AREA<br>CONFERENCE OF THE NAACP;<br>REV. TALBERT W. SWAN, II;<br>NORMAN W. OLIVER; DARLENE<br>ANDERSON; GUMERSINDO GOMEZ;<br>FRANK BUNTIN; RAFAEL RODRIQUEZ;<br>and DIANA NURSE<br>　　　　　　　Plaintiffs,<br>v.<br><br>CITY OF SPRINGFIELD and SPRINGFIELD<br>ELECTION COMMISSION<br>　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)　Civil Action No. 05-30080-MAP<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF DANNY M.C. HALL

I Danny M.C. Hall, on oath do say:

1.    I am the Equal Opportunity Administrator for the City of Springfield, responsible for the implementation of the City's Affirmative Action Employment Plan. I have held this position for 19 years. Within the scope of my duties I monitor the employment practices, and handle internal complaints dealing with discrimination and harassment. In addition, I assist with the recruitment of people in protected categories to help the City reach its goals of diversity in the workplace.

2.    The City of Springfield Affirmative Action Plan sets forth its policy of equal opportunity in employment, to all qualified persons regardless of race, color, age, sex national origin, disability, or membership in any lawful organization and to maintain a non-hostile working environment free from all forms of unlawful discrimination or intimidation.  Under the sexual harassment policy, harassment in any form is unlawful

and will not be tolerated by the City. Any employee who violates this policy is subject to disciplinary action up to and including discharge.

4. With regard to the allegations concerning Michelle Webber, while no formal complaint has been filed by any employee, concerning Ms. Webber statements, pursuant to the City's Affirmative Action Plan and policies contained therein, the City's duty to promptly investigate the allegations in a fair and expeditious manner was triggered by the public disclosure made by State Representative Cheryl Coakley-Rivera.

5. Under the City's Affirmative Action Plan, an investigation was conducted into the allegations in such a way as to maintain confidentiality to the extent practicable as required by the policy. The investigation included private interviews, the details of which are not subject to public dissemination under law, due to their nature as personnel information. This privacy and confidentiality helps foster an atmosphere where employees are willing to come forward, and it should be noted that the employees interviewed cooperated fully.

6. Before the investigation was complete, Webber subsequently resigned her position in a letter to the Mayor dated February 21, 2007 which she authorized the Mayor to release publicly. (Copy attached as Exhibit B) The investigation was closed February 22, 2007 without final determinations being reached.

7. Subsequent to the investigation, the Mayor requested that City Solicitor Pikula and myself meet with Personnel Director Marilyn Montagna and her staff to develop and implement a program of annual diversity training. A meeting has occurred and the process has been initiated. The training will provide every employee with information on cultural sensitivity and highlight the value of differences in the

workplace. Continued emphasis will be placed on the internal and external processes available to employees who feel they have been discriminated against as well as the obligations of Supervisors to report complaints, and the resolution of issues in a confidential and prompt and fair manner, to alleviate any concerns that an employee has about potential retaliation.

Signed under penalty of perjury this 27th day February 2007.

Danny M.C. Hall

**OPPOSITION TO MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND
INTERVIEW WITNESSES AND
CROSS MOTION FOR PROTECTIVE ORDER**

# EXHIBIT B

**MICHELE R. WEBBER**
121 Davis Street
Springfield, MA  01104


February 21, 2007


Mayor Charles V. Ryan
City of Springfield
36 Court Street
Springfield, MA  01103

Dear Mayor Ryan:

It is with a heavy heart that I write to advise you of my decision to resign as your chief of staff.  As you know, over the course of the last few weeks, I have been accused of making racially insensitive remarks.  These allegations have been particularly hurtful to me and my family.  I have always endeavored to treat all people, regardless of their background and regardless of our personal or political differences, with respect.  I emphatically deny that I made racially insensitive remarks.  However, to the extent that anyone may have been offended by words that I have spoken or by actions that I have taken I apologize for that.  My only intention as a member of your administration has been to effectively serve the city.

It was with great pride that I served first as one of your aides and later as your chief of staff.  I have decided, however, that it would be best for my family, and perhaps for your administration as well, for me to return to my private life at this time.

Thank you for affording me the opportunity to serve the city I love.

Sincerely,

Michele R. Webber