UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARISE FOR SOCIAL JUSTICE; ¿OISTE?; NEW ENGLAND STATE-AREA CONFERENCE OF THE NAACP; REV. TALBERT W. SWAN, II; NORMAN W. OLIVER; DARLENE ANDERSON; GUMERSINDO GOMEZ; FRANK BUNTIN; RAFAEL RODRIGUEZ; and DIANA NURSE,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SPRINGFIELD and SPRINGFIELD ELECTION COMMISSION,<br><br>Defendants. | Civil Action No. 05-30080 MAP |

## TRIAL BRIEF

### THE *GINGLES* FACTORS

To prove their Section 2 claim, Plaintiffs must demonstrate that "as a result of the challenged practice or structure, [they] do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Thornburg v. Gingles*, 478 U.S. 30, 43 (1986) (*quoting* S. Rep. No. 97-417, 97th Cong.2d Sess. 28 (1982) (hereinafter "S. Rep."); *see also Uno v. City of Holyoke*, 72 F.3d 973, 980 (1st Cir. 1995) ("the critical question in a vote dilution case is whether minority voters have an equal opportunity to participate in the electoral process.").

To set forth a *prima facie* case of vote dilution under Section 2, Plaintiffs must satisfy the three *Gingles* preconditions: numerosity and compactness; minority political cohesion; and white bloc voting. *Id.*; *see also Uno*, 72 F.3d at 982.

To satisfy the numerosity and compactness precondition, Plaintiffs must demonstrate that African Americans as a group and Hispanics as a group each are sufficiently large and geographically compact to constitute a majority in single-member districts. *Gingles*, 478 U.S. at 50.

To satisfy the minority political cohesion precondition, Plaintiffs must demonstrate that (1) African American voters are politically cohesive, and (2) Hispanic voters are politically cohesive. *Gingles*, 478 U.S. at 49. "A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim." *Gingles*, 478 U.S. at 56.

To satisfy the white bloc voting precondition, Plaintiffs must show that white voters vote sufficiently as a bloc to enable them, in the absence of special circumstances, usually to defeat African American-preferred candidates and Hispanic-preferred candidates. *Gingles*, 478 U.S. at 51. "In establishing this last circumstance, the minority group demonstrates that submergence in a white multimember district impedes its ability to elect its chosen representatives." *Id.*

**PROOF OF NUMEROSITY AND COMPACTNESS**

The first *Gingles* precondition concerns whether it is possible to draw reasonably compact districts in which the minority population constitutes a "numerical" or "statistical" majority. *See, e.g., Meza v. Galvin*, 322 F. Supp. 2d 52, 63 (D. Mass. 2004) (speaking repeatedly of a "statistical" majority). In a vote dilution claim, the issue is "the compactness of the minority population, not . . . the compactness of the contested district." *Bush v. Vera,* 116 S.Ct. 1941, 1971 (Kennedy, J., concurring), quoted in

*League of United Latin American Citizens v. Perry,* 126 S.Ct. 2594, 2618 (2006). *See also id.*, quoting *Shaw II*, at 916, 116 S.Ct. 1894 (the inquiry under § 2 is whether "the minority group is geographically compact" (internal quotation marks omitted)). Defendants in *Arise* have never contended that the districts drawn in plaintiffs' plans for City Council and School Committee are not geographically compact.

To satisfy the numerosity and compactness prong, the minority group need not constitute a numerical majority in a proposed district, provided that the group is "sufficiently numerous to have a significant impact at the ballot box most of the time." *Uno*, 72. F.3d at 991; *see also Metts v. Murphy*, 363 F.3d 8, 11 (2004) (*en banc*) (observing that "several Supreme Court opinions after *Gingles* have offered the prospect, or at least clearly reserved the possibility, that *Gingles*' first precondition . . . could extend to a group that was a numerical minority but had predictable cross-over support from other groups."). Although the issue is open, *see, e.g., Meza v. Galvin*, 322 F. Supp. 2d 52, 63 n.14 (D. Mass. 2004), plaintiffs contend that the first *Gingles* factor would also be satisfied by an influence district. An influence district is one "where black [or Hispanic] voters would be able to exert a significant--if not decisive--force in the election process." *Georgia v. Ashcroft,* 539 U.S. 461, 470 (2003).

There is a distinction between the inquiry under the first *Gingles* precondition and the selection of the final remedy in the case:

> The ultimate viability and effectiveness of a remedy is considered at the remedial stage of litigation and not during analysis of the *Gingles* preconditions. At the initial stage, the plaintiff must only show that 'minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practices.' Although Martin argues the plans are not viable or stable, the ultimate end of the first *Gingles* precondition is to prove that a solution is

> possible, and not necessarily to present the final solution to the problem.

*Cottier v. City of Martin*, 445 F.3d 1113, 1117-18 (8th Cir. 2006) (internal citations omitted) (quoting *Gingles*, 478 U.S. at 50 n.17).  The *Cottier* court went on to describe the nature of the relevant equal protection inquiry:

> The equal protection clause is violated if race is the predominant factor motivating the placement of a significant number of voters within or without a particular district.  *Stabler*, 129 F.3d at 1025 (stating that bizarrely shaped districts "considered in combination with racial and population densities of the proposed districts, support [a] finding that race was the predominant factor in drawing proposed districts to create a majority-minority single-member district").  As the district court noted, examples of bizarrely shaped districts that should raise concern include those that look like "a sacred Mayan bird, with its body running eastward ... [s]pindly legs reach south ... while the plumed head rises northward ... an open beak appears to be searching for worms." (Appellants' Add. at 19 (quoting *Bush v. Vera*, 517 U.S. 952, 974 (1996) additional citations omitted)).)

*Id*. at 1117-18.  In *Cottier*, the proposed plans were adequate in that they followed census blocks, followed marked streets, exhibited more than point contiguity, created wards of equal population, and recognized traditional neighborhoods.  *Id* at 1118.

### **PROOF OF RACIALLY POLARIZED VOTING**

#### **Older Elections Are Less Probative**

"Though past elections may be probative of racially polarized voting, they become less so as environmental change occurs.  In particular, elections that provide insights into past history are less probative than those that mirror the current political reality."  *Uno*, 72 F.3d at 990.

**Low Turnout May Be Probative Of Vote Dilution**

The relevance of low turnout to a Section 2 claim depends on the specific facts and circumstances of the case. *Uno*, 72 F.3d at 987. Low turnout may be probative of vote dilution when it results from the interaction of the electoral system and the effects of past discrimination. *Id.* at 986-87. Plaintiffs "need not show that the sole cause of low numbers is the interaction between racial divisions in the community and identifiable elements of the electoral system. It is sufficient . . . that considerations implicating race contributed substantially to repressing minority participation." *Id.* at 987.

Indeed, there is case law holding that, once plaintiffs show racial discrimination or disparities, plaintiffs do not have the burden to show that racial discrimination or disparities caused, in whole or in part, depressed levels of minority political participation. *Cottier v. City of Martin,* 2006 U.S. Dist. LEXIS 88214, at 36 (D.S.D. Dec. 5, 2006) (citing *United States v. Marengo County Comm'n*, 731 F.2d 1546, 1569 (11th Cir. 1984)). The burden is on defendants to show the cause is something else. *Id.*

The tie between socioeconomic disparities and electoral participation is well-recognized. *See, e.g., Jamison v. Tupelo, Mississippi,* 2007 U.S. Dist. LEXIS 4872, at 21-23 (N.D. Miss. Jan. 23, 2007) ("[P]eople with lower income levels often are unable to contribute financially to the campaign of a candidate. The candidate of choice of communities with lower income levels may have abundant moral support from that community, but members of the community may not have the resources to financially support the candidate in a manner reflective of that support. Voter turnout is also affected by socioeconomic status. On election day, those without vehicles will have much greater difficulty getting to the polls. . ., if they are able to reach the polls at all.")

**Existence Of Some White Crossover Voting And Some Success By Minority Candidates Is Not Decisive.**

The existence of some white cross-over voting will not defeat a Section 2 claim. Rather, "a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting.'" *Gingles*, 478 U.S. at 50.

It is not necessary for Plaintiffs to demonstrate that Latino or African American candidates are defeated in every instance. *Gingles*, 478 U.S. at 74-76. Plaintiffs need demonstrate only that the minority-preferred candidates are *usually* defeated. *Id.* at 51.

"[I]n a district where elections are shown usually to be polarized, the fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting." *Gingles*, 478 U.S. at 57.

In considering evidence that minority candidates have been elected, the Court also may take account of the circumstances surrounding minority candidates' success in those instances. *Gingles*, 478 U.S. at 51, 75-76. Such evidence can include whether the candidates benefited from incumbency; the number of other candidates running against the minority candidates; the presence of bullet voting; the "order of preference" assigned by minority and majority-group voters to minority candidates; and whether minority candidates' successes may have been spurred on by the commencement of litigation under the Voting Rights Act. *Gingles*, 478 U.S. at 54, 74-76.

**INFERENCE FROM *GINGLES* FACTORS AND CAUSATION**

The three *Gingles* factors, if proven, "give rise to an inference that racial bias is operating through the medium of the targeted electoral structure to impair minority

political opportunities." *Uno*, 72 F.3d at 983. This inference is "strong" and "it will endure *unless and until* the defendants adduce credible evidence tending to prove that detected voting patterns can most logically be explained by factors unconnected to the intersection of race with the electoral system. It is only when such evidence possesses convictive force that the inference of racial animus will be called into serious question." *Uno*, 72 F.3d at 983 (emphasis in original). "[C]onvictive force," as used in *Uno*, means that it is not enough for the Defendants merely to offer some evidence that the voting pattern resulted from factors other than race. To meet their burden of production, the Defendants must offer enough evidence to create "a legitimate question . . . whether nonracial factors adequately explain racial voting patterns. . . ." *Id*.

As the Second Circuit has observed, citing *Uno*:

> [I]nquiry into the *cause* of white bloc voting is not relevant to a consideration of the *Gingles* preconditions. In this, we agree with the Fourth Circuit's reading of *Gingles*.
>
>> We think the best reading of the several opinions in *Gingles,* however, is one that treats causation as irrelevant in the inquiry into the three *Gingles* preconditions, *see Gingles,* 478 U.S. at 62, 106 S.Ct. at 2772 (Brennan, J., plurality opinion) but relevant in the totality of circumstances inquiry, *see* 478 U.S. at 100, 106 S.Ct. at 2792 (O'Connor, J., concurring in judgment) (agreeing that use of racial polarization data "solely" to prove *Gingles* second and third elements cannot be rebutted by "evidence that the divergent racial voting patterns may be explained in part by causes other than race," but disagreeing with plurality's claim "that such evidence can never affect the overall vote dilution inquiry.").
>
> *Lewis v. Alamance County, N.C.*, 99 F.3d 600, 616 n.12 (4th Cir. 1996); *see also Milwaukee Branch of the NAACP v. Thompson,* 116 F.3d 1194, 1199 (7th Cir. 1997). (reasons why candidates preferred by black voters lost should be

> considered in totality of circumstances inquiry); *Vecinos De BarrioUno v. City of Holyoke,* 72 F.3d 973, 983 (1st Cir. 1995) (non-racial reasons for divergent voting patterns to be considered under totality of circumstances test); *Nipper v. Smith*, 39 F.3d 1494, 1524 (11th Cir. 1994) (in order for plaintiff to prevail where defendant offers proof that voting patterns can best be explained by non-racial circumstances, showing must be made under totality of circumstances that minority group denied meaningful access to political process).

*Goosby v. Town Bd. Of the Town of Hempstead*, 180 F.3d 476, 493 (2d Cir. 1999).

Even if the Defendants meet their burden of production, the original inference from proof of the three *Gingles* factors remains strong and contributes to the Plaintiffs' proof of their claim. "Despite the allocation of the burden of proof [to the Plaintiffs], this framework imposes a high hurdle for those who seek to defend the existing system despite meaningful statistical evidence that suggests bloc voting along racial lines." *Uno*, 72 F.3d at 983.

"Establishing vote dilution does not require the plaintiffs affirmatively to disprove every other possible explanation for racially polarized voting." *Uno*, 72 F.3d at 983. Ultimately, Plaintiffs must prove "that the three threshold preconditions (alone or in combination with the totality of the circumstances) are strong enough . . . that, notwithstanding the countervailing evidence of other causative agents mustered by the defendant, the record sustains a claim that racial politics – specifically, the interaction of race and the electoral system – have resulted in significantly diminished opportunities for minority participation in elective government." *Uno*, 72 F.3d at 983-84.

### **TOTALITY OF THE CIRCUMSTANCES**

In addition to the three *Gingles* preconditions, the *Gingles* Court identified the following factors, listed in the Senate Report, as typically relevant to a vote dilution

inquiry:

> the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.

478 U.S. at 44-45. Two other factors listed in the Senate Report also have probative value in some cases: "evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous." *Id.* at 45. This list of factors is neither comprehensive nor exclusive, and "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* at 45 (*quoting* S. Rep. at 29).

When minorities are represented in elected government at proportions below the minority group's share of the voting age population, the disproportionality is probative evidence of a lack of equal opportunity for minorities to participate in the electoral process. The degree of such evidence's probative value varies with the degree of disproportionality and with other factors. *Johnson v. DeGrandy*, 512 U.S. 997, 1020-21 (1994).

The Senate factor concerning "the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process" is not limited to official discrimination by the City of Springfield.  It includes discrimination in any form by anyone so long as the effects of that discrimination linger and hinder minority group members from participating in the political process.  *See, e.g., Gomez v. City of Watsonville*, 863 F.2d 1407, 1418-1419 (9th Cir. 1988).

### **CENSUS DATA**

Before the new decennial census, states and municipalities operate under the legal fiction that the prior census numbers are accurate. *Georgia v. Ashcroft*, 539 U.S. 461, 488 n.2 (2003).  *See also League of United Latin American Citizens v. Perry*, 126 S. Ct. 2594, 2611 (2006) (quoting *Georgia v. Ashcroft*).

### **CONCLUSION**

As detailed in Plaintiffs' Preliminary Proposed Findings of Fact, Plaintiffs will offer evidence to establish each of the *Gingles* preconditions, and to address the Senate factors.  Plaintiffs will offer evidence that past and present discrimination, and the operation of the at-large system, have resulted in diminished Latino and African American participation in the electoral process, including diminished turnout.  In all, Plaintiffs' proof will establish that divisions based on race and ethnicity, in combination with the at-large system for electing members of the City Council and the School Committee, have resulted in significantly diminished electoral opportunities for Latinos and African Americans in Springfield.

Respectfully submitted,

ARISE FOR SOCIAL JUSTICE; ¿OISTE?;
NEW ENGLAND STATE-AREA
CONFERENCE OF THE NAACP; REV.
TALBERT W. SWAN, II; NORMAN W.
OLIVER; DARLENE ANDERSON;
GUMERSINDO GOMEZ; FRANK BUNTIN;
RAFAEL RODRIQUEZ; and DIANA NURSE

By their attorneys,


　　/s/ Paul E. Nemser
Paul E. Nemser (BBO #369180)
Monica M. Franceschini (BBO #651208)
Anna-Marie L. Tabor (BBO #662364)
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109
(617) 570-1000



　　/s/ Nadine Cohen
Nadine Cohen (BBO #090040)
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS
UNDER LAW OF THE BOSTON BAR
ASSOCIATION
294 Washington Street, Suite 443
Boston, MA 02108
Dated:  March 5, 2007                    (617) 988-0609

12

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing Trial Brief was filed electronically with this Court on this 5th day of March, 2007 and that all parties will be served via the Court's electronic filing system.

                                                     /s/ Paul E. Nemser
                                              Paul E. Nemser (BBO #369180)