UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ARISE FOR SOCIAL JUSTICE; | ) | |
| ¿OISTE?; NEW ENGLAND STATE-AREA | ) | |
| CONFERENCE OF THE NAACP; | ) | |
| REV. TALBERT W. SWAN, II; | ) | |
| NORMAN W. OLIVER; DARLENE | ) | |
| ANDERSON; GUMERSINDO GOMEZ; | ) | |
| FRANK BUNTIN; RAFAEL RODRIQUEZ; | ) | |
| and DIANA NURSE | ) | Civil Action No. 05-30080-MAP |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF SPRINGFIELD and SPRINGFIELD | ) | |
| ELECTION COMMISSION | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION TO EXCLUDE THE EXPERT OPINION
TESTIMONY OF JOHN E. HARMON**

Defendants, City of Springfield and the Springfield Election Commission, move
to exclude the so-called "expert" testimony of John E. Harmon as represented in "Trial
Affidavit of John E. Harmon," in the above referenced case (February 1, 2007) ("Harmon
Affidavit").

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786,
125 L.Ed.2d 469 (1993), the Supreme Court focused upon the admissibility of scientific
expert testimony. It pointed out that such testimony is admissible only if it is both
relevant and reliable. And it held that the Federal Rules of Evidence "assign to the trial

judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.,* at 597, 113 S.Ct. 2786.

In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999) the Supreme Court concluded that *Daubert's* general holding-setting forth the trial judge's general "gatekeeping" obligation-applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge. See Fed. Rule Evid. 702.

In the present case, applying these standards, it should be determined by this Court in this case-not to admit certain expert testimony by Dr. John Harmon.

**Background**

While Dr. Harmon does appear to have had prior experience creating alternative districting plans and is quite familiar with the use and application of Geographic Information Systems ("GIS"), he was not asked to create a six or nine-single-member districting plan for the Springfield City Council or the School Committee.  Dr. Harmon did not create any of the six or nine-member single-member districting plans created by the Plaintiffs and submitted with his "expert report."  (Deposition, John E. Harmon, Ph.D., Arise for Social Justice v. City of Springfield, C.A. No. 05-30080MFP, April 7, 2006, at 75-78 ("Harmon Depo"))   Dr. Harmon did not direct the creation of the plans, was not present during the creation of any of the plans, did not know what instructions or redistricting criteria had been provided to the individual.  Jeff Arp, of MassVote,  who was purportedly responsible for the creation of both six and nine single-member district plans that Dr. Harmon had submitted as his own.   (Harmon Dep.at 77).  According to his deposition, all that Dr. Harmon was asked to do – with regard to the Plaintiffs' districting

plans, was to verify the racial demographics of the districts in Plaintiffs' six single-member districting plans; two for the School Committee and the districts in Plaintiffs' twp nine single-member districting plans for the City Council ("Plaintiffs' plans")(Harmon Dep. at 75-76).

**Argument**

In that regard, Defendants are prepared to accept his testimony as to the racial demographics (according to the 2000 Census) of the districts in Dr. Harmon's various submitted plans.[1]  Since the time of the deposition of Dr. Harmon, Defendants have enlisted the services of Daniel Marrier, GIS Systems Analyst for the Executive Office of Environmental Affairs for the Commonwealth of Massachusetts (MassGIS) and he has verified the demographics of the districts in Plaintiffs' plans.  Indeed, Defendants would have most likely accepted Mr. Arps' representations as to the demographics of the plans that he created.  Defendants, however, move to exclude any additional so-called expert opinion testimony of Dr. Harmon on the grounds that he is unfamiliar with the legal requirements or even the issues raised by the various inquiries.  In addition, Dr. Harmon is wholly unfamiliar with applicable procedures and underlying data an expert in this field would routinely rely upon in forming opinions or inferences to render the expert opinions.   So absent is any basis – factual or legal – for Dr. Harmon's so-called expert opinions, that even where the Court – as in this case – can be relied upon to make informed decisions about the degree to which an expert's opinion should be accorded weight, Defendants argue that presentation of Dr. Harmon's testimony will confuse and

---

[1] Dr. Harmon has also submitted testimony concerning the demographic changes in Springfield based upon analysis of 1990 and 2000 Census data.  Defendants do not object to the introduction of that evidence or his testimony as to the "interpretation" of that evidence.  (Harmon Affidavit at ¶¶7-11)

otherwise mislead and not be in the interest of judicial economy concerning the kind of evidence that would be sufficient to sustain Plaintiffs' burden of proof.

***Dr. Harmon's Testimony Regarding the Degree to Plaintiffs' Plans Provide for Minority Electoral Opportunities***

Dr. Harmon in deposition knew very little about the prior electoral history of minority persons in School Committee and City Council contests. (Harmon Depo at 149-151, 191). Dr. Harmon was not provided with Dr. Engstrom's racial bloc voting analysis and, indeed, did not seem to understand it, when a copy was provided to him. (Harmon Depo at 140-149). Nevertheless, it is Dr. Harmon's opinion that the "[a]doption of the Plaintiffs' Plan, with its four majority-minority districts, would create a significant opportunity to elect more Black and Hispanic/Latino candidates to Springfield's City Council" (Harmon Affidavit at ¶6(D)) and that the Plaintiffs' six single-member district plan ("based on Census blocks") "would improve the possibilities of the election of Latino/Hispanic and black candidates to the Springfield [School Committee]." (Harmon Affidavit at ¶29(D)). His opinions are based upon his view that a district comprised of one-ninth of the City's population is smaller and would facilitate "face-to-face contact between candidate and voter," support greater minority political organization necessary to induce greater turnout among minority voters, and reduce "the amount of voter contact by mail that a candidate must do." (Harmon Affidavit at ¶32). While it would be difficult to argue with Dr. Harmon's statements, reliance on the size of a district has never constituted a basis from which to conclude that one district provides for greater electoral opportunities than another. It is ludicrous to argue – as Dr. Harmon would appear to be – that a small district in which 90 percent of the voting age population is white would provide for the same opportunity to elect candidates of choice in a citywide

election in which 40 percent of the voting age population is Hispanic and 20 percent of the voting age population is African American and voters have nine choices.  If size were all that was relevant in a determination of whether a district provides for electoral opportunities then, in spite of the Court's admonition to the contrary,  at-large elections would constitute a *per se* violation of Section 2 of the Voting Rights Act, 42 U.S.C. 1973 ("Section 2")  – by virtue of their size relative to the size of a single-member district, even where it is not possible to create a district that is comprised of an effective majority of minority voting age persons, contrary to controlling precedent interpreting Section 2. Thornburg v. Gingles, 478 U.S. 30, 46 (1986).

If all that were needed is an analysis of size of the district, those many pages of analysis and review of analysis conducted by courts since before – and certainly after – Gingles regarding electoral opportunities, applying racial bloc voting analysis and analysis of rates of turnout regarding the electoral opportunities provided by one or more challenged or proposed electoral districts was, indeed, wasted.  Likewise, all of the analysis conducted by the Department of Justice, Civil Rights Division, Voting Section, in its administrative capacity (Section 5 of the Voting Rights Act, 42 U.S.C. 1973c ("Section 5")) regarding whether a district or a proposed plan was retrogressive as to the electoral opportunities provided by the Section 5 benchmark would be wholly unnecessary – under Dr. Harmon's interpretation of what constitutes an evaluation of minority electoral opportunities.

If this Court – or any other Court --  were to adopt Dr. Harmon's view, Section 5 of the Voting Rights Act would be entirely eviscerated and any role that the Department

of Justice might have had in assessing and monitoring voting changes as to retrogression would be rendered a nullity.

Any analysis – conducted by legislators, experts, attorneys, or Courts – involves an application of the estimations of political cohesion among minority voters and evidence of white cross-over voting, as well as estimations of relative rates of voter turnout as between white and minority voters.  See, e.g., Bernard Grofman, Handley, Lisa and Lublin, David, ⱯDrawing Effective Minority Majority Districts: A Conceptual Framework and Some Empirical Evidence,@ 79 N.C. L. Rev.1388.  In the past, such analysis has resulted in the "65 percent rule" which accommodated these factors in the assessment of the degree to which a district in which minority persons constituted a particular portion of the voting age population would provide for an opportunity to elect minority candidates of choice.  (Deposition, Richard L. Engstrom, Ph.D., <u>Arise for Social Justice</u> v. <u>City of Springfield</u>, C.A. No. 05-30080MFP, April 19, 2006, at 152 ("Engstrom Depo" ).  See e.g., <u>Ketchum</u> v. <u>Byrne</u>, 740 F.2d 1398, 1402  (7th Cir. 1984).   Such analysis has resulted in the descriptive phrases  "safe district" or "swing district."  <u>See e.g.</u>, <u>Jeffers</u> v. <u>Clinton</u>, 756 F. Supp. 1195, 1198 (E.D. Ark. 1990)("[o]n a strictly numerical and quantitative view of equality, any district with a (Black voting age population) of 50% or higher would be per se lawful.  We think the Voting Rights Act means more than this").

Not only is Dr. Harmon unfamiliar with this kind of analysis, he also failed to familiarize himself with the degree to which minority persons have been elected to the City Council or School Committee and does not understand the kind of analysis conducted by Dr. Engstrom, which should have informed his conclusion.  Indeed, Dr.

Harmon appears to assume that African American and Hispanic persons support the same candidates (Harmon Depo. at 144-145) – in spite of the fact that Dr. Engstrom's analysis refuted that claim and Dr. Engstrom, in deposition, admitted that there was no evidence of cohesion between African American and Hispanic voters (Engstrom Depo at 121).

Presumably to further bolster his conclusions, Plaintiffs' counsel provided to Dr. Harmon a reaggregation of the voting data from the 2003 Springfield City Council contest. Dr. Harmon did not conduct the analysis himself and, indeed, does not know how is was conducted .  (Harmon Depo at 81).  It is common sense that a reaggregation is simply inappropriate where the "original" election is conducted at-large and where voters have nine choices, with no prohibition against single-shot voting and where the winner is determined by a plurality of the vote and the reaggregation posits a single-member district method of election, where voters have only one choice, but where (apparently) candidates are not required to reside in the district from which they compete.

The reaggregation supplied by Plaintiffs to Dr. Harmon assumes – without support – that a particular candidate would receive the same number of votes when electors had one vote – as compared to nine.  The reaggregation further assumes that we could expect any Hispanic candidate could receive the same kind of support – from African American, white, and Hispanic voters – as did Mr. Tosado.

The reaggregation further assumes that we could expect that any African American candidate could receive the same kind of support – from African American, white, and Hispanic voters – as did Mr. Williams in 2003.  Unfortunately, according to the election returns and Dr. Engstrom's analysis, we know that is not true.

Using the chart supplied by the Plaintiffs as the reaggregation chart, what Dr. Harmon's Affidavit appears to show is that Plaintiffs' proposed nine single-member district plan will provide the opportunity to elect three Hispanic candidates with the same popularity as Mr. Tosado and one African American candidate with the same popularity as Mr. Williams. Mr. Tosado resides in only one of the three districts in which he would have been elected. In the two districts in which Mr. Tosado does not reside but would have been elected, Mr. Foley, a white incumbent, would have been elected in Mr. Tosado's absence. Mr. Williams does not reside in the one district from which he would have been elected.

Defendants assume that Plaintiffs or Dr. Harmon do not intend that the reaggregation provide evidence that the Plaintiffs' proposed plan provides opportunity to Hispanic candidates at the expense of African American candidates but see no basis from which Dr. Harmon could conclude that the Plaintiffs' proposed plan would provide an opportunity to elect two Hispanic candidates to the City Council. (Harmon Affidavit at ¶23)

Accordingly, Defendants move to exclude Dr. Harmon's opinion and the evidence from this reaggregation as to which Dr. Harmon has so little information as to its methodology or the assumptions upon which it is based. In addition, Defendants move to exclude conclusion as to electoral opportunities purportedly based upon this reaggregation or any assessment of the advantages of "small" districts to minority candidates.

***Dr. Harmon's Testimony Regarding the Degree to Which Plaintiffs' Plans Meet Constitutional One-Person; One-Vote Requirement Should be Excluded***

Dr. Harmon opined that the Plaintiffs' nine single-member district City Council plan and six single-member district School Committee plan meet "the Constitutional requirements of one-person, one vote" on the grounds that the deviation among the districts of both plans falls with ±5 percent deviation. The Supreme Court in <u>Larios</u> v. <u>Cox</u>, 542 U.S. 947 (2004) affirming 300 F. Supp.2d 1320 (N.D. Ga. 2004), determined that the ±5 percent deviation cannot be considered the "safe harbor" that – admittedly – it had once been thought to be. Dr. Harmon was entirely unfamiliar with any recent developments in the law, in that regard. (Harmon Depo at 105-106). There should be no "expert" testimony as to the constitutionality of a districting plan without a thorough analysis of the relevant considerations, even though it seems unlikely that the circumstances that led the Court to determine that Georgia's legislative reapportionment plan for the State House of Representatives that met the ±5 percent deviation "standard," nevertheless violated the constitutional one-person, one-vote requirement are applicable to the districting plans for the City of Springfield.

***Dr. Harmon's Testimony Regarding the Degree to Which Plaintiffs' Plans Meet the Prohibition Against Racial Classifications as Explained in <u>Shaw</u> v. <u>Reno</u>***

Dr. Harmon appears to be rendering an opinion that Plaintiffs' proposed nine single-member district plan can constitute an appropriate and legal remedy for a finding of dilution (Harmon Affidavit at ¶¶33-39), where it splits 35 precincts between two districts or among three districts; where 13 of the City's 17 neighborhoods are split between two and among three, four, and five districts; and where the City's eight wards are divided between two and among three and four districts and where the Plaintiffs' proposed nine

single-member district plan otherwise subordinates the City's traditional districting

principles to race.[2]  Shaw v. Reno, 509 U.S. 630, 652 (1993) (Shaw I)(recognizing an

"analytically distinct" equal protection claim for challenging an election district as a

"racial classification").  In response to Defendants' concerns about the "evidence" that

traditional districting principles were subordinated to race, Dr. Harmon submits a mish-

mash of inaccuracies about the existence of identifiable neighborhood boundaries and

irrelevant and confusing information about the location of neighborhood council offices

and the unavoidability of splitting neighborhoods in the creation of a nine single-member

district plans.

   Dr. Harmon further appears to opine that if one precinct must be split in order to

create a six or nine single-member district plan then many can be split because precincts

can be "realigned."  (Affidavit at ¶39).  Notwithstanding the confusion and administrative

hardship of realigning more than 35 precincts or conducting an election with 24 different

ballots, the ability to realign precincts is not an issue in an equal protection analysis

   Dr. Harmon's  opinions fail to take into account that what is relevant is the

motivation of plan-drawers, i.e., the degree to which "race for its own sake, and not other

districting principles, was [the plan drawers'] dominant and controlling rationale in

drawing a district."   Miller v. Johnson, 515 U.S. 900, 901, 916 (1995)(adopting the

"predominant motivation" test for the threshold inquiry of whether a district constitutes a

racial classification, which requires a showing that traditional race-neutral districting

---

[2] By subsequent reference, Dr. Harmon appears to be arguing that Plaintiffs' proposed six single-member district plan
can constitute an appropriate and legal remedy for a finding of dilution where it splits 30 precincts between two districts
or among three districts; where 13 of the City's 17 neighborhoods are split between two or among three districts; where
the City's eight wards are divided between two and among three, four and five districts; and where the implementation
of the six single-member district plan and the nine single-member district plan in municipal elections would require 24
different ballots, and where Plaintiffs' six single-member district plan otherwise subordinates the City's traditional
districting principles to race.  Miller v. Johnson, 515 U.S. 900, 916 (1995).

principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, were subordinated to racial considerations).

The "harm" under an equal protection analysis is in the racial classification and in the fact that "race was the predominant factor motivating [a] decision to place a significant number of voters within or without a district" and not in the number of precincts.  In the absence of evidence or testimony from the individual who actually created the plans and assuming that he had been instructed to create a certain number of districts in which minority persons constituted a majority (racial motivation), the evidence upon which the Court may conclude that Plaintiffs' six and nine single-member district plans violate the Fourteenth Amendment is the fact that it appears that none of the City's traditional districting principles, i.e., precinct boundaries, ward boundaries, neighborhood boundaries, appear to have been considered.

Defendant move to exclude Dr. Harmon's opinion since, Dr. Harmon does not appear to have any understanding of the standard by which a Court determines whether a districting plan constitutes a racial gerrymander that must be subject to strict scrutiny, Bush v. Vera,  517 U.S. 952, __,116 S. Ct. 1941, 1960-1961 (1996)(concluding if the State has a "strong basis in evidence, for concluding that creation of a majority-minority district is reasonably necessary to comply with Section 2, and the districting that is based on race Asubstantially addresses the Section 2 violation,. . .it satisfies strict scrutiny").

Defendants move to exclude Dr. Harmon's statements and conclusions regarding neighborhoods and precincts to the extent that they can be interpreted to provide expert

opinion as to whether the Plaintiffs' proposed six and nine single-member district plans violates the principles established in Shaw I and its progeny.

**Conclusion**

In sum, Dr. Harmon's testimony regarding any opinion that he has offered in his Trial Affidavit regarding electoral opportunities  provided by the plans proposed by Plaintiffs should be excluded based upon absence of requisite legal and factual foundation for such expert opinion testimony on an ultimate determination in this case – whether there is a fairly drawn, constitutional, nondilutive single-member district plan, Hall v. Holder, 512 U.S. 874, 879 (1994), that provides for more electoral opportunities than does the challenged method of election (Section 2 benchmark).   Likewise, since Dr. Harmon did not create the proposed six and nine single-member district plans and has no familiarity with the applicable law, his testimony as to whether Plaintiffs' proposed six and nine single-member district plans constitute a racial gerrymander in violation of the Equal Protection Clause, as established in Shaw I and its progeny, must be excluded as with any testimony advocating for lawfulness of using an unconstitutional districting plan as the Section 2 benchmark.   See Abrams v. Johnson, 521 U.S. 74 (1997)(an unconstitutional redistricting plan cannot serve as the benchmark).

Finally, without further analysis in light of Larios v. Cox, Dr. Harmon's testimony as to whether the Plaintiffs' proposed plans satisfy the one-person, one-vote requirement of the Fourteenth Amendment should be excluded.

Respectfully submitted,

CITY OF SPRINGFIELD and
SPRINGFIELD ELECTION
COMMISSION


By_____
Edward M. Pikula (BBO #399770)
   City Solicitor
Deanne Bogan Ross (BBO #555407)
City of Springfield
Law Department
36 Court Street, Room 210
Springfield, Massachusetts 01103


## **CERTIFICATE OF SERVICE**

     I hereby certify that a copy of the foregoing document has been served on all counsel of record pursuant to electronic case filing the 5th day of March 2007.


_____
Edward M. Pikula, Esq.

# EXHIBIT A

JOHN E. HARMON, Ph.D.
April 7, 2006

Page 75

1    new districting plan to what exists; is that

2    correct?

3        A.      Yes.  I did say that.

4        Q.      That's the benchmark, the status quo.

5        A.      Okay.

6        Q.      ~~Let's say that's~~ the benchmark ~~anyway~~

7    for the purposes of this.

8                Okay.  I asked you to bring some

9    documents.

10       A.      Yes, you did.

11       Q.      Actually, did you bring a big map --

12       A.      I did not.

13       Q.      -- of the districting plan?

14               Well, we probably get to these, and

15   then if I don't, we'll -- you can identify what

16   you brought.

17       A.      Sure.

18       Q.      What exactly did plaintiffs ask you

19   to do?

20       A.      The plaintiffs asked me to prepare a

21   report to evaluate a districting plan, actually,

22   several districting plans, that have been

23   prepared for them.  And specifically, there

24   were -- actually, I received two plans for City

**JOHN E. HARMON, Ph.D.**
**April 7, 2006**

Page 76

1    Council, one of which I did the report on.

2    There was some modifications made to it.  And

3    there was a third plan, which was a City Council

4    plan, assembled by precincts rather than by

5    census blocks.  And then there were two plans

6    for School Committee, one assembled by census

7    blocks, one assembled by precincts, and they

8    were -- these were separate requests, but

9    considered as a group.  I was asked to prepare a

10   report and maps for the report, and tables for

11   the report, and evaluate those districts with

12   respect to the principals we've been discussing

13   and to render some opinions.

14        **Q.       Evaluate them specifically for what?**

15        A.       One person, one vote; compactness;

16   opportunity to elect.

17        **Q.       Did you have anything to do with the**

18   **creation of these plans?**

19             MS. COHEN:  Objection.

20        You may answer.

21             THE WITNESS:  I had conversations

22        with the person who prepared them, and I

23        have actually helped train him in

24        previous activities, putting these plans

JOHN E. HARMON, Ph.D.
April 7, 2006

Page 77

1    together.  But the direct answer to your

2    question is no.

3        Q.      (By Ms. Ross)  When you said you had

4    conversations with him, who is the "him" that

5    drew the plan?

6        A.      His name is Jeff Arp.

7        Q.      And for whom does he work?

8        A.      I believe he works for MassVOTE.

9        Q.      And when you say you had

10   conversations with him, did you have

11   conversations prior to the creation of the plan

12   or after the creation of, let's say, the City

13   Council plan?

14       A.      No.  Not prior to it, no.

15       Q.      And then you were not present during

16   the creation?

17       A.      No.

18       Q.      And so you did not direct the

19   creation in any way?

20           MS. COHEN:  Objection.

21           THE WITNESS:  No.

22       Q.      (By Ms. Ross)  Do you know who did

23   establish the parameters for the plan?

24       A.      Would you define what you mean by

**JOHN E. HARMON, Ph.D.**
**April 7, 2006**

Page 78

1 "parameters"?

2   **Q.**  **Okay.  Do you know who established**

3 **the number of single member districts for the**

4 **plan?**

5   A.  No.  But I can surmise.

6     MS. COHEN:  No surmising.

7     THE WITNESS:  No surmising.  No,

8  I do not know.

9     MS. COHEN:  If you know, you

10  know.

11   **Q.**  **(By Ms. Ross)  Do you know who**

12 **established the threshold of viability for the**

13 **plan?**

14   A.  No, I do not.

15   **Q.**  **Do you know who identified**

16 **traditional districting principals to which the**

17 **plan must comply?**

18   A.  I thought I did that.  I don't know

19 who informed them of that, no.

20   **Q.**  **Do you know who told them what the**

21 **acceptable deviation among the districts aught**

22 **to be?**

23   A.  Jeff and I have had conversations

24 about that in the past, but I do not actually

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOHN E. HARMON, Ph.D.**
**April 7, 2006**

Page 81

1  redistricting maps and the demographic

2  information?

3      A.      Actually, I wasn't supplied the maps.

4  I generated the maps myself.  I was supplied the

5  data.  I was supplied on the report about the

6  reaggregation to precinct level information for

7  2003 election.  I was provided with some

8  election return data on that.  But it was just

9  basically the raw data.

10     Q.      Well, I'm going to table that and get

11  to the reaggregation a little bit later, but

12  were you provided with Dr. Engstrom's regression

13  analysis?

14     A.      No, I was not.

15     Q.      Did you conduct any analysis of your

16  own of voting --

17          MS. COHEN:  Objection.

18     Q.      (By Ms. Ross)  -- behavior in

19  Springfield?

20     A.      No, I did not.  No.

21     Q.      Did you travel to Springfield to

22  familiarize yourself with any of the

23  neighborhoods?

24          MS. COHEN:  Objection, but you

JOHN E. HARMON, Ph.D.
April 7, 2006

Page 105

1    A.    No, I do not.

2    Q.    All right.  You say that the plus or

3  minus five percent is an accepted -- and I'm

4  quoting -- accepted level of variation for state

5  assembly districts after a long string of

6  supreme court cases, what supreme court cases?

7    A.    I can't name one off the top of my

8  head.  I just cannot do that.

9    Q.    And you testified earlier that you're

10  not familiar with Larios versus Cox?

11    A.    That's correct.

12    Q.    Do you have any opinion as to whether

13  this plan would be vulnerable to a

14  constitutional challenge on one person, one vote

15  grounds as interpreted by Larios versus Cox?

16        MS. COHEN:  I'm going to object

17    to the extent it calls for a legal

18    opinion.

19        If you can answer, you may.

20    Q.    (By Ms. Ross)  By "this plan" I mean

21  the nine single member district City Council

22  plan.

23    A.    No, I do not.

24    Q.    Okay.  What is the basis for your

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

**JOHN E. HARMON, Ph.D.**
**April 7, 2006**

Page 106

1  claim that more than a plus or minus five

2  percent deviation is permitted in municipal

3  districts?

4      A.      The reading that I did, which I

5  cannot site to you, mentioned that in municipal

6  districts sometime the standard is allowed to be

7  even broader than plus or minus five percent,

8  and so I decided that adopting the numbers for

9  state assembly districts would be more

10  conservative and a good thing to do.

11      Q.      Do you recall --

12      A.      -- the citation.

13      Q.      -- the citation to a case?

14      A.      No, I do not.

15      Q.      An opinion?

16      A.      No, I do not.

17      Q.      I'm looking at the demographics of

18  your nine single member district City Council

19  plan that you have -- okay.  This is Page 7 of

20  Exhibit A of your report.  What is your reason

21  for underpopulating District 3 and 4 in your

22  nine single member district City Council

23  proposed plan?

24      A.      Since I did not prepare the plan, I

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

JOHN E. HARMON, Ph.D.
April 7, 2006

Page 140

1    statistics, percentages, proportions,

2    deviations, you've set it up to do, and it gives

3    you a lot of opportunity to -- "play games" is

4    not the right word -- to evaluate alternatives

5    without going through the really tedious

6    calculation of opening up the table each time

7    and running numbers in a summary, so it simply

8    streamlines that process.

9        Q.      So am I correct in assuming that what

10   you mean by "methodology" is really the method

11   by which GIS -- the method by which you pull

12   together the plan?

13       A.      Yes.

14       Q.      It's not -- do you mean, at all, the

15   types of considerations that you bring to the

16   physical process of pulling census blocks

17   together?

18       A.      No.  The methodology refers to that

19   physical process, yes.

20       Q.      Am I correct in remembering that you

21   said you did not conduct any analysis of voting

22   in Springfield?

23            MS. COHEN:  Objection.

24       Q.      (By Ms. Ross)  Did you conduct any --

JOHN E. HARMON, Ph.D.
April 7, 2006

Page 141

1   let's start from the beginning -- analysis of

2   voting in Springfield?

3       A.      In the supplemental report on the

4   reaggregation for the precincts, yes, there was

5   some analysis of voting in Springfield.

6       Q.      Did you conduct any other analysis of

7   voting in Springfield, other than what's

8   represented in the supplemental report?

9       A.      No.

10      Q.      Did you review Dr. Engstrom's

11  analysis of voting?

12      A.      No, I did not.

13      Q.      Did you ask to see it?

14      A.      No.

15      Q.      Why not?

16      A.      I wasn't --

17              MS. COHEN:   Objection.

18              THE WITNESS:   I wasn't aware it

19  was being done.

20      Q.      (By Ms. Ross)  Out of curiosity, do

21  you have any knowledge why Dr. Engstrom didn't

22  evaluate the plan?

23              MS. COHEN:   Objection.

24              THE WITNESS:   No.  I do not know.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOHN E. HARMON, Ph.D.**
**April 7, 2006**

Page 142

1    Q.    (By Ms. Ross)  What do you bring --
2    what is your opinion of what you bring to this
3    analysis that the individual who conducted the
4    racial block voting would not?

5    A.    Some experience in putting together
6    reports like this and organizing the
7    information, I think that's probably --
8    organizing it and explaining it.  I think that's
9    probably the principal thing that I bring to
10   this.

11        The actual construction of the
12   district, if you want to go play with the tools,
13   it's fun, it's not that hard.  You can -- and I
14   have trained people to do it in half a day, and
15   it's a very empowering thing to move these
16   things around and play things with that.  But I
17   think I bring something else, other than that,
18   to it.

19   Q.    Okay.  What exactly is your expert
20   opinion as of the City Council plan?

21   A.    The City Council plan?

22   Q.    Yes.  We're back to the City Council
23   plan.

24   A.    Okay.

**JOHN E. HARMON, Ph.D.**
**April 7, 2006**

Page 143

1    Q.      The nine single member district plan,

2    the map that is in Exhibit A of your report.

3    What exactly is your expert opinion?

4    A.      My opinion is that it is a plan,

5    falls within plus or minus five percent of the

6    deviation from ideal, and that upon visual

7    inspection, I don't see any problems -- any

8    major problems, they're not all perfectly

9    circular or hexagonal which would be -- and it

10   would increase the likelihood that those groups,

11   the Hispanics in District 1 and 2, African

12   Americans in District 3, and a combination in

13   District 4 would increase their opportunity to

14   elect candidates of their choice to the City

15   Council.

16   Q.      Okay.  Which districts in -- and I'm

17   back to the nine single member district City

18   Council plan -- do you believe will provide to

19   black persons an opportunity to elect candidates

20   of choice?

21   A.      District 3 and I think District 4

22   provides an opportunity as well.  I mean, all

23   districts provide an opportunity, but I assume

24   you're asking for increased opportunity.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOHN E. HARMON, Ph.D.**
**April 7, 2006**

Page 144

1  District 3 for sure and District 4.

2  **Q.    And what is the basis for concluding**

3  **that District 4 would provide to black persons**

4  **an opportunity to elect candidates of choice?**

5  A.    That's the next highest percentage

6  black VAP, voting age percentage.  It's 58

7  percent in District 3, 38 percent in District 4,

8  and the next closest is at around 13 percent.

9  So I think it provides, on the basis of those

10 numbers, it provides increased opportunity.

11 **Q.    Are you basing that opinion on the**

12 **supposition that black and Hispanic persons tend**

13 **to prefer the same candidates?**

14 A.    No.  I think it gives them -- I mean,

15 if they are a cohesive group, it gives them an

16 area within which they can select the candidate

17 that they choose.  The black population in

18 District 4 may relate and find a fine Hispanic

19 candidate that they want to get behind in which

20 case, if that were to be the case, you got to

21 combine Hispanic, black voting aged population

22 of 55 percent in that district.

23 **Q.    Well, do you have any opinion as to**

24 **whether black and Hispanic candidates are**

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**JOHN E. HARMON, Ph.D.**
**April 7, 2006**

Page 145

1    politically cohesive as a group together?

2        A.      No, I really don't.  And from my

3    experience in Connecticut, the answer would be

4    sometimes.  The coalition I worked for to

5    prepare that redistricting plan for the senate

6    district for the NAACP, was a coalition of

7    Hispanic and the NAACP, and they worked quite

8    well together.  At the state level they have

9    sometimes worked well together, sometimes not.

10   So I don't know enough about Springfield to

11   really know, but if it works in other places I

12   see -- there are opportunities, yes.

13       Q.      Well, the question more precisely is

14   whether black persons and Hispanic persons

15   prefer the same candidate, not whether black or

16   Hispanic leaders can work together, so do you

17   have any evidence that black voters and Hispanic

18   voters tend to prefer the same candidates?

19       A.      No.  I guess I do not, at that

20   individual level, no.

21       Q.      Do you have any recollection as to

22   whether there was evidence in the Metts

23   versus -- I'm going to take, Omen (phonetic),

24   was the first opinion, that black and Hispanic

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**JOHN E. HARMON, Ph.D.**
**April 7, 2006**

Page 146

1  **persons prefer the same candidates?**

2      A.      No, I don't.  I do not know.

3      **Q.      Do you have any recollection as to**

4  **whether there was evidence in Black Political**

5  **Task Force versus Galvin that black and**

6  **Hispanics are cohesive together, not**

7  **individually?**

8      A.      This sort of goes beyond the area of

9  what I consider my expertise, so the answer

10  would be no.  But I suppose if I were to go back

11  and read all the testimony and all the expert

12  reports, I might find different --

13      **Q.      Let me give you --**

14

15          (Cell phone rings)

16

17          (Recess taken)

18

19          MS. ROSS:  Back on the record.

20      **Q.      (By Ms. Ross)  This is Dr. Engstrom's**

21  **report filed by plaintiff in this case.**

22          MS. ROSS:  If you could mark that

23      Exhibit 4.

24

**JOHN E. HARMON, Ph.D.**
**April 7, 2006**

Page 147

1          (Exhibit 4, Dr. Engstrom's

2          report, marked)

3

4     Q.     (By Ms. Ross)  It's up to you what

5  you refer to, but I find it easiest to took at

6  Dr. Engstrom's tables beginning on Page 23, but

7  -- in looking at his charts, Page 23 through 30,

8  do you have any sense of, according to Dr.

9  Engstrom, whether black and Hispanic persons are

10 more likely -- are likely to prefer the same

11 candidate?

12          MS. COHEN: Objection.  I think

13     there's been no foundation, Deanne, for

14     this at all.

15     Q.     (By Ms. Ross)  I said, do you any

16 have sense --

17          MS. COHEN:  I don't think you've

18     even properly identified this, asked him

19     if he's ever seen it before, asked him

20     if he's read it.

21          MS. ROSS:  He said he hadn't.

22          THE WITNESS:  And that's true.

23          MS. COHEN:  Right.  So how can he

24     testify --

**JOHN E. HARMON, Ph.D.**
**April 7, 2006**

Page 148

1              MS. ROSS:  I'm asking him to look
2        at the chart and whether --
3              THE WITNESS:  I'm looking at the
4        chart on Page 23 --
5        Q.      (By Ms. Ross)  Do you even understand
6    these charts?
7        A.      -- and I'm not even sure exactly what
8    these percentages really refer to or how they
9    were estimated or calculated.  I presume that's
10   what was the body of the report was about.
11       Q.      So you've actually never referred or
12   used these types of calculations?
13       A.      No, I have not.
14       Q.      Aside from whether -- and we're
15   talking about the City Council plan -- whether
16   they have a greater opportunity -- well, let me
17   strike that.
18              How much -- I mean, you mentioned
19   that they have a greater opportunity than now
20   under the current method of election, did you
21   testify to that?
22              MS. COHEN:  Objection as to form.
23        You just said "a greater opportunity
24        than now."

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**JOHN E. HARMON, Ph.D.**
**April 7, 2006**

Page 149

1      Q.      (By Ms. Ross)    **Than under the current**
2   **method of election.**
3      A.      I think so, yes.
4      Q.      **What kind of opportunity do they have**
5   **now, in your opinion?**
6      A.      I find that very hard to put a
7   quantitative amount on it.  This is sort of a
8   greater than or less than issue.  I mean,
9   clearly African Americans and Hispanics have
10  been elected to Springfield City Council.  I
11  don't know the long history of it and how many
12  and exactly when.  Clearly, it has happened.  So
13  there obviously is some opportunity.  And --
14     Q.      **So you're not --**
15     A.      I think this increases the
16  opportunity.  But it's very hard to measure how
17  much it increases the opportunity.  And I'll go
18  back to what I said earlier, I really do believe
19  that the formation of districts by itself if
20  they're, you know, formed correctly, is an
21  important component of that; not the only
22  component, but important.
23     Q.      **Other than the fact you just**
24  **testified that you were aware that black and**

**JOHN E. HARMON, Ph.D.**
**April 7, 2006**

Page 151

1    representation" and the term "proportional

2    opportunities to elect"; does that have a --

3    does that even have a separate meaning for you?

4    A.    Well, "proportional representational"

5    would have a meaning to me that if there were a

6    100 members of the City Council and they were

7    breaking into groups this many, that would be a

8    "proportional representation."

9         "Proportional opportunity," I'm not

10   quite sure what that concept would be.  No, I

11   really don't understand that term.

12   Q.    If it were true that two blacks have

13   been elected to the City Council, would you

14   still believe that your proposed plan provides

15   for greater electoral opportunity than does the

16   current method of election?

17        MS. COHEN:  Objection as to form.

18        I don't think it's clear exactly what

19        you're referring to.

20   Q.    (By Ms. Ross)  Actually, if we go to

21   Page 21 of Dr. Engstrom's report, Paragraph 56,

22   he states that in only one of the City Council

23   elections have two African Americans been

24   elected, this occurred in 1999.

**JOHN E. HARMON, Ph.D.**
**April 7, 2006**

Page 191

```
 1   plans are based and to render an opinion as to
 2   whether the proposed districts result in
 3   majority/minority voting aged populations
 4   sufficient to provide plaintiffs with a greater
 5   opportunity to elect candidates of choice.
 6                   MS. COHEN:  It should say
 7        "representatives of their choice."
 8                   THE WITNESS:  I'm sorry.
 9        Representatives of their choice.
10        Q.      (By Ms. Ross)  So in asked to do
11   that, you don't think it's relevant as to the
12   degree to which candidates who have been elected
13   are preferred candidate?
14        A.      That probably is relevant.  It goes
15   beyond my level of expertise.  It goes beyond
16   what I can really speak to.  There are --
17   because there are so many components to that, it
18   takes a broad range of knowledge that I really
19   can't, you know -- I really don't have.  Okay.
20   This is --
21        Q.      So are you saying you don't have the
22   experience to actually render the opinion you
23   just --
24                   MS. COHEN:  Objection.
```

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# EXHIBIT B

RICHARD L. ENGSTROM, Ph.D.
April 19, 2006

Page 121

1    conclusion that a white voter is more likely to

2    support a black African-American, nonincumbent

3    candidate than a Latino voter is?

4            MS. COHEN:  Objection.

5        Q    (By Ms. Ross:) More likely?

6        A.   In absolute terms, in terms of absolute

7    level of support.

8        Q.   Doesn't your analysis also support the

9    conclusion that a white voter is more likely to

10   support a Latino, nonincumbent candidate than is an

11   African-American voter?

12           MS. COHEN:  Objection.

13           THE WITNESS:  In terms of the absolute

14       level of support, yes.

15       Q    (By Ms. Ross:) In your opinion, are black

16   voters and Latino voters, taken together as a group,

17   politically cohesive?

18           MS. COHEN:  Objection.

19           THE WITNESS:  Blacks and Latinos as a

20       group?

21       Q    (By Ms. Ross:) Yes.

22       A.   I would not say they're politically

23   cohesive based on my numbers.

24       Q.   You testified in the black political -- in

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

RICHARD L. ENGSTROM, Ph.D.
April 19, 2006

Page 152

1    **people are a member of a particular group will**

2    **provide an opportunity to elect?**

3         A.    It can be the case that the number would

4    not be a sufficient provider of reasonable

5    opportunities.

6         Q.    **What is the so-called, much maligned**

7    **"65 percent rule" of the 1990s?**

8              MS. COHEN:  Objection.  I see we're

9              getting into legal stand.

10             THE WITNESS:  I don't know about the

11             65 percent rule of the 1990s.  But the

12             65 percent rule began -- a lot of people think

13             of it now as a safe district.  It began as a

14             50-50 type of district.

15             The 65 percent was if you had 65 percent

16             total population and you could assume about 60

17             percent voting age population, you could assume

18             about 55 percent registration and with turnout

19             differentials you may be at a 50-50 electorate

20             on election day.  That was the source of the

21             65 percent notion.

22

23                   (Off the record.)

24