# EXHIBIT A

JOHN E. HARMON, Ph.D.
April 7, 2006

Page 75

1  new districting plan to what exists; is that
2  correct?
3      A.   Yes.  I did say that.
4      Q.   That's the benchmark, the status quo.
5      A.   Okay.
6      Q.   Let's say that's the benchmark anyway
7  for the purposes of this.
8           Okay.  I asked you to bring some
9  documents.
10     A.   Yes, you did.
11     Q.   Actually, did you bring a big map --
12     A.   I did not.
13     Q.   -- of the districting plan?
14          Well, we probably get to these, and
15 then if I don't, we'll -- you can identify what
16 you brought.
17     A.   Sure.
18     Q.   What exactly did plaintiffs ask you
19 to do?
20     A.   The plaintiffs asked me to prepare a
21 report to evaluate a districting plan, actually,
22 several districting plans, that have been
23 prepared for them.  And specifically, there
24 were -- actually, I received two plans for City

**JOHN E. HARMON, Ph.D.**
**April 7, 2006**

Page 76

1  Council, one of which I did the report on.
2  There was some modifications made to it.  And
3  there was a third plan, which was a City Council
4  plan, assembled by precincts rather than by
5  census blocks.  And then there were two plans
6  for School Committee, one assembled by census
7  blocks, one assembled by precincts, and they
8  were -- these were separate requests, but
9  considered as a group.  I was asked to prepare a
10 report and maps for the report, and tables for
11 the report, and evaluate those districts with
12 respect to the principals we've been discussing
13 and to render some opinions.
14         Q.      **Evaluate them specifically for what?**
15         A.      One person, one vote; compactness;
16 opportunity to elect.
17         Q.      **Did you have anything to do with the**
18 **creation of these plans?**
19              MS. COHEN:  Objection.
20           You may answer.
21              THE WITNESS:  I had conversations
22         with the person who prepared them, and I
23         have actually helped train him in
24         previous activities, putting these plans

JOHN E. HARMON, Ph.D.
April 7, 2006

Page 77

```
 1      together.  But the direct answer to your
 2      question is no.
 3         Q.      (By Ms. Ross)  When you said you had
 4   conversations with him, who is the "him" that
 5   drew the plan?
 6         A.      His name is Jeff Arp.
 7         Q.      And for whom does he work?
 8         A.      I believe he works for MassVOTE.
 9         Q.      And when you say you had
10   conversations with him, did you have
11   conversations prior to the creation of the plan
12   or after the creation of, let's say, the City
13   Council plan?
14         A.      No.  Not prior to it, no.
15         Q.      And then you were not present during
16   the creation?
17         A.      No.
18         Q.      And so you did not direct the
19   creation in any way?
20              MS. COHEN:  Objection.
21              THE WITNESS:  No.
22         Q.      (By Ms. Ross)  Do you know who did
23   establish the parameters for the plan?
24         A.      Would you define what you mean by
```

JOHN E. HARMON, Ph.D.
April 7, 2006

Page 78

1  "parameters"?

2  Q.     Okay.  Do you know who established
3  the number of single member districts for the
4  plan?

5  A.     No.  But I can surmise.

6  MS. COHEN:  No surmising.

7  THE WITNESS:  No surmising.  No,
8  I do not know.

9  MS. COHEN:  If you know, you
10  know.

11  Q.     (By Ms. Ross)  Do you know who
12  established the threshold of viability for the
13  plan?

14  A.     No, I do not.

15  Q.     Do you know who identified
16  traditional districting principals to which the
17  plan must comply?

18  A.     I thought I did that.  I don't know
19  who informed them of that, no.

20  Q.     Do you know who told them what the
21  acceptable deviation among the districts aught
22  to be?

23  A.     Jeff and I have had conversations
24  about that in the past, but I do not actually

1  redistricting maps and the demographic
2  information?
3      A.    Actually, I wasn't supplied the maps.
4  I generated the maps myself.  I was supplied the
5  data.  I was supplied on the report about the
6  reaggregation to precinct level information for
7  2003 election.  I was provided with some
8  election return data on that.  But it was just
9  basically the raw data.
10     Q.    Well, I'm going to table that and get
11 to the reaggregation a little bit later, but
12 were you provided with Dr. Engstrom's regression
13 analysis?
14     A.    No, I was not.
15     Q.    Did you conduct any analysis of your
16 own of voting --
17           MS. COHEN:  Objection.
18     Q.    (By Ms. Ross)  -- behavior in
19 Springfield?
20     A.    No, I did not.  No.
21     Q.    Did you travel to Springfield to
22 familiarize yourself with any of the
23 neighborhoods?
24           MS. COHEN:  Objection, but you

JOHN E. HARMON, Ph.D.
April 7, 2006

Page 105

1    A.    No, I do not.

2    Q.    All right. You say that the plus or
3  minus five percent is an accepted -- and I'm
4  quoting -- accepted level of variation for state
5  assembly districts after a long string of
6  supreme court cases, what supreme court cases?

7    A.    I can't name one off the top of my
8  head. I just cannot do that.

9    Q.    And you testified earlier that you're
10 not familiar with Larios versus Cox?

11   A.    That's correct.

12   Q.    Do you have any opinion as to whether
13 this plan would be vulnerable to a
14 constitutional challenge on one person, one vote
15 grounds as interpreted by Larios versus Cox?

16        MS. COHEN: I'm going to object
17     to the extent it calls for a legal
18     opinion.

19        If you can answer, you may.

20   Q.    (By Ms. Ross) By "this plan" I mean
21 the nine single member district City Council
22 plan.

23   A.    No, I do not.

24   Q.    Okay. What is the basis for your

JOHN E. HARMON, Ph.D.
April 7, 2006

Page 106

1  claim that more than a plus or minus five
2  percent deviation is permitted in municipal
3  districts?
4     A.    The reading that I did, which I
5  cannot site to you, mentioned that in municipal
6  districts sometime the standard is allowed to be
7  even broader than plus or minus five percent,
8  and so I decided that adopting the numbers for
9  state assembly districts would be more
10 conservative and a good thing to do.
11    Q.    Do you recall --
12    A.    -- the citation.
13    Q.    -- the citation to a case?
14    A.    No, I do not.
15    Q.    An opinion?
16    A.    No, I do not.
17    Q.    I'm looking at the demographics of
18 your nine single member district City Council
19 plan that you have -- okay.  This is Page 7 of
20 Exhibit A of your report.  What is your reason
21 for underpopulating District 3 and 4 in your
22 nine single member district City Council
23 proposed plan?
24    A.    Since I did not prepare the plan, I

JOHN E. HARMON, Ph.D.
April 7, 2006

Page 140

1  statistics, percentages, proportions,
2  deviations, you've set it up to do, and it gives
3  you a lot of opportunity to -- "play games" is
4  not the right word -- to evaluate alternatives
5  without going through the really tedious
6  calculation of opening up the table each time
7  and running numbers in a summary, so it simply
8  streamlines that process.
9       Q.    So am I correct in assuming that what
10 you mean by "methodology" is really the method
11 by which GIS -- the method by which you pull
12 together the plan?
13      A.    Yes.
14      Q.    It's not -- do you mean, at all, the
15 types of considerations that you bring to the
16 physical process of pulling census blocks
17 together?
18      A.    No.  The methodology refers to that
19 physical process, yes.
20      Q.    Am I correct in remembering that you
21 said you did not conduct any analysis of voting
22 in Springfield?
23           MS. COHEN:  Objection.
24      Q.    (By Ms. Ross)  Did you conduct any --

JOHN E. HARMON, Ph.D.
April 7, 2006

Page 141

1  let's start from the beginning -- analysis of
2  voting in Springfield?
3       A.    In the supplemental report on the
4  reaggregation for the precincts, yes, there was
5  some analysis of voting in Springfield.
6       Q.    Did you conduct any other analysis of
7  voting in Springfield, other than what's
8  represented in the supplemental report?
9       A.    No.
10      Q.    Did you review Dr. Engstrom's
11 analysis of voting?
12      A.    No, I did not.
13      Q.    Did you ask to see it?
14      A.    No.
15      Q.    Why not?
16      A.    I wasn't --
17            MS. COHEN:  Objection.
18            THE WITNESS:  I wasn't aware it
19    was being done.
20      Q.    (By Ms. Ross)  Out of curiosity, do
21 you have any knowledge why Dr. Engstrom didn't
22 evaluate the plan?
23            MS. COHEN:  Objection.
24            THE WITNESS:  No.  I do not know.

JOHN E. HARMON, Ph.D.
April 7, 2006

Page 142

1  Q.  (By Ms. Ross) What do you bring --
2  what is your opinion of what you bring to this
3  analysis that the individual who conducted the
4  racial block voting would not?
5  A.  Some experience in putting together
6  reports like this and organizing the
7  information, I think that's probably --
8  organizing it and explaining it. I think that's
9  probably the principal thing that I bring to
10 this.
11      The actual construction of the
12 district, if you want to go play with the tools,
13 it's fun, it's not that hard. You can -- and I
14 have trained people to do it in half a day, and
15 it's a very empowering thing to move these
16 things around and play things with that. But I
17 think I bring something else, other than that,
18 to it.
19 Q.  Okay. What exactly is your expert
20 opinion as of the City Council plan?
21 A.  The City Council plan?
22 Q.  Yes. We're back to the City Council
23 plan.
24 A.  Okay.

JOHN E. HARMON, Ph.D.
April 7, 2006

Page 143

1   Q.   The nine single member district plan,
2   the map that is in Exhibit A of your report.
3   What exactly is your expert opinion?
4   A.   My opinion is that it is a plan,
5   falls within plus or minus five percent of the
6   deviation from ideal, and that upon visual
7   inspection, I don't see any problems -- any
8   major problems, they're not all perfectly
9   circular or hexagonal which would be -- and it
10  would increase the likelihood that those groups,
11  the Hispanics in District 1 and 2, African
12  Americans in District 3, and a combination in
13  District 4 would increase their opportunity to
14  elect candidates of their choice to the City
15  Council.
16  Q.   Okay.  Which districts in -- and I'm
17  back to the nine single member district City
18  Council plan -- do you believe will provide to
19  black persons an opportunity to elect candidates
20  of choice?
21  A.   District 3 and I think District 4
22  provides an opportunity as well.  I mean, all
23  districts provide an opportunity, but I assume
24  you're asking for increased opportunity.

JOHN E. HARMON, Ph.D.
April 7, 2006

Page 144

1  District 3 for sure and District 4.
2      Q.    And what is the basis for concluding
3  that District 4 would provide to black persons
4  an opportunity to elect candidates of choice?
5      A.    That's the next highest percentage
6  black VAP, voting age percentage.  It's 58
7  percent in District 3, 38 percent in District 4,
8  and the next closest is at around 13 percent.
9  So I think it provides, on the basis of those
10 numbers, it provides increased opportunity.
11     Q.    Are you basing that opinion on the
12 supposition that black and Hispanic persons tend
13 to prefer the same candidates?
14     A.    No.  I think it gives them -- I mean,
15 if they are a cohesive group, it gives them an
16 area within which they can select the candidate
17 that they choose.  The black population in
18 District 4 may relate and find a fine Hispanic
19 candidate that they want to get behind in which
20 case, if that were to be the case, you got to
21 combine Hispanic, black voting aged population
22 of 55 percent in that district.
23     Q.    Well, do you have any opinion as to
24 whether black and Hispanic candidates are

JOHN E. HARMON, Ph.D.
April 7, 2006

Page 145

1  politically cohesive as a group together?
2      A.    No, I really don't. And from my
3  experience in Connecticut, the answer would be
4  sometimes. The coalition I worked for to
5  prepare that redistricting plan for the senate
6  district for the NAACP, was a coalition of
7  Hispanic and the NAACP, and they worked quite
8  well together. At the state level they have
9  sometimes worked well together, sometimes not.
10 So I don't know enough about Springfield to
11 really know, but if it works in other places I
12 see -- there are opportunities, yes.
13     Q.    Well, the question more precisely is
14 whether black persons and Hispanic persons
15 prefer the same candidate, not whether black or
16 Hispanic leaders can work together, so do you
17 have any evidence that black voters and Hispanic
18 voters tend to prefer the same candidates?
19     A.    No. I guess I do not, at that
20 individual level, no.
21     Q.    Do you have any recollection as to
22 whether there was evidence in the Metts
23 versus -- I'm going to take, Omen (phonetic),
24 was the first opinion, that black and Hispanic

JOHN E. HARMON, Ph.D.
April 7, 2006

Page 146

1  persons prefer the same candidates?
2      A.    No, I don't.  I do not know.
3      Q.    Do you have any recollection as to
4  whether there was evidence in Black Political
5  Task Force versus Galvin that black and
6  Hispanics are cohesive together, not
7  individually?
8      A.    This sort of goes beyond the area of
9  what I consider my expertise, so the answer
10 would be no.  But I suppose if I were to go back
11 and read all the testimony and all the expert
12 reports, I might find different --
13     Q.    Let me give you --
14
15            (Cell phone rings)
16
17            (Recess taken)
18
19            MS. ROSS:  Back on the record.
20     Q.    (By Ms. Ross)  This is Dr. Engstrom's
21 report filed by plaintiff in this case.
22            MS. ROSS:  If you could mark that
23     Exhibit 4.
24

Page 147

1            (Exhibit 4, Dr. Engstrom's
2        report, marked)
3
4    Q.    (By Ms. Ross)  It's up to you what
5  you refer to, but I find it easiest to took at
6  Dr. Engstrom's tables beginning on Page 23, but
7  -- in looking at his charts, Page 23 through 30,
8  do you have any sense of, according to Dr.
9  Engstrom, whether black and Hispanic persons are
10 more likely -- are likely to prefer the same
11 candidate?
12           MS. COHEN:  Objection.  I think
13       there's been no foundation, Deanne, for
14       this at all.
15    Q.    (By Ms. Ross)  I said, do you any
16 have sense --
17           MS. COHEN:  I don't think you've
18       even properly identified this, asked him
19       if he's ever seen it before, asked him
20       if he's read it.
21           MS. ROSS:  He said he hadn't.
22           THE WITNESS:  And that's true.
23           MS. COHEN:  Right.  So how can he
24       testify --

JOHN E. HARMON, Ph.D.
April 7, 2006

Page 148

1        MS. ROSS: I'm asking him to look
2    at the chart and whether --
3        THE WITNESS: I'm looking at the
4    chart on Page 23 --
5    Q.    (By Ms. Ross) Do you even understand
6 these charts?
7    A.    -- and I'm not even sure exactly what
8 these percentages really refer to or how they
9 were estimated or calculated. I presume that's
10 what was the body of the report was about.
11   Q.    So you've actually never referred or
12 used these types of calculations?
13   A.    No, I have not.
14   Q.    Aside from whether -- and we're
15 talking about the City Council plan -- whether
16 they have a greater opportunity -- well, let me
17 strike that.
18        How much -- I mean, you mentioned
19 that they have a greater opportunity than now
20 under the current method of election, did you
21 testify to that?
22        MS. COHEN: Objection as to form.
23    You just said "a greater opportunity
24    than now."

**JOHN E. HARMON, Ph.D.**
**April 7, 2006**

Page 149

1   Q.    (By Ms. Ross)  Than under the current
2   method of election.
3   A.    I think so, yes.
4   Q.    What kind of opportunity do they have
5   now, in your opinion?
6   A.    I find that very hard to put a
7   quantitative amount on it.  This is sort of a
8   greater than or less than issue.  I mean,
9   clearly African Americans and Hispanics have
10  been elected to Springfield City Council.  I
11  don't know the long history of it and how many
12  and exactly when.  Clearly, it has happened.  So
13  there obviously is some opportunity.  And --
14  Q.    So you're not --
15  A.    I think this increases the
16  opportunity.  But it's very hard to measure how
17  much it increases the opportunity.  And I'll go
18  back to what I said earlier, I really do believe
19  that the formation of districts by itself if
20  they're, you know, formed correctly, is an
21  important component of that; not the only
22  component, but important.
23  Q.    Other than the fact you just
24  testified that you were aware that black and

JOHN E. HARMON, Ph.D.
April 7, 2006

Page 151

1  representation" and the term "proportional
2  opportunities to elect"; does that have a --
3  does that even have a separate meaning for you?
4      A.    Well, "proportional representational"
5  would have a meaning to me that if there were a
6  100 members of the City Council and they were
7  breaking into groups this many, that would be a
8  "proportional representation."
9           "Proportional opportunity," I'm not
10 quite sure what that concept would be.  No, I
11 really don't understand that term.
12     Q.    If it were true that two blacks have
13 been elected to the City Council, would you
14 still believe that your proposed plan provides
15 for greater electoral opportunity than does the
16 current method of election?
17           MS. COHEN:  Objection as to form.
18      I don't think it's clear exactly what
19      you're referring to.
20     Q.    (By Ms. Ross)  Actually, if we go to
21 Page 21 of Dr. Engstrom's report, Paragraph 56,
22 he states that in only one of the City Council
23 elections have two African Americans been
24 elected, this occurred in 1999.

Page 191

1  plans are based and to render an opinion as to
2  whether the proposed districts result in
3  majority/minority voting aged populations
4  sufficient to provide plaintiffs with a greater
5  opportunity to elect candidates of choice.
6              MS. COHEN:  It should say
7      "representatives of their choice."
8              THE WITNESS:  I'm sorry.
9      Representatives of their choice.
10     Q.      (By Ms. Ross)  So in asked to do
11 that, you don't think it's relevant as to the
12 degree to which candidates who have been elected
13 are preferred candidate?
14     A.      That probably is relevant.  It goes
15 beyond my level of expertise.  It goes beyond
16 what I can really speak to.  There are --
17 because there are so many components to that, it
18 takes a broad range of knowledge that I really
19 can't, you know -- I really don't have.  Okay.
20 This is --
21     Q.      So are you saying you don't have the
22 experience to actually render the opinion you
23 just --
24             MS. COHEN:  Objection.