UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARISE FOR SOCIAL JUSTICE; ¿OISTE?; NEW ENGLAND STATE-AREA CONFERENCE OF THE NAACP; REV. TALBERT W. SWAN, II; NORMAN W. OLIVER; DARLENE ANDERSON; GUMERSINDO GOMEZ; FRANK BUNTIN; RAFAEL RODRIQUEZ; and DIANA NURSE    Plaintiffs,   v. CITY OF SPRINGFIELD and SPRINGFIELD ELECTION COMMISSION    Defendants. | Civil Action No. 05-30080-MAP |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO STAY**

On March 15, 2007 as the Plaintiffs were prepared to rest their case (the beginning of the 8th day of trial) the Court suggested it was considering a possible stay of the proceedings. The Court indicated the stay would potentially remain in effect pending the outcome of a Home Rule petition submitted by the City Council to the Massachusetts State Legislature. If passed, the petition provides for a binding referendum for Springfield voters in the November 2007 municipal elections.

Under the Home Rule petition, a hybrid method of election of eight single-member City Council districts and five members elected at-large, as well as four single-member districts for School Committee members with two elected at-large, would replace the current method of election of nine at-large City Councilors and six at-large School Committee members (H 3963, "An Act providing for the election of City

1

56043

Councilors and School Committee persons in the City of Springfield," filed 1/10/2007). The proposed plan is commonly referred to as "8 and 5." The Court issued an order for the parties to submit either joint or separate reports as to the status of the Home Rule Petition, and ordered that briefs as to each party's position on the potential stay be submitted to the Court.

The Defendants submit this Memorandum of Law in Opposition to such a stay. Halting the proceedings at this stage is in contradiction to the jurisdictional authority of this Court; unwarranted on the facts presented; and is not prudent such as to be in the interests of either judicial economy, or the best interests of the residents of Springfield.

1. Lack of Jurisdiction

While this Court has jurisdiction over the adjudication of the issue of whether the current at-large system is violative of the Voting Rights Act, this Court does not have jurisdiction over the issues of whether the Home Rule petition pending in the State Legislature or a potential local referendum should be passed. The former is a case in controversy and the latter are political processes beyond the reach of this Court's jurisdiction.

It is a fundamental precept that federal courts are courts of limited jurisdiction with limits imposed by the Constitution and Congress. Such limited jurisdiction is found in Constitutional principles of federalism, such as the separation of powers, as well as Constitutional provisions limiting jurisdiction to "cases and controversies." U.S. Const. art. III, § 1. The due administration of justice demands that this separation remain inviolate. A stay of proceedings that would retain jurisdiction over this case while the State Legislature considers whether the voters of Springfield should have a referendum to

2

56043

consider changes in the current method of election infringes upon the guaranteed separateness. Principles of federalism and undue interference with the City's democratic processes, as well as principles relating to ripeness and standing are implicated.

It is well established that "legislative reapportionment is primarily a matter for legislative consideration and determination." *Reynolds v. Sims*, 377 U.S. 533, 586 (1964). Where a court is forced to undertake reapportionment, when the legislative body has failed its responsibility and duty, courts have been cautioned to proceed "circumspectly" *Connor v. Finch*, 421 U.S. 407, 414-415 (1977), and in a manner that is "free from any taint of arbitrariness or discrimination." *Roman v. Sincock*, 377 U.S. 695, 710 (1965). Accordingly, a federal court sitting on a case where no violation has been found should refrain from exercising its jurisdiction over the districting plan where the method of election is proposed from a governing body as the result of that body's balancing of local and political considerations with statutory and constitutional requirements.

Springfield has a "Plan A" form of government based on the model city charter under the provisions of G.L. c. 43, § 50. The current city charter provides: "The legislative powers of the city shall be vested in a city council, consisting of *nine persons*, elected *at-large* by and from the qualified voters of the city (emphasis added)." Revisions in the charter can be accomplished either through Art. 89 of the Amendments to the Constitution of the Commonwealth (the Home Rule Amendment), or through the provisions of G.L. c. 43B (Home Rule Procedures Act) as inserted by St.1966, c. 734, s 1. The Home Rule Amendment to the Massachusetts Constitution and G.L. c. 43B provide alternate routes to charter reform, the first entirely local, the second involving the intervention of the Legislature. The currently pending "8 and 5" legislation approved by

3

56043

the City Council seeks to amend the charter through the State Legislature. Under the Home Rule Petition, approval by the Legislature will result in a binding referendum question where a majority of voters voting on the referendum question in the affirmative is required to enact the charter change.

Pursuant to the Supremacy Clause of Article VI of the U.S. Constitution, state law is only preempted when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Washington Serv. Contractors Coalition v. District of Columbia*, 54 F.3d 811, 815 (D.C.Cir.1995) quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). If no such violation exists, principles of federalism dictate that state law governs. See, e.g., *Perkins*, 47 F.3d at 216; *United States v. Yonkers Bd. of Educ.*, 902 F.2d 213, 219 (2d Cir.1990); *Hoots v. Pennsylvania*, 672 F.2d 1124, 1132 (3d Cir.1982).

In *National Ass'n for Advancement of Colored People v. City of Thomasville, N. Car.*, 401 F.Supp.2d 489 (M.D. N.C. 2005), plaintiffs claimed that the at-large method of election had the purpose and/or effect of diluting minority voting strength in violation of their rights under Section 2 of the Voting Rights Act.

After a series of changes in the method of election, which occurred as a result of a consent decree, the District Court decided to end the injunction that had halted elections and stated: "It is in the public interest to return control over elections to local authorities unless doing so would interfere with the voting rights of minority citizens as protected by the Voting Rights Act." Correspondingly, without any finding of a voting rights violation, retaining jurisdiction in this case would unduly interfere with the political process.

56043

Article III of the Constitution limits judicial action to "cases or controversies." U.S. Const. art. III, § 2. The doctrine of standing ensures that courts remain within the boundaries of their constitutional powers by requiring that plaintiffs have a personal stake in the outcome of the controversy, at least by allegation. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The four-part test to determine whether a party has standing is well-established: (1) there must be an injury in fact; (2) to an interest arguably within the zone of interests protected by the constitutional guarantee at issue; (3) resulting from the putatively illegal conduct and; (4) which could be redressed by a favorable decision of the court. *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).

While the current at-large system is properly before this Court, the pending legislation in the State Legislature is not. There is no allegation that "8 and 5" either causes or redresses an injury. The question of the proposed "8 and 5" legislation is only in evidence on an oblique issue raised by the Affidavit of Michaelann Bewsee. The Affidavit contends that the City Council has not been responsive to the particularized needs of minority residents (relevant to the "totality of the circumstances" analysis under Section 2 of the Voting Rights Act). The recent enactment of the Home Rule legislation by the City Council, after a rare visit to the City Council chambers by the Mayor to urge passage of the matter, shows responsiveness by the City Council to a request by residents to have the chance to vote on a potential change of the method of election. As such, the City Council's responsiveness, considered as part of the "totality of the circumstances," is the only relevance of the testimony concerning the "8 and 5" proposal.

Moreover, there has been no evidence indicating whether such a plan would withstand a challenge under the Voting Rights Act. Speculation on this issue, while interesting, is more relevant at this point to political debate rather than the case before this Court. No analysis of the plan has been introduced in evidence at this trial which exhibits that "8 and 5" has the potential to provide greater opportunities for minorities to elect candidates of choice when compared to the current method of election.

Additionally, while the Plaintiffs' status report claims that the Home Rule petition has a "good" chance of being passed by the Legislature, the Plaintiffs have provided no indication as to whether or not they intend to support its passage and whether or not they will campaign for its approval should it be placed on a referendum. In fact, as indicated in the testimony of Michaelann Bewsee (Tr. 395-401), the Plaintiffs have continually expressed disfavor of the proposal and stated that they "can't" support it (Tr. 400). The question of support or lack of support varies with the political winds, and jurisdiction in this Court should only be tied to the disposition of whether the current at-large method violates the Voting Rights Act based on the evidence presented at trial.

Under the circumstances, where an "8 and 5" method of election has not been subject to the crucible of justice provided by the litigation system and where the support or opposition to such a method by the Plaintiffs is uncertain, the political question of whether to have community based representation through a "8 and 5" system rather than an at-large system is purely a political decision. While the Voting Rights Act guarantees equal opportunities in the electoral process, it does not guarantee a right to neighborhood representation. Such a decision should rightfully remain within the purview of the voters

of the City of Springfield and the State Legislature rather than the jurisdiction of this Court.

Moreover, even if the Plaintiffs had proposed "8 and 5" as a remedy after a finding of a violation, this Court would not have jurisdiction over the size of the City Council. *Holder v. Hall*, 512 U.S. 874, 114 S. Ct. 2581 (1994), established that the size of a governmental body cannot be challenged as dilutive under § 2 because "[t]here is no principled reason why one size should be picked over another...." See *Nipper v. Smith*, 39 F.3d 1494, 1532 (11th Cir. 1994) ("federal courts may not mandate that a state or political subdivision alter the size of its elected bodies as a Section 2 remedy"); *White v. State of Alabama,* 74 F.3d 1058, 1072-1073 (11th Cir. 1996) (in a Section 2 challenge to the method by which appellate judges were elected, the Court erred in requiring the Alabama Legislature to increase the number of the appellate judges in order to achieve proportionality); *SCLE v. Sessions*, 56 F.3rd 1281 (11th Cir. 1995) (remedy changing number of elected judges foreclosed by state interest).

In addition to the principles of federalism expressed above, Defendants advance two additional bases for this Court's lack of jurisdiction over the potential "8 and 5" system. First, the "8 and 5" proposal is not ripe for adjudication.  Second, Plaintiffs lack standing because there has been no showing of a redressable harm relating to the "8 and 5" proposal.

The Plaintiffs cannot assert an infringement of their voting rights at this time with regard to an "8 and 5" proposal because they are not assured of an opportunity to vote on the proposal.  Attempts to obtain advisory opinions on the basis of hypothetical controversies are not within this Court's jurisdiction.  In order for a federal court to

7

56043

exercise jurisdiction over a matter, the party seeking relief must have standing to sue. Standing has both constitutional and prudential dimensions. The constitutional requirements for standing emanate from Art. III, § 2, of the U.S. Constitution, which grants federal courts jurisdiction over "cases and controversies." The Supreme Court recently revisited the constitutional dimension of a federal court's standing inquiry:

> Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have suffered an "injury in fact"- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of - the injury has to be "fairly...trace[able] to the challenged action of the defendant, and not...th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."
>
> *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136 (1992).

Even assuming, for purposes of argument, that Plaintiffs can show an injury in fact and casual connection (which is not conceded here), the Plaintiffs are unable to provide evidence that a different plan (such as "8 and 5" or the Plaintiffs' illustrative plans) would redress such injury. Specifically, there has been no showing of "a reasonable alternative practice as a benchmark against which to measure the existing voting practice" that provides for greater electoral opportunities than the challenged method of election. *Uno v. City of Holyoke*, 72 F.3rd 973, 985 (1st Cir. 1995) quoting *Holder v. Hall,* 512 U.S. 874, 879 (1994). Plaintiffs cannot show that the current method of election is dilutive of electoral opportunities of minority voters as compared to a fairly drawn single-member district plan that would provide for the election of a 6-member School Committee and a 9-member City Council.

Indeed, based upon analysis conducted by Plaintiffs' own experts, there is every reason to believe that the Plaintiffs' proposed nine single-member district plan will provide for the election of fewer minority persons than the current method of electing City Council members. Moreover, Plaintiffs' six single-member district plan would provide for no more opportunities to elect than are provided by the current method of election for the School Committee.

This Court noted in *Vecinos* that "given the important issues of federalism and separation of powers implicated by Voting Rights suits, maintenance of a shadow judicial presence over democratic processes should be reserved for extreme cases." *Vecinos De Barrio Uno, et al v. City of Holyoke*, 960 F. Supp. 515 (Mass. 1997). With pending legislation in the State Legislature and the potential for a referendum, the principles of federalism are even more acute in the present case than they were in *Vecinos*. The City Council, as elected representatives of Springfield's citizens, has had its fundamental role in government curtailed by the imposition of a state-run Financial Control Board through the enactment of Chapter 169 of the Acts of 2004 as discussed in the testimony of State Representative Coakly-Rivera (Tr. 286-295; Ex. A for Identification).

Under the circumstances in Springfield, the already intrusive nature of oversight by the state Finance Control Board will be exacerbated by federal judicial action hanging as a cloud over the City. The City will be managing day-to-day under the scrutiny of the Commonwealth, and will have the Federal Court overly involved in our political process. Especially here, where the City has shown a twenty year history of repeatedly electing African-American and Latino candidates through our at-large method of election in both the City Council and the School Committee, the citizens of the City of Springfield

56043

deserve to have this matter resolved without this Court retaining jurisdiction until after any referendum.

2. UNWARRANTED

The statement of this Court in *Vecinos* bears repeating: "given the important issues of federalism and separation of powers implicated by Voting Rights suits, maintenance of a shadow judicial presence over democratic processes should be reserved for extreme cases." *Vecinos De Barrio Uno, et al v. City of Holyoke*, 960 F. Supp. 515 (Mass. 1997). With respect to a federal court retaining jurisdiction in voting rights cases, a footnote in *Vecinos De Barrio Uno, et al v. City of Holyoke*, 960 F. Supp. 515 (Mass, 1997) pointed out that "in the last twenty years other courts have not adopted this rather unusual judicial mechanism." This approach was used by the First Circuit Court of Appeals in *Black Voters v. McDonough*, 565 F.2d 1 (1st Cir. 1977) in which the Court ordered remand "provisionally and without prejudice to plaintiffs' right to reopen their claim in the future in light of circumstances as they may then appear." *id* at 7.

The facts and circumstances in the present case are a far cry from the situation as described by the Court in *Black Voters v. McDonough*, where the Court emphasized the "inflamed atmosphere" in the City of Boston over desegregation and busing resulting from a plan of the State Board of Education which the Supreme Judicial Court of Massachusetts had directed the Boston School Committee to implement.

In *Vecinos*, this Court rejected retaining jurisdiction as unwarranted. Similar to *Vecinos*, this case does not involve an extreme situation, such that this Court should retain jurisdiction of the matter until passage of the "8 and 5" legislation or passage by the electorate.

The City believes that the Plaintiffs have failed to establish the preconditions required under the requisite analysis of voting rights cases set forth in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Plaintiffs have not proffered sufficient evidence as to the burden put forth by *Gingles* to demonstrate that white persons vote sufficiently as a bloc to defeat minority preferred candidates or that white persons, "by virtue of their numerical superiority, will regularly defeat the choices of minority persons." *Id*. at 48. Indeed, Springfield's at-large election system has functioned over the past twenty-five years in such a way that African-American and Hispanic persons of voting age have been sufficiently numerous to elect candidates of choice (who are cohesively supported) without having to solicit white votes.

The racial bloc voting analysis conducted by Plaintiffs' expert showed that white voters support the candidates most preferred by minority voters in numbers sufficient to elect these candidates. The fact that some African-American candidates are not successful is generally more attributable to low turnout among African-American voters and lacking support by Hispanic voters than it is to white bloc voting. Likewise, the fact that some Hispanic candidates are not successful is generally more attributable to low turn-out among Hispanic voters, lack of cohesion among Hispanic voters, and lack of support by African-American voters than it is to white bloc voting.

The weight of the credible evidence has shown that minority candidates, as well as white candidates who were preferred by minority voters, who were effective campaigners, effective organizers, and hard-working, appealed to voters across all racial lines, and that was evident in City Council, School Committee, Mayoral, State Representative and Gubernatorial elections over the past twenty years.

56043

In addition, Plaintiffs have not provided School Committee and City Council districting plans that establish that the challenged methods of election have made it more difficult to elect candidates of choice than it "should be. . .under an acceptable system." *Gingles*, supra at 88 (O'Connor, J. concurring). Indeed, Plaintiffs' alternative plans may well be the product of the impermissible use of race in their creation (Harmon Tr. 933-934); See *Shaw v. Reno* 509 U.S. 630, 113 S.Ct. 2816 (1993) (facially irregular redistricting done as an effort to segregate races for the purposes of voting absent any compelling justification is impermissible in light of the equal protection clause). Also, the evidence seems to indicate that the implementation of these plans would dilute the voting strength of African-American and Hispanic persons now and in the future, based upon the City's rapid transformation from a City in which white persons constitute the majority into a City "of color." (Harmon 934-938).

Plaintiffs have not provided evidence of a history of official discrimination, a lack of electoral success of minority candidates, a lack of responsiveness on the part of elected members of the City Council and School Committee, or any candidate slating process, or other voting practices that enhance the opportunity for discrimination to any extent that reaches the same level as other cases where courts have reviewed the totality of the circumstances and found a violation of Section 2.

Defendants maintain that while the Court may be inclined to credit the testimony of Plaintiffs' lay witnesses as to the sincerity of their perceptions, feelings, and sentiments, Plaintiffs have not met their Section 2 burden. No cases could be located which find an at-large system, similar to Springfield's, as violative of the Voting Rights Act where African-American and Hispanic persons, collectively, constitute more than a majority of the voting age population; where there had been a long history of African-

56043

American success in City Council and School Committee contests; and a history of Hispanic success roughly commensurate with its rapidly increasing numbers.

3. <u>PRUDENTIAL CONSIDERATIONS</u>

A stay in this case until the referendum is passed by the voters would "moot" this trial. Conversely, in the event the referendum did *not* pass, an entirely new body of evidence would be required before this case could be concluded. The evidence in this case has indicated that the rapid growth of the Latino population has changed the demographic makeup of the City in significant ways and is likely to continue (Harmon Tr. 922-924). Any subsequent proceedings in this matter would hardly be able to rely upon the evidence submitted to date. Amendments to the pleading, further expert analysis as well as discovery would be required to determine an outcome dependent on any newly proposed illustrative plan or method of election. In consideration of the time frame, the changing demographics, the need to let the political process work without unwarranted interference from the federal judiciary, as well as the Plaintiffs' right to return to this forum, the Court should not forestall issuing a final judgment in this case.

Further, as previously indicated in the testimony of Michaelann Bewsee (Tr. 395-401), the Plaintiffs have continually expressed disfavor of the proposal and stated they "can't" support it (Tr. 400). The status report filed by the Plaintiffs seems to indicate that the local state legislative delegation is planning to support the legislation. While support of Representatives Coakly-Rivera and Swan has been confirmed by the Defendants in private phone conversations, support has neither been public, nor privately confirmed from the rest of the delegation. Moreover, during the process of gathering information for submission of the Defendants' Home Rule status report, indications are that the

Plaintiffs may have changed their mind during the course of trial and have now decided to support the "8 and 5" proposal.  However, there is nothing filed with the Court by the Plaintiffs committing to the proposal.  As can be inferred from the comments contained in the newspaper articles, the support of Representatives hinges on the support of the Plaintiffs.  As such, the lack of progress to date on the measure stems from the failure of the Plaintiffs to support the proposal.  Similarly, the Plaintiffs' lack of support to date has likely tainted the "8 and 5" proposal by potentially uniting those opposed to change as well as those who feel "8 and 5" is "not good enough."  These facts emphasize the political, rather than legal, nature of the circumstances.

Even if the referendum passes, it would not take effect until the 2009 municipal elections. Thereafter, a new U.S. Census will be taken in 2010.  Under *Thornburg*, it would appear that a minimum of three elections would be required to generate data to determine whether the method of election works or would be illegal under Section 2.  As such, data from elections through 2013 would likely be required to analyze any new method of election.

The City has hired outside counsel and experts and has devoted substantial funds and resources in the defense of this matter.  While this lawsuit continues to hang over the head of the City, the added risk of exposure to a claim by the Plaintiffs for attorneys' fees will have an ongoing negative impact on the financial stability of the City's balance sheet.  Moreover, the intangible effects from which the City will suffer, such as the polarization of its citizens, will unquestionably have serious and lasting effects.

If the City's method of election violates the Voting Rights Act, the State Legislature should be aware.  Similarly, the City's voters considering a proposed change

14

56043

should also be informed. On the other hand, if there is no violation, the State Legislature should similarly be informed, as should the voters considering proposed changes. But neither body should be kept in a state of uncertainty when considering such important issues, particularly where federal jurisdiction is in question.

As noted previously, Defendants contend that Plaintiffs have not met their burden of proof, and plan to seek dismissal upon the close of the Plaintiffs' case. This trial has generated a substantial amount of discussion in the community, which continues, and which may change with the political winds. However, the process in the State Legislature and any referendum will take place in the political arena, which is unpredictable and not governed by the same rules of evidence found in a trial. Mixing judicial procedure with the political process will expose the judicial process to the tumult of political discourse. While public discourse is certainly healthy, it should not interfere with these judicial proceedings and similarly the judicial process should not be subject to the ever-changing political winds. Moreover, the ongoing litigation will only serve as a festering wound, likely to interfere with the ability of diverse ethnic and racial groups to advance common interests within their community.

The City faces the daunting task of rebuilding its financial base, restoring public confidence in the wake of the well-publicized corruption probes, and addressing issues of public safety. A stay of this litigation will result in one more controversy that remains without closure and may serve as a wedge dividing citizens, and yet another hurdle before the City can recover and realize its potential. As this Court stated in the final footnote in *Vecinos*, "Plaintiffs, in any event, have the right to refile this lawsuit at any

56043

time, if more compelling evidence of a violation of the Act appears." For the foregoing reasons, the Defendants oppose a stay of these proceedings.

        Respectfully submitted,

        CITY OF SPRINGFIELD and
        SPRINGFIELD ELECTION
        COMMISSION

        By_____
        Edward M. Pikula (BBO #399770)
          City Solicitor
        Deanne Bogan Ross (BBO #555407)
        City of Springfield
        Law Department
        36 Court Street, Room 210
        Springfield, Massachusetts 01103

## **CERTIFICATE OF SERVICE**

    I hereby certify that a copy of the foregoing document has been served on counsel of record the 22nd day of March 2007.

        _____
        Edward M. Pikula, Esq.

56043